# EXHIBIT 2

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>            Plaintiffs,<br><br>            – *versus* –<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>            Defendants. | **Civil Action No.: 1:25-cv-10495-IT** |

## DECLARATION OF ANA DOE

I, Ana Doe, upon my personal knowledge, hereby declare as follows:

1.      I was born in Diriamba, Nicaragua in February 1993. I am a national of Nicaragua.

2.      I currently live in Gainesville, Georgia. I have lived here for about a year, since arriving in the United States and receiving parole under parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV").

3.      I currently live with my husband, Armando Doe, in Gainesville. Armando is also a Nicaraguan national and has also received parole through the CHNV parole processes. My husband and I live in the same area as some cousins, including Carlos Doe, and my brothers, including Alejandro Doe, and my father, all of whom are Nicaraguan nationals and are here in the United States through CHNV parole. I have other family members who have CHNV parole too, like my sister, her child and husband who live in a different state.

4.      Since arriving to the United States on CHNV parole, my husband and I have been able to work and contribute to the local community. I obtained my work

authorization in April 2024. My first employer in the United States was a company that makes trailers. Currently I work for a company that supplies personal protective equipment to my former employer, where I am in charge of handling our inventory system, adding and transferring products within the system, and supporting our warehouse's needs. There was a lot to learn when I first arrived, but I've since learned a lot and I've been able to improve my English while on the job. My husband and I both work full time.

5.    Apart from work, my husband and I lead a very normal and peaceful life here. We attend a local church as often as we can. We enjoy exercising when we can and leading a healthy lifestyle. We recently purchased a car to help us navigate life and work here, and we are working to establish good credit here too. On the weekends, when we have free time, we like to enjoy ourselves, including getting together with my brothers and father to enjoy a nice meal together. There is also a large Latino community in our area that has been welcoming, and we have settled into our life here in the United States well.

6.    The life we have begun to create here in the United States looks very different compared to our lives back in Nicaragua. Everything started to deteriorate in 2018, when the social security reforms by President Ortega were announced, which would negatively impact a lot of people in the community. Looting in supermarkets became more common, which made it hard to find food. Many protests against this reform and the government began happening on a regular basis, and the police would come to these protests and take away as many protestors as possible, many times in violent ways.

7.      While I was in college finishing up my studies in computer engineering, in 2018, I met Armando in Nicaragua. As a student I participated with other university friends in peaceful protests that were happening at my university regarding issues with the Nicaraguan government. I remember that during my time as a student I lived near another university, and there were several protests around that university that resulted in people sustaining serious injuries at the hands of the government, and at a certain point it was no longer safe for me to remain living near the school because of the ways these demonstrations were met with violence by the police and militia. At the time, my husband was a government employee and was not allowed to participate in protests, but we supported each other as the situation in Nicaragua grew more intense. We got married in April 2023.

8.      Around July 2018, the police and pro-government militia entered the area where my family lived, as they were actively looking for my uncle. While looking for my uncle, the police raided my grandmother's house. My uncle was not there at the time, but the police arrested my father who was there and put him in jail. He spent about three to four days in jail, where they interrogated him about my uncle's whereabouts and physically beat him. All I could do was hope for his release. Eventually he was released, but our family remained people of interest in the police and government's eyes due to our last name, which is widely known by the government as being anti-government, and our family connection to our uncle and cousins.

9.      While still in Nicaragua, in 2020, Armando worked as a web designer for a digital media platform that publishes commentaries on politics and the government in

Nicaragua. At a certain point, the police found and took hostage some of his co-workers at the company, simply because they took some water to some women who had been protesting a hunger strike. Eventually, once they were released, they left the country for their own safety. Although Armando's role was not very high profile, he remained fearful that he could be discovered by the Nicaraguan government, since the government had already identified the organization as being against the government.

10.    The danger in Nicaragua for me and my family felt as if it was all just closing in on us, making it necessary for us to leave the country for our own safety and security. Armando and I began researching legal pathways to immigrate for our safety. That is why when the CHNV parole processes were announced and we learned about this path, it became a light of hope for me, my husband, and my family.

11.    My cousin, who is a U.S. citizen living in Washington, is my sponsor under CHNV parole. During one of her visits to Nicaragua in May 2023, while visiting her father and my uncle who at the time was sick with cancer, she told us more about the CHNV parole and agreed to support us as our sponsor. This came as such a relief for me and my family, as we were actively looking for ways to lawfully leave the country for quite some time but there were no viable options for us.

12.    We quickly moved to gather all the necessary documents and information needed for the application and process. My U.S. citizen cousin started the process and submitted the application to sponsor Armando and I in September 2023. I was approved to travel to the United States in December 2023, and I arrived in the

United States and was granted parole in February 2024. My parole expires in February 2026.

13.     I first heard the announcement about the government's termination of the CHNV parole processes from the news. This came as a shock to us, and we became concerned that the government would revoke existing grants of parole. It was very rough news for us to hear, because I, my husband, and my family members still have time remaining on our parole. We thought that because we went through this lawful process to get parole in 2023, we would be protected for the full parole period. Now, we are left with uncertainty of what is to come.

14.     My entire family is nervous about the possibility of our parole being terminated. We do not know what is going to happen. The possibility of having to return to Nicaragua is nerve-wracking, as the situation has not improved there, and my family and I remain targets there. And there is no guarantee I would even be let back into Nicaragua given the state of the country, leaving me and my family stranded and vulnerable in some other country. This possibility is devastating and leaves me with fear.

15.     My husband, brothers, father, and I have been talking about this scary possibility of having our parole revoked. We try to remain in constant communication with one another. We are also saving all the money we can through work to prepare for this and what could come — and we are even making sure we all know each other's banking information in case one of us needs to access each other's funds in case of an emergency.

16.  If my parole status is revoked, I will no longer be eligible to work and provide for myself, my husband, and my family. Specifically, my mother, who still lives in Nicaragua, relies on us to send her money to support her. As one of her main supporters, if my parole was revoked and I was no longer able to work or no longer had an income, I would no longer be able to provide for my mother and support her.

17.  Maintaining my parole status is crucial for me, my husband, and my family to live a stable life free from danger, violence, and persecution, which we all face a serious risk for if we are removed and sent back to Nicaragua. And without work authorization, I will no longer be able to provide for myself, my husband, or my mother who remains in Nicaragua.

18.  Last month, in January 2025, my husband and I submitted an application for asylum (Form I-589) to the United States Citizenship and Immigration Services ("USCIS"). I am listed as a derivative under my husband's asylum application. I applied for asylum because I fear that I will be persecuted due to my and my family's well-known political beliefs against the current governmental regime. My father, uncle, and cousin, Carlos, have been persecuted in the past, and my father was imprisoned by the Nicaraguan government before. The government knows where we live in Nicaragua. I do not doubt that my family and I will face the same grave dangers we once did if we are forced to return to Nicaragua.

19.  I recently heard the news about the government's indefinite pause on processing immigration applications of people who entered the United States under CHNV parole. This includes me and my husband, who have both applied for asylum and

whose applications are pending. We did not expect that this would happen at all –
– we thought we did everything right in terms of coming here on parole and then
submitting an asylum application in order to seek additional protection from the
dangers we face in our country. It is frustrating to think that this indefinite pause on
processing my asylum application could cut off our access to this protection for an
indefinite period of time, including our ability to obtain work authorization through
the asylum application process, allowing us to continue working in the United
States after our parole expires and while we wait for a decision on our asylum
applications.

20.    We have no guarantees in terms of our security in Nicaragua if we are forced to
return there, while at the same time there is no guarantee we would even be let back
into Nicaragua. So, without parole and the ability to continue pursuing asylum, our
futures will be left up in the air, and we will be vulnerable and without security.

21.    I am participating in this lawsuit so that I, along with other individuals who are in
the same position, can have our applications for immigration benefits processed, as
they should be.

22.    I am willing to serve as a class representative on behalf of those who are similarly
situated to me.

23.    I know that if the class is certified, I will be representing more than just myself in
this case. I have spoken with the lawyers who represent me about what being a class
representative means. I want to help everyone in my situation because we are all
harmed by the indefinite pause on the processing of immigration applications
benefits.

24.     While I believe in the importance of defending the CHNV parole processes, I am afraid of using my real name in this lawsuit. Specifically, I fear that if my real name were to be made public in this lawsuit, I could be retaliated against by the U.S. government and Nicaraguan government. I fear the possibility that if my name were public in this case and the U.S. government discovered I was going against them in this lawsuit, I could be subject to retaliation and deported, despite my pending asylum case. And if I were forced to return to Nicaragua because of the termination of my CHNV parole status, I am afraid that the Nicaraguan government could retaliate against me and my family again, and I could become a target for the Nicaraguan government due to my family's name and my connection to my uncle and cousin, whom the government was actively searching for.

25.     Also, if my name were to be public, I fear that my other family members, like my sister, her husband, and her child, could be identified and targeted too, both by those who are here in the United States and hold anti-immigrant views, and in Nicaragua if she and her family are forced to return, given our family's name and the fact that the Nicaraguan government has targeted our family before.

26.     For these reasons, I am respectfully asking the court to allow me to proceed as plaintiff in this lawsuit under a pseudonym, to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on 2/28/2025.



Ana Doe

8

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Ana Doe in Spanish and that she affirmed that it is true and correct.

Executed: 2/28/2025

Emily Martin