# EXHIBIT 3

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>                Plaintiffs,<br><br>  – versus –<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>                Defendants. | **Civil Action No.: 1:25-cv-10495-IT** |

**DECLARATION OF ARMANDO DOE**

I, Armando Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Managua, Nicaragua in May 1993. I am a national of Nicaragua.

2. I currently live in Gainesville, Georgia. I have lived in Gainesville since I arrived in the United States one year ago through the parole processes for nationals of Cuba, Haiti, Nicaragua and Venezuela ("CHNV").

3. I live with my wife, Ana Doe, who is from Nicaragua and also traveled to the U.S. on CHNV parole. Several other members of my wife's family live near us in Gainesville and came to the U.S. on CHNV parole.

4. I met Ana several years ago in Managua. We eventually got married in April 2023.

5. Prior to marrying, Ana and I had been thinking about leaving Nicaragua for a while. The sociopolitical situation in Nicaragua is not good and there are a lot of factors contributing to the insecurity there. Food is very expensive, and salaries are low, which makes it very difficult to survive. There were also many security concerns related to my work in Nicaragua.

6. My interaction with the government began in 2014 when I started my professional internship at the Nicaraguan Institute of Territorial Studies (INETER). That same year, I was hired as part of the IT department. Initially, it seemed like a promising professional opportunity, but I soon realized the tensions that came with working for a public institution under the current authoritarian regime.

7. From the beginning, it was clear that neutrality or disagreement with the government's stance was not tolerated. We were forced to participate in pro-government marches and events. Failing to comply with these obligations could cost you your job. Many of us feared retaliation and felt trapped in a system where we had no voice and no option to refuse.

8. In 2018, everything changed, and the situation became unsustainable when the government ignored a fire in a crucial natural reserve and rejected international aid to control it. This, combined with the announcement of increased social security contributions, sparked widespread discontent. On April 18, a peaceful protest was initiated, marking the beginning of a brutal government crackdown.

9. My wife, Ana, who was then a close friend, actively participated in these marches. On at least one occasion, she was in grave danger due to the violent repression by the National Police and pro-government groups. These experiences strengthened our bond, as we both shared the fear and uncertainty of living in a country where expressing an opinion contrary to the regime could cost you your life.

10. In 2018, when the social conflict in Nicaragua reached its peak, Ana was a direct witness to the repression her family suffered at the hand of the regime. In July 2018, Ana's grandmother's house was raided by the police in search of "stolen goods,"

but this was only an excuse for the police to look for her uncle. Ana's uncle was not there at that moment, so the police arrested Ana's father instead. Ana's father was accused of being connected to anti-government protestors. During the time her father was imprisoned, Ana used her social media to denounce her father's disappearance, which quickly gained the support of many people who shared her message, and the denouncement went viral on Twitter.

11. Ana's father was released a few days later, but there were many consequences of the arrest. Her father was labeled as a "defector" and "traitor" by government supporters, and his family was systematically harassed and persecuted. Many members of Ana's family were forced to leave the country. This experience left emotional scars on Ana and solidified our constant fear of living in a country where expressing an opinion can cost you your life.

12. In 2020, I started working for a digital media company founded by friends who had actively participated in the protests. Initially, my role was to develop the website and edit articles and columns. The company's mission is to democratize information and change the culture of politics in Nicaragua and the region at large. Over time, my involvement expanded to projects with other media outlets that documented electoral irregularities and government abuses.

13. Both media outlets frequently conduct investigations and publish reports that are critical of the Ortega government. One report publicized the number of people that did not vote in Nicaragua and, by doing so, directly challenged the accuracy of the government's report regarding the election.

14. Nicaraguan government officials made frequent posts on social media accusing the digital media company for whom I worked of publishing false information. In Nicaragua, it is not uncommon for the police to look for and interrogate people who speak out against the government. In 2019, various employees of the company I worked for were imprisoned for taking water to women who were protesting by hunger strike. This is when the company was labeled as an anti-government platform. Around a month and a half later, and after considerable international pressure, the Nicaraguan government released the four individuals from jail. Due to safety concerns, all four individuals left Nicaragua and fled to other countries after this incident.

15. Everyone who worked at our digital media company had to take precautions to ensure that their identities would not be discovered. All of the employees, except for one coworker and myself, were located outside of Nicaragua. I worked from home, used a virtual private network ("VPN"), and took security measures so that I could not be located. I could not tell anyone where I worked or whom I worked for because I feared that I would be put in jail.

16. Ana and I started living together in 2022. Living together was a relief, but it also meant constant concern for our safety, as we still feared the government discovering my involvement in anti-government projects. In my neighborhood, most residents were staunch supporters of the ruling party, and to this day, they remain so. Living in an area surrounded by people so committed to the regime heightened our fear. We knew that if at any point they discovered my work with anti-government organizations, the consequences would be severe for me and my family.

17. I heard about the possibility to travel to the United States through the CHNV parole processes from friends and family. Many people saw it as a good option because the process of applying for a U.S. visa is very complicated and slow. I was interested in applying for parole because it was a legal way to travel to the U.S. and the process was not as time intensive as other immigration processes like applying for a U.S. visa. I knew that I would need someone to sponsor me, so I decided to speak with family members living in United States to see if they would be willing to be my sponsor.

18. Ana's cousin, a U.S. citizen, lives in Washington state. Ana's cousin was visiting family in Nicaragua in May 2023, and Ana and I decided to talk to her about sponsoring us for parole. Ana's cousin agreed to be our sponsor and submitted her application to sponsor us for CHNV parole in September 2023. Three months later, in December 2023, I was approved to travel to the United States, and in February 2024, Ana and I traveled to the United States. Upon arrival we were granted two years of parole. My parole expires in February 2026.

19. I received my work permit in April 2024 and started working at a company in Gainesville that makes tractor trailers. I work installing axles in the Post Painting Assembly (PPA) area. It is hard work, but time goes by quickly.

20. Ana and I like living in Gainesville. The people are very warm and friendly, and there are many people from Central America. It was an easy adjustment since my wife's father and other family members were already here. We had a lot of help and support, and I feel like things have fallen into place for us. We are both working,

and we have started our savings and have also been building our credit. We would like to buy a house in the future.

21. We enjoy living an active lifestyle and taking care of ourselves. Life can be fast here, so we focus on our health. We like working out together, cooking healthy meals, and spending time outdoors.

22. I first heard that CHNV parole was being terminated in late January 2025. Information spread very quickly on social media and on Nicaraguan news outlets, and I saw an article in the *New York Times* about it as well. We also started to hear reports of immigration officials being in the area and making arrests.

23. After hearing that the CHNV parole processes were ending, I felt stressed and anxious that Ana's and my grants of parole could be revoked. It felt like we were just getting started here and now our wings were getting clipped. Ana and I made so many sacrifices to come to the United States, including leaving my parents, our home, our pets, and our jobs behind. Everything is happening very quickly. One day we were talking about buying a house, and the next day we were talking about what it would mean if we had to leave. It has been very difficult, and it seems very unfair to be told that after only one year, we can't be here anymore. We made the decision to leave Nicaragua through CHNV parole thinking that we were going to have more time.

24. Ana and I started talking and trying to figure out what to do. We are trying to prepare ourselves psychologically for what may happen. If our parole is terminated and we are deported, it is important for us to recoup some of the financial

investments that we've made, so we have discussed selling our car and our other belongings before we have to leave, if it comes to that.

25. Maintaining my parole status is critical for me and my family. It has given me a chance to establish myself and start a new life. The salary I earn at my job allows me to help my family in Nicaragua and build my own savings. I often send money to my parents in Nicaragua to help pay for medical appointments and for living expenses, especially since they are caring for my pets. My parole status has also allowed me time to apply for asylum, which is critical for my safety.

26. If my parole status is revoked, I will no longer be eligible to work and provide for my family. If I am unable to work here, I will be forced to return to my country where I risk facing persecution by the Nicaraguan government.

27. In January 2025, I submitted an application for asylum to USCIS, and in February 2025, I traveled to Atlanta, Georgia to attend my biometrics appointment. I applied for asylum because I am scared to return to Nicaragua, and a grant of asylum would offer my wife and I more long-term protection since our parole will expire next year.

28. Two weeks ago, we heard on the news that the United States government plans to indefinitely pause processing all immigration applications filed by people who came to the United States on CHNV parole. This would mean that mine and Ana's asylum applications are not going to be reviewed for this indefinite period of time. If my parole is terminated, and I am not permitted to continue with my asylum application, I will be completely without protection.

29. I feel like this is very unfair and inhumane. I believe that Ana and I have a right to seek asylum especially since the situation in Nicaragua is dangerous for us. If I am forced to return to Nicaragua, the Nicaraguan government may become aware of my work for the digital media company that it targeted, and I would not be safe. I believe I would be interrogated and imprisoned.

30. After hearing the news regarding the pause on processing immigration applications, I feel very uncertain about our future. It would be very risky to attempt to return to Nicaragua knowing that things have not changed there. If Ana and I were to return to Nicaragua we would be stripped of our citizenship and imprisoned. Those who remain in Nicaragua live under constant surveillance and persecution, and those who have returned have faced arbitrary detentions, torture, and threats. The people I know have not considered returning to Nicaragua out of fear of retaliation. I also believe that it is likely that we would be denied entry to the country. If I am not allowed to pursue asylum in the United States and not allowed to return to Nicaragua, I would be in complete limbo.

31. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

32. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

33. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all

harmed by the indefinite pause on the processing of immigration applications benefits.

34. For related reasons, I am very nervous about publicly using my real name in this lawsuit. I am afraid that if the U.S. government knows that I am participating they will retaliate against me and my family and will deport us all to Nicaragua. If I were to get deported, I would no longer be able to continue with my asylum application, which is very important for my own safety. I am also concerned that the Nicaraguan government could learn about my involvement in this lawsuit and discover the story I am telling about the terrible conditions in the country and how it is unsafe for people who speak out against the government. If I end up being deported to Nicaragua, I fear that I will be targeted for retaliation by the government. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate. I can't risk my safety and that of my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on 2/27/2025.



Armando Doe

9

## CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Armando Doe in Spanish and that he affirmed that it is true and correct.

Executed: 2/28/2025

_____
Emily Martin