# EXHIBIT 5

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>                     Plaintiffs,<br><br>– *versus* –<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>                     Defendants. | **Civil Action No.: 1:25-cv-10495-IT** |

## DECLARATION OF MAKSYM DOE

I, Maksym Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Kharkiv, Ukraine, in 1987. I am a national of Ukraine.

2. I have been living in Brooklyn, New York with my wife, Maria Doe, for about a year. I am the co-founder of a nonprofit organization that provides humanitarian aid in Ukraine. I started the nonprofit with several friends after Russia invaded Ukraine in February 2022.

3. I first came to the United States on a visitor visa in early 2023. Maria and I subsequently were sponsored for parole through the Uniting for Ukraine ("U4U") parole process by a family friend in the United States. Maria and I have been in the United States on U4U parole since the spring of 2023. Maria successfully applied for re-parole under the U4U process and was granted an additional two years of parole in January 2025. My current grant of parole will expire in April 2025, and my re-parole application remains pending.

4. It is difficult to express in words what the Russian invasion of Ukraine has done to our country and to us as nationals of Ukraine. We never wanted to leave Ukraine before the war started. But the war has changed everything.

5. Before the Russian invasion, I worked in professional theater. I also worked at an acting school for children and adults, as well as at a nonprofit organization supporting cultural initiatives in Kharkiv. In addition, Maria had just decided to leave her tech job to start her own business running a massage studio. She had secured an investor and had begun architectural construction work at a location in Kyiv.

6. All these plans came to an end with the invasion—everything stopped once the Russian bombs began dropping. On the day the invasion started, we could see bombs falling and blowing things up from our apartment. Immediately, we found all our family members in Kharkiv, including Maria's mother and brother, and evacuated to western Ukraine with two other families with children.

7. Once our family was safe, I started looking for ways to help. I knew that a friend of mine had evacuated his family from Kharkiv but then had returned to the city to find his car and start evacuating other people. I called him and asked how I could help, because the situation in eastern Ukraine was dire—there was no transportation; no stores were open for people to get food; in some places there was shelling and fighting in the streets; and even if people wanted to evacuate, they couldn't, because all public services had stopped.

8. My friend asked me to start fielding calls from people requesting evacuation, since he was on the ground in Kharkiv trying to evacuate people with his own car, and

he couldn't manage the logistics on his own. I started to answer phone calls and helped coordinate my friend's evacuation efforts. Eventually, another friend pitched in to help our organization and management work. We started finding volunteers who wanted to help and began to organize them. Within a few months, we had a team of 200 volunteers helping to evacuate people from areas in eastern Ukraine that were under attack. Within the first six months of the invasion, we were able to evacuate 22,000 people from eastern Ukraine.

9. From there, we expanded our operations. For example, one of our partners had a few restaurants in Kharkiv, including one with a shelter where some of our on-the-ground volunteers were staying. So we started up operations that would allow us to cook food to feed people in the surrounding area, including people in hospitals or in other shelters. At our peak, we were cooking ten thousand servings every day.

10. Coordinating all these efforts was a lot of work. One of our first volunteers was Maria, who began organizing a hotline for people asking to be evacuated. But we had drivers in Kharkiv, people handling management and logistics, and a large volunteer corps that was getting burned out on a regular and frequent basis. We started to raise funds, registered as a nonprofit organization in Ukraine, hired professionals and turned some of our volunteers into paid employees, and became more organized so that we could help more people.

11. Now, our nonprofit has more than 100 employees and runs eight to ten different projects at the same time. One of our main projects now is to build safe spaces for children to provide emotional support. We have established multiple places in Ukraine where children and their parents can go to get support, including classes,

        psychological counseling, and a safe place for children to be children, including in cities near the front lines where regular schools are closed. We have also established a camp for children who have lost one or both of their parents, or who are from unoccupied territories, so they can be with each other and work with psychologists and therapists. In addition, we fund and support huge humanitarian projects, like building water pump stations in regions that have been shelled, so that people can access clean water.

12. Running this non-profit has been my life's work since the Russian invasion of Ukraine. All my efforts have been dedicated to securing funding, improving our management and logistics, and making sure that we can help as many people as possible. In May 2022, we had relocated to Kyiv because a friend had offered us a place to stay, rent-free, to support my work with the nonprofit. But Maria and I started discussing the possibility of me traveling to the United States, so that I could work with other humanitarian aid organizations, raise additional funding to grow the nonprofit, and continue providing aid to Ukrainians harmed by the war.

13. We agreed that I would travel first to the United States to learn more about how to keep supporting the nonprofit's operations from there. A friend had told us about U4U, but I first came on a visitor's visa and stayed in Chicago with the family of one of my partners at the nonprofit. I started researching how to register a nonprofit organization as a tax- exempt 501(c)(3) organization in the United States, and how to fundraise and connect with other humanitarian aid organizations. Eventually, Maria and I decided that she should also come to the United States and that U4U seemed like the best option.

14. My sister had studied abroad through an exchange program when she was in high school and had stayed with a family in Maine. She and that family remained close ever since that time, and in fact, they have become like extended family to us all—they came to my sister's wedding in Ukraine and we have celebrated big family milestones together. After I started my nonprofit, they have been generous in supporting our humanitarian efforts in Ukraine. So, when Maria and I decided to pursue parole through U4U, we asked my sister to reach out to her host family to see if someone would be willing to sponsor us. Her old high school classmate wanted to help us and agreed to be our sponsor.

15. With our family friend, we filed the U4U sponsorship application for Maria first. She received pre-approval to travel in January 2023 and traveled to Chicago to join me in February 2023. After Maria arrived, I left the United States for Mexico in March 2023, where I also worked with our family friend to submit the necessary U4U application papers. I came back in April 2023 when I was approved to travel and received U4U parole to reenter the United States. We received our work authorizations when we entered the United States on U4U parole.

16. We stayed in Chicago for eight or nine months, working with my partners to build up a 501(c)(3) nonprofit in the United States. It was hard work, and it was also hard on us as a couple, because we were living in a small apartment with two of my partners. Finally, after saving up some money, we were able to find a place of our own. We considered several different cities but eventually decided to move to New York.

17. We have now been living in New York for about a year and we feel like we've been able to start rebuilding our lives after arriving in the United States with practically nothing. I continue to work with the nonprofit to support our humanitarian efforts in Ukraine; I estimate that we have helped over a half million Ukrainians through our various humanitarian aid projects. Maria was able to get a great job back in the tech sector, with a tech start-up doing exactly the kind of work she likes. We have an amazing community in Brooklyn, and we've found the city to be very welcoming and diverse. Although we never wanted to leave Ukraine before Russia invaded, we now want to stay here in the United States because of the safety, stability, and opportunities we've found here. We both applied for re-parole at the earliest permissible date—Maria in September 2024, and I in November 2024—and Maria's application was granted in January 2025. We also applied for Temporary Protected Status and are waiting for those applications to be processed, and Maria is talking with her employer about applying soon for an H-1B employment-based visa. TPS and the H-1B visa would provide a more stable and predictable legal status for us and allow us to keep building our lives and doing our work here.

18. It has been devastating to learn that President Trump has terminated U4U and other parole programs, and has also paused the processing on my re-parole application and the TPS applications that Maria and I have filed. We do not even know if Maria's H-1B application will ever get processed after she is able to file it. My own U4U parole will end in April 2025, if the administration does not prematurely terminate it. If my U4U re- parole application and my TPS application are not

processed and granted by that time, I will lose my work authorization and my permission to remain in the country. We have struggled and worked so hard for three long years since the Russian invasion. It is heartbreaking to think that I may not be able to continue my work for my nonprofit, which is now more important than ever, three years into the war. And on a personal level, I do not want to be at risk of deportation when Maria has two more years of parole, simply because her re-parole application was granted earlier but mine has gotten trapped in limbo due to the pause in processing. I also worry that the administration could simply choose to end everyone's parole, and Maria will lose her two precious years of legal status here.

19. It feels like all the doors are being closed in our faces. After taking so much care to come to the United States legally, after fleeing Kharkiv and being displaced so many times within Ukraine and Europe, and after doing so much to maintain our status to remain here legally, Maria and I never thought something like this could happen in the United States. The prospect of having to leave and start all over again in a new place, especially when we have worked so hard to do everything the right way, both for ourselves and for my humanitarian work for the nonprofit and for Ukraine, is very hard to stomach. When we were able to come to the United States on U4U, we had friends who had evacuated elsewhere in Europe who congratulated us, because we all thought that the United States was a stable, steady country where we could finally be safe and do good work for ourselves, our community, and the people of our homeland. We never thought that the United States government might displace us the same way the Russian invasion did.

20. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

21. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

22. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of immigration applications benefits.

23. The unfairness of what the government is doing makes me feel strongly about participating in this lawsuit, but I pray that the judge in this case will allow me to use a pseudonym in the court filings so that I can hide my true identity from the Trump administration. I am afraid that if the government sees my name on the court papers and knows that I am participating in this lawsuit, they will retaliate against me and either deny my applications for re-parole and TPS, or simply end my current grant of parole, and deport me. Maria and I would also like to apply for green cards eventually, and I am very worried that participating in this lawsuit with my real name will increase the chances that those applications will be denied. I am painfully aware of how easily the government can take away our legal status—it's already moving in that direction, by terminating U4U and other similar parole processes, and preventing any of our applications for other legal statuses from being processed. I am likewise acutely aware of the media reports of President Trump

promising "mass deportations," and how Maria and I could very easily be included in those deportations if the government takes our parole away and doesn't allow us to apply for any alternate legal status. For these reasons, I hope that I will not be forced to use my real name in this lawsuit.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Brooklyn, New York on February 25, 2025.

Maksym Doe

9