# EXHIBIT 8

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al., <br><br> Plaintiffs, <br><br> – versus – <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., <br><br> Defendants. | **Civil Action No.: 1:25-cv-10495-IT** |

## DECLARATION OF SVITLANA DOE

I, Svitlana Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Baku, Azerbaijan, in January 1988. When I was two years old, my family moved to Brovary, Ukraine. At this time, both countries were a part of the Soviet Union until its collapse in 1991. I am a national of Ukraine.

2. I currently live in Dover, Massachusetts. I have lived here since I entered the United States through the Uniting for Ukraine ("U4U") parole process. I was sponsored by a group of four individuals, including the executive director of a leading celiac disease research center in the United States, who partnered to bring me and my family to safety. I received travel authorization pursuant to U4U in early November 2022, and I arrived with my family in the United States on November 20, 2022. In 2024, my family and I were re- paroled under U4U, and my current parole status and work authorization is valid until November 18, 2026.

3. I fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. It is hard to convey how much Russia's war has affected us. When war struck in 2022, I lived with my family in Brovary, a city immediately outside of Kyiv, the capital of Ukraine, which was one of Russia's initial focal points for occupation.

4. The first few months of the war were shocking and terrifying. Russian troops entered the settlements about six miles away from my town, torturing, raping, and shooting people right in the streets, including women and children attempting to flee in cars. They burned down the settlements as they moved through. Bombs rained down and fighting broke out regularly in the streets directly outside our apartment. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled.

5. There was a massive wave of internal migration, with families taking their children away from areas of active hostilities to safer cities. I eventually fled the capital with my family for Cherkasy, a city about two and a half hours away from Brovary. We remained in Cherkasy for about a month and a half, until Russian troops were withdrawn from the Kyiv region and we returned to our home in Brovary.

6. I am the mother to a young son with celiac disease. After he was born and began eating solid food, my son became extremely sick with an undiagnosed condition. Celiac disease is hard to diagnose because its symptoms often mimic other digestive issues. In Ukraine, professional understanding of celiac disease is lower than in the United States—my son was eventually diagnosed in one of the best hospitals in Ukraine, but even there, it took a long time to correctly diagnose his condition.

7. Public awareness of celiac disease is also much lower in Ukraine. Even before the war, I had to shop around at dozens of different grocery stores to find gluten-free products for my son, and when I could find them, they cost twice as much as glutenous products. I would often be criticized by other parents at grocery stores for not buying my son "normal" food.

8. My son is extremely sensitive to gluten—even minimal cross contamination using the same utensil would make him dangerously ill. Because of the difficulty of finding adequate food for him at the grocery store, I had to specially prepare most of his food, but this was further made difficult by daycare procedures. Daycares in Ukraine tend to have their own kitchens and generally will not permit children to bring their own food. This made every day a struggle to provide my son the care he needed to thrive. When the war began, it became almost impossible to take care of him. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after the onset of the war, my son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

9. Before the war began, I never considered leaving Ukraine. I was satisfied with my life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. It was a complex job with complicated but rewarding projects—for example, I oversaw imports of medical supplies for various hospitals around the country. I also organized treatment abroad for children with cancer and other serious medical conditions.

10. But amid my son's failing health and the unceasing fighting and danger which regularly forced us, sometimes for entire nights, into the dirt basement of my son's school to take shelter from missile attacks, we decided we needed to flee Ukraine. I began searching for help on the internet and social media, reaching out to online communities of people living with celiac disease in Poland. From there, community members helped me find a U.S. celiac disease research center. I reached out to them, and an individual there put me in contact with the center's executive director. While we were still in Ukraine, a doctor at the U.S. research center began exploring my son's condition and providing him with treatment.

11. Eventually, the executive director, along with a group of three other individuals in their community, volunteered to sponsor me and my family through the Uniting for Ukraine parole process. We received travel authorization in November 2022, which came as a huge relief. However, it was no guarantee we would all make it out of Ukraine.

12. After the war began, men were generally not permitted to leave Ukraine due to the mandatory draft. However, officers often made exceptions for fathers seeking treatment for their disabled children, so I did everything possible to rapidly assemble a collection of my son's medical documentation, as he had been officially diagnosed as having a temporary disability in Ukraine. The U.S. doctor working with my son even wrote a letter documenting his need for medical treatment outside Ukraine.

13. This was an extremely stressful time—since border officials had individual discretion, we could not guarantee my husband would be allowed to leave the

country. We made all our arrangements in advance—we rented a hotel in Warsaw, Poland; we bought plane tickets from Warsaw to the United States; and we enlisted the help of my father-in-law (who is exempt from the draft due to his age) to drive us across the border. My husband and son left first to maximize their odds of remaining together, worried the entire time that they would be separated. They successfully arrived in Warsaw in mid-November 2022. I followed them the next day and met them in Warsaw. From there we traveled together to the United States, arriving on November 20, 2022, and living since then in Dover, Massachusetts.

14. Since arriving, my son has continued to receive treatment at the medical center specializing in celiac research. After about a year, his health began to improve dramatically, and he is now a healthy young boy, although he will require a strict diet and comprehensive annual checkups for the rest of his life. Additionally, due to the stresses of war, my son was a late speaker and spoke with a speech impediment. He currently receives weekly speech therapy.

15. I, like many Ukrainians, highly value education, and I am very career- and growth-minded. Since I received work authorization around April 2022, I have been working for a local community center, and I enrolled as a student in community college studying child development. I have already received a certificate that allows me to work as a teacher's assistant, and it is my goal to pursue a full education in the U.S. My husband works as well, and we both pay taxes.

16. In 2024, I and my family were granted re-parole under U4U, and my current parole status and work authorization is valid until November 18, 2026. Around the beginning of February 2025, my husband, my son, and I also applied for Temporary

Protected Status ("TPS") to ensure we can remain legally in the U.S. at the conclusion of our parole period.

17. When I found out that the Trump administration has cancelled U4U parole and additionally has paused adjudicating all immigration applications for U4U parolees, I began worrying once again for my family's wellbeing. If my TPS application is not adjudicated, or even paused for too long, I will lose my only chance of being able to remain in safety in the U.S., especially if my parole is revoked as the Trump administration has threatened.

18. If either becomes unavailable to me, I will lose my ability to provide for my family. I will not be able to pay rent (about $2200 per month), purchase groceries (about $800 per month), or pay my family's bills. My son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy, adequate food for his diet, and stability. My husband also has an autoimmune condition and has been receiving treatment from a rheumatologist in the U.S. for the past two years, which he depends on for his wellbeing.

19. My family would be forced to leave the U.S., but there is nowhere else for us to go—we cannot return to Ukraine in the middle of a continuing war, where my husband would be forcefully recruited into the army. The country is still not safe, and I often wonder if my son would still be alive had we remained. About two months after we arrived in the United States, a helicopter crashed, during school hours, into the kindergarten directly in front of the apartment where we used to live in Ukraine and where my son would have been attending had we still lived there.

At least fourteen people were killed and at least twenty-nine injured from the explosion and resulting fire.

20. Even if negotiations win out in Ukraine, there is no promise that peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous.

21. My husband, my son, and I consider the U.S. our new home. Defending U4U parole and the availability of immigration relief is my reason for joining this litigation as a plaintiff. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

22. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

23. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of immigration applications benefits.

24. But for all the above reasons, I fear using my real name in this lawsuit. I fear returning to Ukraine. I fear that if the United States government knows that I am participating, it will retaliate against my family by denying our TPS applications or canceling our parole status, rendering us stateless. U4U and the availability of TPS have been lifelines for me and my family, and losing them would cost more than we can bear.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Dover, Massachusetts on February 28, 2025.

Svitlana Doe