# EXHIBIT 24

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

include: (1) remarks from the administration and CISA leadership on salient NS/EP and cybersecurity efforts; (2) a status update on the NSTAC Addressing the Misuse of Domestic Infrastructure by Foreign Malicious Actors Subcommittee; and (3) a deliberation and vote on the *NSTAC Report to the President on a Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem.*

Dated: January 3, 2023.

**Christina Berger,**

*Designated Federal Officer, NSTAC, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–00181 Filed 1–6–23; 8:45 am]

**BILLING CODE 9110–9P–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Haitians

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Haitian nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Haitian Parole Process

This notice describes the implementation of a new parole process for certain Haitian nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day, and as of the week ending December 4, to an average of 86 a day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Haitian Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_*

Continued

DHS anticipates that implementing a similar process for Haitians will reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all-of-government response. In FY 2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[6] In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago. Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[7]

Haitian migrants are also increasingly taking to the sea in makeshift boats. Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[8] While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti will reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea. This will be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States with the imposition of consequences for those who seek to enter without authorization between POEs along the SWB. Individuals can access this lawful process from safe locations in Haiti or in third countries. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Haitian national (and certain non-Haitian nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

### B. Conditions at the Border

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the

---

%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[7] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf, (last viewed Dec. 11, 2022).

[8] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[9] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[10]

Panama's daily encounters of Venezuelans also declined significantly, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[11]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[12] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[13] Still others who were intending to migrate north are staying where they are to apply for this parole process.[14] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Haitian Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[15] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[16] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[17]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[18] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [19] (NCA) and, since the late 2010s, from countries throughout the Americas.[20] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[21]

*C. Trends in Haitian Migration*

1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[22] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[23]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas, within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[24] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May 2022.[25] While encounters of Haitian migrants at our border have declined since June 2022, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in

---

[9] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[10] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[11] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[12] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama,* *https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[13] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route,* *https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[14] Axios, *Biden's new border policy throws Venezuelan migrants into limbo,* *https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[15] OIS analysis of historic CBP data.

[16] *Id.*

[17] *Id.*

[18] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[19] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[20] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[21] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] *Id.*

[24] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio,* Oct. 7, 2021, *https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/.*

[25] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters,* (last visited, Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July 2022, to 2,170 in September, to 4,607 in November.[26]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there were 62,680 Haitians in Mexico in 2022 and projects that this population will grow to 104,541 in 2023.[27] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of any nationality and almost twice as many as the second-highest nationality.[28] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[29] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the Centers for Disease Control and Prevention (CDC) Title 42 Order is lifted.

2. Migration by Sea

Increasing numbers of Haitian migrants also continue to attempt migration to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[30]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived in the United States by sea.[31] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[32] In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—composing 31 percent of total unique encounters by USBP in the southeast coastal sectors.[33]

3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion of gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation in Haiti is having an impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States; absent such an ability, more individuals may be willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Haiti

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[34]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[35] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[36] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[37] The World Bank estimates that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[38]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[39] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[40] The situation has deteriorated to such a point that the Haitian Government itself, on October 7, 2022, asked for international military assistance to help address the converging crises.[41]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[42] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.[43] This recent surge in gang

---

[26] Servicio Nacional de Migración de Panamá, *Irregulares Por Darien*, November 2022.

[27] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, https://reporting.unhcr.org/mexico?year=2022.

[28] OIS analysis of *Instituto Nacional de Migracion* data.

[29] Estadísticas Comisión Mexicana de Ayuda a Refugiados, *Mexico Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November),* https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic._.pdf, (last viewed Dec. 17, 2022).

[30] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[31] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[32] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[33] *Id.*

[34] Diana Roy, Council on Foreign Relations, *Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022* (Dec. 1, 2022). https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022.

[35] UNICEF, *Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families,* https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti (last viewed Dec. 12, 2022).

[36] The Washington Post, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake,* Aug. 16, 2021, https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/, (last viewed Dec. 19, 2022).

[37] UNICEF, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance,* Sept. 15, 20221, https://www.unicef.org.uk/press-releases/one-month-after-haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef/, (last visited Dec. 19, 2022).

[38] The World Bank, *Haiti Overview,* Updated Nov. 8, 2022, https://www.worldbank.org/en/country/haiti/overview#:~:text=The%20results%20of%20the%20assessment%20of%20the%20effects,in%20damage%20and%20losses%2C%20or%2011%25%20of%20GDP, (last visited Dec. 19, 2022).

[39] *Id.*

[40] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.

[41] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html (last viewed Dec. 17, 2022).

[42] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation* (July 7, 2021). https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.

[43] *See* International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists* (July 27, 2022), https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists; Office of the High Commissioner for Human Rights, *Sexual violence in Port-au-Prince: A weapon used by gangs to instill*

violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[44] Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.[45]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[46]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[47] This Haitian diaspora in South America developed after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people. Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[48] Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free. As of 2020, there were an estimated 143,000 Haitians living in Brazil and 180,000 in Chile.[49] However, over the past two years, declining economic conditions in Chile and Brazil, which were exacerbated by the COVID–19 pandemic, have led many Haitian migrants to leave those countries to head north.[50]

As noted above, UNHCR estimates 62,680 Haitians were in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[51] Many thousands more are between Mexico and South America.

ii. Return Limitations

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by air or maritime repatriations by sea. For example, in early September 2022, destabilizing events, including gangs seizing control of a key fuel terminal, led to a pause in repatriation flights. The ability of our on-the-ground partners to help receive migrants that provide services for individuals returned to Haiti is evaluated on a day-to-day basis.[52] The ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly affected by the limitation on returns. Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources. U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.

4. Impact on DHS Resources and Operations

i. Impact on DHS Resources

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[53]

ii. Impact on Border Operations

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[54] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[55] All three sectors remain at risk of operating, or are currently operating, over capacity.[56] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014–FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[57]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such

---

*fear* (Oct. 14, 2022), *https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear.* Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[44] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[45] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6* (Nov. 17, 2022), *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[46] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html,* (last viewed Dec. 17, 2022).

[47] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas;* Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[48] *Id.*

[49] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* (May 2021), *https://www.migrationportal.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/,* (last visited Dec. 19, 2022).

[50] *Id.* Migration Policy Institute.

[51] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[52] International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). *https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.*

[53] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[54] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[55] *Id.*

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] *Id.*

as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[58]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

### iii. Impact on Maritime Operations

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[59] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[60] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast Guard deployed three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[61] USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[62] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

### II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[63] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[64] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[65] DHS may terminate parole in its discretion at any time.[66] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[67]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Haitian nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[68]

#### A. Significant Public Benefit

The parole of Haitian nationals and their immediate family members under this process—which imposes new consequences for Haitians who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhance Border Security by Reducing Irregular Migration of Haitian Nationals

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have

---

[58] Data from SBCC, as of December 11, 2022.
[59] OIS analysis of USCG data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.
[60] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.
[61] *Id.*
[62] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.
[63] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.
[64] INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).
[65] *See* 8 CFR 212.5(c).
[66] *See* 8 CFR 212.5(e).
[67] *See* 8 CFR 274a.12(c)(11).
[68] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

3. Reduce the Burden on DHS Personnel and Resources

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs, we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Haitian nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have provided services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[69] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[70] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[71] As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Haitian nationals into an orderly and lawful process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide

---

[69] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

[70] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[71] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[72]

In FY 2022, more than 750 migrants died attempting to enter the United States,[73] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[74] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[75] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[76] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[77] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[78] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[79] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[80]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of the capsized vessel and survivor.[81] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[82] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off of the Florida Keys.[83] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[84]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[85] the Collaborative Migration Management Strategy (CMMS);[86] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[87] The

---

[72] CBP, *Fact Sheet: Counter Human Smuggler Campaign Updated* (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[73] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[74] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[80] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[81] Adriana Gomez Licon, Associated Press, *Situation 'dire' as Coast Guard seeks 38 missing off Florida*, Jan. 26, 2022, https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.

[82] Adriana Gomez Licon, Associated Press, *Coast Guard suspends search for migrants off Florida*, Jan. 27, 2022, https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.

[83] Ashley Cox, CBS News CW44 Tampa, *More than 180 people rescued from overloaded vessel in Florida Keys*, Nov. 22, 2022, https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.

[84] *Id.*

[85] National Security Council, *Root Causes of Migration in Central America* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[86] National Security Council, *Collaborative Migration Management Strategy* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.

[87] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[88] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [89]

In June 2022, the U.S. Government announced the planned resumption of operations under the Haitian Family Reunification Parole (HFRP) program.[90] Approved HFRP beneficiaries enter the United States as parolees but are eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State temporarily reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility criteria, coupled with the operational challenges posed by the security situation in Haiti and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process will help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries.

The process also will respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID–19 pandemic.[91] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[92]

Along with the Venezuelan process, this new process will add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Haiti will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to return or remove to Mexico Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[93] This process provides a safe mechanism for Haitian nationals who

---

[88] *Id.*

[89] *Id.*

[90] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (June 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.*

[91] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[92] Reuters, *Thousands of mostly Haitian Migrants Traverse Panama on Way to United States,* Sept. 26, 2021, *https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/,* (last viewed Dec. 19, 2021).

[93] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), *https://crsreports.congress.gov/product/pdf/IF/IF12182.*

seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea.

## IV. Eligibility

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Haitian national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Haiti or be a non-Haitian immediate family member [81] and traveling with a Haitian principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Haitian national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Haiti, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[94]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order; [83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

---

[94] This limitation does not apply to immediate family members traveling with a Haitian national.

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Haitians' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel

via commercial air to an interior POE of the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Haitians at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the Federal Register) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[95] *i.e.,* a ''statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[96] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security ''in his discretion.''

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[97] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.''[98] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[99] This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Haitian nationals to enter the United States. The United States will only implement the new parole process while able to return or remove Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Haitian nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Haiti to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs

---

[95] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).
[96] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).
[97] 5 U.S.C. 553(a)(1).
[98] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).
[99] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[109] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[110] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[111] DHS concluded that "a surge could result in significant loss of human life."[112]

---

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.