# EXHIBIT 27

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# DEPARTMENT OF HOMELAND SECURITY

**[Docket No. CISA–2023–0012]**

## Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.

• *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words "Department of Homeland Security" and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**
*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

# DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]**

**RIN 1615–ZC07**

## Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

Supporter and Declaration of Financial Support, for this process on November 16, 2023.

**FOR FURTHER INFORMATION CONTACT:**
Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Ecuadorian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing an avenue for certain Ecuadorians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to collaboratively manage migration with its partners in the Western Hemisphere.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*.[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of noncitizens encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of access to lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. On October 12, 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[8] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[9] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, would be subject to expulsion or removal.[10] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the existing parole process for Venezuelans to allow for its continued operation.[11]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[12] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[13]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program[14] and

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order (E.O.) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021) *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2, 4.

[4] *See* National Security Council (NSC), *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.pdf.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[9] *See id.*

[10] *Id.*

[11] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[12] 88 FR 31314 (May 16, 2023).

[13] *See id.* at 31325.

[14] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. *See* U.S. Department of State, Restarting the Central American Minors Program, March 10, 2021, *https://www.state.gov/restarting-the-central-american-minors-program/* (last visited Aug. 3, 2023). In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). *See* U.S. Department. of State, Joint

Continued

expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[15] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for noncitizens in the region while enhancing worker protections.[16]

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to noncitizens who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Secretary of Homeland Security (the Secretary) has the discretionary authority under the Immigration and Nationality Act (INA) to parole an applicant for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [17] Parole is not an admission of the noncitizen to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[18] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[19] DHS may terminate parole upon notice in its discretion at any time.[20] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[21]

Past Secretaries have similarly exercised parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, Cuban Family Reunification Parole (CFRP) as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Forms I–130.[22] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[23] Similarly, in 2014, Haitian Family Reunification Parole (HFRP) was established, which allows USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[24] On July 10, 2023, DHS announced the implementation of four new FRP processes for certain nationals from Colombia, El Salvador, Guatemala, and Honduras, and their immediate family members, who have approved family-based petitions filed on their behalf by a U.S.C. or LPR.[25] On August 11, 2023, DHS announced updates to modernize the CFRP and HFRP processes by adopting the new, mostly

---

Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central America Minors Program, June 15, 2021, https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/ (last visited Aug. 3, 2023). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[15] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration; U.S Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; *See* The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.

[16] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See*

Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of the NCA countries and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[17] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[18] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[19] *See* 8 CFR 212.5(c).

[20] *See* 8 CFR 212.5(e).

[21] *See* 8 CFR 274a.12(c)(11).

[22] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[23] *Id.*

[24] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[25] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

online, processing steps implemented for the four new FRP processes.[26]

### III. The FRP Process for Ecuadorians

As in all other FRP processes, the FRP process for Ecuadorians will allow U.S.C. and LPR petitioners who have been invited to file a request and initiate this process for certain eligible family members to receive advance authorization to travel to the United States to seek parole at an interior POE (*i.e.,* an airport). Individuals who are eligible to be considered for parole under this process include nationals of Ecuador who are principal beneficiaries of approved Form I–130 family-based immigrant petitions, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. This process requires that the Form I–130 petitioner first receive an invitation to be able to initiate the process on behalf of the Form I–130 principal beneficiary and their immediate family members. As in other FRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If U.S. Customs and Border Protection (CBP) issues an advance authorization to travel to a beneficiary, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the other FRP processes. If paroled into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with all parole requests, under this FRP process for Ecuadorians, parole will be authorized only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

### IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens who are beneficiaries of approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

#### A. Promoting Family Unity

The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador. Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[27] While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to choose irregular migration in the absence of an alternative, near-term path to come to the United States for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the expeditious reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

---

[26] *See* Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).

[27] For example, under the October 2023 Department of State Visa Bulletin, an Ecuadorian unmarried son or daughter of a U.S.C.—F1 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 8 years ago. *See* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.* However, these dates are not predictive. Due to increases in volume of Form I–130 filings, an Ecuadorian unmarried son or daughter of a U.S.C. for whom a Form I–130 is filed today will likely have an even longer wait before an immigrant visa becomes available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[28] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[29] establishing SMOs in key locations throughout the Western Hemisphere,[30] joining Mexico to announce and develop a humanitarian plan on migration,[31] issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America,[32] and, most recently, announcing full support for an initiative that the Government of Mexico plans to start in southern Mexico to offer new refugee and labor pathways.[33] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively, at great financial, staffing, and domestic political costs, to: (1) create and expand access to lawful pathways in their respective countries, (2) increase enforcement measures along the migratory routes, and (3) introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Implementation of this FRP process is one response to such requests and, thereby, will build goodwill with regional partners and secure cooperation and strengthen bilateral relations in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger foreign policy objectives of this Administration and fits within a framework of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[34] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[35] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[36] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in Spring 2023 as the date on which the CDC Title 42 public health Order [37] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[38] For instance, on April 11, 2023, consistent with the spirit of the L.A. Declaration, in anticipation of the end of the Title 42 public health Order, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[39] Implementing this process fulfills one of the commitments the United States made with its regional partners to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [40]

The United States also continues to encourage regional governments to continue to expand lawful pathways for migrants, including providing legal status to migrants residing in their countries, as well as to establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[41] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.

---

[28] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[29] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[30] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/;* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/;* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[31] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[32] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[33] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.*

[34] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[35] *Id.*

[36] *Id.*

[37] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[38] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[39] *Trilateral Joint Statement,* Apr. 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[40] *See id.*

[41] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—U.S. Department of State ("Blinken-Mayorkas Joint Press Availability"), Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43]

Expanding cooperation with Ecuador can help achieve migration goals within Ecuador, regionally, and around the globe.[44] Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities,[45] providing life-saving assistance to Venezuelan and Colombian refugees and migrants within its borders, and strengthening its border security and controls.[46] Ecuador, along with Costa Rica, Belize, and Peru, is undertaking efforts to regularize migrants from Venezuela and Nicaragua.[47] Ecuador's program for Venezuelans in the country has provided an opportunity for stability and integration for more than 500,000 displaced Venezuelans.[48] Furthermore, establishing an FRP process for certain nationals of Ecuador furthers the USG's efforts to set up SMOs in Ecuador. As part of ongoing negotiations over the establishment of SMOs in Ecuador, the Government of Ecuador has repeatedly emphasized the critical importance of lawful pathways to the United States for nationals of Ecuador, including labor and family reunification pathways.[49]

After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador to guide migrants and refugees towards lawful migration pathways.[50]

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2023 (FY23), CBP encounters with Ecuadorians totaled 117,487 as compared to 24,936 encounters in FY22, a 371% increase.[51] In FY21, CBP encountered a total of 97,074 Ecuadorian nationals, and in all of FY20, CBP encountered 12,892 Ecuadorian nationals.[52] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Ecuador to the United States.[53]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[54]

While beneficiaries of this FRP process will still need to wait to apply to become an LPR, it will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Ecuador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration.

### D. Reducing Strain on Limited U.S. Resources

Increases in irregular migration from Ecuador have strained DHS's reception and processing capacity at the SWB. From FY20 to FY23, encounters of Ecuadorians at the SWB totaled approximately 252,389.[55] By establishing a lawful pathway for some nationals of Ecuador and their immediate family members, on a case-by-case basis, to be paroled into the United States before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB. This would thereby provide a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of noncitizens to interior POEs.

Paroling noncitizens through this process will be significantly less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, preserving space and resources for managing irregular migration.

Furthermore, by establishing a meaningful, near-term lawful pathway that certain noncitizens, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to

---

[42] *See id.*

[43] *See id.*

[44] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf.*

[45] Ministry of Foreign Affairs of Ecuador, LISTA DE PAISES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023). Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan. The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.

[46] *Id.*

[47] *See supra* note 41.

[48] The White House, Readout of Los Angeles Declaration Implementation Launch, Sept. 27, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/27/readout-of-los-angeles-declaration-implementation-launch/.*

[49] *See, e.g.,* The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023. Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the U.S. so that migrants can have family reunification"), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[50] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[51] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

[52] *Id.*

[53] Genevieve Glatsky and José María León Cabrera, *Security is the Main Worry as Ecuador Votes on Sunday. Here's What to Know,* New York Times, Aug. 20, 2023, *https://www.nytimes.com/2023/08/20/world/americas/ecuador-election-assassination-explainer.html;* Genevieve Glatsky and José María León Cabrera, *How Narco Traffickers Unleashed Violence and Chaos in Ecuador,* New York Times, Aug 17, 2023, *https://www.nytimes.com/2023/08/17/world/americas/ecuador-drug-trafficking-election.html?searchResultPosition=16;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sep. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[54] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.*

[55] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

enter the United States irregularly, the process could redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the Northern Central America region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[56] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[57] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[58] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and non-governmental organizations along the SWB. Beneficiaries will be required to fly at their own expense to an interior POE, rather than arriving at the SWB and transiting through border communities. Beneficiaries will only be authorized to come to the United States if they have a U.S.-based supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be immediately eligible to apply for employment authorization, enabling them to support themselves.

### E. Addressing Root Causes of Migration Through Remittances

The case-by-case parole into the United States of noncitizens under this FRP process will also serve a significant public benefit by aiding U.S. efforts to address economic insecurity in Ecuador, which is a key factor that drives out-migration.[59] Unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that, if granted, they may maintain throughout the duration of their parole period, allowing them to support themselves and to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[60] Noncitizens with employment authorization also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[61]

Additional remittances sent back to Ecuador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[62]

In total, remittances sent to Ecuador amounted to $603.97 million in 2021, a significant contribution to development in communities in Ecuador.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Ecuador, impacting individual decisions on whether to leave the country. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, noncitizens are more likely to turn to irregular migration in the short-term.

### V. Eligibility

#### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of an Ecuadorian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of an Ecuadorian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf

---

[56] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019), https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; *see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[57] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[58] *Id.*

[59] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf; Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52; Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sept. 23, 2021, https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration; Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.

[60] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.

[61] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), https://www.nber.org/papers/w23236 (providing that noncitizens without authorization to work earn less than those with employment authorization).

[62] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; *see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.

[63] Statista, Personal remittances paid in Ecuador from 1999 to 2021, https://www.statista.com/statistics/1390805/personal-remittances-paid-ecuador/#:~:text=The%20personal%20remittances%20paid%20in,have%20been%20subject%20to%20fluctuation (last visited July 6, 2023). *See also* The World Bank, Data, GDP (current US$)—Ecuador, https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?end=2021&locations=EC&start=2019 (last visited July 31, 2023), which indicates that the 2021 GDP for Ecuador was 106.17 billion US dollars.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

of an Ecuadorian principal beneficiary of an approved Form I–130, and separate requests for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of their parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationships between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Ecuador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE under this process, a beneficiary must:

• Be outside the United States;
• Be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
• Be a national of Ecuador or be a non-Ecuadorian derivative beneficiary spouse or child [66] of an Ecuadorian principal beneficiary;
• Have a petitioning relative in the United States who received an invitation to initiate this FRP process on the beneficiary's behalf by filing a Form I–134A;
• Have a U.S.-based petitioning relative who filed a Form I–134A on the beneficiary's behalf that USCIS has vetted and confirmed;
• Have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• Have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting by CBP prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting and collection of additional biometrics at the POE by CBP upon inspection, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary approvals of advance authorization to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary has:

• Crossed irregularly into the United States, between POEs, after November 16, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• Been interdicted at sea [67] after November 16, 2023; or
• Been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on urgent humanitarian reasons or significant public benefit, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Ecuador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after November 16, 2023, rather than being considered for parole under this process, will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Ecuadorians may use this process if they are a derivative beneficiary of an Ecuadorian principal beneficiary and traveling with that Ecuadorian beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] INA secs. 275 and 276, 8 U.S.C. 1325 and 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned from the original CFRP and HFRP programs and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except certain medical requirements, and the ultimate parole determination made in person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner be permitted to file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134a Online To Initiate This Process

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries may submit a Form I–134A for each beneficiary with USCIS through the USCIS online system to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, then the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, then the beneficiary named on the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through USCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole under this process and will be processed consistent with established policy and procedure. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate

---

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis in the exercise of discretion for urgent humanitarian reasons or significant public benefit, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions of parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate this FRP process at any point. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**VI. Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes or forms such as parole-related employment authorization applications. Beneficiaries who are paroled into the United States under this FRP process may have to wait before being authorized to work in the United States, depending on the amount of time it takes USCIS to process beneficiaries' requests for employment authorization.[77] However, the impact of that waiting period is to some extent mitigated by the requirements of this process. Beneficiaries may not be paroled under this process unless their Form I–130 petitioner has filed on their behalf to initiate the FRP process, requesting to be a supporter and declaring their ability to financially support the beneficiary. As noted above, the petitioner must provide evidence to demonstrate their ability to support the beneficiary or must include similar evidence establishing that with the help of a co-supporter, they have the financial means to support the beneficiary.

Although personnel and resources may be diverted from other similar processes and programs or for the adjudication of forms such as parole-related employment authorization applications, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure as resource limitations require. Therefore, for the processing of employment authorization applications, for example, the adjudication burden on USCIS can be controlled and limited as needed under this FRP process. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. As explained in detail above, DHS has determined that there are significant public benefits of the case-by-case parole of noncitizens under this process. DHS also recognizes there are costs that may be incurred, such as for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants). Ultimately, DHS has determined that the significant public benefits of the case-by-case parole of noncitizens under this FRP process to the United States, and to other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, justify the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence.[78]

Alternatively, as discussed below, a decision to forego establishing this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation from foreign partners with respect to removals and ensure continued collaboration on migration management. In addition, certain nationals of Ecuador still waiting for their immigrant visas to become available would remain separated from their family members for an extended period of time and could resort to irregular migration without this process. For any such Ecuadorian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of noncitizens living in the United States without authorization, unable to legally seek employment. The states in which they settle may be less likely to benefit from additional tax revenues and other positive economic contributions these noncitizens would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

---

[76] 8 CFR 274a.12(c)(11).

[77] USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/ (last visited Oct. 25, 2023). This website provides the approximate processing time a parolee can expect when filing Form I–765, Application for Employment Authorization.

[78] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.

First, DHS is merely adopting a general statement of policy,[79] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[80] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[81] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[82] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[83]

This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure our partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] Since the April 27, 2023 announcement,[85] the United States has engaged in ongoing negotiations to implement the announced initiatives in close coordination with regional partners including establishing SMOs in Colombia, Guatemala, and Costa Rica as part of its strategy to manage migration collaboratively in the Western Hemisphere.

As with the four recently implemented FRP processes and the modernization of the CFRP and HFRP processes, delaying issuance and implementation of this process to undertake rulemaking would complicate broader discussions and ongoing negotiations with key foreign partners about migration management. Ongoing negotiations with regional partners involve the implementation of a range of new measures, including establishing SMOs in key locations throughout the Western Hemisphere to manage and reduce irregular migration and improve qualified noncitizens' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including FRP processes that will benefit nationals in countries identified to host SMOs.

Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities. To that end, Ecuador unilaterally has taken two very critical actions to prevent certain nationalities from abusing Ecuador's visa regime to irregularly travel to the Western Hemisphere. Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan.[86] The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.[87] While Ecuador is taking this action unilaterally, representatives of the Government of Ecuador have emphasized the critical importance of availability of lawful pathways for Ecuadorian nationals, including labor pathways and processes for nationals of Ecuador to reunify with their family members in the United States.[88] Similarly, Foreign Minister Gustavo Manrique shared with local press that Ecuador is negotiating with the United States on hosting SMOs and noted their position on family reunification and labor pathways for Ecuadorians.[89] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador.[90] In DHS's judgment, the delay associated with a public rulemaking process involving notice and comment and a delayed effective date would negatively impact ongoing efforts to operationalize SMOs in Ecuador to channel migrants to lawful pathways.

Such a delay would also be inconsistent with the dispatch with which DHS has appropriately implemented other FRP processes. Such processes support a series of efforts that the United States has been pursuing in the hemisphere to increase the availability of lawful pathways for migration and involve additional countries with destination pathways and as host countries for certain processing initiatives. The ability to implement such processes rapidly is critical for supporting the Administration's overall goals as part of these efforts, which include multi-faceted negotiations with a range of regional partners.

For instance, on May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that

---

[79] 5 U.S.C. 553(b)(A).

[80] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[81] 5 U.S.C. 553(a)(1).

[82] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[83] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[85] *Id.*

[86] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023).

[87] *Id.*

[88] The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023.

[89] Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the US so that migrants can have family reunification"), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[90] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, which will continue to remain a central topic of bilateral relations.[91] Specifically, the United States stated its intention to welcome as many as 100,000 noncitizens from El Salvador, Guatemala, and Honduras under the FRP processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success.[92] Mexico concurrently agreed to continue to implement the joint initiative whereby the United States provides a lawful pathway through parole for nationals of Cuba, Haiti, Nicaragua, and Venezuela, while Mexico would accept the return of certain third-country migrants on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.[93]

Similarly, on July 28, 2023, building on a series of successful lawful pathway initiatives the United States and the Government of Mexico agreed to launch last year,[94] the United States announced additional steps to expand access to safe, orderly, and lawful pathways for migration.[95] On July 28, the United States noted its full support to the Government of Mexico of efforts to establish international multipurpose space in Mexico to offer protection and labor pathways, including accepting refugee resettlement referrals to the U.S. Refugee Admissions Program from qualified noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.[96] The United States and the Government of Mexico are working to implement this new commitment to expand access to lawful pathways. As stated in the **Federal Register** Notices implementing family reunification processes for certain nationals of Colombia,[97] El Salvador,[98] Guatemala,[99] and Honduras,[100] a delay in implementation of the U.S. commitment on family reunification pathways risks undermining Mexico's commitments, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[101] As the first step of a comprehensive program to manage irregular migration, both countries are implementing a six-month pilot phase of SMOs.[102] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[103] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[104]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[105] The Safe Mobility initiative launched in Colombia on June 28, 2023, with SMOs currently operational in three cities throughout the country. SMOs in Colombia serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[106] The U.S. government also reaffirmed its commitment to expand lawful pathways for Colombians with temporary work visas and expanded family reunification.[107]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, launched an exploratory six-month implementation of SMOs.[108] SMOs in Costa Rica serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[109] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[110]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing negotiations with the Government of Ecuador, specifically, and overall U.S. efforts to manage migration together with foreign partners. Because this FRP process is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining partner countries' multilateral and unilateral efforts, and in the case of Ecuador, putting at risk multiple efforts, including the United States' ability to continue SMO operations in Ecuador and Ecuador's willingness to unilaterally impose certain visa restrictions, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would

---

[91] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[92] *Id.*

[93] *Id.*

[94] *See* The White House, Remarks by President Biden and President López Obrador of Mexico Before Bilateral Meeting, July 12, 2022, *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/12/remarks-by-president-biden-and-president-lopez-obrador-of-mexico-before-bilateral-meeting-2/*.

[95] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/*.

[96] *Id.*

[97] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[98] *See* Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[99] *See* Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[100] *See* Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[101] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[106] *Id.*

[107] *Id.*

[108] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[109] *Id.*

[110] *Id.*

adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals. In diplomatic engagements, regional partner countries have repeatedly requested additional lawful pathways in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. As encounters of Ecuadorians along the SWB have remained high compared to the same months last year, maintaining and expanding their cooperation on removals is necessary to effectively manage irregular migration. Demographics and dynamics are evolving and difficult to predict, requiring flexibility in the responses of all governments involved. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[111] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes [112] and family reunification parole processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras announced on July 10, 2023.[113]

---

[111] *See* Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[112] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[113] *See* DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras, July 17, 2023, *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala;* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[114] Per the normal clearance procedures at 5 CFR 1320.10(e).

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Ecuadorians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143); the revision to the ATA collection will add Ecuador to the list of countries authorized to utilize ATA. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization for OMB approval of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. USCIS and CBP will issue respective **Federal Register** notices seeking comment on these changes.[114]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–25313 Filed 11–15–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7075–N–14]**

**60-Day Notice of Proposed Information Collection: Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion OMB Control No.: 2528–0328**

**AGENCY:** Office of Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 16, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting, "Currently under 60-day Review—Open for Public Comments" or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email; *Anna.P.Guido@hud.gov;* telephone (202) 402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

**A. Overview of Information Collection**

*Title of Information Collection:* Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion.

*OMB Approval Number:* 2528–0328.

*Type of Request:* Extension of currently approved collection.

*Form Number:* N/A.

*Description of the need for the information and proposed use:* The Office of Policy Development and Research (PD&R), at the U.S. Department of Housing and Urban Development (HUD), is proposing this collection of information for the