# EXHIBIT 28

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

**Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices 43581

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

## Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program; [15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

**II. Parole Authority**

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

**III. The FRP Process for Guatemalans**

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

**IV. Justification for the Process—Significant Public Benefit**

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

*A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for

Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order""); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18, and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively.[44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB.[49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit

---

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] *See* Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

*https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, *https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration*; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;
• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
• be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child [66] of a Guatemalan principal beneficiary;
• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• has been interdicted at sea [67] after July 10, 2023; or
• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

**VI. Other Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.''[81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued