# EXHIBIT 35

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**DEPARTMENT OF STATE**

[CIS No. 2724–22; DHS Docket No. USCIS–2022–0009]

RIN 1615–ZB98

**Bureau of Population, Refugees, and Migration; Central American Minors Program**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Bureau of Population, Refugees, and Migration, Department of State.

**ACTION:** Notice of enhancements to the Central American Minors Program.

**SUMMARY:** This notice announces enhancements to the Central American Minors (CAM) Program by, among other things, updating certain eligibility criteria for program access. The CAM Program allows certain qualifying individuals to request access to the U.S. Refugee Admissions Program (USRAP) on behalf of their qualifying children who are nationals of El Salvador, Guatemala, and Honduras (collectively known as northern Central America or NCA), and certain family members of those children, for possible resettlement, or if ineligible for refugee status, for possible parole in the United States. U.S. Citizenship and Immigration Services (USCIS) and the Department of State, Bureau of Population, Refugees, and Migration (PRM) are announcing changes to the CAM Program consistent with an Executive order (E.O.) issued on February 2, 2021, which directed the Secretary of Homeland Security to consider actions to reinstitute and improve upon the CAM parole process, leading to the reopening of the broader CAM Program as part of the USRAP. The CAM Program is a key component of the Collaborative Migration Management Strategy (CMMS), the first U.S. Government strategy focused on strengthening cooperative efforts to manage safe, orderly, and humane migration in North and Central America and complements other U.S. Government efforts to manage the flow of irregular migration to the United States, by providing a lawful, safe, orderly, and humane pathway for certain Central American children to come to the United States and reunite with family members. It also helps to reduce strain on limited U.S. resources through more managed migration and promotes family unity.

**DATES:** The program enhancements announced by this notice are effective on April 11, 2023, with implementation to follow as operational updates are made to accord with the enhanced program, including required revisions to the DS–7699, Affidavit of Relationship (AOR) for Minors Who are Nationals of El Salvador, Guatemala, or Honduras, after a separate **Federal Register** notice to follow.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000. Kelly Gauger, Deputy Director, Office of Refugee Admissions, Bureau of Population, Refugees, and Migration, Department of State, by mail at 2025 E Street NW, Washington, DC 20006.

**SUPPLEMENTARY INFORMATION:**

**Executive Summary**

The U.S. Government (USG) is committed to implementing a comprehensive framework to manage migration throughout North and Central America, in which the CAM Program plays an important role.[1] Issued on February 2, 2021, E.O. 14010 calls for a four-pronged approach to managing this migration, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the Southwest Border (SWB) to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[2] In its section on expanding lawful pathways for protection and opportunity, E.O. 14010 specifically directs the Secretary of Homeland Security to consider actions to "reinstitute and improve upon the CAM Parole Program." [3] On February 4, 2021, E.O. 14013 likewise directed actions to rebuild, expand, and improve the USRAP.[4] On March 10, 2021, consistent with these Executive orders, and following submission of a publicly available report to and consultation with Congressional committees, Department of Homeland Security (DHS) and the Department of State (State or DOS) publicly announced the first phase of reopening and improving the CAM Program to make certain qualified children from El Salvador, Guatemala, and Honduras eligible for potential refugee resettlement to reunite with their parent or parents in the United States in certain qualifying immigration categories.[5] On June 15, 2021, DHS and State provided the details of plans to expand access to an additional number of qualifying individuals.[6]

In July 2021, the White House published the CMMS, which described U.S. strategy to collaboratively manage migration throughout Central America, with specific reference to the structure and purpose of the CAM Program under Pillar 8, "Expand Access to Lawful Pathways for Protection and Opportunity in the United States." [7] In March 2022, DHS published an interim final rule (IFR) to allow U.S. immigration officials to more promptly consider the asylum claims of individuals encountered at or near the SWB, thereby more effectively and efficiently identifying those who have

---

[1] *See, e.g.,* E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 1, 86 FR 8267 (Feb. 2, 2021); Collaborative Migration Management Strategy, National Security Council (July 2021) available at: https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

[2] E.O. 14010, sec. 2–4, 86 FR 8267–71.

[3] Specifically, E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 3(b)(i), directed the Secretary of Homeland Security to "consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program; 'Termination of the Central American Minors Parole Program,' 82 FR 38,926 (Aug. 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program." 86 FR 8269.

[4] *See* E.O. 14013, Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration, 86 FR 8839 (Feb. 9, 2021).

[5] Restarting the Central American Minors Program, DOS (Mar. 10, 2021), available at: https://www.state.gov/restarting-the-central-american-minors-program/.

[6] Joint Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central American Minors Program, DOS (Jun. 15, 2021), available at: https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/.

[7] Collaborative Migration Management Strategy, National Security Council (July 2021) available at: https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

**Federal Register** / Vol. 88, No. 69 / Tuesday, April 11, 2023 / Notices         21695

valid asylum claims, while more promptly removing those who do not.[8]

Furthermore, at the Ninth Summit of the Americas in June 2022, countries in the Western Hemisphere, including the United States, endorsed the Los Angeles Declaration on Migration and Protection (Los Angeles Declaration), in which the countries made significant commitments related to promoting safe, orderly, and humane migration, and countries have since implemented initiatives or reaffirmed their commitments to continuing earlier programs. Specifically, in the Los Angeles Declaration, countries affirmed that ''regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration.''[9] Recognizing the importance of regular pathways, more than 20 countries, including the United States, reaffirmed their commitment to expand access to regular pathways with a goal of changing the way people migrate. Within the framework of deliverables under the Los Angeles Declaration, the United States committed to resettle up to 20,000 refugees from the Americas during the twenty-four months of fiscal years (FYs) 2023 and 2024.

A critical component of the USG's comprehensive framework to manage migration is the creation and expansion of lawful pathways through which migrants can come to the United States. The availability of lawful pathways serves two key goals: First, they provide a safe and lawful alternative to irregular migration, thus helping to reduce irregular migration flows. Second, they serve other significant public benefit and urgent humanitarian needs, including the safe reunification of children with their parents. As part of efforts to increase access to lawful pathways, DHS and State have expanded refugee processing in Central America[10] and reduced immigrant visa backlogs.[11] Additionally, DHS, in consultation with the Department of Labor (DOL), allocated, on multiple occasions, a set number of H–2B visas to NCA countries as part of efforts to increase access to temporary nonimmigrant work visas to individuals in the region while enhancing worker protections.[12] DHS intends for the parole component of the CAM Program (or ''CAM parole process'') to complement these other pathways by providing a process for certain qualifying children and family members to lawfully enter the United States in a safe and orderly manner to reunite with the qualifying child's parent or legal guardian. It therefore contributes to the broader strategy of providing safe, lawful, and orderly pathways to individuals who may otherwise be driven to travel to the United States through irregular means, cuts out the smugglers who prey on vulnerable individuals seeking to make this dangerous journey, and supports the interest in promoting family reunification.

This Notice announces enhancements to the CAM parole process and expands eligibility criteria for those who may request USRAP access for qualifying children through the CAM Program. The notice also provides historical and legal background on the CAM Program and explains the reasons for establishing and continuing the CAM Program as a whole.

## Background on the CAM Program

*History and Purpose of the CAM Program*

A. Initial Establishment and 2016 Expansion

The CAM Program was initially established in December 2014,[13] following a significant surge in the number of unaccompanied children (UC) from El Salvador, Guatemala, and Honduras irregularly crossing the SWB. In Fiscal Year (FY) 2014, the number of UC encounters from these three countries increased to approximately 52,000, more than doubling the number of UC encounters from these countries in FY 2013.[14] The CAM Program was designed to address this increase by providing an alternative to irregular migration for children seeking to reunify with certain family members. Protecting children and providing them with the stability of their families are the driving forces behind the CAM Program and what distinguishes it from many other available lawful pathways. In establishing the CAM Program, the United States recognized that the dangers of irregular migration, including abuse and harm from transnational criminal organizations, are particularly acute for children.

Specifically, the CAM Program allowed, and continues to allow, qualifying parents present in the United States in certain immigration categories to request that their unmarried children under 21 years of age, as well as certain

---

[8] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[9] Los Angeles Declaration on Migration and Protection (June 10, 2022), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[10] The United States continues these efforts by pursuing the use of new technologies and processes to facilitate and expand remote case processing capabilities. It is also seeking to continue increasing U.S. Refugee Admissions Program (USRAP) processing capacity in Central America.

[11] As of January 31, 2022, the United States has resolved the backlog of immigrant visa petitions filed on behalf of Central American nationals from a high of approximately 19,000 in April 2021.

[12] *See, e.g.,* Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022) (DHS and DOL authorized a total of 64,716 supplemental visas, of which 20,000 visas were reserved for nationals of Central American countries); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL again authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of Central American countries, with the addition of Haiti) (available at: *https://www.federalregister.gov/documents/2022/01/28/2022-01866/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2022-numerical-limitation-for-the; see also https://www.federalregister.gov/documents/2022/02/03/C1-2022-01866/exercise-of-time-limited-authority-to-increase-the-fiscal-year-2022-numerical-limitation-for-the* (corrected version as of Feb. 3, 2022)); Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (DHS and DOL authorized an additional 35,000 supplemental visas, of which 11,500 were reserved for nationals of Central American countries and Haiti) (available at: *https://www.federalregister.gov/documents/2022/05/18/2022-10631/exercise-of-time-limited-authority-to-increase-the-numerical-limitation-for-second-half-of-fy-2022*). On October 12, 2022, DHS announced a forthcoming rule that would authorize nearly 65,000 additional visas, of which 20,000 would be reserved for nationals of Central American countries and Haiti. *See* DHS, Press Release, DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for Fiscal Year 2023 (Oct. 12, 2022), *https://www.dhs.gov/news/2022/10/12/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2023* (last visited Nov. 2, 2022).

[13] ''Vice President Biden announced the CAM Program publicly on November 14, 2014, at the Inter-American Development Bank as part of a broader U.S. commitment to working with Central American countries to help create the economic, social, governance, and security conditions to address factors contributing to increases in migration to the United States.'' Written testimony of USCIS Refugee, Asylum and International Operations Associate Director Joseph Langlois for Senate Committee on the Judiciary, Subcommittee on Immigration and The National Interest hearing titled ''Eroding the Law and Diverting Taxpayer Resources: An Examination of the Administration's Central American Minors Refugee/Parole Program'' (Apr. 23, 2015), available at: *https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national*.

[14] Unaccompanied Alien Children Encountered by Fiscal Year, Fiscal Years 2009–2013; Fiscal Year 2014 through September 30, Southwest Border Unaccompanied Alien Children FY 2014, U.S. Customs and Border Protection, *https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2014*.

other eligible family members who are nationals of El Salvador, Guatemala, or Honduras, gain access to the USRAP by filing with State Form DS–7699, Affidavit of Relationship (AOR) for Minors Who Are Nationals of El Salvador, Guatemala, and Honduras.[15] Qualifying children and eligible family members who are granted access to the USRAP via the CAM Program must undergo DNA testing to verify any claimed biological relationship and are interviewed by USCIS Refugee Officers to determine who may be approved for classification as a refugee. Qualifying children and eligible family members who do not establish eligibility for refugee status,[16] may then be considered, on a case-by-case basis, for parole. Qualifying children may be eligible for parole when they face a well-founded fear of harm in their home countries, regardless of whether it is on account of a protected characteristic. In addition, if a qualifying child is eligible for refugee status or parole, any accompanying family members who are ineligible for refugee status will also be considered for parole for the purpose of promoting family unity and based on the positive factor of promoting safe, legal, humane, and orderly migration. CAM applicants approved for refugee status are admitted into the United States as refugees through the U.S. Refugee Admissions Program and are counted against the regional allocation for Latin America and the Caribbean. Parolees are allowed to temporarily enter the United States but do not have access to the benefits afforded to refugees, including lawful immigration status, the ability to sponsor additional family members for lawful immigration status, a pathway to permanent residence and ultimately citizenship, or access to resettlement services and public benefits based on said refugee status.[17]

As established in 2014, certain parents in the United States in a qualifying immigration category could, and remain able to, request access to USRAP via the CAM Program for qualifying children and eligible family members.[18] A qualified child was, and remains, defined as an unmarried child, under the age of 21, who is a national of El Salvador, Guatemala, or Honduras, and is physically located in one of those countries. In some cases, an in-country parent of the qualifying child who is part of the same household and economic unit as the qualifying child and legally married to the parent in the United States could also qualify for access.[19] Children of a qualifying child or of other eligible family members can also qualify, if those children are under the age of 21 and unmarried. If an individual receives access to USRAP via the CAM Program, but is found ineligible for refugee status because, for example, their fear of harm is not based on a protected characteristic,[20] USCIS may consider parole. Each parole determination was, and continues to be made on an individualized, case-by-case basis. Authorization of parole may be warranted based on serving a significant public benefit or for urgent humanitarian reasons, as described below, and if a favorable exercise of discretion is merited.[21]

If USCIS determines that an individual may be eligible for parole,[22] USCIS will authorize parole and issue the necessary travel documents to the beneficiary. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port of entry to join parent(s) or legal guardian(s).

In 2016, DHS and State expanded the CAM Program to allow for additional categories of family members to be eligible to be considered for USRAP access and potential refugee status or parole, also on a case-by-case basis,[23] including: (1) a biological parent of a qualifying child who is not legally married to the qualifying parent and lives in the same household as the qualifying child and is part of the same economic unit; (2) a primary caregiver of the qualifying child who does not qualify as a legal or biological parent and is related to either the qualifying parent (biologically or by legal marriage) or to the qualifying child (through a biological, step, or adoptive relationship); and (3) the qualifying parent's married and/or age 21 or older children. Individuals under these expanded categories are eligible to gain access to the USRAP only in connection with a qualifying child.

### B. Rescission

In 2017, USCIS stopped considering parole in CAM Program cases pursuant to directives in E.O. 13767 that has since been rescinded.[24] On August 16, 2017, DHS published a **Federal Register** Notice (FRN) announcing the termination of the parole component of the CAM Program and rescinded conditional parole approvals for CAM Program beneficiaries who had not yet completed travel to the United States.[25] DHS predicated the 2017 termination of parole for CAM on a ''discretionary

---

[15] Central American Minors (CAM) Refugee and Parole Program, *https://uscis.gov/CAM.*

[16] Among other things, refugee applicants must show that they meet the statutory definition in Immigration and Nationality Act (INA) sec. 101(a)(42): The term ''refugee'' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in 8 U.S.C. 1157(e)) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term ''refugee'' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under 8 U.S.C. chapter 12, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well-founded fear of persecution on account of political opinion.

[17] *See* INA secs. 207, 209, 412.

[18] In 2013, the U.S.-based qualifying parent included those with Lawful Permanent Residence, Temporary Protected Status, Parole, Deferred Action, Deferred Enforced Departure, and Withholding of Removal.

[19] *See https://www.uscis.gov/archive/central-american-minors-cam-refugeeparole-program.*

[20] The primary reason a qualifying child would be found ineligible for refugee status is because they did not establish all elements of the refugee definition, which requires any harm experienced or feared in the future to rise to the level of persecution and to have been committed on account of at least one protected ground (*i.e.* race, religion, nationality, political opinion, or membership in a particular social group).

[21] Any person who is outside the U.S. may apply for parole using USCIS Form I–131, Application for Travel Document. See Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States, at *www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividualsoutsideUS* (last viewed Feb. 14, 2023).

[22] 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5.

[23] U.S. Department of State, Expansion of the Central American Minors (CAM) Program—Fact Sheet (Nov. 15, 2016), available at: *https://2009-2017.state.gov/r/pa/prs/ps/2016/11/264332.htm.*

[24] Border Security and Immigration Enforcement Improvements, E.O. 13767 of January 25, 2017, 82 FR 8793 (Jan. 30, 2017); revoked by Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, E.O. 14010 of February 2, 2021, 86 FR 8267 (Feb. 5, 2021).

[25] Termination of the Central American Minors Parole Program, 82 FR 38926 (Aug. 16, 2017) (available at: *https://www.federalregister.gov/documents/2017/08/16/2017-16828/termination-of-the-central-american-minors-parole-program*).

change in policy'' with respect to how it utilized ''the Secretary's discretionary parole authority and the broad authority to administer the immigration laws.'' [26] Although DHS terminated the parole component of the CAM Program, the FRN did not impact the process for requesting access to USRAP or obtaining refugee status under the CAM Program. However, the annual Report to Congress on Proposed Refugee Admissions for FY 2018 noted that the CAM Program would be phased out citing low refugee approval rates and on November 10, 2017, State stopped accepting new submissions for USRAP access through the CAM Program. On January 31, 2018, USCIS stopped interviewing new refugee cases that accessed USRAP through the CAM Program altogether. Applicants who had already been interviewed and qualified for refugee status were allowed to continue processing and seek admission into the United States as refugees. Under a court order and related settlement agreement reached over litigation regarding the termination of the parole component of the CAM Program, USCIS also agreed to continue processing cases for individuals who received a conditional parole approval notice prior to receiving rescission notices following the termination of the parole component of the CAM Program.[27]

### C. Reinstatement

On February 2, 2021, E.O. 14010 announced the implementation of a multi-pronged approach toward managing migration throughout North and Central America and directed the Secretary of Homeland Security and Secretary of State to ''consider initiating appropriate actions to reinstitute and improve upon'' the CAM Program.[28] In accordance with E.O. 14010, USCIS and State re-examined the previous decision to terminate the CAM parole process as an additional mechanism for creating and expanding lawful pathways for migrants to enter the United States and seek protection. The re-examination also considered that, as a child protection and stability measure, the CAM Program could be improved upon by expanding eligibility to request USRAP access and by adjusting the duration of parole to provide additional time to pursue immigration status.

On February 12, 2021, State submitted a report, including on the CAM Program, to Congressional committees and conducted appropriate consultations regarding the President's proposal to increase refugee admissions for Fiscal Year 2021 due to an unforeseen refugee situation around the globe. On March 10, 2021, DHS and State publicly announced the reopening of the CAM Program in two phases.[29] Phase One began in March 2021 and focused on reopening and processing eligible cases that were closed without having received a refugee interview before CAM interviewing ceased on January 31, 2018. On June 15, 2021, DHS and State jointly announced the details of Phase Two of the reopening,[30] which included expanding eligibility to request USRAP access for their children and certain other qualifying relatives to: (i) legal guardians, in addition to parents, who are in the United States in certain immigration categories; and (ii) U.S.-based parents and legal guardians who have a pending asylum application or a pending petition for U nonimmigrant status [31] filed before May 15, 2021. The reopening of the CAM Program also included providing children with parole additional time to pursue immigration status by providing parole for a three-year period, rather than the previous two-year parole period. Beneficiaries of parole may also continue, as before, to individually request re-parole, where re-parole would generally continue to serve the underlying significant public benefit and/or urgent humanitarian reasons that existed at the time of their initial parole determination.

DHS acknowledges that the reinstatement of the CAM Program in 2021 and the look afresh at the process being announced in this notice are a departure from the decision to terminate the CAM parole process announced in the **Federal Register** in 2017.[32] DHS has changed its position and has initiated these actions to reinstitute and improve upon the CAM parole process after examining the termination as directed by E.O. 14010. Further, this change is permissible under the statute, and as explained in the remainder of this notice, DHS has good reasons for the change in policy and has decided that reinstating and improving the CAM parole process is a better choice than not doing so. The 2017 termination was a discretionary change in policy, and the decision to reinstate the CAM parole process and announce the changes in this FRN is not factually inconsistent or contradictory to the factual findings in the 2017 termination notice. Finally, DHS has made an effort to identify any reliance interests of the parties affected by this Notice and has determined that the 2017 termination did not result in any reliance interests inuring to the affected parties. The CAM parole process does not result in the entry of a child who will rely on state, or local governments; generally, under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), ''qualified aliens'' are eligible for Federal means-tested benefits after 5 years, are not eligible for ''specified federal programs,'' and states are allowed to determine whether the qualified alien is eligible for ''designated federal programs.'' Individuals who are paroled for more than a year, such as CAM parolees, are qualified aliens subject to that 5-year waiting period. And many state services are generally funded by fees that the CAM parolee would pay.[33] To the extent that there may be reliance interests associated with not restarting the CAM parole process that may have attached to other affected parties, DHS ultimately concludes that the other interests and policy concerns described in this document outweigh those interests.

D. Expansion and Enhancements

DHS and State have continued to evaluate the role of the CAM Program as a protection and stability strategy for children, and in light of the Administration's larger migration strategy, including its efforts to reduce

---

[26] Termination of the Central American Minors Parole Program, 82 FR 38926 (Aug. 16, 2017) (available at: https://www.federalregister.gov/documents/2017/08/16/2017-16828/termination-of-the-central-american-minors-parole-program).

[27] Under the Final Judgment and Order for Permanent Injunction in *S.A.* v. *Trump,* No. 3:18–cv–03539–LB (N.D. Cal.) issued on May 17, 2019, and related settlement agreement, DHS is required to continue to process the approximately 2,700 individuals who had been issued conditional approval notices but then received rescission notices at the time of the Program's termination, under the policies and procedures that it had in place prior to the termination.

[28] E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, sec. 3(b)(i), 86 FR 8267 (Feb. 2, 2021).

[29] Restarting the Central American Minors Program, U.S. Department of State, (Mar. 10, 2021), available at: https://www.state.gov/restarting-the-central-american-minors-program/.

[30] Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program (June 15, 2021), available at: https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.

[31] U nonimmigrant status (U visa) is available to certain victims of qualifying crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U); 8 CFR 214.14.

[32] 82 FR 38926.

[33] *See, e.g., https://www.dps.texas.gov/section/driver-license/driver-license-fees* (last viewed February 15, 2023).

irregular migration, to cut out the role of smugglers, and to promote family unity. The Departments have concluded that further program improvements will help achieve all of these goals, as well as those laid out in E.O. 14010: to increase lawful pathways to the United States, discourage irregular migration, and promote family unity.

*USRAP Authority and Procedures*

State, through PRM, has overall responsibility for management of the USRAP in close coordination with DHS' USCIS and the Department of Health and Human Services' Office of Refugee Resettlement. According to section 207(a)(3) of the Immigration and Nationality Act (INA), ''admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.[34] Individuals of special concern for consideration for potential refugee resettlement are determined through the USRAP priority system (note: in the context of USRAP, the term ''priority'' refers only to how an individual or group gains access to the program and does not establish any priority over other types of cases):

*Priority 1:* Cases referred by designated entities, such as the United Nations Refugee Agency, by virtue of their circumstances and apparent need for resettlement;

*Priority 2:* Groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and apparent need for resettlement;

*Priority 3:* Cases granted access for purposes of family reunification.

The Reports to Congress on Proposed Refugee Admissions for Fiscal Years 2015, 2016, 2017 and the February 12, 2021, Report to Congress on Proposed Emergency Determination on Refugee Admissions for Fiscal Year 2021 each included a direct-access Priority 2 designation for certain lawfully present parents in the United States to request USRAP access for their unmarried children in El Salvador, Guatemala, or Honduras. The subsequent Report to Congress for Proposed Refugee Admissions for Fiscal Year 2022 expanded upon this language and extended eligibility for those who can request USRAP access to include legal guardians (in addition to parents) pursuant to any of the previous categories of qualifying lawful presence, as well as to parents and legal guardians with pending asylum applications or pending U visa petitions filed prior to May 15, 2021. It is important to note that USRAP access by means of the above priority systems in no way implies or guarantees that an applicant will ultimately be resettled as a refugee in the United States. That decision will be made by a USCIS officer who will interview and adjudicate the individual claim consistent with the requirements of the INA.

*Parole Authority*

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [35] Parole is not an admission of the individual to the United States.[36] A parolee remains an ''applicant for admission'' during the period of parole in the United States.[37] DHS may set the duration of the parole based on the purpose for granting the parole request.[38] DHS may terminate parole in its discretion at any time.[39]

Individuals who are paroled into the United States generally may apply for employment authorization.[40]

Under the enhanced parole component of the CAM Program, the Secretary of Homeland Security will exercise, on a case-by-case basis, this discretionary parole authority to determine whether certain qualified children who are nationals of El Salvador, Guatemala, and Honduras, as well as certain family members of those children, may join their qualifying parents or legal guardians in the United States for a temporary period of three years.[41]

Consistent with prior implementation of the CAM Program, each parole request will be considered on its own merit, on a case-by-case basis, consistent with the statute, regulations, and applicable guidance to determine whether there is a significant public benefit or urgent humanitarian reason for the parole and whether under the totality of the circumstances the individual warrants a favorable exercise of discretion, taking into account all positive and negative factors.

A three-year parole period is consistent with other family reunification parole processes, such as the Filipino World War II Veterans Parole Program,[42] Haitian Family Reunification Parole Program,[43] and DHS's Family Reunification Task Force parole policy.[44] When established in 2014, the parole component of the CAM Program provided for a two-year period of parole. Upon further consideration of the safety and stability needs for children, DHS expanded the parole period to three years in July 2021. A three-year period of parole is appropriate for CAM parolees, for the following reasons:

*First,* the period of parole needs to be sufficiently long to make it a preferable

---

[34] INA sec. 207(d)(1) and (e): with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information: (1) A description of the nature of the refugee situation; (2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came; (3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement; (4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States; (5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees; (6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States; and (7) Such additional information as may be appropriate or requested by such members.

[35] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission, including parole, to enter the United States to'' noncitizens and individuals who are not ''lawfully admitted for permanent residence in the United States'').

[36] INA secs. 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[37] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 1.2 (defining ''arriving alien''), 1001.1(q) (same).

[38] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[39] 8 CFR 212.5(e).

[40] 8 CFR 274a.12(c)(11). Also, although individuals who are paroled for a period of one year or more are considered to be ''qualified aliens'' for purposes of eligibility for certain federal public benefits, they, like most ''qualified aliens,'' are precluded from receiving most federal means-tested public benefits for a period of five years. 8 U.S.C. 1641(b)(4).

[41] Although section 1182(d)(5) (INA 212(d)(5)) continues to refer to the Attorney General, those references are now understood to refer to the Secretary of Homeland Security. Parole authority was transferred to the Secretary of Homeland Security under the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. 6 U.S.C. 557; *see Clark* v. *Martinez,* 543 U.S. 371, 374 n.1 (2005). USCIS may exercise the Secretary of Homeland Security's parole authority under section 1182(d)(5) of the INA with respect to certain noncitizens located outside the United States.

[42] 81 FR 28097 (May 9, 2016).

[43] 79 FR 75581 (Dec. 18, 2014).

[44] *See* https://www.dhs.gov/family-reunification-task-force.

alternative to the status quo, in which smugglers are responsible for the lives of child migrants entering the United States irregularly. While a two-year parole period may be sufficient to meet the significant public benefit or urgent humanitarian need in some parole processes, consideration of additional factors relevant to child migrants weighs in favor of three years, as children, and their parents, need stability. A three-year period of parole provides children a meaningful opportunity to reunite with their parents or legal guardians and stabilize that relationship, while a shorter period of parole would unnecessarily increase uncertainty for children, which can disrupt a child's emotional and educational development. In addition, DHS also recognizes that children may require more time than adults to seek humanitarian relief or other immigration benefits for which they may be eligible, given the heightened impact that trauma and separation from family can have on children. DHS thus believes that a parole period of three years balances these considerations and is sufficient to encourage potential beneficiaries to seek to utilize the CAM Program to reunify safely and lawfully rather than migrating irregularly.

*Second,* a three-year parole period provides sufficient time for a parent or legal guardian who is pursuing or has acquired a lawful immigration status to seek derivative immigration status for their children paroled into the United States through the CAM Program. This is critical; it helps ensure that children can benefit from derivative status for which they may ultimately be eligible.

Unlike any other parole processes, the parole component of the CAM Program is intended specifically and primarily as a lawful pathway for children to enter the United States and reunite with family members. While adults may be paroled into the United States through the parole component of the CAM Program, that is only permitted if they relate to a qualifying child. Therefore, the duration of the parole period should be tailored to the needs of the children expected to be the main participants in the process.

**Justification and Reasoning**

As noted above, each parole determination in this process will be made on an individualized, case-by-case basis to determine whether urgent humanitarian reasons or a significant public benefit exists to authorize parole, and whether each individual merits a favorable exercise of discretion. Several common factors listed below are likely to support findings of urgent humanitarian reasons or significant public benefit for the CAM population and will be considered in CAM parole adjudications.

*Support Family Unity*

Consistent with the goal of promoting family unity, as laid out in section 3(b)(ii) of E.O. 14010, the parole component of the CAM Program serves a significant public benefit by providing a safe, lawful, and orderly pathway for children to reunite with parents and legal guardians on a case-by-case basis. Parents or legal guardians who are granted certain immigration benefits may petition for their children to receive immigrant visas, but those processes take time and may include a lengthy wait for visa availability. Children whose parents or legal guardians have pending applications or petitions for immigration benefits, such as a U petition or asylum, may have even longer waits—even if the parents or legal guardians have viable protection claims—during which time the family unit is often separated. The CAM parole process allows eligible children, and certain other family members, to reunify in the United States for a set period of time with the qualifying parent or legal guardian who is already in a qualifying immigration category or who has a pending application for lawful status—thus promoting family unity and protecting against prolonged separations.

By facilitating more timely, orderly, and safe family reunification, the CAM parole process improves the well-being of these families. Additionally, by facilitating such reunification temporarily through a safe, legal, and orderly pathway, it promotes the integration of CAM arrivals by incorporating them into networks already built by family members who have been legally living in the United States. This, in turn, provides families an opportunity to have stable financial foundations, housing and transportation, and school and childcare options. The CAM Program will facilitate the ability for parents, legal guardians, and beneficiaries to engage in these activities, allowing them to better integrate into the community and strengthen family ties.[45]

*Provide a Safe, Lawful, and Orderly Alternative to Irregular Migration*

Providing a safe, lawful, and orderly way for minors to reunite with their parents or guardians, serves a significant public benefit by helping to reduce the number of individuals who undertake irregular and unsafe migration in the absence of a viable alternative. While the USG works to address the root causes of irregular migration, the enhanced CAM Program will complement existing lawful alternatives to irregular migration.

In recent years, the deteriorating humanitarian situation in NCA countries has driven an increasing number of people to migrate to the United States. In the past several years, emigration from NCA countries has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In FY 2021, irregular migrants from NCA countries constituted 40 percent of all individuals encountered at the SWB.[46] Economic insecurity, food insecurity, climate change, gang violence, corruption, and sexual, gender-based, and domestic violence, coupled with the desire to reunite with family members already in the United States, are driving child migrants from NCA countries to the United States.[47] A joint report by the United Nations Children's Fund (UNICEF) and the United Nations Refugee Agency (UNHCR) published in December 2020 noted that families in NCA countries reported an increased vulnerability to persecution following the onset of the COVID pandemic.[48] The

---

[45] Providing this alternative lawful pathway to the United States is consistent with family-based immigration to the United States, such as the ability of U.S. citizens and lawful permanent residents to petition for certain relatives to be admitted to the United States as lawful permanent residents. *See* INA sec. 204(a)(1)(A)–(D). Permitting a broader set of noncitizens present in the United States to file an AOR so that their children may be considered for refugee status and, if not eligible, for parole, is consistent with the limitations Congress has established with respect to family-based immigration pathways. *See* INA secs. 201(b)(2), (c); 202; 203(a). As stated above, unlike lawful permanent residence, parole is not an immigration status. It is temporary by nature, does not allow for derivative benefits for family members (although certain qualifying family members of the CAM program participants may be considered for parole on their own merit), and does not provide a pathway to citizenship. Because parole is not comparable to lawful permanent resident status, CAM parole does not expand upon or change Congress' determinations as to who can sponsor certain relatives for a permanent immigration status in the United States.

[46] Southwest Land Border Encounters, U.S. Customs and Border Protection, available at: *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified Aug. 3, 2022).

[47] Central America's Turbulent Northern Triangle, Council on Foreign Relations, available at: *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle* (last updated July 1, 2021); U.S. Strategy for Addressing the Root Causes of Migration in Central America, National Security Council (July 2021), available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] Report: Families on the Run; UNHCR and UNICEF, available at: *https://familiesontherun.org.*

report also found that, of children interviewed who traveled without accompanying family members, violence was a central reason for their displacement.[49] Without an alternative, instability and uncertainty in their home countries, combined with their desire to reunify with family in the United States after prolonged separation, may fuel the desire for children to undertake irregular and unsafe migration.

Therefore, the Administration anticipates that children in the CAM Program's eligible population may, when facing no alternative, seek reunification through irregular migration. Indeed, in the course of resuming to process certain CAM parole cases under the *S.A.* v. *Trump* Final Judgment and Order for Permanent Injunction agreement and related settlement agreement, DHS learned that a significant number of CAM parole beneficiaries whose conditional approvals of parole had been rescinded in 2017 had already found their way to the United States to reunify with their parents, doing so via irregular—and likely dangerous—means. DHS has also encountered other groups of individuals who may, when facing no alternative, seek family reunification through irregular migration. For example, DHS has encountered individuals with approved family-based immigrant visa petitions who nonetheless determined they could not wait for an immigrant visa to become immediately available before traveling to the United States.

*Protecting Children From Smuggling Networks*

The CAM Program, including the CAM parole process, serves a significant public benefit by providing a safe, orderly, and lawful alternative for qualifying children and family members who might otherwise be subject to exploitation at the hands of smuggling networks, in a quest to be reunited with family in the United States.

Transnational criminal organizations (TCOs) engaged in human smuggling along the route from the NCA to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[50] TCOs exploit irregular migration for financial gain, either by charging migrants to cross their territory, forcing migrants to carry contraband as they cross the SWB between POEs, or forcing and coercing migrants into sex or labor trafficking. Child and adolescent migrants are particularly vulnerable to human trafficking and other severe forms of harm, particularly while traveling alone or having been separated from their families.[51] Once in the United States, children who entered the country via irregular migratory routes are at higher risk of exploitation than those who entered through regular pathways.[52]

By providing a safe, orderly, and lawful alternative to irregular migratory routes that funnel money into the hands of TCOs, the continued implementation and expansion of the CAM Program, including the CAM parole process, serves a significant public benefit, thereby supporting the USG's longstanding commitment to anti-trafficking efforts.[53]

*Reduce Strain on Limited U.S. Resources at the Southwest Border*

Increases in irregular migration from NCA countries have strained DHS' processing and holding capacity at the SWB. In response to increases in irregular migration, DHS has taken a series of actions. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities. CBP obligated $669.3 million to stand up, sustain, and operate these facilities in FY 2022. It has detailed 3,770 officers and agents from CBP and U.S. Immigration and Customs Enforcement (ICE) to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs. The Federal Emergency Management Agency has spent $260 million in FY 2021 and FY 2022 on grants to non-governmental organizations and state and local entities through the Emergency Food and Shelter Program—Humanitarian to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 appropriations that were designated SWB enforcement and processing capacities.[54]

In FY 2021, DHS encountered a significant number of UC and dedicated a significant number of resources to respond to the surge. In partnership with the U.S. Department of Health and Human Services (HHS), DHS took steps to identify and create significant efficiencies processing UC at the SWB. Among other things, DHS assisted HHS to significantly expand its emergency influx shelter capacity; established an interagency Movement Coordination Cell to streamline operations in support of the timely transfer of UC from DHS to HHS custody; provided hundreds of USCIS officers to help interview and vet potential sponsors; and activated the DHS volunteer workforce, through which approximately 300–400 volunteers across the country assisted CBP and HHS with oversight and logistics at any given time.

While this whole-of-government effort led to processing UC more efficiently, the number of UC encounters from NCA countries has continued to increase and place a significant toll on USG resources. In all cases, UC must be held separately from adults and cared for by CBP officials while awaiting transfers to the Office of Refugee Resettlement (ORR). CBP must interview each child, attempt to contact the child's parents, and create a record of referral for HHS, which must be quite detailed and requires significant resources to create.[55] ICE generates Notices to

---

[49] Report: Families on the Run; UNHCR and UNICEF, available at: *https://familiesontherun.org.*

[50] Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States, Homeland Security Operational Analysis Center (2019), available at: *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf.*

[51] Migrants and Their Vulnerability to Human Trafficking, Modern Slavery and Forced Labor, Minderoo Foundation's Walk Free initiative and the International Organization for Migration, accessible at: *https://publications.iom.int/system/files/pdf/migrants_and_their_vulnerability.pdf.*

[52] Migrants and Their Vulnerability to Human Trafficking, Modern Slavery and Forced Labor, Minderoo Foundation's Walk Free initiative and the International Organization for Migration, available at: *https://publications.iom.int/system/files/pdf/migrants_and_their_vulnerability.pdf.*

[53] National Action Plan to Combat Human Trafficking (Dec. 2021), available at: *https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf;* White House Briefing Room, Fact Sheet: The National Action Plan to Combat Human Trafficking (Dec. 3, 2021) ("As we continue to address the acute and long-term drivers of irregular migration, we must ensure our legal immigration pathways provide safe alternatives."), available at: *https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/03/fact-sheet-the-national-action-plan-to-combat-human-trafficking-nap/.*

[54] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security (Apr. 26, 2022), available at: *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[55] ORR requests the following information from the referring agency: (1) How the referring agency made the determination that the minor is a UC; (2) Health related information including, but not limited to, if the UC is pregnant or parenting and whether there are any known physical or mental health concerns; (3) Whether the child has any medication or prescription information, including how many days' supply of the medication will be provided with the child or youth when transferred into ORR custody; (4) Biographical and biometric information, such as name, gender, alien number,

Appear and must assign the child to a juvenile coordinator. Once the child is in HHS custody, ORR grantees and contractors provide housing, education, medical care, and counseling services while staff work with potential sponsors who are typically parents, legal guardians, or other relatives to complete necessary paperwork and vetting before the sponsor can be approved and a child is released to the proposed sponsor. Ultimately, nearly 40 percent of UC from CAM countries are processed and released by HHS to their parents or legal guardians.

Resettling as a refugee or paroling a child and their eligible family members through the CAM Program, on a case-by-basis, serves a significant public benefit because it is significantly less resource-intensive than processing an unaccompanied minor encountered at or near the border, who is subject to resource-intensive processing and care by a combination of CBP, ICE, and HHS' Office of Refugee Resettlement (ORR). While processing requests for access to the USRAP via the CAM Program, including refugee claims and review for parole on a case-by-case basis, draws on State as well as DHS resources within USCIS and CBP, this work involves different parts of DHS and requires fewer resources as compared to processing inadmissible noncitizens encountered at or near the SWB. Ultimately, the CAM Program provides a safe, legal, and streamlined alternative to irregular migration, and can reunite these children with their families without the cost and strain associated with the care, custody, and processing of UC encountered at the SWB.

*Foreign Affairs Considerations*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents mentioned above that call for a comprehensive, regional approach to migration: the Root Causes Strategy, the CMMS, and the Los Angeles Declaration.

The Root Causes Strategy identifies factors leading to irregular migration and states the importance of discouraging irregular migration and providing opportunities for youth to feel connected to their families and local communities. Its long-term implementation plan includes regional collaboration to "safely and humanely manage migration." [56] The CMMS shares similarly aligned strategies to "strengthen cooperative efforts to manage safe, orderly, and humane migration," and it identifies goals that include addressing humanitarian needs and enhancing access to legal migration pathways when individuals need to migrate for safety or stability. The CMMS acknowledges that the humanitarian situation in NCA countries demands an immediate response in addition to more long-term approaches, and its strategy includes restarting and continuously considering of ways to expand the CAM Program.[57]

The Los Angeles Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [58] Countries that have endorsed the Los Angeles Declaration are committed to implementing programs and policies to promote stability and assistance for communities of destination, origin, transit, and return. These countries commit to respect and ensure the human rights of all migrants and persons in need of international protection, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through countries in the Western Hemisphere. As stated above, these commitments include that of the Administration to increase refugee resettlement from the Americas to the United States by up to as many as 20,000 over the course of Fiscal Years 2023 and 2024.

The CAM Program, including the CAM parole process, serves a significant public benefit because it helps achieve the goals of these three documents by providing a lawful pathway for certain eligible minors and their family members to safely, orderly, and humanely enter the United States as refugees or parolees rather than taking a dangerous irregular journey.

**Process Improvements and Updates**

In 2021, the CAM Program was reopened as part of a "comprehensive regional migration management strategy." [59] The CAM Program reopened in two phases and aimed to reinstitute and improve upon the previous versions.[60] The first phase focused on processing eligible applications that were suspended and closed in 2017, and the second phase allowed for new applications and expanded access through eligibility requirements. The opportunity now exists to introduce enhancements to further unify families and protect children from the dangers of irregular migration.

The following changes better support the CAM Program:

*1. New Procedures for USCIS Parole Determinations for CAM (Under 18)*

USCIS is instituting new procedures regarding certain minor children issued a travel document under the CAM parole process that enables the beneficiary to travel to the United States and seek parole from CBP at a U.S. port of entry.

This FRN notifies the public that, in certain limited cases where the qualifying individual, such as a stepparent, who filed the AOR for a minor child is not that child's biological or adoptive parent or legal guardian, USCIS will, if needed, gather additional information to evaluate whether the child has a biological or adoptive parent or legal guardian in the United States, to verify that individual's relationship to the child, and to confirm their intention to remain available in the United States to provide for the child's care and physical custody if the child

---

date of birth, country of birth and nationality, date(s) of entry and apprehension, place of entry and apprehension, manner of entry, and the UC's current location; (5) Any information concerning whether the child or youth is a victim of trafficking or other crimes; (6) Whether the UC was apprehended with a sibling or other relative; (7) Identifying information and contact information for a parent, legal guardian, or other related adult providing care for the child or youth prior to apprehension, if known; (8) If the UC was apprehended in transit to a final destination, what the final destination was and who the child or youth planned to meet or live with at that destination, if known; (8) Whether the UC is an escape risk, and if so, the escape risk indicators; (9) Any information on a history of violence, juvenile or criminal background, or gang involvement known or suspected, risk of danger to self or others, State court proceedings, and probation; and (10) Any special needs or other information that would affect the care and placement for the child or youth. ORR Unaccompanied Children Program Policy Guide, available at: *https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-1#1.3*.

[56] U.S. Strategy for Addressing the Root Causes of Migration in Central America, available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[57] Collaborative Migration Management Strategy, available at: *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery*.

[58] Los Angeles Declaration on Migration and Protection, available at: *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[59] Restarting the Central American Minors Program, U.S. Department of State (Mar. 10, 2021), available at: *https://www.state.gov/restarting-the-central-american-minors-program/*.

[60] Restarting the Central American Minors Program, U.S. Department of State (Mar. 10, 2021), available at: *https://www.state.gov/restarting-the-central-american-minors-program/*.

were paroled into the United States. USCIS will share this information with CBP as part of CAM parole processing in these limited cases. Absent new information or circumstances, CBP may rely upon the information gathered by USCIS about the biological or adoptive parent's or legal guardian's availability to provide for the child's care and physical custody in the United States. This will advance the program's goal of reuniting these children with their families by facilitating direct reunification of minor beneficiaries with their U.S.-based relatives in all appropriate instances.

*2. Ensuring Fairness for Those Impacted by 2017 Policy Actions*

Phase one of the reopening of the CAM Program in 2021 focused on applications that were suspended or closed without an interview when the program was terminated. However, Phase One did not include all CAM Program AORs for which: USCIS interviewed before February 2018, considered eligibility for refugee status, and either refrained from assessing parole eligibility or did not issue a Form I–512L, Authorization for Parole of an Alien into the United States, due to policy decisions in response to directives in the since-revoked E.O. 13767.[61] USCIS is committed to exercising its discretion to ensure fairness for this group of children and their qualifying family members who were not afforded a parole determination or an opportunity to complete parole processing. As a result, they will now be able to pursue parole as a beneficiary of the CAM Program. USCIS will verify eligibility, issue requests for evidence and interview notices if necessary, and determine parole on a case-by-case basis.

*3. Evidence of Financial Support*

In the past, at the time of AOR submission, domestic resettlement agencies collected Form I–134, Affidavit of Support, from qualifying parents or legal guardians who filed AORs that included certain categories of add-on family members, in the event that those individuals were ultimately found ineligible for refugee status and recommended for parole. Ongoing processing efficiency reviews concluded that the submission of the I–134 at the time of AOR submission slowed intake and created delays. For that reason, in April 2022, the USG decided that the Form I–134, now called the Declaration of Financial Support, would only be requested at the point that an individual was denied refugee status and subsequently considered for parole. This change immediately improved AOR intake capacity, but the Form I–134 continues to create confusion for program participants, leading to delays in processing as families gather documentation of sufficient income or financial resources to complete the form, which is only in English. Collection of the Form I–134, however, is not the sole means of providing evidence of sufficient financial support during the parole period. Therefore, to improve operational efficiency for initial CAM parole considerations where evidence of financial support is required, USCIS will allow financial supporters to provide a sworn statement as an alternative to completing Form I–134, and USCIS may request supporting documentation as needed. (Applications for re-parole under CAM for beneficiaries already in the United States are separate from CAM parole initial processing and will still require a Form I–134 for case processing.)

*4. Adjusting Eligibility Date and Criteria*

On June 15, 2021, DHS and State jointly announced the second phase of the CAM Program reopening, which included extended eligibility to request access to the CAM Program as an additional part of a ''multi-pronged approach to address the challenges of irregular migration throughout North and Central America.''[62] Eligibility for completing AORs to request access to USRAP for their qualifying children was extended to parents or legal guardians with pending asylum applications or who were victims of crime with pending U visa petitions,[63] filed before May 15, 2021. This eligibility date was established as a cutoff to prevent frivolous filings solely for the purpose of gaining access to the CAM Program. This date will be updated to extend eligibility to qualifying parents and legal guardians with pending applications for asylum or U visa petitions filed on or before April 11, 2023. Additionally, requestor eligibility will now extend to parents or legal guardians with pending applications for T nonimmigrant status[64] filed on or before April 11, 2023. New applications consistent with these new dates and categories of eligibility are contingent upon the approval of an updated Form DS–7699.

The previous termination of the CAM Program left many families in limbo mid-process, often with unrecoverable expenditures for DNA testing and medical exams, and no safe pathway for their children to travel to the United States. As a result, families lost trust in the CAM Program. With these new procedures, the USG seeks to repair that trust and create goodwill. It will also serve the objectives provided in the Justification and Reasoning section above to allow more individuals access to the CAM Program, while the updated eligibility date will limit eligibility to filings already in existence, thereby safeguarding against frivolous asylum, U, or T visa applications or petitions. Expanding access to the CAM Program in this way and allowing victims of human trafficking to also seek reunification with their children, will serve a larger segment of a vulnerable population who will benefit from this process.[65]

**Consideration of Alternatives**

The Administration has considered alternative approaches, including ending the parole component of the CAM Program, continuing to operate it as currently constituted, making some or all of the changes described in this notice, or further expanding eligibility as described in greater detail below, including the benefits and drawbacks associated with each path. As stated throughout this notice, the updates to the parole component of the CAM Program with the changes announced

---

[61] E.O. 13767 stated that ''T[t]he Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole.'' However, at no point did the Secretary determine that the CAM parole program was inconsistent with or an improper use of this parole authority.

[62] Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program (June 15, 2021), available at: *https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.*

[63] If parents or legal guardians are successful in their cases, they may petition for their children to join them in the United States. The CAM Program offers children an option to await results with their parents or legal guardians in the United States, rather than waiting while separated from them.

[64] T nonimmigrant status (T visa) is an immigration benefit that enables certain qualifying victims of a severe form of trafficking in persons, who generally must assist law enforcement, to remain in the United States. INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T).

[65] Data suggests that expanding the U visa eligibility date may offer CAM Program access to the families of more than 3,000 minor derivatives, and including pending T visa applicants may provide CAM Program access for the families of more than 300 minor beneficiaries. The numerical impact of changing the eligibility date for pending asylum applicants is less precise to predict, although there are tens of thousands of individuals with pending asylum cases filed after May 15, 2021 from CAM countries that might have minor children and could benefit from the CAM Program.

herein provides many more benefits than drawbacks. The Administration has determined that the updates to the CAM parole process benefits the United States in support of overall U.S. migration management strategies. The USG acknowledges that those benefits may be accompanied by potential costs, including those that some states may argue they incur for schools, social services, health care, driver's licenses, and similar services, and the Administration has decided to proceed with this notice and its implementation.[66]

As mentioned above, on August 16, 2017, the Acting Secretary of Homeland Security announced the termination of the parole component of the CAM Program through an FRN that characterized the termination as a "discretionary change in policy" to stop automatically considering for parole those found ineligible for refugee status under USRAP processing, accessed via the CAM Program. In other words, the change was the result of a new policy choice, and not a perceived inconsistency of the program with the parole statute or regulations.

When the United States decided to restart the CAM Program in 2021, it decided, as a matter of policy, to include an option for case-by-case consideration for parole for CAM Program beneficiaries. While considering subsequent improvements to the CAM Program for this Notice, the Administration evaluated several additional provisions. It considered whether to remove parole and decided that to meet the goals of providing safety and stability for children whose parents and legal guardians have immigration status or pending cases in the United States, parole needed to remain an option for CAM Program beneficiaries for the urgent humanitarian and significant public benefit reasons described above. The Administration considered including an advance parole provision for CAM parole process beneficiaries in the United States that need to depart and seek parole back into the United States. It also determined that CAM parole process beneficiaries may apply for advance parole in the same manner and under the same eligibility criteria as other individuals and additional guidance is not necessary. Additionally, the Administration considered expanding eligibility by eliminating eligibility dates for pending asylum, T visa, and U visa applicants and petitioners, and also considered announcing eligibility dates that would take effect at a later date, with a future form revision. The Administration has decided on eligibility dates that will take immediate effect based on this notice's publication date because immediate effectiveness forwards the policy objectives described throughout this notice and reserves additional changes for possible future revisions or enhancements. Finally, the Administration considered expanding the CAM Program to allow additional family members to qualify as beneficiaries. It has decided not to expand in this way due to challenges in verifying extended family relationships and a determination that the current eligible beneficiaries are closely connected to children and sufficient to provide the stability and support children need.

The parole component of the CAM Program offers an additional safe, lawful, and orderly alternative to irregular migration for the eligible population, and promotes family unity. The CAM parole process also helps to relieve pressure on the SWB, reduces the strain on U.S. Government resources, and saves lives. This enhanced CAM parole process may further discourage irregular migration and allow children to safely reunite with their families in the United States.

Additional information about the CAM Program, including the parole component, is available on the USCIS website at: *www.uscis.gov*.

**Administrative Procedure Act (APA)**

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* the Departments are merely adopting a general statement of policy,[67] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [68] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[69] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [70] In addition, although under the APA invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that notice-and-comment procedures may result in "definitely undesirable international consequences," [71] some courts have required such a showing. This process satisfies both standards.

As described above, this process is a key component of regional migration strategies and is responsive to requests that the United States expand lawful pathways. The CMMS of 2021 identifies intra-governmental Federal strategies to address regional migration, including expanding the CAM Program. The following year, the United States was able to focus on cooperative strategies with foreign partners. In the Ninth Summit of the Americas in June 2022, countries in the Western Hemisphere, including the United States, made significant commitments in connection with the Los Angeles Declaration, including expanded access to regular pathways. As part of efforts to promote access to regular pathways, DHS and State have expanded refugee processing in Central America.[72] Therefore, the

---

[66] Estimating the fiscal effects associated with CAM parole would be extremely challenging, especially due to State and local governments' control over their budgets. A 2017 National Academies of Sciences, Engineering, and Medicine (NAS) Report, authorized by an expert panel of immigration economists, canvassed studies of the fiscal impacts of immigration as a whole, and it described such analysis as extremely challenging and dependent on a range of assumptions. The Economic and Fiscal Consequences of Immigration, NAS (2017), *https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration,* at 28. The fiscal impacts of CAM parole to State and local governments would vary based on a range of factors, such as the characteristics of the CAM parolee population within a particular jurisdiction at a particular time and local economic conditions and local rules governing eligibility for public services. These costs will depend on choices made by States and will be location specific and, therefore, difficult to quantify let alone predict. Moreover, any estimate would also need to account for the fact that minors who would migrate irregularly to the United States in the absence of the availability of CAM parole would likely also incur these costs. DHS also notes the small size of the CAM parolee population relative to any given jurisdiction's overall population. In short, DHS acknowledges that though CAM parole may result in some indirect fiscal effects on State and local governments (both positive and negative), such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments.

[67] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[68] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[69] 5 U.S.C. 553(a)(1).

[70] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[71] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[72] The United States continues these efforts by pursuing the use of new technologies and processes
Continued

parole component of the CAM Program contributes to the broader USG strategy of providing lawful pathways to individuals who may otherwise be driven to travel to the United States through irregular means due to instability in their home countries and their desire to reunite with family members already in the United States.

Immediate implementation of the process announced in this notice also supports DHS discussions and negotiations about migration management and is fully aligned with larger and important foreign policy objectives of this Administration. Prompt implementation will advance the Administration's foreign policy goals by demonstrating U.S. partnership and commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships in the region.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
**Antony J. Blinken,**
*Secretary of State.*
[FR Doc. 2023–07592 Filed 4–7–23; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7070–N–19]**

**30-Day Notice of Proposed Information Collection: Capital Needs Assessment of Public Housing; OMB Control No.: 2528–New Collection**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* May 11, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/ PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email Anna Guido at *PaperworkReduction ActOffice@hud.gov,* telephone 202–402– 5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.* Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on September 7, 2022 at 87 FR 54709.

**A. Overview of Information Collection**

*Title of Information Collection:* Capital Needs Assessment of Public Housing.
*OMB Approval Number:* 2528–New; pending.
*Type of Request:* New collection.
*Form Number:* N/A.
*Description of the need for the information and proposed use:* The Office of Policy Development and Research at the U.S. Department of Housing and Urban Development (HUD) is proposing the collection of information for the *Capital Needs Assessment of Public Housing.*

Public housing serves the housing needs of low- and very-low-income households, including needy families, the elderly, and the disabled. In the United States, public housing is owned and managed by public housing authorities (PHAs), which are units of state and local government. Public housing is nonetheless heavily subsidized and regulated by HUD's Office of Public and Indian Housing through the Operating Fund, Capital Fund, and other means. The capital needs of public housing have a direct bearing on HUD's Capital Fund budget and its support to PHAs for using alternative means of financing to meet those needs.

The number of public housing developments and units in the United States and the number of PHAs that own and manage public housing developments and units have changed over time. According to the most recent HUD data, there are 2,780 PHAs that own and manage 940,330 units in 6,523 public housing developments.

The public housing Capital Fund provides funds for the capital and management activities of PHAs as authorized under section 9 of the Housing Act of 1937 (42 U.S.C. 1437g) (the Act). Capital needs are defined by section 9(d)(1) of the Act, as codified at 24 CFR part 905, with Section 200 listing eligible activities. These activities include, among others, the development, financing, and modernization of public housing, vacancy reduction, nonroutine maintenance, and planned code compliance. This work is intended to bring each PHA's projects up to applicable modernization and energy conservation standards.

This **Federal Register** Notice provides an opportunity to comment on the information collection for the capital needs assessment (CNA) of public housing.

After OMB approval of the Paperwork Reduction Act package, HUD and its contractor will administer a web-based survey to a sample of approximately 300 PHAs to collect data on their CNA estimates, their practices to arrive at those estimates, and their use of those estimates.

After analyzing the data from the first survey of PHAs, HUD and its contractor will administer a second web-based survey of another 500 PHAs. This survey will ask many of the same questions as the first survey. Both surveys will provide data that, when combined with HUD's other data sources, will be used to estimate the capital needs of public housing following an iterative and duplicable approach.

Both surveys also include questions about the processes that PHAs use to assess their capital needs. Based on responses to those questions, the study will assess PHAs' processes to see how they compare to in-person data collection methods used in previous CNAs and industry best practices.

The purpose of this assessment is to better understand if a non-inspection-

---

to facilitate and expand remote case processing capabilities. It is also seeking to continue increasing USRAP processing capacity in Central America.