**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SVITLANA DOE, et al., <br><br>                    Plaintiffs, <br><br>          *v.* <br><br> KRISTI NOEM, in her official capacity as <br> Secretary of Homeland Security, et al., <br><br>                    Defendants. | Civil Action No.: 1:25-cv-10495-IT |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR**
**PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    I.     The Parole Authority, 8 U.S.C. § 1182(d)(5). ............................................. 3

    II.    The Humanitarian Parole Processes ........................................................... 5

    III.   Defendants' Actions Regarding Parole ..................................................... 10

LEGAL STANDARD ........................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

    IV.   Plaintiffs Are Likely To Succeed In Proving That The Final Agency Actions Were Contrary To Law ............................................................................................... 14

    V.    Plaintiffs Are Also Likely To Succeed On Their Arbitrary And Capricious Claim, Although The Court Need Not Reach It ................................................................ 20

    VI.   Preliminary Relief Is Necessary To Stop Ongoing & To Prevent Future Irreparable Injury ............................................................................................................ 25

    VII.  The Balance Of Hardships And The Public Interest Weigh Heavily In Favor Of Preliminary Injunctive Relief ............................................................................... 28

CONCLUSION .................................................................................................................. 30

CERTIFICATE OF SERVICE .......................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998)...................................................................................................20

*Bennett v. Spear*,
    520 U.S. 154 (1997)...................................................................................................11

*Biden v. Texas*,
    597 U.S. 785 (2022)..............................................................................................18, 19

*CFTC v. Schor*,
    478 U.S. 833 (1986)...................................................................................................17

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)...................................................................................................20

*CMM Cable Rep., Inc. v. Ocean Coast Props.*,
    48 F.3d 618 (1st Cir. 1995)........................................................................................25

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
    743 F. Supp. 3d 325 (D.N.H. 2024)..........................................................................28

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011)...................................................................................11

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)............................................................................................. *passim*

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..................................................................................................22, 24

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)...................................................................................................21

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)...................................................................................................21

*Ferrara v. United States*,
    370 F. Supp. 2d 351 (D. Mass. 2005) ......................................................................25

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020)..............................................................................19, 24

*Hamdan v. Rumsfeld*,
 548 U.S. 557 (2006) .................................................................................................16

*HIAS, Inc. v. Trump*,
 985 F.3d 309 (4th Cir. 2021) ...................................................................................18

*Housatonic River Initiative v. EPA, New England Region*,
 75 F.4th 248 (1st Cir. 2023) ........................................................................21, 22, 24

*Jimenez v. Cronen*,
 317 F. Supp. 3d 626 (D. Mass. 2018) .....................................................................27

*Jimenez v. Nielsen*,
 326 F.R.D. 357 (D. Mass. 2018) ..............................................................................27

*Judulang v. Holder*,
 565 U.S. 42 (2011) ....................................................................................19, 21, 24

*La. Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986) .................................................................................................23

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024) ...........................................................................................14, 18

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
 496 F. Supp. 3d 600 (D. Mass. 2020) .....................................................................13

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ...........................................................................20, 21, 22, 24

*N. Am. Indus., Inc. v. Feldman*,
 722 F.2d 893 (1st Cir. 1983) ...................................................................................14

*Nat'l Lab. Rels. Bd. v. Lily Transp. Corp.*,
 853 F.3d 31 (1st Cir. 2017) (Souter, J.) ..................................................................24

*Nken v. Holder*,
 556 U.S. 418 (2009) .................................................................................................28

*NYLAG v. BIA*,
 987 F.3d 207 (2d Cir. 2021) ....................................................................................11

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
 313 F. Supp. 3d 62 (D.D.C. 2018) (Kentanji Brown Jackson, D.J.) ........................21

*S.A. v. Trump*,
 2019 WL 1593229 (N.D. Cal. Apr. 12, 2019) .........................................................22

*S.A. v. Trump*,
  Case No. 18-cv-03539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) ..........................9, 22

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ...................................................................................................................14

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) .................................................................................................................21

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ....................................................................................19

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
  645 F.3d 26 (1st Cir. 2011) ...............................................................................................13, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................................13, 28

## **Statutes**

5 U.S.C. § 552(a)(1)(B)-(E) .............................................................................................................11

5 U.S.C. § 705 ...............................................................................................................................1, 13

5 U.S.C. § 706 ..................................................................................................................................14

5 U.S.C. § 706(2)(A) ........................................................................................................................20

8 U.S.C. § 1101 ..................................................................................................................................5

8 U.S.C. § 1158 ..................................................................................................................................4

8 U.S.C. § 1182(d)(5) ................................................................................................................ *passim*

8 U.S.C. § 1182(d)(5)(A) .............................................................................................................14, 16

8 U.S.C. § 1182(d)(5)(B) ....................................................................................................................4

8 U.S.C. § 1182 note ....................................................................................................................9, 17

Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128 (May
  21, 2022) .................................................................................................................................6

Afghan Allies Protection Act, Pub L. No. 111-8 (2009) ...................................................................5

Extending Government Funding & Delivering Emergency Assistance Act, Pub. L.
  No. 117-43, Div. C. (Sept. 30, 2021) ......................................................................................7

Immigration and Nationality Act (INA) ............................................................................................3

INA section 212(d)(5) (8 U.S.C. 1182(d)(5)) ...................................................................10

Pub. L. No. 104-208 § 602 (1996) ....................................................................................15

Pub. L. No. 116-92, § 1758 (2019) .........................................................................7, 9, 17

USCIS, *Parole of Spouses, Children, & Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, & Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve & the Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i)* (Nov. 15, 2013), bit.ly/3RaM0U6 ...................................................................................9

## <u>Other Authorities</u>

8 C.F.R. § 212.5(e) ............................................................................................................18

72 Fed. Reg. 65588 (Nov. 15, 2007) (Ex. 34) .................................................................8

79 Fed. Reg. 75581 (Dec. 18, 2014) (Ex. 33) ..................................................................8

87 Fed. Reg. 25040 (Apr. 27, 2022) (Ex. 20) ..................................................................5

87 Fed. Reg. 63507 (Oct. 19, 2022) (Ex. 21) ..................................................................6

88 Fed. Reg. 127 (Jan. 9, 2023) (Ex. 22) .........................................................................6

88 Fed. Reg. 1243 (Jan. 9, 2023) (Ex. 24) .......................................................................6

88 Fed. Reg. 1255 (Jan. 9, 2023) (Ex. 25) .......................................................................6

88 Fed. Reg. 1266 (Jan. 9, 2023) (Ex. 23) .......................................................................6

88 Fed. Reg. 21694 (Apr. 11, 2023) (Ex. 35) ..................................................................9

88 Fed. Reg. 43581 (July 10, 2023) (Ex. 28) ..................................................................8

88 Fed. Reg. 43591 (July 10, 2023) (Ex. 26) ..................................................................8

88 Fed. Reg. 43601 (July 10, 2023) (Ex. 29) ..................................................................8

88 Fed. Reg. 43611 (July 10, 2023) (Ex. 30) ..................................................................8

88 Fed. Reg. 54635 (Aug. 11, 2023) (Ex. 31) .................................................................8

88 Fed. Reg. 54639 (Aug. 11, 2023) (Ex. 32) .................................................................8

88 Fed. Reg. 78762 (Nov. 16, 2023) (Ex. 27) .................................................................8

Bo Cooper, INS Gen. Counsel, *Legal Opinion: Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001) (Ex. 43) ............................................................................................................15

David J. Bier, Cato Institute, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders* (July 17, 2023) (Ex. 38) ................................4

DHS, *U4U Process Overview and Assessment* 11 (Nov. 4, 2024) ..................................6

EO 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 ....................10

EO 14161, *Protecting the U.S. from Foreign Terrorists & Other National Security & Public Safety Threats*, 90 Fed. Reg. 8451 ..................................................10, 12

EO 14165, *Securing Our Borders*, 90 Fed. Reg. 8467 ....................................................10

Federal Rule of Civil Procedure 65: (1) ..........................................................................12

FWD.us, *Industries with Critical Labor Shortages Added 1.1 Million Workers Through Immigration Parole* (Jan. 4, 2024), www.fwd.us/news/immigration-labor-shortages ....................................................................................................29

H.R. Rep. No. 104-469 ....................................................................................................15

HHS, *Fact Sheet: Cuban/Haitian Entrants* ......................................................................7

*Operation Allies Welcome: Afghan Parolee and Benefits Report* (May 8, 2023) ...........7

*U4U Process Overview and Assessment, supra* n.5 ........................................................29

USCIS, *Discretionary Options for Designated Spouses, Parents, & Sons & Daughters of Certain Military Personnel, Veterans, and Enlistees* (Nov. 23, 2016) .............................................................................................................9

## INTRODUCTION

Plaintiffs[1] respectfully move for a preliminary injunction and a stay under 5 U.S.C. § 705 of Defendants' unlawful termination of several processes through which hundreds of thousands of noncitizens are currently in this country on immigration "parole," and of Defendants' unlawful indefinite moratorium on adjudicating *any* application for an immigration benefit (re-parole, asylum, temporary protected status, green cards, etc.) that would permit the parolees to extend their lawful presence in the United States. Defendants' mostly secret actions began in late January, and an unknown number of individuals have already fallen out of status (including Plaintiff Teresa Doe) notwithstanding pending requests for immigration relief under eligibility criteria set by Congress (in Teresa's case, for re-parole). As the suspensions of processing continue, more parolees fall out of status each day; Plaintiff Aleksandra Doe will lose status on March 29, 2025, and Plaintiff Maksym Doe in April 2025, even while applications for adjustment of status (Aleksandra), re-parole (Makysm), and Temporary Protected Status (for both) remain pending. At the same time the processing suspensions render removable an increasing number of parolees, DHS has taken aggressive actions to expand its authority and capacity to deport as many of these individuals as possible. Defendants' actions are as unlawful as they are unjust, violating both the Immigration and Nationality Act ("INA") and the most basic requirements of the Administrative Procedure Act ("APA"). Plaintiffs request expeditious action to prevent deep and broadening irreparable injury and are prepared to meet as fast a briefing and argument schedule as is ordered by this Court, which also has ample discretion to issue a temporary restraining order while considering this motion.

---

[1] Plaintiffs are 18 individuals and a nonprofit organization (Haitian Bridge Alliance) injured by the challenged agency actions. *See* Am. Compl., Doc No. 22.

"Parole" is a statutorily authorized form of temporary permission for a noncitizen to be in the United States that can be granted for humanitarian reasons and/or because it significantly benefits the public, 8 U.S.C. § 1182(d)(5), and per longstanding regulations, parolees can request employment authorization to support themselves and their families. Since the 1950s, humanitarian parole has been used at least 126 times on a categorical basis by administrations of both parties to provide temporary immigration relief, often as a conduit to more durable relief.

Starting on January 20, 2025, Defendants have engaged in a series of actions to systematically and illegally terminate established parole processes and to prevent parolees from obtaining more permanent status to which Congress has made them eligible. These actions have prevented U.S. Citizenship and Immigration Services (USCIS) from adjudicating hundreds of thousands of asylum and other benefit applications that could provide more stable status. Relatedly, at the same time when the Secretary of Homeland Security (hereinafter, "the Secretary") has cut off parole and other forms of immigration relief, Immigration and Customs Enforcement (ICE) is targeting these parolees for removal.

Defendants' erroneous interpretations of the law and their disregard of over 70 years of practice are irreparably injuring Plaintiffs and countless other parole recipients. Plaintiffs include Ukrainians who fled Russia's invasion of their country; Central Americans fleeing persecution and other violence; an Afghan ally who worked with the U.S. military for nearly two decades; U.S. citizen sponsors committed through faith, politics, or moral conviction to support immigrant communities; U.S.-based sponsors seeking to reunite with their loved ones struggling with violence and hardship in Cuba or Haiti; retired and active duty members of the U.S. Armed Forces who hope their service will help facilitate the continued presence here of their family members; and a Haitian-led, community-based nonprofit dedicated to serving Haitian migrants. Plaintiffs,

who seek to represent a class of those similarly situated, are only some of the individuals facing irreparable and immeasurable harm because of the Trump administration's ongoing actions to end humanitarian parole processes and render the parolees removable. The APA and this Court's inherent equitable authority empower it to prevent additional irreparable injury. Plaintiffs request that this Court restore the *status quo ante* by enjoining implementation of the challenged agency actions and directing the Defendants to immediately reverse the suspension of processing parole, re-parole, and requests for other immigration benefits while this case proceeds to final judgment.

Plaintiffs respectfully request expedited oral argument on this motion.

## BACKGROUND

## I. THE PAROLE AUTHORITY, 8 U.S.C. § 1182(D)(5).

Parole authority was included in the Immigration and Nationality Act (INA) when it was originally enacted in 1952, and it has been amended three times, the last in 1996. *See* History of 8 U.S.C. § 1182(d)(5) (Ex. 37), Doc. No. 24-37; Doc No. 22 ¶¶ 40-62. The statute currently reads:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.

Starting in 1956 with President Eisenhower's creation of a parole program for Hungarians fleeing a Soviet crackdown, every Administration—including the first Trump Administration—has used its parole authority on a "categorical" or "programmatic" basis to permit large numbers of noncitizens to come to the United States when other immigration pathways were unavailable, insufficiently expeditious, or otherwise inadequate. *See generally* Schacher Decl. (Ex. 39), Doc.

No. 24-39.[2] In these circumstances, the Executive usually provides criteria and guidance as to when parole could be appropriate—typically by reference to nationals of specified countries who present additional enumerated factors or circumstances—when parole could be appropriate, with applicants then assessed individually on a case-by-case basis. Over the last seven decades, there have been at least 126 "categorical" or "programmatic" parole processes of this nature, where the administration sets criteria and parole applicants are then evaluated individually on a case-by-case basis.[3] Parole processes have advanced the public interest by furthering a variety of important foreign policy interests, including humanitarian, human rights, migration management, anti-trafficking, and regional security goals. *See* Doc. No. 24-39; Schwartz Decl. (Ex. 40), Doc. No. 24-40; Halperin Decl. (Ex. 41), Doc. No. 24-41.

These "programmatic" uses of parole have occasionally prompted criticisms, and there have been occasional but unsuccessful efforts by some in Congress to significantly limit the parole authority to a small number of tightly defined circumstances. *See* Doc. No. 24-39 ¶¶ 19-21. To date, Congress has rejected such efforts and restricted the use of the parole authority in just two narrow circumstances: one involving noncitizens determined to be refugees, 8 U.S.C. § 1182(d)(5)(B), and another involving the employment of noncitizen "crewmen" during a labor dispute, *id.* § 1184(f).

Although it does not itself lead to permanent status, parole is a common transitional status while applying for more durable forms of relief, including asylum, 8 U.S.C. § 1158; Temporary

---

[2] Exhibits are attached to the Index thereof, Doc. No. 24. The Sung Declaration (Ex. 36), Doc. No. 24-36, authenticates and provides additional context where necessary.

[3] David J. Bier, Cato Institute, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders* (July 17, 2023) (Ex. 38), Doc. No. 24-38. "Until recently, programmatic or categorical uses of parole were often not publicized in any formal, consistent, or even public way. The Immigration and Naturalization Service (INS) would simply create internal guidance that would only become public if stakeholders or the media publicized it." *Id.*

Protected Status ("TPS"), *id.* § 1254a; adjustment of status to lawful permanent residence ("green card" holder) through family, *id.* § 1154; employment, *id.* §§ 1153(b)(2)-(3) & 1154(b); and for the lucky few like Plaintiff Aleksandra Doe, the diversity visa lottery, *id.* § 1153(c).  In addition, Afghans whose lives are seriously threatened due to their "faithful and valuable service" to the United States and its allies during military operations in their country can apply for a Special Immigrant Visa, *see* Afghan Allies Protection Act, Pub L. No. 111-8 (2009), *codified at* 8 U.S.C. § 1101.

## II.    THE HUMANITARIAN PAROLE PROCESSES

This case concerns Defendants' unlawful actions terminating several parole processes (hereinafter, the "Humanitarian Parole Processes") and imposing a moratorium on granting any immigration benefit for those in the country by virtue thereof. The parole processes at issue are Uniting for Ukraine (U4U); the processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV); Operation Allies Welcome (OAW) for Afghan evacuees; the family reunification parole (FRP) processes for certain Colombians, Cubans, Guatemalans, Ecuadorians, Haitians, Hondurans, and Salvadorans with family in the United States; the parole process for Central American Minors (CAM) with parents in the United States; and the military parole-in-place (MPIP) program.

**U4U.** Following Russia's invasion of Ukraine in February 2022, DHS created the Uniting for Ukraine process to facilitate the parole into the United States of certain displaced Ukrainians and their immediate family members. U4U was created after a sharp increase in asylum-seeking Ukrainians presenting at the southwest border in early 2022.[4] Ukrainians seeking parole through

---

[4] Implementation of the U4U Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022) (Ex. 20), Doc. No. 24-20.

U4U must have one or more U.S.-based financial sponsors. If approved after security checks and vetting, qualifying individuals can obtain authorization to travel to a port of entry inside the United States (i.e., an airport) where a U.S. Customs and Border Protection (CBP) officer makes the final decision whether to grant parole. After the implementation of U4U, unauthorized border encounters with Ukrainians swiftly declined by more than 99 percent.[5] In May 2022, Congress passed legislation extending resettlement benefits to existing and future U4U parolees.[6] Some quarter million Ukrainians have been paroled through U4U, including several Plaintiffs. Svitlana Doe Decl. (Ex. 8), Doc. No. 24-8 ¶ 2; Maksym Doe Decl. (Ex. 5), Doc. No. 24-5 ¶ 15; Maria Doe Decl. (Ex. 6), Doc. No. 24-6 ¶ 9; Aleksandra Doe Decl. (Ex. 17), Doc. No. 24-17 ¶ 4.

**CHNV.** Following the success of U4U, DHS announced the creation of a similar process for Venezuelans in October 2022 to respond to an increase in southwest border encounters with Venezuelan nationals in summer 2022.[7] DHS subsequently implemented similar processes for nationals of Cuba, Haiti, and Nicaragua in early 2023.[8] The CHNV parole processes were explicitly modeled on U4U and similarly required individuals seeking parole to have financial sponsors. The CHNV processes were capped at no more than 30,000 total travel authorizations per month for the four countries combined. Due to overwhelming demand—and to ensure the processes sufficiently dissuaded nationals of these countries from making the dangerous journey to the southern border

---

[5] DHS, *U4U Process Overview and Assessment* 11 (Nov. 4, 2024), bit.ly/41wMb0X.

[6] Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128 (May 21, 2022).

[7] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022) (Ex. 21), Doc. No. 24-21.

[8] Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 127 (Jan. 9, 2023) (Ex. 22), Doc. No. 24-22; Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023) (Ex. 23), Doc. No. 24-23; Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023) (Ex. 24), Doc. No. 24-24; Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) (Ex. 25), Doc. No. 24-25.

by providing a viable alternative—DHS instituted a lottery to randomly select applications to fill half the monthly slots, with the other half processed in order of filing date.[9] More than 500,000 individuals have been paroled through the CHNV processes, including Plaintiffs who escaped political instability and persecution in Nicaragua. Alejandro Doe Decl. (Ex. 1), Doc. No. 24-1 3; Armando Doe Decl. (Ex. 3), Doc. No. 24-3 ¶ 18; Ana Doe Decl. (Ex. 2), Doc. No. 24-2 ¶ 12; Carlos Doe Decl. (Ex. 4), Doc. No. 24-4 ¶ 6. Two Plaintiffs expended immense effort, time, and money to sponsor as many individuals as they were able to through the CHNV parole processes, including many parolees now here and others with pending applications. Sandra McAnany Decl. (Ex. 9), Doc. No. 24-9 ¶¶ 3, 8-9; Kyle Varner Decl. (Ex. 10), Doc. No. 24-10 ¶¶ 3, 7-10. CHNV helped another Plaintiff reunite with her brother for the first time in more than twenty years, and she has additional applications for other family pending. Wilhen Pierre Victor Decl. (Ex. 11), Doc. No. 24-11 ¶¶ 4-5, 14.

**OAW.** As the U.S. government wound down its military presence in Afghanistan, DHS created the Operation Allies Welcome parole process for evacuated Afghans, including journalists, human rights activists, humanitarian workers, family members of American citizens, and individuals facing death because they assisted the American military.[10] After vetting and performing other security checks on each individual on a case-by-case basis in third countries, the United States paroled in approximately 76,000 Afghan evacuees. *See id.* Congress has twice passed legislation making past and certain future OAW parolees eligible for resettlement benefits.[11]

---

[9] By statute, some Haitian and Cuban parolees are entitled to resettlement support services akin to those for refugees. *See* HHS, *Fact Sheet: Cuban/Haitian Entrants*, bit.ly/3Fyl26o.

[10] *Operation Allies Welcome: Afghan Parolee and Benefits Report* (May 8, 2023), bit.ly/4bFvh4L.

[11] NDAA for FY 2020, Pub. L. No. 116-92, § 1758 (2019); Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. No. 117-43, Div. C. (Sept. 30, 2021).

Plaintiff Omar Doe, who worked for more than eighteen years with the U.S. military in Afghanistan, was evacuated to the United States in 2021 and granted parole under OAW. Omar Doe Decl. (Ex. 7), Doc. No. 24-7 ¶¶ 2-3.

**FRP.** The family reunification parole processes for nationals of certain Latin American countries allow certain approved beneficiaries of family-based immigrant visa petitions—in other words, noncitizens already found eligible to immigrate here—to apply and be considered for parole to reunite with their families in the United States while waiting for their visas to become available. These processes provide significant public benefits by promoting family unification, deterring irregular migration, reducing strain on DHS border resources, addressing root causes of migration through remittances, and furthering foreign policy objectives on regional migration management.[12] FRP allowed one Plaintiff to reunite with his wife and son after more than five years of separation, and he hopes that another (already approved) FRP application will help his daughter and granddaughter come soon, too. Valentin Rosales Decl. (Ex. 12), Doc. No. 24-12 ¶¶ 2, 6, 10-17.

**CAM.** After a sharp, extended increase in the number of unaccompanied noncitizen children from the Northern Triangle countries (El Salvador, Guatemala, and Honduras) presenting at the southern border to reunite with parents lawfully present in the United States, in 2014 DHS

---

[12] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023) (Ex. 26), Doc. No. 24-26; Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023) (Ex. 27), Doc. No. 24-27; Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023) (Ex. 28), Doc. No. 24-28; Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023) (Ex. 29), Doc. No. 24-29; Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023) (Ex. 30), Doc. No. 24-30; Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023) (Ex. 31), Doc. No. 24-31; Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023) (Ex. 32), Doc. No. 24-32; Implementation of Haitian Family Reunification Parole Program,79 Fed. Reg. 75581 (Dec. 18, 2014) (Ex. 33), Doc. No. 24-33; Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 15, 2007) (Ex. 34), Doc. No. 24-34.

created the Central American Minors program to provide a safe alternative to children taking that dangerous journey, which also enriches smugglers and creates logistical challenges for the agency.[13] Defendants terminated CAM in 2017-18, but did so arbitrarily and capriciously. *S.A. v. Trump*, Case No. 18-cv-03539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019). DHS under President Biden restarted CAM in 2021 and twice expanded its eligibility criteria. One Plaintiff and her son were able to reunite with her husband and three other children after many years thanks to CAM; however, her parole period expired on March 13, 2025, while her re-parole application languishes. Teresa Doe Decl. (Ex. 15), Doc. No. 24-15 ¶ 6. Another Plaintiff—a victim of sex trafficking—should already be reunited with her teenage daughter and elderly father conditionally approved for parole, but their travel has been delayed by Defendants' actions. Rosa Doe Decl. (Ex. 16), Doc. No. 24-16 ¶¶ 8-12.

**Military PIP.** In 2013, USCIS issued guidance on granting parole "in place" to relatives of active-duty military personnel and veterans who are already present in the United States, but who entered without inspection.[14] The guidance noted that parole can avoid the adverse effects on military preparedness caused by family separation. *See id.* In 2019, Congress enacted legislation stating that "parole in place reinforces the objective of military family unity" and directed DHS to continue considering MPIP applications under 8 U.S.C. § 1182(d)(5).[15] One Plaintiff is an active-duty member of the U.S. Navy with a pending application for MPIP for his father, *see* Marim Doe

---

[13] *See generally* CAM Program, 88 Fed. Reg. 21694 (Apr. 11, 2023) (Ex. 35), Doc. No. 24-35.

[14] USCIS, *Parole of Spouses, Children, & Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, & Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve & the Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i)* (Nov. 15, 2013), bit.ly/3RaM0U6; *see also* USCIS, *Discretionary Options for Designated Spouses, Parents, & Sons & Daughters of Certain Military Personnel, Veterans, and Enlistees* (Nov. 23, 2016), bit.ly/4hgRasv.

[15] NDAA for FY 2020, Pub. L. No. 116-92, § 1758 (2019), *codified at* 8 U.S.C. § 1182 note.

Decl. (Ex. 14), Doc. No. 24-14 ¶¶ 6-7, 11; while another Plaintiff is a U.S. Army veteran with a

pending request for his wife, *see* Adolfo Gonzalez, Jr. Decl. (Ex. 13), Doc. No. 24-13 ¶¶ 7-8.

## III.    DEFENDANTS' ACTIONS REGARDING PAROLE

**Executive Orders.** On January 20, 2025, President Trump signed a flurry of executive

orders ("EOs"), three of which are relevant here. One directed the Secretary to terminate all

"categorical" parole programs, specifically naming the CHNV processes. EO 14165, *Securing Our*

*Borders*, 90 Fed. Reg. 8467. A second directed the Secretary to "rescind the policy decisions of the

previous administration that led to the increased or continued presence of illegal aliens[16] in the

United States," including by "ensuring":

> that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5))
> is exercised only on a case-by-case basis in accordance with the plain language of
> the statute, and in all circumstances only when an individual alien demonstrates
> urgent humanitarian reasons or a significant public benefit derived from their
> particular continued presence in the United States arising from such parole.

EO 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443. The third order

required the Secretary "to ensure that all aliens seeking admission . . . or who are already in the

United States, are vetted and screened to the maximum degree possible" and "consistent" with the

"vetting and screening standards and procedures" in effect the last full day of President Trump's

first term in office. EO 14161, *Protecting the U.S. from Foreign Terrorists & Other National*

*Security & Public Safety Threats* (hereinafter, "Maximum Screening EO"), 90 Fed. Reg. 8451.

**Final agency actions.** Agency Defendants have taken several discrete final agency actions

regarding the Humanitarian Parole Processes, with cascading effects.[17]

---

[16] Despite the facts that parolees are by definition here lawfully, President Trump routinely refers
to them as (*inter alia*) "illegal aliens," including during the 2024 presidential campaign.

[17] These three agency actions are final agency actions because they represent the "'consummation'
of the agency's decision making process" and are actions "by which 'rights or obligations have

*First*, DHS terminated[18] the Humanitarian Parole Processes: no new applications are being accepted and all pending applications for parole or re-parole—likely numbering in the millions—will not be considered. On January 20, Acting DHS Secretary Benjamine Huffman issued a memorandum to govern "all future actions taken by DHS with regard to the exercise of the parole authority."[19] The Huffman directive contains many legal errors, *see* Doc. No. 22 ¶¶ 160-71, including its conclusion that "the parole statute does not authorize categorical parole programs" because they are "blatantly inconsistent" with the law. In the same memorandum, Mr. Huffman directed the heads of ICE, CBP, and USCIS to "pause, modify, or terminate any parole program" that is "not strictly in accord with" his interpretation of the parole statute. Soon thereafter, Acting USCIS Director Jennifer Higgins reportedly issued a directive prohibiting her staff from making further decisions on request for parole or re-parole made through the Humanitarian Parole Processes; a similar directive presumably went to CBP officers, as CBP warned airlines that they could be fined if they transported into the United States individuals otherwise approved to travel in connection with U4U, OAW, FRP, CHNV, CAM, and other "categorical parole programs." CBP Guidance dated Jan. 24, 2025 (Ex. 45), Doc. No. 24-45. On January 28, USCIS acknowledged that it has "paus[ed] acceptance" of the form used for U4U, CHNV, and FRP parole requests, USCIS

---

been determined', or from which 'legal consequences flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). As discussed below, these actions are all based on DHS's "'definitive' legal position concerning [its] statutory authority," *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 478 (D.C. Cir. 2011), satisfying Bennett's first prong; and its second prong is satisfied by the profoundly negative legal consequences flowing from these actions, including the rights of hundreds of thousands of people to continue living and working lawfully in this country.

[18] Defendants may quibble that they have merely "suspended" some of these processes, rather than terminating them, but the label is irrelevant.

[19] DHS has chosen not to make this memorandum publicly available, notwithstanding Congress's requirement that agencies proactively publish documents of this nature online, 5 U.S.C. § 552(a)(1)(B)-(E); *accord NYLAG v. BIA*, 987 F.3d 207, 216-21 (2d Cir. 2021), and its obvious import to the lives of millions of U.S. citizens and residents

Update on Form-I-134A (Ex. 44), Doc. No. 24-44; then later removed that form from its G-1055 comprehensive fee schedule without explanation, *see* uscis.gov/g-1055 (Ex. 50), Doc. No. 24-50. In response to individual queries, USCIS has told applicants that "due to the current administration" their applications are "now on hold until further notice." USCIS message dated Feb. 28, 2025 (Ex. 48), Doc. No. 24-48.

*Second*, USCIS has suspended adjudicating immigration benefits applications (including asylum or other change of status requests) filed by or that would benefit individuals who received parole via the Humanitarian Parole Processes. This moratorium began shortly after the inauguration and was partially memorialized in a February 14, 2025, memorandum issued by Acting USCIS Deputy Director Andrew Davidson.[20] The Davidson memorandum cites the "Securing our Borders EO" (EO 14165) and the "Maximum Screening EO" (EO 14161) and asserts that suspending benefits is warranted because the "procedures that the parolees under" U4U, CHNV, and FRP underwent purportedly do "not constitute screening and vetting to the maximum degree possible," as required by EO 14161. In response to individual queries, USCIS has acknowledged that it has indefinitely "paus[ed] the processing of any immigration benefit requests filed on or behalf of aliens who were paroled under the U4U, CHNV, or FRP processes," but says that suspension is "[d]ue to EO 14165." *See* USCIS message re: inquiry dated Feb. 25, 2025 (Ex. 47), Doc. No. 24-47; *accord* USCIS message to CHNV parolee (Ex. 46), Doc. No. 24-46; USCIS message dated Mar. 5, 2025 (Ex. 49), Doc. No. 24-49.

## LEGAL STANDARD

The Court considers four factors in deciding a motion for preliminary relief under Federal Rule of Civil Procedure 65: (1) the plaintiffs' likelihood of success on the merits; (2) irreparable

---

[20] USCIS has also chosen not to make the Davidson memorandum public.

harm to the plaintiffs in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiffs' favor; and (4) whether an injunction is the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Motions for stay of agency action under the APA, 5 U.S.C. § 705, are governed by the same standard. *See Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

## ARGUMENT

Plaintiffs respectfully request that the Court preliminarily enjoin and stay the final agency actions discussed above and restore the *status quo ante*. ***First***, DHS's summary termination of "categorical" parole processes—under which no pending applications for parole or re-parole are being adjudicated—is contrary to law, because it is explicitly based on the erroneous legal conclusion that the historically common use of humanitarian parole authority is not authorized by the statute. To the extent that Defendants argue that this erroneous legal interpretation is somehow also a discretionary decision, that "discretionary" decision was plainly arbitrary and capricious. ***Second***, DHS's moratorium on granting immigration benefits to anyone paroled into the United States through one of these processes is similarly contrary to law and also *ultra vires*, as it is not based on any statute or regulatory authority; even if it could be authorized, the agency's justification for it—the possibility that the parolees were not vetted "to the maximum degree possible" —is arbitrary and capricious, particularly in light of the number of people affected and the consequence of freezing those individuals' applications for lawful status at the same time that the agency is ramping up efforts to remove those same individuals.

## IV.    PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT THE FINAL AGENCY ACTIONS WERE CONTRARY TO LAW

The purported authority for every final action challenged here is the parole statute, 8 U.S.C.

§ 1182(d)(5), which DHS has misconstrued to allow for the termination (or indefinite suspension)

of the "categorical" parole processes, whereby no pending applications for parole or re-parole will

be considered; and to impose the moratorium on granting benefits for someone previously paroled

into the United States through one of those processes. It is axiomatic that agency decisions

premised on an incorrect understanding of the law cannot stand. *See Loper Bright Enters. v.

Raimondo*, 603 U.S. 369, 391 (2024) ("[The APA] specifies that courts, not agencies, will decide

'*all* relevant questions of law' arising on review of agency action—even those involving

ambiguous laws—and set aside any such action inconsistent with the law as they interpret it."

(quoting 5 U.S.C. § 706)); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action

"may not stand if the agency has misconceived the law"); *N. Am. Indus., Inc. v. Feldman*, 722 F.2d

893 (1st Cir. 1983) (same).

Here, Plaintiffs are likely to succeed in their claim that in the challenged final agency

actions, DHS erroneously interpreted the law—namely, the January 20, 2025 Huffman

memorandum's interpretation of the parole statute as precluding the Humanitarian Parole

Processes. Because DHS premises its actions on an erroneous legal interpretation, the APA requires

that its decisions be nullified. *Loper Bright*, 603 U.S. at 391.

Starting with the text: The plain language of 8 U.S.C. § 1182(d)(5) is nowhere near as

cramped as the Huffman memorandum claims. To the contrary, the language grants the executive

the discretion to "parole into the United States temporarily *under such conditions as he may

prescribe only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit

any [noncitizen] applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis

added). There is nothing in this language that prohibits DHS from establishing a parole process applicable to categories of noncitizens with general guidance and criteria so long as individual applicants are evaluated on a case-by-case basis. Indeed, the parole statute has been interpreted to permit categorical parole processes for 70 years.[21] And, notwithstanding Mr. Huffman's claims, the statute does not say that it should be of "limited use" and only in "extraordinary situations," let alone delimit the precise circumstances warranting parole, such as the need for medical attention or to participate in legal proceedings, as he suggests.

Notably, the limiting language Huffman cites does not appear in the text of the statute; rather, it is pulled directly from proposed amendments to the statute that *Congress considered and rejected* nearly 30 years ago. While working on what would eventually become the statutory parole provision currently in effect, the House Judiciary Committee considered a proposal that would have authorized parole for "an urgent humanitarian reason," defined as cases involving certain medical emergencies; or "for a reason deemed strictly in the public interest," defined as instances where the parolee assisted the U.S. government in a law enforcement activity, or where the parolee was to be criminally prosecuted. *See* H.R. Rep. No. 104-469, 1996 WL 168955, at 77-78. Before the bill was brought to the floor of the House of Representatives for a vote, however, the language restrictively defining these terms *was stripped from the bill. Compare id.* at 140, *with* IIRIRA, Pub. L. No. 104-208 § 602 (1996); *see also* Doc. No. 24-39 ¶¶ 19-22. The legislation that ultimately

---

[21] *See also* Bo Cooper, INS Gen. Counsel, *Legal Opinion: Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001) (Ex. 43), Doc. No. 24-43 (discussing how the 1996 amendments "generally tighten the criteria by which parole decisions are made," but concluding that "[s]o long as individual consideration is given to parole decisions, the Service's determination—that it is generally in the public interest to parole [specified applicants]—does not violate the case-by-case requirement."); Doc. No. 24-40 (discussing parole programs operating before and after the 1996 amendments, and with no significant differences); Doc. No. 24-41 (same).

passed both chambers and was signed into law left the terms "case-by-case," "urgent humanitarian reasons," and "significant public benefit" undefined. "Congress' rejection of the very language that would have achieved the result the government urges here weighs heavily against the government's interpretation." *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006).

Although the Huffman memorandum states that the "context" of the parole authority "make[s] it abundantly clear that it is a *limited use* authority," the actual historical context proves otherwise. Since the parole authority was enacted in 1952—including after it was amended in 1996 through IIRIRA—successive presidential administrations, including the first Trump administration, have repeatedly invoked § 1182(d)(5)(A) to issue guidance that identifies programmatic circumstances under which parole could be appropriate and allows applications to be considered on a case-by-case basis. Doc. Nos. 24-38 & 24-39. These prior policies were motivated by policy considerations analogous to those that prompted the creation of the Humanitarian Parole Processes, including the need to manage the country's borders, fulfill important foreign policy goals, promote family reunification, promote military readiness, and disincentivize dangerous irregular routes to the United States. *See* Doc. Nos. 24-38 through 24-41; Rogers Decl. (Ex. 42), Doc. No. 24-42 (discussing military readiness and good government reasons for creation of MPIP); *see also* Doc. Nos. 24-20 through 24-35 (explanations for each process's creation).

What is more, Congress has enacted legislation numerous times over the decades extending various benefits and services to parolees who arrived (or, in some instances, were still to arrive in the future) via one of these parole processes, *see, e.g.*, *supra* nn.6, 9-11, 15, demonstrating its clear awareness, acquiescence, and approval of this use of parole. Indeed, in 1996 when Congress considered and rejected language that Mr. Huffman invokes, the parole authority had been

exercised in this "categorical" or "programmatic" way  nearly 80 times in the preceding 44 years, *see* Doc. No. 24-38. Against this backdrop, Congress' rejection of the language amounts to ratification of this longstanding interpretation and practice, *see, e.g.*, *CFTC v. Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress"), particularly given its other actions in the same bill. *See* Doc. No. 24-39 ¶¶ 19-20; IIRIRA § 646 (granting green cards to Hungarian and Polish parolees in the United States because of a "categorical" process); § 606 (authorizing Cuban parolees to adjust status to lawful permanent resident just one year after entry). And when the first Trump Administration threatened to end the discretionary MPIP process, Congress enacted legislation directing the Secretary to consider applications for parole-in-place under 8 U.S.C. § 1182(d)(5) on behalf of an identified *category* of noncitizens (specific family members of a living or deceased member of the Armed Forces) and advised that "military family unity" can be "a significant public benefit" within the meaning of the parole statute. NDAA for FY 2020, Pub. L. No. 116-92, § 1758, *codified at* 8 U.S.C. § 1182 note. In other words, in 2019 Congress repudiated the interpretation Mr. Huffman advanced by directing use of the *existing* parole statute in the same "categorical" way the Executive has used it historically: by defining a group and circumstances under which parole may be appropriate, with individual applicants assessed on a case-by-case basis. *Id.* This congressional direction to the Secretary to use the parole statute "categorically" demonstrates unequivocally that Mr. Huffman is wrong: the Secretary may permissibly use the same statute in the same manner as a matter of the discretion that Congress granted.

In sum, Plaintiffs are likely to prove that Mr. Huffman's January 20, 2025 interpretation of the parole statute is contrary to law, warranting nullification of the actions based thereon.

Remarkably, Mr. Huffman's memorandum acknowledged the strong likelihood that his interpretation is wrong by tacking on a one-sentence savings clause in its final sentence, asserting baldly that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance." This naked attempt at evading judicial review fails for multiple reasons. First, it (again) gets the law wrong, this time by according talismanic powers to the invocation of "discretion." As the Supreme Court has emphasized, "the [parole] authority is not unbounded," *Biden v. Texas*, 597 U.S. 785, 806 (2022), and it contains limits on the authority can be exercised, including when denying or terminating. DHS's regulations likewise impose limits, including on how parole can be terminated, 8 C.F.R. § 212.5(e), and there are likewise constitutional constraints on the exercise of the parole authority, including due process. Here again, Mr. Huffman's misunderstanding of the law requires setting aside actions based thereon. *Loper Bright*, 603 U.S. at 391.

Second, even had Mr. Huffman accurately described the law governing the discretionary aspects of the parole authority, his decision to "implement[] this policy as a matter of [his] discretion" must still be set aside as arbitrary and capricious, for multiple independent reasons. Most obviously, it is not at all clear what "policy" this one-sentence savings clause purports to adopt, which is reason alone to ignore it. *Cf. HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting savings clause with "no procedure for invoking" it, no "standards for applying it," and that, "[m]ore "fundamentally," "effectively would nullify judicial review of the Order's substance"). The only discernable candidate of a "policy" that Mr. Huffman could be

"implementing . . . as a matter of [his] discretion" would be an instruction to all DHS employees to ignore or misapply a duly enacted statute in all future instances—affecting millions of people— in a legally erroneous and sharply limited way that ignores numerous relevant factors, including the human impact of his action, relevant reliance interests, the policy objectives of the processes revoked, and the underlying humanitarian purposes of the statute. *Cf. Grace v. Barr*, 965 F.3d 883, 902-03 (D.C. Cir. 2020) (first Trump Administration's failure to consider the INA's humanitarian purposes rendered arbitrary and capricious an agency decision taking account only of the INA's purpose "to ensure efficient removal of aliens with no lawful authorization to remain in the United States"). Indeed, the only factor the Acting Secretary seems to have considered at all was his own misguided interpretation of the statute.[22] The APA requires more. *Biden*, 597 U.S. at 806-07 ("[U]nder the APA, DHS's exercise of discretion within th[e] statutory [parole] framework must be reasonable and reasonably explained."); *Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("Th[e] task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons.")

\* \* \* \* \*

As explained above, the challenged final agency actions are premised on the clearly erroneous interpretation of the parole statute set out in Mr. Huffman's January 20, 2025 memorandum, which is arbitrary and capricious to boot. Plaintiffs' likelihood of success in proving that the Huffman memorandum is wrong on the law justifies a preliminary injunction and a stay

---

[22] In fairness to the Acting Secretary, "the Executive Order[s] and the January 20 memorandum were both signed within hours of the inauguration of President [Trump]. That did not leave much time for reflection and analysis." *Texas v. United States*, 524 F. Supp. 3d 598, 653-54 (S.D. Tex. 2021) (Tipton, J.) (preliminarily enjoining as arbitrary and capricious and contrary to law the Jan. 20, 2021 DHS memorandum that implemented a President Biden executive order and paused the removal of certain noncitizens for 100 days).

of the subsequent agency actions based thereon—e.g., the termination of the Humanitarian Parole Processes and the moratorium on benefits for those paroled through them—without the need for the Court to consider on this expedited basis the *additional* reasons why those agency actions contravene the APA.[23] Additional reasons for granting relief are nonetheless discussed below.

## V.    PLAINTIFFS ARE ALSO LIKELY TO SUCCEED ON THEIR ARBITRARY AND CAPRICIOUS CLAIM, ALTHOUGH THE COURT NEED NOT REACH IT

Plaintiffs are likely to succeed in proving that each step Defendants have taken to dismantle the Humanitarian Parole Processes so as to deport as many parolees as possible has been in flagrant disregard of the APA's prohibition on arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A). Plaintiffs' success on that claim justifies relief even had all Defendants' actions been substantively lawful. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."); *accord Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (declining to hold agency decision substantively invalid but vacating as arbitrary and capricious because "agencies must pursue their goals reasonably").

Through the APA, Congress has mandated that when Executive agencies exercise their considerable authority, they do so on an informed basis, they ground their justifications on neutral and rational principles, and they "offer genuine justifications for important decisions." *Dep't of Com.*, 588 U.S. at 756; *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48-49 (1983). Review of whether an agency's action reflects reasoned decision-making "is to be searching and careful," *Citizens to Preserve Overton Park, Inc. v. Volpe*,

---

[23] What is more, the Court has inherent equitable authority to enjoin the unlawful actions of the federal officials even outside of the APA. *See* Doc. No. 22 ¶¶ 308-10 (alleging that claim).

401 U.S. 402, 416 (1971), as "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang* 565 U.S. at 53.

To facilitate judicial review, "the most elementary precept[] of administrative law [is] an agency has no choice but to provide a reasoned explanation for its actions." *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs*., 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (Kentanji Brown Jackson, D.J.). "The reasoned explanation requirement of administrative law," the Supreme Court has explained, "is meant to ensure" that agencies provide "reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. 785. The task of the reviewing court is then to examine the proffered reasons—"or, as the case may be, the absence of such reasons." *Judulang*, 565 U.S. at 53. A court may not "attempt itself to make up for [any] deficiencies" in an agency's reasons, *State Farm*, 463 U.S. at 43, but "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 72; *see also*, *SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947).

<u>Termination of categorical parole programs</u>. DHS's termination of the categorical parole programs fails the APA's reasoned decisionmaking requirement at the threshold: DHS has not given *any* explanation for its actions, much less a reasonable one. "Reasoned decisionmaking under the [APA] calls for an explanation for agency action," *Dep't of Com*, 588 U.S. at 785, and particularly when the agency is changing course so significantly, *see Housatonic River Initiative v. EPA, New England Region*, 75 F.4th 248, 270 (1st Cir. 2023) (explaining that although the APA does not impose "a 'heightened standard' of review" when an agency "change[s] its existing position on an issue," "[a] 'more detailed justification' may be required" (quoting *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009)). Where, as here, the agency ignores the most elementary requirement of the APA, its actions are arbitrary and capricious. *Encino Motorcars,*

*LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of [the APA] is that an agency must give adequate reasons for its decisions. . . . [W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious."). Were it otherwise, the Executive would be able to defeat entirely the APA's purposes of public transparency and accountability, and judicial review would "be [no] more than an empty ritual." *Dep't of Com.*, 588 U.S. at 784-85.

In addition to ignoring the reasonable explanation requirement, DHS also plainly failed to consider numerous factors relevant to this hugely consequential exercise of the discretionary parole authority—like its impact on those who had applied for parole or re-parole; the reliance interests of parole applicants, their families, their sponsors, their employers, and their communities; the humanitarian purpose of the statute; the policy reasons why DHS created these parole processes in the first place; and the available alternatives—which likewise makes its decision arbitrary and capricious. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28-33 (2020); *State Farm*, 463 U.S. at 83. It was likewise arbitrary and capricious for DHS to ignore wholesale the reliance interests of the individuals with pending applications—just as DHS did under the first Trump Administration when it (first) precipitously ended CAM. *S.A. v. Trump*, 2019 WL 990680, at *2 (N.D. Cal. Mar. 1, 2019) (preliminarily enjoining "DHS's decision to mass-rescind conditional approvals of parole" through CAM for 2,714 beneficiaries still abroad); *S.A. v. Trump*, 2019 WL 1593229 (N.D. Cal. Apr. 12, 2019) (ordering settlement agreement under which DHS would finish processing parole for those 2,714 CAM beneficiaries); Doc. No. 24-16 (Plaintiff whose teenage daughter and elderly father are conditionally approved). At minimum, a "more detailed justification" for DHS's actions was required. *Housatonic River Initiative*, 75 F.4th at 270.

<u>Moratorium on immigration benefits for parolees</u>. The moratorium—which started in January but which DHS only sought to justify weeks later—also fails the APA's reasoned decisionmaking requirement. For one, the *post hoc* Davidson memorandum does not even explain the statutory basis for the systemwide "pause" on adjudicating requests for immigration benefits— be it a green card, asylum petition, or a visa, an employment authorization document or TPS—for more than a million people whose only common trait is that they came to the United States through one of a number of lawful pathways that the current President disfavors. Instead, the memorandum just points to a couple of EOs. But an executive order cannot give DHS authority it did not already have by statute, and without statutory authority DHS "literally has no power to act." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Mr. Davidson's failure to explain the source of the authority he purported to exercise so that it "can be scrutinized by courts and the interested public" was arbitrary and capricious. *Dep't of Com.*, 588 U.S. at 785.

In addition, the solitary factual basis Mr. Davidson provides for the benefits moratorium is to note that, seven months earlier, "USCIS suspended parts of the CHNV processes" after a "preliminary assessment identified potential concerns related to fraudulent supporter requests." Mr. Davidson acknowledges that USCIS investigated the "potential" fraud identified in this "preliminary" report and that just a fraction contained elements of fraud,[24] and he implicitly acknowledges that USCIS subsequently resumed the "suspended parts of the CHNV process," yet nowhere does he explain, as he must, why that same report *now* justifies an even more

---

[24] At least some of the "potential" fraud the Davidson memorandum cited to justify the benefits moratorium is plainly *not* fraud just on its face: for example, the CHNV processes permitted financially able individuals to sponsor multiple beneficiaries, and some people took that opportunity to do so, often as an act of faith or moral conviction, *see, e.g.*, Doc. Nos. 24-9 & 24-10—yet Mr. Davidson seeks to weaponize that permissible and commendable decision as potential fraud justifying the system-wide moratorium on granting benefits to the sponsored parolees.

consequential "suspension" of immigration relief for individuals who are already here. In other words, USCIS had no new information but radically changed course without providing any reasons for doing so,[25] and this it may not do. *Housatonic River Initiative*, 75 F.4th at 270 ("A more detailed justification may be required, however, when the agency's new position rests upon factual findings that contradict those which underlay the prior position" (citation omitted, cleaned up)).

Further, the Davidson memorandum is arbitrary and capricious for failing to explain why "potential fraud" involving sponsors found in "parts" of the CHNV processes justifies a wholesale suspension of immigration benefits for CHNV parolees *and* those who came through U4U and FRP. *See Judulang*, 565 U.S. at 64. Mr. Davidson also failed to explain why the agency did not consider or decide on alternatives, like a more limited moratorium, *see Regents*, 591 U.S. at 30 ("[Defendant] teaches that when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy]'" (quoting *State Farm*, 463 U.S. at 51) (alterations in original)); "[t]hat omission alone renders Acting [Deputy Director Davidson's] decision arbitrary and capricious." *Id.* Mr. Davidson also should have, but did not, consider the impact of the moratorium on people who should already have the security of more durable immigration relief in hand via the system Congress created; instead, USCIS ignored the human impact entirely, and unreasonably. *See Grace*, 965 F.3d at 901 (DHS must take into account the INA's humanitarian purpose). That failure is particularly damning in light of DHS's vigorous parallel efforts to carry out the President's stated goal of deporting as many of them as possible. The APA requires agencies to address these matters. *State Farm*, 463 U.S. at 43.

---

[25] And even in the (highly unlikely) possibility that the moratorium was based on *new* facts, that would make no difference here given USCIS's failure to provide the required explanation. *See, e.g.*, *Nat'l Lab. Rels. Bd. v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.) ("[A]n about-face on a rule owing to facts changed from those underlying the prior view requires that the new facts be addressed explicitly by reasoned explanation for the change of direction.").

* * * *

In sum, even if Mr. Huffman and DHS correctly interpreted the parole statute, and even if all the challenged actions were purely discretionary, preliminary relief would still be justified by Plaintiffs' likelihood of success in proving that those decisions were arbitrary and capricious.

## VI.    PRELIMINARY RELIEF IS NECESSARY TO STOP ONGOING & TO PREVENT FUTURE IRREPARABLE INJURY

Preliminary relief is necessary to prevent Defendants from continuing to irreparably harm Plaintiffs, others similarly situated, and their families and communities. *See, e.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) (noting salutary "purpose of a preliminary injunction is to preserve the status quo" and "freez[e] an existing situation" while the court engages in "full adjudication").

**Parolees.** Defendants' actions remove vital protections from removal for the parolee Plaintiffs while also preventing their access to other immigration benefits, thereby placing them at imminent risk of deportation and, in many cases upon deportation, of disappearance, persecution, and even death. *See, e.g.*, Doc. Nos. 24-3 ¶ 11; 24-4 ¶¶ 5, 18; 24-1 ¶¶ 6–8; 24-19 ¶¶ 3-4 (describing persecution of family members, including death threats, imprisonment, and torture). For many, being deported to their countries of origin would pose grave dangers to them. *See* Doc. Nos. 24-2 ¶ 18; 24-1 ¶ 19; 24-3 ¶ 30; 24-19 ¶¶ 12-13; *see also Ferrara v. United States*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005) ("Obviously, the loss of liberty is a . . . severe form of irreparable injury."). Plaintiffs Svitlana, Maksym, and Maria Doe face returning to an active warzone in Ukraine, and Plaintiff Omar Doe to a terrorist-run state in Afghanistan. Svitlana Doe and her family narrowly escaped Ukraine with their lives and family intact. *See generally* Doc. No. 24-8. If Svitlana, Maksym, or Maria Doe were forced to return, they would be thrust directly back into the chaos and cruelty of war, and Svitlana's husband would be forcefully recruited into the army. *Id.* ¶ 19.

Plaintiff Omar Doe faithfully served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members. Doc. No. 24-7 ¶¶ 2-4. For Omar, going back to Afghanistan is unthinkable. *Id.* ¶¶ 12, 16 ("I fear what the Taliban could do to me if I am forced to return to Afghanistan.").

Because parole is temporary and Doe Plaintiffs cannot currently return to their home countries, they have each applied or were preparing applications for more permanent forms of status that Congress made available to them by legislation, including TPS,[26] asylum,[27] SIV,[28] and H-1B visas.[29] However, because Defendants have ended parole renewals and stopped adjudicating parolees' immigration applications, Doe Plaintiffs are left with no option but to await with dread the expiration of their parole and work authorization, which for Aleksandra Doe will happen in less than two weeks, Doc. No. 24-17 ¶ 4, and next month for Maksym Doe, Doc. No. 24-5 ¶ 18.

Without immigration status and work authorization, Plaintiffs will also lose their ability to provide for themselves and their families. *See, e.g.*, Doc. Nos. 24-1 ¶ 15 ("[W]e would likely be forced to break apartment leases we have entered into, rendering us homeless."); 24-4 ¶ 8 (describing how Carlos financially supports his family in Nicaragua and Costa Rica); Doc. No. 24-8 ¶ 18 (son would be unable to continue to receive therapy and medical treatment and husband would be unable to continue to receive treatment for autoimmune condition); Doc. No. 24-17 ¶ 14 (family would lose sole source of income and would not be able to pay rent or other necessities).

**Sponsors.** Plaintiffs Sandra McAnany, Kyle Varner, and Wilhen Pierre Victor, as well as other sponsors around the country, are likewise irreparably harmed by the government's about-

---

[26] Doc. Nos. 24-5 ¶ 19; 24-6 ¶ 11; 24-8 ¶ 16; 24-17 ¶ 11.

[27] Doc. Nos. 24-1 ¶ 17; 24-3 ¶ 27; 24-3 ¶ 18; 24-4 ¶ 11; 24-7 ¶ 9; 24-19 ¶ 9.

[28] Doc. No. 24-7 ¶ 9.

[29] Doc. No. 24-6 ¶ 11.

face. First, U.S. citizens, such as Plaintiff Sandra McAnany, were driven by faith and their religious convictions to serve as parole sponsors. Doc. No. 24-9 ¶¶ 4, 9. Others are driven by political and moral conviction—like Plaintiff Kyle Varner whose strong moral and political convictions led him to sponsor seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Doc. No. 24-10 ¶¶ 3, 6. The Trump administration's actions hamper his and other U.S. citizens' abilities to act in conscience in these ways.

Others have relied on these parole pathways to reunite with their families, many of whom are fleeing danger or unrest. Plaintiff Wilhen Pierre Victor sponsored seven of her family members from Haiti, one of whom—her thirteen-year-old niece living without either of her parents in Haiti—is unable to attend school for days or weeks at a time due to gang violence. Doc. No. 24-11 ¶¶ 3-5, 18. Because of Defendants' actions, Wilhen and her five family members who were granted parole and who currently live with her now face re-separation. *See generally id.* Her niece and cousin remaining in Haiti—whose parole applications are pending and now paused—continue to live in terror and are unable to reunite with Wilhen. *Id.* ¶¶ 18-19; *see also Jimenez v. Cronen*, 317 F. Supp. 3d 626, 657 (D. Mass. 2018) (stating that if petitioners were deported and thus separated from their families, any resulting "unjustified loss of liberty for even one more day would be a particularly painful form of irreparable harm to them and to the United States citizens who love them."); *Jimenez v. Nielsen*, 326 F.R.D. 357, 361 (D. Mass. 2018) ("Petitioners' deportation, which would separate them from their families for months or years . . . may be an 'extreme hardship' for their family members who are United States citizens.").

Many sponsors have invested significant time, money, expertise, and resources into sponsoring and providing for their parole beneficiaries. *See* Doc. No. 24-10 ¶¶ 7-10 (describing the immense amount of time, effort, resources, and money spent in supporting his beneficiaries,

from submitting the sponsorship applications for his beneficiaries to facilitating their arrival in the United States, including help with finding and providing housing for them, paying for work permit applications, and otherwise supporting their needs upon arrival). When his beneficiaries applied for asylum, TPS, or other forms of immigration relief, Mr. Varner also lent them money to help pay for attorney fees, helped them compile documents, and provided other resources and support throughout the processes. *Id.* ¶ 14. The time and resources Mr. Varner and sponsors like him around the country have invested will be lost if their beneficiaries' applications are not adjudicated (or adjudicated in time). Parole sponsors are legally responsible to ensure their beneficiaries' financial wellbeing, a fact they attested to in the parole sponsorship application. If parole beneficiaries lose their work authorization because of a change in their immigration status, sponsors will be responsible to invest more time and resources into making sure their beneficiaries have everything they need to survive. *See, e.g.*, *id.* ¶ 18. While financial harms are considered reparable in most instances, "if a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future . . . financial loss can constitute irreparable injury." *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 362 (D.N.H. 2024) (citation omitted). Such is the case here, given sovereign immunity.

**Parole applicants.** Many noncitizens who are the prospective beneficiaries of pending applications for parole through one of the affected programs remain trapped in dangerous conditions in their home countries, with their one possible pathway to the United States gone. *See* Doc. Nos. 24-9 ¶ 13; 24-10 ¶ 12; 24-11 ¶¶ 18-19.

## VII.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY INJUNCTIVE RELIEF

The balance of equities and the public interest, which merge here, likewise support Plaintiffs' request for a preliminary injunction. *See Winter* 555 U.S. at 20; *Nken v. Holder*, 556

U.S. 418, 435 (2009). Defendants' hardship, if any, is substantially outweighed by the countervailing hardships Plaintiffs and others similarly situated will suffer through Defendants' actions, which inflict broad and deep harm to the public as well.

As set out above, Plaintiffs and those like them are irreparably injured by Defendants' unlawful actions, but Defendants can point to no remotely comparable injury to the public by an injunction restoring the *status quo ante*, under which Plaintiffs' applications for immigration benefits should be adjudicated in the ordinary course pursuant to the laws Congress has enacted and the validly promulgated agency rules.

The public has a strong interest in these parole processes and the parolees here by virtue of them. These parole processes have provided numerous opportunities and benefits to the United States and the American people, as DHS itself has explained. Among other significant public benefits of the processes, they have reunited families,[30] promoted economic growth by filling critical labor shortages and dampening inflation,[31] and offered humanitarian protections those in need.[32] They have also discouraged irregular migration, fostered regional cooperation on migration, and served important foreign policy goals.[33]

---

[30] *See, e.g.*, Doc. No. 24-11 ¶¶ 3-5, 20.

[31] *See* FWD.us, *Industries with Critical Labor Shortages Added 1.1 Million Workers Through Immigration Parole* (Jan. 4, 2024), www.fwd.us/news/immigration-labor-shortages.

[32] *See* Doc. Nos. 24-20 (describing ongoing armed conflict and humanitarian crisis in Ukraine); 24-21 (describing the "complex political, humanitarian, and economic crisis" in Venezuela); 24-23 (describing the economic crisis and government repression in Cuba); 24-24 (describing how "natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations [have] devastated [Haiti]"); 24-25 (describing the "political, economic, and humanitarian crises in Nicaragua").

[33] *See, e.g.*, *U4U Process Overview and Assessment*, *supra* n.5 at 11 ("[U4U] was designed to respond to the humanitarian emergency in Ukraine and help DHS better manage flows and encourage orderly arrival by air, relieving pressure on critical resources along the [southwest border]," and in "close coordination with the government of Mexico").

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction and a stay of administrative action.

Dated: March 18, 2025

Respectfully submitted,

*/s/ John A. Freedman*
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Anwen Hughes (*pro hac vice* pending)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Robert Stout (*pro hac vice* pending)
Sarah Elnahal (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 18, 2025

*/s/ John A. Freedman*
John A. Freedman