# EXHIBIT 19 (Amended)

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> Kristi Noem, et al., <br><br> *Defendants*. | C.A. No: 1:25-cv-10495-IT |

**DECLARATION OF ANDREA DOE**

I, Andrea Doe, upon my personal knowledge, hereby declare as follows:

1. I am a citizen of Nicaragua. I was born in the Department of Carazo in Nicaragua in 1991.

2. I currently live in Mount Airy, Maryland, with my husband, Rafael Doe, and our two young children, Isaias and Francisco Doe.

3. My husband Rafael was a political prisoner in Nicaragua before the United States government flew him to this country on February 9, 2023. He was jailed for his opposition to the regime of Daniel Ortega and sentenced to over 20 years in prison. The Nicaraguan government held him under terrible conditions and he suffered physical and mental torture.

4. Our separation was terribly hard on our children and me. It wasn't just that I missed my husband terribly and that the children missed their father—the Nicaraguan police were also surveilling our house and harassing me. Police vehicles would station themselves in front of our house, and when we visited my husband at the penitentiary where he was being held, police agents would be waiting for us at the corner until we got on the bus. It was terrifying for the children.

5. After four long years of this, the Nicaraguan government abruptly released 222 political prisoners, among them Rafael. The Ortega regime agreed to release them on the condition that the United States take them. Before any of us knew what was happening, Rafael and 221 of our imprisoned compatriots had been pulled out of prison and were on a flight to the United States.

6. He and the others in the same situation were brought into the United States through parole.

7. I was so relieved that Rafael was out of prison and safe in the United States, but his departure left me and our children in a very unsafe situation in Nicaragua.

8. A kind American whom Rafael had gotten to know through another passenger on the flight out of Nicaragua sponsored me and the children to be reunited with him here in Maryland. He sponsored us through the program the United States government had set up for Cubans, Haitians, Nicaraguans, and Venezuelans to apply for humanitarian parole to the United States.

9. We were all reunited in Maryland in the summer of 2023. Rafael found volunteer lawyers to represent him in applying for asylum, and he included the children and me in his application.

10. Rafael found a job with a company that installs vinyl on vehicles for use as publicity, and the same company then hired me as well after I received my work permit. We have rented an apartment. Our children have settled in; they are both attending elementary school and have made friends. We felt happy and well-integrated into our new community.

11. The news that the U.S. government was canceling the Nicaraguan parole program and suspending processing of any immigration applications the children and I have filed or may file in the future, has come as a great shock. The children and I are included in Rafael's application for asylum, which is pending. Our safety and our future depend on the protection asylum would give us.

12. If the children and I could not get our asylum application adjudicated and were deprived of that path to safety in the United States, it would be a disaster for us, individually and as a family. The Nicaraguan government saw me visiting Rafael in prison. They were watching our house. They know that I am his wife. If I were forced to go back to Nicaragua now I would be detained and the government would take my children away. When I was trying to leave in 2023, I was held up for two hours at the airport in Managua, they took my passport and those of the children and pulled me out of line. They finally let us go, but it was frightening.

13. Rafael would not want us to face such danger on our own, but if he went back to Nicaragua he would be detained immediately. And he could not return to Nicaragua even if he wanted to: when it expelled him and the other passengers on the February 9 flight to the United States, the regime of Daniel Ortega also stripped them of their Nicaraguan

citizenship. As a result, Rafael is now stateless, and until his application for asylum is approved, he has no access to documentation that would allow him to travel anywhere.

14. We were welcomed here in Maryland and we have felt happy here. We have been working very hard to build a future for our family. These recent decisions by the U.S. immigration authorities are causing us great anxiety. Rafael came to this country under circumstances over which he had no control at all, because the Nicaraguan government decided to expel him and the United States government flew him and the others here to keep them safe. The U.S. government told the passengers on this flight to use this Nicaraguan parole program to apply for reunification with their family members who were left behind in Nicaragua, and that is what Rafael did, with help from the community here.

15. I am participating in this lawsuit so that I and my children and others who are in the same position can have our applications for immigration benefits processed in a normal way.

16. I am asking that my husband and children and I allow us to appear under pseudonyms in the court filings. We have a pending asylum application, and we have security concerns with respect to the Nicaraguan government, but I am also worried now about the consequences for our lives here in the United States if we are known to be plaintiffs in this lawsuit. There has been a lot of ugly talk about immigrants recently, and I do not want my family to be targeted for abuse that we really have done nothing to deserve. My family and I are very grateful for U.S. government's help in getting Rafael released from his unjust sentence in Nicaragua, for bringing him here, and for helping us reunite after our long separation. We just want to make sure we can continue living and working here in safety and that our application for asylum is processed normally.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Signed at Mount Airy, Maryland,
on March 16, 2025.

_____
Andrea Doe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> Kristi Noem, et al., <br><br> *Defendants*. | C.A. No: 1:25-cv-10495-IT |

**DECLARATION OF ANDREA DOE**

Yo, Andrea Doe, según mi conocimiento personal, declaro lo siguiente:

1. Soy ciudadana de Nicaragua. Nací en el departamento de Carazo, Nicaragua, en 1991.

2. Actualmente vivo en Mount Airy, Maryland, con mi esposo, Rafael Doe, y nuestros dos hijos pequeños, Isaías y Francisco Doe.

3. Mi esposo, Rafael, fue preso político en Nicaragua antes de que el gobierno de Estados Unidos lo trasladara a este país el 9 de febrero de 2023. Fue encarcelado por su oposición al régimen de Daniel Ortega y condenado a más de 20 años de prisión. El gobierno nicaragüense lo mantuvo en condiciones terribles y sufrió tortura física y mental.

4. Nuestra separación fue terriblemente dura para nuestros hijos y para mí. No solo extrañaba muchísimo a mi esposo, y a mis hijos a su padre, sino que la policía nicaragüense también vigilaba nuestra casa y me daba asedio. Vehículos policiales se estacionaban frente a nuestra

casa, y cuando visitábamos a mi esposo en la penitenciaría donde estaba detenido, los agentes nos esperaban en la esquina hasta que subíamos al autobús. Fue aterrador para los niños.

5. Después de cuatro largos años de esto, el gobierno nicaragüense liberó abruptamente a 222 presos políticos, entre ellos Rafael. El régimen de Ortega accedió a liberarlos con la condición de que el gobierno de los Estados Unidos los aceptara. Antes de que ninguno de nosotros supiera lo que estaba sucediendo, Rafael y 221 de nuestros compatriotas encarcelados habían sido sacados de la cárcel y estaban en un vuelo a Estados Unidos.

6. A él y a los demás en la misma situación los dejaron entrar a Estados Unidos con "parole."

7. Sentí un gran alivio de que Rafael estuviera fuera de la cárcel y a salvo en Estados Unidos, pero su partida nos dejó a mí y a nuestros hijos en una situación muy insegura en Nicaragua.

8. Un amable estadounidense a quien Rafael había conocido a través de otro pasajero en el vuelo de salida de Nicaragua nos patrocinó a mí y a los niños para que nos reuniéramos con él aquí en Maryland. Nos patrocinó a través del programa que el gobierno de Estados Unidos había establecido para que cubanos, haitianos, nicaragüenses y venezolanos solicitaran permiso humanitario para entrar en Estados Unidos.

9. Nos reunimos en Maryland en el verano de 2023. Rafael encontró abogados voluntarios que lo representaran en la solicitud de asilo y nos incluyó a los niños y a mí en su solicitud.

10. Rafael encontró trabajo en una empresa que instala vinilos publicitarios en vehículos, y la misma empresa me contrató también después de recibir mi permiso de trabajo. Hemos alquilado un apartamento. Nuestros hijos se han adaptado; ambos asisten a la escuela primaria y tienen amigos. Nos sentimos felices y bien integrados en nuestra nueva comunidad.

11. La noticia de que el gobierno de Estados Unidos cancelaría el programa de "parole" humanitario nicaragüense y suspendería el procesamiento de cualquier solicitud de inmigración

que los niños y yo hayamos presentado o podamos presentar en el futuro ha sido una gran sorpresa. Los niños y yo estamos incluidos en la solicitud de asilo de Rafael, que está pendiente. Nuestra seguridad y nuestro futuro dependen de la protección que nos brindaría el asilo.

12. Si mis hijos y yo no lográramos que se aprobara nuestra solicitud de asilo y nos privaran de esa vía hacia la seguridad en Estados Unidos, sería un desastre para nosotros, individualmente y como familia. El gobierno nicaragüense me vio visitando a Rafael en prisión. Vigilaban nuestra casa. Saben que soy su esposa. Si me obligaran a regresar a Nicaragua ahora, me detendrían y el gobierno me quitaría a mis hijos. Cuando intentaba irme en 2023, me retuvieron dos horas en el aeropuerto de Managua; me quitaron el pasaporte y el de los niños, y me sacaron de la fila. Finalmente nos dejaron ir, pero fue aterrador.

13. Rafael no querría que corriéramos ese peligro solos, pero si regresara a Nicaragua, sería detenido de inmediato. Y no podría él regresar a Nicaragua aunque quisiera: cuando lo expulsaron a él y a los demás pasajeros del vuelo del 9 de febrero a Estados Unidos, el régimen de Daniel Ortega también les quitó la ciudadanía nicaragüense. Como resultado, Rafael ahora es apátrida y, hasta que se apruebe su solicitud de asilo, no tiene acceso a la documentación que le permita viajar a ningún lugar.

14. Nos recibieron bien aquí en Maryland y nos sentimos felices. Trabajamos duro para construir un futuro para nuestra familia. Estas recientes decisiones de las autoridades migratorias estadounidenses nos causan gran ansiedad. Rafael llegó a este país en circunstancias que escapaban a su control, porque el gobierno nicaragüense decidió expulsarlo y el gobierno de Estados Unidos los trajo aquí en avión, junto con los demás, para mantenerlos a salvo. El gobierno estadounidense les indicó a los pasajeros de este vuelo que usaran este programa de

"parole" para los nicaragüenses para solicitar la reunificación con sus familiares que se quedaron en Nicaragua, y eso fue lo que hizo Rafael, con la ayuda de la comunidad de aquí.

15. Participo en esta demanda para que yo mis hijos y otras personas en la misma situación podamos tramitar nuestras solicitudes de beneficios migratorios de forma normal.

16. Solicito que mi esposo, mis hijos y yo nos permitan aparecer bajo seudónimos en los documentos judiciales. Tenemos una solicitud de asilo pendiente y tenemos preocupaciones de seguridad con respeto al gobierno nicaragüense, pero también me preocupan las consecuencias para nuestras vidas aquí en Estados Unidos si se nos descubre como demandantes en esta demanda. Últimamente se ha hablado mucho de los inmigrantes de forma bien fea, y no quiero que mi familia sea víctima de abusos que realmente no hemos hecho nada para merecer. Mi familia y yo estamos muy agradecidos por la ayuda del gobierno estadounidense para liberar a Rafael de su injusta condena en Nicaragua, por traerlo aquí y por ayudarnos a reunirnos después de nuestra larga separación. Solo queremos asegurarnos de que podamos seguir viviendo y trabajando aquí con seguridad y de que nuestra solicitud de asilo se tramite normalmente. Declaro bajo pena de perjurio que las declaraciones anteriores son verdaderas y correctas según mi leal saber y entender.

Firmado en Mount Airy, Maryland, el 16 de marzo de 2025.



_____

Andrea Doe

## **CERTIFICATE OF TRANSLATION**

I, Shala Gafary, am competent to translate from Spanish to English, and certify that the translation of **Declaration of Andrea Doe** is true and accurate to the best of my abilities.

Date: 3/17/2025

Shala Gafary
Human Rights First
121 West 36th Street
PMB 520
New York, NY 10018
212-845-5247
gafarys@humanrightsfirst.org