# EXHIBIT A

This document is scheduled to be published in the
Federal Register on 03/25/2025 and available online at
**https://federalregister.gov/d/2025-05128**, and on **https://govinfo.gov**    10-9M

# DEPARTMENT OF HOMELAND SECURITY

**Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans**

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security ("DHS") is terminating the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members (hereinafter referred to as "CHNV parole programs") that DHS announced in 2022 and 2023.  This *Federal Register* notice is intended to provide context and guidance to the public regarding the termination of the CHNV parole programs and related employment authorization.

**DATES:** DHS is terminating the CHNV parole programs as of [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER].  The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER] will terminate on that date unless the Secretary makes an individual determination to the contrary.  Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT**:  Ihsan Gunduz, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528-0445; telephone (202) 447-3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS has implemented programs through which inadmissible aliens who are citizens or nationals of designated countries, and their immediate

family members, could request authorization to travel to the United States in order to be considered for parole into the country.[1]  Under these categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis, for advance authorization to travel to a U.S. port of entry ("POE") in the interior of the country to seek a discretionary grant of parole.

On January 20, 2025, President Trump issued Executive Order 14165, "Securing Our Borders."[2]  Section 2 of the Order establishes a policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law.  Section 7 of the Order directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the CHNV parole programs.  Although DHS established the categorical programs for each country through a separate notice in the *Federal Register*, the justification for the establishment of each of the four categorical programs was very similar,[3] and the rationale for termination is largely consistent for all four parole programs.  Thus, DHS is announcing the termination of all four parole programs by publishing this single notice in the *Federal Register*.

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[2] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[3] *Compare, e.g.*, 88 FR at 1260-63*, with* 88 FR at 1248-52 (setting out the justifications for the parole programs for Nicaragua and Haiti, respectively).

## II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary of Homeland Security ("Secretary") the narrow discretionary authority to parole inadmissible aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien is required to depart the United States "or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the history of the parole authority supports the contention that discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria.[4] Under the law, the determination to parole an alien into the country should only be made on a case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a POE is made by U.S. Customs and Border Protection ("CBP") officers. *See* 8 CFR 212.5(a).

---

[4] Parole was codified into immigration law in the Immigration and Nationality Act of 1952. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, "the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *See Leng May Ma v Barber*, 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress, which in 1996 wrote, "[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary." *See* H.R. Rep. 104-469, pt. 1, at 140 (1996). Furthermore, the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA") struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, "for emergent reasons or for reasons deemed strictly in the public interest" as grounds for granting parole into the United States and inserted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* Pub. L. No. 104-208, div. C, § 602(a). "The legislative history indicates that this change was animated by concern that parole under 8 U.S.C. 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the CHNV parole programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an arriving alien. *See* 8 CFR 1.2; *see also* INA 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B).

### III. Rationale for Initial Implementation

When DHS established the CHNV parole programs, DHS provided several justifications for their promulgation. *See, e.g.*, 88 FR at 1248-51 (Implementation of a Parole Process for Haitians). Overall, DHS stated that the programs would provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries.

With respect to the significant public benefit, DHS wrote that the CHNV parole programs would: (i) enhance border security by reducing illegal immigration between the POEs, (ii) minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities; (iii) improve vetting for national security and public safety; (iv) reduce the strain on DHS personnel and resources; (v) disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

For the reasons discussed below, DHS has determined that it is now appropriate and necessary to terminate the CHNV parole programs.  These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals.[5]  Regarding previous arguments or determinations that these programs were consistent with the requirement of "urgent humanitarian reasons" for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances.  These reasons, independently and cumulatively, support termination of the CHNV parole programs.

Accordingly, the Secretary, in her discretion, is terminating the CHNV parole programs. Consistent with her statutory authority, the Secretary retains discretion to continue to extend parole to any alien paroled under CHNV—temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.  *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).  The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### 1.  The CHNV Parole Programs are Unnecessary to Achieve Border Security Goals

From the announcement of the parole program for Venezuelans and their immediate family members on October 12, 2022, through the subsequent addition of the programs for Cubans, Haitians, Nicaraguans, and their immediate family members in January 2023, and until January 22, 2025, approximately 532,000 inadmissible aliens were granted advance

---

[5] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("…when the purposes of such parole shall, in the opinion the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.").

authorization to travel to the United States and receive consideration for parole into the United States.[6]

One justification for these 532,000 discretionary paroles was to "enhance border security" at the southwest border of the United States.[7]  DHS reasoned that by "incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, . . . the new parole process will mitigate anticipated future surges" of illegal immigration.  *See, e.g.*, 88 FR at 1249 (Implementation of a Parole Process for Haitians).  DHS pointed to past experience with rapidly increasing "encounters of Guatemalan and Honduran nationals from January 2021 until August 2021" along the southwest border, explaining that the resumption of repatriation flights to Guatemala and Honduras helped reduce the amount of illegal immigration but was insufficient to address the sheer numbers.[8]  Accordingly, the CHNV parole programs contemplated enhancing border security by combining "a consequence for [nationals seeking] to enter the United States [in an unlawful manner between POEs (i.e., removal or return to a third country, such as Mexico), while introducing] an incentive to use [a] lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border."[9]

Upon review, DHS concludes that this "deterrent" and "incentive" approach did not result in a sufficient and sustained improvement in border security, and has exacerbated challenges associated with interior enforcement of the immigration laws.  Encounters of CHNV nationals, particularly at POEs, remained unacceptably high while the CHNV parole programs were in effect, and overall migration of CHNV nationals to the United States increased between

---

[6] Office of Homeland Security Statistics ("OHSS") analysis of advanced travel authorizations data provided by CBP Passenger Systems Program Directorate and valid as of January 22, 2025. Beneficiary travel authorizations excluded expired applications. The Venezuelan program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.

[7] *See, e.g.*, 88 FR at 1255 ("The [Nicaraguan] parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs.").

[8] *See, e.g.*, 87 FR at 63509.

[9] *See, e.g.*, 87 FR at 63510.

October 12, 2022 and January 22, 2025.  In addition, the CHNV parole programs have at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status.

As an initial matter, DHS acknowledges that in establishing the CHNV parole programs, and in subsequent DHS evaluations of these programs, DHS focused, in part, on a goal of reducing encounters of CHNV nationals between POEs.[10]  And it is true that there was a reduction in encounters of CHNV nationals between POEs from FY 2022 through FY 2024—from around 600,000 encounters in FY 2022 to 416,000 in FY 2023 and 183,000 in FY 2024.[11] But in implementing the CHNV parole programs, DHS also focused on the importance of reducing pressures at the southwest border generally.  It was for this reason that the CHNV parole programs required, for instance, that CHNV nationals "fly at their own expense to an interior [POE] rather than entering at a land POE"[12] and rendered ineligible those CHNV nationals who irregularly entered the United States, Mexico, or Panama after the programs' announcement.[13]

Consistent with that focus and in light of the reality that DHS's border security mission involves activities at southwest border POEs as well, DHS has concluded that the present assessment of the efficacy of the CHNV parole programs should include encounters at such land POEs.  If one includes encounters of CHNV nationals at POEs, the actual reduction in southwest border encounters of CHNV nationals is much more muted: encounters of CHNV nationals at and between southwest border POEs dropped from approximately 626,000 in FY 2022 only to

---

[10] *See, e.g.*, 87 FR at 63507 ("The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner."); *see also* Circumvention of Lawful Pathways 88 FR 31314, 31317 (May 16, 2023) (noting that in the first weeks following implementation of the CHNV parole programs, encounters of CHNV nationals between POEs dropped significantly).
[11] OHSS analysis of January 2025 OHSS Persist Dataset.
[12] *See, e.g.*, 87 FR at 63507; *see also id.* at 63512 (explaining that by "diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process," DHS could relieve pressure on border communities).
[13] *See, e.g.*, 87 FR at 63515.

584,000 in FY 2023 and to 535,000 in FY 2024.[14]  This is due to a significant increase in encounters of such aliens at southwest border POEs over that time period: from 26,250 in FY 2022 to 168,010 in FY 2023 and 352,790 in FY 2024.[15]  The increase can be attributed to the use of the CBP One mobile application ("CBP One app" or "CBP One") to schedule appointments at southwest border POEs,[16] which resulted in very high numbers of CHNV nationals placed into removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a, ("section 240 removal proceedings") and released into U.S. border communities,[17] exacerbating the immigration court backlog and the poor incentives that the backlog creates.[18]  Finally, it is important to emphasize that in addition to these southwest border encounters, DHS must also consider the 532,000 parolees who entered the United States under the CHNV parole programs.

The decision to terminate the discretionary and temporary parole programs is further informed by the actions of the prior administration, which found the CHNV parole programs, even when paired with the Circumvention of Lawful Pathways rule, to be insufficient to address very high levels of illegal immigration.[19]  For example, DHS and the Department of Justice (DOJ) promulgated the Securing the Border framework[20] as an emergency measure to address

---

[14] OHSS analysis of January 2025 OHSS Persist Dataset.

[15] OHSS analysis of January 2025 OHSS Persist Dataset.

[16] Section 7 of Executive Order 14165 also directed the Secretary to, consistent with applicable law, take all appropriate action to cease using the CBP One app. as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States.  DHS has ceased the use of the CBP One app for this purpose.  *See* CBP, Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app (last updated Jan. 22, 2025).

[17] A total of 582,800 CHNV nationals with CBP One registration numbers were encountered at southwest border POEs from Jan. 1, 2023 – Jan. 31, 2025, including 576,900 (99 percent) that were issued NTAs. OHSS analysis of January 2025 OHSS Persist Dataset.

[18] *See, e.g.*, Securing the Border, 89 FR 81156, 81181 (Oct. 7, 2024) (explaining that particularly in light of the immigration court backlog, "releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal.").

[19] 88 FR 31314 (May 16, 2023).

[20] *See* 89 FR 48710 (June 7, 2024) (interim final rule); 89 FR 81156 (Oct. 7, 2024) (final rule).

ongoing high levels of unlawful immigration between southwest border POEs.[21]   The Departments explained that "at the current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain … [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle."[22]   This conclusion—that DHS's ability to swiftly impose consequences for illegal immigration "continue[d] to be overwhelmed"[23]—followed nearly two years of the CHNV parole programs, whose chief justification had been facilitating operational control of the southwest border of the United States.   Promulgation of the Securing the Border interim final rule in June 2024 reflected the reality that the CHNV parole programs and Circumvention of Lawful Pathways rule did not sufficiently enhance border security.[24]

Finally, to whatever extent the CHNV parole programs could be characterized as reducing encounters of CHNV nationals at the southwest border from the very high levels that existed in late 2022, DHS does not believe that the programs are necessary to achieve such reductions at this time.   In December 2022—the last full month prior to implementation of all four programs—the U.S. Border Patrol (USBP) encountered around 84,000 CHNV nationals at the southwest border.[25]   That figure has been below 12,000 every month since January 2024, and below 6,000 every month since June 2024, when DHS and DOJ issued the Securing the Border rule.[26]   In January 2025, even with the CHNV parole programs paused, USBP encountered

---

[21] "On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens]."  *See* 89 FR at 81157-58.
[22] 89 FR at 48714.
[23] 89 FR at 48715.
[24] DHS notes that on October 4, 2024, the prior administration announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs.   The decision of the prior administration to decline renewal or extension of the CHNV related parole coincided in large part with other actions of DHS to promulgate policies to reduce illegal immigration.
[25] OHSS analysis of January 2025 OHSS Persist Dataset.
[26] OHSS analysis of January 2025 OHSS Persist Dataset.

around 3,400 CHNV nationals at the southwest border.[27]  Whatever the need for these programs may have been in late 2022, the situation at the southwest border now, and the set of tools implemented by DHS to deter illegal immigration, are quite different.

Moreover, with the implementation of President Trump's policies beginning on January 20, 2025, border encounters generally have continued to drop notwithstanding the ongoing pause on these programs.  Southwest border encounters between POEs fell from an average of about 1,180 aliens per day in the two-week period ending on January 20, 2025, to an average of about 640 per day in the two-week period from January 21 to February 3, 2025, and fell further to an average just under 260 per day in the two-week period from February 12, 2025 to February 25, 2025.[28]  Over those same three time periods, southwest border releases from USBP custody fell from an average of about 240 per day to an average of about 50 per day and then an average of fewer than 5 per day.[29]

The need to break the "vicious cycle" of unlawful immigration supports this DHS action to terminate the CHNV parole programs in favor of new presidential directives that address the demand for enhanced border security beyond the 2024 Securing the Border framework.[30] Executive Order 14165, "Securing Our Borders,"[31] and Executive Order 14159, "Protecting the American People Against Invasion,"[32] exemplify more reasoned and realistic initiatives to control unlawful immigration at the southwest border of the United States.

---

[27] OHSS analysis of January 2025 OHSS Persist Dataset.
[28] OHSS analysis of data downloaded from UIP February 25, 2025.
[29] OHSS analysis of data downloaded from UIP Feb. 25, 2025.  DHS also notes that to whatever extent the incentives created by the parole programs for Cubans and Haitians deterred illegal immigration by sea—a particularly dangerous form of migration—the parole programs are not necessary for such deterrence and raise other issues, some of which are outlined in sections III.2-4 of this notice.  DHS has adopted a more robust enforcement posture in general, and will monitor trends in maritime migration and respond as appropriate. Through early February 2025, DHS has yet to see a return to the very high levels of maritime migration observed in 2022.
[30] The streamlined procedures offered by the Securing the Border framework and complementary actions permitted DHS to more than triple the percentage of aliens processed for expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and decrease the number of aliens released by USBP pending immigration court proceedings by 89 percent, a number that has only improved further with the end of "catch and release."  Encounters and releases based on OHSS analysis of January 2025 OHSS Persist Dataset.  Processed for ER based on OHSS analysis of September 2024 OHSS enforcement Lifecycle and CBP data downloaded from UIP ER Daily Report Data Dashboard as of February 4, 2025.
[31] 90 FR 8611 (Jan. 20, 2025).
[32] 90 FR 8443 (Jan. 20, 2025).

**2.    The Domestic Effects of Illegal Immigration Continued to be Felt Throughout Implementation of the CHNV Parole Programs**

Although one goal of the CHNV parole programs was to "help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB," the programs did not have this effect.  As discussed in the preceding section, overall levels of CHNV migration at and between southwest border POEs did not fall dramatically year-over-year in FY 2023 and FY 2024.  In addition, if one takes into account the 532,000 parolees who entered the United States at an interior POE, CHNV migration may have increased over the relevant time period.  Recent policy interventions have proven more effective than the CHNV parole programs in addressing very high levels of illegal immigration.

Over the past few years, there has been extensive public discussion of the effects of high levels of illegal immigration and inadmissible aliens arriving in local communities.  Although public accounts of these effects do not always distinguish between aliens strictly on the basis of how they entered the country or their status (e.g., CHNV parolees; aliens whom DHS encountered at a southwest border POE placed in section 240 removal proceedings; and aliens present without admission or parole), localities nationwide have experienced the effects of very high levels of migration.[33]  CHNV parolees and other recent arrivals have competed for limited resources such as housing, food, transportation, education, legal services, and public benefits.[34] Some localities experienced surges of CHNV parolees in particular.[35]

---

[33] *See, e.g.*, Adam Shaw, Fox News, *Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns* (Oct. 31, 2024), https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns; Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[34] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[35] Nick Mordowanec, *Map Shows Hotspots for Migrants Flying Into US*, Newsweek (May 1, 2024), https://www.newsweek.com/migrants-dhs-flying-border-illegal-1896239.

The domestic impact of the CHNV parole program was also felt at the Federal level in at least three ways.  First, the CHNV parole programs resulted in expanded eligibility for Federal public benefits.  This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a "qualified alien."  *See* 8 U.S.C. 1641(b)(4).  Because DHS generally issued two-year periods of parole from the outset, CHNV parolees generally were considered qualified aliens.  Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.*, 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all CHNV parolees with respect to all public benefit programs.  For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might "a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)," *see* 7 CFR 273.4(a)(6)(ii)(E).  Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to "lawfully residing" children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[36]

Second, the CHNV parole programs have exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large.  For example, the population of aliens paroled into the United States and who have filed an application for asylum contributes to an already taxed immigration system with historically high backlogs before USCIS and the Executive Office for Immigration Review ("EOIR").[37]  Many such parolees may not otherwise have come to the United States and have exacerbated such backlogs or are likely to eventually do so.  U.S.

---

[36] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).
[37] *See* Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog  (2025); *see also* Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time* (Center for Immigration Studies) (July 26, 2024), https://cis.org/Jacobs/Affirmative-Asylum-Backlog-Exceeds-One-Million-First-Time.

Citizenship and Immigration Services ("USCIS") recently reported that as of the end of December 2024, the USCIS asylum backlog had increased to over 1.4 million cases.[38]  CHNV parolees account for approximately 75,000 affirmative asylum applications.[39]  In addition, when a CHNV parolee's two-year parole period ends, if the CHNV parolee has no lawful basis to remain in the United States, DHS may place the alien in section 240 removal proceedings.  But, due in part to the overwhelmed expedited removal system, EOIR's immigration court backlog has already been growing rapidly, and will be further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends.  The immigration court backlog increased by approximately 44 percent between the end of FY 2023 (2.5 million cases) and FY 2024 (3.6 million cases).[40]

Third, the CHNV parole programs had a disruptive impact for CBP operations at interior air POEs.  A progressive increase in beneficiaries of the CHNV parole programs arriving at POEs with advance travel authorizations "(ATAs") were ultimately not granted parole due to CBP's determination that the alien did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country.  As a result, CBP processed these aliens for another appropriate disposition under Title 8, including detention or referral into expedited removal proceedings or section 240 removal proceedings, as appropriate.  This caused further processing delays and coordination with air carriers for return flights when appropriate, and further contributed to the immigration court backlog.

The overwhelmed immigration systems in particular may incentivize aliens to enter the United States, without regard to the strength of any potential claims for immigration status, as

---

[38] USCIS, Performance Data, Asylum Division Monthly Statistics Report (Dec. 2024), https://www.uscis.gov/sites/default/files/document/data/asylumfiscalyear2025todatestats_241231.xlsx (last visited Feb. 25, 2025).
[39] USCIS Office of Performance & Quality.
[40] EOIR, Executive Office for Immigration Review Adjudication Statistics (Jan. 16, 2025), https://www.justice.gov/eoir/media/1344791/dl?inline.

aliens who are subject to expedited removal may nevertheless be placed in section 240 removal proceedings when the system is strained beyond its processing capacity. As a result, many remain in the United States until their immigration benefit requests are adjudicated or their section 240 removal proceedings conclude and any resultant removal order is executed. Any further strain to the immigration systems resulting from aliens pursuing the CHNV parole programs exacerbates these detrimental incentives.

In short, the domestic impact of the CHNV parole programs do not warrant continuing to operate these programs. Implementation of these programs coincided with an overall increase in CHNV migration, significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs.

### 3. The CHNV Parole Programs Are Inconsistent with the Administration's Foreign Policy Goals

One of the stated goals of the CHNV parole programs was to promote the foreign policy objectives of the prior administration. Indeed, DHS explained repeatedly in its notices promulgating the CHNV parole programs that their implementation would advance the foreign policy objectives of the then-current administration.[41] The foreign policy objectives underlying the CHNV parole programs, however, are not consistent with those of the current Administration.

Executive Order 14150, "America First Policy Directive to the Secretary of State" (Jan. 20, 2025) clearly sets out the President's vision that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[42] Executive Order 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025) states that it is the policy of the United States to "faithfully execute the immigration laws against

---

[41] *See e.g.*, 87 FR at 63516 ("the implementation of [the Venezuela process] will advance the Administration's foreign policy goals"); 88 FR at 1253 ("[the Haiti process] is fully aligned with larger and important foreign policy objectives of this Administration").

[42] *See* Executive Order 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." Further, it is the policy of the United States to achieve the "total and efficient enforcement of those laws, including through lawful incentives and detention capabilities."[43]

Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico ("GOM") making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens. Section 13 of that Executive Order 14159 specifically addresses repatriation, and directs the Secretaries of State and Homeland Security to take all appropriate action to cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), and ensure that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States. Section 13 further directs the Secretaries to eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. The Order provides that any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out section 243(d) sanctions and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

Further, as noted above, Executive Order 14165, "Securing Our Borders" states that DHS shall "terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"[44] In the same Order, the

---

[43] See Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).
[44] See Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending section 240 removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

The President has pursued the cooperation of foreign partners in other ways as well.  For instance:

- On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[45]

- On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[46]

- On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to "do what's right" in regard to illegal migration.[47]

- Beginning on February 1, 2025, President Trump has issued a number of tariff-related executive orders in connection with the situation at the southern border.[48]

---

[45] The White House, "Readout of President Donald J. Trump's Call with President Nayib Bukele" (Jan. 23, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/.
[46] The White House, "Statement From the Press Secretary" (Jan. 26, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/.
[47] Meryl Sebastian, *Trump Says India 'Will Do What's Right' on Illegal Immigration* BBC News (Jan. 27, 2025), https://www.bbc.com/news/articles/cj91z842wlmo.
[48] *See, e.g.*, Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

- On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, who will then be repatriated to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[49]

Multiple agencies of the U.S. Government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced multiple discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[50] consistent with Secretary of State Rubio's January 22, 2025 announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[51] In that announcement, the Department of State made clear that it "will no longer undertake any activities that facilitate or encourage mass migration" and that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants."[52] Additionally, pursuant to his authority under section 219 of the INA, 8 U.S.C. 1189,[53] Secretary of State Rubio designated the Venezuelan gang, Tren de Aragua, along with other cartels and gangs, as Foreign Terrorist Organizations.[54]

---

[49] *Panama Receives First US Deportation Flight Under Trump Administration*, The Tico Times (Feb. 16, 2025), https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.

[50] *See, e.g.*, U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) ("President Bukele agreed to take back all Salvadoran MS-13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country."), https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/; U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) ("Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap."), https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.

[51] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025).

[52] *Id.*

[53] *See* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[54] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025).

In other words, in addition to directly fulfilling the President's directive to terminate the CHNV parole programs, this action complements and underscores the Administration's pivot to a foreign policy that prioritizes the United States' interests in a secure border. Regardless of whether the prior Administration saw the CHNV parole programs as a component of a regional migration management strategy, the current Administration is not pursuing that strategy. Rather, as described above, the current Administration has focused its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States and obtain complete operational control of our borders.

These measures will allow DHS to better "achieve the total and efficient enforcement" of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[55] In short, the continued implementation of the CHNV parole programs no longer accords with the President's stated priorities and foreign policy objectives.

### 4. Other Factors Do Not Counsel in Favor of Maintaining the Programs

The other factors cited by DHS in promulgating the CHNV parole programs also do not counsel in favor of maintaining the programs. For instance:

- DHS predicted that by allowing DHS to vet aliens before they travel to the United States, the programs would enhance national security as compared to high levels of illegal immigration. But as discussed above, these programs are unnecessary to counter high levels of illegal immigration. In addition, and critically, such vetting is inherently limited and, as has been reported publicly, there were significant gaps in

---

[55] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

the vetting process.  In response to these problems, the CHNV parole programs were paused briefly in July 2024 to evaluate the program vulnerabilities.[56]

- DHS also initially reasoned that the CHNV parole programs would disincentivize a dangerous journey that puts aliens' lives and safety at risk and enriches smuggling networks.  As noted above, however, although these programs were accompanied by a significant decrease in CHNV encounters between southwest border POEs, they were also accompanied by a significant increase in CHNV encounters at southwest land border POEs.  This indicates that CHNV nationals continued to engage in dangerous migration to the southwest border, even if the overall level of migration to the southwest border dropped somewhat and CHNV aliens did not cross between POEs with the same frequency.  And, as also noted above, the U.S. Government has implemented other policies that have more effectively deterred illegal immigration.

- Another stated goal of the CHNV parole programs was to reduce the burden on DHS personnel and resources that would otherwise be required for detention, monitoring, processing, and removal.  However, as noted above, significant resource burdens persisted even after the programs' implementation, including with respect to encounters at and between POEs.  Program implementation itself occupied significant resources.  For instance, there have been approximately 2,970,000 Forms I-134 and I-134A filed with USCIS since October 2022,[57] which includes 2,140,000 pending

---

[56] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards*, Wash. Times (Aug. 2, 2024), https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.

[57] Under the parole program for Venezuelans, a U.S.-based supporter would initiate consideration for parole under the program by filing Form I-134, *Declaration of Financial Support* (Online), along with supporting evidence.  87 FR at 63515.  In January 2023, when DHS expanded the programs to cover Cubans, Haitians, and Nicaraguans and their immediate family members as well, DHS announced that it would instead begin accepting the Form I-134A *Online Request to be a Supporter and Declaration of Financial Support*, along with supporting evidence, to initiate consideration for parole under all four programs.  *See, e.g.*, 88 FR at 1279.  Neither form could be filed on paper by mail and neither form required the payment of a fee.

review, 642,410 confirmed by USCIS, and 181,820 non-confirmed by USCIS.[58]

Further, DHS needed additional resources to counter the fraud, national security

concerns, and public safety concerns discussed above.  In addition, due to the

originating location of beneficiaries of the CHNV parole programs and available

travel routes via commercial airlines, over 80 percent of the aliens who were issued

an ATA under the CHNV parole programs flew to Florida POEs.  The unexpected

increase in approximately 25,000 inadmissible aliens per month resulted in CBP

experiencing a decrease in enforcement operations and an increase in wait times,

overtime expenditures, and other needs at Florida POEs.  Processing an alien

requesting parole under the CHNV parole programs requires secondary processing

and enrollment of biometrics, resulting in a more extensive and prolonged time in

CBP facilities.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the CHNV parole programs, DHS has

considered potential reliance interests of a range of potential supporters and beneficiaries of

these programs.  At the outset, however, DHS observes that the temporary and discretionary

nature of the programs indicate that reliance on the continued existence of the CHNV parole

programs would be unwarranted.  The notices establishing the CHNV parole programs expressly

advise the public that, "[t]he Secretary retains the sole discretion to terminate the [Parole

Program] … at any point"[59] and that "DHS may terminate parole in its discretion at any time."[60]

The CHNV parole programs were "being implemented as a matter of the Secretary's discretion.

---

[58] OHSS analysis of USCIS Form I-134/Form I-134A data as of January 22, 2025.  The Venezuelan parole program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.  "Confirmed" in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.
[59] E.g., 88 FR at 1268 (Cuba).
[60] E.g., 88 FR at 1272 (Cuba).

[They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal."[61]

In addition, DHS observes that on October 4, 2024, the prior administration announced that there was no re-parole process under CHNV, informing participants that, "if you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires."[62]  Finally, as noted above, Executive Order 14165 directs the Secretary to terminate the CHNV parole programs consistent with law.

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, that DHS made clear months ago that there would be no "re-parole" process under the CHNV parole programs, and the additional notice provided in Executive Order 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution.[63]

### 1. Reliance Interests of Potential Supporters and Beneficiaries

DHS first considered the potential reliance interests of those U.S.-based supporters who had intended to file or have filed a Form I-134A in support of a potential parolee.  In general, the costs associated with such filings are minimal.  The potential supporter may have incurred the opportunity cost of completing Form I-134A, estimated at 2.60 hours per response, and a few potential supporters who submitted Form I-134A may have submitted their biometrics (photograph and fingerprints) at a USCIS Application Support Center for biometric screening and vetting by USCIS as part of the review of their Form I-134A.[64]

---

[61] *E.g.*, 88 FR at 1277 (Cuba).
[62] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program*, CBS News (Oct. 4, 2024), https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/.
[63] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024), available at
https://web.archive.org/web/20250104043158/https/www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.
[64]  Biometrics submission is estimated to require 1.17 hours per respondent.  89 FR 104557 (Dec. 23, 2024).

At this early stage in the process, the costs incurred by a potential beneficiary are also minimal.  Once a supporter is confirmed, the potential beneficiary receives instructions to create a USCIS online account, confirm their biographic information in their online account, and attest to meeting the eligibility requirements, including public health requirements, and certain vaccination requirements.  It is also possible that a beneficiary who has received instructions to create an online account may have obtained vaccinations in anticipation of the required attestation.  After confirming their biographic information, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo.  CBP One was used to collect the beneficiary's biographic information and photo and was an additional step in the process prior to the alien being authorized to travel to the United States to seek parole.  The total estimated time to complete the CBP One part of the ATA process was 10 minutes.  *See* 88 FR 62810, 62812 (Sept. 13, 2023).

In general, these costs are not significant and pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States.  DHS intends to issue a notice of non-confirmation for all remaining pending Forms I-134A.  DHS will also rescind the confirmation of all Form I-134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole.  Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I-134A.

## 2. Reliance Interests of Potential Beneficiaries with Approved ATAs and Their Supporters

A beneficiary with an approved ATA may travel to the United States to seek a discretionary grant of parole.  Authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel, at no cost to the U.S. government, via commercial air

to the United States.[65]  DHS intends to cancel all pending applications for advance authorizations

to travel to the United States to seek a discretionary grant of parole under the CHNV parole

programs.  There are no currently approved ATAs upon which an alien may travel under the

CHNV parole programs.[66]

A beneficiary whose application for an ATA is cancelled may have, for example,

provided notice to their landlord, sold property, and/or resigned from employment.  In addition, a

confirmed Form I-134A supporter may have incurred expenses, for example, to secure living

quarters or furniture for the beneficiary in anticipation of their process being completed through

parole into the United States.

DHS recognizes that the potential costs incurred by supporters and potential beneficiaries

at this point could be viewed as significant.  Nevertheless, as explained above, supporters and

potential beneficiaries were apprised that DHS could terminate the programs at any point.

Moreover, the notices for each parole program made it clear that the approval of an ATA or grant

of parole at a POE was entirely discretionary.  *See*, *e.g.*, 88 FR 1243, 1252 (noting that a

potential beneficiary may be "ineligible for advance authorization to travel to the United States

as well as parole under this process" for a range of reasons, including if the alien "fails to pass

national security and public safety vetting or is otherwise deemed not to merit a favorable

exercise of discretion"); 88 FR at 1253 ("Approval of advance authorization to travel does not

guarantee parole into the United States.  Whether to parole the [aliens] is a discretionary

determination made by CBP at the POE at the time the [alien] arrives at the interior POE"); 88

FR at 1253 ("[Aliens] who . . . otherwise do not warrant parole pursuant to [section 212(d)(5)(A)

of the INA], and as a matter of discretion upon inspection, . . . may be referred to ICE for

detention.").  While the termination of the CHNV parole programs as provided in this notice may

---

[65] Authorization to travel does not guarantee parole.  Parole of the individual is a discretionary determination made by CBP when the individual arrives at the interior POE.  *See*, *e.g.*, 88 FR 1255, 1264 (Jan. 9, 2023).
[66] OHSS analysis of advance travel authorization data provided by CBP PSPD and valid as of February 27, 2025.

result in costs incurred by both the supporter and potential beneficiary who have prepared to travel to the United States, those parties chose to incur such expenses knowing that completion of the process was never guaranteed by the terms of the program, and the termination of the programs was possible at any time. DHS has concluded that any such reliance interests are outweighed by other interests and policy concerns as explained in this notice.[67]

## V. Effect of Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests

The notices establishing the CHNV parole programs explain that parole is not an admission of the alien to the United States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id*. Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the CHNV parole programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

---

[67] DHS has considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms. Even if there were currently approved ATAs, DHS would not pursue this route, because DHS would not wish to incentivize aliens flying to the United States to seek parole under policies that DHS no longer supports or appear to encourage them to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. Such an approach would risk exacerbating the problems created by the CHNV parole programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit. If parole is not granted, the alien may be returned to their home country at U.S. Government expense or processed for another appropriate disposition under the INA.

As noted above, between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs. DHS has determined that as one aspect of the termination of the CHNV parole programs, consistent with the Secretary's statutory and regulatory authority,[68] the parole of aliens who have been paroled into the United States under the CHNV parole programs and whose parole has not already expired by [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER] will terminate on that date unless the Secretary makes an individual determination to the contrary.

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice. Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States before their parole termination date. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home mobile app. Aliens should visit https://i94.cbp.dhs.gov/home for more information about voluntarily reporting their departure.

In implementing this approach, DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (e.g., adjustment of status, asylum, Temporary Protected Status, or T or U

---

[68] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"); 8 CFR 212.5(e)(2)(i) ("[U]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*. . . ." (emphasis added)).

nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (e.g., petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available).  Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS's institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a).  Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b).  DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures.  8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period.  DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States.[69]  Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

However, any assessment of the reliance interests of CHNV parolees must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any

---

[69] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . .  But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy.  In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)).

time when, in her opinion, the purposes of such parole have been served[70]; and that (2) the initial

term of parole would be limited to a maximum of two years.  These clear, limiting conditions of

the parole programs served to attenuate any long-term expectations and interests amongst CHNV

parolees.  Accordingly, DHS has taken these limiting conditions, along with CHNV parolees'

knowledge of them, into consideration when weighing their reliance interests.[71]

DHS has concluded that the potential reliance interests among aliens paroled into the

United States under the CHNV parole programs do not outweigh the U.S. government's strong

interest in promptly removing parolees when the basis for the underlying program no longer

exists.  To effectuate their prompt removal, the U.S. government may in its discretion initiate

expedited removal proceedings where appropriate.  Expedited removal is available only when an

alien has not been continuously present in the United States for at least the two years preceding

the date of the inadmissibility determination.  INA 235(b)(1)(iii)(II), 8 U.S.C. 1225(b)(1)(iii)(II);

8 CFR 235.3.[72]  If DHS were to allow the CHNV parolee population to remain for the full

duration of their two-year parole, DHS would be compelled to place a greater proportion of this

population in section 240 removal proceedings to effectuate their removal, further straining the

already over-burdened immigration court system discussed in Section III.1.

To the extent that current parolees have obtained housing and employment authorization,

or created new ties within the community while in the United States, DHS notes these interests

are qualitatively less than any reliance interests that might be attributed to the Deferred Action

for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS v.

Regents of the Univ. of Cal.*[73]  In *Regents*, the Supreme Court reviewed whether DHS had

---

[70] As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia*, the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.
[71] *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is "unjustified in light of the express limitations" in relevant immigration policy).
[72] *See* Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025).
[73] 591 U.S. 1 (2020).

appropriately considered the reliance interests of DACA recipients when rescinding DACA.[74]
The reliance interests of DACA recipients, all of whom had been present in the United States for
far longer than two years, included their enrollment in degree programs, the beginning of their
careers, the starting of businesses, and the purchase of homes.[75]  As the Court noted, these
interests, though noteworthy, were not "necessarily dispositive," and "DHS may determine, in
the particular context before it, that other interests and policy concerns [in rescinding DACA]
outweigh any reliance interests."[76]  For the purposes of the actions announced in this notice,
DHS notes the reliance interests of those paroled under the CHNV parole programs are far less
than the population in *Regents*.  Further, as stated above, the reliance interests under the CHNV
parole programs must take into account the express, discretionary terms of the parole program.
Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in
promptly returning parolees when the basis for the underlying parole no longer exists.

      Third parties, including employers, landlords, and others, may also have indirect reliance
interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants
of parole to expire at the end of their designated terms, such third parties would have
experienced the effects of such expiration.  By providing 30 days' notice, DHS balances the
benefits of a wind-down period for aliens and third parties with the exigency of promptly
enforcing the law against those aliens lacking a lawful basis to remain in the United States.  For
the same reasons set forth above, DHS finds the U.S. government's interest in terminating these
grants of parole outweigh any reliance interest of third parties.

      DHS has considered the alternative of permitting CHNV participants' parole to remain in
effect until the natural expiration of the parole, as DHS has in the past done with some parole
terminations.  *See, e.g.*, 82 FR 38926, 38927 (Aug. 16, 2017).  However, DHS has opted to not

---

[74] *Id.* at 31.
[75] *Id.*
[76] *Id.*

pursue this route. As explained above, this would essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

DHS has also considered the alternative of a longer than 30-day wind-down period. After due consideration, DHS has also decided not to pursue this option. As discussed above, DHS has a strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system. Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal.[77] DHS has determined that a 30-day wind-down period provides affected parties sufficient notice while also preserving DHS's ability to enforce the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States. Accordingly, DHS is opting not to increase the wind-down period to more than 30 days.

## VI. *Federal Register* Notice as Constructive Notice

This *Federal Register* notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole. *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this

---

[77] According to OHSS analysis of data provided by USCIS, for each month from March 2025 through September 2026, there are thousands of CHNV parolees who will become ineligible for expedited removal upon the natural expiration of their two-year parole.

section, neither humanitarian reasons nor public benefit warrants the continued presence of the

alien in the United States, *parole shall be terminated upon written notice to the alien*. . . ."

(emphasis added)). For the reasons set forth above, the Secretary has concluded that neither

urgent humanitarian reasons nor significant public benefit warrants the continued presence of

aliens paroled under the CHNV programs and the purposes of such parole therefore have been

served. This notice accordingly serves as written notice to CHNV parolees.

DHS has determined that publication of this notice in the *Federal Register* is legally

sufficient notice to all interested or affected persons regardless of actual knowledge or hardship

resulting from ignorance. *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc. v. I.C.C.*, 881 F.2d

663, 667-68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947)

("Congress has provided that the appearance of rules and regulations in the *Federal Register*

gives legal notice of their contents.").

DHS finds *Federal Register* publication of the decision to terminate existing grants of

parole to be the most practicable approach in light of the size of the affected population and

potential noncompliance with change-of-address reporting requirements. *See* 8 U.S.C. 1305; 8

CFR 265.1. Because all CHNV parolees should have a USCIS online account and all processing

under these parole programs took place electronically, DHS will also provide individual notice to

each parolee through their USCIS online account. *Cf., e.g.*, 8 CFR 103.2(b)(19)(ii)(B) ("For

applications or petitions filed electronically, USCIS will notify both the applicant or petitioner

and the authorized attorney or accredited representative electronically of any notices or

decisions. . . ."). This notice, and the individual notice through the USCIS online account, each

independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

**VII. Administrative Procedure Act**

This notice is exempt from notice-and-comment rulemaking requirements because DHS

is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A). *i.e.*, a "statement [] issued

by an agency to advise the public prospectively of the manner in which the agency proposes to

exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).  By terminating the CHNV parole programs—which themselves constituted general statements of policy, *see, e.g.*, 88 FR at 1277—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority.  Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA).[78]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the CHNV parole programs, it is a general statement of policy.  *See Lincoln*, 508 U.S. at 197.  Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary of Homeland Security "in [her] discretion."  The CHNV parole programs therefore were general statements of policy.

Because the CHNV parole programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice and comment rulemaking requirements.  Through the termination of the CHNV parole programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[79]  Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation.[80]

---

[78] *Cf. Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[79] *See Encino Motorcars*, 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[80] *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[81]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[82]  Consistent with the Secretary of State's February 21, 2025 determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[83]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-comment rulemaking, some courts have required such a showing,[84] and DHS can make one here.  Delaying rescission of the CHNV parole programs to undertake rulemaking would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration.  It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

---

[81] *See* 5 U.S.C. 553(a)(1); 88 FR at 1277; 88 FR at 1253; 88 FR at 1264; 87 FR at 63516 (as modified by 88 FR 1279).

[82] *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[83] U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States*, 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025).  The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165.  As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate the CHNV parole programs.

[84] *See, e.g.*, *Rajah* v. *Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

As explained in Section III.3 of this notice, the CHNV parole programs were implemented as an integral part of negotiations with regional neighbors, including Mexico, to address unlawful migratory flows challenging immigration systems throughout the region. For instance, in announcing the Venezuela parole program, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[85] DHS cautioned that it "will not implement the new parole process without the ability to return Venezuelan nationals who enter [unlawfully] to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States [unlawfully] between POEs." DHS explained that "initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements."[86] DHS noted that the program was "not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—[but] also fully aligned with larger and important foreign policy objectives of [the prior] Administration and fits within a web of carefully negotiated actions by multiple governments." [87] When implementing the Cuba, Haiti, and Nicaragua parole programs, DHS invoked the foreign affairs exemption on similar grounds.[88]

Yet, as also discussed in Section III.3 of this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the CHNV parole programs was contingent upon the GOM making an independent decision to accept the return or removal of CHNV nationals who migrated illegally,

---

[85] *See* 87 FR at 63516.
[86] *Id.*
[87] *Id.*
[88] *See* 88 FR at 1277 (Cuba), 88 FR at 1253-54 (Haiti), 88 FR at 1265 (Nicaragua).

the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the CHNV parole programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of CHNV nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.3 of this notice, with countries to accept the removal of illegal aliens, including inadmissible CHNV nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. Any delay for such procedures would harm the U.S. Government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the CHNV parole programs, as explained throughout this notice, contrary to the President's direction to protect the American

people against invasion and to secure the border.  Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.[89]

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[90]  The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part.  This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

This rule does not promulgate new or revise existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104-13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

Kristi Noem,

Secretary of Homeland Security

[FR Doc. 2025-05128 Filed: 3/21/2025 4:15 pm; Publication Date:  3/25/2025]

---

[89] *See* 5 U.S.C. 553(b)(B), 553(d)(3); *see Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) ("a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required"); *see also* Executive Order 14159, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).
[90] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988).