## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; MIGUEL DOE; ANDREA DOE; LUCIA DOE, DANIEL DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; GABRIELA DOE; NORMA LORENA DUS; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; and HAITIAN BRIDGE ALLIANCE, <br><br> Plaintiffs, <br><br> – *versus* – <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD M. LYONS, in his official capacity as the Acting Director of Immigration and Customs Enforcement; PETE R. FLORES, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; KIKA SCOTT, in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | **Civil Action No: 1:25-cv-10495-IT** <br><br> **Leave to File Granted – March 27, 2025** |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    Ukrainians seeking safety from the Russian invasion of their country; Cubans, Haitians, Nicaraguans, and Venezuelans fleeing political instability, persecution, and environmental disasters; Afghans who assisted the United States government during its war in

Afghanistan; the family members of certain U.S. citizens and residents who have been deemed eligible for a visa but are simply waiting in their home countries, often for years, for one to become available for them; the undocumented family members of active and retired U.S. military servicemembers; and parents seeking to reunify with children from certain Central American countries after years of family separation are just a few of the populations that the United States has sought to aid in recent years by granting eligible individuals parole, on a case-by-case basis, so that they may enter or remain in the country for a temporary period of time and find safety and stability here.

2.      The Trump administration, however, has sought not only to terminate those legal humanitarian pathways to the United States, but to block access to any other longer-term, more stable legal status for individuals granted humanitarian parole, so that these people have no options to remain here in safety, to continue contributing to their communities, and to remain with family members here in the United States.

3.      This lawsuit challenges the steps the Trump administration has taken to radically limit what had up to this point been a broad power granted by Congress to allow the executive to respond to migration challenges, address global humanitarian crises, and further important foreign policy objectives in a flexible and adaptive way. It also challenges the Trump administration's dismantling of legally established and congressionally authorized pathways to the United States, including:

- Uniting for Ukraine ("U4U"), for Ukrainians displaced by the war with Russia;

- the processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), countries that have been ravaged by natural disasters and/or political strife;

- Operation Allies Welcome ("OAW"), for Afghans fleeing the newly resurgent Taliban;

- Family Reunification Parole ("FRP"), for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras with approved family-based immigrant visa petitions;

- Military Parole in Place ("Military PIP"), so that U.S. military servicemembers may seek parole for their parents, children, and spouses, and need not worry about the immigration status of these close family members while serving their country; and

- The Central American Minors ("CAM") parole process, which reunites parents who are already in the United States with their children who remain behind.

4.      In addition, this lawsuit challenges the Trump administration's attempts to block individuals paroled through these and other processes from seeking alternate legal statuses created and authorized by Congress.

5.      On January 20, 2025—Inauguration Day—President Trump issued Executive Order 14165, entitled "Securing Our Borders," which directed the Secretary of Homeland Security to terminate all "categorical parole programs," explicitly referencing the CHNV parole processes.

6.      Also on that day, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), in which he authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute." Acting Secretary Huffman directed all DHS staff to implement the new agency policy under which this historically common use of the parole authority is unlawful.

7.      On the basis of Acting Secretary Huffman's conclusion that parole programs are unlawful, DHS has stopped considering parole applications through these processes, as well as requests on behalf of people already here for re-parole or for parole-in-place through the Military Parole-in-Place process. In addition, on March 21, 2025, DHS made public a Federal Register

Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," which was eventually published in the Federal Register on March 25, 2025 (the "March 25 FRN"), and "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." The March 25 FRN further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary."

8.     Also based on Acting Secretary Huffman's erroneous legal conclusion, USCIS has also unlawfully suspended the adjudication of all requests for immigration benefits (including applications for work authorization as well as asylum, Temporary Protected Status ("TPS"), or other status adjustments) for individuals paroled through "categorical" humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

9.     Weeks after this unlawful suspension was imposed, Acting Deputy Director of USCIS Andrew Davidson sought to justify it in a post-hoc February 14, 2025 memorandum (the "February 14 Davidson memorandum"),  That memorandum justified the suspension as to the U4U, CHNV, and FRP processes based solely on the "potential" that the "vetting" that the beneficiaries of these parole processes underwent in connection with their parole applications was not identical to what was in effect on January 19, 2021—the last day of President Trump's first term. This so-called administrative pause may also apply, at a minimum, to the OAW and MPIP processes. There is no authority for this suspension, and it is contrary to the laws Congress enacted governing those immigration benefit applications, in addition to being arbitrary and capricious.

10.     At the same time that it has terminated these humanitarian parole processes for their alleged illegality and suspended the ability of parolees to obtain forms of immigration relief to

which Congress has made them entitled, DHS has also taken aggressive action—challenged separately—to make it easier to deport individuals paroled through these processes as quickly as possible.

11.    Such actions are not only illegal, but shockingly callous. Plaintiff Svitlana Doe[1] fled Ukraine following the Russian invasion and bombing of her town. Her son still requires speech therapy to overcome the horrors of war her family witnessed. Plaintiffs Maksym and Maria Doe likewise fled Ukraine, where Maksym heroically helped to rescue over 22,000 Ukrainians and provided humanitarian assistance to over half a million more. Plaintiffs Alejandro, Armando, Ana, and Carlos fled Nicaragua following the torture of a family member at the hands of the state and subsequent political persecution. Plaintiff Andrea Doe's husband, a political prisoner in Nicaragua, was brought to the United States *by* the United States government, which then asked him and others similarly situated to use the CHNV parole program to achieve reunification with the family members they had been forced to leave behind.  Plaintiff Omar Doe—at great risk to himself and to his family—faithfully served alongside the U.S. military in Afghanistan for over eighteen years before being evacuated by the military following the country's fall to the Taliban. Plaintiff Valentin Rosales Tabares was on the cusp of reuniting with his daughter and granddaughter, who were approved for Cuban Family Reunification Parole but had not yet been given a travel date, when the Trump administration terminated the FRP process. Plaintiff Adolfo Gonzalez, Jr. has served this country honorably as a First Sergeant in the Army, and Marim Doe continues to serve his country in the Navy, but their MPIP applications for their loved ones are now indefinitely

---

[1] The Court has granted leave for Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Andrea Doe, Marim Doe, Aleksandra Doe, Teresa Doe, and Rosa Doe to proceed pseudonymously, and a motion for four other individual plaintiffs to similarly proceed will be filed imminently.

suspended. Plaintiff Teresa Doe's CAM parole has expired and she is now subject to removal because her application for re-parole is indefinitely suspended, and she fears being deported and removed from all her family. And Plaintiff Rosa Doe was about to reunite with her fourteen-year-old daughter and her father through the CAM parole process, but now does not know when she will see them again.

12.    The individuals able to obtain parole through U4U, CHNV, OAW, FRP, and CAM trusted that the U.S. government would help protect them from harm. They waited—even amid active war and persecution—to enter the United States until they had a legal avenue to enter the country. And now CHNV parole beneficiaries have had their grants of parole and work authorization prematurely cut short. All humanitarian parole beneficiaries have been cut off from the immigration relief Congress made available to them. Defendants are treating similarly our Afghan allies who arrived through OAW and individuals closely related to members of our Armed Forces.

13.    Individual Plaintiffs, including Putative Class Representatives on behalf of themselves and similarly situated persons, and Organizational Plaintiff Haitian Bridge Alliance ("HBA"), seek a declaration that humanitarian parole processes like U4U, CHNV, OAW, FRP, MPIP, and CAM are lawful; a preliminary and permanent injunction prohibiting DHS from continuing to apply its unlawful construction of the parole statute; a preliminary and permanent injunction prohibiting DHS from unlawfully and categorically revoking or otherwise placing conditions on grants of parole and work authorization to parole beneficiaries; and vacatur of agency actions taken pursuant to the agency's erroneous understanding of the law.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

15.    Venue is proper in this District because Plaintiffs Svitlana Doe and Wilhen Pierre Victor reside in this District. *See* 28 U.S.C. § 1391(e)(1).

**PARTIES**

16.    Plaintiff **Svitlana Doe** is a citizen of Ukraine. Svitlana fled Ukraine in November 2024 following Russia's unprovoked and unjustified invasion into the country. Svitlana is the mother to a young boy with celiac disease, for whom care was difficult in Ukraine even before the war, and close to impossible during wartime. Svitlana, her husband, and her young son narrowly escaped Ukraine in November 2024, and traveled to the United States pursuant to the U4U parole process. Svitlana currently lives in Dover, Massachusetts. She has a pending application for TPS filed in February 2025, which has been indefinitely stalled due to the administration's pause on processing immigration benefits applications for U4U parolees.

17.    Plaintiff **Maksym Doe** is a Ukrainian national living in Brooklyn, New York, with his wife, Maria Doe. After fleeing Kharkiv on the day Russia invaded Ukraine, he and several partners founded a nonprofit organization in Ukraine that began coordinating volunteer efforts to evacuate people from the war-stricken eastern part of the country. They rescued over 22,000 people within the first six months of the war and since then have provided humanitarian assistance to over a half million Ukrainians. Maksym came to the United States through the U4U parole process in April 2023. He and his wife have applied for Temporary Protected Status ("TPS"), and he has also applied for re-parole in September 2024 because his current grant of U4U parole expires in April 2025. Processing these applications has been paused indefinitely due to the February 14 Davidson memo. If that pause remains in effect, Maksym's parole will expire, he will lose his work authorization and his ability to continue his humanitarian work for Ukrainians, and he will be displaced once again.

7

18.     Plaintiff **Maria Doe** is a Ukrainian national who currently lives with her husband Maksym in Brooklyn, New York. She and Maksym Doe came to the United States through the U4U parole process with all their possessions packed into two suitcases. Maria was able to apply for U4U re-parole and was granted another two years of parole in January 2025, but she has also applied for Temporary Protected Status and is working with her employer to file an H-1B employment-based visa application soon. Not only will these applications not be processed due to the administration's indefinite hold on processing applications for immigration benefits for parole beneficiaries, but if her parole expires or the administration prematurely terminates it, she will once again be displaced.

19.     Plaintiff **Alejandro Doe** is a citizen of Nicaragua. Alejandro is the brother of Ana Doe and Miguel Doe and currently lives in Gainesville, Georgia. Alejandro fled Nicaragua following the abduction and torture of his father by the Nicaraguan state. In July 2024, Alejandro entered the United States through the parole process for Nicaraguans, a component of the CHNV parole processes. He was sponsored by his cousin, Gabriela Doe. Due to the March 25 FRN, Alejandro's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely stalled due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

20.     Plaintiff **Armando Doe** is a citizen of Nicaragua. Armando is married to Ana Doe and currently lives in Gainesville, Georgia. Armando fled Nicaragua due to increasing political repression and danger stemming from the disappearance of Ana's father by the Nicaraguan government and Armando's work at a digital media company dedicated to democratizing information and documenting government abuses. Armando entered the United States in February

2024, through the CHNV parole process for Nicaraguans. He was sponsored by his wife's cousin, Gabriela Doe. Due to the March 25 FRN, Armando's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

21.     Plaintiff **Ana Doe** is a citizen of Nicaragua. Ana is married to Armando Doe and currently lives in Gainesville, Georgia. She is the sister of Alejandro Doe and Miguel Doe and cousin of Carlos Doe. Ana fled Nicaragua due to the increasing instability, political repression, and danger culminating in her father's capture and torture by the Nicaraguan government, as well as the danger her husband Armando faced working for a digital media company targeted by the Nicaraguan government for the information it published. Ana entered the United States and was granted parole through the CHNV parole process for Nicaraguans in February 2024. She was sponsored by her U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Ana's period of parole, and the associated work authorization, have been prematurely terminated. She also has a pending asylum application, as a derivative under her husband's pending asylum application, which is indefinitely on hold due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

22.     Plaintiff **Carlos Doe** is a citizen of Nicaragua. He is the cousin of Ana Doe and Alejandro Doe, and he currently lives in Gainesville, Georgia. Carlos fled Nicaragua because of the political instability and the fact that the Nicaraguan government was actively persecuting him due to his involvement in protests against the government and was issuing death threats against him and his family. As a result, Carlos went into hiding, where he received more death threats, rendering it unsafe for him to remain in Nicaragua. Carlos entered the United States and was

granted parole through the CHNV parole process for Nicaraguans in May 2023. He was sponsored by a U.S. citizen family member. Due to the March 25 FRN, Carlos's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

23.     Plaintiff **Miguel Doe** is a citizen of Nicaragua. He is the younger brother of Alejandro Doe and Ana Doe, and he currently lives in Gainesville, Georgia.  Miguel came to the United States to find work so that he could better support himself and his family, including his mother, who he lived with and helped take care of back in Nicaragua. In his home country, it was difficult for Miguel to find stable work that paid decent wages. Miguel entered the United States and was granted parole through the CHNV parole process for Nicaraguans in July 2024. He was sponsored by his U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Miguel's period of parole, and the associated work authorization, have been prematurely terminated, and he will be vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

24.     Plaintiff **Andrea Doe** is a citizen of Nicaragua.  She arrived in the United States in the summer of 2023 with her two young sons to reunite with her husband, Rafael Doe, a former political prisoner from Nicaragua who had been evacuated to the United States by the U.S. government in February of that year.  Andrea Doe and the couple's two young sons joined Rafael in the United States through CHNV parole because the U.S. State Department was asking the evacuated Nicaraguans to use the CHNV parole program to seek reunification with the family members they had been forced to leave behind in Nicaragua.  The whole family then applied for

asylum together.  Their application for asylum has been pending with the Asylum Office since December 2023.  If that application is not processed, Andrea Doe and the children will be left without protection against removal to Nicaragua.  Andrea would be at risk of detention and of losing her children, and the family would face permanent separation, because the Nicaraguan government, upon expelling Rafael and the other passengers on the evacuation flight, stripped them of their Nicaraguan citizenship. Additionally, due to the March 25 FRN, Andrea's period of parole, and the associated work authorization, have been prematurely ended, putting her in an even more vulnerable position.

25.    Plaintiff **Lucia Doe** is a citizen of Venezuela. She lives in St. Augustine, Florida, and she is the sister of Plaintiff Norma Lorena Dus ("Lorena"), who sponsored her to come to the United States on CHNV parole. Lucia left Venezuela because she and her family were experiencing extreme financial hardship there. Lucia's salary in Venezuela was not sufficient to provide for even basic needs like food, rent, and clothing. She entered the United States and was granted parole through the CHNV parole process for Venezuelans in July 2024. Due to the March 25 FRN, Lucia's period of parole, and the associated work authorization, have been prematurely terminated, and she will be vulnerable to imminent deportation in less than a month.

26.    Plaintiff **Daniel Doe** is a citizen from Haiti currently living in Orlando, Florida. Daniel left Haiti because of the continuing danger and gang-led violence in Haiti, particularly in the neighborhoods where he lived. His wife and three-year-old daughter remain in Haiti, with pending CHNV sponsorship applications that will now never be processed. He entered the United States in February 2024 through the CHNV parole process for Haitians. Due to the March 25 FRN, Daniel's period of parole and work authorization have been prematurely terminated, and he will be at risk of being vulnerable to imminent deportation in less than a month. The February 14

Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

27.     Plaintiff **Omar Doe** is an Afghan national living in Omaha, Nebraska. He worked for over eighteen years in different capacities with the U.S. military in Afghanistan, including as an interpreter. He and his wife and five children were evacuated to the United States as part of the U.S. military's withdrawal from Afghanistan in 2021. His application for a Special Immigrant Visa has been pending for almost three and a half years. Because his parole and his work authorization will expire in September 2025, he is also working on filing an asylum application with assistance from a nonprofit. But none of these applications will be adjudicated if the Trump administration's pause on the processing of immigration benefits continues, and Omar fears that he will lose his legal status and be vulnerable to deportation.

28.     Plaintiff **Sandra McAnany** is a U.S. citizen who lives in La Crosse, Wisconsin. She is driven by her strong Christian faith to serve as the U.S.-based sponsor for seventeen individuals with active parole status through CHNV—fifteen from Venezuela and two from Nicaragua. They were all approved for two-year periods of parole, and most have applied for asylum based on the fears they have of returning to their countries of origin. Sandra has given much of her time, effort, and money over the last few years supporting her CHNV beneficiaries to safely travel to the United States, reunite with family members already in the country, and find work and settle into their communities. Sandra has four pending CHNV applications as well, for nationals from Cuba, that will now never be processed due to the administration's end to CHNV.

29.     Plaintiff **Kyle Varner** is a U.S. citizen and physician who lives in Spokane, Washington. As a long-committed political activist deeply involved in liberal and libertarian movements in Venezuela, he is motivated by his strong moral and political convictions to sponsor

seventy-nine individuals through the CHNV parole processes, most of whom are nationals of Venezuela. Forty-three of his beneficiaries are currently in the United States, and at least twenty-nine have pending applications for asylum, TPS, or other immigration relief that are on pause due to the administration's policies. Over the last few years, Kyle has put immense amounts of time, energy, and money into ensuring that his beneficiaries have what they need, both to travel to the United States and to have a strong footing once they arrived. Kyle also has thirty-two pending CHNV sponsorship applications, including for a Cuban individual and a Nicaraguan individual, that will now never be processed due to the administration's end to CHNV.

30.    Plaintiff **Wilhen Pierre Victor** is a U.S. citizen and healthcare worker who lives in Woburn, Massachusetts. She is the CHNV sponsor for her brother, his wife, and their three children, who are seven, thirteen, and sixteen years old. They arrived in the United States from Haiti in the summer of 2024 and were granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn. Wilhen's application to sponsor her brother for a green card has been pending since 2007, and he has been waiting since then to have another legal pathway to come to the United States. CHNV parole has allowed Wilhen to reunite with her brother for the first time in more than twenty years, and it has allowed Wilhen's brother to find a job for the first time in thirteen years. Wilhen also has two pending applications for CHNV sponsorship of her thirteen-year-old niece (her brother's child) and her fifty-year-old cousin, who experience ongoing threats of extreme violence in Haiti, that will now never be processed due to the administration's end to CHNV.

31.    Plaintiff **Gabriela Doe** is a U.S. citizen and immigrant justice advocate who lives in Tacoma, Washington. She is cousin to Ana Doe, Armando Doe, Alejandro Doe, Carlos Doe, and Miguel Doe, and is the CHNV sponsor to all her cousins except Carlos Doe, who is sponsored

by another family member. The cousins Gabriela sponsored arrived in 2024 and were granted two-year periods of parole. Through the CHNV parole process, Gabriela was able to reunite with her five cousins, whose family faced political repression, danger, and persecution in Nicaragua. Because of the CHNV parole process for Nicaraguans, her cousins have been able to work and support themselves here in the United States and lead more stable, peaceful lives. Through the March 25 FRN, Gabriela's cousins' CHNV parole periods, and associated work authorizations, will prematurely end, subjecting their family to the possibility of separation again and causing Gabriela severe psychological distress knowing her cousins will be at risk of being vulnerable to imminent deportation in less than a month.

32.     Plaintiff **Norma Lorena Dus ("Lorena")** is a U.S. citizen and immigrant justice advocate who lives in West Stockbridge, Massachusetts. She is the CHNV sponsor for her sister, Lucia Doe, who arrived in the United States from Venezuela in July 2024 and was granted a two-year period of parole. The CHNV parole process allowed Lorena and Lucia to reunite with all of their siblings for the first time in six years, and it has allowed Lucia, whose job back in Venezuela did not pay enough for her to cover even her basic needs, let alone the needs of their mother, to become self-sufficient and send money back to their parents as well. This has relieved the financial strain on Lorena and their other siblings, all of whom regularly send money back to their parents to help them survive in Venezuela. The administration's termination of CHNV parole and premature termination of Lucia's two-year grant of parole and associated work authorization will cause severe, unexpected financial burden for Lorena, as well as psychological distress due to her sister becoming vulnerable to imminent deportation.

33.     Plaintiff **Valentin Rosales Tabares** is a U.S. legal permanent resident living in Portland, Oregon. In 2018, he submitted family-based immigrant visa petitions for his wife, son,

and daughter that were quickly approved. His wife and son were issued immigrant visas in 2022 and came to the United States that year to be reunited with him. However, his daughter and her daughter, Valentin's granddaughter, continued to await their immigrant visas in Cuba, where life was extremely difficult. When Valentin was invited by the Department of State to request Cuban Family Reunification Parole for his daughter in November 2024, he immediately submitted a request on her behalf. She was approved in December 2024, but she was not given a travel date before the Trump administration terminated the parole process. Valentin's application for his daughter is now indefinitely on pause. Valentin also applied to sponsor his son's wife and child through the CHNV parole process. Those applications remain pending indefinitely as well.

34.     Plaintiff **Marim Doe** is a U.S. citizen and active-duty member of the U.S. Navy stationed at the U.S. military base in Goose Creek, South Carolina. Marim's father does not have legal status in the U.S., and one of the main reasons Marim joined the military was to help his father obtain legal status through the military parole-in-place process. He wants to provide his father with more job stability and retirement support as he gets older, as well as protection against immigration enforcement, the fear of which has plagued their family. In May 2024, Marim submitted a military parole-in-place application for his father. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

35.     Plaintiff **Adolfo Gonzalez, Jr.** is a U.S. citizen and retired U.S. Army service member who served in the Army for over thirty years. He lives in Zapata, Texas with his wife and sixteen-year-old daughter. Adolfo's wife is a national of Mexico and does not have legal status in the United States, a fact that caused him constant anxiety and fear when he was in active duty and had to be away from home and apart from her and his daughter. In March 2024, Adolfo submitted an application for military parole-in-place for his wife so that she could have a path to permanent

residency and citizenship in the United States. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

36.    Plaintiff **Aleksandra Doe** is a national of Ukraine living in San Jose, California with her husband and five-year-old son. They were granted parole through the Uniting for Ukraine parole process around April 2023. Her and her family's current authorized period of parole and associated employment authorization expires on March 29, 2025. She and her son have pending TPS applications, which she filed in December 2024. She and her family also have pending adjustment of status applications, which they were able to submit because they applied for the diversity visa lottery in October 2023 and were selected in May 2024 to move forward in the process for the Fiscal Year 2025 lottery. Aleksandra had an interview scheduled for her adjustment of status application in February 2025, but a few days before her appointment, she received a notice from USCIS notifying her that her interview had been cancelled. Because of the administration's suspension of adjudication of all immigration benefit applications for people like Aleksandra and her family, who came to the United States through U4U, Aleksandra's applications for TPS and adjustment of status are now indefinitely on hold.

37.    Plaintiff **Teresa Doe** is a national of El Salvador who has lived in Las Vegas for the last eight years with her husband and four children, one of whom is a U.S. citizen and two who are lawful permanent residents. After many years of separation from her husband and three of her children, Teresa was finally able to travel to the United States and be reunited with them when her son was approved for the CAM parole process. The two of them came to the United States in 2017 and were granted parole for an initial period of two years. After that, Teresa has consistently applied for and received CAM re-parole, which has allowed her husband to work and support their family while she takes care of their children and grandchildren. Her current period of parole

expired on March 13, 2025, and her application for re-parole remains pending. Because of the administration's termination of CAM, this application is indefinitely on hold, and Teresa faces the possibility of being torn away from her family again.

38.    Plaintiff **Rosa Doe** is a national of Honduras living in Austin, Texas with her four U.S. citizen daughters. Rosa has one other daughter who is fourteen years old living in Honduras, along with Rosa's father. Rosa came to the United States in 2013. She was trafficked into the United States and is the survivor of rape and other violence in Honduras. Rosa is a U-visa applicant with deferred status while her U-visa application remains pending. In June 2023, she filed an Affidavit of Relationship through the CAM parole process to reunite with her fourteen-year-old daughter and elderly parents. Sadly, Rosa's mother died in October 2024 before Rosa was able to see her again. Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. In November 2024, they both received conditional approval letters for their parole applications. Rosa was planning to purchase their flights to come to the United States in January 2025, but at this point Rosa was no longer able to get updates on their case to facilitate purchasing the tickets for her daughter and father. In early March 2025, Rosa was able to get in contact with the International Organization for Migration and was told that it would take more time for her daughter and father to be able to travel. However, because of the administration's termination of the CAM parole process, Rosa's daughter and father will not be able to travel to the United States, which would ensure Rosa's daughter's safety from the danger she faces in Honduras.

39.    Plaintiff **Haitian Bridge Alliance ("HBA")** is a Haitian-led, Haitian Creole-speaking grassroots and community-based nonprofit organization incorporated in California. HBA was formed in early 2016 to meet the needs of an influx of Haitian and other Black migrants that came to the U.S.-Mexico border seeking humanitarian protection as conditions in their home

countries deteriorated. HBA's core organizational activities have included, since the inception of the CHNV parole process for Haiti, providing direct services and support to thousands of CHNV sponsors and parolees from Haiti. These services include legal consultations for CHNV parolees, assistance completing CHNV sponsorship applications, humanitarian and integration support, and other aid. Defendants' termination of the CHNV parole processes, premature termination of grants of CHNV parole, and suspension of processing immigration benefit applications filed by CHNV parolees have directly interfered with these core activities.

40.     Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025. Until she was confirmed, Benjamine C. Huffman served as the Acting Secretary of Homeland Security from the time when President Trump appointed him to that position on January 20, 2025.

41.     Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS. Prior to Mr. Lyons, Caleb Vitello was the Acting Secretary; he was appointed to that position by President Trump on January 20, 2025. Mr. Vitello was reportedly "reassigned" to a different role on or about February 21, 2025, due to President Trump's frustration that ICE had not arrested more immigrants in the first few weeks of his second term, but he apparently stayed in that role until Secretary Noem announced Mr. Lyons as the next Acting Director on March 9 .

42.     Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS. Mr. Flores has been the Acting Commissioner of CBP since January 20, 2025, when he was appointed to that position by President Trump.

43.     Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS. According to USCIS's website, Ms. Scott has been in this position since February 9, even though it was previously and widely reported that Andrew Davidson, the Acting Deputy Director of USCIS, would become the Acting Director of USCIS on that same date via appointment by President Trump.

44.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

45.     Parole is a temporary form of permission for a noncitizen to be in the United States. Parole does not itself lead to any other form of immigration status, although while here on parole, nothing prevents parolees from applying for any other immigration status for which they are eligible. Many parole recipients have applied for asylum pursuant to 8 U.S.C. § 1158, temporary protected status pursuant to 8 U.S.C. § 1254a, or other forms of status adjustments. Under longstanding regulations, many parolees can apply for employment authorization.

46.     Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

47.     Congress has never defined "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or delineated with further specificity the circumstances under which

the Executive may grant parole, apart from what is encompassed by the clause, "except as provided in subparagraph (B) or in section 1184(f) of this title," discussed more below.

48.     The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "[t]he Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

49.     Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision until 1980.

50.     Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—i.e., by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons – with applications of individuals therein considered on a case-by-case basis.

51.     The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution.

52.     There is no comprehensive accounting of "programmatic" or "categorical" uses of parole, but in the approximately seventy years since this original such use by the Eisenhower Administration, there have been at *least* another 125 categorical parole programs, usually with multiple parole programs operating at the same time throughout that period, and during every single Administration, including the first Trump Administration.

53.    In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees.

54.    In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified in subparagraph (B), 8 U.S.C. § 1182(d)(5)(B), prohibiting the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

55.    The conference report adopted by both chambers accompanying the final legislation explained that § 1182(d)(5)(B) "does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."

56.    Similarly, since it was enacted, the federal officials exercising the parole authority have consistently interpreted § 1182(d)(5)(B)'s restriction as applying only to noncitizens who have already been determined by the U.S. government to be refugees.

57.    Congress next amended the parole statute in 1990 to prohibit granting parole to noncitizens to perform certain work aboard a vessel or aircraft on an air carrier during a labor dispute where there is a strike or lockout unless the parole "is necessary to protect the national security of the United States." Pub. L. No. 101-649, § 202, 104 Stat. 4978, 5014 (1990) (codified at 8 U.S.C. § 1184(f)); *see also* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided . . . in section 1184(f) of this title.").

58.    Congress last amended the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

59.    IIRIRA made just one textual change to the parole statute, striking from § 1182(d)(5)(A) the language allowing the Attorney General to grant parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with language allowing the Attorney General to grant parole "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

60.    In addition to that textual change to the parole statute, IIRIRA contained three other provisions related to exercises of the parole authority. In one, Congress required that the Attorney General annually report to the Judiciary Committee of each chamber the "number and categories of [noncitizens] paroled into the United States."

61.    In another section of IIRIRA, Congress directed that parolees who had been in the United States at least a year and had not become lawful permanent residents must be counted against per-country numerical caps on family-sponsored immigration.

62.    Finally, IIRIRA also directed the Attorney General to give green cards to Polish and Hungarian noncitizens who had been paroled into the United States through a categorical parole program that operated over a roughly two-year period ending at the end of 1991.

63.    As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee criticized the "categorical" use of parole and asserted that such use of the parole authority was *ultra vires*. It therefore proposed to narrow the substantive grounds on which parole could be granted to specify that the only "humanitarian reason" that parole could be granted involved medical emergencies, and the only "public benefit" that would warrant parole involved assisting U.S. law enforcement.

64.    Before the bill was brought to the House floor, however, the Judiciary Committee's language restricting parole was removed, and the legislation that ultimately was signed into law as IIRIRA left undefined the substantive criteria on which parole could be granted.

65.    Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created and administered parole programs to allow the parole of individuals within broadly defined classes, for example:

- Cuban and Haitian beneficiaries of approved family-based immigration petitions awaiting visas (2007-17; 2021-present);

- Haitian children orphaned by the 2010 earthquake in that country (2010);

- Cuban medical professionals in third countries conscripted by the Cuban government (2006-2017);

- Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam for business or pleasure (2009-19);

- family members of U.S. military service members (2013-present);

- minor children from El Salvador, Guatemala, and Honduras with family in the United States (2014-17; 2021-present); and

- family members of Filipino World War II veterans (2016-present).

66.    Consistent with ratifying the view that categorical parole was authorized, both before and after the passage of IIRIRA—and in addition to in IIRIRA itself, as discussed above regarding Polish and Hungarian parolees—Congress has repeatedly passed legislation extending various benefits and services to individuals who obtained parole via a "categorical" parole process, in some cases making benefits available prospectively to individuals who would in the future be paroled pursuant to such processes. For instance, most recently, Congress enacted legislation extending resettlement support services (normally provided only to refugees) to Ukrainians paroled under U4U and Afghans paroled under OAW, for the duration of their period of parole and any re-parole.

67.     The parole authority has enabled administrations to serve urgent humanitarian needs and advance the significant public benefit of promoting the national interest through achieving humanitarian, human rights, anti-trafficking, foreign policy, and regional security goals, among others.

### Uniting for Ukraine ("U4U")

68.     On February 24, 2022, Russia invaded Ukraine, beginning a war that continues to this day.

69.     In the weeks following Russia's invasion, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum . . . .").

70.     At its peak, CBP encountered up to 1,300 Ukrainians per day along the southern border; that surge strained its operations and required diverting personnel to increase processing capacity.

71.     Most Ukrainians who arrived at the southern border during this period—some 20,000 people—were paroled into the country, due at least in part to a lack of detention space. Most received an initial grant of one year of parole.

72.     Every Administration, including the first Trump Administration, has used parole in this way to process applicants for admission, particularly when there is a lack of detention space.

73.     In response to this surge of Ukrainians at the border and the accompanying strain on CBP, President Biden announced in March and April 2022 a variety of humanitarian commitments to the Ukrainian people, including establishing the Uniting for Ukraine parole

process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022). The Federal Register Notice for the U4U parole process cites destruction to civilian infrastructure, ongoing concerns about food security, a lack of medicine and health supplies, rampant sexual exploitation and abuse, continuing violence, and large-scale displacements of Ukrainians as reasons for the establishment of the parole process.

74.     Uniting for Ukraine is a process by which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered, on a case-by-case basis, for a grant of parole, typically for two years.

75.     U4U was created so that eligible Ukrainians could request consideration for parole without having to travel to Mexico and present at the southern border, which can be dangerous for the individuals and further strains CBP resources.

76.     Permitting Ukrainians to apply in advance also benefitted the U.S. government by making it possible to conduct security checks on the individuals before they travel.

77.     Uniting for Ukraine applicants who meet the eligibility requirements, pass security checks, and warrant a favorable exercise of discretion are granted authorization to travel directly (via flight) to the United States, where they are inspected and undergo further security checks before CBP makes the final determination of whether to grant parole.

78.     There is no fee associated with initial applications for parole under Uniting for Ukraine, but applicants must comply with all pre-travel requirements—including public health requirements—at no cost to the United States and likewise must pay for and arrange their own travel.

79.     Once approved to travel to the United States, prospective U4U parolees fly directly to an airport in the interior of the United States, which avoids the disorderly process at the border—

and concomitant impact on border communities and states—that was otherwise occurring because of Russia's invasion of Ukraine.

80.    Like the U4U parolees, potential U4U sponsors undergo security checks; they also must prove their own lawful status and that they have sufficient financial resources to receive, maintain, and support the intended beneficiaries for the duration of their parole period.

81.    In February 2024, USCIS announced the process by which U4U parolees could apply for re-parole, once they had less than six months left on their initial grant of parole. In addition to meeting other eligibility requirements, applicants for re-parole under U4U had to pay a fee or obtain a waiver of fees.

82.    Per legislation enacted by Congress in May 2022 and April 2024, Ukrainians paroled into the United States between February 24, 2022, and September 30, 2024, are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program—the same services to which OAW parolees are entitled, as discussed below—for the duration of their period of parole and any re-parole.

83.    From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by CBP at the southern border dropped *by more than ninety-nine percent*. There were even fewer encounters in fiscal year 2024 than in fiscal year 2023.

84.    Most U4U parolees have claims to other forms of immigration relief that would permit them to stay in the United States permanently, including family-based immigration visas and TPS.

85.    These paths to permanent immigration status for U4U parolees, however, generally take years to navigate due to how long it takes the Defendant agencies to process the immigration benefit applications.

86.     Currently, Ukrainians who have continuously resided in the United States since August 16, 2023 (which would include some U4U parolees) are eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. TPS for Ukrainians is currently set to expire (if not extended) on October 20, 2026.

87.     As of the third anniversary of Russia's invasion of Ukraine, approximately 7 million Ukrainians remain externally displaced. Approximately 200,000 of them are in United States by way of parole. Most Ukrainians here on parole had some preexisting tie to the United States (such as family), which is why they came here for refuge when they fled their home country.

### Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV")

88.     Over the last several years, a significant number of Cubans, Haitians, Nicaraguans, and Venezuelans have been displaced due to natural disasters, economic hardship, and political strife.

89.     Today, there are approximately eleven million displaced nationals of those four countries, most of them Venezuelan; twenty percent of Venezuela's population is displaced.

90.     Due to events internal to each country, emigration from these four countries accelerated remarkably from 2020 to 2022.

91.     Per its data, CBP encountered at the southern border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2020.

92.     Per its data, CBP encountered at the southern border more than 181,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2021.

93.     Per its data, CBP encountered at the southern border more than 600,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2022—comprising more than forty percent of all migrants CBP encountered at the border that year.

94.     The marked increase in the number of nationals of these four countries arriving at the southern border put considerable strain on CBP operations, causing it to divert resources and to provide sub-standard care to those migrants.

95.     As with the Ukrainians coming to the southern border discussed above, many (if not most) of the Cubans, Haitians, Nicaraguans, and Venezuelans who came to the border during this period were paroled into the United States.

96.     In October 2022, the Biden Administration created a parole process for Venezuelans. DHS, *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the success of the Venezuelan parole process, the Biden Administration expanded the parole process for Venezuelans, DHS, *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1279 (Jan. 9, 2023); and created similar parole processes for nationals of Cuba, Haiti, and Nicaragua, DHS, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023).

97.     These Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes were explicitly modeled on the Uniting for Ukraine parole process; like U4U, the rigorous application processes for CHNV parole required passing security checks, having a U.S.-based financial supporter with lawful status who has proven their ability to remain committed to providing for the parolee for the duration of their two-year period of parole, and meeting all pre-travel requirements. The travel itself must be at no cost to the United States.

98.     DHS explained in creating the CHNV parole processes that the processes provide significant public benefits by improving vetting for national security and public safety, reducing

the strain on CBP resources and personnel, and minimizing the impact on the United States of irregular migration from these countries.

99.    DHS also explained that the parole processes address urgent humanitarian concerns by offering a safe and legal pathway out of dangerous conditions in these four countries as an alternative to the perilous overland journey to the U.S. border.

100.    The United States-Mexico border is the world's deadliest land migration route. According to the International Organization for Migration, more than 800 people died attempting to cross the U.S.-Mexico border in 2021; more than 750 in 2022; more than 730 in 2021; but fewer than 500 in 2024.

101.    DHS also explained in creating the CHNV parole processes that they further important foreign policy objectives, including the collaborative management of migration in the hemisphere.

102.    An important aspect of the CHNV parole processes is that Mexico agreed—for the first time ever—to accept the removal of Cubans, Haitians, Nicaraguans, and Venezuelans who do not follow the CHNV parole processes, which thereby makes them presumptively ineligible for asylum in the United States.

103.    For years, the United States has had difficulty removing nationals of those four countries because of their home countries' refusals to accept the deportees.

104.    As part of CHNV, Mexico agreed to accept up to 30,000 (combined) deported nationals of these countries each month.

105.    The CHNV processes allowed up to 30,000 parolees from the four countries combined to come to the United States each month.

106.    The demand for CHNV parole was extraordinary; USCIS received more than 1.5 million applications from potential sponsors in just the first three or four months that the processes were available.

107.    Per legislation enacted by Congress, Cubans and Haitians paroled into the United States are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program.

108.    Per the Cuban Adjustment Act, as amended, Cubans paroled into the United States can become lawful permanent residents after being in the country for a year.

109.    Per a CBP statement on January 14, 2025, CBP encounters of CHNV nationals attempting to cross the southern border unlawfully were down ninety-one percent since the CHNV processes were created.

110.    Similarly, following a bench trial, Judge Tipton of the Southern District of Texas held that the State of Texas did not have standing to challenge the CHNV processes because these processes led to a decrease in Texas's claimed injuries by reducing the overall number of migrants from these countries coming to Texas, which was the source of Texas's claimed injuries.

111.    Most CHNV parolees have claims to immigration relief that would permit them to stay in the United States, including family-based immigration visas and asylum.

112.    These paths to permanent immigration status for CHNV parolees, however, generally take years to navigate recently due to how long it takes the defendant agencies to process the immigration benefit applications.

113.    For example, although Congress has directed DHS to issue final decisions on asylum claims within 180 days of receiving each application absent "exceptional circumstances,"

8 U.S.C. § 1158(d)(5)(iii), most asylum applicants are currently waiting years to get an initial decision.

114.    Currently, Venezuelans who have continuously resided in the United States since July 31, 2024 (including some Venezuelans who received parole through CHNV) are eligible for TPS; approximately 33,600 CHNV parolees from Venezuela have been granted TPS.

115.    On January 10, 2025, Secretary of Homeland Security Ali Mayorkas extended TPS for Venezuelans until October 2026, but on January 28, 2025, Secretary Noem purported to vacate that extension and then, on February 1, 2025, Secretary Noem decided to terminate one of the two TPS designations for Venezuelans. Secretary Noem's February 1 decision was based on her conclusion that the continued presence of the approximately 350,000 Venezuelans with TPS under that designation is contrary to the national interest of the United States. DHS, *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025). Secretary Noem's unprecedented vacatur of the TPS extension for Venezuelans is being separately litigated in multiple cases on the ground (among others) that the TPS statute does not authorize such actions.

116.    Currently, Haitians who have continuously resided in the United States since June 3, 2024 (including some Haitians who received parole through CHNV) are eligible for TPS. In June 2024, Secretary Mayorkas extended TPS for Haitians until February 3, 2026, but on February 20, 2025, Secretary Noem again acted in an unprecedented fashion by purporting to reduce the time remaining for Haitian TPS by six months, such that it now expires on August 3, 2025. DHS, *Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 Fed. Reg. 10511 (Feb. 24, 2025).

117.    Approximately 600,000 Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

## Operation Allies Welcome ("OAW")

118.    Operation Allies Welcome grew out of the U.S. military's chaotic 2021 withdrawal from Afghanistan.

119.    As Afghanistan's military and government quickly fell to the Taliban when the U.S. military withdrew, the U.S. government hastily evacuated approximately 124,000 people from Afghanistan, mostly on military cargo jets. Evacuees included U.S. citizens and lawful permanent residents, nationals of allied countries, and Afghans whose lives were at risk due to their service to the United States (such as interpreters).

120.    After medical, security, and other screenings in third countries, approximately 75,000 Afghans were eventually brought to the United States on parole through OAW.

121.    Most OAW parolees were (and remain) eligible for a congressionally-created Special Immigrant Visa ("SIV") based on having provided "faithful and valuable service" employed by or on behalf of the U.S. Government or the International Security Assistance Force or a successor mission in certain capacities in Afghanistan.

122.    Many other OAW parolees are eligible for other forms of immigration relief—like family-based immigrant visas and asylum—that would likewise give them permanent lawful status in the United States.

123.    These paths to permanent immigration status for OAW parolees, however, generally take years to navigate, due mostly to how long it takes the defendant agencies to process the immigration benefit applications. The federal government has been subject to a class-wide injunction against unreasonable delays in adjudicating Afghan SIV applications since early 2020

and a similar class-wide settlement agreement addressing the unreasonable delays in adjudicating asylum applications of Afghan OAW parolees since September 2023.

124.    In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, Public Law 117-43. Among other things, it instructed DHS to adjudicate asylum applications filed by OAW parolees expeditiously, and to issue final decisions within 150 days of receiving each application, absent "exceptional circumstances."

125.    That Act also made OAW parolees—including those who had yet to be paroled—eligible for resettlement support services typically provided to refugees resettled in the United States through the U.S. Refugee Admissions Program until the later of March 31, 2023, and the end of their parole term. Those services include cash and medical assistance, employment preparation, job placement, and English language training. That Act also appropriated supplemental funds for USCIS and Health and Human Services to carry out these directives.

126.    To date, approximately 20,000 OAW parolees have been granted asylum; fewer than 100 parolees' asylum applications have been denied.

127.    Currently there are approximately 1,300 OAW parolees with pending asylum applications; on average, those applications have been pending for more than 600 days.

128.    Afghans who have continuously resided in the United States since September 20, 2023 (including Afghans brought here through Operation Allies Welcome) are currently eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. Unless extended by the Secretary of Homeland Security, however, TPS for Afghans will expire on May 21, 2025.

129.    In 2023, the federal government determined that "Afghans paroled under Operation Allies Welcome ("OAW"), or those paroled then subsequently granted Temporary Protected

Status ("TPS"), could request U.S. Government-supported family reunification support for their spouses and unmarried children under 21 years of age" who remain physically present in Afghanistan.

130.    Afghans paroled through OAW were initially given two-year grants of parole. There was no formal application process for initial grants of parole through OAW, but in June of 2023, DHS announced a re-parole process for OAW parolees, under which they may apply for an extension of up to two years.

131.    Globally, approximately 11 million Afghans are currently displaced due to the conditions in their home country, most of them in Iran (4.5 million) and Pakistan (3.1 million). Fewer than 50,000 Afghans are in the United States on current grants of parole by virtue of OAW.

### Family Reunification Parole ("FRP")

132.    Ever since the George W. Bush administration established a Cuban Family Reunification parole process in 2007, the United States has had country-specific family reunification parole processes that allow the beneficiaries of approved I-130 petitions for family-based immigrant visas to be paroled into the United States. The grant of parole allows these beneficiaries to reunite with their sponsoring family member in the United States while they wait for their immigrant visa to become available.

133.    Under the family-based immigrant visa system that Congress has devised, a U.S. citizen or lawful permanent resident must first file a petition (Form I-130, "Petition for Alien Relative") to establish that they have a family relationship with a relative abroad that makes the relative eligible for a family-based immigrant visa. Once that petition is approved, the relative abroad must then apply for an immigrant visa—but because family-based visas are distributed to eligible applicants through a complex system of queues and country-specific caps, an intending

immigrant must wait in line—often for years, or even decades—before he or she may apply to receive it. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).

134.    The family reunification parole processes allow a U.S. citizen or lawful permanent resident with an approved I-130 petition to sponsor their family member abroad for parole into the United States. Instead of having to wait abroad, often in precarious situations, for an immigrant visa to become available, a noncitizen family member who receives parole may reunite and be together with their sponsor in the safety of the United States while waiting for their immigrant visa to issue.

135.    The Federal Register Notice for the original Cuban Family Reunification parole process explained that the process "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States."

136.    Since the creation of the Cuban Family Reunification parole process in 2007, the United States has subsequently adopted similar processes for nationals of Haiti (in 2014) and Colombia, El Salvador, Guatemala, Honduras, and Ecuador (in 2023). The processes for Cuba and Haiti were also modernized in 2023.

137.    The Federal Register Notices for these more recently established family reunification parole processes each explain that these processes provide significant public benefits by promoting family reunification, a central purpose of the INA, and by deterring irregular migration, reducing strain on DHS resources at the border, addressing root causes of migration

through remittances sent by parolees and furthering important foreign policy goals in regional migration management.

138.    For each of the Family Reunification parole processes, qualifying sponsors must first receive an invitation from the Department of State or USCIS before they can apply to sponsor their family member abroad. The sponsorship application requires U.S.-based sponsors to show that they can financially support their parole beneficiaries during their parole period.

139.    If the sponsorship application is approved, the beneficiary will receive advance authorization to travel to the United States. The beneficiary must travel to the United States by commercial airline within 90 days of receiving their travel authorization. At the Port of Entry, CBP screens the beneficiary, including administering an additional fingerprint biometric vetting, and grants parole, if warranted, on a case-by-case basis.

140.    Family Reunification Parole beneficiaries generally receive a three-year grant of parole and can request employment authorization while they wait for their immigrant visa to become available. When a visa does become available, they can file for adjustment of status to lawful permanent residence, although they must be independently eligible for adjustment of status; the grant of parole does not automatically qualify or otherwise indicate qualification for adjustment of status.

141.    Reliable statistics regarding the number of individuals paroled through the Family Reunification Parole processes are not publicly available.

**Military Parole-in-Place ("MPIP")**

142.    The Obama administration established a Military "Parole in Place" ("Military PIP") process through a USCIS Policy Memorandum that it adopted in late 2013 (the "2013 Memorandum") to formalize a practice initiated in 2007. Under the Military PIP process, active-duty military personnel, selected reserve members, and veterans can apply to sponsor for parole

their spouses, children, and parents who are already physically present in the United States without inspection or admission. The grant of "parole in place"—so named because the sponsored family members are already in the country—enables the immediate family members of U.S. military personnel to become eligible to adjust status in the United States and thus to become lawful U.S. permanent residents.

143.    The first instance of granting military parole in place occurred in 2007, when after significant media coverage and public pressure, DHS Secretary Michael Chertoff ordered the parole in place of a military spouse who was facing deportation while her U.S. military husband was missing in action in Iraq.

144.    Military families subsequently began to seek humanitarian parole under the INA's parole provision, but doing so was an *ad hoc* process, with no clear guidance from the military or from USCIS about how to apply, and adjudications were inconsistent. Parole was granted on a discretionary basis to military family members, but only in about one in every three cases. In a 2010 letter to DHS Secretary Janet Napolitano, a coalition of 18 Republican and Democratic Members of Congress urged the Secretary to "use all the power at your disposal" to "address the immigration needs of our soldiers," citing the example of a U.S. army lieutenant who refrained from volunteering for combat deployment for fear of losing his wife to deportation.

145.    In establishing the Military Parole in Place process, the 2013 Memorandum's stated purpose was to "ensure consistent adjudication of parole requests" made by U.S. military service members.

146.    The Memorandum noted that "[m]ilitary preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected

Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents, and children."

147.    The Memorandum similarly noted that "our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them."

148.    Noting that parole is one of the "discretionary tools" available to "minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents, and children of military members," the Memorandum amended the USCIS Adjudicator's Field Manual to advise that "parole in place would generally be an appropriate exercise of discretion" for the spouse, child, or parent of a U.S. military servicemember, because the fact that the intended parole beneficiary is an immediate family member of a servicemember "ordinarily weighs heavily in favor of parole in place."

149.    Amid public reports in 2019 that the first Trump administration was considering eliminating the Military Parole in Place process, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."

150.    Reliable statistics regarding the number of individuals who receive Military Parole in Place are not publicly available.

## Central American Minors ("CAM")

151.    CAM was created in 2014 to permit certain nationals of the Northern Triangle countries of El Salvador, Guatemala, and Honduras who are lawfully present in the United States to request that their children still in their home countries be considered for refugee status and humanitarian parole so that the families could be reunited.

152.    CAM's creation was prompted by a surge in unaccompanied children from the Northern Triangle countries coming to the U.S.-Mexico border.

153.    In addition to family reunification, the CAM program was intended to create a safe and lawful pathway toward family reunification to disincentive children making the overland journey to the southern border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS.

154.    In 2017-18, DHS under the first Trump Administration sought to terminate the parole portion of CAM based on its discretion. In a subsequent lawsuit, the district court held that DHS acted arbitrarily and capriciously in terminating CAM and mass rescinding 2,714 conditional grants of parole to individuals still in their home countries without considering their reliance interests.

155.    In 2018, DHS ultimately agreed to finish processing those individuals' parole applications, which it has not yet completed.

156.    DHS under President Biden restarted CAM in March 2021 and then expanded the eligibility criteria in June of that year, which were again adjusted in 2023.

157.    CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

**Summary Termination of Humanitarian Parole Processes**

158.    During the 2024 presidential campaign, Donald Trump frequently criticized the aforementioned parole processes, promising as early as November 2023 that he would end them on "day one" of his second term as President.

159.    As a candidate and as the current President, Donald Trump has denigrated the CHNV parolees as "illegal," notwithstanding their lawful grants of parole.

160.    On the day he was inaugurated—January 20, 2025—President Trump issued Executive Order 14165, entitled "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security to terminate all so-called "categorical parole programs," specifically naming "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans'" as one the Secretary must terminate.

161.    In another executive order signed that day—Executive Order 14159, entitled "Protecting the American People Against Invasion"—President Trump directed the Secretary of Homeland Security (among others) to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole."

162.    And in yet another order signed that day—Executive Order 14161, entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats"—President Trump ordered the Secretary of Homeland Security "to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible," which should be "consistent" with the "vetting

and screening standards" that were in effect on January 19, 2021—the last full day of President Trump's first term in office.

163.    Also on January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" to the heads of ICE, CBP, and USCIS. Upon information and belief, this memorandum has not yet been made public.

164.    In the January 20 Huffman memorandum, the acting secretary authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute."

165.    Although fewer than 800 words, the January 20 Huffman memorandum contains multiple errors of law beyond its conclusion that "categorical parole programs" like U4U, CHNV, OAW, FRP, MPIP, and CAM are unlawful.

166.    For example, in an attempt to equate lawfully present parolees with "illegal aliens," the memorandum claims that noncitizens who are paroled into the United States are "inadmissible aliens," have been "found inadmissible," and, after their parole has been terminated, "must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible."

167.    But that contention—that parolees are necessarily inadmissible—is wrong. The parole statute allows inadmissible noncitizens to come to the United States, but a grant of parole does not require or necessarily involve a finding of inadmissibility.

168.    The January 20 Huffman memorandum also erroneously describes the limitation on parole enacted as part of the Refugee Act, discussed *supra*, that is codified at 8 U.S.C. § 1182(d)(5)(B). The memorandum claims that the limitation in § 1182(d)(5)(B) means that "it is

generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad" as well as "aliens found to have prima facie asylum claims who are being allowed into the United States to await adjudication of those claims."

169.    This interpretation departs from every prior Administration's understanding of § 1182(d)(5)(B), which is that it applies to noncitizens who already have been determined to be refugees pursuant to the procedures created by the Refugee Act—and *not* to those who merely have or could have claims to humanitarian relief.

170.    This interpretation also departs from past practice. Prior to being paroled into the country, for example, a significant number of Afghan OAW parolees had pending applications for refugee status filed abroad. Parole was used because those applications would have taken years to be adjudicated.

171.    Even more starkly, every Administration since at least the 1990s, including the first Trump Administration, has paroled noncitizens found to have prima facie asylum claims into the United States to await adjudication of those claims. The Supreme Court held that this is a permissible use of the parole statute in *Biden v. Texas*, 597 U.S. 785 (2022).

172.    Acting Secretary Huffman's memorandum also misrepresents the statutory parole criteria by adding words that appear nowhere in the statute. Per the statute, parole can be granted "for urgent humanitarian reasons or significant public benefit," but the memorandum claims instead that parole must "either provide[] a significant public benefit to the American public or permit[] the United States to respond to an urgent humanitarian need."

173.    The January 20 Huffman memorandum directed that "all future actions taken by DHS with regard to the exercise of the parole authority [be] consistent" with the interpretation of the statute laid out in his memorandum.

174.    Acting Secretary Huffman ended his memorandum with a hedge, claiming that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

175.    In asserting that he was "also implementing this policy as a matter of my discretion to deny parole in any circumstance," Acting Secretary Huffman's memorandum did not specify anything that he considered in arriving at the allegedly discretionary decision to impose the parole policy reflected in his memorandum.

176.    The January 20 Huffman memorandum relied on an erroneous understanding of the parole statute regarding both what the statute authorizes and the nature of the Secretary of Homeland Security's discretionary authority thereunder.

177.    Also on January 20, 2025, Acting Commissioner of CBP Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. The January 20 Flores memorandum expressly supersedes any prior conflicting guidance.

178.    Later that same week, then-Acting Director of USCIS Jennifer Higgins issued a directive (the "January Higgins directive") prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the U4U, CHNV, OAW, or other named parole processes.

179.    On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, OAW, FRP, and CAM,

among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

180.     These actions taken by Defendants have, at a minimum, effectively terminated all humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM. Defendants base their actions to terminate these and other humanitarian parole processes, including by refusing to adjudicate pending applications for parole or re-parole through these processes, on their erroneous position that such humanitarian parole processes were and are unlawful.

181.     On March 21, 2025, DHS subsequently made public a Federal Register Notice entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which was officially published on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025). Like the January 20 Huffman Memo, the March 25 FRN asserts that "discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria." 90 Fed. Reg. at 13612. As of its date of publication on March 25, 2025, the March 25 FRN "terminat[es] the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." Id. at 13611.

182.     The March 25 FRN also rescinds all grants of CHNV parole, stating that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." Id.

183.     The March 25 FRN asserts that the Notice serves as "Constructive Notice" of the termination of the CHNV parole processes; "is legally sufficient notice to all interested or affected

persons regardless of actual knowledge or hardship resulting from ignorance;" and "satisfies the requirement that DHS provide written notice upon the termination of parole." Id. at 13620.

184.    Like the January 20 Huffman Memo, the March 25 FRN contends that the CHNV parole processes allow "inadmissible" noncitizens into the United States, and that all individuals paroled into the United States under the CHNV parole processes are "inadmissible." 90 Fed. Reg. at 13611, 13612. But a grant of parole does not require or necessarily involve a finding of inadmissibility.

185.    The March 25 FRN offers three main reasons justifying its termination of the CHNV parole processes and its termination of individual grants of parole: that the CHNV parole processes are unnecessary to achieve the current administration's border security goals, 90 Fed. Reg. at 13612;  that the "domestic impact of the CHNV parole programs"—namely, "significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs"— "do not warrant continuing to operate these programs," id. at 13614-13615; and that the CHNV parole processes do not advance the current administration's foreign policy goals, *id*. at 13615.

186.    The March 25 FRN further notes that "[e]xpedited removal is available only when an [individual] has not been continuously present in the United States" for at least two years. *Id*. at 13619. As a result, the March 25 FRN justifies the premature termination of individual grants of CHNV parole on the grounds that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal" instead of placing them in expedited removal proceedings.

187.    The expedited removal statute, however, can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal, regardless of how long they have been in the United States. *Id.*

188.    The March 25 FRN confirms Defendants' intent to terminate humanitarian parole processes for their alleged illegality and make it easier to deport individuals paroled through these processes as quickly as possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly [individuals] who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id*. at 13618. The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate." *Id*. at 13619.

### Summary Suspension of Adjudicating Parolees' Immigration Benefits Requests

189.    During the week of January 20, 2025, then-Acting Director of USCIS Jennifer Higgins prohibited USCIS staff from making any decisions on any request for any immigration benefit—e.g., for asylum, TPS, adjustment of status, a visa, work authorization, etc.—that would benefit individuals who received parole through any humanitarian parole process, such as U4U, CHNV, OAW, FRP, MPIP, CAM, or other named parole processes.

190.    On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum to various USCIS directorates and program offices directing them not to adjudicate immigration benefit requests filed by noncitizens who are or were paroled into the United States under U4U, CHNV, and FRP.

191.    The Davidson memorandum was a post-hoc attempt to justify the suspension of benefits adjudication that had started weeks earlier.

192.    Upon information and belief, the February 14 Davidson memorandum has not yet been made public. Media reporting on the memorandum explained that because paroled individuals are only given work authorization and deportation protections that typically last for two years, many such individuals apply for other immigration benefits, including TPS, asylum, and green cards—but under the February 14 Davidson memorandum, officials will no longer be able to process any applications for such programs or any other benefit, if such requests are filed by migrants who arrived in the United States under the parole processes at issue.

193.    The February 14 Davidson memorandum asserted that the suspension of these individuals' benefits requests was based on Executive Order 14161 (discussed above) and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible or consistent with the vetting "baseline" in effect on the last full day of President Trump's first term, stating: "The procedures that the parolees under these categorical parole programs underwent *may* not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161" (emphasis added).

194.    The February 14 Davidson memorandum does not cite any statutory or regulatory authority for suspending adjudication of benefits applications, including benefits for which there is statutory authorization, including asylum (under 8 U.S.C. § 1158), TPS (under 8 U.S.C. § 1254a), other requests to adjust status (such as visas under 8 U.S.C. § 1201), or work authorization (such as under 8 C.F.R. § 274a.12).

195.    The February 14 Davidson memorandum refers to alleged fraud in the CHNV parole processes that DHS detected, investigated, and, where problems were identified, corrected in the summer of 2024. Some of this claimed "fraud" was based solely on the fact that some sponsors, like Plaintiff Kyle Varner, felt compelled and were financially able to sponsor more than twenty beneficiaries—often based on the sponsors' sincerely held religious beliefs—which was entirely permissible under the rules of the process. What is more, this alleged "fraud" concerned solely the CHNV processes, yet the Davidson memo's suspension of benefits adjudications—like the January Higgins directive—was far broader than the CHNV processes, affecting other parole processes like U4U. Finally, and regardless, the Davidson memorandum's suspension of benefits adjudications was based only on Executive Order 14161 and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible.

196.    As noted above, most individuals paroled into the United States via the U4U, CHNV, and OAW processes are eligible under statutory provisions enacted by Congress for other forms of immigration relief, including but not limited to TPS, asylum, and/or visas based on familial relationships. The INA, for example, makes clear that "*[a]ny* [individual] who is physically present in the United States . . . *irrespective of such [individual's] status*, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Individuals paroled in through the family reunification processes are *all* eligible for family-based visas, because that was a requirement to apply for parole through those processes.

197.    Yet, per the January Higgins directive and the February 14 Davidson memorandum, the parolees' applications for any of these benefits—all of which would preclude their removal— are now suspended, as are any of their applications for re-parole, employment authorization, and adjustment of status.

198.    Meanwhile, at the same time that the Trump Administration has suspended the ability of these parolees to seek relief from deportation by affirmatively applying for benefits, it has aggressively (and unlawfully) expanded the ability of immigration officials to remove individuals paroled into the country through expedited removal—a shortcut deportation process with few procedural protections and even less judicial review. Those actions are challenged elsewhere but comprise part of the injury and irreparable harm threatening Plaintiffs and others similarly situated.

199.    The February 14 Davidson memorandum states that if there is a "litigation need" to lift a suspension of benefits adjudication for individuals paroled through these processes, the suspension can only be lifted on a case-by-case basis with approval of the USCIS Director or Deputy Director, with a memo memorializing the lifting of the suspension as to that individual.

200.    Remarkably, the February 14 Davidson memorandum states that these requirements for lifting the suspension apply even when a court issues an injunction or other order directing the lifting of the suspension on a class-wide basis.

### Defendants' Actions Cause Harm to Plaintiffs

201.    Defendants' termination of humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM, and Defendants' related suspension of processing of immigration benefit requests, have caused Plaintiffs substantial, concrete, particularized, and irreparable injury.

202.    Plaintiff **Svitlana Doe** fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. When war struck in 2022, Svitlana and her family lived in a city immediately outside of Kyiv, the capital of Ukraine, one of Russia's initial focal points for occupation. Bombs rained down and fighting broke out regularly in the streets directly outside her apartment. It was terrifying and unpredictable. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled. Svitlana and her family

49

eventually fled the capital for another district further away from ground zero, where they remained for about a month and a half before returning to the capital.

203.    Svitlana is the mother to a young son with celiac disease. After her son was born and began eating solid food, he became extremely sick with an undiagnosed condition. Even at one of the best hospitals in Ukraine, it took a long time to correctly diagnose her son's condition as celiac disease. It was extremely hard to provide for her son in Ukraine, even before the war. Her son was extremely sensitive—even minimal cross-contamination using the same utensil would make him dangerously ill. Svitlana had to shop around at tens of different grocery stores to find gluten-free products for her son, and when she could find them, they cost twice as much as glutenous products. People would often criticize Svitlana at grocery stores for not buying her son "normal" food. When the war began, it became even more difficult to take care of her son. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after the onset of the war, her son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

204.    Before the war began, Svitlana never considered leaving Ukraine. She was satisfied with her life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. But amid her son's failing health and the regular shriek of air raid sirens which forced Svitlana and her family into the earthen basement of their son's school to take shelter from missile attacks, they decided they needed to flee the country. Svitlana began searching for help on the internet and social media. Eventually, she was put in touch with the executive director of a celiac disease research center in the United States. Doctors at the center began exploring Svitlana's son's condition and treating him from afar, and the executive director eventually volunteered to

assist Svitlana and her family through the Uniting for Ukraine parole process. Svitlana and her family received travel authorization in November 2022.

205.    After the war began, men were generally not permitted to leave Ukraine due to the draft. However, officers often made exceptions for fathers seeking treatment for their disabled children, so Svitlana scrambled to assemble a comprehensive collection of her son's medical documentation, who had been officially diagnosed as having a temporary disability. The U.S. doctor working with Svitlana's son even wrote a letter documenting the medical need for treatment outside Ukraine. This was an extremely stressful time, since border officials maintained individual discretion and the family could not guarantee Svitlana's husband would be allowed to leave the country. Svitlana's husband and son left first to maximize the odds of remaining together, arriving in Poland in mid-November 2022. Svitlana followed the next day, and met her family in the capital of Poland, Warsaw. From there Svitlana and her family traveled to the United States, arriving on November 20, 2022, and living since their arrival in Dover, Massachusetts.

206.    Since arriving, Svitlana's son has continued to receive treatment at the medical center specializing in celiac research. After about a year, his health began to improve dramatically, and he is now a healthy young boy, although he will require a strict diet and comprehensive annual checkups for the rest of his life. Svitlana has worked since receiving her work authorization around April 2022, and she enrolled as a student in community college studying child development. In 2024, Svitlana and her family were re-paroled under U4U, and her current parole status and work authorization is valid until November 18, 2026. Around the beginning of February 2025, Svitlana applied for Temporary Protected Status ("TPS").

207.    If her TPS application is not adjudicated or even paused for too long, Svitlana will lose her only chance of being able to remain in safety in the U.S., especially if her parole is revoked

as the Trump administration has threatened. If either becomes unavailable to her, she will lose her work authorization, and therefore, her ability to provide for her family. She will not be able to pay her rent (around $2200 per month), purchase groceries (around $800 per month), or pay her family's bills, and her son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy and stability. Her family would be forced to leave the U.S., but there is nowhere else for her family to go—they cannot return to Ukraine in the middle of a continuing war, where Svitlana's husband would be forcefully recruited into the army upon return. Even if negotiations won out, there is no promise peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous. U4U and the availability of TPS have been lifelines for Svitlana and her family, and losing them would cost more than they can bear.

208.    Plaintiffs **Maksym and Maria Doe** are a married couple and nationals of Ukraine. They were forced to flee their home in Kharkiv on the day that Russia invaded Ukraine and began bombing the city. Once they found safety, Maksym began looking for a way to do something for his fellow Ukrainians. He and several friends started by coordinating volunteer efforts to evacuate others from cities and towns on the front lines of the war; within six months, they had saved over 22,000 people from eastern Ukraine, solely through the efforts of approximately 200 unpaid volunteers. Eventually, Maksym and his partners formed a nonprofit organization and began raising funds, managing logistics, hiring professionals and converting volunteers into paid employees, and expanding their humanitarian aid operations. In the three years since Russia invaded Ukraine, the nonprofit has grown to a staff of over 100 employees and has assisted over a half million Ukrainians displaced and affected by the war.

209.    Since the invasion, Maksym's work with his nonprofit has been his singular focus. Toward the end of 2022, he and Maria, as well as his partners in the nonprofit, discussed the possibility of Maksym and Maria moving to the United States to expand the nonprofit's work with other humanitarian aid organizations, to raise more funds, and to amplify their ability to provide aid to Ukrainians harmed by the war. Maksym came to the United States first in December 2022 on a visitor visa to research registering a nonprofit in the United States and to explore how to fundraise and collaborate with other humanitarian aid organizations. A generous family friend who has known Maksym and his sister since high school subsequently agreed to be their sponsor to apply for U4U parole. Maria joined Maksym in February 2023 through U4U parole; Maksym then left the United States for Mexico, where he also went through the U4U application process with the sponsorship of his family friend, and was able to return to the United States on U4U parole in April 2023. They received their employment authorization when they entered the United States on U4U parole.

210.    After arriving in the United States with only two suitcases and Maria taking all the jobs she could find to earn money, including dog walking, Maria has since found a job as a quality assurance engineer with a tech start-up and recently got a promotion to a Project Management position. Maksym has continued his work with his nonprofit, and after two years of struggle and hard work in the United States, the couple started to feel like they could finally plan for their future. They applied for U4U re-parole and TPS; while Maria's re-parole application was granted in January 2025, Maksym's re-parole application remains pending, as well as both of their TPS applications.

211.    As a result, it has been devastating for the couple to learn that that President Trump has terminated U4U and paused the processing of all immigration benefits applications of U4U

parolees. Maksym's U4U parole expires in April 2025; if his re-parole application or TPS application is not processed and granted by that time, he will lose his legal status and his work authorization. Maria plans on filing an application for an H-1B work visa with her employer soon, because an H-1B visa will help provide the couple with a more stable and predictable legal status, but it is unclear if that application will ever get processed. After working so hard to come to the United States legally, and after doing all they could to maintain their status to remain here legally so that they can continue working and supporting Maksym's humanitarian efforts in Ukraine, it feels like all the doors are being slammed in their faces. Maksym and Maria never thought that they would have to face the prospect of being displaced, yet again, from a democratic country like the United States.

212.    Plaintiff **Alejandro Doe** fled Nicaragua because of increasing physical danger to his family and untenable economic conditions. In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega. The demonstrations were heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors resulting in hundreds of civilian deaths. Countless others were imprisoned.

213.    Alejandro's father was among those imprisoned. While searching for his uncle, government actors abducted Alejandro's father from his grandmother's house where he lived, beating and violently interrogating him on the way to prison. Once there, guards physically and psychologically tortured him for three days, telling him that they would kill him and that he would never leave the prison. He was withheld food for most of the duration of his three-day imprisonment.

214.    Although Alejandro's father was released, he was labeled an opponent of the regime, and Alejandro felt they had no choice but to leave the country for their safety. Alejandro's cousin, a U.S. citizen who lives in Washington, sponsored him and various other members of his family through the parole process for Nicaraguans. Alejandro received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. Since arriving in the United States, Alejandro has lived in Gainesville, Georgia, and since receiving work authorization has worked producing marble bathroom panels. To ensure he would not lose his newfound safety, Alejandro filed an application for asylum (Form I-589) on January 21, 2025.

215.    When Alejandro learned of the Trump administration's indefinite pause on processing applications for immigration relief filed by individuals who came to the U.S. through CHNV parole, it came as a gut punch, especially considering the U.S. government's recently announced plans to terminate CHNV parole. For years, the Nicaraguan government has considered individuals who apply for asylum in other countries to be political dissidents. What's more, the Parliament loyal to President Ortega recently legalized the banishment and denial of entry or exit to people deemed to be critics of Nicaragua, including Nicaraguan citizens. Alejandro is distraught about what will happen if he is deported and cannot reenter Nicaragua, or if the Nicaraguan government arrests, interrogates, or tortures him or his family upon return given his family's history of political persecution by the State. Asylum and parole were the only avenues that could keep Alejandro and his family safe. If he is no longer permitted to remain the U.S., he would be forced to look for alternative places to flee, because he cannot safely return to Nicaragua.

216.    For Plaintiffs **Ana Doe** and **Armando Doe**, fleeing Nicaragua and obtaining parole through the CHNV parole processes was a matter of seeking stability and safety from the ongoing persecution and violence they faced in Nicaragua. Similar to Alejandro Doe's account, due to the

55

increasing political repression and systemic violence under the Ortega regime, Ana's family has been persecuted for their political ideologies and involvement in anti-government protests. In 2018, while the police were actively looking for Ana's uncle, they found and detained her father instead. Ana's father spent days in prison where he was interrogated and tortured. Although he was eventually released, Ana's entire family had become people of interest in the eyes of the government, and they remained vulnerable to future persecution and violence. In 2020, Armando worked at a digital media company that published information regarding the political situation in Nicaragua and government abuses in the country. Before his arrival at the company, the government found and detained some employees of the company because they were discovered to be assisting some people who had been protesting during a hunger strike. While these individuals were eventually released and fled the country for their safety, it was evident that the government was keeping a close eye on Armando's employer—labeling his employer as anti-government—and Armando's safety grew ever more precarious, despite the precautions he took.

217.    The CHNV parole processes have provided Ana and Armando a safe pathway to escape the danger they faced in Nicaragua. Ana and Armando were sponsored by Ana's cousin, a U.S. citizen who lives in Washington state, and Ana and Armando subsequently received authorization to travel to the United States through the CHNV parole processes in December 2023. They both arrived in the United States and were granted two-year periods of parole in February 2024. Since then, Ana and Armando have created a home and community in Gainesville, Georgia, where they reside along with Alejandro Doe, Carlos Doe, and other members of their family. They have been welcomed by the local community in the Gainesville area. Since Ana and Armando received work authorization under CHNV parole, they have both been working full time. Ana works at a company that provides personal protective equipment, where she is responsible for

overseeing the company's inventory and supporting the company's warehouse. Armando works for a company installing machinery on trailers. Ana and Armando have been saving up money for their own futures while also supporting their family and loved ones who remain in Nicaragua. In January 2025, knowing that they needed to seek additional legal protection from the dangers and risks of persecution they face in Nicaragua, Ana and Armando applied for asylum.

218.    The news about the Trump administration's halt on processing applications for immigration relief filed by individuals who came to the United States through the CHNV parole processes came as a shock to Ana and Armando. This pause means that their asylum applications could be delayed indefinitely or not adjudicated at all in their remaining authorized time in the United States. Since their parole was only for a two-year period, Ana's and Armando's ability to seek asylum was their only avenue to ensure they can continue living a life free from the fear of persecution and danger they face in Nicaragua because of their political and ideological beliefs. If their applications remain on hold and they are subsequently removed, both Ana and Armando face the risk of being returned to the very danger and instability they fled in Nicaragua. Alternatively— if they are removed from the United States and the Nicaraguan government does not allow them to re-enter the country—Ana and Armando would be rendered stateless. Their ability to obtain work authorization through the asylum application process is likewise vital for them to be able to continue working and providing for themselves and their families after their parole expires and while they await the adjudication of their asylum applications. Given these risks, this indefinite pause on processing these applications for immigration relief and the impending termination of the CHNV parole processes irreparably harms Ana and Armando and their family.

219.    Plaintiff **Carlos Doe** also fled Nicaragua due to the political instability and direct persecution he and his family faced by the Nicaraguan government. In 2018, while he was a

university student, he became involved in protests against the government. Eventually, more protests broke out in his city, resulting in numerous assassinations and disappearances. Based on his involvement in these anti-government protests, the Nicaraguan government identified Carlos as a dissident and actively persecuted him and his father. Soldiers and police officers came to his family's home multiple times in search of Carlos and his father, making death threats against Carlos and his family. Given the danger and active persecution against Carlos and his father, they both decided to go into hiding. However, while in hiding, Carlos and his father continued to receive death threats, and at one point military soldiers came to Carlos's mother's house and told her they would imprison him and his father if they ever found them.

220.    Once Carlos learned about the CHNV parole processes, this path became a way for him to safely flee the danger and persecution he faced in Nicaragua. Carlos was sponsored by a U.S. citizen family member, and in May 2023, he received travel authorization to come to the United States under the CHNV parole processes. Carlos arrived in the United States and was granted a two-year period of parole in June 2023. Since his arrival, Carlos has created a community for himself, comprised of friends and family (including Ana, Armando, and Alejandro). He has also made many connections and friendships through his work experiences. Currently, Carlos works as a welder and solderer at a manufacturing plant. His ability to work in the United States with authorization has enabled him to provide for himself, his mother and younger brother who remain in Nicaragua, and his sister who currently lives in Costa Rica. Due to the risks of persecution and danger he faces in Nicaragua, Carlos applied for asylum in January 2025.

221.    After learning about the Trump administration's indefinite suspension of processing applications for immigration relief for individuals who entered the United States with CHNV parole, Carlos became very worried about how this pause will affect his ability to seek

asylum. Because his asylum application could be delayed indefinitely or not adjudicated at all, Carlos's only prospect of safety here in the United States beyond the end of his parole period has been stripped away from him, leaving him at risk of losing legal status or deportation back to Nicaragua where the government knows where he lives and has actively persecuted him. Moreover, obtaining work authorization through his asylum application is imperative for him to be able to support himself and his family in Nicaragua and Costa Rica, and this indefinite pause on the processing of his asylum application could render him without the ability to work, including once his parole expires or is terminated, which would harm both him and his family who rely on him.

222.    Plaintiff **Miguel Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Miguel learned of the CHNV parole processes for Nicaraguans about a year before he arrived. He spent a while deciding whether he wanted to leave his home, including his mother, with whom he lived and whom he helped take care of. In Nicaragua, COVID-related challenges and changes to his university's programs and requirements made it difficult for Miguel to receive consistent university education and progress toward a degree. It was also challenging to find a stable job that would allow him to make enough money to support himself and help his mother. Miguel decided to leave his friends, family, and community in Nicaragua for the United States because he knew it was the best way to help his family and his own future. He saw the United States as a land of opportunity and the CHNV parole processes as a safe, legal pathway there. He was excited to work hard for two years, save up money, and improve his and his family's future.

223.    In the United States, Miguel received work authorization in September 2024 and was able to quickly find work full-time producing marble panels. He has enjoyed his experience

in the United States thus far, working hard and spending time with family outside of his job. However, when he heard about the Trump administration's end to CHNV parole and the revocation of parole and work authorization for people like him, he felt scared and betrayed, and he became fearful of going outside in public given raids and deportations happening in his own town of Gainesville. Miguel has been in the United States for less than a year, and he was granted two years of parole when he entered. The inability to continue to work here for the remaining part of his parole period means that he will not be able to support himself or his mother as well, given his family's limited resources in Nicaragua. In less than a month, Miguel will be subject to imminent deportation, so he is forced to make decisions that will affect his and his family's lives and livelihoods on an extremely expedited timeline.

224.    Additionally, Miguel is worried about what will happen to him and his family if he is deported or otherwise forced to return, given his family's history of political persecution there. When Miguel was a teenager, his family experienced persecution that forced them to flee Nicaragua. He is also aware that the Nicaraguan government treats parolees and people being sent back from the United States with increased scrutiny, and that his family could be subject to harm if they returned. The early termination of Miguel's parole, combined with the administration's suspension of processing immigration benefits for parolees, deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. His legal status, work authorization, and options for protections have been erased all at once.

225.    Plaintiff **Andrea Doe** arrived in the United States in June 2023 with her two young children, Isaias and Francisco Doe, to reunite with her husband, Rafael Doe, a former political prisoner in Nicaragua.  The family lives in Mount Airy, Maryland.  Rafael Doe was part of a group of 222 Nicaraguan political prisoners and prisoners of conscience whom the government of Daniel

Ortega had abruptly released from prison on the condition that the United States government accept them. As many of these prisoners—Rafael Doe included—had been arbitrarily detained for very long periods, all had been exposed to harm amounting to torture, and many had pressing medical needs, the U.S. State Department agreed to evacuate them. The Nicaraguan government proceeded to strip the 222 passengers on this February 9, 2023 flight to the United States of their Nicaraguan citizenship, rendering most of them stateless.

226.    Due to the extraordinary circumstances of their departure from Nicaragua, none of the 222 were able to leave Nicaragua with their family members unless they too had been imprisoned as part of this group. After paroling the passengers on the February 9 flight into the United States, the State Department asked those needing to reunite with their family members to use the CHNV parole process to bring them here. *See* U.S. Dep't of State, 222 Nicaraguan Political Prisoners Released, Enter U.S.—Frequently Asked Questions and Resources (https://www.state.gov/222-nicaraguan-political-prisoners-released-enter-u-s-frequently-asked-questions-and-resources/).

227.    Reuniting his family was an urgent priority for Rafael Doe. He had been a political prisoner for over four years before being expelled from his own country. Not only was the continuing separation from his wife and two very young children humanly difficult for all of them, but the Nicaraguan government had been monitoring and harassing his wife, and Andrea Doe was afraid for her own safety and that of their children.

228.    Since being reunited in the United States, the family has been doing well. The couple are working for the same company that had first hired Rafael, they have rented their own apartment, and their children have settled into their new school and made friends. The family has applied for asylum, with Rafael as the principal applicant, including Andrea and their sons Isaias

and Francisco in his application. The suspension of processing of that application prevents the whole family from achieving permanent safety in this country, and they have no other: stripped of his Nicaraguan citizenship, Rafael could not return to Nicaragua even if it were safe for him, which it is not. If Andrea and the children's parole were terminated and they could not get their asylum application processed, Andrea fears she would be detained in Nicaragua and that her children would be taken away from her.

229.    Plaintiff **Lucia Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Back in Venezuela, Lucia lived with her mother and helped provide for her. Lucia holds a bachelor's degree in Christian Education from the Theological University of the Caribbean in Puerto Rico, and she worked at the Director of Children's Ministries at a local Christian church in Venezuela, but her salary was only around $60 a month, a very typical monthly salary where she lived. This was not nearly enough to cover her and her mom's most basic needs, including food, rent, and clothing, let alone the expensive medical care that her mom requires. Their basic expenses alone were around $500 a month. They were not able to survive on Lucia's income, so, like many other people who lived around them, they had to rely on financial support from family members living abroad. Lucia's siblings, including Plaintiff (and Lucia's CHNV sponsor) Lorena, sent money back to Venezuela regularly to help them get by.

230.    When Lucia heard about the opportunity to come to the United States on CHNV parole, she knew she wanted to pursue the pathway so she could work and help their family in a more robust way. She came to St. Augustine, Florida, because, from a previous trip she made to Florida when she was studying in Puerto Rico, she had several friends living and working there. She knew it would be easier to find work and use public transportation there, as opposed to in rural

Massachusetts, where Lorena lives. Lucia received her work permit in August 2024, started working at a cleaning company, and has settled into the community in St. Augustine. She attends a local Christian evangelical church and hopes to get involved in their ministries.

231.    The Trump administration's end to CHNV parole and the premature revocation of Lucia's parole and work authorization will force Lucia to, in a very short time, make many crucial decisions that will impact her own livelihood and that of her family members. If she is not able to stay in the United States for the two years that she was granted parole, she would be returning to Venezuela with very little savings, which would make her future here uncertain and create more of a financial burden for her siblings. She would not be able to provide the financial support that she planned for her mother, and she would face challenges finding a job in Venezuela, where is it very difficult to secure employment as someone older than 40 years old. Having to make these decisions rapidly or risk the threat of accruing unlawful presence that could prevent her from returning to the United States or deportation back to Venezuela, is causing Lucia a lot of anxiety.

232.    The conditions in Venezuela also threaten Lucia's safety and stability. Without a job for potentially a lengthy period of time, and given inflation that has made necessities unaffordable for the majority of the population, Lucia would struggle even more than before to pay for her basic daily needs, let alone those of her parents. There are also frequent, mass internet and power blackouts, and basic services like water, gas to cook, and transportation are often unavailable for days. She will need to deal too with the constant concern of crime and violence. Lucia is especially scared of what could happen to her if she is forced to return to Venezuela, because she has heard that the Venezuelan government interrogates people who have sought parole in other countries, and military officials have forced people to pay money at the border to be

allowed in. She has heard of Venezuelan citizens having their passports confiscated, being imprisoned, and even being disappeared.

233.    Plaintiff **Daniel Doe** is a Haitian national who was granted parole for two years through the CHNV Haitian parole process in February 2024. Daniel, his wife, and their three-year-old daughter faced imminent danger and risk of kidnapping from gangs in Haiti, in both neighborhoods where they lived. Daniel also worked as a court interpreter for foreigners, and occasionally as a general interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief Services. Daniel has been specifically targeted by the gangs, including being followed by gang members on motorcycles who have also ridden by his house. As a result, Daniel had to change the cars he drove to work, and the routes he took. Daniel's wife also received a warning that she and Daniel should "be careful," which they took as a warning that gangs were watching their movements, and that Daniel was a potential kidnapping target due to his work in Haiti.

234.    These incidents drove Daniel and his wife to the decision to seek safety outside of Haiti. In early 2023, Daniel's father's friend offered to sponsor Daniel through the CHNV parole process for Haitians. Because his father's friend had already agreed to sponsor several other of his own family members, he could only financially afford to sponsor just one more person. He submitted his sponsorship application for Daniel in April 2023. Later that same year, because Daniel's other application was taking a long time to process, Daniel and his wife learned about Welcome.US and their matching process where they would match prospective CHNV beneficiaries with individuals who could serve as sponsors. Daniel and his family were matched with a sponsor through Welcome.US, who submitted their sponsorship application for Daniel, his wife, and their daughter in early January 2024. About a week after this application was submitted,

Daniel received travel authorization to come to the United States through his father's friend's sponsorship application. Although it was extremely difficult, Daniel and his wife decided that Daniel should use this travel authorization to come to the United States on CHNV parole alone. Daniel's parole expires in February 2026, and his wife and daughter remain in Haiti with their pending application through the Welcome.US sponsor. In September 2024, Daniel was also granted TPS until February 2026, but due to the administration's recent termination of Haitian TPS, that status is also now only valid until August 2025.

235.    Daniel received his work permit in March 2024. Although it required some adjusting to life in the United States, Daniel has been able to adapt and become part of the community in Orlando. He has joined a local Haitian church and is currently working as an English as a Secondary Language ("ESL") teacher at two different schools serving adult students who are immigrants or in the United States on a student visa. Daniel also supports the Haitian community by providing free online classes to Haitian immigrants who have recently arrived to the United States, teaching them about U.S. culture, teaching them English, and providing general updates on immigration policies affecting the Haitian immigrant population.

236.    The Trump administration's end to CHNV parole and the premature revocation of Daniel's parole and work authorization will prevent him from being able to continue working, which is essential not only for him to support himself but also for him to be able to support his wife and daughter who remain in Haiti, as he is the main financial supporter for them. Daniel will also be at risk of imminent deportation back to a country where he faces increased risk of targeting by gangs, and the administration's suspension of processing immigration benefits for parolees deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. Moreover, with the CHNV parole processes terminated, the chance for

him to be reunited with his wife and daughter here in the United States through CHNV parole is lost.

237.    Plaintiff **Omar Doe** is an Afghan national who faithfully and loyally served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members, that forced him to relocate his wife and children from his home province. He built up good relationships with the soldiers he worked with, so when the U.S. military withdrew from Afghanistan in 2021, they brought Omar and his family with them. His departure from Afghanistan was chaotic—up until just two or three days before the collapse of the Afghan government, he was stationed with U.S. troops in Kandahar Province. They were relocated to the Kabul airport, and then suddenly, at 3 am in the morning, he was told that if he wanted to bring his family with him to the United States, they would need to come to the airport immediately. Omar called his father, who was able to bring his family to the airport at 6 am, but congestion and crowding at the airport was so dense that Omar's family was only able to reach him at 10 am. That brief interaction, when Omar received his family at the airport, was the last time Omar saw his father. He never got to say goodbye to his mother.

238.    Upon arriving in the United States, Omar was registered by the troops he had worked with and given a work permit. He was told that he would receive a passport and a green card, and he was told not to worry about anything. Three and a half years later, however, he has yet to receive permanent legal status in the United States, which has been extremely traumatic and stressful for him and his wife. Although he is grateful that his family is safe here and that his children are in school, the lack of legal documentation has caused so much stress that he has lost all his hair, and he and his wife have both lost teeth. After so many years of service to the U.S. military, it is very frustrating to Omar that he still lacks permanent legal status.

239.    Shortly after arriving in the United States, Omar applied for a Special Immigrant Visa ("SIV"), which are issued to, among others, Afghan nationals who provided faithful and valuable service to the U.S. government, and who endure serious threats because of that service. In addition, because his parole and work authorization will expire in September 2025, he is working with a nonprofit to file an asylum application, which will enable him to maintain his work authorization so that he can keep working to support his family until his SIV is granted. But the Trump administration's pause on the processing of immigration benefits means that these applications will not be adjudicated. This is especially hard for Omar to stomach, given all that he has done and sacrificed for the U.S. military over the course of most of his adult life. Going back to Afghanistan is not an option for him and his family after his service to the U.S. military, and he does not know what will happen to them if they are deported there. Omar had expected dignity from the government that he had served and that brought him to this country, but that has not happened for him.

240.    Plaintiff **Sandra McAnany** is a U.S. citizen and sponsor for seventeen individuals who were approved to come to the United States and granted parole through CHNV. Fifteen of these beneficiaries who are currently in the United States are nationals of Venezuela, and two are nationals of Nicaragua. They all arrived in the United States between September and December 2023 and were approved for two-year parole periods and work authorization. To Sandra's knowledge, most have pending asylum applications that are now on hold due to the administration's suspension of processing immigration benefits requests for CHNV parolees. Sandra's beneficiaries include five sets of parents with young children, who were only able to reunite with family members in the United States because of the CHNV parole process, and six adults without children. They seek both stability with their families and safety from persecution

67

and violence in their countries of origin. One beneficiary is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela, and her grant of CHNV parole allowed her to care for him while he went through treatment.

241.    Sandra also has four CHNV applications, for nationals of Cuba, that remain pending. Due to the administration's termination of the CHNV parole process and end to processing new CHNV parole applications, these applications will now never be processed. Daily life in Cuba is extremely difficult for these beneficiaries, as they struggle under the government system there to make enough money to pay for food for themselves and their families. They sought to come to the United States through CHNV parole either to reunite with family or to earn money to support their families in Cuba, including for critical medical treatment. One of these Cuban beneficiaries has also lost jobs in Cuba for speaking out against the government and fears being arrested if he continues to speak out. He and other beneficiaries hope to experience the democracy and freedoms of the United States.

242.    Sandra was driven to serve as a CHNV parole sponsor by her religious convictions, her experiences volunteering abroad in Central and South America, and her close connections with immigrant neighbors and friends in Wisconsin. As a Christian, she believes strongly in caring for others and supporting those in need, so sponsoring immigrants through CHNV parole allows her to live out her religious convictions in a meaningful way. In addition to putting considerable time and effort into completing the applications for her beneficiaries, Sandra has provided constant support, advice, and resources to them as they traveled to the United States and integrated into their communities. She provided travel guidance and support on job searches and enrollment in English classes, and one family lived with her in her home for over a year while the parent got a work permit and found a job. She helped pay for some of her beneficiaries' initial cell phone plans,

and she provided winter clothing or money to buy it for several families weathering a harsh winter for the first time.

243.    Over the last couple years, Sandra has allocated large amounts of time, effort, and money into helping the people she sponsors establish safe and stable lives in the United States, and in growing those relationships, she has come to see many of them like family. The administration's premature termination of grants of CHNV parole and pause on processing her beneficiaries' asylum applications means that all the time and money she has invested could be lost. If her beneficiaries become vulnerable to deportation, Sandra fears the harm that will come to them if they are forced to return to their countries of origin, and she will lose relationships that are valuable to her as a meaningful way to live out her faith. She worries that she may never be able to see them again.

244.    Plaintiff **Kyle Varner** has long been involved in supporting liberal and libertarian political movements in Venezuela, and he has done global health work at the Venezuelan border. Through his experiences, he has seen the challenges faced by people in poverty in the country. His personal and political convictions have led Kyle to serve as the U.S.-based sponsor for seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Of the forty-three of those individuals who are currently in the United States, at least thirty-one have pending applications for asylum, TPS, or other forms of immigration relief. The first of Kyle's beneficiaries arrived in the United States in November 2022. The people he has sponsored include a son who could only pay for his mother's life-saving cancer treatment because he got a job in the United States, and a mother and her young son who lived with Kyle's parents for eight months when they first arrived.

245.    Kyle also has thirty-two other pending applications for CHNV sponsorship, including for one Cuban individual and one Nicaraguan individual. Due to the administration's termination of the CHNV parole processes and end to processing of new CHNV parole applications, these applications will now never be processed, and the beneficiaries are deprived of a legal pathway to the United States. In Venezuela, these beneficiaries will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are unable to support the country's residents.

246.    Kyle has dedicated immense time, effort, and money into supporting the people he has sponsored. He spent hours submitting applications, and after people received approval to travel to the United States, he purchased plane tickets for most of them. After they arrived, he helped them find safe housing, including allowing many of them to live with him temporarily at first. He also co-signed leases and rented properties that he owns to many beneficiaries for reduced rates and under favorable terms. He purposefully kept some of his properties vacant when he was waiting for his CHNV sponsorship applications to be granted, which meant he missed out on leasing them to other renters. Kyle paid for most of his beneficiaries' work permit applications, helped them with job applications and enrollment in English classes, paid for cell phone SIM cards, and even taught a few how to drive. As a physician, he provided free medical care for minor health conditions and helped translate Spanish-language medical records from Venezuela.

247.    When his beneficiaries were applying for asylum, TPS, and other forms of immigration relief, Kyle lent money to some to help pay for attorney fees, helped them compile documents, and otherwise provided resources that they needed to complete their applications. Kyle has invested significantly in all of his beneficiaries to assist them in settling into their communities in the United States so they can in turn support their families and other loved ones. The time and

money he has invested could be lost if his beneficiaries' applications for relief are not adjudicated. Additionally, if his beneficiaries lose their work authorization because of a change in their status, Kyle would need to put more time and resources into making sure they have everything they need to survive.

248.    Plaintiff **Wilhen Pierre Victor** is the U.S.-based CHNV parole sponsor for seven of her family members from Haiti. Five of them—her brother, his wife, and their three children— were approved to travel to the United States in May 2024, and arrived between June and July 2024. They were all granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn, Massachusetts. Wilhen also has two pending CHNV sponsorship applications for her niece and cousin, both of whom are still in Haiti living under unstable political conditions and subject to the daily threat of violence. Wilhen's niece is thirteen years old and in Haiti without either of her parents. She is unable to attend school consistently because there is often gang violence, including gunfire, in the streets where she lives, which prevents her from going outside at all. Sometimes, she is unable to leave to go to school for up to a week. Wilhen's cousin, who is fifty years old, lives with the constant fear of kidnapping for ransom, especially if the gangs find out she has family in the United States. She has heard of people being kidnapped and murdered when they cannot produce large sums of money. There are often days when she cannot go outside even to run minor errands because of the fear of gang violence. Given the administration's end to processing new CHNV parole applications, Wilhen's applications to bring her niece and cousin to the United States will now never be processed. Because of this, Wilhen's niece and cousin continue to live in terror of the ongoing violence in Haiti, and they are unable to reunite with their family members in the United States.

249.    Wilhen applied for a green card for her brother back in 2007, and they were still waiting for an interview with USCIS when the parole process for Haitians was announced in 2023. Wilhen sponsored him to come through CHNV parole because it provided a legal way for them to reunite in the United States and to bring Wilhen's family to a safer, more stable place while they continued to await adjudication of the green card application, which remains pending.

250.    Back in Haiti, Wilhen's brother had been unable to find a job for thirteen years due to the lack of economic opportunities. His wife worked as a salesperson for a small business, but they relied on support from Wilhen and other family members to survive. Their children were not able to attend school consistently, and their family dealt with frequent reports of kidnappings, murders, and other violence. In the United States, Wilhen's brother has obtained work authorization and is working at a local nursing home. His kids are enrolled in school as well, and he and his wife are both taking English classes and attending their local church.

251.    Being together as a family has been beneficial for Wilhen, her brother, and his entire family, and Wilhen has invested her time and energy into ensuring that they arrived safely and have had the resources to settle into their lives in the United States. When her brother and his family were approved to travel to the United States through the CHNV parole processes, Wilhen pooled money with other family members to pay for their plane tickets. She prepared her home for all five of them to stay with her. Once they arrived, she picked them up at the airport, where they were overjoyed to be reunited for the first time in more than twenty years. Wilhen then supported them all while her brother received his work permit and looked for work, and she helped him find his current job.

252.    The administration's premature termination of grants of CHNV parole and pause on processing applications for immigration relief for individuals who came to the United States

under CHNV parole means that her brother's longstanding green card application could be delayed even further or not adjudicated at all, and that he could become vulnerable to deportation and lose out on the chance to apply for asylum as well. The years that Wilhen and her brother have spent waiting for it to be processed will be lost, and her brother and his family could be forced to return to a life in Haiti rife with instability and violence. Given the difficulty of finding a job in Haiti and the frequent violence Wilhen's family experienced there, the end to the CHNV parole processes and suspension of adjudication of immigration benefits causes direct harm to Wilhen and her loved ones.

253.    Plaintiff **Gabriela Doe** is the U.S.-citizen CHNV parole sponsor to her cousins, who are Nicaraguan nationals—Ana Doe, Armando Doe (Ana's husband), Alejandro Doe, and Miguel Doe. Carlos Doe is also her cousin, but he was sponsored through CHNV by another family member. After her father passed away in June 2023 from cancer, her cousins were a great support for her during a difficult time. Thus, Gabriela wanted to help her cousins in any way she could and carry on the legacy of her father who was known for always taking care of his family. Knowing her cousins faced dangerous living conditions, violence, and persecution in Nicaragua, Gabriela offered to support her cousins through CHNV sponsorship. Gabriela submitted her sponsorship applications for her four cousins in 2023. All the cousins she sponsored arrived in the United States and were granted parole under CHNV at different points throughout 2024.

254.    Since arriving to the United States, Gabriela's cousins have acclimated to life here in the United States and have become self-sufficient in supporting themselves since they secured work authorization. Gabriela has been able to reunite with them in Gainesville, Georgia where they currently live, and she feels proud of how well they are doing here in the United States and how well they have supported one another.

255.    The Trump administration's termination of CHNV parole and the premature termination of all five of her cousins' grants of parole has left Gabriela feeling very scared and worried for her cousins. If their parole prematurely ends and they are left without status, they will be at risk of being removed back to Nicaragua, a country where they—and their entire family— face grave risks of danger and persecution by the Nicaraguan police and government because of their political ideologies. Her cousins will also be left without work authorization and the ability to support themselves and their other family members. Given that Gabriela has clinical depression and anxiety, the termination of her cousins' parole status and the impending effects that could have on them and their well-being would cause Gabriela severe psychological distress.

256.    Plaintiff **Norma Lorena Dus ("Lorena")** is the U.S.-based CHNV parole sponsor for her sister, Plaintiff Lucia Doe. Lorena submitted the CHNV sponsorship application for Lucia in December 2022, and Lucia was approved to travel to the United States in May 2024. Lucia arrived in July 2024 and was granted a two-year period of parole, and she received her work permit a month or so later. Lorena paid for Lucia's plane ticket and her work application fee, and she sent money to help support her while she was waiting for her work authorization.

257.    Once Lucia started working and was able to, she began sending money back to their parents in Venezuela, something Lorena and their other siblings who live abroad do consistently. Lucia came to the United States precisely because she sought the opportunity to work and earn wages that would allow her to support herself, help alleviate the financial burden on her siblings, and provide for their parents, including their mother, who has health conditions that require expensive doctor's visits, exams and labs, and medication. Their mother has to pay for her medical care out of pocket, but she receives a pension that is not even enough for a dozen eggs. Lorena and Lucia saw the CHNV parole process as a blessing for their entire family.

74

258.     In addition to the economic opportunity, Lucia being in the United States has made it easier for their family to reunite. Last October, Lucia traveled to Massachusetts, and their mother and other siblings traveled in as well. For the first time in six years, all the siblings were together for a joyful reunion. As a U.S. citizen, it is difficult for Lorena to travel in and out of Venezuela, so having Lucia closer has allowed them to see each other more and strengthen their relationship.

259.     The administration's termination of CHNV parole and the premature termination of Lucia's parole was devastating for both Lorena and Lucia. Lorena feels disappointed and hurt that the government would punish people like Lucia who applied from abroad, are supported by a sponsor, came through a legal pathway, and are working to support themselves and contribute to the economy. If Lucia is forced to return to Venezuela, Lorena will need to send more money back to her parents to help make up the difference, which will cause financial strain on her and require her to stretch financially and make more sacrifices to help them. Lorena is also already experiencing the emotional and psychological toll of her sister facing the possibility of imminent, sudden deportation, after having come to the United States with the permission of the government, and the decisions they have to make together as a family to try and keep her safe.

260.     Plaintiff **Valentin Rosales Tabares** fled his birth country of Cuba for the United States in 2016 and received his green card in 2017. That same year, he was able to submit a family-based immigrant visa petition for his wife and son, who was less than 18 years old at the time, and another petition for his daughter. Both of these petitions were approved in May 2018. In 2022, Valentin was overjoyed that his wife and son received immigrant visas and were able to reunite with him in Portland, but his family remained separated: his daughter and her young daughter, Valentin's granddaughter, continue to this day to wait for their immigrant visas in Cuba. Valentin's son also had to leave his wife and young son behind in Cuba.

261.    Valentin fears for the safety and stability of his family members still in Cuba every day. The living conditions in Cuba have been incredibly difficult for many years, and they continue to deteriorate. In Valentin's family's experience, there are often food, gas, and electricity shortages, including long periods of time where there is no electricity at all. There is very limited public transportation, so travel is nearly impossible. Cuba has also seen an increase in violence and crime, as well as retaliation from the government for speaking out. Valentin's daughter and granddaughter are afraid to leave their home even to get groceries, and other family members have suffered from incidents of theft that are on the rise.

262.    When Valentin learned about the CHNV parole processes in February 2023, he applied to sponsor his son's wife and child for humanitarian parole. Those applications were never adjudicated and, due to the administration's termination of the CHNV parole processes, now never will be.

263.    In November 2024, Valentin also learned that he had been invited by the Department of State to request Cuban Family Reunification Parole for his daughter, which would allow his daughter to come to the United States while she waited for her family-based immigrant visa to become available. Valentin quickly submitted the request for Family Reunification Parole in December 2024, and only a few days later, it was approved. He and his wife were excited that they would finally be reunited with their daughter and granddaughter after so many years, and they set about preparing for her travel. They paid for the medical exam that his daughter was required to do for the parole process, prepared a room in their home for their arrival, and purchased winter clothes and other items for them to feel welcome. However, as they waited eagerly for the issuance of a travel date for their daughter, it never came. In January 2025, Valentin received the news that the Family Reunification Parole process had been terminated. Now, he and his wife live in

uncertainty and fear about whether their daughter will be allowed to come to the United States at all through this parole process. All of the resources they put into planning for her arrival will be lost, and, far more devastatingly, their family will continue to be separated.

264.    Plaintiff **Marim Doe** joined the Navy in January 2024. He is a student in the nuclear training program, through which he is learning to operate nuclear reactors on naval carriers and submarines. Before joining the Navy, Marim lived with his family in Texas. He has a close relationship with his family, including with his father, who does not have legal status in the United States. Marim has seen his father work hard to provide for their family his entire life, enduring much hardship and making many sacrifices so that his family can thrive. When Marim heard about the military parole-in-place process in high school, he decided to join the Navy after graduation so that he could continue his education, but also help his father obtain legal status.

265.    Marim's application for military parole-in-place for his father has been pending since May 2024. A grant of parole would provide his father with more stability, particularly as he ages, both in terms of staying in the United States safely with his family and in terms of financial well-being. With parole, Marim's father would no longer fear being let go from his job if they found out he was undocumented, or being detained and subject to deportation by ICE.

266.    The news that military parole-in-place was going to be paused was heartbreaking for Marim, his father, and their entire family. At a time when Marim should be focusing on the U.S. Navy's rigorous training program, Marim is distracted and worrying about the safety and wellbeing of his family. Marim is suffering extreme emotional distress from the possibility that his father could be deported, and that such an important benefit provided to servicemembers dedicating themselves to the U.S. military is being eliminated.

267.    Plaintiff **Adolfo Gonzalez, Jr.** served in the U.S. Army as a First Sergeant for more than 30 years. In February 2025, he retired from active service and was honorably discharged. Adolfo and his wife have been together since 2017, and they have a sixteen-year-old daughter, who is Adolfo's wife's biological daughter but whom Adolfo recently legally adopted.

268.    Adolfo's wife is undocumented, which has meant that their family has lived for many years with the fear that she could be detained or deported. When Adolfo had to be away from home with the Army, he was always anxious that something would happen to her. They learned of military parole-in-place through meeting with an immigration attorney, and it felt like a beacon of hope for them. They felt it was an incredible benefit for people who served the United States military. The application that Adolfo submitted for his wife has been pending since around March 2024.

269.    In March 2025, Adolfo and his wife found out that military parole-in-place applications were no longer being processed by the U.S. government. The fact that their application has been paused indefinitely has caused him and their family immense anxiety and sadness. They worry constantly about their family being separated and their daughter losing her mother. Adolfo also feels let down by the government after serving the military honorably for more than three decades. Without military parole in place, Adolfo, along with his wife and daughter, will continue to suffer emotional distress from the prospect of their family being separated through detention or deportation.

270.    Plaintiff **Aleksandra Doe**, along with her husband and five-year-old son, fled Ukraine through the U4U parole process to seek stability and safety following the Russian invasion of Ukraine in 2022. Life in Ukraine was extremely difficult for her and her family due to the war. Aleksandra would hear missiles flying over them every day. For days on end, Aleksandra and her

family would go without electricity in their home, which would lead to her son getting sick from the cold temperatures. The U4U parole process offered Aleksandra and her family an opportunity to escape the danger and instability they faced in Ukraine. In April 2023, Aleksandra and her family were granted parole under the U4U parole process. Aleksandra and her family eventually settled in San Jose, California, where her sister (who is also in the United States with U4U parole) lives.

271.    Aleksandra and her family have settled into new lives here in the United States. Her husband works in construction, and her son is attending a transitional kindergarten school, where he is enjoying learning English and socializing with other children. Aleksandra and her family also greatly enjoy the area they live in and the local community.

272.    In October 2023, Aleksandra and her family applied for the diversity visa lottery, and in May 2024, Aleksandra was notified that their applications were selected for further processing in the diversity visa program for Fiscal Year 2025. This was life-changing news for Aleksandra and her family, because if they were able to successfully move through the process and obtain green cards, they would be able to continue living in the United States, where they have established a stable life for themselves and their son, while also being able to visit their elderly and ailing relatives in Ukraine when necessary. Aleksandra and her family followed all of the required steps in the diversity visa process and spent upwards of $6,000 on all of the application fees and other expenses associated with the process, including the required medical examinations for each of them. They submitted their I-485 applications for adjustment of status in December 2024.

273.    Aleksandra and her son also applied for TPS in December 2024 given the ongoing conflict and conditions that persist in their home country.

274.    In January 2025, USCIS scheduled an interview for Aleksandra and her family on February 27, 2025, regarding their adjustment of status applications. However, a few days before the interview, on February 19, USCIS sent a notice to Aleksandra informing her that the interview had been cancelled, without any explanation as to why.

275.    Now, Aleksandra and her family's parole will expire in less than two weeks, on March 29, 2025. If Aleksandra's TPS and adjustment of status applications are not adjudicated or are kept on hold for too much longer, she and her husband will lose their work authorization and ability to support themselves and their young son, and their entire family will lose the ability to remain safely in the United States. Without work authorization, her husband will likely lose his job at his construction company, leaving them without the ability to support themselves and pay for their basic living expenses. And if their adjustment interview and applications are indefinitely suspended, by September 2025, Aleksandra and her family will lose their once-in-a-lifetime opportunity to obtain a visa through the diversity visa lottery system and will have wasted the thousands of dollars they have invested in this process. Consequently, Aleksandra remains extremely afraid and anxious for herself, her husband, and her young son. The indefinite suspension of processing immigration benefit applications for U4U parolees is causing Aleksandra and her family tremendous emotional strain and distress.

276.    Plaintiff **Teresa Doe** and her son reunited with her husband and three other children in the United States in 2017 through the CAM parole process. They had lived apart for many years until Teresa's husband was able to petition for their son to receive parole through CAM. When his petition was approved, Teresa was able to accompany him to the United States as an eligible family member.

277.    Since they arrived in 2017, Teresa and her son were granted CAM re-parole for more than eight years, allowing them to settle into their community in Nevada and allowing Teresa to consistently care for her family. Teresa's husband works and provides the income for their family, while Teresa stays home and takes care of their children and house. She takes her youngest son, who is a U.S. citizen, to high school every day. During the week, she is also the caretaker for her two U.S. citizen granddaughters, who are 2.5 years old and 6 months old, while their parents work full-time. Being together again after so many years of separation has been beneficial for their family.

278.    Teresa's most recent grant of CAM parole expired on March 13, 2025. She has a pending application for re-parole that has not yet been adjudicated, and she fears that due to the administration's termination of CAM and other parole processes, it never will be. The possibility of losing parole and being separated from her family again is devastating for Teresa. Her youngest son and grandchildren would have no one to take care of them, and Teresa would miss out on watching them grow up. She is also afraid of returning to El Salvador, given safety concerns and the political climate there. The termination of CAM is causing Teresa and her family more emotional distress with every passing day.

279.    Plaintiff **Rosa Doe** escaped Honduras in 2013 after surviving rape and other violence. She was trafficked upon entering the United States. Rosa now lives in Austin, Texas with her four U.S. citizen daughters. She also has one fourteen-year-old daughter living in Honduras with Rosa's elderly father. Rosa applied for her daughter and mother through the CAM parole process in June 2023 in order to reunite with them after over a decade of being apart, and also for Rosa's daughter's safety. After Rosa's mother died in October 2024, Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. Rosa's daughter and father then

moved through the screening and multi-step process and were conditionally approved for CAM parole in November 2024. Rosa did not have enough money to pay for their travel in December 2024 due to having spent all her savings on her mother's medical care and funeral expenses. Rosa began planning for their arrival in late January of 2025. After January 20, 2025, Rosa was unable to reach the organization handling their applications, the International Organization for Migration, for an update on their case. Rosa went without answers regarding her daughter and father's CAM applications until early March 2025. At that time, she was informed that it would take additional time for her daughter and father to travel to the United States on parole. Around the same time, Rosa was informed about the government's plans to terminate the CAM parole process.

280.    If the CAM parole process is terminated, Rosa fears her daughter and father will not be able to travel to the United States at all. With each day that passes without parole, Rosa's fourteen-year-old daughter remains in active danger from the same perpetrator who inflicted sexual violence and harm onto Rosa when she was fourteen years old. The termination of the CAM parole process is causing Rosa and her family serious anxiety and distress everyday Rosa's daughter remains in Honduras.

281.    Plaintiff **Haitian Bridge Alliance ("HBA")** was founded for the purpose of assisting Haitian and other Black immigrants to acclimate to the United States and to promote their ability to navigate their new lives in the United States. HBA's core organizational activities have been to educate Black migrants about legal pathways and humanitarian protections and to provide them with legal services to access them. HBA has provided direct services to over 1,000 CHNV sponsors and parolees from Haiti.

282.    Since January 2023, HBA has received over 3,000 urgent requests from potential Haitian parolee clients seeking sponsors to apply for the Haitian parole process and has conducted hundreds of consultations with Haitians wanting to apply for parole.

283.    HBA has provided aid to individuals looking to sponsor Haitian migrants through the Haitian parole process by assisting these sponsors with the completion of their sponsorship applications (the Form I-134A) and ensuring they understand each aspect of the application. Between June 2023 and January 2024 alone, HBA staff spent over 500 hours on this work.

284.    HBA has also partnered with Welcome.US—a national initiative that mobilizes and empowers Americans from across the country to welcome and support those seeking refuge here in the United States—to mobilize individuals eager to sponsor and help Haitians fleeing danger and seeking refuge in the United States through the Haitian parole process. Through HBA's partnership with Welcome.US, HBA registered over 140 Haitian parolee clients to help them get connected with potential sponsors and successfully matched 20 Haitian parolee clients with sponsors.

285.    HBA has also provided integration services to Haitian parolees once they arrive, including with regards to housing and other basic needs, transportation, and education.

286.    As a result of the overwhelming demand for assistance with the CHNV parole processes, HBA expanded their team in 2023 by hiring additional staff members to continue supporting this work for CHNV sponsors and parolees in connection to HBA's overall mission and services.

287.    The Trump administration's termination of the CHNV parole processes, including stopping the processing of CHNV parole applications, and the administration's suspension of

processing immigration benefit applications filed by CHNV parolees directly and concretely impair HBA's core activities, and in multiple ways.

288.    For one, the termination and suspensions waste the resources that HBA has already expended in helping potential sponsors and beneficiaries prepare and file applications for parole and, with regards to those who are already here, other immigration benefits.

289.    In addition, the termination of parole for those Haitian parolees already here—which will also terminate their employment authorization—will require HBA to modify its approach to its core activities to meet the needs of those parolees, including their basic economic needs and their heightened legal needs.

290.    The administration has terminated a legal pathway that is relied upon by many of HBA's clients and community members, and its actions directly interfere with HBA's humanitarian and legal support services being provided to CHNV sponsors and Haitian parolees. These needs have already increased, as the reporting of CHNV's termination by the Trump Administration has led to a rapid increase in the number of Haitians and others seeking assistance from HBA, be it legal and otherwise.

291.    The termination and suspension and the new needs it has created has forced HBA to suspend indefinitely its plans to expand the affirmative legal services it could offer its clients, and it will require HBA to respond to any deportation defense needs of CHNV parolees if they lose their status, which would be work that is outside the normal realm of services it offers CHNV parolees. Rather than move forward with their previous plans, HBA now must change course to meet the more immediate humanitarian and legal needs of the community it serves.

292.    Since the release of the March 25 FRN, HBA has been receiving increasing numbers of calls to their hotline from individuals with CHNV parole panicking about how the

March 25 FRN will affect them, including whether their parole has been or will be terminated, what will happen to their work authorization, and whether they could be targeted for expedited removal. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

293.    HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to an upcoming know-your-rights training, which will make it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

## CLASS ALLEGATIONS

294.    Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Lucia Doe, Daniel Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, Valentin Rosales Tabaras, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, and Rosa Doe (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all similarly situated persons for whom the January 20 Huffman

memorandum, the February 14 Davidson memorandum, the March 25 FRN, and subsequent similar actions have halted the processing of their applications to sponsor parole beneficiaries and to seek additional immigration benefits and rescinded existing grants of parole. The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of:

295.    All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to CHNV, U4U, OAW, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

296.    All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

297.    All individuals who have received humanitarian parole through the already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

298.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

299.    The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The demand for to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been high; USCIS received over 120,000 sponsorship applications for U4U,

and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available. Although U4U has no monthly cap on the number of applications that can be granted, only a maximum of 30,000 CHNV applications can be granted each month, which is why USCIS eventually adopted a lottery system to process some CHNV applications, rather than processing them all on a first-come-first-served basis.  Similarly, by the time the first Trump administration attempted to take steps to terminate the CAM process, over 12,000 people had applied for the program. And while reliable statistics regarding the number of applications for FRP and MPIP are not publicly available, the FRP process for Haiti alone issued over 12,000 invitations to eligible sponsors within two years, and it appears that USCIS had approved close to 4,000 MPIP applications within two years in the late 2000s. The number of beneficiaries of humanitarian parole processes is also high: Approximately 200,000 Ukrainians have entered the United States through the U4U parole process; approximately 600,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela have entered the United States through the CHNV parole processes; and approximately 75,000 Afghans were brought to the United States through Operation Allies Welcome. The numbers of beneficiaries of FRP, MPIP, and CAM together also number in the many thousands. Although not all of these individuals are eligible for or have applied for additional immigration benefits, many thousands of them have already applied for asylum, TPS, and other status adjustments.

300.    The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' interpretation of the INA's parole provision is lawful and supported by the text of the statute; whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, and other similar agency actions are not in accordance with law and/or with the agencies' own regulations; and whether the January 20 Huffman memorandum,

the February 14 memorandum, the March 25 FRN, and other similar agency actions violate Plaintiff Class members' rights under the APA.

301.    The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the January 20 Huffman memo, the February 14 Davidson memorandum, and the March 25 FRN, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them; whether Defendants quantified or considered harms that result from the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, and their implementation; and whether class members have suffered harm as a result of the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, and Defendants' actions taken to implement these memoranda.

302.    Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

303.    The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the INA's parole provision, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing. They have further been harmed by Defendants' failure adequately to explain their decision to issue the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, as well as Defendants' premising these

memoranda and their implementation on an erroneous interpretation of the INA's parole provision. Each of these actions, independently and collectively, have caused harm to the Putative Class Representatives and the Plaintiff Class members.

304.    The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

305.    The members of the proposed class are readily ascertainable through Defendants' records.

306.    Through implementation and enforcement of the memoranda at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

307.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act (APA) – Contrary to Law**
**(Termination of parole processes)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

308.    All foregoing allegations are repeated and realleged as though fully set forth herein.

309.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

310.    As explained above, within days of President Trump taking office again, DHS stopped adjudicating any pending requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and stopped accepting new requests for parole or re-parole through them.

311.    Plaintiffs refer to the actions in the preceding paragraph as "terminating" those processes, but that characterization is immaterial to the legal infirmities of the actions.

312.    DHS has not informed the public that it has stopped adjudicating requests for parole and re-parole made through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM. USCIS did put on its website on January 28, 2025 that it has "paused" accepting new applications for parole through U4U, CHNV, and FRP "until we review all categorical parole processes as required by" the "Securing Our Borders" executive order.

313.    DHS subsequently published a Federal Register Notice on March 21, 2025, which expressly "terminat[es]" the CHNV parole processes and states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date." 90 Fed. Reg. 13611.

314.    DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes and to stop adjudicating any pending such requests constitutes final agency action, as do the discrete actions the agency Defendants took to implement this decision, including but not limited to the January Higgins directive and the March 25 FRN.

315.    DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM; to stop adjudicating any pending such requests; and to "terminat[e]" the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, 90 Fed. Reg. 13611, was based in substantial part on an erroneous interpretation of the parole statute, 8 U.S.C. § 1182(d)(5), contained in the January 20, 2025, memorandum of the then-Acting Secretary Huffman.

316.    DHS's early termination of all existing grants of parole was also based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b). The March 25 FRN states that *the* reason DHS decided not to let CHNV parolees keep what is left on their existing two-year grants of parole is that once they are here for more than two years, they would be ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). 90 Fed. Reg. at 13620. But CHNV parolees cannot be put in expedited removal under § 1225(b)(1)(A)(iii) regardless of how long they have been here, because the statute can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal under § 1225(b)(1)(A)(iii)(II).

317.    Because of DHS's actions, parole and re-parole applications that have been filed are now pending indefinitely, which eliminates the right for beneficiaries to obtain parole and

holds legal consequences both for the applicants and their sponsors. For example, Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, and Valentin Rosales Tabares all have pending applications for individuals for whom CHNV parole is the only legal pathway available for them to seek safety and stability in the United States. For Wilhen, those individuals are family members of hers who deal with routine violence in Haiti; for Valentin, CHNV parole has enabled him to sponsor his daughter-in-law and granddaughter, so that they may reunite with his son and be together as a family again. The termination of the CHNV parole processes means that the beneficiaries of Plaintiffs McAnany, Varner, Victor, and Tabares have lost their opportunity to come to the United States and potentially seek further protection here. The termination of the FRP processes similarly and further harms Valentin Rosales Tabares, whose daughter and granddaughter have approved family-based immigrant visa petitions, but who have been waiting for years in Cuba for their visas to become available.

318.    Humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and remain authorized by the statutory parole authority, codified at 8 U.S.C. § 1182(d)(5).

319.    Defendants' legal conclusion regarding the scope of the parole authority and the legality of these specific parole processes is contrary to law.

320.    Even Defendants' allegedly discretionary decisions are based on an erroneous understanding of their discretionary legal authority. For example, the January 20 Huffman memorandum's assertion that the Secretary of Homeland Security has absolute discretion to deny parole for any reason and in any circumstance is wrong; not only is the Secretary's exercise of that discretion subject to constitutional constraints and self-imposed regulatory constraints, it is also currently restricted by numerous injunctions and other court orders.

321.    Defendants' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Contrary to Law &amp; *Ultra Vires***
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

322.    All foregoing allegations are repeated and realleged as though fully set forth herein.

323.    As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM.

324.    USCIS did not seek to justify the suspension of the adjudication of benefits for individuals into the United States through one of these humanitarian parole processes until February 14, 2025, in the Davidson memorandum, which addressed only U4U, CHNV, and FRP.

325.    DHS has not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

326.    Defendants' suspension of benefits adjudication for parolees constituted final agency action, as did the discrete actions taken to implement it and on what it is based, including but not limited to the January 20 Huffman memorandum, the January Higgins directive, and the February 14 Davidson memorandum.

327.    Defendants' suspension of the processing of immigration benefits for those paroled through an already established humanitarian parole process has clear legal consequences for many applicants, including because a suspension of an application for relief could leave an applicant

stranded without status in the United States. For example, Plaintiff Teresa Doe's parole and work authorization expired on March 13, 2025; Plaintiff Aleksandra Doe's parole and work authorization will expire imminently on March 29, 2025; Plaintiff Maksym Doe's U4U parole and work authorization will expire in April 2025. If Aleksandra Doe cannot move forward in the FY2025 Diversity Visa process or have her TPS application processed, and if Maksym Doe's pending applications for re-parole or TPS remain suspended and are not processed and granted soon, they will lose their legal status and his work authorization and become subject to deportation, just as Teresa Doe already has. Other Plaintiffs are similarly at risk of losing their status if this suspension continues.

328.    Defendants' suspension of adjudicating applications that would benefit these parolees is in excess of their statutory authority and contrary to the statutory regime Congress created that give applicants the right to apply for immigration benefits to be adjudicated under the legal standards and through the process that Congress created. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1254a (TPS).

329.    Defendants' blanket suspension of adjudicating applications that would benefit these parolees is also contrary to the parole statute, which requires that conditions for parole be "prescribe[d] only on a case by case basis." 8 U.S.C. § 1182(d)(5).

330.    Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

### THIRD CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act – Arbitrary and Capricious
### (Termination of parole processes)
### (Against Defendants Noem, Lyons, Flores, and Davidson)

331.    All foregoing allegations are repeated and realleged as though fully set forth herein.

332.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

333.    As detailed above, DHS has stopped adjudicating any pending requests for parole or re-parole through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; stopped accepting new requests for parole or re-parole through them; and issued the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations and doing so constitutes final agency action as also discussed above.

334.    Defendants' decision to stop adjudicating pending requests for parole or re-parole through already established humanitarian parole processes, to stop accepting new requests for parole or re-parole through those processes, and to expressly terminate the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, was arbitrary and capricious, for failure to consider and reasonably explain its consideration of the many factors relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the parole statute makes relevant. In so doing, DHS failed to consider important aspects of the problem and also failed to meet the APA's requirement to reasonably explain important decisions like this one.

335.    To the extent Defendants do offer some justifications for their actions, such as in the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, those justifications

were not offered contemporaneously with the termination itself and reveal a disconnect between the decision made and the rationale provided, and therefore do not provide a satisfactory explanation for Defendants' actions.

336.    Even had the explanations in the Mar. 25 FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the Mar. 25 FRN failed to consider the purposes of the parole statute and the INA more generally; the current conditions in Cuba, Haiti, Nicaragua, and Venezuela; the combined effects on CHNV parolees, their families, and their communities of the various other actions Defendants have taken, including the other agency actions challenged here; the correct interpretation of the parole statute and the expedited removal statute, 8 U.S.C. § 1225(b); and available alternatives.

337.    In imposing an erroneously narrow interpretation of the parole statute on agency personnel while also authorizing and directing them to terminate all previously established humanitarian parole processes, Acting Secretary Huffman claimed that, even if a court disagrees with his legal conclusion, "I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

338.    Acting Secretary Huffman's claim that he would impose the same policy as a discretionary matter was a pretextual and/or contrived attempt to insulate his unlawful actions from judicial review.

339.    In allegedly deciding to adopt the same policy as a matter of discretion, Acting Secretary Huffman failed to consider any factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and

potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the statute makes relevant. In so doing, he failed to consider important aspects of the problem.

340.    DHS thus acted arbitrarily and capriciously in allegedly adopting, as a matter of discretion, its parole policy, and in taking all the aforementioned actions regarding specific parole processes and the individuals who have been paroled through them.

341.    DHS' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

### FOURTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act – Arbitrary and Capricious
### (Suspension of benefits adjudication for parolees)
### (Against Defendants Noem, Lyons, Flores, and Davidson)

342.    All foregoing allegations are repeated and realleged as though fully set forth herein.

343.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

344.    As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, and doing so constitutes final agency action as also discussed above.

345.    DHS's decision to suspend adjudication of these requests for benefits was arbitrary and capricious due to Defendants' failure to consider seemingly every factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on those directly affected and on their family members and communities; the impact of it on the United States'

foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or the criteria made relevant by the statutes governing the applications. In so doing, Defendants failed to consider important aspects of the problem.

346.    In addition, DHS ignored and otherwise violated the APA reasonable explanation requirement.

347.    DHS thus acted arbitrarily and capriciously in suspending the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

348.    Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

### FIFTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act – *Accardi* Doctrine
### (Failure to follow agency procedures)
### (Against Defendants Noem, Lyons, Flores, and Davidson)

349.    All foregoing allegations are repeated and incorporated as though fully set forth herein.

350.    Plaintiffs are entitled to written notice that their parole is being terminated before expiry of the authorized duration pursuant to 8 CFR § 212.5(e)(2)(i), which states that "parole shall be terminated upon written notice to the alien . . . " Plaintiffs are also entitled to written notice that their employment authorization is being terminated before the expiry of the authorized duration pursuant to 8 C.F.R. § 274a.14(b), which states that a "written notice of intent to revoke the employment authorization" must be served, and that the individual "will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence."

351.    Defendants' actions will result in Plaintiffs being deprived of the written notice of termination they are entitled to because the March 25 FRN terminating parole processes for CHNV nationals, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (Mar. 25, 2025), fails to provide written notice or set forth any procedure by which Defendants are provided with written notice of the premature termination of their parole. The March 25 FRN states that parolees under the CHNV parole processes will be notified that their parole is being terminated on April 24, 2025 through the March 25 FRN itself and notifications sent to the parolees' online USCIS accounts.

352.    Publication of a FRN and/or electronic notification to online USCIS accounts do not qualify as "written notice" of termination.

353.    Defendants' actions, as set forth above, violate agency procedures, including those found at 8 CFR § 212.5(e)(2)(i), which state that parolees are entitled to "written notice" of termination when parole is terminated before expiry of the authorized duration.

354.    Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

355.    Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
### Non-Statutory Claim to Enjoin Unlawful Executive Action
### (Termination of parole processes & suspension of benefits adjudication for parolees)
### (All Defendants)

356.    All foregoing allegations are repeated and realleged as though fully set forth herein.

357.    As discussed above, Defendants' decisions terminating humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and suspending benefits

adjudications for individuals paroled through those processes, are contrary to the INA and in excess of the legal authority granted Defendants.

358.    Defendants' actions should therefore be declared unlawful and enjoined pursuant to this Court's inherent equitable authority.

## SEVENTH CLAIM FOR RELIEF
### Due Process Clause of the Fifth Amendment to the U.S. Constitution
### (Termination of parole processes & suspension of benefits adjudication for parolees)
### (All Defendants)

359.    All foregoing allegations are repeated and realleged as though fully set forth herein.

360.    Plaintiffs have a protected interest in applying for parole, re-parole, and other immigration benefits; and in any grant of parole, re-parole, and other immigration benefits.

361.    Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to notice, an opportunity to be heard, and to have their claims adjudicated pursuant to the laws enacted by Congress.

362.    Defendants' actions terminating the parole processes and suspending benefits adjudication violate Plaintiffs' right to due process in numerous ways by depriving them of a meaningful opportunity to establish—under lawful standards—their eligibility for parole, re-parole, other immigration benefits, and to the remainder of any grant of parole they have already received.

363.    Defendants' termination of these parole processes and suspension of benefits adjudication must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Issue a preliminary injunction and/or a stay under 5 U.S.C. § 705 in order to restore the *status quo ante*, under which CHNV parole beneficiaries are entitled to enjoy the full duration of their already-issued grants of parole, and under which adjudications for requests for parole and/or re-parole under already established humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM, as well as other requests for immigration benefits for individuals paroled through such processes, all resume and continue in the ordinary course pursuant to the policies in effect prior to the January 20 Huffman memorandum.

2.      Declare that humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and are in accordance with the statutory parole authority, 8 U.S.C. § 1182(d)(5);

3.      Declare that Defendants' termination of already existing humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, arbitrary and capricious, and violated the constitutional guarantee of due process;

4.      Declare that the March 25 FRN terminating parole and work authorization granted under the CHNV parole processes was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

5.      Declare that Defendants' suspension of the adjudication of benefits applications for individuals paroled through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

6.      Hold unlawful, set aside, and/or otherwise vacate Defendants' suspension of the adjudication of requests for parole and re-parole through established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; Defendants' suspension of the adjudication

of requests for immigration benefits for individuals paroled through such humanitarian parole processes; the January 20, 2025 Huffman memorandum; the January Higgins directive; the February 14, 2025 Davidson memorandum; and all DHS actions based thereon or implementing one thereof;

7.    Enjoin Defendants from applying their erroneous interpretation of the parole statute to individuals paroled into the United States through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; and from suspending the adjudication of immigration benefits of individuals paroled through such processes;

8.    Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

9.    Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

10.    Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: March 27, 2025

Respectfully submitted,

*/s/ John A. Freedman*

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org


Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31ˢᵗ Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org


Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com


H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com


Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com


Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

_/s/ John A. Freedman_
John A. Freedman