# EXHIBIT B

Plaintiffs' Notice of Supplemental Authority

*Doe et al. v. Noem et al.*

1:25-cv-10495-IT (D. Mass.)

2025 WL 655075
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Plaintiff PACITO; Plaintiff Esther;
Plaintiff Josephine; Plaintiff Sara; Plaintiff
Alyas; Plaintiff Marcos; Plaintiff Ahmed;
Plaintiff Rachel; Plaintiff Ali; HIAS, Inc.;
Church World Service, Inc., and Lutheran
Community Services Northwest, Plaintiffs,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; Marco Rubio, in
his official capacity as Secretary of State; Kristi
Noem, in her official capacity as Secretary
of Homeland Security; Robert F. Kennedy,
Jr., in his official capacity as Secretary of
Health and Human Services, Defendants.

CASE NO. 2:25-cv-255-JNW
|
Signed February 28, 2025

**Synopsis**
**Background:** Refugees and former refugees living abroad
and in the United States, along with resettlement agencies
that provided services to refugees, sued President and
Secretaries of State, Homeland Security, and Health and
Human Services, challenging executive order that indefinitely
suspended activities under the United States Refugee
Assistance Program (USRAP) and agency actions, including
the suspension of all refugee arrivals to the United States
and the suspension of funding to resettlement agencies, taken
before and after order's effective date, alleging that the
executive order was ultra vires, that the agencies' actions
were invalid under the Administrative Procedure Act (APA),
and that the order and certain agency actions violated
refugees' procedural due-process rights. Plaintiffs moved for
a preliminary injunction.

**Holdings:** The District Court, Jamal N. Whitehead, J., held
that:

plaintiffs had Article III standing;

plaintiffs were likely to succeed on the merits of their
argument that the executive order was ultra vires;

challenged agency actions were discrete and final actions
reviewable under the APA;

challenged agency actions were invalid under the APA
because they exceeded agencies' statutory authority under
the Immigration and Nationality Act (INA) and were not in
accordance with law;

plaintiffs were likely to succeed on the merits of argument that
agencies' suspension of activities under USRAP was invalid
under the APA because agencies did not engage in notice-and-
comment rulemaking;

plaintiffs were not likely to succeed on the merits of their
argument that agencies' suspension of federal funding to
resettlement agencies was invalid under the APA for agencies'
failure to engage in notice-and-comment rulemaking;

plaintiffs were likely to succeed on the merits of their
argument that agencies' actions were invalid under the APA
because they were arbitrary and capricious;

refugees were likely to succeed on the merits of claim that
order and certain agency actions violated their rights to
procedural due process;

plaintiffs experienced or were faced with irreparable harm;

the balance of equities and public interest favored plaintiffs;
and

a nationwide injunction was warranted to provide plaintiffs
complete relief.

Motion granted.

**Attorneys and Law Firms**

Deepa Alagesan, Pro Hac Vice, Ghita Schwarz, Pro Hac Vice,
Linda B. Evarts, Pro Hac Vice, Mevlude Amina Akay Alp,
Pro Hac Vice, International Refugee Assistance Project, New
York, NY, Esme Aston, Jonathan Patrick Hawley, Shireen

Lankarani, Harry H. Schneider, Jr., Perkins Coie, Seattle, WA, Joel Wayne Nomkin, Pro Hac Vice, Perkins Coie, Phoenix, AZ, John M. Devaney, Pro Hac Vice, Laurie Ball Cooper, Pro Hac Vice, Megan McLaughlin Hauptman, Pro Hac Vice, Perkins Coie, Washington, DC, Melissa S. Keaney, Pro Hac Vice, International Refugee Assistance Project, Fair Oaks, CA, Nicholas James Surprise, Pro Hac Vice, Perkins Coie LLP, Madison, WI, for Plaintiffs Pacito, Esther, Josephine, Sara, Alyas, Marcos, Ahmed, Rachel, Ali, HIAS Inc., Church World Service Inc.

Deepa Alagesan, Pro Hac Vice, Ghita Schwarz, Pro Hac Vice, Linda B. Evarts, Pro Hac Vice, International Refugee Assistance Project, New York, NY, Esme Aston, Jonathan Patrick Hawley, Shireen Lankarani, Harry H. Schneider, Jr., Perkins Coie, Seattle, WA, Joel Wayne Nomkin, Pro Hac Vice, Perkins Coie, Phoenix, AZ, John M. Devaney, Pro Hac Vice, Laurie Ball Cooper, Pro Hac Vice, Megan McLaughlin Hauptman, Pro Hac Vice, Perkins Coie, Washington, DC, Melissa S. Keaney, Pro Hac Vice, International Refugee Assistance Project, Fair Oaks, CA, Nicholas James Surprise, Pro Hac Vice, Perkins Coie LLP, Madison, WI, for Plaintiff Lutheran Community Services Northwest.

Alexandra Lee Yeatts, August Flentje, Joseph McCarter, Lindsay Zimliki, Nancy K. Canter, U.S. Department of Justice, Washington, DC, for Defendants.

Cristina Sepe, Emma S. Grunberg, Kelly A. Paradis, Attorney General's Office, Olympia, WA, for Amicus State of Washington.

Tasha J. Bahal, Pro Hac Vice, Office of the Massachusetts Attorney General, Boston, MA, Emma S. Grunberg, Kelly A. Paradis, Attorney General's Office, Olympia, WA, for Amicus Commonwealth of Massachusetts.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION

Jamal N. Whitehead, United States District Judge

## 1. INTRODUCTION

**\*1** This case presents a challenge to the President's authority to indefinitely suspend a statutory refugee program. Hours into his second term, President Trump issued Executive Order 14163, "direct[ing] that entry into the United States of refugees under the [United States Refugee Assistance Program (USRAP)] be suspended" indefinitely pending a determination by the President that "resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States." This action fulfilled the President's campaign promise to "suspend refugee resettlement" as part of efforts to "immediately end the migrant invasion of America." The order halts, without a defined end date, the carefully constructed framework Congress established through the Refugee Act of 1980. The Court must determine whether this executive action exceeds statutory bounds, and whether the federal agencies' implementation of the Order comports with administrative law.

After carefully reviewing the Parties' briefing and holding a hearing on the matter, the Court granted Plaintiffs' motion and issued a preliminary injunction on February 25, 2025. Dkt. No. 39. This Order is to elucidate the Court's reasoning and define the parameters of the injunction further. In sum, though the Executive enjoys considerable latitude to suspend refugee admissions, that discretion is not boundless. Where, as here, Presidential action effectively nullifies a congressionally established program, causing irreparable harm to vulnerable individuals and organizations, judicial intervention becomes necessary to preserve the separation of powers our Constitution demands.

## 2. BACKGROUND

### 2.1 Refugee admission in the United States.

Congress amended the Immigration and Nationality Act (INA) through the Refugee Act of 1980 to provide a "permanent and systematic procedure" for refugee admissions.[1] Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980). In passing the Refugee Act, Congress found that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." *Id.* Under the Refugee Act, "[a]dmissions ... shall be allocated among refugees of special humanitarian concern to the United States." 8 U.S.C. § 1157(a)(3).

---

[1]    A "refugee" is defined in relevant part as follows:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that

country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42).

The Refugee Act provides for the admission and resettlement of refugees in the United States. *See generally* 8 U.S.C. §§ 1157, 1521–24. The government fulfills this statutory mandate through USRAP, which is jointly administered by the Department of State (DOS), through its sub-agency the Bureau of Population, Refugees, and Migration (PRM); the Department of Homeland Security (DHS), through its sub-agency U.S. Citizenship and Immigration Services (USCIS); the Department of Health and Human Services (DHHS), through its sub-agency the Office of Refugee Resettlement (ORR); and through partnerships with the United Nations—in particular, the International Organization for Migration (IOM) and United Nations High Commissioner for Refugees (UNHCR); and nonprofit agencies that provide case processing and refugee resettlement services.

**\*2** The Refugee Act creates a deliberate framework for refugee admissions that balances presidential authority with congressional oversight. While the President sets annual refugee ceilings through "Presidential Determinations," this power operates within statutory constraints. *See* 8 U.S.C. § 1157(a)(3), (b), (d). The law requires "appropriate consultation" with Congress—specifically, in-person meetings with Judiciary Committee members where the administration must justify proposed admission levels and provide detailed information about anticipated impacts and resettlement plans. *See* 8 U.S.C. § 1157(d) ("Oversight reporting and consultation requirements."); 8 U.S.C. § 1157(e) (" 'Appropriate consultation' defined"). Even when increasing admission limits for humanitarian emergencies, the President remains bound by these consultation requirements. *See* 8 U.S.C. § 1157(d), (e). Further, Congress directs the Executive to report on the admission of certain groups of refugees that it has identified by statute, such as refugees fleeing North Korea. *See* 22 U.S.C. § 7845 (contained within the subchapter "Protecting North Korean Refugees"). This structure reflects Congress's intent that refugee admission decisions involve both political branches, not unilateral executive action. *See* 8 U.S.C. §§ 1157(e) (3), (4).

In accordance with the Refugee Act, President Biden determined that 125,000 refugees should be admitted in the 2025 fiscal year. Presidential Determination No. 2024-13, 89

Fed. Reg. 83,767 (Sept. 30, 2024). As of December 31, 2024, nearly 30,000 refugees had been admitted. Dkt. No. 15-2 at 3.

Applying for admission to the United States as a refugee is a highly regulated process. "The first step for most individuals seeking refugee status is to register with the [UNHCR] in the country to which they have fled." Dkt. No. 15-1 (DOS webpage). To be eligible to apply for admission under USRAP, "a refugee must either be referred to the program by an authorized entity or group (such as UNHCR) or belong to certain designated groups with common characteristics, defined either by statute or by the State Department in its joint reports to Congress." Dkt. Nos. 1 ¶ 47; 15-3 at 16–33 (USRAP report to Congress, submitted by DOS, DHS, and DHHS) (providing overview of procedures for refugee applications, vetting, processing, and admissions).

One such statutorily defined designated group is "Follow-to-Join" ("FTJ") petitioners. *See* 8 U.S.C. § 1157(c)(2)(A). Under the FTJ program, if a refugee resettles in the United States but their unmarried, minor child or spouse remains abroad, the resettled individual may apply for the admission of the abroad family member as a refugee under USRAP. *Id.* (stating that spouse or child, if not inadmissible, "shall" be entitled to refugee status).

DHS and DOS work cooperatively to process and adjudicate applications from eligible individuals. To facilitate the application process, DOS enters "cooperative agreements" with third-party, non-governmental Resettlement Support Centers (RSCs). *See* Dkt. No. 1 ¶¶ 52–54. "RSC staff pre-screen applicants for eligibility ... and prepare cases for USCIS [by] ... assist[ing] applicants in completing documentary requirements and schedul[ing] USCIS refugee eligibility interviews." Dkt. No. 15-3 at 30.

Once DOS (through a cooperative agreement with an RSC) has prepared an eligible individual to apply for refugee status, DHS (through USCIS) adjudicates the application. *See* 6 U.S.C. § 271(b)(3); 8 C.F.R. §§ 207.1–207.7 (DHS implementing regulations). "A USCIS officer conducts an inquiry of each principal refugee applicant designed to elicit information about the applicant's claim for refugee status, any grounds of inadmissibility, and factors related to the exercise of discretion." Dkt. No. 15-3 at 29. The USCIS officer investigates the applicant's activities, background, and criminal history, using extrinsic evidence to assess the applicant's credibility and claim. *Id.* "For derivative

applicants, the officer also asks questions to inform the decision of eligibility based on family relationships." *Id.*

Throughout this process, DOS and DHS perform careful, individualized security vetting. According to the most recent Presidential report to Congress on USRAP, "Refugees are the most thoroughly screened and vetted group to enter the United States." *Id.* Refugee applicants undergo rigorous background checks, as well as biometric checks for those within certain age limits. *Id.* "Refugee applicants must have all required security checks completed and fully addressed prior to an applicant's admission to the United States as a refugee." *Id.*

**\*3** "Approval of a refugee application by USCIS outside the United States authorizes [Customs and Border Patrol] to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved." 8 C.F.R. § 207.4. Once a refugee has been conditionally approved by USCIS, "RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs." Dkt. No. 15-13 at 30; *see also* 8 C.F.R. § 207.2(b) ("medical examination as required by sections 221(d) and 232(b) of the [Refugee] Act"). The RSC also arranges the applicant's mandatory, pre-entry cultural orientation. *See* Dkt. No. 15-3 at 30–32.

Like the application and adjudication process, the transportation, admission, and resettlement processes are governed by a detailed statutory and regulatory scheme, jointly administered by PRM and ORR. *See generally* 8 U.S.C. §§ 1521–24. This scheme, like the application scheme, relies on "cooperative agreements" with nonprofit agencies, who receive federal funds from PRM to deliver statutorily mandated resettlement services. *See* 8 U.S.C. § 1522(b)(1)-(7). "In FY 2024, PRM funded cooperative agreements with ten non-profit resettlement agencies to provide initial resettlement services to refugees and Afghan SIVs arriving in the United States pursuant to [statutory] authority." Dkt. No. 15-3 at 32. "The resettlement agencies are responsible for providing initial reception and core services to arriving refugees." *Id.* at 32–33. "These national resettlement organizations maintain a nationwide network of approximately 355 affiliated offices in 226 communities to provide services." *Id.*

Even before a refugee travels to the United States, the RSC obtains a "sponsorship assurance" from an approved resettlement agency within the United States; that

resettlement agency ensures that it, or its affiliates, will provide the refugee with initial services during the refugee's first 90 days in the United States. *Id.* at 30, 33 (listing services that resettlement agencies provide); *see also* 8 U.S.C. § 1522(b)(7) (resettlement agencies' statutory responsibilities); 8 C.F.R. § 207.2(c).

When it comes time for a refugee to move to the United States, the RSC refers the refugee's case to the International Organization for Migration (IOM) to book their travel. Dkt. No. 15-13 at 30. IOM funds this travel with an interest-free loan that the refugee is expected to pay back after they arrive in the United States. *Id.* at 32; *see e.g.*, Dkt. No. 15-14 ¶ 14 ("I confirmed with IOM on January 6 that I would ... pay for the plane ticket if needed, but they told me the way it works for refugees is that they pay for the ticket and I pay them back after [the refugee] is in the United States.").

Once in the country, refugees receive statutorily authorized support services—including employment training and placements, direct cash support, and English-language training—from their sponsoring resettlement agency or its affiliates. *See generally* 8 U.S.C. § 1522. Those agencies use federal funding, private donations, and volunteer support to facilitate effective resettlement with the goal of placing "employable refugees ... on jobs as soon as possible after their arrival" to cultivate "economic self-sufficiency." *See* 8 U.S.C. § 1522(a)(1). These agencies also assist refugees in adjusting their status to obtain permanent lawful residence within one year of entry. *See* 8 U.S.C. § 1159 ("Adjustment of status of refugees"); 8 C.F.R. § 209.1 (same).

## 2.2 The USRAP EO's terms.

On January 20, 2025, President Trump signed Executive Order 14163, "Realigning the United States Refugee Admissions Program." *See* Executive Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("USRAP EO"). As the name suggests, the EO purports to "realign" the entire statutory refugee admissions system with the President's political priorities. In two-and-a-half pages, the President indefinitely suspends all refugee admissions and directs the Secretary of DHS to "suspend decisions on applications for refugee status." *See* USRAP EO § 3(b).

**\*4** The Order begins by asserting that "over the last 4 years, the United States has been inundated with record levels of migration, including through the U.S. Refugee Admissions Program (USRAP)." USRAP EO § 1. It notes that communities "from Charleroi, Pennsylvania,

and Springfield, Ohio, to Whitewater, Wisconsin" have experienced "significant influxes of migrants," and that even major urban centers like "New York City, Chicago, and Denver have sought Federal aid to manage the burden of new arrivals." *Id.* The Order further observes that "some jurisdictions, like New York and Massachusetts, have even recently declared states of emergency because of increased migration." *Id.*

Based on these alleged circumstances, the USRAP EO concludes that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." *Id.*

The Executive Order establishes several key policies. First, "it is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens." *Id.* § 2. And the Order states that "[i]t is also the policy of the United States that to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions" of refugees. *Id.*

The central operational provisions of the USRAP EO include:

1. A suspension of "entry into the United States of refugees under the USRAP," effective on January 27, 2025. *Id.* § 3(a).

2. An immediate suspension of "decisions on applications for refugee status." *Id.* § 3(b).

3. A case-by-case exception mechanism allowing the Secretaries of State and Homeland Security to "jointly determine to admit aliens to the United States as refugees ... only so long as they determine that the entry of such aliens as refugees is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* § 3(c).

4. A directive for the Secretary of Homeland Security to "examine existing law to determine the extent to which, consistent with applicable law, State and local

jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions." *Id.* § 3(d).

The USRAP EO also establishes a review process requiring the Secretary of Homeland Security, in consultation with the Secretary of State, to submit a report to the President through his Homeland Security Advisor within 90 days "regarding whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, in light of the policies outlined in section 2[.]" *Id.* § 4. It requires further reports "every 90 days thereafter until [the President] determine[s] that resumption of the USRAP is in the interests of the United States." *Id.* Thus, the President's say-so is the only way USRAP can resume.

## 2.3 Agency implementation of the USRAP EO.[2]

[2]    On February 26, 2025—one day after the Court granted Plaintiffs' motion for preliminary injunction—Defendant Secretary Rubio's agents emailed termination notices to the organizational Plaintiffs, purporting to terminate their funding entirely and immediately. *See* Dkt. Nos. 44-1–44-5. As this written Order further explains the Court's February 25th oral ruling issuing a preliminary injunction, it does not address subsequent developments. The Court has set a separate hearing to address the termination notices.

**\*5**  Rather than waiting for the USRAP EO's suspension on entry to take effect on January 27, Defendants Marco Rubio (Secretary of State), Kristi Noem (Secretary of Homeland Security), and Robert F. Kennedy, Jr. (Secretary of Health and Human Services) (collectively, "Agency Defendants") implemented it immediately. The day after President Trump signed the USRAP EO, PRM sent an email to refugee resettlement partners stating that:

Following the issuance of the Executive Order (EO), "Realigning the United States Refugee Admissions Program," refugee arrivals to the United States have been suspended until further notice. All previously scheduled travel of refugees to the United States is being cancelled, and no new travel bookings will be made. RSCs should not request travel for any additional refugee cases at this time.

Additionally, all refugee case processing and pre-departure activities are also suspended. RSCs and IOM should not move refugees to transit centers in anticipation of travel and should halt all pre-departure activities for refugee cases. No new referrals should be made into the USRAP.

Dkt. Nos. 15-23 ¶ 29; 15-24 ¶ 35.

In a follow-up email the next day, PRM confirmed that "all planned refugee arrivals for this week have been cancelled and we do not anticipate any being scheduled[.]" Dkt. Nos. 15-23 ¶ 30; 15-24 ¶ 36. This action left stranded thousands of people in the process of fleeing their home countries under fear of persecution and harm. *See* Dkt. No. 1 at ¶ 207; *see, e.g.,* Dkt. No. 15-17 ("I live in fear."). Plaintiffs call these actions the "Agency Suspension."

The Agency Defendants also suspended all funding to RSCs and resettlement agencies, despite the cooperative agreements promising federal funding for work completed on behalf of DOS. On January 24, 2025, PRM sent notices of suspension ("Suspension Notices") to the resettlement agencies, stating in relevant part:

> Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) [referencing recipient-specific grants] are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

> Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

> [...]

> Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

Dkt. Nos. 31-3, 31-4; *see also* Dkt. No. 15-23 ¶ 43; Dkt. No. 15-24 ¶¶ 44–35. As noted in the quoted text, the Agency Defendants cite to the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, Executive Order No. 14,169, 90 Fed. Reg. 8,610 (Foreign Aid EO) to justify the suspensions.

Additionally, on January 20, 2025, the Agency Defendants began withholding reimbursements owed to resettlement agencies for work already performed under cooperative agreements to support recently arrived refugees and Special Immigrant Visa (SIV) recipients. Dkt. Nos. 15-23 ¶¶ 46–47, 53; 15-24 ¶ 59. This has resulted in millions owed to the resettlement agencies for work performed in November and December 2024.

**\*6** Plaintiffs refer to the Suspension Notices and the *sub silentio* withholding of reimbursements, together, as the "Refugee Funding Suspension."

## 2.4 Plaintiffs' experiences.

Plaintiffs challenge the USRAP EO, the Agency Suspension, and the Refugee Funding Suspension. Each Plaintiff has suffered harm as a result of the USRAP EO, the Agency Defendants' actions, or both.

Plaintiff Pacito[3] is a refugee from the Democratic Republic of the Congo. He and his family were scheduled to travel to the United States on January 22, 2025. Dkt. No. 15-4 ¶ 17. The family sold all their belongings that they could not bring with them, packed their bags, and gave up their home. *See id.* ¶¶ 17, 20. On January 18, 2025, IOM told Pacito and his family to report to the transit center on January 21—the day before their travel. *Id.* ¶ 21. Before they made it to the transit center on January 21, Pacito received a phone call "telling [him] there was a problem and [they] would not be able to travel to the United States after all." *Id.* ¶ 23.

---

3    The individual Plaintiffs wish to proceed using pseudonyms for fear of the serious harms and retaliation they may face should their participation in this lawsuit become public. Dkt. No. 1 at 5 n.1; *see* Dkt. No. 15-14 ¶¶ 45–48; Dkt. No. 15-15 ¶¶ 31–35; Dkt. No. 15-16 ¶¶ 32–35; Dkt. No. 15-17 ¶¶ 22–24; Dkt. No. 15-18 ¶¶ 31–35; Dkt. No. 15-19 ¶¶ 25–27; Dkt. No. 15-20 ¶¶ 27–30; Dkt. No. 15-21 ¶¶ 16–19; Dkt. No. 15-22 ¶¶ 26–28. Given the heated political climate surrounding immigration issues and the other plaintiff-specific harms alleged in their declarations, these fears are reasonable. Their privacy interests also outweigh any prejudice to Defendants or the public's interest in disclosure. *Cf. Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1069 (9th Cir. 2000) (reversing district court for denying plaintiffs permission to proceed anonymously). Accordingly, the individual Plaintiffs may proceed using pseudonyms.

Plaintiff Esther is a U.S. citizen and former refugee living in Idaho. Her daughter, Josephine, is now stranded in South Africa. They have been waiting years to reunite under the FTJ program. Dkt. No. 15-15. Indeed, Esther filed her FTJ application for Josephine in 2017, and after years of waiting for a decision, her daughter was finally approved for resettlement in Idaho. *Id.* ¶ 20. Esther explains that her daughter was on the verge of travel when the President issued the USRAP EO. Josephine's admission and reunification with her mother were suspended indefinitely.

Plaintiff Marcos faces a similar situation. He is a citizen of El Salvador with Temporary Protected Status; he has lived in the United States for 25 years and works in private security. Dkt. No. 15-19 ¶¶ 4–7. He first applied for his stepdaughter's entry into the United States from El Salvador under the Central American Minors (CAM) refugee program in 2016. *Id.* ¶ 2, 11. "However, because of President Trump's actions to end the CAM program during his first administration, the process was stopped." *Id.* ¶ 11. He restarted the process in 2022, *id.*, and on January 6, 2025, IOM told him that his stepdaughter would travel to the United States in the first or second week of February. *Id.* ¶¶ 13–14. Eager to see his stepdaughter, he offered to buy her plane ticket, but IOM told him "the way it works for refugees is that [IOM] pay[s] for the ticket." *Id.* ¶ 14. Marcos was "particularly devastat[ed]" to hear that his stepdaughter's travel had been cancelled because this is the second time the refugee process has been halted by President Trump's executive orders. *Id.* ¶ 18.

 **\*7** Plaintiff Sara is an Iraqi refugee stranded in dangerous conditions in Jordan. She applied for refugee status for herself and her son in 2014. Dkt. No. 15-17 ¶ 10. In 2024, they were finally, conditionally approved for refugee resettlement and began the post-application resettlement process. *See id.* ¶¶ 11–14. She planned to join her son and his family—all U.S. citizens—living in Idaho. *Id.* ¶¶ 6, 15–16, 21. But now she cannot do so because of the USRAP EO.

Plaintiff Alyas is a Yazidi refugee from Iraq who applied for refugee admission to the United States in 2011 because his life was in danger. Dkt. No. 15-18 ¶ 11. After he married and had a son, he added his wife and child to the application. *Id.* ¶ 12. They received conditional approval and began the post-application process, including cultural orientation. *Id.* ¶¶ 13–16. IOM bought tickets and arranged for the family's travel. *Id.* ¶ 17. They were scheduled to travel on February 3, 2025, after years of waiting, but on January 21, 2025, IOM called him "to say that [he and his] family ... could not

travel anymore," as "flights were cancelled because of the U.S. suspension of refugee admissions." *Id.* ¶ 18.

Plaintiff Ali is an Iraqi refugee, newly arrived and living on his own in the United States. He is 22-years old, and he arrived on January 9, 2025, through USRAP. *See* Dkt. No. 15-20 1. As a gay man, he fled Iraq for his safety and to avoid persecution. *See id.* When his application was approved and he learned he would be resettled in the United States, "[he] was so excited that [he] began screaming with happiness and jumping and dancing," because "for the first time in [his] life, [he] thought [he] would be able to live ... free of fear." *Id.* ¶¶ 14–15. Because Ali is alone in the United States and arrived with only $120, he depended on the resettlement agencies to help him get established. *See id.* ¶¶ 19–21. But because the USRAP EO has indefinitely suspended funding for resettlement agencies within the United States, many have stopped accepting applications for specific programs they have historically offered to assist refugees. He worries that "he may not be able to get the help [he] needs to establish [himself] here and find a job." *Id.* ¶ 24.

Plaintiff Ahmed is an Afghan refugee and peace activist who wishes to pursue his studies and begin a new life in the United States. Because of the USRAP EO, he is stuck "in limbo" in Germany. Dkt. No. 14 at 12 (citing Dkt. No. 15-21 ¶¶ 4, 7, 13–15).

And finally, Plaintiff Rachel is a Washington-based sponsor who has fundraised over $15,000 to welcome an Afghan refugee family through the Welcome Corps program. *Id.* (citing Dkt. No. 15-22 ¶¶ 3, 5, 8–18).

As for the organizational Plaintiffs, Church World Services, Inc. (CWS) is an RSC that has cooperative agreements with DOS to assist with overseas USRAP processing as well as domestic resettlement of refugees. Dkt. No. 15-23. "Either directly or through its affiliates, CWS currently supports refugees resettled in 44 active locations in 24 states." *Id.* ¶ 9. HIAS, Inc., too, is an RSC that provides resettlement services in the United States through 30 affiliates in 17 states. *Id.* ¶ 22. Pacific Lutheran Community Services Northwest ("LCSNW") is an affiliate of a national resettlement agency headquartered in Tacoma, Washington, with more than 40 locations in the Pacific Northwest, more than 700 employees, and dozens of programs providing services to more than 40,000 clients each year. *Id.* ¶ 24. As a result of the Refugee Funding Suspension, these resettlement agencies suddenly, and without advance notice, lost their funding indefinitely.

The financial impact of the EO is devastating for these organizations, threatening their core existence, as they have already been forced to furlough or lay off hundreds of staff. Dkt. Nos. 14 at 14; 15-23 ¶¶ 3, 41, 54, 56; 15-24 ¶¶ 3, 42, 61–62.

### 3. DISCUSSION

**3.1 Plaintiffs have standing to sue.**

 **\*8**  "Article III of the Constitution limits the federal judicial power to the adjudication of 'Cases' and 'Controversies.' " *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 786 (9th Cir. 2019) (quoting U.S. Const. art. III, § 2, cl. 1.). An essential element of the case-or-controversy requirement is that the plaintiff must have standing to sue. *Id.* To demonstrate standing, the plaintiff must show " 'concrete and particularized' injury that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.' " *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)). "At least one plaintiff must have standing to seek each form of relief requested, and that party bears the burden of establishing the elements of standing with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (cleaned up). On a preliminary injunction, "plaintiffs 'may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden.' " *Id.* (quoting *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)).

The individual and organizational plaintiffs have standing here because their injuries, as described above, are concrete and non-speculative; traceable to the USRAP EO, the Refugee Funding Suspension, and the Agency Suspension; and redressable by the relief sought.

Defendants challenge this finding only as far as they contend that "Plaintiffs lack standing to seek any relief against the President" because "the President may not be enjoined in the performance of his official non-ministerial duties." Dkt. No. 31 at 18. While it is unclear why Defendants discuss this issue in relation to standing, "[t]his position of the Government is [nevertheless] well taken." *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (*Hawaii*), *vacated on other grounds*, 583 U.S. 941, 138 S.Ct. 377, 199 L.Ed.2d 275 (2017). In general, courts lack "jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*

*v. Massachusetts*, 505 U.S. 788, 802–03, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501, 4 Wall. 475, 18 L.Ed. 437 (1866)); *see Hawaii*, 859 F.3d at 802 ("[I]njunctive relief against the President ... is extraordinary, and should ... raise[ ] judicial eyebrows.").

And yet, the Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *see Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) ("[A] challenge to presidential action will be considered constitutional, and therefore justiciable ..., so long as a plaintiff claims that the President has 'violated constitutional separation of powers principles' because the President's action lacked both 'statutory authority' and 'background constitutional authority.' " (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019)). When the President acts outside his constitutional power, federal courts—even if they cannot enjoin the President directly—can enjoin executive officials from carrying out Presidential directives. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (*Youngstown*) (holding that President Truman exceeded his constitutional power in seizing steel mills and affirming decision enjoining the Secretary of Commerce from carrying out Presidential order); *Hawaii*, 859 F.3d at 788 ("We conclude that Plaintiffs' injuries can be redressed fully by injunctive relief against the [Secretaries of State and Homeland Security], and that the extraordinary remedy of enjoining the President is not appropriate here.").

Thus, that the Court may lack jurisdiction to directly enjoin the President does not affect the justiciability of Plaintiffs' claims. The Court finds that the USRAP EO, Refugee Funding Suspension, and Agency Suspension are subject to judicial review, that Plaintiffs have established standing to challenge those actions, and that "Plaintiffs' injuries can be redressed fully by injunctive relief against the remaining Defendants," without enjoining the President himself. *See Hawaii*, 859 F.3d at 788.

**3.2 Plaintiffs are entitled to a preliminary injunction.**

 **\*9**  A preliminary injunction is an extraordinary remedy, never awarded as a matter of right. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Its purpose is to maintain the " 'status quo ante litem' "—that is, " 'the last uncontested status' " before the controversy erupted—pending a decision on the merits. *Flathead-Lolo-Bitterroot*

*Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). To obtain a preliminary injunction, the plaintiff must clearly show (1) likely success on the merits, (2) likely irreparable harm without preliminary relief, (3) a balance of equities in their favor, and (4) service of the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). These four factors—the *Winter* factors—apply whenever a preliminary injunction is sought. *Winter*, 555 U.S. at 20, 129 S.Ct. 365; *see Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a showing on all four prongs" is required).

The Ninth Circuit takes a "sliding scale" approach to preliminary injunctions, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (cleaned up). This approach allows a stronger showing of one *Winter* factor to offset a weaker showing of another. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024).

As explained below, all four *Winter* factors are met here.

### 3.3 Plaintiffs are likely to succeed on the merits of their ultra vires claim.

Plaintiffs challenge the USRAP EO as ultra vires, asserting that it exceeds the statutory and constitutional limitations on the President's power. Plaintiffs' reply clarifies that they only request a preliminary injunction on the grounds that the USRAP EO exceeds the scope of the President's statutory power—specifically under the INA. *See* Dkt. No. 36 at 11 n.3. The Court finds that Plaintiffs are likely to succeed on the merits of that claim.

The President's authority to issue the USRAP EO must come from either Congress or the Constitution. *Youngstown*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Under the *Youngstown* framework, Presidential power is strongest when "act[ing] pursuant to an express or implied authorization of Congress," *id.* at 635, 72 S.Ct. 863, weakest when opposing Congress's will, *id.* at 637, 72 S.Ct. 863, and uncertain in the "zone of twilight" between these poles, *id.* at 636, 72 S.Ct. 863.

The parties dispute where on this spectrum the USRAP EO falls. While the Constitution gives Congress authority over immigration policy, *see* U.S. Const. art I, § 1; *id.* art. I, § 8, cl. 4, Congress delegated to the President the power to suspend entry of foreign nationals deemed detrimental to U.S. interests, *see* 8 U.S.C. § 1182(f). Based on this delegation, the President claims maximum authority for the USRAP EO. Section 1182(f) states:

**Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate ....

8 U.S.C. § 1182(f).

In *Trump v. Hawaii* (*Hawaii III*), the Supreme Court addressed the scope of presidential authority under Section 1182(f), establishing both its breadth and its boundaries. 585 U.S. 667, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018). Section 1182(f) "exudes deference" to the President and "vests [him] with 'ample power'" to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* at 684, 138 S.Ct. 2392 (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)). The statutory text imposes a single, straightforward condition: that the President "find[ ]" that the entry of certain aliens "would be detrimental to the interests of the United States." *Id.* (quoting 8 U.S.C. § 1182(f)).[4]

---

[4]    Congress expressly conditioned the President's suspension authority under Section 1182(f) on a finding that entry would be "detrimental to the interests of the United States." The statutory text employs the term "finding," which ordinarily denotes the conclusion of an inquiry or investigation—not merely a proclamation or announcement, as is the case here. *Compare Finding* and *To find*, Webster's Third New International Dictionary of the English Language at 851, 852 (2021) *with To proclaim* and *Proclamation*, *id.* at 1808. When comparing the USRAP EO with the proclamation reviewed in *Hawaii III*, notable differences emerge. The latter contained a thorough description of a multi-agency evaluation process and specific

recommendations supporting the restrictions, *see* 585 U.S. at 685, 138 S.Ct. 2392, while the USRAP EO simply "proclaim[s]" detriment without providing evidence of any investigative process or factual determinations— i.e., findings—specifically related to refugee admissions under USRAP, USRAP EO § 3(a). The textual divergence between Section 1182(f)'s requirements and the USRAP EO's language raises questions about its conformity with congressional authorization, but the Court need not resolve this issue as it concludes for other reasons that the USRAP EO exceeds the President's authority under Section 1182(f).

**\*10** This authority, while substantial, is not without limits. In *Hawaii III*, the Supreme Court delineated the outer boundaries of this presidential power, accepting the premise that Section 1182(f) "does not give the President authority to countermand Congress's considered policy judgments." *Id.* at 689, 138 S.Ct. 2392. The provision "does not allow the President to expressly override particular provisions of the INA." *Id.* at 689, 691, 138 S.Ct. 2392.

Indeed, the Supreme Court's analysis in *Hawaii III* turned precisely on this limitation. The Court upheld the presidential proclamation at issue because the "plaintiffs [did] not point to any contradiction with another provision of the INA," and thus "the President [had] not exceeded his authority under § 1182(f)." *Id.* at 691, 138 S.Ct. 2392. This reasoning establishes the principle that the President's invocation of Section 1182(f) becomes unlawful and ultra vires when it overrides or conflicts with the INA's statutory provisions.

The Ninth Circuit, applying this precedent, has further clarified this framework, noting that while "§ 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States ... the substantive scope of this power is not limitless." *Doe #1 v. Trump*, 957 F.3d 1050, 1066 (9th Cir. 2020).[5] The President may not invoke Section 1182(f) to "eviscerate" an entire "statutory scheme," *id.* at 1064, or "revers[e] course on legislatively enacted policy in its entirety," *Nat'l Ass'n of Mfrs. v. United States Department of Homeland Security*, 491 F. Supp. 3d 549, 565 (N.D. Cal. 2020).

[5]   The Ninth Circuit "re-examined the merits" of *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), in a subsequent decision, but that decision was later vacated. *See Doe #1 v. Trump*, 984 F.3d 848 (9th Cir. 2020), vacated, *Doe #1 v. Biden*, 2 F.4th 1284, 1285 (9th Cir. 2021). At oral argument, the Parties expressed agreement that *Doe*

*#1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), is binding precedent.

Thus, the President may not employ Section 1182(f) to effect a wholesale reversal of legislatively established policy, nor may he use the provision to nullify an entire statutory framework through executive decree. The Constitution's separation of powers demands this limitation.

### 3.3.1 The USRAP EO eviscerates an entire statutory scheme, replacing it with the President's unfettered discretion.

The USRAP EO is ultra vires because it unlawfully overrides USRAP in its entirety. The order suspends USRAP indefinitely, with resumption contingent solely on President Trump's determination that allowing refugee entries "is in the interests of the United States." USRAP EO §§ 1, 4. The order provides neither criteria for this determination nor a timeline for making it. Given these terms, President Trump could effectively suspend USRAP permanently based solely on his judgment about American interests.

This executive action unlawfully "countermand[s] Congress's considered policy judgment[ ]," *see Hawaii III*, 585 U.S. at 688, 138 S.Ct. 2392, that allowing refugees into the country is in the United States' interest, thereby "reversing course on legislatively enacted policy in its entirety" and " 'eviscerate[ing]' " it. *Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 565 (quoting *Doe #1*, 957 F.3d at 1064). Congress clearly and expressly stated its purpose and policy judgments in passing the Refugee Act:

(a) The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States ....

**\*11** (b) The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

Pub. L. No. 96-212, § 101(b), 94 Stat. 102, § 101 (defining "Purpose" of 8 U.S.C. § 1521 (USRAP)).

By replacing these "carefully considered policy judgments" with his own "America-First" policy to exclude refugees from the nation, the President unlawfully nullifies and overrides USRAP with a "different and inconsistent" approach to the same issue of refugee admissions. *See Hawaii III*, 585 U.S. at 689, 138 S.Ct. 2392; *Youngstown*, 343 U.S. at 639, 72 S.Ct. 863.

Additionally, with respect to Section 3(b) of the USRAP EO, that section plainly exceeds Section 1182(f)'s statutory language. Through Section 1182(f), Congress has authorized the President to "suspend ... entry" and to "impose on the entry of aliens any restrictions he may deem appropriate." 8 U.S.C. § 1182(f). But Section 3(b) of the USRAP EO directs the "Secretary of Homeland Security [to] suspend decisions on applications for refugee status," until he finds that "resum[ing]" USRAP is "in the interests of the United States." USRAP EO §§ 3(b), 4. The plain language of Section 1182(f) does not reference refugee applications, much less delegate authority to suspend agency operations directed by Congress.

On top of overriding USRAP, Plaintiffs argue that the USRAP EO conflicts with Congress's statutorily implemented FTJ program. *See* Dkt. No. 14 at 16 (citing 8 U.S.C. § 1157(c) (2)(A); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1078–79 (W.D. Wash. 2017)). Given the findings above, the Court need not reach this issue.

### 3.3.2 The USRAP EO is ultra vires because it does not "suspend" entry under Section 1182(f).

The USRAP EO exceeds the "textual limitation" imposed by Section 1182(f) requiring that suspensions on entry be temporary or conditional in nature. *See* 8 U.S.C. § 1182(f); *Hawaii III*, 585 U.S. at 687, 138 S.Ct. 2392 (analyzing statute's plain-language limitations); *Doe #1*, 957 F.3d at 1065 (same). As the Supreme Court recognized in *Hawaii III*, Section 1182(f) allows the President to "suspend" entry "for [a] period"—*not to terminate entry.* The term "suspend" means "to cause to stop temporarily," *Suspend*, Merriam-Webster Dictionary (2019), or "connotes a deferral till later," suggesting a finite interruption rather than permanent cessation. *Doe #1*, 957 F.3d at 1065 (quoting *Hawaii III*, 585 U.S. at 687, 138 S.Ct. 2392 (citation omitted)).

While the President need not "prescribe in advance a fixed end date" for entry restrictions—which would be impractical or impossible in some cases—there must be some temporal limitation. For example, when responding to a diplomatic dispute or policy concern, a President may "link the duration of the suspension, implicitly or explicitly, to the resolution of the triggering condition." *Hawaii III*, 585 U.S. at 687, 138 S.Ct. 2392. The proclamation in *Hawaii III* satisfied this requirement by making clear that its "conditional restrictions would remain in force only so long as necessary" to address identified "inadequacies and risks," with the aim to "relax or remove the entry restrictions as soon as possible." *Id.* at 708, 138 S.Ct. 2392.

The USRAP EO lacks any such temporal limitation. Unlike the proclamation upheld in *Hawaii III*, it contains no language—implicit or explicit—suggesting that the suspension is tied to the resolution of a specific triggering condition. This deficiency mirrors the problem the Ninth Circuit identified in *Doe #1 v. Trump*, in which the court invalidated a proclamation suspending entry of immigrants based on domestic healthcare system concerns. 957 F.3d at 1065. That proclamation, like the USRAP EO, had no fixed end date and failed to tie the suspension to any resolvable, triggering event or condition. *Id.* at 1065–66.

**\*12** Also like the unlawful proclamation in *Doe #1 v. Trump*, the USRAP EO cites broad, long-term policy concerns without demonstrating how these concerns will be resolved or how the suspension relates to addressing them. It notably fails to identify deficiencies in the existing refugee program that would be remedied by the suspension, and its zero-sum view that admitting refugees necessarily depletes resources for Americans creates an unresolvable justification. Without these elements, there is no way to "render the limitation feasibly temporary," as required by the Ninth Circuit in *Doe #1*. 957 F.3d at 1066.

Consequently, the USRAP EO does not merely "suspend" entry "for [a] period" as permitted by Section 1182(f); rather, it effectively displaces the refugee program entirely and indefinitely, exceeding the President's statutory authority.

### 3.3.3 The Court rejects Defendants' sweeping characterization of the President's inherent powers here.

Defendants argue that the USRAP EO is well within the President's discretion because his "authority reigns principally in the realm of admissions of aliens and foreign

affairs." Dkt. No. 31 at 18–19 (citing *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952)). Without citation, they also assert that the President "has broad authority to ... determin[e] how foreign aid funds are used." *Id.* at 20. These contentions seem to be part of a larger argument that the Constitution provides the President with inherent authority to act as he did here. The Court finds these arguments unpersuasive for the reasons below.

To start, Defendants' cases do not support the conclusion that the Constitution gives the President inherent power to unilaterally override entire immigration statutes passed by Congress. Rather, those cases highlight that the Legislative Branch is constitutionally responsible for passing immigration laws. *See e.g.*, *Fiallo*, 430 U.S. at 792, 794, 97 S.Ct. 1473 (1977) (citation omitted) ("Congress has ... exceptionally broad power to determine which classes of aliens may lawfully enter this country."); *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S.Ct. 309, 94 L.Ed. 317 (1950) ("[N]ormally Congress supplies the conditions of the privilege of entry into the United States," and "[e]xecutive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent."). The Constitution expressly vests the Legislative Branch—not the Executive Branch—with the power to "establish [a] uniform Rule of Naturalization" and pass all laws. U.S. Const. art I, § 1; *id.* art. I, § 8, cl. 4; *see also Fiallo*, 430 U.S. at 792, 97 S.Ct. 1473 ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens" (internal citations and quotation marks omitted)). Indeed, the Constitution requires the President to "take Care" to ensure that Congress's laws are "faithfully executed." U.S. Const. art. II, § 3.

Next, Defendants' argument mischaracterizes the USRAP EO as a creature of foreign policy, when in fact, its "purpose" and "policy" sections primarily reference domestic economic matters and the "appropriate assimilation of refugees" within our country. *See* USRAP EO §§ 1, 2 ("The United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, ... and that ensures the appropriate assimilation of refugees" ... "It is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens."). Although the USRAP EO makes a conclusory reference to "national security," it's clearly distinguishable from other national security focused executive orders, including the Presidential Proclamation at issue in *Hawaii III*. *See* Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017) ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats"). Unlike the USRAP EO, that Presidential Proclamation "identif[ied] ongoing deficiencies in the information needed to assess whether nationals of particular countries present[ed] 'public-safety threats.' " *Hawaii III*, 585 U.S. at 677, 138 S.Ct. 2392.

**\*13** In the realm of domestic economic matters, however, "the national security and foreign affairs justifications for policy implementations disappear, and the normal policy-making channels remain the default rules of the game." *Doe #1*, 957 F.3d at 1067. Like the Ninth Circuit in *Doe #1*, this Court rejects the notion that the USRAP EO implicates the President's foreign affairs powers simply because it affects refugees.

Instead, the focus of the USRAP EO is domestic—the economic impact on American communities, tax-payer resources, and "appropriate assimilation." *See* USRAP EO § 1. This is not a use of Section 1182(f) that affords the President maximum deference. Indeed, "Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d at 563. Rather, "there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." *Id.*

Accordingly, this Court also rejects Defendants' argument that the USRAP EO falls within the President's plenary authority to manage foreign affairs.

### 3.4 Plaintiffs are likely to succeed on their APA claims against Secretary Rubio, Secretary Noem, and Secretary Kennedy.

The Court turns now to Plaintiffs' claims against the Agency Defendants. Whereas Plaintiffs' ultra vires claims against the President challenge the USRAP EO itself, their Administrative Procedure Act (APA) claims against the

Agency Defendants challenge agency actions taken to halt and defund USRAP.

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin*, 505 U.S. at 796, 112 S.Ct. 2767. Under the APA, persons "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court" are "entitled to judicial review thereof." 5 U.S.C. §§ 702, 704. Section 706(2) of the APA requires reviewing courts to "hold unlawful and set aside agency action ... found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). While the precise "procedure required by law" varies by context, of relevance here are the notice-and-comment procedures set forth in Section 553, which govern agency rulemaking. *See* 5 U.S.C. § 553.

Plaintiffs offer three arguments why the Court, under Section 706(2), must hold unlawful and set aside the agency actions interpreting, implementing, and expanding the USRAP EO: first, that these actions violate statutory law; second, that these actions ignored required procedures of notice-and-comment rulemaking; and third, that these actions are arbitrary and capricious. On all three fronts, the Court agrees that Plaintiffs have shown a likelihood of success on the merits.

### 3.4.1 The Refugee Funding Suspension and the Agency Suspension are final agency actions reviewable under the APA.

To begin, Defendants argue that Plaintiffs fail to allege any final agency action reviewable under the APA. They posit four arguments why this is the case. First, they say that Plaintiffs fail to identify a discrete agency action at issue. Second, they argue that actions implementing executive orders are not reviewable under the APA. Third, they argue that the actions at issue are merely temporary and therefore not "final" within the meaning of the APA. And fourth, they argue that the claims challenging the Refugee Funding Suspension belong, if anywhere, in the United States Court of Federal Claims. The Court addresses—and rejects—each argument, concluding that the Agency Suspension and Refugee Funding Suspension are both reviewable under the APA.

*a. Plaintiffs adequately identify discrete agency actions for APA review.*

**\*14**   According to Defendants, Plaintiffs identify no "discrete" agency action for court review, instead mounting an impermissibly broad "programmatic challenge" seeking "wholesale improvement" of agency programs. Dkt. No. 31 at 26. In support of this argument, they cite *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (finding that environmental groups' APA claims failed to specify a final agency action). But *Sierra Club* involved a "sweeping argument that the Forest Service's 'on-the-ground' management of the Texas forests over the last twenty years violate[d] the [National Forest Management Act]." *Id.* Plaintiffs, by contrast, narrowly challenge discrete agency actions made over several days or weeks.

Concretely, Plaintiffs break down their allegations against the Agency Defendants into two sets of agency actions: the "Agency Suspension" and the "Refugee Funding Suspension." The "Agency Suspension" refers to the categorical suspension of all USRAP-related refugee case processing, case decisions, refugee admissions, and refugee travel into the United States. *See* Dkt. No. 14 at 6. The Agency Defendants implemented the Agency Suspension a full week before the USRAP EO called for the suspension of refugee admissions into the country. *Compare* USRAP EO, § 3(a) ("This suspension shall take effect at 12:01 am eastern standard time on January 27, 2025.") *with* Dkt. No. 31-1 ¶ 20 (Zerbinopoulos Decl.) ("PRM officials canceled all refugee travel scheduled for after 12:00 pm on January 20, 2025.").

The "Refugee Funding Suspension" refers to the suspension of federal funding to USRAP nonprofit partners for their work processing refugee applications abroad and providing services to refugees domestically. USRAP nonprofit partners, including Plaintiff resettlement agencies, learned of the Refugee Funding Suspension on January 24, when PRM issued mass "Suspension Notices" directing resettlement agencies to immediately stop work, cancel obligations, and incur no new costs. Dkt. No. 31-3. Plaintiffs allege that, along with these Suspension Notices, the Refugee Funding Suspension also includes a *sub silentio* suspension, enacted without notice, of contractual reimbursements owed to USRAP partner nonprofits for work already performed under cooperative agreements. *See* Dkt. No. 15-23 ¶¶ 46-47.

The Court finds that these agency actions—the Agency Suspension and the Refugee Funding Suspension—are discrete enough to facilitate APA review. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206–07 (S.D. Cal. 2019) (finding that unwritten, informal DHS policy limiting access to asylum at border was APA-reviewable); *Washington v. U.S. DHS*, 614 F. Supp. 3d 863, 872–73 (W.D. Wash. 2020) (same as to unwritten CBP policy of courthouse arrests of noncitizens).

*b. Agency Defendants cannot evade APA review merely by claiming they are implementing executive orders.*

Because the "President is not an agency within the meaning of the [APA]," Presidential actions, including executive orders, are immune from APA review. *Franklin*, 505 U.S. at 796, 112 S.Ct. 2767. Attempting to expand this rule, Defendants argue that agency actions implementing executive orders are also immune from APA review. Dkt. No. 31 at 26.

In support of this argument, Defendants cite just one authority, an out-of-circuit district court case: *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 99–104 (D.D.C. 2016). There, the plaintiffs brought an APA challenge to DOS's issuance of a "Presidential permit" for the construction of an international bridge. *Id.* The court found that the permit issuance was not an APA-reviewable "agency action" because DOS issued the permit at the statutorily authorized direction of the President, with no agency discretion. *Id.* Defendants assert that the Refugee Funding Suspension and Agency Suspension, because they merely implement the USRAP EO and Foreign Aid EO, are analogous to the permit issuance in *Detroit Int'l Bridge Co.*

**\*15** Not so. The Ninth Circuit has held that "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). "[F]inal agency actions, even if implementing an executive order, are subject to judicial review under the APA." *Id.* The Ninth Circuit decision in *E. Bay Sanctuary Covenant v. Trump* provides clear guidance. 932 F.3d 742, 770–71 (9th Cir. 2018). There, plaintiffs brought an APA challenge to an agency rule that purported to implement a Presidential Proclamation calling for the suspension of migrant entry on the southern border outside ports of entry. *Id.* The Ninth Circuit held that while it did "not have any authority under § 706 of the APA to review the

Proclamation ..., *we may review the substantive validity of the Rule together with the Proclamation.*" *Id.* (emphasis added).

The reason for this is clear. As another court recently noted in a case challenging agency implementation of the Foreign Aid EO, exempting agency action from APA oversight just because it purports to carry out presidential policy "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Nos. CV 25-00400 (AHA), ⸺ F.Supp.3d ⸺, ⸺, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025) (finding likelihood of success on merits of APA claim challenging agency implementation of Foreign Aid EO).

To make an even finer point, this case is distinguishable from *Detroit Int'l Bridge Co.* in two key respects. First, the USRAP EO itself is unlawful. *Supra* § 3.3. Defendants cite no authority indicating that an ultra vires Executive Order can shield agency actions—even those that merely color within the lines of the Order—from APA review.

Second, the Agency Suspension and Refugee Funding Ban do not merely color within the lines. Unlike the permit issuance in *Detroit Int'l Bridge Co.*, these are not ministerial implementations, sans discretion, of Presidential authority. Rather, they represent substantive expansions of the Executive Orders they purport to carry out. A brief look at each agency action clarifies this point.

Defendants claim they enacted the Refugee Funding Suspension to comply with the Foreign Aid EO. But the Foreign Aid EO calls only for a pause in "foreign development assistance." Foreign Aid EO § 3(a). It says nothing about USRAP or refugees. *See generally id.* Without explanation, the State Department construed the term "foreign development assistance" to include funding for USRAP programs—even including programs Congress has expressly characterized as "domestic." *See* 8 U.S.C. § 1522(a)(3) ("domestic assistance" to refugees). This surprising construction indicates vast agency discretion.

The Agency Defendants also claim they enacted the Agency Suspension in compliance with the USRAP EO. But the USRAP EO, on its face, authorizes the Secretaries of State and Homeland Security to "jointly determine ... *in their discretion*" to admit refugees on a "case-by-case basis." USRAP EO, § 3(c) (emphasis added). Armed with this discretion, the Agency Defendants opted not to

create a process to consider case-by-case admissions before implementing a total cessation of refugee travel into the country—a full week before the date called for in the EO. Additionally, while the USRAP EO calls only for the suspension of refugee case decisions and admissions, the Agency Suspension also suspended all case processing, effectively shuttering USRAP operations.

That Defendants allege these extraordinary actions were taken to carry out the President's Executive Orders does not immunize them from APA review. *See, e.g., Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021) ("The means by which the Secretary implements the Proclamations are therefore within the discretion of the Secretary, are not dictated by the Proclamations themselves, and require the Secretary to exercise judgment."); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) ("State's action—suspending visa adjudications when the Proclamation merely directs the suspension of 'entry'—thus required the agency to exercise its judgment.").

*c. The Agency Suspension and Refugee Funding Ban are "final agency actions" within the meaning of the APA.*

 **\*16**  Defendants argue that because the Agency Suspension and Refugee Funding Suspension are temporary, they are not "final agency actions" subject to APA review. They point out that the Foreign Aid EO provides for a 90-day suspension of funding assistance; the USRAP EO provides for a 90-day suspension of refugee admissions; and both EOs call for a Presidential determination after 90 days of whether to lift the suspension. On this basis, Defendants assert that the agency actions implementing the temporary suspensions are not "final" within the meaning of 5 U.S.C. § 704 (authorizing review of "final agency action").

But the fact that the challenged actions are ostensibly temporary is immaterial—for, as Plaintiffs point out, "*all* agency actions are subject to future change." Dkt. No. 36 at 9. Under the well-settled standard, an agency action is final if it (1) marks the "consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Defendants do not dispute that the Agency Suspension and Refugee Funding Suspension produce "legal consequences" for USRAP nonprofit partners, refugees, and others. Nor do they dispute that the Agency

Suspension and Refugee Funding Suspension each represent the consummation of an internal administrative decision-making process, even if opaque. The Court concludes that the Refugee Funding Suspension and Agency Suspension are final agency actions subject to APA review. *See Nat'l Council of Nonprofits v. OMB*, No. 25-239 (LLA), ––– F.Supp.3d ––––, ––––, 2025 WL 368852, at \*11 (D.D.C. Feb. 3, 2025) (in case challenging similar "pause" to funding and disbursements, finding that "[b]y any measure, Defendants' action[s] led to legal consequences and constituted final agency action").

*d. Plaintiffs' APA claims challenging the Refugee Funding Suspension are not subject to the exclusive jurisdiction of the United States Court of Federal Claims.*

Defendants' final argument against APA-reviewability pertains only to the Refugee Funding Suspension. According to Defendants, Plaintiffs' challenge to the Refugee Funding Suspension is ultimately a contract claim alleging a breach of the terms of the agreements between USRAP nonprofit partners and the government—and is therefore subject to the exclusive jurisdiction of the United States Court of Federal Claims.

Defendants provide almost no briefing to support this position. But reading between the lines, their argument seems to invoke the relationship among Sections 702 and 704 of the APA and the Tucker Act. Section 702 states that claims against the federal government challenging agency actions are not barred by sovereign immunity—except for "money damages" claims. 5 U.S.C. § 702. In other words, claims seeking "money damages" from the government, including *contractual* damages, are barred by sovereign immunity and cannot proceed under the APA. Section 704 provides that only agency actions "for which there is no other adequate remedy in a court" are subject to APA review. *Id.* § 704. That is, if a claim could be brought, for example, in the Court of Federal Claims, it cannot proceed under the APA. Finally, the Tucker Act provides that the Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Synthesizing these provisions, the Court understands Defendants to be arguing that Plaintiffs' claims challenging the Refugee Funding Suspension—because they seek money damages for a breach of contract and could

therefore be brought in the Court of Federal Claims—satisfy neither the Section 702 waiver of sovereign immunity nor the Section 704 no-other-adequate-forum requirement.

**\*17** This argument, even when properly formulated, misses the mark. As the Supreme Court clarified in *Bowen v. Massachusetts*, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages' " within the meaning of Section 702. 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (holding that federal district court, not Court of Federal Claims, has jurisdiction to review federal agency action denying reimbursements owed for Medicaid expenditures). The *Bowen* Court carefully distinguished money damages, which "are given to the plaintiff to *substitute* for a suffered loss," from specific remedies, which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895, 108 S.Ct. 2722 (quotations omitted) (emphasis original); *see also Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) ("An action for specific performance is not an action for 'money damages' under APA § 702, even if the remedy may actually require a payment of money by the government."). The *Bowen* Court made crystal-clear that when a party suing the federal government "seek[s] funds to which a statute allegedly entitles it, rather than money in compensation for the losses," such a claim is not excepted from Section 702's sovereign-immunity waiver. *Bowen*, 487 U.S. at 896, 108 S.Ct. 2722.

As in *Bowen*, Plaintiffs here "do not bring breach-of-contract claims for money damages." Dkt. No. 36 at 13. "Instead, they challenge agency actions suspending all USRAP processing and funding for USRAP and resettlement assistance and seek an injunction and ultimately vacatur of those unlawful actions." *Id.* Plaintiffs could not obtain these remedies in the Court of Federal Claims, which "has no power to grant equitable relief[.]" *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).

Because Plaintiffs could not obtain the equitable relief they seek outside federal district court—and because Plaintiffs seek specific remedies, not damages—the Court rejects Defendants' final argument about non-reviewability. The Court concludes that the Refugee Funding Suspension and Agency Suspension are final agency actions properly subject to APA review.

### 3.4.2 The Refugee Funding Suspension and Agency Suspension are contrary to law and exceeded the Agency Defendants' statutory authority.

Under the APA, reviewing courts must "hold unlawful and set aside agency action ... found to be ... not in accordance with law"; "contrary to constitutional right [or] power"; or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A)–(C). Plaintiffs argue that the Agency Suspension and Refugee Funding Suspension exceed the Agency Defendants' statutory authority and are not in accordance with law. *See* 5 U.S.C. § 706(2)(A), (C). The Court agrees.

To begin with, the Refugee Funding Suspension and Agency Suspension, like the USRAP EO, contradict the clear intent of Congress "to provide a permanent and systematic procedure for the admission to this country of refugees ... and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102. The Court has already concluded that the President lacks authority to nullify the Refugee Act. *Supra* § 3.3. The same applies *a fortiori* to the Agency Defendants, who unlike the President, lack authority to suspend admissions under Section 1182(f). Counsel for the government conceded this point at oral argument, distinguishing *Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017), on the grounds that the "suspension [in *Doe*] was issued by the Secretary of State, so it was not based on [Section 1182(f)] precedential authority." *See Doe*, 288 F. Supp. 3d at 1080 ("DHS Secretary [could not] simply ignore the 'permanent and systematic procedure' for refugee admission and resettlement that Congress established in the Refugee Act of 1980.").

The lawfulness of the Refugee Funding Suspension merits particular scrutiny here because the Refugee Funding Suspension claims support from the Foreign Aid EO, not the USRAP EO, and therefore exhibits statutory infirmities not already discussed in the Court's analysis of the USRAP EO, *supra* § 3.3. In particular, the Refugee Funding Suspension contradicts the clear will of Congress, codified in Section 1522 of the INA, to create a federally funded system to support domestic refugee resettlement.

**\*18** Defendants argue that "[w]hile it is true that § 1522(b) ... authorizes the Secretary of State 'to make grants to, and contracts with, ... nonprofit agencies" for resettlement services, "nothing requires the Secretary to

exercise this authority at all or to any specific degree." Dkt. No. 31 at 28. The Court disagrees. The Statute mandates the Agency Defendants to administer the domestic refugee resettlement program. *See* 8 U.S.C. §§ 1521–24. Congress appropriates funds, and the agencies are required, "to the extent of available appropriations," to ensure the provision of support services for resettled refugees—including employment training and placement, English language teaching, and direct cash support. 8 U.S.C. § 1522(a). The statutory scheme envisions that the federal agencies will meet this obligation by entering contract and grant relationships with nonprofit service providers. 8 U.S.C. § 1522(a)–(d). "Each [such] grant or contract ... shall require the [nonprofit] agency to," among other things, "fulfill its responsibility to provide for the basic needs (including food, clothing, shelter, and transportation for job interviews and training) of each refugee resettled and to develop and implement a resettlement plan including the early employment of each refugee resettled and to monitor the implementation of such plan." 8 U.S.C. § 1522(b)(7)(D).

By withholding funding, the Agency Defendants likely act contrary to law not only by abdicating their own obligations to fund and administer the program but also by prohibiting resettlement partners from complying with their statutory obligations. And given that neither the USRAP EO nor the Foreign Aid EO call for the defunding of the domestic refugee resettlement program, the Court is not inclined to credit the ostensibly temporary nature of those Orders as a factor weighing against the illegality of the Refugee Funding Suspension.[6]

[6]    The Court notes that the Refugee Funding Suspension also likely violates the Congressional Budget and Impoundment Control Act (ICA), 2 U.S.C. § 682 *et seq.*, though the parties did not address this issue. The ICA restricts the Executive's ability to defer spending appropriated funds through both procedural and substantive requirements. *See* 2 U.S.C. §§ 682(1)(A), 684(a), (b). The Refugee Funding Suspension withholds congressionally appropriated USRAP funds indefinitely, likely constituting a "deferral of budget authority" under the ICA. *See id.* § 682(1)(A). It appears from the record that neither the procedural nor the substantive requirements were met here. But as the Parties did not brief the ICA, the Court will not decide this motion on ICA grounds.

### 3.4.3    The Agency Suspension did not comply with required procedures of notice-and-comment rulemaking.

Plaintiffs argue that the Court must hold unlawful and set aside the Refugee Funding Suspension and Agency Suspension because they amount to substantive, or legislative, rulemakings "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D). "Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009); *see* 5 U.S.C. § 553 (notice-and-comment rulemaking procedures). Under these required procedures, federal agencies must "publish notice of proposed rules in the Federal Register and then allow 'interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.' " *E. Bay Sanctuary Covenant*, 932 F.3d at 775 (quoting 5 U.S.C. § 553(c)). "The 'agency must consider and respond to significant comments received during the period for public comment.' " *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 135 S. Ct. 1199, 1203, 191 L.Ed.2d 186 (2015)). "These procedures are 'designed to assure due deliberation' of agency regulations and 'foster the fairness and deliberation that should underlie a pronouncement of such force.' " *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)).

Defendants do not dispute that the Agency Defendants enacted the Agency Suspension and Refugee Funding Ban without following notice-and-comment procedures. Nor do they invoke the "good cause" or "foreign affairs" exceptions to Section 553. *See* 5 U.S.C. §§ 553(a)(1), 553(b)(B). Instead, they argue that their actions merely implemented the President's Orders, and thus were not subject to APA procedures. Dkt. No. 31 at 29. But as discussed above, the Agency Suspension and Refugee Funding Suspension are not mere ministerial implementations of Executive Orders; they are discretionary—and far-reaching—final agency actions. *See supra* § 3.4.1(b). Thus, Defendants' argument is unavailing.

**\*19**  The Court agrees with Plaintiffs that the agency actions at issue qualify as substantive, or legislative, rules. Under the APA, a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4). An action need not be in writing

to be a rule; otherwise, an agency could "shield its decisions from judicial review simply by refusing to put those decisions in writing." *Grand Canyon Tr. v. Pub. Serv. Co. of New Mexico*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003). Rules are distinct from "adjudications" in that adjudications "resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994). And legislative, or substantive, rules are distinct from interpretive rules in that they "create rights, impose obligations, or effect a change in existing law[.]" *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087–88 (9th Cir. 2003). Interpretive rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Id.*

The Agency Suspension and Refugee Funding Suspension are substantive, or legislative, rules because they effect legal changes of general applicability. They terminate all USRAP case processing, decisions, admissions, and travel, and they block all funding to USRAP partner nonprofits. The fact that they effectively nullify pre-existing regulations that were themselves codified through notice-and-comment rulemaking only bolsters this conclusion. *See* Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. § 207); Procedures for Filing a Derivative Petition (Form I–730) for a Spouse and Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3792 (Jan. 27, 1988) (to be codified at 8 C.F.R. § 207.7); *Doe*, 288 F. Supp. 3d at 1075 ("Where the original rule was adopted after a notice and comment period, courts have generally found the decision to alter those rules to be substantive, and therefore subject to APA rulemaking procedures as well." (citing cases)). The Court thus concludes that Plaintiffs are likely to succeed on their claim that the Agency Suspension violates the procedural requirements of the APA.

But the Court does not reach the same conclusion with respect to the Refugee Funding Suspension. The APA expressly excepts "matter[s] relating to ... loans, grants, benefits, or contracts" from the procedural requirements of Section 553 notice-and-comment rulemaking. 5 U.S.C. § 553(a)(2). This "statutory exception 'cuts a wide swath through the safeguards generally imposed on agency action[.]' " *Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir. 1984) (quoting *Good Samaritan Hospital, Corvallis v. Mathews*, 609 F.2d 949, 953 (9th Cir. 1979)). The parties provided almost no briefing on this issue.[7] Nevertheless, the Court is preliminarily persuaded

that the Refugee Funding Ban qualifies as a "matter relating to ... grants, benefits, or contracts" and is therefore likely exempt from Section 553 procedural requirements. Of course, this does not exempt it from Section 706. Thus, that the Refugee Funding Suspension is arbitrary, capricious, and contrary to law is sufficient to set it aside.

[7]    In their reply brief, Plaintiffs state that "Defendants have not asserted that any exceptions to the notice-and-comment rulemaking requirement apply, and those arguments are now forfeited." Dkt. No. 36 at 12. This is false. *See* Dkt. No. 31 at 29 (opposition brief) (stating, with no further analysis, that "any activity relating to the pause in funding necessarily involves 'loans, grants, benefits, or contracts' ").

### 3.4.4 The Refugee Funding Suspension and Agency Suspension are arbitrary and capricious.

Plaintiffs argue that the Agency Suspension and Refugee Funding Suspension must also be set aside under Section 706(2)(A) for the separate reason that they are arbitrary and capricious. Dkt. No. 14 at 25. The Court agrees.

**\*20**  "Under the arbitrary and capricious standard, our scope of review is narrow and deferential." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). "Agency action is valid 'if a reasonable basis exists for [the agency's] decision.' " *Id.* (quoting *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)). "A reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.' " *Id.* (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agriculture*, 415 F.3d 1078, 1093 (9th Cir. 2005)). "Although we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, we may not infer an agency's reasoning from mere silence." *Id.* (citations and quotation marks omitted). Thus, an agency bears the burden to "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). And where an agency action rescinds a prior policy, the agency must show consideration of both "serious reliance interests," *id.*, as well as "alternatives ... within the ambit of the existing policy." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020) (cleaned up).

The Court applies these review standards first to the Agency Suspension, then to the Refugee Funding Suspension.

As discussed throughout this Order, the Agency Suspension substantively expanded the USRAP EO in at least three ways. First, it terminated all refugee travel into the United States a full week prior to the date called for in the USRAP EO. Dkt. No. 31-1 ¶ 20. Second, it terminated not just all case decisions and admissions, but also all USRAP case processing and operations—effectively shuttering the program. *See* Dkt. No. 15-24 ¶ 25. And third, where the USRAP EO expressly authorized the Secretaries of State and Homeland Security to "jointly determine to admit aliens to the United States as refugees on a case-by-case basis," USRAP EO § 3(c), the Agency Defendants discretionarily opted not to create such a system for case-by-case admissions before terminating all refugee entry into the country. *See* Dkt. No. 31-1 ¶ 22 n.2.

The Agency Defendants provided no explanation whatsoever for these substantive expansions of the USRAP EO. They did not, as is required under arbitrary-and-capricious review, acknowledge, let alone meaningfully consider, the reliance interests of refugees, U.S. citizens, and resettlement nonprofits harmed by their actions. Nor did they articulate any consideration of alternative options—such as the implementation of a case-by-case admissions system at the discretion of the Secretaries of State and Homeland Security —that might mitigate the harms of the Agency Suspension. Instead, they merely cite the USRAP EO as a justification for their actions. But the USRAP EO—which is itself unlawful —cannot, on its face, explain the Agency Defendants' discretionary expansions of the USRAP EO.[8]

[8]    Defendants advance the remarkable position that suspending refugee admissions *before* the cutoff specified in the USRAP order was somehow an act of compassion—a preemptive attempt to prevent incoming refugees from being "stranded at U.S. ports of entry[.]" Dkt. No. 31-1 ¶20. This explanation rings hollow, however, when confronted with the real-world impact on refugees like Plaintiff Pacito—who had already sold his belongings, terminated his housing lease, and prepared for imminent departure. As courts have repeatedly held, post hoc rationalizations cannot retroactively justify agency actions lacking a rational basis. *Arrington*, 516 F.3d at 1113.

The Refugee Funding Suspension likewise went far beyond the text of the Foreign Aid EO that it purported to implement. As discussed above, the Foreign Aid EO calls only for a pause in "foreign development assistance" and says nothing about USRAP, refugee case processing, or refugee services. Foreign Aid EO § 3(a). Nevertheless, the Agency Defendants, with

no explanation, construed the Foreign Aid EO as requiring the total suspension of all funding for USRAP operations— including, contrary to reason, funding for *domestic* refugee resettlement support. *See* Dkt. No. 31-1 ¶¶ 24–27.

**\*21**   As with the Agency Suspension, the Agency Defendants provided no reasoned explanation for the Refugee Funding Suspension. Defendants' counsel states that Secretary Rubio issued the Suspension Notices because USRAP-related funding "is appropriated under the 'Migration and Refugee Assistance' (MRA) heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOAA)"—which was paused in response to the Foreign Aid EO. *Id.* This is no explanation at all. Defendants effectively concede that Secretary Rubio discretionarily halted USRAP funding yet give no insight into the reasons for that decision. Nor did the Agency Defendants apparently consider reasonable alternatives. *See AIDS Vaccine*, ––– F.Supp.3d at ––––, 2025 WL 485324, at \*5 (D.D.C. Feb. 13, 2025) ("Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs.").

Additionally, the State Department did not acknowledge the apparent deviation from its own regulations implementing the Refugee Act. *See* 2 C.F.R. § 600.101 (incorporating by reference *id.* § 200.305(b)(6)); *see California v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 718 F. Supp. 3d 1060, 1085 (N.D. Cal. 2024) ("Some courts have concluded that an agency's failure to comply with its own regulations is 'not in accordance with law' for purposes of the APA. Other courts have held that, when an agency fails to comply with its own regulations, it has acted arbitrarily and capriciously for purposes of the APA." (citations omitted)). Those regulations expressly provide that "[p]ayments for allowable costs must not be withheld ... unless required by Federal statute, regulations, or" if "[t]he recipient ... has failed to comply with the terms and conditions of the Federal award" or "is delinquent in a debt to the United States." *See* 2 C.F.R. § 200.305(b)(6). None of those conditions appear to be met here.

In sum, the Court finds that the Plaintiffs are likely to prove that the Agency Suspension and the Refugee Funding

Pacito v. Trump, --- F.Supp.3d ---- (2025)

Suspension are arbitrary and capricious and must therefore be set aside under the APA.

**3.5 Plaintiffs are likely to succeed on their claims that Defendants violate the due process rights of follow-to-join petitioners.**

Plaintiffs contend that suspending USRAP violates the due process rights of follow-to-join petitioners, including Plaintiff Esther. Dkt. No. 1 ¶¶ 228–29. The Defendants counter that this "procedural due process claim" lacks merit, mainly relying on *Department of State v. Muñoz*, 602 U.S. 899, 909, 144 S.Ct. 1812, 219 L.Ed.2d 507 (2024). Dkt. No. 31 at 25. This argument misapprehends the fundamental distinction between this case and *Muñoz*.

In *Muñoz*, the Supreme Court addressed whether a United States citizen possessed a constitutional liberty interest in having her foreign-national spouse admitted to this country. The plaintiff there asserted that the right to live with her noncitizen spouse was "implicit in the 'liberty' protected by the Fifth Amendment," and claimed that the unexplained denial of her husband's visa application violated this interest. 602 U.S. at 902–03, 144 S.Ct. 1812. The Court rejected this position, finding no unenumerated constitutional right to secure a noncitizen spouse's entry into the United States. *Id.* at 903, 144 S.Ct. 1812.

Here, in contrast, Esther's interest stems not from constitutional implications but from a separate statutory entitlement. Under 8 U.S.C. § 1157(c)(2)(A), spouses and children of refugees "shall be entitled to the same admission status" when following to join the principal refugee. This mandatory language establishes a substantive right, not a discretionary privilege. Other courts examining this statute have reached the same conclusion. *See Doe*, 288 F. Supp. 3d at 1078–79.

Ninth Circuit precedent recognizes that procedural due process protections attach to liberty interests grounded in "nonconstitutional law, such as a statute." *Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021). The mandatory language in § 1157(c)(2)(A) creates precisely such an interest —an entitlement for refugees' eligible family members to receive the same refugee status, which in turn gives rise to procedural protections before that entitlement can be suspended.

**\*22** The fundamental requirement of due process is "the opportunity to be heard at a meaningful time and in a

meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In evaluating whether due process requirements have been satisfied, courts consider three factors: (1) the private interest affected by government action; (2) the risk of erroneous deprivation through the procedures used and the value of additional safeguards; and (3) the government's interest. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1207 (9th Cir. 2022).

Applying these principles, the Court finds that Plaintiff Esther's interest in her daughter's admission is substantial. After eight years of pursuing her petition, when her daughter was finally "on the verge of travel," Esther learned, with no prior notice or opportunity to be heard, that her daughter's admission was indefinitely suspended. *See* Dkt. No. 15-15.

And given the Court's conclusion that the Executive Order is itself likely unlawful, *supra* § 3.3, the government's interests cannot justify this procedural deficiency. The government has no legitimate interest in enforcing an order that exceeds its statutory authority. *See State v. Trump*, No. C25-0127-JCC, ––– F.Supp.3d ––––, ––––, 2025 WL 415165, at \*6 (W.D. Wash. Feb. 6, 2025) ("[T]he Government has no legitimate interest in enforcing an Order that is likely unconstitutional and beyond its authority.").

Accordingly, the Court finds that Plaintiffs are likely to succeed on their due process claim.

**3.6 Plaintiffs will face irreparable harm without immediate injunctive relief.**

Plaintiffs seeking a preliminary injunction must show that they are likely to suffer irreparable harm without preliminary relief. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. A "showing of a mere possibility of irreparable harm is not sufficient under *Winter*." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). Plaintiffs have easily met their burden here.

The individual plaintiffs submit declarations showing the USRAP EO, Agency Suspension, and Refugee Funding Suspension have caused them irreparable harm—plaintiffs stranded abroad face physical danger and financial hardship after cancelling travel plans and selling their possessions; several plaintiffs suffer ongoing separation from family members in the U.S.; and plaintiffs who have recently arrived to the U.S. have been cut off from critical resettlement benefits and support services needed to establish their new lives in America. These harms compound daily and cannot be remedied after the fact. *See, e.g.*, *E. Bay Sanctuary Covenant*

*v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (economic harm is irreparable "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases"); *Washington v. Trump*, 847 F.3d at 1169 ("separated families" constitute irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (per curiam) (recognizing that "important [irreparable harm] factors include separation from family members" (cleaned up)); *Al Otro Lado, Inc. v. McAleenan,* 423 F. Supp. 3d 848, 876–77 (S.D. Cal. 2019) (threat of physical danger to refugees is irreparable harm); *Doe v. Trump,* 288 F. Supp. 3d 1045, 1082 (W.D. Wash. 2017) (prolonged family separation, including in context of refugee suspension, constitutes irreparable harm); *cf. Leiva-Perez*, 640 F.3d at 969 (likelihood of physical danger if asylum-seeker is returned to his or her home country is part of irreparable harm inquiry).

**\*23** The organization plaintiffs will suffer a similar fate absent an injunction. The record shows that they face devastating and irreparable harm from the Refugee Funding Suspension, which has frozen over \$100 million in anticipated revenue and thrown them into a cash-flow crisis. This has forced them to furlough or lay off hundreds of staff members, cancel obligations, and halt essential refugee services. This is an existential threat to their survival, as the combination of staff reductions, loss of institutional knowledge, damaged community partnerships, and declining service quality threatens to permanently shut down their operations. Under established legal precedents, these injuries all constitute irreparable business harm. *See, e.g., HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business is sufficient to establish irreparable harm[.]" (cleaned up)); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ("a substantial loss of business" and prospect of "bankruptcy" constitute irreparable harm).

The Government's arguments to the contrary are, to put it charitably, unconvincing, as the Government tries to wave away concrete evidence of devastating harm to both individual and organizational plaintiffs, offering instead the tepid suggestion that these injuries amount to mere economic inconvenience. But the record shows otherwise: refugees stranded in dangerous conditions abroad, families who sold everything they owned before having travel cancelled, and organizations facing the wholesale destruction of decades-worth of refugee resettlement infrastructure are not theoretical injuries that can be remedied by a check from the Treasury.

And the Government's suggestion that Plaintiffs cannot demonstrate irreparable harm because the refugee resettlement process is already slow-moving fundamentally misunderstands both the nature of preliminary injunctive relief and the concrete evidence of harm in this case. That refugees often wait months or years for processing does not negate the immediate and irreparable nature of the injuries caused by the Government's abrupt suspension of the entire refugee program. The fact that some of the threatened harms may not occur for several months is not reason, by itself, to deny a preliminary injunction. *Privitera v. California Bd. of Med. Quality Assur.*, 926 F.2d 890, 897 (9th Cir. 1991) (improper to deny preliminary injunction only because license revocation hearing was three months away); *see also Joint Bd. of Control of Flathead, Mission and Jocko Irr. Dist. v. United States*, 646 F. Supp. 410, 419 (D. Mont. 1986) *rev'd on other grounds by* 832 F.2d 1127 (9th Cir. 1987) (holding "future injury of uncertain date and incalculable magnitude is irreparable harm, and protection against such injury is a legitimate end of injunctive relief"); *Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 630 (4th Cir. 1979) (same). The Government's position, taken to its logical conclusion, would mean that no refugee could ever obtain preliminary injunctive relief for a denial of entry into the country or life-sustaining resettlement services because the USRAP process is inherently long. This cannot be correct.

The evidence overwhelmingly shows that both individual and organizational plaintiffs face concrete, immediate, and irreparable harms that can be prevented only through preliminary injunctive relief. Thus, the Court finds that the second *Winter* factor—irreparable harm—is met here.

### 3.7 The balance of equities and public interest favor a preliminary injunction.

When considering a preliminary injunction motion, "district courts must 'give serious consideration to the balance of equities and the public interest'—the third and fourth *Winter* factors. *Earth Island Inst.*, 626 F.3d at 475 (quoting *Winter,* 555 U.S. at 27, 129 S.Ct. 365). In weighing the equities, courts "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24, 129 S.Ct. 365. Weighing the public interest, on the other hand, "primarily addresses impact on non-parties rather than parties." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019). When the Government is a party to a case, "the balance of the equities and public interest factors merge."

*Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

**\*24** As discussed above, the record shows concrete and severe harms to the individual and organizational plaintiffs flowing directly from the USRAP EO and its implementation. These harms are mostly irreversible and warrant immediate intervention to stop more harm from befalling Plaintiffs.

In contrast, the Government offers only an abstract assertion about harm to executive authority over immigration matters. To be sure, the President has considerable discretion in managing immigration and foreign affairs, but that authority does not extend to actions that override Congress's carefully crafted statutory schemes. The public interest is not served by maintaining executive actions that conflict with federal law, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (no legitimate government interest in violating federal law), particularly where those actions threaten to dismantle a refugee resettlement infrastructure built over decades to carry out Congress's expressed commitment to humanitarian protection, *see Doe v. Trump*, 288 F. Supp. 3d at 1084 (collecting cases).

The USRAP EO also cites concerns about national security, refugee assimilation, and preserving taxpayer resources. But Congress has already carefully addressed these precise issues through comprehensive legislation that requires thorough security screening, provides structured support for integration through established resettlement agencies, and includes detailed provisions for efficient use of public resources. The Government has identified no deficiencies in these existing safeguards that would warrant wholesale suspension of the refugee program. *See Hawaii*, 859 F.3d at 783, *vacated on other grounds and remanded*, 583 U.S. 941, 138 S.Ct. 377, 199 L.Ed.2d 275 (2017) (equities tipped in plaintiffs favor when "the Government ha[d] not put forth evidence of injuries resulting from the preliminary injunction, or how the screening and vetting procedures in place before the [prior refugee ban executive] Order was enjoined were inadequate such that the Order should take immediate effect.").

Particularly striking is the position of the States whose emergency declarations the Government invokes to justify its actions. Dkt. No. 26-1. New York and Massachusetts—joined by seventeen other states that together resettle nearly half of all refugees in the United States—explain that their emergency declarations addressed distinct circumstances involving asylum seekers and other migrants at the southern border, not legally admitted refugees who arrive with work authorization and federal support for resettlement. This clarification undermines a central premise of the USRAP EO and highlights the disconnect between the Government's stated justifications and its sweeping actions.

Thus, the balance of equities and the public interest—the third and fourth *Winter* factors—tip sharply in Plaintiffs' favor. *CTIA*, 928 F.3d at 841 ("[A] preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.' " (quoting *Cottrell*, 632 F.3d at 1132)).

### 3.8 Scope of relief.

In recent years, nationwide injunctions have sparked significant debate. *See* Amanda Frost*, In Defense of Nationwide Injunctions,* 93 N.Y.U. L. Rev. 1065, 1090 (2018). Relying on general critiques about the propriety of district courts issuing such injunctions, the Government argues that any injunctive relief here must be limited to the named Plaintiffs only. Dkt. No. 31 at 26 (citing *United States v. Texas*, 599 U.S. 670, 694, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023) (Gorsuch, J., concurring)). The day may soon come when the Supreme Court addresses the boundaries of the lower courts' ability to issue nationwide injunctions, but until then, district courts retain the flexibility to craft remedies that effectively address the actual harms at stake—and here, that means nationwide relief.

**\*25** Our legal system has long recognized that "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). For this reason, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

Here, complete relief for the named plaintiffs entails enjoining portions of the USRAP EO. That the benefits or protections of such an injunction would flow to other, nonparties does not render such an injunction overbroad. *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action —*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" (emphasis in original)); *see*

*Hawaii v. Trump,* 859 F.3d 741, 788 (9th Cir.), vacated and remanded, 583 U.S. 941, 138 S.Ct. 377, 199 L.Ed.2d 275 (2017) ("Narrowing the injunction to apply only to Plaintiffs would not cure the statutory violations identified, which in all applications would violate provisions of the INA.").

In any event, a partial or "fragmented" approach to an injunction "would run afoul of the constitutional and statutory requirement for uniform immigration law and policy. *Washington v. Trump,* 847 F.3d 1151, 1166–67 (9th Cir. 2017) (citing *Texas v. United States,* 809 F.3d 134, 187–88 (5th Cir. 2015)). "Congress has instructed that the immigration laws of the United States should be enforced vigorously and uniformly, and the Supreme Court has described immigration policy as a comprehensive and unified system." *Texas,* 809 F.3d at 187–88 (footnotes and quotation marks omitted). A piecemeal approach would be impracticable, as the refugee resettlement system functions as an integrated whole, with interconnected processes spanning international borders and domestic agencies. Requiring the government to maintain parallel systems—one operational for the named Plaintiffs and one suspended for everyone else —would create an administrative nightmare.

Thus, any order enjoining the implementation of the USRAP EO must be nationwide. *See Trump v. Hawaii,* 585 U.S. 667, 751 n.13, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (Sotomayor, J., dissenting) ("[T]he imposition of a nationwide injunction was 'necessary to provide complete relief to the plaintiffs.' ") (quoting *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)).

## 4. CONCLUSION

The Court granted Plaintiffs' Motion for a Preliminary Injunction, Dkt. No. 14, for the reasons above and ORDERS as follows:

1. Defendants, except for President Trump individually, and all Defendants' respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of this Order, are fully ENJOINED from the following:

   a. Enforcing or implementing Executive Order 14163 § 3(a), (b), and (c), and § 4 in its entirety;

   b. Suspending or implementing the suspension of refugee processing, decisions, and admissions;

   c. Suspending or implementing the suspension of USRAP funds, including implementing the Suspension Notices sent by the U.S. State Department to all refugee and resettlement partners on January 24, 2025;

   **\*26** d. Withholding reimbursements to resettlement partners for USRAP-related work performed pursuant to cooperative agreements before January 20, 2025.

2. Defendants' attorneys must provide written notice of this Order to all Defendants and agencies, including President Trump, and to Defendants' employees, contractors, and grantees by March 7, 2025, at 5:00 p.m. (Pacific Standard Time). Defendants must file a copy of the notice on the docket at the same time.

3. No security bond is required under Federal Rule of Civil Procedure 65(c).

4. This preliminary injunction will remain in effect pending further orders from this Court.

**All Citations**

--- F.Supp.3d ----, 2025 WL 655075

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.