# EXHIBIT C

Plaintiffs' Notice of Supplemental Authority

*Doe et al. v. Noem et al.*

1:25-cv-10495-IT (D. Mass.)

2025 WL 957677
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

NATIONAL TPS ALLIANCE, et al., Plaintiffs,
v.
Kristi NOEM, et al., Defendants.

Case No. 25-cv-01766-EMC
|
Signed March 31, 2025

**Synopsis**

**Background:** Venezuelan temporary protected status (TPS) holders and nonprofit organization representing Venezuelan TPS holders nationwide brought action against the Secretary of Department of Homeland Security (DHS), challenging the Secretary's decisions vacating prior extension of redesignation of Venezuela for TPS and terminating the redesignation. TPS holders and organization moved under the Administrative Procedure Act (APA) to postpone the effective dates of the Secretary's decisions pending judicial review.

**Holdings:** The District Court, Edward M. Chen, J., held that:

Immigration and Nationality Act (INA) provision limiting judicial authority to provide injunctive relief did not bar postponement under APA;

plaintiffs were likely to suffer irreparable injury absent postponement pending judicial review of Secretary's decision;

public interest favored postponement of Secretary's decision;

plaintiffs were likely to succeed on merits of claim that Secretary lacked inherent authority to vacate extension of Venezuela's TPS designation, so as to warrant postponement of Secretary's decision;

even assuming Secretary had inherent authority to vacate extension, plaintiffs were likely to succeed on merits of claim that Secretary's decision was arbitration and capricious;

plaintiffs were likely to succeed on merits of claim that Secretary's decision violated Equal Protection Clause; and

nationwide relief was warranted.

Motion granted.

**Attorneys and Law Firms**

Ahilan Thevanesan Arulanantham, UCLA School of Law, Los Angeles, CA, Eva Lucia Bitran, ACLU Foundation of Southern California, Los Angeles, CA, Stephany Martinez Tiffer, Center for Immigration Law & Policy, Los Angeles, CA, Amanda Young, Michelle Young Cho, Emilou MacLean, ACLU Foundation of Northern California, San Francisco, CA, Erik Matthew Crew, Pro Hac Vice, Haitian Bridge Alliance, San Diego, CA, Jessica Karp Bansal, Lauren Michel Wilfong, Pro Hac Vice, National Day Laborer Organizing Network, Pasadena, CA, for Plaintiffs National TPS Alliance, Mariela Gonzalez, Freddy Arape Rivas, M.H., Cecilia Gonzalez Herrera, Alba Purica Hernandez, E.R., Hendrina Vivas Castillo.

Ahilan Thevanesan Arulanantham, UCLA School of Law, Los Angeles, CA, Amanda Young, Emilou MacLean, ACLU Foundation of Northern California, San Francisco, CA, Erik Matthew Crew, Pro Hac Vice, Haitian Bridge Alliance, San Diego, CA, for Plaintiffs Viles Dorsainvil, A.C.A., Sherika Blanc, G.S.

Sarah L. Vuong, Amanda Saylor, Anna Dichter, Catherine Ross, Eric Michael Snyderman, Jeffrey Michael Hartman, Lauren Bryant, Luz Restrepo, William Weiland, DOJ-United States Attorney's Office, Washington, DC, for Defendants.

Cleland B. Welton, II, Pro Hac Vice, Office of the New York State Attorney General, New York, NY, Jesse P. Basbaum, California Department of Justice, Oakland, CA, for Amicus State of California.

Mark Ankcorn, San Diego City Attorney, San Diego, CA, for Amicus City of San Diego.

**ORDER GRANTING PLAINTIFFS' MOTION TO POSTPONE**

Docket No. 16

EDWARD M. CHEN, United States District Judge

## I. INTRODUCTION

**\*1**  At issue is whether this Court should temporarily postpone actions by Kristi Noem, Secretary of the Department of Homeland Security, taken against over 600,000 Venezuelan nationals who have legal status to reside and work temporarily in the United States. The Secretary's actions will shortly strip nearly 350,000 of these residents of their protection under the Temporary Protected Status ("TPS") program, subjecting them to possible imminent deportation back to Venezuela, a country so rife with economic and political upheaval and danger that the State Department has categorized Venezuela as a "Level 4: Do Not Travel" country "due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure."     https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (last visited 3/30/2025). The unprecedented action of vacating existing TPS (a step never taken by any previous administration in the 35 years of the TPS program), initiated just three days after Secretary Noem took office, reverses actions taken by the Biden administration to extend temporary protection of Venezuelan nationals that have been in place since 2021. Although the Secretary's actions appear predicated on negative stereotypes casting class-wide aspersions on their character (insinuating they were released from Venezuelan prisons and mental health facilities and imposed huge financial burdens on local communities), the undisputed record establishes that Venezuelan TPS beneficiaries, in fact, have higher education attainment than most U.S. citizens (40-54% have bachelor degrees), have high labor participation rates (80-96%), earn nearly all their personal income (96%), and annually contribute billions of dollars to the U.S. economy and pay hundreds of millions, if not billions, in social security taxes. They also have lower rates of criminality than the general U.S. population.

Following Secretary Noem's actions, Plaintiffs filed the instant action. Plaintiffs are seven individuals from Venezuela who are TPS holders, plus the National TPS Alliance ("NTPSA"). The NTPSA is "a member-led organization representing Temporary Protected Status ('TPS') holders across the country." Compl. ¶ 2. NTPSA's members include over 84,000 Venezuelan TPS holders living in all fifty states and the District of Columbia. *See* Jimenez Decl. ¶ 13. Among other things, NTPSA "engages in advocacy to defend TPS and

win a path to permanent status for TPS holders."[1] Jimenez Decl. ¶ 21.

[1]  NTPSA has submitted a declaration from Jose A. Palma Jimenez, the Co-Coordinator of the organization. In his declaration, Mr. Jimenez explains that NTPSA also organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country; facilitates community and civic engagement by TPS holders; and provides access to timely and accurate TPS-related information and services to its members.

Jimenez Decl. ¶ 21. The government has not contested NTPSA's standing to bring suit. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (noting that, "where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways[:] [e]ither the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members' ").

**\*2**  Having considered the parties' briefs and accompanying submissions, the oral argument of counsel, and the views of Amici (a collection of various states, cities, and counties throughout the United States),[2] the Court hereby **GRANTS** Plaintiffs' motion. For the reasons stated below, the Court finds that the Secretary's action threatens to: inflict irreparable harm on hundreds of thousands of persons whose lives, families, and livelihoods will be severely disrupted, cost the United States billions in economic activity, and injure public health and safety in communities throughout the United States. At the same time, the government has failed to identify any real countervailing harm in continuing TPS for Venezuelan beneficiaries. Plaintiffs have also shown they will likely succeed in demonstrating that the actions taken by the Secretary are unauthorized by law, arbitrary and capricious, and motivated by unconstitutional animus. For these reasons, the Court grants Plaintiffs' request to postpone the challenged actions pending final adjudication of the merits of this case.

[2]  There are two sets of Amici: (1) the Amici States and (2) the Amici Cities and Counties. The Amici States are California, New York, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia. The Amici Cities and Counties are Denver, San Francisco, Hartford, Cambridge, San Diego, Chicago, Iowa City, Minneapolis, Saint Paul, Boston, and Santa Clara. Both

Amici have submitted briefs in support of Plaintiffs' motion.

## II. FACTUAL & PROCEDURAL BACKGROUND

A. Background on TPS

As part of the Immigration Act of 1990, Congress created the TPS program. The TPS program is a humanitarian program; the governing statute is codified at 8 U.S.C. § 1254a.

Under § 1254a, the Secretary of DHS may **designate** a foreign country for TPS when individuals from that country cannot safely return due to armed conflict, natural disaster, or other extraordinary and temporary circumstances. *See* 8 U.S.C. § 1254a(b). The initial designation lasts for 6, 12, or 18 months, at the Secretary's discretion. *See id.* § 1254a(b)(2).

Once a foreign country is given a TPS designation, individuals from that country may apply for immigration status. If granted, they may not be removed from the United States; furthermore, they are given authorization to work in the United States. *See id.* § 1254a(a)(1).

For individuals to become TPS holders, there are specific requirements that must be met. For example, an individual must have "been continuously physically present in the United States since the effective date of the most recent designation of that [foreign] state." *Id.* § 1254a(c)(1)(A)(i). In addition, an individual must be "admissible as an immigrant." *Id.* § 1254a(c)(1)(A)(iii). An individual is inadmissible if, *e.g.*, they have been convicted of certain crimes (such as a crime involving moral turpitude or drugs) or are a member of a terrorist organization.[3] *See id.* § 1182(a)(2)-(3). Moreover, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B). The Secretary "shall withdraw [TPS] granted to an alien ... if [the Secretary] finds that the alien was not in fact eligible for such status." *Id.* § 1254a(c)(3)(A).

[3]     The TPS statute bars the Secretary from waiving certain inadmissibility grounds. *See* 8 U.S.C. § 1254a(c)(2)(A)(iii).

After a foreign country has been given a TPS designation, that designation is subject to periodic review to determine if the TPS designation should be **terminated** or **extended**.

At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary of DHS[4]], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.

**\*3** *Id.* § 1254a(b)(3)(A).

- "If the [Secretary] determines ... that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation ...." *Id.* § 1254a(b)(3)(B).

- "If the [Secretary] does not determine ... that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

[4]     The TPS statute "originally provided the Attorney General with this authority" but, "[w]ith the Homeland Security Act of 2002 (Pub. L. No. 107-296, 116 Stat. 2135), the former Immigration and Naturalization Service was transferred to the Department of Homeland Security, and the responsibility for administering the TPS was transferred from the Attorney General to the Secretary of DHS." *Ramos v. Wolf*, 975 F.3d 872, 879 n.1 (9th Cir. 2020), *vacated for rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023).

In addition, it is possible for a country to be given more than one TPS designation. As explained by Plaintiffs (with no dispute by the government),

[a] TPS designation for a country that is already designated for TPS is called a "**redesignation**." When DHS redesignates a country for TPS, it generally has the effect of expanding the pool of potential beneficiaries to include individuals who came to the United States after the country was first designated for TPS.

Compl. ¶ 26 n.4 (emphasis added).

B. TPS Designation for Venezuela

1. 2021 TPS Designation

In March 2021, Secretary Mayorkas (the Secretary of DHS under the Biden administration) first designated Venezuela for TPS – specifically, for 18 months, from March 9, 2021, through September 9, 2022. *See* 86 Fed. Reg. 13574, 13577 (Mar. 9, 2021). The designation allowed those "who have continuously resided in the United States since March 8, 2021, and have been continuously physically present in the United States since March 9, 2021, to apply for TPS." *Id.* at 13575. U.S. Citizenship and Immigration Services ("USCIS") estimated that "approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela." *Id.*

The basis for the designation was stated as follows:

> Venezuela is currently facing a severe humanitarian emergency. Under Nicolás Maduro's influence, the country "has been in the midst of a severe political and economic crisis for several years." Venezuela's crisis has been marked by a wide range of factors, including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID-19 pandemic, among other factors.

**\*4** *Id.* at 13576.

The parties refer to this designation as the "2021 Designation."

2. First and Second Extensions of the 2021 Designation

The 2021 Designation was set to expire, as noted above, in September 2022. However, on September 8, 2022, before expiration, DHS **extended** the 2021 Designation for 18 months – *i.e.*, from September 10, 2022, through March 10, 2024. *See* 87 Fed. Reg. 55024, 55027 (Sept. 8, 2022). The basis for the extension was as follows: "Extraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety include severe economic and political crises ongoing within Venezuela, which have an impact across

sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights." *Id.* at 55026. As Plaintiffs point out, "because the decision [here] was only an extension, and not also a re-designation, it did not provide protection to Venezuelans who had arrived in the U.S. *after* March 9, 2021 [*i.e.*, the date of the 2021 Designation]." Compl. ¶ 42 (emphasis added).

DHS **extended** the 2021 Designation a second time on October 3, 2023, for another 18 months. The extension ran from March 11, 2024 (when the first extension above would end) to September 10, 2025. *See* 88 Fed. Reg. 68130, 68131 (Oct. 3, 2023).

3. 2023 TPS Designation

At the same time as the second extension of the 2021 Designation, DHS also **redesignated** Venezuela for TPS. *See id.* The redesignation covered an 18-month period, from October 3, 2023, through April 2, 2025. *See id.* While the 2021 Designation allowed individuals who had been in the United States since March 2021 to apply, this designation – which the parties refer to as the "2023 Designation" – allowed individuals to apply if they had continuously resided in the United States since July 31, 2023, and had continuously been physically present since October 3, 2023. *See id.* DHS estimated that "approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela." *Id.* at 68134.

For both (1) the second extension of the 2021 Designation and (2) the 2023 Designation, the basis was the same:

> Venezuela continues to face a severe humanitarian emergency due to a political and economic crisis, as well as human rights violations and abuses and high levels of crime and violence, that impacts access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty. Additionally, Venezuela has recently experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides. Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.

> Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis." "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition,

and infant mortality, together with frequent electricity outages and the collapse of health infrastructure." Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.

**\*5** *Id.* at 68132.

4. Extension of the 2023 Designation

On January 17, 2025, shortly before the second Trump administration was to begin, Secretary Mayorkas **extended** the 2023 Designation by 18 months, through October 2, 2026. *See* 90 Fed. Reg. 5961 (Jan. 17, 2025). As indicated above, without an extension, the 2023 Designation would end on April 2, 2025. The basis for the extension was as follows:

> Venezuela is experiencing "a complex, serious and multidimensional humanitarian crisis." The crisis has reportedly disrupted every aspect of life in Venezuela. "Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world." Venezuela's "complex crisis" has pushed Venezuelans into "poverty, hunger, poor health, crime, desperation and migration." Moreover, Nicolás Maduro's declaration of victory in the July 28, 2024 presidential election – which has been contested as fraudulent by the opposition – "has been followed by yet another sweeping crackdown on dissent."

*Id.* at 5963.

In the extension, DHS also clarified the relationship between the two designations for Venezuela – (1) the 2021 Designation and (2) the 2023 Designation – both of which had been subject to extensions. DHS addressed the following question:

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No. USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations. To date, USCIS has created

operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations. To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension.** This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time. Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

*Id.* at 5964 (some emphasis added).

5. Vacatur of the Extension of the 2023 Designation

On January 20, 2025, President Trump began his second administration. That same day, President Trump issued an Executive Order titled "Protecting the American People Against Invasion." *See* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (last visited 3/30/2025). Section 16 of the Executive Order states as follows:

**\*6** Addressing Actions by the Previous Administration. The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

....

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute ...

*Id.*

Secretary Noem was sworn in as Secretary of DHS on January 25, 2025. Three days later, on January 28, 2025, the Secretary vacated the extension of the 2023 Designation. DHS formally published notice of the vacatur on February 3, 2025. *See* 90 Fed. Reg. 8805 (Feb. 3, 2025). This is the first time – in TPS's thirty-five-year history – that an extension of a TPS designation has ever been vacated.

The notice began by stating that:

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must make a decision by February 1, 2025 [*i.e.*, 60 days in advance]. The Venezuela 2021 TPS designation expires on September 10, 2025, and the Secretary must make a decision by July 12, 2025. Notwithstanding the fact that these are both decisions that would lie with new Secretary of Homeland Security Kristi Noem, Secretary Mayorkas [the DHS Secretary under the Biden administration] took action with respect to both designations.

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025, determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3) (A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See* Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs [employment authorization documents]. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation. *Id.* at 8806.

The notice then stated that the extension given by Secretary Mayorkas was vacated:

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain

EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination. *Id.*

The reason for the vacatur was stated as follows: "The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." *Id.* at 8807.

**\*7** The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b) (2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance. *Id.*

The effect of the vacatur was stated as follows:

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

*Id.* In its papers, the government characterizes the vacatur as a "restor[ation] [of] the status quo." Opp'n at 6.

6. Termination of the 2023 Designation

On February 1, 2025 (*i.e.*, just three days after the vacatur was first announced), Secretary Noem decided to terminate the 2023 Designation, effective in April 2025 (*i.e.*, 60 days after publication of the termination notice). DHS formally published noticed on February 5, 2025. *See* 90 Fed. Reg. 9040 (Feb. 5, 2025).

In explaining the basis for the termination, DHS began by stating as follows:

> Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.

> The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

*Id.* at 9042. Although DHS referred to a consultation with other agencies and suggested there was review of a country conditions report, the government failed to provide any evidence in conjunction with the pending motion to support such claims. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (noting that the general process for a TPS designation (on periodic review) includes the following: RAIO (a division within USCIS) provides a Country Conditions Memo, OPS (another division within USCIS) drafts a Decision Memo, and the State Department provides further input). It is difficult to imagine how such a considered process could have been accomplished in such a short period.

DHS continued its explanation for the termination as follows:

> Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no

nationality who last habitually resided in Venezuela) to remain temporarily in the United States.

> **\*8** In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1) ....

*Id.* at 9042.

The notice continued in relevant part:

> "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

> ....

> [First,] TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua. Tren de Aragua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations. In Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States. The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV [the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans"] and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. airport of entry and allowed to settle in American communities. The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels." For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025. Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.

....

Third, President Trump declared a national emergency at the southern border. As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation. The same is true for Venezuela....

 **\*9** Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.
*Id.* at 9042-43.

The notice concluded with the statement that "DHS is terminating only the October 3, 2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until September 10, 2025." *Id.* at 9044. Because of the decision to terminate (which was possible only because of the decision to vacate Secretary Mayorkas's extension in the first place), the 2023 Designation will end on April 7, 2025. *See id.*

C. Causes of Action

Following the vacatur and termination decisions made by Secretary Noem, Plaintiffs filed suit. In their complaint, Plaintiffs assert three claims for relief:

(1) The government violated the APA because the Secretary's decision to vacate the extension of the 2023 Designation was arbitrary and capricious. Most fundamentally, the Secretary did not have inherent authority to reconsider the prior Secretary's extension. "The TPS statute carefully regulates the length of TPS extensions, the conditions under which they may be terminated, and the timetable for doing so. Defendants had no authority to annul a TPS extension under the timetable and procedures they utilized here." Compl. ¶ 149(a). In addition, the Secretary "objected to the ... extension for allowing 2021 TPS holders to re-register under the 2023 extension, but failed to consider that 2021 TPS holders were necessarily eligible for TPS under the 2023 designation as well." Compl. ¶ 149(b).

(2) The government further violated the APA because the Secretary's decision to terminate the 2023 Designation was arbitrary and capricious. For example, the decision assumed that TPS designations are illegal, and "[t]he research, consultation, and review process leading up to the decision deviated dramatically from past practice without explanation." Compl. ¶ 153(a), (c).

(3) The government violated the Equal Protection Clause because the "decisions to vacate the ... TPS extension for Venezuela, and to terminate the 2023 Venezuela Designation ... were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin." Compl. ¶ 157.

In the pending motion, Plaintiffs largely focus on the first and third claims above. To be clear, however, the relief Plaintiffs seek would result in postponement of both (1) Secretary Noem's decision to vacate the extension of the 2023 Designation and (2) the decision to terminate the 2023 Designation.

III. **DISCUSSION**

As indicated by the above, Plaintiffs' case is founded in large part on the APA. The APA provides in relevant part that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; [or] (B) contrary to constitutional right, power, privilege or immunity ....5 U.S.C. § 706(2)." 5 U.S.C. § 706(2). Plaintiffs' present motion seeks temporary relief pursuant to § 705 of the APA. Section 705 provides as follows:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

**\*10** 5 U.S.C. § 705.

### A. Jurisdiction

Although § 705 expressly authorizes a court to postpone the effective date of any agency action, or to preserve status or rights pending judicial review, the government contends that the Court lacks jurisdiction to grant the relief sought by Plaintiffs. The government raises two jurisdictional arguments, one based on 8 U.S.C. § 1252(f)(1) and the other based on § 1254a(b)(5)(A).

### 1. Section 1252(f)(1)

According to the government, Plaintiffs are effectively seeking "classwide" injunctive relief in their motion, and thus their motion must be denied pursuant to § 1252(f)(1) which prohibits such relief. Section 1252(f)(1) provides as follows:

> (f) Limit on injunctive relief
>
> (1) In general. Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ["IIRIRA"], other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

8 U.S.C. § 1252(f)(1). As the Supreme Court has explained, § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry

out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550, 142 S.Ct. 2057, 213 L.Ed.2d 102 (2022).

The government maintains that the TPS statute (§ 1254a) is one of the specified provisions to which § 1252(f)(1) applies – *i.e.*, that the TPS statute falls within "part IV of this subchapter." 8 U.S.C. § 1252(f)(1). The government acknowledges that the U.S. Code places the TPS statute within part V, not part IV, which is consistent with the statements by a number of courts that part IV covers only §§ 1221-32.[5] No court has yet to hold that § 1252(f)(1) applies to § 1254a, which, as a facial matter, is reasonable given that § 1252 is titled "Judicial review of orders of removal" and TPS does not directly involve orders of removal. *Cf. Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (noting that "the title of a statute and the heading of a section cannot limit the plain meaning of the text" but they can be of use "when they shed light on some ambiguous word or phrase").

5
> *See, e.g., Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020) (stating that " 'Part IV' [as used in § 1252(f)(1)] is a reference to the provisions titled 'Inspection, Apprehension, Examination, Exclusion, and Removal,' which currently include 8 U.S.C. §§ 1221-1232 of the INA"); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (stating that § 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231"); *Biden v. Texas*, 597 U.S. 785, 798, 142 S.Ct. 2528, 213 L.Ed.2d 956 (2022) (discussing § 1252(f)(1) and its impact on a court's power to hear claims "brought under sections 1221 through 1232").

**\*11** Nevertheless, the government argues that the U.S. Code contains an error; that the IIRIRA, when it amended the INA in 1996, designated the TPS statute, among other sections, under part IV, *see* 110 Stat. 3009, at 3009-548, 614-15 (Sept. 30, 1996) (in § 308 of the IIRIRA, amending the table of contents); and that "the text of the United States Code 'cannot prevail over the Statutes at Large [*i.e.*, the IIRIRA/INA] when the two are inconsistent.' " *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Yet, it appears that the codification of § 1254a into part V may well have been consistent with IIRIRA and the INA. Part IV is titled "Inspection, Apprehension, Examination, Exclusion, and Removal" whereas Part V is titled "Adjustment and Change of Status." TPS is more akin to

an adjustment of status (albeit temporary) than a deportation proceeding.

In any event, because Plaintiffs opted at this juncture not to focus on this aspect of the government's argument, the Court shall turn to and analyze in greater depth Plaintiffs' assertion that § 1252(f)(1) has no application where a court is simply called upon to vacate an agency action as opposed to issue an "injunction" that would, *inter alia*, govern the conduct of a government official. *See Aleman Gonzalez*, 596 U.S. at 548, 142 S.Ct. 2057 (noting that "[t]he term 'to enjoin' ordinarily means to 'require,' 'command,' or 'positively direct' an action or to 'require a person to perform, ... or to abstain or desist from, some act'[;] [w]hen a court 'enjoins' conduct, it issues an 'injunction,' which is a judicial order that 'tells someone what to do or not to do' "). In other words, according to Plaintiffs, there is a material distinction between vacatur of a specific agency action under § 706 (and likewise postponement of such action under § 705) and an injunction under Federal Rule of Civil Procedure 65. Plaintiffs emphasize that "[e]very court to consider the question – including the Fifth Circuit and at least five district courts – has rejected [the government's] view that APA relief is functionally an injunction barred by Section 1252(f)(1)." Reply at 2.

In assessing Plaintiffs' position, the Court must begin with the "strong presumption ... that the actions of federal agencies are reviewable in federal court." *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1989); *see also Sackett v. E.P.A.*, 566 U.S. 120, 128, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012) (stating that "[t]he APA ... creates a presumption favoring judicial review of administrative action"). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Moreover, where there is no other forum for a litigant to raise their claim, that should also factor into a court's determination as to whether judicial review is available. *Cf. Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1034-35 (9th Cir. 2012) (noting that, "because [a veterans organization] cannot bring its suit in the Veterans Court, that court cannot claim exclusive jurisdiction over the suit," and, "[b]ecause [the organization] would be unable to assert its claim in the review scheme established by the [Veterans' Judicial Review Act], that scheme does not operate to divest us of jurisdiction").

The Court also bears in mind that the Supreme Court has, to date, declined to address the issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA. For example, in *Aleman Gonzalez*, the Supreme Court held that § 1252(f)(1) barred a lower court from entering an injunction requiring the government to provide bond hearings for not only plaintiffs but also all other class members (all of whom had been detained under 8 U.S.C. § 1231(a)(6)). But, as Justice Sotomayor pointed out in her concurrence/dissent, the majority decision did

**\*12** not purport to hold that § 1252(f)(1) affects courts' ability to "hold unlawful and set aside agency action, findings, and conclusions" under the Administrative Procedure Act. 5 U. S. C. § 706(2).... In addition, the Court rightly does not embrace the Government's eleventh-hour suggestion at oral argument to hold that § 1252(f)(1) bars even classwide declaratory relief, a suggestion that would (if accepted) leave many noncitizens with no practical remedy whatsoever against clear violations by the Executive Branch.

*Aleman Gonzalez*, 596 U.S. at 571-72, 142 S.Ct. 2057 (Sotomayor, J., concurring in part and dissenting in part). Justice Barrett made the same point as part of her dissent in *Biden v. Texas*, 597 U.S. at 785, 142 S.Ct. 2528 (where the Supreme Court held that § 1252(f)(1) did not deprive lower courts of all subject matter jurisdiction but rather simply withdrew the authority to grant a particular form of relief). Specifically, she noted that the majority "reserves the question whether § 1252(f)(1) bars declaratory relief, an issue on which there are conflicting views" and further "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act." *Id.* 839, 142 S.Ct. 2528 (Barrett, J., dissenting). The Supreme Court, therefore, has not adopted any view of § 1252(f)(1) that would preclude Plaintiffs from obtaining relief. *See also Biden v. Texas*, 597 U.S. at 801 n.4, 142 S.Ct. 2528 ("At our request, the parties briefed several additional questions regarding the operation of section 1252(f)(1), namely, whether its limitation on 'jurisdiction or authority' is subject to forfeiture and whether that limitation extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA. We express no view on those questions.").

No court has adopted the construction of § 1252(f)(1) advanced by the government. Rather, all courts that have addressed the issue have rejected the government's construction of the statute. For example, in a decision issued after *Aleman Gonzalez* and *Biden v. Texas*, the Fifth Circuit

rejected DHS's contention that vacatur of an agency action is a de facto enjoining or restraining of an agency enforcement decision. The Fifth Circuit explained:

> There are meaningful differences between an injunction, which is a "drastic and extraordinary remedy," and vacatur, which is "a less drastic remedy." The Supreme Court has indicated that § 1252(f) is to be interpreted relatively narrowly. Indeed, the Court described § 1252(f) as "nothing more or less than a limit on injunctive relief."

*Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (addressing DHS's memoranda regarding immigration guidance for the apprehension and removal of noncitizens). The Fifth Circuit added:

> [A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making. We decline to extend *Aleman Gonzalez* to such judicial orders, especially when doing so would be contrary to the "strong presumption favoring judicial review of administrative action."

*Id.* at 220; *see also Texas v. United States*, 126 F.4th 392, 419 n.40 (5th Cir. 2025) (reaffirming the same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) (stating that "[v]acatur is 'a less drastic remedy' than an injunction, and the Fifth Circuit concluded in the opinion currently on review at the Supreme Court that § 1252(f)(1) does not preclude vacatur under the APA because vacatur 'does nothing but re-establish the status quo absent the unlawful agency action' and 'neither compels nor restrains further agency decision-making' ").

**\*13** Notably, the Fifth Circuit's holding is directly supported by the Supreme Court's decision in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). There, the Supreme Court noted that

> [a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. If a less drastic remedy (**such as partial or complete vacatur of APHIS's deregulation decision**) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.

*Id.* at 165-66 (emphasis added).

Furthermore, while *Monsanto* itself did not explain why a vacatur is a less drastic remedy, it is clear that there are

material differences between a vacatur and an injunction. While a court may only enter a vacatur to re-establish the status quo absent the unlawful agency action, *see Texas v. United States*, 40 F.4th at 220, it has "broad latitude in fashioning equitable relief [through an injunction] when necessary to remedy an established wrong." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (collecting cases). Injunctions may apply to parties and nonparties who act "in concert with" named parties. *See, e.g., SEC v. Wencke*, 622 F.2d 1363, 1368 (9th Cir. 1980) ("[Federal Rule of Civil Procedure 65 is] binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."); *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit – even if it is not a class action – *if such breadth is necessary to give prevailing parties the relief to which they are entitled.*") (emphasis in original). Courts may hold both parties and nonparties in contempt for violating an injunction. *See Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 877 F.2d 787, 788-89 (9th Cir. 1989) (affirming a lower court's imposition of sanctions on a nonparty held "in civil contempt for disobeying the injunction by acting in concert with the named defendants"); *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949-50 (9th Cir. 2014) (affirming courts may hold nonparties in contempt for "aiding and abetting violations" of the injunction, and courts may also hold parties in contempt for "giving a non-party the means to violate an injunction"). Injunctions may be mandatory, compelling a wide range of affirmative conduct. *See Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (affirming lower court's injunction that required affirmative conduct by drug manufacturer to continue providing drug to participants after clinical trial). Injunctions may compel or restrain further agency decision-making. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (noting that although a vacatur or injunction would strike down ICE's "knock and talk" policy, "only an injunction would restrain Defendants from, in the future, attempting to institute a modified or amended version of the "knock and talk" policy that complies with constitutional limitations."). Injunctions may prohibit "otherwise lawful conduct" as well as unlawful conduct. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) ("The district court may even enjoin certain otherwise lawful conduct when the defendant's conduct has demonstrated that

prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment."). And injunctions may evolve and morph over time. *See Brown v. Plata*, 563 U.S. 493, 542-43, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) ("The three-judge court ... retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion.... A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order."). Conversely, none of the above is true of a court's vacatur of unlawful agency action under § 706(2) involved here. *See, e.g., Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 954-55 (N.D. Cal. 2010) (finding that a vacatur was more appropriate as to an injunction, but noting that the court's "[o]rder is without prejudice to Plaintiffs seeking further redress if, after the deregulation decision is vacated, Plaintiffs can demonstrate that Defendant-Intervenors or other third parties have in fact violated the vacatur").

**\*14**  In addition, as Plaintiffs argued at the hearing, the Supreme Court's decision in *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), lends further support. In *Nken*, the plaintiff asked the Supreme Court to stay his removal pending an adjudication of his petition for a review of a BIA order. The government argued that the plaintiff could not obtain a stay of removal because of 8 U.S.C. § 1252(f)(2), which provides that "no court shall *enjoin* the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2) (emphasis added). The Supreme Court did not agree with the government, explaining that a stay and an injunction cannot be equated with one another.

> An injunction and a stay have typically been understood to serve different purposes. The former is a means by which a court tells someone what to do or not to do. When a court employs "the extraordinary remedy of injunction," it directs the conduct of a party, and does so with the backing of its full coercive powers.

> It is true that " '[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*.' " This is so whether the

injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct.

> By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.

> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one. Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct. A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts."

*Nken*, 556 U.S. at 428-49, 129 S.Ct. 1749. Although the instant case concerns § 1252(f)(1), while *Nken* considered § 1252(f)(2), the point that the *Nken* Court made has force in the case at bar: to wit, an injunction has a specific legal meaning, and the fact that a different procedural mechanism can achieve the same result as an injunction does not mean that the two should be deemed the same. A material distinction still obtains. The fact that the title of Section 1252(f)(1) is a "limit on *injunctive* relief" (emphasis added) specifically suggests the distinction between an injunction and a vacatur is implied. *Cf. Bhd. of R.R. Trainmen*, 331 U.S. at 529, 67 S.Ct. 1387 (noting that "the title of a statute and the heading of a section cannot limit the plain meaning of the text" but they can be of use "when they shed light on some ambiguous word or phrase"). Moreover, the operative language of § 1252(f)(1) limiting a court's authority "to enjoin or restrain" operations tracks Federal Rule of Civil Procedure 65 which governs preliminary *injunctions* and temporary *restraining* orders. It does not track §§ 705 and 706(2) of the APA which only grant courts the authority to "set aside" (*i.e.*, vacate) and "postpone" agency action.

Finally, the Court takes note that, under binding Ninth Circuit law, § 1252(f)(1)'s bar on classwide injunctive relief does not preclude a court from issuing declaratory relief. *See Al Otro Lado v. Exec. Off. for Immigr. Review*, 120 F.4th 606, 625 (9th Cir. 2024) (stating that "§ 1252(f)(1) does not 'bar classwide declaratory relief' "); *see also Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 986 (C.D. Cal. 2024) (stating that "the Court can issue declaratory relief – which is not precluded by § 1252(f)"); *Immigrant Defenders Law Ctr. v. Mayorkas*, No. CV 20-9893

JGB (SHKx), 2023 U.S. Dist. LEXIS 75206, at *40 (C.D. Cal. Mar. 15, 2023) (stating that "[t]he best reading of *Biden v. Texas* and *Aleman Gonzalez* is that district courts like this one retain jurisdiction to award declaratory relief in immigration class actions").[6] Here, Plaintiffs do seek declaratory relief. *See* Compl., Prayer ¶¶ 1-3; FAC, Prayer ¶¶ 1-3. Thus, if the Court were to deny Plaintiffs' motion to postpone based on § 1252(f)(1) – as the government requests – that would effectively render any declaratory relief moot. The TPS of the 2023 Designation beneficiaries, if the Secretary's vacatur is not postponed, will expire in early April 2025, long before any final judgment ordering declaratory relief could be obtained herein.

[6]    The Supreme Court has not yet addressed this issue. *See Aleman Gonzalez*, 596 U.S. at 551 n.2, 142 S.Ct. 2057 ("At oral argument, the Government suggested that § 1252(f)(1) not only bars class-wide injunctive relief but also prohibits any other form of relief that is 'practically similar to an injunction,' including class-wide declaratory relief.... Because only injunctive relief was entered here, we have no occasion to address this argument."); *Biden v. Texas*, 597 U.S. at 801 n.4, 142 S.Ct. 2528 ("At our request, the parties briefed several additional questions regarding the operation of section 1252(f)(1), namely, whether its limitation on 'jurisdiction or authority' is subject to forfeiture and whether that limitation extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA. We express no view on those questions.").

**\*15**    Accordingly, the Court rejects the government's contention that § 1252(f)(1) is a bar to Plaintiffs' request for relief.

### 2. Section 1254a(b)(5)(A)

The government argues that, even if § 1252(f)(1) is not a bar to Plaintiffs' case, there is another jurisdictional hurdle – specifically, § 1254a(b)(5)(A). Section 1254a(b)(5)(A) is part of the TPS statute. It provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

In assessing the government's argument based on § 1254a(b)(5)(A), the Court must first separate out the challenges being made by Plaintiffs in the case at bar. Plaintiffs are contesting (1) Secretary Noem's decision to vacate the extension of

the 2023 Designation and (2) her decision to terminate the 2023 Designation. With respect to (1), Plaintiffs have multiple arguments: (a) the Secretary lacked the inherent authority to vacate the extension; (b) even if she had the authority, the rationale to vacate the extension was arbitrary and capricious; and (c) even if she had the authority, the decision to vacate was motivated at least in part by unconstitutional animus based on race, ethnicity, and/or national origin. With respect to (2), Plaintiffs assert, *inter alia*, that the decision to terminate (like the decision to vacate) was infected by unconstitutional animus.

At the hearing, the government explicitly conceded that § 1254a(b)(5)(A) does *not* bar the Court from entertaining Plaintiffs' contention that the Secretary lacked the inherent authority to vacate the extension of the 2023 Designation. The government acknowledged that whether the Secretary had such authority is purely a matter of statutory construction (*i.e.*, of the TPS statute) and is not a "determination" with respect to a TPS designation, termination, or extension.

The government, however, contends that § 1254a(b)(5)(A) bars the other claims asserted by Plaintiffs (*i.e.*, whether the vacatur was arbitrary and capricious and/or whether the vacatur or termination was unconstitutionally motivated). The Court does not agree. The Court previously addressed the scope of § 1254a(b)(5)(A) in *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018), another case that involved TPS terminations but during the first Trump administration. When *Ramos* was appealed, the Ninth Circuit panel also addressed the scope of § 1254a(b)(5)(A), *see Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). However, the panel decision was later vacated so that the matter could be reheard en banc. *See Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023). Ultimately, the en banc hearing did not take place because the government, having transitioned to the Biden administration, made new decisions regarding the TPS designations and terminations at issue. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876 (N.D. Cal. 2023) (reviewing history of proceedings).

Because the *Ramos* panel decision was vacated and no en banc ruling ever issued, this Court's decision in *Ramos* has not been overturned. Moreover, although the Ninth Circuit panel in *Ramos* ultimately held that § 1254a(b)(5)(A) did bar Plaintiffs from proceeding based on the particular nature of the claims asserted, the panel basically agreed with this Court that the scope of § 1254a(b)(5)(A)'s bar on judicial review was limited to "inquiring into the underlying considerations and reasoning employed by the Secretary in reach her

country-specific TPS determinations." *Ramos*, 975 F.3d at 891. It does not apply to, *e.g.*, a pattern or practice that is "collateral to and distinct from the specific [country] TPS decisions and their underlying rationale."[7] *Id.* at 891-92.

[7]  In her dissent in *Ramos*, Judge Christen agreed that § 1254a(b)(5)(A) "bars review of TPS determinations only, not collateral challenges," *Ramos*, 975 F.3d at 911, but she disagreed with the majority that the plaintiffs' claims constituted direct challenges instead of collateral ones.

**\*16** Given these circumstances, the Court adheres to its prior views on the scope of § 1254a(b)(5)(A). Nothing in the government's papers or oral arguments presented in the case at bar persuade the Court that § 1252a(b)(5)(A) should be construed differently.[8] Thus, here, the government's argument that § 1254a(b)(5)(A) is a jurisdictional bar lacks merit for several reasons.

[8]  For example, the government argues that, because § 1254a(b)(5)(A) refers to "any determination" and "any" is a word with an expansive meaning, *see* Opp'n at 12 (citing *Patel v. Garland*, 596 U.S. 328, 338, 142 S.Ct. 1614, 212 L.Ed.2d 685 (2022)), § 1254a(b)(5)(A) must be construed broadly. But the word "any" cannot overcome the fact that, as discussed below, § 1254a(b)(5)(A) refers to "any determination ... with respect to the designation, or termination or extension of a designation." 8 U.S.C. § 1254a(b)(5)(A). The key is what constitutes "determination."

a. Presumption of Judicial Review

First, as noted above, there is a "strong presumption ... that the actions of federal agencies are reviewable in federal court," *KOLA*, 882 F.2d at 363, and "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs.*, 387 U.S. at 141, 87 S.Ct. 1507.

b. Applicability to Plaintiffs' APA Claim

Second, Plaintiffs' claim that the Secretary's decision to vacate was arbitrary and capricious does not fall within the scope of § 1254a(b)(5)(A) because the statute bars judicial review of determinations made with respect to TPS designations, terminations, or extensions only. A decision to vacate (a matter not expressly authorized by the TPS statute)

is, literally and textually, not a "designation, or termination or extension of a designation, of a foreign state under this subsection." 5 U.S.C. § 1254a(b)(5)(A).

Furthermore, as the Court held in *Ramos*, § 1254a(b)(5) (A) was designed to bar judicial review of substantive country-specific conditions in service of TPS designations, terminations, or extensions of a foreign state – not judicial review of general procedures or collateral practices related to such. *See Ramos*, 321 F. Supp. 3d at 1102 (taking note of Supreme Court cases holding that "similar statutes which preclude review of a 'determination' of immigration status did not preclude review of collateral practices and policies"; citing, *e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) (individual denials on the merits were not challenged but rather the process under which denials were determined)). This holding is consistent with the panel decision in *Ramos*. *See Ramos*, 975 F.3d at 891-92 ("[A court] may still have jurisdiction over a broad challenge to the agency's procedures or practices. To the extent a claim purports to challenge an agency pattern or practice rather than a specific TPS determination, we may review it only if the challenged pattern or practice is indeed collateral to, and distinct from, the specific TPS decisions and their underlying rationale, which the statute shields from judicial scrutiny.") (internal quotation marks omitted). It is also consistent with the understanding of multiple district courts who have addressed TPS cases. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 330-32 (E.D.N.Y. 2019) (stating that "the jurisdiction-stripping provision proscribes only direct review of individual TPS determinations" but does not block challenges based on deficiencies in the process employed to terminate TPS); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317-21 (D. Md. 2018) (concluding that the TPS jurisdiction-stripping provision "is best read as barring judicial review of the merits of the determination itself, but not whether the determination was made through 'unconstitutional practices and policies' "; adding that "Plaintiffs' constitutional and APA claims do not threaten the 'agency's primacy over its core statutory function' "); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 404-09 (D. Mass. 2018) (noting that plaintiffs' "constitutional and statutory claims [are] frame[d] as challenges to Defendants' process of adjudication rather than the content of any particular adjudication").

**\*17** In the case at bar, Plaintiffs' contention that the decision to vacate was arbitrary or capricious – and thus should be set

aside – does not dictate how the Secretary should ultimately rule on a TPS designation, termination, or extension. Indeed, Secretary Noem's vacatur decision was based purely on procedural concerns (*e.g.*, whether Secretary Mayorkas had taken a "novel approach" or caused confusion) and did not turn, *e.g.*, on country conditions in Venezuela or a concern about U.S. interests. Therefore, Plaintiffs are simply making a collateral challenge, not a direct one, and § 1254a(b)(5)(A) is not implicated.

That Plaintiffs' challenge to the vacatur decision is collateral in nature is underscored by *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994), where the Ninth Circuit considered the following factors in determining whether a challenge is direct or collateral: (1) whether the plaintiff's claims are based on the "merits of his individual situation" or, instead, a "broad challenge to allegedly [improper agency] practices"; (2) whether the administrative record "for a single [decision] would have ... relevance" to the plaintiff's claims; and (3) whether the claims raised matters "peculiarly within the agency's 'special expertise' " or "an integral part of its 'institutional competence.' " *Id.* at 859; *see also Ramos*, 975 F.3d at 892 (panel decision) (considering the above factors); *id.* at 912-13 (Christen, J., dissenting) (same). *City of Rialto v. West Coast Loading Corp.*, 581 F.3d 865 (9th Cir. 2009), added a fourth consideration: whether there is another forum where a plaintiff's claim may be heard. *See id.* at 874 (taking note that, in a prior decision, "we rejected jurisdiction over the plaintiffs' claim in part because we held that the claim 'can be effectively advanced in the context of an appeal from an individual order of deportation' "); *see also Ramos*, 975 F.3d at 913 (stating that "*City of Rialto* teaches that we must consider whether another forum exists where plaintiffs' claim may be heard").

In the case at bar, the first factor points to a collateral challenge for the reasons stated above. The second factor also weighs in favor of a collateral challenge; for instance, whether Secretary Mayorkas had taken a "novel approach," as claimed by Secretary Noem when she vacated the extension, will likely require consideration of matters outside the administrative record. The same is true for the third factor – *e.g.*, whether Secretary Mayorkas's decision engendered confusion was not something particularly within DHS's expertise. Finally, there does not appear to be any other forum where Secretary Noem's decision to vacate could be challenged. *Cf. Ramos*, 975 F.3d at 894 (panel decision) ("recogniz[ing] that Plaintiffs cannot raise their APA challenge in another forum or at a different stage in

the proceedings"); *id.* at 913 (Christen, J., dissenting) (noting that "[t]he TPS statute includes an administrative review process for challenging denials of individual noncitizen TPS applications, but it does not include a path for challenging the termination of a foreign state's TPS designation").

The Court, therefore, holds that § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs' challenge to the Secretary's decision to vacate.

### c. Applicability to Plaintiffs' Equal Protection Claim

Finally, § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs' separate claim for violation of equal protection, whether based on the decision to vacate or the decision to terminate. "The presumption in favor of judicial review [of agency action] is particularly important in regards to constitutional claims." *CASA de Md.*, 355 F. Supp. 3d at 317. Here, "there is no 'clear and convincing' evidence that Congress intended to preclude the Court from reviewing constitutional challenges of the nature alleged. Indeed, as Plaintiffs point out, where Congress otherwise intended to preclude review of all constitutional claims in the INA, it said so explicitly." *Ramos*, 321 F. Supp. 3d at 1105. As above, the panel decision in *Ramos* is in accord. *See Ramos*, 975 F.3d at 895 (entertaining the equal protection claim on the merits – *i.e.*, not applying a jurisdictional bar under § 1254a(b)(5)(A)). It is also notable that the APA expressly provides that agency action shall be set aside if unconstitutional. *See* 5 U.S.C. § 706(2)(B) (providing that a court shall "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right, power, privilege, or immunity").

**\*18**  The Court, therefore, rejects the government's contention that jurisdiction is lacking based on § 1254a(b)(5)(A) for both Plaintiffs' APA claim and their equal protection claim.

### B. Section 705 of the APA

According to the government, even if there is no jurisdictional bar to Plaintiffs' suit, § 705 of the APA still cannot provide them with any relief because the statute "by its own terms does not authorize relief [where] the challenged actions *have already taken effect*." Opp'n at 9 (emphasis added). The government's position here seems to be that, because the Secretary's vacatur decision took effect *immediately* (as reflected in the Federal Register notice), *see* 90 Fed. Reg. at

8807 (stating that "[t]he vacatur is effective immediately"), it is impossible to postpone the effective date of the vacatur pursuant to § 705. *See* 5 U.S.C. § 705 (providing that "the reviewing court ... may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings").

There are several problems with the government's position.

First, although Plaintiffs may technically be asking for postponement of the effective date of the vacatur decision (which enabled the termination decision), what they are ultimately seeking is postponement of the *impact* of the vacatur decision – *i.e.*, the actual termination of the 2023 TPS Designation. As the actual termination of the 2023 Designation has not yet gone into effect, since the challenged actions have yet not changed the status of TPS beneficiaries, Plaintiffs should be able to seek postponement.[9]

> [9]    Ironically, at the hearing, the government argued that Secretary Noem had the authority to reconsider the extension of the 2023 Designation because that extension had not yet gone into effect.

Second, the government's reliance on *Center for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022), in support of its position is flawed because that case focused on when an *agency* – and not a *court* – can postpone agency action (*i.e.*, pending judicial review). *See id.* at 204 ("The D.C. Circuit has declared – albeit in a non-precedential order – that Section 705 'permits an *agency* to postpone the effective date of a not yet effective rule, pending judicial review,' but 'it does not permit the agency to suspend without notice and comment a promulgated rule.' ") (emphasis added). To be sure, § 705 of the APA does address both postponement by an agency and postponement by a court.[10] However, that does not mean that postponement by an agency and postponement by a court are treated the same under § 705.

> [10]    As stated above, the full text of § 705 is as follows: When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of

an agency action or to preserve status or rights pending conclusion of the review proceedings.
5 U.S.C. § 705.

**\*19**  The district court in *Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), made this very point.[11] In *Texas v. Biden*, as here, the government argued that "Section 705 may only remedy an agency action that has *yet* to take effect." *Id.* at 769 (emphasis added). The court disagreed, stating that "[w]hether the effective date of the [DHS's] October 29 Memoranda [which terminated an immigration program] has passed is irrelevant to this *Court's* ability to issue a Section 705 stay. Courts – including the Supreme Court – routinely stay *already-effective* agency action under Section 705." *Id.* at 770 (emphasis added).

> [11]    The case was ultimately appealed the Supreme Court, *see Biden v. Texas*, 597 U.S. at 785, 142 S.Ct. 2528, but the matter at issue here was not presented as part of the appeal.

The *Texas v. Biden* court pointed out that

> [t]he cases Defendants cite [including *Center for Biological Diversity*] preclude *agencies* – not *courts* – from staying the effective date of agency actions after the effective date. [This was reasonable because] [a]uthorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements. An agency's "order delaying [a] rule's effective date ... [is] tantamount to amending or revoking a rule." The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." This includes the general requirement that rules be subject to notice-and-comment procedures.

> The limitation on agencies contrasts with courts' inherent authority to stay agency action to facilitate judicial review.

*Id.* at 770-71 (emphasis added). *See, e.g., GB Int'l, Inc. v. Crandall*, No. 19-35866, 2020 U.S. App. LEXIS 20008 at *1 (9th Cir. June 25, 2020) ("The renewed motion to postpone the effective date of agency action is granted. *See* 5 U.S.C. § 705. The effective date of the USCIS' denial of appellants' adjustment of status applications is postponed pending resolution of this appeal.").

Finally, the government gives short shrift to the fact,

> [w]hereas an agency may only "postpone the effective date of action taken by it, pending judicial review," a federal court has broader power to "issue all necessary

and appropriate process to postpone the effective date of an agency action *or to preserve status or rights pending conclusion of the review proceedings.*" 5 U.S.C. § 705 (emphasis added). The greater limitation on agencies exists because "agencies are creatures of statute" and, thus, "possess only the authority that Congress has provided." *Id.* at 770 (emphasis in original). In its opposition, the government contends that the latter provision still cannot save Plaintiffs' case because "[a]n order staying a policy after it has already gone into effect ... does not preserve the status quo, but rather, *alters* it." Opp'n at 10 (emphasis in original). This argument, however, is without merit because, traditionally, "[t]he 'status quo' to be restored is 'the last peaceable uncontested status existing between the parties *before* the dispute developed.' " *Texas v. Biden*, 646 F. Supp. 3d at 771 (emphasis added); *cf. Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (stating that "[t]he 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits,' " and " '[s]tatus quo ante litem' refers to 'the last uncontested status which *preceded* the pending controversy' ") (emphasis added). Here, the last uncontested status that preceded the pending controversy was the state of the TPS designations at the time Secretary Mayorkas extended the 2023 Designation in January 2025 – *i.e., before* Secretary Noem took the contested action of vacating the extension and then terminated the 2023 Designation.

## C. Section 705 Factors in Determining Postponement

**\*20** Having addressed the government's procedural challenges to Plaintiffs' motion to postpone, the Court may now turn to the merits of the motion. The factors considered in determining whether to postpone pursuant to § 705 " 'substantially overlap with the ... factors for a preliminary injunction.' " *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020); *see also Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating that the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary injunction).

The Ninth Circuit has explained the standard for a preliminary injunction as follows:

A party seeking a preliminary injunction must meet one of two variants of the same standard. Under the original *Winter* standard, a party must show "that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Neither party disputed that this framework would also apply to a motion brought pursuant to § 705 of the APA.

### 1. Irreparable Injury

The Court considers first the factor of irreparable injury. Irreparable injury is particularly important as § 705 explicitly invokes it as a basis to issue relief. Plaintiffs have submitted a number of declarations establishing that, without postponement of the agency actions, TPS beneficiaries will suffer irreparable injury. The declarations have been submitted by, *e.g.*, TPS holders (including the named Plaintiffs), experts, and leaders of community organizations.

The declarations reflect that TPS beneficiaries feel stuck between a rock and a hard place because of DHS's actions. Absent relief from the Court, TPS beneficiaries will no longer have authorization to work in the United States and thus will lose their jobs – which in turn imperils their livelihoods, housing, and health care. Absent relief from the Court, they will no longer have legal status, which means not only loss of, *e.g.*, driver's licenses and educational opportunities, but also – and most significantly – the prospect of removal from the United States.

Removal is a concrete reality because, for many TPS holders, TPS is their only avenue for legal status in the United States. For example, those with asylum cases have been waiting for years for their adjudications. *See* Watson & Veuger Decl. ¶ 11 (Senior Fellow at the Brookings Institution in Economic Studies and Senior Fellow in economic policy studies at American Enterprise Institute) (testifying that, "[a]s of 2024[,] it was estimated that 132,272 Venezuelans had filed asylum cases which had not yet been adjudicated, consistent with the well-documented backlogs in the immigration system"). Even if an individual could obtain asylum – or even parole – these legal mechanisms do not provide the same protections as TPS. *See* Tolchin Decl. ¶ 11 (immigration

attorney) (testifying that, "[a]lthough many Venezuela TPS holders may ... be eligible for protection from removal and work authorization through other avenues [*e.g.*, asylum and parole], only a small minority will actually receive relief, and it is very likely that many Venezuelans TPS holders would *not* be protected to the same degree by any other statute") (emphasis in original).

**\*21** Removal presents significant hardship for several reasons. First, removal would mean separation from family, friends, and communities. *See Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (recognizing the separation of families as "substantial injuries and even irreparable harms").[12] Some TPS holders have been in the United States for years; some TPS holders who are children have known or remembered only the United States as their home. *See, e.g.*, M.R. Decl. ¶¶ 3, 7, 18 (arrived in 2015 with her then two-year-old daughter, both of whom have TPS). Furthermore, separation is particularly complicated because many TPS holders live in mixed-status families – *i.e.*, some family members, including partners and/or some children, are U.S. citizens. *See* Docket No. 62 (Amicus Br. at 4) (noting that, "[i]n 2022, approximately 54,000 U.S. citizen children and 80,000 U.S. citizen adults lived with a Venezuelan TPS holder"). Decisions, therefore, would have to be made about whether families should stay together or split apart. Decisions would also have to be made how to provide for families in either scenario, both in terms of economic and emotional support. *Cf.* Docket No. 62 (Amicus Br. at 6) (noting that "parental deportation is a deeply traumatic and disruptive event, linked to extreme psychological distress, anxiety, depression, post-traumatic stress disorder (PTSD), externalizing behaviors (such as aggression), and difficulties sleeping").

[12] In *Washington v. Trump*, the district court temporarily enjoined an executive order that banned entry into the United States of individuals from seven countries. The government moved for an emergency stay of the district court decision pending appeal. In evaluating, *inter alia*, the balance of hardships and the public interest, the Ninth Circuit noted:

the States have offered ample evidence that if the Executive Order were reinstated even temporarily, it would substantially injure the States and multiple "other parties interested in the proceeding." When the Executive Order was in effect, the States contend that the travel prohibitions harmed the States' university employees and students, separated families, and

stranded the States' residents abroad. These are substantial injuries and even irreparable harms.

*Washington v. Trump*, 847 F.3d at 1168-69.

Second, removal presents a great deal of uncertainty because it is not clear where TPS holders stripped of their legal status in the United States can go. Removal could mean a return to Venezuela which has been in the throes of a political and economic crisis for years, *see, e.g.*, Young Decl. ¶¶ 3, 13-18 (opining that "the political and economic crisis that Venezuela has been experiencing for the last decade continues to this day"; discussing, *inter alia*, political repression in Venezuela throughout the Hugo Chávez and Nicolás Maduro regimes, fraudulent election in July 2024, and mismanaged economy and U.S. economic sanctions that have left over 80% of Venezuelans in poverty and over 50% in extreme poverty); Watson & Veuger Decl. ¶¶ 8-9 (describing economic crisis that began under Hugo Chávez and worsened under Nicolás Maduro, Nicolás Maduro's use of anti-democratic means to maintain power, and fraudulent election in 2024) – **and** which is still classified by the U.S. State Department as a "Level 4: Do Not Travel" country.[13] *See* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (Venezuela travel advisory reissued in September 2024) (designating Venezuela a Level 4 country and stating: "Do not travel to Venezuela due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure"). Removal to a different country is not a readily available option because there is no Venezuelan consulate in the United States where to update or get passports. *See* Ferro Decl. ¶ 16 (Executive Director of Venezuelan American Caucus). And even if there were such an option, the prospect of rebuilding in a new place – finding a job, health care, basic necessities – is no easy task.

[13] The Watson & Veuger Declaration fairly points out that it is not clear how TPS holders could return to Venezuela given that this would "require cooperation with the Maduro regime," which the United States does not recognize and on which the United States has imposed sanctions. Watson & Veuger Decl. ¶ 24.

**\*22** The declarations detailing hardships are compelling. For example, Plaintiff M.H. and her seven-year-old daughter are TPS beneficiaries from Venezuela. *See* M.H. Decl. ¶ 2. TPS is their only form of legal status because of long waits and delays in the asylum and green card processes. *See id.* ¶¶ 11-16. M.H.'s Venezuelan passport is expired, and she has no way to renew it because the U.S. severed diplomatic relations

with Venezuela, so she cannot travel to another country. *See id.* ¶ 24. Her husband and two-year-old son are U.S. citizens. *See id.* ¶ 2. M.H. left Venezuela because of political repression for working with an opposition party, including facing a warrant for her arrest. *See id.* ¶¶ 5, 6. Currently, the family lives in Tennessee, where M.H. cares for the children full-time and volunteers at a local health clinic, while her husband works a full-time job to provide for the family and is gone all day at work. *See id.* ¶ 7. Both roles require M.H. to have a driver's license (which is dependent on her having legal status) to drive her severely asthmatic son to the hospital, her daughter to school, and herself to the clinic to volunteer. *See id.* ¶¶ 7, 8. The son requires M.H.'s daily care because of the risk of asthma attacks. *See id.* ¶ 18. Her family in Venezuela tells her about the ongoing political and economic crisis in the country, including facing shortages of basic necessities and water and power shut offs. *See id.* ¶ 10. These family members rely on remittances from M.H. to survive. *See id.* Without postponement, the DHS actions would result in her TPS expiring on April 7, 2025. *See id.* ¶ 2. This prospect has brought M.H. fear and sadness of being separated from her family and traumatizing her children. *See id.* ¶¶ 19-23. M.H. would lose her driver's license, crucial to her caring for her son's asthma attacks. *See id.* ¶ 18. If removed to Venezuela with her daughter, she fears political persecution, hunger, and facing a lack of housing, healthcare, and basic goods. *See id.* ¶¶ 19-23. The family would be forced to make the difficult decision of separating or all moving to Venezuela, a country that lacks 34 the medical infrastructure to meet the son's needs. *See id.* If the husband remains in the United States, he will have to leave his job to care for the son, leaving both sides of the family without income and health insurance. *See id.*

Plaintiff Freddy Jose Arape Rivas has lived in the U.S. since January 2023 and registered for TPS pursuant to the 2023 Designation. *See* Rivas Decl. ¶ 2. TPS is his sole legal authorization to remain and work in the U.S. *See id.* ¶ 14. In Venezuela, he studied computer science in college but was forced to flee Venezuela due to repression for supporting the opposition party and inability to obtain necessities. *See id.* ¶¶ 5-7. In the United States, he has worked an IT job for an energy and technology company in Texas, and the company is so pleased with his performance that that they sponsored him for an H1B visa application, which is still pending. *See id.* ¶ 8. He has filed a tax return for each year he has lived in the U.S. *See id.* ¶ 9. He is the sole source of economic support for his parents, who have chronic health conditions, and other family members still in Venezuela. *See id.* ¶ 10. Based on the extension of the 2023 Designation (in January

2025), he renewed his lease for his house and extended his employment. *See id.* ¶ 11. Without TPS, Mr. Rivas would lose his job, home, and driver's license; live under constant fear of deportation, particularly to Venezuela where he could be tortured for his prior political opposition; and would no longer be able to provide for his parents and family in Venezuela, including paying for life-saving medications. *Id.* ¶¶ 15-17, 19. Mr. Rivas also has many family members in Texas who are TPS holders themselves, including a cousin who works at a hospital and has a seven-year-old child protected by TPS and two young U.S.-born children. For the child who has TPS, the United States is the only country she remembers. *See id.* ¶ 13.

Plaintiff Cecilia Daniela González Herrera has lived her entire adult life in the U.S. and relies on TPS for legal status because her family's asylum application has been pending for eight years. *See* Gonzalez Herrera Decl. ¶ 2. She and her parents fled political persecution in Venezuela in 2017. *See id.* ¶¶ 4-6. She attends university and works as a voting rights advocacy coordinator. *See id.* ¶ 9. TPS allows her to pay in-state tuition and be eligible for scholarships; without TPS, she would likely be forced to abandon her studies. *See id.* ¶ 10. Ms. Herrera feels scared to go outside for fear of being racially profiled and detained by ICE, and a decline in mental health has caused an inability to focus on schoolwork. *See id.* ¶¶ 14-16. She has no family or home in Venezuela and fears returning to Venezuela and facing violence or harm from the government. *See id.* ¶ 17.

The Executive Director of the Venezuelan American Caucus takes note of even more hardships faced by numerous Venezuelan TPS holders to whom she has spoken:

> small business owners unsure whether to sell their businesses or close their doors; employees who will lose their employment authorization, and their livelihood, in a matter of weeks; students fearful of the loss of financial aid which guarantees their ability to pursue their education; individuals terrified that they will be deported without this essential legal status, and trying to determine whether to stay or flee to avoid this outcome; business owners with employees unsure whether to lay them off in preparation for closure; Venezuelans who have taken out significant loans from banks to start businesses or buy homes and properties, now unable to sleep at night, wondering what to do and how to resolve these matters; and Venezuelans who honestly know they have no grounds to apply for political asylum, and who, wanting to do things the right way, have turned to TPS while they wait for a real solution to the political and humanitarian crisis caused by the dictatorship of Nicolás

Maduro, especially after the largest electoral fraud ever perpetrated in the region in July 2024.

**\*23** Ferro Decl. ¶ 13.

Notably, the government offers no evidence to counter Plaintiffs' showing of irreparable injury. The government conceded at the hearing that it had no counter-evidence and no basis to doubt the bona fides of the factual declarations filed herein. Its main assertion at the hearing was that most of these facts are not relevant, an assertion the Court rejects. They are indeed relevant to the issue of irreparable injury, the public interest, and the balance of hardships.

At best, the government makes a passing claim that conditions have improved in Venezuela, *see* 90 Fed. Reg. at 9042 (in decision to terminate the 2023 Designation, stating that there was "consultation with the Department of the State," that conditions in Venezuela were reviewed, and that "[o]verall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country"), but there is no evidence – not even a country conditions report – to support that claim.[14] The claim is also squarely contradicted by the expert declarations submitted by Plaintiffs, *see, e.g.*, Young Decl. ¶ 3 (opining that "the political and economic crisis that Venezuela has been experiencing for the last decade continues to this day"), and the U.S. State Department's classification of Venezuela as a "Level 4: Do Not Travel" country because of its dangerous conditions.

[14] To be clear, the government represents that Secretary Noem found there to be improvements after examining DHS's "review of country conditions," Opp'n at 6, but no country conditions report has been provided to the Court in conjunction with the pending motion. To the extent the government suggested at the hearing that Secretary Mayorkas found improved conditions when he extended the 2023 Designation, that is not accurate. The Federal Register notice for the extension stated: "Recently, Venezuela's economy has shown some signs of recovery; however, it is still in a precarious condition." 88 Fed. Reg. at 68133.

The government also tenders a legal argument – to wit, that the harms identified by Plaintiffs are not cognizable because they are inherent to the temporary nature of TPS. *See* Opp'n at 22-23 (arguing that, "[w]hile Plaintiffs heavily focus on the burden that TPS beneficiaries will face should

the termination be permitted to go into effect, the underlying cause of this harm flows from the statute ('temporary' protected status) itself" – *i.e.*, "the alleged harms would exist with or without the termination at issue" because "a country's TPS designation must be reviewed at least every 18 months, and there is no guarantee of renewal"). The Court previously rejected this argument in *Ramos, see Ramos*, 336 F. Supp. 3d at 1087 (noting that, "[a]lthough the TPS program is temporary in nature, that does not mean that Plaintiffs' injuries claimed herein are the purely result of the temporary nature of the program as opposed to the government's actions"), and it fares no better here. Although the TPS designations for Venezuela are only temporary, they still afford TPS holders with concrete, meaningful relief: for a fixed period of time, TPS holders have both the right to work and the right to be free from removal, which give not only stability but also security in their lives and time with their families otherwise threatened by Secretary Noem's actions. In short, time matters, even if that time is limited. Certainly, anyone who, for instance, has experienced the loss of a loved one to a terminal illness understands the preciousness of time, even if short.[15]

[15] At the hearing, Plaintiffs also pointed out that time matters in practical terms because some TPS holders have, *e.g.*, asylum applications pending which would provide for longer-term relief. It is possible that adjudications on such applications could be made during the time TPS holders are still present in the United States, *i.e.*, if the Court postpones the agency actions pending judicial review. Removal before the application is acted upon could impact the application, if only as a practical matter.

**\*24** Faced with the above, the government's remaining argument is that the interests of TPS holders are outweighed by other interests – in particular, the public interest in national security. The public interest factor is addressed below. To the extent the government argues the Secretary has an interest in having her actions enforced, that would only be if her actions were lawful. As discussed below, the Plaintiffs have made a showing that the Secretary has acted unlawfully.

2. Public Interest

Contrary to what the government argues, the public interest weighs in favor of, not against, postponement of the agency actions.

a. Economic Impacts

As reflected in the declarations submitted by Plaintiffs and the two Amici briefs (representing the views of a number of states, cities, and counties), Venezuelan TPS holders are integrated into the U.S. communities in which they live. Many are married to, or are parents of, U.S. citizens. A great number work – and in diverse settings. *See also* Morten Decl. ¶ 4 (Professor of Economics at Stanford University) (noting that employment rates associated with TPS holders generally is estimated to be between 81 and 96%); Ferro Decl. ¶ 11 (noting that, "[i]n the United States, TPS holders work in frontline jobs, hospitality, delivery, customer service, retail, restaurants, transportation, construction, factories, and manufacturing, among many other professional fields").

By virtue of their work alone, Venezuelan TPS holders make significant economic contributions to their communities. For example, if one were to consider only the 360,000 Venezuelans who arrived in the United States between 2021 and 2023 (the two TPS designations for Venezuela), "there were approximately 195,000 people age 16 and over who had earnings in the United States in the year before they were interviewed in the [2023 American Community Survey]," and "[t]heir average earnings were $17,981 per person. Termination of their TPS status would result in an estimated 3.5 billion dollar annual loss to the U.S. economy, and an annual loss of 434.8 million dollars in Social Security taxes." Card Decl. ¶ 9(i) (emphasis omitted); *cf.* Watson & Veuger Decl. ¶ 20 ("Economists largely agree that immigration is good for the U.S. economy overall, promoting GDP growth and if anything raising wages for the average U.S. born worker."). If one were to consider the additional 320,000 Venezuelans who were present in the United States in 2023 and who arrived in the country between 2013 (when Nicolás Maduro assumed power) and 2020, there were approximately 230,000 people age 16 and over who had earnings in the United States, and

[t]heir average earnings were $37,161 per person. Assuming a fraction **x** of this group would lose TPS status as a result of the proposed termination, there would be an estimated 8.55**x** billion dollar[ ] annual loss to the U.S. economy, and an annual loss of 1.06**x** billion dollars in Social Security taxes.

Card Decl. ¶ 9(ii).[16]

16    In his declaration, Professor Card also explains that Venezuelan TPS holders who work do not pose a "significant threat to the labor market opportunities of native workers" (*i.e.*, because they "have about the same education as natives" do). Card Decl. ¶ 9(iv).

The two Amici briefs underscore the economic contributions made by TPS holders generally, and Venezuelan TPS holders specifically, because they work, spend, and pay taxes. *See, e.g.*, Docket No. 62 (Amici Br. at 8) ("California TPS households earned $2.1 billion in income, paid $291.2 million in federal taxes, $226.5 million in state and local taxes, and contributed $1.6 billion in spending power. In New York, TPS households earned $2.3 billion in income, paid $348.9 million in federal taxes, $305.5 million in state and local taxes, and also contributed $1.6 billion in spending power. Moreover, at least 41 percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion."); Docket No. 71 (Amici Br. at 6) ("It is ... reasonable to estimate that the 344,335 Venezuelans with approved TPS in 2024 had spending power of approximately $8 billion, if not more given their higher participation in the work force and higher percentage of educational attainment relative to other populations.").

**\*25**  The evidence above on the economic contributions of Venezuelan TPS holders is consistent with evidence that Venezuelan TPS holders have a relatively high level of educational attainment and receive only modest public assistance benefits. *See* Card Decl. ¶ 9(iv) (noting that, with respect to 366,000 Venezuelans who arrived in the United States between 2021 and 2023, 40% have bachelor's degrees and that, with respect to 320,000 additional Venezuelans who arrived between 2013 and 2020, 54% have bachelor's degrees); Card Decl. ¶ 9(vi) (testifying that Venezuelans who arrived in the United States between 2021 and 2023 "received an average of $56.9 in public assistance payments over the previous 12 months" and, "[o]n average, over 96% of their personal income was attributable to their own earnings").

If TPS holders from Venezuela lose their work authorization under the TPS program, there would be additional economic impacts on the United States and the communities where the TPS holders currently live. The cost to companies to replace laid-off TPS employees could be as high as $1.3 billion, *see* Morten Decl. ¶ 7(a) (citing in support a 2017 report from the Immigration Legal Resource Center), and "[e]nding TPS would also impose costs on the government due to deportation expenses.... Deporting approximately 350,000 Venezuelan TPS holders could ... cost taxpayers an estimated

$4.8 billion." Morten Decl. ¶ 7(b). Moreover, if TPS holders no longer have jobs, they or their families may need to seek public assistance. *See* Watson & Veuger Decl. ¶ 27 ("Terminating TPS will increase, not decrease, the burden on localities by preventing TPS holders from working in the formal sector, thus increasing the number of people needing assistance (*e.g.*, the U.S.-citizen children of deported TPS holders and TPS holders who lose their work permit but are not yet removed)."). Without jobs, TPS holders and their families would also lose employer-sponsored health insurance, which would likely increase health care expenditures for local governments. *See* Docket No. 62 (Amici Br. at 9) (explaining that health care expenditures for Amici States would increase "both by increasing the proportion of Venezuelan immigrants who are on public health insurance ... and by increasing public expenditures on emergency care provided to uninsured patients").

### b. Public Safety

Termination of the Venezuelan TPS designations would also have more than just an economic impact on the United States and the local communities where TPS holders live. Public safety would also be implicated. Fears of detention and deportation cause undocumented immigrants to forego medical care, such as diagnostic testing and vaccinations, which increases health risks to the broader community. *See, e.g.*, Watson & Veuger Decl. ¶ 16 (stating that public health would suffer from terminating TPS for Venezuelans because immigrants without legal status forego healthcare for fear of being apprehended at medical facilities); Docket No. 62 (Amici Br. at 10-11). In addition, immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult. *See* Docket No. 62 (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

### c. National Security

Similar to above, the government has offered no evidence to counter that provided by Plaintiffs and Amici. The government conceded, at the hearing, that they had no counter-evidence.[17] Instead, the government simply contends that the public interest weighs against postponement of the agency actions because of national security interests. But the government's assertion that Venezuelan TPS holders pose some kind of danger to the country or the communities where

they live is entirely unsubstantiated. In fact, an individual must be "admissible as an immigrant," 8 U.S.C. § 1254a(c)(1)(A)(iii), in order to be eligible for TPS, which means, *inter alia*, they cannot have been convicted of certain crimes (*e.g.*, a crime involving moral turpitude or drugs) or a member of a terrorist organization. *See id.* § 1182(a)(2)-(3). In addition, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B). It is not surprising, therefore, that Amici state and local jurisdictions from across the United States expressly state they have not faced any "crime wave" because of Venezuelan TPS holders. *See* Docket No. 62 (Amici Br. at 13); *see also* Perez Decl. ¶ 7 (noting that "immigrants have had lower incarceration rates than the U.S.-born throughout American history (including lower incarceration rates than U.S. born whites)" and that "immigrants' relative incarceration rates have actually declined since the 1960s in the U.S.") (emphasis omitted). The government's attempt to cast Venezuelan TPS holders as criminals is also in tension with record evidence reflecting that Venezuelan TPS holders are largely employed and have relatively high education levels. It is a form of group defamation.

[17]   At the hearing, the government appeared to refer to the Federal Register notice for the termination of the 2023 Designation, which stated that "over 180,000 illegal aliens have settled in New York City, [which will] cost the city [approximately] $10.6 billion through the summer of 2025." 90 Fed. Reg. at 9043. But TPS holders are not in the United States illegally.

**\*26**  To the extent the government contends that there is a threat from the Venezuelan gang Tren de Aragua ("TdA"), it has made no showing that any Venezuelan TPS holders are members of the gang or otherwise have ties to the gang. In fact, Plaintiffs have submitted evidence that, although the TdA gang is "a powerful criminal organization in Venezuela and some other parts of South America, there is no evidence of a structured or operational presence in the United States." Dudley Decl. ¶ 16 (Co-Director of InSight Crime). According to the Co-Director of InSight Crime, a think tank that specializes in investigating and analyzing organized crime in the Americas and assessing state efforts to combat these organizations, *see* Dudley Decl. ¶ 4, "local police we have spoken to in the United States have not asserted that [TdA] has any significant criminal operations in the country," and "[t]he few crimes attributed to alleged [TdA] members in the United States appear to have no connection with the larger group or its leadership in Venezuela." Dudley Decl. ¶ 16; *see*

*also id.* ¶ 20 (stating that "[i]t is rare – indeed, practically unheard of – for foreign street and prison gangs from Latin America to gain a significant foothold in the United States in light of a complex array of factors"). InSight Crime also reports that, "[i]n March 2024, a review of all federal and state court databases found only two criminal cases which even mentioned [TdA]," and,

> [b]y February 18, 2025, we had identified only five federal cases of an alleged [TdA] connection. However, none of these cases appeared to be connected to each other or the international structure of the gang outside of the U.S. What's more, the details of the cases do not suggest any sophisticated criminal operations or modus operandi, and there was no discernable pattern of criminal behavior or indications these individuals were seeking to regroup with [TdA] members or other gangs.

*Id.* ¶ 19.

Finally, even assuming a legitimate concern about the presence of TdA gang members in the United States, the government has failed to show that it cannot deal with that specific problem through other means. As noted above, anyone who is convicted of a felony or two misdemeanors or an act of terrorism will be ineligible for TPS status. The government has made no showing the traditional law enforcement and immigration measures cannot handle criminal problems that might be caused by the TdA and that *en masse* action stripping all Venezuelan nationals of TPS status is necessary. In addition, the government has shown no basis for attributing criminality to the entire population of Venezuelans or Venezuelan TPS holders in the United States and seeking their exclusion wholesale instead of focusing on specific TdA gang members. *Cf. Korematsu v. United States*, 323 U.S. 214, 218-19, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (stating that "exclusion of those of Japanese origin [from the West Coast war area] was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country"), *abrogated by Trump v. Hawaii*, 585 U.S. 667, 710, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (stating that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and – to be clear – 'has no place in law under the Constitution' ").

Indeed, there is uncontradicted evidence in the record that stripping Venezuelan beneficiaries of TPS protection would impede law enforcement and threaten public safety. As noted above, immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making

effective law enforcement more difficult. *See* Docket No. 62 (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

Finally, the government's interest in national security is unclear. Terminating TPS could actually have adverse ramifications to national security (in addition to impeding domestic prosecutions) because "deporting Venezuelan TPS holders will require cooperation with the Maduro regime." Watson & Veuger Decl. ¶ 24. Since taking office in January 2025, the Trump administration has made an agreement with the Maduro government to resume deportations to Venezuela. *See id.* And yet, this action would seem to contradict U.S. foreign policies that have refused to recognize Nicolás Maduro as the legitimate president of Venezuela since 2019. *See id.* ¶¶ 8, 24. Indeed, the U.S. is still offering a $25 million reward for information leading to Nicolás Maduro's arrest and/or conviction. *See id.* ¶ 8. Therefore, it would seem that normalizing relations with Nicolás Maduro to deport immigrants "to a place known for human rights abuses may also weaken the standing of the United States in the international community and adversely affect national security." *See id.* ¶ 24. It is hard to discern precisely what the U.S. interest is in this instance.

### 3. Balance of Hardships

**\*27** As discussed above, Plaintiffs have provided significant evidence that TPS holders and their families would suffer irreparable harm if they are not afforded temporary relief, and the public interest also weighs in favor of Plaintiffs because of the substantial economic, public safety, and humanitarian ramifications. In contrast, the government's contention that the public interest weighs in its favor is not convincing because the government lacks any evidence of national security harms. Accordingly, the balance of hardships (including consideration of the public interest) tips sharply in Plaintiffs' favor.

### 4. Likelihood of Success on the Merits

Because the balance of hardships tips sharply in their favor, Plaintiffs need only show serious questions going to the merits of their claims. *See All. for the Wild Rockies*, 865 F.3d at 1217. But as discussed below, Plaintiffs have not only shown that there are such serious questions; they have also established a likelihood of success on the merits, thus entitling them to postponement of the Secretary's vacatur and termination even without the benefit of the sliding scale test.

a. Authority to Vacate Extension of 2023 Designation

The threshold question is whether Secretary Noem lacked the authority to vacate the extension of the 2023 Designation.[18] Plaintiffs are likely to succeed on the merits of this issue. As noted above, this is the first time that an extension of a TPS designation has ever been vacated in the statute's history. While the Secretary has the ultimate authority to terminate a TPS designation and can "change her mind," she may do so only under the terms and timeframe set forth in the TPS statute.

[18]    As noted above, the government has conceded that § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs' claim that the Secretary lacked the inherent authority to vacate the extension of the 2023 Designation.

i. Notice of Vacatur

In the notice of vacatur, the Secretary stated: "An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination." 90 Fed. Reg. at 8806. In a footnote, she cited the following:

> See INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion.... "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Mactal*

*v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

**\*28**  *Id.* at 8806 n.2.

ii. Authorities Cited by the Secretary

As an initial matter, the Court takes note that the statutes cited by the Secretary do not give her the authority to vacate.

- 8 U.S.C. § 1103(a)(1) is simply a general provision stating that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens ...."

- 8 U.S.C. § 1254a(b)(3) is about periodic review, terminations, and extensions of TPS.

- 8 U.S.C. § 1254a(b)(5) is the jurisdictional provision – stating that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

Thus, ultimately, the Secretary's claim for authority to vacate rests on the concept of inherent authority to reconsider.

As a general matter, the government is correct that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). But

> the term "inherent" is misleading because "it is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.' " Thus, "the more accurate label" for the power EPA describes "is **'statutorily implicit.'** " And although the power to decide is **normally** accompanied by the power to reconsider, **"Congress ... undoubtedly can limit an agency's discretion to reverse itself."**

*NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (emphasis added); *see also Ivy Sports*, 767 F.3d at 86 (stating that "any inherent reconsideration authority does not apply in cases where Congress has spoken"). Thus, the power to reconsider and revoke prior agency decision is not universally inherent, but is "statutorily inherent" – it turns on construction of the governing statute. For instance, "an agency may not rely on inherent reconsideration authority 'when Congress has provided a mechanism capable of rectifying mistaken actions.' " *Id.*; *see also id.* at 87 (stating that "it would be unreasonable under [the] statutory scheme to infer that FDA retains inherent authority to short-circuit or end-run **the carefully prescribed statutory reclassification process** [for a medical device] in order to correct the same mistake") (emphasis added).

Ninth Circuit authority is consistent with that of the D.C. Circuit. To determine whether an agency has the statutorily implicit authority to reconsider an earlier agency decision depends on the statute and whether such legislative intent to confer such authority can be inferred. For example, in *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), the Ninth Circuit considered whether the Attorney General's "power to confer citizenship through the process of naturalization necessarily includes the power to revoke that citizenship." *Id.* at 1089. The Ninth Circuit noted that, "[b]ecause 'an agency may not confer power upon itself,' the Attorney General needs some statutory authority to have the power to take away an individual's American citizenship." *Id.* at 1092-93. The court reviewed the "established and carefully constructed statutory scheme" which provided, *inter alia,* that U.S. attorneys could institute actions to revoke naturalization in federal court and that the Attorney General could cancel "certificates of citizenship"[19] but such cancellations affected only the document and not the citizenship status itself. The Ninth Circuit held that "implying authority for the Attorney General to take away people's citizenship administratively would gravely upset this carefully constructed legislative arrangement." *Id.* at 1094.

19    "The certificate of naturalization is issued by the Commissioner of Immigration and Naturalization. It says, 'the Attorney General having found that' the person is entitled to citizenship and has met the requirements and taken the oath of allegiance, 'such person is admitted as a citizen of the United States of America.' " *Gorbach*, 219 F.3d at 1090.

**\*29**   Notably, the court recognized the "heart" of the government's argument was that "the power to denaturalize is

'inherent' in the power to naturalize" but it explicitly rejected that contention. *Id.* at 1095.

> The formula the government urges, that what one can do, one can undo, is sometimes true, sometimes not. A person can give a gift, but cannot take it back. A minister, priest, or rabbi can marry people, but cannot grant divorces and annulments for civil purposes. A jury can acquit, but cannot revoke its acquittal and convict. Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.

*Id.* at 1095. The agency power to revoke prior action was sufficiently circumscribed to preclude an inference of statutorily implicit power to reconsider the grant of citizenship.

In *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024) [hereinafter *CUA*], the Ninth Circuit held that the agency *did* have the implicit authority to reconsider the decision at issue but, again, only after reviewing the statutory scheme to determine what was Congress's intent. *See, e.g., id.* at 1149 (noting that, "[w]here Congress has provided a particular mechanism, with specified procedures, for an agency to make such alterations, 'it is not reasonable to infer' an implied authority that would allow an agency to circumvent those statutory procedural protections"). CUA, the plaintiff in the case, was a California company but ultimately owned by the Chinese government. It "was authorized to provide domestic and international telecommunications services pursuant to certificates granted to it many years ago" by the FCC under § 214 of the Communications Act of 1934. *Id.* at 1132. In 2020, the FCC "issued an order directing CUA to show cause why the FCC should not revoke its § 214 certificates" based on "national security concerns," as articulated during proceedings in which the agency had denied an application for a § 214 authorization submitted by a *different* Chinese government-owned carrier. *Id.*; *see also id.* at 1136 (noting that the other proceedings raised concerns about "the susceptibility of Chinese state-owned enterprises, including subsidiaries, to Chinese government influence, control, and exploitation"). Ultimately, in 2022, the FCC revoked CUA's certificates "on the grounds that CUA's retention of them presented an unreasonable national security risk and, separately, that CUA had exhibited a lack of candor and trustworthiness over the course of the proceedings." *Id.* at 1132; *see also id.* at 1141.

Before the Ninth Circuit, CUA argued that, "as a matter of law, the FCC lacks any statutory authority [including implicit] to revoke a § 214 certificate, except as a penalty imposed

in connection with adjudicated violations of applicable law." *Id.* at 1142. The court disagreed after reviewing the statutory text and structure. The Ninth Circuit acknowledged that, in a different title in the Communications Act that dealt with radio licensing, there was an express provision that empowered the FCC to revoke any station license for a variety of reasons. But,

> [i]n our view, no negative inference can be drawn from the fact that the "radio" licensing provisions in Title III of the Communications Act contain an express revocation provision, while the common-carrier certificate provisions in Title II do not. As the Supreme Court has noted, the two distinct regulatory systems established under Title II and Title III are very different, because, in "contradistinction" to wire-telecommunications carriers, the Act recognizes that "broadcasters are not common carriers and are not to be dealt with as such." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 1037 (1940) (footnote omitted).... **Indeed, given that broadcast licenses are generally issued for fixed, renewable terms of up to eight years,** *see* **47 U.S.C. § 307(c)(1), the statute reflects a clear temporal expectation that, absent contrary indication in the statutory text, such a license will endure for the length of that term. The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time, and it is therefore unsurprising that Title III contains a provision expressly recognizing an agency power of revocation.** By contrast, as noted earlier, Title II's silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in favor of an implied power of revocation.

**\*30** *Id.* at 1147-48 (emphasis added). The court thus held that

> the FCC possesses statutory authority to revoke a § 214(a) certificate by invoking grounds that it may properly consider in denying issuance of such a certificate as an original matter. Of course, any actual exercise of such authority must consider the relevant constraints that may be placed upon that action by the Constitution, other statutes, or applicable principles of administrative law. In some cases, such as ones involving substantial reliance interests, those constraints may be significant and may preclude a particular exercise of such authority.

*Id.* at 1150-51; *see also id.* at 1160-61 (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).[20]

20

As indicated above, Judge Bea issued a dissent in *CUA*. Judge Bea stated that "the specificity of § 214's provision of authority to the FCC to grant a certificate to start, to modify, to change, or to end services only upon a telecommunications carrier's application would normally imply Congress intended not to grant the FCC the authority to take a different course of action with respect to such certificates." *CUA*, 124 F.4th at 1158. He also rejected

> the premise that the power to refuse certification is the functional equivalent of the power to revoke certification ... because it ignores the reliance interests carriers may develop in their § 214 certificates.
>
> A business that is refused a certificate can decide to expend no further capital – money – for its proposed enterprise. But a business that has been granted a certificate is likely to have invested further capital, time, and resources into existing infrastructure in reasonable reliance on the vested right to build a telecommunications line pursuant to its duly granted § 214 certificate. Simply put, there is a material difference between the power to refuse and the power to revoke. It is not reasonable to assume that the power to grant, to refuse, or to condition a grant also encapsulates the power to revoke.
>
> *Id.* at 1161 (citing *Gorbach*).

Hence, the critical question in the instant case is whether there is anything in the statutory scheme of the INA suggesting that the Secretary does or does not have the inherent authority to vacate a TPS designation or extension.

### iii. Statutory Analysis

Plaintiffs argue that the Secretary does not have the implicit authority because the TPS statute lays out specific timelines and processes for TPS designations, extensions, and terminations.

> The fixed terms of TPS designations, extensions, and terminations, and the statutorily prescribed processes governing how the Secretary must proceed after an initial TPS designation, are inconsistent with implicit vacatur authority. Unless otherwise specified in the original notice, an initial designation "take[s] effect upon the date of publication of the designation" and "shall remain in effect until the effective date of the termination of the designation." 8 U.S.C. § 1254a(b)(2). The same is true of extensions. 8 U.S.C. § 1254a(b)(3)(C). "At least 60 days before the end of the initial period of designation, and any extended period of designation," the Secretary "after

consultation with appropriate agencies of the Government, shall review the conditions in the foreign state ... and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary must "provide on a timely basis for the publication of such determination ... in the Federal Register." *Id.* If the Secretary determines "that a foreign state ... no longer continues to meet the conditions for designation" the Secretary "shall terminate the designation by publishing a notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Without such a determination, the designation "is extended." 8 U.S.C. § 1254a(b)(3)(A) & (C). Extensions take effect immediately, and last for the length of time specified in the notice, up to 18 months. *Id.* In contrast, a termination "shall not be effective earlier than 60 days after the date the notice is published *or, if later, the expiration of the most recent previous extension.*" 8 U.S.C. § 1254a(b)(3)(B) (emphasis added).

**\*31** Mot. at 6 (italics in original).

Plaintiffs' analysis is compelling. Secretary Noem's claim that she had the inherent right to vacate the extension of the 2023 Designation effectively gave her the power to countermand Secretary Mayorkas's decision and in practical terms terminate the TPS designation given to Venezuela is at odds with the structure of the TPS statute. The TPS statute is specifically prescriptive as to the time frame within which a TPS designation may be terminated. *See* 8 U.S.C. § 1254a(b) (3)(B) (providing that a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension"). It expressly provides that termination of TPS designation can be *no earlier* than the *expiration* of the most recent extension. It does not permit the Secretary to terminate a TPS designation "midstream" during the term of the prior designation. Yet, the upshot of the Secretary's action herein does just that. And while the statute carefully and expressly sets forth in detail the process of "designation," "extension," and "termination," it says *nothing* about vacatur.

The Ninth Circuit's *CUA* decision is particularly instructive here. As noted above, in *CUA*, the Ninth Circuit reasoned that,

> given that broadcast licenses are generally issued for fixed, renewable terms of up to eight years, *see* 47 U.S.C. § 307(c)(1), the statute reflects a clear temporal expectation that, absent contrary indication in the statutory text, such a license will endure for the length of that term. The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time, and it is therefore unsurprising that Title III [addressing radio licensing] contains a provision expressly recognizing an agency power of revocation. By contrast, as noted earlier, Title II's silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in favor of an implied power of revocation.

*CUA*, 124 F.4th at 1148 (emphasis added). Here, "clear temporal expectations" are reflected in the TPS statute, and the clear stated terms for extensions and terminations of TPS designations are likewise "affirmatively inconsistent with the positing an implied power to revoke" or vacate a prior designation (or extension). *Id.*

It is also worth noting that, in the vacated *Ramos* decision, the panel noted that "Congress enacted the TPS statute to curb and control the executive's **previously unconstrained discretion** under the [extended voluntary departure] process ...." *Ramos*, 975 F.3d at 890 (emphasis added); *cf. NRDC v. Regan*, 67 F.4th at 401-02 (noting that, "[i]n 2011, EPA determined that perchlorate satisfied the statutory criteria for regulating," and, therefore, "[u]nder the statute, ... EPA has one authorized course of action: it 'shall' propose and promulgate the MCLG and regulations, and it 'shall' do so by the statutory deadlines"; "[t]o read into the statute another course of action – one that allows EPA to withdraw its regulatory determination entirely and decide that it 'shall not' regulate – would be to contravene the statute's clear language and structure and 'nullif[y] textually applicable provisions **meant to limit [EPA's] discretion**' ") (emphasis added). To permit the Secretary unconstrained discretion to revoke, at any time, a prior TPS designation would not be consistent with Congress's general intent to cabin such discretion.[21]

21      To be sure, the *Ramos* panel also stated that, "to the extent the TPS statute places constraints on the Secretary's discretion, it does so in favor of limiting unwarranted designations or extensions of TPS." *Ramos*, 975 F.3d at 891. Nevertheless, the limitations that Congress established by setting forth the specific circumstances under which designations, extensions, *or* terminations evidence a more general intent to constrain discretion.

**\*32** To the extent the government relies on a prior claim by the Biden administration of the implicit authority to reconsider – specifically, when dealing with the TPS designation for El Salvador, *see* 88 Fed. Reg. 40282, 40285

(June 21, 2023) – that reliance is misplaced for several reasons. First, prior agency practice is not dispositive. *See New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) ("[P]revious statutory violations cannot excuse the one now before the court. '[W]e do not see how merely applying an unreasonable statutory interpretation for several years can transform it into a reasonable interpretation.' "). Simply put, the legality of the action by the Biden administration was not tested in court.

Second, assuming the action of the Biden administration was legally authorized, the Biden administration reconsidered a decision to *terminate* a TPS designation, not a decision to *extend* a TPS designation. This difference is significant. Where a TPS extension is given, it creates important reliance interests.[22] *See, e.g.*, Rivas Decl. ¶ 12 (testifying that, the day the extension of the 2023 Designation was given, he submitted his renewal application, he thereafter received a receipt that confirmed his work authorization was extended for 540 days, he provided that information to his employer so he could continue to work, and, "[w]ith that assurance, [he] renewed [his] lease on [his] home").[23] Indeed, the TPS statute itself implicitly recognizes the importance of such reliance interests because it provides that, during periodic review of a TPS designation, if the Secretary does not make an express decision that the foreign country "no longer meets the conditions for designation ..., the period of designation of the foreign [country] is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 to 18 months)." 8 U.S.C. § 1254a(b)(3)(C). It essentially provides extension as a default and its effect can be immediate. In contrast, the TPS statute partially builds in some delay before termination of TPS becomes effective: termination does not take effect until the later of 60 days from the date of notice or the expiration of the most recent previous extension. *See* 8 U.S.C. § 1254a(b)(3)(B). Thus, given the difference in reliance interests (between extensions and terminations) and the structure of the statute, even if there is room to argue that the Secretary has the implicit authority to vacate a decision to terminate, the same cannot necessarily be said for a decision to extend.

22    *Cf. CUA*, 124 F.4th at 1150-51 (recognizing that, "[i]n some cases, such as ones involving substantial reliance interests, ... constraints [on an agency's authority to revoke] may be significant and may preclude a particular exercise of such authority [to revoke]"); *id.* at 1160-61 (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).

23    The government has suggested that there cannot be any real reliance interests in the instant case because Secretary Noem vacated Secretary Mayorkas's extension shortly after it was given. The Rivas Declaration is but one example of why that argument lacks merit.

Third, as Plaintiffs point out, it is notable that the Biden administration reconsidered terminations only after they had already been

> *enjoined for five years*; [the terminations] never took effect. Agencies have flexibility to undo decisions already found unlawful by courts. *United Gas Improvement Co. v. Callery Props., Inc.*, 382 U.S. 223, 229-30, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) (agency had power to "undo what is wrongfully done" when original decision never became final and was overturned on judicial review).

**\*33**   Mot. at 7 (emphasis in original).

Ultimately, the government's main response to Plaintiffs' position is that it is extreme – *i.e.*, under Plaintiffs' position, "no Secretary of Homeland Security could ever vacate a designation or extension of a designation, no matter the type of national security threat posed or the seriousness of the error or legal defect in the prior determination" (unless the specific timeline under the TPS statute allowed for a new determination to be made). Opp'n at 15. The government's argument may have some surface appeal, but it is ultimately unpersuasive.

First, Secretary Noem's decision to vacate the extension of the 2023 Designation was not based on any claimed national security interest. While this rationale may have been one basis of her subsequent decision to terminate (a basis which, as discussed below, is unsupported by any evidence), her decision to vacate the extension was based on her purported belief that Secretary Mayorkas's decision was novel, possibly in violation of the TPS statute, and engendered confusion regarding registration process. It was not based on any claim of national security.

Second, "[r]egardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotation marks omitted). Thus, as Plaintiffs point out, in spite of possible national security interests, the Secretary does not have the ability, *e.g.*, to "revoke en masse green

cards, H-1B visas, or student visas; such authority resides with Congress." Reply at 7. Congress did not create a national security exception to the framework it prescribed for the termination of TPS status. Instead, under the TPS statute, national security is an explicit consideration in one circumstance: when granting TPS to a foreign country on the basis of extraordinary and temporary conditions. *See* 8 U.S.C. § 1254a(b)(1)(C) (providing for TPS designation if the Secretary "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States").

Third, to the extent concern for national security comes into play, the TPS statute accounts for that in several ways: (a) TPS is temporary, not permanent, in nature; (b) the Secretary is to consult with other government agencies before making a decision on TPS designations, terminations, or extensions, and, presumably, the agencies would alert her to any potential for concern; and (c) if there are any concerns, the Secretary can issue a TPS designation of short duration (*e.g.*, 6 months instead of 18).

Perhaps more to the point, the Secretary maintains the authority to *withdraw* a TPS holder's status if a beneficiary presents a danger to national security: the Secretary "shall withdraw [TPS] granted to an alien ... if [the Secretary] finds that the alien was not in fact eligible for such status," 8 U.S.C. § 1254a(c)(3)(A), and ineligibility includes, *e.g.*, committing a crime involving moral turpitude, committing a felony, or being a member of a terrorist organization. Moreover, the government, of course, has law enforcement resources to address any such threat posed by an individual or group of individuals. Indeed, the government has already attempted to employ extraordinary means against putative TdA gang members. *See generally J.G.G. v. Trump*, No. 25-766 (JEB) (D.D.C.) (addressing claim brought by Venezuelan noncitizens fearing removal pursuant to the Alien Enemies Act of 1798 instead of the INA). Revocation/vacatur of TPS status en masse because of the suspect acts of a few would be statutory overkill. Nothing in the TPS statute indicates there is an exception to its statutorily imposed temporal limitations and expectations that would implicitly permit the Secretary to vacate at will, in midstream, a TPS designation still in effect.

**\*34**  Accordingly, the Court concludes that Plaintiffs have established a likelihood of success on the merits for their claim that Secretary Noem lacked the inherent authority to vacate the extension of the 2023 Designation. And if Secretary Noem lacked the authority to vacate the extension, she necessarily did not have the authority to terminate the 2023 Designation thereafter, which Secretary Mayorkas had extended to October 2026.

b. Arbitrary and Capricious – Legal Error

Given the Secretary did not have the legal right to vacate the 2023 extension, the Plaintiffs have established a likelihood of success on the merits. But even if, contrary to the above analysis, the Secretary had the implicit authority to reconsider and vacate the extension of the 2023 Designation (*i.e.*, could supplant Secretary Mayorkas's decision on whether to terminate or extend with her own), Plaintiffs would still be entitled to relief. This is because, as Plaintiffs argue, even if the Secretary had the authority to vacate the extension, her vacatur was founded on legal error and thus was arbitrary and capricious. *See* 5 U.S.C. § 706(2).

In vacating the extension of the 2023 Designation, the Secretary claimed that the extension did not simply extend the 2023 Designation to October 2026 but also, in effect, extended the 2021 Designation to the same 2026 date. *See* Opp'n at 16 ("By consolidating the registration processes for both the 2021 and 2023 TPS designations, the notice had the practical effect of extending the 2021 Designation by up to 13 months and allowing for employment authorization for that period as well."). She characterized this as a "novel approach." 90 Fed. Reg. at 8807 ("The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation.").

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and

inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

But Secretary Noem's stated rationale was legally erroneous. As Plaintiffs argued in their papers and at the hearing, the Secretary failed to recognize that a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation.

> [E]very earlier designation is "subsum[ed]" by a later one because redesignation expands the pool of potential beneficiaries **to include not only those who qualified under an earlier designation, but also those who arrived after their country was first designated**. *See* 8 U.S.C. § 1254a(c)(1)(A)(i) (TPS applicants must have been "continuously physically present in the United States since the effective date of the most recent designation of [their country]"). Thus, TPS holders who initially registered for TPS under Venezuela's 2021 designation had to prove they remained continuously present since March 9, 2021. 86 Fed. Reg. 13575. Accordingly, they **necessarily** also satisfied the later continuous presence requirement in Venezuela's 2023 re-designation."

 **\*35** Mot. at 9 (emphasis added). When Secretary Mayorkas extended the 2023 Designation, he simply recognized that a TPS holder under the 2021 Designation could choose to register as a TPS holder under the 2023 Designation:

> **Will there continue to be two separate filing processes for TPS designations for Venezuela?**
>
> No. USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations. To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations. To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension**. This would not, however,

require that a beneficiary registered under the March 9, 2021 designation to re-register at this time. Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

*Id.* at 5964 (some emphasis added).

Contrary to what Secretary Noem suggested, streamlining the two tracks for the two designations into one (so long as a TPS holder under the 2021 Designation was willing to register under the 2023 Designation) would tend to eliminate, not create, confusion – *i.e.*, confusion that could arise based on the fact that there are two tracks. Moreover, contrary to what Secretary Noem suggested, as a factual matter, it was not "novel" for different tracks to be streamlined as part of a TPS process. Plaintiffs have pointed out that there has been similar streamlining for both the Sudan and Haiti TPS designations. *See, e.g.*, 79 Fed. Reg. 52027, at 52028-29 (Sept. 2, 2014) (extending Sudan's TPS designation and establishing one process for re-registration, regardless of which designation individual initially registered under); 88 Fed. Reg. 5022, at 5028 (Jan. 26, 2023) (permitting "[i]ndividuals who [initially registered for TPS under Haiti's 2010 or 2011 designation and] currently retain their TPS [through June 30, 2024] under the *Ramos* injunction" to "re-register" under a later redesignation to receive TPS through August 3, 2024).

Furthermore, nothing in the TPS statute prevents the Secretary from extending TPS designation of a country well in advance of the natural expiration date of the prior designation. The statute only requires that the Secretary review the designation at least 60 days in advance of the expiration. *See* 5 U.S.C. § 1254a(b)(3)(A) ("*At least* 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.") (emphasis added). It does not place a limit on how far in advance the extension may be considered and granted. Thus, to the extent the extension of the 2023 Designation had the independent effect of extending the status of the 2021 Designation 8 months in advance of the September 2025 expiration date, it was entirely consistent with the TPS statute.

**\*36** Thus, the practical operation of the extension of the 2023 Designation was not "novel," did not engender undue confusion as to registration, and was entirely consistent and compliant with the TPS statute. The Court therefore concludes that Plaintiffs are likely to succeed on their claim that the decision to vacate (assuming the Secretary had implicit authority to vacate) was arbitrary and capricious because it was based on legal (as well as factual) error.

c. Arbitrary and Capricious – Failure to Consider Alternatives Short of Termination

Even if vacatur were permitted and not founded on any legal error, the vacatur was still arbitrary and capricious because, in revoking prior action, the Secretary failed to consider alternatives short of termination.

As a general matter, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016). But "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].' " *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020).

Here, there were alternatives within the ambit of the existing policy that the Secretary failed to consider. Most notably, if Secretary Noem was truly concerned about confusion arising from Secretary Mayorkas's decision to allow 2021 TPS holders to register as 2023 TPS holders, she easily could have chosen to "deconsolidate" the registration process and keep the 2021 and 2023 Designations on two different tracks – with the 2021 Designation ending in September 2025 and with the 2023 Designation still ending in October 2026. But Secretary Noem did not so act – effectively demonstrating that confusion was not her concern so much as the desire to totally undo Secretary Mayorkas's decision.

The government admitted as much at the hearing. The government conceded the Secretary's ultimate goal extended beyond minimizing registration confusion; it was to revisit and undo Secretary's Mayorkas's decision to extend the TPS designation for Venezuela to October 2026. The government also effectively conceded as much in its papers. In the opposition brief, the government asserted:

In issuing the Vacatur, Secretary Noem indicated that the decision to vacate provided "an opportunity for informed determinations regarding the TPS designations and clear guidance." 2025 Vacatur, 90 Fed. Reg. at 8807 (citing Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025)). Thus, the alternative of simply deconsolidating the re-registration periods would not meet the stated reasons for the 2025 Vacatur and is neither arbitrary and capricious nor an impermissible decision.

Opp'n at 17. The failure to consider the alternative action to address the stated reasons for the vacatur further renders the vacatur arbitrary and capricious.

d. Equal Protection – APA and Constitutional Claims

Finally, Plaintiffs contend that they are likely to succeed on their equal protection claim[24] – *i.e.*, that the Secretary's decisions to vacate and terminate TPS for Venezuelans are unconstitutional because they were motivated at least in part by animus based on race, ethnicity, or national origin. Based on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus.

[24]    Plaintiffs' complaint could suggest that the equal protection claim is a constitutional claim alone but, as Plaintiffs noted at the hearing, an APA claim can also be based on a constitutional violation. *See* 5 U.S.C. § 706(2) (providing that a court may hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity").

**\*37** "As a general matter, where an equal protection claim is based on membership in a suspect class such as race [or ethnicity or national origin] or the burdening of a fundamental right, then strict scrutiny is applied; otherwise there is only rational review." *Litmon v. Brown*, No. C-10-3894 EMC, 2012 WL 243330 at \*2, 2012 U.S. Dist. LEXIS 8381 at \*4-5 (N.D. Cal. Jan. 25, 2012); *see also Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2004) (stating that, "[w]hen no suspect class is involved and no fundamental right is burdened, we apply a rational basis test to determine the legitimacy of the classifications").

In spite of this general principle, the government argues that a deferential review should still apply in the instant case because the DHS's actions were based on national security

interests. In support, it cites *Trump v. Hawaii*, 585 U.S. 667, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018). This Court, however, rejected application of *Trump v. Hawaii* in the *Ramos* case, and so did the Ninth Circuit (vacated) panel decision. Central to the Court's reasoning was that

> the TPS-beneficiaries here, unlike those affected by the Proclamation in *Trump [v. Hawaii]*, are already in the United States. They are not aliens abroad seeking entry or admission who "have no constitutional right of entry"; TPS-beneficiaries have been admitted to the United States. As Plaintiffs currently reside lawfully in the United States, this case is unlike *Trump [v. Hawaii]*; it does not implicate "the admission and exclusion of foreign nationals," who have "no constitutional rights regarding [their] application" in light of the "sovereign prerogative" "to admit or exclude aliens." Hence, the basis for invoking broad judicial deference to executive action in excluding aliens does not apply.

*Ramos*, 321 F. Supp. 3d at 1129; *see also id.* (adding that "aliens *within* the United States have greater constitutional protections than those *outside* who are seeking admission for the first time") (emphasis added). The Court also noted that

> the executive order at issue in *Trump [v. Hawaii]* was issued pursuant to a very broad grant of statutory discretion: Section 1182(f) "exudes deference to the President in every clause" by "entrust[ing] to the President the decisions whether and when to suspend entry ...; whose entry to suspend ...; for how long ...; and on what conditions." In contrast, Congress has not given the Secretary *carte blanche* to terminate TPS for any reason whatsoever. Rather, the TPS statute empowers the Secretary of Homeland Security discretion to initiate, extend, and terminate TPS in specific enumerated circumstances. Even though the statute circumscribes judicial review, Congress prescribed the discretion of the Secretary in administering TPS.

*Id.* at 1130. The Ninth Circuit panel in *Ramos* invoked similar reasoning, stating that "the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time." *Ramos*, 975 F.3d at 896.

To be sure, in *Ramos*, there was a further confluence of the fact that the government had asserted "to a lesser extent" national security and foreign policy reasons as a basis to terminate TPS. *Ramos*, 975 F.3d at 896; *cf. Ramos*, 321 F. Supp. 3d at 1129. Here, the government does assert, perhaps more strenuously than in *Ramos*, that the Secretary's decisions in vacating the extension of the 2023 Designation and in terminating the designation were informed by these additional concerns.

**\*38** However, as noted above, the decision to vacate the extension did not cite national security as a rationale therefor. Nor did it cite an interest in effecting foreign relations in connection with the vacatur decision. Thus, the deferential standard of *Trump v. Hawaii* does not apply to Secretary Noem's vacatur decision.

As to Secretary's Noem's second decision – to terminate the 2023 Designation – the invocation of national security and foreign relations is insufficient to implicate *Trump v. Hawaii*'s deferential standard.[25] The government does not get a free pass to deferential review under *Trump v. Hawaii* simply because it makes an *ipse dixit* assertion that there is a national security interest. There must be some basis for such a claim, but, as the Court has discussed above, the government's claim of a national security interest is not supported by any concrete evidence. The government has referred to the TdA gang, but (1) "the danger of criminal conduct by an alien is [not] automatically a matter of national security," *Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir. 2004), and (2) even if the TdA is a foreign terrorist organization that poses a national security threat (as claimed by President Trump in Executive Order 14157 (*see* 90 Fed. Reg. at 9042-93)), there is no evidence to tie TPS holders to TdA or even to establish that TdA has a substantial presence in the United States. *See generally* Dudley Decl. ¶ 16. Nor has the government demonstrated that its employment of law enforcement resources cannot handle the criminal threat posed by members of the TdA. *See* page ——, *supra*.

25    As discussed above, § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs' equal protection claim because "there is no 'clear and convincing' evidence that Congress intended to preclude the Court from reviewing constitutional challenges of the nature alleged." *Ramos*, 321 F. Supp. 3d at 1105; *see also Ramos*, 975 F.3d at 895 (panel decision entertaining the equal protection claim on the merits); *accord* 5 U.S.C. § 706(2)(B) (providing that a court shall "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right, power, privilege, or immunity").

Nor is there any basis to the government's claim that the vacatur and termination of Venezuelan TPS status effected relations with Venezuela. The government suggests that there is a "magnet effect" associated with a TPS designation, but that assertion does not address how there is a magnet effect for an *extension* of TPS (not a designation or redesignation) which does not make more people eligible for TPS. *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason that the extension of an existing TPS designation would act as an immigration magnet. TPS status is not available to those arriving after the 2023 designation.").

The government also seems to suggest that there can be no equal protection violation because Secretary Noem's actions were focused on the nation of Venezuela, and not the race of its people, and "[n]ational origin is inherently part of TPS." Opp'n at 21. This argument misses the point. The point is not that a person has been treated on the basis of national origin, which as the government asserts, is inherent in the TPS decisions which are made on a country-by-country basis. Rather, the claim here is that the decisions made against Venezuelan TPS beneficiaries are driven by animus and generalized stereotypes directed against them. Plaintiffs also claim that the decisions made by Secretary Noem are infected by racial animus. Moreover, courts must be mindful of the fact that there can be overlap between national origin and race. *See, e.g., St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Brennan, J., concurring) (noting that "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or nation of ... origin,' is not a bright one"); *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (stating that "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case" – *e.g.*, "[r]ace and national origin discrimination may present identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group' "); *Krowel v. Palm Beach Cnty.*, No. 22-cv-81958, 2023 WL 3157429 at *3, 2023 U.S. Dist. LEXIS 76203 at *7-8 (S.D. Fla. Apr. 27, 2023) (stating that, as recognized by other courts, "discrimination based on national origin often overlaps with other forms of racial discrimination").

**\*39** Animus and stereotypes based on national origin and/or race trigger strict scrutiny. *See Valeria v. Davis*, 320 F.3d 1014, 1020 (9th Cir. 2003) ("[D]iscriminatory intent, by itself, triggers strict scrutiny ...."). Strict scrutiny applies if such discriminatory purpose is a motivating factor. *Cf.*

*Cal. v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1023 (N.D. Cal. 2020). The framework for discerning whether a discriminatory purpose was a motivating factor is set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *id.* at 265-66, 97 S.Ct. 555 (noting that a plaintiff does not have to "prove that the challenged action rested solely on racially discriminatory purposes" or that such was a dominant or primary purpose). That is, *Arlington Heights* provides a methodology for determining whether a discriminatory purpose was a motivating factor.

In *Arlington Heights*, the Supreme Court indicated that there could be either direct or circumstantial evidence of a discriminatory purpose and further provided examples of what evidence would support a discriminatory purpose – *e.g.*:

- "The impact of the official action – whether it 'bears more heavily on one race than another.' " *Id.* at 266, 97 S.Ct. 555.

- "The historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. 555.

- "The specific sequence of events leading up to the challenged decision," including "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*

- "The legislative or administrative history ..., especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. 555.

In the instant case, there is evidence of discriminatory animus by the decisionmaker at issue, Secretary Noem. There is also evidence of discriminatory animus by President Trump and that his intent and actions bore a direct nexus to the actions taken by Secretary Noem in the instant case.

i. Discriminatory Statements by Secretary Noem

Plaintiffs have catalogued a number of discriminatory statements made by Secretary Noem, beginning as early as February 2024 as part of the 2024 presidential race and continuing through early 2025, when she issued her decisions to vacate the extension of the 2023 Designation and then terminate the designation. *See, e.g.*, MacLean Decl. ¶¶ 2-7, 12, 14-15. In many of these comments, the Secretary equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like. Such statements play on "longstanding tropes or stereotypes that certain races have inherently immoral traits." MacLean Decl., Ex. 20, at 19 (2020 article titled "The Racialization of Crimes Involving Moral Turpitude); *see also* Young Decl. ¶ 3 (noting that "characterizing Venezuelan TPS holders as dangerous criminals who harm the U.S. economy is a false narrative, and one reflecting racist tropes that have long been wielded against immigrants to the United States"); *cf. United States v. Taveras*, 585 F. Supp. 2d 327, 338 (E.D.N.Y. 2008) (stating that, " '[w]hen government officials are permitted to use race [or ethnicity and national origin] as a proxy for gang membership and violence ... society as a whole suffers' "). Furthermore, as discussed above, there is no evidence that Venezuelan TPS holders are tied to gangs or are criminals. Indeed, "[i]t is well documented that immigrants are much less likely to commit crimes than U.S.-born Americans, and TPS recipients in particular have passed a criminal background check and have a clear incentive to stay out of legal trouble to maintain their status." Watson & Veuger Decl. ¶ 15.

**\*40** Examples of discriminatory statements by Secretary Noem include the following.

• MacLean Decl. ¶ 3 & Ex. 2. A social media post from February 28, 2024, that stated: "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America. [¶] Deportations need to start on DAY ONE of [President Trump's] term' in office."

• MacLean Decl. ¶ 13 & Ex. 12 (Tr. at 104-05). Testimony during her January 15, 2025, confirmation hearing such as: "[The TPS] program has been abused and manipulated by the Biden administration and that will no longer be allowed to allow that and these extensions going forward the way that they are, the program was intended to be temporary and this extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there."

• MacLean Decl. ¶ 15 & Ex. 14 (Tr. at 3). A statement during a January 29, 2025, interview on Fox that: "Today we signed an executive order within the Department of Homeland Security in a direction that we were not going to follow through on what he did to tie our hands, that we are going to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of [TdA]. Listen, I was in New York City yesterday and the people of this country want these dirt bags out." This statement is particularly notable because, as Plaintiffs point out, "Secretary Noem called Venezuelans 'dirt bags' when announcing [her] very decision [to vacate the extension of the 2023 Designation]." Reply at 1.[26]

• MacLean Decl. ¶ 16 & Ex. 15 (Tr. at 18-19). A statement during a February 2, 2025, interview on Meet the Press that: "[T]he TPP program has been abused and it doesn't have integrity right now. And folks from Venezuela that have come into this country are members of [TdA]. And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America. So we are ending that extension of that program, adding some integrity back to it. And this administration's evaluating all of our programs to make sure they truly are something that's to the benefit of the United States, so that they're not to benefit of criminals." Similar to above, this statement is notable because it was effectively made contemporaneously with the decision to terminate the 2023 Designation.

26    Though the government claims this statement was taken out of context and that Secretary Noem was referring to the TdA, not to Venezuelan TPS beneficiaries generally, there is a reasonable inference that her reference was not so narrowly confined. The Secretary has not submitted any declaration under oath elucidating her intended message.

It is evident that the Secretary made sweeping negative generalizations about Venezuelan TPS beneficiaries *in toto*. This is evident not only in what she said, but also in the fact that she decided to take *en masse* actions against all Venezuelan TPS beneficiaries, who number in the hundreds of thousands. Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is the classic example of racism. *Cf. Hirabayashi v. United States*, 320 U.S. 81, 96-99, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)

(describing why Japanese Americans as a group, despite the fact that most were American citizens, were susceptible to disloyalty and thus constitute a security threat, relying on assumed stereotypes); *Korematsu*, 323 U.S. at 233, 235, 65 S.Ct. 193 (Murphy, J., dissenting) (characterizing the majority decision upholding the mass internment of Japanese Americans as falling into the "ugly abyss of racism"; noting that the "forced exclusion [of Japanese Americans] was the result in good measure of the erroneous assumption of racial guilt ...").

ii. Discriminatory Statements by President Trump

**\*41** Like Secretary Noem, President Trump also made a number of discriminatory statements – and not only about Venezuelan immigrants and/or TPS holders specifically, but also about non-white immigrants and/or TPS holders generally. President Trump's statements span years, starting with his first administration when he terminated the TPS designations of Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal, and continuing through the start of his second administration where one of the first actions he endorsed was ending TPS designations to put "America first."

Examples of discriminatory statements by President Trump targeting non-white immigrants generally include the following.

- MacLean Decl. ¶ 17 & Ex. 16. A Washington Post article from January 12, 2018, indicating that, during a discussion about "protecting immigrants from Haiti, El Salvador and African countries," President Trump stated: " 'Why are we having all these people from shithole countries come here?' " He "then suggested that the United States should instead bring more people from countries such as Norway ...."

- MacLean Decl. ¶ 19 & Ex. 18. A New York Times article from May 16, 2018, indicating that President Trump claimed "dangerous people were clamoring to breach the country's borders and brand[ed] such people 'animals.' "

- MacLean Decl. ¶ 25 & Ex. 24. A New York Times article from April 7, 2024, reflecting that President Trump stated that "people were not immigrating to the United States from 'nice' countries like 'Denmark' " as well as Switzerland and Norway. President Trump also stated with respect to immigrants from the Southern border that " '[t]hese are people coming in from prisons and

jails. They're coming in from just unbelievable places and countries, countries that are a disaster.' "

- MacLean Decl. ¶ 9 & Ex. 8 (Tr. at 29, 34-35). Statements during the presidential debate on September 10, 2024, that Haitian immigrants – TPS holders – living in Springfield, Ohio, are "eating the dogs," "eating the cats," and "eating the pets of the people that live' in Springfield, Ohio." President Trump also stated: "They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. Do you know that crime in Venezuela and crime in countries all over the world is way down? You know why? Because they've taken their criminals off the street, and they've given them to her to put into our country.... [T]hey're destroying the fabric of our country by what they've done. There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in."

Examples of discriminatory statements by President Trump targeting Venezuelan noncitizens specifically include the following.

- MacLean Decl. ¶ 10 & Ex. 9 (Tr. at 32-33). Statements during a campaign speech held on October 11, 2024, that: "[E]very day, Americans ... are living in fear all because Kamala Harris decided to empty the slums and prison cells of Caracas [Venezuela] and many other places happening all over the world.... [¶] You know, prison populations all over the world are down. Crime all over the world is down because they take the world's criminals, gang members, drug dealers, and they deposit them into the United States bus after bus after bus. In Venezuela, their crime rate went down 72 percent. You know why? Because they took the criminals out of Caracas and they put them along your border and they said, 'If you ever come back, we're going to kill you.' [¶] Think of that. And we have to live with these animals, but we're not going to live with them for long, you watch."

**\*42** • MacLean Decl. ¶ 11 & Ex. 10 (Tr. at 6, 12-13). Statements during a campaign speech held on October 27, 2024, that the Venezuelan gang TdA is "savage." President Trump also stated: "The United States is now an occupied country, but it will soon be an occupied country no longer. Not going to be happening. Not going to be happening. November 5th, 2024, nine days from

now will be Liberation Day in America. It's going to be Liberation Day. [¶] On day one, I will launch the largest deportation program in American history to get these criminals out. I will rescue every city and town that has been invaded and conquered, and we will put these vicious and bloodthirsty criminals in jail. We're going to kick them the hell out of our country as fast as possible."

- President Trump's Executive Order, issued on the first day of his second administration, which claimed that Americans needed protection from an immigrant "invasion," stated that "[t]he American people deserve a Federal Government that puts their interests first," and specifically identified the TPS program as a problem. https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion; *cf. Ramos*, 336 F. Supp. 3d at 1104 (where plaintiffs argued that "America first" was "a code word for removal of immigrants who are non-white and/or non-European, and counsel for the government could not articulate a "clear and direct response" to what " 'an America first view of the TPS decision' " meant).

The Court also takes note of an article from Axios, dated October 2024, that analyzed 109 of President Trump's speeches, interviews, debates, and rallies from September 1, 2023, to October 2, 2024, and found that he called Venezuelan migrants "criminals" at least 70 times. *See* MacLean Decl. ¶ 33 & Ex. 32.

Significantly, the vacated panel decision in *Ramos* declined to find that President Trump's statements made in 2018 were not evidence of racial discrimination. Instead, the panel found there was an insufficient showing of a nexus between President Trump's statements and intent and the specific TPS decisions made by the Secretary of DHS. *See Ramos*, 975 F.3d at 897 (stating that "Plaintiffs' EPC claim fails predominantly due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations – such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by animus against 'non-white, non-European' countries").

Relying on the vacated panel decision in *Ramos*, the government suggests that President Trump's statements cited here should likewise not be given any consideration because (1) the statements were not sufficiently tied or linked to TPS policy or decision-making specifically; (2) there is

insufficient evidence that "the President personally sought to influence the TPS terminations"; and (3) even if so, "[t]he mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not in itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions" because "[i]t is expected – perhaps even critical to the functioning of government – for executive officials to conform their decisions to the administration's policies." *Id.* at 897-98.

None of these arguments is convincing. First, contrary to what the government suggests, some of President Trump's statements *did* relate to TPS policy or decision-making (*e.g.*, statements about Haitian immigrants present in Springfield because of the TPS program, statements in the Executive Order about an "invasion" and targeting, *inter alia*, the TPS program). Furthermore, even if other statements did not directly relate to TPS policy or decision-making, there is no principled reason to hold that these statements should thereby be ignored, especially when the discriminatory statements still addressed the issue of immigration and, further, were not isolated occurrences but rather comments made repeatedly over time – including in the several months immediately preceding Secretary Noem's decisions to vacate and then terminate.[27] The length of time over which discriminatory statements were made, including those in close temporal proximity to Secretary Noem's actions, differentiate this case from *Ramos*.

[27]    The Ninth Circuit panel in *Ramos* suggested that there must be a close nexus between a discriminatory statement and the challenged action, citing in support *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) (stating that, even if "offensive quotes about Mexican nationals attributed to Sheriff Arpaio and published in newspapers" were admissible, "they do not mention the Restraint Policy and do not otherwise lead to any inference that Sheriff Arpaio's 2006 Restraint Policy was promulgated to discriminate against Mexican nationals"). But *Mendiola-Martinez* is distinguishable because, there, the Restraint Policy at issue was facially neutral, "mandat[ing] that ... officers restrain all inmates during transport, including those who are 'sick or injured.' " *Id.* at 1245; *see also id.* at 1261 (acknowledging that the Restraint Policy was "a facially neutral policy"). Here, the TPS-related decisions were not facially neutral as they specifically targeted Venezuelan TPS holders.

**\*43**  More than that, there is evidence *in this case* that President Trump directly influenced TPS policy and/or

decision-making at issue. This is apparent from both his Executive Order addressed above *and* Secretary Noem's decision to terminate, which expressly took note of President Trump's

> recent, immigration and border-related executive orders and proclamations [which] clearly articulated an array of policy imperatives bearing upon the national interest....

> [A]s the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.

90 Fed. Reg. at 9042 (also stating that "President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest"). The challenged actions by Secretary Noem were instituted shortly after issuance of the Executive Order and almost immediately upon her taking office. The inference of a nexus here between President Trump and the TPS vacatur and termination, is, more so than in *Ramos*, compelling. Thus, the *Ramos* panel's rejection of the "cat's paw" theory, *see Ramos*, 975 F.3d at 897-98, applies with far less force to the case at bar. And notably, numerous district courts that considered TPS designations and terminations during the first Trump administration still applied the cat's paw theory and found the plaintiffs' equal protection claims viable. *See, e.g., Saget v. Trump*, 375 F. Supp. 3d 280, 368-69 (E.D.N.Y. 2019) (in TPS case, noting that "the evidence suggests the Secretary was influenced by the White House and White House policy to ignore statutory guidelines, contort data, and disregard objective reason to reach a predetermined decision to terminate TPS and abate the presence of non-white immigrants in the country"); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) (in TPS case, noting that President Trump made racially discriminatory statements about Latino immigrants and he was allegedly "involved in the decision to terminate TPS for El Salvador"; adding that, "if, as alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory motivation cannot be laundered through the Secretary"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 414, 416 (D. Mass. 2018) (in TPS

case, stating that " 'liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action' "; "find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision").

**\*44** Accordingly, the Court rejects the government's attempt to avoid consideration of President Trump's statements. That being said, the Court emphasizes that, even without consideration of these statements, Plaintiffs have sufficiently established animus based on, *inter alia*, Secretary Noem's discriminatory statements. That Secretary Noem – the clear decision-maker on the vacatur and termination – made discriminatory comments (some contemporaneously with her decisions to vacate and terminate) further distinguishes the instant case from *Ramos. See Ramos*, 975 F.3d at 897 (stating there was no evidence that "any administration officials involved in the TPS decision-making process were themselves motivated by animus against 'non-white, non-European' countries").

### iii. Historical Background

Consistent with the above, the Court also considers the historical background of the first Trump administration and its termination of TPS for non-white, non-European TPS holders from Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. As the Court held in *Ramos*, there was "sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate [these] TPS designations" based on, *e.g.*, President Trump's discriminatory statements, irregular decision making, and departures from prior practice. *See Ramos*, 336 F. Supp. 3d at 1098-105. *But see Ramos*, 975 F.3d at 896-99 (vacated panel decision disagreeing with this Court's equal protection analysis). Secretary Noem's decision here to vacate the extension of the 2023 Designation and then terminate the designation continues a pattern of the Trump administration's targeting of non-white, non-European TPS holders.

### iv. Sequence of Events

Even putting aside the general historical background, the sequence of events related to Secretary Noem's decision-making on the TPS designations here is clearly anomalous. As Plaintiffs note, the decision-making process for the vacatur and termination "took place over a week, at most" and at the very outset of the second Trump administration. Opp'n at 14. The Secretary vacated the extension of the 2023 Designation only three days after she was confirmed. Then just a few days later, she terminated the TPS designation for Venezuela (even though, under the TPS statute, she was required to, *e.g.*, consult with other government agencies before making a decision). This was a clear departure from longstanding prior practice which included obtaining the considered analysis from constituent agencies and the State Department before reaching a decision on TPS status of a particular country. *See, e.g., Ramos*, 336 F. Supp. 3d at 1082 (taking note that the parties agreed on the general process for a TPS designation (on periodic review): "RAIO (a division within USCIS) provides a Country Conditions Memo [for the Secretary]" while "OP&S (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation"; "[t]he State Department provides further input (e.g., country conditions, recommendations" and, "[a]t times input can also come from other government sources"). Moreover, as noted above, Secretary Noem's vacatur was the first-ever vacatur of an extension of TPS over the TPS program's thirty-five-year history.

v. Lack of Support for Both the Vacatur of the Extension and for the Termination of the 2023 Designation

The lack of support for the vacatur – both legal and evidentiary – has already been discussed above. In addition, the lack of evidentiary support for the termination of the 2023 Designation further indicates that the termination was motivated at least in part by animus. In the Federal Register, Secretary Noem justified the termination of the 2023 Designation on the following grounds: (1) members of the Venezuelan TdA gang have crossed into the United States; (1) the resources of local communities have not been adequate to "meet the demands" of the Venezuelan TPS holders, and their presence has cost local communities billions of dollars; (3) a TPS designation has a potential "magnet effect" – *i.e.*, it is a "pull factor[ ] driving Venezuelan nationals to the United States"; and (4) an extension of the TPS designation is contrary to the Trump administration's

policy of "America first" as it "facilitate[s] or encourage[s] illegal and destabilizing migration." 90 Fed. Reg. at 9042-43.

**\*45** As discussed in other parts of this order, the Secretary's rationale is entirely lacking in evidentiary support. For example, there is no evidence that Venezuelan TPS holders are members of the TdA gang, have connections to the gang, and/or commit crimes. Venezuelan TPS holders have lower rates of criminality than the general population. Generalization of criminality to the Venezuelan TPS population as a whole is baseless and smacks of racism predicated on generalized false stereotypes. Moreover, Venezuelan TPS holders are critical contributors to both the national and local economies: they work, spend money, and pay taxes. Barring these TPS beneficiaries from the labor market in which they enjoy higher rates of participation than the general population, *see* Docket No. 71 (Amici Br. at 5), will cost the United States billions in taxes. *See*, Card Decl. ¶ 9(i) (stating that termination of TPS for just those Venezuelans who arrived in the U.S. between 2021 and 2023 would result in an estimated $3.5 billion annual loss to the U.S. economy and a $434.8 million annual loss in social security taxes); *see also* Docket No. 62 (Amici Br. at 7) (noting that, "[i]n 2023, TPS holders from all countries paid $3.1 billion in federal taxes, contributing to programs like Social Security and Medicare, and paid $2.1 billion in state and local taxes"); Docket No. 71 (Amici Br. at 6) (noting that, "[i]n 2021, the approximately 354,000 TPS holders in the United States from all countries paid an estimated $966.5 million in state and local taxes"). Far from being a burden, a number of jurisdictions – states, cities, and counties – have emphasized the value that Venezuelan TPS holders bring to their communities. They have documented the adverse impact on the economy, public health, and public safety of terminating TPS status of these beneficiaries. *See generally* Docket No. 62 (Amici Br.); Docket No. 71 (Amici Br.). And as noted above, the purported "magnet effect" of TPS designation makes no sense because a mere *extension* of TPS (not a designation or redesignation) does not make more people eligible for TPS. *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason that the extension of an existing TPS designation would act as an immigration magnet. TPS status is not available to those arriving after the 2023 designation. The current administration's termination of the parole program makes it clear it is not interested in facilitating additional migration from Venezuela, and a reasonable migrant would not believe that a TPS designation for new Venezuelan immigrants is likely to be issued by this administration. TPS status does not allow individuals

to sponsor relatives for migration."). Finally, the Trump administration's invocation of "America first" raises a further inference of animus given the historical connotation of that phrase. *See Ramos*, 336 F. Supp. 3d at 1104 (noting that the government could not articulate a "clear and direct response" to what " 'an America first view of the TPS decision' " meant). The lack of bona fides of purported justifications gives rise to an inference of pretext. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (in Title VII case, noting that " 'the fact of pretext alone may allow the inference of discrimination' ").

### vi. Disparate Impact of Agency's Action

Finally, it is clear that the agency's action has a disparate impact, bearing more heavily on one race/ethnicity/national origin than others. *See, e.g., Saget*, 375 F. Supp. 3d at 367 (stating that "it is axiomatic the decision to terminate TPS for Haitians impacts one race, namely non-white Haitians, more than another"). To be sure, this factor is less probative where, by definition, a TPS decision by country will have an inherent disparate impact based on national origin. Any relevance of disparate impact in this context is instead rooted in the racially charged historical context discussed above – the invocation of a pattern of adverse TPS decision directed at non-whites – those from so-called "shithole countries."

### vii. Summary

Taking into account the *Arlington Height* factors, including but not limited to the direct animus of Secretary Noem, the animus of President Trump that appears to have directly influenced the Secretary's decision making, the anomalous procedures followed (the highly compressed time in which the decisions to vacate and then terminate were made and the precedential and unique nature of the decisions made), and the lack of bona fides for the decisions to vacate and then terminate, the Court concludes that Plaintiffs have established a likelihood of success on their equal protection claim directed against both the decision to vacate and the decision to terminate.

### D. Nationwide Relief

Because the § 705 factors weigh strongly in Plaintiffs' favor, the Court holds that Plaintiffs are entitled to relief. Although § 705 expressly states that relief that may be afforded is postponement of the effective date of agency action, without limitation, the government asserts that the Court should nevertheless restrict the relief given – specifically, to only the named individual Plaintiffs. The government takes the position that "universal relief benefitting non-parties" is "broader than necessary to remedy actual harm shown by specific Plaintiffs." Opp'n at 25.

The government's position lacks merit. As a preliminary matter, its position is predicated on criticisms made of nationwide injunctions but, as discussed above, Plaintiffs are seeking to postpone or set aside agency actions, and vacatur of agency action is not the same thing as an injunction. More importantly, where agency action is challenged as a violation of the APA, nationwide relief is commonplace. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680-81 (9th Cir. 2021) (in APA case, noting that there is " 'no general requirement that an injunction affect only the parties in suit' " and, " '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed' "); *see also Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1006-07 (N.D. Ill. 2020) (noting that "vacatur will prevent DHS from enforcing the Rule against nonparties," but "that is a consequence not of the court's choice to grant relief that is broader than necessary, but of the APA's mandate that flawed agency action must be 'h[e]ld unlawful and set aside' ").

**\*46** Nationwide relief is also warranted because the agency actions here have had a uniform and nationwide impact on all Venezuelan TPS holders located across the United States. And here, NTPSA – the named organizational plaintiff – advocates for Venezuelan TPS holders nationwide and has more than 84,000 members who are Venezuelan TPS holders *in all fifty states, plus the District of Columbia. See* Jimenez Decl. ¶ 13; *cf. City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (indicating that, to support a nationwide injunction, record must be sufficiently developed on nationwide impact of challenged actions); *E. Bay Sanctuary*, 993 F.3d at 680 (noting that organizational plaintiffs did " 'not operate in a fashion that permits neat geographic boundaries' "). Full relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia. Nor has the government explained how, as a practical matter, relief could be afforded to some subset of all Venezuelan TPS holders, particularly given that NTPSA has tens of thousands of members located across the country. *See id.* at 680-81

(criticizing the government for failing to propose a workable alternative form of injunction).

Finally, there is an interest in uniformity in the immigration system. *See id.* at 681 (noting that, "in immigration cases, we 'consistently recognize[ ] the authority of the district courts to enjoin unlawful policies on a universal basis' "); *Texas v. United States*, 40 F.4th at 229 n.18 ("reject[ing] DHS's contention that the nationwide vacatur is overbroad[;] [i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistent in enforcement").

Accordingly, consistent with the text of section 705, the Court grants Plaintiffs' motion to postpone the agency actions at issue, and the relief afforded here is nationwide in scope. The Court acknowledges that there are at least three other recent TPS cases that have been filed against the Trump administration, with at least two related to Venezuela specifically. *See Casa, Inc. v. Noem*, No. C-25-0525 GLR (D. Md.); *Haitian Ams. United Inc. v. Trump*, No. C-25-10498 RGS (D. Mass.). How the courts in those cases should proceed in light of the relief that the Court orders here will be up to those courts to decide; the Court is confident these sister courts are aware of the various proceedings and will be mindful of the issues.

E. Motion to Shorten Time to Confer

Finally, the Court addresses a motion that Plaintiffs filed shortly before the hearing on their motion to postpone. In the new motion, Plaintiffs ask that the Court shorten the deadline for the parties to begin their Rule 26(f) conference and/or open discovery now. The Court holds as follows. (Some of the rulings were made during the hearing on the motion to postpone.)

- Given the Court's ruling on the jurisdictional arguments raised by the government, there is no reason to delay production of the administrative record, even if the government intends to file a motion to dismiss. The parties shall meet and confer regarding production of the administrative record (to the extent they have not already) and the record shall be produced by the government within one week of the date of this

order. There is an interest in moving this case forward promptly.

- At this time, the Court does not opine on what discovery, if any, Plaintiffs may be entitled to beyond the administrative record. The administrative record should be produced in the first instance. What the administrative record does or does not reveal will likely inform whether additional discovery is warranted. The Court does not bar Plaintiffs from serving discovery requests on the government now, but the government is not required at this point to respond to those requests.

- Although the Court is not requiring the government to respond to any discovery requests at this juncture, the parties shall meet and confer (if they have not already) and reach agreement on a stipulated document preservation order.

IV. **CONCLUSION**

**\*47** For the foregoing reasons, the Court grants Plaintiffs' motion to postpone the actions taken by Secretary Noem, specifically, her decisions to vacate the extension of the 2023 Designation and to terminate the 2023 Designation.

Within one week of the date of this order, the parties shall file a joint status report (after meeting and conferring), addressing (1) whether the government intends to appeal this Court's order; (2) whether Plaintiffs will be filing a motion to postpone with respect to agency action related to Haiti's TPS designation (which is within the scope of the newly filed amended complaint); and (3) a proposed date for the initial case management conference in which the Court and the parties will discuss ways in which adjudication of the merits of this case can be expedited.

This order disposes of Docket Nos. 16 and 79.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2025 WL 957677

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.