UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SVITLANA DOE, et al.,                    )
                                         )
          Plaintiffs,                    )
                                         )
     v.                                  )
                                         )   Civil Action No.
KRISTI NOEM, in her official capacity )   1:25-cv-10495-IT
as Secretary of Homeland Security,    )
et al.,                               )
                                         )
          Defendants.                    )
                                         )
_____


        BEFORE THE HONORABLE INDIRA TALWANI DISTRICT JUDGE


                        HEARING


                Monday, April 7, 2025
                    10:06 a.m.




John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

1                          **A P P E A R A N C E S**

2
    On behalf of the Plaintiffs:
3
        JUSTICE ACTION CENTER
4       BY:  KAREN C. TUMLIN
             ESTHER SUNG
5            HILLARY LI
             LAURA FLORES-PERILLA
6       PO Box 27280
        Los Angeles, CA  90027
7       (323) 450-7272
        karen.tumlin@justiceactioncenter.org
8       esther.sung@justiceactioncenter.org
        hillary.li@justiceactioncenter.org
9       laura.flores-perilla@justiceactioncenter.org

10
        LAW OFFICE OF JUSTIN B. COX
11      BY:  JUSTIN B. COX
        PO Box 1106
12      Hood River, OR  97031
        (541) 716-1818
13      justin@jcoxconsulting.org

14
        ARNOLD & PORTER KAYE SCHOLER LLP
15      BY:  H. TIFFANY JANG
        200 Clarendon Street
16      53rd Floor
        Boston, MA  02116
17      (617) 351-8050
        tiffany.jang@arnoldporter.com
18
19      ARNOLD & PORTER KAYE SCHOLER LLP
        BY:  JOHN A. FREEDMAN
20      601 Massachusetts Avenue NW
        Washington, DC  20001
21      (202) 942-5000
        john.freedman@arnoldporter.com
22

23

24

25

```
 1        HUMAN RIGHTS FIRST
          BY:  ANWEN HUGHES
 2        75 Broad Street
          31st Floor
 3        New York, NY  10004
          (212) 845-5200
 4        hughesa@humanrightsfirst.org

 5

 6   On behalf of the Defendants:

 7        UNITED STATES DEPARTMENT OF JUSTICE
          BY:  BRIAN C. WARD
 8        PO Box 868
          Washington, DC  20044
 9        (202) 616-9121
          brian.c.ward@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (In open court at 10:06 a.m.)

 3              THE DEPUTY CLERK:  United States District Court is

 4    now in session, the Honorable Judge Indira Talwani presiding.

 5              This is Case Number 25-cv-10495, Doe, et al. v.

 6    Noem, et al.  Will counsel please identify themselves for the

 7    record.

 8              MS. TUMLIN:  Good morning, Your Honor.  Karen

 9    Tumlin for the plaintiffs.

10              THE COURT:  Good morning.

11              MR. COX:  Good morning, Your Honor.  Justin Cox for

12    the plaintiffs.

13              THE COURT:  Good morning.

14              MS. JANG:  Good morning, Your Honor.  Tiffany Jang

15    for the plaintiffs.

16              THE COURT:  Good morning.

17              MR. FREEDMAN:  Good morning, Your Honor.  John

18    Freedman for the plaintiffs.

19              THE COURT:  Good morning.

20              MS. SUNG:  Good morning, Your Honor.  Esther Sung

21    for the plaintiffs.

22              THE COURT:  Good morning.

23              MS. HUGHES:  Good morning, Your Honor.  Anwen

24    Hughes for the plaintiffs.

25              THE COURT:  Good morning.
```

1              MS. LI:  Good morning, Your Honor.  Hillary Li for

2     the plaintiffs.

3              THE COURT:  Good morning.

4              MS. FLORES-PERILLA:  Good morning, Your Honor.

5     Laura Flores-Perilla for the plaintiffs.

6              THE COURT:  Good morning.

7              MR. WARD:  Good morning, Your Honor.  Brian Ward

8     for the defendants.

9              THE COURT:  Good morning.

10             So I've been trying to keep up with your filings as

11    best I can.  I have some specific questions coming in today,

12    and then I will let you move beyond that if you need to.

13             The issues in front of me today relate to the three

14    actions that were raised in the original and first amended

15    complaint.  There were additional actions in the second

16    amended complaint that I'm -- still having briefing coming in

17    on.

18             With regard to the actions originally at issue,

19    the -- my understanding of the plaintiffs' challenge is that

20    there, in your view, are three actions.  You refer to them as

21    the "Huffman memo," the "Higgins email," and the "Davidson

22    memo" -- or maybe I'm referring to them that way.  You're

23    referring to them in different ways.

24             And I'd like to start off -- I think there's some

25    confusion or disagreement between the parties regarding the

1    Higgins email.  And the debate, as I understand it, is

2    whether the Higgins email is relating to parole applications,

3    re-parole, et cetera, or whether it's relating to the type of

4    benefits referred to in the Davidson email.

5            I understand the plaintiffs' position to be the

6    Higgins email addresses the types of benefits at issue in the

7    Davidson memo and the defendants' position to be that the

8    Higgins email is limited to parole application processing,

9    reapplication, et cetera.

10           So I'll let plaintiffs start on that.

11           MR. COX:  Sure.  Thank you, Your Honor.

12           So we would submit that the -- what we're

13   challenging is the suspension of the adjudication of

14   re-parole and other benefits, and those are encompassed by

15   the Higgins directive --

16           THE COURT:  Why?

17           MR. COX:  Well, the re-parole are --

18           THE COURT:  That's what it's about.

19           MR. COX:  Yes.  Beyond that, we would say that

20   it -- the language "petition, motion, or other request" seems

21   to be intended to encompass more than the two prior actions

22   that it references, which is initial parole or re-parole

23   application.

24           THE COURT:  Why don't those mean petitions,

25   motions, et cetera, relating to parole and re-parole?

1          MR. COX:  I am not aware of a motion that could be

2     filed relating to parole or re-parole, for example, or a

3     petition for that matter.  And so it seems --

4          THE COURT:  A motion to extend time to get

5     something in, a motion to stay, a motion to participate by

6     telephone, a motion --

7          MR. COX:  Those, to my knowledge, are not -- are

8     not available motions when it comes to parole.

9          THE COURT:  So your original complaint said that

10    this was in the directive, in the email.  Your amended

11    complaints took out the words "in the email," so you are

12    still limiting it to the email.  You're not saying there's

13    some other world of information you have that something's

14    happening per the Higgins email, because if you're just

15    saying this is your interpretation versus their

16    interpretation of the email, then I'll go and look at my

17    interpretation of the email.

18          But your complaint, by deleting the words that it

19    was from the email, suggested to me that you were leaving

20    open this -- that it was coming somewhere else.

21          MR. COX:  We are certainly leaving open -- we

22    intentionally phrased our wording to say we are challenging

23    the suspensions.  We think they're reflected in these

24    actions.

25          THE COURT:  So I have a specific matter in front of

1    me today.  One is the preliminary injunction question is

2    still open, and the other is the class certification question

3    is still open.

4         With regard to the preliminary injunction, you have

5    a burden of coming forward with sufficient evidentiary

6    material to support your request for preliminary injunction.

7    And would you agree with me that, with regard to the

8    consideration of the preliminary injunction, I can only look

9    as to the -- what the Higgins memo is doing?  I can only --

10   sorry, Higgins email, what the Higgins email is doing.  I can

11   only look at the Higgins email?  I can't look at the concern

12   that maybe these things are happening somewhere else because

13   I don't have any evidence of that in front of me?

14        MR. COX:  I would agree generally, Your Honor.  The

15   one caveat I would make is that, for the military

16   parole-in-place program, which is not addressed in either --

17   any of the three --

18        THE COURT:  Well, the Davidson says all programs,

19   more or less, so --

20        MR. COX:  Fair enough.

21        THE COURT:  Higgins says these specific three

22   programs.

23        MR. COX:  So the reason we think there might --

24   there could be something more is because of the evidence in

25   the record, specifically at Document Number 24-48, I believe,

1    where a military PIP applicant said -- got an email from

2    USCIS, and USCIS said this is indefinitely suspended and

3    that -- and because it was an initial parole application, it

4    seems that it should have come from -- something should have

5    originated with the Huffman memorandum, perhaps the Higgins

6    email.  But that is --

7              THE COURT:  I'm sorry; which is the number?

8              MR. COX:  It's Document Number 24-48.  It says,

9    "Due to the current administration, it is now on hold until

10   further notice."  And we received this from the attorney for

11   the applicants as described in the Sung declaration, which is

12   Document Number 24-36, paragraph 15.

13             THE COURT:  Let me turn the question, then, to the

14   government.  Is the pause, as you call it, on processing

15   parole applications, reapplications, et cetera, broader than

16   what is in the Higgins memo?  And if so, is that because

17   there's a different memo or email, or is it due to the

18   Higgins email?

19             MR. WARD:  Is that -- so our understanding from --

20   my understanding from my clients is that the Higgins email is

21   limited to pausing adjudication of parole applications and

22   that this language about "petition, motion, or other request"

23   is intended to just broadly encompass the various ways in

24   which people might seek parole under these various programs.

25   Now, I don't know --

1           THE COURT:  Okay.  So the second question is,

2   there's evidence in the record that one of the plaintiffs has

3   received direction that there is a pause on the other parole

4   program.

5           He's in the OAW?

6           MR. COX:  Military parole-in-place.

7           THE COURT:  So he's in the military

8   parole-in-place.  Is there any reason to understand -- any

9   reason not to take the email that the plaintiffs have put in

10  that his program is also stayed?

11          MR. WARD:  So I haven't -- I confess that I haven't

12  looked at that exhibit recently, so I don't remember off the

13  top of my head what that particular exhibit said.  I don't

14  know if plaintiffs could clarify.

15          Did that say his application for parole was paused

16  or --

17          MR. COX:  Yes.  It was an application for military

18  parole-in-place.  It wasn't a plaintiff, to clarify,

19  Your Honor.  It's a member of the putative class.  The

20  plaintiffs, the military parole-in-place plaintiffs, have had

21  their applications pending for about a year and over a year,

22  respectively.

23          THE COURT:  Right.  But the question is -- things

24  take a lot of time.  So the fact that some have been pending

25  for a year or more than a year actually argues against what

1    you're saying here, rather than in favor of what you're

2    saying here.

3              So the question is, there was a notice -- and I'm

4    trying to pull mine up also, and I don't have it right in

5    front of me either.  But there's a notice that is --

6              MR. COX:  It's Exhibit 48 to our initial motion for

7    preliminary injunction.

8              THE COURT:  Do I have it?

9              MR. COX:  We can -- we have a couple extra copies.

10             THE COURT:  Ah.  Found it.

11             MR. COX:  Okay.  And I can hand a copy to Mr. Ward

12    here.

13             THE COURT:  No, if I have it, I'd rather stick with

14    what I have.

15             So Exhibit 48 -- so what we're looking at is that

16    last "Due to the current administration, it is now on hold

17    until further notice."

18             MR. COX:  Yes, Your Honor.

19             THE COURT:  Counsel, just so I understand what I

20    have in front of me, looking at these -- looking at this

21    exhibit and then thinking about the information I have from

22    the government, I fully understand your argument that the

23    Higgins email is only referring to the specific programs and

24    that the motions, et cetera, refer to those -- no, sorry.

25    We're going the other way, that it's the --

1       Yeah, the Higgins email says these are the programs
2  where we're doing -- we've paused re-parole or parole
3  consideration, correct?
4       MR. WARD:  Yes, Your Honor.
5       THE COURT:  And that's your argument, and that's
6  what you have responded to in your filings.
7       MR. WARD:  Yes, Your Honor.
8       THE COURT:  If I read the plaintiffs as having now
9  made a showing that there is sufficient reason to understand
10  the administration actions to have paused all parole
11  applications, programmatic parole applications, not just the
12  three in the Higgins email, am I correct that none of your
13  filings thus far would address that contention; that what
14  your contentions have been -- what I have in front of me is
15  your statements that, pursuant to the Higgins email, this
16  broader matter hasn't happened, but I don't have an
17  affirmative "There is no broader pause on the other parole
18  programs."
19       Is that a fair statement of the record?
20       MR. WARD:  Yes, Your Honor.  And I'm only aware of
21  what's in the record.  On this particular exhibit, I could
22  check with my clients, but I'm not aware of what this -- this
23  line in 24-48 is referring to.
24       THE COURT:  Understood.
25       MR. WARD:  It could be something with respect to

 1    that particular individual.

 2              THE COURT:  Well, it doesn't say that.

 3              MR. WARD:  It could be something --

 4              THE COURT:  It doesn't say a particular individual.

 5              MR. WARD:  Yeah, that's true.

 6              THE COURT:  It says, "But due to current the

 7    administration, it's on hold until further notice."

 8              I guess my -- I have two questions here, one, I

 9    think you've just answered, which is your response to what

10    the plaintiff has -- claiming is limited to the response to

11    what the Higgins email does or doesn't do.

12              MR. WARD:  Yes, Your Honor.

13              THE COURT:  And would you like an opportunity to

14    respond more broadly or to see if your client wants to

15    respond more broadly to, essentially, confirm that your

16    understanding is correct and there's no other parole pauses

17    other than these or confirm what the plaintiff is contending,

18    which is all of the parole programs?

19              And so I don't want to cause you to be put on

20    administrative leave, and so I will be careful here.  I am

21    not directing that you have to answer that question.  I'm

22    asking if you would like an opportunity to talk with your

23    client as to whether you want to respond to the evidence that

24    they've put in, which I am understanding to be evidence of a

25    broader policy.  And I want -- I'm offering whether you want

1  a chance to respond to that.

2          MR. WARD:  Yes, Your Honor.  Thank you for that.  I

3  appreciate that.

4          I think we can only respond to what is before us,

5  and so I would like an opportunity to ask my client about

6  this particular exhibit and the military parole-in-place

7  parole program.

8          THE COURT:  Okay.

9          MR. WARD:  I think asking to respond broadly to

10  other parole programs, I don't know what that would cover.

11  And I think that might be a bit of a vague ask.  But in terms

12  of this concrete example here, I would like an opportunity

13  to -- or I'd be happy to ask my client --

14          THE COURT:  Okay.

15          MR. WARD:  -- and try to submit an explanation, if

16  they have one.

17          THE COURT:  So this is what I'm -- you know, I need

18  to get something out on this one, one way or another, in very

19  short order.  But I am -- I'm giving you an opportunity to

20  supplement the record.  If you don't want to take the

21  opportunity, your client -- you should let your client know

22  that I read this as, essentially, being an answer that -- or

23  being evidence that the military parole-in-place program is

24  also on hold.

25          I'm not sure that gets me to the other three or

1    four parole programs being in place, but I do think it's a

2    broader thing than just this particular individual.  It's

3    certainly as to the -- whether the military parole program is

4    on hold.

5              MR. WARD:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MR. COX:  If I may just add one --

8              THE COURT:  Sure.

9              MR. COX:  I just wanted to mention that we have two

10   declarations from sponsors in the military PIP program, and

11   both of them mention that their attorneys have been informed

12   that the program is paused.  That's Document 24-13 at

13   paragraph 8, and Document 24-14 at paragraph 11.

14             THE COURT:  Okay.

15             MR. COX:  And then on the Higgins memo more

16   generally, I think the only other program that is not listed

17   is the Operation Allies Welcome.  I think every other program

18   that is listed in the Higgins memo is -- every other program

19   that we are here today about is listed.

20             THE COURT:  Okay.

21             MR. WARD:  I think that OAW -- excuse me just to

22   correct --

23             MR. COX:  Actually, I'm wrong.  Thank you so much.

24   It is there.  I apologize.  So it was just military PIP, was

25   the only one not listed.

1          THE COURT:  Okay.  So that's the question, is does

2     the Higgins -- not does the Higgins email -- but simply the

3     fact is that program now on pause or not?  And --

4          MR. WARD:  Yes.  I'm happy to ask my clients that

5     and see if they have an answer they'd like to provide.

6          THE COURT:  Okay.

7          MR. WARD:  Thank you, Your Honor.

8          THE COURT:  So whether we -- whether we have that

9     individual difference of OAW or not is going to turn on this

10    other evidence.  I read the Higgins email as talking -- not

11    mentioning the OAW, so whether there's a follow-on email or

12    something, I don't know.

13         MR. COX:  You mean military PIP, right, not just --

14         THE COURT:  Sorry.  Sorry.  No, I appreciate it.

15    The military PIP program, parole-in-place.

16         Okay.  The next question, which is a related

17    question -- well, let me know -- let me let you know where

18    I'm -- what I am thinking and then focus on this question,

19    and then we can come back to arguments you may have on the

20    way.

21         I feel like for all of the requests that you are --

22    have in front of me now, I still have to start with the

23    initial question as to whether plaintiffs have standing to

24    assert the particular causes of action at issue here; in

25    other words, do the plaintiffs have standing to assert

1    challenges under the APA to these discrete actions and seek a

2    remedy of stopping those discrete actions?  And on a

3    constitutional level of standing, I -- my -- currently

4    anticipating that I do find that they have standing.

5            I have a next question of whether my jurisdiction

6    has been stripped by either Section 1252 or the APA.  And my

7    current view, as I sit here, that my jurisdiction to address

8    the question of whether the actions are outside of the

9    Secretary's discretion because they violate the law or the

10   Constitution, that jurisdiction has not been stripped from me

11   by either 1252 or the APA.

12           If the matter doesn't violate the law or raise a

13   constitutional issue, the objections to the actions are

14   addressed at the discretion that's being exercised, then I

15   don't get there.

16           But the question of whether I can make a

17   determination, whether I have jurisdiction to determine

18   whether something is falling within discretion or is

19   violating the law of the Constitution, I read both 1252 and

20   APA as -- that I do have jurisdiction.

21           For me, the next issue, then, in terms of the order

22   of how I'm proceeding here is to think about whether this

23   action can proceed as a class action.  And since the

24   challenge that -- the only challenge that I have jurisdiction

25   over is this, essentially, legal challenge to the particular

1    actions.  I see that as an appropriate matter for class

2    consideration.

3            I then am turning to whether the appropriate

4    subclasses or classes that I could articulate to take these

5    different things, and to some degree, it seems to me as I see

6    it to which action is being challenged.

7            And if there's an action that is challenged, even

8    though I don't reach the merits at this stage, either under

9    the class cert questions or the PI questions, I don't get to

10    the final resolution of the merits; if there is a strong

11    problem with challenging one of these, then it would seem

12    counterproductive to think about the class.

13            So my next question as I go through here turns on

14    how the Huffman memo can be challenged if -- well, it can be

15    challenged.  How I can get anywhere on it if -- under the

16    APA -- this is an APA claim, APA claims -- if I don't find

17    that it is a final decision, final action.

18            And my view of the Huffman memo, as I look at it,

19    is that the Huffman memo is saying, "Here are concerns,

20    policies, issues; and you, my leads in the agency, go at it

21    and work on it."  How is that an action that you can

22    challenge under the APA?

23            MR. COX:  The shortest answer, Your Honor, is that

24    the Higgins email explicitly relies on the Huffman memo.  It

25    states so expressly.  And so the application of the legal

1    interpretation in the Huffman memo, it's made in the Higgins

2    email, and so --

3            THE COURT:  Okay.  So I can -- but imagine the

4    world where that Higgins email never was sent.  You would

5    agree -- or put into practice, whether it's by email or some

6    other way, that if what is happening is limited to what the

7    Huffman memo says -- review, look, research, figure things

8    out, come back with a plan -- that is not, in and of itself,

9    actionable under the APA, correct?

10           MR. COX:  I suspect that's correct, Your Honor,

11   yes.

12           THE COURT:  Okay.  And so if I focus for today --

13   the question of whether there's an appropriate class or

14   subclass, if I focus on the Higgins email, with or without

15   the extra military piece, but the Higgins email on the one

16   hand and the Davidson memo as the two actions and put aside

17   the Huffman -- recognizing that the Higgins is informed by

18   the Huffman.  I'm not saying we're not talking about the

19   Huffman, but I'm thinking about the classes and who is

20   challenging what and what's happening, I don't need to have

21   someone who is challenging the Huffman memo.  I need to

22   have -- question whether plaintiffs are challenging the

23   Higgins email --

24           MR. COX:  Yes.

25           THE COURT:  -- and the Davidson memo.

```
1              MR. COX:  Yes.  We do think it would be helpful and
2       probably required to explain why the Huffman memo is wrong on
3       the law, but we certainly agree that -- yes, with what
4       Your Honor is saying, yes.
5              THE COURT:  Yeah, I'm not taking the Huffman memo
6       out of conversation, but I'm trying to think about who is
7       appropriate, are there appropriate classes that you could
8       take to -- I mean, everybody who is sitting here in the
9       galley, for all I know, they may all have a position on
10      whether the Huffman memo is legally or not legally correct.
11      But by that, they're not having standing.  They're not part
12      of a final action.
13             The final action is the Higgins email or the
14      Davidson memo and maybe this additional piece about military
15      program.  But it's not just the Huffman -- we don't get to
16      challenge people's legal idea of what they think is or isn't
17      the law when they simply state that that's what it is and --
18             MR. COX:  Agreed, Your Honor.
19             THE COURT:  Okay.  So if I think about potential
20      subclasses, the -- and I'm going to go to the Davidson memo
21      for a minute just because it's simpler.  The Davidson memo
22      says parolees in these three programs cannot -- that we're
23      going to have a pause on benefits, applications for parolees
24      in these three programs, correct?
25             MR. COX:  Yes, Your Honor.
```

1          THE COURT:  And that's -- that's what it says,

2     right?

3          MR. WARD:  Yes, Your Honor.

4          THE COURT:  So if I have a class that is the

5     individuals who are -- have applications in or while this

6     litigation is going on put applications in for benefits,

7     parolees who are here in this country, who put applications

8     in for benefits, isn't that a reasonable way to look at it

9     and a reasonable subclass?

10          MR. FREEDMAN:  Your Honor, John Freedman.

11          Yes, it is.  We're prepared to change our proposed

12     definition of the beneficiary subclass to the three programs

13     actually named, identified in the Davidson memo.

14          THE COURT:  Okay.  Any -- I know, for the

15     government, you're disagreeing with my earlier steps that I

16     got myself here to, and I'm going to give you a chance to

17     speak to it.  But this is what's on my mind right now, and I

18     want my questions addressed first.

19          Any disagreement that if we are proceeding here,

20     that there is a subclass that commonly -- has a common

21     challenge to the Davidson memo pausing these three programs?

22          MR. WARD:  So -- yes, Your Honor.  We preserve our

23     arguments on standing and jurisdiction.

24          We believe that, at most, a class related to the

25     Davidson memo could be related to these three programs,

1    although I'll note that the -- one of these three programs is

2    actually four separate programs, the CHNV processes, which

3    are sort of in a separate category now, and that's the

4    subject of the briefing still ongoing in the hearing on

5    Thursday.  So they're in a little bit of a different

6    category.

7            I'd also note, just reiterate arguments in our

8    papers that we think it's inappropriate to certify a class

9    even with respect to those couple of programs with respect to

10   other benefits because the class would involve individuals

11   who have only recently filed for other benefits --

12           THE COURT:  Why --

13           MR. WARD:  -- filed for benefits that wouldn't be

14   adjudicated in the near term in any case, and so --

15           THE COURT:  So you may have an argument that those

16   individuals aren't facing irreparable harm and so forth, and

17   we can get to that question.  But I'm sort of -- I'm trying

18   to make my way down to try to figure out what the questions

19   are that I am adjudicating at each step for the right -- the

20   box gets narrowed as you get down, and I'm trying to figure

21   this out.

22           So as to -- there may be -- there may be people

23   whose arguments are more urgent and some people whose

24   arguments are less -- circumstances more urgent and some

25   people whose circumstances are less urgent, but they have a

1    commonality of whether what has happened here is lawful, is

2    within the agency's discretion or is unlawful and, therefore,

3    outside of the agency's discretion or whatever.  They have

4    that common argument.

5         And I don't see -- I can see how a distinction

6    might happen as we go down, and certainly I have been a

7    little bit seeing the CHNV group as having additional issues

8    going on that might make them -- either if we're talking

9    about benefits as a subclass appropriately or not.  But the

10   overall question, which is can you do this pause on your

11   benefit program, which seems to me the fundamental question

12   that I'm being presented with, is common.

13        MR. WARD:  Our position on that would be that that

14   is treating commonality as too broad a question, that that

15   question --

16        THE COURT:  That's the question that they've

17   changed.

18        MR. WARD:  But that question is not appropriate for

19   class certification because resolving that question doesn't

20   provide any redress to plaintiffs.  In particular, it doesn't

21   provide any redress to the individual plaintiffs.

22        So the case law is very clear that, in order to

23   represent a class, the individuals must be able to show that

24   they are injured.  So take, again, individuals in the couple

25   programs covered here that may have applied for an asylum

benefit.  If, as the individual plaintiffs have in this case, they only have done so in the last few months, there are cases saying that delays of several years with the adjudication of asylum applications is not unreasonable.

And so it's unclear how -- if the Court phrases the commonality question broadly enough -- because in any circumstance, the question may be made broad enough to cover a class of people, but the question is whether that question can be answered in a common way in one stroke that will provide relief to all individuals in the class.

THE COURT:  So --

MR. WARD:  And our position would be that answering that common question would not provide relief to most people in the class and would not provide relief to the individual plaintiffs seeking to represent that class.

THE COURT:  Okay.  And I think where I land on this is that if you were to define the ability to challenge anything in the immigration world as saying we have to weigh whether there's ultimately relief for a particular individual, then what you've said is the courts can have no role because, at the end of the day, the question as to that individual is with the Secretary.

And so what you're saying is you can demand a focus on that ultimate question; and by then having the focus on the ultimate question, you can say, therefore, it's all in

1  your discretion and, therefore, it's not reviewable.

2        But it seems to me that if you have sort of a

3  larger question and I don't get into the individual

4  determinations, that does provide some relief, which is that

5  they have the opportunity to not have an unlawful barrier to

6  what they're doing.  So they may not get to have what it is

7  they want, but at least -- you know, let me give you an

8  example.

9        If, for example, someone said you can't have one of

10 these benefits because of the color of your skin, I think we

11 would all agree that that's an abuse of the agency's

12 discretion, that the agency can't be deciding who's coming

13 into this country because of their skin color.

14        And so if there was something that broad on the

15 outside, I might not -- if I said you can't do that, you

16 can't make a decision based on skin color, I might not

17 actually give a remedy.

18        And the executive branch can say, yes, but we can

19 distinguish between different countries; and we can say we

20 want to have people here from Europe, but not people here

21 from Asia.  And I think with some of our visas, et cetera,

22 there's limits and so forth that the Congress has put; but

23 certainly for something like parole, I don't think that -- I

24 think you could do that, and that's why these things have

25 been done in a programmatic way because you can do that kind

1    of thing.

2          My point being that I may not be able to say to

3    someone you get allowed into the country or you get a work

4    authorization.  I clearly don't have that authority.  But if

5    you're saying to me that the fact that I can't give them that

6    final relief means I couldn't consider the question, what if

7    we said no person of color can come in, I think you would

8    agree with me, at that point, I could say you can't say that.

9          MR. WARD:  I think there are -- there are several

10   important distinctions between that hypothetical and our case

11   here, including, first of all, here we're dealing with

12   nothing along those lines of a determination under the memos

13   that are before the Court that these individuals will

14   ultimately not be able to get these benefits.  It's a pause.

15         And so I think we're not saying that there is no

16   avenue for relief here.  We're saying that courts in this

17   district and in the First Circuit have said that the

18   appropriate remedy for a challenge to something that you're

19   alleging is delaying your adjudication of benefits is a

20   mandamus case where the Court applies the *TRAC* factors.

21         And in this case, if these are individuals that

22   have all come in on parole in the last year or two, and if it

23   takes three, four years for our asylum claims to be

24   adjudicated -- and courts in this district have said that's

25   normal, that's not unreasonable -- then it's hard to see how

1    the plaintiffs can show this pause has had any effect on

2    them.

3            If this pause goes for 60 days and their asylum

4    application --

5            THE COURT:  Well, we're more than 60 days now,

6    right?  So you can't argue the 60 days to me.

7            MR. WARD:  Say it's -- well, I can clarify a little

8    bit on that point, because I asked my clients about that as

9    well.

10           But say it's 90 days.  Say there's a 90-day pause,

11   and without the pause, the individuals and these plaintiffs,

12   their asylum claims would be ripe for adjudication two years

13   from now.  And with the pause, without the pause, if the

14   pause is lifted, it won't affect that because the agency is

15   continuing to adjudicate other asylum claims that are further

16   ahead in the backlog.

17           So I think this is why the case law is saying it's

18   inappropriate to certify an unreasonable delay class because

19   these determinations depend on individual factors related to

20   the categories, when someone applied, the delay, such that,

21   setting aside this memo, it's unclear how it will provide

22   relief to anyone in this case.

23           And I think that's different than a circumstance

24   where the agency says that -- the hypothetical that you gave,

25   individuals from a particular country are not subject -- will

1    not be able to apply for parole here.  They're saying we're

2    pausing adjudication of --

3            THE COURT:  So, in your view -- in your view, if

4    the hypothetical was, "We're pausing adjudication for all

5    Blacks," that would be okay, or that wouldn't be okay?

6            MR. WARD:  Well, that, obviously, would raise

7    different constitutional questions than we have at issue

8    here.

9            THE COURT:  Okay.  But my test here isn't limited

10   to constitutional claims.  My test is limited to legal

11   challenge -- right? -- if it's unlawful.

12           So -- and, you know, I -- sometimes when rights --

13   whether it's by statute or by constitution, we have -- we

14   have a system under the APA which basically allows change to

15   happen through certain layers of notice and opportunity,

16   right?  Certain things can be changed instantaneous.  Some

17   things have to go out for notice and comment.  We have this

18   varying scheme.

19           And what is implicit in that is that each

20   administration can come in and change those rules that are

21   being set by the executive branch, but what the APA does, it

22   says we have a system for doing it.  And as long as we're

23   using that system for doing it, we leave the agency to figure

24   out their right pace and so forth.  That's why you have this

25   line of cases.

1          But if the executive branch comes in and says, "We

2     are going to ignore the APA and simply say that, unlike every

3     administration before us, where we come up with what we want

4     to do and we follow what the requirements are of the various

5     levels under the APA," if instead the administration says,

6     "We end everything.  We stop everything.  We pause

7     everything, and we do nothing for a certain amount of time,"

8     60 days, 90 days, the first 100 days, whatever it is, why is

9     it that the only avenue to look at it is, "Oh, well, things

10    are delayed," as opposed to saying, no, this is a wholesale

11    avoidance of any requirement under the APA to, essentially,

12    saying we're going to terminate everyone, we're going to end

13    this program, we're going to -- or we're going to pause these

14    things, we're going to lay you off and then bring you back,

15    we're going to do all of these things where we're doing it

16    instantaneous today without any consideration as to whether

17    the various requirements of the APA would apply?

18          MR. WARD:  So I think I agree with everything the

19    Court just said --

20          THE COURT:  Careful.

21          MR. WARD:  -- except I would note that there are

22    many different types of systems under the APA.  So there are

23    systems for formal rulemaking in which, if the agency wanted

24    to unwind a rule or change a rule because it went through

25    rulemaking, there would be certain steps they would have to

1    take before doing that.

2            None of the processes at issue here went through

3    rulemaking.  And it might be different if there was some

4    particular statutory requirement or guarantee.

5            THE COURT:  And if what the agency was doing was

6    changing the rules going forward, you would say, is this the

7    kind of rule you can just change, or is this the kind of rule

8    you have to do notice and comment for?

9            But that's not what the agency is doing.  The

10   agency is, quote, "pausing it."  And what you're saying is

11   that, because we're using the word "pause" instead of

12   "terminating," we don't have to consider whether -- what

13   level of APA requirement does or doesn't apply here.  We're

14   simply saying no requirement applies to a pause, right?

15           MR. WARD:  So, again, none of these programs are

16   issued through notice and comment rulemaking, so it can't be

17   that notice and comment rulemaking is required to unwind

18   them.

19           I'd also --

20           THE COURT:  Sometimes you need a reasoned decision,

21   right?  You sometimes don't need notice and comment, but you

22   need a reasoned decision.

23           So is it your client's position that a pause is

24   permitted?  Regardless of what you're changing, a pause is

25   permitted without Court review?

1          MR. WARD:  Well, I don't want to say regardless of

2    what's being changed because I don't know how far that

3    hypothetical goes, but as to the things at issue in this

4    case, then yes.  I think that it depends on the discretionary

5    nature of the statutory authority.

6          Here you have a statute that plainly places the

7    decision-making authority with respect to parole in the

8    Secretary's sole discretion.  There is no timeline for

9    determining if, at all, any benefits under the parole statute

10   will ever be granted.

11         And, in fact, if you look at the individual federal

12   register notices or other policy documents with respect to

13   these parole programs when they were issued, it notes that

14   they were issued under the Secretary's sole discretion, and

15   they can be rescinded at any time.  It notes that parole

16   grants under those processes are issued solely under the

17   Secretary's discretion and can be rescinded at any time.

18         So here we have something that is -- where the

19   statutory scheme, Congress authorized it, but placed it in

20   discretionary terms in the Secretary's authority, so there's

21   no standard for which the Court can review whether a pause

22   has any legal meaning in this context.

23         And that's why we point to bars in both 8 USC

24   Section 1252(a)(2)(B)(ii) and in 701(a)(2) of the APA that

25   provides that when a decision like this is committed to the

1    agency's discretion, as we argue 1182(d)(5) does with respect
2    to the Secretary, that there is no APA review because it is
3    solely up to the agency to decide whether they want to pause
4    or change these programs.

5        And here the pause is related to a particular
6    couple of issues that the agency has identified, including
7    stating that they want to look further into instances of
8    fraud in some of these programs and to the grants of parole
9    under them and also determine whether the parole processes
10   accord with the current executive's desires with respect to
11   how it wants to exercise that parole.

12       Now, I think the CHNV processes are an example that
13   those were paused.  The agency has made a decision to
14   terminate those processes.  They've issued a federal register
15   notice with respect to that, and the parties are briefing
16   that separately, and there may be different issues that apply
17   there.  The agency here is simply saying that they've gone --
18   they're taking a temporary pause to evaluate.

19       And with respect to the 60-day pause in the Huffman
20   memo, I note that I asked my clients about that, and they
21   said that subparagraph 1 of the Huffman memorandum -- this is
22   on the third page -- lists a number of things that the
23   Court -- that the agency is undertaking in review.

24       They -- they've noted for me they have completed
25   that review.  They haven't issued anything in particular

1    lifting the Huffman memorandum, but they say they've

2    completed the 60-day review in the first part.  And then what

3    happens next, if anything, with these programs is now simply

4    up to the agencies to evaluate internally and decide.

5              THE COURT:  And I don't think I have to take any

6    action on it, but assuming we have another email that goes

7    out like last week's email to the Ukrainian parolees, that

8    your parole has been terminated, leave the country within

9    seven days, you would agree with me that it's not just that

10   that was sent out by mistake, but that can't be sent out

11   without violating the APA?

12             MR. WARD:  The notice to the --

13             THE COURT:  The Ukrainian -- the notice to all the

14   Ukrainian parolees that you rescinded over Saturday, came

15   back, another email to all of them that that was a mistake.

16             MR. WARD:  So that -- and the question is whether

17   that can be sent out without violating the APA?  That's a

18   question I would have to think more on.  I believe the

19   agency's position is that that parole was granted as a matter

20   of discretion.  The process says it can be terminated in the

21   agency's discretion at any time.

22             THE COURT:  So --

23             MR. WARD:  And that can be done under the statute

24   even without the individual process.

25             THE COURT:  So here's the part I don't understand

1    about it.  And I -- I don't think I have in the record what

2    the notices look like granting the parole.  But my

3    understanding is that under these parole programs, they're

4    paroled for a year or two years.  There's a finite date.  Am

5    I correct about that?

6            MR. COX:  It depends on the program, but, yes, it's

7    typically two years for --

8            THE COURT:  It depends on the program as to the

9    length, but each one of them has a date.

10           MR. COX:  Yes, on the -- on the entry document, the

11   I-94, it says --

12           THE COURT:  Any disagreement that their entry

13   document, same with student visas, for example, the entry

14   document has a date for when it ends?

15           MR. WARD:  I believe so, as far as I'm aware.

16   There are a lot of different programs at issue here, but my

17   understanding is that the different programs authorize up to

18   a certain amount of time.  That might not be granted in a

19   particular case.  For instance, CHNV was up to two years.  I

20   don't know if the agency retained discretion to grant it for

21   less.  I believe they are notified of a date when that is

22   issued, but that's --

23           THE COURT:  And --

24           MR. WARD:  I haven't looked into this deeply or

25   seen all the notices that have gone out, but that is my

1    understanding.

2        THE COURT:  And, presumably, if somebody -- I don't

3    think the plaintiffs would disagree -- if someone is paroled

4    in for a year or two years and during that time they do

5    something that gives cause individually for that person to

6    have their parole revoked, the government would have

7    authority to individually revoke that person's parole?

8        MR. COX:  Yes, Your Honor, pursuant to the

9    regulatory procedures.

10       THE COURT:  Okay.  So the question then is, when

11   the government is contending that categorical actions are

12   inappropriate, why would it be categorically okay to send a

13   categorical email to all Ukrainians and say you have to leave

14   the country in seven days?

15       MR. WARD:  Our position on that is that the statute

16   has various provisions and that the first part of the statute

17   says the parole can be granted on a case-by-case basis, but

18   that it doesn't say the determinations that parole is no

19   longer serving its purpose need to be made on a case-by-case

20   basis, that the later provisions of that statutory provision

21   simply say that when the Secretary determines that parole is

22   no longer serving its purpose, it can be rescinded.

23       THE COURT:  Okay.  And what's your response to

24   that?

25       MR. COX:  Well, we've briefed this already,

1    Your Honor, in the -- with regard to the federal register

2    notice.  But, no, the statute says that the conditions of

3    parole may only be prescribed on a case-by-case basis.  And

4    so if you're telling a group of people you have seven days to

5    leave, you are not prescribing any condition of the parole on

6    a case-by-case basis.  That is a categorical -- categorical

7    imposition of the -- or change to their conditions of parole.

8            THE COURT:  Okay.  I think -- oh, I got sidetracked

9    on subclass definitions.  I've divided, in my mind, the

10   subclass between those who are challenging benefits under the

11   Davidson memo and a subclass that is challenging the Higgins

12   email.

13           But I think, within the Higgins email, there may be

14   subclasses that are not situated the same.  Some of your

15   plaintiffs are seeking to re- -- I don't know the right

16   word -- re-up their parole.

17           MR. COX:  Re-parole yes.

18           THE COURT:  Re-parole.  Some are applying through a

19   family program to have family members in.  And is that just

20   the military at issue now under the Higgins?

21           MR. COX:  No, Your Honor.  The -- we have a CAM

22   plaintiff, Rosa Doe, whose application to bring her daughter

23   here was conditionally approved, and the --

24           THE COURT:  But is she covered by the Higgins

25   email?

1          MR. COX:  CAM is, yes, Your Honor.

2          THE COURT:  CAM is?

3          MR. COX:  Yes, Your Honor.  And we also have our

4    Family Reunification Parole plaintiff, Valentin Rosales.  His

5    position for his daughter was also conditionally approved.

6          THE COURT:  Okay.  So the first group are people

7    who are trying to re-up their own parole.  One group is

8    people who are here who are trying to bring a family member

9    into the country or into parole status?

10          MR. COX:  (Nods head.)

11          THE COURT:  And one group are the nonfamily

12    sponsors who are trying to bring people who are outside of

13    the US into the US?

14          MR. COX:  Yes, Your Honor.  That's the other group

15    of plaintiffs.

16          THE COURT:  And I think you would agree that those

17    are not situated identically, that they would be appropriate

18    for subclasses.

19          MR. FREEDMAN:  Your Honor, we proposed both the

20    family-related sponsors and the nonfamily-related sponsors as

21    one subclass.  It's perfectly appropriate to split them into

22    two subclasses.  We have no objection to that.

23          We grouped them together because they are subject

24    to the same common question, which Your Honor posed at the

25    beginning, commonality.  Have they been impacted by the

1    Higgins email in violation of the APA?  But it -- given that

2    they are -- there are slightly different considerations

3    between seeking parole and seeking re-parole, it -- we are

4    okay splitting it into that -- that into two subclasses.

5          THE COURT:  So a way that I'm thinking about

6    this -- and maybe the problem is I don't know whether it goes

7    under commonality or typicality, but when I think about how a

8    class action works in the course of the litigation, what you

9    worry about on these commonality and typicality questions is

10   that the interests of the representatives, whether the

11   representatives can fairly represent the interests of all of

12   the members of the class.

13         And it seems to me that if you were able to -- I

14   mean, one way to think about it is if you could achieve some

15   of your goals, if the administration ends up saying, "You

16   know what?  We're no longer going to pause this group, or

17   we're no longer -- or we're going to recognize the interests

18   of the family sponsors for people who" -- well, maybe the

19   military one is a good example.

20         "So for the military one, we're going to take into

21   account that, and we're going to make a decision as to that

22   group; but for some person out there who just wants to

23   sponsor someone to come into our country," which is where the

24   Secretary clearly has the highest part of the discretion

25   here, is that initial entry into the country, it would seem

1    to me their interests start being different.

2              MR. FREEDMAN:  Your Honor, that's fair.  I would

3    think of it as an adequacy issue, is there some kind of

4    conflict between class representatives and parts of the

5    class?

6              I think if you're talking about a partial -- you

7    know, essentially, a partial redress, if the government

8    concedes as to some parts of the action, that's not unusual

9    for class actions where you have a defendant who offers

10   redress as to some of the class.  I don't think it poses a

11   front-end fundamental problem to the adequacy of our class

12   representatives, but I do see Your Honor's --

13             THE COURT:  No, but it does -- it does -- to the

14   extent that you can anticipate what those could be, it does

15   suggest subclasses.  That's all.

16             MR. FREEDMAN:  As I said earlier, Your Honor, I

17   think you're right that we could certainly have subclasses.

18   And I think Your Honor's suggestion of having the sponsors,

19   the sponsor class that we've proposed, one for family

20   sponsors, one for nonfamily sponsors, makes sense.

21             THE COURT:  Okay.  My -- and the family sponsors

22   are divided between people who have -- the parole-in-place,

23   might have someone who is in this country, and the other

24   program, the beneficiary of the action is outside of the

25   country currently?

1          MR. FREEDMAN:  That's generally correct, although

2     Mr. Cox will correct me if I have this wrong, but I believe

3     that Family Reunification Parole, Central American Minors

4     parole, military parole-in-place, all have somebody in the

5     country who somebody out of the country is trying to reunite

6     with.

7          MR. COX:  Well, the military parole-in-place,

8     everyone is --

9          MR. FREEDMAN:  Everyone is in the country.

10          But then for U4U, CHNV, it's generally -- it

11     doesn't have to be a family sponsor, and it's typically a

12     nonfamily sponsor trying to bring in and agreeing to

13     financially support somebody who is outside of the country.

14          THE COURT:  Okay.  I think the next area that I

15     wanted to cover is moving over to the preliminary injunction

16     questions.  I am, again -- and I will let you go back and

17     make sure that -- if there's some points that you need to

18     cover that I seem to be going over.

19          But I do seem -- I do feel like there's appropriate

20     subclasses that can address the discrete actions that are at

21     issue, the Higgins email and the Davidson memo and then the

22     Higgins one being divided into sort of the different parole

23     processes that are involved.

24          And assuming I get through that far, the next

25     question, turns to -- sorry.  One last question on the class

1    certification, which is I understand your challenges to the

2    individuals who are here as named plaintiffs to be subsumed

3    under the standing argument.  So if I get past the standing

4    argument and I've divided my subclasses as I think is -- are

5    appropriate, do you have any further specific arguments about

6    any of the specific named plaintiffs?  Because I didn't see

7    that.

8            MR. WARD:  With respect to standing, Your Honor?

9            THE COURT:  No, with respect to -- so assuming --

10    you disagree with me on standing on those, and I understand

11    those arguments.  Assuming I get past the standing argument

12    and I say, yes, this individual has standing, assuming I get

13    there, I didn't see that there was anything further under the

14    rubric of class certification challenging any particular one

15    of these individuals other than where you challenged them

16    individually in the standing section.

17            MR. WARD:  If I can just clarify one thing that is

18    unclear to me at the moment.  We understood the classes that

19    they were seeking with respect to parole to be individuals

20    who had parole and sought some other benefit.  Is that

21    still -- I don't know if that's how the Court is viewing

22    that, and then in which case it's not clear, and we've noted

23    this in our brief.

24            I don't think that every plaintiff -- they

25    necessarily have a plaintiff that's in that category for each

1    of these.  For instance, I don't believe that they have a

2    plaintiff in the CAM category who has sought another benefit.

3    And I don't believe they have a sponsor plaintiff for the U4U

4    category.

5             THE COURT:  So I do think that, to the extent that

6    the subclass is not divided program by program, to the extent

7    that the subclass is this memo challenges these --

8    eliminates, pauses these four programs, I think I can have a

9    class representative cover them all.

10            To the extent that I think that there are

11   subclasses that need to be treated distinctly, then, yes, you

12   need to have an individual who is there.  And with regard to

13   the sponsor class, I think all of the outside sponsors are

14   tied to the CHNV program, correct?

15            MR. FREEDMAN:  I believe that the -- yes,

16   Your Honor, that is correct.  The outside sponsors are --

17            THE COURT:  I think --

18            MR. FREEDMAN:  Just for the nonfamily-related

19   sponsors.

20            THE COURT:  Yeah.

21            MR. FREEDMAN:  We do have family related-sponsors

22   for CAM and military parole-in-place.

23            THE COURT:  But for the nonfamily sponsors, the

24   only ones we have are for the CHNV program.  And so I think,

25   in light of that, it may be that I have that subclass, which

1      is challenges of sponsors, but I don't have a class

2      representative in the conversations that we're having right

3      now where I'm not yet talking about the CHNV people, and that

4      in order to get to there, I need to get to the CHNV issue,

5      which I haven't gotten to yet.

6              MR. FREEDMAN:  Your Honor, there's -- and our view

7      is we have a lot of nonfamily sponsors.  They are all CHNV.

8      But the programs are similar enough that we could -- you

9      could --

10             THE COURT:  And I think I need -- I think it may be

11     that those -- if I -- if -- depending on what I end up doing

12     with the CHNV matter -- and I set it aside because it felt

13     like the landscape had changed sufficiently that it needed to

14     be thought about carefully, it may be that it has nothing.

15     It doesn't matter.

16             But for right now, until we finish the briefing on

17     Wednesday or Thursday, I'm putting that separately, not to

18     say this can't be changed, because classes can be redefined

19     as we go if need to.

20             So putting aside those individuals, I think I'm

21     correct that I have no named plaintiffs, or defendants are

22     correct that there is no named plaintiff asserting nonfamily,

23     nonrelated sponsorship other than on this program.

24             And so my inclination is to just sort of see that

25     as a subclass, the outside sponsors, and not yet certify it

1    until I'm comfortable that I either have a new named

2    plaintiff or a different named plaintiff who's using one of

3    the other programs or that -- how I'm going forward with the

4    CHNV program.

5            MR. WARD:  Yes, Your Honor.  I think the -- I think

6    there are a couple of other issues here with respect to the

7    number of different programs and the different circumstances

8    these individuals might be in.

9            One point I'd like to clarify from our briefing is

10   that as plaintiffs define the class, they, I think, in some

11   circumstance define them as challenging these particular

12   agency actions, but also any future action that might happen.

13   And we think that is too vague.

14           And I think the CHNV circumstance is a good example

15   of why certifying a class with all of these different

16   programs and granting relief with respect to a class that

17   broad and that diffuse might be problematic, is that it

18   could -- it might not.  We don't know what's going to happen

19   in the future, but it could be that changes with respect to

20   these individual programs will put these people in separate

21   circumstances that makes it inappropriate to have

22   representatives that might be appropriate for one subclass or

23   for one program represent other programs.

24           THE COURT:  So what I'm anticipating at this point

25   is a certification under 23(b) --

1          MR. FREEDMAN:  (2).

2          THE COURT:  -- (2) as a -- recognizing that during

3     the course of the litigation, those classes, subclasses,

4     could be decertified, could be modified, et cetera, as the

5     litigation goes.

6          And because there is no requirement of notice at

7     this point, my decision is what it is, will be what it is.

8     It gets the notice that a decision that gets publicized

9     happens, but nobody has to bear the cost at this point of

10    what if we -- I do it this way, and in a month, we need to

11    change the definition slightly?

12         Assuming I go ahead and do this as I'm intending to

13    do it, it is an appealable order once I certify it, I

14    believe, in which case even though that might change, it's in

15    that form when it happens.  So I want to make sure I'm doing

16    it correctly.

17         But I agree with the defendant here that I can't

18    certify -- I can certify a class that consists of people who

19    have applied for benefits or re-parole or who may apply for

20    benefits or re-parole while the programs -- while this is

21    being litigated, but I can't certify a class for any actions

22    that might happen coming down.  I don't know what actions are

23    going to happen.  I don't know whether I'll have jurisdiction

24    over any actions that happen.

25         MR. FREEDMAN:  Your Honor, just a couple of

1    observations.  So first on -- we can take up the benefits

2    question again on Thursday when we're expressly talking about

3    CHNV.

4         But we do fundamentally think that the U4U, CHNV,

5    OAW benefits are all -- they're all -- there's commonality

6    here because they all turn on the fundamental question, was

7    the Davidson memo issued in violation of the APA?  So we

8    think that there is commonality there.  It's not a

9    program-specific determination.

10        On the question of the inclusion of future action,

11   I just -- three quick points.  So, first, this is a 23(b)(2)

12   class, and the primary relief we're seeking is declaratory

13   and injunctive relief, which necessarily has to be

14   forward-looking relief.  It's not unusual in these cases that

15   you have an injunction that not only covers agency actions

16   that have occurred, but also enjoins future actions that

17   would violate the law.

18        I can give some examples if that would be helpful,

19   but because it's a (b)(3)(ii), fundamentally, there's no

20   issue with enjoining similar future action.

21        And we see that that language is important, because

22   at the time we proposed -- originally proposed this class

23   definition, since that time, there have been future actions.

24   There was the action on March 21st when they issued the CHNV

25   federal register notice.  There was the action last Friday

1    when they issued the mistaken U4U notice.

2         So it's certainly -- this isn't hypothetical.  It's

3    certainly conceivable that there will be future actions that

4    are illegal in the same way that the past actions have been.

5         THE COURT:  Well, a federal register notice may

6    have problems with whatever they've done, but you can't say

7    it's illegal in the same way that the email notice was sent,

8    where the email notice was sent without all of what's in the

9    federal register notice.

10         I mean, it may or may not be that the federal

11    register notice is sufficient, but there is part -- a huge

12    part of your challenge here -- I mean, your entire challenge.

13    Let's be very blunt about it.  Your entire challenge is a

14    procedural challenge.  I don't have the authority to set

15    immigration policies.  It's procedural as to how immigration

16    policy is set.

17         And maybe it's a challenge to what can be done by

18    rulemaking and what has to be done by statutory changes and

19    so forth.  That may be properly in front of me.  But I have

20    to -- I --

21         I mean, if you're looking for similar emails to the

22    Higgins email that does exactly what the Higgins email does,

23    which may be exactly what happened here -- I mean, we don't

24    know.  We're going to get some answer on the other things,

25    but the Higgins email seems to say it only applies to this

1    group of things, and you're -- what you're finding out in the

2    field is that it seems to be applying to a larger thing, and

3    maybe that's because there's a second email.

4         So I can see articulating it as an injunction to

5    the -- as to the Higgins email or any email doing exactly

6    that type of thing.

7         But I can't do the next thing, which is all of the

8    U4U, sending them out of the country.  That's just a whole

9    different thing.

10    MR. FREEDMAN:  Your Honor, that's all fair.

11         Let me make the point, though, that for a class

12    certification definition, that's a different question from

13    whether the Court is going to be enjoining future government

14    actions.  And for purposes of the certification definition,

15    we do think that a (b)(2) class can encompass future

16    individuals who are subject to the illegal government

17    conduct.

18         If we need to come back on the -- on a U4U

19    termination, we will come back on a U4U termination.  But our

20    preference would be not to have to play whack-a-mole every

21    time the government changes and issues a memo that is

22    consistent with the Higgins email or the Huffman memo and to

23    have to come back every time and say let's change the class

24    definition every time.

25    THE COURT:  So here's the problem:  Saying it's

consistent or inconsistent with the Higgins email, you have
me there.  I think we don't want to waste resources.  And if
we're talking about the exact issue, sure, that makes sense.

        But the Huffman memo is, essentially, a policy
statement and a plan to change policy.  So to say anyone who
tried to implement what the Huffman -- any action that tries
to implement what the Huffman memo says, all you're doing by
a class of that is you're inviting a finding that the Court
doesn't have jurisdiction.

        MR. FREEDMAN:  Fair enough, Your Honor.

        THE COURT:  I am not -- I will read the Huffman
memo to understand what the Higgins email is doing and what
the Davidson memo is doing because they are both trying to be
consistent with the Huffman memo.  So it certainly is the
backdrop.  But I can't say that -- I mean, let's take the
most simple point.

        The Huffman memo says categorical programs, parole
programs, are illegal.  Okay?  Let's say I agree with you
that that is wrong.  It doesn't mean they have to have
categorical programs, right?  If they decide that they want
to, you know -- Myanmar just had this earthquake.  If they
decide they want to do a parole program or don't do a parole
program for Myanmar, that's not something that's in front of
me.

        So the fact that they want to eliminate the idea of

1    categorical parole problems, programs, if they do it because

2    they're illegal in their view, I might disagree with that.

3    But if they choose not to have a particular parole program or

4    to stop a parole program, the only -- the only review I have

5    is whether it is or isn't consistent under -- with the APA,

6    not whether I disagree with whether you can do that or not,

7    right?

8          MR. FREEDMAN:  That's all correct, Your Honor.

9          Just one other point.  I just want to -- Your Honor

10    said very early in the discussion of this ascertainability

11    discussion that it's not -- a (b)(2) class doesn't have an

12    ascertainability requirement.

13          I just want to make clear the record that that's

14    the law in the First Circuit.  The key case is *Yaffe*,

15    Y-a-f-f-e, *v. Powers*, 454 F.2d 1362, First Circuit, 1972.

16    It's been cited recently by Judge Saris in the *Brito v. Barr*

17    case, 395 F.Supp.3d 135, Note 2 -- that's a 2019 decision --

18    and Judge Guzman last year *Diggs v. Mici*, which is Case

19    Number 22-40003.

20          THE COURT:  Okay.  I think we've been going for a

21    while.  I think I've gotten answers to what I need, and I

22    guess I just give you each a few minutes on what you want to

23    make sure I'm not forgetting as we go through here.

24          MR. COX:  A couple of quick points to respond to

25    Mr. Ward's earlier comments on redressability.  We understand

1  why Mr. Ward focuses on asylum, but wanted to make the point

2  that with U4U, for example, there are more than 200,000 U4U

3  parolees here.  Our understanding is more than half of them

4  have TPS applications pending right now, and so we're not

5  talking about --

6          THE COURT:  Do I have a list somewhere of the

7  benefits that are referenced in the Davidson memo or in your

8  papers when we talk about benefits?  You gave me parole being

9  a benefit, and I'm going to go with my definition, though

10 we're just talking apples and oranges here, and re-parole is

11 a different category.

12         But benefits that you're talking about, what are

13 you talking about?

14         MR. COX:  So TPS is -- most Ukrainian parolees have

15 TPS applications pending, and the more likely -- the closer

16 their current period of parole is to expire, the more likely

17 they are to have a TPS application pending.

18         We also have adjustment of status.  This is

19 particularly relevant to the Family Reunification Parole

20 individuals, because that's, in fact, the whole point of

21 bringing them in here, is that they can wait until they're

22 able to adjust status.  Our understanding is that there are

23 at least a couple of thousand, perhaps more, family

24 reunification folks who have adjustment of status

25 applications pending right now that are suspended.

1          Employment authorization -- employment

2     authorization documents are also an immigration benefit that

3     is suspended by the Davidson memo.

4          We have the diversity visa, which is sort of a type

5     of adjustment of status, but we have an individual plaintiff

6     who won that lottery this year, and that's suspended.

7          H-1B, other employment, any employment visa,

8     employment-based visas would be suspended.  Asylum, of

9     course, would also be one.

10         I'm trying to think of -- I mean, it's literally

11    all of them, anything that someone could be eligible for.

12         THE COURT:  So other than -- other than the

13    employment authorization, all of them are tied to visa

14    status-type questions, visa questions or status questions

15    or -- not -- "visa" is the wrong word, but adjustment of

16    status one way or another?

17         MR. COX:  Yes, Your Honor, which, of course, would

18    bring with it employment authorization too.  And then --

19    right.  And the Davidson memo says "all benefits," so we take

20    it at its word, all.

21         The other --

22         THE COURT:  Let me stop you there.

23         MR. COX:  Yes.

24         THE COURT:  Any disagreement that these six things

25    that they listed -- TPS, adjustment of status, employment

```
 1    authorization, diversity visa, H-1B visa, asylum -- would all
 2    be covered by the Davidson memo?
 3             MR. WARD:  That's what it appears from the face of
 4    the memo, Your Honor.  I don't -- I haven't confirmed that
 5    specifically with my clients, but I'm not aware of anything
 6    else.
 7             THE COURT:  But unlike the parole where we're just
 8    disagreeing with terms that parole is not one of these things
 9    covered by the --
10             MR. WARD:  Yes, Your Honor.  And a point on that is
11    just I believe that their individual plaintiffs have alleged
12    that they have adjustment TPS and asylum, and perhaps -- I
13    don't know -- work authorization.  But I believe that the
14    additional benefits that the individual plaintiffs in this
15    case have raised, that they have pending, are asylum, TPS;
16    and then one plaintiff, I believe, has a pending adjustment
17    application.
18             THE COURT:  I think there's also employment listed,
19    no?
20             MR. COX:  I -- I thought that we had someone who
21    also has -- I'm not certain.  I assume that adjustment of
22    status is encompassing, like, the diversity visa, for
23    example.
24             MR. WARD:  That would be the basis, I assume, of
25    the adjustment application in that one case, yes.
```

1          And employment authorization, my understanding is

2     that's generally something that's adjudicated when someone

3     first comes in on parole, and so would have been -- and it's

4     tied to their parole, but would have been dealt with when

5     individuals were first paroled into the United States in

6     those cases.

7          MR. COX:  That's true, but we have -- when folks

8     fall out of status, they also -- when their parole expires,

9     their employment authorization document also expires.  And so

10    when they have re-parole application pending --

11         THE COURT:  But that's under the re-parole problem,

12    not under the benefits problem.

13         MR. COX:  Yes.  When they have a TPS application

14    pending, that would also come with employment authorization.

15    So there are folks who have fallen out of status with TPS.

16    They also can't work, is sort of my point.

17         THE COURT:  Well, but just to make my life slightly

18    easier here --

19         MR. COX:  Yes, Your Honor.

20         THE COURT:  -- when I'm looking at what it is that

21    you're saying is impacted, I might actually go and read the

22    statute.  So these are things where there's an adjustment of

23    status, various things.  I'm not going and looking for a

24    separate employment authorization application process.  The

25    employment authorization is tied to the status.

1          MR. COX:  Yes.  It's generally incident to status.

2          THE COURT:  Okay.

3          MR. COX:  Yes, Your Honor.

4          The other thing --

5          THE COURT:  And, therefore, the losing status means

6     not all -- not only are you here unlawfully and able -- going

7     to be picked up if necessary, but also that you lose your

8     ability to work if you do stay.

9          MR. COX:  Yes, Your Honor.

10          And the -- and for Ukrainians in particular, just

11     wanted to note that of the 200,000 parolees who are here, we

12     believe some 10- to 15,000 of them have already fallen out of

13     status since inauguration and that there are going to be

14     several more falling out of status each month, you know,

15     until -- they will all be out in approximately two years from

16     inauguration.  And that number will increase every --

17     every -- every month.

18          The other -- I think the only other thing that --

19     that I wanted to mention is the -- the notice that went to

20     the U4U folks on Friday, just to clarify, it didn't go just

21     to the U4U folks.  We don't know who else it went to

22     because -- you know, we've asked for information about --

23     about that, but every -- everything the government's told us

24     it has also told the Court in its filing on Saturday.  But we

25     do know it went to other parolees.  We just don't know who.

1          THE COURT:  How do you know it went to other

2     parolees?

3          MR. COX:  Because they -- some of them contacted

4     us, Your Honor.

5          THE COURT:  And from what programs?

6          MR. COX:  Some of -- it wasn't -- it wasn't always

7     clear.  Some of them came -- I think at least some came

8     through what's called CBP One, which is a program that's not

9     at issue here.  But we don't know who else.  And some of them

10    were in Spanish.  Some of them were in Russian.  We don't --

11    we don't know who all was affected.

12         THE COURT:  Do we know if they've all been

13    rescinded?

14         MR. COX:  No, Your Honor.  And we've read the

15    government's statement about this going out in error to U4U

16    parolees to be carefully worded to not say that it went out

17    erroneously generally.

18         THE COURT:  Do you have any further information

19    that you can share on that?

20         MR. WARD:  On the U4U thing?

21         THE COURT:  On the question of notice going out to

22    people that they're having to leave the country within a

23    week.

24         MR. WARD:  Yes.  So we -- the clarification I got

25    from our clients is what we submitted to the Court in our

1    filing on Saturday, that the notification went out to -- in

2    error for U4U parolees.  I don't believe it was all of them.

3    I believe it was a subset that have been here for almost two

4    years.

5              I'm not aware of it, of whether it went out to

6    other programs.  The information I have is what we submitted

7    to the Court in our filing on Saturday.

8              THE COURT:  I don't -- I don't know that I have in

9    front of me a request that would address these types of

10   notices going out.

11             MR. COX:  We don't disagree, Your Honor.  And I --

12   you know, part of that is because we don't have information.

13   And certainly this -- we would welcome additional information

14   from the government or would welcome the Court requesting or

15   ordering the government to at least provide some information

16   as to, you know, who this went to so we can know if it

17   affects our putative class members beyond the ones that we

18   know of.

19             And, you know, more generally -- sorry.

20             THE COURT:  So it seems a little beyond the scope

21   of what -- the relief that you have asked.

22             MR. COX:  Understood, Your Honor.

23             THE COURT:  Because that Ukrainian notice came out

24   after the briefing was completed on this.  But it does raise

25   the question regarding future actions.  You've asked for no

1    future -- you've asked for similar actions or anything

2    relating to the Huffman memo, et cetera.

3        It does seem -- I don't see it going to similar

4    actions writ large, but I'm not sure it wouldn't be

5    appropriate for me to enjoin further emails notifying

6    parolees that they have to leave the country, absent a --

7    going through whatever happens with the notice and comment

8    and things of that sort.

9        I don't know that that's fully briefed, but I think

10   it's something I need to think about.  I don't -- I

11   appreciate that the government turned around quickly and got

12   the email out saying, "Never mind."  But I think it's a

13   pretty horrific thing for someone to receive those emails,

14   and I don't know who else is going to get them on what day.

15       So I would suggest you think about it.  Maybe

16   there's some agreement that can be reached, and you don't

17   even need to come to me on it.  But I do think that that's

18   not -- you know, if the government wants to create as much

19   outrage as possible at what they're doing, then, you know,

20   you go and you do these things.

21       But if they're actually trying to have an agenda to

22   address legal issues that they want to address, then you do

23   it in a slightly more ordered way than sending emails.  So I,

24   you know --

25       MR. COX:  Thank you, Your Honor.  Understood,

1    Your Honor.

2          And, actually, I have just a couple of things.

3    First, I would -- Ms. Jang is prepared to talk about

4    irreparable harm and the public interest regarding the

5    injunction.

6          Before we get there, I wanted to talk briefly about

7    the injunction itself.  We think it would be appropriate here

8    to have some reporting requirements and, for example, a

9    weekly report of how many applications have actually been

10   processed.

11         Our concern, Your Honor, is that as we've seen in

12   our own and other cases, the government is not -- is reticent

13   to comply and also reticent to share information about its

14   own compliance.  And a reporting requirement is common in

15   order to address that issue.  And so our request would be a

16   weekly report of the number of applications processed and the

17   dispositions of those just so that we know that things are

18   actually moving.

19         And we also think it would be appropriate for the

20   Court to -- to specify in its injunction that it's not simply

21   blocking the Higgins directive and Davidson memo, but that

22   that means that they need to restart processing pursuant to

23   the policies that were in effect on January 19th of '21.

24   This is precisely what the Northern District of California

25   Court did in the CAM case in 2019, which the government ended

1    up settling on those precise terms.

2            And so we think those could really head off a lot

3    of -- sort of a lot briefing and time spent from the parties

4    and the Court concerning compliance with the injunction if

5    the Court could be clear, because it seems the government

6    will, at most, do things that it is specifically ordered to

7    do right now, and sometimes not even that.

8            And so we just want to take that into account and

9    try to get ahead of it so that we don't waste a lot of

10   people's time.

11           THE COURT:  Any response?

12           MR. WARD:  On the reporting specifically,

13   Your Honor?  We would say that that reporting would be

14   burdensome on the agency and is unnecessary.  And so we would

15   ask that --

16           THE COURT:  I understand why you would argue the

17   burdensomeness argument.  What is your response to the

18   necessity part of the argument, the plaintiffs contending

19   that, absent reporting, the government wouldn't follow my

20   order?

21           MR. WARD:  I don't believe there's been any

22   evidence of that in this case, Your Honor.  And my concerns

23   here is that an injunction requiring anything in particular

24   in terms of processing would be difficult to administer.

25           Parole applications are, obviously, subject to a

1    range of different circumstances.  They're adjudicated by

2    individual agency officers all across the country.  They're

3    adjudicated under the I-131 process in some circumstances at

4    ports of entry and in other circumstances -- so that is

5    information that I don't even know if the agency tracks in a

6    unified way or is that information that they could -- they

7    regularly gather.

8            And so I have serious concerns about being able to

9    fully track and comply and provide that type of information

10   to the -- to the Court, particularly on that frequent a

11   basis.

12           THE COURT:  I will think about that.  I think, at

13   least at the outset, I am more inclined to make sure that

14   whatever I end up ordering is received by the individuals who

15   are -- need to be -- have notice of my order.

16           And so I'm more likely to ask the -- or to have --

17   to tell the defendants to provide me information as to the

18   dissemination of my order rather than the -- assuming that

19   there would be a lack of compliance, to make sure that the

20   order is received where it needs to be received.

21           MR. COX:  If I may --

22           THE COURT:  Yes.

23           MR. COX:  -- two quick things on that, Your Honor.

24   First, Mr. Ward's speculation about the tracking, we happen

25   to know that they do track those things because of litigation

1    in Texas involving the CHNV program.  That data exists.  I

2    don't hear Mr. Ward saying anything to the contrary.

3            We also requested this in our opening motion, and

4    there was no opposition from the government to this in their

5    opposition either.  And so, to some extent, I would argue

6    that they have waived this issue.

7            The last thing I wanted to add, Your Honor, is the

8    Davidson memo, the final paragraph in it states that even

9    when there is classwide injunctive relief ordered, the -- it

10   specifies a process that has to be gone through in order to

11   lift the hold.

12           We would ask that the Court be clear in the

13   injunction that the injunction applies to that paragraph as

14   well; because, otherwise, that is -- seems to be an

15   intentional choke point that is not warranted.

16           THE COURT:  Is that paragraph -- Counsel, in your

17   view, does that paragraph allow the agency to disregard my

18   orders?

19           MR. WARD:  Your Honor, I'll need to ask my client

20   to clarify how they view what they mean in that particular

21   paragraph.

22           THE COURT:  Thank you.

23           MR. COX:  Thank you, Your Honor.  And --

24           THE COURT:  Okay.

25           MR. COX:  And Ms. Jang is prepared to talk about

1    the nonmerits factors of the preliminary injunction.

2              THE COURT:  I'm going to give you a very short

3    time, and then I'm going to give the government an

4    opportunity to close, and then we're going to need to be

5    done.

6              MR. COX:  Thank you, Your Honor.

7              MS. JANG:  Sure.  Your Honor, I'll just spend a few

8    minutes addressing irreparable harms and public interest.

9              Your Honor, here, preliminary relief is needed in

10   order to avoid harm to the proposed class and as well as the

11   plaintiffs.

12             Right now, there are plaintiffs that are falling

13   out of status.  Since this complaint was filed on

14   February 28th, already two of our named plaintiffs have

15   fallen out of status.  Those are Aleksandra Doe and Teresa

16   Doe.  Maksym Doe, he's going to fall out of status this

17   month, and many more plaintiffs will fall out of status

18   during the pendency of this litigation in the absence of

19   preliminary relief.

20             And as Mr. Cox just previewed, there have been

21   thousands in the U4U program alone that have fallen out of

22   status.  So this is emblematic of a wider issue.

23             Something else I want to talk about is that there

24   are members of the proposed class that have very rare, if not

25   once-in-a-lifetime, opportunities to seek certain immigration

1  benefits here in the United States, but they may lose out on

2  those opportunities because the government has indefinitely

3  suspended benefits processing.

4       So I'll give you an example.  One is Aleksandra

5  Doe.  She has already reached the final stages of the

6  diversity visa application.  She was selected for the

7  diversity visa lottery.  She proceeded to pay thousands of

8  dollars toward her green card application fees, and then she

9  had an interview scheduled in February, and that was close to

10  the very end of the process.

11       And that interview was canceled abruptly at the

12  last minute with no explanation.  And as -- and her parole

13  expired in March.  She is currently out of status.

14       We have another plaintiff, Maria Doe.  She just won

15  the H-1B employment-based lottery for the 2026 fiscal year.

16  Her employer indicated an interest in sponsoring her for

17  that.  And her deadline to apply for the H-1B visa would be

18  June 30th of this year, but under the Davidson memo, her H-1B

19  application would not be adjudicated if she were to apply.

20       THE COURT:  But she's not stopped from applying?

21       MS. JANG:  She's not stopped from applying, but if

22  she were to apply, the Davidson memo would prevent that

23  application --

24       THE COURT:  And if she doesn't apply, you never win

25  the lottery, right?  I mean, I'm not sure where we go with

1    people not applying.

2           MS. JANG:  Your Honor, you know, she's likely going

3    to apply.  Unfortunately, the Davidson memo would mean that

4    her application would never be adjudicated; and if it's not

5    adjudicated, then she has no opportunity for the next fiscal

6    year.

7           And, Your Honor, there are just undoubtedly

8    thousands of people in the proposed class who are sharing --

9    in the same circumstances as Aleksandra Doe and Maria Doe.

10   They're on the cusp of some kind of adjustment of status, but

11   their applications just would not be adjudicated.

12          Your Honor, I just also wanted to emphasize that

13   our parolees are people who cannot return to their home

14   countries.  Svitlana Doe, she's a mother who resides in this

15   district, in Dover, Massachusetts.  She has a young son with

16   a medical condition, and he was not properly treated in

17   wartime conditions.  He became gravely ill in Ukraine, and he

18   faces serious irreparable harm if he's returned there.

19          Maksym Doe, who I just alluded to earlier, he faces

20   conscription and possible death if he has to return to

21   Ukraine this month.

22          And Omar Doe, he's here under the Operation Allies

23   Welcome parole process.  He worked with the US military.

24          THE COURT REPORTER:  I'm sorry.  If you could start

25   that --

```
 1              THE COURT:  Even if you're reading or going
 2    quickly, you have a court reporter needing to get it down.
 3              MS. JANG:  Sure.
 4              Omar Doe, he's here under the OAW process.  He
 5    worked with the United States military in Afghanistan for
 6    over 18 years.  It's the only job he's ever had in his adult
 7    life, and he's faced serious prosecution in Afghanistan
 8    because of that job.
 9              He's currently here with his entire family.  He
10    fears what the Taliban might do to him if he were to return.
11    And despite faithfully serving the United States for
12    18 years, he's had a special immigrant visa for over three
13    years with no final decision.  His parole is up in August,
14    and if it's up in August, he's going to be out of status.
15              And, Your Honor, I'll just reiterate there are
16    thousands of people in the proposed class who are facing
17    similar circumstances.
18              And, Your Honor, this district and other districts
19    recognize family separation as an irreparable harm.  And
20    our -- our proposed class includes people who are relying on
21    the parole processes to reunite with their family members or
22    to prevent family separation.
23              Teresa Doe, she's a mother and a grandmother.  She
24    came here under the CAM process to reunite with her husband
25    and her son.  She fell out of status last month.  She resides
```

1    in Las Vegas, and she faces a possibility of being separated

2    from her children and her grandchildren if she's deported.

3                Rosa Doe, she's a survivor of rape and trafficking.

4    She's here with a pending U visa application.  And she

5    petitioned for her 14-year-old daughter and her daughter's

6    father to come to the United States.  They already received

7    conditional approval in November, but they have received no

8    status updates since then.

9                And we also have plaintiffs here under -- who have

10   petitioned for family members under the military parole in

11   process -- military parole in process [sic], specifically so

12   that an undocumented family member could gain legal status.

13               One example is Marim Doe.  He enlisted in the Navy

14   specifically so that he could help his undocumented father

15   who has worked tirelessly his entire life to support his

16   family, but who lives in the shadows and fears he could be

17   apprehended and taken away from his family.  And, Your Honor,

18   there are just thousands of people in the proposed class who

19   are in the same situation.

20               I'll take just a moment to quickly address balance

21   of equities and public interest.  Your Honor, I'm sure you've

22   seen the amicus brief from the 15 states in the District of

23   Columbia.  That was submitted by some of the largest states

24   by population in GDP, including California, New Jersey,

25   New York, and Illinois.  And they've stated that their local

1  immigrant communities are essential.  They contribute

2  significant sums to tax revenues.  They're helping to ease

3  worker shortages in critical industries.

4        And, Your Honor, I'll just add that there are other

5  public benefits that stem from the categorical parole

6  processes.  They ease migration at the border.  When the

7  Ukraine war first broke out, thousands of refugees presented

8  at the southern border.

9        THE COURT:  So I -- just to be very clear, this is

10  not the right forum to decide whether, in the long run, we

11  should or shouldn't have categorical parole.  That's beyond

12  what I'm addressing here.

13        MS. JANG:  Your Honor, that's fair.  I think we

14  just wanted to highlight that there are very immediate harms

15  that could be redressed with preliminary relief, and we

16  wanted the opportunity to present those to you.

17        THE COURT:  Thank you.

18        MR. WARD:  Just to reiterate a couple quick points,

19  Your Honor, the first of which is, as I've said before, none

20  of these parole processes guarantee that they will be

21  extended to allow other benefits to be adjudicated.  These

22  particular benefits, each of them have different statutory

23  provisions that govern them.

24        The timelines for adjudicating TPS and other

25  benefits is often discretionary, and there are decisions

1    finding that review of the timelines for those are barred by

2    the same discretionary bars that we raise in this case, 1252

3    and 701(a)(2), and also note that adjustment, TPS, asylum are

4    claims that the individuals, if they end up being placed in

5    removal proceedings, that they can renew those applications

6    and have them considered in immigration courts.

7            And then just one final point is a point I made

8    last time, is that I'd ask that if the Court is considering

9    granting some -- a preliminary injunction or some classwide

10   relief, that the Court considers staying that order for seven

11   days to allow the Solicitor General to evaluate whether she

12   wants to seek an emergency appeal or relief, and if the Court

13   determines that staying that order to allow for that is not

14   appropriate, if the Court would note that, that that request

15   is denied in the order so that we could, if the Solicitor

16   General elects to, proceed directly to seeking appeal.

17            THE COURT:  Okay.

18            MR. COX:  Just to correct one thing.  When

19   individuals are placed in expedited removal, they are not

20   permitted to renew their request as Mr. Ward just said.  And

21   this administration has indicated that it intends to put as

22   many as possible in expedited removal.

23            The second thing I would say is, on the stay, we

24   would just ask that Your Honor, if Your Honor --

25            THE COURT:  Just so --

1          MR. COX:  Yes, Your Honor.

2          THE COURT:  Because expedited removal is something

3    in the far reaches of my mind, if I recall correctly,

4    expedited removal is the process when you're, essentially,

5    picked up at the border, and you can be expelled immediately

6    without any -- or with very, very short protections.

7          MR. COX:  That's, essentially, correct, Your Honor.

8    The statute does permit the -- it to be applied against

9    people who are here up to two years, so long as they have not

10   been admitted or paroled.

11         This administration has expanded to the statutory

12   limit of two years and has stated in the FRN that we'll

13   discuss on Thursday, for example, that it believes it can put

14   parolees through expedited removal.  That's, in fact, the

15   justification in the FRN for clawing back the grants, is they

16   say if it goes -- if they're here for the full two years, we

17   can't put them through ER.

18         THE COURT:  So let me just put the question back

19   to -- and in terms of the balance of equities in a connection

20   with a stay, if people lose all of their rights in the event

21   that they fall out of status -- and I don't know that they

22   lose all of their rights, but they certainly will lose a lot

23   of their rights if they fall out of status, isn't -- at least

24   insofar as the impact is allowing people to fall out of

25   status, isn't that a reason not to stay whatever I do?  That,

1    essentially, for every day that I haven't acted on this or

2    that I stay whatever I do do, people are permanently losing

3    these rights?

4              MR. WARD:  The rights with respect to parole,

5    Your Honor?

6              THE COURT:  No, rights with respect to applying for

7    all of these things, which once you're out of status and you

8    get picked up for expedited removal, you can't assert.

9              MR. WARD:  Well, with respect to asylum, you could,

10   even if the agency elects to put you in expedited removal,

11   could still assert --

12             THE COURT:  And all the others?

13             MR. WARD:  The others, if you're placed in removal

14   proceedings and you go before an immigration judge, you could

15   assert the others in that context.

16             THE COURT:  In expedited removal, you're not in

17   front of an immigration judge.

18             MR. WARD:  Yes, Your Honor.  But in expedited

19   removal, but in expedited removal, if they have a fear

20   claim --

21             THE COURT:  But that's it, just the fear claim.

22             MR. WARD:  Yes, Your Honor.

23             MR. COX:  If I could add one thing on the stay,

24   Your Honor, it's just if and when Your Honor does address the

25   stay, we think it would be helpful to note that the

1    government has not made any arguments about why a stay is
2    warranted.  Even when they address this in their papers,
3    they've simply said that they want one because they want to
4    act otherwise.  They have not articulated any harm to the
5    government whatsoever.
6              And the reason we think it could be helpful to say
7    that is that if they come up with something new on appeal, we
8    think it would be helpful to be able to say they didn't make
9    this argument.
10             THE COURT:  So what's the harm?  Frankly, what's
11   the harm?  I understand all of your arguments, I think, as to
12   why I don't have the authority or should not enjoin the
13   action.  What's the argument for the harm in pausing the
14   pause?
15             MR. WARD:  So the argument for harm is that some of
16   these processes have been paused because of demonstrated
17   instances of fraud in the granting of parole as they were
18   done under the last administration.
19             And so the agency's view is that making them move
20   forward with parole applications or adjudicating applications
21   for other benefits for categories where they view parole is
22   not alining with the current agency's views of how to best
23   exercise its discretion or use its agency resources or devote
24   resources to categories where they don't feel like sufficient
25   vetting is in place, to determine that these benefits have

1    been properly submitted and applied for would cause harm to

2    the agency and to the United States.

3            THE COURT:  And I guess the one -- well, I won't --

4    I don't think I will elaborate there.

5            We've pretty much run our time.  I will -- I told

6    you last time I was trying to get done something

7    expeditiously.  There's, unfortunately, a lot of different

8    pieces to this.  I am trying to put this together as quickly

9    as I can.  And I'll see you all in a few days.

10            MR. WARD:  Thank you, Your Honor.

11            MR. COX:  Thank you, Your Honor.

12            THE DEPUTY CLERK:  We are in recess.

13            (Court in recess at 11:56 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Robert W. Paschal, Registered Merit Reporter and

5    Certified Realtime Reporter, in and for the United States

6    District Court for the District of Massachusetts, do hereby

7    certify that pursuant to Section 753, Title 28, United States

8    Code, the foregoing pages are a true and correct transcript

9    of the stenographically reported proceedings held in the

10   above-entitled matter and that the transcript page format is

11   in conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                         Dated this 10th day of April, 2025.

15

16

17

18

19                    /s/ Robert W. Paschal

20                    _____

21                    ROBERT W. PASCHAL, RMR, CRR
                      Official Court Reporter

22

23

24

25