UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| KRISTI NOEM, in her official capacity as | * | |
| Secretary of Homeland Security; TODD M. | * | |
| LYONS, in his official capacity as the | * | |
| Acting Director of Immigration and | * | |
| Customs Enforcement; PETE R. FLORES, | * | Civil Action No. 1:25-cv-10495-IT |
| in his official capacity as Acting | * | |
| Commissioner of U.S. Customs and Border | * | |
| Protection; KIKA SCOTT, in her official | * | |
| capacity as the Senior Official Performing | * | |
| the Duties of the Director of U.S. | * | |
| Citizenship and Immigration Services; and | * | |
| DONALD J. TRUMP, in his official | * | |
| capacity as President of the United States, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER GRANTING IN PART PLAINTIFFS'
EMERGENCY MOTION FOR A STAY OF DHS'S *EN MASSE* TRUNCATION
OF ALL VALID GRANTS OF CHNV PAROLE

April 14, 2025

Among several motions pending before the court is Plaintiffs' Emergency Motion for

Preliminary Injunction and Stay of DHS's *En Masse* Truncation of All Valid Grants of CHNV

Parole [Doc. No. 70]. For the reasons that follow, and pending further court order, the court

grants emergency relief staying the *Termination of Parole Processes for Cubans, Haitians,*

*Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), insofar as it revokes,

without case-by-case review, the previously granted parole and work authorization issued to

noncitizens paroled into the United States pursuant to parole programs for noncitizens from

Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's

originally stated parole end date.

## I.    Background

### A.    The Statutory Parole Authority

Under the Immigration and Nationalization Act, as amended:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit <u>any alien applying for admission</u> to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (emphasis added).[1]

### B.    The CHNV Processes

On October 19, 2022, the Department of Homeland Security ("DHS") announced an

effort to address the increasing number of Venezuelan nationals arriving at the southern border

of the United States by "coupl[ing] a meaningful incentive to seek a lawful, safe and orderly

means of traveling to the United States with the imposition of consequences for those who seek

to enter irregularly." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507

(Oct. 19, 2022). Under the program, individuals who passed a national security and public safety

vetting and who had a supporter in the United States who agreed to provide housing and other

support could receive an advanced authorization to travel to the United States for the purposes of

seeking, on a case-by-case basis, a discretionary grant of parole at an internal port of entry. <u>See</u>

---

[1] An "alien" is "any person not a citizen or national of the United States." <u>Id.</u> § 1101(a)(3).

id. at 63515; see also id. at 63508 ("[o]nly those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.").[2] The program specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization. See id. at 63508. The program specified further that those "who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires." Id. The process was capped at 24,000 beneficiaries. See id. Individuals who had been ordered removed from the United States in the past five years, or who crossed into the United States between ports of entry or entered Mexico or Panama without authorization after October 19, 2022, were barred from the program. Id.

In early 2023, DHS implemented similar processes for nationals of Cuba, Haiti, and Nicaragua. See Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023).

On October 4, 2024, DHS announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. See Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614 n.24 (Mar. 25, 2025).[3]

---

[2] In contrast, "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i).

[3] Plaintiffs do not dispute that re-parole is not available through the CHNV processes. See Mem. ISO Second Mot. for PI at 3 n.4 [Doc. No. 72].

C. *The January 20, 2025 Executive Orders*

On January 20, 2025, President Trump signed numerous executive orders, including two that are relevant here:

The first order directed the Secretary of Homeland Security to "take all appropriate action [consistent with applicable law] to . . . [t]erminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the [CHNV program]." See Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 30, 2025).

The second order directed the Secretary to take "all appropriate action, consistent with law," to:

> ensur[e] that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole[.]

See Exec Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

D. *The Huffman Memorandum*

On January 20, 2025, Acting Secretary of Homeland Security Benjamin C. Huffman issued a memorandum stating that "[i]t is evident that many current DHS policies and practices governing parole are inconsistent with [8 U.S.C § 1182(d)(5)]." See Huffman Memorandum 2 [Doc. No. 41-1]. The memorandum stated that the language and context of 8 U.S.C. § 1182(d)(5) "make it abundantly clear that it is a limited use authority, applicable only in a very narrow set of circumstances," and that the statute "does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria." Id. at 1-2 (emphasis in original). The memorandum further stated that "it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens

4

found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims." Id. at 2.

The Huffman memorandum ordered that within 60 days, the Director of U.S. Immigration and Customs Enforcement ("ICE"), the Commissioner of U.S. Customs and Border Protection ("CBP"), and the Director of U.S. Citizenship and Immigration Services ("USCIS") were to compile and review all policies pertaining to parole to determine "which are not strictly in accord with" 8 U.S.C § 1182(d)(5), and to thereafter "[f]ormulate a plan for phasing out" any such policies. See id. It further ordered that pending such review, DHS Components would have "discretion to pause, modify, or terminate any parole program described in [the previous paragraph] to the extent" that: (1) the policy was not promulgated pursuant to the procedural requirements of the APA; (2) DHS could take such action while protecting legitimate reliance interests; and (3) taking such action was otherwise consistent with applicable statutes, regulations, and court orders. See id.

Huffman concluded his memorandum by stating that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance." Id.

*E. The Davidson Memorandum*

On February 14, 2025, Andrew Davidson, the Acting Deputy Director of USCIS, issued a memorandum authorizing an immediate agency-wide administrative hold on all pending status readjustment and benefit requests filed by individuals paroled into the United States under the CHNV programs, pending "the completion of additional vetting flags in ELIS to identity any fraud, public safety, or national security concerns." Davidson Memorandum [Doc. No. 41-3]. The memorandum stated that USCIS had suspended parts of the CHNV processes in July 2024

after a USCIS assessment identified potential concerns related to fraudulent sponsorship

requests. Id. at 2. Based on this assessment, the memorandum stated that "benefit requests filed

by aliens who are or were paroled under any of these categorical parole programs need further

review to determine the level of fraud and the possible involvement of beneficiaries." Id.[4]

The Davidson memorandum concluded by stating:

> Any case subject to this administrative hold with a litigation need may only be lifted
> from the hold on a case-by-case basis, in a subsequent memo to file, with approval
> by the USCIS Director or USCIS Deputy Director. This case-by-case requirement
> must be followed even when aliens are member of a class that is subject to
> injunction, settlement agreement, or other court order. Once USCIS completes a
> comprehensive review and evaluation of the in-country population of aliens who
> are or were paroled into the United States under these categorical parole programs,
> USCIS may issue a subsequent memo lifting this administrative hold.

Id. To date, the "administrative hold" has not been lifted.

### F. The March 25, 2025 Federal Register Notice

On March 25, 2025, DHS published a Federal Register Notice ("FRN") announcing that,

effective immediately, DHS "is terminating the categorical parole programs for inadmissible

aliens from Cuba, Haiti, Nicaragua, and Venezuela." See Termination of Parole Processes for

Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).[5] The

---

[4] The Davidson Memorandum also suspended benefits requests filed by individuals paroled
under the Uniting for Ukraine and Family Reunification Parole programs. See Davidson
Memorandum 1 [Doc. No. 41-3]. The court will address Plaintiffs' challenge to the Davidson
Memorandum in a separate order.

[5] The FRN repeatedly uses the term "inadmissible aliens" in describing the individuals in the
United States pursuant to these parole programs. See e.g. id. at 13614 (referring to "inadmissible
aliens arriving in local communities"); id. at 13618 ("Between October 19, 2022, and January 22,
2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant
to the CHNV parole programs.") (emphasis added). Parole is authorized for individuals
"applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). In other words, parole
may be granted when an individual has not yet been deemed either admissible or inadmissible.
The FRN gives no reason for mislabeling individuals who received parole through CHNV (or
any other program) as "inadmissible" and, when detailing the statutory scheme, acknowledges

FRN announced further that "[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025[,] will terminate on that date unless the Secretary makes an individual determination to the contrary." Id. It directed further that "[p]arolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date." Id. The FRN detailed further that:

> DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice.

Id. at 13618.[6]

The FRN stated that terminating the CHNV programs and existing grants of parole under CHNV was consistent with the President's executive orders, including Executive Order 14165. See id. at 13611. According to the FRN, the CHNV programs "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." Id. at 13612.[7] The FRN further

---

that "a parolee remains an applicant for admission during the period of parole in the United States." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13618 (Mar. 25, 2025).

[6] The FRN further stated that "DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (e.g., adjustment of status, asylum, Temporary Protected Status, or T or U nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (e.g., petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available)." Id. at 13619.

[7] The FRN explained in some detail why the original grounds for the CHNV program did not warrant continuing the program. See id. at 13612-13614 (explaining why, in DHS's view, the

stated that as to prior arguments or determinations "that these programs were consistent with the requirement of 'urgent humanitarian reasons' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." Id. The FRN concluded that these reasons, independently and cumulatively, support termination of the CHNV programs. Id.

After addressing DHS's rationale for terminating the CHNV programs, the FRN turned to the reliance interests of prospective supporters and parolees. Id. at 13617. The FRN asserted first that "the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted," but that it was addressing certain reliance interests "in an abundance of caution." Id.

The FRN addressed first the reliance interests of supporters and potential beneficiaries of the CHNV programs, concluding that the costs potentially incurred by these individuals were minimal and "pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States." Id. at 13617-18.

The FRN addressed next the reliance interests of potential beneficiaries with approved advanced travel authorizations ("ATA") and their supporters. The FRN stated that "[t]here are no currently approved ATAs upon which an alien may travel under the CHNV programs," and that

_____

CHNV programs were unnecessary to achieve border security goals); id. at 13614-15 (explaining why, in DHS's view, the CHNV programs did not minimize "the burden on communities, state and local governments, and NGOs"); id. at 13615-16 (explaining why, in DHS's view, the CHNV programs are inconsistent with the new administration's foreign policy goals); id. at 13616-17 (explaining why, in DHS's view, other factors do not counsel in favor of maintaining the CHNV programs).

the interests of any individual whose application for an ATA has been cancelled are outweighed by the other concerns specified in the FRN. Id. at 13618.[8]

Finally, the FRN addressed the reliance interests of individuals with a current grant of parole under the CHNV programs, including that these individuals "will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside." Id. at 13619. The FRN stated that "any assessment of" these interests "must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served; and that (2) the initial term of parole would be limited to a maximum of two years." Id.

The FRN concluded that "the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." Id. DHS stated that it considered the alternative of permitting CHNV parole recipients to

---

[8] The absence of any approved ATA requests followed a directive issued on January 23, 2025, by Jennifer B. Higgins, then Acting Director of USCIS, to her colleagues to "ensure effective immediately that your staff do not make any final decisions (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request" for the CHNV, or other parole programs. See Higgins E-mail [Doc. No. 41-2]. On January 28, 2025, USCIS provided notice on its website that it was "pausing acceptance" of the Form I-134A, Online Request to be a Supporter and Declaration of Financial Support used to initiate the parole processes for the CHNV and certain other programs, "until the Agency had reviewed all categorical parole programs as instructed by Executive Order (EO) 14165." See Kika Scott Decl. ¶ 4 [Doc. No. 41-4]. The court will address Plaintiffs' challenge to the Higgins E-mail in a separate order.

remain in the country until the natural expiration of the parole, but the FRN rejected that

alternative on the grounds that it would:

> essentially foreclose DHS's ability to expeditiously remove those CHNV parolees
> with no lawful basis to remain in the United States. Under this alternative, CHNV
> parolees may begin to accrue more than two years of continuous presence in the
> United States, such that DHS would have to initiate section 240 removal
> proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C.
> 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system
> would be further taxed with adjudicating the section 240 removal proceedings for
> the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

Id. at 13619-20.

For the same reason, DHS rejected the alternative of more than a 30-day

termination period for existing grants of parole. See id. at 13620.

The FRN concluded by stating DHS's view that publication of the notice in the Federal

Register constitutes legally sufficient notice to all interested or affected persons. Id.

### G. Plaintiffs Who Were Paroled into the United States Under the CHNV Programs[9]

Plaintiffs[10] who were paroled into the United States under the CHNV Programs have

supported the pending motions with declarations stating the following:

---

[9] For the purposes of this order, this court addresses only the claims of individuals who received
parole through a CHNV program. The court does not address here the claims of Plaintiffs who
supported individuals or are seeking to support individuals for parole through the CHNV
programs. The court is also not addressing here the claims of Plaintiffs who received parole or
have supported or are seeking to support individuals through any parole program other than
CHNV.

[10] These Plaintiffs are proceeding here under pseudonyms pursuant to the parties' Stipulated
Protective Order Concerning Confidential Doe PII [Doc. No. 57] and this court's Electronic
Order [Doc. No. 69] granting Plaintiffs' Second Supplemental Motion to Proceed Under
Pseudonym [Doc. No. 64]. All Plaintiffs except Miguel Doe voluntarily provided their identities
to Defendants, and all Plaintiffs have provided their identities to this court for *in camera* review.
See Mem. & Order [Doc. No. 79]; Sealed Notice Providing Plaintiffs' Identities [Doc. No. 81-1].

1.  Armando Doe[11]

Armando Doe fled Nicaragua due to the dangers he faced stemming from his work dedicated to documenting government abuse, the arrest of his father-in-law, and the harassment and persecution of his wife's family.[12] He lawfully entered the United States pursuant to a two-year grant of parole in February 2024. He received work authorization in April 2024 and has been working at a company that makes tractor trailers. The salary he earns helps him provide for his family here as well as for his parents in Nicaragua, including to pay for their medical appointments and living expenses. If Armando Doe cannot work in the United States, he will be forced to returned to Nicaragua and face persecution by the Nicaraguan government. He is scared to return to Nicaragua and has a pending asylum application, which he submitted in January 2025. He attended his biometrics appointment for his asylum application in February 2025.

2.  Ana Doe[13]

Ana Doe, the wife of Armando Doe, is also a citizen of Nicaragua who received a two-year grant of parole in February 2024. She received work authorization in April 2024. In Nicaragua, Ana Doe completed college studies computer engineering. Here, she has been working for a company that supplies personal protective equipment. She uses her salary here to provide for her family and for her mother who lives in Nicaragua.

---

[11] See Armando Doe Decl. [Doc. No. 24-3].

[12] Armando Doe's wife is Plaintiff Ana Doe.

[13] See Ana Doe Decl. [Doc. No. 24-2].

Ana Doe has a pending asylum application that she submitted in January 2025 because she fears persecution by the current governmental regime. She states that she is not even certain she would be allowed entry into Nicaragua, which would leave her and her family stateless.

3.    Carlos Doe[14]

Carlos Doe is a citizen of Nicaragua and is the cousin of Ana and Alejandro Doe. In his hometown in Nicaragua, the government assassinated 32 people and disappeared more than 50 after protests broke out. The army identified him as being involved in the protests and in opposition to the government, and soldiers and police officers came to his home several times and made death threats against him and his family. He and his father fled their hometown and went into hiding, but later received anonymous calls and more death threats. Soldiers visited his mother's home in 2021 and told her that they would imprison Carlos Doe and his father for treason if they found them. A family member living in the U.S. sponsored him for CHNV parole, and he was approved to travel to the United States in May 2023. He arrived in the United States and received a two-year grant of parole, originally set to expire in June 2025.

Carlos Doe obtained work authorization in October 2023. He currently works at a manufacturing plant performing welding and soldering. He has also worked providing food delivery services and performing home renovations and has learned English through these jobs.

 Carlos Doe has a pending application for asylum that he submitted in January 2025 and had an appointment with USCIS for his asylum application scheduled for March 4, 2025.

---

[14] See Carlos Doe Decl. [Doc. No. 24-4].

4.    Andrea Doe[15]

Plaintiff Andrea Doe is a citizen of Nicaragua whose husband was sentenced to over 20 years in prison due to his opposition to the Nicaraguan government. In prison, Andrea Doe's husband suffered physical and mental torture. While her husband was incarcerated, Andrea Doe's home was surveilled, and police vehicles stationed themselves in front of her home. When Andrea Doe and her children traveled to the penitentiary to visit her husband, police agents waited at the corner until she and her children got on the bus. After her husband was in prison for four years, the Nicaraguan government agreed to release 222 political prisoners, including her husband, on the condition that the United States would take them. The political prisoners were abruptly released from prison and placed on a flight to the United States. Her husband received parole into the United States, and the Nicaraguan government stripped him and the other passengers on the flight of their Nicaraguan citizenship, making Andrea Doe's husband stateless.

Andrea Doe states that the U.S. government told her husband and other passengers on his flight to use the CHNV programs to apply for reunification with their family members who were left behind in Nicaragua. Her husband followed that instruction, and Andrea Doe and their children arrived in the United States in the summer of 2023, after being sponsored for CHNV parole by someone outside her family.

In the United States, Andrea Doe received work authorization, and she and her husband both work at a company that installs vinyl on cars for advertising. Their children attend elementary school.

---

[15] See Andrea Doe Decl. [Doc. No. 27-1].

Andrea Doe's husband included her on his asylum application, which is still pending. She fears returning to Nicaragua, where government officials saw her visiting her husband in prison and know she is his wife. She reports that when she and her children were leaving Nicaragua, they were pulled out of the line, had their passports taken, and were held up at the airport for two hours. She believes that if she was forced to return to Nicaragua, she would be detained, and the government would take away her children.

5.    Lucia Doe[16]

Plaintiff Lucia Doe is a Venezuelan national who left her home country due to her family's difficult financial circumstances. She has a bachelor's degree in Christian Education from a university in Puerto Rico, but her salary as Director of Children's Ministries at a Christian church in Venezuela was insufficient to provide for basic needs like food, rent, and clothing. Her family had to rely on financial assistance from her relatives living abroad. She received a two-year grant of parole in July 2024 and obtained a work permit in August 2024.

Lucia Doe works cleaning apartments, condominiums, houses, schools, and businesses. Her plan when seeking parole was to use her two-year grant of parole to work to support her parents and to save money for the future, as well as to pay back her sister for the money her sister spent helping Lucia Doe obtain a work permit and secure transportation to the United States. She fears returning to Venezuela, where she says it is especially difficult to find employment over the age of 40. She has been saving money in case she needs to purchase a last-minute ticket to Venezuela, as to avoid unlawful status in the United States.

---

[16] <u>See</u> Lucia Doe Decl. [Doc. No. 64-3].

Lucia Doe is concerned about returning to Venezuela with a parole stamp on her passport and states that other Venezuelans who have returned with such stamps have been forced to pay money to military officials at the border in order to be allowed to return to Venezuela, while others have had their passports confiscated, have been imprisoned, or have disappeared.

6.       Miguel Doe[17]

Plaintiff Miguel Doe is a Nicaraguan national and is the brother of Alejandro Doe. In Nicaragua, he struggled to find stable work, after being unable to complete his university studies due to interruptions from the Covid-19 pandemic, subsequent changes to the curriculum and course requirements, and the frequent cancellation of courses at his public university. He received a two-year grant of parole in July 2024 after being sponsored by his cousin. He intended to use his two-year grant of parole to provide for his family and save money. He never intended to stay in the United States indefinitely, as his mother needs help caring for herself. Miguel Doe received work authorization in September 2024 and currently works full-time producing marble panels.

Miguel Doe fears that the Nicaraguan government will assume he opposes it if he returns as a deportee and recipient of parole. He believes the risk is even greater if he applies for but does not receive asylum in the United States. However, he also fears staying in the United States without lawful status.

7.       Daniel Doe[18]

Plaintiff Daniel Doe is a Haitian national. While in Haiti, Daniel Doe worked as a court interpreter and as an interpreter for the U.S. Embassy, among other groups. On multiple

---

[17] See Miguel Doe Decl. [Doc. No. 64-4].

[18] See Daniel Doe Decl. [Doc. No. 64-5].

occasions, he was followed by people on motorcycles on his way to work; Daniel Doe believes these individuals were part of a gang and were tracking his and his family's whereabouts due to his work as an interpreter and with the U.S. Embassy.

In Haiti, his neighborhood came under the control of a gang, whose members attacked and kidnapped neighborhood residents. Daniel Doe and his wife left their original neighborhood after the gang broke into their neighbor's home, physically attacked the husband of the household, and kidnapped the wife of the household. In their new neighborhood, a gang attacked the police station, and there are no longer police forces in the neighborhood.

A friend of Daniel Doe's father offered to support him for CHNV parole but could only afford to support Daniel and not his family. Daniel Doe and his wife searched for a supporter through a matching process so that they could be paroled as a family. They were matched with a sponsor, but Daniel Doe subsequently received travel authorization through his original application. He was granted a two-year period of parole in February 2024.

Daniel Doe received work authorization in March 2024. He worked as a tutor and currently works as an English as a Second Language teacher at two schools. He also obtained his license as a life insurance agent, is currently taking courses on financial investing, and is seeking to receive certification to work as an interpreter in the United States. Daniel Doe has also started a company that promotes education for Haitian immigrants who are new to the United States. He is the main financial supporter of his wife and daughter who live in Haiti. Without work authorization, Daniel Doe will not be able to provide for his family.

Daniel Doe received Temporary Protected Status in September 2024, which was originally set to expire in February 2026. The government has since modified his TPS to terminate in August 2025.

16

II.    **Jurisdiction and Reviewability**

Defendants raise numerous challenges to this court's jurisdiction. While Defendants are correct that the Secretary's discretion in this area is broad, their conclusion that the Secretary's actions are wholly shielded from judicial review is incorrect. Accordingly, while this court recognizes that its role in reviewing agency action in this area is limited, within that limited role the court is not precluded from considering Plaintiffs' APA claims or from staying the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 5, 2025) insofar as it revokes, without case-by-case review, previously granted parole and work authorizations for individuals currently in the United States.

A.    *Standing*

"If at least one plaintiff has standing, the suit may proceed." <u>Biden v. Nebraska</u>, 600 U.S. 477, 489 (2023). To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 409 (2013) (quoting <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." <u>Murthy v. Missouri</u>, 603 U.S. 43, 58 (2024). The court finds that the Plaintiffs listed above are similarly situated for purposes of this inquiry and are all likely to establish each element of standing to challenge the FRN's early termination of their parole and work authorization.

The Plaintiffs described above attest to the risks they face from the loss of lawful status and work authorization as well as from a subsequent removal from the United States. <u>See</u> <u>supra</u> Part I.G. Defendants argue that these injuries are not redressable by a stay of the FRN because even if the FRN is stayed, the Secretary still retains authority (1) to end the CHNV programs any

time, without issuing guidance in the Federal Register; and (2) to make individual determinations terminating Plaintiffs' parole.

The first argument goes to the underlying merits of this dispute, namely whether the discretion to end the CHNV program moving forward allows the Secretary to ignore, on a categorical basis, the specific duration of parole accorded in the grant of parole to each individual parolee. The first argument does not go to the threshold question of standing. The second argument is beside the point, where Defendants have made no individual determinations regarding the revocation of individual grants of parole and Plaintiffs' challenge is to Defendants' categorical actions.

The court finds that Plaintiffs have standing to challenge the shortening of their grant of parole. Plaintiffs were paroled into the United States by complying with the immigration processes made available to them. As lawful parolees, they did not have to fear arrest for being in the United States, were permitted to legally work if they received work authorization, and could apply for adjustment of status or other benefits while paroled into this country. The immediate impact of the shortening of their grant of parole is to cause their lawful status in the United States to lapse early—in less than two weeks. If their parole status is allowed to lapse, Plaintiffs will be faced with two unfavorable options: continue following the law and leave the country on their own, or await removal proceedings.

If Plaintiffs leave the country on their own, they will face dangers in their native countries, as set forth in their affidavits. For some Plaintiffs, leaving will also cause family separation. Leaving may also mean Plaintiffs will have forfeited any opportunity to obtain a remedy based on their APA claims, as leaving may moot those claims.

If, in the alternative, Plaintiffs remain in the United States and await removal proceedings, they may be subject to arrest and detention, they will no longer be authorized to work legally in this country[19] and their opportunities to seek any adjustment of status will evaporate. In this litigation, Defendants have repeatedly contended that Plaintiffs will have the opportunity to renew their requests for immigration benefits if placed in removal proceedings.[20] But even if Plaintiffs can renew requests for certain benefits, some requests may very well be denied simply because Plaintiffs would no longer be in lawful status. Defendants' positions are also inconsistent. Despite claiming Plaintiffs could renew requests in removal proceedings, Defendants: (1) are defending the FRN, which states that the revoking of parole is designed to ensure expedited removal (thereby avoiding removal proceedings); and (2) insist that Plaintiffs can be subjected to expedited removal proceedings while acknowledging, at a hearing before this court, that Plaintiffs could not renew most immigration benefits requests if placed in expedited proceedings. See infra Part IV.A. Finally, Defendants neglect to mention that the Davidson Memorandum—which Defendants maintain is lawful—imposed an indefinite suspension of immigration benefits adjudications, rendering Plaintiffs' chances of having any benefits adjudicated outside of removal proceedings a virtual nullity.

In either event, Plaintiffs have standing.

---

[19] Denial of work authorization over the course of this litigation would cause harm to Plaintiffs that could not be remedied through damages. See supra Part I.G.

[20] See, e.g., Opp. to Supp. Mot. for Class Cert. 8 [Doc. No. 90] ("If Rescinded Parolee Plaintiffs are placed into removal proceedings under 8 U.S.C. § 1229a, they can renew their requests for relief—whether for asylum, withholding of removal, TPS, or adjustment of status—in those proceedings, which have multiple levels of appellate review."); Opp. to Mot. for PI 7 [Doc. No. 42] ("If a Parolee Plaintiff who asserts a fear of return to her home country or entitlement to TPS is placed in removal proceedings under § 1229a, those claims could be raised before the immigration judge.").

B. *Section 1252(a)(2)(B)(ii)*

Defendants argue that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes this court's review of Plaintiffs' claims. See Opp. to Second Mot. for PI 7 [Doc. No. 89]. That is incorrect.

Section 1252(a)(2)(B)(ii) strips district courts of jurisdiction to review "any [] decision or action of . . . the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."[21] The decision to categorically truncate, without any individual review, grants of parole is not specified in the Subchapter to be within the Secretary's discretion.

Defendants argue that the decision whether to terminate parole is within the Secretary's discretion under 8 U.S.C. § 1182(d)(5)(A) and is therefore precluded from review by Section 1252(a)(2)(B)(ii). As to the revocation of an individual grant of parole, that statement is unremarkable: The parole statute, which is in the same subchapter, provides that an alien's parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served[.]" 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Section 1252(a)(2)(B)(ii) applies to matters where discretion is conferred by statute on the Secretary, see Kucana v. Holder, 558 U.S. 233, 251-52 (2010) (emphasis added), and under 8 U.S.C. § 1182(d)(5)(A), Congress has placed individual parole determinations, and the decision of whether to revoke such individual grants of parole, within the Secretary's discretion.

But there is a separate question as to whether Congress, by statute, also has given the Secretary the discretion, after parole has been granted and individuals have entered the country

---

[21] Section 1158(a) pertains to the granting of asylum. See 8 U.S.C. § 1158(a).

on a lawful basis for approved periods, to categorically truncate these grants of parole *en masse* and without individual review, such that review of that *en masse* revocation may be precluded here under Section 1252(a)(2)(B)(ii). The answer is no. As this court explains below, the FRN's categorical truncation of Plaintiffs' previously awarded period of parole violates Section 1182(d)(5)(A). That statute requires grants of parole to be made on a case-by-case basis. Thus, the statute requires that to determine whether the purposes of a grant of parole "have been served" such that termination is warranted, the Secretary must attend, in some way, to the reasons an individual alien received parole. See infra Part IV.A. Because the categorical termination of the period of parole previously awarded to the parolees violates the parole statute, the same statute cannot be read to give the Secretary the discretion to take such unlawful action. Therefore, Section 1252(a)(2)(B)(ii) is no bar to review.

The Supreme Court's decision in Kucana points to the same conclusion. The Kucana Court, in considering whether Section 1252(a)(2)(B)(ii) barred judicial review of an administrative determination, emphasized "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." 558 U.S. at 251. "When a statute is 'reasonably susceptible to divergent interpretation, [the Court] adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review" Id. (internal quotations omitted)." With these principles in mind, the Kucana Court concluded that Section 1252(a)(2)(B)(ii)'s limitation on judicial review applied only to Attorney General determinations made discretionary by statute, and not to determinations declared discretionary by the Attorney General. Id. at 249-52.[22]

---

[22] It is thus of no consequence, despite Defendants' suggestion to the contrary, see Opp. to Second Mot. for PI 7 [Doc. No. 89], that the guidance instituting the CHNV programs asserted

Consistent with that distinction, "courts have declined to apply [Section 1252(a)(2)(B)(ii)] to claims challenging the legality of policies and processes governing discretionary decisions under the INA." Roe v. Mayorkas, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023) (quoting Aracely, R v. Nielsen, 319 F. Supp. 3d 110, 135 (D.D.C. 2018)); R.F.M. v. Nielsen, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019) ("The plaintiffs do not seek to litigate individual claims but rather a policy the agency uses to adjudicate those claims."); Doe 1 v. Mayorkas, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021) ("[T]he Court does not find 8 U.S.C. § 1252(a)(2)(B)(ii), which applies to decisions made to individual applications, applicable here to this challenge of immigration policy."); Doe v. Trump, 288 F. Supp. 3d 1045, 1072 (W.D. Wash. 2017) (concluding Section 1252(a)(2)(B)(ii) may bar challenge to denial of refugee admission, but not challenge to failure to act on refugee admissions).

Defendants suggest that there is no reason to distinguish the FRN's "announcement of the decision to terminate numerous CHNV parolees' existing parole terms . . . from an individual decision to terminate a particular grant of parole for purposes of § 1252(a)(2)(B)(ii)." Opp. to Second Mot. for PI 7 [Doc. No. 89]. That argument is addressed on the merits below. But as to the jurisdiction stripping statute, the distinction between an individual revocation of parole and the categorical truncation of grants of parole is warranted where the presumption of reviewability has been "consistently applied" to immigration statutes and can only be overcome by "clear and

_____

that "[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point" and that the CHNV programs were "being implemented as a matter of the Secretary's discretion." 88 Fed. Reg. 1266, 1277 (Jan. 9, 2023) (alterations in original). Section 1252(a)(2)(B)(ii)'s bar on review applies only to determinations made discretionary by statute and not to determinations made by the guidance itself.

convincing evidence" of congressional intent to preclude judicial review. Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (internal citations omitted).

Nor do cases relied upon by Defendants dictate otherwise, as each finds a stripping of jurisdiction under Section 1252(a)(2)(B)(ii) warranted only after examining the specific immigration statute at issue, none of which involved Section 1182(d)(5)(A). See Thigulla v. Jaddou, 94 F.4th 770, 774-76 (8th Cir. 2024) (finding that Section 1252(a)(2)(B)(ii) barred review of an adjudication hold policy promulgated under authority granted in 8 U.S.C. § 1255(a)); accord Cheejati v. Blinken, 106 F.4th 388, 394-95 (5th Cir. 2024); Geda v. Dir. United States Citizenship and Immigr. Servs., 126 F.4th 835, 843-44 (3d Cir. 2025).[23]

Defendants cite Patel v. Garland, 596 U.S. 328 (2022), for the proposition that "the statutory bar applie[s] to every decision in the chain leading to [a] particular decision, including, as relevant to the CHNV termination, the agency's guidance related to that ultimate discretionary judgment." Opp. to Second Mot. for PI 8 [Doc. No. 89]. But the Patel Court was construing Section 1252(a)(2)(B)(i), which bars review of judgments under five specific statutes providing for individual, discretionary relief.[24] 596 U.S. at 336. While the Kucana Court noted that

---

[23] In Patel v. Jaddou, defendants argued that the challenged action was an act within the Secretary's discretion conferred by Section 1255(a), precluding judicial review by the district court. 695 F. Supp. 3d 158, 166 (D. Mass. 2023). This court determined that the inquiry first required consideration of the claim on the merits, see id. at 169, and concluded, after a detailed review of Section 1255(a), that the challenged action "does not contradict § 1255" and was "an act within the Secretary's discretion[.]" Id. at 173. The First Circuit, in turn, affirmed the dismissal based on its review of Section 1255(a), without addressing defendants' continuing objection that courts are barred by Section 1252(a)(2)(B)(ii) from even considering the question. Gupta v. Jaddou, 118 F.4th 475 (1st Cir. 2024).

[24] See 8 U.S.C. § 1252(a)(2)(B)(i) (listing § 1182(h) (waiver of alien's inadmissibility based on single offense of marijuana possession), § 1182(i) (waiver of immigrant's inadmissibility for fraud or willful misrepresentation of material fact), § 1229b (cancellation of removal for certain permanent residents), § 1229c (permission for alien to voluntarily depart the United States), and § 1255 (adjustment of status of alien).

decisions shielded from review by Sections 1252(a)(2)(B)(i) and 1252(a)(2)(B)(ii) "are of a like kind," 558 U.S. at 248, <u>Patel</u> focused in large part on language found only in the former Section, namely that courts are without jurisdiction to review any judgment "regarding the granting of relief" under the specified statutes. <u>Patel</u>, 596 U.S. at 336-40. The <u>Patel</u> Court parsed this phrase, including the term "regarding," which it found "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject [any judgment regarding the granting of relief], but also matters relating to that subject.'" <u>Id.</u> at 338-39. Given this language, the Court found that Section 1252(a)(2)(B)(i) barred review of an immigration judge's underlying factual findings in a proceeding under the five statutes identified in Section 1252(a)(2)(B)(i). <u>Id.</u> at 339. The text of Section 1252(a)(2)(B)(ii) is distinct and, specifically, does not include the broadening word "regarding."

The Court in <u>Patel</u> found its reading of Section 1252(a)(2)(B)(i) reinforced by Section 1252(a)(2)(D), <u>id.</u>, "which preserves review of constitutional claims and questions of law" by appellate courts of the judgments obtained through the individual discretionary-relief process under the enumerated statutes, 8 U.S.C. § 1252(a)(2)(D). In contrast, there is no individual discretionary-relief process before an immigration judge (with appellate review of questions of law) as to the impending termination of the grant of parole or of the revocation of parole after it has occurred.[25] Accordingly, if Section 1252(a)(2)(B)(ii) precludes a district court from

_____

[25] Instead, an individual who leaves the United States voluntarily may forfeit all claims related to the original grant of parole. And while an individual who stays may be able to seek review of a removal order and seek adjustment of status, he would be treated as an applicant for admission, not a parolee, for the purposes of that petition, <u>see</u> 8 U.S.C. § 1182(d)(5), negating any potential legal challenge to the categorical termination of his parole.

24

considering Plaintiffs' challenges to Defendants' categorical actions at issue here, review of that question of law will not be preserved by Section 1252(a)(2)(D).

As discussed further below, "[t]he APA . . . creates a 'presumption favoring judicial review of administrative action." Sackett v. E.P.A., 566 U.S. 120, 128 (2012) (quoting Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984)). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 141 (1967) (citing Rusk v. Cort, 369 U.S. 367, 379-80 (1962)). The reasoning in Patel as to Section 1252(a)(2)(B)(i) does not suggest any clear legislative intent that the categorical actions challenged here are precluded from judicial review by Section 1252(a)(2)(B)(ii).

C. *Committed to Agency Discretion by Law*

Defendants argue that Plaintiffs cannot challenge the actions at issue here because Section 1182(d)(5)(A) commits parole and other immigration benefits decisions to the "discretion" of the Secretary of Homeland Security. See Opp. to Second Mot. for PI 8-9 [Doc. No. 89]. The APA "establishes a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action[,]'" but that presumption may rebutted, including by a showing that the "agency action is committed to agency discretion by law." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16-17 (2020) (first alteration in original) (citations omitted). The Supreme Court has read this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Dep't of Com. v. New York, 588 U.S. 752, 772 (2019) (citations omitted).

This is not the rare circumstance in which the agency's decision is "committed to agency discretion by law." As a preliminary matter, as stated above and discussed further below, the Secretary does not have the discretion to categorically terminate grants of parole. In any event, the parole statute establishes standards for the Secretary's exercise of discretion in granting parole—in that such grants must be made on a case-by-case basis for urgent humanitarian reasons or public benefit—and the statute also establishes standards for the termination of parole by requiring a determination by the Secretary that "the purposes of such parole . . . have been served[.]" 8 U.S.C. § 1182(d)(5)(A).

This court finds further support for the view that Plaintiffs' challenge to the FRN is reviewable in the Supreme Court's decision in Department of Homeland Security v. Regents of the University of California, 591 U.S. 1 (2020). Rejecting the government's argument that decisions related to Deferred Action for Childhood Arrivals ("DACA") were committed to agency discretion by law, the Court determined that DACA was not an unreviewable non-enforcement policy but rather was a program for conferring affirmative immigration relief, including the conferral of eligibility for work authorization and Social Security. Id. at 18-19. On that basis, the Court reasoned that "[t]he creation of that program—and its rescission—is an 'action [that] provides a focus for judicial review.'" Id. at 18 (second alteration in original) (quoting Heckler v. Chaney, 470 U.S. 821, 832 (1985)).

The CHNV programs similarly created processes for conferring affirmative immigration relief and related benefits, including lawful entry into the United States and work authorization. The categorical termination of all grants of parole made pursuant to the CHNV programs creates a focal point for judicial review. See Regents, 591 U.S. at 10 (DACA Memorandum instructed ICE to "exercise prosecutorial discretion[] on an individual basis"); see also I.N.S. v. Yueh-

26

Shaio Yang, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset,

if it announces and follows—by rule or by settled course of adjudication—a general policy by

which its exercise of discretion will be governed, an irrational departure from that policy (as

opposed to an avowed alteration of it) could constitute action that must be overturned as

'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative

Procedure Act, 5 U.S.C. § 706(2)(A)."); see also Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir.

1987) ("Judicially manageable standards may be found in formal and informal policy statements

and regulations as well as in statutes[.]"). Therefore, the action challenged by Plaintiffs here is

not committed to agency discretion by law.

 Accordingly, Defendants' arguments that this court lacks jurisdiction to consider

Plaintiffs' challenge to the truncation of their periods of parole and related benefits fail.

### III. Class Treatment

 Because the relief that Plaintiffs seek will have nationwide impact, the court considers

whether Plaintiffs may proceed on a class-wide basis as to this relief.[26]

 "An order that certifies a class action must define the class and the class claims, issues, or

defenses[.]" Fed. R. Civ. P. 23(c)(1)(B). The order "may be altered or amended before final

judgment." Fed. R. Civ. P. 23(c)(1)(C).

 Plaintiffs' Supplemental Motion for Class Certification [Doc. No. 73] proposes a subclass

consisting of "[a]ll individuals who have received parole through humanitarian parole processes,

including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject

---

[26] This court will address class certification in full, including other subclasses proposed by
Plaintiffs and Defendants' objections to such proposals, in subsequent orders.

to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the 'Rescinded Parolee Class')."

Plaintiffs' proposed Rescinded Parolee Subclass is defined more broadly than necessary for the challenge to the March FRN presently before the court. First, it encompasses programs besides CHNV, which are not the subject of the present order. It also includes "subsequent similar actions by Defendants," referring to actions that have not yet occurred,[27] and does not exclude individuals who have already left the United States.[28] Accordingly, the court considers whether certification is appropriate only as to the "Early Revocation Parolee Class," which this court defines to include:

> All individuals who have received a grant of parole that is subject to the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), rescinding individual grants of parole on a categorical and *en masse* basis, except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of that Notice; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

*A. The Rule 23(a) Requirements*

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[27] If Defendants take or threaten further action affecting Plaintiffs, modification of the class definition might be warranted, but the request here is premature.

[28] Individuals who voluntarily leave the United States generally lose their parole authorization. See 8 C.F.R. § 212.5 ("Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized[.]").

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The Early Revocation Parolee Class satisfies these four requirements. First, the class is numerous because it includes several hundred thousand members.

Second, there are common issues of law and fact capable of class-wide resolution under the standard set forth in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) ("What matters to class certification . . . is not the raising of common 'questions' . . . but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.") (first alteration in original) (emphasis in original) (internal citations omitted). All members of the class challenge the FRN's categorical revocation of their existing grants of parole. That categorical revocation was made on the same terms for every class member. Answering the question of whether such termination was lawful will resolve the issue of whether, in the absence of individual determinations, all class members' parole should expire no later than the date specified in the FRN or, by contrast, on the date set forth on each class members' original grant of parole.

Third, the claims of the representative Plaintiffs are typical of the claims of the class. "The plaintiff can meet [the typicality] requirement by showing that [their] injuries arise from the same events or course of conduct as do the injuries of the class, and that [their] claims are based on the same legal theory as those of the class." In re Boston Scientific Corp. Secs. Litigation, 604 F. Supp. 2d 275, 282 (D. Mass. 2009). The claims of the representative Plaintiffs described above are typical in that all Plaintiffs advance the same arguments as to why the categorical termination of their grants of parole was unlawful.

29

Fourth, the representative Plaintiffs fairly and adequately protect the interests of the class. "The First Circuit requires two elements to establish adequacy under Rule 23(a)(4): (1) 'that the interests of the representative party will not conflict with the interests of any of the class members,' and (2) 'that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" Bowers v. Russell, 2025 WL 342077, at *5 (D. Mass. Jan. 30, 2025) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)). The interests of the representative Plaintiffs will not conflict with those of any class members because the FRN does not differentiate between the different CHNV programs and instead categorically revokes parole for all individuals paroled through those programs. Additionally, the FRN's rationale for why parole was no longer justified for these individuals did not depend on circumstances specific to any Plaintiff or to Plaintiffs from any of the four countries at issue. Finally, this court finds that Plaintiffs' attorneys are qualified, experienced, and able to vigorously conduct the proposed litigation.

Therefore, the Rule 23(a) requirements are satisfied as to the Early Revocation Parolee Class.

### B.  The Rule 23(b)(2) Requirements

Plaintiffs argue that certification is appropriate here under Rule 23(b)(2), which applies where Defendants have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Wal-Mart, 564 U.S. at 360.

Certification under Rule 23(b)(2) is appropriate here. A stay of the FRN as to the revocation of existing grants of parole would address each Plaintiffs' injuries, as described above. See supra Part II.A.

**IV.    Preliminary Relief**

Courts weigh four factors in determining whether a stay should issue: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 425-26 (2009).

*A.  Likelihood of Success on the Merits*

"An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" Id. (quoting Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).

Plaintiffs raise two arguments regarding DHS's termination of existing grants of parole made pursuant to the CHNV programs.

First, Plaintiffs argue that the FRN's explanation for why DHS rejected the alternative of allowing CHNV parole to expire naturally rather than in 30 days was based on an "obvious legal error." Mem. ISO Mot. for Second PI 10 [Doc. No. 72]. The FRN stated that DHS rejected that alternative because allowing parolees to remain in the United States for longer than 30 days

would "essentially foreclose" DHS's ability to deport them via expedited removal because it would increase the likelihood that they would accrue more than two years of continuous presence in the United States. <u>See</u> 90 Fed. Reg. at 13620 (citing 8 U.S.C. § 1232(b)(1)(iii)(II)).

Plaintiffs are likely to prevail on this argument because they are not subject to expedited removal even if they have been here less than two years. Section 1225(b)(1), entitled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," provides for screening and expedited removal for a non-citizen "arriving in the United States" or a non-citizen "who has not been admitted or paroled into the United States, and who has not affirmatively shown . . . that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(A)(iii)(II). The statute thus allows for expedited removal for a non-citizen "arriving in the United States" (i.e., arriving at the border or a port of entry) and for a non-citizen who entered the United States without authorization, except that a non-citizen who entered the United States without authorization, that is an individual who "has not been paroled or admitted into the United States," may not be subject to the expedited removal period if that individual has been present in the United States for two years. The statute does not subject persons who were authorized to enter the United States to expedited removal, regardless of how long they have been in the United States.

Citing a case from the 11th Circuit, Defendants respond that the use of the present perfect tense ("has not been . . . paroled") reflects a "state that continues into the present," meaning such an alien may be processed for expedited removal under the provision once said alien's parole has been terminated or has expired. <u>See</u> Opp. to Second Mot. for PI 12 [Doc. No. 89]. But that case

merely explained that "the use of the present-perfect tense can, as a matter of pure semantics, refer to a time in the indefinite past <u>or</u> to a past action or state that continues into the present." <u>Turner v. U.S. Att'y Gen.</u>, 130 F.4th 1254, 1261 (11th Cir. 2025) (emphasis in original). That the present perfect tense may sometimes denote a state continuing into the present is obvious. But the text of the provision at issue here makes clear its purpose, which is to limit the Secretary's authority to utilize expedited removal only with regard to those arriving at the border or a port of entry, or those who entered the country unlawfully and have not been present in the country long enough to warrant consideration of any interests their residence may have created.

The government further argues that, in any event, individuals whose parole has terminated "may also be processed for expedited removal as an alien 'arriving in the United States' under § 1225(b)(1)(A)(i)." That argument is contrary to the FRN's rationale. The FRN justified early termination of the parole periods based on the two-year period of accrual specified in 1225(b)(1)(iii)(II). If, as Defendants contend, removal is proper under a provision with no two-year period of accrual, early termination cannot be justified on the grounds that it would remove an obstacle to expedited removal.

Plaintiffs are thus likely to prevail on their claim that DHS's sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error. While "DHS was not required . . . to 'consider all policy alternatives in reaching [its] decision' . . . it <u>was</u> required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." <u>Regents of the Univ. of California</u>, 591 U.S. at 33 (quoting <u>State Farm</u>, 463 U.S. at 51). DHS acknowledged the reliance interests of individuals who are lawfully present in the United States based on grants of parole pursuant to

the CHNV programs, but its stated reason for terminating parole grants within 30 days lacked a

rational basis.[29]

Defendants maintain that even if this justification for rejecting the alternative was in

error, the decision was separately justified by DHS's conclusion that "neither urgent

humanitarian reasons nor significant public benefit warrants the continued presence of aliens

paroled under the CHNV programs and the purposes of such parole therefore have been served."

See 90 Fed. Reg. at 13620. But the FRN did not attend to any of the humanitarian reasons

underlying the creation of the CHNV programs and ignores that, under the CHNV programs,

"case-by-case temporary parole" was being used to address the relevant humanitarian concerns.[30]

_____

[29] DHS's rationale regarding expedited removal may have a further problem, namely, that
expedited removal proceedings "[do] not apply to an alien who is a native or citizen of a country
in the Western Hemisphere with whose government the United States does not have full
diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

[30] See, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63515
(Oct. 19, 2022) ("The case-by-case temporary parole of individuals pursuant to this process will
address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive
regime of Nicolás Maduro."); Implementation of a Parole Process for Cubans, 88 Fed. Reg.
1266, 1275 (Jan. 9, 2023) ("The case-by-case temporary parole of individuals pursuant to this
process will address the urgent humanitarian needs of Cuban nationals who have fled crippling
economic conditions and social unrest in Cuba. The [Government of Cuba] continues to repress
and punish all forms of dissent and public criticism of the regime and has continued to take
actions against those who oppose its positions. This process provides a safe mechanism for
Cuban nationals who seek to leave their home country to enter the United States without having
to make the dangerous journey to the United States."); Implementation of a Parole Process for
Haitians, 88 Fed. Reg. 1243, 1251 (Jan. 9, 2023) ("The case-by-case temporary parole of
individuals pursuant to this process also will address the urgent humanitarian needs of many
Haitian nationals[.] . . . [E]scalating gang violence, the aftermaths of an earthquake, and a
cholera outbreak have worsened already concerning political, economic, and social conditions in
Haiti."); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1263 (Jan. 9,
2023) ("The case-by-case temporary parole of individuals pursuant to this process will address
the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and
Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent
and public criticism of the regime and has continued to take actions against those who oppose its
positions.").

The FRN gave no explanation or support for the conclusion that the CHNV programs were addressing relevant humanitarian concerns through something other than case-by-case determinations. The FRN also gave no rationale for its conclusion that such humanitarian concerns no longer justified the existing parole programs and offered no reasons for categorically revoking parole despite the humanitarian concerns previously articulated by DHS. Finally, despite asserting that "DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances," 90 Fed. Reg. at 13612, the FRN provides for no individual case-by-case determination as to the humanitarian concerns facing each parolee whose parole is being truncated.

Given the significant reliance interests at stake—which the FRN recognized as aliens departing their native countries, incurring expenses traveling to the United States, obtaining housing and means of transport, and building connections in their communities—DHS was required to give a justification for terminating existing grants of parole within 30 days instead of on the original termination dates. Plaintiffs are likely to prevail on their claim that DHS's justification was inadequate because it was based on a legal error and failed to explain why humanitarian concerns no longer justified the original periods of parole extended to the CHNV parolees. Therefore, Plaintiffs are likely to prevail on their claim that the early termination of parole was arbitrary and capricious.[31]

---

[31] Defendants' contention that Plaintiffs are improperly seeking to challenge the application of expedited removal, see Opp. to Second Mot. for PI at 13 [Doc. No. 89], mischaracterizes Plaintiffs' argument, which is that a desire to avoid the two-year accrual period of the expedited removal statute was not a valid reason for early termination of grants of parole.

Second, Plaintiffs argue that the decision to truncate all existing grants of parole was contrary to the statutory requirement that parole be exercised "only on a case-by-case basis." 8 U.S.C § 1182(d)(5)(A). Defendants respond that while Section 1182(d)(5)(A) requires grants of parole to be made on "a case-by-case basis," it imposes no similar requirement on terminations of parole, where "[t]he sole statutory requirement to terminated parole is that, 'in the opinion of the Secretary,' the purposes of parole have been served." See Opp. to Second Mot. for PI 13 [Doc. No. 89] (quoting 8 U.S.C § 1182(d)(5)(A)). But the text of the statute supports Plaintiffs' reading. Throughout the provision, Section 1182(d)(5)(A) refers in singular, rather than plural, to grants of parole:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(Emphasis added). The statute thus seems to contemplate termination of parole on an individual, rather than categorical, basis. This makes sense: Even under the categorical programs, grants of parole were to be made on a case-by-case basis. While the reasons underlying grants pursuant to the CHNV programs were likely fairly consistent, an individual parolee's application was subject to case-by-case review. The grant of parole may well have been justified for reasons not applicable to others paroled through the programs, such that a categorical determination that the "purposes of such parole" have been served may not attend to the reasons for that individual's grant of parole. Certainly, the Secretary has significant discretion to terminate a grant of parole

under the statute. But by the terms of the statute, such termination must attend to the reasons an individual alien received parole.

Defendants point to <u>Zheng v. Napolitano</u>, No. 09-cv-00347, 2009 WL 1258908, at *2 (D. Colo. May 4, 2009), as "rejecting argument asserted in habeas petition that sought to 'engraft[] the requirements pertaining to initial parole decisions onto parole revocation decisions.'" <u>See</u> Opp. to Second Mot. for PI at 14 [Doc. No. 89] (alteration in original). While that court did note that it had found no case law supporting petitioner's claim that individual determinations were required, it explained that petitioner's notice that his parole had been revoked "specifically informed him that parole had been granted initially to allow him to acquire appropriate travel documents," that such documents had been obtained previously, and there was no reason to believe that travel documents would not be forthcoming. 2009 WL 1258908, at *2. In other words, an individual decision was made to revoke his parole. The absence of case law supporting Plaintiffs' position may thus reflect DHS's prior practice of making individual determinations to revoke parole and does not undermine the textual analysis.

Therefore, Plaintiffs are likely to succeed on their claim that the FRN's categorical termination of existing grants of parole was arbitrary and capricious.

### B.  Irreparable Harm

Absent preliminary relief, the FRN will cause Plaintiffs' parole to terminate in less than two weeks, at which time they will be forced to choose between two injurious options: continue following the law and leave the country on their own, or await removal proceedings. The court discussed the harmful consequences of either of these two options above. <u>See</u> <u>supra</u> Part II.A. The first option will expose Plaintiffs to dangers in their native countries and will cause Plaintiffs forfeit their APA claims. The second option will put Plaintiffs at risk of arrest and detention and,

because Plaintiffs will be in the United States without legal status, undermine Plaintiffs' chances of receiving other forms of immigration relief in the future—potentially permanently. Waiting for final relief will not spare Plaintiffs from these consequences.[32]

*C.  The Balance of Equities and the Public Interest*

The final two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." <u>Nken</u>, 556 U.S. at 435. Defendants maintain that preliminary relief would "limit the Administration's ability to pursue its foreign policy goals and to exercise its discretionary powers with respect to immigration." Opp. to Second Mot. for PI 18 [Doc. No. 89]. However, the relief contemplated in this order would not authorize the entry of any individual currently outside the United States. Nor would it extend the original grants of parole awarded by DHS. It would only require the agency to give fuller consideration to the reliance interests of parolees who entered the United States lawfully and who followed instructions established by the United States government for seeking discretionary grants of parole, and to make any decisions terminating grants of parole in an individual, case-by-case manner.

Defendants contend that preliminary relief would "impede the Government's strong interest in being able to remove aliens from the United States who lack the ability to obtain more

---

[32] At an April 10, 2025 hearing before the court, Defendants emphasized the FRN's language indicating that DHS would not prioritize for removal aliens who had filed requests for benefits such as TPS or asylum prior to the issuance of the FRN. <u>See</u> 90 Fed. Reg. at 13619. But this statement is essentially meaningless, where Defendants gave no specificity, in the FRN or at the hearing, as to what it means in this circumstance for individuals with pending benefits requests to not be an enforcement priority. Regardless of whether particular individuals are "enforcement priorities," they would still be unlawfully present in the United States and therefore subject to the negative repercussions of that status, including an inability to legally work and the possibility of being arrested when stepping outside their door. Moreover, Defendants' Davidson Memorandum has indefinitely suspended benefits adjudications filed by CHNV parolees, further undermining Defendants' enforcement priority argument.

permanent status." Id. at 19. The suggestion that these noncitizens "lack the ability to obtain more permanent status" reflects the Defendants' choice to not make permanent status more available to them. Regardless, Defendants have offered no substantial reason or public interest that justifies forcing individuals who were granted parole into the United States for a specified duration to leave (or move into undocumented status) in advance of the original date their parole was set to expire. Nor is it in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families. Instead, the early termination, without any case-by-case justification, of legal status for noncitizens who have complied with DHS programs and entered the country lawfully undermines the rule of law.

The court finds the balance of equities and public interest weigh in favor of preliminary relief.[33]

_____

[33] Defendants argue that, should preliminary relief issue, such relief should be subject to bond. See Fed. R. Civ. P. 65(c). "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (citing Crowley v. Local No. 82, Furniture and Piano Moving, 679 F.2d 978, 999-1001 (1st Cir. 1982)). In Crowley, the court stated that in deciding whether to set a bond requirement in non-commercial cases, the court should consider "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant," and, "[s]econd, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right[.]" Crowley, 679 F.2d at 1000. Here, the court finds: (1) no showing of any monetary loss on the enjoined parties in staying the early termination of the grants of parole; (2) that requiring a bond would impose a substantial hardship on the Plaintiffs; and (3) a grave risk that imposing a bond would undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions. Accordingly, the court finds that the burden of a bond on Plaintiffs outweighs any likely loss by the government.

V.    **Request for a Stay Pending Appeal**

Defendants orally requested a stay of this decision pending appeal. As with Plaintiffs' request for a stay of the FRN, the court must weigh four factors in determining whether a stay of the court's order pending appeal should issue: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." See Nken, 556 U.S. at 425-26. Here, Defendants have not made a strong showing that they are likely to succeed on the merits or that they will be injured absent a stay, while the issuance of a stay of the court's order would allow for the truncation of parole of hundreds of thousands of parolees. And for the reasons set forth above, the public interest lies in denying Defendants' request for a stay. Accordingly, Defendants' request for a stay in DENIED.

VI.    **Conclusion**

Accordingly, the court grants emergency relief as follows:

1.    The *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), is hereby STAYED pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's originally stated parole end date.

2. All individualized notices[34] sent to noncitizens from Cuba, Haiti, Nicaragua, and

Venezuela via their USCIS online account notifying them that their parole is being

revoked without case-by-case review pursuant to the *Termination of Parole Processes*

*for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25,

2025) are also STAYED pending further court order.

IT IS SO ORDERED.

April 14, 2025                                   /s/ Indira Talwani
                                                 United States District Judge

---

[34] See, e.g., Termination of Parole Notice [Doc. No. 88-1] ("Effective March 25, 2025, the U.S. Department of Homeland Security (DHS) has exercised its discretion to terminate the categorical parole programs for aliens who are nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members.").