UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,                          *
                                               *
        Plaintiffs,                            *
                                               *
        v.                                     *
                                               *
KRISTI NOEM, in her official capacity as       *
Secretary of Homeland Security; TODD M.        *
LYONS, in his official capacity as the         *
Acting Director of Immigration and             *
Customs Enforcement; PETE R. FLORES,           *     Civil Action No. 1:25-cv-10495-IT
in his official capacity as Acting             *
Commissioner of U.S. Customs and Border        *
Protection; KIKA SCOTT, in her official        *
capacity as the Senior Official Performing     *
the Duties of the Director of U.S.             *
Citizenship and Immigration Services; and      *
DONALD J. TRUMP, in his official               *
capacity as President of the United States,    *
                                               *
        Defendants.                            *

## MEMORANDUM & ORDER GRANTING PARTIAL RELIEF ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION

May 28, 2025

This lawsuit primarily challenges actions by the Department of Homeland Security ("DHS") regarding non-citizens who entered the United States lawfully, have not been accused of engaging in any criminal conduct, whether in the United States or elsewhere, and have sought to avail themselves of legal pathways for remaining in the United States. In prior orders, this court stayed the termination of existing grants of immigration parole for several hundred thousand individuals who lawfully entered the United States and certified a class consisting of such individuals. See First Order on Mot. to Stay [Doc. No. 97]; Order Granting Class Certification [Doc. No. 98].

Among several motions pending before the court is Plaintiffs' Emergency Motion for Preliminary Injunction and Stay of Administrative Action [Doc. No. 23]. The court addresses here the requests for preliminary relief for those Plaintiffs already paroled into the United States through certain categorical parole programs ("Parole Programs") and those Plaintiffs seeking to support someone who is already present in the United States for parole through the Military Parole in Place ("MPIP") program.[1] For the reasons that follow, the court grants temporary relief, on a class-wide basis, staying: (1) the suspension of adjudications of re-parole applications filed by individuals who received parole pursuant to the Parole Programs; (2) the suspension of adjudications of initial parole applications filed by individuals already present in the United States pursuant to the MPIP program; and (3) the suspension of adjudications for immigration benefits applications filed by individuals who received parole through the Parole Programs.

## I.    Background

### A.  The Statutory Parole Authority

Under the Immigration and Nationalization Act, as amended:

> The Secretary of Homeland Security [("Secretary")] may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien[2] applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary, . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

---

[1] The requests for preliminary relief related to actions limiting, suspending, or ending the Parole Programs as to applicants who are not yet in the United States will be addressed in a separate order.

[2] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

8 U.S.C. § 1182(d)(5)(A) (emphasis added).[3]

### B. The Parole Programs

#### 1. Military Parole-in-Place

The Military Parole-in-Place ("MPIP") program allows certain current and former members of the military and their relatives who are in the United States without legal status to apply for parole. The program was adopted through a United States Citizenship and Immigration Services ("USCIS") policy memorandum. Second Am. Compl. ¶ 142 [Doc. No. 68]. Congress later included a provision in the National Defense Authorization Act of 2020 directing the Secretary to "consider, on a case-by-case basis, whether granting the request would enable military family unity that would constitute a significant public benefit." See National Defense Authorization Act FY 2020, Pub. L. No. 116-92, § 1758(a) (2019), codified at 8 U.S.C. § 1182; see also id. § 1758(b) ("It is the sense of Congress that . . . parole in place reinforces the objective of military family unity[.]").

#### 2. Operation Allies Welcome

In 2021, as the United States wound down its military presence in Afghanistan, DHS developed the Operation Allies Welcome ("OAW") program to support at-risk Afghans, including those who worked with the United States military over the previous twenty years, and

---

[3] DHS has repeatedly used the term "inadmissible aliens" in describing the individuals in the United States pursuant to these parole programs. See, e.g., Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614, 13618 (Mar. 25, 2025). No finding of inadmissibility, however, has yet been made as to the parolees under the Parole Programs. Parole is authorized for individuals "applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). In other words, parole may be granted when an individual has not yet been deemed either admissible or inadmissible. In contrast, "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i) (emphasis added).

facilitate their resettlement into the United States. Following screening and vetting, Afghan

nationals arriving as part of the evacuation effort could receive parole on a case-by-case basis,

for a period of two years.[4] Aliens whose parole applications were granted were eligible for

resettlement assistance. The United States had paroled approximately 76,000 Afghan evacuees as

of September 30, 2022.[5]

      3.   Uniting for Ukraine

On February 24, 2022, Russia invaded Ukraine. See Second Am. Compl. ¶ 68 [Doc. No.

68]. In the weeks following, thousands of Ukrainians presented themselves at U.S. ports of entry

at the Southern Border with Mexico. See id. ¶ 64.

On April 27, 2022, DHS announced the implementation of a parole process called

Uniting for Ukraine ("U4U"). See Implementation of the Uniting for Ukraine Parole Process, 87

Fed. Reg. 25040 (Apr. 27, 2022). U4U established a process by which certain Ukrainian citizens

and their immediate family members who were recently displaced by the war could apply for

advanced authorization to travel the United States for the purposes of requesting parole, to an

internal port of entry. See id. at 25040.

To be eligible for the U4U program, prospective beneficiaries needed a U.S.-based

supporter. See id. at 25042. The supporter, who could be an individual acting on their own behalf

or on behalf of an organization, filed a Declaration of Financial Support (Form I-134). If USCIS

determined that there was sufficient evidence of financial support, the Ukrainian beneficiary

---

[4] See *Operation Allies Welcome*, https://www.dhs.gov/archive/operation-allies-welcome (last accessed May 28, 2025).

[5] See *Operation Allies Welcome: Afghan Parolee and Benefits Report* (May 8, 2023), https://www.dhs.gov/sites/default/files/2022-12/DMO-PLCY%20-%20DHS%20Operation%20Allies%20Welcome%20Afghan%20Parolee%20and%20Benefits%20Report%20-%20Update%202.pdf.

would be notified and be prompted to submit required information. To be eligible, a beneficiary needed to be physically present in Ukraine as of February 11, 2022, needed a Ukrainian passport or be a child included on a parent's passport, and needed to clear biographic and biometric checks and to meet public health requirements. See id. If, after vetting, USCIS determined that advanced authorization to travel was warranted, beneficiaries would be authorized to travel via commercial routes to the United States for 90 days, at their own expense, for a case-by-case parole determination. See id. at 25041 ("The decision to parole a noncitizen into the United States is made at the port of entry, on a case-by-case basis[.] [A]pproval of travel authorization to apply for parole at a U.S. port of entry . . . does not guarantee that the individual will be paroled."). Individuals granted parole pursuant to the process would typically be paroled for up to two years and would be eligible to apply for employment authorization with USCIS. See id. at 25043.

On May 21, 2022, Congress passed the Additional Ukraine Supplemental Appropriations Act, which authorized resettlement benefits for Ukrainians paroled into the United States. See Additional Ukraine Supplemental Appropriations Act, 2022, Pub. L. No. 117-128 (May 21, 2022). As of September 30, 2023, Customs and Border Protection ("CBP") had approved travel authorization for over 199,000 beneficiaries, denied it for 8,722 individuals, and had paroled 158,000 individuals into the United States.[6]

---

[6] See DHS, U4U Process Overview and Assessment 11 (Nov. 4, 2024), https://www.dhs.gov/sites/default/files/2024-12/2024_1104_dmo_plcy_uniting_for_ukraine_process_overview_and_assessment.pdf.

4.  Parole Programs for Noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV Parole Programs")

On October 19, 2022, DHS announced an effort to address the increasing number of Venezuelan nationals arriving at the southern border of the United States by "coupl[ing] a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022). Under the program, individuals who passed a national security and public safety vetting and who had a supporter in the United States who agreed to provide housing and other support could receive an advanced authorization to travel to the United States for the purposes of seeking, on a case-by-case basis, a discretionary grant of parole at an internal port of entry. See id. at 63515; see also id. ("[o]nly those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process."). The program specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization. See id. at 63508. The program specified further that those "who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires." Id. The process was capped at 24,000 beneficiaries. See id. Individuals who had been ordered removed from the United States in the past five years, or who crossed into the United States between ports of entry or entered Mexico or Panama without authorization after October 19, 2022, were barred from the program. Id.

In early 2023, DHS implemented similar processes for nationals of Cuba, Haiti, and

Nicaragua. See Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9,

2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023);

Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023).

     5.   Family Reunification Parole

Beginning in July 2023, DHS established and updated processes permitting certain

individuals from Colombia, Cuba, Guatemala, Ecuador, Haiti, Honduras, and El Salvador to

receive advanced authorization to travel to the United States to be considered for parole while

their petitions for family-based immigration visas are pending (collectively, "Family

Reunification Parole Programs", or "FRP").[7] Individuals seeking parole through FRP were

considered on a case-by-case basis. See, e.g., Implementation of a Family Reunification Parole

Process for Colombians, 88 Fed. Reg. 43591, 43593 (July 10, 2023) ("Consideration of

noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully

---

[7] See Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591, 43591 (July 10, 2023) ("Under this process, certain Colombian principal beneficiaries of an approved Form I-130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available."); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023). The Haitian and Cuban Family Reunification Programs were established years prior but updated in 2023. See Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014); Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007).

contribute to the broader [U.S. Government] strategy of expanding access to lawful pathways to

individuals who may otherwise undertake an irregular migration journey to the United States.");

Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg.

54635, 54637 (Aug. 11, 2023) (CBP "will determine, on a case-by-case basis, whether to

exercise discretion to grant parole to the beneficiary at an interior [port of entry] upon their

arrival.").

      6.   Central American Minors Program

      The Central American Minors Program ("CAM") permits individuals from El Salvador,

Honduras, and Guatemala who are lawfully present in the United States to request that their

qualifying children and relatives not present in the United States be granted access to the U.S.

Refugee Admissions Program ("USRAP").[8] See Central American Minors Program, 88 Fed.

Reg. 21694 (Apr. 11, 2023). Qualifying children and eligible family members granted access to

the USRAP via the CAM program are interviewed by USCIS Refugee Officers and are either

granted refugee status or, upon a failure to establish refugee status, considered on a case-by-case

basis for parole. See id. at 21696;[9] cf. 8 U.S.C. § 1182(d)(5)(B) ("The [Secretary] . . . may not

parole into the United States an alien who is a refugee unless the [Secretary] . . . determines that

compelling reasons in the public interest with respect to that particular alien require that the alien

_____

[8] The USRAP is an interagency effort involving governmental and non-governmental partners overseas and in the United States that addresses processing priorities for the United States' participation in resettling refugees. See *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities*, https://www.uscis.gov/humanitarian/refugees-and-asylum/usrap (Nov. 22, 2024) (last accessed May 28, 2025).

[9] "If USCIS determines that an individual may be eligible for parole, USCIS will authorize parole and issue the necessary travel documents to the beneficiary. These travel documents will enable the beneficiary to travel to the United States and seek parole from [CBP] at a U.S. port of entry to join parent(s) or legal guardian(s)." Id. at 21696.

be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.").

Under the parole component of the CAM program, the Secretary exercises "on a case-by-case basis, [the] discretionary parole authority to determine whether" eligible family members "may join their qualifying parents or legal guardians in the United States for a temporary period of three years." See 88 Fed. Reg. at 21698. DHS determined that "[s]everal common factors . . . [were] likely to support findings of urgent humanitarian reasons or significant public benefit for the CAM population and [would] be considered in CAM parole adjudications[,]" including supporting family unity, providing a safe, lawful, and orderly alternative to irregular migration, protecting children from smuggling networks, and reducing strain on resources at the Southern Border. Id. at 21699-21701. Beneficiaries were permitted to request re-parole. See id. at 21697.

### C. The Government's Statements and Actions

#### 1. January 20, 2025 Executive Orders

On January 20, 2025, President Trump signed numerous executive orders, including three that are relevant here:

The first order, entitled "Securing Our Borders," asserted that the United States had endure a "large-scale invasion" by "[m]illions of illegal aliens." See Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025). As relevant here, the Executive Order directed that "[t]he Secretary . . . shall, consistent with applicable law, take all appropriate action to . . . [t]erminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the [CHNV program]." Id. at 8468.

The second order, entitled "Protecting the American People Against Invasion," directed

the Secretary to take "all appropriate action, consistent with law," to:

> ensur[e] that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole[.]

See Exec Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

The third order, entitled "Protecting the United Sates from Foreign Terrorists and Other

National Security and Public Safety Threats," directed the Secretary to promptly "identify all

resources that may be used to ensure that all aliens seeking admission . . . or who are already in

the United States, are vetted and screened to the maximum degree possible," Exec. Order 14161,

90 Fed. Reg. 8451, 8451 § 2(a)(i) (Jan. 20, 2025), "re-establish a uniform baseline for screening

and vetting standards and procedures, consistent with the uniform baseline" in place on January

19, 2021, id. § 2(a)(iii), and "vet and screen to the maximum degree possible all aliens who

intend to be admitted, enter, or are already inside the United States," id. § 2(a)(iv).

Plaintiffs do not directly challenge the Executive Orders.

### 2.   The Huffman Memorandum

On January 20, 2025, then Acting Secretary of Homeland Security Benjamine C.

Huffman issued a memorandum stating that "[i]t is evident that many current DHS policies and

practices governing parole are inconsistent with [8 U.S.C § 1182(d)(5)]." See Huffman

Memorandum 2 [Doc. No. 41-1]. The memorandum stated that the language and context of 8

U.S.C. § 1182(d)(5) "make it abundantly clear that it is a *limited use* authority, applicable only in

a very narrow set of circumstances," and that the statute "does not authorize categorical parole

programs that make aliens presumptively eligible on the basis of some set of broadly applicable

criteria." Id. at 1–2 (emphasis in original). The memorandum further stated that "it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims." Id. at 2.

The Huffman Memorandum ordered that within 60 days, the Director of U.S. Immigration and Customs Enforcement ("ICE"), the Commissioner of CBP, and the Director of USCIS were to compile and review all policies pertaining to parole to determine "which are not strictly in accord with" 8 U.S.C § 1182(d)(5), and to thereafter "[f]ormulate a plan for phasing out" any such policies. Id. Huffman concluded his memorandum by stating that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance." Id.

The Plaintiffs challenge the reasoning and directives of the Huffman Memorandum. While the Huffman Memorandum is relevant here to the extent that it underlies subsequent agency action, it is not actionable on its own, as it merely directed the formulating of a plan and did not prescribe any final action.

3.  The Higgins Email

On January 23, 2025, Jennifer B. Higgins, then Acting Director of USCIS, sent an email directing her colleagues, "[p]ursuant to the Executive Order . . . *Securing our Borders*, and in accordance with [the Huffman Memorandum][,]" to "ensure effective immediately that your staff do not make any final decisions (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request, for the" U4U, OAW,

FRP, CAM, CHNV, or other parole programs. <u>See</u> Higgins Email [Doc. No. 41-2].[10] The two-paragraph email stated that the instruction "[did] not include requests for advance parole, non-categorical Form I-131 Humanitarian Parole requests, or government referrals for parole filed and adjudicated on a case-by-case basis for urgent humanitarian reasons or significant public benefit." <u>Id.</u>

According to Kika Scott, the Senior Official Performing the Duties of the Director of USCIS, DHS and USCIS "continue to accept and process certain individual parole requests filed on Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, on a case-by-cases basis, for urgent humanitarian reasons or significant public benefit, including requests based on military parole in place (MIL PIP), Immigrant Military Members and Veterans Initiative (IMMVI), U.S. Government referrals for parole, as well as individual parole requests not under a particular program or process." Kika Scott Decl. ¶ 8 [Doc. No. 41-4]. Kika Scott also reports that "[w]here an alien needs to remain in the United States after their period of parole terminates, the alien may request a new period of parole, also known as re-parole, by filing Form I-131 with USCIS from within the United States," and that "[s]uch

---

[10] The Higgins Email did not reference MPIP. Plaintiffs submitted a letter from USCIS to an individual supporting somebody seeking advanced parole stating that "the processing of the [advanced parole] application was determined to be within our current agency processing times but due to the current administration it is now on hold until further notice." <u>See</u> Feb. 28, 2025 Letter Regarding Advanced Parole [Doc. No. 24-48]. <u>See also</u> Esther H. Sung Decl. ¶ 15 [Doc. No. 24-36] (stating that the document is "a true and correct copy of a communication, sent on February 28, 2025, from USCIS to a Military Parole in Place sponsor"). Plaintiffs argue that this is evidence that applications for benefits under MPIP have also been indefinitely suspended. But as stated herein, in her declaration, Kika Scott states that "[a]lthough certain categorical parole programs have been paused pending further review, DHS and USCIS continue to accept and process certain individual parole requests filed on Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, on a case-by-cases basis, for urgent humanitarian reasons or significant public benefit, <u>including requests based on military parole in place (MIL PIP)</u>[.]" Kika Scott Decl. ¶ 8 [Doc. No. 41-4] (emphasis added).

requests are also adjudicated on a case-by-case basis for urgent humanitarian reasons or significant public benefit which warrants the new period of parole." Id.

On January 28, 2025, USCIS provided notice on its website that it was "pausing acceptance of the Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, until the Agency had reviewed all categorical programs as instructed by EO 14165." Id. ¶ 4.[11]

### 4. The Davidson Memorandum

On February 14, 2025, Andrew Davidson, the Acting Deputy Director of USCIS, issued a memorandum authorizing an immediate agency-wide administrative hold on all pending status readjustment and benefit requests filed by individuals paroled into the United States under the U4U, CHNV, or FRP programs, pending "the completion of additional vetting flags in ELIS[12] to identity any fraud, public safety, or national security concerns." Davidson Memorandum [Doc. No. 41-3] (emphasis added). The Memorandum explained that the parole processes are initiated under the U4U, CHNV, and FRP programs when a U.S.-based potential supporter files a request for each proposed beneficiary, and that the potential supporter is vetted by USCIS. Id. at 2. The Memorandum explained further that USCIS had suspended parts of the CHNV processes in July 2024 after a USCIS assessment identified potential concerns related to fraudulent sponsorship requests. Id. The Memorandum stated that, "[t]here were instances identified where certain beneficiaries were not fully vetted by CBP . . . prior to parole[.]" Id. The Memorandum found that "[t]herefore, benefit requests filed by aliens who are or were paroled under any of these

---

[11] "The Form I-134A is used to initiate the parole processes for the U4U, CHNV, and FRP programs." Id.

[12] ELIS is USCIS's Electronic Immigration System.

categorical parole programs need further review to determine the level of fraud and the possible

involvement of beneficiaries." Id. The Memorandum asserted further that "fraud information and

public safety or national security concerns are not being properly flagged in USCIS' adjudication

system." Id. The Davidson Memorandum concluded by stating:

> USCIS will immediately place an administrative hold on all benefit requests filed
> by aliens who are or were paroled into the United States under the U4U, CHNV, or
> FRP processes, pending the completion of the required screening and vetting . . . to
> identify any fraud, public safety, or national security concerns.
>
> Any case subject to this administrative hold with a litigation need may only be lifted
> from the hold on a case-by-case basis, in a subsequent memo to file, with approval
> by the USCIS Director or USCIS Deputy Director. This case-by-case requirement
> must be followed even when aliens are member of a class that is subject to
> injunction, settlement agreement, or other court order. Once USCIS completes a
> comprehensive review and evaluation of the in-country population of aliens who
> are or were paroled into the United States under these categorical parole programs,
> USCIS may issue a subsequent memo lifting this administrative hold.

Id. (emphasis added). To date, three months later, the "administrative hold" has not been lifted.

     5.   The March 25, 2025 Federal Register Notice

On March 25, 2025, after the pending motion was filed, DHS published a Federal

Register Notice ("FRN") announcing that, effective immediately, DHS "is terminating the

categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and

Venezuela." See Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and

Venezuelans, 90 Fed. Reg. 13611, 13611 (Mar. 25, 2025). The FRN announced further that

"[t]he temporary parole period of aliens in the United States under the CHNV parole programs

and whose parole has not already expired by April 24, 2025[,] will terminate on that date unless

the Secretary makes an individual determination to the contrary." Id. The FRN directed further

that "[p]arolees without a lawful basis to remain in the United States following this termination

of the CHNV parole programs must depart the United States before their parole termination

date." Id. at 13618-19. On April 14, 2025, this court granted emergency relief staying the FRN

insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States under the CHNV parole programs. See First Order on Mot. to Stay 40-41 [Doc. No. 97].[13]

### D. Plaintiffs Who Have Been Paroled into the United States

The following individual Plaintiffs[14] entered the United States after receiving parole pursuant to a Parole Program:

1. Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe

As detailed in the court's First Order on Motion to Stay [Doc. No. 97], Plaintiffs Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe were paroled into the United States pursuant to one of the CHNV programs. See First Order on Mot. to Stay 11-16 [Doc. No. 97].

---

[13] In the First Circuit, Defendants sought a stay of this court's order pending appeal. See Emergency Mot. for Stay, Doe v. Noem, No. 25-1384 (1st Cir. Apr. 21, 2025). The First Circuit denied that request on May 5, 2025, holding that Defendants had not made a strong showing that their categorical termination of Plaintiffs' parole is likely to be sustained on appeal. See Order, Doe v. Noem, No. 25-1384 (1st Cir. May 5, 2025). On May 8, 2025, Defendants filed an application to stay this court's order with the Supreme Court. See App. for Stay, Noem v. Doe, No. 24A1079 (May 8, 2025). That application is pending before the Court.

[14] These Plaintiffs and Plaintiff Marim Doe (described in the next section) are proceeding here under pseudonyms pursuant to the parties' Stipulated Protective Order Concerning Confidential Doe PII [Doc. No. 57] and this court's Electronic Order [Doc. No. 69] granting Plaintiffs' Second Supplemental Motion to Proceed Under Pseudonym [Doc. No. 64]. All Plaintiffs except Miguel Doe voluntarily provided their identities to Defendants, and all Plaintiffs have provided their identities to this court for in camera review. See Mem. & Order [Doc. No. 79]; Sealed Notice Providing Pls.' Identities [Doc. No. 81-1].

2.  Svitlana Doe[15]

Plaintiff Svitlana Doe is a Ukrainian national who received parole through the U4U program in November 2022. In Ukraine, she worked as a project manager for a charity foundation. She left Ukraine due to the war, which struck a few miles from the city where her family lived. Her son has celiac disease and was hospitalized for several weeks in 2022 due to contact with gluten. In Ukraine, she struggled to take care of her son when grocery prices increased due to the war.

Svitlana Doe and her family were granted re-parole under U4U in 2024, and her current grants of parole and work authorization are valid until November 18, 2026. She and her family applied for Temporary Protected Status ("TPS") in February 2025, and that application remains pending.

In the United States, Svitlana Doe has been working for a local community center and is enrolled as a community college student studying child development. She has received a certification to work as a teacher's assistant. She states that a failure to secure additional re-parole, another immigration benefit, or work authorization would cause her to be unable to provide for her family's basic needs and help her husband, who has an autoimmune condition, and her son obtain the medical treatment they need.

3.  Maksym Doe[16]

Maksym Doe is a Ukrainian national who received parole through U4U in 2023. In Ukraine, he worked in professional theater as well as at an acting school for children and adults

_____

[15] See Svitlana Doe Decl. [Doc. No. 24-8].

[16] See Maksym Doe Decl. [Doc. No. 24-5].

and at a nonprofit supporting cultural initiatives. He evacuated Ukraine due to the war and could see bombs dropping from his apartment.

After evacuating to a safer region of Ukraine, Maksym Doe recruited volunteers and helped to evacuate 22,000 people from areas under attack. He and his fellow volunteers also began preparing meals for people and raising funds and registered as a nonprofit in Ukraine. The nonprofit now has more than 100 employees. He traveled to the United States to work with other humanitarian aid organizations, raise additional funds, and continue providing aid to those affected by the war.

His current grant of parole expired in April 2025, and he applied for re-parole in November 2024. He has also applied for TPS.

4. Maria Doe[17]

Maria Doe, wife of Maksym Doe, is a Ukrainian national who came to the United States in February 2023 pursuant to the U4U program. She received work authorization and was initially dog-sitting and dog-walking. She has since found a job at a technology start-up in project management.

Maria Doe was granted two additional years of parole in January 2025. She has a pending application for TPS and has worked with her employer to file an H1-B visa application.

5. Aleksandra Doe[18]

Aleksandra Doe is a Ukrainian national. She, her husband, and her young son left Ukraine due to the war. In Ukraine, she heard missiles and lived for several weeks without electricity. She and her family received parole in April 2023. She received work authorization in

---

[17] See Maria Doe Decl. [Doc. No. 24-6].
[18] See Aleksandra Doe Decl. [Doc. No. 24-17].

May 2023 and has worked by cleaning houses part-time. Her husband works full-time in construction. Their son attends kindergarten. Their grants of parole expired on March 29, 2025.

She has a pending TPS application, filed in December 2024, and a pending adjustment of status application through the diversity lottery. She and her family members were selected to move forward in the diversity visa program and had an interview scheduled for February 2025, but the interview was canceled. She and her family did not apply for U4U re-parole because they did not think doing so was necessary after they moved forward in the diversity lottery, and because they had spent upwards of $6,000 on their I-485 applications and additional requirements and could not afford to spend money on another application.

6. Teresa Doe[19]

Teresa Doe is a national of El Salvador who received parole in 2017 pursuant to the CAM program. She has spent the last eight years in the United States and has consistently received CAM re-parole during that time. Her current period of parole expired March 13, 2025. She applied for re-parole, but her application has not been approved. She has not returned to El Salvador since she left almost 9 years ago, and she does not have family in that country.

If Teresa Doe is deported, she will face family separation. Her husband has Temporary Protected Status, two of her children are lawful permanent residents, and her third child is a U.S. citizen. Her husband works to financially support the family, and Teresa is the caretaker to her children and her two U.S-citizen granddaughters, whose parents cannot care for them because they work full-time. If she is deported, her youngest child and grandchildren would not have caretakers.

---

[19] See Teresa Doe Decl. [Doc. No. 24-15].

Teresa Doe has concerns for her safety in El Salvador and states that "[y]ou cannot trust the authorities to protect you" and that "the political climate is not good there."

7. Omar Doe[20]

Omar Doe is a national of Afghanistan. He, his wife, and their six children—the youngest of whom is two and was born in the United States—were brought to the United States by the U.S. military in 2021, when the U.S. military withdrew from Afghanistan. In Afghanistan, he worked for the U.S. military for his entire adult life. He served with troops and worked as a cook and security guard. He received threats and feared for his safety due to his work with the U.S. military and eventually had to leave his home province due to the threats.

When he arrived in the United States, Omar Doe received a work permit and was told he would receive a passport, green card, and legal status. He currently works at a plastics company operating machinery. He has applied for a Special Immigrant Visa, which has now been pending for three and a half years. He is also working on an asylum application. His work permit will expire in September 2025.

E. *Plaintiffs Seeking to Support Family Members for Parole in Place*

1. Adolfo Gonzales, Jr.[21]

Adolfo Gonzales, Jr., is a United States citizen who was born in Texas. He served in the United States Army for about 35 years, including as a First Sergeant. He retired from active service and was honorably discharged in February 2025.

---

[20] See Omar Doe Decl. [Doc. No. 24-7].

[21] See Adolfo Gonzales, Jr., Decl. [Doc. No. 24-13].

Gonzales lives with his wife and their sixteen-year-old daughter[22] in Zapata, Texas, where he has lived for about 37 years. Gonzales's wife is a Mexican national without lawful status in the United States.

Around December 2023, Gonzales and his wife met with an immigration attorney, who informed them that his wife could seek parole in place because of Gonzales's service with the military. Their attorney submitted an MPIP application on their behalf around March 2024.

In March 2025, the attorney informed Gonzales and his wife that MPIP applications were no longer being reviewed or processed.

Gonzales attests to feeling sad and anxious about what the indefinite suspension of adjudications means for his family. He states that he and his wife live in fear at the possibility of her deportation. He further states that their sixteen-year-old daughter depends on his wife for many needs, including transportation to and from school and parental support.

Given his years of service in the U.S. military, Gonzales states that the indefinite suspension on MPIP adjudications has caused him to feel "let down by the government."

    2.  Marim Doe[23]

Marim Doe is a United States citizen born in Long Island, New York in December 2003. She joined the United States Navy in January 2024 and currently lives at a United States military base in South Carolina. She is a student in the nuclear training program and is training to operate a nuclear reactor on a naval carrier or submarine.

---

[22] Their daughter is his wife's biological child and Gonzales's adopted daughter. He is in the process of obtaining a certificate of citizenship for her.

[23] See Marim Doe Decl. [Doc. No. 24-14].

Marim Doe's father entered the country unlawfully in 1997 and still does not have lawful status in the United States.[24]

When Marim Doe was in high school, her father told her the family did not have money for her to attend college. Marim Doe states that her father was ashamed but that she assured him it would be alright. Marim Doe states that one reason she joined the military was to eventually attend college. She further states that helping her father obtain lawful status was one of the main reasons she decided to join the U.S. military, having first heard of MPIP while she was in high school.

Marim Doe enlisted in the Navy in January 2024 and submitted a Form I-131 to apply for MPIP for her father on May 6, 2024.

Marim Doe's father has worked at a large corporation in Texas for 20 years. He currently is a manager and works the night shift. When at home, Marim Doe's father spends his time helping Marim Doe's mother with her cleaning business.

Marim Doe states that she is concerned that her father will lose his job if his employer learns of his unlawful status. She further states that her father will not have retirement benefits or be able to access his social security benefits without lawful status.

Marim Doe does not know how her family will survive financially if her father is fired or deported. She and her family fear immigration raids and checkpoints, and her father cannot visit her in South Carolina because the family does not feel safe making the trip. Marim Doe states that she feels distracted during class and helpless and upset due to her current separation from her family and the risks her father faces.

---

[24] Marim Doe's mother recently obtained lawful status.

II.    **Jurisdiction and Reviewability**

Defendants raise numerous challenges to this court's jurisdiction. While Defendants are correct that the Secretary's discretion in this area is broad, their conclusion that the Secretary's actions are wholly shielded from judicial review is incorrect. Accordingly, while this court recognizes that its role in reviewing agency action in this area is limited, within that limited role the court is not precluded from considering Plaintiffs' claims under the Administrative Procedure Act ("APA") or from staying in part Defendants' actions challenged here.

*A. Standing*

"If at least one plaintiff has standing, the suit may proceed." Biden v. Nebraska, 600 U.S. 477, 489 (2023). To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024).

1.    Plaintiffs Who Have Been Paroled into the United States

Plaintiffs who have been paroled into the United States have standing to challenge the suspension of re-parole adjudications and of adjudications for other immigration benefits, but these Plaintiffs do not have standing to challenge any suspension of initial parole adjudications, as these Plaintiffs have already received an initial grant of parole.

 Plaintiffs attest to the risks they face if removed. See, e.g., Teresa Doe Decl. [Doc. No. 24-15] (detailing risks she faces if deported to her native El Salvador after living eight years spent lawfully present in the United States, including separation from her husband and from her children and grandchildren, for whom she is the primary caretaker). The indefinite suspensions

of adjudications manufacture the lapse of Plaintiffs' lawful status in the United States, as the suspensions leave Plaintiffs no meaningful opportunity for consideration for re-parole or more permanent forms of immigration relief. If their parole status lapses—as it is essentially guaranteed to do while the Higgins Email and Davidson Memorandum are in effect—Plaintiffs will face two unfavorable options: continue following the law and leave the country on their own, or await removal proceedings.[25]

Beyond the risk of deportation and detention, the Higgins Email and the Davidson Memorandum also jeopardize Plaintiffs' ability to receive work authorization. Denial of work authorization over the course of this litigation would cause harm to Plaintiffs that could not be remedied through damages. See, e.g., Alejandro Doe Decl. ¶ 15 [Doc. No. 24-1] ("[W]e would likely be forced to break apartment leases we have entered into, rendering us homeless."); Svitlana Doe Decl. ¶ 18 [Doc. No. 24-8] ("I will not be able to pay rent . . . purchase groceries . . . or pay my family's bills. My son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy, adequate food for his diet, and stability. My husband also has an autoimmune condition . . . .").

Many of Defendants' arguments against standing turn on a mischaracterization of Plaintiffs' claims as seeking grants of a particular benefit on a particular timeline, as opposed to a lifting of the suspension on adjudications. But Plaintiffs are not required to show that

---

[25] The harms Plaintiffs would face in either scenario are detailed in this court's previous order. See First Order on Motion to Stay 17-19 [Doc. No. 97]. Defendants maintain that Plaintiffs may raise claims as to asylum and other immigration benefits once they are placed in removal proceedings—the suggestion being that an order from this court enjoining Defendants' actions is not necessary for Plaintiffs to avoid removal. See Opp. to Mot. for PI 7, 27 [Doc. No. 42]. But as explained in the court's prior order, that argument misses the mark by assuming the only injury Plaintiffs face is removal itself.

preliminary relief would "compel grants of . . . re-parole" within a particular time frame, despite Defendants' suggestion to the contrary. See Opp. to Mot. for PI 9 [Doc. No. 42]. Relatedly, Plaintiffs have standing even though they seek discretionary benefits to which they cannot claim a legal entitlement. See FEC v. Akins, 524 U.S. 11, 25 (1998) ("[T]hose adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground."). And while it is true that adjudications of many benefits are significantly delayed, lifting the indefinite suspensions would mean the chance of a final benefits adjudication before the expiration of parole would no longer be effectively zero. That change is meaningful where, as here, the potential harm to Plaintiffs is of such a significant magnitude.

Defendants also raise arguments against standing that suggest a far more stringent causation showing than is required. Despite Defendants' suggestion, Plaintiffs' injuries are redressable by this court even though preliminary relief may not ultimately prevent the termination of their parole. Plaintiffs need not prove that DHS could not cause Plaintiffs' same injuries through some other agency action to satisfy the redressability prong. Nor does it defeat Plaintiffs' standing that they can seek re-parole outside of one of the Parole Programs. See Kika Scott Decl. ¶ 8 [Doc. No. 41-4]. The existence of some hypothetical other avenue for relief—one that likely offers a substantially lower likelihood of success for Plaintiffs—does not defeat Plaintiffs' claim that their injuries are traceable to the challenged Email and Memorandum.

In sum, the individual Plaintiffs who have been paroled into the United States have standing to challenge the Higgins Email's and the Davidson Memorandum's suspension of re-parole adjudications and adjudications for other immigration benefits.

2.   Plaintiffs Seeking to Support Family Members for Parole in Place

Plaintiffs seeking to support family members for the MPIP program have standing to challenge the suspension of initial parole and re-parole adjudications pursuant to the MPIP program, as well as to challenge any suspension of other benefits adjudications filed by individuals who received parole through the MPIP program. Defendants' actions here increase the risk that Plaintiffs will experience family separation. In Trump v. Hawaii, the Supreme Court explained that "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact." 585 U.S. 667, 698 (2018). That statement concerned plaintiffs seeking to bring individuals into the United States, whereas the MPIP supporter Plaintiffs' interests here are even stronger, as they seek to prevent separation from family members who have resided in the United States for several years or even decades. The MPIP supporter Plaintiffs attest to the anxiety and fear they have experienced due to the risk of separation from their family members and to the financial consequences for their families if their loved ones remain unable to obtain lawful status. Plaintiff Marim Doe even states that one of the main reasons she joined the military immediately after high school was for the possibility of accessing the MPIP program and potentially helping her father obtain lawful status. See Marim Doe Decl. ¶ 6 [Doc. No. 24-14]. Therefore, the MPIP supporter Plaintiffs' injuries are sufficient to confer standing.[26]

---

[26] Defendants argue that supporter Plaintiffs are not within the zone of interests of the parole statute—or, it seems, other relevant sections of the Immigration and Nationality Act. Opp. to Mot. for PI 19-20 [Doc. No. 42]. The zone-of-interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012) (quoting Clarke v. Securities Industry Assn., 479 U.S. 388, 399 (1987)). The interests of supporter Plaintiffs seeking to prevent separation from their family members are clearly not "so

B. *Section 1252(a)(2)(B)(ii)*

Section 1252(a)(2)(B)(ii) of Title 26 strips district courts of jurisdiction to review "any []
decision or action of . . . the Secretary . . . the authority for which is specified under this
subchapter to be in the discretion of . . . the Secretary . . . , other than the granting of relief under
section 1158(a) of this title."[27] 8 U.S.C. § 1252(a)(2)(B)(ii). Defendants argue that the "bar on
review of discretionary decisions encompasses the agency's judgments regarding guidance and
process for rendering of discretionary judgments" and that Section 1252(a)(2)(B)(ii) therefore
"precludes jurisdiction over Plaintiffs' challenges to Defendants' . . . pause on adjudication of re-
parole, asylum or adjustment of status for parole beneficiaries[.]" Opp. to Mot. for PI 10-11
[Doc. No. 42].

This court addressed in detail the applicable law concerning Section 1252(a)(2)(B)(ii) in
its First Order on Motion to Stay and incorporates that discussion here. In that Order, this court
agreed that individual grants or revocations of parole are generally not reviewable but rejected
Defendants' overbroad argument, based on Patel v. Garland, 596 U.S. 328 (2022), that "the
statutory bar applie[s] to every decision in the chain leading to [a] particular decision." Opp. to
Second Mot. for PI 8 [Doc. No. 89]; First Order on Motion to Stay 23 [Doc. No. 97]. Review of
the indefinite suspension of initial parole and re-parole applications is not precluded by Section
1252(a)(2)(B)(ii) for reasons explained in the First Order on Motion to Stay [Doc. No. 97],
including that challenges to policies and processes governing grants and revocations of parole
are generally reviewable.

---

marginally related" to the purposes of the immigration statutes as to foreclose them from
bringing suit.

[27] Section 1158(a) pertains to the granting of asylum. See 8 U.S.C. § 1158(a).

As to the Davidson Memorandum's suspension of other adjudications, Defendants state that "asylum and most applications for adjustment of status are discretionary." Opp. to Mot. for PI 10 [Doc. No. 42]. Asylum adjudications are expressly exempted from Section 1252(a)(2)(B)(ii), so that Section does not bar review of the Davidson Memorandum's suspension of asylum adjudications. See 8 U.S.C. § 1252(a)(2)(B)(ii) ("other than the granting of relief under section 1158(a) of this title").

Other courts have found that Section 1252(a)(2)(B)(ii) bars review of DHS's policy requiring an immigrant visa number to be available before approving or denying pending adjustment of status ("AOS") applications. See Thigulla v. Jaddou, 94 F.4th 770, 775-76 (8th Cir. 2024); Cheejati v. Blinken, 106 F.4th 388, 394-96 (5th Cir. 2024); Geda v. Dir. United States Citizenship and Immigr. Servs., 126 F.4th 835, 843-45 (3d Cir. 2025). In that vein, this court similarly found that "although USCIS and DOS are directed to adjudicate AOS applications generally [under Section 1255(a)], the language of the statute does not require adjudication of an AOS application where no appropriate immigrant visa is available for the applicant." Patel v. Jaddou, 695 F. Supp. 3d 158, 171 (D. Mass. 2023). Accordingly, this court held that USCIS's decision to hold AOS applications "in abeyance until a visa becomes available to them is a discretionary act," the review of which was precluded by Section 1252(a)(2)(B)(ii). Id. at 171-73.[28]

But here, Plaintiffs are not challenging a policy of Defendants to triage AOS applications based on a discretionary policy. Nor are Plaintiffs bringing unreasonable delay claims, despite

---

[28] The First Circuit affirmed the dismissal based on its review of Section 1255(a), without addressing defendants' continuing objection that courts are barred by Section 1252(a)(2)(B)(ii) from even considering the question. Gupta v. Jaddou, 118 F.4th 475, 483 (1st Cir. 2024).

Defendants' arguments to the contrary.[29] Rather, Plaintiffs are challenging Defendants' categorical refusal to adjudicate—on any timeline—AOS applications filed by individuals paroled through the U4U, FRP, and CHNV programs. The Davidson Memorandum imposing the indefinite suspension has been in place for three months, and the government gives no indication of any intent to lift the suspension. Therefore, the Davidson Memorandum effectively imposes a policy of refusing to act on entire categories of AOS applications. Section 1252(a)(2)(B)(ii) is not a bar to review of such a policy. A contrary finding would "conflict with the congressional intent, embodied in the APA, to allow courts to intervene when agencies fail to carry out their mandatory duties in a reasonable period of time." Zhou v. FBI, 2008 WL 2413896, at *3 (D.N.H. June 12, 2008); see also id. at *4 (citing cases concluding that Section 1252(a)(2)(B)(ii) is not a bar to a court's review of the Secretary's refusal to act).

Therefore, Defendants' arguments based on Section 1252(a)(2)(B)(ii) are unavailing as to the indefinite suspensions of adjudications.

### C. Committed to Agency Discretion by Law

Defendants argue that the agency actions Plaintiffs seek to challenge are precluded from APA review because such actions are "committed to agency discretion by law." See Opp. to Mot. for PI 12 [Doc. No. 42]; 5 U.S.C. § 701(a)(2).

As explained in this court's prior order, the APA "establishes a basic presumption of judicial review [for] one suffering legal wrong because of agency action[,]" but that presumption may rebutted, including by a showing that the "agency action is committed to agency discretion by law." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16-17 (2020)

---

[29] Courts are split over whether courts have jurisdiction concerning claims of unreasonable delay. See Lamarche v. Mayorkas, 691 F. Supp. 3d 274, 278 n.1 (D. Mass. 2023) (explaining the split).

(internal quotations omitted) (first alteration in original) (citations omitted). The Supreme Court has read this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 772 (2019) (citations omitted).

The indefinite suspension of initial parole and re-parole adjudications is not an action that is "committed to agency discretion by law" because, as stated previously, the parole statute establishes standards for the Secretary's exercise of discretion and the Parole Programs created processes for conferring affirmative immigration relief and related benefits, thereby providing a focal point for judicial review.

Title 5, Section 701(a)(2) also does not bar review of Plaintiffs' challenges to the Davidson Memorandum's indefinite suspension of benefits adjudications. Defendants are correct that at least some of "the benefits Plaintiffs claim to have applied for are expressly discretionary[,]" Opp. to Mot. for PI 13 [Doc. No. 42], but Defendants fail to demonstrate that any of the statutes governing the benefits adjudications indefinitely suspended by the Davidson Memorandum are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Dep't of Com.</u>, 588 U.S. at 772. For instance, the asylum statute specifies that the Secretary or Attorney General "may grant asylum" but also states that the Secretary or Attorney General must determine whether "such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A).[30] The TPS

---

[30] The statute further specifies procedures that must be followed in adjudicating asylum applications, including scheduling an initial interview or hearing within 45 days and completing a final adjudication of an application within 180 days. <u>See</u> 8 U.S.C. § 1158(d)(5).

statute similarly specifies conditions under which the Attorney General can make TPS

designations. See 8 U.S.C. § 1254a(b). Accordingly, there are "meaningful standard[s] against

which to judge the agency's exercise of discretion[,]" Dep't of Com., 588 U.S. at 772 (citations

omitted), and 5 U.S.C. § 701(a)(2) is not a bar to review.

### III.    Preliminary Relief

Courts weigh four factors in determining whether a stay should issue: "(1) whether the

stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether

the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public

interest lies." Nken v. Holder, 556 U.S. 418, 425-26 (2009) (citation omitted).

### A.  Likelihood of Success on the Merits

"An agency's decision is arbitrary and capricious if the agency relied on improper

factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter

to the evidence,' or when a reasonable explanation for the agency's decision cannot be

discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Mfrs. Ass'n

of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). "[A] court 'is not to

substitute its judgment for that of the agency' but rather determine 'whether there has been a

clear error of judgment.'" Id. (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513

(2009)).

1.  Plaintiffs' Challenge to the Suspension of Initial Parole and Re-Parole
    Adjudications

On January 23, 2025, the Higgins Email ordered USCIS staff not to finally adjudicate any parole or re-parole applications submitted pursuant to the U4U, OAW, FRP, CAM, CHNV programs[31] or several other programs. Higgins Email [Doc. No. 41-2].

The Email stated that such action was being taken pursuant to the Huffman Memorandum and the Executive Order entitled "Securing Our Borders." See id. The cited Executive Order, issued three days earlier, had instructed the Secretary to "take all appropriate action [consistent with applicable law] to . . . [t]erminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders[.]" Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). Executive Order 14159, in turn, directed the Secretary to "all appropriate action, consistent with law," to "ensur[e] that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis . . . ." Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

Plaintiffs do not challenge the President's Executive Orders, and an agency's reference to executive action may, in some circumstances, implicate the President's significant latitude over immigration matters. But the executive orders relevant to the Higgins Email did not order an agency to terminate or suspend any specific parole program, but only those determined to be

_____

[31] Plaintiffs do not dispute that re-parole is not available through the CHNV processes. See Mem. ISO Second Mot. for PI 3 n.4 [Doc. No. 72]; see also Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614 n.24 (Mar. 25, 2025) ("DHS notes that on October 4, 2024, the prior administration announced that there would be no 're-parole' beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs.").

contrary to the President's policies, and even then, to do so only as "consistent with law." The Executive Orders thus do not provide a basis for the Higgins Email's indefinite suspension of applications for re-parole made pursuant to the Parole Programs.[32]

The Huffman Memorandum, also issued on January 20, 2025, ordered the Director of USCIS, among others, to review policies, within sixty days of that order, to determine which were not "strictly in accord with" 8 U.S.C. § 1182(d)(5) and to formulate a plan for phasing out such policies. See Huffman Memorandum 2 [Doc. No. 41-1]. This portion of the Huffman Memorandum similarly did not order the termination or suspension of any specific parole program, but instead, ordered factfinding and formulation of a plan. This portion of the Huffman Memorandum thus also does not provide a basis for the Higgins Email's indefinite suspension of applications for re-parole made pursuant to the Parole Programs.

The Huffman Memorandum did authorize "DHS Components" to pause or even terminate parole programs pending review. Id. But in so doing, the Memorandum imposed three limitations on the DHS Components' pausing, modifying, or terminating of such programs, finding such action to be appropriate only "to the extent":

    a. The policy was not promulgated pursuant to the procedural requirements of the Administrative Procedure Act or any comparable scheme;

    b. The DHS Component can do so in a manner that protects any legitimate reliance interests; and

    c. Doing so is otherwise consistent with applicable statutes, regulations and court orders.

---

[32] Only the CHNV programs were terminated through notice in the Federal Register. See Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025). As previously noted, re-parole was not available under the CHNV programs, and no Plaintiff considered in this order has standing to challenge any suspension of initial parole adjudications as to the CHNV programs.

Id.

The Higgins Email disregards each of these limitations. First, the U4U, OAW, FRP, CAM, and other programs were promulgated by formal notice, in accordance with the APA. See supra Part I.B. Second, the Higgins Email fails to consider the reliance interests of any individual. Third, the agency gives no reasoned explanation for its decision and thus no basis for the suggestion that such action is "consistent with applicable statutes, regulations and court orders."

Additionally, while the Huffman Memorandum directed an examination of certain parole programs to determine if they were strictly in accord with 8 U.S.C. § 1182(d)(5)—although precisely which programs was unclear, as the Memorandum referred to "categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria"—the Higgins Email includes no findings that the Parole Programs are not strictly in accord with 8 U.S.C. § 1182(d)(5).

Nor can the Higgins Email be justified on the ground that any program that categorizes applicants is automatically unlawful. Section 1182(d)(5) grants the Secretary the discretion to parole aliens "into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5). The plain language of the statute necessitates that final parole determinations be made on a case-by-case basis. See Biden v. Texas, 597 U.S. 785, 806 (2022) ("the [parole] authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'") (quoting 8 U.S.C. § 1182(d)(5)(A)); id. at 814-15 (Kavanaugh, J., concurring) ("Parole entails releasing individuals on a case-by-case basis into the United States . . . ."). Accordingly, it would be contrary to the

statute for the Secretary to promulgate a rule stating that every individual from a particular country should receive a favorable parole determination, as that would mean parole determinations were not being made case-by-case. But nothing in the text prohibits the Secretary from setting forth general principles, such as guidance as to whether individuals from a particular country are likely to present an urgent humanitarian need for parole, that can guide frontline adjudications in making case-by-case determinations.

Although not dispositive as to the meaning of the statute, the court notes that, since the parole authority was enacted in 1952 (including after the statute was amended to include the "case-by-case" language), Presidential administrations have identified programmatic circumstances under which case-by-case parole determinations might be warranted. See Programmatic Parole Orders Table [Doc. No. 24-38]; Yael Schacher Decl. ¶ 8 [Doc. No. 24-39] ("Congress has frequently responded to parole programs by seeming to approve of the Executive's programmatic use of parole by, for example, extending immigration and other benefits to individuals who were or will be paroled through a program; and by declining to amend the parole provision to limit the use of parole to narrow, highly prescriptive circumstances that likely would significantly constrain its programmatic use."). Recently, Congress passed legislation specifically extending resettlement benefits to parolees from Afghanistan, see Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43 (Sept. 30, 2021), and from Ukraine, see Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128 (May 21, 2022). At a minimum, this indicates Congressional awareness of the categorical parole programs. If Congress had wished to amend the parole statute to prohibit such programs, it could have.

The Huffman Memorandum did not include any findings of fact or even reference to any program that, in then-Acting Secretary Huffman's determination, violated the parole statute.[33] Nor did the Higgins Email include such findings. The guidance documents instituting the parole programs at issue in this case stated that final parole determinations were to be made by a CBP officer on a case-by-case basis. See supra Part I.B. Nothing on the face of those documents suggested that final parole determinations were not being made on a case-by-case basis. While it is possible that the programs were, in practice, operating contrary to the statute, the Huffman Memorandum and Higgins Email offered no facts suggesting that to be the case.

In sum, Plaintiffs paroled into the United States under the Parole Programs (excluding the CHNV parole programs)[34] are likely to succeed on their claim that the Higgins Email's suspension of re-parole adjudications was arbitrary and capricious.[35]

The parties dispute whether the Higgins Memorandum or some other agency action suspended parole, re-parole, and advanced parole adjudications of applications filed by individuals who received parole through the MPIP program. To the extent that adjudications of applications through the MPIP program are suspended, then Plaintiffs are also likely to succeed in challenging this suspension of such adjudications, for the reasons stated herein.

---

[33] The Huffman Memorandum also stated that 8 U.S.C. § 1182(d)(5)(B) limits the circumstances under which an alien defined as a refugee may be paroled into the United States but pointed to no program that purportedly violated that provision.

[34] The court reiterates that the CHNV programs do not provide for re-parole, despite the Higgins Email's reference to those programs.

[35] None of the Plaintiffs who have already been paroled into the United States has standing, however, to challenge any suspension as to initial parole adjudications.

2.  Plaintiffs' Challenge to the Suspension of Benefits Adjudications

Plaintiffs also challenge as arbitrary and capricious the indefinite suspension of adjudications of immigrant benefits applications beyond those for parole and re-parole. See Mem. ISO Mot. for PI 23-24 [Doc. No. 25].

Plaintiffs allege the suspension on adjudications went into effect weeks before the Davidson Memorandum was issued on February 14, 2025, and that the Davidson Memorandum was a post-hoc justification of the suspension. Second Am. Compl. ¶¶ 8-9 [Doc. No. 68].[36] The Higgins Email can also be read to have suspended such adjudications by directing the suspension of "any . . . other request" for the U4U, OAW, FRP, CAM, CHNV, or other parole programs. Higgins Email [Doc. No. 41-2]. To the extent the Higgins Email suspended adjudications for benefits other than parole and re-parole, no reason for such suspension was offered. Plaintiffs are therefore likely to succeed on the merits of their argument that any such suspension by the Higgins Email was arbitrary and capricious.[37]

For its part, the Davidson Memorandum stated:

Due to the potential fraud trends already identified for supporter fraud by [USCIS Fraud and Detection and National Security Directorate ("FDNS")] in their initial review of the U4U and CHNV processes, the implication of beneficiary participation in the supporter fraud, and the explicit instruction to DHS to screen and vet aliens seeking immigration benefits to the maximum degree possible, USCIS is pausing the adjudication of benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes to ensure that these benefit requests are being reviewed with the appropriate screening and vetting standards and procedures as set out in EO 14161.

---

[36] This court need not consider Plaintiffs' allegation here because this court finds that the suspension was arbitrary and capricious even when taking into account the rationale for the suspension offered in the Davidson Memorandum.

[37] To the extent the Higgins Email suspended such adjudications as to individuals paroled through the MPIP program, such suspension was likewise arbitrary and capricious.

Davidson Memorandum 3 [Doc. No. 41-3].

Plaintiffs emphasize that the evidence of fraud described in the Davidson Memorandum was discovered last year, not more recently, and that discovery of such potential fraud led to a suspension of parts of the CHNV processes in July 2024 that has since been lifted. See Mem. ISO First Mot. for PI 23-24 [Doc. No. 25]. Plaintiffs maintain, therefore, that the indefinite suspension now imposed is unwarranted, where the agency does not indicate that it discovered any *new* evidence of fraud.

Plaintiffs' argument suggests too stringent a degree of scrutiny than is justified in an arbitrary-and-capricious analysis. The Davidson Memorandum cited the President's Executive Order No. 14161, which instructed the agency, *inter alia*, to:

> (i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible . . .
> [(ii)] re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and
> [(iii)] vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

Exec. Order No. 14161, 90 Fed. Reg. 8451, 8451 § 2(a) (Jan. 20, 2025). Given the purported evidence of fraud in the CHNV program and alleged "potential fraud trends already identified for supporter fraud by FDNS in their initial review of the U4U and CHNV processes," had adjudications recommended, Plaintiffs would not likely succeed on their claim that DHS's justification for its decision to "paus[e] the adjudication of benefit requests" to give the agency time to establish a baseline for screening and vetting standards and procedures for subsequent

screening and vetting of individuals who received parole through the U4U, CHNV, and FRP programs was inadequate.[38]

But the Davidson Memorandum went further. The "pause" has now been in place for more than three months; the pause is, in effect, an indefinite suspension. And the Davidson Memorandum stated that the "pause" on benefits adjudications would remain in place at least until "USCIS completes a comprehensive review and evaluation of the in-country population of aliens who are or were paroled into the United States under these categorical parole programs[.]" Davidson Memorandum 3 [Doc. No. 41-3]. Nothing in the Davidson Memorandum, or the executive orders cited therein, explains the agency's decision to suspend benefits adjudications for any individual who received parole through one of the relevant programs until every single such person has been screened and vetted. Nor did the Davidson Memorandum even consider the reasonable alternative of performing screening and vetting, through application of a "uniform baseline," as part of the adjudication of an application for immigration benefits, rather than pausing adjudications altogether for vetting to be performed separately.

Beyond the inadequate justification for the indefinite suspension of all applications, the Davidson Memorandum gave no consideration of the reliance interests of individuals already present in the United States seeking immigration benefits. While such reliance interests of course

---

[38] To be certain, the purported evidence of fraud in the Davidson Memorandum lacked specificity and, arguably, relevance to the agency action taken. The Memorandum's details and numbers of incidents regarding fraud primarily concerned supporters, and no details or numbers were included as to the "instances identified where certain beneficiaries were not fully vetted by CBP and were the subject of national security or public safety information that was not properly assessed prior to parole by CBP." See Davidson Memorandum 2 [Doc. No. 41-3]. But this court emphasizes that the finding here that Plaintiffs will likely succeed on their claim that the suspension of benefits adjudications was arbitrary and capricious does not depend on the strength or weakness of the agency's evidence of fraud.

do not necessitate the granting of any benefit, these reliance interests are sufficiently strong to necessitate that the agency acknowledge them, at a minimum, before effectively rendering individuals who lawfully entered the United States ineligible for more lasting forms of immigration relief.

Therefore, Plaintiffs' challenge to the Davidson Memorandum's suspension of adjudications is likely to prevail.

## B. Irreparable Harm

Absent preliminary relief, the grants of parole of many Plaintiffs will expire before final relief is entered in this action, during which time Plaintiffs would not have been able to receive meaningful consideration for re-parole or more permanent immigration benefits, effectively ensuring their removability. While some Plaintiffs may not receive favorable benefits determinations before their parole expires even with a stay in place, a stay would move some Plaintiffs' chances of receiving favorable determinations from zero to possible. Where, as here, the magnitude of the injury is so great, that increase is meaningful. As stated in this court's previous order, if parole expires and Plaintiffs have not received any other benefit, Plaintiffs will be forced to choose between two injurious options: continue following the law and leave the country on their own, or await removal proceedings. See First Order on Motion to Stay 37 [Doc. No. 97].[39] For reasons stated in that order, that suffices to show irreparable harm absent a stay.

---

[39] Notably, in their appellate briefing concerning the termination of existing grants of parole under the CHNV programs, Defendants have argued that "[i]nsofar as CHNV parolees have other pending requests for immigration benefits, then it is not true that 'revocation of all CHNV parole grants through the FRN will cause irreparable harm to hundreds of thousands of CHNV parolees[,]'" and that "[revocation of CHNV parole grants] would instead harm only those who have not asserted a basis for lawfully remaining in this country." Defs.' First Circuit Reply 10-11, Doe v. Noem, No. 25-1384 (1st Cir. Apr. 28, 2025). But by suspending applications for a

Absent preliminary relief as to the indefinite suspension of adjudications of applications filed by individuals seeking parole through or already paroled through MPIP, Plaintiffs seeking to support family members present in the United States for parole pursuant to MPIP will continue to experience the fear, anxiety, and economic risk that results when a family member lacks lawful status in the United States. If their family members are placed in removal proceedings, it is possible they will be unable to seek other forms of immigration protection, particularly where they were unlawfully present in the United States. And because the MPIP program was designed to allow members of the military to support family members <u>already present</u> in the United States in obtaining parole, a family member's removal from the United States may prevent them from accessing MPIP even if a final determination on the merits of this lawsuit causes MPIP adjudications to resume. Therefore, preliminary relief is necessary to prevent irreparable harm.

*C. The Balance of Equities and the Public Interest*

The final two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." <u>Nken</u>, 556 U.S. at 435. Defendants assert that preliminary relief precluding a pause on applications to the Parole Programs "irreparably harms the United States by limiting the Executive's discretionary authority under § 1182(d)(5)." Opp. to Mot. for PI 28 [Doc. No. 42]. However, the relief contemplated in this order would not limit that discretionary authority as to any individual case. It would, however, require the agency to give Plaintiffs who were lawfully paroled into the United States the opportunity for consideration of

---

wide range of benefits, Defendants have sought to undermine the parolees' ability to assert a basis for lawfully remaining in the country.

their applications for other benefits and to give Plaintiffs who served in the United States military consideration of parole applications for their family members.

Defendants further state that the government would be harmed by preliminary relief because such relief would impede the government from taking steps to minimize the risk of fraud in its immigration programs. See id. But a stay of actions here would only require the government to give a reasoned explanation of the actions taken by the agency to categorically suspend adjudications of benefits applications for all individuals who received parole through the U4U, CHNV, and FRP programs.

This court emphasizes, as it did in its prior order, that it is not in the public interest to manufacture a circumstance in which hundreds of thousands of individuals will, over the course of several months, become unlawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families. Nor is it in the public interest for individuals who enlisted and are currently serving in the United States military to face family separation, particularly where some of these individuals joined the military in part to help their loved ones obtain lawful status.

The court finds the balance of equities and public interest weigh in favor of preliminary relief.[40]

---

[40] Again, the court rejects Defendants' argument that any preliminary relief ordered should be subject to bond. See Fed. R. Civ. P. 65(c); First Order on Motion to Stay 39 n.33 [Doc. No. 97]. The court finds: (1) no showing of any monetary loss on the enjoined parties in staying the indefinite suspension of benefits adjudications; (2) that requiring a bond would impose a substantial hardship on the Plaintiffs; and (3) a grave risk that imposing a bond would undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions. Accordingly, the court finds that the burden of a bond on Plaintiffs outweighs any likely loss by the government.

41

IV.    **Class Treatment**

The court previously considered class treatment in connection with the <u>First Order on Motion to Stay</u> [Doc. No. 97]. Because Plaintiffs also seek class treatment in connection with the claims at issue in the instant order, the court considers whether the prior certification order should be modified. <u>See</u> Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses[.]"); Fed. R. Civ. P. 23(c)(1)(C) (The order "may be altered or amended before final judgment."); Fed. R. Civ. P. 23(f) ("An appeal [from an order granting or denying class-action certification] does not stay proceedings in the district court unless the district judge or the court of appeals so orders.").

*A. Class Under Consideration*

Plaintiffs' <u>Supplemental Motion for Class Certification</u> proposed a class defined to include three subclasses, referred to by Plaintiffs as the "Rescinded Parolee Subclass," the "Immigration Benefits Subclass," and the "Sponsor Subclass." Supp. Mot. for Class Cert. 1-2 [Doc. No. 73]. The court's <u>Order Granting Class Certification</u> [Doc. No. 98] addressed only the first of these subclasses, certifying a class consisting of:

> All individuals who have received a grant of parole that is subject to the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), rescinding individual grants of parole on a categorical and *en masse* basis, except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of that Notice; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

<u>Id.</u> at 1.[41]

---

[41] The court referred to the "Early Revocation Parolee Class" in the <u>First Order on Motion to Stay</u>, <u>see</u> First Order on Mot. to Stay 28 [Doc. No. 97], but refers to the class herein as a subclass, in light of the additional subclasses under consideration.

As to Plaintiffs' proposed Immigration Benefits Subclass, because there may be different legal issues with regard to re-parole than other immigration benefits, the court has divided this proposed subclass in two. The court considers a "Re-Parole Subclass" consisting of:

> All individuals who have received humanitarian parole through already established humanitarian parole processes that provide for re-parole,[42] such as the U4U, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for re-parole, except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of the relevant agency action; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

The court also considers an "Other Immigration Benefits Subclass" consisting of:

> All individuals who have received humanitarian parole through already established humanitarian parole processes and have a pending application for any additional immigration benefit (besides re-parole), except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of the relevant agency action; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

As to the proposed "Sponsor Subclass," because this order only addresses the requests for preliminary relief for those Plaintiffs already paroled into the United States and those Plaintiffs seeking to support someone who is already present in the United States for parole through the MPIP program,[43] the court considers here a "Parole in Place Supporter Subclass" consisting of:

> All individuals who have a pending application to support any family member for initial parole through the Military Parole in Place program, except: (1) those individuals whose family members have voluntarily left, and remain outside, the United States prior to the issuance of the relevant agency action; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

---

[42] The subclass does not include individuals who received parole through a CHNV program, as those programs did not provide for re-parole.

[43] As previously noted, the requests for preliminary relief related to actions limiting, suspending, or ending the Parole Programs as to applicants who are not yet in the United States will be addressed in a separate order.

B.  *The Rule 23(a) Requirements*

One or more members of a class may sue or be sued as representative parties on

behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

1.  Numerosity

The court previously found that the Early Revocation Parolee Subclass met the

numerosity requirement based on the number of individuals who received parole under the

CHNV programs. First Order on Motion to Stay 29 [Doc. No. 97]. The additional subclasses

only make the class larger. Plaintiffs contend that approximately 200,000 Ukrainians and 75,000

Afghans were paroled into the country under the U4U and OAW parole processes. See Mem.

ISO Supp. Mot. to Certify Class 10 [Doc. No. 74]. Plaintiffs also contend that USCIS approved

nearly 4,000 MPIP applications within two years in the late 2000s. Id. at 11. Defendants do not

dispute these figures and raise no arguments that the numerosity requirement has not been met.

The court therefore finds the numerosity requirement is satisfied when considering the

additional subclasses.

2.  Commonality

"What matters to class certification . . . is not the raising of common 'questions' . . . but

rather, the capacity of a class-wide proceeding to generate common answers apt to drive the

resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (emphasis

in original) (citation omitted). Plaintiffs argue that the proposed class satisfies the commonality requirements because "all claims arise from the common contention that Defendants terminated the parole processes and adjudication of benefits for parolees in violation of the Administrative Procedure Act, 5 U.S.C. 706(2)(A)-(C)" and that "each . . . challenged agency action[] is predicated upon the same set of fundamental legal errors[.]"  See Mem. ISO Supp. Mot. to Certify Class 10 [Doc. No. 74].

The court previously found that there are common issues of law and fact capable of class-wide resolution as to the Early Revocation Parolee Subclass. First Order on Motion to Stay 29 [Doc. No. 97]. The commonality requirement is similarly satisfied as to the Re-Parole Subclass, as answering the question of whether the Higgins Memorandum was lawfully issued will effectively resolve, on a class-wide basis, the issue of whether Plaintiffs' applications for re-parole were properly suspended. Similarly, as to the Immigration Benefits Subclass, answering the question of whether the Davidson Memorandum was lawfully issued will effectively resolve, on a class-wide basis, the issue of whether Plaintiffs' applications for other immigration benefits were properly suspended.[44] The commonality requirement is also satisfied as to the Parole in Place Supporter Subclass, as the question of whether MPIP adjudications were lawfully suspended is capable of class-wide resolution.

---

[44] Defendants argue that whether "the pause on adjudication of certain benefits is 'contrary to the statutory regime' cannot be decided on a common basis" because the Davidson Memorandum indefinitely suspended several different kinds of benefits adjudications, "some of which are discretionary." See Opp. to Mot. to Certify Class 15 [Doc. No. 85]. But Plaintiffs' argument—that suspending adjudications was unlawful because the agency based its decision on an erroneous reading of the parole statute and failed to consider other important factors—is the same for all suspended benefits.

3. Typicality

The typicality requirement is also satisfied here, both as to those Plaintiffs who have been paroled into the United States, and those who are seeking to support family members who are already present in the United States for parole through the MPIP program.[45] "[P]laintiff[s] can meet [the typicality] requirement by showing that [their] injuries arise from the same events or course of conduct as do the injuries of the class, and that [their] claims are based on the same legal theory as those of the class." In re Boston Scientific Corp. Secs. Litigation, 604 F. Supp. 2d 275, 282 (D. Mass. 2009).

This court previously found the claims of Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe to be typical of the claims of the Early Revocation Parolee Subclass, as these Plaintiffs advanced the same arguments as to why the categorical termination of their grants of parole was unlawful. See First Order on Motion to Stay 29 [Doc. No. 97]. The claims of the other Plaintiffs who have been paroled into the United States or seek to support family members—Svitlana Doe, Maksym Doe, Maria Doe, Aleksandra Doe, Teresa Doe, Omar Doe, Adolfo Gonzalez, Jr., and Marim Doe—similarly advance the same arguments as to why the suspension of adjudications of applications for re-parole, other immigration benefits, and parole-in-place are unlawful.

4. Adequacy

The adequacy requirement is satisfied as to those Plaintiffs who have been paroled into the United States or are seeking to support family members who are already present in the United States for parole through the MPIP program, as well as for these Plaintiffs' counsel. "The First

---

[45] The court will address requests by the remaining Plaintiffs to serve as class representatives in a separate order.

Circuit requires two elements to establish adequacy under Rule 23(a)(4): (1) 'that the interests of the representative party will not conflict with the interests of any of the class members,' and (2) 'that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" Bowers v. Russell, __ F. Supp. 3d __, 2025 WL 342077, at *5 (D. Mass. Jan. 30, 2025) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).[46]

This court previously found Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe to be adequate class representatives. See First Order on Motion to Stay 30 [Doc. No. 97]. The court finds Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alexandra Doe, Teresa Doe, and Omar Doe, all of whom have also been paroled into the United States, and Adolfo Gonzalez, Jr., and Marim Doe, who seek parole for a family members already present in the United States, to have no conflict with the interests of other class members because, as explained in the previous section, the representative parties all seek similar relief based on similar legal theories.

Therefore, the court finds that the interests of the representative parties will not conflict with the interests of any of the class members. The court further finds, as it did in its prior order, see id., that Plaintiffs' attorneys are qualified, experienced, and able to vigorously conduct the proposed litigation.

### C. The Rule 23(b)(2) Requirements

Plaintiffs argue that certification is appropriate here under Rule 23(b)(2), which applies where Defendants have "acted or refused to act on grounds that apply generally to the class."

---

[46] This court's previous order found Plaintiffs' attorneys to be qualified, experienced, and able to vigorously conduct the proposed litigation. See First Order on Motion to Stay 30 [Doc. No. 97].

Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a <u>different</u> injunction or declaratory judgment against the defendant." <u>Wal-Mart</u>, 564 U.S. at 360.

Certification under Rule 23(b)(2) is appropriate here. A stay of the Higgins Email's suspension of re-parole adjudications would address the injuries of the Re-Parole Subclass, and a stay of the Davidson Memorandum's suspension of immigration benefits adjudications would address the injuries of the Other Immigration Benefits Subclass. A stay of Defendants' actions terminating MPIP parole adjudications would similarly address the injuries of the Parole in Place Supporter Class.

**V.      Request for a Stay Pending Appeal**

Defendants orally requested a stay of this decision pending appeal. As with Plaintiffs' request for a stay of the FRN, the court must weigh four factors in determining whether a stay of the court's order pending appeal should issue: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken, 556 U.S. at 425-26. Here, as to those actions this court is staying, Defendants have not made a strong showing that they are likely to succeed on the merits or that they will be injured absent a stay, while the issuance of a stay of the court's order would give Plaintiffs a greater opportunity to receive meaningful consideration for immigration relief. And for the reasons set forth above, the public interest lies in denying Defendants' request for a stay. Accordingly, Defendants' request for a stay in DENIED.

48

## VI.    Conclusion

For the above reasons, the court grants emergency relief as follows:

1. The January 23, 2025 email from former Acting Director of the U.S. Citizenship and Immigration Services Jennifer B. Higgins is hereby STAYED pending further court order, insofar as it suspends adjudications of re-parole applications filed by individuals who received parole pursuant to the programs specified in that email and insofar as it suspends adjudications of applications for non-parole benefits filed by individuals who received parole pursuant to those same programs;

2. Any actions by Defendants suspending adjudications of initial parole and re-parole applications filed by individuals who are seeking or who have received parole pursuant to the Military Parole in Place (MPIP) program, as well as applications for other immigration benefits filed by individuals paroled through that program, are hereby STAYED pending further court order;

3. The February 14, 2025 memorandum by Acting Deputy Director of USCIS, Andrew Davidson, is hereby STAYED pending further court order, insofar as it suspends adjudications for immigration benefits applications filed by individuals who received parole through the Uniting for Ukraine (U4U) and Family Reunification Parole (FRP) programs, as well as through the parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the CHNV parole programs), and insofar as it directs agency staff that the administrative hold may only be lifted on a case-by-case basis "even when aliens are members of a class that is subject to . . . [a] court order."

IT IS SO ORDERED.

May 28, 2025                          /s/ Indira Talwani
                                     United States District Judge