**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SVITLANA DOE, et al., <br><br> Plaintiffs, <br><br> *v.* <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., <br><br> Defendants. | Civil Action No.: 1:25-cv-10495-IT |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO THE MASS TRUNCATION OF CHNV PAROLE**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................1

LEGAL STANDARDS ................................................................................................4

ARGUMENT ..............................................................................................................5

I.    SECRETARY NOEM'S DECISION TO MASS TRUNCATE CHNV PAROLE
      & EMPLOYMENT AUTHORIZATION WAS ARBITRARY & CAPRICIOUS..............6

      a.    Secretary Noem ignored humanitarian considerations that she had to
            consider. ......................................................................................................6

      b.    Secretary Noem's consideration of reliance interests was inadequate,
            illogical, and legally erroneous. ..............................................................12

II.   SECRETARY NOEM'S MASS TRUNCATION OF CHNV PAROLE WAS
      *ULTRA VIRES* & CONTRARY TO THE PAROLE STATUTE .......................................15

III.  SECRETARY NOEM'S DECISION TO RELY ON CONSTRUCTIVE
      AND/OR ELECTRONIC NOTICE OF THE MASS TRUNCATIONS OF
      CHNV PAROLE WAS ARBITRARY & CAPRICIOUS AND CONTRARY TO
      THE AGENCY REGULATIONS AND DUE PROCESS .................................................16

CONCLUSION..........................................................................................................20

CERTIFICATE OF SERVICE ..................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) ................................................................................4

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ..........................................................................................9

*California v. U.S. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025) .........................................................................9, 15

*Caplash v. Johnson*,
   230 F. Supp. 3d 128 (W.D.N.Y. 2017) ..........................................................18

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) ............................................................14

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) (Thomas, J., concurring) ........................................5, 6, 9, 14

*DHS v. Regents of the Univ. of Calif.*,
   591 U.S. 1 (2020) ...................................................................................5, 11, 15

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) .................................................................................. *passim*

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..........................................................................................9

*Frontier Fishing Corp. v. Pritzker*,
   770 F.3d 58 (1st Cir. 2014) .........................................................................5, 20

*Garcia v. Meza*,
   235 F.3d 287 (7th Cir. 2000) ..........................................................................18

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) ...............................................................9, 10, 12

*Judulang v. Holder*,
   565 U.S. 42 (2011) ...................................................................................5, 11, 14

*Kucana v. Holder*,
   558 U.S. 233 (2010) ........................................................................................11

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)..................................................................5, 13

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024)......................................................4, 20

*Mennonite Bd. of Missions v. Adams*,
    462 U.S. 791 (1983)........................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................8, 11, 15

*New York v. Dep't of Com.*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd*, *Dep't of Commerce*, 588 U.S. .........................6

*NLRB v. Lily Transp. Corp.*,
    853 F.3d 31 (1st Cir. 2017).............................................................9

*Noem v. Doe*,
    S. Ct. App., No. 24A1079..............................................................2, 3

*River Street Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009).........................................................14

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    123 F.4th 1 (1st Cir. 2024)..............................................................5

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..........................................................................13

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)..........................................................................9

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)........................................................................18

**Statutes**

1 U.S.C. § 1....................................................................................19

5 U.S.C.
    § 706(2)(A) ....................................................................................4
    § 706(2)(D) ....................................................................................5
    § 706............................................................................................1, 5, 6

8 U.S.C.
    § 1182(d)(5) ......................................................................................................10, 16
    § 1182(d)(5)(A) ...................................................................................................7, 16
    § 1225(b)(1)(iii)(II) ...................................................................................................2
    § 1225(b)(1)(A)(iii)(II) ...........................................................................................13
    § 1229(a)(1) .............................................................................................................17
    § 1305 ......................................................................................................................19
    § 1305(a) ..................................................................................................................19
    § 1306 a ...................................................................................................................20

44 U.S.C.
    § 1505 ......................................................................................................................18
    § 1507 ......................................................................................................................18

## **Other Authorities**

8 C.F.R. § 103.2(b)(19)(ii)(B) .......................................................................................19

8 C.F.R. § 212.5(e)(2)(i) .........................................................................................17, 20

8 C.F.R. § 265.1 .............................................................................................................19

8 C.F.R. § 274a.14(b) .....................................................................................................17

*Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and
    Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025) .................................... *passim*

## INTRODUCTION

Pursuant to Federal Rule 56 and Local Rule 56.1, the CHNV Plaintiffs[1] respectfully move for summary judgment on claims 1, 3, 5, 6, and 7 of the operative Complaint (Doc. No. 68) regarding the mass truncation of all unexpired grants of CHNV parole (and associated employment authorization documents) via the March 25, 2025 Federal Register Notice ("FRN"). As set forth below and in their Statement of Undisputed Facts ("Pls.' SUF"), Doc. No. 129-1, there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law on their claims that the mass truncation was unlawful and was contrary to (and exceeded the Department of Homeland Security's ("DHS") authority under) the Immigration and Nationality Act ("INA"), the agency's own regulations, and due process. In addition to the claims on which the Court already held Plaintiffs are likely to succeed, the administrative record ("AR") recently produced is patently deficient and provides multiple additional bases for holding the action unlawful and vacating the FRN on behalf of the Early Revocation Parolee Subclass.[2] *See* 5 U.S.C. § 706 (authorizing that relief upon "the court . . . review[ing] the whole record or those parts of it cited by a party").

## BACKGROUND[3]

This motion concerns the portion of the March 25 FRN that took the unprecedented step of cutting short the unexpired grants of CHNV parole and associated employment authorization of nearly half a million people who have done nothing wrong, and without providing them actual

---

[1] The "CHNV Plaintiffs" are the eight individual Plaintiffs who received parole via the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"); the five individual Plaintiffs who sponsored CHNV parolees who are here, and organizational Plaintiff Haitian Bridge Alliance (HBA), which serves Haitian parolees. *See* SUF ¶¶ 1-3.

[2] *See* First Stay Order, Doc. No. 97 at 28; Second Stay Order, Doc. No. 107 at 42 n.41.

[3] Plaintiffs assume the Court's familiarity with this case and incorporate by reference their prior briefing regarding the pertinent issues. *See* Doc. Nos. 25, 72 & 125.

notice. *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025). In cutting short their parole, Secretary Noem explained she had determined the purposes of everyone's parole "ha[d] been served because" the current Administration took a different view regarding the significant public benefits provided by the CHNV parole processes. *Id.* at 13619 n.70. She did not, however, address the considerable independent humanitarian bases for establishing the processes and grants thereunder. Secretary Noem also said she considered simply letting the parole grants expire naturally but rejected that alternative because it would have resulted in fewer parolees being amenable to expedited removal, given the two-year statutory limit in 8 U.S.C. § 1225(b)(1)(iii)(II). *Id.* at 13619-70.

This Court temporarily stayed that action on April 14 on behalf of a class it certified. Doc. No. 97. The First Circuit denied Defendants' motion for a stay pending appeal, holding they failed to make a strong showing of their likelihood of success on appeal.

Thereafter, the Defendants applied to the Supreme Court for an "emergency" stay of this Court's order, which it characterized as a "*de facto* permanent injunction" entered on behalf of "a rubber-stamped nationwide class" that blocks the Biden Administration's unlawful "categorical grant of parole" to CHNV nationals "en masse." Stay Application, *Noem v. Doe*, No. 24A1079, at 2, 4, 24.[4] The Solicitor General argued that this Court's April 14 decision "creates a perverse one-way ratchet," whereby "Secretary Mayorkas granted CHNV parole categorically" but this Court "faulted only Secretary Noem's decision to *restore* the traditional case-by-case process by undoing the prior categorical grant of CHNV parole." *Id.* at 2, 4-5; *see also id.* at 18 ("an extraordinarily

---

[4] *See also* Stay Application at 19 ("Here, one independently sufficient ground for terminating the CHNV parole programs is that those programs granted parole to hundreds of thousands of aliens without any case-by-case determinations in the first place."), www.supremecourt.gov/DocketPDF/24/24A1079/358354/20250508121118618_Kristi_Noem_v _Svitlana_Doe_et_al_%20application_stay.pdf.

perverse result"). Defendants asserted that this Court's order "stymies" the government's efforts to remove CHNV parolees by "effectively compel[ling]" DHS to use regular removal proceedings rather than expedited removal, *id.* at 24, 26, and that this Court's April 14 decision was "tantamount to permanently enjoining *any* termination of the CHNV programs," *id.* at 26.

On May 30, the Supreme Court issued an unsigned and unreasoned one-paragraph order granting the Application, staying "[t]he April 15, 2025" (sic) order of this Court pending the completion of appellate proceedings. DHS issued a press release advising that it "can once again start removing illegal aliens under the disastrous CHNV parole programs" and "keep Americans safe" now that the Supreme Court had stayed the order of "an activist judge [who] ruled that DHS could not outright end the CHNV program." Doc. No. 128-18. Two weeks later, DHS announced it would email these "illegal aliens" to notify them that "both their parole is terminated, and their parole-based employment authorization is revoked – effective immediately." Doc. No. 128-20.

Defendants' appeal of this Court's first stay order will be fully briefed at the First Circuit in early July; oral argument has not yet been scheduled. The Supreme Court's stay will remain in place for at least several months, regardless of the outcome of the appeal.

Meanwhile, on May 23, Defendants produced the Administrative Record for the FRN. The AR has 68 entries consisting of two Excel spreadsheets and 66 documents totaling 840 pages, nearly all of which were already publicly available.[5] SUF ¶¶ 10-22. Plaintiffs have submitted the

---

[5] Most of the AR is comprised of this or that executive order or agency directive (much of it already on this Court's docket) that do not shed light on any decision that Secretary Noem made about CHVN parolees. The rest of the AR is comprised almost exclusively of printouts of government websites (100+ pages); printed online news articles and reports about matters to which DHS has access to better and more reliable information (80+ pages); statistics to back up the FRN's (largely irrelevant) numerical claims (40+ pages and two native format spreadsheets); and a CBP memorandum (plainly prepared for litigation) summarizing hearsay about problems caused Florida airports by the fact that 82% of CHNV parolees traveled through them, but ignoring that DHS could have distributed arrivals elsewhere to address those problems. *See* SUF ¶ 17.

certification and index of the AR, Doc. No. 128-1, as well as the few non-public documents in the AR, excluding some Excel statistical files, Doc. Nos. 128-2 through 128-13. According to AR, the FRN truncated the parole of at least 426,151 individuals, SUF ¶ 4, of whom about half had (as of March 9) pending applications for adjustment of status to lawful permanent residence, asylum, or temporary protected status, SUF ¶ 8. Adjudications of those applications was suspended for more than three months until this Court stayed that suspension on May 28, 2025. Doc. No. 107.[6]

## LEGAL STANDARDS

Plaintiffs' motion for summary judgment "tee[s] up" the FRN's mass truncation of CHNV parole for judicial review. *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). An agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citation omitted). The legal standard varies by inquiry.

An agency action is "arbitrary or capricious" under 5 U.S.C.706(2)(A) if the agency's process was deficient for one or more reasons, such as a failure "to consider an important aspect of the problem," "reliance on factors Congress did not intend it to consider," an explanation of the action "in terms that run counter to the evidence," or a decision that is simply "implausible." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 15 (1st Cir. 2024). Where, as here, "an agency rescinds a prior policy[,] its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy],'" *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted, all but first alteration in original); as well as the "facts and

---

[6] Defendants did not purport to begin to try to comply with that order for nearly two weeks, and even then, only after this Court ordered reporting of their compliance efforts. Doc. No. 119. The two short declarations Defendants have filed in response, Doc. Nos. 120-1 & 124-1 do not establish that they are complying with the Court's May 28 order, Doc. No. 107.

circumstances that underlay or were engendered by the prior policy," with "a reasoned explanation . . . for disregarding" either, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). If the agency meets these procedural requirements, arbitrary and capricious review does not permit a court "to substitute its judgment for that of the agency." *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011) (citation omitted). Nonetheless, the Court's role in holding agencies to those requirements is "important," *id.*, as it "promotes agency accountability" to the public and the rule of law, *Regents*, 591 U.S. at 22-23.

The substantial evidence test under 5 U.S.C.706(2)(D), for its part, asks whether a reasonable factfinder could have reached the same conclusion(s) as the agency based upon the evidentiary record it had before it. *See Frontier Fishing Corp. v. Pritzker*, 770 F.3d 58, 62 (1st Cir. 2014).

Finally, the court's "review of the agency's interpretation and application of the law" is "plenary." *Dep't of Com. v. New York*, 588 U.S. 752, 789 n.3 (2019) (Thomas, J., concurring); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (citing 5 U.S.C. § 706)).

## ARGUMENT

The APA requires vacating Secretary Noem's mass truncation of unexpired grants of parole and employment authorization. Not only did Secretary Noem fail to consider several factors that she was not permitted to ignore, each of which is an "important aspect of the problem," the minimal explanation that she did provide is illogical, unsupported by evidence, and (as the Court has already found) predicated on legal error. Additionally, the Secretary's decision to rely on constructive and/or electronic notices (rather than personal service or via U.S. mail) to communicate the truncation not only violated the agency's regulations, but was arbitrary and capricious as well because her explanation ("potential noncompliance with change-of-address reporting requirements") is illogical and speculative, as it lacks any support in the record the Secretary

considered, and violates Due Process. Secretary Noem's action was also *ultra vires* and contrary to the parole statute itself, largely for the reasons this Court has already considered. Under the APA, all of Plaintiffs' claims support the same relief—vacatur. *See* 5 U.S.C. § 706. Each claim has several independent bases.

While the Court need only agree with Plaintiffs as to one basis for one claim to justify vacatur, Plaintiffs urge the Court to make clear the full "veritable smorgasbord of classic, clear-cut APA violations," *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 516 (S.D.N.Y. 2019), *aff'd*, *Dep't of Commerce*, 588 U.S. at 785, to ensure the Court's judgments are respected in the appellate process. And to be clear, denying relief, on the other hand, requires Defendants to run the table and prevail on every issue raised in this motion.

## I.    SECRETARY NOEM'S DECISION TO MASS TRUNCATE CHNV PAROLE & EMPLOYMENT AUTHORIZATION WAS ARBITRARY & CAPRICIOUS

In distinctly remarkable ways, Secretary Noem's decision to *en masse* truncate CHNV parole veered outside "the bounds of reasoned decisionmaking." *Dep't of Commerce*, 588 U.S. at 773 (citation omitted). For analytical convenience, Plaintiffs group the distinct errors into two categories: those relating to the failure to address humanitarian considerations and those relating to the treatment of with reliance interests. Plaintiffs also incorporate their prior briefing on this topic. Doc. No. 72 at 10-18. For these reasons, Plaintiffs are entitled to judgment on Claim 3.

### a.    Secretary Noem ignored humanitarian considerations she had to consider.

As Secretary Noem acknowledged, 90 Fed. Reg. at 13612, when DHS established each of the four CHNV processes, it independently justified each process under both the significant public benefit *and* urgent humanitarian statutory standards of 8 U.S.C. § 1182(d)(5)(A). *See* Doc. Nos. 24-1 through 24-5 (FRNs for each of the CHNV parole processes). In creating each process, DHS explained that the process provided a variety of significant public benefits relating to (*inter alia*)

border security, migration management, and foreign policy; those benefits were similar (but not the same) across the four parole processes. *See id.* The urgent humanitarian reasons, on the other hand, were country-specific, and necessarily so: the urgent humanitarian concerns regarding Haitians are not the same as those for Venezuelans, Cubans, or Nicaraguans. *See id.* Those country-specific humanitarian concerns were detailed in each of the four separate FRNs establishing each process[7] and were based on extensive evidence in the administrative record supporting each action. *See* Doc. Nos. 128-14 through 128-17.[8]

Since DHS justified the creation of the CHNV parole processes on statutorily independent bases, DHS was required to provide "a reasoned explanation" for "disregarding" the "facts and circumstances that underlay" each of those two bases when reversing course. *Encino*, 579 U.S. at 222 (citation omitted). In stark contrast to her extensive discussion of many of the significant public benefits DHS previously identified as justifying the CHNV process creation, 90 Fed. Reg. at 13612-17 (Section III "Rationale for Initial Implementation"), Secretary Noem provided a single sentence to explain her reasoning for disregarding DHS's prior conclusion that the CHNV parole processes generally (and the grants thereunder) were justified by humanitarian considerations:

> Regarding previous arguments or determinations that these programs were consistent with the requirement of "urgent humanitarian reasons" for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute,

---

[7] *See, e.g.*, *Implementation of a Parole Process for Cubans*, Doc. No. 24-23 at 4 (addressing the "crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's [] violent repression of dissent" as urgent humanitarian reasons for parole); *Implementation of a Parole Process for Haitians*, Doc. No. 24-24 at 3, 5-6, 10-11 (citing the "health, economic, and political crises," the "explosion of gang violence in Haiti," and rising number of migrant deaths resulting from the perilous journey by land or sea); *Implementation of a Parole Process for Nicaraguans*, Doc. No. 24-25 at 3, 5-6 (discussing the "widespread and violent repression and human rights violations and abuses by the Ortega regime."); *Implementation of a Parole Process for Venezuelans*, Doc. No. 24-21 at 3, 10 (noting the "repression and unsafe conditions" due to "the repressive regime of Nicolas Maduro.").

[8] DHS produced the administrative records for the CHNV processes in Texas's lawsuit over them.

and taking into consideration each alien's specific circumstances.[9]

90 Fed. Reg. at 13612. Consistent with this minimalist lip service, the administrative record contains nothing reflecting agency consideration of the humanitarian bases that warranted each of the CHNV parole processes—no assessments from the Department of State, Attorney General, Director of National Intelligence, any non-governmental organizations or any other source as to the current conditions in these countries, nor anything to suggest that circumstances have changed since the 2022 assessments. In sum, there is nothing in the record. *See* Doc. No. 128-1. And this reflects Secretary Noem paid no consideration at all.

1.      Given the Administrative Record, it is apparent Secretary Noem completely failed in her duty to "examine the relevant data" and "articulate a satisfactory explanation for [her] action" that connects "the facts found" to "the choice made" to abandon her agency's prior position. *Encino Motorcars*, 579 U.S. at 221 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While she need not provide an exegesis, *see id.* (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)), here the Court can only "guess at the theory underlying" Secretary Noem's one-sentence conclusion regarding the humanitarian purposes that were previously found by her agency to require the parole processes, *SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194, 197 (1947). Her failure to provide a reasoned explanation for abandoning her predecessor's rationale simply does

---

[9] Secretary Noem also acknowledged that under the CHNV parole processes, "potentially eligible beneficiaries were adjudicated on a case-by-case basis, [sic] for advance authorization to travel to a U.S. port of entry ('POE') in the interior of the country to seek a discretionary grant of parole" from an individual CBP officer. 90 Fed. Reg. at 13611; *accord id.* at 13617 (twenty-two percent of support applications were denied ("not confirmed")). The administrative record reflects the same. *See*, *e.g.*, Doc. No. 128-6 (memorandum "FOR THE FILE" discussing the operational challenges and negative impact the CHNV processes had on Florida airports, in significant part resulting from CBP officers denying parole to CHNV nationals who were authorized to travel there to request it).

not suffice, as has been plain for nearly eighty years.[10] *See Dep't of Commerce*, 588 U.S. at 785 (explaining that "[t]he reasoned explanation requirement" of the APA "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public," lest judicial review be just "an empty ritual"). Indeed, Secretary Noem's one-sentence explanation reciting the statutory criteria fails to acknowledge that she *is* departing from her agency's prior conclusions, further underscoring its inadequacy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (the reasoned explanation requirement "demand[s]" that an agency "display awareness that it *is* changing position.") (emphasis in original); *NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) ("an agency is not forever bound by an earlier resolution of an interpretive issue, but . . . a change must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent."). *Grace v. Barr*, 965 F.3d 883, 901 (D.C. Cir. 2020) (agency action regarding asylum policy was arbitrary and capricious where "readers would have no idea" from the agency's explanation that it was changing its policy, which was "especially egregious given its potential consequences for asylum seekers").

      2.     Independent of her failure to provide a reasoned explanation, Secretary Noem failed to consider any of the facts or circumstances underlying DHS's prior conclusions. Although proving that contention might be difficult in other cases, it is remarkably easy here: one need only

---

[10] *Chenery II*, 332 U.S. at 196-97 ("[Because] the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'" (citation omitted)); *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (same); *accord Encino Motorcars*, 579 U.S. at 221 ("[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious").

compare the administrative records of what DHS considered when it created each of the CHNV processes, Doc. Nos. 128-14 through 128-17; with what Secretary Noem considered in terminating them all, Doc. No. 128-1. Other than the Federal Register notices establishing the CHNV programs, there is not a single point of overlap, SUF ¶ 22. Secretary Noem is not required to agree with her predecessor's conclusions regarding the humanitarian benefits of the CHNV parole processes, but she must at least consider the facts and circumstances they considered before reversing their decisions. *Encino Motorcars*, 579 U.S. at 221.

3.      Wholly separate from how her predecessor justified his exercise of the parole authority, Secretary Noem was required, under the parole statute, to consider the "humanitarian" impacts of her actions given the clear statutory invocation and expressly humanitarian purposes of the parole statute itself. *See* 8 U.S.C. § 1182(d)(5). While Secretary Noem extols at some length her intent to maximally pursue the purpose of other parts of the INA—removal of certain noncitizens—she ignores that the INA generally, and the parole statute specifically, have a purpose of responding to urgent humanitarian needs of noncitizens, including those beyond our borders. *See id.* Secretary Noem's failure to consider this "second, equally important goal" of the statutory parole authority she exercises was arbitrary and capricious. *Grace*, 965 F.3d at 902 (holding that the Trump Administration's failure to consider the INA's humanitarian purposes rendered arbitrary and capricious an agency decision based only on the INA's purpose "to ensure efficient removal of aliens with no lawful authorization to remain in the United States"); *accord Judulang*, 565 U.S. at 64 (reversing agency policy "unmoored from the purposes and concerns of the immigration laws"). Here and elsewhere, Defendants ignore that "no law pursues its purpose at all costs." *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (citation omitted).

4.      Even if Secretary Noem's one-sentence *ipsa dixit* that the CHNV processes were

no longer justified by humanitarian considerations could explain ending them prospectively, it does not explain why that means the purposes of the *existing* grants of parole "have been served." 90 Fed. Reg. at 13619 n.70. Secretary Noem's treatment of her assertion regarding the former "as sufficient" for the latter as well, "without explanation," was arbitrary and capricious, *Regents*, 591 U.S. at 28, particularly given that she did not consider the record before the agency either when it created the parole processes or when it granted each class member parole, SUF ¶¶ 26-28.

5.    Each of these defects in Secretary Noem's decisionmaking reflects that she "entirely failed to consider [an] important aspect of the problem,"  which "alone . . . renders Secretary [Noem's] decision arbitrary and capricious." *Regents*, 591 U.S. at 30 (citation omitted). Secretary Noem simply ignored her statutory obligation to examine humanitarian considerations.

6.    Secretary Noem also should have considered other obvious alternatives, like not ending the parole or work authorizations of the more than 200,000 CHNV parolees who have other immigration benefit applications pending, lest they be unable to support themselves while they await their adjudication. SUF ¶¶ 8-9. Secretary Noem was not required to choose that alternative, but it was "within the ambit" of existing policy, *Regents*, 591 U.S. at 30 (citation omitted), as reflected by her stating that those without such an application pending would be "prioritize[d] for removal," 90 Fed. Reg. at 13619, and the fact that facilitating the filing of those applications was an explicit purpose of the CHNV parole processes themselves, SUF ¶ 9.

Secretary Noem's failure to consider this alternative was particularly egregious in light of her stated concerns. She justified terminating the CHNV parole processes prospectively in part based on her belief concern that parolees are burdensome, and overly reliant on public benefits for support. *See* 90 Fed. Reg. at 13614-15. Putting aside that there is no evidence in the administrative record to support this view, Secretary Noem did not appear to recognize that this concern is

significantly exacerbated by taking away employment authorization from those already here. What is more, when unable to support themselves, many of those parolees will leave, abandoning meritorious applications for the other forms of relief to which Congress has made them eligible, undermining the various purposes of the INA under which CHNV parolees have sought relief, including family reunification, the humanitarian purposes of TPS and the asylum statute, the foreign policy and humanitarian purposes of the Cuban Adjustment Act, among others. Indeed, DHS's various actions are plainly calculated to *prevent* CHNV parolees from obtaining that relief. Secretary Noem is not permitted to ignore the purposes of (and the legal rights under) the statutes she purports to administer. *See Grace*, 965 F.3d at 901.

> **b.    Secretary Noem's consideration of reliance interests was inadequate, illogical, and legally erroneous.**

Secretary Noem gave similarly short shrift to the interests of those who had relied to their detriment on the CHNV parole processes—parolees, their families, their sponsors, their employers, and their communities. Her failure is evident in multiple ways that each warrant vacatur.

1.    The Court is familiar with the first reason: Secretary Noem justified truncating all existing grants of parole *en masse*—notwithstanding the reliance interests of those affected—to subject CHNV parolees to expedited removal. 90 Fed. Reg. at 13620 ("Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal" because they "may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to" use regular removal proceedings instead.). As Plaintiffs have explained and this Court has found, CHNV parolees by definition "ha[ve] been . . . paroled into the United States," 8 U.S.C. § 1225(b)(1)(A)(iii)(II), and are thus ineligible for expedited removal no matter how long they have been here. *See* Doc. No. 97 at 32 ("[T]he statute does not subject persons who were authorized to enter the United States to

expedited removal"); Doc No. 72 at 15-16. Secretary Noem is wrong on the law on which she justified her decision, rendering it arbitrary and capricious. *See SEC v. Chenery Corp.* ("*Chenery I*"), 318 U.S. 80, 94 (1943) ("[I]f the action is based upon a determination of law . . . an order may not stand if the agency has misconceived the law."); *see also Loper Bright*, 603 U.S. at 391.

2.      Secretary Noem's reasoning is intractably inconsistent with what DHS otherwise claims to be its expedited removal authority. Specifically, DHS asserts that it has the authority to subject parolees to expedited removal as an "arriving alien" no matter how long they have been here. SUF ¶ 35; Doc. No. 89 at 12 n.4 (making this claim). Her conception of "arriving"—one that extends into perpetuity—is grammatical and legal nonsense. *See* Doc. No. 72 at 11 n.9.

Regardless, it is arbitrary and capricious to claim simultaneously, as Secretary Noem does, that her agency can: (a) subject parolees in perpetuity to expedited removal as "arriving aliens"; *and* (b) upend the lives of hundreds of thousands of people simply because otherwise they may accrue enough continuous presence to make them ineligible for expedited removal. *See Encino Motorcars*, 579 U.S. at 222 ("Unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (cleaned up); *accord River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 115 (1st Cir. 2009); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 416-17 (D. Mass. 2018); *see also Dep't of Commerce*, 588 U.S. at 783-85 (vacating agency action where "the evidence tells a story that does not match the explanation the Secretary gave" because courts "cannot ignore th[is] disconnect"); *cf. Judulang*, 565 U.S. at 64 ("We must reverse an agency policy when we cannot discern a reason for it.").

3.      Even had Secretary Noem gotten the law correct and been consistent about it, her consideration of parolees' reliance interests was woefully inadequate, because she only considered a small subset of their reliance interests. The only parolee reliance interest she acknowledged was

that they had traveled to the United States and are now living here. 90 Fed. Reg. at 13619 ("Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside."). Among other things, Secretary Noem ignored that parolees had been told they could apply for other forms of relief once here, that at least half have done so, and that her truncation of their parole and work authorizations severely undermines their ability even to stay long enough for those applications to be adjudicated. She likewise ignored that many parolees relied on the CHNV processes to reunite with their family members here and that her decision will result in family separation. Parolees plainly also have a strong interest in not being subjected to immigration detention and the removal process—a significant reason that many parolees used these processes rather than coming to the southern border that Secretary Noem perversely weaponizes against them through her threats of enforcement. Secretary Noem was required to "account[] for all relevant impacts" of her decision on parolees, *California*, 132 F.4th at 99; her failure to do so was an arbitrary and capricious failure to consider "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

4.      Secretary Noem acknowledged that her decision to cut short all grants of CHNV parole would disrupt the reliance interests of sponsors, employers, landlords, and others, 90 Fed. Reg. at 13618-19, but she gave a nonsensical explanation for overriding them. According to Secretary Noem, those interests are of no moment because those individuals would suffer the same harms regardless because the parole would have ended at some point anyway. *Id.* at 13620 ("[E]ven if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration."). Secretary Noem ignores that employers, landlords, and others entered into contracts with and made countless other decisions

regarding parolees in reliance on their ability to maintain parole for an expected two-year term. Forcing hundreds of thousands of individuals to break leases, disappear from jobs, drop out of school, and renege on promises is not the same thing as letting individuals continue on the multi-year course DHS itself previously put them on; it was arbitrary and capricious for her to ignore that distinction. *See Regents*, 591 U.S. at 31. Had Secretary Noem properly considered the reliance interests of parolees and their communities, "she might, for example, have considered" a longer wind-down period "based on the need for [parolees] to reorder their affairs." *Id.* at 32.[11]

## II.    SECRETARY NOEM'S MASS TRUNCATION OF CHNV PAROLE WAS *ULTRA VIRES* & CONTRARY TO THE PAROLE STATUTE

Plaintiffs incorporate by reference their prior briefing on how Secretary Noem's mass truncation was *ultra vires* and/or contrary to the parole statute's requirement that the "conditions" of parole must be "prescribe[d] only on a case-by-case basis," 8 U.S.C. § 1182(d)(5)(A). *See* Doc. No. 72 at 11-12; *see also* Doc. No. 97 at 36-37. For reasons previously presented, Plaintiffs are entitled to judgment on Claims 1 and 5.

In the alternative, even assuming the parole statute does not strictly require case-by-case consideration for however one characterizes what Secretary Noem did here (terminate, truncate, revoke, etc.), there is no dispute that the statute required that it be predicated on her conclusion that the "purposes of such parole shall . . . have been served." 8 U.S.C. § 1182(d)(5). But Secretary Noem never actually reached that conclusion. To the contrary, and as discussed in Section I.A.i *supra*, she considered only a few of the significant public benefits of the CHNV processes writ large, without any consideration of the humanitarian basis of the distinct processes (not all Latin

---

[11] *See also* 591 U.S. at 32 ("Alternatively, [the Secretary] might have considered more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen.").

American countries are the same) nor the individual grants of parole, each of which had an even more individualized humanitarian basis. Further underscoring Secretary Noem's deliberate indifference to the humanitarian basis and impact of her actions, there is nothing in the Administrative Record from which she could conclude that the humanitarian purposes of *anyone*'s parole had been served, much less that the purposes of *everyone*'s parole had been served. In short, whatever conclusion Secretary Noem purported to make, it was not the one required by the statute to cut short the parole of the 426,000 members of the class.

## III. SECRETARY NOEM'S DECISION TO RELY ON CONSTRUCTIVE AND/OR ELECTRONIC NOTICE OF THE MASS TRUNCATIONS OF CHNV PAROLE WAS ARBITRARY & CAPRICIOUS AND CONTRARY TO THE AGENCY REGULATIONS AND DUE PROCESS

Secretary Noem's decision to mass truncate parole must also be vacated because of her separate decision to rely on constructive and/or electronic notice notify parolees their status and work authorization had or would end. *See* 90 Fed. Reg. at 13620. That decision was arbitrary and capricious, lacked substantial evidence, was contrary to DHS's own regulations, and violated due process. Plaintiffs incorporate by reference their prior briefing on this topic. Doc. No. 72 at 7-18; *see also* Doc. No. 97 at 21, 27, 31, 35-37. Plaintiffs are entitled to judgment on Claims 3, 6 and 7.

Secretary Noem asserted that publication in the Federal Register would provide "legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance," 90 Fed. Reg. at 13620, but that legal conclusion was erroneous. DHS's own regulation requires, to terminate parole, "written notice to the alien," 8 C.F.R. § 212.5(e)(2)(i), as does its separate regulation regarding revocation of employment authorization (which Secretary Noem ignores), 8 C.F.R. § 274a.14(b). On their face, both regulations require DHS to provide notice that is written and individualized. That meaning is corroborated by the parole regulation's sole example of what constitutes the required "written notice to the alien"—a charging document,

8 C.F.R. § 212.5(e)(2)(i), which by statute must be a "written notice" served "in person" or, "if personal service is not practicable, through service by mail," 8 U.S.C. § 1229(a)(1).[12] The employment authorization regulation likewise corroborates this understanding: it requires "written notice" of the intent to revoke employment authorization and 15 days for the individual to provide countervailing evidence, 8 C.F.R. § 274a.14(b), plainly requiring an individualized inquiry.[13] Secretary Noem's refusal to adhere to her agency's own regulations warrants setting aside her action. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954).

The FRN asserts that constructive notice is adequate under 44 U.S.C. § 1507, *see* 90 Fed. Reg. at 13620, but it is not. That statute only allows constructive notice for the few types of documents that "have general applicability and legal effect" specifically authorized to be filed under 44 U.S.C. § 1505 (which covers Executive Orders, Presidential Proclamations, and documents "required so to be published by Act of Congress") and has no applicability to individualized immigration notices or any other case "where notice by publication is insufficient in law." 44 U.S.C. § 1507. Here, notice by publication *is* insufficient by law: by the agency's regulations, as discussed above, and by the constitutional guarantee of due process. As courts have consistently found in this context, notice by publication is insufficient. *See, e.g., Garcia v. Meza*, 235 F.3d 287, 292 (7th Cir. 2000) (finding INS agents' "[n]otice by publication is not sufficient

---

[12] "In removal proceedings under section 1229a of this title, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any)" containing specific information, including notifying the noncitizen of the obligation to provide DHS their mailing address and any changes to it. 8 U.S.C. § 1229(a)(1).

[13] Defendants concede that giving notice and opportunity to be heard in this circumstance would surely be futile, Doc. No. 89 at 17 ("[I]t is questionable that any evidence could be submitted that would undercut the revocation determination"), which further supports Plaintiffs' contention that the regulatory regime contemplates that revocations would be based on individualized considerations, not categorical policy decisions

with respect to an individual whose name and address are known or easily ascertainable"); *Caplash v. Johnson*, 230 F. Supp. 3d 128, 142-44 (W.D.N.Y. 2017). *See generally Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 797 (1983) (deeming notice by publication insufficient when names and addresses are ascertainable).

The FRN also asserts that the parole regulation's "written notice" requirement is "independently" satisfied by an electronic message that DHS "will also provide" via parolees' "USCIS online account[s]." 90 Fed. Reg. at 13620. But the parole and employment authorization regulations do not authorize electronic service—unlike other DHS regulations that are inapplicable here. *See, e.g.*, 8 C.F.R. § 103.2(b)(19)(ii)(B) (permitting electronic service in some circumstances, but only where the individual is represented by an "authorized attorney"). Service aside, the requirements that the notice be "written" reflect that it is to have a physical (rather than only electronic) form.[14] At least in this context, messages sent to USCIS online accounts, as has occurred here, do not satisfy the regulatory requirements for Secretary Noem's actions.

In addition to these substantive legal errors, Secretary Noem's decision about giving parolees notice was also arbitrary and capricious *and* unsupported by substantial evidence. Secretary Noem said that she believed "Federal Register publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements." 90 Fed. Reg. at 13620 (citing 8 U.S.C. § 1305; 8 C.F.R. § 265.1). Under the referenced requirement, noncitizens must inform DHS within 10 days of a address change, 8 U.S.C. § 1305(a); by statute, the failure to do so is both a crime and a basis to civilly detain and remove noncitizens (regardless

---

[14] *Cf.* Dictionary Act, 1 U.S.C. § 1 ("'writing' includes printing and typewriting and reproductions of visual symbols by photographing, multigraphing, mimeographing, manifolding, or otherwise").

of whether they are prosecuted for it), *id.* § 1306(b). Notably, Secretary Noem did not assert that constructive notice was the "most practicable approach" because of *actual* "noncompliance" with the change-of-address reporting requirements; instead, she cites "potential" noncompliance alone. 90 Fed. Reg. at 13620. Lest there be any doubt that Secretary Noem's explanation was pure speculation, the Administrative Record contains nothing whatsoever about the change-of-address reporting requirements—no data or even a mention. SUF ¶ 32. On this record, no reasonable factfinder could conclude that there is *any* noncompliance with the requirement to keep addresses updated; if anything, the existence of the requirement and the severe penalties for noncompliance[15] is strong evidence in the other direction. So, too, is the fact that at least half of CHNV parolees have pending with DHS applications for other relief, SUF ¶ 8, which is a strong incentive to ensure DHS can contact them. Secretary Noem's decision must be vacated as "unsupported by substantial evidence." *Melone*, 100 F.4th at 29; *see also Frontier Fishing Corp.*, 770 F.3d at 62.

There are more reasons why the decision must be vacated as arbitrary and capricious. First, Secretary Noem apparently never considered (or did not explain if she did) why DHS could not *also* mail notices to CHNV parolees. Even assuming widespread noncompliance, mailing notices to the last known address for parolees and sponsors would surely reach far more parolees than would the Federal Register. This failure is particularly strange given Secretary Noem's asserted interest in and intent to remove parolees—which itself requires personal or mailed service of a charging document, *see* note 12, *supra*, which by regulation also automatically terminates the respondent's parole, 8 C.F.R. § 212.5(e)(2)(i).[16] Second, her explanation is illogical, as she never

---

[15] Attorney General Bondi has made prosecutions of 8 U.S.C. § 1306 a priority. SUF ¶ 34.

[16] Relatedly, Secretary Noem never explains why DHS has any interest in rendering parolees unlawfully present when it has not sought their removal (through service of the charging document just discussed); if anything, her emphasis on the importance of lawful presence and her concerns

explains why assumed noncompliance with address reporting requirements makes constructive notice a "more practicable" alternative, given that (as Secretary Noem herself notes) it imposes consequences without regard to actual notice. Third, Secretary Noem's explanation for not providing service by mail conflicts with her explanation in the next *sentence* that DHS would send electronic messages to USCIS accounts that CHNV parolees "should" have (which also has no factual basis in the AR). Unlike mailing addresses, CHNV parolees were not required to maintain or check a USCIS account, and there is no reason for them to do so once they are here. If anything, and at least in this context, electronic messages are *less* calculated to provide actual notice than service by mail, yet Secretary Noem nowhere addresses that issue at all, likely because she had no record on which to evaluate any of the service options.[17]

## CONCLUSION

The class members followed the rules of the U.S. government and came here lawfully to reunite with family and/or to escape, even temporarily, the instability, dangers, and deprivations of their home countries. The Secretary is admittedly under no obligation to continue the CHNV parole process that brought class members here, but she nonetheless must respect required procedures and apply the law correctly before stripping them of status, upending their lives, and causing mass disruption to their families, employers, and communities. Plaintiffs respectfully request that the Court grant their motion, enter judgment on Claims 1, 3, 5, 6, and 7, and vacate the mass truncation of CHNV parole.

---

about over-burdening the immigration court system are directly contrary to her voluntary decision to strip status from hundreds of thousands of lawfully present CHNV parolees.

[17] Further underscoring the arbitrariness of Secretary Noem's decision regarding service, after the Supreme Court's stay, she relied on a form of service that she nowhere mentioned in the FRN—email. Doc. No. 128-20.

Dated: June 16, 2025

Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

Anwen Hughes (*pro hac vice*)
Inyoung Hwang (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I, Justin B. Cox, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 16, 2025

/s/ Justin B. Cox
Justin B. Cox