YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

BRIAN C. WARD
*Acting Assistant Director*

PATRICK GLEN
*Senior Litigation Counsel*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ZACHARY CARDIN
ELISSA FUDIM
DANIEL SCHUTRUM-BOWARD
*Trial Attorneys*

U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br><br>Svitlana Doe, *et al.*, )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>Kristi Noem, in her official capacity as )<br>Secretary of Homeland Security, *et al.*, )<br> )<br> Defendants. )<br>_____ ) | Civil Action No. 1:25-cv-10495 |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO
### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Introduction ........................................................................................................................ 2

Background ......................................................................................................................... 2

Argument ........................................................................................................................... 4

    I.    Plaintiffs' Motion Should Be Denied For Threshold Reasons ................................ 4

    II.    The Secretary's Termination of Parole Was Not Arbitrary
        and Capricious ........................................................................................................ 6

      i.    The Secretary Considered The Humanitarian Reasons for
           Parole ............................................................................................................... 6

      ii.    The Secretary Reasonably Addressed Additional Factors ................................. 12

    III.    The Termination of CHNV Parole Was Not Contrary to Law
        or Ultra Vires ......................................................................................................... 15

    IV.    The Notice Was Sufficient and Complied With The Law ..................................... 17

    V.    The Court Should Stay or Limit Any Remedy ...................................................... 20

Conclusion ....................................................................................................................... 20

# TABLE OF AUTHORITIES

Cases

*Aldea-Tirado v. PricewaterhouseCoopers, LLP*,
    101 F.4th 99 (1st Cir. 2024) ............................................................... 18

*Amanullah v. Nelson*,
    811 F.2d 1 (1st Cir. 1987) ............................................................... 2, 9

*Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.*,
    513 F.2d 164 (10th Cir. 1975) ............................................................ 18

*Biden v. Texas*,
    597 U.S. 785 (2022) ......................................................................... 9

*Celebi v. Mayorkas*,
    744 F. Supp. 3d 100 (D. Mass. 2024) .................................................... 12

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ......................................................................... 7

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................................... 19

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ............................................................ 9

*Great Lakes Commc'n Corp. v. Fed. Commc'ns Comm'n*,
    3 F.4th 470 (D.C. Cir. 2021) ............................................................. 19

*Harris v. Univ. of Massachusetts Lowell*,
    43 F.4th 187 (1st Cir. 2022) ............................................................. 5

*Kucana v. Holder*,
    558 U.S. 233 (2010) ......................................................................... 5

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ...................................................................... 14, 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... 6, 10

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ............................................................ 20

*Noem v. Doe,*
  No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025)..................................... 1, 15

*D.H.S. v. Thuraissigiam,*
  591 U.S. 103 (2020).................................................................................... 14

*Trump v. Casa, Inc.,*
  No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025)........................................ 20

*Webster v. Doe,*
  486 U.S. 592 (1988)...................................................................................... 6


**Statutes**

8 U.S.C. § 1101(a)(13)(B) ................................................................................. 9

8 U.S.C. § 1182(d)(5)......................................................................... 2, 5, 11, 16, 17

8 U.S.C. § 1225(b)(1)(i) ................................................................................... 10

8 U.S.C. § 1252(a)(2)(B) .................................................................................... 5

8 U.S.C. § 1229a ............................................................................................. 10


**Regulations**

8 C.F.R. § 212.5 ........................................................................................ 2, 17, 18

8 C.F.R. § 274a.12(c)(11)................................................................................. 11

8 C.F.R. § 274a.14 .......................................................................................... 11

8 C.F.R. § 274a(c)(8) ...................................................................................... 12

8 C.F.R. § 274a.14(b)(2) .............................................................................. 18, 19

## INTRODUCTION

Plaintiffs move for summary judgment on their claims challenging the government's termination of the parole of aliens who received parole under certain programs for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV programs) established in 2022 and 2023 via policy announcement. Those programs relied on categorical reasons that the parole statute's requirements were met to permit the parole into the United States of 532,000 aliens who had not established any entitlement to otherwise reside in the country. Parolees were not able to seek re-parole under the CHNV programs and were encouraged to file for asylum or other status where applicable. Parolees were also advised that their parole could be terminated at any time.

On March 25, 2025, the Secretary of Homeland Security terminated the CHNV programs as well as existing periods of parole for CHNV parolees. Plaintiffs contend that the Secretary's decision was arbitrary and capricious, contrary to law, and effected without proper notice. *See generally* Doc. No. 129. These arguments are neither new nor correct. Plaintiffs made similar arguments in support of their motion for a preliminary injunction and in opposition to Defendants' requests to the First Circuit and to the Supreme Court seeking a stay of the district court's resulting injunctive-relief order. In response to those arguments, the Supreme Court stayed this Court's preliminary injunction, in a decision with just two justices noting dissent. *Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025). Essentially, the Supreme Court previewed what is already clear—the Secretary's discretionary decision was not reviewable and was in any event neither contrary to law nor arbitrary and capricious. For the reasons set forth herein, summary judgment for Plaintiff should be denied, and this case should be dismissed for the reasons set forth in Defendants' Motion to Dismiss, *see* Doc. No. 114, or in the alternative, summary judgment should be granted to Defendants.

## BACKGROUND

Parole is, by definition, a temporary permission for an alien to enter the United States. In 8 U.S.C. § 1182(d)(5)(A), Congress granted the Secretary "remarkably broad" discretion with respect to parole. *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987). That statute authorizes the Secretary, "in [her] discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It further provides that parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." *Id.*; *see also* 8 C.F.R. § 212.5.

In late 2022 and early 2023, the Department of Homeland Security (DHS) created special parole programs for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members. Doc. Nos. 24-21, 24-22, 24-23, 24-24, 24-25.[1] DHS cited categorical reasons that parole of nationals from these four countries would provide a significant public benefit and address the aliens' urgent humanitarian needs, based on general migration and country conditions. *See* Doc. No. 24-21 at 6-10; Doc. No. 24-23 at 8-11; Doc. No. 24-24 at 7-11; Doc. No. 24-25 at 7-10. DHS stated that each CHNV program would fulfill the same six goals: reducing "irregular migration" of nationals from those countries; enabling national-security and public-safety vetting of aliens before they arrive in the United States; reducing the strain on DHS personnel and resources from surges in southwest border and maritime encounters; minimizing the burden on border communities by routing aliens to communities in the interior; disincentivizing dangerous journeys through criminal smuggling networks; and addressing foreign-policy goals by

---

[1] As the cited portions of the administrative record have already been filed, Defendants cite to those prior exhibits and refer the Court to Plaintiffs' Index of Exhibits, Doc. No. 129-2, for the administrative record pagination.

managing migration collaboratively in the Western Hemisphere. *See* Doc. No. 24-21 at 6-10; Doc. No. 24-23 at 8-11; Doc. No. 24-24 at 7-10; Doc. No. 24-25 at 7-9.

Under those programs, DHS could consider granting advance authorization to qualifying aliens to travel by air to U.S. ports of entry to request parole for up two years. *See, e.g.*, Doc. No. 24-23 at 11-12. Approved aliens "could seek humanitarian relief or other [immigration] benefits and receive work authorization" during the two-year parole period, but "those 'who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.'" *E.g.*, Doc. No. 24-21 at 3. DHS later announced "there would be no 're-parole' beyond the initial two-year period" under the CHNV programs. *See Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans,* 90 Fed. Reg. 13611, 13614 n. 24 (March 25, 2025). Even within the two-year parole period, DHS expressly stated that it "may terminate parole in its discretion at any time." *E.g.*, Doc. No. 24-23 at 8. DHS granted CHNV parole to some 532,000 aliens in the ensuing two years. 90 Fed. Reg. at 13612.

On March 25, 2025, Secretary Noem published a notice in the Federal Register announcing that DHS was "terminating the CHNV parole programs as of March 25, 2025," and "[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." 90 Fed. Reg. at 13611. The Secretary explained that the CHNV programs "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." *Id.* at 13612. The Secretary also explained why the original

grounds for the CHNV programs did not warrant their continuation. *Id.* at 13612–17. As to the categorical humanitarian grounds briefly cited in support of those programs, the Secretary determined that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis." *Id.* at 13612.

The Secretary acknowledged reliance interests of parolees and others. *Id.* at 13617–19. But she found that, any costs to parolees did not outweigh the government's "sovereign interest in determining who is paroled into the United States" and "the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." *Id.* at 13618–19. DHS chose to terminate parole in 30 days rather than allow parolees' two-year terms to expire because the latter option would "essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States" under expedited removal procedures in accordance with 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *Id.* at 13620.

Following the Secretary's announcement, Plaintiffs amended their Complaint to challenge it. This memorandum assumes the Court's familiarity with the procedural history of this case and the arguments previously presented. Defendants refer the Court to its briefs at Doc. Nos. 89, 114.

## ARGUMENT

### I.    Plaintiffs' Motion Should Be Denied For Threshold Reasons.

Plaintiffs should be denied summary judgment for threshold reasons. First, several Plaintiffs lack standing, *see* Doc. No. 114 at 5-9 (the organizational Plaintiff and sponsor Plaintiffs lack standing). Further, Plaintiff Carlos Doe's challenge to the termination is moot, as his parole would have expired in June 2025, Doc. No. 24-4 at ¶ 6, and there is no further relief the Court can grant on this claim. *Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 191 (1st Cir. 2022).

Second, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes jurisdiction over claims challenging the

discretionary parole termination decision. Doc. No 114 at 12. The Secretary may terminate parole when she determines, in her "opinion," that the "purposes" of parole "have been served." *See* 8 U.S.C. § 1182(d)(5)(A); *see also* 90 Fed. Reg. 13,612-17, 13,619 n.70. The statute thus specifies that the authority to terminate parole is in the Secretary's discretion, and § 1252(a)(2)(B)(ii)'s judicial-review bar applies. *See* 8 U.S.C. 1252(a)(2)(B)(ii); *Kucana v. Holder*, 558 U.S. 233, 247–48 (2010). Plaintiffs incorporate by reference their previous argument that the Secretary's assessment of whether the purpose of parole has been served must be made on a case-by-case basis. Doc. No. 129 at 15. Setting aside that no such requirement exists, Doc. No. 89 at 13-14, Plaintiffs' reasoning cannot be squared with the fact that a court may not review the determination of whether the purposes of parole have been served. The language "no court shall have jurisdiction to review" in § 1252(a)(2)(B) is about as specific as language gets—and this bar applies without exception and "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(B). And the INA makes clear that review is precluded where the statute makes a determination discretionary, *regardless* of whether that discretion is exercised appropriately. *Cf. Kucana*, 558 U.S. at 247–48. It is beyond dispute that where the Secretary makes an *individual* parole-termination decision, that decision would not be judicially reviewable. Left unexplained is why such a decision would become reviewable if made alongside approximately 500,000 others. Under Plaintiffs' logic, had the Secretary issued separate notices terminating each alien's parole— with no explanation whatsoever—that would be unreviewable. Yet, under Plaintiffs' view, those determinations become reviewable when combined and set forth in a notice explaining in detail the common reasons governing the parole terminations, with explicit consideration of parolees' reliance interests. Nothing in the statutory text suggests that Congress intended such a scheme.

Third, the APA similarly precludes challenges to decisions that are "committed to agency

discretion" by law like the parole termination decision. Doc. No. 114 at 15. Congress's delegation of authority to the "opinion" of the Secretary indicates that Congress committed this decision to her own judgment and "foreclose[s] the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988). This clearly forecloses, at minimum, any substantive review, including "arbitrary-and-capricious" review, of the rationales for the Secretary's substantive opinion that the purposes of parole of have been served.

## II.    The Secretary's Termination of Parole Was Not Arbitrary and Capricious.

The termination of parole is committed to the Secretary's "opinion," and the APA's requirements do not compel the Secretary to painstakingly justify that opinion. But the Secretary nonetheless did lay out her decision in detail, addressing the goals of the prior program and why the purposes of parole had been served, acknowledging changes from prior policy, relevant factors, and discussing potential reliance interests. The Secretary's decision to terminate CHNV paroles, thus clearly withstands the APA's deferential standards of review. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"). Plaintiffs may disagree with the Secretary's decision, but the Court cannot substitute its judgment for that of the agency. *See id.*

### (i)    The Secretary Considered the Humanitarian Reasons for Parole.

Plaintiffs argue that the Secretary's termination decision was arbitrary and capricious because she failed to consider the humanitarian concerns in the four subject countries described in the notices announcing the programs. Doc. No. 129 at 6-12. But the Secretary did consider the "previous arguments [and] determinations that these programs were consistent with the requirement of 'urgent humanitarian reasons' for granting parole." 90 Fed. Reg. at 13612. She

concluded that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." *Id.* Citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), Plaintiffs argue that this reasoning is insufficient because DHS is changing its policy. Doc. No. 129-1 at 7-8. But that's not what *Encino* stands for. In *Encino*, the Supreme Court said:

> Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. *In such cases* it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*Encino*, 579 U.S. at 221-222 (internal citations and quotations omitted) (emphasis added).

Here, the Secretary published a detailed notice in the Federal Register that addresses each of the stated goals of CHNV parole and meets any potential requirements to explain her decision. The Secretary also addressed the categorical analysis of country conditions that Secretary Mayorkas cited to demonstrate that the parole was consistent with "urgent humanitarian reasons" for granting parole, but reasoned these conditions were better addressed on case-by-case applications for parole. 90 Fed. Reg. at 13612. Moreover, the Court's language in *Encino* makes clear that only where "longstanding policies" have "engendered serious reliance interests" does an agency's decision need to specifically set forth its reasons for disregarding facts and circumstances that underlay its prior policy. Otherwise, the agency must simply "display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. Unlike in *Encino*, where the Court repeatedly commented upon the reliance interests generated by a multi-*decade* policy, here, the CHNV programs were in effect for fewer than three years, and there were no

7

reasonable reliance interests because beneficiaries were advised both that the processes were discretionary and that their parole could be terminated at any time. 90 Fed. Reg. at 13618–19. As such, the Secretary did not need to discuss in detail the humanitarian issues that previously underlaid, in part, the adoption of the CHNV processes. It was enough that she acknowledged that DHS was changing its policy and provided good reasons for the change, including her assessment that "[t]hese programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." 90 Fed. Reg. at 13612. "[T]hese reasons," coupled with her assessment that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis," "independently and cumulatively," supported her decision to terminate the CHNV programs.

Plaintiffs contend that the Secretary "fails to acknowledge that she *is* departing from her agency's prior conclusions." Doc. No. 129 at 9. But the Secretary clearly stated that the purpose of the notice was to "terminat[e] the categorical [CHNV] parole programs." 90 Fed. Reg. at 13611. And after detailing the prior Administration's rationale for implementing the CHNV programs, she concluded that "it is now appropriate and necessary to terminate the CHNV parole programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." 90 Fed. Reg. 13612. No reasonable person could come away from reading the Termination Notice without understanding the agency was departing from its prior position. Although this is sufficient to satisfy any APA requirements, the Secretary also specifically announced that DHS was departing from its prior position that country-wide humanitarian reasons supported requests

8

for CHNV parole, *see* Doc Nos. 24-23 at 11; Doc. No. 24-21 at 10; Doc. No. 24-24 at 10-11; Doc. No. 24-25 at 9-10, stating that "consideration of any urgent humanitarian reasons . . . is best addressed on a case-by-case basis . . . taking into consideration each alien's specific circumstances." 90 Fed. Reg. at 13612.

Second, Plaintiffs argue that the Secretary was required to address the humanitarian aspects of the CHNV program "given the clear statutory invocation and expressly humanitarian purposes of the parole statute itself" and the "INA generally." Doc. No. 129 at 10. Plaintiffs rely on *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020), to argue that "Secretary Noem's failure to consider this 'second, equally important goal' of the statutory parole authority she exercises was arbitrary and capricious." Doc. No. 129 at 10. Plaintiffs misread *Grace*. In *Grace*, the court was reviewing a policy change under the expedited removal statute, a statute that provides certain procedural protections for aliens seeking asylum relief. *See Grace*, 965 F.3d at 262 (one purpose of the statute is accurate assessment of asylum claims under the law). The parole statute is different in that it serves only to confer discretion on the Secretary. While § 1182(d)(5)(A) *references* humanitarian reasons as a possible basis for granting parole (in DHS's discretion), the *goal* of § 1182(d)(5) is not to provide humanitarian parole upon a specified showing (like the asylum screen statute in *Grace*). The statute's goal is to provide the Secretary with maximum flexibility to permit certain aliens to be released into the United States temporarily without having such release qualify as an admission. *See Amanullah*, 811 F.2d at 6 ("parole was meant to be the exception rather than the rule"); 8 U.S.C. § 1101(a)(13)(B) (aliens paroled under § 1182(d)(5) "shall not be considered to have been admitted."); *cf. Biden v. Texas*, 597 U.S. 785, 807 (2022) (noting the availability of parole as an alternative to mandatory detention). And the statute expressly grants the Secretary discretion to use parole, on a case-by-case basis, for such purpose, provided the use is supported

9

by a significant public benefit or an urgent humanitarian reason. The parole statute displays no entitlement to or preference for parole, instead, leaving the matter to the discretion of the Secretary. Indeed, as explained, aliens have no right to sue for the denial of parole for humanitarian bases— or for any other reason. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). By contrast, the expedited removal statute, at issue in *Grace*, by its terms *requires* immigration officers to provide aliens with credible fear screenings, and if the aliens are found to have a credible fear, *requires* the government to consider the alien's asylum claim. 8 U.S.C. § 1225(b)(1)(i) and (ii).

Next, Plaintiffs argue that the Secretary did not explain how "the purposes of the *existing* grants of parole 'have been served.'" Doc. No. 129 at 10-11. Yes, she did. She explains that "one aspect of" DHS's termination of the CHNV parole programs is the termination of existing paroles. 90 Fed. Reg. at 13618 (discussing "effect of termination on current parolees under the CHNV parole programs"). The Secretary expressly referenced those reasons for terminating the CHNV programs—including the "domestic impact" of the programs—as the same reasons underlying her determination that the purposes of CHNV paroles have been served. *Id.* at 13619 n.70. Indeed, several cited reasons for terminating the parole program apply to existing parolees. *Id.* at 13614 (parolees impose costs due to eligibility for Federal benefits), *id*. at 13615 (the immigration court backlog will be "further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends" if they are placed in removal proceedings under 8 U.S.C. § 1229a), *id.* at 13616 (discussing "significant gaps" in the vetting process for CHNV parolees); *see also Motor Vehicle Mfrs.*, 463 U.S. at 43 ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Finally, she stated that "neither humanitarian reasons nor public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served." 90 Fed.

Reg. at 13620. The statue vests the decision as to when the purpose of parole has been served to the Secretary's "opinion." 8 U.S.C. § 1182(d)(5). The Secretary provided her opinion. Plaintiffs simply disagree with it.

Plaintiffs next argue that the Secretary's decision was arbitrary and capricious because she purportedly failed to consider alternatives like preserving parole or work authorizations for those aliens who have pending applications for other immigration benefits. Doc. No. 129 at 11. Leaving aside that there is no constraint on the Secretary's discretion to terminate parole, the Secretary extensively considered alternatives to terminating parole and the impact on those who already had parole. *See* 90 Fed. Reg. 13618-20. She considered both allowing parole to expire under existing time limits or providing a greater than 30-day termination period. But she rejected these options because they were ultimately inconsistent with the goal of "enforc[ing] the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States" and the desire for those individuals to "depart the United States." 90 Fed. Reg. at 13618, 13620. There was also risk that parolees would not be subjected to expedited removal if parole were not promptly terminated. *Id.*; *see also CHIR*, 1:25-cv-00872, at ECF Nos. 21, 22-1 (seeking order that prevents parolees from being placed into expedited removal). As for work authorizations, the Secretary did not terminate any work authorizations through the Federal Register notice. Work authorization is available to parolees not based on the parole statute or the CHNV programs, but because parolees generally may apply for work authorization under long-standing regulations. *See* 8 C.F.R. § 274a.12(c)(11). Such employment authorization terminates upon expiration of the Employment Authorization Document (EAD) or upon revocation by DHS. *See* 8 C.F.R. § 274a.14.

Plaintiffs seemingly claim that the Secretary failed to adequately consider the possibility that many CHNV beneficiaries may leave the United States and abandon their applications for

other immigration benefits as a result of losing work authorization. Doc. No 129 at 12. This is wrong. First, those with pending applications are often separately eligible for work authorization. 8 C.F.R. § 274a(c)(8), (9). Second, the Secretary did more than consider that other aliens whose parole is terminated may voluntarily leave the United States—that is the intended purpose of the termination. "Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States before their parole termination date." 90 Fed. Reg. at 13618-19.[2] Further, it is unlikely one, non-renewable, two-year period of parole would result in a different outcome—asylum applications, for example, take longer than two years to adjudicate. *See, e.g.*, *Celebi v. Mayorkas*, 744 F. Supp. 3d 100, 104 (D. Mass. 2024) (noting 3.5 year wait for adjudication of asylum application). So eventual loss of employment authorization was a consequence of the original CHNV program.

In sum, the Secretary considered the relevant factors. While Plaintiffs disagree with her conclusion, there is no defect in the decision-making process.

### (ii)    The Secretary Reasonably Addressed Additional Factors.

Relying on this Court's prior order, Plaintiffs argue—in summary fashion—that the Secretary's termination of parole was arbitrary and capricious because her "sole" rationale for her decision—that termination would allow DHS to place CHNV parolees in expedited removal proceedings—is wrong as a matter of law. Doc. No. 129 at 12-13. Plaintiffs are wrong for a few reasons. First, as discussed above, the Secretary did not rely solely on the expedited removal rational for terminating parole. *See supra* at pg. 10. Second, while Plaintiffs cite this Court's prior order, they ignore that the Supreme Court stayed this Court's order, indicating that the Court

---

[2] The FRN states that those with pending applications or petitions for immigration benefits—like many Parolee Plaintiffs—will not be prioritized first for removal. 90 Fed. Reg. at 13619.

disagreed with this Court's analysis as to likelihood of success on the merits. Third, on the law, Plaintiffs are wrong. *See* Doc. No. 89 at 12-13, Doc. No. 114 at 19-20.

The Secretary was concerned that time limits might be imposed on her authority to use expedited removal—and that concern was valid given litigation that now seeks to preclude the Secretary from placing formerly paroled aliens into expedited removal proceedings in part based on that two-year limit. *See Coalition for Humane Immigrant Rights (CHIR) v. Noem*, No. 1:25-cv-00872 (D.D.C.) (lawsuit asserting systematic challenge to the application of both § 1225(b)(1)(A)(i) and § 1225(b)(1)(A)(iii)(II) to former parolees). Plaintiffs also argue that the Secretary's rationale is inconsistent with DHS's view of its expedited removal authority that it can subject a parolee whose parole has naturally expired to expedited removal as an "arriving alien" under 8 U.S.C. § 1225(b)(1)(A)(i) no matter how long he has been here. Doc. No. 129 at 13. But there is nothing inconsistent or irrational about the Secretary's invocation of § 1225(b)(1)(A)(iii)(II). Indeed, Plaintiffs themselves disagree that §1225(b)(1)(A)(i) applies—attacking the government's application of this provision to former parolees as "grammatical and legal nonsense." Doc. No. 129 at 13. Although Plaintiffs are incorrect, this disagreement about the applicability of § 1225(b)(1)(A)(i) only serves to underscore the reasonableness of the Secretary's rationale. By safeguarding the ability to rely on § 1225(b)(1)(A)(iii)(II) as an authority for invoking expedited removal against parolees, the Secretary "preserve[s] the ability to initiate expedited removal proceedings to the maximum extent possible," 90 Fed. Reg. at 13620, even if § 1225(b)(1)(A)(i) presents an alternative authority.

Plaintiffs argue that even if the Secretary were right on the law with respect to expedited removal, her consideration of reliance interests was inadequate because, even though the Secretary included an extensive discussion of those interests, she did not expressly account for the fact that

parolees were told they could apply for other immigration benefits and that the termination of parole "severely undermines their ability even to stay long enough for those applications to be adjudicated." Doc. No. 129 at 14. Again, the Secretary was under no requirement to address these issues. But in any event, this argument fails because an application for a benefit does not necessarily entitle anyone to remain in the country, and many of those applications for immigration status or benefits—in particular, asylum applications—were always likely to take longer to adjudicate than the 2-year parole period in any event. *See supra* at pg. 12. Moreover, both removal proceedings and expedited removal provide a prompt way to consider an alien's claim for asylum, and Plaintiffs' argument devolves to a request to string out asylum processing while remaining illegally in this country, a factor the Secretary properly did not credit. Plaintiffs also argue that the Secretary failed to account for family separations, and that "Parolees plainly also have a strong interest in not being subjected to immigration detention and the removal process." Doc. No. 129 at 14. But the Secretary did discuss the issue of remaining in the country, expecting aliens with no entitlement to remain here to return to their home country. These arguments ignore that parole was for a maximum of two years and was never intended to be permanent. Even if the Secretary did not terminate parole, most CHNV beneficiaries were still required to leave the country at the expiration of their parole, and if they did not do so voluntarily, DHS always had the authority to subject them to detention and removal.[3] That the Secretary did not expressly discuss these inevitable consequences of parole was not arbitrary or capricious.

Similarly, the Secretary's acknowledgement that her decision would affect the reliance interests of third parties, such as supporters, employers and landlords, explained that this effect

---

[3] Further, CHNV parolees may have a general interest in avoiding detention and removal, but as applicants for admission, they are entitled to only the process Congress provided by statute. *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

would have occurred regardless of whether the parole terms were allowed to expire. 90 Fed. Reg. at 13620. Plaintiffs argue this still fails to account for the fact that such third parties may have entered contracts with beneficiaries for specific time periods in reliance on their ability to maintain parole for an expected two-year term. Doc. No. 129 at 14-15. This argument is not persuasive. It was clear from the outset—indeed from the statute itself—that the Secretary had discretion to terminate any person's parole at any time. If third parties entered two-year contracts with such aliens, they did so at their own risk. But again, the Secretary's discussion addressed this interest and determined that it did not override the interest in terminating parole.

### III.    The Termination of CHNV Parole Was Not Contrary to Law or Ultra Vires.

Plaintiffs summarily state that the Secretary's termination decision was *ultra vires* and contrary to law and refer the Court to their prior filings. Doc. No. 129 at 15. Plaintiffs' position, as repeated here and asserted previously, is wrong. *See* Doc. Nos. 89 at 10-17, 114 at 16-20. The Court preliminarily determined that Plaintiffs are likely to succeed on their claims that the decision to terminate individual CHNV paroles was contrary to law because the decision to truncate all existing parole was contrary to the statutory requirement that parole be exercised "only on a case-by-case basis." *Id.* at 36-37. Defendants respectfully maintain that the Court's reasoning is incorrect as a matter of statutory interpretation, as supported by the Supreme Court's recent decision staying the effect of this Court's ruling which necessarily concluded the government was likely to prevail on the merits. *Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025); *see also* Doc. No. 114 at 16-20; *see also Noem v. Doe*, No. 24A1079, Appl. for Stay at 17-21, 21-23 (U.S. May 8, 2025); *id.*, Reply at 7-10 (U.S. May 16, 2025). In any event, for the reasons explained above, this court was not correct in its interpretation.

Plaintiffs now argue that the Secretary's decision was also contrary to law because even if

she could lawfully terminate the parole of CHNV beneficiaries en masse, such a decision had to "be predicated on her conclusion that the purposes of such parole shall. . . have been served," DOC No. 129 at 15 (internal citations omitted), and according to Plaintiffs, the Secretary never reached that conclusion. *Id*. Plaintiffs are wrong. The Secretary concluded that "the purposes of parole under the CHNV programs have been served because, *inter alia*, the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals." 90 Fed. Reg. at 13619. These same factors supported the decision to terminate parole, as "one aspect" of the termination of the parole program. 90 Fed. Reg. at 13618, 13619 n.70. The Secretary's decision was based on a "complicated balancing of a number of factors which are peculiarly within [agency] expertise," including the Executive Branch's comprehensive efforts to manage foreign affairs and border security, 90 Fed. Reg. at 13616.

Plaintiffs argue that the Administrative Record doesn't contain support for the conclusion "that the humanitarian purposes of . . . *everyone*'s parole had been served." Doc. No. 129 at 16. But the Secretary did consider the humanitarian reasons cited by the prior Administration and determined they were best addressed through case-by-case applications for parole. 90 Fed. Reg. at 13612. And nothing prevents anyone from seeking parole on a case-by-case basis based on their circumstances. The Secretary was under no obligation to consider the specific humanitarian concerns of each beneficiary to determine, *in her opinion*, that the purposes of CHNV parole— which had been based on categorical determinations that the statutory requirements for parole were met—had been served, and thus to terminate CHNV paroles. Such reasoning would in effect turn a discretionary program into one that could not be eliminated, in contravention of the statute and democratic accountability. Indeed, the fact that 8 U.S.C. § 1182(d)(5)(A) permits the Secretary to

terminate parole based on *her opinion* as to whether the purpose of the parole has been served, demonstrates why her decision is not subject to review under the APA. *See* Doc. No. 114 at 15.

Moreover, this further demonstrates why imposing a case-by-case requirement to examine the specific humanitarian reasons for each alien for parole termination, but not for grants, creates a perverse result as applied here: although the prior Administration used common reasons to categorically determine that the prerequisites for *granting* parole were met as to over half a million aliens, this Administration cannot use common reasons to *terminate* parole.[4] The statute doesn't support this outcome. In fact, the reverse is true: the statute provides parole may only be *granted* on a "case-by-case" basis where certain conditions are met, *see* 8 U.S.C. § 1182(d)(5)(A), but it contains no parallel language imposing that requirement on terminating parole.

**IV.    The Notice Was Sufficient and Complied with the Law.**

Plaintiffs argue that the Secretary's method of notifying parolees of their parole termination through both the Federal Register and individualized notice through the USCIS online account did not follow agency regulations requiring "written notice" and was arbitrary and capricious. Doc. No. 129 at 15-20. Plaintiffs are wrong. *See* Doc. No. 114 at 22-23. DHS's provision of notice met its regulatory notice requirements. Regulations implementing the parole authority address the mechanics of terminating parole before its expiration date, providing that "upon accomplishment of the purpose for which parole was authorized or when in the opinion of [the Secretary or her designees], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien[.]" 8 C.F.R. § 212.5(e)(2)(i). Neither the statute nor regulations define or limit "written notice" of termination,

---

[4] Plaintiffs tellingly do not argue that any case-by-case consideration of a particular parolee's request for CHNV parole required the alien to demonstrate that urgent humanitarian reasons supported their specific request for parole.

other than to provide that a charging document qualifies as "written notice." *See id.*

Plaintiffs incorrectly contend that notice in the Federal Register does not constitute "written notice" of termination of parole as required by 8 C.F.R. § 212.5(e)(2)(i). Doc. No. 129 at 15-16. They posit that because the "parole regulation's sole example of what constitutes the required 'written notice to the alien' [is] a charging document"—which pursuant to statute, requires personal service—it is fair to assume that the regulation also contemplates personal service when it refers to "written notice." Doc. No. 129 at 16-17. This conclusion does not follow. The fact that a charging document constitutes notice of termination does not suggest that other types of written notice are insufficient. On the contrary, the regulation does not specify that written notice must be accomplished by a particular means or require DHS to "furnish individual notice." *See Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.*, 513 F.2d 164, 167 (10th Cir. 1975).

Notwithstanding, every CHNV parolee received individualized notice of parole termination and notice of the intent to revoke their EAD via their USCIS online account. *See* 90 Fed. Reg. at 13620. This notice complies with the regulation that provides for electronic notice where, as here, the parole application was filed electronically, 8 C.F.R. § 103.2(b)(19)(ii)(B), and independently satisfies the regulatory notice requirement. *Cf. Aldea-Tirado v. PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103-06 (1st Cir. 2024) (finding email notice sufficient). DHS notified parolees through accounts they created specifically to apply for parole under the CHNV programs. *See* 90 Fed. Reg. at 13,620 (noting that all parolees should have such an account). Plaintiffs argue that "the parole and employment authorization regulations do not authorize electronic service." Doc. No. 129 at 18. But the regulations do not require "service" at all. They require only "written notice." 8 C.F.R. § 212.5(e)(2)(i); 8 C.F.R. § 274a.14(b)(2). And they do not limit the mechanisms for providing such written notice. *Id*. Yet, Plaintiffs persist in

arguing that "written" requires "a physical (rather than only electronic) form." Doc. No. 129 at 18. Tellingly, they cite no cases to support this argument, *see id.*, and such a requirement makes no sense where parole was obtained through an online account. Plaintiffs also argue that "CHNV parolees were not required to maintain or check a USCIS account." Doc. No. 129 at 20. While they were not "required" to check their USCIS accounts, by regulation, they were on notice that decisions and notices could be sent via such account. *See* 8 C.F.R. § 103.2(b)(19)(ii)(B).

Plaintiffs argue that, at minimum, the Secretary's decision not to *also* send notices via U.S. mail was arbitrary and capricious. Doc. No. 129 at 18-20. Not so. The Secretary explained that she found "Federal Register publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements." 90 Fed. Reg. at 13620. Plaintiffs take issue with the Secretary's reliance upon potential noncompliance with change-of-address requirements rather than citing data demonstrating actual non-compliance. Doc. No. 129 at 19. But agencies can "rely on common sense and predictive judgments within its expertise even if not explicitly backed by information in the record." *Great Lakes Commc'n Corp. v. Fed. Commc'ns Comm'n*, 3 F.4th 470, 476 (D.C. Cir. 2021); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) ("[E]ven in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense."). Here, the Secretary's observation that some aliens may not comply with change-of-address requirements is an "exercise in logic rather than clairvoyance," *id*., which is permissible without citation to supporting data. *Id*.

Plaintiffs complain that the Secretary should have explained "why DHS could not *also* mail notices to CHNV parolees." Doc. No. 129 at 19. But Plaintiffs fail to explain why the beneficiaries of a program that required an online account and relied on an entirely online electronic process,

19

involving no paper notices, are now prejudiced by the decision not to send paper termination notices. Further, the Secretary was not required to consider every possible means of notification. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). She explained why she rejected the use of mail (the possibility of non-compliance with change-of-address requirements), noted why she believed use of the Federal Register was preferable (based on the size of the affected population), and explained why she believed that additional electronic notice would also be beneficial (because processing for the CHNV programs was done electronically, and 8 C.F.R. § 103.2(b)(19)(ii)(B) put aliens on notice that USCIS may use electronic means to provide aliens notices and decisions). 90 Fed. Reg. at 13620. That is all that was required.

**V.    The Court Should Stay or Limit Any Remedy.**

In all events, the Court should decline to grant the requested relief of universal vacatur—especially as the Supreme Court has already stayed nearly identical relief pending appeal. Class-wide vacatur would be improper based on the Court's limited prior analysis of commonality and typicality, which did not address the particular merits theories asserted here. *See Trump v. Casa, Inc.*, No. 24A884, 2025 WL 1773631, at *18 (U.S. June 27, 2025) (Alito, J., concurring) (cautioning against certification without "scrupulous adherence to the rigors of Rule 23"). If the Court does grant relief, the government requests that the Court stay its ruling for 14 days to permit the government to seek a stay pending appeal.

## <u>CONCLUSION</u>

The Court should deny summary judgment to Plaintiffs. If the Court does not grant Defendants' motion to dismiss in its entirety or with respect to the claims at issue here, it should grant summary judgment to Defendants.

DATED: July 7, 2025                    Respectfully submitted

                                       By: /s/ *Elissa Fudim*
                                       ELISSA FUDIM
                                       Trial Attorney
                                       U.S. Department of Justice, Civil Division
                                       Office of Immigration Litigation
                                       *Counsel for Defendants*