# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

               Plaintiffs,

       *v.*

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, et al.,

             Defendants.

Civil Action No.: 1:25-cv-10495-IT

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE MASS TRUNCATION
OF CHNV PAROLE (Doc. No. 196)**

# TABLE OF CONTENTS

INTRODUCTION .........................................................................................................................1

BACKGROUND ...........................................................................................................................2

LEGAL STANDARDS..................................................................................................................5

ARGUMENT ................................................................................................................................5

I.    THE ADMINISTRATIVE RECORD ESTABLISHES SECRETARY NOEM
      FAILED TO CONSIDER IMPORTANT FACTORS ..........................................................6

      A.    The AR Establishes that Secretary Noem Ignored the Facts &
            Circumstances Underlying Prior Policies .................................................................6

      B.    The AR Shows Secretary Noem Failed to Adequately Consider Reliance
            Interests.....................................................................................................................8

      C.    The AR Demonstrates Secretary Noem Failed to Consider Obvious
            Alternatives.............................................................................................................11

II.   SECRETARY NOEM RELIED ON IMPERMISSIBLE FACTORS CONGRESS
      NEVER INTENDED HER TO CONSIDER....................................................................12

III.  SECRETARY NOEM'S EXPEDITED REMOVAL RATIONALE WAS BOTH
      LEGALLY ERRONEOUS AND PRETEXTUAL ............................................................13

      A.    The Expedited Removal Rationale Rested on Fundamental Legal Error.............14

      B.    The Expedited Removal Rationale Was Pretextual in Any Event ........................15

IV.   SECRETARY NOEM EXCEEDED HER STATUTORY AUTHORITY .........................16

      A.    Secretary Noem Violated the Substantive "Purposes Have Been Served"
            Standard ..................................................................................................................16

      B.    Secretary Noem Violated the Procedural Case-by-Case Requirement ..................18

V.    SECRETARY NOEM VIOLATED REGULATIONS AND DUE PROCESS
      THROUGH INADEQUATE NOTICE.............................................................................19

CONCLUSION............................................................................................................................20

CERTIFICATE OF SERVICE ....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) .................................................................................5

*Castellon v. Kaiser*,
No. 1:25-cv-00968, 2025 WL 2373425 (E.D. Cal. Aug. 14, 2025) ........................................14

*Castillo v. Bondi*,
140 F.4th 777 (6th Cir. 2025) ................................................................15

*Coal. for Humane Immigrant Rts. v. Noem ("CHIRLA")*,
__ F. Supp. 3d__, 2025 WL 2192986 (D.D.C. Aug. 1, 2025), *stay denied*, No.
25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025) ...................................14, 15

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ..........................................................................8, 16

*DHS v. Regents of the Univ. of Calif.*,
591 U.S. 1 (2020) .............................................................................. *passim*

*Doe v. Noem*,
152 F.4th 272 (1st Cir. 2025) ................................................................ *passim*

*E.V. v. Raycraft*,
No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025) ........................................14

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..........................................................................6, 10

*Espinoza v. Kaiser*,
No. 1:25-CV-01101, 2025 WL 2675785 (E.D. Cal. Sept. 18, 2025) ........................................14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ...........................................................................9-10

*Garcia v. Andrews*,
No. 1:25-cv-01006, 2025 WL 2420068 (E.D. Cal. Aug. 21, 2025) ........................................14

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ................................................................13

*Judulang v. Holder*,
565 U.S. 42 (2011) ............................................................................12, 13

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)................................................................................5

*Mata Velasquez v. Kurzdorfer*,
    __ F. Supp. 3d __, 2025 WL 1953796 (W.D.N.Y. July 16, 2025)..............18, 19, 20

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024)................................................................5

*Mennonite Bd. of Missions v. Adams*,
    462 U.S. 791 (1983)...........................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................ *passim*

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)....................................................................... 19-20

*Munoz Materano v. Arteta*,
    No. 25-cv-6137, 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025) ...........14, 18, 19, 20

*Noori v. Larose*,
    No. 25-cv-1824, 2025 WL 2800149 (S.D. Cal. Oct. 1, 2025)....................18, 19, 20

*Orellana v. Francis*,
    No. 25-CV-04212, 2025 WL 2402780 (E.D.N.Y. Aug. 19, 2025)....................18, 19

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)............................................................................9

*Perez Guerra v. Woosley*,
    No. 4:25-cv-119, 2025 WL 3046187 (W.D. Ky. Oct. 31, 2025)...........................14

*Salazar v. Casey*,
    No. 25-CV-2784, 2025 WL 3063629 (S.D. Cal. Nov. 3, 2025) .......................18, 20

*Salazar v. Kaiser*,
    No. 1:25-CV-01017, 2025 WL 2456232 (E.D. Cal. Aug. 26, 2025)......................14

*Savane v. Francis*,
    No. 25-CV-2784, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025)..................18, 19, 20

*Smiley v. Citibank (S. Dakota), N.A.*,
    517 U.S. 735 (1996)..........................................................................10

*Y-Z-L-H v. Bostock*,
    __ F. Supp. 3d. __, 2025 WL 1898025 (D. Or. July 9, 2025) ...................18, 19, 20

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ............................................................................................... 19

## **Statutes**

5 U.S.C. § 705 ........................................................................................................... 15

5 U.S.C. § 706 ............................................................................................................. 2

8 U.S.C. § 1158 ........................................................................................................ 13

8 U.S.C. § 1182(d)(5)(A) ................................................................................. *passim*

8 U.S.C. § 1225(b)(1)(A)(iii)(II) .................................................................... 5, 11, 14, 15

8 U.S.C. § 1252(e)(3)(A) ......................................................................................... 15

8 U.S.C. § 1254a ...................................................................................................... 13

8 U.S.C. § 1255 ........................................................................................................ 13

8 U.S.C. § 1306(b) ................................................................................................... 20

## **Other Authorities**

8 C.F.R. § 212.5(e) ............................................................................................. 17, 19

Application for Stay, *Noem v. Doe*, No. 24A1079 (U.S. May 8, 2025) ...................... 15

Reply in Support of Application for Stay, *Noem v. Doe*, No. 24A1079 (U.S. May
    16, 2025) ........................................................................................................ 15-16

Pet'rs Opening Br., *DHS v. Regents of the Univ. of Calif.*, Nos. 18-587, 18-588,
    18-589, 2019 WL 3942900 (U.S. Aug. 19, 2019) .................................................. 10

Pet'rs Reply Br., *DHS v. Regents of the Univ. of Calif.*, Nos. 18-587, 18-588, 18-
    589, 2019 WL 3942900 (U.S. Oct. 28, 2019) ....................................................... 10

## INTRODUCTION

The administrative record in this case exposes a stark truth: Secretary Noem's mass truncation of CHNV parole was not a reasoned policy decision but an exercise in predetermined conclusion-reaching. While the First Circuit held that Plaintiffs had not made the "strong showing" required for preliminary relief on a subset of their claims, that interlocutory ruling—made without the benefit of the administrative record—cannot salvage what the record now reveals to be a paradigmatic example of unlawful agency action.

Consider what Secretary Noem actually did. She truncated the parole of more than 425,000 individuals without examining whether the justifications for their parole had abated or whether the purposes of their parole had been served. She justified her decision to change longstanding DHS policies on a novel legal interpretation of the expedited removal statute that numerous federal courts have unanimously rejected and that Defendants now admit was pretextual anyway. She dismissed the reliance interests of half a million people with a single paragraph of illogical boilerplate. She violated DHS' own regulations by refusing to provide individual notice, speculating—without a shred of evidence—that parolees might not have complied with change-of-address requirements. And she explicitly sought to coerce the parolees into abandoning meritorious applications for immigration benefits, including family reunification petitions filed by U.S. citizens, and without bothering to justify it.

The First Circuit addressed narrow, legal questions on a preliminary posture. This Court now confronts what the Secretary did and why she did it against the complete record. On this record, only one conclusion is possible: the CHNV Plaintiffs[1] are entitled to judgment on claims

---

[1] The "CHNV Plaintiffs" are the eight individual Plaintiffs who received parole via the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"); the five individual

1, 3, 5, 6, and 7 of the operative Complaint (Doc. No. 68) and the "March 25 FRN"[2] (or "FRN") must be vacated on behalf of the Early Revocation Parolee Subclass.[3] 5 U.S.C. § 706 (authorizing that relief upon "the court . . . review[ing] the whole record or those parts of it cited by a party").[4]

## BACKGROUND[5]

The story of the CHNV programs begins not with Secretary Noem but with her predecessors, who confronted genuine humanitarian crises requiring urgent response. Between October 2022 and January 2023, DHS—consistent with 70 years of agency practice, Pls.' SUF (Doc. No. 197) ¶ 26—established four parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Doc. Nos. 24-1 through 24-5. Each process was justified by extensive evidence: State Department reports detailing political persecution, intelligence assessments warning of regional instability, and humanitarian analyses documenting widespread suffering. Doc. Nos. 128-14 through 128-17 (indices of the administrative record for each process). To respond to those crises and to deter irregular migration, the central function of the CHNV processes was to parole noncitizens into the United States to seek immigration relief for which they are eligible. SUF ¶ 9.

---

Plaintiffs who sponsored CHNV parolees who arrived here, and organizational Plaintiff Haitian Bridge Alliance (HBA), which serves Haitian parolees. *See* SUF ¶¶ 1-3.

[2] *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025).

[3] *See* First Stay Order, Doc. No. 97 at 28; Second Stay Order, Doc. No. 107 at 42 n.41.

[4] Given the likelihood of appellate review, Plaintiffs include in their Index of Exhibits (Doc. No. 197-2) evidence relevant to the myriad arguments Defendants have made throughout this litigation. Of those documents the Court has yet to consider in adjudicating prior motions, the most relevant are Doc. Nos. 128-2 through -4 (statistics regarding the class), 128-12 (the guide used by agency personnel adjudicating Form I-134A CHNV parole requests), 128-14 through -17 (the indices of the administrative records of each of the four parole processes), 153-1 (an example Form I-134A, for Plaintiff Ana Doe), and two 2023 declarations of an Assistant Sec'y of Homeland Security, offered for their operational details of the CHNV processes, Doc. Nos. 196-1 and -2.

[5] Plaintiffs assume the Court's familiarity with this case and incorporate by reference their prior briefing regarding the pertinent issues. *See* Doc. Nos. 25, 72 & 125.

Consistent with a long history of similar parole processes, every CHNV parolee underwent individualized assessment at multiple stages. SUF ¶¶ 28-29. First, they needed a U.S.-based financial supporter who passed background checks and demonstrated financial capacity through Form I-134A. Second, parolees underwent rigorous security vetting, including biometric screening and database checks. Third, they had to establish eligibility for parole based on their individual circumstances.[6] Finally, even after receiving advance authorization to travel, they faced a discretionary determination by a CBP officer at a port of entry. Of the applications adjudicated, approximately 78 percent were given travel authorization—more than 180,000 were rejected, 90 Fed. Reg. at 13617—and significant numbers were denied parole at ports of entry. SUF ¶ 30.

By January 2025, approximately 532,000 individuals had received parole through these processes. 90 Fed. Reg. at 13612. These were people who chose legal pathways over dangerous irregular migration to the border. Each came with sponsors who vouched for them. They passed security screening. They obtained work authorization and began contributing to their communities. About half had already filed applications for other immigration benefits—adjustment of status, asylum, or other relief for which Congress had made them eligible. SUF ¶ 8.

Then came the new Administration and the March 25 FRN, which is remarkable not only for what it says but also for what it omits. What the FRN says is troubling enough. The Secretary justified mass truncation primarily on her novel reinterpretation of a provision of the expedited removal authority to cover parolees—a rationale based on a fundamental misreading of the statute. 90 Fed. Reg. at 13619-20. She claimed the "purposes" of parole had been "served" not because of

---

[6] Per the 63-page Form I-134A Reviewers Guide (Doc. No. 128-12), officers considering parole requests were to conduct extensive individualized assessments of each parole application, evaluating individualized humanitarian circumstances including family reunification needs, medical treatment requirements, economic hardships, caregiving responsibilities, and individual vulnerabilities of both beneficiaries and their U.S.-based sponsors. *See, e.g.*, *id.* at 32.

anything about the parolees themselves, but because the new Administration disagreed with the prior one's policy judgments. *Id*. at 13619 n.70.

What the March 25 FRN omits is even more telling. It contains no assessment of whether conditions in Cuba, Haiti, Nicaragua, or Venezuela had improved. It has no evaluation of how mass truncation would affect the hundreds of thousands of people who had ordered their lives around two years of authorized stay. It reflects no consideration of alternatives that might address any legitimate concerns while honoring commitments made; nor does it acknowledge the novelty of the Secretary's expedited removal interpretation. And it has no information at all about parolees.

The administrative record ("AR") Defendants produced in May 2025 confirms these omissions were not oversights but reflections of a decision-making process that never grappled with consequences. The AR consists largely of materials that were already public: executive orders, Federal Register notices, website printouts, news articles. Doc. No. 128-1. Conspicuously absent are, *inter alia*: (i) any assessment of humanitarian conditions, (ii) any evaluation of reliance interests, (iii) any analysis of alternatives, (iv) any evidence of address-reporting noncompliance, and (v) any consideration of the varied individual circumstances that led to each grant of parole.

This Court temporarily stayed the mass truncation on April 14, finding Plaintiffs likely to succeed on the merits. Doc. No. 97. The First Circuit declined to stay that ruling pending appeal. But the Supreme Court, acting on Defendants' emergency application, stayed this Court's order on May 30, 2025, but without providing an explanation. That stay will remain in effect for some time.

Thereafter, the parties briefed and argued Defendants' appeal to the First Circuit, which subsequently issued an opinion vacating this Court's April 14 order. *Doe v. Noem*, 152 F.4th 272 (1st Cir. 2025). The First Circuit held that Plaintiffs had not made the "strong showing of likelihood of success on the merits" required for preliminary relief—a deliberately demanding standard. *Id*.

at 285. Interpreting the parole statute, the Court concluded that its "text and legislative history favor the Government's position" that the "case-by-case" requirement constrains grants but not terminations. *Id*. at 287. On the expedited removal question, the panel declined to definitively interpret 8 U.S.C. § 1225(b)(1)(A)(iii)(II), finding both parties' readings "plausible" and holding only that the Secretary's interpretation was not so unreasonable as to constitute "clear legal error" at the preliminary injunction stage. *Id*. at 288-89. The Court explicitly did not resolve which interpretation was correct. *Id*. at 289. Similarly, the panel held that the FRN's explanation of humanitarian considerations and reliance interests, while "brief," was not necessarily inadequate on the record before it. *Id*. at 289-92. Throughout, the Court emphasized the preliminary posture and the limited scope of its review, noting it was not making final determinations on the merits. *See, e.g.*, *id*. at 292 n.8. Critically, the panel reviewed only the FRN, the Supreme Court's unreasoned stay, and preliminary briefing, but not the administrative record.[7]

## LEGAL STANDARDS

Plaintiffs' motion for summary judgment "tee[s] up" the FRN's mass truncation of CHNV parole for judicial review. *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). An agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citation omitted). This Court reviews legal questions *de novo*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024).

## ARGUMENT

This motion seeks summary judgment on five independent grounds, any one of which warrants vacatur and setting aside the mass truncation: (1) the administrative record conclusively

---

[7] Plaintiffs subsequently filed a petition for rehearing that will be fully briefed as of November 10.

establishes the Secretary's failure to consider required factors; (2) she relied on impermissible factors Congress never intended; (3) the expedited removal rationale was both legally erroneous and, as Defendants have now admitted, pretextual; (4) the Secretary exceeded her statutory authority; and (5) she violated both regulations and due process through inadequate notice.

# I.  THE ADMINISTRATIVE RECORD ESTABLISHES SECRETARY NOEM FAILED TO CONSIDER IMPORTANT FACTORS

When reversing policy, especially one affecting hundreds of thousands of people, an agency bears a heavier burden. It must confront "the facts and circumstances that underlay or were engendered by the prior policy" and provide a "reasoned explanation" for disregarding either. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). The agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020). And it must consider reasonable alternatives "within the ambit of the existing [policy]" and either adopt them or explain their rejection. *Id*. at 30 (citation omitted, alteration in original).

## A.  The AR Establishes that Secretary Noem Ignored the Facts & Circumstances Underlying Prior Policies

The administrative record tells a damning story through what it contains and, more importantly, what it does not. Of the 840 pages that comprise the administrative record, only 162 contained non-public information, SUF ¶ 12, and even those shed no light on the critical questions any reasonable decision-maker would ask. The record contains more pages of news articles—Fox News, CBS News, Washington Times opinion pieces, Newsweek maps, even BBC articles about India—than pages of actual agency analysis. Doc. No. 128-1. This is not the record of reasoned decision-making; it is a Google search masquerading as administrative deliberation.

Compare this record to the record used to establish each of the CHNV processes. Each was justified by extensive documentation of humanitarian crises and significant public benefits. The

administrative records supporting their creation contain hundreds of pages of State Department reports, intelligence assessments, diplomatic cables, and expert analyses documenting the dire conditions in Cuba, Haiti, Nicaragua, and Venezuela. Doc. Nos. 128-14 through 128-17. This documentation supported DHS justification that establishing the Venezuelan parole process was warranted based on "the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro." Doc. No. 24-21 at 10. For Cuba, DHS documented "crippling economic conditions and dire food shortages" alongside government repression of "all forms of dissent." Doc. No. 24-23 at 4, 11. For Haiti, the agency substantiated "escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak" that had "worsened already concerning political, economic, and social conditions." Doc. No. 24-24 at 10. For Nicaragua, DHS verified the Ortega regime "continues to repress and punish all forms of dissent and public criticism." Doc. No. 24-25 at 9; *accord* Doc. No. 128-12 (I-134A Reviewer's Guide) at 3-4.

In contrast, the Secretary's administrative record terminating parole grants for hundreds of thousands of people contains literally nothing—not a single document—evaluating whether these crises persist. SUF ¶¶ 13-16. There is no evidence Secretary Noem checked whether Haiti's gang violence had abated. There is no evidence she considered whether Venezuela's political repression continued. Nor is there evidence she evaluated whether Cuba's economic collapse persisted or Nicaragua's authoritarianism had softened. Remarkably, the AR does not even include the information that DHS considered when it created the CHNV parole processes. SUF ¶¶ 18-25.

This wholesale disregard of evidence is even clearer when the termination is compared to the record supporting each individual parole determination. Each CHNV parolee received individualized consideration based on specific humanitarian needs and public benefits documented in Form I-134A. SUF ¶¶ 28-29. Sponsors were required to explain in the I-134A "why a favorable

7

exercise of discretion is merited for this individual," and agency adjudicators were instructed to consider whether the application involves "[r]ejoining with family," "[m]edical needs or treatment," "[s]evere economic hardship," "civil strife or political unrest," and/or "[v]ulnerabilities of either the beneficiary or a US-based person, including the need to provide caregiving assistance." Doc. No. 128-12 at 32. Yet Secretary Noem cut short 426,151 individual grants of parole with no evidence about the individual parolees or their circumstances. SUF ¶¶ 31-32.

The First Circuit, reviewing at the preliminary injunction stage without the benefit of the administrative record, held the Secretary's "somewhat conclusory" discussion of humanitarian considerations potentially sufficient, particularly given that the notices creating the CHNV processes themselves had a "similarly conclusory" discussion. 152 F.4th at 291. But that preliminary assessment was necessarily tentative, based only on what the Secretary said in the FRN. The AR now reveals that the Secretary's single sentence about humanitarian considerations was not a summary of her analysis—it was the entirety of her consideration. There is no underlying analysis in the administrative record, nor are there any documents that support the conclusion. There is nothing but a single-sentence assertion in the FRN—without evidence, it is a conclusion without consideration. Under longstanding precedent, that is paradigmatically arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52, 56 (1983) (agency acted arbitrarily and capriciously because "there [was] no direct evidence in support of [its] finding[s]" and it "failed to offer the rational connection between facts and judgment required to pass muster"); *accord Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) ("[W]e cannot ignore the disconnect between" the "explanation for agency action" and "what the record reveals about the agency's priorities and decisionmaking process").

**B.  The AR Shows Secretary Noam Failed to Adequately Consider Reliance Interests**

The Supreme Court in *Regents* could not have been clearer: when an agency rescinds a

policy that has "engendered serious reliance interests," it must give them "serious" consideration. 591 U.S. at 30, 34. The Secretary's treatment of reliance interests—one partial paragraph for those 426,151 people[8]—falls short of the legal standard, as the administrative record now makes plain.

While the First Circuit held that Plaintiffs had not made a strong showing that Secretary Noem's explanation was insufficient, it is clear from the administrative record that she did not consider the full range of reliance interests and that what little she said was devoid of underlying substance. For example, nothing in the AR grapples with the fact that allowing parolees to seek humanitarian relief or other immigration benefits was an explicit purpose of the processes, SUF ¶ 9, and that at least half of parolees (212,542 as of March 9) had pending applications for such relief, SUF ¶ 8. The AR has no information about how many parolees had U.S. citizen children enrolled in schools, how many had employment contracts or leases extending through their parole periods, how many were undergoing medical treatment (or caring for those who were), or how many had made other life decisions based on two years of authorized stay. There is likewise nothing in the AR about the impact on third parties who might have relied on the parolees.[9] And though expedited removal was the only basis for overriding the few reliance interests considered, nothing in the AR even acknowledges the remarkable change in the agency's legal interpretation. The Supreme Court has held consistently that ignoring such matters is arbitrary and capricious. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015); *FCC v. Fox Television Stations,*

---

[8] 90 Fed. Reg. at 13619 ("DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States. Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.") (footnote omitted).

[9] Defendants have justified Secretary Noem's cavalier treatment of the reliance interests of employers and landlords with a claim of *caveat emptor*: if third parties employed or contracted with parolees, Defendants say, "they did so at their own risk," Doc. No. 140 at 15, ignoring that such discrimination (in hiring, housing, contracting, etc.) is generally unlawful under federal law.

*Inc.*, 556 U.S. 502, 515 (2009); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996).

Apart from the legal error regarding expedited removal (discussed *infra*), Secretary Noem dismissed reliance interests with the boilerplate assertion that parole is "inherently temporary" and thus would have ended at some point regardless. 90 Fed. Reg. at 13620. This misses the point entirely. The question is not whether parole is permanent but whether parolees and their communities reasonably relied on completing the specific two-year period they were granted, particularly given the legal requirements for early termination and the knowledge that, in the seven decades of similar parole processes, none had ever ended with an *en masse* early revocation of all existing grants. SUF ¶ 27. *Regents* rejected a similar argument: that the temporary nature of deferred action meant DHS did not have to consider reliance interests in ending the Deferred Action for Childhood Arrivals (DACA) program prospectively.[10] 591 U.S. at 30-33.

*Regents* also dispenses with Defendants' argument that agencies need only consider reliance interests created by "longstanding" policies, because that is what was at issue in *Encino Motorcars*, 579 U.S. at 222. Not true; what matters is whether the reliance interests are "serious," *id.*, which can be *informed* by the length of time the policy has been in place, but *Regents* (among others) demonstrates that the policy need not be longstanding: it concerned DHS's 2017 attempt to end DACA, created in 2012. Moreover, here Secretary Noem additionally reversed the agency's longstanding policies and practices regarding parole processes of this nature, under which

---

[10] The First Circuit noted that *Regents* suggested that DHS "did not address the reliance interests of [DACA] beneficiaries in terminating [DACA]." 152 F.4th at 290 (citation omitted). In *Regents*, however, DHS argued both that it did not have to consider reliance interests *and* that had adequately done so regardless. Pet'rs Opening Br., *DHS v. Regents*, 2019 WL 3942900, at *42 (U.S. Aug. 19, 2019) ("[T]he Secretary sufficiently considered the reliance interests of DACA recipients" and "balanced those interests by permitting existing DACA grants to expire according to their stated two-year terms and by allowing a limited window for additional renewals," whereby those with less than six months remaining could renew once for two years); Pet'rs Reply Br., *DHS v. Regents*, 2019 WL 5589031, at *16-17 (U.S. Oct. 28, 2019).

parolees' authorized periods of parole have been allowed to expire naturally and parolees have not been subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). SUF ¶¶ 27, 35.

### C. The AR Demonstrates Secretary Noem Failed to Consider Obvious Alternatives

The administrative record confirms Secretary Noem's complete failure to consider obvious alternatives that would have addressed any legitimate governmental concerns while respecting reliance interests and minimizing disruption. Agencies must consider alternatives "within the ambit" of the existing policy. *Regents*, 591 U.S. at 30; *State Farm*, 463 U.S. at 51. While the FRN says the Secretary considered "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done," or at least giving more than 30 days' notice, 90 Fed. Reg. at 13619-20, there is no evidence of that purported consideration. The AR contains no mention of alternatives whatsoever, and certainly no analysis of relative costs and benefits. Without any evidentiary basis, Secretary Noem's "consideration" of those two alternatives was arbitrary and capricious. *See State Farm*, 463 U.S. at 52-53.

Beyond the alternatives allegedly considered, others "within the ambit" were obvious and numerous. Secretary Noem could have allowed the parolees with pending applications for immigration relief to complete that process. This would have served governmental efficiency (avoiding the considerable expense of removal), humanitarian concerns (protecting those in the pipeline for legal status), and basic fairness (DHS told parolees they could pursue such relief once here). Secretary Noem also could have provided transition periods or conducted a case-by-case review for those with compelling circumstances: serious medical conditions, family caregiving responsibilities, or other humanitarian factors warranting completion of the parole period.[11]

---

[11] Instead, Secretary Noem sought to shift that burden to parolees themselves, saying that she would consider their reprieve requests on a case-by-case basis, upon filing of a new request for parole. 90 Fed. Reg. at 13612. As of Aug. 1, 2025, DHS had granted two such requests. SUF ¶ 36.

The administrative record's silence on these and many other alternatives—including honoring the grant terms—is deafening. There are no memoranda evaluating options. No cost-benefit analyses of available approaches. No assessment of how alternatives might minimize disruption while achieving policy goals. Even the one-page "Decision Document," which might show options considered, instead redacts that information without explanation. Doc. No. 128-5.

* * * * *

In short, the administrative record produced in this case is not the record of an agency grappling with a complex policy decision affecting hundreds of thousands of people. It in no way supports the decisions reflected in the FRN. Rather, it reflects an agency that had already decided what to do and skipped any pretense of reasoned decisionmaking beyond the most superficial.

## II.     SECRETARY NOEM RELIED ON IMPERMISSIBLE FACTORS CONGRESS NEVER INTENDED HER TO CONSIDER

Secretary Noem also affirmatively relied on impermissible considerations. Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. This principle is distinct from the requirement to consider relevant factors; it prohibits agencies from basing decisions on factors that are "arbitrary" or "irrelevant" to the statutory scheme. *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (citation omitted).

Secretary Noem's decision was explicitly intended to prevent CHNV parolees from pursuing meritorious immigration benefits, including applications for family reunification with U.S. citizen relatives. SUF ¶ 33. In the FRN, Secretary Noem expressed frustration that parolees were filing adjustment applications, asylum claims, and other requests for relief. 90 Fed. Reg. at 13616-17. She complained about the "significant downstream consequences" of parolees applying for benefits, including the "strain" on USCIS and immigration courts. *Id*. She stated her intent to cut short their parole to coerce them into abandoning these applications. *Id.*; SUF ¶ 33.

This purpose is directly contrary to Congress' efforts to provide avenues of immigration and other relief to noncitizens, including parolees, in violation of fundamental administrative law principles. In *Judulang*, the Supreme Court (unanimously) invalidated an immigration policy that made deportation decisions based on factors bearing "no relation" to the purposes of the immigration laws or their "rational operation." 565 U.S. at 55-56, 62. The Court explained that "agency action must be based on non-arbitrary, 'relevant factors'" that are tied to statutory purposes; agency action based elsewhere "is arbitrary and capricious." *Id.* at 55 (citation omitted). Here, Secretary Noem used parole truncation to frustrate the very immigration benefits that Congress created, by trying to prevent people from pursuing them notwithstanding the congressional choice to make them available.

Consider the perversity: Congress created various forms of immigration relief—among them, asylum for those fleeing persecution, 8 U.S.C. § 1158; adjustment of status for those with qualifying relationships, 8 U.S.C. § 1255; and TPS for those from troubled countries, 8 U.S.C. § 1254a—and made parolees eligible for these benefits. DHS itself said that allowing CHNV parolees to pursue these benefits was a purpose of the parole processes. SUF ¶ 8. Yet Secretary Noem terminated parole precisely *because* parolees were pursuing these congressionally authorized benefits. Secretary Noem's reliance on this factor—the goal of preventing eligible parolees from obtaining statutory benefits—is not something Congress intended her to consider, and it means her decision was arbitrary and capricious. *Judulang*, 565 U.S. at 55; *State Farm*, 463 U.S. at 43; *see also Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (vacating agency action taken to serve statutory goal of the "efficient removal of aliens with no lawful authorization to remain" because it ignored the statute's "second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution").

## III.    SECRETARY NOEM'S EXPEDITED REMOVAL RATIONALE WAS BOTH LEGALLY ERRONEOUS AND PRETEXTUAL

The Secretary's sole justification for truncating parole—to maximize the number of CHNV parolees she could put through expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), *see* 90 Fed. Reg. at 13620—reveals both fundamental legal error and confessed governmental bad faith. This was not a minor or subsidiary rationale: the sole reason Secretary Noem gave for rejecting the only alternatives she considered was that "[a]ny lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal" because, she said, § 1225(b)(1)(A)(iii)(II) no longer applies once the CHNV parolees "accrue more than two years of continuous presence in the United States." *Id.*

### A.  The Expedited Removal Rationale Rested on Fundamental Legal Error

This rationale suffers a fundamental legal flaw: CHNV parolees are not subject to expedited removal at all, regardless of how long they remain in the United States. The statutory authority the Secretary relies upon applies only if the noncitizen "has *not* been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added). By definition, CHNV parolees have been "paroled into the United States." They are therefore categorically excluded from expedited removal, as this Court correctly held. Doc. No. 97 at 33. Since this Court reached that conclusion, federal courts across the country have agreed in at least eight additional cases.[12] Notably, this includes a case (*CHIRLA*) in which the District Court for the District of Columbia—

---

[12] *Perez Guerra v. Woosley*, 2025 WL 3046187, at *3-4 (W.D. Ky. Oct. 31, 2025); *E.V. v. Raycraft*, 2025 WL 2938594, at *4 (N.D. Ohio Oct. 16, 2025); *Espinoza v. Kaiser*, 2025 WL 2675785, at *5 (E.D. Cal. Sept. 18, 2025); *Munoz Materano v. Arteta*, 2025 WL 2630826, at *11 (S.D.N.Y. Sept. 12, 2025); *Salazar v. Kaiser*, 2025 WL 2456232, *4 (E.D. Cal. Aug. 26, 2025); *Garcia v. Andrews*, 2025 WL 2420068, at *4 (E.D. Cal. Aug. 21, 2025); *Castellon v. Kaiser*, 2025 WL 2373425, at *4 (E.D. Cal. Aug. 14, 2025); *Coal. for Humane Immigrant Rts. v. Noem* ("*CHIRLA*"), __ F. Supp. 3d __, 2025 WL 2192986, at *12 (D.D.C. Aug. 1, 2025), *stay denied*, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025).

which has exclusive statutory jurisdiction over challenges to the implementation of expedited removal, 8 U.S.C. § 1252(e)(3)(A)—granted a stay under 5 U.S.C. § 705 of several agency policies (including the March 25 FRN) to the extent they subjected parolees to expedited removal under either prong of the expedited removal statute (both the provision noted above and the "arriving alien" provision), which the D.C. Circuit refused to stay pending appeal.

The First Circuit, reviewing Secretary Noem's rationale at the preliminary injunction stage, found both parties' interpretations "plausible" and declined to definitively resolve which was correct. 152 F.4th at 288-89. But that necessarily tentative assessment has been overtaken by overwhelming judicial consensus. Not a single court examining this issue has agreed with Secretary Noem that former parolees like those whose parole she cut short in the March 25 FRN are subject to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[13]

## B. The Expedited Removal Rationale Was Pretextual in Any Event

Even more damning than the legal error is Defendants' own admission that this rationale did not actually make a difference in the Secretary's decision, conceding its pretextual nature. Before the Supreme Court, Defendants characterized the expedited removal issue as central to their emergency stay application, arguing that immediate relief was essential precisely to preserve expedited removal authority before the two-year clock ran out for more parolees. Defendants warned that this Court's April 14 order "stymie[d]" efforts to "expeditiously remov[e] aliens who lack a lawful basis to remain" and "effectively compels" the use of regular, non-expedited removal proceedings. Application for Stay at 6, 26; *see also* Reply in Support of Application for Stay at 15 (arguing "the district court's order is inimical" to Defendants' interest in subjecting CHNV

---

[13] Even were the statute in "equipoise," the "longstanding principle of construing it in favor of the alien kicks into gear." *Castillo v. Bondi*, 140 F.4th 777, 781 (6th Cir. 2025) (Sutton, C.J.).

parolees to expedited removal).[14] Before *this* Court, however, and required to fully defend their statutory interpretation, Defendants concede that Secretary Noem did not actually believe that letting the grants of parole expire naturally would effect on her authority to subject them to expedited removal. SUF ¶ 34. Defendants have argued the Court should simply ignore this rationale because Secretary Noem would have done the same thing anyway. Doc. No. 140 at 13.

The government cannot have it both ways. Either expedited removal was the justification for the decision to summarily truncate parole grants for hundreds of thousands of people, or it wasn't. If it was the Secretary's reason, the decision fails for legal error, as explained above. If it didn't matter, the decision fails for pretext. *Dep't of Com.*, 588 U.S. at 785-86 (pretext invalidates agency action because "[a]ccepting contrived reasons would defeat the purpose of the enterprise").

Here, the evidence of pretext is stronger than in *Department of Commerce*. There, the Court inferred pretext from the "incongruent" circumstantial evidence—timing, procedural irregularities, and evolving explanations. 588 U.S. at 784-85. Here, Defendants have admitted—argued, even— that Secretary Noem's sole rationale for truncating grants actually had no impact on her decision. "If judicial review is to be more than an empty ritual, it must demand something better" than what Secretary Noem has offered. *Id.* at 785.

## IV.    SECRETARY NOEM EXCEEDED HER STATUTORY AUTHORITY

The parole statute constrains the Secretary's authority through both procedural and substantive requirements. While the First Circuit addressed only the procedural question at the preliminary stage, the substantive constraints independently render the mass truncation unlawful.

### A.  Secretary Noem Violated the Substantive "Purposes Have Been Served" Standard

The parole statute provides that parole ends "when the purposes of such parole shall, in the

---

[14] *Available at* https://www.supremecourt.gov/docket/docketfiles/html/public/24a1079.html.

opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5)(A). This language establishes a substantive standard for termination, and its meaning is not abstract. The statute incorporates the "purposes" of the parole grant in question ("such parole") and makes the termination of that parole contingent on the Secretary determining that its purposes "have been served." *Id.* Here, Secretary Noem neither made nor had the basis to make that determination.

In cutting short the parole of some 426,151 people from four different countries with their own distinct challenges, the March 25 FRN said two things of potential relevance. One, in the "constructive notice" discussion, the FRN says "the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served." 90 Fed. Reg. at 13620. This is not the determination required by the statute; it is a partial recitation of DHS's regulation on terminating an individual grant of parole before its natural expiration.[15]

Two, in a footnote, the March 25 FRN says:

> As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia*, the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.

90 Fed. Reg. 13619 n.70. This determination is also not that the purposes of the grants of parole have been served; rather, it is Secretary Noem's statement that she does not believe that the parole processes are justified by the border security concerns that animated the prior Administration given

---

[15] 8 C.F.R. § 212.5(e)(2)(i) ("On notice. In cases not covered by paragraph (e)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, *neither humanitarian reasons nor public benefit warrants the continued presence* of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole.") (emphasis added).

their domestic impact and this Administration's foreign policy goals. Although relevant to arbitrary and capricious review, it is not a determination that the purposes of the parole grants have been served; it is (at best) a declaration that Secretary Noem would not have created the processes in the first place and so will not continue them. In conflating whether to continue the processes with whether the purposes of individual grants thereunder "have been served," the Secretary repeats a common agency error: treating a rationale applicable to only part of a policy as sufficient to justify the larger agency action. *See, e.g.*, *Regents*, 591 U.S. at 28; *State Farm*, 463 U.S. at 51.

Were there any doubt, the categorical absence of relevant information in the AR makes clear Secretary Noem never determined whether the purposes of the grants of parole have been served. As noted above, the AR does not overlap at all with the administrative records for any of the CHNV parole processes, each of which was unique. SUF ¶¶ 18-25. Similarly, Secretary Noem knew nothing about the bases of the individual grants. SUF ¶¶ 31-32. There is thus no question that the Secretary did not determine that the "purposes of such parole . . . have been served," and regardless of whether that inquiry is made the level of the individual (as the statutory text indicates), at the country-specific level, *or* as to the four processes writ large. She thus exceeded her authority by not making the required determination, as several courts have recently held in these and similar circumstances.[16]

## B. Secretary Noem Violated the Procedural Case-by-Case Requirement

While Plaintiffs respectfully disagree with the First Circuit's holding that the "case-by-

---

[16] *Salazar v. Casey*, 2025 WL 3063629, at *5 (S.D. Cal. Nov. 3, 2025); *Noori v. Larose*, 2025 WL 2800149, at *13 (S.D. Cal. Oct. 1, 2025); *Savane v. Francis*, 2025 WL 2774452, at *8 (S.D.N.Y. Sept. 28, 2025); *Munoz Materano v. Arteta*, 2025 WL 2630826, at *14 (S.D.N.Y. Sept. 12, 2025); *Orellana v. Francis*, 2025 WL 2402780, at *5-6 (E.D.N.Y. Aug. 19, 2025); *Mata Velasquez v. Kurzdorfer*, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025); *Y-Z-L-H v. Bostock*, 2025 WL 1898025, at *13 (D. Or. July 9, 2025).

case" requirement applies only to grants and not terminations, 152 F.4th at 287, Plaintiffs preserve this argument for appeal. The statutory text, properly read, requires individualized consideration for both grants and terminations, as several other courts have also recently held.[17]

## V.    THE SECRETARY VIOLATED BOTH REGULATIONS AND DUE PROCESS THROUGH INADEQUATE NOTICE

The Secretary's method of implementing the mass truncation violated both regulatory requirements and constitutional due process. These violations are not mere technicalities—they go to the heart of fair treatment and the rule of law.

DHS's own regulation is clear: parole "shall be terminated upon written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i). The mandatory "shall" admits of no exception for administrative convenience or mass terminations. The requirement that "written notice" be served "on the alien" demands individual notice, not constructive notice through publication. When agencies promulgate regulations providing procedural protections, they must follow them, particularly when the regulation protects individual rights. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). The requirement of individual written notice protects parolees' ability to understand their status, make informed decisions, and pursue available remedies. The Secretary's violation of DHS's regulation justifies vacating her decision.

The Constitution also demands fair notice before the government deprives individuals of protected interests. Due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.

---

[17] *Noori*, 2025 WL 2800149, at *13; *Savane*, 2025 WL 2774452, at *8; *Munoz Materano*, 2025 WL 2630826, at *14; *Orellana*, 2025 WL 2402780, at *5-6; *Mata Velasquez*, 2025 WL 1953796, at *11; *Y-Z-L-H*, 2025 WL 1898025, at *13.

306, 314 (1950). Publication in the Federal Register satisfies due process only when individual notice is impossible or impracticable. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983). Here, individual notice was entirely practicable. DHS had mailing addresses for the CHNV parolees, who were legally required (upon criminal penalty) to keep current. 8 U.S.C. § 1306(b).

The Secretary's sole justification for abandoning individual notice was "potential noncompliance with change-of-address reporting requirements." 90 Fed. Reg. at 13620. The AR confirms this was rank speculation; it contains not a shred of evidence in support. SUF ¶ 17 When stripping immigration benefits from 426,151 people, due process demands more, as many courts have held regarding DHS's recent actions regarding CHNV and other parolees.[18]

## CONCLUSION

The class members followed the rules of the U.S. government and came here lawfully to reunite with family and/or to escape, even temporarily, the instability, dangers, and deprivations of their home countries. The Secretary is admittedly under no obligation to continue the CHNV parole process that brought class members here, but she nonetheless must respect required procedures and apply the law correctly before stripping them of status, upending their lives, and causing mass disruption to their families, employers, and communities. Plaintiffs respectfully request that the Court grant their motion, enter judgment on Claims 1, 3, 5, 6, and 7, and vacate the mass truncation of CHNV parole.

---

[18] *Salazar v. Casey*, 2025 WL 3063629, at *3-5; *Noori*, 2025 WL 2800149, at *9-11; *Savane*, 2025 WL 2774452, at *6-10; *Munoz Materano*, 2025 WL 2630826, at *11-16; *Mata Velasquez*, 2025 WL 1953796, at *11-17; *Y-Z-L-H*, 2025 WL 1898025, at *13.

Dated: November 10, 2025

Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com

Anwen Hughes (*pro hac vice*)
Inyoung Hwang (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Justin B. Cox, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: November 10, 2025

/s/ Justin B. Cox
Justin B. Cox