UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, *et. al.*,<br>Plaintiff,<br>v.<br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al.*,<br>Defendants. | Civil Action No. 1:25-cv-10495-IT<br>**CERTIFICATION OF ADMINISTRATIVE RECORD** |

**CERTIFICATION**

I, Juliana Blackwell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am employed with the U.S. Department of Homeland Security ("DHS"), as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records. I have held this position since August 2019.

2. I certify that, to the best of my knowledge, information, and belief, the documents listed in the accompanying Index and annexed hereto constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the Federal Register Notice entitled *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on: May 23, 2025

Juliana Blackwell

Deputy Executive Secretary

**Certified Administrative Record Index:**
***Termination of Parole Processes for Cubans, Haitians,***
***Nicaraguans, and Venezuelans,* 90 Fed. Reg. 13611 (Mar. 25, 2025)**

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00001 | Adam Shaw, *Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns*, Fox News (Oct. 31, 2024) |
| CHNV-FRN-00005 | Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Online Request to be a Supporter and Declaration of Financial Support, 89 FR 104557 (Dec. 23, 2024) |
| CHNV-FRN-00009 | America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) |
| CHNV-FRN-00010 | Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program*, CBS News (Oct. 4, 2024) |
| CHNV-FRN-00015 | Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) |
| CHNV-FRN-00154 | Dep't of Homeland Sec'y, Decision Document, USCIS Notice: Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 21, 2025) |
| CHNV-FRN-00155 | Dep't of Homeland Sec'y, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans |
| CHNV-FRN-00204 | Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025) |
| CHNV-FRN-00206 | Determination Foreign Affairs Functions of the United States, 90 Fed. Reg. 12200 (Mar. 14, 2025) |
| CHNV-FRN-00207 | Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time*, Ctr. for Immigr. Stud. (July 26, 2024) |
| CHNV-FRN-00213 | EOIR, Adjudication Statistics, Pending Cases, New Cases, and Total Completions (Jan. 16, 2025) |
| CHNV-FRN-00214 | Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025) |
| CHNV-FRN-00216 | Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025) |
| CHNV-FRN-00222 | Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025) |
| CHNV-FRN-00225 | Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025) |
| CHNV-FRN-00227 | Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data Caseloads and the Pending Cases Backlog (2025) |
| CHNV-FRN-00232 | Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023) |
| CHNV-FRN-00235 | Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023) |

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00237 | Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023) |
| CHNV-FRN-00252 | Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023) |
| CHNV-FRN-00264 | Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023) |
| CHNV-FRN-00277 | Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022) |
| CHNV-FRN-00288 | Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023) |
| CHNV-FRN-00292 | Interim Staff Report of H. Comm. on the Judiciary, The Biden-Harris Administration's CHNV Parole Program Two Years Later: A Fraud-Ridden, Unmitigated Disaster (Nov. 20, 2024) |
| CHNV-FRN-00306 | Jason Richwine, *The Cost of Welfare Use by Immigrant and Native Households*, Ctr. for Immigr. Stud. (May 2016) |
| CHNV-FRN-00324 | Memorandum from Acting Sec'y Huffman to Component Heads, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) |
| CHNV-FRN-00326 | Memorandum from Acting Sec'y Huffman to Component Heads, Exercising Appropriate Discretion Under Parole Authority (Jan. 20, 2025) |
| CHNV-FRN-00328 | Memorandum from Andrew Davidson, Acting Deputy Dir., U.S. Citizenship & Immigr. Servs. to Assoc. Dirs., Administrative Hold on All USCIS Benefit Requests filed by Parolees Under the Uniting for Ukraine (U4U) Process, Processes for Haitians, Cubans, Nicaraguans, and Venezuelans (CHNV) Process, or Family Reunification Parole (FRP) Process (Feb. 14, 2025) |
| CHNV-FRN-00331 | Memorandum from Graham Dudley, Dir., U.S. Customs & Border Prot. to File, Impact of the Parole Programs for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 14, 2025) |
| CHNV-FRN-00336 | Memorandum from Ray Provencio, Acting Exec. Dir., U.S. Customs & Border Prot. to Exec. Dirs., Implementation of Active Executive Orders - January 27 2025 (Jan. 27, 2025) |
| CHNV-FRN-00338 | Meryl Sebastian, *Trump says India 'will do what's right' on illegal immigration*, BBC (Jan. 27, 2025) |
| CHNV-FRN-00342 | Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Pol'y Inst. (Aug. 1, 2024) |
| CHNV-FRN-00350 | Nick Mordowanec, *Map Shows Hotspots for Migrants Flying Into US*, NEWSWEEK (May 1, 2024) |
| CHNV-FRN-00367 | *Panama Receives First US Deportation Flight Under Trump Administration*, Tico Times (Feb. 16, 2025) |
| CHNV-FRN-00371 | Proclamation No. 10773, Securing the Border, 89 Fed. Reg. 48487 (June 7, 2024) |
| CHNV-FRN-00378 | Proclamation No. 10817, Amending Proclamation 10773, 89 Fed. Reg. 80351 (Oct. 2, 2024) |
| CHNV-FRN-00381 | Proclamation No. 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 29, 2025) |

| **Starting Bates No.** | **Document Title** |
|---|---|
| CHNV-FRN-00384 | Securing the Border FR, 89 FR 81156 (Oct. 7, 2024) |
| CHNV-FRN-00514 | Securing the Border IFR, 89 FR 48710 (June 7, 2024) |
| CHNV-FRN-00577 | Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards*, Wash. Times (Aug. 2, 2024) |
| CHNV-FRN-00586 | Stephen Dinan, *Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program*, Wash. Times (Nov. 20, 2024) |
| CHNV-FRN-00597 | The White House, Briefings & Statements, Statement From the Press Secretary (Jan. 26, 2025) |
| CHNV-FRN-00599 | The White House, Briefings & Statements, Readout of President Donald J. Trump's Call with President Nayib Bukele (Jan. 23, 2025) |
| CHNV-FRN-00602 | U.S. Citizenship and Immigr. Serv., Asylum Div., Performance Data, Monthly Statistics Report, Fiscal Year 2025 (Jan. 28, 2025) |
| CHNV-FRN-00603 | U.S. Citizenship and Immigr. Serv., Check Case Processing Times (acessed Feb. 22, 2025) |
| CHNV-FRN-00607 | U.S. Citizenship and Immigr. Serv., Form I-134A NON CONFIRM Notice |
| CHNV-FRN-00608 | U.S. Citizenship and Immigr. Serv., Fraud Detection & Nat'l Sec. Directorate, *I-134A Filing Trend Analysis* (May 10, 2024) |
| CHNV-FRN-00620 | U.S. Citizenship and Immigr. Serv., Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024) |
| CHNV-FRN-00642 | U.S. Citizenship and Immigr. Serv., Immigr. Recs. & Identity Servs. Directorate, *Form I-134A - Reviewers Guide* (Dec. 2, 2024) |
| CHNV-FRN-00705 | U.S. Citizenship and Immigr. Serv., Immigr. Recs. & Identity Servs. Directorate, *Form I-134A - Reviewers Guide* (July 9, 2024) |
| CHNV-FRN-00768 | U.S. Citizenship and Immigr. Serv., *Notice Of Revocation Of Parole-Based Employment Authorization* (Mar. 13, 2025) |
| CHNV-FRN-00769 | U.S. Citizenship and Immigr. Serv., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Jan. 20, 2025) |
| CHNV-FRN-00784 | U.S. Citizenship and Immigr. Serv., *Special Humanitarian Parole Program Dashboard* (Feb. 13, 2025) |
| CHNV-FRN-00785 | U.S. Citizenship and Immigr. Serv., *Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics* (Feb. 9, 2025) |
| CHNV-FRN-00793 | U.S. Citizenship and Immigr. Serv., *Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics* (Mar. 9, 2025) |
| CHNV-FRN-00794 | U.S. Citizenship and Immigr. Serv., Update on Form I-134A (Jan. 28, 2025) |
| CHNV-FRN-00795 | U.S. Customs & Border Prot., Carrier Liaison Program, Executive Order on Securing Our Borders (Jan. 22, 2025) |
| CHNV-FRN-00796 | U.S. Customs & Border Prot., Carrier Liaison Program, Updated Guidance: Executive Order on Securing Our Borders (Jan. 24, 2025) |
| CHNV-FRN-00797 | U.S. Customs & Border Prot., Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025) |

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00801 | U.S. Dep’t of Homeland Sec’y, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025) |
| CHNV-FRN-00802 | U.S. Dep’t of Homeland Sec’y, Off. of Homeland Sec. Stats., Data Table for CHNV Notice (Feb. 26, 2025) |
| CHNV-FRN-00803 | U.S. Dep't of Homeland Sec'y, Off. of Homeland Sec. Stats., CBP Encounters (accessed Jan. 29, 2025) |
| CHNV-FRN-00812 | U.S. Dep't of Homeland Sec'y, Off. of Homeland Sec. Stats., Immigration Enforcement and Legal Processes Monthly Tables (Jan. 16, 2025) |
| CHNV-FRN-00823 | U.S. Dep’t of State, Off. of the Spokesperson, Readout, Secretary Rubio’s Meeting with Panamanian President Mulino (Feb. 2, 2025) |
| CHNV-FRN-00826 | U.S. Dep’t of State, Off. of the Spokesperson, Readout, Secretary Rubio’s Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) |
| CHNV-FRN-00829 | U.S. Dep’t of State, Press Statement, Priorities and Mission of the Second Trump Administration’s Department of State (Jan. 22, 2025) |
| CHNV-FRN-00832 | U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States*, 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). |
| CHNV-FRN-00833 | Agency Information Collection Activities; Revision of an Existing Collection of Information; Advance Travel Authorization (ATA), 88 FR 62810 (Sept. 13, 2023). |

Print Close

# Biden admin faces mounting pressure to dismantle migrant parole program amid 'stress' on small towns

By Adam Shaw

Published October 31, 2024

Fox News

**FIRST ON FOX**: Pressure is growing on the Biden administration to shut down its migrant travel program for four nationalities, as Republicans say migrants from those countries have caused "stress and burdens" on communities throughout the U.S.

Twenty-seven lawmakers, led by Reps. Guy Reschenthaler, R-Pa., and Chip Roy, R-Texas, have written to Department of Homeland Security (DHS) Secretary Alejandro Mayorkas calling for the end to what they say is an "unlawful" parole process for Cubans, Haitians, Nicaraguans and Venezuelans (CHNV).

The program allows up to 30,000 nationals each month to enter the U.S. via humanitarian parole from those four countries after receiving advance travel authorization. More than half a million nationals have entered as part of the program, which is part of the effort to expand "lawful pathways" by the administration.

However, the lawmakers note communities across the U.S. that have reported intense strain due to an influx of migrants from those countries, particularly Haiti.

**HAITIAN MIGRANTS OVERWHELMING SMALL INDIANA TOWN: 'IT'S JUST OVERRUN'**



Pennsylvania Rep. Guy Reschenthaler speaking to Fox News Digital. (FOX NEWS DIGITAL )

"While the United States faces an unprecedented crisis, created by the Biden-Harris Administration, at our southern border, nearly 530,000 inadmissible aliens have entered the U.S. through the CHNV program since January 2023 alone. This decision has placed significant financial stress and burdens on communities across the United States, including Charleroi, Pennsylvania; Springfield, Ohio; and Logansport, Indiana," they write.

Fox spoke to residents in Charleroi, some of whom say they have seen significant pressure due to Haitian migration, including on schools and other services. In Logansport, residents have said they have been "overrun" as the population has grown by 20-30% since 2021, mostly from Haitians.

reschenthaler-roy-letter-%E2%80%94-final-1.pdf

CHNV-FRN-00001

Teschenthaler-roy-letter-%E2%80%94-final-1.pdf

**PDF reader has been disabled in Microsoft Edge**

If you want to open the file instead of downloading it:

1. Go to **Settings** > **Site Permissions** > **PDF Documents**.
2. Turn off **Always download PDF files** and refresh this page.

Download file

Meanwhile, the Biden administration has extended Temporary Protected Status (TPS) for Haitians and Venezuelans in the U.S., meaning many arrivals are protected from deportation and can receive work permits.

The lawmakers say that, according to 25 governors, the administration has "failed to communicate arrival times, duration of residency, legal status, and locations of CHNV parolees while also creating 'considerable confusion and alarm among local officials and the general public.'"

**SWING STATE OFFICIAL WARNS VILLAGE STRUGGLING WITH FINANCIAL LOSSES AFTER INFLUX OF ILLEGAL IMMIGRANTS**



This split shows migrants in Mexico, right, and the town of Logansport, Indiana. (Fox News | Photo by Christian Torres Chavez/Anadolu Agency via Getty Images)

They also note that the Biden administration paused issuing authorizations briefly after fraud was found among sponsor applications in the program. Recently, the Biden administration said it would not be renewing paroles for arrivals but would still be accepting new applications.

"We call on the administration to end the unlawful, fraud-filled CHNV program and curtail TPS and other immigration relief provided to aliens paroled through CHNV. Without doing so, the Biden-Harris Administration's immigration policies will continue to place significant burdens on communities across our nation," they say.

The DHS said it "responds to congressional correspondence directly via official channels, and the Department will continue to respond to congressional oversight."

**HAITIAN MIGRATION ROILS TOWN IN KEY BATTLEGROUND STATE WITH SIGNS OF PRO-TRUMP SUPPORT ON THE RISE**

Meanwhile, officials have stressed that CHNV processes are a "safe and orderly way" to reach the U.S. and have been linked to a

99% drop in encounters between ports of entry at the border from those nationalities.

They have stressed that migrants are responsible for their own travel and that DHS does not select their final destination, although they are vetted by multiple databases and not allowed in if they do not pass that process.

The agency says it is "working with communities on their unique situations, and developing new efficiencies that speed up the work authorization process and providing on-the-ground immigration services to migrants who are eligible to apply for a work permit but have not yet done so."

Officials have also noted that more than $650 million has been allocated to support communities receiving migrants throughout the U.S. by DHS.

**CLICK HERE TO GET THE FOX NEWS APP**

The letter comes as migration and related border security has become a top issue in the election. Former President Donald Trump has promised to shut down parole programs if allowed into office. This week, Rep. Jim Banks, R-Ind., introduced legislation that would limit the number of parolees to 1,000 a year and curtail the use of TPS.

Vice President Kamala Harris has pledged to sign a border security bill if elected while also renewing her calls for a more sweeping piece of legislation that includes a pathway to citizenship for illegal immigrants -- including TPS recipients.

Adam Shaw is a politics reporter for Fox News Digital, primarily covering immigration and border security.

He can be reached at adam.shaw2@fox.com or on Twitter.

Print Close

**URL**

https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

Federal Register / Vol. 89, No. 246 / Monday, December 23, 2024 / Notices 104557

which the Section 321 exemption is claimed, either through the submission of Type 86 entries or for entry by presenting the manifest under 19 CFR 143.23(j){3) and 143.26(b), are required to have an LVSS bond on file in the Automated Commercial Environment (ACE). This bond also will be a requirement for all applicants for newly established facilities used to process shipments for which the Section 321 exemption is claimed.

The bond will be transmitted to CBP electronically, via email, to the Office of Finance—Revenue Division and be manually entered into ACE eBond.

There are no changes being made to the CBP Form 5297.

*Type of Information Collection:* 5297 Power of Attorney.

*Estimated Number of Respondents:* 500.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 500.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 125.

*Type of Information Collection:* 301 Customs Bond.

*Estimated Number of Respondents:* 609,392.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 609,392.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 152,348.

*Type of Information Collection:* LVSS Specific Instruction Bond.

*Estimated Number of Respondents:* 700.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 700.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 175.

Dated: December 18, 2024.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2024–30614 Filed 12–20–24; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[OMB Control Number 1615–0157]**

## Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Online Request to be a Supporter and Declaration of Financial Support

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invites the general public and other Federal agencies to comment upon this proposed extension of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until February 21, 2025.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0157 in the body of the letter, the agency name and Docket ID USCIS–2023–0004. Submit comments via the Federal eRulemaking Portal website at *https://www.regulations.gov* under e-Docket ID number USCIS–2023–0004.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, telephone number (240) 721–3000 (This is not a toll-free number. Comments are not accepted via telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *https://www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**SUPPLEMENTARY INFORMATION:**

### Comments

You may access the information collection instrument with instructions or additional information by visiting the Federal eRulemaking Portal site at: *https://www.regulations.gov* and entering USCIS–2023–0004 in the search box. Comments must be submitted in English, or an English translation must be provided. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *https://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Online Request to be a Supporter and Declaration of Financial Support.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–134A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses Form I–134A to determine whether certain U.S.-based individuals have sufficient financial resources and access to those funds to support the beneficiary named on the Form I–134A for the duration of their temporary stay in the United States, as well as to obtain information concerning whether the beneficiary merits a favorable exercise of discretion and whether parole of the beneficiary would serve urgent humanitarian reasons or significant public benefit under the statutory parole standard. Currently, Form I–134A is used for the Uniting for Ukraine (U4U) process; the processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV); and the Cuban, Colombian, Ecuadorian, Guatemalan, Haitian, Honduran, and Salvadoran family reunification parole (FRP) processes.

Form I–134A is filed by a U.S.-based individual (the potential supporter) to request to be a supporter, agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States, and to provide information concerning why the beneficiary warrants a discretionary grant of parole. Form I–134A is filed online.

USCIS will require the submission of biometrics from all potential supporters and co-supporters filing the Form I–134A, to verify the potential supporter's identity, obtain new or updated background checks, and produce any necessary documentation related to the supporter's support of the beneficiary.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–134A is 1,373,600 and the estimated hour burden per response is 2.60 hours; the estimated total number of respondents for the information collection Biometrics services is 1,288,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,078,320 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.00.

Dated: December 19, 2024.

**Samantha L. Deshommes,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2024–30732 Filed 12–20–24; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7092–N–36]**

## Privacy Act of 1974; System of Records

**AGENCY:** Office of Multifamily Housing, HUD.

**ACTION:** Rescindment of a system of records notice.

**SUMMARY:** The Department of Housing and Urban Development (HUD) is issuing a public notice of its intent to rescind the Application Submission and Processing System (ASAP). During a routine review of the Office of Multifamily Housing (MFH) system of records notices, it was determined that this system of records is no longer necessary because the ASAP development project was terminated, and it was never implemented into production.

**DATES:** December 23, 2024. This proposed action will be effective immediately upon publication.

**ADDRESSES:** You may submit comments, identified by docket number by one of the following methods:

*Federal e-Rulemaking Portal: http://www.regulations.gov.* Follow the instructions provided on that site to submit comments electronically.

*Fax:* 202–619–8365.

*Email: www.privacy@hud.gov.*

*Mail:* Attention: Privacy Office; LaDonne White, Chief Privacy Officer; The Executive Secretariat; 451 Seventh Street SW, Room 10139; Washington, DC 20410–0001.

*Instructions:* All submissions received must include the agency name and docket number for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov.* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** LaDonne White, The Privacy Office, 451 Seventh Street SW, Room 10139; Washington, DC 20410–0001; telephone number (202) 708–3054 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

**SUPPLEMENTARY INFORMATION:** The Application Submission and Processing System (ASAP) was being developed to provide an automated underwriting solution to support application processing, to track MFH insurance applications from initial endorsement through final closing, and to replace the MFH Development Application Processing System (DAP). The Deputy Assistant Secretary for Multifamily Housing Programs, Office of Housing/Federal Housing Administration, Department of Housing and Urban Development, presents the rescindment of the ASAP Privacy Act System of Records Notice (SORN), due to the termination of the system development, modernization and enhancement (DME) project. Records are no longer maintained by MFH and have run the record retention period. All tests and other data containing PII used in development have been deleted in accordance with the NARA records schedule.

#### SYSTEM NAME AND NUMBER:

Application Submission and Processing System (ASAP), HUD/MFH–02

#### HISTORY:

[Docket Number FR–5763–N–08], on September 17, 2014, at 72 FR 55824.

**LaDonne White,**

*Chief Privacy Officer, Office of Administration.*

[FR Doc. 2024–30490 Filed 12–20–24; 8:45 am]

BILLING CODE P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7086–N–30]**

## 60-Day Notice of Proposed Information Collection: Request for Prepayment of Section 202 or 202/8 Project; OMB Control No.: 2502–0554

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection

which the Section 321 exemption is claimed, either through the submission of Type 86 entries or for entry by presenting the manifest under 19 CFR 143.23(j){3) and 143.26(b), are required to have an LVSS bond on file in the Automated Commercial Environment (ACE). This bond also will be a requirement for all applicants for newly established facilities used to process shipments for which the Section 321 exemption is claimed.

The bond will be transmitted to CBP electronically, via email, to the Office of Finance—Revenue Division and be manually entered into ACE eBond.

There are no changes being made to the CBP Form 5297.

*Type of Information Collection:* 5297 Power of Attorney.

*Estimated Number of Respondents:* 500.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 500.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 125.

*Type of Information Collection:* 301 Customs Bond.

*Estimated Number of Respondents:* 609,392.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 609,392.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 152,348.

*Type of Information Collection:* LVSS Specific Instruction Bond.

*Estimated Number of Respondents:* 700.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 700.

*Estimated Time per Response:* 15 minutes.

*Estimated Total Annual Burden Hours:* 175.

Dated: December 18, 2024.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2024–30614 Filed 12–20–24; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[OMB Control Number 1615–0157]**

## Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Online Request to be a Supporter and Declaration of Financial Support

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invites the general public and other Federal agencies to comment upon this proposed extension of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until February 21, 2025.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0157 in the body of the letter, the agency name and Docket ID USCIS–2023–0004. Submit comments via the Federal eRulemaking Portal website at *https://www.regulations.gov* under e-Docket ID number USCIS–2023–0004.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, telephone number (240) 721–3000 (This is not a toll-free number. Comments are not accepted via telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *https://www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**SUPPLEMENTARY INFORMATION:**

### Comments

You may access the information collection instrument with instructions or additional information by visiting the Federal eRulemaking Portal site at: *https://www.regulations.gov* and entering USCIS–2023–0004 in the search box. Comments must be submitted in English, or an English translation must be provided. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *https://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Online Request to be a Supporter and Declaration of Financial Support.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–134A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses Form I–134A to determine whether certain U.S.-based individuals have sufficient financial resources and access to those funds to support the beneficiary named on the Form I–134A for the duration of their temporary stay in the United States, as well as to obtain information concerning whether the beneficiary merits a favorable exercise of discretion and whether parole of the beneficiary would serve urgent humanitarian reasons or significant public benefit under the statutory parole standard. Currently, Form I–134A is used for the Uniting for Ukraine (U4U) process; the processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV); and the Cuban, Colombian, Ecuadorian, Guatemalan, Haitian, Honduran, and Salvadoran family reunification parole (FRP) processes.

Form I–134A is filed by a U.S.-based individual (the potential supporter) to request to be a supporter, agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States, and to provide information concerning why the beneficiary warrants a discretionary grant of parole. Form I–134A is filed online.

USCIS will require the submission of biometrics from all potential supporters and co-supporters filing the Form I–134A, to verify the potential supporter's identity, obtain new or updated background checks, and produce any necessary documentation related to the supporter's support of the beneficiary.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–134A is 1,373,600 and the estimated hour burden per response is 2.60 hours; the estimated total number of respondents for the information collection Biometrics services is 1,288,000 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,078,320 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.00.

Dated: December 19, 2024.

**Samantha L. Deshommes,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2024–30732 Filed 12–20–24; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7092–N–36]**

### Privacy Act of 1974; System of Records

**AGENCY:** Office of Multifamily Housing, HUD.

**ACTION:** Rescindment of a system of records notice.

**SUMMARY:** The Department of Housing and Urban Development (HUD) is issuing a public notice of its intent to rescind the Application Submission and Processing System (ASAP). During a routine review of the Office of Multifamily Housing (MFH) system of records notices, it was determined that this system of records is no longer necessary because the ASAP development project was terminated, and it was never implemented into production.

**DATES:** December 23, 2024. This proposed action will be effective immediately upon publication.

**ADDRESSES:** You may submit comments, identified by docket number by one of the following methods:

*Federal e-Rulemaking Portal: http://www.regulations.gov.* Follow the instructions provided on that site to submit comments electronically.

*Fax:* 202–619–8365.

*Email: www.privacy@hud.gov.*

*Mail:* Attention: Privacy Office; LaDonne White, Chief Privacy Officer; The Executive Secretariat; 451 Seventh Street SW, Room 10139; Washington, DC 20410–0001.

*Instructions:* All submissions received must include the agency name and docket number for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov.* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** LaDonne White, The Privacy Office, 451 Seventh Street SW, Room 10139; Washington, DC 20410–0001; telephone number (202) 708–3054 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

**SUPPLEMENTARY INFORMATION:** The Application Submission and Processing System (ASAP) was being developed to provide an automated underwriting solution to support application processing, to track MFH insurance applications from initial endorsement through final closing, and to replace the MFH Development Application Processing System (DAP). The Deputy Assistant Secretary for Multifamily Housing Programs, Office of Housing/Federal Housing Administration, Department of Housing and Urban Development, presents the rescindment of the ASAP Privacy Act System of Records Notice (SORN), due to the termination of the system development, modernization and enhancement (DME) project. Records are no longer maintained by MFH and have run the record retention period. All tests and other data containing PII used in development have been deleted in accordance with the NARA records schedule.

#### SYSTEM NAME AND NUMBER:

Application Submission and Processing System (ASAP), HUD/MFH–02

#### HISTORY:

[Docket Number FR–5763–N–08], on September 17, 2014, at 72 FR 55824.

**LaDonne White,**

*Chief Privacy Officer, Office of Administration.*

[FR Doc. 2024–30490 Filed 12–20–24; 8:45 am]

BILLING CODE P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7086–N–30]**

### 60-Day Notice of Proposed Information Collection: Request for Prepayment of Section 202 or 202/8 Project; OMB Control No.: 2502–0554

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 14150 of January 20, 2025**

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2**. *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

U.S. World Politics HealthWatch MoneyWatch Entertainment Crime Sports

POLITICS

# U.S. won't extend legal status for 530,000 migrants who arrived under Biden program

By **Camilo Montoya-Galvez**
Updated on: October 4, 2024 / 4:55 PM EDT / CBS News




00:12 / 02:52

**Be the first to know**
Get browser notifications for breaking news, live events, and exclusive reporting.

e legal status of hundreds of
the U.S. under a sponsorship
gs, the Department of

r the policy will be directed to
n programs, leave the country
or face deportation proceedings.

CHNV-FRN-00010

The administration first launched the sponsorship program in October 2022 to discourage Venezuelans from traveling to the U.S.-Mexico border by offering them a legal way to enter the country if American-based individuals agreed to sponsor them. It was then expanded in January 2023 to include migrants from Cuba, Haiti and Nicaragua, whose citizens were also crossing the U.S. southern border in record numbers at the time.

As of the end of August, 530,000 migrants from these four countries had flown into the U.S. under the policy, known as the CHNV program, government figures show. They were granted permission to live and work in the U.S. legally for two years under an immigration law known as parole, which presidents can use to welcome foreigners on humanitarian or public interest grounds.

Roughly 214,000 Haitians, 117,000 Venezuelans, 111,000 Cubans and 96,000 Nicaraguans have come to the U.S. so far under the policy, according to government data. The first group set to start losing their parole status this month are Venezuelans, who began coming to the U.S. through the CHNV program in October 2022. The parole periods of Cubans, Haitians and Nicaraguans will not start to expire until early next year.

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

n to extend the parole status of Afghan evacuees and U.S. under the parole

l against offering migrants who arrived in the U.S. under the CHNV initiative parole extensions, or what the

Watch CBS News

government calls "re-parole." Instead, these immigrant parolees, as the government calls them, will be given notices instructing them to apply for another immigration benefit or leave the country.

"If you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires," the government said in a notice to parolees.

CBS News first reported on Thursday the decision to not renew the parole status of the Venezuelan CHNV arrivals.

Some of those who have arrived under the sponsorship policy may be eligible to remain in the U.S. legally through other programs. For example, many Haitians and Venezuelans are eligible for Temporary Protected Status if they came to the U.S. before June 4, 2024, and July 31, 2023, respectively. Cuban parolees can also request permanent U.S. residency, or a green card, through a Cold War-era immigration law.

CHNV arrivals can also apply for asylum, but that benefit is only available to those who can prove they are fleeing persecution based on their religion, race, political views or other grounds. Those with U.S. citizen relatives who are willing to sponsor them may be eligible for an immigrant visa.

Still, the decision to refrain from offering parole extensions to migrants under the
limbo, without the ability to
tion, unless they manage to get
ually be deported is unclear,
nezuela currently reject or limit
deportations to Haiti in recent

Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

rrivals parole renewals drew
significant ire from progressives and immigration advocates, who have argued

CHNV-FRN-00012

Watch CBS News

Cubans, Haitians, Nicaraguans and Venezuelans are being treated differently than the Afghans and Ukrainians who came to the country under similar processes.

"When Trump is running on promises to revoke legal status & conduct mass deportations, why would the Biden admin force more people into legal limbo?" Andrea Flores, a former Biden administration official, wrote on X. "They re-paroled Afghans & Ukrainians, why single out Venezuelans & make them uniquely vulnerable?"

But the decision could also blunt criticism from Republicans, who have strongly denounced the CHNV policy as a fraud-ridden program that circumvents the legal immigration processes established by Congress. The policy was paused for weeks this summer as officials investigated fraud concerns relating to those applying to sponsor migrants.

The CHNV policy has been a pillar of the Biden administration's strategy to deal with the unprecedented levels of migrant crossings recorded at the U.S.-Mexico border since it took office in 2021. It has paired the program, and other processes for migrants to enter the country legally, with restrictions on asylum for those crossing the southern border unlawfully.

Following the enactment of a partial ban on asylum claims in early June, unlawful border crossings have fallen to and remain at a four-year-low. The drop in illegal crossings by the migrants eligible for the sponsorship policy has been even more pronounced, federal data show.

...rmer President Donald Trump ...Biden administration

Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

...d with jail time, fines

CHNV-FRN-00013

**Judge blocks immigration arrests at some places of worship**

Watch CBS News

**Trump officials prepare plans to revive Title 42 policy to expel migrants**

**Trump administration ends TPS protections for half a million Haitians**

**More ›**

**Camilo Montoya-Galvez**

Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

Twitter

*© 2024 CBS Interactive Inc. All Rights Reserved.*

CBS NEWS

Copyright ©2025 CBS Interactive Inc. All rights reserved.

Privacy Policy
California Notice
Your Privacy Choices
Terms of Use
About
Advertise
Closed Captioning
CBS News Store
Site Map
Contact Us
Help

31314 Federal Register / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**[CIS No. 2744–23; Docket No: USCIS 2022–0016]**

**RIN 1615–AC83**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

**[A.G. Order No. 5660–2023]**

**RIN 1125–AB26**

# Circumvention of Lawful Pathways

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments on expanded applicability in maritime context.

**SUMMARY:** The Department of Homeland Security (''DHS'') and the Department of Justice (''DOJ'') are issuing a final rule in anticipation of a potential surge of migration at the southwest border (''SWB'') of the United States following the termination of the Centers for Disease Control and Prevention's (''CDC'') public health Order. The rule encourages migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain. The rule does so by introducing a rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel. In the absence of such a measure, which would apply only to those who enter at the southwest land border or adjacent coastal borders during a limited, specified date range, the number of migrants expected to travel without authorization to the United States would be expected to increase significantly, to a level that risks undermining the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system, in the face of exceptionally challenging circumstances. Coupled with an expansion of lawful, safe, and orderly pathways into the United States, the Departments expect the rule to lead to a reduction in the number of migrants who seek to cross the SWB without authorization to enter, thereby reducing the reliance by migrants on dangerous human smuggling networks, protecting against extreme overcrowding in border facilities, and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. In addition, the Departments are requesting comment on whether applicability of the rebuttable presumption should be extended to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at a maritime border.

**DATES:**

*Effective date:* This rule is effective on May 11, 2023.

*Comment period for solicited comments:* Comments on expanded applicability in maritime context identified in Section V of this preamble must be submitted on or before June 15, 2023. The electronic Federal Docket Management System will accept comments before midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2022–0016 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issue identified in Section V of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS 2022–0016. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs or USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For Executive Office for Immigration Review (''EOIR''):* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to submit comments on the specific issue identified in Section V of this preamble by submitting relevant written data, views, or arguments. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must submit it to DHS Docket Number USCIS 2022–0016. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

## II. Executive Summary

### *A. Purpose of Action*

Economic and political instability around the world is fueling the highest

levels of migration since World War II, including in the Western Hemisphere. Analysis by the DHS Office of Immigration Statistics (''OIS'') found that even while CDC's Title 42 public health Order [1] has been in place, encounters at our SWB [2]—referring to the number of times U.S. officials encounter noncitizens [3] attempting to cross the SWB of the United States without authorization to do so—reached an all-time high in 2022, driven in large part by an unprecedented exodus of migrants at different times from countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela.[4] The U.S. Border Patrol (''USBP'') completed 221,710 encounters between ports of entry in December 2022, second only to May 2022 (224,371 encounters) for the most monthly encounters since at least Fiscal Year (''FY'') 2000 (the period for which detailed records are available), and very likely the most ever.[5] Daily encounters between Ports of Entry (''POEs'') averaged 7,152 for December 2022 and exceeded 8,000 per day 11 times during the month, as compared to average daily encounters of 1,977 for all of 2000–2019 and average daily encounters of 1,265 in the immediate pre-pandemic period, 2014–2019.[6] Smuggling networks enable and exploit this unprecedented movement of people, putting migrants' lives at risk for smugglers' financial gain.[7] Meanwhile, the current asylum system—in which a high number of migrants are initially determined eligible to pursue their claims, even though most ultimately are not granted asylum in the subsequent EOIR removal proceedings [8]—has contributed to a growing backlog of cases awaiting review by asylum officers (''AOs'') and immigration judges (''IJs''). The practical result of this growing backlog is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[9] As the demographics of border encounters have shifted in recent years to include larger numbers of non-Mexicans—who are far more likely to assert asylum claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[10]

While the CDC's Title 42 public health Order has been in effect, migrants who do not have proper travel documents have generally not been processed into the United States; they instead have been expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in Title 8 of the United States Code, which includes the Immigration and Nationality Act (''INA'' or ''the Act''). When the Order is lifted, however, the United States Government will process all migrants into the United States under Title 8 authorities, as required by statute. At that time, the number of migrants seeking to cross the SWB without authorization is expected to increase significantly, unless other policy changes are made. Such challenges were evident in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[11] Leading up to the expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[12] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. In the weeks between the November 2022 announcement that the Title 42 public health Order would be lifted, and the December 19, 2022, stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of just under 7,700 per week (early November) to nearly 8,800 per

[1] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[2] United States Government sources refer to the U.S. border with Mexico by various terms, including ''SWB,'' ''the southern border,'' ''U.S.-Mexico border,'' or ''the land border with Mexico.'' In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. The ''southern border'' is both a land and maritime border extending from beyond California to the west to beyond Florida to the east. This rule applies along the entirety of the U.S. land border with Mexico, referred to in the regulatory text as the ''southwest land border,'' but the Departments use different terms in the preamble to describe the border. This is in large part to reflect the source material supporting the rule, but the Departments believe that the factual circumstances described in the preamble call for applying the rule across the entirety of the U.S. land border with Mexico, referred to throughout as the ''SWB.'' As discussed in greater detail below, the Departments believe that the factual circumstances described in this preamble call for applying the rule to coastal borders adjacent to that land border as well; accordingly, this final rule applies to those who enter the United States from Mexico, whether at the southwest land border or adjacent coastal borders.

[3] For purposes of this discussion, the Departments use the term ''noncitizen'' to be synonymous with the term ''alien'' as it is used in the Immigration and Nationality Act. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 140 S. Ct. 1442, 1446 n.2 (2020).

[4] OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS analysis of historic U.S. Border Patrol data.

[5] OIS analysis of OIS Production data based on data through March 31, 2023.

[6] OIS analysis of OIS Production data for fiscal year (''FY'') 2000–March 2023 and OIS Yearbook data for FY 1925–FY 1999. As discussed further below, daily encounters between ports of entry fell sharply in January 2023 following the launch of the Cuba, Haiti, and Nicaragua parole processes, and daily encounters between ports of entry at the SWB averaged just over 5,200 a day the 30 days ending April 10, 2023. OIS analysis of Unified Immigration Portal (UIP) data pulled on April 13, 2023.

[7] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* N.Y. Times, July 25, 2022, *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.*

[8] *See* EOIR, Executive Office for Immigration Review Adjudication Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 16, 2023), *https://www.justice.gov/eoir/page/file/1062976/download.* The EOIR adjudication outcome statistics report on the total number of cases originating with credible fear claims resolved on any ground in a FY, without regard to whether an asylum claim was adjudicated. The asylum grant rate is a percentage of that total number of cases.

[9] OIS analysis of EOIR data as of March 31, 2023.

[10] For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to U.S. Citizenship and Immigration Services for adjudication, compared to nearly 57 percent of people from Northern Central America (*i.e.,* El Salvador, Guatemala, and Honduras), and just over 90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of December 31, 2022. Of note, according to OIS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at the SWB. Both trends accelerated in the 2010s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 2021, as people from countries other than Mexico and Northern Central America now account for the largest numbers of border encounters.

[11] *See Huisha-Huisha* v. *Mayorkas,* No. 21–100, 2022 WL 16948610 (D.D.C. Nov. 15, 2022), *cert. and stay granted, Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022).

[12] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times, Dec. 23, 2022, *https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion.*

week (mid-December), a change not predicted by normal seasonal effects.[13]

While a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the SWB without authorization or present at a U.S. POE without documents sufficient for admission after the lifting of the Title 42 public health Order, DHS encounter projections and planning models from early April suggest that encounters could rise to 11,000 per day, absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan (''CHNV'') nationals who do not have a valid protection claim.[14] As discussed in greater detail below, data indicate that recently announced enforcement processes, as applied to CHNV nationals, which couple new parole processes with prompt returns of those who attempt to cross the SWB without utilizing these processes, are effectively deterring irregular migration [15] from those countries to the United States, thus yielding a substantial decrease in encounter numbers for nationals of CHNV countries.[16]

However, DHS will no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order, which means that an important disincentive associated with the parole processes would no longer be present. In addition, there are a number of factors that could contribute to these gains being erased after the lifting of the Title 42 public health Order, including the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere, the unprecedented recent growth in migration from countries of origin not previously typical, the already large number of migrants in proximity to the SWB, and the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order on the movement of migrants. Thus, the high end of the estimated encounter rate remains a possibility for which the Departments need to prepare. In the absence of the policy changes included in the rule, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum,[17] a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained, high encounter rates.

A sustained, high encounter rate risks overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered. This would put an enormous strain on already strained resources, risk overcrowding in already crowded USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north.

In response to this urgent and extreme situation, the Departments are issuing a rule that—

- incentivizes migrants to use lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection;
- provides core protections for noncitizens who would be threatened with persecution or torture in other countries; and
- builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to eligible migrants with the United States' regional partners.

At the same time, the rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. Specifically, this rule establishes a presumptive condition on asylum eligibility for certain noncitizens who fail to take advantage of the existing and expanded lawful pathways [18] to enter the United States, including the opportunity to schedule a time and place to present at a POE, and thus seek asylum or other forms of protection in a lawful, safe, and orderly manner, or to seek asylum or other protection in one of the countries through which they travel on their way to the United States.

This effort draws, in part, on lessons learned from the successful Venezuela parole process,[19] as well as the similar processes for Cubans, Haitians, and Nicaraguans,[20] under which DHS

[13] Month over month change from November to December for all of FY 2013–FY2022 averaged negative 2 percent. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[14] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023. The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors.

OIS leads an interagency SWB Encounter Projections Working Group that generates encounter projections every two to four weeks, with ongoing refinements to the model based on feedback from the working group and model diagnostics. The enterprise encounter projection utilizes a mixed method blended model that combines a Bayesian structural time series statistical model produced by OIS with subject matter expert input to account for real-time policy developments and pending litigation, among other factors, that are not captured by the statistical model. The blended model is run through a standard statistical process (Monte Carlo simulations) to generate 68 percent and 95 percent confidence intervals for each of 33 separate demographic groupings. In light of the greater-than-usual uncertainty at the current time, the Departments' planning models are designed to prepare the Departments for all reasonably likely eventualities, and therefore focus on the upper bounds of the blended model's 68 and 95 percent confidence intervals. As noted in Section IV.B.2 of this preamble, in the current context, the Departments must focus their planning efforts on the high and moderately high planning models rather than plan to an optimistic scenario that could leave enforcement efforts badly under-resourced and harm efforts to provide a safe and orderly process.

[15] In this preamble, ''irregular migration'' refers to the movement of people into another country without authorization.

[16] In the week prior to the announcement of the parole processes (ending October 12, 2022, for Venezuela and January 6, 2023, for Cuba, Haiti, and Nicaragua), the daily average of CHNV encounters was nearly 2,000 between POEs. A month after the parole announcements, daily encounters of CHNV nationals averaged just under 300 encounters. In the most recent seven days ending April 10, 2023, CHNV daily encounters averaged 195. OIS analysis of OIS Persist dataset based on data through March 31, 2023, and OIS analysis of CBP UIP data downloaded April 13, 2023.

[17] See Section III.C of the preamble to the notice of proposed rulemaking, Circumvention of Lawful Pathways, 88 FR 11704, at 11715–11716 (Feb. 23, 2023). Overall, 63 percent of non-Mexicans placed in expedited removal from 2014–2019 made fear claims, and 85 percent of those claiming fear (54 percent of all those placed in expedited removal) established fear or were otherwise placed in section 240 removal proceedings as a result of their fear claim. These rates are likely to be higher after May 11, 2023, because of the growing prevalence of extra-regional nationals (*i.e.,* noncitizens not from Mexico or Northern Central America), who are more likely than those from Northern Central American countries to make fear claims and to establish fear. OIS analysis of OIS Enforcement Lifecycle data based on data through February 28, 2023.

[18] The terms ''lawful pathways'' and ''lawful, safe, and orderly pathways,'' as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection as described in this rule.

[19] *See* DHS, Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans* (Oct. 12, 2022), *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans; see also* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[20] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and*

coupled a mechanism for noncitizens from these countries to seek entry into the United States in a lawful, safe, and orderly manner, with the imposition of new consequences for those who cross the border without authorization to do so—namely returns to Mexico.[21] Prior to the implementation of these processes, the Government of Mexico had not been willing to accept the return of such nationals; the Government of Mexico's independent decision to allow such returns was predicated, in primary part, on the implementation of these processes.

A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.[22] U.S. Customs and Border Protection (''CBP'') encountered an average of 106 Venezuelans between POEs per day in March 2023, about one-tenth the number of encounters prior to the announcement of the parole process.[23] Similarly, the number of Cuban, Haitian, and Nicaraguan (''CHN'') nationals encountered between POEs dropped significantly in the wake of the introduction of the new processes, which coupled a lawful, safe, and orderly way for such nationals to seek parole in the United States with consequences (in the form of prompt returns to Mexico) for those who crossed the SWB without authorization. Between the announcement of these processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[24] CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.[25] DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.[26]

This rule, which draws on these successful processes, and which will apply only to those who enter during a limited, specified date range at the southwest land border or adjacent coastal borders, will discourage irregular migration by encouraging migrants to use lawful, safe, and orderly pathways and allowing for swift returns of migrants who bypass such pathways, even after the termination of the Title 42 public health Order. It responds to the expected increase of migrants seeking to cross the SWB following the termination of the Title 42 public health Order that would occur in the absence of a policy shift by encouraging reliance on lawful, safe, and orderly pathways, thereby shifting the incentives that otherwise encourage migrants to make a dangerous journey to the SWB. It is also responsive to the requests of foreign partners that have lauded the sharp reductions in irregular migration associated with the aforementioned process for Venezuelans and have urged that the United States continue and build on this kind of approach, which couples processes for individuals to travel directly to the United States with consequences at the land border for those who do not avail themselves of these processes. The United States has, as noted above, already extended this model to Cuba, Haiti, and Nicaragua, and the Government of Mexico and the United States recently announced a set of additional measures on migration, including the United States' continued commitment to welcoming CHNV nationals under these parole processes and Mexico's commitment to continue to accept back migrants on humanitarian grounds after May 11, 2023.[27] The Departments assess that continuing to implement and build on this approach is critical to the United States' ongoing engagements with regional partners, in particular the Government of Mexico, regarding migration management in the region.[28]

Consonant with these efforts, over the past two years, the United States has taken significant steps to expand safe and orderly options for migrants to lawfully enter the United States. The United States has, for example, increased and will continue to increase—

- refugee processing in the Western Hemisphere;
- country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit on a case-by-case basis; and
- opportunities to lawfully enter the United States for the purpose of seasonal employment.

In addition, once the Title 42 public health Order is terminated, the United States will expand implementation of the CBP One™ mobile application (''CBP One app''),[29] an innovative mechanism for noncitizens to schedule a time to arrive at POEs along the SWB, to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs, in accordance with operational limitations at each POE.[30] Use of this app keeps

*Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[21] While the Title 42 public health Order has been in place, those returns have been made under Title 42. As noted below, after the Title 42 public health Order is lifted, affected noncitizens may instead be subject to return or removal to Mexico under Title 8. *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* [hereinafter The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023)]; Government of Mexico, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published.*

[22] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[23] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[24] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[25] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[26] In December 2022, prior to the announcement of the CHN parole processes, the OIS Enterprise Encounter Projection predicted 273,000 total encounters of CHNV nationals in January through March 2023, a projection equivalent to 265,000 unique encounters given CHNV repeat encounter rates. During that same period, following the enactment of the CHN parole processes, unique SWB encounters (excluding scheduled arrivals via the CBP One app) of CHNV nationals was 20,204–245,000 fewer unique encounters than had been predicted. By comparison, a total of 61,967 CHNV nationals entered the United States pursuant to the CHNV parole processes during the same period. OIS analysis of OIS Persist Dataset based on data through March 31, 2023, and of CBP OFO CHNV Advance Travel Authorization reports.

[27] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023).

[28] *See also* The White House, *Joint Statement by President Biden and Prime Minister Trudeau* (Mar. 24, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/24/joint-statement-by-president-biden-and-prime-minister-trudeau/* (reaffirming commitment of United States and Canada to a collaborative regional approach to migration centered on expanding legal pathways and humane border management, including deterrence of irregular migration).

[29] The Departments note that unless otherwise specified, references to the CBP One app refer to usage of the CBP One tool, which can be accessed via the smartphone application. Although there is a desktop version of the CBP One app, it does not currently allow users to submit their information in advance. CBP is developing the capability to use the desktop version for this purpose.

[30] As of January 12, 2023, this mechanism is currently available for noncitizens seeking to cross SWB land POEs to request a humanitarian exception from the Title 42 public health Order. *See* CBP, *Fact Sheet: Using CBP One™ to Schedule an Appointment* (last modified Jan. 12, 2023), *https://www.cbp.gov/document/fact-sheets/cbp-one-fact-sheet-english.* Once the Title 42 public health Order is terminated, and the POEs open to all migrants who wish to seek entry into the United States, this mechanism will be broadly available to migrants in central and northern Mexico, allowing them to

Continued

migrants from having to wait in long lines of unknown duration at the POEs, and enables the POEs to manage the flows in a safe and efficient manner, consistent with their footprint and operational capacity, which vary substantially across the SWB. Once present in the United States, those who use this mechanism can make claims for asylum and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility. They are vetted and screened, and assuming no public safety or national security concerns, may be eligible to apply for employment authorization as they await resolution of their cases.[31]

Moreover, on April 27, 2023, DHS and the Department of State announced several new measures to further reduce irregular migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.[32] These new measures include—

• creating family reunification parole processes for El Salvador, Guatemala, Honduras, and Colombia, as well as modernizing the longstanding Haitian Family Reunification Parole process and the Cuban Family Reunification Parole process;

• committing to referring for resettlement thousands of additional refugees per month from the Western Hemisphere, with the goal of doubling the number of refugees the United States committed to welcome as part of the Los Angeles Declaration on Migration and Protection (''L.A. Declaration'');

• establishing regional processing centers in key locations throughout the Western Hemisphere to reduce irregular migration;

• launching an aggressive anti-smuggling campaign targeting criminal networks in the Darién Gap and combating smuggler misinformation;

• surging AOs to complete credible fear interviews at the SWB more quickly; and

• ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance, and support.[33]

These measures will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Colombia, and Guatemala, as well as the government of Spain.[34]

Available pathways provide lawful, safe, and orderly mechanisms for migrants to enter the United States and make their protection claims. Consistent with the CHNV processes, this rule also imposes consequences on certain noncitizens who fail to avail themselves of the range of lawful, safe, and orderly means for entering the United States and seeking protection in the United States or elsewhere. Specifically, this rule establishes a rebuttable presumption that certain noncitizens who enter the United States without documents sufficient for lawful admission are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, unless they were provided appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process; presented at a POE at a pre-scheduled time or demonstrate that the mechanism for scheduling was not possible to access or use due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or sought asylum or other protection in a country through which they traveled and received a final decision denying that application. Unaccompanied children (''UC'') are excepted from this presumption.[35] This presumption may be rebutted, and would necessarily be rebutted if, at the time of entry, the noncitizen or a member of the noncitizen's family with whom they are travelling had an acute medical emergency, faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder,[36] or satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a). The presumption also may be rebutted in other exceptionally compelling circumstances.

The rebuttable presumption is a ''condition[ ]'' on asylum eligibility, INA 208(b)(2)(C) and (d)(5)(B), 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), that applies in affirmative and defensive asylum application merits adjudications, as well as during credible fear screenings. Individuals who are subject to and do not rebut the presumption remain eligible for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT'').[37]

With the ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways, this system is designed to (1) protect against an unmanageable flow of migrants arriving at the SWB; (2) further ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners; (3) ensure that those with valid asylum claims have an opportunity to seek protection, whether in the United States or elsewhere; (4) enable the Departments to continue administering the immigration laws fairly and effectively; and (5) reduce the role of exploitative transnational criminal organizations and smugglers.

The rule applies to noncitizens who enter the United States without authorization from Mexico at the southwest land border or adjacent coastal borders on or after the date of termination of the Title 42 public health Order and before a specified date, 24 months from the rule's effective date. However, the rule will continue to apply to such noncitizens who entered the United States during the 24-month time frame in their Title 8 proceedings and in any subsequent asylum applications, except for those applications filed after the two-year period by those who entered the United

request an available time and location to present and be inspected and processed at certain POEs.

[31] Under current employment authorization regulations, there is no waiting period before a noncitizen parolee in this circumstance may apply for employment authorization, except where the noncitizen is in expedited removal proceedings, including after a positive credible fear determination, and paroled from custody. *See* 8 CFR 274a.12(c)(11), 235.3(b)(2)(iii), (b)(4)(ii).

[32] *See* DHS, Fact Sheet, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration* [hereinafter DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023)].

[33] *See id.*

[34] *See id.; see also* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023) (committing to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration).

[35] The term ''unaccompanied child'' as used in this rule is the same as ''unaccompanied alien child,'' which is defined at 6 U.S.C. 279(g)(2) to mean ''a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.''

[36] The term ''imminent'' refers to the immediacy of the threat; it makes clear that the threat cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat. The term ''extreme'' refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal.

[37] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, 114.

States as minors and who apply as principal applicants. The Departments intend that the rule will be subject to review to determine whether the entry dates provided in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i) should be extended, modified, or remain as provided in the rule.

*B. Effective Date*

Issuance of this rule is justified in light of the migration patterns witnessed in recent months, and the concern about the possibility of a surge in irregular migration upon, or in anticipation of, the lifting of the Title 42 public health Order. The Departments seek to underscore that migrants will not be able to cross the border without authorization to enter without consequence upon the eventual lifting of the Order. Under this rule, the Departments will use their Title 8 authorities to process, detain, and remove, as appropriate, those who enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization and do not have a valid protection claim.

The Departments are issuing this rule without the 30-day delayed effective date typically required by the Administrative Procedure Act (''APA'')[38] because the Departments have determined that it is necessary to implement the rule when the Title 42 public health Order is lifted. The lifting of the Order could occur as a result of several different litigation and policy developments, including the vacatur of the preliminary injunction entered in *Louisiana* v. *CDC,* 603 F. Supp. 3d 406 (W.D. La. 2022), *appeal pending,* No. 22–30303 (5th Cir. June 15, 2022); the lifting of the stay entered by the Supreme Court in *Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022); or ''the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency,'' Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 FR 42828, 42829 (Aug. 5, 2021). The expiration of the declaration by the Secretary of Health and Human Services (''HHS'') that COVID–19 constitutes a public health emergency is expected to occur on May 11, 2023, in light of the recent announcement that ''[a]t present, the Administration's plan is to extend'' the public health emergency to May 11 and then allow it to expire ''on that date.''[39] The Departments have thus sought to move as expeditiously as possible, while also allowing sufficient time for public comment.

*C. Changes From Proposed Rule to Final Rule*

On February 23, 2023, the Departments issued a notice of proposed rulemaking (''NPRM'' or ''proposed rule'')[40] in anticipation of a potential surge of migration at the SWB following the eventual termination of the CDC's public health Order. Following careful consideration of public comments received, the Departments have made modifications to the regulatory text proposed in the NPRM, as described below. The rationale for the proposed rule and the reasoning provided in the proposed rule preamble remain valid, except as distinguished in this regulatory preamble.

1. Removing Provisions Implementing the Proclamation Bar IFR and the TCT Bar Final Rule

Consistent with the proposed rule, Circumvention of Lawful Pathways, 88 FR 11704, 11727–28 (Feb. 23, 2023), the Departments have added amendatory instructions to remove provisions enacted to implement the bars to asylum eligibility established in an interim final rule (''IFR'') entitled, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) (''Proclamation Bar IFR''), and a final rule entitled, Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) (''TCT Bar Final Rule'').[41]

To remove the provisions enacted to implement the Proclamation Bar IFR and TCT Bar Final Rule, the Departments have made the following changes:

- removed and reserved paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the Proclamation Bar IFR's applicability;
- removed and reserved paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability;
- removed and reserved paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications;
- amended 8 CFR 208.30(e)(5) to remove paragraphs (ii) and (iii), which regard application during credible fear of the Proclamation Bar IFR and TCT Bar Final Rule, respectively;
- removed reference to 8 CFR 208.30(e)(5)(ii) through (iv) from what was previously (i) and redesignated (i) as (e)(5);
- amended 8 CFR 1003.42(d) to remove paragraphs (1) and (2) and redesignated paragraph (3) as (d) because paragraphs (d)(1) and (2) provided the standard of review for Proclamation Bar and TCT Bar determinations made during credible fear screenings; and
- removed and reserved 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar and the TCT Bar during credible fear reviews.

2. Applicability of Rebuttable Presumption After the Two-Year Period

The rule applies to certain noncitizens who enter during the two-year period in any asylum application they submit, regardless of when the application is filed or if the noncitizen makes subsequent entries. *See* 8 CFR 208.13(f) (''For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 208.33.''); 8 CFR 1208.13(f) (same); 8 CFR 208.33(a)(1), 1208.33(a)(1) (providing that the rebuttable presumption applies to noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission between the effective date and a date 24-months later and after the end of implementation of the Title 42 public health Order with certain exceptions).

[38] *See* 5 U.S.C. 553(d). The Departments further address this requirement in Section VI.A of this preamble.

[39] Office of Mgmt. & Budget, Exec. Office of the President, Statement of Administration Policy (Jan. 30, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf; see also* HHS, *Fact Sheet: COVID–19 Public Health Emergency Transition Roadmap* (Feb. 9, 2023), *https://www.hhs.gov/about/news/2023/02/09/fact-sheet-covid-19-public-health-emergency-transition-roadmap.html* (''Based on current COVID–19 trends, the Department of Health and Human Services (HHS) is planning for the federal Public Health Emergency (PHE) for COVID–19, declared under Section 319 of the Public Health Service (PHS) Act, to expire at the end of the day on May 11, 2023.'').

[40] 88 FR 11704.

[41] The TCT Bar Final Rule amended an earlier IFR on the same topic. *See* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019). The IFR was vacated prior to the issuance of the TCT Bar Final Rule. Additionally, where the Departments refer to the ''Proclamation Bar'' or ''TCT Bar'' without including ''IFR'' or ''Final Rule,'' the Departments are referring to the bars as applied and not to the rulemaking documents that implemented them.

To remove any potential ambiguity regarding the ongoing applicability of the lawful pathways rebuttable presumption, the final rule makes the presumption's ongoing applicability explicit in 8 CFR 208.33(c)(1) and 1208.33(d)(1) by stating that the lawful pathways condition on eligibility shall apply to ''any asylum application'' that is filed by a covered noncitizen ''regardless of when the application is filed and adjudicated.''

The Departments have exempted from this ongoing application of the rebuttable presumption certain noncitizens who enter the United States during the two-year period while under the age of 18 and who later seek asylum as principal applicants after the two-year period. In the NPRM, the Departments requested comment on ''[w]hether any further regulatory provisions should be added or amended to address the application of the rebuttable presumption in adjudications that take place after the rule's sunset date.'' 88 FR at 11708. After reviewing comments raising concerns about the impact of the rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents, the Departments have decided to adopt a provision excepting such children from the rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognize that children who enter with their families are generally traveling due to their parents' decision-making. Exempting children from the rebuttable presumption entirely would mean, under the rule, that all family units that include minor children would also be exempted, which could incentivize families who otherwise would not make the dangerous journey to do so. And if the rule were amended to only exempt the child, it could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening as they would not be subject to the rebuttable presumption but their parents could be.

Although accompanied children remain subject to the rebuttable presumption generally, the Departments have determined that the presumption should not apply to them in any application for asylum they file after the two-year period, but only if they apply as a principal (as opposed to a derivative) applicant. The Departments believe this exception to the general applicability provision balances the interest in ensuring the rebuttable presumption has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the rebuttable presumption, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to all children after the two-year period, even if they applied only as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the two-year period expires, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the presumption entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exemption, in light of the urgent need to disincentivize a further surge in irregular migration.

3. Expansion of Applicability to Adjacent Coastal Borders

As proposed in the NPRM, the rule would apply to certain noncitizens who enter the United States at the SWB—that is, ''along the entirety of the U.S. land border with Mexico.'' 88 FR at 11704 n.1. The Departments received comments that applying the rule only to those who enter the United States from Mexico across the U.S.-Mexico land border would inadvertently incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making a hazardous attempt to reach the United States by sea. In this final rule, the Departments have decided to modify 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) to provide that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States from Mexico at ''adjacent coastal borders.'' The term ''adjacent coastal borders'' refers to any coastal border at or near the U.S.-Mexico border. This modification therefore means that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States at such a border after traveling from Mexico and who have circumvented the U.S.-Mexico land border.

This modification mirrors the geographic reach of the CDC's Title 42 public health Order, which likewise applied—as relevant here—to certain covered noncitizens traveling from Mexico who would otherwise be introduced into a congregate setting ''at or near the U.S. land and adjacent coastal borders.'' *See* 86 FR at 42841. Because the Title 42 public health Order did not define the phrase ''adjacent coastal borders,'' its meaning was developed during the public health Order's implementation. Specifically, as implemented by CBP, the term ''adjacent coastal borders'' was interpreted to apply to the same population as the Amended CDC Order issued in May 2020, which first introduced the concept of ''coastal'' application. The Amended Order applied to ''persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal POE or Border Patrol station at or near the U.S. border with Canada or Mexico, subject to exceptions.'' [42] With regard to persons traveling from Mexico, in line with the interpretation above, CBP implemented the Title 42 public health Order as covering any coastal border adjacent to the U.S.-Mexico border reached by an individual traveling from Mexico and landing within the United States having circumvented the U.S.-Mexico land border. Applying the same geographic reach that has been applied by CBP for the past three years to this rule will avoid the risk that smugglers would exploit what could be perceived as a new ''loophole'' following the lifting of the Title 42 public health Order to persuade migrants to make a perilous crossing to the United States from Mexico by sea. In DHS's experience, that risk may well materialize, as smugglers routinely prey on migrants using perceived changes in U.S. immigration law.[43] Any such campaign by smugglers to persuade more migrants to circumvent the land border would result in life-threatening risks for migrants and DHS personnel, given the elevated danger associated with maritime crossings. As just one example of how dangerous such attempts can be, the Departments note that in March 2023, two suspected human smuggling boats from Mexico capsized and eight

[42] *See* Amendment and Extension of Order Under Sections 362 and 365 of the Public Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020); CBP, CBP COVID–19 Response: Suspension of Entries and Imports Concept of Operations 1–3 (May 20, 2020), *https://www.cbp.gov/document/foia-record/title-42*.

[43] *See* Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* (''A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.'').

people died off the coast near San Diego, California.[44] This incident, as well as the increases in maritime migration over the past few years, as discussed further in Section V of this preamble, and commenters' concerns that the NPRM would have encouraged migration by sea, as discussed further in Section IV.B.8.i of this preamble, have led the Departments to extend the rebuttable presumption to the adjacent coastal borders. Specifically, in the interest of ensuring that this rule is not used to encourage intending migrants to undertake attempts that could end in similar tragedies, the Departments believe it is important that the text of 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) make clear that the rule's presumption applies equally to noncitizens who arrive from Mexico on coasts adjacent to the southwest land border.

4. Clarification of Meaning of ''Final Decision''

As was proposed in the NPRM, the rule excepts from the rebuttable presumption noncitizens who sought asylum or other protection in another country through which they traveled and received a ''final decision'' denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments have amended this paragraph to further define what constitutes a ''final decision'' for the purposes of this exception. With this change, the final rule specifies that a ''final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim.'' *Id.* The provision further states that a ''final decision does not include a determination by a foreign government that the noncitizen abandoned the claim.'' *Id.* The Departments have made this change in response to comments, as discussed below, and to provide clarity that a noncitizen must in fact pursue the claim since a denial based on abandonment would be insufficient.

5. Exception for Unaccompanied Children

The NPRM provided that ''[u]naccompanied alien children, as defined in 6 U.S.C. 279(g)(2), are not subject to paragraph (a)(1) of this section.'' *See* 88 FR at 11750–51 (proposed 8 CFR 208.33(b), 1208.33(b)). The Departments have modified the proposed language to explicitly state that this exception applies to noncitizens who were UCs at the time of entry.[45] 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

This added language makes clear that the UC exception aligns with other exceptions in this rule, which are based upon conditions at the time of a noncitizen's presentation at a POE, *see* 8 CFR 208.33(a)(2), 1208.33(a)(2), and more closely aligns the regulatory text with the Departments' stated purpose in the NPRM that ''unaccompanied children would be categorically excepted from the rebuttable presumption,'' 88 FR at 11724.

6. Expansion of Family Unity Provision

The NPRM provided that where a principal applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. *See* 88 FR at 11752 (proposed 8 CFR 1208.33(d)). Commenters raised concerns that excluding asylum applicants who travel without their families may inadvertently incentivize families to engage in irregular migration together so as not to risk that the principal applicant would be prevented from later applying for their family members to join them. This could involve making a dangerous journey with vulnerable family members, such as children. Accordingly, as discussed in Section IV.E.7.ii of this preamble, in response to these comments, the Departments have expanded the provision to also cover principal asylum applicants who have a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). *See* 8 CFR 1208.33(c).

7. Other Changes

In addition to the changes this final rule makes to the NPRM detailed above, this final rule also makes other changes to the regulatory text set out in the NPRM.

First, the Departments have reorganized and made other edits to proposed 8 CFR 208.33(a) and 1208.33(a) to improve clarity for noncitizens, counsel appearing before the Departments, other members of the public, and adjudicators. For example, the Departments added the exception for unaccompanied children to 8 CFR 208.33(a)(2)(i) and 1208.33(a)(2)(i) rather than maintaining it as a standalone paragraph at 8 CFR 208.33(b) and 1208.33(b). Similarly, the Departments added headings and additional guideposts within 8 CFR 208.33(a) and 1208.33(a). Second, the Departments revised 8 CFR 208.33 and 1208.33 to move instructions from 8 CFR 208.33 to 8 CFR 1208.33 regarding IJ review that are better placed in EOIR's regulations. For example, the Departments removed the sentence at proposed 8 CFR 208.33(c)(2)(ii) stating that noncitizens may apply for asylum, withholding of removal, and protection under the CAT in removal proceedings and included that at new 8 CFR 1208.33(b)(4). These revisions do not change the meaning of those provisions.

*D. Rule Provisions*

The rule contains the following key provisions:

- The rule imposes a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in INA 212(a)(7), 8 U.S.C. 1182(a)(7). *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The rebuttable presumption applies to only those noncitizens whose entry was (1) between May 11, 2023 and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order; and (3) after the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention'') or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 (''Refugee Protocol''). *See* 8 CFR 208.33(a)(1)(i) through (iii), 1208.33(a)(1)(i) through (iii).

[44] *See* Karen Kucher et al., *8 Reported Dead After 2 Suspected Smuggling Boats Crash at Black's Beach in San Diego,* L.A. Times, Mar. 12, 2023, *https://www.latimes.com/california/story/2023-03-12/8-reported-dead-after-2-suspected-smuggling-boats-crash-at-blacks-beach-in-san-diego;* Wendy Fry, *An Endless Fight: As Border Infrastructure on Land Improves, Smugglers Take to the Water,* San Diego Tribune, Nov. 6, 2019, *https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-11-06/an-endless-fight-as-border-infrastructure-on-land-improves-smugglers-take-to-the-water.*

[45] Numerous commenters recognized that the NPRM proposed an exception for UCs, but did not indicate a clear understanding of whether this exception applied to those who were UCs at the time of entry or at the time of adjudication.

• The rule excepts from the rebuttable presumption any noncitizen who is an unaccompanied child as defined in 6 U.S.C. 279(g)(2). *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

• The rule also excepts from the rebuttable presumption a noncitizen if the noncitizen or a member of the noncitizen's family with whom the noncitizen is traveling (1) was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE, pursuant to a pre-scheduled time and place, or presented at a POE without a pre-scheduled time and place, if the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See id.* 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

• The rule allows a noncitizen to rebut the presumption by demonstrating by a preponderance of the evidence that exceptionally compelling circumstances exist. A noncitizen necessarily rebuts the presumption if they demonstrate by a preponderance of the evidence that the noncitizen, or a member of the noncitizen's family with whom the noncitizen is traveling, (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a). *See id.* 208.33(a)(3), 1208.33(a)(3). In addition, as a measure to ensure family unity, the rule provides that in removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a (''section 240 removal proceedings''), where a principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the rebuttable presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal or where the principal asylum applicant has a spouse or child who would be eligible to follow to join them if they are granted asylum, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the presumption is deemed rebutted as an exceptionally compelling circumstance. *See* 8 CFR 1208.33(c).

• The rule establishes procedures, applicable in the expedited removal context, under which AOs will determine whether the noncitizen has made a sufficient showing that the rebuttable presumption does not apply or that they meet an exception to or can rebut the presumption. *See id.* 208.33(b). If the AO determines that the rebuttable presumption does not apply or the noncitizen falls within an exception or has rebutted the presumption, the general procedures in 8 CFR 208.30 apply. *See id.* 208.33(b)(1)(ii). On the other hand, if the AO determines that the rebuttable presumption does apply and no exception or rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See id.* 208.33(b)(1)(i), 208.33(b)(2).

• The rule provides that an AO's adverse determination as to the applicability of the rebuttable presumption, whether an exception applies or the presumption has been rebutted, and whether the noncitizen has established a reasonable possibility of persecution or torture, are all subject to de novo IJ review. *See id.* 208.33(b)(2)(iii) through (v), 1208.33(b). The noncitizen must request such review by so indicating on a Record of Negative Fear Finding and Request for Review by Immigration Judge. *See id.* 208.33(b)(2)(iv) and (v), 1208.33(b)(1).

• The rule establishes procedures for such IJ review. Specifically, if the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they meet an exception to or can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT withholding, the IJ issues a positive credible fear finding and the case proceeds under existing procedures at 8 CFR 1208.30(g)(2)(iv)(B). *See id.* 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the rebuttable presumption applies and has not been rebutted and no exception is applicable, but the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the IJ will issue a positive credible fear finding and DHS will issue a Form I–862, Notice to Appear, to commence section 240 removal proceedings. *See id.* 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See id.* 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that U.S. Citizenship and Immigration Services (''USCIS'') reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See id.* 208.33(b)(2)(v)(C).

• The rule provides that a noncitizen who is found to be subject to the lawful pathways condition during expedited removal proceedings may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible during those removal proceedings. *See id.* 1208.33(b)(4).

• The rule declines to adopt the Proclamation Bar IFR on a permanent basis and removes the language effectuating the Proclamation Bar. Specifically, the rule removes and reserves paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the bar's applicability.

• The rule removes regulatory provisions implementing the TCT Bar Final Rule. The rule removes and reserves paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability. The rule also removes and reserves paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications. Given the removal of the TCT Bar Final Rule and its implementing provisions, these provisions are no longer necessary.

• The rule also amends the CFR to remove provisions implementing the Proclamation Bar IFR and TCT Bar Final Rule during the credible fear process. The rule removes 8 CFR 208.30(e)(5)(ii) and (iii), which implemented the Proclamation Bar IFR and TCT Bar Final Rule, respectively. The rule also removes reference to (ii) though (iv) from what was previously (i) and redesignates (i) as (e)(5). Similarly, the rule also amends provisions relating to IJ standard of review for Proclamation Bar and TCT Bar determinations by removing 8 CFR 1003.42(d)(2) and (3), and redesignates 8 CFR 1003.42(d)(1) as paragraph (d). Finally, the rule removes and reserves 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar

and the TCT Bar during credible fear reviews.

- The rule contains a special provision providing that the rebuttable presumption does not apply to an asylum application filed after May 11, 2025, if the noncitizen was under the age of 18 at the time of entry, and the noncitizen is applying for asylum as a principal applicant. *See id.* 208.33(c)(2), 1208.33(d)(2).
- The rule contains a severability clause reflecting the Departments' intention that the rule's provisions be severable from each other in the event that any aspect of the new provisions governing the rebuttable presumption is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance. *See id.* 208.33(d), 1208.33(e).

### III. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning asylum, statutory withholding of removal, and CAT determinations. The Homeland Security Act of 2002 (''HSA''), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the administration and enforcement of Federal immigration law while maintaining many functions and authorities with the Attorney General, including concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary ''with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,'' except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions ''necessary for carrying out'' the Secretary's authority under the immigration laws, INA 103(a)(1) and (3), 8 U.S.C. 1103(a)(1) and (3); *see also* 6 U.S.C. 202.

The HSA charges the Attorney General with ''such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to [EOIR].'' INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to ''establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out'' his authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within DOJ adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (''BIA''), also within DOJ, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1) and (b)(3); *see also Garland* v. *Ming Dai,* 141 S. Ct. 1669, 1677–78 (2021) (describing appeals from IJ to BIA). In addition, the INA provides that the ''determination and ruling by the Attorney General with respect to all questions of law shall be controlling.'' INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the ''Secretary of Homeland Security or the Attorney General'' to ''grant asylum'' to a noncitizen ''who has applied for asylum in accordance with the requirements and procedures established by'' the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a refugee. INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to ''establish[ ]'' ''requirements and procedures'' to govern asylum applications. *Id.* The statute further authorizes them to ''establish,'' ''by regulation,'' ''additional limitations and conditions, consistent with'' section 208, under which a noncitizen ''shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to ''provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]'').[46] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and to establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and USCIS AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouler'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' 120%

Congress codified these obligations in the Refugee Act of 1980, creating the precursor to what is now known as statutory withholding of removal.[47] The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the

[46] Under the HSA, the references to the ''Attorney General'' in the INA also encompass the Secretary, either solely or additionally, with respect to statutory authorities vested in the Secretary in the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 557.

[47] Public Law 96–212, 94 Stat. 102 (''Refugee Act'').

Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[48] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1) and (3), (g)(1) and (2), 8 U.S.C. 1103(a)(1) and (3), (g)(1) and (2).

The Departments also have authority to implement Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994). The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') provides the Departments with the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note). DHS and DOJ have implemented the United States' obligations under Article 3 of the CAT in the CFR, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through 208.18, 1208.16(c) through 1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

This rule does not change the eligibility requirements for statutory withholding of removal or CAT protection. As further discussed below, the rule applies a ''reasonable possibility'' standard in screenings for statutory withholding of removal and CAT protection in cases where the presumption of asylum ineligibility is applied and not rebutted. While the application of this standard is a change from the prior practice in the expedited removal context, it is the same standard used in protection screenings in other contexts and is consistent with both domestic and international law. *See* 8 CFR 208.31.

## IV. Public Comments and Responses

The Departments received 51,952 comments on the proposed rule, the majority of which expressed opposition to the proposal. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

### *A. General Support*

#### 1. General Support

*Comment:* Many commenters stated their support for the rule overall. Commenters emphasized the importance of border security, stating that the Government must do what is necessary to both manage workloads at the border and stop migrants from entering the United States without permission.

*Response:* Promulgation of this rule is needed because, once the Title 42 public health Order is lifted, the number of migrants traveling to the United States without authorization is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. Such a surge would also place additional pressure on States, local communities, and non-governmental organization (''NGO'') partners both along the border and in the interior of the United States.

To address these issues, the rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States outside of safe, orderly, and lawful pathways and without first seeking protection in a third country they have traveled through en route to the SWB, during a designated period of time. The rule (1) incentivizes the use of multiple existing lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection; (2) continues to provide core protections for noncitizens who would be threatened with persecution or torture in other countries; and (3) builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to deserving migrants with the United States' regional partners.

The successful implementation of the CHNV parole processes has demonstrated that an increase in lawful pathways, when paired with consequences for migrants who do not avail themselves of such pathways, can incentivize the use of such pathways and undermine transnational criminal organizations, such as smuggling operations. The rule, which is fully consistent with domestic and international legal obligations, provides the necessary consequences to maintain this incentive under Title 8 authorities. In short, the Departments expect the rule, coupled with an expansion of lawful, safe, and orderly pathways, to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

The benefits of reducing the number of encounters include protecting against overcrowding in border facilities; allowing for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and helping to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. Even where the rule applies, the presumption against asylum eligibility may be rebutted in certain circumstances, such as where, at the time of the noncitizen's entry into the United States, they or a family member with whom they are traveling are experiencing an acute medical emergency or an extreme and imminent threat to life or safety, or are a victim of a severe form of trafficking. Moreover, DHS will still screen migrants who cannot overcome the rebuttable presumption to determine if the migrant has established a reasonable possibility of persecution for the purposes of statutory withholding of removal or a reasonable possibility of torture for the purposes of protection under the regulations implementing the CAT. *See* 8 CFR 208.33(b)(2)(i). Should a migrant receive a negative credible fear determination, they can also seek review of the determination by an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). Those who are found to have credible fear due to a reasonable possibility of persecution or torture will then have the opportunity for further consideration of their protection claims via a section 240 removal proceeding. *See* 8 CFR 208.33(b)(2)(ii).

#### 2. Need, Effectiveness, and Rationale for the Rule

*Comment:* Commenters described the rule as a common-sense approach to managing migration at the border and

[48] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation and Article 34's call to ''facilitate the assimilation and naturalization of refugees,'' which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'').

discouraging illegal migration, while others stated that the rule would contribute to the ''rule of law'' at the border. Other commenters noted that a change such as that made by this rule is necessary, as it is simply impossible to admit all migrants who want to enter the United States. Some commenters stated that the rule is a reasonable solution until Congress can take legislative action to address the issue. Other commenters supported the rule's encouragement for migrants to first seek protection in third countries they pass through before requesting asylum at the SWB and asserted that such a requirement is standard in international law; commenters further stated that the rule would discourage ''asylum shoppers.'' Commenters stated that allowing migrants to cross multiple countries en route to the United States before claiming asylum defeats the true purpose of asylum. Some commenters stated that migrants know that claiming asylum allows them entry into the United States, and thus take advantage of the process.

*Response:* As noted above, the Departments have designed this rule in response to the number of migrants expected to travel without authorization to the United States after the lifting of the Title 42 public health Order, absent a policy change such as this one. In that case, the circumstances likely to occur include the following: an additional number of migrants anticipated to arrive at the border; the severe strain on resources that this influx of migrants would cause DHS; and a substantial resulting impact on U.S. Government operations, as well as local communities. DHS's successful Uniting for Ukraine (''U4U'') and CHNV parole processes—under which DHS coupled a mechanism for noncitizens from these countries to seek entry to the United States in a lawful, safe, and orderly manner with the imposition of new consequences for those who cross the SWB without authorization—have demonstrated that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can incentivize the use of lawful pathways and undermine transnational criminal organizations, such as smuggling operations. The Departments expect similar benefits from this rule, especially a reduced number of encounters at the border, which will help to protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain.

The Departments designed the rule to strike a balance that maintains safe and humane processing of migrants while also including safeguards to protect especially vulnerable individuals. The rule provides exceptions to the rebuttable presumption and allows migrants to rebut the presumption in exceptionally compelling circumstances. These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT. In addition, to further aid migrants, the Departments plan to continue to work with foreign partners to expand lawful pathways for migration, as well as expand the Departments' mechanisms for lawful processing. Thus, the rule will disincentivize irregular migration and instead incentivize migrants—including those intending to seek asylum—to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel.

3. Mitigate Irregular Migration and the Associated Impacts

*Comment:* Many commenters expressed support for the rule for a variety of reasons. Commenters supported the change in policy, noting that this rule would result in a more efficient use of government resources at the border. Commenters also supported the proposed rule's use of a formal process for asylum applicants. Some commenters stated their support for the rule because the journey to the SWB is dangerous due to harsh conditions and smugglers, and this rule would weaken smugglers and transnational criminal enterprises and reduce their exploitation of migrants. Commenters also stated that incentivizing migrants to present themselves at POEs would reduce their risk of exploitation by human traffickers or other harm when attempting to cross between POEs. Commenters commended the Departments for prioritizing safe and orderly processing methods for those seeking refuge. Some commenters indicated that border security is critical and expressed concerns that malicious actors could enter the United States more easily during a surge in migration.

*Response:* The Departments recognize these commenters' support for the rule and agree that maintaining border security is critical. The Departments agree that irregular migration is dangerous and can lead to increased strain on SWB operations and resources, increased illegal smuggling activity, and increased pressure on communities along the SWB. The United States has taken several measures to meet the influx of migrants crossing the SWB and is taking new steps to address increased flows throughout the Western Hemisphere.[49]

However, the anticipated increase in the number of migrants following the lifting of the Title 42 public health Order threatens to exceed the Departments' capacity to safely and humanely process migrants. By coupling the rule with additional lawful pathways and allowing migrants to schedule their arrival at a SWB POE, currently via the CBP One app, the rule will reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. This reduction will protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and help to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. The Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs and, accordingly, allow them to better absorb releases from CBP border facilities and provide support to the migrant community. Ultimately, this rule will disincentivize irregular migration and instead incentivize migrants to use safe, orderly, and lawful pathways to the United States or to seek protection in third countries.

4. Positive Impacts on Operations and Resources

*Comment:* Commenters supported the rule, stating that allowing migrants to remain in the United States at the government's expense while waiting for their asylum claim to be adjudicated is a waste of government resources. Commenters said that the rule—specifically when coupled with the expanded use of the CBP One app and the ability for migrants to schedule appointments—would allow for more efficient processing at the SWB. Commenters stated that, by decreasing

[49] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

the number of migrants seeking asylum, the Departments would adjudicate asylum claims much faster and decrease the amount of time migrants must wait in the United States before receiving a final decision in their case.

*Response:* The Departments recognize these commenters' support and agree that the rule will have benefits for both those granted asylum and the U.S. immigration system. The rule encourages noncitizens to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is designed to channel the high numbers of migrants expected to seek protection in the United States following the termination of the Title 42 public health Order into lawful, safe, and orderly pathways and ensure they can be processed in an effective, humane, and efficient manner. In addition, the Departments anticipate that the use of the CBP One app—the current scheduling mechanism that provides migrants with a means to schedule a time and place to present themselves at a SWB POE—will allow CBP to streamline the processing of noncitizens at POEs on the SWB and process significantly more individuals in a safe and orderly manner.

Adjudication on the merits of an asylum claim for those who establish credible fear and are placed into removal proceedings can be a long process. Thirty-eight percent of all noncitizens who entered along the SWB, received a positive credible fear determination, and were placed into proceedings before EOIR between FY 2014 and FY 2019 remained in EOIR proceedings as of December 31, 2022.[50] Further, almost half (47 percent) of those in EOIR cases who received positive credible fear determinations resulting from FY 2019 encounters (referrals to EOIR) remained in proceedings as of December 31, 2022.[51] Excluding *in absentia* orders, the mean completion time for EOIR cases in FY 2022 was 3.7 years.[52] Thus, those who have a valid claim to asylum in the United States often wait years for a final relief or protection decision; likewise, noncitizens who will ultimately be found ineligible for asylum or other protection—which occurs in the majority of cases—often have spent many years in the United States prior to being ordered removed.

This lengthy adjudications process means that migrants who can establish credible fear can expect to remain in the United States for an extended period regardless of whether they will ultimately obtain asylum status at an EOIR hearing on the merits. Allowing a migrant to remain in the United States for years before ultimately determining the migrant is ineligible for asylum or other protection is inefficient, risks creating a pull factor for other intending migrants, and runs counter to principles of judicial fairness, including the swift adjudication of claims. As discussed in the NPRM, *see* 88 FR at 11737, and below at Section IV.B.2 of this preamble, the Departments have determined that this rule will lead to increased efficiencies in the asylum adjudications process so that claims can be adjudicated without a lengthy delay.

5. Other Support

*Comment:* Commenters agreed that the Departments have the legal authority to restrict asylum eligibility based on a migrant's failure to seek protection in a third country that they have traveled through on route to the SWB and that such a policy is consistent with both domestic and international law. Commenters stated that the rule was necessary because most migrants do not have legitimate asylum claims, noting low grant rates by EOIR, and are instead seeking economic opportunities in the United States. Other commenters expressed general support for the rule and stated a belief that asylum seekers do not have legitimate claims because they may be coached by NGOs or other organizations.At least one commenter stated that if a migrant traveled through a third country with a legitimate asylum process on their way to the United States, DHS should assume that the migrant is not really in fear for their life; otherwise, the U.S. asylum system would be used for economic migration, the demand for which should be addressed by other means. Another commenter said that the proposed rule encourages asylum-seekers to use the ''front door'' by presenting at POEs and fulfills domestic and international legal obligations by removing eligibility for asylum for those who fail to do so while maintaining access to statutory withholding of removal and protection under the CAT. The commenter noted that countries are within their rights to limit access to asylum. The commenter also stated that many individuals are barred from asylum eligibility for reasons such as fraud, criminal convictions, and illegal reentry, and that the proposed rule would add those who do not avail themselves of asylum in the nearest country and do not apply at a POE to this list, which should limit further unlawful entries and use of government resources. Some commenters supported the rule and suggested that the Government disseminate information about the rule in other countries to ensure migrants planning to seek asylum are aware of both the asylum process and the consequences of non-compliance.

*Response:* As discussed further below in Section IV.B.D, the Departments agree that the rule is consistent with U.S. obligations under both domestic and international law, including the INA; the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. While the Departments appreciate these commenters' support for the rule, the Departments emphasize that this rule is necessary to prevent the expected increase in the number of migrants who would otherwise seek to travel without authorization to the United States after the termination of the Title 42 public health Order, which would risk undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. In other words, the Departments do not rely on the alternative goals or bases of support for the rule expressed in the comments summarized above.

The Departments appreciate the importance of disseminating information about the rule to the public, including intending migrants, and are planning a robust communication effort in conjunction with and immediately following the publication of this rule.

*B. General Opposition*

1. General Opposition

*Comment:* The Departments received many comments expressing general opposition to the rule. Some commenters expressed opposition to the rule and encouraged the Administration to withdraw it, without further explanation. Commenters also stated, without explanation, that the rule would allow future administrations the ability to decide which nationalities are afforded protections, instead of making protections available for everyone in need. Other commenters stated the rule creates barriers, not pathways, for asylum seekers.

*Response:* The Departments take seriously the concerns expressed by commenters who generally oppose the rule. Because some of these comments failed to articulate specific reasoning underlying the general opposition, the

[50] *See* OIS analysis of OIS Enforcement Lifecycle data based on data through December 31, 2022.

[51] *Id.*

[52] *See* OIS analysis of DOJ EOIR data based on data through March 31, 2023.