exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[109] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[110] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[111] DHS concluded that "a surge could result in significant loss of human life."[112]

---

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject. org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Nicaraguans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Nicaraguan Parole Process**

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Nicaraguans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Nicaraguan Parole Process**

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

CHNV-FRN-00265

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[18]

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system, and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

---

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf, (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama,* https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route,* https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo,* https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7, 2022 (last viewed Dec. 8, 2022).

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5.

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, https://news.un.org/en/story/2022/03/1114792, Mar. 25, 2022 (last viewed Dec. 9, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/, Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html, Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that "[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary." [31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . supported by the other branches of government." [32] The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua," [33] and that as of late September, "more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled" since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists." [35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country." [37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative activities." [38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily," and "17 percent of children aged under five suffer from chronic malnutrition." [41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

---

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.
[25] Id.
[26] Id.
[27] Id.; OIS analysis of UIP CBP data pulled on November 28, 2022.
[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the U.S.* (July 29, 2021), https:// www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.
[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections* (Nov. 8, 2022), https:// www.latimes.com/world-nation/story/2022-11-08/ sandinistas-complete-political-domination-nicaragua-local-elections.
[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President* (Nov. 3, 2021), https://www.reuters.com/world/americas/ ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.
[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua* 2 (Sept. 2, 2022), https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.
[32] Inter-American Commission On Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law,* OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), https://www.oas.org/ en/iachr/reports/pdfs/2021_nicaragua-en.pdf.
[33] Inter-American Commission On Human Rights, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775, (June 2, 2022), https://www.oas.org/en/iachr/ reports/ia.asp?Year=2021.
[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, https://www.oas.org/en/iachr/expression/ showarticle.asp?lID=1&artID=1257.
[35] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.
[36] IACHR, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775 (June 2, 2022), https://www.oas.org/ en/iachr/reports/ia.asp?Year=2021.
[37] Inter-American Commission On Human Rights, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 20, 2021), http:// www.oas.org/en/IACHR/jsForm/?File=/en/iachr/ media_center/PReleases/2021/346.asp.
[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent* (Aug. 19, 2022), https:// www.washingtonpost.com/world/2022/08/19/ nicaragua-bishop-rolando-alvarez-arrest-ortega/.
[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), https:// www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.
[40] The World Bank, *GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua,* https:// data.worldbank.org/indicator/NY.GDP.PCAP.CD? locations=ZJ-NI&most_recent_value_desc=false (last visited Dec. 6, 2022).
[41] World Food Programme, *Nicaragua,* https:// www.wfp.org/countries/nicaragua (last visited: Sept. 26, 2022).

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central De Nicaragua, Remesas Por País de Origen, https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, https://www.unhcr.org/en-us/displacement-in-central-america.html.

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, https://www.unhcr.org/62a9d1494/global-trends-report-2021.

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] *Id.,* and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

significant public benefit."[52] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[54] Individuals may be granted advance authorization to travel to the United States to seek parole.[55] DHS may terminate parole in its discretion at any time.[56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization.[57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[58]

### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures, withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.
[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).
[54] *Id.*
[55] *See* 8 CFR 212.5(f).
[56] *See* 8 CFR 212.5(e).
[57] *See* 8 CFR 274a.12(c)(11).
[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

---

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); [74] the Collaborative Migration Management Strategy (CMMS); [75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

---

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.*

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[76] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[77] *Id.*

[78] *Id.*

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

- be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

- be outside the United States;
- be a national of Nicaragua or be a non-Nicaraguan immediate family member [81] and traveling with a Nicaraguan principal beneficiary;
- have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- possess an unexpired passport valid for international travel;
- provide for their own commercial travel to an air U.S. POE and final U.S. destination;
- undergo and pass required national security and public safety vetting;
- comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

- fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order; [83]
- has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;
- has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or
- is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV*.

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua*.

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the process at any point.The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare."); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.
**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Cubans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register**.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**
*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*
[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.
**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America [5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity." [12] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/ (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC*,—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



**NOTE:** Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17] Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.