that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit." [23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

---

[21] Data from SBCC, as of September 29, 2022.

[22] Data from SBCC, as of September 29, 2022.

[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).

[27] *See* 8 CFR 212.5(e).

[28] *See* 8 CFR 274a.12(c)(11).

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

### 3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights— enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

### 4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on

communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office (last visited Sept. 29, 2022).*

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sept. 14, 2022, available at: *https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/* (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: *https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/* (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day* (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream* (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

**6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere**

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

---

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticas*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X* (last visited Oct. 2, 2022).

[43] L.A. Declaration.

[44] The Department of State Cable, 22 Panama 624.



**Note:** September figure is a preliminary estimate.

Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters will initiate an application on behalf of a Venezuelan national[48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Venezuela or be a non-Venezuelan immediate family member[49] of and traveling with a Venezuelan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;

• possess a passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order;[51]

• has crossed irregularly into the United States, between the POEs, after October 19, 2022;

• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

*C. Processing Steps*

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.

[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to

apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

D. Sunset, Renewal, and Termination

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

E. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will

not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7050–N–52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 18, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

*A. Overview of Information Collection*

*Title of Information Collection:* Debt Resolution Program.

*OMB Approval Number:* 2502–0483.

*OMB Expiration Date:* November 30, 2022.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–56141, HUD– 56142, HUD–56146.

*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).

*Respondents:* Individuals or Households, Business or other For-Profit.

*Estimated Number of Respondents:* 648.

*Estimated Number of Responses:* 2,159.

*Frequency of Response:* 1.

*Average Hours per Response:* 1.

*Total Estimated Burden:* 590 hours.

---

[58] *See* 82 FR 4902 (Jan. 17, 2017).

[59] 5 U.S.C. 553(b)(B).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

## III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

### A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

### B. Updated Eligibility Criteria

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who were encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

## C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point.The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM would no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/*, Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]

### South Carolina; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:



# THE BIDEN-HARRIS ADMINISTRATION'S CHNV PAROLE PROGRAM TWO YEARS LATER: A FRAUD-RIDDEN, UNMITIGATED DISASTER

Interim Staff Report of the

Committee on the Judiciary
and
Subcommittee on Immigration Integrity, Security, and Enforcement

U.S. House of Representatives



November 20, 2024

CHNV-FRN-00292

---

### EXECUTIVE SUMMARY

---

Since January 2021, President Joe Biden and border czar Vice President Kamala Harris have welcomed 7.7 million illegal aliens into the United States, including at least 1.9 million known illegal alien "gotaways."[1] During the Biden-Harris Administration, there have been 44 straight months with more than 100,000 southwest border illegal alien encounters, including 101,790 such encounters in September 2024 alone.[2] Amidst headlines like "*Everyone can now agree – the US has a border crisis*,"[3] and "*More than 10,000 migrants packed under Texas bridge, number still rising*,"[4] the Administration felt political pressure to cover up the largest mass migration in American history. To mask the border crisis and artificially decrease historically high border encounters, President Biden and Vice President Harris implemented programs and policies that allowed aliens to bypass the southwest border so they would not be included as encounters in Border Patrol data.[5] In particular, the Administration created, without Congressional authorization, what it called "lawful pathways" for illegal aliens to enter the U.S.[6] One such avenue is the Biden-Harris Administration's categorical parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV).[7]

Through CHNV, each month up to 30,000 aliens, who otherwise have no basis to enter the country and who have "a supporter" in the United States, can bypass the U.S. border and fly directly into the country "on commercial flights" to be "granted parole" for a period of two years by the Secretary of the Department of Homeland Security (DHS).[8] As of "the end of September

---

[1] Info. provided to the H. Comm. on the Judiciary by U.S. Dep't of Homeland Sec., Table 1: Detention Histories of CBP Encounters, January 20, 2021 – March 31, 2024 (Aug. 16, 2024); U.S. Customs and Border Prot., *Custody and Transfer Statistics FY 2024*, U.S. DEP'T OF HOMELAND SEC. (last accessed Sept. 16, 2024); Camilo Montoya-Galvez, *Biden administration has admitted more than 1 million migrants into U.S. under parole policy Congress is considering restricting*, CBS NEWS (Jan. 22, 2024); *Latest UC Data, Total Monthly Discharges to Individual Sponsors Only*, U.S. DEP'T OF HEALTH AND HUMAN SERVS. (last accessed Mar. 22, 2024); Off. of Refugee Resettlement, *Unaccompanied Children Released to Sponsors by State*, U.S. DEP'T OF HEALTH AND HUMAN SERVS. (last accessed Sept. 16, 2024); U.S. Customs and Border Prot., *CBP Releases August 2024 Monthly Update*, U.S. DEP'T OF HOMELAND SEC. (Sept. 16, 2024); Immigr. and Customs Enf't, *Daily SWB Placemat*, U.S. DEP'T OF HOMELAND SEC. (May–Sept. 2024) (on file with Comm.); Off. of Homeland Sec. Statistics, *Immigr. Enf't and Legal Processes Monthly Tables – Apr. 2024*, U.S. DEP'T OF HOMELAND SEC. (last accessed Aug. 19, 2024); Casey Harper, *Border crisis creates national security threat for U.S., observers say*, WASH. EXAMINER (Aug. 7, 2023); Bill Melugin (@BillMelugin_), X (June 20, 2024, 10:22 AM).

[2] *Id.*

[3] Stephen Collinson, *Everyone can now agree – the US has a border crisis*, CNN (Dec. 16, 2022), https://www.cnn.com/2022/12/16/politics/biden-immigration-crisis-title-42/index.html.

[4] Julia Ainsley, *More than 10,000 migrants packed under Texas bridge, number still rising*, NBC NEWS (Sept. 17, 2021), https://www.nbcnews.com/politics/immigration/more-10-000-migrants-packed-under-texas-bridge-number-still-n1279423.

[5] Andrew Arthur, *Breaking Down the FY 2024 Southwest Border Numbers*, CENTER FOR IMMIGR. STUDIES (Oct. 24, 2024), https://cis.org/Arthur/Breaking-Down-FY-2024-Southwest-Border-Numbers.

[6] Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans*, U.S. DEP'T OF HOMELAND SEC. (Oct. 12, 2022), https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[7] *See generally* U.S. Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, U.S. DEP'T OF HOMELAND SEC., https://www.uscis.gov/CHNV (last accessed Oct. 29, 2024), https://www.uscis.gov/CHNV [hereinafter USCIS CHNV Process].

[8] *Id.*; Press Release, *CBP Releases September 2024 Monthly Update*, U.S. CUSTOMS AND BORDER PROT. (Oct. 22, 2024), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-september-2024-monthly-update.

CHNV-FRN-00293

2024, more than 531,000 Cubans, Haitians, Nicaraguans, and Venezuelans" had done so.[9] The CHNV supporter must "file a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support" (Form I-134A) with U.S. Citizenship and Immigration Services (USCIS) and must agree "to provide [the CHNV beneficiary] with financial support for the duration of their parole in the United States."[10] The CHNV alien then arrives at a U.S. airport where a DHS official paroles the alien into the country.[11] Once paroled, the alien can apply for a work permit.[12]

Federal law requires that the DHS Secretary use his parole authority only on a "case-by-case basis for urgent humanitarian reasons or significant public benefit."[13] The Biden-Harris Administration not only ignores federal law to achieve its desired goals; even worse, the Biden-Harris Administration's unlawful CHNV program is plagued by so much fraud that DHS itself was forced to pause the program in July 2024.[14] An internal DHS report on the CHNV parole program found, among other major problems with supporter applications, that "forms from those applying for the program included social security numbers, addresses[,] and phone numbers being used hundreds of times in some cases."[15] Nonetheless, despite this documented evidence of fraud, the Biden-Harris Administration announced in late August 2024 that it would restart the program.[16]

Since 2023, the Committee on the Judiciary and its Subcommittee on Immigration Integrity, Security, and Enforcement have conducted rigorous oversight of the Biden-Harris border crisis, including the Administration's abuses of immigration law. This oversight has uncovered how the Biden-Harris Administration's willingness to cast aside the best interests of Americans has enabled fraud, undermined national security, and endangered public safety, all in favor of ensuring that hundreds of thousands of otherwise illegal aliens can come to the U.S. through CHNV. For example:

- USCIS has approved CHNV supporters even when the supporter submitted fraudulent documents as a part of the supporter application.[17]

- USCIS has approved CHNV supporters who admitted that the income they plan to use to support the CHNV alien includes income derived from criminal activity.[18]

---

[9] Press Release, *CBP Releases September 2024 Monthly Update*, U.S. CUSTOMS AND BORDER PROT. (Oct. 22, 2024), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-september-2024-monthly-update.

[10] USCIS CHNV Process, *supra* note 7.

[11] *Id*.

[12] *Id*.

[13] 8 U.S.C. § 1182(d)(5)(A).

[14] *See* Julia Ainsley, *Biden administration to restart immigration program that was paused over fraud concerns*, NBC NEWS (Aug. 29, 2024, 2:00 PM), https://www.nbcnews.com/investigations/biden-admin-restart-chnv-immigration-program-paused-fraud-concern-rcna168838.

[15] Adam Shaw, *Biden admin freezes controversial migrant flight program after fraud revelations*, FOX NEWS (Aug. 2, 2024, 10:55 AM), https://www.foxnews.com/politics/biden-admin-freezes-controversial-migrant-flight-program-after-fraud-revelations.

[16] *See* Ainsley, *supra* note 14.

[17] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).

[18] *Id*.

- USCIS has approved CHNV supporters who admitted to receiving means-tested public benefits as part of their income listed as evidence that they can support a CHNV alien.[19] Thus, American taxpayers may actually end up supporting CHNV aliens despite Biden-Harris Administration claims that those aliens will have supporters in the U.S.

- USCIS has refused to tell the Committee whether it has any mechanism or remedy to ensure that CHNV supporters fulfill their agreement to provide the CHNV alien financial support during the time for which the alien is paroled in the U.S.[20] If the approved supporter does not financially support the CHNV alien, that burden will fall to American taxpayers.

- USCIS has confirmed CHNV supporters who are aliens in the United States *on a short-term basis* and who are subject to removal from the U.S. at any time, such as aliens on temporary visas, Temporary Protected Status (TPS) holders, Deferred Action for Childhood Arrival (DACA) recipients, and even parolees themselves.[21] As a result, CHNV is a supercharged chain migration program in which foreign nationals in the U.S. on a temporary basis can sponsor additional foreign nationals to travel to the U.S. on a temporary basis, who can then sponsor additional foreign nationals to enter the country, and so on.

- USCIS has approved CHNV applications to allow aliens into the country who do not even reside in one of the four CHNV countries.[22]

- Sex traffickers have potentially used CHNV to exploit women and girls. A fraud analysis of CHNV applications revealed that some applications that were sent from the same IP addresses were submitted on behalf of a high proportion of female CHNV aliens. In one such case, 21 supporter applications were submitted from the same IP address on behalf of 18 females and only three males. At least six of the females were under the age of 18.[23]

This interim staff report builds upon of the Committee's and Subcommittee's oversight of the Biden-Harris Administration's enforcement of immigration law to inform legislative reforms. It is clear that Congress must act to address the massive influx of illegal immigrants during the Biden-Harris Administration and rein in the Administration's dangerously radical open-border policies.

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Biden-Harris Admin. records (on file with Comm.) [hereinafter Biden-Harris Admin. records].

CHNV-FRN-00295

## TABLE OF CONTENTS

EXECUTIVE SUMMARY..................................................................................................... 1

TABLE OF CONTENTS .................................................................................................... 4

THE BIDEN-HARRIS ADMINISTRATION CREATES AN ILLEGAL PROGRAM RIPE FOR FRAUD ............. 5

FRAUD IS NOT THE ONLY FLAW IN THE BIDEN-HARRIS ADMINISTRATION'S CHNV PROGRAM....... 9

CONCLUSION.................................................................................................................. 12

CHNV-FRN-00296

## THE BIDEN-HARRIS ADMINISTRATION CREATES AN ILLEGAL PROGRAM RIPE FOR FRAUD

For the past four years, President Biden and Vice President Harris have upended the U.S. immigration system by not only opening the southwest border but also failing to enforce the nation's immigration laws. Under the Constitution, Congress has plenary power over U.S. immigration law.[24] As part of this power, in 1952, Congress created immigration parole authority to allow aliens without the legal means to enter the United States a way to do so "temporarily."[25] Over time, administrations began to abuse the parole authority by using it to admit indefinitely large classes of aliens not otherwise admissible to the United States.[26] In 1996, in response to increasing abuses of parole authority by the Executive Branch, Congress placed explicit restrictions on the parole authority.[27] Under current law, these restrictions require that parole be used only on a "case-by-case basis for urgent humanitarian reasons or significant public benefit."[28]

Despite the clear restrictions on parole, the Biden-Harris Administration refuses to follow the law, instead opting to abuse its authority by creating parole programs for entire classes of foreign nationals.[29] For example, in October 2022, the Administration announced a categorical parole program for Venezuelan nationals that would allow "[a]ny U.S.-based individual with lawful status, including representatives of businesses or other organizations or entities[,]. . ." to "support a potential beneficiary[]" who would then be paroled into the United States and would be eligible to receive a work permit.[30] On January 5, 2023, DHS announced that it would expand the program to nationals of Cuba, Haiti, and Nicaragua.[31]

---

[24] U.S. CONST. Art. 1, §8, cl. 4.

[25] Immigration and Nationality Act of 1952, § 212(d)(5).

[26] George Fishman, The Pernicious Perversion of Parole: A 70-year battle between Congress and the president, CENTER FOR IMMIGR. STUDIES (Feb. 2022), https://cis.org/sites/default/files/2022-02/fishman-parole_0.pdf.

[27] 8 U.S.C. § 1182(d)(5)(A).

[28] Id.

[29] *The Biden Border Crisis: Is the Law Being Faithfully Executed?: Hearing Before the H. Subcomm. on Immigration Integrity, Security, and Enforcement, H. Comm. on the Judiciary,* 118th Cong. (June 7, 2023) (statement of Joseph B. Edlow).

[30] Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans*, U.S. DEP'T OF HOMELAND SEC. (Oct. 12, 2022) https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[31] Press Release, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes, U.S. DEP'T OF HOMELAND SEC. (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

CHNV-FRN-00297

Aliens eligible for CHNV not only include "national[s] of "Cuba, Haiti, Nicaragua, or Venezuela," but also "their immediate family member of any nationality."[32] According to information provided to the Committee by DHS, as of August 6, 2024, while over 650,200 CHNV supporter applications had been approved, applications had actually been filed on behalf of nearly three million CHNV aliens.[33] So many CHNV supporter applications were filed that as one Administration document stated, the application "is now the second most filed form" at USCIS.[34] Of the almost three million total applications, nearly 760,000 CHNV applications have been filed on behalf of Cuban nationals, nearly 1.5 million on behalf of Haitian nationals, nearly 178,000 on behalf of Nicaraguan nationals, and more than 432,300 on behalf of Venezuelan nationals.[35]



According to U.S. Customs and Border Protection (CBP), as of "the end of September 2024, more than 531,000" aliens had been paroled into the U.S. through the CHNV program.[36] Of those, more than 110,000 were nationals of Cuba, nearly 211,000 were nationals of Haiti, more than 93,000 were nationals of Nicaragua, and about 117,000 were nationals of Venezuela.[37] As of August 6, 2024, the Biden-Harris Administration had granted work permits to nearly 405,000 of those aliens paroled in through the CHNV program.[38]

---

[32] USCIS CHNV Process, *supra* note 7.
[33] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[34] Biden-Harris Admin. document (on file with Comm.)
[35] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[36] Press Release, *CBP Releases September 2024 Monthly Update*, U.S. CUSTOMS AND BORDER PROT. (Oct. 22, 2024) https://www.cbp.gov/newsroom/national-media-release/cbp-releases-september-2024-monthly-update.
[37] *Id*.
[38] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).

CHNV-FRN-00298



Aliens paroled into the U.S. via the CHNV program do not even have to reside in their country of nationality. The Administration simply asserts that they must "be outside the United States."[39] Thus, according to DHS, as of August 6, 2024, supporter applications had been filed on behalf of nearly 80,000 CHNV aliens who were living in countries other than Cuba, Haiti, Nicaragua, or Venezuela.[40]

After encouraging nearly half a million foreign nationals to take advantage of the CHNV parole program to enter the U.S., the Biden-Harris Administration quietly suspended parts of the program in early July 2024[41] following "revelations of massive fraud"[42] documented in an analysis compiled by DHS fraud detection experts.[43] The DHS analysis, which was completed in May of 2024, documented substantial evidence of fraudulent activity in the Biden-Harris Administration's CHNV program. For example:

---

[39] USCIS CHNV Process, *supra* note 7.

[40] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).

[41] Getbacks from the CHNV briefing for staff of DHS Authorizers held on Monday, August 5, 2024 (Aug. 19, 2024) (on file with Comm.).

[42] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards*, WASH. TIMES (Aug. 2, 2024), https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.

[43] Biden-Harris Admin. records.

CHNV-FRN-00299

- The same Social Security Number was used on at least 20 different CHNV supporter applications. This happened more than 3,200 times.

- The same phone number was used on at least 20 different supporter applications. This happened more than 3,300 times.

- The same email address was used on at least 20 different supporter applications. This happened nearly 2,000 times.

- The same 184-word text response to a question on the supporter application was used on more than 1,800 such applications by nearly 190 different CHNV supporters.

- More than 460 nonexistent zip codes were used on supporter applications on behalf of more than 2,800 CHNV aliens.[44]

In addition to identifying rampant fraud, the DHS fraud analysis documented other "concerning trends."[45] For instance, it found that a number of electronically filed supporter applications were sent from the same IP addresses and were submitted on behalf of a high proportion of female CHNV aliens, raising concerns about potential sex trafficking.[46] In one such case, 21 supporter applications were submitted from the same IP address on behalf of 18 females and only three males.[47] At least six of the females were under the age of 18.[48] Another concern surrounded the use of the same physical address by many supporters. According to the DHS analysis, 100 physical addresses were used at least 124 times each on behalf of 19,062 CHNV aliens.[49]

Media reports documented additional fraud in the CHNV program in September 2024, citing an internal DHS document.[50] According to reports, the author of the document stated, "[s]ince there is little to no barrier to entry to file . . . there is a lot of fraud, exploitation, and duplicative filings that have occurred."[51] For example, the document explained, individuals in the United States "sell sponsorships on social media to migrants with whom they had no connection," and "[n]early 1,000 applications [were] approved with Social Security numbers of dead people."[52]

Incredibly, DHS itself admitted to the Committee that it had approved CHNV supporter applications for which fraudulent documents had been submitted, claiming that some fraud "may

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] Stephen Dinan, *Fraud plagues Biden 'parole' program: Michelle Obama's passport used; dead people named sponsors*, WASH. TIMES (Sept. 9, 2024), https://www.washingtontimes.com/news/2024/sep/9/biden-immigration-parole-program-plagued-by-fraud-/.
[51] *Id.*
[52] *Id.*

CHNV-FRN-00300

only be evident after a supporter has filed several Forms I-134A with similar elements."[53] Thus, because DHS is knowingly allowing fraudulent CHNV applications to proceed, the true number of supporter applications approved with fraudulent documents is unknown. Despite this rampant fraud, the Biden-Harris Administration has no plans to retroactively verify any of the potentially fraudulent information provided in CHNV supporter applications approved prior to August 2024 and for which aliens have already been paroled into the U.S.[54]

### FRAUD IS NOT THE ONLY FLAW IN THE BIDEN-HARRIS ADMINISTRATION'S CHNV PROGRAM

The Committee's oversight of the CHNV program has revealed flaws other than fraud in the Biden-Harris Administration's CHNV program. According to nonpublic data provided by DHS pursuant to Committee requests, among other concerns, CHNV supporters are approved by USCIS despite the supporter's participation in illegal activity, use of welfare benefits, and temporary status in the U.S.[55]



*USCIS will approve CHNV application even if supporters acknowledge their income to support a parolee comes from "means-tested public benefits."*

USCIS approves CHNV supporters who cannot even support themselves without assistance from the federal government.[56] The supporter application asks potential supporters whether "any of the income" listed by the supporter as a means to financially support the CHNV alien comes "from means-tested public benefits."[57] These benefits "include food stamps, Medicaid, Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), and the State Child Health Insurance Program (SCHIP)."[58] According to DHS, as of August 6, 2024, USCIS had approved 336 CHNV supporter applications for individuals who admitted to having income from means-tested public benefits that would be used to support a CHNV alien.[59]

Perhaps even more concerning is the Biden-Harris Administration's desire to reward criminal behavior. The CHNV supporter application asks the potential supporter whether "any of the income" listed by the supporter as a means to financially support the CHNV alien comes "from an illegal activity or source (such as proceeds from illegal gambling or illegal drug

---

[53] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[54] Briefing by U.S. Dep't of Homeland Sec. officials for House Comm. staff, Oct. 13, 2024.
[55] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[56] *Id.*
[57] Form I-134A, *Online Request to be a Supporter and Declaration of Financial Support*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf.
[58] *See generally* U.S. Citizenship and Immigr. Servs., *I-864P, 2024 HHS Poverty Guidelines for Affidavit of Support*, U.S. DEP'T OF HOMELAND SEC., https://www.uscis.gov/i-864p.
[59] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[59] *Id.*

CHNV-FRN-00301

sales)."[60] According to DHS, as of August 6, 2024, USCIS had approved 21 supporter applications despite the supporter's admission that at least part of the income was derived from an illegal source or activity.[61] Incredibly, DHS told the Committee that the applications were approved because "the financial evidence provided was evaluated and a determination was made that the supporters had sufficient income that didn't arise from an illegal activity."[62] Thus, USCIS adjudicators knowingly allowed individuals in the U.S. who were actively participating in criminal enterprises to sponsor foreign nationals to come to the U.S.



*USCIS will approve CHNV application even if supporters acknowledge their income to support a parolee comes from "an illegal activity or source."*

Also surprising is that USCIS approves as CHNV supporters aliens who are in the United States *on a short-term basis,* such as on temporary (worker or visitor) visas, as Temporary Protected Status holders, as Deferred Action for Childhood Arrival recipients, and even as CHNV parolees themselves. When a supporter files a Form I-134A on behalf of an alien, the supporter agrees "to provide [the alien] with financial support for the duration of their parole in the United States."[63] However, aliens in the U.S. on a temporary basis are subject to removal from the country at any time.[64] Thus, there is no guarantee that CHNV supporters in the U.S. on

---

[60] Form I-134A, *Online Request to be a Supporter and Declaration of Financial Support*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf.

[61] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).

[62] *Id.*

[63] USCIS CHNV Process, *supra* note 7.

[64] 8 U.S.C. § 1227.

CHNV-FRN-00302

a temporary basis will be in the country for the same time period as the CHNV alien they agreed to support.

Nonetheless, as of August 6, 2024, DHS had approved more than 80,000 CHNV supporters who are in the U.S. on a temporary basis.[65] These short-term supporters included:

- 224 CHNV parolees approved as CHNV supporters;

- 170 additional parolees (non-CHNV) approved as CHNV supporters;

- 28,322 Temporary Protected Status holders approved as CHNV supporters;

- 19,865 asylees approved as CHNV supporters;

- 311 DACA recipients approved as CHNV supporters;

- 1,317 aliens in the U.S. on temporary visas (including as visitors, as workers, as students, as fiancés of U.S. citizens, and as exchange visitors) approved as CHNV supporters;

- 64 refugees approved as CHNV supporters; and

- 1,912 Conditional Permanent Residents approved as CHNV supporters.[66]

In other words, the Biden-Harris Administration's CHNV program incentivizes a new form of chain migration, in which foreign nationals in the U.S. on a temporary basis can sponsor additional foreign nationals to travel to the U.S. on a temporary basis, who can then sponsor additional foreign nationals to enter the country, and so on. The cycle appears unending. Despite repeated requests, DHS has refused to tell the Committee whether there is any proactive mechanism in place to ensure that CHNV supporters comply with the supporter agreement to provide the CHNV alien financial support during the time for which the alien is paroled in the U.S.[67] Instead, DHS merely noted that USCIS has a "centralized mailbox for government partners to share concerns discovered after USCIS has [approved] the Form I-134A," but that no referrals regarding "supporter noncompliance" had been received as of August 6, 2024.[68]

DHS has also refused to be candid and forthcoming with the Committee about its approvals of CHNV supporters who commit criminal activity that is not necessarily related to their income. When the Committee requested data regarding approved supporters who had criminal convictions, including an exhaustive list of the crimes for which the supporters have been convicted, DHS did not provide the information.[69] Instead, DHS offered an official response stating that "USCIS is not aware" of any approved supporters who have "confirmed"

---

[65] Info. provided to Comm. staff by U.S. Dep't of Homeland Sec. (Aug. 19, 2024) (on file with Comm.).
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*

CHNV-FRN-00303

records for known gang affiliation, commission of aggravated felonies (such as murder, rape, and sexual abuse), or commission of firearms offenses. [70]

While DHS's response suggests that there are no CHNV supporters who have criminal convictions, a version of this response that DHS drafted and never sent—and which the Committee obtained—shows that DHS did not tell the whole story.[71] According to this draft DHS response, the agency could not answer the Committee's question about supporters' criminal convictions "because USCIS does not conduct biometric or biographic based criminal history checks on all CHNV



supporters."[72] In addition, even if USCIS wanted to do its due diligence with regard to supporters' criminal records, the draft response noted that "USCIS is not authorized to conduct systematic National Crime Information Center . . . criminal history checks . . . as USCIS is not considered a criminal justice law enforcement entity, and is not given full systemic access to criminal history records by the FBI."[73] This draft response is an alarming admission that despite knowing it could not properly vet CHNV supporters, the Biden-Harris Administration created and implemented CHNV to, in part, fulfill its open-borders agenda.

---

## CONCLUSION

Whether aliens who have no legal basis to be in the United States run across the open southwest border or fly directly into U.S. airports via one of the Biden-Harris Administration's illegal categorical parole programs, the damaging economic, public safety, and national security effects on Americans are the same. Communities across the country have been negatively affected by the influx of aliens under this Administration, including the more than half a million CHNV parolees.[74] These damaging effects on American communities are all the more disturbing

---

[70] *Id*.

[71] Biden-Harris Admin. draft document (on file with Committee).

[72] *Id*.

[73] *Id*.

[74] Catherine E. Shoichet, '*Why Springfield?' How a small Ohio city became home for thousands of Haitians,* CNN (Sept. 19, 2024), https://www.cnn.com/2024/09/19/us/springfield-ohio-haitians-immigration-cec/index.html; Josh Christenson, *DHS restarts migrant flights from Cuba, Haiti, Nicaragua, and Venezuela – weeks after halting*

CHNV-FRN-00304

in light of the massive fraud and other concerns discovered in the CHNV program. That the Biden-Harris Administration implemented the program without regard to fraud prevention, criminal activity, or the effect on American communities serves as further proof that the Administration prioritizes the best interests of illegal aliens above the best interests of Americans.

---

*program over 'fraud' concerns*, N.Y. POST (Aug. 29, 2024), https://nypost.com/2024/08/29/us-news/dhs-restarts-migrant-flights-from-cuba-haiti-nicaragua-and-venezuela-weeks-after-halting-program-over-fraud-concerns/.

CHNV-FRN-00305

CENTER FOR IMMIGRATION STUDIES                     MAY 2016

# The Cost of Welfare Use
# By Immigrant and Native Households

## By Jason Richwine

In September 2015, the Center for Immigration Studies published a landmark study of immigration and welfare use, showing that 51 percent of immigrant-headed households used at least one federal welfare program — cash, food, housing, or medical care — compared to 30 percent of native households. Following similar methodology, this new study examines the dollar cost of that welfare use.

- The average household headed by an immigrant (legal or illegal) costs taxpayers $6,234 in federal welfare benefits, which is 41 percent higher than the $4,431 received by the average native household.

- The average immigrant household consumes 33 percent more cash welfare, 57 percent more food assistance, and 44 percent more Medicaid dollars than the average native household. Housing costs are about the same for both groups.

- At $8,251, households headed by immigrants from Central America and Mexico have the highest welfare costs of any sending region — 86 percent higher than the costs of native households.

- Illegal immigrant households cost an average of $5,692 (driven largely by the presence of U.S.-born children), while legal immigrant households cost $6,378.

- The greater consumption of welfare dollars by immigrants can be explained in large part by their lower level of education and larger number of children compared to natives. Over 24 percent of immigrant households are headed by a high school dropout, compared to just 8 percent of native households. In addition, 13 percent of immigrant households have three or more children, vs. just 6 percent of native households.

## Introduction

In September 2015, the Center for Immigration Studies published a landmark study of immigration and welfare use, showing that 51 percent of immigrant-headed households (legal and illegal) use at least one federal welfare program, compared to 30 percent of native households.[1] "Welfare" refers to means-tested anti-poverty programs. These include direct cash assistance in the form of Supplemental Security Income (SSI) and Temporary Assistance for Needy Families (TANF); food aid such as free school lunch, the Women, Infants, and Children (WIC) nutrition program, and food stamps; Medicaid; and housing assistance in the form of rent subsidies and public housing. Not included are social insurance programs for which participants must generally pay into the system before drawing benefits, such as Social Security and Medicare.

The earlier CIS study was notable for showing much higher welfare participation rates than previously reported. The reason is that earlier studies measured welfare participation with the Annual Social and Economic Supplement (ASEC) of the Current Population Survey. The ASEC is a simple cross-sectional dataset widely used in labor market research. However, the ASEC substantially undercounts welfare participation, in part because it asks respondents to recall their welfare use over a period between three and 15 months before the interview takes place. To address the undercount problem, CIS used a more complex dataset called the Survey of Income

*Jason Richwine, PhD, is an independent public policy analyst based in Washington, D.C., and a contributing writer at* National Review.

CHNV-FRN-00306

and Program Participation (SIPP). As the name implies, the Census Bureau specifically designed the SIPP to measure participation in government programs. In addition, the SIPP is a "longitudinal" dataset, meaning it follows the same respondents over time, asking them about their *monthly* program participation in three different interview "waves" throughout the year. The result is a much more complete picture of welfare participation compared to what the ASEC provides.

Table 1, adapted from that CIS study, quantifies the differences. While the SIPP shows that 51 percent of immigrant-headed households and 30 percent of native-headed households used at least one welfare program in 2012, the comparable figures in the ASEC for immigrant and native households are just 39 percent and 24 percent, respectively.

Note that the ASEC generally undercounts immigrant welfare use more than it undercounts native use. For example, the Medicaid participation rate among native households is 1.27 times (or 27 percent) higher in the SIPP compared to the ASEC, while Medicaid participation among immigrant households is 1.39 times (or 39 percent) higher.

## Table 1. Comparison of Welfare Participation Rates in the SIPP and the ASEC

|  | Native Households | | | Immigrant Households | | |
|---|---|---|---|---|---|---|
| Program | SIPP | ASEC | Ratio | SIPP | ASEC | Ratio |
| Any Welfare | 30.2% | 24.0% | 1.26 | 51.3% | 38.5% | 1.33 |
| Cash | 9.5% | 5.3% | 1.80 | 11.9% | 6.3% | 1.88 |
| SSI | 7.1% | 4.2% | 1.69 | 9.0% | 4.5% | 1.99 |
| TANF | 1.7% | 1.3% | 1.33 | 2.1% | 2.0% | 1.05 |
| Food | 21.8% | 14.7% | 1.49 | 40.3% | 25.6% | 1.58 |
| School Lunch | 12.4% | 6.8% | 1.82 | 30.0% | 17.3% | 1.73 |
| WIC | 4.2% | 2.5% | 1.67 | 10.9% | 5.9% | 1.84 |
| SNAP | 15.6% | 10.7% | 1.46 | 20.8% | 13.5% | 1.54 |
| Medicaid | 22.8% | 17.9% | 1.27 | 41.6% | 29.9% | 1.39 |
| Housing | 5.9% | 4.3% | 1.38 | 6.0% | 5.2% | 1.15 |
| Public | 5.0% | 3.0% | 1.67 | 5.0% | 3.5% | 1.43 |
| Subsidized | 1.7% | 1.3% | 1.27 | 1.6% | 1.6% | 0.98 |

**Source:** Camarota, "Welfare Use by Immigrant and Native Households", Table A1. The ASEC is the Annual Social and Economic Supplement of the Current Population Survey. The SIPP is the Survey of Income and Program Participation. Ratio is the SIPP participation rate divided by the ASEC participation rate. In this table, the Cash category includes several miscellaneous programs such as state general assistance and veterans' compensation. In the rest of this paper, Cash refers exclusively to SSI and TANF. See the Appendix for more details.

**Why Study the Cost of Welfare Use?** The contribution of this new CIS study is to go beyond participation rates in the SIPP by estimating the dollar costs associated with immigrant and native welfare use. The purpose is two-fold. First, cost estimates are a natural extension of the original project. While it is important for Americans to understand the rate of welfare use among immigrants, expressing that use in dollar terms offers a more tangible metric that is tied to current debates over fiscal policy. With the nation facing a long-term budgetary deficit, this study helps illuminate immigration's impact on the problem.

The second purpose is more technical. As elaborated in the next section and in the Appendix, a standard strategy in cost studies is to take the undercounted costs in survey data and adjust them so that the total equals the official budgetary numbers. For example, when the National Research Council conducted its comprehensive fiscal analysis of immigration in 1997, the report's authors first calculated the percentage of a given welfare program's cost attributed to immigrants in the ASEC, then applied that percentage to the program's official budgetary cost.[2] The assumption was that the undercount of welfare participation in the ASEC was the same for both immigrants and natives.[3] Given Table 1 above, we now know that assumption does not hold. Undercount is greater for immigrants in the ASEC, meaning that immigrants use more welfare relative to natives than is reported in the National Research Council analysis. Estimating the dollar costs of welfare programs using the SIPP offers the chance for a more fine-tuned comparison.

**Methodology Outline.** The federal budget shows only how much the government spends on each program, not the demographics of recipients. Therefore, the only way to allocate welfare costs between immigrants and natives is to start with a survey — in this case, the SIPP — that includes both respondents' welfare participation *and* their demographic characteristics.

The SIPP can be used to estimate the portion of welfare costs listed in the government's budget that goes to immigrants. The assumption here is *not* that immigrants cost exactly what is reported in the SIPP, since surveys inevitably undercount receipt of government services. The key assumption is only that the fraction of costs attributed to immigrants in the SIPP is the same as the fraction of the real budgetary costs consumed by immigrants. For example, if immigrants account for 20 percent of SSI dollars reported in the SIPP, this study assumes that immigrants consume 20 percent of actual SSI spending reported in the budget.

The above approach — calculating the costs attributable to immigrant- or native-headed households in a survey, then adjusting those costs so that the total reflects official budgetary numbers — is equivalent to the National Research Council method mentioned earlier, except that CIS uses the more accurate SIPP rather than the ASEC to establish the initial allocation between immigrants and natives. Please see the Appendix for more details.

Technical specifics aside, the findings presented in the next section are *estimates.* All surveys — even the best ones, such as the SIPP — are subject to measurement error, particularly when the surveys ask respondents for the amount of money they receive from various programs. Adjusting the survey costs to reflect budgetary totals eliminates much of the uncertainty. However, the estimates presented in the next section should not be confused with exact budgetary figures.

# Findings

The main findings are presented in Table 2. The average welfare cost in immigrant-headed households is $6,234, compared to $4,431 in native-headed households. Immigrant households consume more cash, food, and Medicaid dollars than native households, while housing costs are roughly the same for both groups. Figure 1 shows that Medicaid is the largest welfare program, driving a large part of the overall difference between immigrants and natives.

**Sending Region**. The cost of immigrant welfare use varies by the immigrants' region of origin. Figure 2 shows that the highest-cost households are those headed by immigrants from Central America and Mexico, consuming an average of $8,251 in welfare spending. Households headed by immigrants from Europe and Asia tend to be the least costly. Unfortunately, individual countries are not identified in the SIPP, so a finer-grained analysis is not possible.[4]

**Legal Status**. Although the SIPP does not directly measure legal status, probability models can be used to determine which immigrants are most likely to be in the country illegally.[5] Table 3 indi-

## Table 2. Average Cost of Household Welfare Use in 2012

| Program | Native Households Cost | Native Households 90 % C.I. (±) | Immigrant Households Cost | Immigrant Households 90 % C.I. (±) | Immigrant/ Native Cost Ratio |
|---|---|---|---|---|---|
| Any Welfare | 4,431 | 140 | 6,234 | 413 | 1.41 |
| Cash | 517 | 29 | 686 | 93 | 1.33 |
| SSI | 446 | 27 | 589 | 89 | 1.32 |
| TANF | 70 | 8 | 97 | 27 | 1.38 |
| Food | 689 | 26 | 1,083 | 89 | 1.57 |
| School Lunch | 66 | 3 | 179 | 12 | 2.71 |
| WIC | 32 | 2 | 83 | 9 | 2.57 |
| SNAP | 590 | 24 | 821 | 79 | 1.39 |
| Medicaid | 2,831 | 99 | 4,072 | 270 | 1.44 |
| Housing | 395 | 26 | 394 | 63 | 1.00 |
| Sample Size | 22,077 | | 2,980 | | |
| Weighted n (millions) | 104.6 | | 16.16 | | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data. Households are classified by the nativity of the household head.

C.I. = confidence interval.



Figure 1. Immigrant households consumed more welfare than native households in 2012.

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.

Food programs include free or reduced school lunch, WIC, and food stamps; cash includes SSI and TANF; and housing includes subsidized and public housing.

Households are classified by the nativity of the household head.

cates that households headed by (likely) illegal immigrants have an average welfare cost of $5,692. Illegal immigrants are barred from directly accessing most (though not all) welfare programs, but they can receive welfare through their U.S.-born children.[6] Legal immigrant households, which have greater eligibility for welfare, cost $6,378 on average.

**Workers.** A popular misconception about the American welfare system is that it mainly benefits people who are not in the labor force. In fact, most means-tested anti-poverty programs are open to low-wage workers. For that reason, limiting the analysis to households with at least one worker, as Table 4 does, only modestly reduces the welfare cost estimates. The drop is especially small for immigrant households — from an overall cost of $6,234 in Table 2 to $5,340 in Table 4 — because 84 percent of immigrant households already contain a worker (vs. 73 percent of native households). Therefore, the higher welfare spending on immigrant households compared to native households is *not* due to a lack of work among immigrants. The difference is better explained by the demographic factors analyzed below.

**Education.** It is easy to understand why people with fewer skills are more likely to participate in welfare programs, since eligibility for those programs requires a low income. Unsurprisingly, Table 5 shows that welfare costs decrease as the education of the household head increases. Whereas immigrant households headed by a high school dropout cost an average of $10,329, immigrant households with college-educated heads cost just $2,455. The table demonstrates that the difference between immigrant and native household welfare costs becomes smaller after accounting for education.

Some differences remain. College-educated immigrant households consume substantially more welfare than comparably educated na-



**Figure 2. Household welfare consumption in 2012 tended to be higher among immigrants from Latin America and lower among immigrants from Europe and Asia.**

| | |
|---|---|
| Natives | $4,431 |
| Central America and Mexico | $8,251 |
| South America | $6,159 |
| Caribbean | $5,705 |
| Africa | $5,631 |
| East Asia | $5,260 |
| Europe | $3,509 |
| South Asia | $2,565 |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
Individual countries are not identified in the source data.

**Table 3. Average Household Cost of Welfare Use in 2012, by Legal Status**

| Program | Native Households Cost | Native Households 90% C.I. (±) | Legal Imm. Households Cost | Legal Imm. Households 90% C.I. (±) | Illegal Imm. Households Cost | Illegal Imm. Households 90% C.I. (±) |
|---|---|---|---|---|---|---|
| Any Welfare | 4,431 | 140 | 6,378 | 485 | 5,692 | 669 |
| Cash | 517 | 29 | 805 | 113 | 238 | 84 |
| SSI | 446 | 27 | 712 | 108 | 122 | 65 |
| TANF | 70 | 8 | 92 | 31 | 116 | 54 |
| Food | 689 | 26 | 999 | 95 | 1,399 | 194 |
| School Lunch | 66 | 3 | 143 | 12 | 314 | 33 |
| WIC | 32 | 2 | 64 | 9 | 156 | 25 |
| SNAP | 590 | 24 | 792 | 85 | 929 | 166 |
| Medicaid | 2,831 | 99 | 4,131 | 313 | 3,846 | 476 |
| Housing | 395 | 26 | 443 | 73 | 209 | 84 |
| Sample Size | 22,077 | | 2,412 | | 568 | |
| Weighted n (millions) | 104.6 | | 12.77 | | 3.39 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data. Households are classified by the nativity of the household head. Legal status is determined by a probability model described in Camarota, "Welfare Use by Legal and Illegal Immigrant Households". C.I. = confidence interval.

tives. At the other end of the skill spectrum, immigrant households headed by a high school dropout use less welfare than their native counterparts. More important than those intra-education differences, however, is the distribution of education across households. The "Percentage" rows in Table 5 show that over 24 percent of immigrant households are headed by a high-school dropout, vs. just 8 percent of native households. Such stark educational differences will inevitably lead to differences in welfare consumption.

**Children.** Another important cause of the difference between immigrant and native households is the presence of minor children. Table 6 shows that costs are similar for a given number of children, and immigrant households have more children on average than native households. However, the presence of children is not the only reason for the relatively higher welfare cost of immigrant households. Table 6 shows that immigrant households *without* children consume significantly more welfare dollars than childless native households.

**Race and Ethnicity.** Regardless of nativity, households headed by blacks or Hispanics consume more welfare dollars on average than households headed by whites or Asians. However, Table 7 shows some interesting immigrant-native differences within racial groups. Immigrant households headed by blacks and Hispanics cost less than their native counterparts, while white- and Asian-headed immigrant households cost more. Despite the lower cost among immigrant Hispanics compared to native Hispanics, a much larger proportion of immigrant households are headed by Hispanics, which contributes to the greater overall cost difference between immigrants and natives.

### Table 4. Average Cost of Welfare Use in 2012 in Households with a Worker

| Program | Native Households | | Immigrant Households | |
|---|---|---|---|---|
| | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
| Any Welfare | 3,208 | 126 | 5,340 | 391 |
| Cash | 291 | 25 | 458 | 83 |
|   SSI | 250 | 24 | 384 | 79 |
|   TANF | 41 | 8 | 75 | 26 |
| Food | 596 | 27 | 1,035 | 85 |
|   School Lunch | 71 | 3 | 196 | 13 |
|   WIC | 35 | 3 | 91 | 10 |
|   SNAP | 490 | 25 | 748 | 75 |
| Medicaid | 2,135 | 93 | 3,638 | 277 |
| Housing | 187 | 18 | 208 | 44 |
| Sample Size | 15,372 | | 2,427 | |
| Weighted n (millions) | 76.7 | | 13.64 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
Worker status is determined by the January interview.
C.I. = confidence interval.
Table A5 contains more detailed data.

**Explaining Immigrant-Native Cost Differences with Regression Analysis.** What explains the cost difference between immigrant and native households? The preceding sections control one at a time for factors such as education and number of children. This section uses regression analysis to simultaneously control for multiple explanatory variables, giving a better sense of which factors are most important.

Table 8 shows how the difference between immigrant and native welfare costs varies depending on the controls. The first row gives the baseline estimate with no controls other than an indicator for immigrant status. In the no-control scenario, immigrant households cost $1,803 more than native households, which is consistent with Table 2 above. The second row shows that the immigrant-native difference becomes larger — up to $2,323 — when we control for the presence of a worker in the household. The difference then becomes gradually smaller as controls are added for education and number of children. The fourth row shows that immigrant households with the same worker status, education, and number of children as native households cost just $309 more, which is a statistically insignificant difference. The fifth row shows that immigrants use fewer welfare dollars when they are compared to natives of the same race as well as worker status, education, and number of children.

Although this regression analysis is interesting from a sociological perspective, it is important not to overstate its importance. Once we control for demographic factors, we are now looking only at hypothetical costs that might exist *if* immigrants had the average characteristics of natives. It is easy to see how these hypothetical costs could be abused in policy debates. For example, immigration restrictionists might argue that immigrants are uniquely prone to using welfare because they cost more than natives with the same employment status. Supporters of expanded immigration might counter that immigrants' greater attachment to the workforce is more important than their welfare use.

Similarly, immigration advocates often argue that although immigrants use more welfare than natives, low-skill immigrants use less welfare than low-skill natives.[7] (See the "less than high school" column in Table 5.) Critics respond that this is the

wrong standard for judgment. Just because poor and unskilled immigrants may consume fewer welfare dollars than equally poor and unskilled natives, it does not necessarily follow that such immigrants are good candidates for residence and citizenship, since the United States could simply pursue immigrants who do not have low levels of education in the first place.

The most important row in Table 8 is the first one, which shows the actual cost differences between immigrants and natives. The remaining rows help establish the reasons for the differences — and, in so doing, may inform policy debates regarding skill selection — but immigrants do not become more or less costly based on their hypothetical characteristics. It is the actual characteristics that matter.

**Cost of Households Currently Using a Given Welfare Program.** Up to this point, every table in this study has shown welfare costs averaged across all households regardless of whether the households are participating in a welfare program. In other words, many $0 values are included in the averages. These tables answer the question, "How much does the average immigrant household cost in welfare expenditures compared to native households?"

A related but different question is how much immigrant and native households cost once they are on the welfare program in question. Table 9 restricts the cost averages to households participating in the welfare program listed in each row. For example, among immigrant households receiving SSI, the average benefit is $6,561, compared to $6,274 for native households receiving SSI. Immigrant and native household costs are generally similar in Table 9, with the important exception of Medicaid. Once enrolled in Medicaid, immigrant households cost less on average than native households, perhaps due to immigrant coverage being more tilted toward children rather than the elderly and disabled. In fact, because of legal restrictions, immigrant households are more likely to be "child-only" welfare recipients.[8]

| Table 5. Average Cost of Household Welfare in 2012, by Education | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Native Households** | | | | | | | |
| | Less Than High School | | High School | | Some College | | College Degree Or More |
| **Program** | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
| Any Welfare | 11,671 | 804 | 6,202 | 412 | 4,496 | 217 | 1,099 | 115 |
| Cash | 1,573 | 174 | 700 | 70 | 509 | 42 | 112 | 23 |
| SSI | 1,395 | 164 | 582 | 65 | 441 | 42 | 104 | 22 |
| TANF | 179 | 54 | 118 | 20 | 68 | 16 | 7 | 4 |
| Food | 1,653 | 130 | 989 | 71 | 736 | 43 | 147 | 21 |
| School Lunch | 141 | 13 | 84 | 7 | 78 | 5 | 19 | 3 |
| WIC | 50 | 10 | 47 | 6 | 36 | 4 | 11 | 3 |
| SNAP | 1,462 | 119 | 857 | 65 | 622 | 40 | 117 | 19 |
| Medicaid | 7,169 | 532 | 3,941 | 286 | 2,885 | 152 | 779 | 89 |
| Housing | 1,275 | 159 | 573 | 58 | 367 | 38 | 61 | 14 |
| Sample Size | 1,988 | | 5,645 | | 7,885 | | 6,559 | |
| Weighted n (millions) | 8.15 | | 25.81 | | 38.44 | | 32.20 | |
| Percentage | 7.8% | | 24.7% | | 36.7% | | 30.8% | |
| **Immigrant Households** | | | | | | | |
| | Less Than High School | | High School | | Some College | | College Degree Or More |
| **Program** | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
| Any Welfare | 10,329 | 879 | 7,829 | 745 | 5,081 | 794 | 2,455 | 397 |
| Cash | 1,067 | 179 | 762 | 158 | 637 | 270 | 349 | 99 |
| SSI | 897 | 175 | 577 | 142 | 603 | 269 | 336 | 97 |
| TANF | 170 | 67 | 185 | 73 | 34 | 31 | 13 | 12 |
| Food | 1,946 | 215 | 1,486 | 168 | 729 | 153 | 314 | 83 |
| School Lunch | 332 | 27 | 239 | 25 | 123 | 23 | 47 | 7 |
| WIC | 159 | 26 | 100 | 24 | 68 | 17 | 19 | 8 |
| SNAP | 1,456 | 192 | 1,147 | 149 | 538 | 139 | 248 | 79 |
| Medicaid | 6,776 | 658 | 5,008 | 526 | 3,407 | 542 | 1,598 | 261 |
| Housing | 539 | 119 | 573 | 133 | 309 | 102 | 194 | 68 |
| Sample Size | 756 | | 694 | | 637 | | 893 | |
| Weighted n (millions) | 3.93 | | 3.87 | | 3.56 | | 4.81 | |
| Percentage | 24.3% | | 23.9% | | 22.0% | | 29.7% | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
C.I. = confidence interval.
Table A5 contains more detailed data.

# The Broader Fiscal Picture

This study focuses on the cost of major welfare programs used by immigrant and native households. By contrast, a complete fiscal analysis would measure the cost of *all* government services and compare those costs with the taxes paid by each type of household. Some readers may wonder whether broadening the analysis would reveal that immigrant households make up for their greater welfare cost by paying higher taxes. This is not the case. As the previous CIS study of welfare participation demonstrated, immigrant households pay only about 89 cents in federal income and payroll taxes for every dollar paid by native households.[9]

The aforementioned report by the National Research Council, which did measure all government expenditures and taxes paid, found that immigrant households cost taxpayers as much as $2,200 per year in the 1990s, depending on their state of residence.[10] More recently, the Heritage Foundation's complete fiscal analysis (to which the author of this study contributed) estimated that the average legal immigrant household paid $4,344 less in taxes than it received in services in 2010, compared to a deficit of just $310 for the average native household.[11] For the most up-to-date numbers, the National Research Council will release a new analysis later this year.

The studies mentioned above measure the *direct* fiscal effects of immigration by comparing the services households receive with the taxes they pay. But what about indirect effects? Immigration touches all aspects of American life, so one could give almost endless examples of immigrants influencing society in ways that indirectly change how much the government taxes and spends. Attempting to quantify some of those indirect effects is not objectionable in itself, but it does open a "Pandora's Box" of selectivity bias and exaggeration.

### Table 6. Average Cost of Household Welfare Use in 2012, by Number of Children

| | Native Households | | | | | | | |
| | No Children | | One Child | | Two Children | | Three or More Children | |
| Program | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 2,620 | 123 | 6,115 | 373 | 7,512 | 512 | 15,461 | 1,054 |
| Cash | 452 | 34 | 631 | 83 | 584 | 94 | 874 | 137 |
| SSI | 436 | 33 | 472 | 70 | 420 | 79 | 554 | 100 |
| TANF | 16 | 5 | 159 | 35 | 165 | 45 | 320 | 82 |
| Food | 245 | 16 | 1,082 | 72 | 1,463 | 103 | 3,395 | 247 |
| School Lunch | 3 | 1 | 94 | 6 | 178 | 11 | 513 | 31 |
| WIC | 3 | 1 | 66 | 9 | 87 | 12 | 192 | 24 |
| SNAP | 240 | 16 | 922 | 67 | 1,199 | 95 | 2,689 | 218 |
| Medicaid | 1,632 | 81 | 3,849 | 274 | 4,912 | 336 | 10,271 | 733 |
| Housing | 291 | 23 | 554 | 83 | 552 | 96 | 921 | 161 |
| Sample Size | 15,838 | | 2,706 | | 2,238 | | 1,295 | |
| Weighted n (millions) | 72.59 | | 13.94 | | 11.51 | | 6.57 | |
| Percentage | 69.4% | | 13.3% | | 11.0% | | 6.3% | |

| | Immigrant Households | | | | | | | |
| | No Children | | One Child | | Two Children | | Three or More Children | |
| Program | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 4,145 | 396 | 5,490 | 678 | 7,467 | 1,014 | 14,540 | 1,482 |
| Cash | 820 | 139 | 397 | 128 | 538 | 186 | 723 | 214 |
| SSI | 796 | 141 | 339 | 120 | 362 | 139 | 355 | 158 |
| TANF | 23 | 15 | 58 | 33 | 175 | 84 | 368 | 145 |
| Food | 374 | 51 | 910 | 140 | 1,557 | 236 | 3,717 | 352 |
| School Lunch | 5 | 2 | 151 | 17 | 303 | 27 | 794 | 40 |
| WIC | 6 | 3 | 88 | 26 | 157 | 30 | 307 | 43 |
| SNAP | 363 | 50 | 671 | 128 | 1,098 | 209 | 2,616 | 332 |
| Medicaid | 2,528 | 255 | 3,732 | 496 | 5,065 | 710 | 9,807 | 1,150 |
| Housing | 423 | 74 | 451 | 147 | 308 | 125 | 292 | 160 |
| Sample Size | 1,672 | | 500 | | 445 | | 363 | |
| Weighted n (millions) | 8.63 | | 2.99 | | 2.47 | | 2.07 | |
| Percentage | 53.4% | | 18.5% | | 15.3% | | 12.8% | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
Child status is determined by the January interview. Some children occasionally enter the household after January, which explains why non-child households have non-zero costs for school lunch and WIC.
C.I. = confidence interval.
Table A6 contains more detailed data.

For example, consider the reaction to the Heritage Foundation's estimate that illegal immigration and amnesty would generate a direct lifetime cost of $6.3 trillion. Supporters of amnesty quickly settled on a rebuttal point: Although illegal immigrants who receive amnesty may pay as a group $6.3 trillion less in taxes than they receive in benefits over their lifetimes, their labor boosts economic productivity so much that natives probably still end up in the black.[12] That claim is, first of all, a tremendous exaggeration. Most of the gains from immigration go to immigrants themselves, not to natives.[13] In a paper for CIS back in 2013, economist George Borjas estimated that illegal immigrants increased GDP by $395 billion to $472 billion. Of that amount, however, only about $9 billion went to natives.[14] After extending that $9 billion annually over an adult lifetime of 50 years, productivity gains would add back just 7 percent of the $6.3 trillion fiscal cost.

Furthermore, an increase in productivity is just one of many indirect fiscal effects of immigration. What is the cost of additional welfare spending on natives when they are displaced from jobs or see their wages lowered by immigrant competition?[15] What are the moving and commuting costs incurred by natives who flee overcrowding? What are the costs of less social trust and cooperation identified by Robert Putnam and others?[16] How about the increase in English-language learners in public schools? One could go on and on with costs and benefits of immigration that *indirectly* impact the government's fiscal situation. But once advocates enter the world of indirect effects, they become decidedly selective with the effects they wish to include.

## Conclusion

When researchers analyze welfare participation and costs, their dataset of choice has traditionally been the Annual Social and Economic Supplement (ASEC) of the Current Population Survey. While the ASEC is certainly useful — CIS uses it frequently — it substantially undercounts welfare participation. For that reason, CIS turned to the Survey of Income and Program Participation (SIPP), a more complex dataset developed by the Census Bureau specifically to analyze welfare use. CIS's analysis of the SIPP has now generated two major studies. The first study, published in September 2015, measured welfare participation *rates*. It showed that 51

### Table 7. Average Cost of Household Welfare Use in 2012, by Race

| | Native Households | | | | | | | |
| | Hispanic | | Black | | White | | Asian | |
| Program | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 8,375 | 646 | 10,073 | 655 | 2,957 | 136 | 3,183 | 1,237 |
| Cash | 1,010 | 154 | 1,231 | 141 | 333 | 24 | 467 | 308 |
| SSI | 798 | 136 | 1,030 | 123 | 303 | 24 | 464 | 308 |
| TANF | 212 | 60 | 201 | 42 | 30 | 5 | 3 | 3 |
| Food | 1,392 | 127 | 1,702 | 120 | 433 | 24 | 178 | 65 |
| School Lunch | 197 | 17 | 151 | 11 | 37 | 2 | 54 | 22 |
| WIC | 77 | 13 | 68 | 10 | 21 | 2 | 3 | 3 |
| SNAP | 1,117 | 114 | 1,483 | 111 | 375 | 22 | 121 | 57 |
| Medicaid | 5,072 | 435 | 5,863 | 429 | 2,007 | 100 | 2,373 | 944 |
| Housing | 901 | 161 | 1,276 | 118 | 185 | 17 | 165 | 137 |
| Sample Size | 1,217 | | 2,714 | | 17,322 | | 176 | |
| Weighted n (millions) | 8.05 | | 13.40 | | 78.96 | | 1.03 | |
| Percentage | 7.7% | | 12.8% | | 75.5% | | 1.0% | |

| | Immigrant Households | | | | | | | |
| | Hispanic | | Black | | White | | Asian | |
| Program | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 7,863 | 692 | 6,470 | 1,556 | 4,564 | 615 | 4,764 | 691 |
| Cash | 756 | 175 | 464 | 183 | 549 | 131 | 804 | 146 |
| SSI | 575 | 172 | 441 | 180 | 503 | 122 | 788 | 144 |
| TANF | 181 | 56 | 24 | 21 | 46 | 24 | 16 | 13 |
| Food | 1,632 | 160 | 1,034 | 245 | 571 | 104 | 579 | 149 |
| School Lunch | 317 | 23 | 110 | 26 | 72 | 12 | 50 | 12 |
| WIC | 148 | 19 | 57 | 22 | 29 | 9 | 26 | 12 |
| SNAP | 1,167 | 138 | 867 | 227 | 470 | 94 | 504 | 144 |
| Medicaid | 5,163 | 472 | 4,378 | 1,120 | 2,959 | 394 | 3,019 | 446 |
| Housing | 312 | 72 | 593 | 278 | 485 | 120 | 362 | 109 |
| Sample Size | 1,157 | | 272 | | 867 | | 626 | |
| Weighted n (millions) | 7.08 | | 1.54 | | 4.06 | | 3.20 | |
| Percentage | 43.8% | | 9.5% | | 25.1% | | 19.8% | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
C.I. = confidence interval.
The Black, White, and Asian columns exclude Hispanics. "Other" race not shown.
Table A6 and Table A7 contain more detailed data.

## Table 8. Immigrant Household Welfare Use Minus Native Household Welfare Use

| Regression | Controls | Cost Difference | 90 % C.I. (±) |
|---|---|---|---|
| 1 | None | 1,803 | 446 |
| 2 | Household worker | 2,323 | 435 |
| 3 | Household worker Number of children | 1,196 | 401 |
| 4 | Household worker Number of children Education of head | 309 | 427 |
| 5 | Household worker Number of children Education of head Race of head | -626 | 472 |
| Sample Size | 25,057 | | |
| Weighted n (millions) | 120.8 | | |

Source: Source: Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
A positive value means that immigrants cost more than comparable natives. A negative value means immigrants cost less.
Households are classified by the nativity of the household head.
C.I. = confidence interval.

## Table 9. Average Cost of Households Currently Using Given Welfare Program

| Program | Native Households Cost | Native Households 90 % C.I. (±) | Immigrant Households Cost | Immigrant Households 90 % C.I. (±) |
|---|---|---|---|---|
| Any Welfare | 14,954 | 373 | 12,217 | 677 |
| Cash | 6,266 | 238 | 6,545 | 555 |
| SSI | 6,274 | 253 | 6,561 | 597 |
| TANF | 4,070 | 310 | 4,637 | 777 |
| Food | 3,190 | 98 | 2,686 | 176 |
| School Lunch | 535 | 16 | 597 | 21 |
| WIC | 755 | 31 | 751 | 38 |
| SNAP | 3,886 | 103 | 4,023 | 254 |
| Medicaid | 12,419 | 353 | 9,793 | 493 |
| Housing | 6,672 | 214 | 6,604 | 535 |

Source: Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Unlike every other table in this study, the costs shown here are averaged over only the households that are using the welfare program in question. In other words, no zeroes are included in the averages.
Sample sizes vary depending on the program.
Households are classified by the nativity of the household head.
C.I. = confidence interval.

percent of immigrant-headed households used some form of welfare, compared to 30 percent of native households.[17] This second study extends the SIPP analysis by moving from rates to *costs*. It finds that immigrant-headed households consume an average of $6,234 in welfare spending, compared to $4,431 for native households. The highest-cost immigrant households tend to be those headed by a person from Latin America, while the lowest-cost households are headed by people from Europe and Asia.

This study implies that two competing narratives about immigration are *both* true. Immigrants do indeed have a strong attachment to the labor force, as immigration advocates often point out. At the same time, however, immigrants consume a large amount of welfare spending, just as critics claim. The reason that both narratives are true is that the American welfare system has become increasingly focused on buttressing low-wage workers rather than supporting non-workers. Put more simply, welfare and low-wage work go together. Just as natives with low levels of education and large numbers of children are apt to consume welfare, immigrants with those same characteristics are also likely to be on welfare. A strong work ethic does not change this reality.

In order to reduce the cost of immigrant welfare use, either the welfare system or the immigration system must change. The former option is sometimes described as "building a wall around the welfare state" to prevent new immigrants from accessing it. It is easier said than done. Loopholes and exceptions have weakened previous attempts to limit immigrant access to welfare.[18] More importantly, Congress has no power to prevent the U.S.-born children of immigrants from using the same welfare programs that the children of natives do. No matter how strong the "wall around the welfare state" is built, it cannot stop immigrant parents from signing up their U.S.-born children for Medicaid, SNAP, free school lunch, etc., as long as native parents can do the same.

Only a full-scale rollback of the welfare state for both immigrants and natives would prevent immigrant families from consuming welfare dollars. Whatever one thinks of that proposal, it is not a policy change likely to occur in the near future.[19] In fact, importing new clients of the welfare state likely makes it even harder to roll back.[20] As long as the U.S. continues to admit large numbers of low-skill immigrants (legal or illegal), then immigrant welfare consumption will remain high.

# Appendix

To determine which households use which welfare programs in the SIPP, this study follows almost the exact methodology of the previous CIS report, "Welfare Use by Immigrant and Native Households". The one exception is that the aggregate Cash category now refers exclusively to SSI and TANF. In the previous study, Cash also included several miscellaneous programs such as state general assistance, veterans' compensation, and, in the cryptic words of the SIPP documentation, "other welfare".[21] Because these smaller programs are too vaguely defined to locate in budget documents, the Cash category is now limited to the two largest cash assistance programs, SSI and TANF.

The contribution of this study is to estimate the dollar costs associated with the welfare use rates previously reported. That process involves two major steps. First, some program costs in the SIPP must be imputed because they are not measured directly in the survey. Second, due to measurement error in the survey responses and imputations, the SIPP costs must be adjusted to reflect the full cost of each welfare program as reported in the government's budget.

**Program Costs in the SIPP.** The SIPP provides direct cost estimates for some but not all of the welfare programs for which it measures participation. Determining the annual household cost of SSI, TANF, WIC, and food stamps is simply a matter of summing the monthly values of the variables provided in the SIPP.[22] However, the cost of free or reduced school lunch, Medicaid, and subsidized housing (the "cost-unknown programs") must be imputed separately.

Recall that the ASEC substantially undercounts program participation, making it suboptimal for a welfare analysis. However, the ASEC does provide direct cost estimates for the cost-unknown programs using imputation procedures developed by the Census Bureau. The approach of this study is to apply the same imputation to the SIPP's cost-unknown programs as the Census Bureau uses with the ASEC. The aim is to produce a "best of both worlds" dataset that combines the more accurate participation rates of the SIPP with the more complete cost estimates of the ASEC. Table A1 outlines the process.

## Table A1. Cost Calculation Methods by Program

| Program | Source |
|---|---|
| Any Welfare | Sum of cash, food, Medicaid, and housing listed below |
| Cash | Sum of SSI and TANF |
| SSI | Directly measured in the SIPP |
| TANF | Directly measured in the SIPP |
| Food | Sum of school lunch, WIC, and SNAP |
| School Lunch | Annual cost of both free and reduced lunch derived from ASEC |
| WIC | Directly measured in the SIPP |
| SNAP | Directly measured in the SIPP |
| Medicaid | Average cost by age, disability status, and state; derived from ASEC |
| Housing | Average cost by region, income, and size; derived from ASEC |
| Public | Not individually calculated |
| Subsidized | Not individually calculated |

SIPP = Survey of Income and Program Participation.
ASEC = Annual Social and Economic Supplement to the Current Population Survey.

For its ASEC estimates, the Census Bureau determined that the average annual cost of free lunch for one child in 2012 was $507, while the annual cost of reduced lunch was $440. The SIPP distinguishes between free and reduced lunch receipt at the household level, so determining the *monthly* cost in the SIPP — remember that the SIPP measures welfare use by month — is simply a matter of dividing either $507 or $440 by 12, then multiplying by the number of eligible children in the household each month. The resulting monthly estimates are summed to produce an annual household cost.

Medicaid is more complicated. The Bureau identifies four "risk classes" — children (below age 21), non-elderly adults, seniors (age 65 and over), and the disabled.[23] It then assigns each class an average cost by state. That generates 4*50 = 200 unique cost estimates. In addition, Medicaid pays the cost of Medicare premiums for people enrolled in both programs. The Bureau adds the annual Medicare premium, which was $1,199 in 2012, to the total cost of Medicaid for dual enrollees.[24] To perform the imputation in the SIPP, the full matrix of cost estimates was generated in the ASEC, then merged into the SIPP using the same identifying variables of age, disability status, state, and Medicare coverage.[25] As with school lunch, the annual ASEC cost estimates are divided by 12 to produce monthly SIPP costs, then summed to produce an annual figure.

The original CIS welfare study separately classified public housing and subsidized rent, but the ASEC collapses the cost of housing assistance into one category. The ASEC imputation is based on three groups of family income (below $6,000, be-

CHNV-FRN-00315

tween $6,000 and $10,000, more than $10,000), three bedroom counts (one, two, three or more), and four regions (Northeast, Midwest, South, West).[26] Generating reliable bedroom counts is too difficult with the SIPP, so this study uses the number of people in the household (one, two, three or more). After generating the full matrix of cost estimates at the household level in the ASEC — based on region, household income, and the number of people — the costs are merged into the SIPP using those same three household characteristics. Unlike school lunch and Medicaid, housing costs in the ASEC are provided as a monthly cost, meaning no division by 12 is required when transferred to the SIPP.

**Adjustment to Reflect Budgetary Costs.** After all the welfare costs in the SIPP are established, the next step is to adjust those costs to reflect the real budgetary totals. Table A2 compares the total costs reported (or imputed) in the SIPP with the total costs listed in the federal government's budgetary records. For consistency with the SIPP, the budgetary numbers collected here generally reflect the cost of actual benefits, not administrative costs. In addition, the cost of nursing home care is excluded from the Medicaid budget, since the SIPP does not cover the institutionalized population.

Some minor inconsistencies are unavoidable. For example, the budgetary cost of housing refers only to federal programs, although state and local programs are a small part of the housing cost measured in the SIPP. Tracking down the cost of every non-federal housing program would be infeasible. In addition, most budgetary figures are available only for the "fiscal year", which runs from October through Sep-

| Table A2. Adjustment Factors for Program Costs in 2012 | | | |
|---|---|---|---|
| Program | SIPP Cost (billions) | Budgetary Cost (billions) | Adjustment Factor |
| SSI | 60.5 | 56.2 | 0.93 |
| TANF | 5.6 | 8.9 | 1.60 |
| School Lunch | 12.6 | 9.8 | 0.78 |
| WIC | 3.7 | 4.7 | 1.26 |
| SNAP | 56.5 | 75.0 | 1.33 |
| Medicaid | 251.0 | 361.9 | 1.44 |
| Housing | 17.3 | 47.6 | 2.75 |

SIPP = Survey of Income and Program Participation.
Adjustment Factor is the ratio of budgetary cost to SIPP cost.
Budgetary costs are modified. See text for details.

tember, whereas the SIPP covers the "calendar year" of January through December.[27] This means that the SIPP time period includes nine months of FY 2012 (January through September) and three months of FY 2013 (October through December). To correct for the misalignment, this study's budgetary costs for the 2012 calendar year are calculated as a weighted average of fiscal-year costs: (9/12)*(FY 2012) + (3/12)*(FY 2013).

There are several reasons why the total cost of a given program in survey data does not match the total budgetary cost of the program. First, the cost of direct transfers such as TANF, WIC, and food stamps are typically underreported in surveys. Second, the cost imputations of school lunch, Medicaid, and housing are inherently inexact. Third, the budgetary figures may not refer to the exact same costs measured in the survey, as is the case with housing.

Costs are generally undercounted in the SIPP, but the discrepancies vary considerably from program to program, and SSI and school lunch are actually overestimated.[28] These discrepancies may seem like a threat to the study's validity. Remember, however, that the SIPP cost estimates are merely a tool for dividing up the real *budgetary* costs between immigrants and natives. As noted in the main text, the assumption here is not that immigrants cost exactly what is reported in the SIPP; rather, it is that the fraction of costs attributed to immigrants in the SIPP is the same as the fraction of the real budgetary costs consumed by immigrants. Any bias in the SIPP data unrelated to immigration status — for example, if both immigrants and natives underreport their TANF income by the same percentage — is irrelevant once the costs are adjusted to reflect budgetary totals.

Table 1 demonstrates that the SIPP helps correct the ASEC's bias toward undercounting immigrant welfare participation vis-à-vis native participation. As long as the reported and imputed costs of that participation in the SIPP are reasonably unbiased *with respect to immigration status*, then the final adjusted cost estimates will be good approximations of the true budgetary numbers.

The adjustment procedure is simple. The cost of each SIPP household's participation in a given program is multiplied by an adjustment factor, which is the ratio of total budgetary spending on the program to the total spending on the same program reported in the SIPP. For example, the SNAP adjustment factor is $75.0 billion / $56.5 billion = 1.33. In other words, the total budgetary cost of SNAP is 1.33 times (or 33 percent) higher than the total SNAP cost in the SIPP. The cost of each SIPP household's SNAP usage is multiplied by 1.33 to bring the total SIPP costs up to the budgetary level. This is mathematically equivalent to calculating the portion of SNAP costs attributed to immigrants or natives in the SIPP, then multiplying that percentage by the total budgetary cost of SNAP.

CHNV-FRN-00316

**11**

CENTER FOR IMMIGRATION STUDIES

## Supplemental Tables

### Table A3. Average Cost of Household Welfare Use in 2012, by Age

**Native Households**

| Program | 29 and Under Cost | 90 % C.I. (±) | 30-39 Cost | 90 % C.I. (±) | 40-49 Cost | 90 % C.I. (±) | 50-64 Cost | 90 % C.I. (±) | 65 and Over Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 5,704 | 460 | 6,617 | 459 | 4,780 | 326 | 4,192 | 245 | 2,309 | 155 |
| Cash | 352 | 60 | 517 | 72 | 686 | 57 | 686 | 57 | 328 | 39 |
| SSI | 212 | 50 | 367 | 58 | 491 | 63 | 646 | 57 | 308 | 38 |
| TANF | 140 | 36 | 151 | 34 | 71 | 17 | 40 | 8 | 20 | 7 |
| Food | 1,472 | 125 | 1,350 | 89 | 692 | 55 | 427 | 34 | 202 | 16 |
| School Lunch | 86 | 11 | 182 | 12 | 86 | 7 | 27 | 3 | 9 | 1 |
| WIC | 125 | 15 | 68 | 7 | 25 | 4 | 9 | 2 | 2 | 1 |
| SNAP | 1,262 | 113 | 1,100 | 79 | 581 | 51 | 391 | 32 | 191 | 16 |
| Medicaid | 3,183 | 295 | 4,244 | 329 | 3,169 | 229 | 2,766 | 172 | 1,462 | 108 |
| Housing | 697 | 113 | 505 | 78 | 356 | 48 | 313 | 40 | 317 | 35 |
| Sample Size | 1,645 | | 3,216 | | 3,839 | | 7,014 | | 6,363 | |
| Weighted n (millions) | 10.89 | | 17.59 | | 19.65 | | 32.21 | | 24.26 | |

**Immigrant Households**

| Program | 29 and Under Cost | 90 % C.I. (±) | 30-39 Cost | 90 % C.I. (±) | 40-49 Cost | 90 % C.I. (±) | 50-64 Cost | 90 % C.I. (±) | 65 and Over Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 4,003 | 865 | 7,152 | 889 | 5,856 | 696 | 6,105 | 720 | 7,026 | 986 |
| Cash | 102 | 76 | 419 | 124 | 458 | 126 | 844 | 162 | 1,519 | 414 |
| SSI | 37 | 31 | 252 | 105 | 342 | 110 | 791 | 168 | 1,465 | 393 |
| TANF | 66 | 62 | 167 | 74 | 116 | 60 | 53 | 30 | 53 | 40 |
| Food | 1,084 | 270 | 1,740 | 218 | 1,123 | 174 | 768 | 114 | 605 | 91 |
| School Lunch | 134 | 29 | 338 | 34 | 234 | 20 | 91 | 14 | 27 | 14 |
| WIC | 223 | 63 | 160 | 22 | 70 | 19 | 32 | 10 | 8 | 5 |
| SNAP | 726 | 230 | 1,243 | 192 | 819 | 160 | 645 | 107 | 571 | 85 |
| Medicaid | 2,666 | 637 | 4,793 | 624 | 3,923 | 475 | 4,068 | 508 | 4,082 | 584 |
| Housing | 151 | 157 | 200 | 94 | 352 | 114 | 425 | 132 | 820 | 171 |
| Sample Size | 184 | | 570 | | 771 | | 864 | | 591 | |
| Weighted n (millions) | 1.36 | | 3.57 | | 4.51 | | 4.19 | | 2.53 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data. Households are classified by the nativity of the household head.
C.I. = confidence interval.

## Table A4. Average Cost of Immigrant Welfare Use, by Household Head's Length of Residence in U.S.

| | Immigrants' Residence in U.S. (years) | | | | | | | | | |
| | Less than 5 | | 5-10 | | 11-15 | | 16-25 | | More than 25 | |
| Program | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) | Cost | 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 7,537 | 2,884 | 5,576 | 723 | 6,537 | 853 | 6,601 | 1,009 | 6,225 | 691 |
| Cash | 766 | 534 | 573 | 154 | 798 | 303 | 532 | 168 | 766 | 147 |
| SSI | 676 | 535 | 531 | 152 | 644 | 283 | 408 | 139 | 673 | 141 |
| TANF | 90 | 121 | 42 | 27 | 154 | 87 | 125 | 80 | 93 | 45 |
| Food | 1,152 | 467 | 1,033 | 156 | 1,264 | 196 | 1,370 | 290 | 851 | 132 |
| School Lunch | 162 | 77 | 161 | 22 | 206 | 29 | 262 | 40 | 148 | 21 |
| WIC | 137 | 77 | 101 | 19 | 101 | 25 | 97 | 33 | 50 | 12 |
| SNAP | 852 | 403 | 770 | 140 | 957 | 169 | 1,010 | 262 | 653 | 119 |
| Medicaid | 4,997 | 2,038 | 3,560 | 474 | 4,094 | 533 | 4,243 | 681 | 4,238 | 496 |
| Housing | 622 | 546 | 410 | 120 | 381 | 109 | 455 | 189 | 370 | 79 |
| Sample Size | 77 | | 634 | | 530 | | 378 | | 1,170 | |
| Weighted n (millions) | 0.41 | | 3.61 | | 3.06 | | 2.13 | | 5.92 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
C.I. = confidence interval.
Some immigrants are missing because the relevant SIPP question was asked as part of a one-time module.

CHNV-FRN-00318

## Table A5. Average Cost of Welfare Use in 2012 in Households with a Worker, by Education

### Native Working Households

| Program | Less Than High School Cost | Less Than High School 90 % C.I. (±) | High School Cost | High School 90 % C.I. (±) | Some College Cost | Some College 90 % C.I. (±) | College Degree Or More Cost | College Degree Or More 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 10,185 | 1,180 | 4,882 | 326 | 3,446 | 202 | 920 | 112 |
| Cash | 1,006 | 203 | 450 | 57 | 296 | 38 | 85 | 23 |
| SSI | 870 | 191 | 374 | 53 | 256 | 39 | 79 | 22 |
| TANF | 136 | 83 | 76 | 21 | 40 | 12 | 6 | 4 |
| Food | 1,940 | 226 | 943 | 80 | 649 | 46 | 131 | 20 |
| School Lunch | 216 | 24 | 100 | 9 | 83 | 6 | 20 | 3 |
| WIC | 76 | 17 | 54 | 8 | 38 | 4 | 12 | 3 |
| SNAP | 1,649 | 201 | 789 | 72 | 528 | 43 | 99 | 18 |
| Medicaid | 6,574 | 795 | 3,178 | 232 | 2,305 | 153 | 672 | 91 |
| Housing | 665 | 194 | 311 | 50 | 196 | 31 | 31 | 9 |
| Sample Size | 852 | | 3,497 | | 5,668 | | 5,355 | |
| Weighted n (millions) | 3.79 | | 16.99 | | 28.98 | | 26.99 | |

### Immigrant Working Households

| Program | Less Than High School Cost | Less Than High School 90 % C.I. (±) | High School Cost | High School 90 % C.I. (±) | Some College Cost | Some College 90 % C.I. (±) | College Degree Or More Cost | College Degree Or More 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|
| Any Welfare | 9,072 | 865 | 6,895 | 699 | 4,565 | 836 | 1,899 | 362 |
| Cash | 666 | 127 | 581 | 148 | 469 | 301 | 201 | 83 |
| SSI | 533 | 116 | 428 | 145 | 456 | 299 | 188 | 81 |
| TANF | 133 | 56 | 153 | 72 | 13 | 17 | 13 | 13 |
| Food | 1,964 | 220 | 1,405 | 183 | 706 | 165 | 288 | 92 |
| School Lunch | 381 | 31 | 258 | 27 | 136 | 26 | 52 | 8 |
| WIC | 181 | 29 | 107 | 28 | 79 | 20 | 21 | 9 |
| SNAP | 1,401 | 198 | 1,040 | 162 | 490 | 148 | 215 | 86 |
| Medicaid | 6,186 | 678 | 4,563 | 518 | 3,231 | 576 | 1,310 | 256 |
| Housing | 256 | 105 | 346 | 121 | 159 | 91 | 101 | 56 |
| Sample Size | 585 | | 560 | | 508 | | 774 | |
| Weighted n (millions) | 3.18 | | 3.25 | | 2.95 | | 4.26 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data.
Households are classified by the nativity of the household head.
C.I. = confidence interval.
Worker status is determined by the January interview.

## Table A6. Average Cost of Welfare Use in 2012 in Households with Children, by Race

### Native Households with Children

| Program | All Cost | All 90% C.I. (±) | Hispanic Cost | Hispanic 90% C.I. (±) | Black Cost | Black 90% C.I. (±) | White Cost | White 90% C.I. (±) | Asian Cost | Asian 90% C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 8,536 | 357 | 11,216 | 1,152 | 18,256 | 1,285 | 5,704 | 369 | 5,679 | 3,325 |
| Cash | 664 | 54 | 975 | 216 | 1,672 | 227 | 368 | 45 | 689 | 681 |
| SSI | 470 | 46 | 607 | 184 | 1,187 | 187 | 281 | 41 | 684 | 679 |
| TANF | 194 | 26 | 368 | 101 | 485 | 112 | 87 | 19 | 5 | 9 |
| Food | 1,694 | 76 | 2,315 | 236 | 3,676 | 273 | 1,125 | 77 | 322 | 170 |
| School Lunch | 210 | 10 | 392 | 29 | 400 | 28 | 130 | 9 | 159 | 59 |
| WIC | 100 | 7 | 148 | 25 | 174 | 24 | 73 | 7 | 8 | 9 |
| SNAP | 1,384 | 69 | 1,775 | 215 | 3,102 | 255 | 922 | 69 | 155 | 143 |
| Medicaid | 5,549 | 258 | 6,886 | 779 | 10,951 | 873 | 3,977 | 278 | 4,667 | 2,633 |
| Housing | 629 | 63 | 1,041 | 249 | 1,956 | 266 | 234 | 41 | 0 | 0 |
| Sample Size | 6,239 | | 601 | | 888 | | 4,493 | | 61 | |
| Weighted n (millions) | 32.01 | | 3.93 | | 4.93 | | 21.69 | | 0.35 | |

### Immigrant Households with Children

| Program | All Cost | All 90% C.I. (±) | Hispanic Cost | Hispanic 90% C.I. (±) | Black Cost | Black 90% C.I. (±) | White Cost | White 90% C.I. (±) | Asian Cost | Asian 90% C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 8,626 | 688 | 10,233 | 908 | 9,223 | 2,583 | 6,855 | 1,436 | 4,837 | 1,270 |
| Cash | 533 | 98 | 608 | 131 | 228 | 157 | 407 | 205 | 461 | 219 |
| SSI | 351 | 81 | 342 | 107 | 179 | 121 | 290 | 162 | 419 | 212 |
| TANF | 182 | 53 | 267 | 89 | 49 | 52 | 117 | 67 | 42 | 33 |
| Food | 1,894 | 156 | 2,454 | 242 | 1,818 | 460 | 1,203 | 279 | 914 | 328 |
| School Lunch | 378 | 21 | 528 | 32 | 260 | 58 | 217 | 33 | 127 | 27 |
| WIC | 171 | 17 | 242 | 28 | 126 | 49 | 85 | 26 | 58 | 29 |
| SNAP | 1,345 | 141 | 1,683 | 215 | 1,431 | 428 | 901 | 254 | 729 | 306 |
| Medicaid | 5,839 | 485 | 6,880 | 664 | 6,405 | 1,931 | 4,675 | 914 | 3,327 | 833 |
| Housing | 360 | 93 | 291 | 112 | 772 | 474 | 570 | 307 | 136 | 91 |
| Sample Size | 1,308 | | 660 | | 108 | | 276 | | 232 | |
| Weighted n (millions) | 7.53 | | 4.20 | | 0.63 | | 1.32 | | 1.23 | |

Source: Survey of Income and Program Participation covering calendar year 2012, along with federal budget data. Households are classified by the nativity of the household head.
C.I. = confidence interval.
The Black, White, and Asian columns exclude Hispanics. "Other" race not shown.
Child status is determined by the January interview.

## Table A7. Average Cost of Welfare Use in 2012 in Households in Poverty, by Race

### Native Households in Poverty

| Program | All Cost | All 90 % C.I. (±) | Hispanic Cost | Hispanic 90 % C.I. (±) | Black Cost | Black 90 % C.I. (±) | White Cost | White 90 % C.I. (±) | Asian Cost | Asian 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 14,368 | 591 | 19,944 | 1,873 | 20,809 | 1,592 | 10,556 | 688 | 11,681 | 5,077 |
| Cash | 1,301 | 107 | 1,874 | 436 | 1,974 | 284 | 867 | 99 | 684 | 823 |
| SSI | 989 | 90 | 1,221 | 330 | 1,461 | 222 | 721 | 94 | 684 | 823 |
| TANF | 312 | 52 | 653 | 301 | 513 | 133 | 146 | 38 | 0 | 0 |
| Food | 2,855 | 136 | 4,182 | 451 | 4,070 | 323 | 2,105 | 160 | 673 | 492 |
| School Lunch | 209 | 14 | 434 | 60 | 302 | 30 | 130 | 13 | 90 | 59 |
| WIC | 110 | 11 | 181 | 40 | 150 | 30 | 81 | 13 | 0 | 0 |
| SNAP | 2,536 | 124 | 3,568 | 411 | 3,618 | 294 | 1,893 | 147 | 582 | 496 |
| Medicaid | 8,318 | 407 | 10,852 | 1,172 | 11,182 | 1,041 | 6,590 | 502 | 9,159 | 3,954 |
| Housing | 1,895 | 149 | 3,036 | 672 | 3,582 | 381 | 994 | 127 | 1,166 | 1,213 |
| Sample Size | 2,932 | | 260 | | 694 | | 1,813 | | 18 | |
| Weighted n (millions) | 14.37 | | 1.58 | | 3.50 | | 8.52 | | 0.10 | |

### Immigrant Households in Poverty

| Program | All Cost | All 90 % C.I. (±) | Hispanic Cost | Hispanic 90 % C.I. (±) | Black Cost | Black 90 % C.I. (±) | White Cost | White 90 % C.I. (±) | Asian Cost | Asian 90 % C.I. (±) |
|---|---|---|---|---|---|---|---|---|---|---|
| Any Welfare | 13,086 | 1,230 | 13,386 | 1,143 | 13,796 | 6,102 | 12,441 | 2,422 | 12,329 | 3,800 |
| Cash | 988 | 193 | 818 | 213 | 636 | 440 | 1,316 | 523 | 1,629 | 703 |
| SSI | 683 | 162 | 367 | 158 | 571 | 424 | 1,123 | 473 | 1,615 | 702 |
| TANF | 305 | 116 | 451 | 190 | 65 | 90 | 193 | 153 | 13 | 21 |
| Food | 2,870 | 285 | 3,438 | 389 | 2,435 | 887 | 1,956 | 493 | 2,041 | 718 |
| School Lunch | 372 | 31 | 537 | 46 | 208 | 71 | 136 | 47 | 90 | 42 |
| WIC | 183 | 31 | 268 | 47 | 91 | 54 | 64 | 34 | 50 | 36 |
| SNAP | 2,314 | 261 | 2,633 | 353 | 2,136 | 829 | 1,755 | 454 | 1,902 | 688 |
| Medicaid | 8,077 | 806 | 8,448 | 810 | 9,192 | 4,250 | 6,924 | 1,419 | 7,158 | 2,408 |
| Housing | 1,152 | 224 | 682 | 247 | 1,534 | 1,121 | 2,246 | 570 | 1,501 | 621 |
| Sample Size | 612 | | 322 | | 52 | | 133 | | 95 | |
| Weighted n (millions) | 3.33 | | 1.94 | | 0.30 | | 0.60 | | 0.44 | |

**Source:** Survey of Income and Program Participation covering calendar year 2012, along with federal budget data. Households are classified by the nativity of the household head.
C.I. = confidence interval.
The Black, White, and Asian columns exclude Hispanics. "Other" race not shown.
Poverty status is determined by the January interview.

CHNV-FRN-00321

# End Notes

[1] Steven A. Camarota, "Welfare Use by Immigrant and Native Households", Center for Immigration Studies *Backgrounder*, September 2015.

[2] National Research Council, *The New Americans*, Washington, D.C.: National Academy Press, 1997, p. 308.

[3] The Heritage Foundation's 2013 fiscal analysis makes the same assumption. Robert Rector and Jason Richwine, "The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer", Heritage Foundation Special Report, May 6, 2013, p. 47.

[4] Here is a list of the countries grouped under the region categories in Figure 2. **Central America**: Belize, Mexico, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama. **Caribbean**: Barbados, Cuba, Dominica, Dominican Republic, Grenada, Haiti, Jamaica, Trinidad and Tobago, West Indies. **South America**: Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Guyana, Peru, Uruguay, Venezuela. **Europe**: Austria, Belgium, France, Germany, Ireland, Holland/Netherlands, Norway, Sweden, Switzerland, United Kingdom, Albania, Bulgaria, Greece, Hungary, Italy, Poland, Portugal, Romania, Spain, Czech Republic, Bosnia and Herzegovina, Croatia, Lithuania, Belarus, Russia, Ukraine, USSR. **East Asia**: China, Hong Kong, Japan, Korea, South Korea, Taiwan. **South Asia**: Afghanistan, Bangladesh, India, Iran, Nepal, Pakistan, Sri Lanka, Uzbekistan. **Africa**: Egypt, Equatorial Guinea, Ethiopia, Eritrea, Ghana, Kenya, Liberia, Morocco, Nigeria, Sierra Leone, Somalia, South Africa, Sudan.

[5] Steven A. Camarota, "Welfare Use by Legal and Illegal Immigrant Households", Center for Immigration Studies *Backgrounder*, September 2015, pp. 2-3.

[6] Camarota, "Welfare Use by Immigrant and Native Households", Appendix.

[7] See, for example, Shikha Dalmia, "Heritage's Updated Study on the Welfare Costs of Immigrants: Garbage In, Garbage Out", *Reason*, May 7, 2013.

[8] Camarota, "Welfare Use by Immigrant and Native Households", Appendix.

[9] *Ibid.*, pp. 22-23.

[10] National Research Council, *The New Americans*, pp. 284-289. The $2,200 figure refers to California, which the authors describe as likely to be an upper bound estimate.

[11] Rector and Richwine, "The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer", Table 6. Both types of households are in deficit because the government spends more than it takes in.

[12] See, for example, Will Wilkinson, "Welfare and Amnesty", *The Economist*, May 8, 2013.

[13] The mistaken belief that immigration generates large indirect fiscal benefits seems to stem from confusing GDP growth with gains for natives. The latter is just a tiny proportion of the former. For a more in-depth discussion, see Jason Richwine, "Most of the Gains from Immigration Go to Immigrants Themselves – Not to Natives", Center for Immigration Studies, February 10, 2016.

[14] George Borjas, "Immigration and the American Worker", Center for Immigration Studies *Backgrounder*, April 2013.

[15] See, for example, George J. Borjas, Jeffrey Grogger, and Gordon H. Hanson, "Immigration and the Economic Status of African-American Men", *Economica*, Vol. 73 (2010), pp. 255-282.

[16] Robert D. Putnam, "*E Pluribus Unum*: Diversity and Community in the Twenty-first Century", *Scandinavian Political Studies*, Vol. 30, No. 2 (June 2007), pp. 137-174.

[17] Camarota, "Welfare Use by Immigrant and Native Households".

[18] *Ibid.,* Appendix.

[19] Means-tested anti-poverty spending has trended ineluctably upward. Even the famous "cuts" in 1981 and 1996 were just minor speed bumps on the road to higher spending. See Jason Richwine, "Crying Wolf Over Spending Cuts", The Richwine Archive, January 18, 2014.

[20] "How Mass (Legal) Immigration Dooms a Conservative Republican Party", Eagle Forum, first published January 2014.

[21] Personal communication with Shelley Irving at the Census Bureau.

[22] One reported value for annual SSI receipt is an implausibly high $69,934. It appears to be a mis-code, as the next-highest value is just $37,281. The implausible value has been top-coded to $37,281 for this study.

[23] A disabled person in the ASEC is under age 65 and has at least one of the following additional characteristics: SSI income, Social Security income, or not working due to illness.

[24] Personal communication with Jessica Semega at the Census Bureau.

[25] Unfortunately, the SIPP does not identify Medicare recipients who are under 15 years old, even though children with kidney disease could be on the program. Therefore, the cost of Medicaid never includes an additional $1,199 Medicare premium for respondents under 15 in this study.

[26] Paul D. Johnson, Trudi Renwick, and Kathleen Short, "Estimating The Value of Federal Housing Assistance for the Supplemental Poverty Measure", U.S. Census Bureau Working Paper, December 2010, pp. 6-7.

[27] The SIPP panel used in this study started in 2008, so it is possible to calculate SIPP welfare costs over the fiscal-year period of October 2011 to September 2012 rather than over the calendar-year period. The trouble is that the Census Bureau provides longitudinal weights only for calendar years. Without those weights, the SIPP would be unrepresentative of the general population.

[28] One reason SSI is overestimated in the SIPP may be that respondents confuse it with disability insurance (DI) payments. Both SSI and DI are administered by the Social Security Administration, but DI is a social insurance program open only to workers who pay into the system, while SSI is a means-tested transfer payment.



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

January 23, 2025

MEMORANDUM FOR:      Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Jennifer B. Higgins
Acting Director
U.S. Citizenship and Immigration Services

FROM:      Benjamine C. Huffman
Acting Secretary

SUBJECT:      Guidance Regarding How to Exercise Enforcement Discretion

On January 20, 2025, I signed a memorandum entitled Exercising Appropriate Discretion Under Parole Authority. That memorandum clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5), and directs a variety of actions to implement the memorandum. The memorandum also authorizes DHS components to pause, modify, or terminate, effective immediately, any parole program that is inconsistent with the memorandum—subject to certain conditions designed to ensure any such actions are lawful.

On January 21, 2025, I signed and transmitted to the Federal Register a notice entitled Designating Aliens for Expedited Removal. That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which, as further explained in the notice, includes certain aliens who have not been continuously present in the United States for two years.

This memorandum provides guidance regarding how to exercise enforcement discretion in implementing these policies.

"[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U. S. 683, 693 (1974). That principle applies with equal force to immigration enforcement. *United States v. Texas*, 599 U.S. 670, 679 (2023); *see*

1

CHNV-FRN-00324

*also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (Scalia, J.) (describing the Executive Branch's broad discretion to initiate or abandon removal proceedings).

To effectively implement these two new policies, consistent with the principles of enforcement discretion discussed above, I am directing you to take the following actions.

(1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied:
   a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding and/or any active parole status.
(2) For any alien DHS is aware of who does not meet the conditions described in (1) but has been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum:
   a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether any such alien should be placed in removal proceedings; and
   b. Review the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances.

The actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests. It should be noted, however, that parole is a positive exercise of enforcement discretion to which no alien is entitled and that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. *See* 8 U.S.C. § 1225(b)(1). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id.* § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

CHNV-FRN-00325



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:    Caleb Vitello
                           Acting Director
                           U.S. Immigration and Customs Enforcement

                           Pete R. Flores
                           Senior Official Performing the Duties of the Commissioner
                           U.S. Customs and Border Protection

                           Jennifer B. Higgins
                           Acting Director
                           U.S. Citizenship and Immigration Services

FROM:                  Benjamine C. Huffman
                           Acting Secretary

SUBJECT:            Exercising Appropriate Discretion Under Parole Authority

---

Congress granted to the U.S. Department of Homeland Security (DHS) authority to parole certain otherwise inadmissible aliens into the United States when, in the discretion of the Secretary of DHS, doing so either provides a significant public benefit to the American public or permits the United States to respond to an urgent humanitarian need.

Authority to grant parole is discretionary and may be exercised only on a case-by-case basis by immigration officers in the employ of DHS. When in the opinion of the Secretary of DHS the purposes of an alien's parole have been served, the alien must be returned to the custody of DHS and the alien's case must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible.

The Secretary of DHS's parole authority is set forth in 8 U.S.C. § 1182(d)(5). The statutory language and context make it abundantly clear that it is a *limited use* authority, applicable only in a very narrow set of circumstances. Congress retained its authority to legislatively determine which categories of aliens are admissible or inadmissible to the United States, while simultaneously providing DHS with the operational flexibility to deal with extraordinary situations including, but not limited to: inadmissible aliens with emergency medical conditions and the temporary entry of otherwise inadmissible aliens coming to the United States whose presence is required in legal proceedings as a defendant or witness.

Although parole is a discretionary authority to be exercised in narrow circumstances and only on a case-by-case basis, it has been repeatedly abused by the Executive Branch over the past several

1

decades in ways that are blatantly inconsistent with the statute. Most important, the parole statute does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria.

Furthermore, 8 U.S.C. § 1182(d)(5)(B) limits the circumstances under which an alien who is a refugee as defined in 8 U.S.C. § 1101(a)(42) may be paroled into the United States. This means it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims. The sole exception to this bar is when the Secretary of DHS determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than admitted as a refugee.

It is evident that many current DHS policies and practices governing parole are inconsistent with the statute.

Therefore, I order the following:
(1) Within sixty (60) days of the date of this order, the Director of U.S. Immigration and Customs Enforcement; the Commissioner of U.S. Customs and Border Protection; and the Director of U.S. Citizenship and Immigration Services are directed to:
   a. Compile a list of all instructions, policies, procedures, rules, and regulations pertaining to parole;
   b. Review all such instructions, policies, procedures, rules, and regulations and determine, in consultation with the DHS General Counsel, which are not strictly in accord with the text and structure of 8 U.S.C. § 1182(d)(5);
   c. Formulate a plan for phasing out any such instructions, policies, procedures, rules, and regulations, accompanied by a proposal and timeline for any necessary public notices to be published pursuant to the terms of the Administrative Procedure Act or any other applicable law;
   d. Provide the Secretary of DHS with a report summarizing the results of the following reviews and inquiries.

(2) Pending the review contemplated by paragraph (1), DHS Components have discretion to pause, modify, or terminate any parole program described in paragraph (1) to the extent:
   a. The policy was not promulgated pursuant to the procedural requirements of the Administrative Procedure Act or any comparable scheme;
   b. The DHS Component can do so in a manner that protects any legitimate reliance interests; and
   c. Doing so is otherwise consistent with applicable statutes, regulations, and court orders.

The purpose of this memorandum is to ensure that all future actions taken by DHS with regard to the exercise of the parole authority are consistent with law and within the scope of DHS's authority. Having said that, should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance.

CHNV-FRN-00327

FOR OFFICIAL USE ONLY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration
Services
*Office of the Director*
Camp Springs, MD 20588-0009

February 14, 2025

# Memorandum

FROM:       Andrew Davidson,
            Acting Deputy Director, U.S. Citizenship and Immigration Services

TO:         Connie Nolan, Associate Director, Service Center Operations
            Michael Valverde, Associate Director, Field Operations
            Ted Kim, Associate Director, Refugee, Asylum and International Operations
            Tammy Meckley, Associate Director, Immigration Records and Identity Services
            Rebecca Maxwell, Chief (A) Administrative Appeals Office

SUBJECT:    **Administrative Hold on All USCIS Benefit Requests filed by Parolees Under the
            Uniting for Ukraine (U4U) Process, Processes for Haitians, Cubans,
            Nicaraguans, and Venezuelans (CHNV) Process, or Family Reunification Parole
            (FRP) Process**

**Purpose:**  This memorandum authorizes an immediate USCIS-wide administrative hold on all
pending benefit requests filed by aliens who are or were paroled into the United States under the
U4U, CHNV, or FRP processes pending the completion of additional vetting flags in ELIS to
identity any fraud, public safety, or national security concerns.

**Background:**  USCIS' authority to exercise the parole power stems from the Immigration and
Nationality Act (INA) section 212(d)(5)(A), which states that parole is available "only on a case-
by-case basis for urgent humanitarian reasons or significant public benefit."

Over the previous two years, the U.S. Department of Homeland Security (DHS) has implemented
processes through which Ukrainians, Cubans, Haitians, Nicaraguans, Venezuelans, and nationals of
other countries, and their immediate family members, could request to travel to the United States to
seek parole.[1] Under the U4U, CHNV, and FRP processes, potential beneficiaries with a confirmed

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Change to the Parole
Process for Cubans, 88 FR 26329 (Apr. 28, 2023). Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9,

FOR OFFICIAL USE ONLY

U.S.-based supporter may be considered, on a case-by-case basis, for advanced authorization to travel to an interior U.S. port of entry to seek a discretionary grant of parole for urgent humanitarian reasons or significant public benefit. The processes are initiated when a U.S.-based potential supporter files a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through myUSCIS for each beneficiary they seek to support. The potential supporter is vetted by USCIS and if the potential supporter passed vetting checks and is determined by USCIS as able to financially support the beneficiary, USCIS confirms the Form I-134A.

In July 2024, USCIS suspended parts of the CHNV processes after a USCIS Fraud Detection and National Security (FDNS) Directorate preliminary assessment identified potential concerns related to fraudulent supporter requests, during an internal review of the U4U and CHNV processes (or, as the report stated, the "UCHNV" process). An Interim Staff Report of the Committee on the Judiciary and Subcommittee on Immigration Integrity, Security, and Enforcement, titled "The Biden-Harris Administration's CHNV Parole Program Two Years Later: A Fraud-Ridden, Unmitigated Disaster," indicates, in part, that Forms I-134A filed by potential supporters under the CHNV processes included social security numbers, addresses, and phone numbers that had been used hundreds of times and, in some cases, were filed used biographical information for individuals who are deceased. Roughly 100,948 Forms I-134A were filed by 3,200 "serial" supporters, defined as a supporter whose biographical data appeared on 20 or more Forms I-134A. The report also found that nearly 1,000 Form I-134A applications provided Social Security numbers of confirmed dead people. Meanwhile, 100 physical addresses for potential supporters were used at least 124 times on over 19,000 Forms I-134A. Upon further investigation, fraud was confirmed in some of these cases, while it was not in others.[2] Further, the identified potential concerns related to fraudulent supporter requests exposed serious vulnerabilities in USCIS' vetting process not only for potential supporters but also for potential beneficiaries. There were instances identified where certain beneficiaries were not fully vetted by CBP and were the subject of national security or public safety information that was not properly assessed prior to parole by CBP. Therefore, benefit requests filed by aliens who are or were paroled under any of these categorical parole programs need further review to determine the level of fraud and the possible involvement of beneficiaries.

On January 20, 2025, the President issued Executive Order (EO) 14165, Securing our Borders, requiring DHS to terminate all categorical parole programs that are contrary to law or policy, including the parole program known as CHNV.[3] The President also issued EO 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats,

---

2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023). Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023). Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023)). Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023); Implementation of the Uniting for Ukraine Parole Process (Apr. 27, 2022).

[2] For additional details on the fraud found in the CHNV parole process, see Interim Staff Report of the Committee on the Judiciary and Subcommittee on Immigration Integrity, Security, and Enforcement (November 20, 2024).
[3] See, Securing Our Borders, Executive Order 14165, 90 FR 8467, 8468 (Jan. 20, 2025) available at (last viewed Jan. 28, 2025).

requiring DHS to identify all resources that may be used to ensure that all aliens seeking admission to the U.S., or who are already in the U.S., are screened and vetted to the maximum degree possible and re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind.[4]

Currently, fraud information and public safety or national security concerns are not being properly flagged in USCIS' adjudicative systems. The procedures that the parolees under these categorical parole programs underwent may not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161.

Due to the potential fraud trends already identified for supporter fraud by FDNS in their initial review of the U4U and CHNV processes, the implication of beneficiary participation in the supporter fraud, and the explicit instruction to DHS to screen and vet aliens seeking immigration benefits to the maximum degree possible, USCIS is pausing the adjudication of benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes to ensure that these benefit requests are being reviewed with the appropriate screening and vetting standards and procedures as set out in EO 14161.

**Recommendation/Decision:** Accordingly, USCIS will immediately place an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes, pending the completion of the required screening and vetting in ELIS to identify any fraud, public safety, or national security concerns.

Any case subject to this administrative hold with a litigation need may only be lifted from the hold on a case-by-case basis, in a subsequent memo to file, with approval by the USCIS Director or USCIS Deputy Director. This case-by-case requirement must be followed even when aliens are member of a class that is subject to injunction, settlement agreement, or other court order. Once USCIS completes a comprehensive review and evaluation of the in-country population of aliens who are or were paroled into the United States under these categorical parole programs, USCIS may issue a subsequent memo lifting this administrative hold.

C.C. John Miles, Chief Counsel (A)
      Susan Knafla, Associate Director (A), Fraud Detection and National Security

---

[4] *See*, Protecting the United States from Foreign Terrorists and Other National Security and Public Safey Threats, 90 FR 8451 (Jan. 29, 2025) (last viewed Feb. 4, 2025).

March 14, 2025

MEMORANDUM FOR THE FILE

FROM:              Graham Dudley
                   Director, Enforcement Programs Division
                   Office of Field Operations
                   U.S. Customs and Border Protection

SUBJECT:           Impact of the Parole Programs for Cubans, Haitians, Nicaraguans,
                   and Venezuelans

I am currently the Director of the Enforcement Programs Division, U.S. Customs and Border
Protection (CBP). This memo provides certain data and information about the impact of
processing Advance Travel Authorizations (ATAs) for the Department of Homeland Security
(DHS) Parole Programs for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV,
or CHNV parole programs) at U.S. Ports of Entry (POEs) within CBP's Miami/Tampa Field
Office. This information was confirmed and relied upon in the *Federal Register* notice
terminating these programs.

Beginning January 6, 2023, certain nationals of Cuba, Haiti, and Nicaragua and their qualifying
immediate family members were added to the list of countries (which beginning in October 2022
included Venezuela) whose nationals could request ATAs to travel to the United States to seek a
discretionary grant of parole. Up to 30,000 aliens from Cuba, Haiti, Nicaragua, and Venezuela
were allowed into the United States per month through these programs. To qualify, these aliens
were required to have a financial supporter in the United States and pass vetting. As of January
23, 2025, approximately 531,686 beneficiaries who had been issued ATAs had subsequently
been granted parole at a POE.

I.      **Operational Impact**

The CHNV programs significantly impacted operations at POEs within CBP's Miami/Tampa
Field Office, which processed approximately 82% of all CHNV nationals arriving in the United
States under these programs. As of January 23, 2025, CBP's Miami/Tampa Field Office
processed more than 426,268 of the 531,686 total CHNV beneficiaries.

This amounts to approximately 25,000 additional CHNV ATA travelers per month who were all
required to be referred to secondary inspection for additional processing and biometric
collection, necessitating additional CBP officers focused on specific CHNV ATA processing.
This reallocation of CBP personnel resulted in a corresponding decrease in enforcement
operations, such as focused efforts towards enhancing the CBP mission of protecting the U.S.
and preventing the smuggling of narcotics, contraband, banned agriculture items, and identifying

immigration violations from potential inadmissible aliens. The reallocation of CBP officers from primary to CHNV ATA secondary processing also affected the traveling public, who experienced an increase in primary inspection wait times upon their return to the United States. The increase in CHNV ATA travelers created an overtime expenditure and an increase in spending on supplies including food, water, blankets, and diapers within the Miami/Tampa Field Office. The POEs impacted include Miami International Airport (MIA), Fort Lauderdale-Hollywood International Airport (FLL), Orlando International Airport (MCO), Tampa International Airport (TPA), and Southwest Florida International Airport, Ft. Myers (RSW).

Some general challenges included:

- To address staffing needs resulting from the increased number of CHNV nationals arriving daily across the United States pursuant to these programs, CBP hired Data Entry Contractors (DECs) at MIA and FLL. The DECs mainly assisted with escorting CHNV travelers, crowd control, serving as translators, distributing food to aliens in secondary inspection as appropriate, and with document/equipment movement. Some DECs also assisted in entering data into the relevant electronic system of record.

- The POEs saw a progressive increase in aliens who arrived with approved CHNV ATAs but were ultimately not granted parole because they did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country. Additionally, the ports experienced an influx of CHNV minors identified as Unaccompanied Alien Children (UAC) or traveling with a non-parent or legal guardian and then turned over to their parent/legal guardian at the POE. Those aliens, approximately 1,500, had to be processed in accordance with CBP policies for processing aliens for an appropriate adverse action under Title 8, including detention, expedited removal, or referral into section 240 removal proceedings, as appropriate. This caused further processing delays and resource expenditures, as well as coordination with air carriers for return flights, when appropriate, and further contributed to the immigration court backlog.

- Beginning March 3, 2024, Haiti's government declared a state of emergency due to civil unrest. As a result, the Department of State issued an urgent security alert to U.S. citizens that led commercial airlines, American Airlines, Spirit, and JetBlue, to suspend daily flights into Port-au-Prince, Haiti. This created an increase of thousands of Haitian aliens with approved ATAs pending arrival into the United States who later arrived on public charter flights and commercial flights when those resumed.

- The POEs also faced processing challenges including: CHNV aliens arriving that were determined to be ineligible for parole; the inability to determine if a traveler with an approved ATA had dual citizenship or lawful residency status in a third country which would make them ineligible for parole; the fact that travelers with expired/cancelled ATAs were not always denied boarding by the airline; and issues with system updates in

the systems of record so that ATA travelers could not be processed while certain systems were unavailable.

Port-specific challenges included:

### Miami International Airport

Throughout the parole programs' operation, MIA processed over 250,000 CHNV aliens. This unanticipated increase oversaturated the secondary processing locations, requiring the assignment of dedicated CBP officers per shift to CHNV processing, including targeting flights from destinations with large numbers of CHNV aliens (Port au Prince, Havana, Managua, Santo Domingo), responding to arrival gates, and escorting CHNV travelers to the secondary processing area. To accommodate CHNV processing, MIA had to consolidate resources during its busiest peaks including modifying the hours of operations at the Central Terminal, rerouting personnel to the North Terminal where the bulk of the CHNV arrivals occurred, and reassigning CBP officers from enforcement operations. In addition, overtime that would traditionally be allocated to enforcement activities such as tactical operations, trade enforcement, and special operations was reallocated to passenger operations for CHNV processing. The assignment of these CBP officers to CHNV processing had an adverse impact on overall wait times at MIA. For example, in February 2023, the average wait time at MIA increased over 19% compared to February 2022. Industry partners, including American Airlines, the Miami-Dade Aviation Department, and the MIA Airline Management Council, noticed and complained about the increase in wait times.

The oversaturation of secondary processing locations also required the creation of an alternate processing area, in an area that was previously used for in-transit passengers. This necessitated the need for numerous additional workstations, including, desktop computers, monitors, laptops, cameras, and fingerprint scanners. Facility constraints due to the increase of CHNV travelers during peak processing hours at the in-transit lounge created a need for still another overflow location. At that location, passengers had to sit on the floor with CBP officers providing overwatch and security, because the area was not a holding room.

### Fort Lauderdale-Hollywood International Airport

Throughout the parole programs' operations, FLL was processing between 200 to 400 CHNV aliens daily. With most CHNV aliens arriving from one destination on the same flights, FLL's secondary processing areas quickly became over-capacitated, posing an unanticipated potential safety/fire hazard. To alleviate the pressure, FLL created a CHNV ATA secondary processing area in a space previously used for primary queuing and primary processing. FLL was required to add a second CHNV ATA secondary processing area, in another area of the port, and even added 50 seats for CHNV arrivals in this second location.

The increased traffic also caused a depletion of food, water, diapers, and other supplies provided to passengers in secondary inspection. There also was an increase in minimum staffing for Passenger Operations secondary work units and a decrease in enforcement operations, with funds and staffing reallocated to support CHNV processing. FLL worked with stakeholders and county partners for solutions to help alleviate strains on the facility and created an overflow queuing area. Increased costs included an increase in purchasing of items depleted during the detention of the individuals such as food, water, bedding, and personal hygiene supplies as well as an increase in overtime spending for CHNV processing, incidental secondary case processing, and overnight detention.

FLL also saw an increase in secondary adverse action immigration cases, including passengers previously removed from the U.S. who received ATA approval and arrived at the airport.

### Orlando International Airport

Throughout the parole programs' operations, MCO had to use additional officers to augment normal staffing levels in passport secondary due to the high volume of arrivals. MCO saw increased expenditures relating to overtime due to high volume of CHNV aliens arriving on the last flights of the evening and requiring processing past midnight.

### Tampa International Airport

Throughout the parole programs' operations, TPA reported that the increased number of secondary referrals of passengers with an ATA was straining secondary, on occasion, and that an increased number of officers was needed to process CHNV aliens.

### Southwest Florida International Airport, Ft. Myers

Throughout the parole programs' operations, RSW reported impacts in reduced staff available for routine primary and secondary processing due to the need to pull officers to process CHNV aliens.

### II.    Vetting and Screening

The CHNV parole programs, as implemented, involved advanced vetting of both potential U.S.-based supporters and potential beneficiaries. U.S. Citizenship and Immigration Services (USCIS) had the responsibility for vetting supporters, while CBP vetted potential beneficiaries as part of the determination of whether to issue an ATA to travel to the United States to seek parole. CBP's vetting was based on biometric and biographic information provided by the potential beneficiary. As part of its vetting, CBP performed systems queries to determine, among other things, whether the potential beneficiary had been previously encountered by the U.S. government, had a criminal record or otherwise posed a public safety threat, or posed a potential national security risk. However, this vetting was not based on Cuban, Haitian, Nicaraguan, or

Venezuelan information or records, as DHS does not have information-sharing arrangements with the relevant countries.

In 2024, DHS performed an audit of the CHNV parole programs, specifically focusing on the vetting of both supporters and beneficiaries. During that audit, fraud and other issues were discovered primarily among the supporter population. Following this audit, CBP spearheaded an effort to update and expand the vetting of CHNV supporters, including expanding system queries to additional databases and additional information and taking steps to better integrate CBP and USCIS electronic systems to facilitate more efficient information sharing.



1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

January 27, 2025

MEMORANDUM FOR:    Executive Directors
Directors, Field Operations
Office of Field Operations

FROM:    Ray Provencio
Acting Executive Director, Admissibility and Passenger Programs
Office of Field Operations

SUBJECT:    Implementation of Active Executive Orders – January 27, 2025

This memorandum and accompanying muster update the guidance package of the same title, issued on January 21, 2025.

There are multiple active Executive Orders / Presidential Proclamations as of January 27, 2025, including:

- *Guaranteeing the States Protection Against Invasion* (January 2025)
- *Securing Our Borders* (January 2025)
- *Securing the Border* (September 2024)

Among other authorities, the *Guaranteeing the States Protection Against Invasion* and the *Securing the Border* Proclamations leverage INA 212(f) authorities. This authority provides the ability for U.S. Customs and Border Protection (CBP) personnel to immediately and efficiently repatriate undocumented aliens that are not excepted. This process is specific to the southern land border and applicable to those that may attempt to circumvent CBP operations at the international boundary. Travelers who are subject to these Proclamations that circumvent CBP operations should be processed for Expedited Removal (ER) or Withdrawal (WD), detailed in the attached muster.

In alignment with the executive actions, the Department of Homeland Security has ceased actions on the following programs and processes:

- Uniting for Ukraine (U4U)
- Operations Allies Welcome (OAW)
- Family Reunification Parole (FRP) Processes
- Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV)
- Safe Mobility Offices (SMOs)
- Central American Minor (CAM) Processes

For Official Use Only
Law Enforcement Sensitive

Implementation of Active Executive Orders
Page **2** of **2**


Arriving aliens claiming association to these programs or processes should generally be processed as undocumented aliens.  Any alien traveling with a **_valid_** Forms I-512 or authorization should be processed accordingly.

Recent changes have been implemented regarding the processing of arriving refugees, as well as expanded use of ER, both detailed in the attached muster. Active executive actions do not change existing policies on the identification and processing of unaccompanied alien children (UACs), the processing of children consistent with the *Flores* Settlement Agreement, requirements under *Orantes*, or requirements under the *Ms. L v. ICE* Settlement Agreement.


Please ensure this memorandum and the attached muster are distributed to port personnel. Should you require additional information, please contact ████████, Director, Enforcement Programs Division.

For Official Use Only
Law Enforcement Sensitive

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 58 of 420

 

☰  🔍                    **B B C**            ⦿ Watch    [ Register ]    Sign In
                                                 Live

Home   News   Sport   Business   Innovation   Culture   Arts   Travel   Earth   Audio   Video   Live

# Trump says India 'will do what's right' on illegal immigration

28 January 2025                                                          Share ⤳    Save 🔖

**Meryl Sebastian**
BBC News, Kochi



Getty Images

Since taking office on 20 January, President Trump has announced a number of immigration-related executive orders

US President Donald Trump has said India "will do what's right" on the deportation of illegal migrants following a phone call with Prime Minister Narendra Modi.

The leaders spoke on Monday, their first conversation since Trump's inauguration last week.

CHNV-FRN-00338

2/27/25, 10:48 AM
Modi and Trump discuss illegal immigration as president says India will take 'right' on illegal immigrants
Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 59 of 420

They discussed immigration, security issues and trade in what the White House described as a "productive call".

Trump told reporters after the call that Modi was likely to visit the United States "sometime in February".

Since taking office on 20 January, Trump has announced a number of immigration-related executive orders, paving the way for a widespread effort to crack down on undocumented migrants in the US.

According to the Pew Research Center, there are an estimated 725,000 undocumented Indian immigrants in the US as of 2024.

Last week, India's foreign ministry said Delhi would take in Indians overstaying "anywhere in the world" as long as their documents were shared and nationality was verified.

In their phone call on Monday, the ministry said, Trump and Modi discussed the bilateral relationship, "including in the areas of technology, trade, investment, energy and defence".

The two leaders also discussed security in the Indo-Pacific, the Middle East and Europe.

According to a White House statement, Trump emphasised the importance of India increasing its procurement of US-made security equipment and moving towards a "fair" bilateral trading relationship.

In a post on X (formerly Twitter), Modi called Trump a "dear friend" and said they were "committed to a mutually beneficial and trusted partnership".

The White House said both leaders emphasised their commitment to advancing their countries' strategic partnership and the Indo-Pacific Quad partnership, which also includes Japan and Australia.

India will be hosting Quad leaders for the first time later this year.

Modi and Trump shared cordial relations during the US president's first term between 2017 and 2021.

But India faced a bitter tariff war with the Trump administration that affected businesses on both sides.

In November, following Trump's election victory, India's Foreign Minister S Jaishankar said the country was not nervous about working with the US president.

Trump had called Modi a "great leader" last year but also accused India of charging excessive tariffs.

Analysts say it will be interesting to watch if the bonhomie between the two will help overcome concerns about trade and immigration.

Immigration      Narendra Modi      US immigration      India      Donald Trump      United States

CHNV-FRN-00339

2/27/25, 10:48 AM    Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 60 of 420
Modi and Trump call US president says India will lower tariffs 'right' on illegal immigrants...

Trade

## RELATED

**Facts on migrants key to cohesion – charity boss**

10 hrs ago        England

**Has Channel 4 immigration show branded toxic changed anyone's mind?**

2 days ago        Newsbeat

**Digital travel permit to be introduced in late 2025**

2 days ago        Isle of Man

## MORE

1 hr ago

### Trump cancels oil deal in major blow to Venezuela

The US president said Venezuela had not lived up to its promises on taking back deported migrants.



1 hr ago        Latin America

1 hr ago

### Watch: BBC's Chris Mason looks ahead to when Starmer meets Trump

President Trump is set to meet with Prime Minister Keir Starmer



1 hr ago        Politics

2 hrs ago

### How much has the US given to Ukraine?

President Trump has repeatedly claimed that the US has given over $300bn to Ukraine, but he is incorrect.



2 hrs ago        World

3 hrs ago

### Why are the Tate brothers heading to the US?

Andrew Tate and his brother Tristan have left Romania, where they were previously under a travel ban.



3 hrs ago        World

4 hrs ago

### What are tariffs and why is Trump using them?

Tariffs are a central part of Trump's political vision, but economists warn they could put prices up.

CHNV-FRN-00340

2/27/25, 10:48 AM        Modi and Trump call US president says India will 'do what's right' on illegal immigration.

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 61 of 420



4 hrs ago    World



Home   News   Sport   Business   Innovation   Culture   Arts   Travel   Earth   Audio   Video   Live   Weather   BBC Shop

BBC in other languages  ▼

**Follow BBC on:**    𝕏    f    ⌾    ♪    in    ▶

Terms of Use   About the BBC   Privacy Policy   Cookies   Accessibility Help   Contact the BBC   Advertise with us   Do not share or sell my info

Contact technical support

Copyright 2025 BBC. All rights reserved.  The *BBC* is *not responsible for the content of external sites.* **Read about our approach to external linking.**

2/27/25, 9:48 AM
After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal | migrationpolicy.org

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 62 of 420



NEWSROOM | MPI EN ESPAÑOL | MULTIMEDIA | DONATE | CONTACT

| Articles |

RESEARCH & INITIATIVES    PUBLICATIONS    EVENTS    ABOUT US    MPI EU

Home » Migration Information Source

### THE ONLINE JOURNAL // MIGRATION POLICY INSTITUTE
# MIGRATION INFORMATION SOURCE
FRESH. GLOBAL. AUTHORITATIVE.

ADJUST FONT | PRINT | RSS | COPYRIGHT & REUSE

# After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal

AUGUST 1, 2024  POLICY BEAT  | By Muzaffar Chishti and Colleen Putzel-Kavanaugh



Asylum seekers receive assistance at the Brooklyn Cruise Terminal in New York City. (Photo: Michael Appleton/Mayoral Photography Office)

At the recent Republican National Convention, Texas Governor Greg Abbott took credit for bringing the immigration debate to Democratic leaders: "I took the border to them," he said. When his state in April 2022 began busing thousands of asylum seekers and other migrants to cities far from the Texas-Mexico border—dropping them off often with little to no warning—it struck many as a crisis. Chaotic scenes took place at city shelters and dropoff points, some of which—such as outside Vice President Kamala Harris's residence in Washington, DC—had clearly been chosen for political reasons. Tent encampments sprouted on the streets of Chicago, Denver, New York, and other so-called sanctuary cities, which spent billions of dollars to provide basic necessities. The situation threatened to "destroy New York City," Mayor Eric Adams famously warned last September.

Politically, the arrivals forced a rift within the Democratic Party, exposing the Biden administration on its most politically vulnerable issue and prompting wide bipartisan support for tougher border restrictions, including blanket denials of access to asylum for certain migrants. "Those buses will continue to roll until we finally secure our border," Abbott said at the Republican convention. And indeed, city leaders in Chicago already are bracing for the prospect that Texas will bus up to 25,000 new migrants to the city before the start of the Democratic National Convention there in August.

Even as the busing of migrants has continued, cities have started to put the crisis in the rearview mirror. In the more than two years since the beginning of unprecedented arrivals, many cities have seemed to settle into a new normal. Fewer than 1,000 migrants per week sought shelter in New York

### AUTHORS

Muzaffar Chishti is an MPI Se and Director of the MPI office York University School of Law

Colleen Putzel-Kavanaugh is a Policy Analyst with MPI's U.S. Immigration Policy Program.

### RELATED ARTICLES

New York and Other U.S. Struggle with High Costs Migrant Arrivals

Busing and Flights of Migr GOP Governors Mark a N in State Intervention on Immigration

In the Twilight Zone: Reco Number of U.S. Immigrant Limbo Statuses

Activism on Immigration I States Is Back, with New and Different Targets

Texas Leads Resurgence i Restrictive State Actions Immigration Enforcement

### RELATED RESEARCH

Outmatched: The U.S. Asy System Faces Record Der

Shifting Patterns and Poli Reshape Migration to U.S Border in Major Ways in 2

Diverse Flows Drive Incre U.S. Unauthorized Immig Population

**In This Article**

- Many cities quickly triaged arrivals and built on initial services over time

- The cost of migrant services has so far outpaced federal reimbursements

- Other cities and states have doubled down on efforts to discourage asylum seekers and other unauthorized migrants

- Will cities be better able to respond if arrivals increase again?

CHNV-FRN-00342

City in July, the mayor's office said this week, the fewest since October 2022. Local governments and nonprofits have made progress responding to newcomers' initial needs by relying on new approaches and, in part, imposing restrictions on access to shelters. Now, the cities have entered a new phase for the immediate response, but border arrivals' integration over the medium and long term remains a challenge. Local and state governments also are facing deep budget constraints, after spending massive sums on the lodging, feeding, and care of the arrivals while receiving only minimal reimbursement from the federal government.

Those policy responses may be all the more important if the record encounters witnessed at the U.S.-Mexico border over the past two years marked not a one-time surge but a fundamental reshaping of the patterns of irregular immigration and the resulting need for the government to more efficiently process cases. Most arrivals today are swiftly processed by federal authorities, with those permitted into the country pending a future immigration court hearing heading almost immediately to interior cities rather than spending extended amounts of time in border communities. Unlike in the past, many recent border arrivals are coming without friends or family in the United States upon whom they can rely. Cities could be tested again if recent election-related unrest in Venezuela leads to new largescale emigration from the country, as some analysts expect.



The more than 119,000 migrants bused from Texas as of July are only a portion of the several hundred thousand to have settled in interior cities. New York City says that since 2022 it has received more than 200,000 migrants, which would be the largest number by far, followed by Chicago and Denver (about 40,000 each) and, to a lesser extent, Washington, DC, Philadelphia, Los Angeles, and Boston. Secondary destinations may be emerging in California, Utah, and Florida, as migrants leave initial stopping points to meet up with family or friends or in search of more favorable opportunities.

This article reviews how interior cities have adapted to the rise in migrant arrivals and examines the challenges they continue to face.

### A Spectrum of Adaptations

Asylum seekers and other migrants arriving at the border without authorization typically receive critical initial assistance from organizations operating there before heading to their final destinations, often far away. Historically, this relocation happened gradually and organically, and often with the assistance of local nonprofits. What is different about the past two years is the orchestrated transportation of border arrivals by state governments, mostly Texas and, to a lesser extent, Arizona and Florida. The situation has also been affected by the sheer number of arrivals, with a record 2.5 million encounters at the Southwest border in fiscal year (FY) 2023, many coming without a strong social or familial network already in the United States. Given the scale and profile of recent arrivals, some observers have argued the federal government should take responsibility for deciding where to send them and, based on those decisions, duly compensate the receiving states and localities. This would be somewhat similar to the government's process for refugees resettled from overseas. But absent a clear federal response, and with few examples of best practices to follow, cities have begun adapting policies within the constraints of their political environments and existing capacities, resulting in patchwork approaches.

Bridging the Gap betwee
Economy and Migration F

Immigrants' Eligibility for
Public Benefits: A Primer

### IN THE SPOTLIGHT

**Maps of the Foreign Born in th
States**



Use our interactive maps, with
available data, to learn where i
populations, by country or reg
birth, live in the United States
county, and metro levels. Inter
the top immigrant population
state or metro area? Check out

GET STARTED

### CONTACT

Source@MigrationPolicy.org

CHNV-FRN-00343

Drawing from their ethos of welcoming immigrants, many cities quickly triaged arrivals and built on initial services over time. As cities such as New York and Denver began to feel overwhelmed and their capacities were stretched thin, authorities placed limits on services and in some cases even sought to discourage migrants from coming, using social media and even messaging trips to the U.S. border and beyond to discourage arrivals. During a trip to Latin America last fall, Adams, the New York mayor, warned that migrants were being given false information that an easy life awaited them in his city.

Once the initial chaos abated, cities adapted in different ways, with some commonalities and clear distinctions.

*Housing and Shelter Limits*

Housing is the most visible need of newly arrived migrants, and its provision can raise the most vexing political, fiscal, and capacity challenges. In New York City, for example, the focal point became the city's universal right to shelter, which derived from a 1979 consent decree in the *Callahan v. Carey* case and was based in the state constitution's guarantee of shelter to all who are homeless. Housing and immigrant-rights groups claimed arriving migrants were eligible under the consent decree, forcing the city to house newcomers in existing homeless shelters, temporary lodging facilities, and hotels. The right to shelter, city officials argued, became a magnet for migrants, especially those without established U.S. connections.

The situation soon became unsustainable. Months of negotiations between city officials and housing advocates concluded in March, when a judge approved a mediated settlement resulting in temporary changes to the right to shelter. The changes, which took effect in April and apply to migrants who arrived in the city after March 15, 2022, allow shelters to cap stays at 30 days for single adults (age 24 and above) and 60 days for individuals ages 18-23 and families. There are exceptions to the time limits, and early reporting found that 118 out of 192 applications for exemptions (61 percent) were approved. While adults must prove they are making strides towards self-sufficiency or meet an exemption to remain, families can reapply. Given these data, it is plausible to assume this new rule will only apply to a small number of people. Still, the changes are likely to have meaningful impacts. People who are not granted an exemption must find a place to live, which can further limit how they can get to work or their children attend school.

Chicago, Denver, and other cities have enacted similar shelter restrictions. In Chicago, shelter stays are limited to 60 days, though people can apply for extensions for extenuating circumstances. With a reduction in migrant arrivals, in April, Denver began closing shelters and instituted a 72-hour limit on stays (while also offering longer-term assistance to a small group of migrants, as described below). The high costs have made temporary housing the prime candidate for slashing, but critics warn this could be devastating for migrants and increase visible homelessness.

*Consolidating Access to Assistance*

Beyond shelter, cities faced major challenges meeting migrants' basic needs such as for food or hygiene products, and assistance navigating transportation, education systems, legal services, and applications for public benefits. As buses of migrants became a regular occurrence, city leaders, nonprofits, and volunteers provided as many services as possible to as many arrivals as they could. Over time, cities refined their approaches, which continue to evolve with the changing situations.

Chicago's extensive network of services, largely offered by nongovernmental organizations (NGOs), has played a critical role. Since arrivals ticked up, city officials have been meeting migrants at the main bus depot and transporting them to temporary shelters, where they are assisted by NGOs. New York set up similar service centers, including Project Open Arms, which was started in August 2022 to support newly arrived school-age migrants entering the education system. Another New York service center was created in May 2023 and served more than 150,000 people in its first year, and an asylum application help center opened in June 2023. These networks cover a wide array of needs and aim to reach the most people possible.

CHNV-FRN-00344

In contrast, Denver—which has received the largest number of migrants relative to its population—in April shifted its approach to provide more intense services to a smaller number of people. The Denver Asylum Seekers Program is specifically designed for migrants who arrived in Denver prior to April 10, 2024 and who did not enter via the CBP One app (which since May 2023 has been the primary way that migrants can schedule appointments at ports of entry, after which they may go on to seek asylum).

Denver's new program provides case management, access to legal services, connections to employers, and rental assistance. The city estimates that about 800 migrants are eligible. Those who arrived in Denver after the cutoff date or who entered via a CBP One appointment are still eligible for humanitarian services offered by city nonprofits, such as work authorization clinics, but not the wraparound assistance. This approach coordinates extensive resources for a specific group of migrants seen as the most vulnerable, even if relatively small. The full effects of Denver's new approach are not yet known, though previous efforts by other agencies to provide temporary rental assistance have not had the desired long-term effect, with some families unable to afford rent once assistance stopped.

*Overfocus on Work Authorization?*

Asylum seekers and others who arrive at the U.S. border without authorization are typically not eligible to apply for a work permit until their application for asylum is submitted, and despite major strides in processing applications, the wait time is still several months. A common rallying cry from city and state leaders has been for the federal government to issue work authorization quicker. The Department of Homeland Security (DHS) increased efforts to make migrants aware they could apply for work permits by using a targeted media campaign and providing educational materials for interior cities. In April, U.S. Citizenship and Immigration Services (USCIS) released a temporary final rule extending the validity of work permits from 180 to 540 days, thus reducing the risks of people's employment authorization documents expiring while awaiting reauthorization. Cities, too, have focused on assisting migrants fill out work permit applications, with many even making applying for work authorization a condition for exemption from shelter-stay limits.

Without these changes, far fewer people would likely be authorized to work, thus making them more reliant on city supports or working in precarious situations. Yet the single-minded focus on work authorization as a guarantor of migrants' self-sufficiency is somewhat short-sighted. Newly arrived migrants, regardless of how they entered, require support while awaiting work authorization and often afterwards, too.

The average employment authorization processing time as of June was three months (see Figure 1). For those eligible to apply right away—including beneficiaries of the humanitarian parole program for Cubans, Haitians, Nicaraguans, and Venezuelans, or CBP One entrants—many still require assistance filing the application and must wait for it to be processed. Even those who obtain a work permit are not guaranteed employment, nor will their income necessarily be sufficient to afford rent and other living expenses in pricey cities.

Figure 1. Average U.S. Employment Authorization Processing Time, by Month, November 2022-June 2024



CHNV-FRN-00345

*Source*: Authors' analysis of various months of application processing data from U.S. Citizenship and Immigration Services (USCIS), "Immigration and Citizenship Data," accessed July 30, 2024, available online.

Given lags in processing work authorization and limited medium-term services such as extended shelter or cash assistance, migrants often turn to informal, under-the-table employment. In New York and other cities, for example, news organizations noted a rise in newcomers, presumably without work authorization, earning money delivering food and doing other gig work. Working without authorization is risky; it puts workers at the mercy of employers or others, and could have negative impacts on migrants' future immigration applications.

Still, absent more support at the federal level, advocating for work authorization has remained a constant refrain.

### Federal Funding Falls Short

Thus far, the cost of migrant services to cities has far outpaced reimbursements through the federal government's Shelter and Services Program (SSP), which is the only vehicle for offsetting those expenditures. The New York City comptroller estimates the city spent nearly $4.6 billion for shelter and services for newly arrived migrants through May 2024. Chicago's leaders estimate the city spent nearly $434 million for food, shelter, and other services between July 2022 and July 2024. And Denver incurred between $216 million and $340 million in costs for food, education, housing, and other services from December 2022 to May 2024, according to the Common Sense Institute's estimates.

Congress has provided funds for newly arrived migrant services nearly every year since 2019. In FY 2024, lawmakers appropriated $641 million for SSP, less than the $800 million awarded the year prior. FY 2024 funds are being delivered in two tranches: one through direct allocation, the other through a competitive grant process. The first slice, for $300 million, was released in April; 60 percent went to local governments and other recipients in border states and 40 percent to those in the interior (see Figure 2). Some of the largest recipients in the U.S. interior were in New York ($39.7 million, or 14 percent of the total), Illinois ($19.3 million, or 7 percent), and Colorado ($9.7 million, or 4 percent). The second tranche of funding is set to be awarded by October.

Figure 2. Receipt of Initial Tranche of Shelter and Services Program Funding, by State Amount and Share of Tranche, FY 2024



*Source*: U.S. Federal Emergency Management Agency (FEMA), "FY24 Awards from the Shelter and Services Program," updated May 1, 2024, available online.

In addition to being paltry compared to the costs, SSP funds can only be used for services for migrants during their first 45 days after release from federal custody at the border. While it may be helpful to cover outlays associated with immediate needs, SSP is not suitable for medium- and long-term expenses outside of the 45-day period, such

CHNV-FRN-00346

as for housing. Given this disconnect, a group of Democratic senators has urged appropriators to establish a new fund specifically for destination reception needs as part of the FY 2025 DHS appropriations. This fund would complement SSP funding, providing specific resources for migrants' medium-term needs including housing, health care, and workforce development. As of this writing, the proposed DHS appropriations bill in the House did not include SSP money and no companion bill has been introduced in the Senate.

## As Some Destinations Veer Left, Others Tack Right

New York, Chicago, and Denver became top destinations in part because of the Texas busing, but also through word of mouth and migrants' tendencies to converge where they can find connections. Although these cities were generally categorized as receptive, they took on a different posture when resources ran thin, encouraging migrants not to come or to move elsewhere. Denver, for instance, purchased bus tickets for migrants to go to other U.S. cities. New York offered to pay for airfare, even internationally.

While other cities—including Dayton, Ohio; Detroit; and Pittsburgh—voiced a willingness to welcome some of the border arrivals, seeing in them a ready workforce and solution to population decline, they have as yet offered few policies encouraging this migration.

Elsewhere, some cities and states have doubled down on efforts to discourage asylum seekers and other unauthorized migrants from coming. In Florida, Governor Ron DeSantis signed into law SB 1718, which since July 2023 has mandated the use of the E-Verify system for confirming work authorization, required hospitals to inquire about patients' immigration status, and criminalized the transport of unauthorized immigrants into the state. Since the law went into effect, many Florida businesses have reportedly faced worker shortages, especially in the construction and agriculture sectors that typically rely on migrant labor.

Texas, too, has moved towards criminalizing unauthorized migrants and migrant-serving organizations. In an unusual legal battle, state Attorney General Ken Paxton has accused the El Paso aid organization Annunciation House of human smuggling and sought to shut down its shelter and service program after nearly 50 years of operation. Similar attempts have been made against other migrant-serving organizations in Texas, including Catholic Charities of the Rio Grande Valley and Team Brownsville. Through the sweeping SB 4, Texas also aimed to deputize all state and local law enforcement officials to enforce immigration law; the law also imposes civil penalties for crossing the border without authorization. A federal appeals court has blocked the law's implementation for now.

These enforcement-focused efforts, occurring alongside other jurisdictions' provision of services to newly arrived migrants, showcases the stark divergence over immigration at the state level and underscores how polarized the issue remains.

## Planning for an Uncertain Future

The roles of cities and states in responding to irregular migrant arrivals have become paramount. Over the last two years, some governments, particularly at the local level, have sought to provide services to newcomers, while others at state levels have created a chilling effect for unauthorized immigrants. Interior cities have seemed to adapt to their new normal, but the question of whether the situation is sustainable still looms.

Although irregular border arrivals have fallen sharply in 2024, amid rising Mexican enforcement and the Biden administration's new policy further limiting access to asylum when border encounters hit a particular level, it is unclear if this lull will continue. Many cities have reduced shelter capacity and reframed their policies in response to lower numbers. However, it is plausible to assume they will be better able to respond if large numbers of migrants arrive again, since they did once before.

The outcome of the November election may offer new or different challenges. If Republican presidential nominee Donald Trump returns to the White House, his administration is likely to rescind or let expire programs for migrants with liminal statuses—including parole for Cubans, Haitians, Nicaraguans, and Venezuelans, as well as

CHNV-FRN-00347

various grants of Temporary Protected Status—which would mean many migrants lose authorization to work and become at risk of deportation. This would create problems for individual migrants and their communities, as well as employers and service providers. Trump has promised a massive deportation campaign and other aggressive enforcement, which could lead to standoffs with "sanctuary" cities and an adversarial relationship. If Harris, the likely Democratic nominee, wins, the current Biden policies are expected to continue, with an emphasis on providing liminal statuses to more subsets of the unauthorized population, and quicker and longer-term work authorization. Shifts in Congress may lead to the possibility of more durable statuses for some immigrants holding temporary statuses, such as evacuees from Afghanistan and displaced Ukrainians. No matter the change in November and the federal policies that follow, more resources are clearly needed for receiving cities to meet the continued needs of recently arrived migrants.

Two years after the beginning of the crisis, U.S. cities far from the Southwest border have implemented an array of programs and found their footing after early, chaotic days. But the services provided have mostly been a reaction to immediate demands, rather than in anticipation of longer-term needs. Even as the number of new migrants fluctuates, their arrival in interior cities should be acknowledged as a sustained phenomenon requiring capacity to assist them on an ongoing basis. The federal government has largely declined to take the lead in developing mechanisms for assisting border arrivals' onward movement and appropriately compensating cities that receive them. A change of course would be beneficial not only for those migrants but for the host cities as well.

## Sources

Beaty, Kevin. 2024. Newly Settled Immigrants Are Being Evicted and in Some Cases Ending Up Back in the Streets. Denverite, May 2, 2024. **Available online**.

Bojorquez, Manuel. 2024. Florida's Immigration Law Brings About Significant Unintended Consequences, Critics Say. CBS News, January 12, 2024. **Available online**.

City of Chicago. 2024. Cost Dashboard. Updated July 10, 2024. **Available online**.

---. N.d. New Arrivals Timeline. Accessed July 22, 2024. **Available online**.

City of Denver. N.d. Community Partners: Denver Asylum Seekers Program - FAQ. Accessed July 22, 2024. **Available online**.

Craig, Tim. 2023. Some States Spurn Migrants. The Rust Belt Wants Them. *The Washington Post,* December 8, 2023. **Available online**.

Eng, Monica and Carrie Shepherd. 2024. Chicago Braces for Potential Surge of Thousands of Migrants. Axios Chicago, July 23, 2024. **Available online**.

Kramer, Marcia and Dick Brennan. 2024. New York City Homeless Advocates Agree to Modified Right-to-Shelter Law Amid Migrant Crisis. CBS New York, March 15, 2024. **Available online**.

Marcelo, Philip. 2024. NYC Is Beginning to Evict Some People in Migrant Shelters Under Stricter Rules. Associated Press, May 22, 2024. **Available online**.

Mathurin, Desiree. 2024. Here's How Denver's New, Pared-Down Asylum Program Is Starting to Work. Denverite, April 25, 2024. **Available online**.

National Immigration Forum. N.d. Five Things to Know About Texas' SB 4. Accessed July 24, 2024. **Available online**.

New York City Comptroller. 2024. Accounting for Asylum Seeker Services: Fiscal Impacts. Updated June 13, 2024. **Available online**.

CHNV-FRN-00348

NYC Health + Hospitals. 2024. NYC Health + Hospitals Celebrates One-Year Anniversary of the Arrival Center for Newly Arriving Asylum Seekers. Press release, May 22, 2024. **Available online**.

Office of Ed Markey, U.S. Senator for Massachusetts. 2024. Markey, Warren, Durbin Lead Call to Establish a New 'Destination Reception Fund' to Supplement Local Efforts, Support New Arrivals. Press release, May 23, 2024. **Available online**.

Office of the Texas Governor. 2024. Texas Apprehends Over 516,000 Illegal Immigrants. Press release, July 19, 2024. **Available online**.

Sanchez, Sandra. 2024. Texas Attorney General Going After 3rd Border Nonprofit that Helps Migrants. The Border Report, July 25, 2024. **Available online**.

Summers, DJ. 2024. *The Ongoing Cost of Denver Migrants*. Greenwood Village, CO: Common Sense Institute. **Available online**.

U.S. Department of Homeland Security (DHS). 2023. DHS Supports Interior Cities by Educating Qualified Noncitizens on Work Permit Eligibility. Press release, September 6, 2023. **Available online**.

---. 2024. Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants. *Federal Register* 89 (68): 24628-24676. **Available online**.

Zea, Tibisay. 2023. A New Underground Gig Economy Is Booming in New York City as Migrants Wait for Work Permits. PRX and WGBH, The World, September 28, 2023. **Available online**.

IF YOU HAVE QUESTIONS OR COMMENTS ABOUT THIS ARTICLE, CONTACT US AT **Source@MigrationPolicy.org**



RESEARCH & INITIATIVES | PUBLICATIONS | EVENTS | NEWS | ABOUT US    CONTACT US | SITE MAP | PRIVACY POLICY | EXPERTS

1275 K St. NW, Suite 800, Washington, DC 20005 | ph. 202-266-1940 | fax. 202-266-1900



Copyright © 2001-2025 Migration Policy Institute. All rights reserved.

CHNV-FRN-00349

**Newsweek**    SUBSCRIBE FOR $1    **Login**

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China    ✕

U.S.    |    Migrants    Immigration    Department Of Homeland Security    Flying    Republ

# Map Shows Hotspots for Migrants Flying Into US

**Published** May 01, 2024 at 3:09 PM EDT

By **Nick Mordowanec**
Staff Writer

 Newsweek Is A Trust Project Member

FOLLOW

**News Article**    |    0

More than 200,000 migrants entered the U.S. between January and August 2023 as part of the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) program, according to **documents** obtained by the House Homeland Security Committee.

CHNV-FRN-00350



LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China

to 30,000 nationals on a monthly basis.

Among the approximately 200,000 migrants from those countries in that eight-month stretch, about 80 percent of them or 161,562 individuals arrived at Florida-based airports in Miami (91,821), Fort Lauderdale (60,461), Orlando (6,043) and Tampa (3,237)—ranking first, second, fifth and seventh within the top 10 cities with the most newcomers, respectively.

A DHS spokesperson told *Newsweek* via email that the program's processes are publicly available online, and that DHS has been providing regular updates on their use to the public.

"These processes are part of the Administration's strategy to combine expanded lawful pathways with stronger consequences to reduce irregular migration, and have kept hundreds of thousands of people from migrating irregularly," the spokesperson said. "The CHNV parole processes are public; claims of a secret program are false."

They added: "Through these processes, and if approved after screening and vetting, individuals with advanced travel authorization are responsible for arranging their own travel and for the cost of purchasing their own commercial airline ticket. Beneficiaries are also screened and inspected when arriving at an airport port of entry, where CBP Officers will inspect and consider them for a grant of discretionary parole on a case-by-case basis."

CHNV-FRN-00351

**Newsweek**    SUBSCRIBE FOR $1



Migrant people of different nationalities seeking asylum in the United States walk towards the border between Mexico and the US after disembarking from the Mexican train known as "The Beast" in the border city of...    More

**HERIKA MARTINEZ/AFP VIA GETTY IMAGES**

New York City, ranking No. 3, accounted for 14,827 migrants during that time span, followed by Houston at No. 4 with 7,923 migrants.

Los Angeles came in sixth with 3,271 migrants, Dallas in eighth with 2,256 migrants, San Francisco in ninth with 2,052 migrants, and Atlanta finished the top 10 with 1,796 migrants.

Other airports used were located in Newark, New Jersey; Washington D.C.; Chicago, Illinois; Las Vegas, Nevada; and Austin, Texas.

"Biden's parole program is unlawful, and constitutes an abuse of constitutional authority," Jeremy Redfern, spokesperson for Florida Governor Ron DeSantis, told Fox News. "Florida is currently suing Biden to shut it down, and we believe that we will prevail."

Redfern reiterated the same remarks via email to *Newsweek*.

CHNV-FRN-00352



**SUBSCRIBE FOR $1**

LATEST NEWS    *Trump Announces Tariff Update For Mexico, Canada And China*

 **Trump Immigration Policies: What's Been Blocked, What's Still In Place**

ICE Agents' Identities Exposed by Activists

Judge Blocks Trump Policy Allowing ICE Operations in Some Houses of Worship

NYC Hotel That Symbolized Migrant Crisis to Be Cleared Out

## States Asking People to Not Use Their Cars



✳ A Flourish map

House Homeland Security Committee Chairman Mark Green, a [Republican](#) from Tennessee, said in a statement that the documents further implicate DHS Secretary [Alejandro Mayorkas](#) as part of what is viewed as a national immigration crisis.

CHNV-FRN-00353



**SUBSCRIBE FOR $1**

LATEST NEWS    **Trump Announces Tariff Update For Mexico, Canada And China**

"Secretary Mayorkas' CHNV parole program is an unlawful sleight of hand used to hide the worsening border crisis from the American people," Green said. "Implementing a program that allows otherwise inadmissible aliens to fly directly into the U.S.—not for significant public benefit or urgent humanitarian reasons as the Immigration and Nationality Act mandates—has been proven an impeachable offense.

"Following our subpoena and the House's impeachment vote—especially in light of the Senate's complete failure to fulfill its duty to hold a trial—the Committee will not rest until this administration is finally held accountable for its open-borders agenda and its devastating impact on our homeland security."



A staffer within the committee told *Newsweek* via email that Mayorkas "has consistently and willfully abused the clear text of the Immigration and Nationality Act, including the

 SUBSCRIBE FOR $1

LATEST NEWS    **Trump Announces Tariff Update For Mexico, Canada And China**

interpreted to mean actions like admitting someone for urgent medical care or to testify in legal proceedings.

"Mass-paroling more than 400,000 individuals from these countries—so far—whom DHS itself has admitted are otherwise inadmissible is inconsistent with the law. Secretary Mayorkas was impeached, in part, for willfully and systemically refusing to comply with the laws passed by Congress. This program, part of the secretary's unprecedented embrace of mass parole, certainly is more evidence the House made the right decision."

"200,000 illegal aliens FLEW into US cities thanks to these illegal categorical parole programs," Texas Representative Chip Roy wrote on X. "Remember: 1.6M foreign nationals are CURRENTLY waiting for approval to ENTER the US under these open border schemes."

The CHNV program was designed to allow certain individuals to enter the U.S., namely those with domestic sponsors and who pass background checks.

But criticism has mounted on the lawfulness of the program and the individuals being accepted into the U.S., notably due to increased numbers of southern border apprehensions involving people from those countries.

U.S. Border Patrol agents at the U.S.-Mexico apprehended 9,822 illegal migrants from Cuba, 4,359 from Haiti, 2,123 from Nicaragua and 1,227 from Venezuela in fiscal year 2020, totaling 17,531.

That number climbed to more than 181,000 the following fiscal year—which included the first months of the Biden administration—and then ballooned to more than 600,000 in fiscal year 2022.

---

**Request Reprint & Licensing**

**Submit Correction**

**View Editorial & AI Guidelines**

CHNV-FRN-00355



**Newsweek**    **SUBSCRIBE FOR $1**

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China



### Learn How Gold Could Protect Your Retirement Funds

Goldco



### Look For Your Old High School Yearbook, It's Free

Classmates



### : Three Banks Introduce 12% Interest Rates On Savings!

Search Ads



### The New Way That Frederick Residents Are Protecting Their Homes

Vivint Smart Home Security



### A Teaspoon On An Empty Stomach Burns 12 Lbs Of Fat A Week Safely!

Keto

### RELATED PODCASTS



### Critical: Retirement Protection For Everyday People Like You

GoldCo

CHNV-FRN-00356

# NEWSWEEK    SUBSCRIBE FOR $1

**LATEST NEWS**    Trump Announces Tariff Update For Mexico, Canada And China

### Newsweek Radio

Trump Confirms Russian Stooge
Status as The Left Struggles with
Pronouns

### Newsweek Radio

Musk Fires Army Vet Twice, Trump
Threatens Journos Over
Anonymous Sources

### Newsweek Radio

Trump's Inevitable Collapse, Epstein
List Delays, Mark Cuban Won't Be
POTUS

## Top Stories



## Who Will Win in Donald Trump and Judiciary's Power Battle?

CHNV-FRN-00357

Map Shows Hotspots for Migrants Flying Into US - Newsweek

**Newsweek**    SUBSCRIBE FOR $1

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China



## Gene Hackman and Wife Found Dead at Home

CHNV-FRN-00358

**Newsweek**    SUBSCRIBE FOR $1

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China



## Donald Trump Suffers Legal Setback Over Transgender Order

CHNV-FRN-00359

Map Shows Hotspots for Migrants Flying Into U.S. - Newsweek

**SUBSCRIBE FOR $1**

LATEST NEWS    **Trump Announces Tariff Update For Mexico, Canada And China**



### Gene Hackman's Cause of Death: What We Know So Far

## About the writer

### Nick Mordowanec

FOLLOW

Nick Mordowanec is a Newsweek investigative reporter based in Michigan. His focus includes U.S. and international politics and policies, immigration, ... read more



**SUBSCRIBE FOR $1**

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China

## Trending



**01**    Gene Hackman's Cause of Death: What We Know So Far

    17 comments

**02**    Gene Hackman and Wife Found Dead at Home

    20 comments

**03**    Nearly 300,000 Americans Are Waiting to Dispute Social Security Decision

    21 comments

**04**    Social Security is Boosting Benefits: When To Expect Increased Payments

CHNV-FRN-00361



**SUBSCRIBE FOR $1**

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China

← Back To Homepage

THE DEBATE

## Sen. Jim Banks: Trump Leading America Into New Golden Age | Opinion

By Jim Banks



**VS**



## The Dealmaker-in-Chief Just Sold Off America's National Security | Opinion

By Matt Robison

OPINION

## Trump's New 'Pardon Czar' Brings Hope for Criminal Justice Reform | Opinion

By James Davis



## The Mythology of Free Markets | Opinion

By Nicholas Creel



## A Unique Opportunity for Israel to Normalize Ties With Lebanon | Opinion

By Yaakov Katz



## America the Mercenary: Ukraine Shakedown Turns Us Into Gangsters | Opinion

By Dan Perry



   SUBSCRIBE FOR $1

LATEST NEWS    **Trump Announces Tariff Update For Mexico, Canada And China**

## Dan Bongino's Nomination Is Meant to Demoralize the FBI | Opinion

By David Faris



## War Crimes Demand Accountability—No Matter the Perpetrator | Opinion

By Faisal Kutty



## Justice Department Should Rescind Biden's Big Pharma Bailout | Opinion

By James Fishback



## These Media Companies Figured Out the Secret. Will Anyone Else? | Opinion

By Matt Robison And Cliff Schecter



## The Presidential Power Grab That Should Terrify Every American | Opinion

By Traci Feit Love



## Trump's E.O. On Anti-Christian Bias Should Extend to Iraq's Assyrians

By Sarah Behjet



## Secretary Doug Collins Must Finally Fix the VA | Opinion

By Sean O'connor



CHNV-FRN-00363



**SUBSCRIBE FOR $1**

LATEST NEWS     Trump Announces Tariff Update For Mexico, Canada And China

| | | |
|---|---|---|
| Entertainment › | Fact Check › | Digital+ Yearly $49.00 |
| My Turn › | Education › | Premium Monthly $9.99 |
| Events › | Sports › | Premium Yearly $99 |
| Podcasts › | Better Planet › | |
| Better Workplaces › | Vault › | |
| Mightier › | Autos › | |
| Newsletters › | Unconventional › | |
| Vantage › | Experts › | |
| Voices › | | |

**Trending**

Israel at War     Vladimir Putin     Russia-Ukraine War

Donald Trump

**Newsletters in your inbox** See all                    **In The Magazine**

☐ The Bulletin (Daily)          ☐ The Gist of It (Daily)
   See Sample

☐ Geoscape (Twice a            ☐ The 1600 (Daily)
   Week)

☐ Inside Trump Policy          ☐ Sports Daily (Daily)
   (Weekly)

CHNV-FRN-00364



**SUBSCRIBE FOR $1**

LATEST NEWS    **Trump Announces Tariff Update For Mexico, Canada And China**



| | |
|---|---|
| ☐ Breaking News (As it Breaks) | ☐ The Debate (Twice a Week) |
| ☐ Pawsitively (Daily) | ☐ Better Planet (Weekly) |
| ☐ Newsweek Pulse (2x3 Times a Month) | |

Email address              **Sign up now**

You can unsubscribe at any time. By signing up you are agreeing to our Terms of Service and Privacy Policy

March 07
2025 Issue

---

**Company**

About Us

Masthead

Diversity

Announcements

Archive

Policies and Standards

Mission Statement

Leadership

Newsletters

Press Center

**Terms of Use**

Cookie Policy

Copyright

Privacy Policy

**Editions:**

U.S. Edition

日本

Polska

România

**Contact**

Advertise

Careers

Contact Us

Corrections

CHNV-FRN-00365



**SUBSCRIBE FOR $1**

LATEST NEWS    Trump Announces Tariff Update For Mexico, Canada And China

© 2025 NEWSWEEK DIGITAL LLC

CHNV-FRN-00366





Home › Topics › Latin America › Panama Receives First US Deportation Flight Under Trump Administration

# Panama Receives First US Deportation Flight Under Trump Administration



By **Tico Times**   *February 16, 2025*



*Illustration Purposes (Photo by JAIME SALDARRIAGA / AFP)*

Panama said it had received a first US military plane transporting 119 deportees of various nationalities, who will now be repatriated to their own countries. President Jose Raul Mulino, who has offered his country as a stopover for migrants expelled from the United States by the Donald Trump administration,

said the plane arrived Wednesday with "people of the most diverse nationalities," many from Asia. US Secretary of State Marco Rubio visited Panama two weeks ago, meeting Mulino in the midst of a dispute over ownership of the Panama Canal, which Trump had vowed the United States would be "taking back."

After the visit, Rubio voiced optimism Panama would address US concerns, including over alleged Chinese influence on the operation of the critical US-built waterway. Mulino also promised to step up cooperation on the new administration's top priority — repatriating undocumented migrants.

He offered Rubio the use of an airstrip in the town of Meteti in Darien, the dense jungle that has become a major crossing point for migrants seeking to exit South America en route to the United States. Trump's predecessor Joe Biden had already sealed a deal after Mulino's election last year to provide $6 million to assist in expelling migrants.

Since then, Panama has closed several routes in the Darien and deported migrants on flights to countries including Colombia and Ecuador. On his first day in office last month, Trump declared a national emergency at the southern US border and vowed to deport "millions and millions" of migrants. – Flown out soon – Mulino said a US Air Force plane landed at Howard west of the capital Panama City Wednesday, and the 119 migrants onboard were taken to hotels.

CHNV-FRN-00368

From there, they will be transported to a shelter in the Darien, and flown home on repatriation flights from an airstrip in the jungle. "We hope to get them out of there as soon as possible," said Mulino, as he underlined the "contribution that Panama is making on the migration issue."

The deportees included citizens of China, Pakistan and other Asian countries, said the president, adding more planes are expected from the United States soon. Latin America is the original home of most of the United States estimated 11 million undocumented migrants. Many had made the dangerous journey through the Darien, braving treacherous terrain, wild animals and criminal gangs for a chance at a better life. On Tuesday, Panamanian police turned back dozens of migrants, mostly Venezuelans, trying to return home after abandoning their journey to the United States over Trump's deportation intentions.

Riot police forced the group to return to Costa Rica for an orderly repatriation process. Since Trump took office on January 20, undocumented migrants have also flown to Colombia, Venezuela, Brazil and Guatemala, as well as the notorious Guantanamo US military base in Cuba.

CHNV-FRN-00369

CHNV-FRN-00370

Federal Register

Vol. 89, No. 111

Friday, June 7, 2024

# Presidential Documents

Proclamation 10773 of June 3, 2024

## Securing the Border

### By the President of the United States of America

### A Proclamation

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID–19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID–19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken—and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS

to manage conditions on the southern border, as well as funding for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a) over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b) over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c) 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d) shelter and critical services for newcomers in our cities and States; and

(e) 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118–47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final

decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system—the result of outdated laws and inadequate resources—has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the

United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1.** *Suspension and Limitation on Entry.* The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2.** *Applicability of Suspension and Limitation on Entry.* (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

(b) Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

(c) For purposes of subsection (a) and subsection (b) of this section, unaccompanied children (as defined in section 279(g)(2) of title 6, United States Code) from non-contiguous countries shall not be included in calculating the number of encounters.

**Sec. 3.** *Scope and Implementation of Suspension and Limitation on Entry.* (a) The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

(b) The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c) An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d) The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e) Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4.** *Definitions.* (a) The term ''encounter'' refers to a noncitizen who:

(i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term ''southern coastal borders'' means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term ''southwest land border'' means the entirety of the United States land border with Mexico.

(d) The term ''southern border'' means the southwest land border and the southern coastal borders.

**Sec. 5.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held

to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

[FR Doc. 2024–12647
Filed 6–6–24; 8:45 am]
Billing code 3395–F4–P


# Presidential Documents

Proclamation 10817 of September 27, 2024

## Amending Proclamation 10773

### By the President of the United States of America

### A Proclamation

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the

border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Amendment to Section 2(a) of Proclamation 10773*. Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

**Sec. 2**. *Revocation of Section 2(c) of Proclamation 10773*. Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3**. *Severability*. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4**. *Effectiveness*. The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final

rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 FR 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

**Sec. 5**. *General Provisions*. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2024–22942
Filed 10–1–24; 11:15 am]
Billing code 3395–F4–P

CHNV-FRN-00380



Federal Register

**Presidential Documents**

Vol. 90, No. 18

Wednesday, January 29, 2025

Title 3—

The President

Proclamation 10886 of January 20, 2025

Declaring a National Emergency at the Southern Border of the United States

By the President of the United States of America

A Proclamation

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

America's sovereignty is under attack. Our southern border is overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans, including America.

This invasion has caused widespread chaos and suffering in our country over the last 4 years. It has led to the horrific and inexcusable murders of many innocent American citizens, including women and children, at the hands of illegal aliens. Foreign criminal gangs and cartels have begun seizing control of parts of cities, attacking our most vulnerable citizens, and terrorizing Americans beyond the control of local law enforcement. Cartels control vast territories just south of our southern border, effectively controlling who can and cannot travel to the United States from Mexico. Hundreds of thousands of Americans have tragically died from drug overdoses because of the illicit narcotics that have flowed across the southern border.

This assault on the American people and the integrity of America's sovereign borders represents a grave threat to our Nation.

Because of the gravity and emergency of this present danger and imminent threat, it is necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border.

To protect the security and safety of United States citizens, to protect each of the States against invasion, and to uphold my duty to take care that the laws be faithfully executed, it is my responsibility as President to ensure that the illegal entry of aliens into the United States via the southern border be immediately and entirely stopped.

As Commander in Chief, I have no more solemn duty than to protect the American people.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of

title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

**Section 1**. *Deployment of Personnel and Resources.* The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Armed Forces, including the Ready Reserve and the National Guard, as the Secretary of Defense determines to be appropriate to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States. The Secretary of Defense shall further take all appropriate action to facilitate the operational needs of the Secretary of Homeland Security along the southern border, including through the provision of appropriate detention space, transportation (including aircraft), and other logistics services in support of civilian-controlled law enforcement operations.

**Sec. 2**. *Additional Physical Barriers.* The Secretaries of Defense and Homeland Security shall immediately take all appropriate action, consistent with law, including 10 U.S.C. 2214, to construct additional physical barriers along the southern border. To the extent possible, the Secretaries of Defense and Homeland Security shall coordinate with any Governor of a State that is willing to assist with the deployment of any physical infrastructure to improve operational security at the southern border.

**Sec. 3**. *Unmanned Aerial Systems.* The Secretary of Transportation and the Federal Communications Commission shall, consistent with applicable law, consider waiving all applicable Federal Aviation Administration and Federal Communications Commission regulations or policies, respectively, that restrict the Department of Homeland Security's ability to counter unmanned aerial systems within 5 miles of the southern border.

**Sec. 4**. *Revision of Policies and Strategies.* The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Attorney General, shall take all appropriate action, consistent with law, to prioritize the impedance and denial of the unauthorized physical entry of aliens across the southern border of the United States, and to ensure that use of force policies prioritize the safety and security of Department of Homeland Security personnel and of members of the Armed Forces.

**Sec. 5**. *Revocation.* Proclamation 10142 of January 20, 2021 (Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction), is hereby revoked.

**Sec. 6**. *Reporting Requirement.* (a) Within 30 days of the date of this proclamation, the Secretary of Defense shall submit to the President, through the Homeland Security Advisor, a report outlining all actions taken to fulfill the requirements and objectives of this proclamation; and

(b) Within 90 days of the date of this proclamation, the Secretary of Defense and the Secretary of Homeland Security shall submit a joint report to the President about the conditions at the southern border of the United States and any recommendations regarding additional actions that may be necessary to obtain complete operational control of the southern border, including whether to invoke the Insurrection Act of 1807.

**Sec. 7**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–01948
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

[CIS No. 2778–24; Docket No: USCIS–2024–0006]

**RIN 1615–AC92**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

[A.G. Order No. 6053–2024]

**RIN 1125–AB32**

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Final rule; request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA'') suspending and limiting the entry of certain noncitizens into the United States during emergency border circumstances. DHS and DOJ (''the Departments'') issued a complementary interim final rule (''IFR'') shortly thereafter. This final rule responds to public comments received on the IFR, makes certain revisions to the regulatory text, and seeks comment on potential changes to the Circumvention of Lawful Pathways rule as well as changes that parallel modifications made by the subsequent Proclamation.

**DATES:**

*Effective date:* This rule is effective at 12:01 a.m. eastern daylight time on October 1, 2024.

*Comment period for solicited comments:* Comments on the extended and expanded applicability of the Circumvention of Lawful Pathways rebuttable presumption in Section IV of this preamble and changes that parallel modifications made by the subsequent Proclamation described in Section II.C.1 of this preamble must be submitted on or before November 6, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the IFR that preceded this rule, search for docket number USCIS–2024–0006 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS–2024–0006. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage device, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, USCIS, DHS, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, DHS; telephone (202) 447–3459 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, DOJ, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  1. Basis for the IFR
  2. The Departments' Experience With the IFR
  B. Legal Authority
  C. Changes From the IFR to Final Rule
  1. Changes to the IFR's Thresholds
  2. Clarifying Changes to Regulatory Text
  3. Other Technical Changes
  D. Rule Provisions
  E. Severability
III. Public Comments and Responses
  A. Legal Authority and Background
  1. Legality Concerns
  a. General Comments on Domestic Law
  b. Statutory Conditions and Limitations on Asylum Eligibility
  c. Expedited Removal
  d. General Comments on International Law
  e. UNHCR Guidelines on International Protection
  f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children
  2. Justification and Statements on Need for the Rule
  a. Rule Is Unjustified, Unsubstantiated, or Arbitrary
  b. Lack of Resources Does Not Justify the Rule
  c. Rule Does Not Acknowledge Factors Contributing to Migration
  d. Other Comments Related to the Departments' Justification
  B. General Feedback on the IFR
  1. General Support
  2. General Opposition
  a. Negative Impacts on Noncitizens and Others
  i. Conflicts With Humanitarian Values
  ii. Procedural and Due Process Concerns
  (1) General Concerns
  (2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare
  (3) Noncitizens' Ability to Have Their Claims Heard
  (4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations
  (5) Fairness or Risks Associated With Process
  iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns
  iv. Impacts on Criminal Enforcement
  v. Negative Impacts on Other Affected Entities
  b. Negative or Minimal Impacts on Immigration System and Government Operations
  i. Undermines the Administration's Promises and Goals
  ii. Similarity to Actions of Past Administration
  iii. Would Be Ineffective or Not Achieve Its Intended Outcomes
  c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety
  d. Other General Opposition
  C. Provisions of the Rule
  1. Limitation on Asylum Eligibility
  a. Proclamation Exceptions—Section 3(b) of Proclamation
  i. Legal Concerns Related to CBP One and the Lack of Exceptions
  ii. Wait Times for CBP One Appointments
  iii. Availability of and Access to CBP One Appointments and Concerns about Discrimination
  b. Regulatory Exception—Exceptionally Compelling Circumstances
  i. Implementation by CBP Officers
  d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR
  e. Family Unity Provisions
  2. Manifestation of Fear Standard
  a. Legality Concerns
  b. Concerns About the Efficiency and Complexity of the Manifestation Standard
  c. Implementation Guidance and Accuracy of Manifestation To Identify Fear of Return
  d. Trauma Impacting Manifestation and Vulnerable Populations

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum
f. Noncitizens May Not Understand Their Legal Right to Seek Asylum
3. ''Reasonable Probability'' Screening Standard for Statutory Withholding of Removal and CAT Protection
4. Other Comments on the Regulatory Provisions
a. Application to Mexican Nationals
b. Adequacy of Statutory Withholding of Removal and CAT Protection
c. Requests for Reconsideration
D. Other Issues Relating to the Rule
1. Scope of the Rule and Implementation
a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary
b. Concerns Regarding Exceptions From the Encounter Thresholds
c. Other Concerns About the Encounter Thresholds
2. Other Comments on Issues Relating to the Rule
E. Statutory and Regulatory Requirements
1. Administrative Procedure Act
a. Foreign Affairs Exception
b. Good Cause Exception
c. Length and Sufficiency of Comment Period
2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)
3. Alternatives
a. Address Root Causes of Migration
b. Prioritize Funding and Other Resources
c. Further Expand Refugee Processing or Other Lawful Pathways
d. Expand Asylum Merits Process
e. Other Congressional Action
f. Additional Suggested Measures or Revisions
F. Out of Scope
IV. Requests for Comments
A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule
B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption
V. Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
1. Effects Under a Without-IFR Baseline
2. Effects Under a With-IFR Baseline
3. Discontinuation Analysis Under a Without-IFR Baseline
4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

## List of Abbreviations

AO    Asylum Officer
AMI    Asylum Merits Interview
APA    Administrative Procedure Act
BIA    Board of Immigration Appeals (DOJ, EOIR)
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CBP One app    CBP One mobile application
CDC    Centers for Disease Control and Prevention
CHNV    Cuba, Haiti, Nicaragua, and Venezuela
DHS    Department of Homeland Security
DOJ    Department of Justice
EOIR    Executive Office for Immigration Review
ERO    Enforcement and Removal Operations
FARRA    Foreign Affairs Reform and Restructuring Act of 1998
FERM    Family Expedited Removal Management
FY    Fiscal Year
HSA    Homeland Security Act of 2002
ICE    U.S. Immigration and Customs Enforcement
IFR    Interim Final Rule
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ    Immigration Judge
INA    or the Act Immigration and Nationality Act
LGBTQI+    Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex
MPP    Migrant Protection Protocols
NGO    Non-Governmental Organization
NEPA    National Environmental Policy Act of 1969
NTA    Notice to Appear
OFO    Office of Field Operations
OHSS    Office of Homeland Security Statistics
POE    Port of Entry
RFA    Regulatory Flexibility Act
SWB    Southwest Land Border
TCO    Transnational Criminal Organization
TVPA    Trafficking Victims Protection Act of 2000
UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UDHR    Universal Declaration of Human Rights
UIP    U.S. Customs and Border Protection Unified Immigration Portal
UMRA    Unfunded Mandates Reform Act of 1995
UNHCR    United Nations High Commissioner for Refugees
USBP    U.S. Border Patrol
USCIS    U.S. Citizenship and Immigration Services
USCG    U.S. Coast Guard

## I. Public Participation

Interested persons are invited to submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble by submitting relevant written data, views, and arguments by the deadline stated above. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

#### 1. Basis for the IFR

On June 3, 2024, the President signed Proclamation 10773 (''June 3 Proclamation'')[1] under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and

---

[1] As discussed in Section II.C.1 of this preamble, the President has since issued a proclamation amending portions of the June 3 Proclamation. That amending proclamation is referred to as the ''September 27 Proclamation'' in this preamble. Where the preamble refers to ''the Proclamation'' without specifying a date, it is referring to Proclamation 10773 as amended by the September 27 Proclamation.

suspending and limiting the entry of such noncitizens. 89 FR 48487, 48487–91 (June 7, 2024). The June 3 Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border of the United States, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492. The Departments subsequently promulgated an IFR, effective June 5, 2024, "designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances." [2] Securing the Border, 89 FR 48710, 48718 (June 7, 2024) ("the IFR").

The June 3 Proclamation and the IFR explain that, since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including at the southwest land border ("SWB"). 89 FR at 48487; *id.* at 48711 & n.3. In December 2023, migration levels at the SWB surged to the highest monthly total on record.[3] *Id.* at 48712 n.5. DHS assessed that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools made available by Congress and the Government of Mexico's operational constraints caused by a lack of funding at the end of the 2023 calendar year, which limited its ability to enforce its own immigration laws. *Id.* at 48725 & n.115.

These sustained high encounter rates outstripped the Departments' abilities—based on available resources—to deliver

[2] The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed the Department of Homeland Security's ("DHS's") capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. *See* 89 FR at 48711 & n.2.

[3] There were nearly 302,000 U.S. Customs and Border Protection ("CBP") encounters at and between ports of entry ("POEs") along the southwest land border ("SWB") in December 2023, higher than any previous month on record. Office of Homeland Security Statistics ("OHSS") analysis of July 2024 OHSS Persist Dataset [Encounters Fiscal Year ("FY") 2000–2024]; 89 FR at 48714 n.21; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* (last updated Sept. 6, 2024), *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (SWB encounters from FY 2014 through December 2023). OHSS figures are generally rounded throughout this preamble.

timely decisions and consequences in significant numbers for those without a legal basis to remain in the United States. 89 FR at 48714. Due to its funding shortfall, DHS lacked adequate resources such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "softsides." *Id.* These factors limited DHS's ability to conduct credible fear interviews for individuals in U.S. Customs and Border Protection ("CBP") custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process. *Id.* The substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to impose timely consequences through expedited removal, the main consequence Congress has made available at the border under title 8 authorities. 89 FR at 48713–14. Consistent with past practice prior to the Title 42 public health Order, individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead generally released, after screening and vetting, pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an immigration judge ("IJ").

These higher encounter rates also place significant strain on the immigration courts. Recently, despite significant increases in the total number of IJs and case completions since Fiscal Year ("FY") 2021, newly initiated cases have far outpaced such completions.[4] Placing more noncitizens in section 240 removal proceedings before an IJ—rather than processing eligible noncitizens through the expedited removal process—only further contributes to the immigration court backlog, and those cases can take several years to conclude.[5] This strain is

[4] *See* Executive Office of Immigration Review ("EOIR"), *Adjudication Statistics: New Cases and Total Completions* (July 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (July 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline*.

[5] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated during that time were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, EOIR's Strategic Context, Current Operating Environment, https://www.justice.gov/eoir/*

also particularly acute in light of EOIR's current underfunding. Rather than increase funding to support IJ team hiring, EOIR's FY 2024 budget was $16 million less than in FY 2023 and was $94.3 million less than its inflation-adjusted funding requirements (referred to as "Current Services").[6]

The Departments reasoned that their capacity to predictably deliver timely decisions and consequences is jeopardized by emergency border circumstances, which, left unmitigated, further add to the incentives and motivations for migrants to make the dangerous journey to the SWB, regardless of their ultimate likelihood of success on an asylum or protection application, and that the current immigration and asylum systems had become a driver for irregular migration[7] throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations ("TCOs"). 89 FR at 48714. Despite the Departments' efforts to address these substantial levels of migration, strengthen the consequences in place at the border, and enhance the overall functioning of the immigration system, including through the

*strategic-plan/strategic-context/current-operating-enviroment* (last visited Sept. 20, 2024) ("EOIR . . . suffered operational setbacks during the COVID-19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). Although EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving unaccompanied children ("UACs"). *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,254 days); EOIR, *Median Completion Times for Detained Cases* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the second quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[6] *See* Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133; EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf*.

[7] As used in this preamble, "irregular migration" refers to the movement of people into another country unlawfully or without authorization. With respect to the United States' borders, the term "irregular" is used in this preamble to refer to physically entering between POEs or otherwise entering without documents sufficient for lawful admission, unless entering with advance authorization to travel or at a pre-scheduled time and place to present at a POE.

Circumvention of Lawful Pathways rule, 88 FR 31314 (May 16, 2023), these circumstances still existed as a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. 89 FR at 48711–13, 48715.

In the absence of congressional action, and consistent with the President's direction in the June 3 Proclamation to consider issuing regulations, the Departments adopted the provisions in the IFR, which were intended to address the emergency border circumstances and to substantially improve the Departments' ability to deliver timely decisions and consequences during such circumstances. *See* 89 FR at 48710. The IFR established a limitation on asylum eligibility that applies to certain individuals who enter irregularly across the southern border during emergency border circumstances and revised certain procedures applicable to the expedited removal process during such periods to reduce the time required to apply consequences to those individuals and remove noncitizens who do not have a legal basis to remain in the United States. *Id.* at 48715. The IFR was expected to achieve several benefits: reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; protect against overcrowding in border facilities; and reduce the ability of exploitative TCOs and smugglers to operate. *Id.* at 48745, 48767.

### 2. The Departments' Experience With the IFR

The IFR's limitation on asylum eligibility and revised procedures are working as intended, though as discussed below, the Departments have determined that modest adjustments to the threshold calculations are warranted. As explained in the paragraphs that follow, in the weeks since June 5, 2024, U.S. Border Patrol ("USBP") encounters between the ports of entry ("POEs") have dropped markedly. Although the Departments believe that this has occurred for a range of reasons, one important reason is that the rule itself has significantly shifted incentives at the southern border. As explained further below, and consistent with the explanation provided in the IFR, the rule has, at least in part, significantly improved DHS's ability to place into expedited removal a majority of single adults and individuals in family units encountered by USBP; to

avoid large-scale releases of such individuals into the United States pending section 240 removal proceedings; and to allow for swift resolution of such individuals' cases and, where appropriate, their removal. *See id.* At the same time, the Departments have continued to implement the largest expansion of lawful, safe, and orderly pathways and processes[8] for individuals to come to the United States and to uphold the United States' non-refoulement obligations under international law.

In the period between June 5, 2024, and August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and IFR have fallen 59 percent from the level of average daily encounters during the immediate post-pandemic period, *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023,[9] and before the IFR entered into effect on June 5, 2024.[10] This dramatic decrease in encounters has spanned multiple demographic categories. For instance, DHS has observed a drop in encounters of family units, a demographic category that presents particular operational challenges. During the immediate post-pandemic period, DHS experienced an average of about 2,000 daily encounters of individuals in family units.[11] Since the Departments issued the IFR, that daily average has dropped 70 percent to

about 600 individuals in family units encountered daily.[12] Other significant drops in encounter numbers occurred with single adults and unaccompanied children ("UCs").[13]

In contrast to processing before the IFR, DHS is now placing the majority of single adults and individuals in family units encountered by USBP at the SWB into expedited removal. Between June 5, 2024, and August 31, 2024, DHS placed 59 percent of these noncitizens into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order.[14] In the pre-pandemic period,[15] DHS placed 41 percent of such noncitizens into expedited removal proceedings.[16] The decrease in the number of encounters at the SWB directly enabled DHS's increased placement rate of noncitizens into expedited removal proceedings. Because encounter levels have decreased, DHS is able to use its operational resources to refer a higher percentage of noncitizens into expedited removal proceedings and deliver timely consequences in a greater proportion of cases.[17] The IFR is remedying the

---

[8] The terms "lawful pathways," "lawful, safe, and orderly pathways," "lawful pathways and processes," and "lawful, safe, and orderly pathways and processes," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner, including to seek asylum and other forms of protection or other immigration benefits for which they may be eligible.

[9] While the rule's effective date was May 11, 2023, 88 FR at 31314, the rule only applies to noncitizens who enter the United States "[s]ubsequent to the end of implementation of the Title 42 public health Order[,]" 8 CFR 208.33(a)(1)(ii), which expired at 11:59 p.m. on May 11, 2023, *see* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Security Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.* Therefore, the Circumvention of Lawful Pathways rule began to apply on May 12, 2023.

[10] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on September 3, 2024 (Summary Statistics tab). There was an average of about 2,100 total encounters per day (including all demographic groups) between POEs at the SWB from June 5, 2024, to August 31, 2024, compared to around 5,100 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

[11] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[12] OHSS analysis data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[13] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[14] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[15] Throughout this preamble the "pre-pandemic period" refers to FY 2014 to FY 2019.

[16] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab). DHS reinstated removal orders for a larger share of single adults and individuals in family units during the pre-pandemic period (26 percent during the pre-pandemic period compared to 14 percent under the interim final rule ("IFR")), which is unsurprising given that the Departments are seeing fewer repeat encounters as a result of the higher proportion of non-Mexicans/non-northern Central Americans—with more limited migration histories—as a share of total encounters. *Id.;* 89 FR at 48721 n.49. Notably, the sum of reinstatements and expedited removals is still higher during the IFR (a combined 73 percent) than it was during the pre-pandemic period (67 percent). OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[17] The most effective way to deliver timely consequences to noncitizens who enter irregularly is through the expedited removal system, but DHS's capacity to use that system on a large scale is subject to resource constraints. One such constraint is space to hold noncitizens in DHS custody during the expedited removal process. Because noncitizens in expedited removal are subject to detention, including during the pendency of their credible fear proceedings, the use of expedited removal may lead to an increase in the time that an individual spends in CBP custody. This is particularly the case when the individual is receiving their credible fear interview while in CBP custody. When there are high numbers of individuals placed in expedited removal, the number of individuals who remain in CBP custody for a lengthier period can increase rapidly, leading to overcrowded conditions. In

Continued

negative effects of the previously sustained high encounter numbers described in the IFR and in this rule. *See, e.g.,* 89 FR at 48749 ("In order to maximize the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain in the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims.").

Relatedly, the IFR has also significantly reduced the percentage of noncitizens encountered between POEs at the SWB who are released into the United States pending completion of their section 240 removal proceedings. For instance, from June 5, 2024, through August 31, 2024, USBP placed 25 percent of noncitizens encountered at the SWB into section 240 removal proceedings.[18] This is down 41 percentage points from the immediate post-pandemic period, when USBP placed 66 percent of such noncitizens into section 240 removal proceedings, translating to a reduction of over 60 percent.[19] Similarly, between June 5, 2024, and August 31, 2024, 33 percent of all noncitizens encountered at the SWB were sent to Enforcement and Removal Operations ("ERO"); this figure is up from 19 percent during the immediate post-pandemic period.[20]

The IFR's change to how DHS immigration officers identify and refer noncitizens for credible fear interviews has resulted in a reduction of such referrals. Under the IFR, during emergency border circumstances, instead of asking specific questions about fear or providing lengthy advisals, DHS refers a noncitizen for such an interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to the noncitizen's country or the country of removal. From June 5, 2024, through August 31, 2024, 27 percent of noncitizens encountered between POEs at the SWB and processed for expedited removal indicated an intention to apply for asylum or a fear of persecution or torture, compared with a 37 percent fear-claim rate during the pre-pandemic period and 57 percent during the immediate post-pandemic period.[21] In the IFR, DHS explained that based on its extensive experience administering the expedited removal process, it concluded that the affirmative questions asked under steady state operations are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection. 89 FR at 48743.[22] The shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA.

The shift to a "reasonable probability" standard for screening for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465

U.N.T.S 85,[23] has further reduced the difference between high screen-in rates and historically low ultimate grant rates of protection or relief. Overall, of those USBP has referred for credible fear interviews, the comprehensive screen-in rate has dropped to 57 percent, compared to 83 percent during the pre-pandemic period and 62 percent during the immediate post-pandemic period.[24] Of USBP encounters screened by USCIS under the rule's "reasonable probability" standard, the screen-in rate has decreased to approximately 48 percent[25] compared to 76 percent[26] under the "significant possibility" standard during the pre-pandemic period, and approximately 51 percent[27] for those screened under the Circumvention of Lawful Pathway rule's lower "reasonable possibility" standard.[28] The Departments believe the lower screen-in rate under the IFR better

---

addition, given the nature of CBP facilities—which are designed for short-term temporary holding—CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding.

Thus, if high encounter levels result in a significant number of individuals in CBP custody, or if those individuals have been in custody for a significant period of time, CBP may lose optionality: having lost the capacity to place additional noncitizens into the expedited removal process, CBP generally must take steps to release some individuals from custody to ensure safe and sanitary conditions and appropriate time in custody. In cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear ("NTA") before an immigration judge ("IJ") prior to their release from custody. Although in some circumstances transfer of such noncitizens to U.S. Immigration and Customs Enforcement ("ICE") for detention for the duration of the credible fear process is possible, the ability to do so is dependent on the availability of space in ICE's already significantly strained detention network. Therefore, when ICE detention space is unavailable, noncitizens must then be processed by CBP through non-expedited removal pathways.

[18] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[19] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[20] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[21] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[22] From FY 2014 through 2019, of total SWB encounters processed for expedited removal and then referred to section 240 proceedings, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n.219; OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). During that same period, 37 percent of SWB encounters processed for expedited removal claimed fear, and 76 percent of those who claimed fear were screened in and referred to section 240 removal proceedings. OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[23] In this preamble, consistent with the IFR, the Departments generally refer to protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") as "CAT protection." *See, e.g.,* 89 FR at 48716.

[24] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Data for immediate post-pandemic and IFR periods are limited to SWB encounters between POEs. The comprehensive screen-in rate includes positive determinations issued by U.S. Citizenship and Immigration Services ("USCIS"), cases where an IJ vacated USCIS's negative determination, and cases administratively closed by USCIS in which a discretionary NTA was issued. For cases processed under either the Circumvention of Lawful Pathways rule or the IFR, the comprehensive screen-in rate encompasses cases where USCIS or an IJ determined that the noncitizen was found not subject to the Circumvention of Lawful Pathways rule's rebuttable presumption or the IFR's limitation on asylum eligibility under the significant possibility standard, in addition to cases screened-in under the "reasonable possibility" or "reasonable probability" standards, as applicable.

[25] OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab, Line 9 divided by Line 8). Data are limited to SWB encounters between POEs.

[26] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). Data are limited to SWB encounters between POEs.

[27] OHSS analysis of July 2024 Persist Dataset (Fear Screening—CLP tab, Line 13 divided by Line 12). Data are limited to SWB encounters between POEs.

[28] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Although in the preamble to the IFR, DHS anticipated that the manifestation approach "will likely lead to a higher proportion of those referred having colorable claims for protection[,]" *see* 89 FR at 48743, USCIS screen-in rates have dropped slightly, as noted above, *see* OHSS analysis of June 2024 Enforcement Lifecycle dataset, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Historic ERCF Results, Fear Screening—STB, and Fear Screening—CLP tabs). There could be multiple reasons for this development, including the effects of the "manifestation" and "reasonable probability" provisions, which are difficult to disentangle.

aligns with the percentage of noncitizens who have historically been granted protection or relief. That is to say, noncitizens screened under the higher "reasonable probability" standard that receive positive findings are more likely to have meritorious claims in ultimate adjudications.

As a result of the IFR, DHS is able to more quickly remove a greater percentage of those who do not have a legal basis to remain in the United States. In the pre-pandemic period, the median processing time for a noncitizen encountered by USBP with a negative fear determination in expedited removal was 75 days from encounter to removal.[29] During the immediate post-pandemic period, this metric dropped to 44 days.[30] From June 5, 2024, through August 31, 2024, the metric dropped again to 32 days.[31] Similarly, the processing time from when a noncitizen is referred for a credible fear interview to when the noncitizen receives a fear determination is down 58 percent compared to the immediate post-pandemic period and down 71 percent compared to the pandemic period.[32] The Departments attribute the decreased processing time to key provisions of the IFR. For instance, the manifestation of fear provision has resulted in streamlined processing and a lower percentage of individuals indicating fear, thereby shortening the average processing time as those who do not indicate fear do not receive a screening by an AO or review by an IJ prior to removal. Then, for those who indicate fear, following a minimum consultation period that DHS reduced through separate guidance,[33] AOs, supervisory

AOs, and IJs have been applying the IFR's reasonable probability screening standard. In addition, between June 5, 2024, and August 31, 2024, 32 percent of all noncitizens encountered at the SWB were removed or returned to their home country or to Mexico directly from USBP custody.[34] This is double the rate of repatriations from USBP custody (16 percent) that occurred during the immediate post-pandemic period.[35] Overall, from June 5, 2024, through August 31, 2024, DHS has removed or returned 70 percent of single adults and individuals in family units encountered by USBP.[36] This contrasts with a 28-percent rate during the immediate post-pandemic period.[37] Viewed in terms of daily averages, under the IFR through August 31, 2024, there have been about 1,880 daily encounters of single adults and individuals in family units.[38] And DHS has averaged about 1,320 total daily repatriations and 580 releases from CBP custody pending immigration proceedings over that time frame.[39]

Faster repatriations free up DHS resources and capacity for processing new arrivals, allowing for further increases in the use of expedited removal and fewer releases pending completion of section 240 removal proceedings. These successes disrupt the "vicious cycle" the Departments sought to counteract in issuing the IFR. 89 FR at 48714; *see id.* at 48751 ("This reality contributes to the vicious cycle . . . in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are

encountered at the border will be allowed to remain and work in the United States for long periods of time.").

Meanwhile, noncitizens have continued to use lawful, safe, and orderly pathways and processes to seek entry to the United States. For example, the use of the CBP One mobile application ("CBP One app") to schedule an appointment at a SWB POE is an available tool that permits noncitizens to present themselves at the border in a lawful, safe, and orderly manner. From June 5, 2024, through August 31, 2024, approximately 123,500 noncitizens with CBP One appointments presented at SWB POEs and were accordingly processed outside of the procedures set forth in the IFR.[40] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); section 3(b)(v)(D) of the Proclamation. During the pre-pandemic period, approximately 300 encounters were processed at SWB POEs per day.[41] Since the launch of the CBP One app in January 2023, approximately 1,500 encounters have been processed at SWB POEs each day (with and without CBP One appointments).[42] And from the start of FY 2024 through August 31, 2024, that average increased to approximately 1,700 per day.[43] Other lawful pathways that continue to be available include expanded parole processes for specific populations and demographics such as nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), which allow certain individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;[44] the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other services, access to information and referrals for humanitarian and family parole processes, labor pathways, expedited refugee processing, and other lawful, safe, and orderly pathways for eligible

---

[29] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Summary Statistics tab).

[30] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[31] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[32] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[33] The Immigration and Nationality Act ("INA") requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to [duly prescribed] regulations." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); *see* INA 103(a), 8 U.S.C. 1103(a); 6 U.S.C. 557. Under those regulations, including during circumstances in which the measures in the IFR apply, consultation shall be at no expense to the Government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, . . . and shall not unreasonably delay the process." 8 CFR 235.3(b)(4)(ii), 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.* On June 4, 2024, to support implementation of the

Proclamation and IFR, as a matter of internal policy, USCIS reduced the minimum consultation period for noncitizens subject to the rule's provisions from at least 24 hours to at least 4 hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. *See* Memorandum for Jennifer B. Higgins, Deputy Dir., USCIS, from Ted Kim, Assoc. Dir., Refugee, Asylum, and Int'l Operations Directorate, USCIS, *Re: Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024).

[34] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[35] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[36] DHS encountered 165,000 single adults and individuals in family units between June 4, 2024, and August 31, 2024, and had repatriated 119,000 of them as of September 3, 2024. OHSS analysis of data downloaded from UIP on Sept. 3, 2024 (IFR Details tab).

[37] During that time period, there were 1.87 million such encounters with noncitizens other than UCs, of which 511,000 noncitizens were repatriated. OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).

[38] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab).

[39] *Id.*

---

[40] *Id.*

[41] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[42] *Id.* On June 30, 2023, CBP announced the expansion of available appointments for noncitizens through the CBP One mobile application ("CBP One app") to 1,450 per day, up from 1,250. Cumulatively, the expansion to 1,450 appointments represented a nearly 50 percent increase from May 12, 2023, when CBP processed 1,000 appointments per day. *See* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[43] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[44] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last reviewed/updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

CHNV-FRN-00389

individuals to the United States and other countries; [45] country-specific family reunification parole processes for certain nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras who have qualifying U.S. citizen relatives in the United States; [46] and temporary nonimmigrant worker visas, which provide employment opportunities for eligible individuals.[47]

Thus, the provisions of the IFR and other measures taken to assist in the IFR's implementation are effective tools in managing levels of irregular migration that, absent key policy interventions like this rule, severely strain the Departments' abilities to safely, effectively, and humanely enforce and administer U.S. immigration laws. The historically high level of encounters that DHS experienced in the months before the IFR's implementation has decreased markedly, and DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the United States has therefore improved significantly.

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the CAT. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.[48]

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to certain other officers. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA grants the Secretary the authority to establish regulations and take other actions that the Secretary deems "necessary for carrying out" the Secretary's authority under the immigration laws. INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521(a). In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the immigration laws. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521(a); INA 103(g)(1), 8 U.S.C. 1103(g)(1); 8 CFR 1240.1. With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai*, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[ ]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[49] The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2); *see also, e.g.,* INA 235(b)(1)(B)(iii)(III), (B)(iv), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (B)(iv), (C).

The INA and HSA grant DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in expedited removal proceedings, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(1), (a)(3), 8 U.S.C. 1103(a)(1), (a)(3); INA 208(b)(1)(A), (d)(1), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (d)(1), (d)(5)(B); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b)(3) (providing for the transfer of adjudication of asylum and

---

[45] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Aug. 23, 2024).

[46] *See* USCIS, *Family Reunification Parole Processes* (last reviewed/updated Sept. 10, 2024), *https://www.uscis.gov/FRP.*

[47] *See* USCIS, *Temporary (Nonimmigrant) Workers* (last reviewed/updated July 24, 2024), *https://www.uscis.gov/working-in-the-united-states/temporary-nonimmigrant-workers.*

[48] The Homeland Security Act of 2002 ("HSA") further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." 116 Stat. at 2274 (codified at 6 U.S.C. 522).

[49] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. 557 (providing that references to any officer from whom functions are transferred under the HSA are to be understood as referring to the Secretary of Homeland Security). Within DHS, AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted, all of which are subject to review by a supervisory AO. *See* 8 CFR 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). The INA grants IJs the authority to review AO negative credible fear determinations. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33.1 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouling") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Because the Refugee Protocol is not self-executing,[50] Congress implemented these non-refoulement obligations through the INA, as amended by the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"). *See* 8 U.S.C. 1253(h) (1952); *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (describing the history of the statutory withholding provision and the Refugee Act amendments). The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one

of the protected grounds listed in Article 33 of the Refugee Convention.[51] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT, which is likewise not self-executing.[52] The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") delegates to the Departments the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681 (codified at 8 U.S.C. 1231 note). Consistent with FARRA, DHS and DOJ have implemented in the Code of Federal Regulations the United States' obligations under Article 3 of the CAT. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), amended by 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, although the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures. This recognition that section 212(f) does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades.[53] That

longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only within its "sphere." *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[54] First enacted in the Refugee Act, the asylum statute today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States[,]

[50] *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." (citations omitted)).

[51] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees[,]" which the Court found aligned with the discretionary provision in section 208 of the INA, 8 U.S.C. 1158).

[52] *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) ("This multilateral treaty is non-self-executing and thus does not itself create any rights enforceable in U.S. courts." (citation omitted)).

[53] In 1984, then-Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)]

proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws[,]" including "expedited-removal proceedings" where they could "raise any claims for protection[.]" *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (updated Feb. 21, 2024). At the same time, nothing in the proclamations or the INA has precluded the Departments from considering as an adverse discretionary criterion that a noncitizen is described in a section 212(f) proclamation.

[54] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States. *Cf., e.g., Sale,* 509 U.S. at 164 n.13, 174–77, 187–88 (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA[,]" while emphasizing the particular "sphere[ ]" in which it operates).

. . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States." [55] *Id.* As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[56]

[55] Section 212(f) of the INA, 8 U.S.C. 1182(f), contrasts with 42 U.S.C. 265, which authorizes the Centers for Disease Control and Prevention ("CDC") to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued a public health Order invoking section 265 to expel certain noncitizens generally without title 8 protections, including asylum applications. As the final rule implementing section 265 explained, that provision originates in a "broad public health statute" that Congress intended to "operate[] separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law[] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265's predecessor was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration[.]" Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC Order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public-health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[56] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[,]" the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing

This rule, as discussed in the IFR and this preamble, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 8 U.S.C. 1103(a)(1), (a)(3), (g); INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

## C. Changes From the IFR to Final Rule

The Departments issued the IFR, effective June 5, 2024, adopting provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuated three key changes to eligibility for asylum and the expedited removal process for noncitizens who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June 3 Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances, that is considered during credible fear screenings in addition to its application during adjudications on the merits; (2) rather than asking specific questions of every noncitizen encountered and processed for expedited removal, providing general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection and referring a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because they could not establish a significant possibility that they are not subject to or are exempt from the limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard.

Following careful consideration of public comments received and the Departments' experiences implementing the IFR's provisions since early June 2024, the Departments have made

provisions governing entry). This does not mean, however, that the President is prohibited from invoking section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

modifications to the regulatory text adopted in the IFR, as described below. The rationale for the provisions adopted in the IFR and the reasoning provided in the IFR's preamble remain valid, except as distinguished in this regulatory preamble.

### 1. Changes to the IFR's Thresholds

On September 27, 2024, the President issued a proclamation amending the June 3 Proclamation. *See* Presidential Proclamation of September 27, 2024, *Amending Proclamation 10773* ("September 27 Proclamation"). Following the issuance of the IFR, the Departments have closely monitored its implementation and results across the southern border. The Departments recommended to the President adjustments to the Proclamation based on their experiences implementing the Proclamation and IFR. Following those recommendations, the President issued the September 27 Proclamation, which amended section 2 of the June 3 Proclamation in two ways. First, section 2(a) of the June 3 Proclamation provided that the suspension and limitation on entry would be discontinued at 12:01 a.m. eastern time on the date that is 14-calendar-days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs. As amended by the September 27 Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters between POEs for 28-consecutive-calendar-days before the 14-calendar-day waiting period is triggered.[57] Second, the September 27 Proclamation deleted section 2(c) of the June 3 Proclamation, which provided that UCs [58] from non-contiguous countries shall not be included in calculating the number of encounters for purposes of section 2(a) and 2(b) of the June 3 Proclamation.

The Departments are implementing changes in this final rule that parallel those made in the September 27 Proclamation. Specifically, the Departments are revising §§ 208.13(g) and 1208.13(g) to refer to "the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section." Paragraph (h) of each section now defines "Presidential Proclamation of June 3, 2024" as referring to

[57] As an illustration, for any given day, DHS will calculate the average number of encounters for that day and the prior 6 calendar days *i.e.,* the 7-consecutive-calendar-day average. If that average remains below 1,500 for 28 consecutive calendar days, the 14-day waiting period will begin.

[58] In this preamble, as in the Proclamation, the terms "unaccompanied children" or "UCs" have the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

''Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024[ ]'' for the purpose of §§ 208.13(g), 208.35, and 235.15 (in the case of § 208.13(h)) and §§ 1208.13(g) and 1208.35 (in the case of § 1208.13(h)). The Departments are also making conforming changes in §§ 208.35, 235.15, and 1208.35. To ensure that the rule can function even if the September 27 Proclamation were rendered inoperative by court order, and consistent with the September 27 Proclamation, the Departments have also included a severability clause in both §§ 208.13(h) and 1208.13(h).

The Departments believe that shifting to the 28-consecutive-calendar-day requirement for this rule, in parallel with the changes made in the September 27 Proclamation, is necessary to ensure that the rule's measures discontinue only once there has been a durable and sustained decrease in encounters at the southern border such that the emergency border circumstances have in fact abated. Premature and frequent discontinuations of the rule's measures, as discussed below, would increase the risk of sizeable and disruptive surges and could undermine the message the Departments intend the rule to send, which is to discourage noncitizens from utilizing irregular migration and the services of smugglers and TCOs to enter the United States. In the IFR, the Departments explained that at 1,500 daily encounters between POEs, ''DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries.'' 89 FR at 48752. The Departments further explained that ''[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749 n.248. The changes made here further both purposes.

Requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters for 28 consecutive calendar days instead of one calendar day will guard against a circumstance in which the threshold for discontinuation is met solely due to a short-term, erratic decrease (such as a short-term holiday downturn [59] or a decrease due to an

extreme weather event) that does not signal a meaningful reduction in overall migration pressures. Such short-term decreases could force the provisions of the rule to trigger on and off more frequently, causing operational strain while also signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided by waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing. Moreover, if the Departments had opted for a substantially smaller number of consecutive days, there is a significant risk that the rule would deactivate due to a transient drop due to holidays, weather, or another cause, which can lead to several weeks of uncharacteristically low encounters. At the same time, a 28-day period is still a short enough period to ensure a timely response when an actual, sustained downturn occurs. The Departments have therefore decided that 28 days strikes an appropriate balance.

The Departments' experience since the IFR's implementation has informed their view that the limited changes made by this rule are necessary to provide greater assurance that a decrease is likely to be sustained and to guard against costly toggling of the rule when a brief decrease proves not to be sustained. For one thing, this experience highlights the risk that under an approach that looks only to a 7-consecutive-calendar-day average, the rule might discontinue even though a reduction is unlikely to be sustained. Comparing the week ending June 4, 2024, to the week ending August 31, 2024, the Departments observed (as expected) a significant decrease in encounters at the southern border, but Mexico's government reported a much smaller decrease in encounters within Mexico.[60] This trend suggests that even

though the IFR has affected incentives for migrants to try to cross the U.S. border, migrants continue to travel towards the U.S. border in large numbers, and that even if the 7-consecutive-calendar-day average dropped below 1,500 encounters, that drop likely would not be sustained given the large and growing population of migrants in Mexico who could relatively quickly reach the U.S. border. Moreover, if the IFR's provisions did deactivate, that large and growing population in Mexico would be a ready target for smugglers and TCOs, increasing the risk of a surge following a discontinuation that does not reflect a truly sustained decrease in migration flows.

Adding this rule's 28-consecutive-day requirement reduces those concerns by providing for greater stability. With that change, the rule's provisions will not be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the IFR's 14-day waiting period after the Secretary makes the factual determination necessary to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy. Although the Departments recognize that this change does not eliminate the risk of the rule discontinuing even when regional migration flows remain high, they assess that this rule's approach better balances this risk against this rule's purpose as an exceptional measure to address emergency border circumstances that should not apply when encounters have fallen for a sustained period. The Departments further discuss later in this subsection why the rule's approach appropriately balances those considerations.

The Departments' concern is also consistent with some of the public comments received on the IFR. For instance, one commenter remarked that some migrants had concluded that they should congregate near the border in preparation for the Proclamation and IFR's measures to discontinue. Other commenters expressed concern regarding potential misunderstandings about the threshold for discontinuation. Given the reality that a surge remains possible, the Departments seek to avoid a situation where the emergency

---

[59] Short-term decreases that are not associated with changes in the fundamental drivers of migration have been especially notable during the end-of-year holiday season. From FY 2013 through FY 2024, SWB encounters fell by an average of 42 percent in the two weeks between December 23 and January 5, only to be followed by an average

increase of 41 percent in the two weeks between January 5 and January 18. *See* OHSS analysis of July 2024 Persist Dataset (USBP Encounters—Holiday Dip tab). Although the January rebound was less dramatic in 2023 and 2024, this historic pattern suggests that if average encounters heading into the holidays are even as low as the mid-2000s—well above the intended threshold for discontinuation of emergency circumstances—a short-term decrease could push the 7-day average number of encounters below 1,500 even though the fundamental drivers of high levels of migration have not changed. A metric based on a 7-day average would trigger a discontinuation of emergency circumstances in this scenario, but the likely January rebound means a 28-day metric would not.

[60] *See* OHSS analysis of data downloaded from UIP on September 3, 2024, and data provided by the Government of Mexico as of August 31, 2024 (Mexican Enforcement tab) (showing that comparing the week ending June 4, 2024, to the week ending August 31, 2024, total Mexican

enforcement apprehensions dropped 19 percent, while total U.S. Border Patrol (''USBP'') encounters dropped 48 percent).

measures in this rule are discontinued prematurely.

The Departments note that the existing 14-day waiting period before discontinuation once this threshold is reached will continue to help the Departments complete processing of noncitizens encountered during emergency border circumstances and to confirm that a sustained downward trend in encounters has been achieved. *See* 89 FR at 48749 n.248. At the same time, under the prior standard for discontinuation, a rapid shift between discontinuing and reactivating the rule's provisions would remain possible.[61] Such a shift would pose significant operational challenges.

Experience with the IFR suggests that rapidly switching between the rule's provisions discontinuing and reactivating would result in harmful operational burdens. For instance, upon implementation of the Proclamation and IFR, the Departments had to prioritize processing of individuals encountered prior to June 5. Therefore, USBP was unable to immediately maximize processing of the desired number of noncitizens through expedited removals.[62] USBP took 6 days to ramp up processing for expedited removal under the IFR, from about 60 encounters processed under the rule on June 5 to about 1,500 on June 10, which was the first day that a majority of encounters were processed for expedited removal under the rule.[63] Similarly, USBP released an average of about 930 post-June 4 encounters per day between June 5 and June 17, including 8 days of over 1,000 releases, before releases fell to an average of about 510 per day between June 18 and August 31, including an average of about 410 per day in August.[64] And although ICE repatriated approximately 38,500 single adults and members of family units from June 5 through July 31, 2024, only around

15,400 (40 percent) of them were encountered by USBP after June 4, 2024.[65] The rest were pre-June 5th USBP SWB encounters and pre- and post-June 5th Office of Field Operations (''OFO'') encounters (39 percent) or non-SWB encounters and interior enforcement (21 percent).[66] USCIS did not complete its first credible fear interview under the IFR until June 9, 2024, and completed an average of about 20 interviews per day for the first two weeks after June 4, compared to an average of roughly 330 per day in the month of August.[67] EOIR did not conduct its first review of an adverse credible fear determination under the IFR until June 11, 2024, and averaged approximately 9 reviews per day in the first 3 weeks after June 4 compared to an average of about 90 per day in August.[68] The lag between the rule's activation and the Departments' ability to fully avail themselves of the rule's efficiencies means that when the provisions of the rule discontinue and then reactivate, the Departments' abilities to deliver timely decisions and consequences consistent with the rule's purpose may be unnecessarily impaired.

In addition, although the Departments continue to believe that the burden of shifting between applying this rule and the Circumvention of Lawful Pathways rule is warranted when there has been a sustained reduction in irregular migration, such a burden is much harder to justify in the context of a short-lived reduction in encounters followed by very high levels of encounters. For instance, USCIS required time to provide training, procedures, and guidance to the field before its staff could process credible fear referrals under the IFR. Additionally, EOIR required time to ensure IJs have sufficient docket capacity for any increase in credible fear reviews in response to any increased number of expedited removal cases. EOIR also required time to provide training to IJs who conduct credible fear reviews or who adjudicate cases involving individuals who enter the United States while the Proclamation and rule are in effect. To be sure, subsequent reactivation of the rule's measures will be easier given that the Departments' personnel will have become familiar with the rule's provisions. Nonetheless, reactivation will always require resources and

coordination within the workforce necessitating the need to ensure that discontinuations and reactivations do not occur with undue frequency.[69]

The Departments have also determined that it is appropriate and necessary to include UCs from non-contiguous countries in the encounter calculations relevant to discontinuing and continuing or reactivating the provisions of this rule, in parallel with the changes made in the September 27 Proclamation. Under the June 3 Proclamation and the IFR, the thresholds for such discontinuation and continuation or reactivation did not include encounters of such UCs. But as some commenters on the IFR correctly noted, excluding such encounters results in an unrealistic assessment of the Departments' resources and capabilities. All UCs (regardless of whether they came from a contiguous country or a non-contiguous country) require a greater proportion of resources to process and hold safely in CBP facilities and merit inclusion in the threshold calculations to accurately reflect this reality. For example, UCs in CBP custody generally must be referred to the Department of Health and Human Services' Office of Refugee Resettlement and transferred to its care within 72 hours after determining that the noncitizen is a UC, absent exceptional circumstances. 8 U.S.C. 1232(b)(3); *see also* 6 U.S.C. 279. Because of this, UCs are generally prioritized for processing in CBP facilities. The processing and treatment of UCs also include a number of other unique legal and policy requirements, such as conducting a thorough screening for trafficking and any claims of fear of return.[70] During their time in custody, UCs receive medical screenings and child-appropriate activities and humanitarian supplies. They also must generally be held separately from unrelated adults, impacting CBP's holding capacity. This means that DHS must expend resources to quickly process, refer, and transfer UCs to the Office of Refugee Resettlement's care. This time-consuming and resource-intensive process must always be followed for

---

[61] From FY 2013 through FY 2019, there were 2,014 days where the 7-consecutive-calendar-day average of USBP encounters (including encounters of UCs from non-contiguous countries) was below 1,500. OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab). Of those 2,014 days, 1,813 days (90 percent of the total) were also part of a period of time when the 7-consecutive-calendar-day average had remained below 1,500 for 28 consecutive days. *Id.* Thus, considering hypothetical lower-bound thresholds for the period FY 2013 through FY 2019, switching from the IFR's approach to this rule's approach would have reduced the number of below-threshold day by only 10 percent. *Id.* While it is too early in the post-IFR period to know the precise reduction in volatility it has brought about, requiring the 7-day average to remain below 1,500 encounters for 28 consecutive days may have a broadly similar effect.

[62] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[63] *Id.*

[64] *Id.*

[65] OHSS analysis of July 2024 Persist Dataset (IFR Ramp Up tab).

[66] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[67] *Id.*

[68] *Id.*

[69] The Departments acknowledge that they have not made a similar change to require 28 consecutive days of a 7-day average of encounters above 2,500 for the rule's provisions to be reactivated. The absence of a similar requirement prior to reactivation reflects the operational exigencies in a circumstance where there has been a 7-consecutive-calendar-day average of more than 2,500 encounters. *See* 89 FR at 48749 n.248. The Departments have determined that those operational exigencies require the rule's provisions to be reactivated and outweigh the resources and coordination that reactivation requires.

[70] *See* 8 U.S.C. 1232(a)(2)(A)(ii).

UCs encountered at the southern border, regardless of whether emergency border circumstances are present.

In addition, UCs who are nationals or habitual residents of a contiguous country may, in certain circumstances, be permitted to withdraw their applications for admission and voluntarily return to their respective countries of nationality or habitual residence. *See* 8 U.S.C. 1232(a)(2). To determine whether such an outcome is permissible, such UCs are screened for indicators of trafficking or credible evidence that they are at risk of being trafficked upon return, whether they are able to make an independent decision to withdraw their applications, and whether they have any fear of return owing to a credible fear of persecution. *See* 8 U.S.C. 1232(a)(2)(A), (a)(4). However, as a matter of longstanding policy, CBP screens all UCs—even those from non-contiguous countries—in this manner.

Because one of the primary purposes of the rule is to alleviate undue strain on the limited resources of the border security and immigration systems, the Departments found that they must consider the operational burden that results from all UC encounters at the border. That is why UC encounters from all countries, not just from contiguous countries, should be considered by the Secretary when making a factual determination that average daily encounters at the southern border have exceeded or fallen below the requisite thresholds contained in the rule and the Proclamation.

Also informing the Departments' decision to reconsider the IFR's approach is that in recent months, encounters of UCs from non-contiguous countries have grown relative to other encounters. That growth, which adds operational burdens separate from those inherent in the processing of individuals for expedited removal, increases the distorting effects of excluding these UCs. Specifically, the Departments had observed from June 2023 through May 2024 that rates of encounters of UCs from non-contiguous countries had generally accounted for about 6.5 percent of total encounters of all non-contiguous nationalities, and comprised about 15 percent of encounters of nationals of El Salvador, Guatemala, and Honduras.[71] However, while encounters of UCs from non-contiguous countries have decreased in absolute terms since June 2024, such

encounters have not decreased in proportion with the decreases seen among single adults and individuals in family units. Rather, the UCs' share of total non-contiguous encounters has increased to 8.9 percent, including 24 percent of all encounters of nationals of El Salvador, Guatemala, and Honduras.[72] As a result, the share of total encounters attributable to UCs from non-contiguous countries increased from 4.6 percent from June 2023 to May 2024 to 6.4 percent from June 2024 to August 2024, and the share of all UCs increased from 6.2 percent to 9.4 percent.[73]

With the two changes just described, the rule will continue to serve the purposes that the IFR pursued from the start. First, the rule continues to target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered; Section III.D.1 of this preamble describes why the rule's thresholds continue to reflect those circumstances, accounting for the inclusion of UCs from non-contiguous countries.

Second, the rule will continue to deactivate when a decrease in encounters means that those emergency border circumstances no longer exist. Although the change to require that the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive days appropriately ensures that the rule does not deactivate prematurely, the rule will continue to deactivate where a decrease is likely to be genuinely sustained. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as natural disasters, economic changes, and political instability. However, the Departments believe, based on past experience, that the Departments may experience an average daily encounter rate below 1,500 encounters for 28 consecutive days. In fact, from FY 2013 through FY 2019, the 7-consecutive-calendar-day USBP encounter average was below 1,500 encounters for 28 consecutive days 71 percent of the

time.[74] Even since the IFR was promulgated, encounters have dropped to levels indicating that the threshold in section 2(a) of the Proclamation will be met if migration dynamics change for a sustained period. If, consistent with the June 3 Proclamation, one excludes UCs from non-contiguous countries, the Departments have observed 40 separate days between June 5, 2024, and August 31, 2024, with encounters within 15 percent of 1,500 (*i.e.,* below 1,725).[75] And if, consistent with the September 27 Proclamation, one includes such UCs, the Departments have observed 15 such days.[76] These single-day figures suggest that the threshold for discontinuation, as revised, will be met if migration dynamics change for a sustained period.

## 2. Clarifying Changes to Regulatory Text

This final rule also makes clarifying changes to the regulatory text. In §§ 208.35(b)(2) and 1208.35(b)(2)(iii), the Departments removed from the definition of "reasonable probability" the clause: "that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal." The Departments believe that the remaining definition of "reasonable probability"—"substantially more than a reasonable possibility, but somewhat less than more likely than not"— accurately defines the reasonable probability standard. The deleted clause describes what the AO or IJ is assessing for rather than what the standard means, so it need not be part of the standard's definition.

## 3. Other Technical Changes

The final rule also implements two technical changes. First, the rule replaces the term "alien" with "noncitizen" where it appears in 8 CFR 1208.35. *See* 8 CFR 1001.1(gg). Second, the rule amends 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) as well as the provisions of the Circumvention of Lawful Pathways rule at 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) to update the cross-references to the definition of "victim of a severe form of trafficking in persons." Specifically, the rule replaces the cross-references to 8

---

[71] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[72] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab). While the monthly average single adult encounters fell 53 percent between June 2023–May 2024 and June 2024–August 2024, and the monthly average number of encounters of individuals in family units fell 69 percent, encounters of non-contiguous UCs fell just 42 percent, and encounters of UCs overall fell just 37 percent. *Id.*

[73] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam status tab).

[74] *See* OHSS analysis of July 2024 OHSS Persist Dataset (Trigger Analysis tab). The Departments rely on data from FY 2013 through FY 2019 and not data from the pandemic period given the unique circumstances dictating migratory trends during the latter time.

[75] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters tab).

[76] *See id.*

CFR 214.11 with cross-references to 8 CFR 214.201. This change recognizes that on August 28, 2024, after the Departments published the IFR, DHS's rule Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 89 FR 34864 (Apr. 30, 2024),[77] became effective, which moved the definition of "victim of a severe form of trafficking in persons" from § 214.11 to § 214.201. *See id.* at 34931–32.

### D. Rule Provisions

The rule contains the following key provisions:

• The rule applies to certain individuals who seek asylum, statutory withholding of removal, or CAT protection during emergency border circumstances giving rise to this rule and to the suspension and limitation on entry under the June 3 Proclamation, as amended by the September 27 Proclamation. *See* 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35.

• The rule establishes that those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Exceptionally compelling circumstances may also be established for noncitizens in section 240 removal proceedings or the asylum merits interview ("AMI") process under specified conditions to ensure family unity. *See* 8 CFR 208.35(c), 1208.35(c).

• The rule also establishes that, during emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the June 3 Proclamation, DHS will provide general notice regarding the process for seeking

asylum, statutory withholding of removal, and protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal. *See* 8 CFR 235.15.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet an exception. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not. 8 CFR 208.35(b), 1208.35(b).

### E. Severability

As stated in 8 CFR 208.13(h), 208.35(b)(3), 208.35(e), 235.15(g), 1208.13(h), 1208.35(b)(4), and 1208.35(e), the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.[78] *See* 89 FR at 48757–59. During emergency border circumstances, the Departments' abilities to refer and safely process noncitizens through expedited removal is overwhelmed and prevents the border security and immigration systems from delivering timely decisions and consequences to noncitizens arriving at the southern border. *See* 89 FR at 48714. Consequently, each provision of the rule

is designed to function sensibly without the others, and the Departments intend for them to be severable so that each can operate independently.

For example, the Departments intend for the "reasonable probability" screening standard to be used—even in the absence of a limitation on asylum eligibility, the manifestation of fear procedures, or the Proclamation—to screen for statutory withholding of removal and CAT protection claims if a noncitizen was otherwise unable to establish a credible fear of persecution for asylum purposes due to the Lawful Pathways rebuttable presumption. 8 CFR 208.35(b)(3), 1208.35(b)(4); *see* 8 CFR 208.35(b)(2), (e), 1208.35(b)(2), (e), 235.15(g); 89 FR at 48757. That approach ensures that, during emergency border circumstances, the Departments will continue to be able to benefit from the higher screening standard, even without the limitation on asylum eligibility this rule adopts.

To maintain operational flexibility, DHS similarly intends for manifestation of fear procedures under 8 CFR 235.15 to remain in effect, even without a limitation on asylum eligibility, the reasonable probability standard, or the Proclamation. *See* 8 CFR 235.15(g). As with the reasonable probability standard, allowing for the continued use of the manifestation of fear provisions absent the other portions of the rule or Proclamation ensures that such a tool remains available to the Departments during emergency border circumstances.

Finally, the Departments intend for the limitation on asylum eligibility to be severable from the manifestation of fear procedures, the reasonable probability standard, and the Proclamation because the limitation on asylum eligibility operates independently of those provisions and the Proclamation, and in the absence of those tools would likewise continue to be an important tool for addressing emergency border circumstances at the southern border. *See* 8 CFR 208.35(e), 1208.35(e).

## III. Public Comments and Responses

The Departments received 1,067 comments on the IFR, the majority of which expressed opposition. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

### A. Legal Authority and Background

1. Legality Concerns

a. General Comments on Domestic Law

*Comment:* Commenters asserted that the rule violates domestic law and

---

[77] *See also* 89 FR 68081 (Aug. 23, 2024) (making corrections).

[78] Courts have uniformly held that the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

emphasized that U.S. law allows noncitizens to apply for asylum regardless of where they entered the United States. Some commenters described a fundamental right to apply for asylum for anyone inside the United States and stated that analysis of an asylum application should focus on the applicant's reasonable fear of persecution rather than manner of entry, criticizing what a commenter characterized as a categorical exclusion of those "apprehended between ports of entry from asylum eligibility, barring narrow exceptions." Commenters asserted that entering the United States either through a POE or across the southern border between POEs and asking for asylum constitutes a "lawful pathway." Other commenters stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. One commenter claimed that the rule effectively closes the border and asserted that closing the border is unconstitutional.

Although some commenters agreed that the rule is within the scope of the Departments' authority and is consistent with the INA, other commenters claimed that the rule would violate the Refugee Act of 1980 and the INA, specifically section 208 of the INA, 8 U.S.C. 1158. Commenters claimed that the rule conflicts with the plain language of these provisions, which permit a noncitizen "physically present in the United States" to apply for asylum. Refugee Act of 1980, 94 Stat. at 105; INA 208(a)(1), 8 U.S.C. 1158(a)(1). Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Commenters also stated that, although Congress gave the Attorney General and the Secretary authority to impose additional limitations on asylum eligibility, such limitations must be consistent with legislation and congressional intent. Along the same lines, a commenter stated that the IFR undermines the separation of powers between Congress and the Executive Branch because it is Congress, not the Executive Branch, that enacts laws, and the IFR rewrites the INA.

*Response:* The Departments disagree that this rule is inconsistent with U.S. law or congressional intent. The rule does not effectively close the border, require the Departments to turn away migrants at the southern border, or categorically deny all asylum applications filed by noncitizens who

enter the United States across the southern border. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of their entry into the United States. Rather, the rule is a limitation on asylum eligibility, as authorized by sections 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), and the Departments' other discretionary authorities, *e.g.*, sections 103(a)(3), (g)(2), and 208(b)(1)(A) of the INA, 8 U.S.C. 1103(a)(3), (g)(2), and 1158(b)(1)(A). Given these authorities for the Departments to act, the Departments disagree that the IFR (or the final rule) violates the principle of separation of powers.

The rule's limitation on asylum eligibility does not prevent anyone from pursuing a claim for asylum, nor does it categorically foreclose eligibility for asylum. The Departments have authority to impose limitations on asylum eligibility. As explained above, the INA authorizes the Secretary and the Attorney General to establish, by regulation, "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]"). And section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), authorizes the Secretary or the Attorney General to grant asylum in their discretion. The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 235(b)(1)(B)(iii)(III), (B)(iv), (C), 241(a)(3), (d)(2)(B), 8 U.S.C. 1103(a)(3), (g)(2), 1225(b)(1)(B)(iii)(III), (B)(iv), (C), 1231(a)(3), (d)(2)(B); *see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).

Consistent with these authorities, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674,

30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those convicted in the United States of a particularly serious crime or those who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who were firmly resettled in a third country prior to arriving in the United States); Asylum Procedures, 65 FR 76121, 76124 (Dec. 6, 2000) (providing that an applicant does not have a well-founded fear of persecution if they could avoid persecution by internally relocating); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation), *overruled on other grounds by Bringas-Rodriguez* v. *Sessions,* 850 F.3d 1051 (9th Cir. 2017) (en banc); *Yang* v. *INS,* 79 F.3d 932, 935–36 (9th Cir. 1996) (holding that the regulatory firm resettlement limitation was a permissible exercise of the Attorney General's authority under the asylum statute). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum consistent with section 208 of the INA, 8 U.S.C. 1158, would be contrary to Congress' intent that the Departments' only constraint be that additional limitations and conditions are consistent with section 208, 8 U.S.C. 1158, and "this chapter." INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B); *see also DHS* v. *Thuraissigiam,* 591 U.S. 103, 112 (2020) (recognizing that the "theme" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") "was to protect the Executive's discretion from undue interference by the courts" (alteration and internal quotation marks omitted)); *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017) (reasoning that the "delegation of authority" in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); Circumvention of Lawful Pathways, 88 FR 11704, 11740 (Feb. 23, 2023).

The rule is within the scope of the Departments' authority and does not conflict with the statutory requirement that noncitizens "physically present in the United States" be permitted to apply for asylum because it adds a limitation on asylum eligibility as permitted under section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and

(d)(5)(B). The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *E.g., East Bay Sanctuary Covenant* v. *Biden (East Bay III),* 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was "effectively a categorical ban" on migrants based on their method of entering the United States, in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)).

Under this rule—and contrary to commenter assertions—manner of entry alone is never dispositive. Rather, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Specifically, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances, when it is essential that noncitizens use such pathways to ensure the Government's ability to manage the border.

Limitations and conditions on asylum eligibility do not need to directly relate to whether a noncitizen satisfies the definition of a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (8th Cir. 2007) (noting that IIRIRA included several provisions, including the one-year bar, "intended to reduce delays and curb perceived abuses in removal proceedings"); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law "was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives" (internal quotation marks and citation omitted));

*Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the persecutor bar, and noting that Congress intended to make "certain forms of immigration relief," including asylum, "unavailable to persecutors"), *stayed by Matter of Negusie,* 28 I&N Dec. 399, 399 (A.G. 2021); *Singh* v. *Nelson,* 623 F. Supp. 545, 556 (S.D.N.Y. 1985) ("[A]ttempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories" of noncitizens who are not lawfully present.).

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with meritorious asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that will overwhelm the Departments' ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of their authority to promulgate limitations on asylum eligibility and in recognition of the limited resources provided by Congress, electing to implement a limitation on asylum eligibility that places greater weight on manner of entry. This limitation on asylum eligibility is expected to disincentivize irregular migration by those unlikely to establish exceptionally compelling circumstances during times when encounters exceed certain benchmarks and therefore challenge the Departments' ability to swiftly process single adults and individuals in family units encountered by USBP at the SWB through expedited removal. See Section II.A.2 of this preamble for further discussion of the Departments' experience with the IFR.

*Comment:* Commenters claim that the rule violates the principles of non-refoulement and nondiscrimination in the Refugee Act and other U.S. laws. Some commenters claimed the rule conflicts with congressional intent to create a uniform procedure for noncitizens applying for asylum regardless of manner of entry.

*Response:* The Departments disagree that the rule conflicts with U.S. law or congressional intent. The rule does not violate the principles of non-refoulement and nondiscrimination. And the rule does not conflict with what commenters describe as a congressional intent to create a uniform

procedure for noncitizens applying for asylum. *See Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 258 (3d Cir. 2017). The Departments may create additional substantive limitations and conditions on asylum eligibility—as Congress itself has done, and as Congress expressly authorized the Departments to do. INA 208(b)(2)(A), (b)(2)(C), 8 U.S.C. 1158(b)(2)(A), (b)(2)(C). Moreover, all noncitizens to whom the rule applies are subject to the same procedures for adjudicating their asylum claims as those who are not subject to the rule. The United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (which is referred to as statutory withholding of removal) and the regulations implementing U.S. obligations under Article 3 of the CAT at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, and 1208.18. The INA's provision in section 208, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., Cardoza-Fonseca,* 480 U.S. at 441.

*Comment:* Commenters asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors. A commenter claimed that manner of entry can only be considered in determining whether a noncitizen merits asylum as a matter of discretion and not in determining whether the noncitizen is eligible for asylum.

*Response:* The rule is consistent with historical consideration of manner of entry as a relevant factor in considering whether to grant asylum as a matter of discretion. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry"; whether they "passed through any other countries or arrived in the United States directly"; "whether orderly refugee procedures were in fact available to help" in any transit countries; and whether they "made any attempts to seek asylum before coming to the United States." 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating

applications filed by any noncitizen, "irrespective of such alien's status," but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 473. The BIA also stated that while the manner of entry could "be a serious adverse factor, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473. The BIA cautioned against placing "too much emphasis on the circumvention of orderly refugee procedures" as "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.* at 473–74.

While the Departments acknowledge that the rule places greater weight on manner of entry under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. Both how much weight to place on that factor and whether to do so in weighing asylum eligibility fall well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) (government can rely on rulemaking to "resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority" (quoting *Am. Hosp. Ass'n* v. *NLRB,* 499 U.S. 606, 612 (1991)); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993) (noting that INS need not "forswear use of reasonable presumptions and generic rules" even where the statute "requires some level of individualized determination" (citations and quotation marks omitted)).

Under this rule, manner of entry, standing alone, is never dispositive. Rather, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States has established when it is essential that noncitizens use such pathways to ensure the United States' ability to manage the border. And even during these situations, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was

a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

In line with *Matter of Pula,* then, the rule considers factors other than manner of entry. And, like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers in "a way that the practical effect is" not "to deny relief in virtually all cases." 19 I&N Dec. at 473. Rather, the manner of entry reduces the availability of relief only in limited circumstances—during emergency border circumstances described in the Proclamation and this rule—and only for those unable to establish exceptionally compelling circumstances.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how this rule considers manner of entry (as part of provisions governing asylum eligibility). *See* 19 I&N Dec. at 472. The Departments, in exercising their broad discretion to issue regulations adopting additional limitations on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. While *Matter of Pula* allows manner of entry to be one factor in the consideration of whether a noncitizen merits a grant of asylum as a matter of discretion, it does not purport to restrict the Departments from considering a noncitizen's manner of entry in assessing eligibility. *Id.* at 473–74.

Moreover, while *Matter of Pula* considered manner of entry for purposes of a discretionary grant whereas the rule considers manner of entry as a limitation on asylum eligibility, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was "not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion"); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who "qualifies as a 'refugee'" and whose criminal conviction did "not preclude her eligibility" for asylum could

nevertheless be "manifestly unfit for a *discretionary* grant of relief").

The Departments conclude that this rule does not conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations in the absence of a regulation that otherwise governs the discretionary determination. *See, e.g., Thamotar* v. *U.S. Att'y Gen.,* 1 F.4th 958, 970–71 (11th Cir. 2021) (observing that discretionary asylum determinations continue to be governed by *Matter of Pula*); *Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (stating that "circumvention [of proper immigration procedures] may be taken into account as a 'serious adverse factor'" (quoting *Matter of Pula,* 19 I&N Dec. at 473)); *see also Andriasian* v. *INS,* 180 F.3d 1033, 1043–44 (9th Cir. 1999) (finding that reliance on certain *Matter of Pula* factors was inappropriate once regulations controlling discretionary denials of asylum on the basis of a petitioner's stay or opportunity to stay in a third country had been promulgated). And the Departments view *Matter of Pula* as providing support for the proposition that it is lawful to consider manner of entry for asylum applicants.

**b. Statutory Conditions and Limitations on Asylum Eligibility**

*Comment:* Commenters stated that the rule would be inconsistent with or would otherwise render superfluous the statutory firm-resettlement bar and safe-third-country bar. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

*Response:* This rule is within the Departments' broad authority to create new limitations on asylum eligibility, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or limitations on a noncitizen's eligibility for a grant of asylum under section 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2).

The INA's firm-resettlement provision precludes a noncitizen who "was firmly resettled in another country prior to arriving in the United States" from demonstrating eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15, 1208.15 (2020).[79] The INA's safe-third-

---

[79] These regulations were amended by *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 FR 80274 (Dec. 11, 2020), but the amendments were preliminarily enjoined. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021). This order remains in effect, Continued

country provision prohibits a noncitizen from applying for asylum if the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement" to a safe third country in which the noncitizen would not be subject to persecution and "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

The rule does not conflict with or otherwise render the firm-resettlement bar or safe-third-country bar superfluous; instead, this rule and the statutory bars apply independently.

First, this rule has a different scope. In contrast to those statutory bars, this limitation on asylum eligibility only applies to those who enter the United States during emergency border circumstances. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). Additionally, unlike those who are subject to the firm-resettlement or safe-third-country bars, those who are subject to this limitation on asylum eligibility are not categorically barred from applying for asylum or from being eligible for asylum, as application of the rule's limitation on asylum eligibility will be considered on a case-by-case basis, including to determine if exceptional circumstances apply to overcome this limitation.

The rule also serves a different purpose than those statutory bars. The INA's firm resettlement and safe-third-country provisions limit asylum eligibility and applications, respectively, for noncitizens who have available sustained protection in another country, and they help protect against forum shopping. *See Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 55–56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing "a haven for the world's homeless people" while encouraging "other nations to do likewise"); *see also Maharaj* v. *Gonzales,* 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring in part and dissenting in part) (recognizing that the firm-resettlement provision protects against forum shopping, an issue "that our immigration laws have long sought to avoid"). The limitation on asylum eligibility adopted in this rule, by contrast, seeks to streamline the Departments' processing of noncitizens while upholding all screening and protection requirements, thereby conserving limited resources during the emergency border circumstances

and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE. The rule is also designed to encourage noncitizens to use lawful, safe, and orderly pathways to the United States during emergency border circumstances or to wait until such circumstances have abated, to the extent possible. Thus, the limitation has a different object and purpose, and it is consistent with those statutory provisions.

Moreover, the INA permits the Attorney General and the Secretary to create new eligibility limitations and does not limit this authority from overlapping with existing statutory conditions. *See R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of the right to seek asylum); *cf. Hawaii,* 585 U.S. at 690–91 (recognizing that the existence of the Visa Waiver Program "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas).

Indeed, section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), provide no subject-matter limit other than requiring any regulation be "consistent with" section 208 of the INA, 8 U.S.C. 1158, and the INA generally. *See R–S–C,* 869 F.3d at 1187 n.9. The limitation on asylum eligibility established by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and the INA generally, and it is consistent with the firm-resettlement and safe-third-country bars in particular.

### c. Expedited Removal

*Comment:* Several commenters claimed that the rule conflicts with the expedited removal process created by Congress in IIRIRA. Commenters noted that the statutory framework provides for preliminary screening of noncitizens in credible fear interviews, where noncitizens may apply for asylum after demonstrating a "significant possibility" that the noncitizen could establish eligibility for asylum. In this regard, one commenter asserted that Congress had intended the "significant possibility" standard to be a "low screening standard," but that the IFR "would convert the preliminary screening into a full adjudication" of whether the IFR applied and would eliminate the "significant possibility" standard "entirely for all asylum seekers covered[,] . . . forc[ing] them to meet an

even higher 'reasonable probability' standard." Commenters asserted that the rule's requirement that noncitizens instead show a "reasonable probability" of persecution or torture is in conflict with this statutory framework. Commenters further asserted that the rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process. One commenter claimed that the rule unlawfully shuts down the U.S. asylum system.

*Response:* The Departments disagree that the rule conflicts with the expedited removal process created by Congress. The expedited removal process is applicable to certain noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation required for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B). But Congress has not provided for such a screening for statutory withholding of removal or CAT protection. In the absence of a statutory process for screening for potential eligibility for statutory withholding of removal and CAT protection, the Departments have also used the credible fear screening process to identify potentially valid claims for such protection. *See generally* 8 CFR 208.30, 1003.42, 1208.30 (providing for screenings for potential eligibility for statutory withholding of removal and CAT protection alongside screening for potential asylum eligibility). If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to an AO to determine whether the noncitizen has a credible fear of persecution or torture in the

country of nationality or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 208.30(e)(2), 235.3(b)(4); *id.* 208.13(b)(1)–(2), 1208.13(b)(1)–(2) (defining the grounds for asylum eligibility); *id.* 208.16(b)–(c), 1208.16(b)–(c) (defining the grounds for statutory withholding of removal and CAT protection). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

Just as the statute is silent on the availability of screening procedures for statutory withholding of removal and CAT protection, it is also silent on the standard applied during such screenings. By regulation, the Departments have applied the "significant possibility" standard to also screen for potential eligibility for statutory withholding of removal and CAT protection, *see* 8 CFR 208.30(e)(2)–(3), 1003.42(d): AOs must determine whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility . . . for withholding of removal under section 241(b)(3) of the Act," 8 CFR 208.30(e)(2), and whether the noncitizen "shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17," 8 CFR 208.30(e)(3). If the AO determines that the noncitizen does not have a credible fear of persecution or torture in the proposed country of removal, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.16(b)–(c), 208.30(g), 208.33(b)(2)(v), 1208.16(b)–(c), 1208.30(g).

To the extent commenters allege that the Departments are not applying the "significant possibility" standard to screen for asylum eligibility—such as for application of the limitation on asylum eligibility—the commenters are mistaken. Under this rule, the AO or IJ determines whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet the exception

for exceptionally compelling circumstances. The "significant possibility" standard applies by statute, section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), and the regulation does not in any way displace that standard, by its terms or otherwise. The Departments did not explicitly include this language in the regulation itself. This is because the provisions regarding credible fear screenings at 8 CFR 208.35(b) and 1208.35(b)(2) generally explain the order of operations—instructing the AO or IJ to consider the limitation first before considering the rest of the asylum claim. In other rules adopting conditions and limitations on asylum eligibility, the Departments have consistently used the regulatory text to explain the order of operations for consideration of the limitations during credible fear screenings without explicitly restating the applicable statutory standard,[80] while at the same time explaining that the "significant possibility" standard applies in the preamble.[81] Deviating from the Departments' practice here could wrongly imply that, in other regulations pertaining to the credible fear process, the default standard of proof for AO and IJ determinations is something other than the "significant

---

[80] For example, under the Circumvention of Lawful Pathways rule, "[t]he asylum officer shall first determine whether the alien is covered by the presumption . . . and, if so, whether the alien has rebutted the presumption[.]" 8 CFR 208.33(b)(1); *see also* 8 CFR 1208.33(b)(2) ("The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3)."); *Asylum Eligibility and Procedural Modifications,* 84 FR 33829, 33843–45 (July 16, 2019) (interim final rule amending and adding provisions at 8 CFR 208.30(e)(5)(ii) through(iii), 1003.42(d)(2) and(3), and 1208.30(g)(1)(i) through (ii), providing the order of operations for applying two now-rescinded bars to asylum eligibility); 88 FR at 31319; *id.* at 31449 (adding amendatory instructions to remove regulatory provisions added to implement the bars to asylum eligibility adopted in two prior rules).

[81] *See, e.g.,* 89 FR at 48755 (explaining that, during the credible fear interview, "the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the [rule's] limitation on asylum eligibility"); *id.* at 48757–58 (discussing the application of the "significant possibility" standard under the rule during IJ review of a negative credible fear determination); 84 FR at 33837 ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

possibility" standard. To avoid that unwanted implication, the Department declines to modify the text of §§ 208.35 and 1208.35 as well. The "reasonable probability" standard does not affect or change the "significant possibility" standard used to screen for asylum eligibility, which, as discussed above, is set by statute and remains in effect for asylum claims in the credible fear process. Accordingly, the Departments disagree with the claim that the use of the "reasonable probability" standard for the purposes of screening for potential eligibility for statutory withholding of removal and CAT protection would eliminate, or in any way affect, the "significant possibility" standard as it applies to screening for asylum eligibility.

The Departments also disagree that the rule's application of the "reasonable probability" standard to screen for potential eligibility for statutory withholding of removal or CAT protection is inconsistent with the "significant possibility" standard under the expedited removal statute. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications." 88 FR at 11742. Section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening standards and procedures are to be employed in determining potential eligibility for statutory withholding of removal or CAT protection, and the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions. *See, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2). Accordingly, the Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and CAT protection. As discussed in Section III.C.3 of this preamble, the Departments continue to believe that during the emergency border circumstances described in the IFR and this rule, the "reasonable probability" screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection and better captures the population of noncitizens with potentially valid claims for such protection. *See* 89 FR at 48745–47.

Thus, despite the claims of some commentators, the rule does not effectively shut down the U.S. asylum system or deviate from applicable statutory standards. Noncitizens still

may seek asylum and protection in the United States.

d. General Comments on International Law

*Comment:* Commenters generally asserted that the rule violates international law. A commenter wrote that seeking asylum is a human right guaranteed by international law and the rule unjustly denies people this right. In this regard, a commenter asserted that the use of emergency border circumstances as a justification for promulgating the rule is insufficient to justify violating international law and that the lack of a time frame or sunset provision denies access to migrants seeking asylum and places them at risk of refoulement. Commenters claimed that the rule imposes prohibited penalties on asylum seekers, bars refugees from a path to citizenship, and impermissibly discriminates based on manner of entry, race, and nationality. A commenter stated that regulations that deny access to asylum based on arbitrary factors that do not relate to a person's status as a refugee are inconsistent with the Refugee Convention and that the United States has an obligation under the Convention to provide a "fair and efficient refugee status determination procedure" to individuals in the U.S. asylum process.

Commenters were concerned that the rule violates the United States's non-refoulement obligations under the Refugee Convention (through the Refugee Protocol) and Article 3 of the CAT. For example, commenters predicted many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding of removal and CAT protection claims and that, in turn, would lead to the refoulement of persons who, if not for the rule's limitation on asylum eligibility, would have been granted asylum. Several of these commenters also asserted that statutory withholding of removal and CAT protection are insufficient to satisfy the United States's non-refoulement obligations because they afford lesser protection than asylum. Commenters expressed apprehension that the rule would result in the turning away of migrants who seek refuge at the southern border.

Another commenter wrote that the rule is consistent with U.S. commitments under the Refugee Protocol and the CAT, reasoning that neither is self-executing and therefore the United States is bound only by its own law implementing these treaties. The commenter acknowledged that the United States implements its non-

refoulement obligations through the withholding of removal statute at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). Another commenter, however, asserted that the argument that asylum is discretionary under U.S. law and therefore the rule does not violate the Refugee Protocol is incorrect as a matter of international law, even if true under domestic law, because parties to the Refugee Convention must provide asylum and protection from refoulement to those who meet the definition of "refugee."

*Response:* This rule is consistent with the United States' international treaty obligations. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. 88 FR at 31384. Together, these documents provide a framework for states to provide protection to noncitizens fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. *Id.*

These treaties, however, do not prescribe or impose any particular minimum procedures for implementation of non-refoulement obligations. Although the United States is a party to the 1967 Refugee Protocol [82] and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the CAT "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts") Instead, the United States has implemented its obligations through domestic legislation and implementing regulations. The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory "where his life or freedom would be threatened" on account of an enumerated ground. 19 U.S.T. at 6276,

---

[82] *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the [1951 Refugee] Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951." (citation omitted)).

189 U.N.T.S. at 176. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are "substantial grounds for believing" the person will be tortured. S. Treaty Doc. No. 100–20 at 20, 1465 U.N.T.S. 85, 114. The United States has implemented its obligations under Article 3 of the CAT through regulations. *See* FARRA, Public Law 105–277, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit ultimate eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's limitation on asylum eligibility will be screened for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard, which is lower than the ultimate statutory or regulatory standard of proof for those forms of protection.

The rule will limit asylum eligibility for some noncitizens. But, as the Supreme Court has explained, asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34[,]" which provides that contracting countries "shall as far as possible facilitate the assimilation and naturalization of refugees." *Cardoza-Fonseca,* 480 U.S. at 441 (quoting Refugee Convention art. 34, 19 U.S.T. at 6276, 189 U.N.T.S. at 176); *see also* United Nations High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 16 para. 25 (2019 ed.) ("[T]he granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol"). Article 34 "is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible." *Cardoza-Fonseca,* 480 U.S. at 441. Because the limitation on asylum eligibility does not affect ultimate eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating,

among other things, Article 33 of the Refugee Convention and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important form of protection and acknowledge that the right to seek asylum has been recognized under the Universal Declaration of Human Rights (''UDHR''), art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a nonbinding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.'').

Moreover, although the rule creates a limitation on eligibility for asylum, the rule does not bar those seeking asylum from taking part in procedures that protect them from refoulement. Under the rule, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. Even in those cases where the AO determines that the noncitizen has not established a significant possibility that they could ultimately demonstrate by a preponderance of the evidence that they are not subject to the limitation on asylum eligibility or are excepted from it, the noncitizen may still demonstrate credible fear by showing a reasonable probability of persecution or torture. Similarly, even if found ineligible for asylum by an IJ due to the application of the limitation on asylum eligibility, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including the specific provisions cited by commenters. The rule does not violate the nondiscrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of ''race, religion or country of origin.'' 19 U.S.T. at 6264, 189 U.N.T.S.

at 156. The rule does not discriminate on the basis of any of the protected characteristics described in Article 3. This rule is limited to the southern border because that is the U.S. border where emergency circumstances exist. The Departments acknowledge that this limitation will affect those noncitizens with easier access to the southern border and not those with easier access to other borders of the United States. However, the rule does not treat such noncitizens differently on that basis; the rule applies equally based on the actions of a noncitizen during emergency border circumstances. Specifically, the application of this rule is limited to those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances. For the same reason, the rule does not violate other antidiscrimination principles described in other international human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, arts. 2–5, Dec. 21, 1965, T.I.A.S. No. 94–1120, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights, arts. 2–3, Dec. 16, 1966, T.I.A.S. No. 92–908, 999 U.N.T.S. 171.

Similarly, the rule is consistent with Article 31.1 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence'' if such refugees are ''coming directly from a territory where their life or freedom was threatened'' and ''present themselves without delay to the authorities and show good cause for their illegal entry or presence.'' 19 U.S.T. at 6275, 189 U.N.T.S. at 174. As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31.1 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' UNHCR, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Dr. Paul Weis* 219, *https://www.unhcr.org/us/media/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul-weis; see Cazun,* 856 F.3d at 257 & n.16 (rejecting argument that the reinstatement bar on asylum was a ''penalty'' within the meaning of Article 31.1). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit

concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31.1 of the Refugee Convention because it imposed a ''penalty.'' As described in the IFR, the rule here does not create a categorical bar to asylum, but instead a limitation on asylum eligibility, and *East Bay III* accordingly does not address the lawfulness of this rule. 89 FR at 48735. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31.1. *Id.* at 48736.

*Comment:* One commenter asserted that the IFR conflicts with the United States Supreme Court's decisions in *Murray* v. *Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804), which generally states that ambiguous U.S. statutes should be interpreted to avoid conflicts with international law where possible, and *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 436–37 (1987), which explained that ''one of Congress' primary purposes'' when passing the Refugee Act of 1980 ''was to bring United States refugee law into conformance with the 1967 [Refugee Protocol].''

*Response:* The Departments disagree with the commenter that the IFR conflicts with *Charming Betsy* or *Cardoza-Fonseca.*[83] As explained above, the rule is consistent with the United States' obligations under international law, specifically the Refugee Convention, the Refugee Protocol, and the CAT. The rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection and is consistent with the United States' non-refoulement obligations. Moreover, the rule does not prohibit any person from seeking asylum or, more importantly for purposes of U.S. non-refoulement obligations, from seeking or obtaining statutory withholding of removal or CAT protection. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview. Even in cases in which the AO determines that the noncitizen is subject to the limitation on eligibility for asylum, the noncitizen may still receive a positive credible fear determination by

---

[83] For purposes of this response, the Departments assume *arguendo* that the *Charming Betsy* canon applies with respect to non-self-executing treaties. *See, e.g., Saleh* v. *Bush,* 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting that the question remains unsettled).

showing a reasonable probability of persecution or torture. Similarly, after applying for asylum before an IJ, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

e. UNHCR Guidelines on International Protection

*Comment:* Commenters stated that the rule violates UNHCR statements and guidelines and the right to seek asylum guaranteed by Article 14 of the UDHR. Commenters also claimed that the pre-screening procedures in expedited removal proceedings are contrary to UNHCR guidelines and that adjudicators must instead provide full and individualized assessments of each asylum case.

*Response:* The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under article 14 of the UDHR. However, the UDHR is a nonbinding human rights resolution of the UN General Assembly and does not impose legal obligations on the United States. *See Sosa,* 542 U.S. at 734–35 ("[T]he [UDHR] does not of its own force impose obligations as a matter of international law."). Moreover, UNHCR's interpretations of, or recommendations regarding, the Refugee Convention and Refugee Protocol are "not binding on the Attorney General, the BIA, or United States courts." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status "itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n.22). Such guidance "may be a useful interpretative aid," *id.* at 427, but it does not impose obligations on the United States.

*Comment:* Commenters stated that the rule violates the Refugee Convention because the exclusion grounds in Article 1(F) of the Refugee Convention are exhaustive, yet the rule creates an exclusion ground not found in Article 1(F). The commenters acknowledged that the rule's limitation on asylum eligibility contains an exception but asserted that the exception is insufficient to comply with the Refugee Convention. Along the same lines, a commenter asserted that such exclusionary grounds should only be considered after an assessment of whether the noncitizen is a "refugee"

and be balanced against the need for protection itself, as is the order of procedures in a full merits hearing.

*Response:* The Departments disagree with the commenters' characterization of the limitation on asylum eligibility in this rule as a ground of exclusion like those in Article 1(F) of the Refugee Convention. Article 1(F) of the Refugee Convention provides that the provisions of the Convention "shall not apply to any person with respect to whom there are serious reasons for considering that" they have: (1) "committed a crime against peace, a war crime, or a crime against humanity"; (2) "committed a serious non-political crime outside the country of refuge prior to [their] admission to that country as a refugee"; or (3) "been guilty of acts contrary to the purposes and principles of the United Nations." As explained above, the United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. This rule's limitation on asylum eligibility does not extend to statutory withholding of removal and therefore does not implicate the application of the Convention's exclusion grounds to the mandatory non-refoulement obligation of Article 33. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that "the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given *full effect* by the Attorney General's withholding-only rule" (emphasis added)). Nor does the rule restrict who qualifies as a refugee. *Cf.* INA 101(a)(42), 8 U.S.C. 1101(a)(42) (excluding those who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground from the "refugee" definition); UNHCR, *UNHCR Statement on Article 1F of the 1951 Convention* at 1 (July 2009), *https:// www.unhcr.org/us/media/unhcr-statement-article-1f-1951-convention* (providing that the exclusion grounds "exclude a person from being a refugee where there are serious reasons for considering that she/he has committed certain heinous acts").

In any event, the exclusion clauses of Article 1(F) of the Refugee Convention do not limit the United States from adopting additional or different limitations on asylum eligibility. Congress has implemented Article 1(F) in establishing mandatory bars to eligibility for statutory withholding of

removal. *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B). Congress adopted certain parallel bars to asylum eligibility, *see, e.g.,* INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), but also authorized the Departments to establish additional limitations on asylum eligibility, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As discussed earlier in this preamble, the asylum statute implements the precatory provision in Article 34 of the Convention, but neither the mandatory nor the precatory provisions of the Convention and Protocol are directly enforceable in U.S. law. *See Stevic,* 467 U.S. at 428 & n.22; *Al-Fara,* 404 F.3d at 743 ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." (citations omitted)). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol "serves only as a useful guide in determining congressional intent in enacting the Refugee Act." *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000) (citations omitted). Thus, the Refugee Protocol does not circumscribe the United States' prerogative to establish limitations on asylum eligibility that extend beyond the exclusion grounds described in Article 1(F).

f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

*Comment:* A commenter stated that the rule conflicts with the United States' obligations under the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319 ("Trafficking Protocol"), and the Trafficking Victims Protection Act of 2000 ("TVPA"), 22 U.S.C. 7101 *et seq.,* because the rule will not prevent human trafficking and will instead drive trafficking networks further underground and make people more vulnerable to exploitation. The commenter stated that the reality of human movement and escape from harm will drive people to take other routes and reported that they had handled cases involving individuals who were mistreated after being forced to take on large debts to pay smuggling networks to seek safety in the United States. The commenter also claimed the rule will exacerbate violent crime, which increases asylum seekers' vulnerabilities to trafficking.

*Response:* The Departments disagree that the rule conflicts with U.S.

obligations under the Trafficking Protocol or the TVPA. At the outset, the Departments note that the Trafficking Protocol is separate from the Refugee Convention and Refugee Protocol; the Trafficking Protocol explicitly disclaims any impact upon those agreements or on the non-refoulement principle they contain. *See* Trafficking Protocol art. 14(1) ("Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including . . . , in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of non-refoulement as contained therein.").

In addition, the rule is consistent with the Trafficking Protocol and TVPA. Nothing in the IFR or the rule is implicated by or conflicts with the provisions of the Trafficking Protocol, none of which relate to limitations on asylum eligibility. Moreover, the IFR and this rule remain in line with the purpose of the Trafficking Protocol in protecting and assisting the victims of human trafficking,[84] as they specify that any person who can demonstrate by a preponderance of the evidence that they are a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201 will thereby show exceptionally compelling circumstances, and will therefore not be subject to the rule's limitation on asylum eligibility. Similarly, the IFR and this rule are entirely consistent with the TVPA, which provides immigration relief to certain victims of a severe form of trafficking in persons who assist law enforcement (or meet certain exceptions), Public Law 106–386, sec. 107(e), 114 Stat. 1464, 1477, but does not otherwise implicate immigration authorities under title 8.

Regarding the commenter's concerns about smuggling and trafficking, the Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase the availability of lawful pathways for migration.

This rule is expected to continue to reduce irregular migration, which benefits human smuggling and trafficking organizations. The rule is also expected to reduce human trafficking and smuggling by reducing overall flows of migrants, thereby allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain. *Id.* at 48762, 48766–67.

Moreover, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. *Id.* at 48744. They are trained to identify potential trafficking victims or victims of crimes and to take appropriate follow up action. *Id.* The commenter's prediction that the rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking. Additionally, without this rule, incentives for irregular migration would likely increase, which would likely exacerbate the very vulnerabilities about which the commenter expressed concern, including by driving more migrants into the hands of human traffickers promising a pathway to the United States. *See id.* at 48714–15.

Regarding the commenter's concerns about the safety of noncitizens attempting to enter the United States, one cause of recent surges in irregular migration is smugglers and migrants' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. *Id.* at 48714. The Departments assess that the IFR has significantly increased the ability to deliver timely decisions and consequences, combating contrary messaging and perceptions. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. Additional discussion of the rule's incentive effects is found at Sections III.A.2 and III.B.2 of this preamble.

2. Justification and Statements on Need for the Rule

a. Rule Is Unjustified, Unsubstantiated, or Arbitrary

*Comment:* Several commenters argued that the Departments' reliance on the success of the Circumvention of Lawful Pathways rule to justify the IFR is erroneous because the evidence regarding the high levels of encounters at the border does not support implementing such "extreme" measures as those contained in the IFR. One commenter stated that the Departments cannot argue that the Circumvention of Lawful Pathways rule has been successful at alleviating the stress on the border and immigration systems while at the same time arguing that the measures in the IFR are needed to address the surge in high levels of migration at the southern border. Another commenter argued that (1) the increase in encounters prior to the end of the Title 42 public health Order does not necessarily mean that encounters would have remained high after the Title 42 public health Order ended, and (2) it is implausible that the Circumvention of Lawful Pathways rule led to higher encounters prior to its implementation and lower encounters after its implementation, as most migrants did not know what the Circumvention of Lawful Pathways rule was before it was implemented. Thus, the commenter claimed, it is more likely that the end of the Title 42 public health Order was the reason for higher encounters prior to its end and lower encounters after its end. The commenter concluded that, as there is insufficient evidence to support the asserted success of the Circumvention of Lawful Pathways rule, a fundamental justification of the IFR, it is not justifiable to institute more stringent processes under the IFR.

Another commenter similarly took issue with the effectiveness of the Circumvention of Lawful Pathways rule, stating that it is well understood that the Title 42 public health Order drove border crossings to record highs, and the end of the Title 42 public health Order would therefore have led to a substantial decrease in border crossings without further policy changes. However, the commenter said the Departments claimed, without any evidence, that crossing levels under the Title 42 public health Order were somehow predictive of crossing levels after the Title 42 public health Order ended; the commenter said this assertion is contrary to the record.

*Response:* The Departments disagree with commenters' claim that there is not enough evidence demonstrating the Circumvention of Lawful Pathways rule's impact on encounters at the SWB. In the first month following the implementation of the Circumvention of Lawful Pathways rule, encounters between POEs along the SWB decreased by 69 percent compared to their peak just before the end of the Title 42 public health Order.[85] The Departments believe that overall encounters would not have decreased after the end of the Title 42 public health Order absent their implementation of policy changes, including the Circumvention of Lawful Pathways rule, to address the level of irregular migration. The Departments

---

[84] Trafficking Protocol art. 2.b, 2237 U.N.T.S. at 344.

[85] *See* Decl. of Blas Nuñez-Neto ¶ 13, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

**81178    Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

agree with commenters that the Title 42 public health Order increased repeat crossing attempts, but as noted in the Circumvention of Lawful Pathways rule, repeat crossings were a contributing factor, but not the only reason, for the increase in overall encounters: for example, unique encounters with nationals of countries outside of Mexico and Northern Central America were also rising also increased in each of FYs 2022–2024, as compared with the pre-pandemic period.[86] In addition to the overall increase in encounters and unique encounters, several other factors caused the Departments to project a spike in average daily encounters in the run-up to the end of the Title 42 public health Order, including: (1) the prospect that DHS would no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order; (2) the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere; (3) the unprecedented recent growth in migration from countries of origin not previously typically encountered; (4) the already large number of migrants in proximity to the SWB; and (5) the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order. *See* 89 FR at 48723; *see also* 88 FR at 31316. Consistent with their projections, the Departments planned for, and briefly observed, a very significant spike in average daily encounters. *See* 89 FR at 48723. Had these levels of migration persisted without the incentives put in place by the Circumvention of Lawful Pathways rule, encounters may have exceeded even the very high levels of irregular migration that the Departments observed under that rule. *See id.* at 48723–24. The Departments believe the Circumvention of Lawful Pathways rule mitigated the overall impact on the border security and immigration systems that would have been caused by an expected surge following the end of processing under the Title 42 public health Order. This is evidenced by the sharp initial drop CBP saw in overall encounters at the SWB in the weeks following the expiration of the Title 42 public health Order and when the Circumvention of Lawful Pathways rule

went into effect.[87] Instead of seeing a surge of migrants arriving at the border following the end of the Title 42 public health Order, there was a precipitous drop that lasted through June 2023.[88] At about the same time DHS assessed, and public reporting confirmed, that DHS messaging about the Circumvention of Lawful Pathways rule and associated measures were effective in dissuading potential migrants from attempting to cross the U.S. border due to the disincentives created by that rule.[89]

The Departments recognize that while the Circumvention of Lawful Pathways rule is a valuable tool available to the Departments to reduce irregular migration, it is not, by itself, able to mitigate all the factors influencing migration trends. Despite the success of the Circumvention of Lawful Pathways rule and complementary measures, for much of the immediate post-pandemic period until issuance of the IFR, border encounters remained higher than the Departments' abilities to consistently deliver timely decisions and consequences.[90] Therefore, even if the

evidence supporting the Circumvention of Lawful Pathways rule's success was inconclusive (which the Departments do not believe), the Departments would have adopted the IFR in response to the high number of migrants subsequently arriving at the southern border, overwhelming the Departments' resources and preventing them from delivering timely decisions and consequences to those who lack a lawful basis to remain.

The rule is a tailored approach designed to substantially improve the Departments' abilities to process noncitizens more expeditiously and deliver timely decisions and consequences to most noncitizens who cross between POEs into the United States during emergency border circumstances. As discussed in Section II.A.2 of this preamble, the IFR is working as intended. DHS is placing into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB, the rule has reduced the percentage of noncitizens encountered at the SWB who are released, and DHS is more quickly removing a greater percentage of those without a legal basis to remain in the United States than during the immediate post-pandemic period, which in turn discourages additional crossings.[91] Since promulgating the IFR,

---

[86] Unique USBP SWB encounters of nationals of countries other than Mexico and Northern Central America were more than 30 times higher in each of FY 2022–FY 2024 (through May 2024) than in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset (USBP Encounters by Citizenship tab).

[87] Average daily CBP SWB encounters fell 68 percent from their May 12, 2023, level in the first 11 days after the CLP rule went into effect and remained at similar low levels throughout May and June 2024. OHSS analysis of July 2024 OHSS Persist Dataset (Encounters FY2000–2024 tab).

[88] *Id.* In July 2023, total monthly CBP SWB encounters remained below 200,000. While total encounters increased from August 2023 through December 2023, the same increase occurred between August 2022 and December 2022 while the Title 42 public health Order was still in place, suggesting that these surges are more consistent with seasonal migration trends that changes in U.S. immigration policy cannot unilaterally mitigate. *Id.*

[89] *See* Mary Beth Sheridan, Maria III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush,* Wash. Post (May 12, 2023), *https:// www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/; see also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted,* PBS (May 11, 2023), *https:// www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted;* Decl. of Blas Nuñez-Neto ¶ 22, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); *Testimony of Blas Nuñez-Neto Before U.S. House of Representatives Committee on Homeland Security Subcommittee on Border Security and Enforcement on "Examining DHS' Failure to Prepare for the Termination of Title 42"* (June 6, 2023), *https:// www.congress.gov/118/meeting/house/115908/ witnesses/HHRG-118-HM11-Wstate-Nuez-NetoB-20230606.pdf.*

[90] Total daily SWB encounters averaged about 5,700/day in April and May 2024 and USBP SWB encounters averaged about 4,100/day, compared to averages of 1,600 and 1,300/day, respectively, in the pre-Pandemic period (OHSS analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab). In late 2023, while the Title 42 public health Order was in place, total encounters at the SWB reached all-time highs. OHSS's analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab) shows that total SWB encounters reached over 242,000 in November 2023 and over 301,000 in December

2023. Total SWB encounters for the month of May 2023 were approximately 207,000. This was the month the Title 42 public health Order ended and when the Circumvention of Lawful Pathways rule went into effect. Total SWB encounters for the following month (June 2023) dropped precipitously to 145,000 encounters, but total SWB encounters climbed back to 233,000 in August 2023 and remained at highly elevated levels through December 2023.

[91] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP August 6, 2024, for encounters since May 1, 2024 (Summary Statistics tab). For encounters under the IFR through July 31, 2024, 34 percent of bookouts of single adults and individuals in family unit were releases, compared to 64 percent in the immediate post-pandemic period. Thirty percent of bookouts from CBP custody were repatriations, up from 16 percent during the immediate post-pandemic period. Overall, DHS repatriated an average of approximately 1,370 noncitizens encountered at the SWB per day during the first two months of enforcement under the IFR, up from approximately 1,360 in the immediate post-pandemic period. *Id.* This marginal increase understates the actual impact of the IFR, however, given the sharp drop in encounters: repatriations of noncitizens encountered at the SWB as a share of SWB encounters were equivalent to 26 percent in the immediate post-pandemic period compared to 62 percent under the IFR—a rate that is also slightly higher than the pandemic period (58 percent, only 5 percent of which were title 8 repatriations) and the pre-pandemic period (61 percent, at a time of much lower encounters and when Mexicans and Northern Central Americans accounted for over 90 percent of USBP encounters). *Id.* For public reporting suggesting that migrants are aware of the IFR and that it has discouraged attempts to cross

---

USBP has placed 59 percent of noncitizen single adults and individuals in family units encountered at the SWB into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order,[92] and 41 percent in the pre-pandemic period.[93]

While more noncitizens without a legal basis to remain in the United States were removed under the Circumvention of Lawful Pathways rule than in the pre-pandemic period, the Departments recognize that the volume of noncitizens arriving at the SWB remained beyond the Departments' capacity to timely process given the resources provided by Congress.[94] As explained in the IFR's preamble, once the Departments resumed widespread processing under their title 8 authorities, it became clear that, even with the Circumvention of Lawful Pathways rule's expanded measures to impose consequences along the SWB, substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to meaningfully address the historic levels of encounters at the southern border. *See* 89 FR at 48713.

The Departments did not and have not represented that the Circumvention of Lawful Pathways Rule would singlehandedly resolve migratory pressures in the region; the Departments

into the United States irregularly, see Mariana Martínez Barbra & Caterina Morbiato, *US Border Policy Spurred Migrant Camps Hundreds of Miles Away in Mexico's Capital*, Associated Press, Sept. 1, 2024, *https://apnews.com/article/mexico-migrants-asylum-cbp-app-camps-22b49fabf6e4d7d25d2873d0637544fe*.

[92] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab).

[93] *Id.*

[94] OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab). Although sustained high encounter rates outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers in the immediate post-pandemic period, between May 12, 2023, and June 4, 2024, CBP placed into expedited removal an average of about 920 individuals encountered between POEs each day on average, and USCIS conducted more than 206,000 credible fear interviews, a record number. *Id.* Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 796,000 noncitizens who did not have a legal basis to remain in the United States, the vast majority of whom crossed the SWB. *Id.* USBP encounters at the SWB decreased by 16 percent compared to the previous 12 months, to an average of 5,100 per day for the period from May 12, 2023, to June 4, 2024, *id.,* and border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures. April 2023 OHSS Encounter Projection.

only represent that it would reduce the number of daily encounters at the SWB that, absent intervention, were predicted to materialize in a post-Title 42 public health Order surge. The pre-IFR status quo of the broken immigration and asylum systems had become a driver for irregular migration throughout the region and an increasingly lucrative source of income for dangerous TCOs. *See* 89 FR at 48714. Without adequate countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate. *See id.* All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit. *See id.* at 48715.

Moreover, the Departments do not expect the Circumvention of Lawful Pathways rule or this rule to solve every migration problem in the region. Its provisions cannot account for every factor impacting the unprecedented level of migration occurring in the Western Hemisphere, which is why the Departments have instituted complementary measures such as creating lawful, safe, and orderly pathways. Thus far, as discussed in Section II.A of this preamble, this rule has demonstrated that it helps meet its goal of allowing the Departments to deliver timely decisions and consequences during emergency border circumstances.

*Comment:* Several commenters argued that the rule's characterization of the situation at the border as an "emergency" is arbitrary. Commenters took issue with the rule's use of the daily encounter thresholds to identify the existence of emergency border circumstances. One commenter argued that the circumstances that give rise to "emergency border circumstances" and so trigger the provisions of the rule have been met for quite some time and are not a uniquely emergent circumstance but a reflection of an increase in migration globally. Another claimed that rather than starting with an assessment of need, looking at the number of asylum seekers and the capacities of other countries in the region, the Departments began with the current level and allocation of resources in the United States and "work[ed] backwards from there."

Commenters also argued that the rule is arbitrary because it invokes emergency authority while simultaneously asserting that border crossings are down. One commenter

argued that the existence of this emergency is undercut by an almost 50 percent drop in unauthorized border crossings since December 2023, a period during which the Departments' threshold has nonetheless been met. Citing to a statement in Section III.B.2 of the IFR's preamble, a commenter stated the Departments "concede" that the rule was based on a fear of a future emergency rather than a current one.

Finally, one commenter wrote that if a unilateral declaration of an emergency is all that is required for a Federal agency to violate statutes and court decisions, then the Executive Branch could call everything an "emergency." The commenter claimed that the IFR's limitation on asylum eligibility violates section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and is indistinguishable from prior regulations that imposed limitations on asylum eligibility that some courts have held unlawful. The commenter also claimed that the rule violates section 235 of the INA, 8 U.S.C. 1225, because it conditions a noncitizen's access to a credible fear interview on the ability to obtain a CBP One appointment. The commenter argued that labeling the situation at the southern border an emergency does not allow the Departments to disregard these statutes and court decisions.

*Response:* The Departments disagree that the numerical encounter thresholds are arbitrary and do not reflect the existence of "emergency" circumstances at the southern border. As explained in the IFR, emergency border circumstances exist when "encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 FR at 48711. Thus, an emergency border circumstance is a function of high levels of encounters combined with resource constraints that substantially limit DHS's ability to place eligible noncitizens into expedited removal, the primary consequence-delivery mechanism Congress has made available to the Departments for managing border encounters under title 8. *See id.* at 48714. When southern border encounters exceed DHS's ability to process noncitizens for expedited removal, DHS generally must release those noncitizens pending section 240 removal proceedings, a process that can take several years to conclude. *Id.* The comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against the irregular migration of noncitizens without strong claims for asylum, and

this disincentive is diminished when noncitizens are placed into section 240 removal proceedings, which may take several years to conclude.

Given the resources made available by Congress, the Departments determined that the daily encounter thresholds described in the June 3 Proclamation and this rule are a reasonable proxy for when such emergency border circumstances exist. *See* 89 FR at 48749–54. Specifically, when daily encounters average less than 1,500 for a sustained period, DHS anticipates that it "would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries." *Id.* at 48752. In contrast, when daily encounters exceed 2,500, "DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level." *Id.* For example, as noted in the IFR, during the FY 2013 to FY 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, an average of 210 individuals were released each day in months in which daily encounters were between 1,500 and 2,500, while approximately 1,300 individuals were released each day in months in which daily encounters exceeded 2,500, with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.* (footnote omitted). And as discussed below in Section III.D.1 of this preamble, the Departments' demonstrated capacity during the immediate post-pandemic period confirms that these thresholds reflect current operational capacity. If Congress provides significant additional resources, the Departments may then reevaluate whether the current thresholds still serve as a reasonable proxy for when such emergency border circumstances exist.

Relatedly, the Departments disagree with commenters' suggestion that it was arbitrary to rely on the United States' own processing capacity and challenges as a justification for the rule without any consideration of the capacities of other countries in the region to address heightened migration. The Departments acknowledge that since 2021, due to political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, which have severely strained the capacities of immigration systems in countries throughout the region. *See* 89 FR at 48722. The United States Government

has been working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[95] including by working closely with partner countries across the Western Hemisphere.[96] The Departments do not believe it would be appropriate to defer this rulemaking until foreign partners have developed enough capacity to absorb all irregular migrants, or to measure whether an emergency exists at the southern border by reference to whether such migrants have what commenters would view as sufficient opportunities to resettle elsewhere. Instead, the rule is part of the United States' efforts to act as a regional leader in responding to increased migratory flows. *See* Section III.E.1.a of this preamble. Moreover, the rule is structured to complement those regional efforts, as success in reducing push factors and in promoting alternatives to migration to the United States would contribute to decreasing encounter levels and alleviating emergency border circumstances. The rule permissibly responds to existing challenges at our southern border by providing effective safeguards that improve the Departments' ability to enforce the United States' immigration laws during periods of heightened migration by creating an incentive for noncitizens to use the lawful, safe, and orderly pathways that the Departments have put in place while simultaneously imposing swift consequences on those who do not have a legal basis to remain in the United States. *See* Section II.A.2 of this preamble. And this ability to impose consequences quickly, combined with a historic expansion of lawful pathways, is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. *See id.* at 48759–60.

The Departments further note that the United States Government is working with regional partners in a concerted and historic effort via the groundbreaking Los Angeles Declaration on Migration and Protection to address the shared challenge of irregular migration that has strained the resources

of countries throughout the region.[97] The United States has taken steps to address migratory flows throughout the region by encouraging foreign partners to increase their enforcement efforts, integrate migrants residing in their territories, expand lawful pathways and processes, and channel intending migrants into those pathways.[98] The United States is also working to address the root causes of migration, such as a lack of opportunity, poor government and corruption, crime, and violence in countries across the region and the world.[99] However, these measures will take time to have significant impacts and have not been in effect long enough to alleviate the stress that high encounters impose on the United States border security and immigration systems. *See id.* at 48727. In the face of these challenges to the United States' own border and immigration systems, however, the Departments believe that it is appropriate to act at the southern border while pursuing efforts to address the root causes of migration more broadly.

Second, the Departments disagree that, prior to implementation of the IFR, there had not been emergency circumstances at the southern border. During the immediate post-pandemic period, average daily encounters were at levels that significantly exceeded the Departments' capacity to impose consequences on most noncitizens who crossed irregularly at the southern border.[100] As the June 3 Proclamation explains, the border security and immigration systems are badly strained and have been for many years. 89 FR at 48490. DHS processing facilities frequently become overcrowded, forcing DHS to release into the United States noncitizens who could otherwise be

---

[95] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[96] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[97] *See* The White House, *Press Release: Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[98] *Id.*

[99] *See* Marcela X. Escobari, *FPC Briefing: Migration Policy and the Biden-Harris Administration's Root Cause Strategy* (June 22, 2023), *https://www.state.gov/briefings-foreign-press-centers/migration-policy-and-the-biden-harris-admins-root-causes-strategy; see also* The White House, *Fact Sheet: Strategy to Address the Root Causes of Migration in Central America* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-strategy-to-address-the-root-causes-of-migration-in-central-america/.*

[100] OHSS analysis of July 2024 OHSS Persist Dataset (Summary Statistics tab) (reflecting that average daily encounters were over 5,100 per day during the immediate post-pandemic period). From May 12, 2023 through June 4, 2024, USBP referred a daily average of about 860 individuals encountered at the SWB into the expedited removal process. *See id.* (Imm Post-Pandemic ERCF tab).

processed for expedited removal, and place them into section 240 removal proceedings, the resolution of which can take years given the pre-existing backlog. By the end of the first half of FY 2024, despite EOIR being on pace to complete a record number of cases during FY 2024 and DHS maximizing expedited removal as much as resources allow, EOIR had received over 1 million initial receipts, some of which could have been processed for expedited removal had there been sufficient resources to do so, increasing the pending caseload before EOIR to over 3.1 million cases.[101] The Departments believe that releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal. 88 FR at 31326. Moreover, maximizing credible fear screening capacity pulls resources away from USCIS processing cases in the affirmative asylum backlog, which had reached over 1.25 million cases as of the third quarter of FY 2024.[102] This vicious cycle is exactly the circumstance to which the rule is responding.[103] The decrease in encounter levels after December 2023 was not an indication that emergency border circumstances had abated or the IFR was not warranted, because encounters remained well above the daily encounter thresholds that, as described above, the Departments determined reflect the existence of emergency

border circumstances.[104] *See* 89 FR at 48752. That DHS had anticipated an increase in migration absent the IFR was not a concession that the rule was unnecessary. Rather, that projection reflected the urgent need to take immediate action, without which encounters would have increased, and the emergency border circumstances that existed at the time that the IFR was issued would have continued to worsen. *See* 89 FR at 48726. Given that daily encounters persistently remain above 1,500—and could rise above 1,500 again, even if they decline for a time—the IFR is currently and will remain an important policy tool.

Finally, the Departments disagree with one commenter's suggestion that the Departments are characterizing the situation at the southern border as an emergency to avoid complying with their legal obligations under the INA and certain court decisions. The commenter is incorrect because the rule is fully compliant with relevant provisions of the INA and applicable judicial decisions. For the reasons discussed in Section III.A.1 of this preamble, the rule is fully consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). Moreover, for the reasons discussed in Section III.C.1.a.i. of this preamble, the Departments also disagree that the rule conditions noncitizens' access to the credible fear process on the ability to obtain CBP One appointments in violation of section 235 of the INA, 8 U.S.C. 1225. Finally, for the reasons discussed in the IFR, *see* 89 FR at 48735–39, and Section III.A of this preamble, the Departments disagree with commenters' comparison between this rule and prior regulatory actions imposing a limitation on asylum eligibility that some courts have ruled unlawful.

*Comment:* Several commenters argued that the Departments justified the rule using mischaracterizations of asylum grant rates resulting from positive credible fear determinations. Commenters took issue with the Departments' reference to a "small proportion" of noncitizens in the credible fear process who are likely to

be granted asylum, stating that the Departments artificially deflated the grant rate by including cases where there was no decision on the merits— such as cases where the asylum application was withdrawn or not adjudicated, or the case was administratively closed—in calculating the proportion of cases where asylum was granted. Commenters argued that "'the majority of people who establish a credible fear of persecution are granted asylum' when their asylum claim is adjudicated," quoting a statistic claiming that 55 percent of noncitizens whose cases were decided on the basis of their asylum claim after a positive credible fear determination were ultimately granted asylum in FY 2022 and 2023.

Commenters said that the EOIR denial rate in cases originating from a credible fear claim is an unreliable indicator of meritless asylum claims because a denial could result from factors that have nothing to do with the underlying merits of the case, including: noncitizens' lack of timely access to counsel, translation issues, noncitizens' lack of familiarity with the statutory 1-year bar to filling an asylum application after entering the United States, and the significant discretion provided to IJs by law.

One commenter took issue with the Departments' claim that an increase in positive credible fear determinations was evidence that meritorious asylum claims were still making it through the initial screening process, saying that those subject to the Circumvention of Lawful Pathways rule's presumption of ineligibility for asylum are three times more likely to receive negative credible fear determinations than individuals not subject to the presumption. The commenter said it has documented examples of individuals subjected to the Circumvention of Lawful Pathways rule in expedited removal who were wrongfully ordered removed or refouled, outcomes that the commenter stated will only become more frequent under the IFR. The commenter concluded that the available evidence makes clear that many, if not most, people subject to the IFR will have plausible, or even grantable, claims for humanitarian relief.

A commenter alleged that the Departments' focus on the gap between historical credible fear interview screen-in rates and asylum grant rates is "willfully blind to reality." The commenter stated that the Departments "simply ignore the fact that," even before the IFR, such screen-in rates had declined dramatically, and that historical asylum grant rates were for a

---

[101] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*. Initial receipts equal removal, deportation, exclusions, asylum-only, and withholding only cases.

[102] USCIS, *Asylum Division Monthly Statistics Report: Fiscal Year 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx*.

[103] 89 FR at 48489 ("Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.").

[104] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Encounters FY2000–2024 tab). With the exception of the pandemic period (March 2020–May 2023), total SWB encounters for January 2024 and for FY 2024Q2 were the highest for the month of January and for Quarter 2 of the fiscal year since FY 2000, including over 4,000 average daily USBP encounters in January and nearly 5,000 in February (CBP SWB Encounter FY 2000–24 tab and Encounters FY2000–2024 tab). *See also* OHSS analysis of July 2024 OHSS Persist Dataset (USBP Encounters—Holiday Dip tab) (showing that encounters tend to dip immediately after each New Year before increasing again by the end of January).

population of people seeking asylum that, by the IFR's own admission, looked very different—and included many more single Mexican men seeking to work—than the current population of people seeking asylum. The commenter further objected that the Departments' focus on the gap between screen-in rates and merits rates ignores the fact that credible fear interviews are intended to be evaluated at a lower standard; according to the commenter, a screening interview is not, and cannot be, a merits adjudication.

*Response:* The Departments disagree that they have mischaracterized the data related to the percentage of EOIR asylum grants in cases originating from the credible fear process. The data consistently show that only a small percentage of cases referred for section 240 removal proceedings before EOIR after a credible fear determination ultimately result in a grant of asylum.[105]

In the IFR, the Departments noted that from FY 2014 through FY 2019, of the total SWB encounters with positive credible fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n. 219. The Departments included the underlying data in the IFR docket.[106] The Departments acknowledge that the denominator includes cases where there was no decision on the merits of the asylum claim, such as, for example, applications that were withdrawn or not adjudicated, or where the case was administratively closed, terminated, or dismissed.[107] The Departments disagree, however, that this approach is misleading. The cited statistic demonstrates that the number of noncitizens who are placed in section 240 removal proceedings after the expedited removal process greatly exceeds the number of noncitizens who are ultimately granted relief or protection. Even if one excludes cases involving termination, dismissal, or administrative closure as well as in absentia removal orders, DHS and EOIR data show that from 2014 through 2019, of the total SWB encounters referred to EOIR after being processed for expedited removal, only 33 percent of EOIR case completions ultimately resulted in a grant of relief on the merits.[108] The rate increases slightly to 36 percent if the ''relief rate'' is defined as all EOIR findings of non-removability and grants of asylum, statutory withholding of removal, CAT protection, cancellation of removal, and adjustment of status, divided by the sum of those grants and removal orders not issued in absentia.[109] Whether one uses the 18 percent, 33 percent, or 36 percent figure, the data demonstrate that historically there is a significant disparity between positive credible fear findings and ultimate grants of relief in section 240 removal proceedings.[110]

The Departments disagree with the statistical approach presented by at least one commenter who claimed that the majority of people (55 percent in FY 2023 and 2024) who establish a credible fear are ultimately granted asylum when their asylum claim is adjudicated. The commenter seems to have arrived at this statistic by dividing the number of asylum grants by the total number of grants and denials from a chart provided on EOIR's website.[111] But the EOIR chart also demonstrates that a large percentage of completed cases resulting from a positive credible fear determination involve noncitizens who never filed asylum applications once placed in section 240 removal proceedings or who abandoned or withdrew their applications.[112] The Departments believe that it is inaccurate to exclude these cases in assessing the disparity between positive credible fear findings and ultimate relief because the noncitizens in these cases did not actually pursue an asylum claim during section 240 removal proceedings even though the opportunity to pursue such a claim was the sole reason they were placed in section 240 removal proceedings rather than being removed on an expedited removal order. Instead,

relying on the most recent version of the EOIR chart cited by the commenter, if one includes these cases, which are numerous, in the denominator (and excludes cases where the asylum application was not adjudicated or the case was administratively closed), the ultimate grant rates for cases reflect a much smaller percentage than commenter's representation of the ultimate asylum grant rate. As EOIR's adjudication statistics reflect, the asylum grant rates of cases completed by EOIR in FYs 2022 and 2023 that originated with a credible fear claim were just 23 percent and 18 percent, respectively.[113]

The Departments cited these data to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings, which can take years to resolve. *See* 89 FR at 48743 n.219 (noting that from FY 2014 through FY 2019, of the total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief). That reality, as well as the length of time it can take before a removal takes place after a removal order is final, creates a strong incentive for some number of migrants without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. And that risk is magnified by Congress's failure to provide the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during periods of high encounters. The rule's limitation on asylum eligibility is intended in part to reduce this incentive and encourage migrants with meritorious asylum claims to use the lawful, safe, and orderly pathways that the United States Government has provided. *See* 89 FR at 48732.

Regarding commenters' concerns that the data cited include noncitizens whose asylum applications may have been denied for reasons unrelated to the meritoriousness of their underlying claim—such as noncitizens' lack of access to counsel, translation issues, noncitizens' lack of knowledge about the one-year bar, and IJ discretion—the Departments disagree that these potential issues would undermine the Departments' reliance on DHS and EOIR

---

[105] *See, e.g.,* EOIR, Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results Tab)

[106] *See* OHSS Data Spreadsheet Data for Securing the Border IFR, tab 219 (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

[107] *See id.; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[108] Relief on merits rate is defined as EOIR grants of asylum, conditional grants of asylum, or adjustment of status under statutory provisions divided by the sum of those grants of relief plus removal orders not issued in absentia. OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[109] *See id.*

[110] *See id.*

[111] *See* Human Rights First, Correcting the Record: The Reality of U.S. Asylum Process and Outcomes (Nov. 2023) *https://humanrightsfirst.org/wp-content/uploads/2023/11/US-Asylum-process-and-outcomes-Fact-Sheet_Nov-2023.pdf* [citing EOIR, *Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 12, 2023), *https://www.justice.gov/eoir/page/file/1062976/download*].

[112] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline* (last visited Sept. 2, 2024).

[113] *See id.*

data to demonstrate the disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. The factors cited by commenters exist in the absence of the rule and are not impacted by the rule. Furthermore, the Departments' procedures aimed at mitigating these concerns remain unchanged and are expected to continue mitigating those concerns. For example, all AOs are trained to elicit testimony and, even with this rule's changes to the credible fear screening process, the type of information sought to be elicited during a credible fear interview and IJ review is generally well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. *See* Section III.B.2.a.ii of this preamble. USCIS also has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures to address interpretation and rare language issues. *See* 8 CFR 208.30(d)(5). Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[114] Those long existing procedures remain in place under this rule. Nor have any of the procedural requirements for filing an asylum application changed, including the requirement that noncitizens must generally file their application within one year of their arrival in the United States, *see* section 208(a)(2)(B) of the INA, 8 U.S.C. 1158(a)(2)(B), and must show that they should be granted relief in the exercise of discretion. *See Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.").

The Departments agree that credible fear screenings are not meant to mirror ultimate merits adjudications and that, by design, these screenings will result in some noncitizens being screened in who ultimately are not granted asylum or protection. However, the number of noncitizens who are granted asylum or other protection following a screening necessarily reflects the effectiveness of those screenings; the gap between the screen-in rate and the rate of those granted asylum or other protection matters. With a screening standard that is more likely to identify meritorious claims, the Departments expect to see a

higher share of screened in noncitizens ultimately granted relief or protection. While a credible fear screening in the expedited removal process takes place shortly after entry into the United States, the ultimate adjudication of an asylum (or other protection) claim may be months or years later. The outcome of the screening compared with the outcome of the asylum application's ultimate adjudication on the merits is an important measure of the credible fear interview's effectiveness at ensuring that meritorious asylum claims proceed in the application process because only cases that could be viable should continue on in the process.

Finally, the Departments acknowledge that, as with all screening mechanisms, there is some risk under the rule that a meritorious case might not proceed to a credible fear screening or a merits adjudication. The Departments believe that during emergency border circumstances, the rule's provisions strike an appropriate balance, and that the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures, as discussed in more detail in Section III.C.3 of this preamble. The Departments reiterate that nothing in this rule prevents a noncitizen from raising a fear claim. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. For the reasons discussed in Section III.C.2 of this preamble, DHS believes that the manifestation standard will continue to provide noncitizens with an adequate opportunity to seek relief and protection in the United States. Moreover, under the rule, those referred for a credible fear screening will continue to have an opportunity to have their claims assessed by an AO in a non-adversarial interview and will be able to seek IJ review of the AO's decision. Although many noncitizens may be subject to the limitation on asylum eligibility under this rule, during the credible fear interview and IJ review (if elected), they will still be screened for potential eligibility for statutory withholding of removal and CAT protection. In sum, as explained in the IFR, the Departments expect that these provisions will continue to produce accurate outcomes, although the Departments believe that the rule continues to be necessary and appropriate to address emergency

border circumstances even if this expectation turns out to be misplaced in close cases. 89 FR at 48750 n.250.

Indeed, as discussed in Section II.A.2 of this preamble, the Departments believe that the IFR is working to reduce the gap between high rates of referrals and screen-ins and the historically low percentage of those who are ultimately granted protection or relief, while still providing noncitizens with opportunities to raise and have their claims considered. The Departments believe that the difference between the positive credible fear rate during the pre-pandemic period and the rate under the IFR is attributable to the rule's limitation on asylum eligibility and the higher "reasonable probability" screening standard for statutory withholding of removal and CAT claims, which, as the Departments explained in the IFR, is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

*Comment:* At least one commenter argued that the IFR is arbitrary and capricious because the Departments impermissibly use the availability of pathways not related to asylum or humanitarian relief as justification for reducing asylum access. The commenter stated that the availability of lawful pathways is not a factor that Congress intended the agencies to consider as a basis for limiting asylum.

*Response:* The Departments disagree with the assertion that the rule impermissibly relies on the availability of lawful, safe, and orderly pathways to reduce access to asylum. As an initial matter, the Departments note that the primary purpose of the rule's temporary limitation on asylum eligibility is to reduce the daily number of entrants by discouraging irregular migration during periods when the border security and immigration systems are over capacity and unable to effectively process noncitizens through expedited removal. *See* 89 FR at 48731–32. Because section 3(b)(v)(D) of the Proclamation contains an exception for arrivals at the SWB under a process approved by the Secretary, and because this rule's limitation on asylum eligibility excepts those who are described in section 3(b) of the Proclamation, the limitation will also not apply to such arrivals. *See id.* at 48754. In this way, the Proclamation

---

[114] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court 1–2* (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

and the rule continue to maintain incentives for noncitizens seeking protection to use the safe, lawful, and orderly process that the United States has provided. *See id.* at 48730–31 (stating that "applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with"); *see also id.* at 48754 (explaining that the rule "provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways"). Indeed, the use of such pathways and tools to access those pathways, like the CBP One app, is critical for promoting efficient border processing especially during emergency border circumstances. *See id.* at 48737 ("During emergency border circumstances [the] use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources." (citations omitted)); *see also* 88 FR at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). However, contrary to the commenter's claim, the rule does not impose a limitation on asylum eligibility based solely on the availability of such pathways. Rather, the rule's limitation applies to noncitizens who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. *See* 8 CFR 208.13(b), 208.35(a), 1208.13(g), 1208.35(a). And even during these situations, the rule provides an exception for noncitizens (including those who do not use the lawful, safe, and orderly pathways) who demonstrate exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).

In any event, Congress did not preclude the Departments from considering a noncitizen's use of lawful pathways and processes as a factor when establishing conditions and limitations on asylum. As described in Section III.A.1.a of this preamble, in *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for discretionary asylum determinations, 19 I&N Dec. at 472–73, and this rule merely takes such circumvention into account to determine eligibility. And exactly how much weight to put on that factor and whether to do so in weighing asylum eligibility falls well within the broad discretion conferred by section

208 of the INA, 8 U.S.C. 1158, including section 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). For the reasons discussed in Section III.A.1 of this preamble and in the IFR, *see* 89 FR at 48733–38, this rule's limitation on asylum eligibility is consistent with the statute, a proper exercise of the Departments' authority, and distinguishable from the prior regulations that some courts have found invalid.

*Comment:* One commenter disagreed with the Departments' assertion that the IFR will undermine TCOs' ability to incentivize migrants to utilize irregular migration methods. The commenter argued that the IFR will instead have the opposite effect of forcing many migrants to use irregular routes, thus strengthening the organized smuggling operations and TCOs the agencies seek to combat. The commenter also argued that the IFR makes the "bizarre assertion that *new* measures punishing vulnerable people are necessary because" smuggling operations have ways to avoid existing asylum restrictions.

*Response:* The Departments disagree that the IFR will incentivize irregular migration and thereby strengthen organized smuggling operations and TCOs. The IFR has enhanced the disincentives to crossing irregularly, reducing the overall number of encounters between POEs. Through August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and the IFR have fallen 59 percent from the level of average daily encounters during the "immediate post-pandemic period," *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before the IFR entered into effect on June 5, 2024.[115] This rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The procedures in place before the publication of the IFR resulted in the release of a high proportion of migrants into the United States to await section 240 removal proceedings, creating a vicious cycle in which exploitative smuggling networks could effectively advertise that border crossers were likely to remain in the United States

upon arrival, encouraging higher encounter numbers, which in turn led to more releases. *See* 89 FR at 48714–15. This created a situation in which large numbers of migrants—regardless of their ultimate likelihood of success on an asylum or protection application—were subject to exploitation and risks to their lives by the networks that drove their movements north. *See id.* In contrast, the Departments believe that the reduction in migration resulting from this rule will, over time, weaken the TCOs that prey on migrants for profit by starving such TCOs of funding.

The IFR does not "punish[ ] vulnerable people," as the commenter alleges. The Departments explained that although heightened enforcement efforts by the United States and Mexico helped to mitigate very high levels of irregular migration, "[s]muggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes [in enforcement efforts] are not enough— and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs." 89 FR at 48726. The Departments further stated that "[w]ithout the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States." *Id.*

The rule is consistent with concern for vulnerable people and the Departments' operational capacity to administer and enforce the immigration laws. As a means of preventing migrants from falling prey to smuggling and other criminal organizations, the Departments have discouraged attempts to enter the United States without inspection while increasing the availability of lawful pathways. The limitation on asylum eligibility contained in the rule undercuts claims made to migrants by TCOs and smugglers that simply arriving at the border will result in them being released into the United States. Additionally, the Departments believe that increasing the availability of lawful pathways for migration helps discourage attempts to enter the United States without inspection by providing individuals with options that do not involve putting their lives in the hands of smugglers. The Departments believe that this balanced approach—expanded lawful pathways to enter the United

---

[115] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab). There were, on average, 2,077 encounters per day (including all demographic groups) between POEs at the SWB from June 5 through August 31, 2024, compared to 5,119 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

States, coupled with conditions on asylum eligibility for those who fail to exercise those pathways and the swift imposition of immigration consequences when individuals do not establish a legal basis to remain in the United States—will continue to decrease attempts to irregularly enter the United States, and thereby reduce reliance on smugglers and human traffickers.

*Comment:* A commenter argued that the IFR fails to account for the effect of existing and contemporaneously promulgated policies, such as EOIR's "recent arrivals docket."

*Response:* The IFR is one of several tools that the Departments employ to encourage the use of safe, orderly, and lawful processes for accessing the border and to maintain a manageable operational capacity to adequately deliver timely decisions and consequences to noncitizens encountered at the southern border who do not establish a legal basis to remain. The Departments are not aware of any evidence that the recent arrivals docket or any other recent procedural changes in case processing could have, on their own, addressed the record high levels of migration that the Departments have contended with in recent years. Such changes offer important efficiency benefits but by themselves do not adequately address problems such as the large number of non-meritorious claims for asylum and related protection.

For example, as the Departments announced on May 16, 2024, the recent arrivals docket applies to certain noncitizen single adults.[116] For cases on the recent arrivals docket, IJs will generally aim to render a final decision within 180 days, which is substantially longer than the expedited removal process.[117] The recent arrivals docket

provides efficient case processing procedures for removal proceedings, which are, as a general matter, designed to be more comprehensive proceedings for the full adjudication of claims,[118] as compared with expedited removal, which is designed to quickly screen out those who cannot demonstrate a sufficient likelihood of ultimate success on the merits. Thus, the recent arrivals docket is not as efficient as either expedited removal proceedings generally or expedited removal proceedings undertaken pursuant to this rule. Accordingly, the recent arrivals docket is best considered as a complementary measure to this rule for those who are not subject to or cannot be processed under expedited removal despite the resource-saving measures laid out in this rule. Similarly, while the Departments are constantly making efforts to maximize the efficiency of their procedures, all such changes are inadequate, on their own, to accommodate the high volumes of encounters that make this rule necessary.

*Comment:* Citing 89 FR at 48724 nn.99–100 as an example, a commenter objected that the Departments' reliance on an undisclosed data analysis with unknown assumptions as a basis for projecting future trends is arbitrary.

*Response:* The Departments included in the rulemaking docket extensive data supporting the IFR, including an explanation of assumptions underlying certain projections.[119] As DHS explained in the IFR, the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. *See* 89 FR at 48727 n.127. The period leading up to the IFR

was characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.*, the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *Id.* Nonetheless, the Departments included ample basis for their assessment that the IFR was needed and did not rely exclusively on internal projections as a basis for the rule. *See, e.g.,* 89 FR at 48726 (explaining that "between January and April, 2024, [UNCHR] tracked 139,000 irregular entries [through the Darién jungle], up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022," and that "[p]ast unprecedented migration surges [described in the IFR] bolster . . . the need for this rulemaking"). Further, the Departments note that they are including in the docket extensive data supporting this final rule, including data related to the impact of the IFR, the changes made in this final rule, and the request for comment discussed in Section IV of this preamble, as well as detailed explanations of certain projections.

### b. Lack of Resources Does Not Justify the Rule

*Comment:* Some commenters stated that the Departments' justification of the IFR based on the lack of resources and congressional funding needed to effectively and efficiently meet process demands for migrants and those in the U.S. asylum process is not a valid basis for the Departments' purportedly disregarding their legal obligations to migrants when managing asylum claims and upending the asylum system. A commenter similarly stated that resource constraints should have no relationship to the treatment of newly arriving migrants whose right to remain has not yet been assessed.

Another commenter said that the IFR is arbitrary and capricious because, while the agencies argue that the IFR is required because of a lack of funding, they provided no analysis to justify that conclusion. The commenter stated that the primary reason USCIS lacks enough AOs is that USCIS faces challenges with hiring and retention. The commenter stated that the agency underpays officers, forces them to work 60-hour weeks, and routinely requires them to apply new and illegal requirements in credible fear interviews, all while ignoring their primary duty of

---

[116] Press Release, *DHS, DHS and DOJ Announce "Recent Arrivals" Docket Process for More Efficient Immigration Hearings* (May 16, 2024), *https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration* ("Recent Arrivals Docket Announcement").

[117] Credible fear interviews generally take place close in time to when a noncitizen arrives in the United States. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i) (providing that AOs "shall conduct interviews" of noncitizens who indicate either an intention to apply for asylum or a fear of persecution "at a port of entry or at such other place designated by the Attorney General"). If the noncitizen is not found to have a credible fear, the noncitizen may request review by an IJ, but such review must take place "in no case later than 7 days after the date" of the AO's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). DHS data show a median processing time from credible fear referral to result of 8 days in the pre-pandemic period; 17 days during the pandemic period; 12 days during the immediate post-

pandemic period; and 5 days during the IFR period. *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[118] Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: the rights to representation at no expense to the Government, to a reasonable opportunity to examine and present evidence, and to cross-examine witnesses, INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)-(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the Board of Immigration Appeals ("BIA"), 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of certain decisions in the appropriate U.S. Court of Appeals, *see generally* INA 242, 8 U.S.C. 1252. For these reasons, the completion goals for cases on the recent arrivals docket remain subject to case-specific circumstances and procedural protections, including allowing time for noncitizens to seek representation where needed. *See* Recent Arrivals Docket Announcement.

[119] *See* OHSS Data Spreadsheet, *Data for Securing the Border IFR* (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

conducting asylum adjudications. The commenter stated that CBP has the ability under current resources to greatly expand its capacity at POEs, but that CBP and DHS simply refuse to take that step. Another commenter similarly said that the IFR repeatedly invokes resource constraints as the reason to deny access to asylum, yet CBP is the nation's largest Federal law enforcement agency, and it has "seriously understated" its processing capacity in the past. A few commenters said that real solutions to alleviate conditions at the southern border include operational efficiency, better resource allocation, and increasing resources to meet demand and fairly process applications.

One commenter said the rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Further, this commenter wrote that, without any monitoring of the consequences of removal, it is unclear if the IFR's supposed efficiency is in the best interests of the United States, which include a commitment to upholding human rights and providing humanitarian aid.

*Response:* With respect to the claim that the rule's reliance on resource and funding constraints and efficiency concerns are impermissible bases to disregard legal obligations to migrants seeking asylum and protection, the Departments first reiterate that the rule does not violate any legal obligations to migrants, as explained in Section III.A.1 of this preamble and in the IFR. *See* 89 FR at 48733–39. This rule is consistent with U.S. domestic law and with the United States's treaty obligations. The United States implements its non-refoulement obligations through statutory withholding of removal and CAT protection. Even when the threshold for emergency border circumstances has been reached, these forms of protection remain available. From June 5, 2024, through August 31, 2024, 27 percent of those encountered between ports of entry at the SWB and placed into expedited removal were referred for a credible fear interview, and over half of individuals referred for credible fear interviews under the IFR have ultimately been screened in.[120] Those who have not received such determinations have either been determined to have not manifested a fear of removal or have been determined to have not shown a significant possibility that they could ultimately demonstrate by a preponderance of the

evidence eligibility for asylum in light of the rule's limitation on asylum eligibility or a reasonable probability of persecution or torture.

In addition, the Departments disagree with commenters' assertion that it is impermissible to consider resource constraints and lack of funding as supporting the need for the IFR and this rule. Congress provided the Departments with broad discretionary authority under section 208 of the INA, 8 U.S.C. 1158, including expressly conferring discretion to impose limitations on asylum eligibility. INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B). Nothing in the INA explicitly or implicitly forecloses the Departments from considering the impact of resource constraints when exercising their discretionary authorities. For this reason, as explained in Section II.A.1 of this preamble and in the IFR, *see* 89 FR at 48731–49, the rule's changes to certain expedited removal procedures and the credible fear process are a lawful exercise of the Departments' authorities and are consistent with the INA.

Indeed, resources and funding cannot be separated from the safe, effective, and humane enforcement and administration of our immigration laws. The Departments can only function with the resources provided to them by Congress. While the Departments carefully utilize the resources that they are given, they are inadequate in the face of substantial and unprecedented global migration. As explained in the IFR, these constraints prevent the border and immigration systems from properly functioning to provide timely relief for those who warrant it and timely consequences for those without a legal basis to remain when encounters reach the thresholds identified in the rule. *See* 89 FR at 48730 (discussing the impact of resource limitations); *see also id.* at 48752 (explaining that "[g]iven current resources[] . . . there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold").

The rule is carefully tailored to address these challenges and is therefore a reasonable exercise of the Departments' discretionary authorities. By shifting to a manifestation standard for fear claims, and heightening the screening standard for withholding and CAT protection, DHS will be able to devote more of its limited resources to more effectively and quickly processing migrants, and the Departments will be able to focus on those claims that are more likely to have merit. *See id.* at 48744–45. The limitation on asylum

eligibility disincentivizes attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to address claims of fear raised by individuals who do not fall within the exception to the limitation. *See* 89 FR at 48731–33. At the same time, the rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action: It includes an exception for exceptionally compelling circumstances, including for noncitizens (or members of their families with whom they are traveling) who experience an acute medical emergency, face an imminent and extreme threat to life or safety, or are a "victim of a severe form of trafficking in persons." *See* 89 FR at 48732–33. And those referred to the credible fear process will continue to be screened for potential eligibility for statutory withholding of removal and protection under the CAT. Thus, the rule allows the Departments to use their limited resources more effectively to administer and enforce the nation's immigration laws, while also reducing incentives for migrants to make the dangerous journey to the southern border in the hope that the overwhelmed and under-resourced immigration system will not be able to expeditiously process them for removal. In sum, the rule is needed to support the effective "operation of the immigration system" during emergency border circumstances. *Judulang* v. *Holder,* 565 U.S. 42, 55 (2011).

Contrary to commenters' claim, the IFR fully explains the funding shortfall facing the Departments and how it has severely impacted their abilities to effectively and efficiently process noncitizens at the southern border and deliver timely decisions and consequences to those without a legal basis to remain. *See* 89 FR at 48728–30. Under current appropriations, DHS will, at best, be able only to sustain most of its current operations and will not be able to expand capacity along the southern border or increase its ability to deliver consequences through referrals into expedited removal. *See id.* at 48729. Because of the funding shortfall, in the circumstances in which the measures enacted by this rule apply, DHS simply lacks sufficient personnel and facility resources to safely detain a majority of border crossers for the time needed to complete the expedited removal process, which forces DHS to release noncitizens pending prolonged processing pathways outside of expedited removal. *See id.* at 48752. This renders DHS unable to swiftly process migrants and impose

---

[120] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab and IFR ERCF tab).

consequences on those who fail to establish a legal basis to remain in the United States, which in turn leads to higher encounter rates. *See id.*

These resource constraints are not unique to front-line officials. In recent years, EOIR adjudicators have completed a record number of cases.[121] However, the drastic increase in the number of newly initiated cases—composed in large part of cases that could have been processed through expedited removal if DHS resources allowed, *id.* at 48751 ("Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[.]")—has significantly outpaced even these record numbers of case completions, thus increasing the pending caseload before EOIR.[122]

Similarly, USCIS has experienced a dramatic increase in credible fear referrals. USCIS received an estimated 137,000 credible fear referrals resulting from SWB encounters in FY 2023, up from an average of about 52,000 from 2010 to 2019 and an average of about 5,700 from 2005 to 2009.[123] However, as the Departments explained in the IFR, USCIS does not have enough AOs to keep pace with the number of noncitizens who could be referred for credible fear interviews, much less keep pace with new affirmative asylum receipts or the existing affirmative backlog. 89 FR at 48730. The USCIS affirmative asylum application backlog has reached over 1.25 million cases.[124] Despite its growing affirmative asylum backlog, USCIS must continue to assign AOs to certain caseloads (some of which are included in the affirmative asylum backlog and some of which are not) that must be staffed to meet processing time frames established by statute, regulation, settlement agreement, court order, or litigation need, including: reasonable fear screenings; Operation Allies Welcome affirmative asylum cases; affirmative asylum cases subject to litigation; and Safe Third Country Agreement screenings. With a focus on

credible fear screenings and while having to address the required caseloads mentioned above, AOs are unavailable to fully support efforts to reduce the affirmative asylum backlog. If there is a surge in credible fear referrals, USCIS would be forced to detail and train additional staff from other parts of the agency, further affecting the overall immigration system.

USCIS has filled 850 out of 1,011 available AO positions as of August 15, 2024. USCIS is working diligently to avoid a gap between the number of AOs on board and the number of available positions, but some gap in these numbers persists, in part due to the time it takes to hire and receive security clearances for individuals to come on board as AOs. As of August 15, 2024, USCIS has a total of approximately 702 permanent AOs fully trained and certified to complete its workloads, including credible fear screening, reasonable fear screening, and affirmative asylum adjudication. Given that the ebb and flow of hiring and the number of credible fear referrals prior to the implementation of the IFR required far more officers to maintain pace, USCIS has trained staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). As of August 15, 2024, USCIS had a total of 807 credible fear trained AOs (702 permanent staff and 105 detailees, who are trained to conduct credible fear screenings only). Given the need to address the Departments' various required workloads mentioned above, 511 AOs are currently assigned to work exclusively on credible fear cases. With this number of available AOs and accounting for some fluctuation, USCIS can generally complete credible fear determinations for an average of 650 individuals daily Monday through Friday and an average of 200 individuals daily on Saturday and Sunday. Workload priorities related to border enforcement, statutory requirements, and litigation obligations, along with insufficient resourcing allocations from Congress, continue to affect USCIS's ability to staff at appropriate levels. Accordingly, these funding shortfalls, combined with high encounter levels at the southern border, necessitate this rule's limitation on asylum eligibility and its changes to the credible fear referral process and screening standard for statutory withholding of removal and CAT protection to ensure the Departments are able to deliver timely decisions and

consequences using the resources provided. *See* 89 FR at 48729–31.

DHS disagrees with the claim that USCIS's resource challenges are due to hiring and staff retention problems caused by working conditions and underpay, rather than Congress's failure to provide the agency with sufficient resources. Resource challenges at USCIS are not a novel issue. Nearly 96 percent of USCIS's funding is from filing fees, not from congressional appropriations. Fees for adjudication and naturalization services are set at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." INA 286(m), 8 U.S.C. 1356(m). On April 1, 2024, DHS implemented a new fee schedule for USCIS-processed immigration benefits, which will generate approximately an additional $1 billion annually; the schedule includes a new asylum program surcharge for employment-based petitioners. 89 FR 6194, 6205, 6391 (Jan. 31, 2024). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[125] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[126] As DHS explained in proposing the new fee schedule, the new fee schedule was created based on historical data and the additional funding provided by the new fee schedule may not be sufficient to cover the increased costs of the asylum program, including credible fear processing, if encounters exceed historic rates. 88 FR 402, 432–38 (Jan. 4, 2023). Even with the very limited appropriations provided by Congress to USCIS, the President's budget requests demonstrate the need to supplement USCIS's ability to address credible fear screenings. The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000

---

[121] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline; see also* 89 FR at 48751 (noting that due to its resource constraints, "the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[]" (footnote omitted)).

[122] *Id.*

[123] *See* OHSS analysis of Asylum Pre-Screening Officer ("APSO") Global and OHSS Persist Datasets current as of June 30, 2024 (Historic CFIs tab).

[124] USCIS, *Asylum Division Monthly Statistics Report. Fiscal Year 2024. June 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[125] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[126] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

**81188**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

credible fear determinations.[127] A supplemental request in October 2023 sought congressional funding for 1,600 AOs.[128] Congress failed to provide resources to address credible fear screenings with respect to these appropriation requests. Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget [129] would impose a burden on other filers. *See* 89 FR at 48729. USCIS takes workforce retention seriously, but any concern about pay, hours, or workload does not obviate the systemic obstacles in running an underfunded program with limited resources.

With regard to the specific comments regarding CBP's ability and capacity to process noncitizens at POEs on the SWB, DHS disagrees that it has the resources to meaningfully expand that capacity under current conditions. CBP has finite resources available at POEs, all of which must be distributed both to processing of noncitizens and to implementing CBP's other priority missions, including facilitating lawful trade and travel and protecting national security interests.[130] That said, CBP has taken steps to increase the number of noncitizens processed at POEs, including through tools such as the CBP One app, which has helped CBP to maximize its limited resources as it permits noncitizens to pre-schedule appointments and mitigates long waiting times at POEs.[131] The

Departments welcome additional resources from Congress, but must respond to emergency border circumstances with the resources currently available.[132]

Finally, the Departments disagree that this rule is motivated by a concern that too many people are seeking asylum. The rule is intended to address the very high levels of irregular migration that the Departments have recently observed, without discouraging those with valid claims from applying for asylum or other protection. By managing flows more effectively, the rule will help ensure the continued effective, humane, and efficient processing of migrants who arrive at the southern border during emergency border circumstances.

Moreover, the Departments disagree with the suggestion that the rule is not in the best interests of the United States. On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. 89 FR at 48490–91. The Departments determined that the IFR was necessary to respond to the emergency border circumstances discussed in the Proclamation. *Id.* at 48715. Exercising their authorities, including under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Secretary and the Attorney General determined that during emergency border circumstances, it is in the "best interests of the country . . . to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing of noncitizens who do not enter in violation of it." *Id.* at 48737 (alteration, citation, and internal quotation marks omitted). At this time, the Secretary and

people daily. *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

the Attorney General continue to believe that this rule's limitation on asylum eligibility is in the best interests of the United States and that it should continue to apply, while encounter levels remain above the thresholds in the rule (*i.e.*, during emergency border circumstances), to noncitizens who enter across the southern border and who are not described in section 3(b) of the Proclamation, unless such noncitizens demonstrate that exceptionally compelling circumstances exist.

The Departments further disagree with the assertion of commenters that, without monitoring the consequences of removal, it is unclear if the IFR's improvement to systemic efficiency is in the best interests of the United States. The Departments believe that the present rulemaking strikes the appropriate balance between facilitating efficiency during times when emergency border circumstances are present and upholding the commitment of the United States to protecting human rights and honoring its non-refoulement obligations. Indeed, the credible fear screening process itself is designed to make a case-by-case determination related to the consequences of removal and whether those potential consequences warrant allowing a noncitizen to remain in the United States to pursue an asylum or related protection claim. While it is not feasible for the United States to monitor the exact consequences of removal in every individual case, AOs and IJs routinely use country conditions information, including Department of State Country Reports on Human Rights Practices, to inform their evaluation of potential consequences of removal as part of the credible fear determination, as part of their statutory obligation to consider "such other facts as are known" to them in the credible fear of persecution determination (INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)); likewise, they are required by regulation to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "any other relevant information regarding conditions in the country of removal" in any evaluation of protection under the CAT, 8 CFR 208.16(c)(3)(iii)–(iv).[133] The

---

[127] *See* DHS, *FY 2024 Budget-in-Brief* 74 (2024), *https://www.dhs.gov/publication/fy-2024-budget-brief* (last visited Sep. 3, 2024).

[128] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[129] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/*.

[130] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land*.

[131] *Id.* During the pre-pandemic period, CBP's Office of Field Operations ("OFO") processed around 330 people per day. From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed approximately four-and-a-half times that number of

[132] *See* Letter for the Hon. Patrick McHenry, Speaker Pro Tempore of the U.S. House of Representatives, from Shalanda D. Young, Dir., Off. of Mgmt. & Budget, *Re: Critical National Security Funding Needs for FY 2024* (Oct. 20, 2023), *https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/* ("This request includes resources for an additional 1,300 border patrol agents to work alongside the 20,200 agents already funded in the FY2024 Budget; 375 immigration judge teams to strengthen the immigration court system—the largest incremental request ever; [and] 1,600 asylum officers to speed up processing of asylum claims[.]").

[133] USCIS RAIO Directorate, *Officer Training: Credible Fear of Persecution and Torture Determinations* 19–20 (May 9, 2024) ("Additionally, pursuant to the statutory definition of 'credible fear of persecution,' the asylum officer must take account of 'such other facts as are known to the officer.' Such 'other facts' include relevant country conditions information. Similarly, country conditions information should be considered when evaluating a credible fear of torture. The Convention Against Torture and implementing

CHNV-FRN-00416

present rulemaking does not change the types of evidence AOs and IJs rely on, such as human rights monitoring reports relating to the potential consequences of removal to a particular country, in making credible fear determinations at the higher "reasonable probability" of persecution or torture standard.

c. Rule Does Not Acknowledge Factors Contributing to Migration

*Comment:* Some commenters argued that the Departments failed to analyze to what extent migration patterns are shaped by U.S. immigration enforcement system incentive structures relative to other factors, such as the many reasons people are forced to flee their homes.

These commenters disagreed with what they characterized as the Departments' decision to impose further consequences on individuals seeking protection. Some commenters argued that many factors contribute to the number of border encounters, including dire conditions in migrants' countries of origin and their personal circumstances, and that while the IFR acknowledges that various push factors such as violence, persecution, poverty, human rights abuses, climate change, and others contribute to current migratory patterns, it does not fully engage with them and instead "assumes, without foundation, that the perceived incentives, responsive to U.S. enforcement measures, single-handedly shape migration patterns," despite ample United States Government and academic analyses that demonstrate that U.S. enforcement measures are only one of several factors informing patterns of migration.

Similarly, another commenter stated that, although the IFR asserts that insufficient enforcement leads to high encounter levels, it is more plausible that the world is experiencing high levels of displacement and international migration and that the United States is a desirable destination for migrants. The commenter added that such global pressures would be more productively met with policies that directly address the desire, ability, and opportunities for people to migrate, rather than imposing harsher enforcement.

*Response:* The Departments agree that many factors that are outside the U.S. Government's control influence migration patterns, including push factors. The Departments have never

asserted that U.S. enforcement measures singlehandedly shape migration patterns. Economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. 88 FR at 11704. However, the effects of these factors and U.S. immigration enforcement are complementary to each other. They can both simultaneously and separately influence migrants' decisions regarding when, how, and where to migrate. The Departments believe that ensuring the timely enforcement of consequences for noncitizens who enter the United States irregularly without a legal basis to remain in the United States is a powerful tool for addressing the situation at the southern border, particularly when combined with the expanded availability of lawful pathways. This view is supported by the success of the IFR in reducing levels of irregular migration as further discussed in Section II.A.2 of this preamble. Timely enforcement of consequences is but one approach to respond to the specific issue of incentivizing the use of lawful, safe, and orderly pathways and disincentivizing migrants from utilizing dangerous, irregular migration routes along the southern border. This rule was designed to address encounters on our SWB, not to singlehandedly reshape migration patterns throughout the region.

d. Other Comments Related to the Departments' Justification

*Comment:* Commenters suggested that high encounter levels are due to the Biden Administration's border security and immigration regulatory and policy efforts. One commenter disagreed with the Departments' assigning blame for the border crisis to Congress's failure to appropriate additional funding to the Departments, instead stating that it is the Administration's consistent "abdication of border security and immigration enforcement[]" that has resulted in the sustained high rate of encounters since 2021. The commenter said DHS must implement additional deterrence policies to discourage "illegal immigration" across the SWB.

*Response:* The Departments disagree that the Administration's regulatory and policy efforts have led to the emergency border circumstances. Rather, the Departments believe that the COVID–19 global pandemic upended travel throughout the world, forcing many noncitizens to delay their journeys to the United States. This was further exacerbated by the implementation of the Title 42 public health Order, which quickly expelled noncitizens who were

crossing the border back into Mexico without applying an immigration consequence. *See* 88 FR at 31335 (discussing lack of immigration consequences associated with expulsions under the Title 42 public health Order). These factors contributed greatly to the significant surge in migration immediately following the end of the COVID–19 pandemic period. Since 2021, the United States Government has taken a series of significant steps to strengthen consequences for irregular entry at the southern border in response to record levels of encounters there. The Circumvention of Lawful Pathways rule created disincentives for irregular border crossings and is a critical component of the Government's regional strategy. DHS also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful, safe, and orderly pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal.[134] In the immediate post-pandemic period, DHS maximized the use of expedited removal given its limited resources, placing an average of 900 individuals encountered between POEs at the SWB into the process each day between May 12, 2023, and June 4, 2024, and conducting an average of 490 credible fear interviews daily, both of which are record highs.[135] Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 794,000 noncitizens who did not have a legal basis to remain in the United States, the majority of whom crossed the SWB.[136] Average daily removals and returns during the immediate post-pandemic period exceeded daily rates for every FY since 2010.[137] The majority of all individuals encountered at the SWB from FY 2021 to FY 2023 were removed, returned, or expelled.[138]

Unfortunately, despite maximizing the usage of resources available to the Departments, these efforts have not been as effective as they could have been had Congress provided the tools and resources needed to address substantial

---

regulations require consideration of '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal.' " (quoting 8 CFR 208.16(c)(3)(iii)–(iv)]).

[134] *See* Decl. of Blas Nuñez-Neto ¶ 20, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[135] OHSS analysis of June 2024 Enforcement Lifecycle data (Immediate Post-Pandemic ERCF tab); OHSS analysis of APSO Global and OHSS Persist Datasets (Historic CFIs tab).

[136] *Id.*

[137] OHSS 2022 Yearbook of Immigration Statistics (OHSS YB Table 39 tab) (listing past repatriations).

[138] OHSS analysis of June 2024 Enforcement Lifecycle data (Enforcement Lifecycle 6.2024 tab).

levels of migration impacting the southern border. Encounter levels increased toward the end of 2023,[139] and December 2023 saw the highest level of encounters between POEs in history,[140] as increasing numbers of people migrated through the Western Hemisphere. 89 FR at 48713. The Departments' inability, given a lack of sufficient resources, to deliver timely decisions and consequences through expedited removal for those without a legal basis to remain creates incentives for further irregular migration and creates further strain on the border security and immigration systems. *See id.* at 48713–14. The IFR was needed to respond to this emergency situation, and it is having its intended effect as discussed in Section II.A.2 of this preamble. However, only Congress can provide the resources and authorities that the Departments need to ensure durable solutions to heightened levels of global migration and the impact it has on the border security and immigration systems.

*B. General Feedback on the IFR*

1. General Support

*Comment:* Some commenters approved of the rule's limitation on asylum eligibility, reasoning that the U.S. asylum system is being "abused" and "exploit[ed]." A commenter stated that the Federal Government should stop permitting undocumented immigrants to stay in the country while their asylum claims are processed, as many exploit the system to remain for years, and that daily border crossings pose national security risks. That commenter also stated that the United States has housing and job shortages, so allowing immigrants to take housing and jobs is hurting America. Another commenter thanked the Departments for implementing this rule and asked that all enforcement mechanisms be deployed to uphold it.

*Response:* The Departments agree that maintaining border security is critical and that the rule will have benefits for the U.S. border security and immigration systems. Specifically, the United States Government has better ensured timely decisions and consequences for irregular entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States in decades. *See, e.g.,* 89 FR at 48712–13; *id.* at 48721–26

[139] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024, for July 2024 (Encounters FY 2000–2024 tab).
[140] *Id.*

(discussing the increase in migration at the SWB, consistent with global trends and regional United States Government efforts); 88 FR at 11716–18 (discussing United States Government measures to offer alternative pathways to address the root causes of migration, improve the asylum system, and address the pernicious role of smugglers). This approach has allowed DHS to process noncitizens arriving at the southern border for removal in record numbers and with record efficiency. 89 FR at 48713, 48727.

This rule has improved DHS's ability to place into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB and to swiftly issue decisions and impose consequences that have proven effective to disincentivize noncitizens who do not have a strong claim for asylum or other protection from entering the United States to pursue such claims. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. This rule is also designed to identify more effectively those with a fear of return, and, for noncitizens who have manifested or expressed a fear of return, to screen out and swiftly remove those whose claims have a low likelihood of succeeding on the merits. *See* 89 FR at 48743–46. As a result, the Departments believe that this rule will also improve the overall functioning and efficiency of the immigration system by reducing strains on EOIR and USCIS resources and allowing DHS to remove more noncitizens through expedited removal, rather than adding them to the backlogged immigration courts.

2. General Opposition

a. Negative Impacts on Noncitizens and Others

i. Conflicts with Humanitarian Values

*Comment:* Several commenters expressed opposition to the IFR based on general humanitarian and moral concerns, with some commenters urging the Departments to reconsider or rescind the rule. Commenters addressed the general right to seek asylum and the United States' obligations to protect those seeking asylum. For example, commenters emphasized that people have the right to migrate and seek asylum, which commenters described as a human right. Commenters stated the Administration should provide rights to those in the U.S. asylum process. Commenters also stated that people have a right to work and live in a safe environment with their families so that they can enjoy a better life. Several commenters stated that the IFR denies

the right to seek asylum or that it harms those with the right to asylum. Commenters stated that the United States has a responsibility or moral obligation to welcome noncitizens who might make claims of asylum, that the United States should provide protection to those who seek it, and that turning them away is unconscionable. Some commenters suggested that the United States should welcome all people, regardless of their origin or when or how they arrive. Commenters stated that the United States has contributed to the conditions or push factors that promote migration and that it should share the responsibility for the geopolitical and climatic conditions it has created, especially since the response of the United States may shape how other countries react to humanitarian crises.

*Response:* The Departments agree that the United States has certain legal obligations to protect those present in the United States who fear persecution or torture in their home countries or countries of removal and recognize the importance of offering migrants the opportunity to seek protection from removal. *See* 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble, this rule does not run afoul of those obligations or otherwise undermine the commitment of the United States to adhering to international law principles concerning non-refoulement. *See also id.* at 48716–17, 48735–36. The Departments have instead exercised their authority to adopt a limitation on asylum eligibility and an exception to that limitation in certain circumstances. *See id.* at 48718. As discussed more fully in Section III.A.1 of this preamble, this framework comports with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), which permits limitations and conditions on asylum as long as they are consistent with the INA.

Any noncitizen who is physically present in the United States may apply for asylum, but there is no right for a noncitizen to enter the United States or to be processed in a particular manner. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) ("At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government."). No individual present in the United States will be denied the opportunity to seek asylum or protection under this rule.

In particular, this rule does not preclude noncitizens who cross the

southern border from seeking asylum. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear of or concern about potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although many individuals may be ineligible for asylum under this rule, they may seek to establish that they are subject to the rule's exception for exceptionally compelling circumstances, and they may also still seek statutory withholding of removal and CAT protection in the United States.

The purpose of this rule is to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718. Consistent with that purpose, the rule limits eligibility for asylum during such circumstances and ensures that the process is not overwhelmed by those with nonviable claims in the expedited removal process who will add to an already-large backlog. Those referred to an IJ will become part of the backlog of pending immigration cases before EOIR, which at the end of the third quarter of FY 2024 was over 3.46 million cases.[141] Continuing to process non-viable claims will also exacerbate USCIS's asylum backlog, which, based on case filings through August 31, 2024, was over 1.3 million cases.[142]

*Comment:* Commenters wrote that the IFR contradicts U.S. values and history. Commenters stated that the United States is a nation of immigrants and is built on a history of welcoming migrants. Some commenters described the IFR's limitations on asylum as contrary to U.S. values and democracy and termed it ''un-American.'' Commenters stated that the IFR does not treat noncitizens with dignity and respect. Many commenters emphasized the desire for any process to be ''welcoming, transparent, humanitarian,

and fair;'' one commenter specifically expressed concern for ''the dignity, safety, and human rights of asylum seekers;'' and another expressed concern for those people ''seeking safety and the American dream.'' Another commenter emphasized that immigrants ''are human beings and deserve to be treated as such.'' Many commenters generally desired policies that ''welcome immigrants.'' Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. Commenters emphasized their own status as descendants of immigrants and expressed a desire for fairness in welcoming noncitizens at all borders. Commenters argued that the IFR undermines the historic commitment of the United States to protecting those who seek refuge. At least one commenter described the IFR as ''authoritarian.''

Commenters also addressed moral concerns related to the IFR or the immigration system overall. One commenter stated that immigrants are not ''a problem;'' rather it is ''our immigration system that is the problem.'' Some described the IFR, or denying asylum, as ''immoral,'' ''inhumane,'' ''cruel,'' ''unjust'' or ''unfair,'' or ''xenophobi[c].'' Commenters asserted that the United States should have an accessible, diverse, safe, welcoming, dignified, fair, and balanced immigration system. Commenters stated that the United States should not make it harder for those fleeing danger to seek protections. Commenters stated that the United States should treat immigrants and refugees with respect, dignity, and compassion while defending human life. Commenters stated that Mexico and Latin America are neighbors of the United States and should be treated with goodwill. One commenter stated that asylum seekers from Mexico should be given the full rights of citizens. One commenter stated that there is no real border security or immigration crisis, but rather the concept has been created to distract Americans from certain political agendas, and that the ''real crisis'' is climate change.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with administering and enforcing those laws and endeavor to do so humanely. The Departments agree that the historical openness of the United States to immigration has enriched our culture, expanded economic opportunities, and

enhanced our influence around the world. However, the Departments reject the contention that the IFR's limitation on asylum eligibility and other provisions are inconsistent with American values, fairness, and showing respect for immigrants.

The United States has a long tradition of accepting and welcoming refugees. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., Stevic,* 467 U.S. at 409 (''For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported.''). Under this rule, the United States will continue to offer such protection. The rule is designed to implement the Proclamation's policies and objectives by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718. The rule enhances the Departments' ability to manage high levels of irregular migration to the United States during emergency border circumstances and allows the Departments to quickly deliver decisions and consequences to those who cross the southern border irregularly and are unable to establish a legal basis to remain, while upholding domestic and international protection obligations. *Id.* at 48731.

Without a policy in place to ensure lawful, safe, and orderly processing of migrants entering the United States, the number of migrants would exceed DHS's already limited resources and facilities. Over the past several years, the border security and immigration systems have experienced extreme strain, with a dramatic increase in the number of noncitizens attempting to cross the SWB between POEs. 89 FR at 48722. Despite the meaningful impact of the Circumvention of Lawful Pathways rule and related measures, encounter levels continued to exceed DHS's capacity to, as appropriate, effectively and safely process, detain, and remove noncitizens. *Id.* at 48727. As explained in the IFR, the Departments believed that, without meaningful policy change, encounters between POEs would continue to rise and surpass DHS's capacity and abilities based on available resources. *Id.* at 48726. The Departments disagree with the sentiment that the rule is unnecessary, as it responds to this urgent situation. The Departments reiterate that the goal

---

[141] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (July 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding-only cases.

[142] *See* OHSS analysis of USCIS Global data as of September 10, 2024.

of the rule is not to discourage migrants with valid claims from applying for asylum or other protection, but rather to discourage the unprecedented level of irregular migration while at the same time maintaining access to lawful, safe, and orderly pathways to enter the United States. The Departments have determined that the benefits to the overall functioning and efficiency of the immigration system at our southern border justify the rule; applying the rule is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

The rule does not render noncitizens to whom it applies categorically ineligible for asylum, nor does it alter their ultimate eligibility for withholding or CAT protection. To ensure that particularly vulnerable migrants are not unduly burdened by the rule, the Departments have included an exception to the limitation on asylum eligibility that will allow some migrants to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And even those ineligible for asylum may continue to seek statutory withholding of removal and CAT protection. A noncitizen who seeks to maintain eligibility for asylum can also utilize one of several lawful, safe, and orderly pathways to the United States, including use of the CBP One app, or, for some noncitizens, refugee resettlement, parole processes, family reunification, and labor pathways. Indeed, as noted above, the CBP One app has permitted the United States Government to process nearly five times more individuals at land border POEs each day than it did on an average day in the six years preceding the pandemic—providing an important avenue for individuals who may wish to access protection in the United States to so in a safe and orderly manner.[143] The Safe Mobility Initiative, which includes Safe Mobility Offices in several countries in the Western Hemisphere, processes and educates migrants about the aforementioned pathways.[144] By reducing migration flows to a reasonable rate, the rule will reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the

Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and reduce the role of exploitative TCOs and smugglers. 89 FR at 48767. Finally, as explained in Section III.A.1 of this preamble, the rule is fully consistent with the Departments' authority and obligations under section 208 of the INA, 8 U.S.C. 1158.

ii. Procedural and Due Process Concerns

(1) General Concerns

*Comment:* A commenter stated that the IFR does not violate noncitizens' due process rights because asylum is a discretionary benefit to which noncitizens have no inherent due process interest; instead, they have only the procedural rights guaranteed by statute. Because the IFR preserves all procedural statutory protections, the commenter stated, the IFR complies with due process. The commenter further stated that regulatory bars to asylum do not alter the basic procedural protections, such as the opportunity to be heard, for noncitizens who make credible fear claims.

Other commenters urged the Departments to rescind the IFR entirely. Some commenters expressed general concern that the IFR would violate or undermine due process protections. One commenter said that U.S. immigration law is already confusing, citing research that it said showed that 55.9 percent of noncitizen respondents did not understand the requirements and processes for accessing United States territory. The commenter further stated that noncitizens arriving at the southern border will not be able to understand the procedures for seeking asylum or protection given the IFR's complexity.

Commenters discussed the importance of due process in the asylum system, as required by international human rights law, and said that the United States has a duty to ensure that noncitizens receive a fair trial and fully understand their rights. Similarly, one commenter stated that noncitizens who express the desire to seek asylum have a due process right to information about their rights and obligations, including deadlines and appeals, the interview process, and their right to legal representation. Such safeguards, the commenter wrote, would ensure that noncitizens receive the necessary guidance for pursuing their asylum claims.

Commenters wrote that fair and efficient asylum procedures are even more important for noncitizens with particular vulnerabilities, such as UCs. Commenters stated that the IFR would

hamper consistent application of the law and result in arbitrary application of the law, thus severely restricting access to asylum and humanitarian protections.

*Response:* The Departments disagree that the rule violates the Due Process Clause of the Fifth Amendment or impermissibly restricts access to asylum. Noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute."[145] *Thuraissigiam,* 591 U.S. at 140; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam,* 591 U.S. at 139)). As discussed above in Section III.A.1 of this preamble, the changes in this rule are consistent with the INA. They thus comply with the Due Process Clause with respect to noncitizens in expedited removal proceedings.[146]

Contrary to commenters' assertions, the rule ensures that noncitizens receive

---

[143] OHSS analysis of July 2024 OHSS Persist Dataset (OFO Encounters tab).

[144] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 24, 2024).

[145] Courts also have held that noncitizens do not have an underlying property or liberty interest in a grant of asylum to which the protections of the Due Process Clause attach. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, and asylum is a discretionary form of relief." (citation and internal quotation omitted)); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an 8-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause."). Notably, UCs are excepted from expedited removal and have other rights under the nation's immigration laws. *See generally* 8 U.S.C. 1232. Procedural concerns related to UCs are addressed later in this section.

[146] Although this rule's limitation on asylum eligibility also applies in section 240 removal proceedings, even if noncitizens in those proceedings had an interest protected by the Due Process Clause, the application of the limitation would not violate the Due Process Clause because, as noted below, noncitizens in such proceedings are entitled to all the procedural protections such proceedings normally entail. *See Pouhova* v. *Holder,* 726 F.3d 1007, 1011 (7th Cir. 2013) (citing section 240(b)(4) of the INA, 8 U.S.C. 1229a(b)(4), and explaining that "[a]ny proceeding that meets the requirements of the statute also satisfies constitutional due process").

a fair process. Indeed, although the rule changes some procedures, as discussed throughout this preamble, it leaves much of the process unaltered. Specific comments concerning the rule's manifestation of fear standard and related changes to the process for determining whether a noncitizen should be referred to an AO for a credible fear interview are addressed in Section III.C.2 of this preamble. The Departments address commenters' concerns about the rule's consistency with international obligations in Section III.A.1 of this preamble.

First, with respect to one commenter's claim that noncitizens do not understand the requirements for accessing United States territory because U.S. immigration law is confusing, the Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or this rule's limitation on asylum eligibility upon arrival. In addition, to the extent the commenter's objection is to the complexity of the INA, that concern is a matter for Congress to address.

Second, under the rule, DHS is continuing to provide noncitizens who are subject to expedited removal with notice of their ability to raise a claim of fear of persecution or torture. DHS is using signs and videos that are reasonably designed to ensure that noncitizens in its custody are aware of their right to request asylum or protection. As discussed further in Section III.C.2 of this preamble, these signs and videos are provided in languages that are common to the large majority of noncitizens encountered by CBP at the southern border. ICE likewise provides information in a number of languages to detainees being processed under the rule.[147] And the signs provide a simple instruction to noncitizens that, if they fear persecution or torture if they are removed from the United States, they should tell an immigration officer and an AO will conduct an interview and ask the noncitizens questions about

any fear they may have. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies. These procedures are consistent with DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).

Moreover, to the extent that commenters have expressed due process concerns about the manifestation standard, the Departments reiterate that the expedited removal statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if the noncitizen has a fear of persecution or torture. *See* 89 FR at 48740. Instead, the statute provides that only those noncitizens who ''indicate[] either an intention to apply for asylum . . . or a fear of persecution,'' INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As discussed in detail in Section III.C.2 of this preamble, the statute does not place any affirmative obligation on the Government to question noncitizens about intent to seek relief or fear in their home countries, nor does it define what circumstances constitute the requisite indication of intent or fear; to the contrary, the onus under the statute is on the noncitizen to ''indicate[]'' either of the circumstances warranting referral. Because the Departments' procedures comply with the statute, they comport with due process. *See Thuraissigiam,* 591 U.S. at 139–140.

Third, noncitizens who manifest or express a fear and who are referred for a credible fear interview will receive additional information about the credible fear process that has the same types of procedural and substantive information as that provided in the Form M–444, which is used for those not subject to the rule's expedited removal procedures and during times when this rule's provisions do not apply. 89 FR at 48739–40. The new ''Information About Credible Fear Interview Sheet'' informs the noncitizen that the noncitizen may consult with another person, including a legal service provider, and is provided to the noncitizen along with an EOIR-maintained list of pro bono legal service providers. It gives the noncitizen information about the credible fear interview itself, including that an interpreter will be provided, if needed or requested. It explains that the noncitizen may request a male or female interpreter or AO and may speak to the AO separately from the noncitizen's

family. It highlights the importance of telling the AO about the noncitizen's fear of harm and that this may be the only opportunity to do so. The information sheet notifies the noncitizen of the right to have an IJ review a negative fear determination and gives details about the steps following a positive determination.

Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing before their interview, and such persons may be present for the interview itself. 8 CFR 235.15(b)(4)(i)(B). Asylum seekers also may present evidence relevant to their claim during their interviews. 89 FR at 48746 & n.239. Additionally, USCIS provides interpreter services at the agency's expense to noncitizens who cannot proceed effectively in English. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those subject to the rule and unable to show that the exception to the limitation on asylum eligibility applies). The rule requires noncitizens to respond affirmatively when asked whether the noncitizen would like to request such review, rather than providing review if the noncitizen does not respond, but IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1). The rule is thus fully consistent with the Departments' legal authority and obligations.

In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the limitation on asylum eligibility applies only to noncitizens properly within the scope of 8 CFR 208.35(a) and 1208.35(a). During the credible fear review, an IJ will evaluate de novo whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen meets the exception. 8 CFR 208.35(b)(2)(v), 1208.35(b). Even where an IJ determines that the noncitizen has not met that burden, if the noncitizen demonstrates a reasonable probability of persecution or torture in the country or countries of removal, the noncitizen will have an opportunity to apply for statutory withholding of removal,

---

[147] *See* Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Off. Performing the Duties of the Dir., ICE, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border 5 (June 4, 2024) (''These signs must be posted in English and Spanish. [Enforcement and Removal Operations ('ERO')] will have additional translations available in facility law libraries in the following languages . . . .''); ICE, *National Detainee Handbook* 7, 15, 25 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ ndhEnglish.pdf.*

protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings, including asylum. 8 CFR 1208.33(b)(2)(ii), 1208.35(b)(2)(iii). These standards help to ensure the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the limitation on asylum eligibility receive sufficient opportunity for consideration and review of threshold eligibility determinations to satisfy any putative due process rights they may have. *See Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted)).

Nor does the rule violate any procedural due process rights noncitizens may have in section 240 removal proceedings. For those placed in section 240 removal proceedings, the rule's limitation on asylum eligibility will be litigated in those proceedings before an IJ with all the procedural rights that apply in such proceedings. *See Pouhova,* 726 F.3d at 1011; *see also Rehman* v. *Gonzales,* 441 F.3d 506, 508 (7th Cir. 2006) ("Any proceeding that meets [the requirements of section 240 of the INA, 8 U.S.C. 1229a, and the INA's implementing regulations,] satisfies the Constitution as well.").

Additionally, the Departments disagree with comments characterizing the IFR as resulting in unfair procedures that are especially harmful to those with particular vulnerabilities, such as UCs, individuals with mental health issues or intellectual capacity challenges, and victims of violence, torture, or other traumatic experiences. Nothing in the IFR changes the longstanding framework establishing that UCs are not subject to expedited removal. *See* 8 U.S.C. 1232(a)(5)(D). UCs are also specifically excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation and, accordingly, the IFR's limitation on asylum eligibility. 89 FR at 48487; 8 CFR 208.35(a)(1), 1208.35(a)(1). Moreover, the process outlined in the IFR does not prohibit USCIS from exercising its discretion to issue notices to appear ("NTAs") and place noncitizens, including those who are unable to testify or who speak a rare language, in section 240 removal proceedings, where they can request asylum. *See* 8 CFR 208.30(b); *see also Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011) (finding that the INA provides DHS with "discretion to put aliens in section 240 removal

proceedings even though they may also be subject to expedited removal"). Additionally, EOIR has established a specialized juvenile docket at each immigration court with an established caseload of children's cases; has issued guidance to its adjudicators regarding special considerations and procedures for cases involving children, including UCs; and has provided training to IJs on cases involving children, including UCs.[148]

Noncitizens in section 240 removal proceedings have a wide range of well-established statutory and regulatory rights, including the following: the right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of a final removal order in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252. Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[149] And safeguards are provided to those who are not competent to participate in their proceedings, *see Matter of Matter of M–A–M–,* 25 I&N Dec. 474, 481–82 (BIA 2011), which may include termination of the proceedings where "[f]undamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable," 8 CFR 1003.1(m)(1)(i)(B), 1003.18(d)(1)(i)(B).

The Departments also disagree with commenters' assertion that the IFR would lead to disparate or arbitrary application of the law. USCIS AOs and supervisory AOs have received the same training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use Global, a cloud-based case management system,[150] which includes interview guides, forms, and instructions—including specific interview guides, forms, and instructions to implement the IFR—to

ensure consistency in procedures and substantive guidelines. Moreover, the IFR does not change the fact that all credible fear determinations issued by USCIS are reviewed by a supervisory AO prior to being served on a noncitizen, 8 CFR 208.30(e)(8), another important safeguard to ensure quality and consistency within and between offices.

Additionally, IJs are career employees who are selected through a competitive process.[151] The Director of EOIR has authority to order "comprehensive, continuing training and support" directed at "promot[ing] the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). And the Chief IJ has the authority to "[p]rovide for appropriate training of the immigration judges and other [Office of the Chief Immigration Judge] staff on the conduct of their powers and duties." 8 CFR 1003.9(b)(2). Regulations also require IJs to "resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." 8 CFR 1003.10(b). To that end, all IJs receive ongoing training to facilitate the implementation of new policies and procedures, such as the IFR.[152] EOIR's Legal Education and Research Services Division also offers nationwide legal training for IJs and "regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations." [153]

*(2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare*

*Comment:* Commenters stated that access to counsel is a due process right. Commenters also discussed statutory and regulatory requirements that provide noncitizens eligible for a credible fear interview the right to consult with legal counsel and said that the recent change to a minimum 4-hour consultation period prior to a credible fear interview—which DHS made via guidance—would effectively deny noncitizens that right.

One commenter additionally stated that less than 3 percent of migrants in

---

[148] *See* EOIR, *Director's Memorandum 24–01, Children's Cases in Immigration Court* (Dec. 21, 2023), *https://www.justice.gov/d9/2023-12/dm-24-01_1.pdf.*

[149] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court 1–2* (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

[150] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

[151] EOIR, *Make a Difference—Apply for an Immigration Judge Position* (last updated Sept. 17, 2024), *https://www.justice.gov/eoir/Adjudicators* (describing application process and core position requirements for IJ position).

[152] *See, e.g.,* EOIR, *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[153] EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division.*

expedited removal were able to obtain legal representation. Other commenters said that less than 1 percent were able to find representation in the credible fear process. A commenter stated that in 2023, 35 percent of represented individuals had their negative fear determinations vacated, compared to just 15 percent of unrepresented noncitizens. Commenters emphasized that any immigration solution should include procedures for asylum seekers to access legal representation.

Another commenter said that a 2010 study found that 54 percent of noncitizens with representation were granted asylum, compared to 11 percent of noncitizens without representation. Another commenter said that noncitizens with representation were twice as likely to receive a grant of asylum as their unrepresented counterparts. The commenter said that such data indicate that, as a result of the IFR and reduced access to counsel, applicants with meritorious claims who would have otherwise been referred to full hearings will be denied.

Commenters stated that many noncitizens do not understand the function and purpose of a credible fear interview without speaking with an attorney, particularly those who speak languages not included on orienting signs. Commenters explained that a majority of noncitizens do not have legal representation and thus may struggle to effectively present their cases, particularly if they do not speak English. Commenters also stated that, without legal counsel, many noncitizens will not understand the process nor the legal grounds for their asylum claims. Commenters stated that access to counsel significantly affects asylum outcomes and that less access to counsel is particularly troubling considering that noncitizens must now meet a new, higher standard for protection screenings. One commenter stated that the rule will worsen the issues that already exist in expedited removal proceedings, adding that children and adults are routinely denied access to legal advice if they get referred for fear screenings. Commenters who provide legal services also claimed that they have been excluded from credible fear interviews and subsequent credible fear review hearings before IJs.

Another commenter stated that the availability of legal information and representation at the outset of the asylum process increases efficiency, discourages frivolous claims, reduces the number of appeals and repeat claims, and shortens the time required to determine a claim.

Several commenters stated that noncitizens face significant barriers to obtaining legal representation during the credible fear process. A commenter stated that noncitizens in custody already face insurmountable hurdles to access legal counsel, such as knowing how to contact a lawyer, knowing where they are being detained, having access to a phone, and being given enough information to understand the credible fear process. Another commenter stated that having only 4 hours would make it impossible for providers to meet with clients before credible fear interviews, stating that legal representatives often face barriers to accessing clients within 48 hours, much less 4. The commenter discussed such barriers, stating that legal representatives frequently wait 24 to 48 hours for their interviews with their clients to be scheduled and may be barred from including translators or interpreters in those interviews. Some commenters stated that immigration advocates and attorneys face numerous issues in trying to provide legal consultations, such as being unable to physically access detention facilities or obtain the requisite signatures from their clients. Another commenter added that advocates lack access to private meeting rooms and experience long waits to meet with clients, malfunctioning technology, and unsafe or uncomfortable environments.

Several commenters stated that the rule would effectively eliminate access to legal representation because noncitizens would have only 4 hours to find and consult with a lawyer before an initial hearing. Commenters emphasized that they viewed a 4-hour window as troubling in light of the newly increased standards noncitizens must meet. Commenters stated that it takes more than 4 hours to adequately prepare a noncitizen for the credible fear process. Commenters stated that noncitizens will not have the time or resources to contest arguments and present evidence before the credible fear screenings. Commenters believed that the 4-hour window will lead to greater rates of refoulement. Commenters stated that the 4-hour window may fall on a weekend or after business hours, when legal service providers and aid organizations are closed. Commenters asserted that noncitizens will lose access to legal counsel because the United States does not provide free counsel for noncitizens, and 4 hours is not enough time for individuals to retain counsel. Commenters stated that the rule's restrictions are arbitrary and impermissible, not supported by evidence, and will lead to the denial of

otherwise meritorious asylum claims. Commenters stated that counsel would not be able to access their clients physically or telephonically in a 4-hour window.

Commenters stated that, by reducing noncitizens' ability to secure counsel and connect with communities, the IFR will prevent individuals from becoming aware of other protections from which they could potentially benefit.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. The Supreme Court has held that the rights of individuals seeking asylum at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 591 U.S. at 140. The INA provides that a noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," provided that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). This statutory right to consult does not attach until a noncitizen becomes eligible for a credible fear interview, and it does not guarantee an absolute right to retain counsel. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). The regulations implementing expedited removal elaborate that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii).

Moreover, because this rule does not alter procedures governing consultation or representation, commenters' concerns regarding those issues—including the minimum 4-hour consultation period violates section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), or is unreasonable—are outside the scope of this rulemaking. Procedures regarding consultation and representation are governed by other DHS regulations, guidance, and policies.

Nevertheless, insofar as commenters' concerns relate to the Departments' decision to adopt the changes made by the IFR and this rule, DHS's changes to the consultation period do not undermine the Departments' decision to promulgate this rule. Those changes aim to address the same emergency border circumstances as this rule—specifically, DHS determined that shortening the minimum consultation period would reduce the risk that DHS's processing capacity would become overwhelmed by increasing DHS's ability to impose

consequences swiftly, which in turn lowers incentives for additional irregular migration. DHS's 4-hour minimum consultation period, moreover, continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations. DHS is not aware of any data supporting the assertion that this approach has decreased the effective availability of consultation. Finally, even if this approach had some adverse effect on noncitizens' ability to consult, the Departments would still find it necessary and appropriate to adopt this rule's changes, including the two changes to the portions of the removal process that follow consultation—the asylum limitation and the reasonable probability standard.

The Departments start by explaining how the consultation process works. Once a noncitizen is referred to USCIS for a credible fear interview pursuant to 8 CFR 235.15(b)(4), the rule ensures that the noncitizen receives information about that interview and the right to consult with a person or persons of the noncitizen's choosing. Specifically, all those referred for a credible fear interview receive a written "Information About Credible Fear Interview Sheet" describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of any negative fear determination an AO enters; and the consequences of a failure to establish a credible fear of persecution or torture. 8 CFR 235.15(b)(4)(i)(B). This written disclosure is available in English, Spanish, Haitian Creole, and Portuguese, and the noncitizen is also provided with a list of pro bono legal service providers. If the noncitizen does not speak one of these languages, then language access services are provided to orally communicate the written material in a language understood by the noncitizen.[154] As stated in the "Information About Credible Fear

Interview Sheet," the minimum 4-hour consultation period begins at the time a noncitizen who has been referred to USCIS for a credible fear interview has access to a phone or another opportunity to consult with an individual of the noncitizen's choosing, and the minimum 4-hour period runs only between the hours of 7 a.m. and 7 p.m. This period is calculated in local time. Procedurally, a noncitizen is scheduled for a credible fear interview only after the minimum consultation period has elapsed, regardless of whether the noncitizen used the phone or consulted with anyone during that period.

The "Information About Credible Fear Interview Sheet" further explains that the noncitizen may have a consultant of the noncitizen's choice participate in the interview with USCIS by telephone, and an EOIR-maintained list of pro bono legal service providers who may be able to speak with the noncitizen is also provided. The information sheet instructs noncitizens to ask a DHS officer for assistance if they want to call someone. Individuals who manifest fear in CBP custody and go through the credible fear process in CBP custody are provided access to a phone in order to telephonically consult with any individual of their choosing, including legal counsel, and do not need to ask CBP employees to do so. After manifesting a fear, when a phone becomes available, such noncitizens are brought to the phone and given at least 4 hours in which to use it. If a noncitizen requests use of a phone after the end of the noncitizen's consultation period, but before the noncitizen's interview occurs, the noncitizen is afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as because of a lack of available personnel to escort the noncitizen to the consultation area). The phone booths in which such consultations occur are private, closed, confidential booths and include an EOIR-maintained list of pro bono legal service providers.[155]

Those detained noncitizens who go through the credible fear process in ICE custody generally have direct access to phones (without having to interact with facility staff to request access, for instance) and have access to a free call platform that includes telephone numbers of legal service providers who are listed on the EOIR-maintained list of pro bono legal service providers, in accordance with ICE detention

standards.[156] Beyond telephone access, visits between a legal representative and a detained noncitizen are confidential and not subject to auditory supervision.[157] Private consultation rooms may be available for these meetings.[158] To facilitate improved access to legal resources and representation, ICE has also expanded its Virtual Attorney Visitation program, which facilitates confidential attorney-client conversations through virtual technology.[159]

Commenters' arguments concerning the minimum 4-hour consultation period, first, miss that Congress did not provide an unqualified right to consultation or representation during the credible fear process. Rather, noncitizens may consult "according to regulations prescribed by" the Secretary, and "[such consultation . . . shall not unreasonably delay the process." *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). And those regulations specify that "consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii). "Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas Immigr. Advoc. Ctr.* v. *Wolf*, 507 F. Supp. 3d 1, 25 (D.D.C. 2020); *cf.* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (providing that IJ review of an AO's negative credible fear determination "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination").

DHS, moreover, moved to the 4-hour minimum consultation period for credible fear referrals for noncitizens

---

[154] *See, e.g.,* ICE, *2019 National Detention Standards for Non-Dedicated Facilities,* Foreword (2019), *https://www.ice.gov/detain/detention-management/2019* ("Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate."); ICE, *2011 Operations Manual ICE Performance-Based National Detention Standards,* Standard 2.13 (2011), *https://www.ice.gov/detain/detention-management/2011* ("Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.").

[155] *See* USBP, *6.4.24 USBP Field Guidance,* at 4.

[156] ICE, *Attorney Information and Resources: Communicating with Your Client or Prospective Client* (last updated Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.* Telephone access and use may be limited in the event of emergencies (for instance, escapes, escape attempts, disturbances, fires, power outages) or other events that disrupt orderly facility operations. If such disturbances occur, officers are responsible for ensuring that the minimum 4-hour consultation period is afforded.

[157] *Id.*

[158] *Id.*

[159] ICE, *Virtual Attorney Visitation Program* (last updated Aug. 16, 2024), *https://www.ice.gov/detain/detention-facilities/vav.*

covered by the IFR to address the emergency border circumstances described in the President's June 3 Proclamation based on a determination that operational imperatives necessitated this change in order to avoid unreasonable delays to the process in the context of these emergency border circumstances—exactly the type of determination that Congress authorized DHS to make. Under DHS's guidance that applies outside of the context of emergency border circumstances, noncitizens are not interviewed until at least 24 hours after the noncitizen's acknowledgment of receipt of the Form M–444,[160] unless the noncitizen, at the noncitizen's request, voluntarily waives the consultation period. Even if a noncitizen consults at the start of that 24-hour period, the noncitizen's credible fear interview is not conducted until after that period ends.

The 4-hour approach allows a swifter cadence of scheduling noncitizens for credible fear interviews. This minimum 4-hour consultation period thus enables credible fear screenings to take place in a more efficient manner and reduces the time noncitizens remain in custody; in turn, those improvements mitigate overcapacity issues in DHS facilities, free up detention space to allow for greater expedited-removal processing capacity over time, and help to avoid situations in which DHS must issue NTAs to individuals otherwise eligible for expedited removal and release them pending section 240 removal proceedings—in turn delaying the imposition of consequences for those without a legal basis to remain in the United States and creating incentives for additional arrivals at the border. Conversely, a longer minimum consultation period would delay credible fear screenings, increase the amount of time noncitizens remain in immigration detention, and contribute to a situation where DHS's capacity could quickly become overwhelmed, including potentially requiring the release of individuals into section 240 removal proceedings instead of processing such individuals under expedited removal due to resource constraints—thus delaying the imposition of consequences for those without a legal basis to remain and creating incentives for more irregular migration.

The Departments disagree with the conclusion drawn by certain

commenters that a shortened minimum consultation period effectively eliminates access to counsel or that the hours during which the consultation period runs make it practically impossible for noncitizens to reach attorneys or consultants. To the contrary, the minimum 4-hour period that DHS has adopted allows sufficient time for individuals to make multiple phone calls and have in-depth conversations prior to the credible fear interview. *Cf. Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. 3d at 12–14, 30.

The difference between DHS's 24-hour approach and its approach during these emergency border circumstances is also less significant in practice than certain commenters suggested. For example, the consultation period during emergency border circumstances begins to run only when the individual is provided access to a phone and confers access during at least that 4-hour period; the 24-hour period, by contrast, begins when a noncitizen acknowledges receipt of the Form M–444, and the noncitizen does not necessarily have access to a phone immediately at that point. For those who express a fear in CBP custody, under either approach, CBP generally takes a noncitizen to a phone booth once during the noncitizen's time in custody for consultation, and CBP generally will accommodate requests for additional phone access when operationally feasible. In addition, a significant share of the 24-hour period occurs overnight, when fewer people are likely be available to take calls. Under the 4-hour approach, by contrast, the clock runs only during daytime hours.

The 4-hour period is also a minimum, and noncitizens may receive greater time. For example, for noncitizens in CBP custody, if a noncitizen requests access to a phone booth after the consultation, but the interview has not yet occurred, the agent or officer would in the normal course facilitate another call, to the extent operationally feasible. For noncitizens in ICE custody, noncitizens are generally housed in areas with phones that they may use at any time. Hence, noncitizens have phone access even during times when the 4-hour consultation period is tolled, as well as in circumstances in which the noncitizen's credible-fear interview is delayed for a longer time than the 4-hour minimum. The result is that noncitizens in ICE custody will often have more than 4 hours of phone access. Requests to reschedule the credible fear interview may be accommodated for reasons that constitute extraordinary circumstances, such as serious illness of the noncitizen's consultant or serious

facility issues that prevented the noncitizen from contacting a consultant.

The Departments acknowledge that the period includes Saturdays, Sundays, holidays, and periods outside of traditional business hours (7 a.m. to 9 a.m. and 5 p.m. to 7 p.m.). And while the Departments recognize that it may be more difficult for detained noncitizens to connect with the person or persons with whom they wish to consult during these times, this concern again does not undermine the Departments' decision to adopt the changes in the IFR and this rule. DHS's 24-hour approach also includes Saturdays, Sundays, and holidays.[161] Although DHS's 4-hour approach uses a shorter window during those periods than its 24-hour approach, the Departments have already explained why that change makes less of a practical difference than some commenters suggest. Moreover, although DHS's approach during emergency border circumstances may sometimes result in some or all of the 4-hour period falling outside of traditional business hours, noncitizens may reach out to individuals in different time zones during these periods. For those who manifest fear in CBP custody, CBP provides noncitizens with a list of legal service providers operating in multiple time zones.[162] For those who manifest fear in ICE custody, ICE provides noncitizens with a list of legal service providers who service the area in which the noncitizen is detained and ICE will, upon request, provide the noncitizen a list of providers in additional States identified by the noncitizen. In addition, DHS's 24-hour approach also does not guarantee that noncitizens would have access to phones during traditional business hours (for example, when the period falls over a weekend or holiday).[163] Excluding weekends, holidays, and periods outside of traditional business hours would thus mark a significant

---

[160] *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023).

[161] *See* DHS, *M–444 Information About Credible Fear Interview* (May 10, 2023) (noting that the interview will occur no earlier than 24 hours after receipt of the form without mention of any tolling or stoppage).

[162] *See, e.g., EOIR, List of Pro Bono Legal Service Providers (Noncitizens in U.S. Customs and Border Protection Custody)* (July 2024), *https://www.justice.gov/eoir/page/file/1582586/dl.*

[163] The consultation period was not tolled for weekends, holidays, or periods outside of normal business hours under the 48-hour approach that predated the 24-hour approach. *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023) ("Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.").

81198    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

change in DHS's practice that could lead to unreasonable delays. And because CBP continues to encounter individuals and to take them into custody 24 hours a day and 7 days a week, that change would be inconsistent with the imperative to facilitate the prompt operation of the expedited removal process, especially during the emergency border circumstances when this rule applies.

In addition, when a noncitizen receives a negative credible fear determination, the noncitizen also has an additional opportunity to consult before review of that determination by an IJ (if requested). INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Noncitizens can obtain counsel or consult with other individuals of their choosing and seek to introduce new evidence before IJs, allowing for additional consultation beyond the initial 4 hours. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). That additional consultation opportunity further reinforces the Departments' view that the minimum 4-hour consultation period prior to the credible fear interview does not undermine their decision to adopt the changes made by the IFR and this rule.

In response to comments alleging that legal representatives have been excluded from credible fear interviews, the Departments again note that neither this rule nor the consultation period policy changes the procedures and regulations governing attorney participation during credible fear interviews. Under existing regulations, all noncitizens are afforded the opportunity to have a person or persons of their choosing present, including by phone, during their credible fear interview. 8 CFR 208.30(d)(4). In any case where USCIS has received a properly executed G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, prior to the credible fear interview, asylum office staff notify the attorney or accredited representative of the scheduled interview date and time, and the AO must call the attorney or representative before beginning the interview so the attorney or representative may be present. If the AO is unable to reach the attorney or accredited representative, the AO documents this in the interview notes and asks the noncitizen if the noncitizen would like to proceed without the attorney or accredited representative present. Guidance instructs that, where a properly executed Form G–28 is on file, asylum office staff will attempt to ensure that the attorney or accredited representative is present at the interview if the

noncitizen desires such a person's presence. Further, as long as it does not unreasonably delay the process, the asylum office has discretion to reschedule interviews on a case-by-case basis to ensure that an attorney or accredited representative may attend. At the beginning of the credible fear interview, if it has not already been established through a Form G–28, the AO asks the noncitizen if the noncitizen has an attorney or consultant and verifies whether the noncitizen received a list of free or low-cost legal service providers. If the noncitizen does not have an attorney or consultant present, the AO reminds the noncitizen that the noncitizen may have an attorney or consultant present during the interview and asks the noncitizen if the noncitizen wants to continue with the interview without an attorney or consultant present. In addition, as noted above, if a noncitizen requests to reschedule the interview for reasons that constitute extraordinary circumstances, such as illness of the noncitizen's consultant or technical issues that prevented the noncitizen from contacting a consultant, such requests may be accommodated. If there are individual instances where commenters believe legal representatives have been excluded from a credible fear interview contrary to the wishes of a noncitizen, commenters should lodge those complaints through the proper channels,[164] but the Departments emphasize that the present rule does not change the regulatory provisions that govern who may be present during the credible fear interview or impact how asylum office staff ensure those provisions are enforced.

As for the credible fear interview itself, as discussed more fully below in Section III.C.3 of this preamble, even with the heightened screening standard for those found not to have a significant possibility of demonstrating eligibility for asylum under this rule's limitation on asylum eligibility, the type of information sought to be elicited during a credible fear interview is well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. 89 FR at 48747–48. Indeed, even after implementation of the IFR, the experience of DHS has been that noncitizens who do not have an attorney or consultant present during

the credible fear interview are often able to successfully satisfy the "reasonable probability" screening standard.[165] Additionally, under the IFR and this rule, a noncitizen may request IJ review of an AO's negative credible fear determination, which provides an additional layer of protection, including for those noncitizens who are unable to consult with an attorney.

With respect to commenters' reliance on data that purport to show that few noncitizens are able to secure the assistance of counsel during the credible fear process and that those who do receive better outcomes, the Departments note that such data fail to take into account any screening that may occur by legal service providers to determine the perceived validity of the claim before agreeing to provide representation to a noncitizen. Even assuming some instances of improved results for those with counsel, due process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey* v. *Montryn,* 443 U.S. 1, 13 (1979). Moreover, as discussed in Section II.A.2 of this preamble, 51 percent of SWB encounters between POEs referred to the credible fear process under the rule—including many who did not have an attorney or consultant present during the credible fear interview—have received a positive result.[166]

With regard to commenter concerns about lack of privacy during credible fear interviews, DHS notes that these interviews are conducted "separate and apart from the general public." 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[167] For those going through the consultation and credible fear process in CBP custody, noncitizens consulting with an attorney or other individual before a credible fear interview do so in a private phone booth. USCIS contract interpreters

---

[164] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[165] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[166] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[167] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 19–20 (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024).

conducting telephonic interpretation are bound by the confidentiality requirements protecting all credible fear determinations pursuant to 8 CFR 208.6 [168] and must pass all required DHS background checks applicable to contractors.[169] All AOs receive training on working with interpreters, which includes explaining confidentiality, assessing competency, and recognizing other factors that may affect the accuracy of interpretation.[170] AOs are trained to elicit all relevant testimony during credible fear interviews [171] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. And all AOs receive training on interviewing survivors of torture and other severe trauma.[172]

The Departments therefore decline to amend in this rule existing practices with respect to credible fear proceedings based on commenters' concerns about noncitizens' ability to obtain and consult with counsel. Nothing in the rule alters noncitizens' existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments believe that any minimal adverse impact on the ability to retain counsel resulting from the rule and changes in DHS's practices are outweighed by the significant benefits to efficiency that the rule and DHS's changed practices promote. In addition, the Departments do not believe that the limitation on asylum eligibility or the heightened "reasonable probability" standard applied to those who do not establish a credible fear of persecution for asylum purposes due to the

limitation require significant development prior to the credible fear interview. At the screening stage, the information pertinent to the limitation— including the existence of exceptionally compelling circumstances—and the reasons for the noncitizen's fear of persecution or torture are reasonably expected to be within the noncitizen's personal knowledge at the time of the credible fear interview. *See* 89 FR at 48747–48. And as explained in the IFR, AOs and IJs are trained on and have extensive experience eliciting such information from noncitizens. *Id.* at 48747–48 & nn.241–44. The Departments do not seek to diminish the importance of being able to consult with a person or persons of the noncitizen's choosing during the screening process as provided by statute, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), but the Departments also do not believe that the information required for the screening process under the IFR and this rule is such that the screening interviews must be significantly delayed to allow for greater consultation time. Doing so in the context of emergency border circumstances would "unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

As to commenters' arguments that ensuring legal representation increases efficiency, discourages frivolous claims, shortens the time required to determine a claim, and reduces the number of appeals and repeat claims, the Departments note that even assuming those claims are true, ensuring legal representation for all noncitizens would impose extraordinary burdens on DHS and would undermine the speed that Congress sought to achieve in the expedited removal system. Moreover, because Congress refrained from creating an unqualified right to legal representation, the approach adopted in this rule accords with the statute and is a reasonable exercise of the Departments' discretion. *See* INA 235(b)(1)(B)(iv) 8 U.S.C. 1225(b)(1)(B)(iv) (providing the noncitizen only an opportunity to "consult" with a person prior to a credible fear interview).

(3) Noncitizens' Ability To Have Their Claims Heard

*Comment:* Commenters stated that a quota system would deny vulnerable individuals and families the opportunity to have their claims fairly considered, in contravention of U.S. and international law. Similarly, a commenter stated that, by imposing a cap on daily asylum claims and automatically denying asylum to those

who exceed the limit, the IFR "nullifies fundamental rights that the United States is obligated to uphold." The commenter wrote that this "blanket denial" would deviate from due process principles under U.S. and international law that mandate non-refoulement and the individualized assessment of asylum claims. Commenters also stated that the IFR strips away the humane aspects of the asylum system.

*Response:* The Departments do not believe that the rule affords noncitizens an insufficient opportunity to have their asylum or protection claims heard, and the rule's limitation on eligibility includes no automatic "blanket denials" based on quotas or caps. Instead, during the emergency border circumstances described in the Proclamation, in the IFR, and in this rule—which relate to encounter levels as described in Section III.D.1 of this preamble—the rule's provisions (which are consistent with U.S. domestic and international law, as discussed in Section III.A.1 of this preamble) impose a limitation on asylum eligibility (with an appropriate exception) and changes to the expedited removal and credible fear process aimed at providing the Departments a greater ability to deliver timely decisions and consequences to noncitizens encountered along the southern border. The rule does so while ensuring that those in expedited removal proceedings who fear removal continue to have their fear claims heard.

First, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Such referrals occur irrespective of how many noncitizens have presented at the border or sought protection on a given day.

Second, this rule does not change the longstanding procedural protections that are provided to noncitizens during these credible fear interviews. Credible fear interviews are conducted in a non-adversarial manner,[173] and all AOs are

---

[168] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024); *see also* USCIS, *Credible Fear Procedures Manual* sec. III.E.3.d (May 10, 2023), *https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf.*

[169] *See* DHS, *Fact Sheet: Contractor Fitness at DHS, https://www.dhs.gov/sites/default/files/publications/personnel_security_contractor_fitness_fact_sheet_new.pdf* (last visited Sept. 20, 2024).

[170] USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* 14, 17–22, 24, 30, 43–44 (Apr. 24, 2024).

[171] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); *id.* at 12 ("It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.").

[172] USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[173] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 13–15 (Apr. 24, 2024). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

**81200**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

trained in non-adversarial interview techniques to facilitate their duty to elicit relevant and useful information— in effect, to help the noncitizen meet their burden through testimony alone.[174] 8 CFR 208.1(b). AOs are also trained to consult country conditions information, which often provides context to a noncitizen's claim. *Id.* In evaluating whether a noncitizen has shown a credible fear, AOs are instructed by statute to take into account the credibility of the statements made by the noncitizen and such other facts as are known to the AO. INA 235(b)(1)(B)(ii)–(iii), 8 U.S.C. 1158(b)(1)(B)(ii)–(iii). Just as a noncitizen's testimony alone without corroboration may be sufficient to establish the noncitizen meets the definition of a refugee where it is credible, persuasive, and refers to specific facts, INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii), a noncitizen's testimony alone, in the credible fear context, may meet the burden to demonstrate a credible fear of persecution or torture.[175] Accordingly, insofar as it is part of a credible fear determination, credible testimony and evidence available to the AO alone may be sufficient to demonstrate a significant possibility that the noncitizen could show that the noncitizen is eligible for the "exceptionally compelling circumstances" exception to this rule's limitation on asylum eligibility. The procedures outlined above do not depend on how many noncitizens have presented at the border or have sought protection on a given day.

Third, all negative credible fear determinations are reviewed by a supervisory AO prior to becoming final, *see* 8 CFR 208.30(e)(8), and, consistent with the sole statutorily provided mechanism for review of negative credible fear determinations, *see* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), noncitizens may request review of a negative credible fear determination before an IJ, *see* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those described in the Proclamation and unable to show that the rule's exception to the limitation on asylum eligibility applies).

Unlike the process that applies to negative credible fear determinations under 8 CFR 208.30(g)(1)(i), during which a noncitizen's refusal or failure to request or decline IJ review is treated as a request for IJ review, noncitizens under the present rule must indicate whether they desire IJ review when asked, *see* 8 CFR 208.35(b)(2)(iv). When serving the negative credible fear determination, USCIS staff read the contents of the Form I–869SBIFR, Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a), to the noncitizen in a language the noncitizen understands, using an interpreter if needed.[176] The Form I–869SBIFR includes a statement that the noncitizen may request that an IJ review the negative determination and that, if the noncitizen does not request IJ review, the noncitizen will not receive review by an IJ and may be removed from the United States immediately. The noncitizen then must check one of two boxes on the I–869SBIFR indicating either that the noncitizen requests IJ review or does not request IJ review. The noncitizen will be referred to an IJ for review of a negative determination only where the noncitizen requests such review. 8 CFR 208.35(b)(2)(iv)–(v). Under the IFR and this rule, IJ review remains available in all cases with a negative credible fear determination, and such review includes an opportunity for the noncitizen to be heard and questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1) and (2). Additionally, while it is not equivalent to another level of review, USCIS retains the sole discretion to reconsider its own negative credible fear determination following IJ concurrence. 8 CFR 208.35(b)(2)(v)(B). Thus, the rule maintains review of any negative credible fear determination by a supervisory AO prior to service and, following service of a negative credible fear determination, the opportunity to have an IJ review the finding de novo. *See* 8 CFR 1208.35(b)(1).

As discussed above in this section of the preamble, the Departments believe these processes are adequate in light of the high levels of training received by adjudicators and the high volume of cases before the Departments.

**(4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations**

*Comment:* Several commenters expressed concern with the conduct of AOs during credible fear interviews and suggested that AOs are ill-equipped to conduct the analysis the rule requires, including applying the "exceptionally compelling circumstances" exception to the limitation and screening fear claims at a higher evidentiary standard. Some commenters stated that they are aware of instances where AOs have failed to comply with established guidelines during credible fear interviews and that translation issues, such as Indigenous language speakers being interviewed in Spanish, exist in some cases. One commenter recounted examples of noncitizens who, the commenter believes, were wrongly issued negative credible fear determinations; the commenter said that noncitizens' statements were incorrectly translated by interpreters and that noncitizens were not adequately asked about their experiences or were interrupted by AOs during screenings. Other commenters discussed alleged violations of the credible fear interview procedures experienced by noncitizens, such as alleged failures to address language barriers, that prevent noncitizens from adequately telling their stories, resulting in refoulement.

An organizational commenter discussed its experience with clients who it contends were wrongfully deported and returned to violence, stating that the rule will only increase the frequency with which USCIS errs in conducting credible fear screenings and IJs err in reviewing credible fear determinations. Commenters emphasized that hearings take place shortly after noncitizens have endured lengthy and traumatic journeys to reach the United States and asserted that they take place while noncitizens are in detention facilities with deplorable conditions. Commenters stated that the harm caused by the IFR will be exacerbated by expedited removal policies such as conducting credible fear interviews while noncitizens are in CBP custody. A commenter stated that courts have questioned the reliability of credible fear interviews because of the expedited and stressful nature of the process.

*Response:* The Departments take any allegations of misconduct by AOs or other government officials seriously, and there are existing channels available to report any such alleged

---

[174] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11–12 (Apr. 24, 2024).

[175] *See* USCIS, *RAIO Directorate—Officer Training: Credible Fear of Persecution and Torture Determinations* 19 (May 9, 2024); *see also Kiakombua* v. *Wolf,* 498 F. Supp. 3d 1, 46–47 (D.D.C. 2020) (asylum officer ("AO") cannot require an applicant to provide corroborating evidence at the credible fear stage where the applicant's testimony is otherwise found credible).

[176] Following issuance of this rule, the form will be designated I–869SB instead of I–869SBIFR.

misconduct.[177] To the extent that commenters suggested that examples where they believe AOs failed to follow existing guidance related to credible fear screenings or failed to conduct a fair credible fear interview are representative of AOs generally and are grounds for reasoning that AOs are ill-equipped to perform credible fear screenings under the current rule, the Departments disagree with these assertions and find them unpersuasive. Instances where commenters believe AOs failed to conduct credible fear interviews fairly should be reported through the proper channels and will be addressed on a case-by-case basis, but these anecdotal complaints do not dissuade the Departments from concluding that AOs are capable of performing their duties under this rule. These complaints about AO conduct in specific credible fear interviews do not undermine the statutorily prescribed role of AOs to conduct credible fear interviews and make credible fear determinations, and the Departments are confident, for the reasons explained above, that AOs have the necessary training and expertise to fulfill that role.

As discussed in Section III.A.1.c of this preamble, the rule operates within the expedited removal and credible fear screening process established by section 235 of the INA, 8 U.S.C. 1225, and comports with all statutory requirements. Under the credible fear statutory framework, AOs conduct credible fear screening interviews. INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i). By definition, AOs are individuals who have had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications under section 208 of the INA, 8 U.S.C. 1158. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). They are supervised by officers who meet the same training requirements and have had substantial experience adjudicating asylum applications. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). AOs conducting credible fear interviews do so in a non-adversarial manner, beginning with ensuring the noncitizen understands the purpose of the interview, that the noncitizen has a right to have a legal representative or other person of the noncitizen's choosing present during the interview, and that the noncitizen understands the

interpreter, where applicable. 8 CFR 208.30(d). USCIS has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures in place that all AOs must follow to address instances where rare language interpreters may not be available, including issuing a discretionary NTA in certain circumstances. After the noncitizen has received an NTA, the noncitizen's language barrier can be addressed in proceedings before an IJ. At the beginning of a credible fear interview, AOs explain to noncitizens the confidentiality provisions governing credible fear interviews pursuant to 8 CFR 208.6, including that the AO and interpreter will keep the noncitizen's information and testimony confidential. The AO verifies that the noncitizen is comfortable proceeding with the interpreter and the AO of the given gender. AOs also ask noncitizens if there are any issues that could affect their ability to testify, such as a language barrier or health issue, and deal with any such issue according to established procedures. All credible fear determinations, including those in which the IFR limitation on asylum eligibility applies, are reviewed by supervisory AOs before becoming final and being served on the noncitizen, and this will remain true under the final rule. 8 CFR 208.30(e)(8). Supervisory review includes ensuring that AOs follow all applicable procedures and guidelines related to language access and other issues that could impede the noncitizen's ability to effectively communicate during a credible fear interview.

As already explained, AOs are specifically trained on eliciting testimony, working with interpreters, engaging in cross-cultural communication, detecting possible victims of trafficking, and interviewing vulnerable populations, including survivors of torture and other severe trauma. In addition to receiving specialized training on interviewing and eliciting testimony, AOs are trained on and well-versed in applying substantive asylum law in both full asylum adjudications and in screening determinations. As explained in the IFR, AOs and supervisory AOs have the training and experience necessary to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage. 89 FR at 48748. AOs frequently assess physical and psychological harm

when adjudicating asylum applications and are trained to do so in a sensitive manner.[178] AOs may also evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing "other serious harm" under 8 CFR 208.13(b)(1)(iii)(B) in full asylum adjudications.[179] When conducting a credible fear interview where the IFR's limitation on asylum eligibility applies, AOs' questioning will necessarily include information related to whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception, regardless of whether the noncitizen affirmatively raises the issue. Since May 11, 2023, when the Circumvention of Lawful Pathways rule went into effect, AOs and supervisory AOs have evaluated the exceptionally compelling circumstances grounds for rebutting the presumption of asylum ineligibility under that rule, including the enumerated examples of an acute medical emergency, imminent and extreme threat to life or safety, and satisfying the definition of a victim of a severe form of trafficking in persons. 8 CFR 208.33(a)(3). The enumerated examples mirror the enumerated examples of exceptionally compelling circumstances that except noncitizens from the limitation on asylum eligibility under the IFR and this rule, *see* 8 CFR 208.35(a)(2), so not only have AOs and supervisory AOs been implementing this approach since the IFR was implemented, but they also already had considerable experience in eliciting testimony related to the "exceptionally compelling circumstances" exception and determining whether that exception applied in the context of the Circumvention of Lawful Pathways rule. Likewise, IJs have extensive experience and training in applying such concepts to individual cases under the Circumvention of Lawful Pathways rule and the IFR.[180] Accordingly, the

---

[177] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[178] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, and forced sterilization. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); *see also* USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* 23–27 (Apr. 24, 2024).

[179] *See* USCIS, *RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution* 56–57 (Apr. 24, 2024).

[180] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1)–(2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory
Continued

Departments believe that IJs and AOs will continue to fairly and competently examine the facts and circumstances of each individual's case to determine whether the individual has established a significant possibility that the individual would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the individual satisfies the rule's exception.

The Departments consider the commenters' concerns about the quality of determinations unfounded. USCIS AOs and supervisory AOs have received the same thorough training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use the Global case management system,[181] which includes updated interview guides, forms, and instructions for processing cases under the IFR to ensure consistency in procedures and substantive guidelines. All credible fear determinations, as noted above, are subject to review by a supervisory AO, 8 CFR 208.30(e)(8), and IJ (if requested), INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and determinations made in section 240 removal proceedings are subject to administrative appeal and judicial review.

Regarding concerns about noncitizens going through the credible fear process while in CBP custody, the Departments disagree with the contention that such a process causes or exacerbates harm. Noncitizens who are going through the credible fear process in CBP custody are given at least 4 hours between 7 a.m. and 7 p.m. to telephonically consult with an individual of their choosing, including legal counsel, before their credible fear interview. Additionally, the noncitizens are afforded privacy for these consultations, which occur in a private phone booth. These phones and phone booths are also used to conduct the credible fear interview.

Additionally, to the extent that commenters have generalized concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to reduce the risk of overcrowding in DHS detention facilities. *See* 89 FR at 48742 (noting that "[h]igh [encounter] numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded . . . [which] creates health and safety concerns for noncitizens and Government personnel").

(5) Fairness or Risks Associated With Process

*Comment:* Commenters stated that the rule would undermine the commitment of the United States to providing refuge for those fleeing persecution and violence and exacerbate the humanitarian crisis at the southern border. Other commenters stated that the rule would increase refoulement and that the Departments did not adequately consider this consequence. Commenters asserted that the rule could cause arbitrary denials of asylum, thus placing noncitizens back into harm's way and resulting in life-threatening outcomes. A commenter asserted that the IFR ignores the realities of initial fear screenings (including that individuals have often experienced a long and difficult journey, undergo screenings within days of arrival, and may face barriers to accessing counsel and language services) and establishes an even higher screening standard that may prevent noncitizens from factually presenting claims before an AO. A commenter stated that a decline in positive credible fear determinations under the Circumvention of Lawful Pathways rule is a result of an orchestrated effort to reduce the screen-in rate by erecting barriers to eligibility and attorney consultation and eroding due process protections, not the result of the appropriate screening out of claims that would in fact be non-meritorious, as suggested by the Departments in the IFR.

Some commenters discussed the existing difficulties that noncitizens in CBP custody have in obtaining what they need, such as a pen and paper to write down essential information, access to counsel, and access to private phone services. Some commenters

stated that they have witnessed failures by USCIS and EOIR to notify attorneys of their clients' interviews and immigration court reviews.

*Response:* The present rule complies with all statutory and regulatory requirements related to access to counsel, including the right of a noncitizen to access counsel at no cost to the Government, the right to consult with a person of the noncitizen's choosing prior to the credible fear interview, and the right to have a person of the noncitizen's choosing (including a legal representative) present during the interview, provided it will not cause unreasonable delay. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). Moreover, in addition to protecting the procedural safeguards guaranteed by statute, the rule also ensures the United States honors its non-refoulement obligations under international law by screening for statutory withholding and protection under regulations implementing the CAT, even where a noncitizen is subject to the rule's limitation on asylum eligibility and cannot establish that the rule's exception applies under the significant possibility standard. 8 CFR 208.35(b)(2). Contrary to commenters' assertions that noncitizens may be prevented from presenting factual claims to an AO where they are subject to the IFR's limitation on asylum eligibility, AOs elicit testimony, and noncitizens have the opportunity to present testimony and other evidence relevant to a potential persecution or torture claim, even where the limitation applies and no exception is established during the credible fear interview; this allows the AO to effectively screen the noncitizen for a reasonable probability of persecution or torture. 8 CFR 208.35(b)(2)(i). Indeed, the experience of USCIS with the IFR since its implementation illustrates that noncitizens are still able to meet the higher reasonable probability standard in approximately 48 percent of cases where the IFR's limitation on asylum eligibility applies and no exception is established during the credible fear interview.[182]

Further, while a commenter suggested that the drop in the overall screen-in rate under the Circumvention of Lawful Pathways rule resulted from barriers to eligibility or to counsel and the erosion of due process rights, as opposed to screening out more potentially non-meritorious cases under the higher "reasonable possibility" standard in the

---

[181] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

[182] OHSS analysis of data pulled from CBP UIP on September 3, 2024 (Fear Screening—STB tab).

IFR, *see* 89 FR at 48746, a more granular examination of the various screen-in rates undermines the commenter's assertion. In fact, SWB encounter credible fear screen-in rates for screenings conducted by USCIS under the significant possibility standard remain consistent or increase when comparing (1) interviews that took place in the pre-pandemic period (76 percent positive); (2) interviews that took place under the Circumvention of Lawful Pathways rule where the presumption of asylum ineligibility applied but an exception was established (79 percent positive) or the presumption was rebutted (86 percent positive); and (3) interviews that took place under the IFR where the IFR's limitation on asylum eligibility applied but the IFR's exception was applicable (81 percent positive).[183] If anything, then, the screen-in rate at the significant possibility standard is higher under the Circumvention of Lawful Pathways rule and under the IFR, notwithstanding commenters' claims that factors such as difficulty in accessing counsel necessarily reduce screen-in rates. Rather, USCIS screen-in rates for USBP encounters effectively drop only when AOs apply the higher substantive standards, dropping (1) to approximately 51 percent for cases screened at the reasonable possibility standard where the Circumvention of Lawful Pathways presumption of asylum eligibility applies and no exception or rebuttal is established; and (2) to approximately 48 percent for cases screened at the reasonable probability standard where the IFR's limitation on asylum eligibility applies and no exception is established.[184] Accordingly, the analysis provided by the Departments in the IFR concluding that the drop in screen-in rates under the higher ''reasonable possibility'' standard relates to the merits of the potential claim, *see* 89 FR at 48746, remains supported and is only further bolstered by the experience of the Departments in implementing the IFR.

The IFR acknowledges that the rule's manifestation of fear and reasonable probability standards may increase the risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or may not receive a positive credible fear

determination. 89 FR at 48767. It also explains that there may be costs to noncitizens that result from their removal—indeed, such costs are likely. *Id.* Thus, the Departments did consider these risks, and they have continued to consider these risks in finalizing this rule.

The Departments weighed the fact that, despite the protections preserved by the rule, the available exception, and the training and expertise of DHS personnel, the changes to the credible fear process adopted may result in the denial of asylum when such an asylum claim otherwise may have been granted. *Id.* at 48750 n.250. As with all screening mechanisms, there is some risk that a case that might otherwise lead to a grant of asylum might not proceed to a merits adjudication, *id.,* but as discussed in Sections III.C.2.c and III.B.2.a.ii of this preamble, DHS personnel have significant experience and training in recognizing and interviewing noncitizens with protection claims, which the Departments believe will minimize the frequency of such cases. Regardless, in light of the emergency border circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate, necessary, and legally permissible. *Id.* And given the emergency border circumstances facing the Departments and the gap between high rates of referrals and screen-ins during the immediate post-pandemic period and historic ultimate grant rates, as described in Section II.A.2 of this preamble, the Departments believe the rule's provisions are appropriate and justified even if certain close cases result in imperfect outcomes. *Id.* As with other conditions and limitations imposed under section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that would overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. The Departments have determined that these important policies outweigh whatever marginal impact on meritorious claims the rule might have.

DHS serves noncitizens with all the necessary documents related to their credible fear determination, 8 CFR 208.30(f)–(g), which for noncitizens in detention may be served through a telephone call by USCIS, during which

information on the noncitizen's determination is relayed in a language that the noncitizen understands, while CBP or ICE personnel physically provide the documents to a noncitizen. While any person may consult with a noncitizen in the credible fear process, DHS provides copies of documents only to legal representatives who have completed a fully executed Form G–28.[185] Although commenters expressed concern about the burden of obtaining consent and a signature from a detained noncitizen, the Departments must balance the sensitive nature of credible fear interviews and the importance of confidentiality pursuant to the nondisclosure provisions in 8 CFR 208.6.

With regard to the comment about noncitizens in CBP custody having difficulties obtaining items such as pen and paper, or having access to counsel or to private phone booths, the Departments disagree with the commenters' characterizations. Noncitizens who are going through the credible fear process in CBP custody are provided with pen and paper, and they are afforded a period of time to consult with an individual of their choosing, which occurs in a private phone booth, as discussed in this section.[186] These phones and phone booths are also used to conduct the credible fear interview.

iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns

*Comment:* Many commenters expressed concern that the rule would disproportionately harm vulnerable groups, including Black individuals, Indigenous individuals, and People of Color (''BIPOC''), those who are HIV positive, and people with disabilities. For example, a commenter remarked that the Departments did not analyze the effect the rule has on particularly vulnerable populations such as Black migrants. A commenter voiced concern about the impact the rule could have on predominantly BIPOC communities, remarking that the rule perpetuates harmful political rhetoric about these communities and the border that can lead to long-term detrimental effects and violence. While sharing specific examples of the way the IFR has impacted members of BIPOC communities, another commenter raised

---

[183] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Summary Statistics tab; Fear Screening—CLP tab; Fear Screening—STB tab).

[184] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Fear Screening—CLP tab and Fear Screening—STB tab).

[185] DHS, *Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative* 1, 4 (Sep. 17, 2018), *https://www.uscis.gov/sites/default/files/document/forms/g-28instr.pdf.*

[186] To the extent that commenters have concerns regarding compliance with this policy, DHS notes that such complaints about noncompliance can be addressed under the process described in Section III.C.2.c of this preamble.

concern for the discrimination these populations may face under the rule while seeking asylum and waiting for an appointment. A commenter stated that the rule would prevent fair and equal access to lifesaving protections and lead to the unnecessary deaths of individuals who are denied entry and returned to dangerous and unsafe countries. Therefore, the commenter urged, the rule should be rescinded in its entirety.

*Response:* The Departments are committed to the equal treatment of all persons, and this rule does not distinguish between individuals based on race, nationality, ethnicity, or any other protected characteristic. The Departments also acknowledge that certain populations, including members of BIPOC communities, may have unique vulnerabilities or face unique issues in their country of origin or countries of transit, and agree that the United States has certain legal obligations to protect noncitizens present in the United States who fear harm in their home countries. But as explained more fully in Section III.A.1 of this preamble, the rule ensures that noncitizens may continue to seek asylum or other protection in the United States. The Departments note that the rule and its exception apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographics of concern identified by the commenters. Further, as explained in this section, adjudicators receive training to help them identify members of vulnerable communities and account for the harms such individuals may face. And, to the extent that members of certain communities may face greater risks because of their membership in those communities, the Departments believe that the "exceptionally compelling circumstances" exception will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question.

*Comment:* Several commenters expressed concern regarding the separation of families and the treatment of trafficking victims. A commenter generally supported allowing united families to escape persecution and cross the border together. Other commenters raised concern that the IFR and associated policy changes routinely separate families and often complicate or prevent family reunification. Another commenter wrote that the rule is likely to impose negative impacts on family wellbeing and result in family separations, as the commenter reasoned the changes in policy would incentivize an increase in the arrival of UCs because

families are unable to seek or receive protection by crossing the border together. One commenter also expressed concern that the rule puts children at risk to migrate alone. Another commenter elaborated that family unity and reunification is fundamental to our Nation's immigration policies and the foundational principles of a Catholic social teaching. The commenter voiced concern that the effects of this rule would be similar to the effects of the Migrant Protection Protocols ("MPP") and the Title 42 public health Order, which, the commenter stated, "led families to 'self-separate' at the border" because either the adults decided the conditions in Mexico were too dangerous to wait with them or the adults were injured or had disappeared. The commenter urged the Departments to rescind the rule entirely, arguing that the policy changes undermine families' ability to seek humanitarian protection.

Additionally, a commenter stated that the rule's exemption for survivors of trafficking is inadequate. The commenter wrote that survivors could be returned to trafficking situations when the new heightened credible fear standard fails to trigger safeguards codified in the TVPA.

*Response:* The Departments have designed the rule with a goal of keeping families together. As described in Section III.C.1.e of this preamble, the Departments have adopted family unity provisions that apply during both AMIs and section 240 removal proceedings. *See* 8 CFR 208.35(c), 1208.35(c). Additionally, if one member of a family unit traveling together is excepted from the limitation on asylum eligibility based on exceptionally compelling circumstances, then the entire family unit is excepted. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Accordingly, commenters are incorrect that the rule disallows families from obtaining relief or protection together.

Additionally, the Departments believe that the safeguards in place for victims of human trafficking are sufficient. A noncitizen who is a victim of a severe form of trafficking in persons as defined in 8 CFR 214.201 is excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and is also separately excepted from the provisions of this rule. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1) (excepting from the limitation on asylum eligibility noncitizens described in section 3(b) of the Proclamation); 8 CFR 235.15(a) (excepting from the manifestation provision noncitizens described in section 3(b) of the Proclamation). Noncitizens who meet that definition

are also excepted from the limitation on asylum eligibility as having established exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C). In practice, these two provisions provide two significant safeguards and work alongside section 3(b) of the Proclamation and 8 CFR 235.15(a) to ensure that noncitizens are not subject to the suspension and limitation on entry or any of the rule's provisions if they meet the definition of a victim of a severe form of trafficking.

*Comment:* A commenter raised concern for non-Mexicans under the rule being removed and left stranded in Mexico without migration documents or resources. The commenter explained that undocumented individuals removed to Mexico are vulnerable to arrest, detention, and potential deportation by Mexican immigration authorities. The commenter stated that this process has been a dangerous and unsafe practice that results in human rights violations and that government officials in Mexico have confirmed this practice will continue and potentially expand under the rule.

*Response:* This rule does not change the statutory and regulatory process for designating the country to which a noncitizen may be removed. To the extent that a greater number of noncitizens may be removed through the operation of this rule—some of whom may be removed to Mexico rather than their home countries, consistent with country of removal designation authorities—the Departments note that noncitizens may assert claims of fear of harm in Mexico and that the rule explicitly provides that noncitizens are screened for fear of harm in their "designated country or countries of removal." 8 CFR 208.35(b)(2)(ii); *see also* 8 CFR 208.35(b)(2)(iii).

The Departments acknowledge that noncitizens other than Mexicans who are removed to Mexico may be subject to Mexican immigration law. However, the Departments disagree that being returned to Mexico is necessarily unsafe, whether because of actions by the Government of Mexico or otherwise. Over the last several years, the Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. For instance, Mexico's Federal Public Defender's office provides legal counseling and support to asylum seekers and migrants who file claims with Mexico's Commission for Refugee Assistance, and the office has expanded its specialized staff and increased its visits to migration stations. 88 FR at

31411. Further, not only is Mexico a party to the 1951 Convention [187] relating to the Status of Refugees and its 1967 Refugee Protocol,[188] but also Mexico's Constitution includes a right to seek and receive asylum from political persecution. *See* Mex. Const. art. 11. In fact, the available grounds to qualify for asylum are broader in Mexico than in the United States. *See* 88 FR at 31411 (explaining that Mexico has joined the Cartagena Declaration on Refugees, which expands the definition of ''refugee,'' ''thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they have in the United States''). And applicants who do not qualify for asylum in Mexico are automatically considered for complementary protection if they possess a fear of harm in their country of origin, or if there is reason to believe that they will be subjected to torture or to cruel, inhuman, or degrading treatment, but do not meet the ''refugee'' definition; those granted complimentary protection are able to regularize their status.[189]

*Comment:* Multiple commenters expressed concerns for the health and safety of women and noncitizens from Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex (''LGBTQI+'') communities. For example, one commenter voiced concern for the asserted lack of equal opportunity and the Departments' asserted lack of analysis of the effect of the rule on particularly vulnerable populations, such as LGBTQI+ migrants. Another commenter wrote that the rule erroneously separates the imminent threat the noncitizen suffer at the border from their future threat of persecution upon return, especially for those noncitizens fleeing from Mexico who identify as LGBTQI+. The commenter wrote that violence towards members of the LGBTQI+ community can happen randomly and unexpectedly, and hence that noncitizens would be unable to predict or articulate the violent risks they may face when seeking refuge in the United States. In addition, the commenter voiced concern for the disproportionate impacts of the rule on LGBTQI+ community members from Mexico and the ''Northen Triangle'' countries of Guatemala, Honduras, and El Salvador because, the commenter asserted, these countries have long and documented histories of severe violence against the LGBTQI+ population. Citing research, the commenter wrote that 4,385 claims of fear were related to LGBTQI+ status and 98.4 percent of the interviews resulted in positive determinations for fear of persecution. In conclusion, the commenter urged that it is imperative for the United States to remain a haven for all people fleeing danger and violence, especially LGBTQI+ migrants and therefore requested that the IFR be immediately rescinded. This commenter further expressed concern that the IFR was contrary to President Biden's February 2021 memorandum on advancing the human rights of LBGTQI+ persons around the world, which included an explicit instruction to the Departments of State and Homeland Security to ''enhance their ongoing efforts to ensure that LGBTQI+ refugees and asylum seekers have equal access to protection and assistance, particularly in countries of first asylum.''

Citing experts on gender-based violence in Mexico, a commenter stated that violence against asylum seekers who are women or members of LGBTQI+ communities is endemic in many parts of the country. While sharing specific examples involving both LGBTQI+ community members and women, a commenter raised concern about the violence these populations may face under the rule while seeking asylum. For example, the commenter shared that migrant girls, adolescents, and women have either witnessed or been victims of exploitation, sexual violence, kidnapping, and human trafficking both in transit and while waiting in Mexico. The commenter also remarked that the rule adds new barriers that further endanger LGBTQI+ individuals, such as lack of access to safe housing, employment, and medical care.

Another commenter asserted that the rule arbitrarily and unlawfully prevents women, children, families, and LGBTQI+ community members from seeking safety in the form of asylum based on border encounter numbers that are unrelated to the individuals' need for protection. The commenter wrote that the result would be to severely harm the health and safety of those who would otherwise merit protection.

*Response:* The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries and recognize the importance of offering noncitizens the opportunity to seek protection from removal from the United States based on a likelihood of future persecution or torture. 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble and in the IFR, this rule complies with all such obligations and does not deny anyone the ability to apply for asylum or other protection in the United States. *See id.* at 48716–17, 48735–36.

The rule does not prevent noncitizens with valid claims from seeking asylum or other protection. To the extent that, as commenters asserted, women and members of the LGBTQI+ community do in fact face a greater risk of violence, those individuals would necessarily have a greater ability to establish that exceptionally compelling circumstances exist that would except them from the rule's limitation on asylum eligibility. To be clear, generalized risks of violence would not be sufficient to establish such circumstances, but insofar as such generalized risks manifest as specific threats to women and members of the LGBTQI+ community, the rule affords an avenue for those individuals to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And the rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection. A noncitizen who seeks to apply for asylum can also schedule arrival at a POE under a process approved by the Secretary, including by using the CBP One app, and avoid application of the rule. 8 CFR 208.35(a)(1), 1208.35(a)(1); Proclamation sec. 3(b)(v); 89 FR at 48737.

This rule does not preclude noncitizens who cross the southern border from seeking asylum or protection. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). AOs receive mandatory, specific training on screening and adjudicating gender-related claims.[190] This training includes information about violence against women (including domestic

---

[187] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Convention Relating to the Status of Refugees, https://treaties. un.org/doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-2.en.pdf* (last visited Sept. 24, 2024).

[188] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Protocol Relating to the Status of Refugees, https://treaties.un.org/ doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-5.en.pdf* (last visited Sept. 24, 2024).

[189] 88 FR at 11721 & n.144 (citing Government of Mexico, *Ley sobre Refugiados, Protección Complementaria y Asilo Político* (Jan. 27, 2011), *https://www.gob.mx/cms/uploads/attachment/file/ 211049/08_Ley_sobre_Refugiados__Protecci_n_ Complementaria_y_Asilo_Pol_tico.pdf*).

[190] USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* (Apr. 24, 2024).

**81206**   **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

violence), and guidance on interview considerations specific to gender-based claims.[191] AOs also receive training on screening and adjudicating claims relating to LGBTQI+ noncitizens.[192] This training includes information about types of harm that may be directed at LGBTQI+ individuals, as well as guidance on interview considerations specific to LGBTQI+ claims.[193] AOs are trained to recognize the sensitive nature of these claims and to pursue appropriate lines of inquiry.[194] AOs also receive training on country of origin information specific to LGBTQI+ issues, while recognizing that LGBTQI+ country-of-origin information may sometimes be difficult to find.[195]

Additionally, the Departments recognize the sensitive nature of credible fear interviews, especially for vulnerable populations, including LGBTQI+ noncitizens. For example, for those going through the credible fear process in CBP custody, CBP has taken steps to protect the privacy of noncitizens during their interviews. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. Additionally, ICE provides similar reasonable access to legal counsel for those who are detained in ICE custody during the credible fear process.[196]

*Comment:* Commenters stated that many immigrants today are Punjabi-speaking Sikhs seeking protection due to the worsening human rights conditions under India's current administration. The commenters stated that these immigrants may face hardships such as language barriers and difficulty accessing employment opportunities and resources upon arrival. Commenters stated that the rule would exacerbate language-barrier issues. Specifically, a commenter stated that the requirement to express a fear of persecution explicitly and proactively in order to be referred for a credible fear screening, and the limited time to seek legal advice from a language-accessible attorney, would prevent many Sikh noncitizens from understanding their legal rights or the need to express their credible fear. The commenters wrote

that it is critical for the Sikh community and many other populations fleeing persecution to have the opportunity to seek asylum and requested clarification on how the Government intends to address the concerns of religious minorities who would be impacted by the rule.

*Response:* The Departments disagree that the rule will exacerbate language-barrier issues. For those who are going through the credible fear process in CBP custody, CBP provides language assistance services for those who do not speak English, consistent with CBP's Language Access Plan.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. *See* 89 FR at 48741. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages, including Punjabi.[198] With respect to the signs and videos in CBP facilities that provide general information about the ability to express a fear, individuals who are unable to read those signs or communicate effectively in one of the languages in which the sign and video are presented are read the contents of the sign and video in a language they understand. *See* 89 FR at 48741.

The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries, including those who are fleeing for religious reasons, and recognize the importance of offering noncitizens the opportunity to seek protection from removal. But as explained more fully in Section III.A.1 of the preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States and meets all such legal obligations. *See also id.* at 48716–17, 48735–36. Further, although commenters asserted generally

that religious minorities would be harmed by the IFR and DHS's policy changes, the commenters provided no specific reason to believe that the IFR and policy changes would disproportionately impact any particular religious groups other than the Punjabi-speaking Sikhs discussed above.

*Comment:* Commenters discussed the rule's impact on noncitizens with fewer financial resources and means. For example, a commenter wrote that the rule would further disadvantage those noncitizens with fewer financial resources because they are less likely to pursue alternative routes to safety. A few commenters expressed concern for noncitizens with physical and mental health disabilities. And a commenter remarked that individuals with cognitive issues, disabilities, and language barriers are less likely to effectively articulate fears to border officials.

*Response:* The Departments agree that the United States has certain legal obligations to protect from removal those who fear specific types of harm upon removal and recognize the importance of offering noncitizens the opportunity to seek protection from removal, including noncitizens with fewer financial resources, noncitizens with physical and mental health disabilities, and noncitizens with cognitive issues, disabilities, and language barriers. But as explained more fully in Section III.A.1 of this preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States. *See also id.* at 48716–17, 48735–36. Further, there is no fee to download or use the CBP One app to schedule an appointment and thereby avoid the IFR's limitation on asylum eligibility,[199] and DHS has designed the CBP One app to be accessible to people with disabilities. Additionally, the Departments note that, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the "exceptionally compelling circumstances" standard, or, as discussed previously, AOs may exercise their discretion to issue an NTA to place such noncitizens into section 240 removal proceedings as appropriate, where additional procedural safeguards are available to noncitizens. For

---

[191] *E.g., id.* at 15–20, 42.

[192] USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Apr. 24, 2024).

[193] *E.g., id.* at 18–19, 27–34.

[194] *Id.* at 28–30, 37–38, 49.

[195] *Id.* at 43–44, 50.

[196] ICE, *Access to Due Process: Fiscal Year 2023 Report to Congress* 2–3 (Feb. 20, 2024), *https:// www.dhs.gov/sites/default/files/2024-04/2024_ 0220_ice_access_to_due_process.pdf.*

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publication/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Feb. 7, 2020), *https://www.dhs.gov/sites/default/files/ publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/ publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 24, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https:// www.dhs.gov/sites/default/files/publications/ Habla%20Poster_12-9-16.pdf* (last visited Sept. 24, 2024); *see also* DHS, *DHS Language Access Resources* (last updated July 17, 2023), *https:// www.dhs.gov/publication/dhs-language-access-materials.*

[199] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/ about/mobile-apps-directory/cbpone* (explaining in response to frequently asked questions that "the CBP One™ mobile application is FREE and available to everyone who has access to a mobile device").

example, during section 240 removal proceedings, IJs may more fully consider whether a noncitizen demonstrates indicia of mental incompetency and, if so, what procedural safeguards are appropriate. *See Matter of M–A–M–*, 25 I&N Dec. at 481–83. Additionally, CBP officers may determine that such noncitizens are excepted from the suspension and limitation on entry (and thus that the provisions of this rule do not apply) under Section 3(b)(vi) or (vii) of the Proclamation.

iv. Impacts on Criminal Enforcement

*Comment:* Commenters stated that they are concerned that noncitizens would face criminal charges if they attempted to return to the United States following removal under the rule. One commenter stated that an increased number of expedited removal orders would inevitably lead more noncitizens to attempt to reenter the United States after their removal, potentially subjecting them to felony charges and two years of imprisonment, and that noncitizens should not be deemed criminals and incarcerated for seeking asylum in the United States. Another commenter stated that charging noncitizens criminally would decrease their access to humanitarian relief and increase the risk that criminal organizations would target those noncitizens.

*Response:* The Departments are committed to the fair, evenhanded enforcement of the law as Congress has enacted it. The Departments agree that, in appropriate cases, noncitizens who have been removed pursuant to an expedited removal order may be subject to criminal charges if they attempt to unlawfully reenter the United States. *See* INA 276(a), 8 U.S.C. 1326(a). Because the rule will allow the Departments to predictably and swiftly impose consequences on noncitizens who enter the United States without a legal basis to remain, the Departments believe noncitizens will be disincentivized from attempting to enter without a legal basis to remain or to reenter after being removed. Nevertheless, for the relatively few who choose nevertheless to reenter unlawfully, congressionally enacted criminal penalties remain an important tool to enforce the law.[200]

v. Negative Impacts on Other Affected Entities

*Comment:* Commenters stated that the rule would impose more burdens on nonprofit organizations, legal-service providers, and communities near the border. One commenter believed that the increase in negative fear determinations would cause legal-service providers to dedicate significant resources to preparing clients for and representing them in hearings before IJs and potential requests for reconsideration to USCIS. The commenter also alleged that the Departments have failed to consider reliance interests such as those of legal-service providers that prepare informational material, employ internal protocols, and deliver client services predicated on access to asylum and on access to clients in custody; the commenter stated that their organization would need to understand the changes effected by the rule, train staff and pro bono volunteers on those changes, and rewrite published legal information in multiple languages. Another commenter stated that its presentations would become longer and more complex to explain the effect of the rule's limitation on asylum eligibility, the exceptionally compelling circumstances needed to overcome it, and the new, heightened "reasonable probability" standard in credible fear interviews. The commenter asserted that the rule would also affect its staff's ability to provide services to callers of its hotline and its clients' ability to understand the legal issues involved.

*Response:* The Departments decline to modify the rule in response to the commenters' concerns. The concerns raised are not unique to immigration. Any change to any law or policy regulating the public requires providers who practice in the relevant area to adapt—they must learn the new law and advise clients accordingly. To facilitate the transition to the new provisions, since the Proclamation and IFR came into force, DHS personnel have regularly made themselves available to answer questions about these policies and the Departments' implementation activities, made information about these policies public on the Departments' websites,[201] and proactively engaged a

variety of stakeholder groups to promote understanding of the rule. The Departments believe that any purported costs that nonprofit organizations and legal-service providers assert they will bear in adapting to the changes effected by the rule are outweighed by the interest in reducing the current levels of encounters and allowing the Departments to invest more of their limited resources into predictably and swiftly delivering consequences to noncitizens who cross the border without a lawful basis to remain in the United States. *See* 89 FR at 48714. Although returning to the status quo before the IFR may eliminate some of the asserted burdens to which the commenters object, that status quo would perpetuate the vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to those encountered at the southern border who lack a lawful basis to remain in the United States, ultimately incentivizing more noncitizens to attempt to cross the border. *See id.* Conversely, a decrease in encounters at the southern border could be expected to allow organizations like the commenters to allocate more resources to each of their individual clients, allowing them to serve their clients more effectively.

The Departments also disagree that the rule will burden communities near the border. To the contrary, the rule will free resources to allow DHS to more effectively patrol the border and interdict smugglers and TCOs.[202] Moreover, the rule enables the delivery of predictable, swift consequences to noncitizens who cross the border without a legal basis to remain in the United States. That will disincentivize such noncitizens from attempting to cross the border, depriving smugglers and TCOs of opportunities to perpetuate their illegal operations. *See* 89 FR at 48730. In these ways, this rule is expected to reduce smuggler and TCO activity in border communities, ultimately reducing the harms that those activities bring to those communities. Additionally, the same incentives are expected to ultimately lower the number of noncitizens present in border communities, further reducing the burdens on those communities.

---

[200] Even so, although convictions for certain "particularly serious crimes" may render noncitizens ineligible for asylum or withholding of removal, unlawful reentry alone is not necessarily a particularly serious crime. *See* INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii); INA 241(b)(3)(B)(ii), 8 U.S.C. 1231(b)(3)(B)(ii); *Matter of N–A–M–*, 24 I&N Dec. 336, 342 (BIA 2007) ("Where,

as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.").

[201] *See, e.g.,* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[202] *See* 89 FR at 48729–30.

**81208** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

b. Negative or Minimal Impacts on Immigration System and Government Operations

i. Undermines the Administration's Promises and Goals

*Comment:* Some commenters urged the Administration to keep its promises, stating that "[w]e are all immigrant[s]." Specifically, one commenter stated that the Administration "has not upheld its promise to safeguard the legal right to asylum and protect individuals from persecution, violations of due process, and family separation." Other commenters asserted that the Administration issued the Proclamation for political reasons, including using it as a political tool and for reelection purposes, while another commenter stated that the rule will not be effective in achieving the Administration's perceived political messaging or in "sway[ing]" right-wing individuals. And a third commenter argued that the Democratic Party supported discriminatory ideas like those found in the rule despite claiming to disagree with such policies.

Along the same lines, commenters stated that the rule is inconsistent with the Administration's goal of creating a just immigration system and goes against the Administration's promise to not deny asylum for noncitizens fleeing persecution and violence. One commenter claimed that the Administration had "previously pledged to restore the United States' 'moral standing in the world and our historic role as a haven for refugees and asylum seekers, and those fleeing violence and persecution,'" but that the rule "is misaligned with the values promised by this administration, including promises to end Trump-era restrictions on asylum seekers." Other commenters asserted that the Departments sought to curtail the rights of noncitizens arriving at the border by shutting them out of the asylum process based "solely" on how they arrived in the United States, even though the Administration had previously called on agencies to review expedited removal procedures to make them fairer. Another commenter expressed concern regarding what they alleged was a shift in the Administration's "rhetoric" and support for "fear-based restrictions" on asylum, instead of proposing measures to overhaul and ameliorate the asylum process, which they said was "sadly a very different stance" from the Administration's position a few years ago. A few commenters urged the Administration to expand the asylum system and to not close the southern border.

*Response:* The Departments agree that the United States has a long tradition of accepting and welcoming refugees and note that in the past few years, the United States Government has taken steps to significantly expand refugee admissions worldwide,[203] including for refugees from Latin America and the Caribbean. *See* 89 FR at 48712; 88 FR at 31333, 31341. However, without a policy in place to ensure lawful, safe, and orderly processing of noncitizens entering the United States during emergency border circumstances, the number of noncitizens in such circumstances would exceed DHS's already limited resources and facilities. *See* 89 FR at 48711–15. As explained in the IFR and under this rule, noncitizens seeking protection in the United States will still be able to do so, either before USCIS or in removal proceedings before EOIR, subject to the rule's provisions.

The Departments have determined that the changes effected by the IFR and the rule during emergency border circumstances will allow for better management of the limited resources Congress has provided to the Departments. Specifically, noncitizens intending to seek asylum are encouraged to do so using lawful pathways and processes, which facilitate the orderly processing of claims. In addition, the changes in the IFR and this rule permit the Departments to swiftly screen noncitizens not likely to establish eligibility for relief or protection, as well as to efficiently identify and process valid claims. The combined effect of the changes has reduced the percentage of noncitizens placed in section 240 removal proceedings,[204] where cases may take years to resolve.[205] In addition to reducing the impact on EOIR operations, reducing the number of noncitizens in removal proceedings reduces ancillary benefit requests to USCIS, *see* 8 CFR 208.7 (employment authorization for pending asylum applicants), and alleviates the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of section 240 removal proceedings but who do not comply with their orders, *see, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or

release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal").

The Departments reiterate that a noncitizen may avoid application of the limitation on asylum eligibility if the noncitizen establishes by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). The Departments recognize that some noncitizens who would otherwise be granted asylum may not be eligible due to this rule. However, because such noncitizens remain able to seek statutory withholding of removal and CAT protection, the Departments believe that this rule strikes the appropriate balance between the need to protect those who wish to seek protection in the United States and the need to use resources effectively during emergency border circumstances.

Moreover, the Departments have determined that responding to emergency border circumstances is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws, as well as to reduce the role of exploitative and dangerous smuggling and human trafficking networks. *See* 89 FR at 48714, 48723, 48726, and 48767. One cause of recent surges in irregular migration is smugglers' and noncitizens' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. Indeed, this rule follows congressional inaction limiting DHS's capacity to impose such consequences despite the Departments' repeated attempts to obtain the legislative framework and resources required to address unprecedented levels of irregular migration. In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[206] 89 FR at 48729.

---

[203] U.S. Dep't of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024,* at 6 (2023), *https://www.state.gov/wp-content/uploads/2023/11/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf.*

[204] OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[205] *See* OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab).

[206] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

Critically, the proposal included more than $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities.[207] *Id.* However, Congress failed to move forward with this bipartisan legislative proposal.[208] *Id.* It also failed to pass the emergency supplemental funding requests that the Administration submitted. *Id.* Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. *Id.*

In light of congressional inaction, this rule is designed to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances with the resources and tools Congress did make available. As discussed in Section II.A.2 of this preamble, the Departments assess that this rule significantly increases their ability to deliver timely decisions and consequences. Accordingly, the Departments reject commenters' claim that the Departments' basis for promulgating the rule is political. Rather, the Departments believe that the rule will continue to reduce irregular migration by allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain in the United States.

### ii. Similarity to Actions of Past Administration

*Comment:* Some commenters stated that the rule was akin to the asylum-related rulemaking and policies of the prior Administration, which, the commenters said, denied noncitizens their "legal right to request asylum in the United States" and were "struck down" by Federal courts. Specifically, one commenter stated that the prior Administration "provided [a] similar rationale" for its policies: "to alleviate the mass illegal immigration crises along the Southern border by discouraging the submission of fraudulent or otherwise meritless asylum claims." And another commenter asserted that the rule was

similar to the prior Administration's interim final rule entitled *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR"), in that it is "again barring people crossing between ports from accessing asylum protections for no legitimate reason beyond false optics of border 'control' that unlawfully penalize and seek to deter those who need access to protection." A number of commenters criticized the rule as an insufficient break from prior immigration policies that the commenters described as "inhumane," "cruel[]," and "punishing." Some commenters claimed that the Administration was "walking back promises to protect fair asylum processes" since revoking Title 42. And another commenter stated that the Administration's echoing of "reactionary measures" of the prior Administration "during a looming election season" was a "cynical approach" that would foster "division and xenophobia," fail to address the root causes of immigration issues, and "alienat[e] an electorate that values fairness and justice for immigrants."

*Response:* The Departments disagree that the rule is indistinguishable from or too similar to the asylum-related rulemakings and policies commenters cited. The Proclamation Bar IFR, for instance, imposed a categorical eligibility bar for noncitizens crossing the southern border outside a POE. *See* 83 FR at 55935; *cf. East Bay III,* 993 F.3d at 669–70. By contrast, this rule does not operate as a categorical bar on asylum eligibility based on manner of entry. Instead, the rule provides a limitation on asylum eligibility for certain noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Importantly, then, noncitizens may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety;

or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Noncitizens may also be excepted from the limitation if, during section 240 removal proceedings or the asylum merits process, they meet the family unity exception. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, under the family unity provision, the following noncitizens may be treated as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those who (1) are found eligible for statutory withholding of removal or CAT withholding; (2) would be eligible for asylum but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) have a qualifying spouse or child. *See id.* The Departments believe that the distinctions between this rule and the Proclamation Bar IFR are of legal significance, and those distinctions are discussed at length in the IFR. *See* 89 FR at 48735–36.

In addition, the rule is designed to implement policies distinct from those motivating the Proclamation Bar IFR. This rule seeks to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718, 48726–31. The rule is intended to better manage already strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. *See* 89 FR at 48767. In that vein, the Proclamation Bar IFR differed in important respects from this rule. *See* 89 FR at 48734–36, 48738 (explaining that this rule does not treat the manner of entry as dispositive in determining asylum eligibility, contains an exception that accounts for varied circumstances, and is narrowly tailored to address the emergency border circumstances described in the Proclamation and this rule and thus does not allow for implementation of future proclamations or orders).

Moreover, this rule is a response to emergency border circumstances that did not exist when the Proclamation Bar IFR was promulgated. 89 FR at 48726–28. Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution,

---

[207] Deirdre Walsh & Claudia Grisales, *Negotiators Release $118 Billion Border Bill as GOP Leaders Call It Dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[208] Stephen Groves, Rebecca Santana & Mary Clane Jalonick, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance,* AP News (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

poverty, human rights abuses, the impacts of climate change, and other factors. *Id.* at 48726. The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[209] including by working closely with partner countries across the Western Hemisphere.[210] *Id.* at 48727. But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. *Id.*

iii. Would Be Ineffective or Not Achieve Its Intended Outcomes

*Comment:* Commenters expressed opposition to the rule, claiming that the rule would decrease, not increase, the efficiency of USCIS management of asylum cases and could lead to further backlogs and inefficiencies for AOs and immigration courts, complicating the asylum process. One commenter believed that the rule would "exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture." Some commenters asserted that the Departments have created an "unworkable, convoluted, and unfair" system at the border, which CBP officers and AOs will not be prepared to adapt to. Commenters claimed that the rule would create additional administrative burdens by requiring officers, applicants, stakeholders, and judges to apply multiple tests in one proceeding. Further, commenters stated that having to track, identify, and apply different standards would be more complex for all those involved.

Other commenters stated that the rule would exacerbate conditions at the southern border and would increase the number of migrants who enter between POEs, further straining resources and escalating the current humanitarian crisis. A commenter stated that the rule may cause migrants to be turned away if they walked up to a POE, and thus, it would "inadvertently encourage desperate individuals to resort to dangerous methods to reach safety." One commenter voiced concern that the rule would have an adverse effect on the asylum process because the rule would cause a foundational shift in the U.S. asylum system, causing access to asylum to be the exception rather than the norm. Another commenter claimed that decades of deterrence policies have "proven that punitive policies do not reduce irregular migration—they only increase chaos, confusion, and human suffering." (Emphasis omitted.)

Other commenters claimed that the rule would be ineffective at achieving its intended goals for managing the border. One commenter stated that people were coming to the United States because they had no choice, so securing the border would not solve the problem. Similarly, a commenter stated that the rule would be like playing "whack-a-mole, except with real live people, most of whom would not undertake such a dangerous, difficult journey to the border if they felt they could stay where they were." Furthermore, a commenter stated that, without additional resources, the Government will have no way of fully implementing its own policy. Commenters cited an article stating that "it is hard to say with confidence whether this regulation will work as the administration intends."[211] One commenter stated that the Proclamation did not address the actual needs of asylum seekers, nor did it address the problem that has led the U.S. immigration system to be "broken." This commenter described a "broken legal system that takes years to process cases, leading individuals to live in limbo and without important legal rights." Along the same lines, another commenter stated that turning away noncitizens is evidence of a faulty immigration system and, thus, there are better solutions than turning away those asking for help.

Other commenters asserted that the rule had not substantiated its aim of incentivizing a sustained drop in the number of encounters at the southern border. While citing a study, one commenter stated that any change in border policy triggers a short-term drop in encounters, regardless of the intent of the policy change. The commenter also stated that the rule has not provided an adequate explanation for the assumption that it would achieve its objective of reducing the number of encounters at the border. And while referencing another study, another commenter elaborated that policies that limit access to POEs increase irregular crossings by noncitizens who cannot wait in Mexico, which they stated was also confirmed by DHS's Office of Inspector General. Conversely, another commenter remarked that, while there has been a temporary drop in encounters immediately after the issuance of the IFR, the IFR would be ineffective in deterring migrants in the long term because of the rule's exceptions and loopholes. Lastly, another commenter expressed concern that "[a]s written, the [IFR] simply continues the status quo by encouraging mass illegal immigration and abuse of our asylum system."

*Response:* The Departments disagree that the rule decreases the efficiency of management of asylum claims. The Departments recognize that the rule may require additional time for AOs and IJs during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and noncitizens' fear claims. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the IFR has resulted in significantly reduced irregular migration and has allowed the Departments to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. *See* Section II.A.2 of this preamble. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be accompanied by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule. And as discussed in Section III.C.3 of this preamble, AOs and IJs are specifically trained to apply multiple tests in the same proceedings; any claim that these trained and skilled professionals would be burdened by multiple tests is unfounded. Moreover, any burdens imposed by the rule on

---

[209] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[210] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[211] Am. Immigr. Council, *Analysis of the President's 212(f) Proclamation & Interim Final Rule Restricting Asylum* 2 (2024), *https:// www.americanimmigrationcouncil.org/research/american-immigration-council-analysis-presidents-212f-proclamation-and-interim-final-rule.*

CBP officers and agents have been accompanied by a substantial reduction in other resource burdens due to a substantial reduction in encounters at the southern border caused by this rule.

The Departments agree with commenters that the immigration system is badly in need of additional resources and efficiencies. This rule is not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade. However, the Departments disagree that these fundamental challenges mean this rule will be ineffective in achieving its aims. Given the absence of reforms by Congress, the Departments are working within the legal framework and with the resources provided by Congress to ensure the functioning of the border security and immigration systems during emergency border circumstances. After the implementation of the Proclamation and IFR, the Departments saw a significant decrease in encounters along the southern border, which has allowed the Departments to more efficiently process noncitizens through expedited removal, delivering timely decisions and consequences and discouraging irregular migration. In other words, commenters are incorrect that the rule would lead to an increase in encounters between POEs and decreased efficiencies in the process.

Notably, in addition to the decrease in encounters, operations at POEs have remained largely steady over this time. For example, vehicle wait times at POEs on the SWB have not shown changes from typical monthly fluctuations. The numbers of vehicle occupants and pedestrians entering the United States with lawful status have remained aligned with normal entry data. In particular, between August 2023 and May 2024—the last month before implementation of the IFR—the average wait time across all SWB POEs (passenger vehicle, pedestrian, and truck cargo) was 32 minutes for vehicles, 15 minutes for cargo trucks, and 9 minutes for pedestrians. From June 2024 through July 2024, the average wait times were 34 minutes for vehicle traffic, 9 minutes for truck cargo, and 7 minutes for pedestrians.

With respect to the suggestion that the rule would inadvertently encourage desperate individuals to resort to dangerous methods to reach safety (such as crossing between POEs), the Departments note that the rule creates no such incentive; experience shows that the IFR has improved DHS's capacity to swiftly deliver consequences to those who cross between POEs and

do not have a lawful basis to remain, including through the use of expedited removal. *See* Section II.A.2 of this preamble. Notably, the comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against irregular migration of noncitizens who cross between POEs without viable claims for asylum. In addition, the rule, by adopting the exceptions contained in section 3(b) of the Proclamation, complements and incentivizes the use of lawful, safe, and orderly pathways and processes for individuals to come to the United States.

With respect to the claim that this rule will yield at most a short-term reduction in encounters as noncitizens decide that they cannot wait in Mexico, the Departments note that thus far, encounters have not increased to the levels that were seen in the years leading up to the IFR. *See* Section II.A.2 of this preamble. Moreover, in the Departments' experience, migrants are sensitive to the incentives created by national policy,[212] and the Departments see an imperative to act in the face of the challenging problem of very high levels of irregular migration. Even if the rule's effects did not last indefinitely, moreover, that would not be a reason to depart from the rule's approach now—when its approach is having its intended effect.

The Departments do assess that ensuring that the reduction in border encounters is sustained will require not just the rule itself but work on the confluence of factors that also contribute to high levels of irregular migration. And in parallel with this rule, the Administration is working to address those factors.[213] For instance, the United States Government is working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[214] including through working

closely with partner countries across the Western Hemisphere.[215] 89 FR at 48727; *see* Section II.A.2 of this preamble. Additionally, increased access to lawful, safe, and orderly pathways will continue to complement one of the rule's goals of discouraging irregular migration where appropriate.[216] While these and other parallel measures are necessary complements to the rule, they cannot substitute for the rule: These efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. 89 FR at 48727.

c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety

*Comment:* Commenters expressed general concern that the IFR would negatively impact the U.S. workforce and economy, stating that the United States needs immigrants to bolster the workforce and address labor shortages, that the United States was built on the labor of immigrants, and that reliance on immigrant labor continues today. They argued that restricting immigration into the United States exacerbates population shortages, and that closing borders to immigrants negatively impacts the food supply chain because a significant portion of agricultural workers and food processing employees are immigrants. One commenter specified that migrants are currently needed because "the reproductive birthrate here has declined" and "replacement" of economic contributors is "essential to avoid complete replacement by 'artificial intelligence.'"

*Response:* The Departments do not dispute the importance and contributions of immigrants to the economy. As noted in Section V.B. of this preamble (in which the Departments describe the estimated

---

[212] *See, e.g.,* Miriam Jordan, One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay, N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[213] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and;* U.S. Agency for Int'l Dev., *U.S. Strategy to Address the Roots Causes of Migration in Central America—FY 2022 USAID Results, https://www.usaid.gov/central-america-and-mexico-regional-program/fy-2022-root-causes-strategy-results* (last visited Sept. 15, 2024).

[214] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-*

strengthen-joint-humanitarian-plan-on-migration/ (describing the commitment of the United States and Mexico to addressing root causes of migration).

[215] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[216] *See, e.g.,* Ezra Klein, *The Real 'Border Czar' Defends the Biden-Harris Record,* N.Y. Times (Sept. 13, 2024), *https://www.nytimes.com/2024/09/13/opinion/ezra-klein-podcast-alejandro-mayorkas.html* (interview response of Secretary of Homeland Security Alejandro Mayorkas explaining that one "leg[] of the stool" for decreasing encounters is presenting migrants with "alternative means of accessing humanitarian relief in the United States," including "the lawful pathways that we have built").

effects of the rule pursuant to Executive Order 12866), the expected effect of this rule is primarily to reduce incentives for irregular migration and illegal smuggling activity. This rule does not inhibit or prevent regular migration into the United States. In particular, the Departments have been clear that the IFR does not apply to any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States or presents at a POE pursuant to a pre-scheduled time and place. 89 FR at 48715; *see also* 8 CFR 208.35(a), 1208.35(a) (excepting from the limitation on asylum eligibility noncitizens who are excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation). Additionally, this rule does not change or place any restrictions on those who may be eligible for employment authorization within the United States. The Departments recognize that there may be an impact on some people who attempt to enter the United States irregularly and who are removed after their entry, but the Departments find that the limitation on asylum eligibility is, on balance, an appropriate response to surges in irregular migration during emergency border circumstances. For those whom this rule renders ineligible for asylum but who ultimately receive statutory withholding of removal or CAT protection, another effect would be the increased frequency with which those subject to this rule who are present in the United States are required to renew their employment authorization and a reduced ability for their family to immigrate to the United States.

Additionally, as noted in the IFR, 89 FR at 48712 & nn.10–13, over the past several years the United States Government has implemented a historic expansion of lawful pathways and processes to come to the United States, including:

• The CHNV parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;

• The Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other things, information and referrals to humanitarian or family reunification parole processes, labor pathways, and expedited refugee processing for eligible individuals;[217]

• The expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 up to 50,000 in FY 2024; and

• Expanding access to labor pathways.

More specifically, recognizing the significant contributions noncitizens make to the U.S. economy, the United States Government significantly expanded access to labor pathways to maintain strong economic growth and meet labor demand in the United States. Our efforts to expand access to labor pathways have yielded results. In FY 2023, the United States issued 442,000 H–2A and H–2B nonimmigrant worker visas globally.[218] Similarly, in FY 2023, the United States issued 265,777 H–1B specialty occupation visas,[219] the highest number of visas issued or otherwise utilized in decades.[220] Furthermore, the United States also issued more than 192,000 employment-based immigrant visas in 2023—far above the pre-pandemic number—and ensured that no employment-based visas went unused for the second year running.[221]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this rule will reduce the likelihood that newly arrived migrants will be subjected to labor

trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the limitation on asylum eligibility or the other provisions of the rule.

*Comment:* Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. While citing a 2024 article, a commenter stated that the IFR would subject noncitizens who cross the border irregularly to expedited removal and further criminalization through criminal prosecution, costing taxpayers over $7 billion to incarcerate migrants charged or convicted with unauthorized entry or reentry crimes.

*Response:* The Departments emphasize that neither the IFR nor this rule requires DHS to refer noncitizens it encounters at the border for prosecution for unauthorized entry or other immigration-related offenses. It is incorrect to cite expedited removal as the vehicle leading to mass incarceration and criminal prosecution of migrants. To the contrary, expedited removal is a process that allows DHS officials to quickly remove certain noncitizens encountered at the border. While it is true that noncitizens will spend some time in custody pending completion of the expedited removal process (and for a credible fear determination where referred), such custody is not for purposes of criminal prosecution. Although the Departments recognize commenters' concerns regarding the amount of taxpayer funds used to incarcerate migrants who are charged and convicted with unauthorized entry or reentry crimes, that is not at issue here. And in any event, as discussed in Section V.B of this preamble, the Departments expect that the rule will result in significantly reduced irregular migration. Accordingly, the Departments expect AOs and IJs to conduct a smaller number of credible fear cases than AOs and IJs would otherwise be required to handle in the absence of this rule, with the possibility of attendant savings of Government resources.

### d. Other General Opposition

*Comment:* Several comments urged the Departments not to close the SWB.

*Response:* The rule does not close the SWB. It adds a limitation on asylum eligibility and alters the process for those individuals described in section 3(a) of the Proclamation who are not described in section 3(b) of the

---

[217] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sep. 20, 2024);

The White House, *Fact Sheet: Biden-Harris Administration on World Refugee Day Celebrates a Rebuilt U.S. Refugee Admissions Program* (June 20, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/20/fact-sheet-biden-harris-administration-on-world-refugee-day-celebrates-a-rebuilt-u-s-refugee-admissions-program/*.

[218] U.S. Dep't of State, *Worldwide Visa Operations: Update, https://travel.state.gov/content/travel/en/News/visas-news/worldwide-visa-operations-update.html* (last updated Jan. 2, 2024).

[219] U.S. Dep't of State, *Nonimmigrant Visa Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited Aug. 27, 2024) (see the "FY2019–2023 Detail Table (PDF)" under "Nonimmigrant Visas by Individual Class of Admission (e.g. A1, A2, etc.)").

[220] *Id.* (see the "FY1997–2023 NIV Detail Table (Excel spreadsheet)" under "Nonimmigrant Visa Issuances by Visa Class and by Nationality" showing issuance totals of H–1B specialty occupation visas).

[221] USCIS, *Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade* (Feb. 9, 2024), *https://www.uscis.gov/EOY2023*.

Proclamation, but it does not "close" the border.

Additionally, the rule does not impose any changes to asylum eligibility or processing of noncitizens who use lawful, safe, and orderly pathways to seek entry to the United States. Noncitizens who use the CBP One app to pre-schedule an appointment at a SWB POE to present themselves at the border in a safe, orderly, and lawful manner are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and so are excepted from the limitation on asylum eligibility and changes to expedited removal processing. This exception is significant. From June 5, 2024, through August 31, 2024, 123,600 noncitizens with CBP One appointments presented at POEs and were accordingly processed outside of the IFR's provisions and will be excepted from the limitation on asylum eligibility if they choose to apply for asylum.[222] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D). During the pre-pandemic period, approximately 330 encounters were processed at SWB POEs per day.[223] Since January 2023 through August 2024, approximately 1,500 encounters have been processed at SWB POEs per day.[224] And since the start of FY 2024 through August 2024, that average has increased to approximately 1,700 per day.[225]

### C. Provisions of the Rule

1. Limitation on Asylum Eligibility

a. Proclamation Exceptions—Section 3(b) of Proclamation

*Comment:* Commenters raised a number of concerns regarding the exceptions to the Proclamation's suspension and limitation on entry, including the exceptions for UCs; those permitted to enter based on the totality of the circumstances; and those permitted to enter based on operational considerations.

As an initial matter, a majority of commenters supported the Proclamation's exclusion of UCs from the suspension and limitation on entry or from provisions of the rule. However, some commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry, without also providing an exception for family units,

would lead families traveling together to choose to "self-separate" at the border and send the children across unaccompanied because conditions in Mexico are too dangerous for children to wait with their parents until the family can cross together. Similarly, commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry would encourage the trafficking and exploitation of children. Commenters stated that the rule, without an additional family-unit exception, would therefore result in the separation of families.

Another commenter opposed the Proclamation's exception for UCs. This commenter stated that noncitizens, including those who pose security risks, would attempt to pose as UCs to evade the Proclamation's suspension and limitation on entry.

Additionally, some commenters opposed the exceptions in sections 3(b)(vi) and 3(b)(vii) of the June 3 Proclamation, which provide that the suspension and limitation on entry will not apply to a noncitizen if a CBP immigration officer determines that the noncitizen is permitted to enter either based on the totality of the circumstances or based on operational considerations. Commenters expressed concern that these exceptions are vague and subjective and should not be left to the discretion of CBP immigration officers.

Specifically, commenters asserted that the Proclamation does not provide any standards or make clear how CBP officers will determine when someone is excepted based on the totality of the circumstances or operational considerations. Commenters also stated that CBP immigration officers may not be properly equipped to apply the Proclamation's exceptions, which would result in arbitrary decision-making and removals in violation of non-refoulement principles.

Other commenters stated that the Proclamation's exceptions were overly broad and would authorize CBP immigration officers to use them as a "loophole" to permit large populations of noncitizens to enter the country based on the "totality of the circumstances" or due to "operational considerations." These commenters stated that, as a result, overbroad use of these exceptions will result in fewer noncitizens being removed and will not change the status quo of large numbers of noncitizens crossing the border.

Lastly, commenters expressed concern that noncitizens excepted under section 3(b)(vi) or 3(b)(vii) of the June 3 Proclamation based on the totality of the circumstances or for

operational considerations and who are subsequently placed into immigration court proceedings will be unable to demonstrate that they are not subject to the rule's provisions in immigration court.

*Response:* Any comments opposing provisions of the Proclamation, as opposed to the parallel provisions of the rule, are outside of the scope of this rule. President Biden issued the Proclamation by the authority vested in the President by the INA. *See* INA 212(f), 8 U.S.C. 1182(f); INA 215(a), 8 U.S.C. 1185(a); 89 FR 48487. Under section 3(d) of the Proclamation, the President directed the Secretary and Attorney General to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions to such asylum eligibility limitations and conditions that they determine are warranted. The Departments lack authority to amend the exceptions to the Proclamation's suspension and limitation on entry, as set forth in section 3(b) of the Proclamation, and any proposal to do so would be outside the scope of this rule. At the same time, the Departments may depart from the Proclamation's section 3(b) exceptions in determining which exceptions to this rule's limitation on asylum eligibility are warranted to the extent they are adopted in this rule, and the Departments have responded to comments suggesting such exceptions below.

To the extent that commenters suggest excepting family units from the rule's limitation on asylum eligibility, the Departments reiterate that excepting all family units could incentivize families to bring their children on the often-perilous journey to the United States. *See* 89 FR at 48757. Such a broad exception would also be at odds with the Proclamation and rule's goals in addressing emergency border circumstances. *See id.* at 48726–31 ("Need for These Measures").

Further, the Departments do not believe that the rule will meaningfully incentivize the "self-separation" of families. Because UCs are already excluded from expedited removal by statute, *see* 8 U.S.C. 1232(a)(5)(D), the Departments do not expect based on their experience implementing border enforcement and asylum that excepting UCs, but not family units, from the limitation on asylum eligibility would lead to increased incentives to "self-separate." Rather, in the time since the

---

[222] OHSS analysis data downloaded from UIP on September 3, 2024 (IFR Details tab).

[223] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[224] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[225] *Id.*

IFR took effect, average daily encounters of UCs at the SWB have actually decreased by 37 percent.[226]

Moreover, on balance, the Departments believe that the important interests of protecting the statutorily recognized vulnerabilities of UCs, while maintaining the fundamental goals of the rule in addressing emergency border circumstances, outweigh any consequences of claimed incentives for noncitizens to "self-separate" at the border. Notably, the Departments emphasized the importance of maintaining family unity in the IFR and crafted a number of exceptions to the limitation to preserve family unity and avoid family self-separations. *See* 8 CFR 208.35(a)(2), 208.35(c), 1208.35(a)(2), 1208.35(c); *see also* 89 FR at 48733 (explaining that the rule contains exceptions that "avoid[] the separation of families"). For instance, if any member of a noncitizen's family—as described in 8 CFR 208.30(c)—with whom the noncitizen is traveling demonstrates exceptionally compelling circumstances for entering the United States during emergency border circumstances, then all of the members of that family unit traveling together will be excepted from the rule's limitation on asylum eligibility. 8 CFR 208.35(a)(2), 1208.35(a)(2); *see also* 89 FR at 48754. The rule also contains an explicit family unity provision in the AMI process before USCIS and in removal proceedings before EOIR; this provision allows a principal asylum applicant to be excepted from the rule's limitation on asylum eligibility if the applicant can establish that the applicant meets the statutory requirements for statutory withholding of removal or CAT protection, among other requirements. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 89 FR at 48733 (explaining family unity provision requirements).

The Departments recognize commenters' concerns about the vulnerability of UCs. The Departments encourage all those who seek to travel to the United States, including UCs, to take advantage of available lawful, safe, and orderly pathways and processes rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. 89 FR at 48723; 88 FR at 31346. However, the Departments note that UCs are particularly vulnerable and entitled to special protections under the law. *See* 88 FR at 31346 (citing INA 208(a)(2), 8 U.S.C. 1158(a)(2) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs)); *see generally* 8 U.S.C. 1232. Given that UCs have long had special rules and protections applicable to them in immigration proceedings, the Departments disagree with commenters that this rule's adoption of the exception for UCs at section 3(b)(iii) of the Proclamation would create any meaningful new incentive for noncitizens who may be a security risk to attempt to pose as UCs in order to circumvent the rule's provisions. Further, immigration officers have training, knowledge, skills, and experience in identifying fraudulent behavior. *See* 89 FR at 48744 (explaining that CBP immigration officials "have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow ups steps with regards to any behaviors or indicators of concern").

Furthermore, with respect to commenters' concerns regarding the discretionary nature of the exceptions at sections 3(b)(vi) and 3(b)(vii) of the Proclamation based on the totality of the circumstances and operational considerations, the Departments reiterate that comments on the Proclamation itself are outside the scope of this rulemaking. And insofar as these comments relate to this rule, the Departments disagree that these exceptions will essentially swallow the rule, as commenters suggest, or that CBP immigration officers will be unable to apply these exceptions fairly or consistently. Section 3(b)(vi) of the Proclamation permits entry based on the totality of the circumstances, and then delineates examples such as "consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter." Thus, this "totality of the circumstances" exception provides numerous examples that would allow the CBP immigration officer to determine whether such circumstances were present such that a noncitizen would not be subject to the

Proclamation's suspension and limitation on entry. The discretionary nature of the "operational considerations" exception provides flexibility for CBP immigration officers to better manage migratory flows during emergency border circumstances, which is a driving purpose of this rule. 89 FR at 48723, 48726–31 (explaining, in detail, the need for the rule). Moreover, CBP officers have experience considering various factors and factual scenarios when exercising their discretion as immigration officers, including determining appropriate processing pathways, and such experience is also relied upon in making these decisions.

Finally, as to commenters' concerns about whether noncitizens who were excepted from the Proclamation's suspension and limitation on entry under subsections 3(b)(vi) and (vii) of the Proclamation would nonetheless be subject to the rule's limitation on asylum eligibility in immigration court, those concerns are misplaced. By their terms, subsections 3(b)(vi) and (vii) apply to "any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer," based on certain considerations. Whether a noncitizen was excepted from the Proclamation and permitted to enter the United States is a question of historical fact, documented by CBP in the appropriate electronic processing system(s),[227] and does not require a separate assessment by an AO or IJ. *See* 89 FR at 48732 n.169. Thus, any noncitizen who is described in subsections 3(b)(vi) and (vii) of the Proclamation will not be subject to the limitation on asylum eligibility contained in the rule. *Id.*

i. Legal Concerns Related to CBP One and the Lack of Exceptions

*Comment:* Commenters raised a number of concerns regarding the rule's exception to the limitation on asylum eligibility for noncitizens who use the CBP One app to present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D).

Commenters expressed concern that use of CBP One is unlawful. Some commenters voiced concern that "barring" those who enter the United States along the SWB without a pre-

---

[226] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Consistent with the discussion in Section II.C.1 of this preamble, encounters of individuals in family units and single adults have fallen more sharply than encounters of UCs, which has caused UCs' share of total encounters to increase, notwithstanding the overall drop in UC encounters in absolute numbers. The relative stability of UC flows compared to family unit flows is consistent with the fact that most policy changes in recent years (including the current rule) have not had a direct impact on UCs.

[227] Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5 (June 4, 2024) (Muster).

scheduled CBP One appointment would violate U.S. and international law and "effectively eliminate[] asylum" for every noncitizen who crosses into the United States at the southern border without an appointment. Commenters further stated that, while the Departments seek to distinguish the IFR from the vacated Proclamation Bar IFR by explaining that it is being implemented during an emergency and some lawful pathways remain available to migrants, most who cannot wait for a CBP One app appointment would be barred from asylum under the IFR. Similarly, commenters stated that the INA requires DHS to provide every noncitizen who arrives in the United States with the opportunity to establish a credible fear of persecution—not just those with the resources to own a smartphone and the ability to schedule an appointment. Other commenters stated that the CBP One app codifies a form of electronic metering and essentially replaces a program that relied on metering to limit the number of noncitizens who could approach POEs, a practice that, the commenters argued, was held unlawful by the Federal courts.

One commenter expressed concern with the use of the CBP One app, stating that the app has been used to release record numbers of undocumented noncitizens into the United States. The commenter warned that the Biden Administration could continue to utilize and expand upon the CBP One app without any limits under the IFR. The commenter also raised concerns that the number of appointments available through the CBP One app can be expanded without limit, such that a large population of noncitizens could be excepted from the Proclamation's suspension and limitation on entry.

Several commenters expressed concern that the IFR, unlike the Circumvention of Lawful Pathways rule, does not provide an exception for those who are unable to access or use the CBP One application. Other commenters asserted that the IFR does not provide a justification for deviating from the Circumvention of Lawful Pathways rule's scheduling issues exception and expressed concern that while the Circumvention of Lawful Pathways rule's exception has not been properly applied, the lack of such an exception in the IFR would expose migrants who are unable to access or use the CBP One app to the risk of refoulement.

*Response:* The Departments believe the exception for noncitizens who present at a POE pursuant to a pre-scheduled time and place, such as through the CBP One app, is consistent with the INA and the purpose of the Proclamation and this rule.

As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs); *id.* 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). While the CBP One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens, the app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection.

The Departments disagree that the use of the CBP One app to manage the flow of migration and intake into POEs and to encourage the use of safe, orderly, and lawful pathways constitutes a form of "digital metering," unlawfully withholds or bars access to the asylum process, or conflicts with the agency's duties under 8 U.S.C. 1225(a)(3). Any noncitizen who is processed for expedited removal upon arrival at a POE and who indicates an intention to apply for asylum or a fear of return, whether or not the noncitizen uses the CBP One app, will be referred for a credible fear interview. Further, as noted in Sections II.B and III.A of this preamble, the United States implements its non-refoulement obligations under the 1967 Refugee Protocol through the provisions governing withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through section 208 of the INA, 8 U.S.C. 1158, which governs asylum. Noncitizens who are ineligible for asylum under the rule, such as those who enter the United States without pre-scheduling an appointment through the CBP One app, and are unable to establish that exceptionally compelling circumstances exist remain eligible to seek statutory withholding of removal and CAT protection consistent with these obligations.

The Departments also disagree with commenter concerns regarding unlimited expansion of CBP One or the use of CBP One to release individuals. The CBP One app is intended to allow for the orderly processing of noncitizens and, under the Proclamation and this rule, use of the app is especially critical during emergency border circumstances because it allows DHS to maximize the use of its limited resources. 89 FR at 48737; *see also* 88 FR at 31317–18 (explaining that the CBP One app

"enables the POEs to manage the flows in a safe and efficient manner, consistent with [each POE's] footprint and operational capacity, which vary substantially across the SWB"). Thus, because the CBP One app allows each POE to manage the daily number of appointments that the POE has the capacity to handle, commenter concerns that the use of CBP One appointments will be vastly expanded beyond CBP's capacity to process them are unfounded, especially during the emergency border circumstances that the Proclamation and this rule are designed to address. In addition, with regard to concerns regarding the number of noncitizens released following the use of the CBP One app to schedule an appointment, use of the CBP One app does not guarantee a particular processing disposition, and all such determinations are made on a case-by-case basis.[228]

Regarding commenters' concerns that the IFR does not provide an exception for those who present at a POE but are unable to access or use the CBP One app, here, and as noted in the IFR, the Departments choose not to include an exception to the rule's limitation on asylum eligibility for those who present at a POE but have an inability to access the CBP One app due to significant technical failure or other ongoing and serious obstacle. 89 FR at 48732 n.171. The IFR explained that the Departments made this decision in part because of the different purposes of this rule and the Circumvention of Lawful Pathways rule. This rule, unlike the Circumvention of Lawful Pathways rule, applies only during emergency border circumstances as described in the Proclamation and the rule, when encounters strain the border security and immigration systems' capacity. In contrast, the primary aim of the Circumvention of Lawful Pathways rule was to encourage the use of lawful, safe, and orderly pathways. Therefore, the Departments determined that the heightened need to address these emergency border circumstances necessitated limiting the scheduling issues exception in this rule.

Moreover, experience applying the Circumvention of Lawful Pathways rule in credible fear screenings indicates that

---

[228] *See* Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5–6 (June 4, 2024) (Muster); CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* ("Upon arriving at a POE, CBP officers inspect and evaluate all individuals to determine the appropriate processing disposition.").

**81216**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

the exception for presenting at a POE and being unable to access or use the CBP One app rarely applied.[229] The Circumvention of Lawful Pathways rule excepted, in addition to UCs, three categories of noncitizens: (1) individuals provided authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) individuals who presented at a POE with a CBP One appointment or who presented at a POE and demonstrated ''it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle''; and (3) individuals who sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Leaving aside UCs, as UCs are not subject to expedited removal, 8 U.S.C. 1232(a)(5)(D), noncitizens could establish at least one of these three exceptions in only approximately 4.7 percent of total credible fear screenings conducted by USCIS under the Circumvention of Lawful Pathways rule (*i.e.,* including referrals from USBP and OFO).[230] While DHS data do not differentiate among the types of exceptions, available data show that the exception for presenting at a POE and being unable to utilize the CBP One app applied in less than 5 percent of all credible fear determinations made by USCIS when considering whether the presumption of asylum ineligibility applied.[231]

The data showing the limited application of the exception for presenting at a POE and being unable to use CBP One reinforce the Departments' judgment not to adopt a similar exception in the emergency border circumstances in which this rule applies. Consistent with AOs' obligation under 8 CFR 208.30(d) to elicit testimony on all potentially relevant information, USCIS guidance instructs AOs to elicit testimony related to all exceptions to the presumption of asylum ineligibility where they may apply and evaluate their applicability, which for the exception under the Circumvention of Lawful Pathways rule (8 CFR 208.33(a)(2)(ii)(B)) would be any case where the presumption of asylum ineligibility applied and the noncitizen presented at a POE. At a time where emergency border circumstances are present that trigger a suspension and limitation on entry and necessitate the

limitation on asylum eligibility in the current rule, the Departments do not believe it would be appropriate to expend the resources it would take to elicit testimony about possible ways a noncitizen was unable to access the CBP One app and analyze that information in every credible fear interview where the noncitizen presented at a POE without an appointment in order to apply an exception to the limitation on asylum eligibility similar to the one present at 8 CFR 208.33(a)(2)(ii)(B), particularly where recent experience shows that such an exception is rarely applicable in credible fear determinations.

In addition to these exceptions, the Circumvention of Lawful Pathways Rule also contains a ''[r]ebuttal'' ground for ''exceptionally compelling circumstances.'' 8 CFR 208.33(a)(3), 1208.33(a)(3). The Departments determined that this rule should also contain an exception for exceptionally compelling circumstances to ensure that noncitizens with a time-sensitive imperative for entering the United States without authorization may avoid application of this rule's limitation on asylum eligibility. Notably, under the Circumvention of Lawful Pathways rule, across the set of all expedited removal cases that resulted in credible fear interviews (*i.e.,* from encounters at and between POEs), USCIS found that an ''exceptionally compelling circumstances'' rebuttal ground applied in over 10 percent of those cases where the rule's presumption of asylum ineligibility was analyzed as part of the credible fear determination.[232] Under the present rule, the ''exceptionally compelling circumstances'' exception to the rule's limitation on asylum eligibility was found to apply in approximately 11 percent of all encounters with credible fear determinations issued by USCIS where the limitation on asylum eligibility was considered.[233] Under this rule, noncitizens may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. For those who are unable to meet such an exception, the Departments believe that, in the emergency border circumstances in which this rule applies, such noncitizens should wait for a CBP One appointment. *See* 89 FR at 48732 n.171.

For those individuals seeking a CBP One appointment, CBP continues to take steps to make the process of seeking appointments more equitable and accessible. For instance, individuals have the chance to request an

appointment within a 12-hour period each day, with appointments allocated to the requesting group the following day.[234] In addition, noncitizens are not required to use the same mobile phone or device to request an appointment each day, as appointment requests are allocated based on the requesting registration. In other words, if a noncitizen has a registration, they can request an appointment each day from any mobile device. Individuals are not required to utilize a single device for each step of the process, and they may use a shared or borrowed device to request and schedule an appointment.

If a noncitizen receives an appointment, they are notified by an email notification, a push notification to the device that made the appointment, an in-app message, and a change to their registration status in the app.[235] The push notification that is sent to the device provides a notification to check the app, alerting a user to log into the app to review and confirm their appointment. This ensures that the notification is provided in multiple ways, such that those without continuous access to the same mobile device can still learn of their appointment status by logging into the app. If selected for an appointment, the individual then has 23 hours to complete the geolocation and liveness check and schedule the appointment.[236] Individuals may also request an automatic 24-hour extension to complete the process, if needed. Again, this can be done via any mobile device.

Individuals who do not have a smartphone or have other phone-related problems can seek assistance from trusted partners, if needed. Individuals are also permitted to seek assistance from others to complete the registration, request, and appointment confirmation process.

## ii. Wait Times for CBP One Appointments

*Comment:* Commenters expressed concerns with long wait times for those using the CBP One app to schedule an

---

[229] OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[230] *Id.*

[231] *Id.*

[232] *See id.*

[233] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—STB tab).

[234] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[235] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_ia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

[236] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_ia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

appointment, with one organizational commenter stating that waiting times routinely reach half a year due to the "enforced scarcity of appointments." Several commenters expressed concern that capping CBP One appointments at 1,450 per day is insufficient to address the number of arrivals at the border. For example, a commenter stated that, while 1,450 CBP One appointments are assigned each day, the "average number of appointment requests made per month between January 2023 and February 2024 was just under 5 million." A commenter stated that appointments are limited to less than 20 percent of the POEs at the SWB, while others noted that CBP One appointments are offered at only eight POEs along the almost 2,000 miles of the SWB.

Commenters further stated that the IFR would likely increase wait times by incentivizing more people to use the CBP One app—including Mexican nationals subject to the IFR—thereby exacerbating the significant backlog for securing an appointment.

Several commenters expressed additional concern that long wait times heighten the risk of danger for migrants in Mexico who intend to seek asylum in the United States. Specifically, multiple commenters warned that long wait times place migrants at severe risk of rape, assault, torture, kidnapping, and death, while leaving Mexican nationals to wait in the same country from which they are fleeing, and that those waiting for a CBP One appointment are vulnerable to being targeted by "criminal actors and detained or mistreated by Mexican government officials." Other commenters expressed concern about the hot weather, insufficient housing, and lack of access to essential resources. Additionally, commenters remarked that violence, coercion, and apprehensions by Mexican authorities prevent migrants waiting in Mexico from attending their pre-scheduled appointments. Commenters further expressed that particularly vulnerable populations who are waiting in Mexico, including Black migrants and women, are particularly susceptible to discrimination, violence, and heightened barriers to report crimes and access support services.

A few commenters further addressed health concerns for noncitizens required to wait in Mexico for their CBP One appointment. A commenter observed that the wait times for an appointment are "neither predictable nor reliable," which compounds stress and difficulties for noncitizens. The commenter further stated that health problems among certain noncitizens make it more

untenable for them to wait in Mexico. The commenter wrote that living conditions in Mexico exacerbate preexisting conditions such as asthma, cancer, and mental health concerns related to trauma, and that migrants have limited access to adequate medical care and life-saving medicine in Mexico. Likewise, another commenter observed that noncitizens living with HIV—both Mexican and non-Mexican—experience barriers to accessing treatment and medication while waiting in Mexico. Another commenter expressed concern over documented outbreaks of chicken pox in informal migrant encampments in Mexico City due to the high number of asylum seekers waiting for an appointment.

A commenter remarked that noncitizens may be granted appointments at a POE far from where they are physically located, despite the app's purported use of geolocational technology, forcing individuals to risk travel within Mexico. The commenter stated that Mexican authorities do not issue and renew temporary humanitarian visas to a majority of migrants, despite the fact that these visas are required to access bus and airline travel. The commenter additionally wrote that Mexican authorities have set up checkpoints targeted at preventing individuals from accessing public transportation required to make it to their scheduled CBP One appointments.

*Response:* Regarding concerns about long wait times to schedule a CBP One appointment, and the uncertainty this may cause, in large part due to high levels of migration in the region, the Departments note that CBP One is a tool that facilitates safe and orderly processing of noncitizens at POEs, and has aided CBP's efforts to increase processing at POEs.[237] CBP currently allocates a certain number of appointments per day to those registrations that have been pending for the longest period of time, based on the date on which a registration was created. CBP also regularly monitors wait times to be able to address any issues. While average wait times have generally increased since June 2023 due to demand for appointments, as of August 25, 2024, CBP has not seen evidence that average wait times have

increased at a greater rate following the implementation of the Proclamation and IFR. Indeed, CBP One represents a significant expansion of CBP's capacity to process noncitizens at SWB POEs: During the pre-pandemic period, CBP's OFO processed around 330 people per day.[238] From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed four-and-a-half times that number daily.[239] Although demand for appointments currently outpaces supply, there are now more CBP One appointments available daily (1,450) than average daily encounters at and between POEs between FYs 2011 and 2018 (1,300).[240]

With regard to concerns about the number of available CBP One appointments, DHS acknowledges that there are more noncitizens seeking appointments than there are available appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. The total appointment requests over multiple day periods include a significant number of repeat requests because individuals are encouraged to submit an appointment request each day until gaining an appointment, and thus monthly totals do not reflect an accurate count of unique individuals seeking appointments. However, this high level of demand reflects the high levels of migration throughout the region, which CBP has responded to by increasing capacity to process noncitizens at POEs. CBP has increased the number of available appointments since January 2023 but notes that POEs can safely and securely process only a finite number of migrants,[241] and that the current number of appointments reflects that capacity. The Departments disagree that there is "enforced scarcity" of appointments or that the number of appointments is set in an arbitrary manner. The number of appointments is determined by a port's capability and capacity to process noncitizens. CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP

---

[237] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf;* 89 FR at 48737.

[238] *See* OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[239] *See id.*

[240] *See* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[241] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* 1–2 (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

resources, including infrastructure and personnel.[242]

With regard to the number of POEs at which appointments are available and the locations of such ports, OFO must evaluate each POE's unique capabilities, both with respect to processing and staffing. There are also important variances between POEs due to geography, infrastructure, and workload. These considerations are evaluated continuously as OFO determines the number of appointments to schedule and at which ports to schedule them. OFO has limited use of CBP One to certain POEs that have the space and infrastructure to process elevated numbers of inadmissible noncitizens and has assigned staff to those POEs to conduct this processing. Adding additional POEs would require reallocation of that staffing, exchanging capacity in one location for another. Additionally, OFO has sought to utilize POEs that are located in or near urban areas with sufficient resources for migrants who may be released from OFO custody.

The Departments acknowledge that there may be humanitarian and health concerns for noncitizens in Mexico, including but not limited to individuals seeking a CBP One appointment, particularly for those with preexisting or underlying health conditions. The Departments also acknowledge that the congregation of groups of individuals can lead to increased transmission of communicable diseases. Similarly, the Departments acknowledge that some noncitizens seeking an appointment— including Mexican nationals—may be required to travel through Mexico to reach their appointment, and to wait in Mexico for their appointment, which may present safety concerns. The Departments also recognize that such concerns may be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a POE, which may make it harder to schedule medical care or travel within Mexico.

Such circumstances, however, have been a reality that existed for migrants seeking to present at POEs prior to the introduction of CBP One. Indeed, before CBP One's introduction, migrants faced greater unpredictability given the high levels of migration in the region, which predate the introduction of CBP One,[243]

and the fact that before CBP One's introduction, migrants did not have the ability to wait anywhere in the expanded geographic boundaries now available to migrants using CBP One. In another respect, too, migrants would face worse conditions without this rule: As explained elsewhere in this preamble, the Departments assess that, when levels of encounters by USBP are elevated, such that DHS does not have the capacity to process most noncitizens through expedited removal and therefore must release a significant number of noncitizens pending section 240 removal proceedings, this dynamic serves to incentivize more migrants to travel through Mexico. This dynamic both exacerbates dangerous conditions along that route and exposes more migrants to dangerous conditions along the way. While CBP has continued to take steps to increase processing at POEs in an effort to provide a safe and orderly mechanism to enter the United States, it continues to be operationally impossible for CBP to immediately process all noncitizens seeking to enter the United States.

With regard to the location of scheduled appointments, the CBP One app does not arbitrarily designate the location for appointments. The location is selected by the user, and the location can be changed by the user every time the user requests an appointment. The Departments continue to believe that the use of CBP One to schedule appointments facilitates the safe and orderly entry of noncitizens at POEs, including migrants who are already waiting in Mexico to enter the United States. In particular, the use of the app enables migrants to schedule their arrival at a pre-determined date and time, providing migrants with certainty about the date of their entry. Migrants may then wait in whatever location they deem best before approaching the border for their appointment. To this end, as of August 23, 2024, the CBP One app allows non-Mexican nationals to request and schedule an appointment from the southern Mexican states of Tabasco and Chiapas in addition to their existing ability to request and schedule appointments from Northern and Central Mexico.[244] Mexican nationals may request and schedule an appointment from anywhere in Mexico.[245] CBP continues to encourage

migrants to make appointments at POEs close to where they may be geographically located in Mexico or seek to enter the United States.

With regard to claims regarding the actions of government authorities in Mexico, the Departments note that they do not control the actions or decisions of the Mexican government or Mexico's implementation of its own laws.

### iii. Availability of and Access to CBP One Appointments and Concerns About Discrimination

*Comment:* Several commenters raised concerns about unequal access to POEs and asylum resulting from barriers to using the CBP One app, such as language, disability, resource, and other access issues that disparately impact and discriminate against migrants. A commenter acknowledged that CBP One may allow for certain positive gains in receiving and processing migrants, and also expressed concern that the application is wielded to penalize those with possible protection needs who cannot access it or obtain an appointment. One commenter called the CBP One app "inherently discriminatory," and another commenter articulated that the CBP One app has "pervasive" accessibility issues. A commenter cited a 2024 Amnesty International report,[246] where that organization called on the United States to "stop the mandatory use of the CBP One application" due to concerns over language access, technological barriers, and privacy and surveillance.

In the same vein, numerous commenters raised concerns related to the accessibility of the app for those lacking the required technology. Specifically, commenters expressed concern that scheduling an appointment via CBP One is not a viable option for those who lack access to reliable internet, electricity, or a smartphone. Some commenters provided examples that migrants have reported that their phones have been stolen by Mexican authorities or cartels, or lost or damaged during their travels. A commenter stated that in encampments with limited access to electricity, migrants are charged high prices for access to an outlet to charge their phones. Another commenter expressed that the IFR places people who do not have access to technology in the prejudicial position of having to meet a higher standard of proof to receive a positive credible fear

[242] *See, e.g., id.*

[243] *See, e.g.,* Perla Trevizo, *Dozens of Families, Many from Guatemala, Arrive in Nogales Seeking US Asylum,* Ariz. Daily Star (Aug. 2, 2018), *https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html;* Ariel G. Ruiz Soto, *Record-Breaking Migrant*

*Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[244] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[245] *See id.*

[246] Amnesty Int'l, *CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States* (May 9, 2024), *https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-application-violates-the-rights-of-people-seeking-asylum-in-the-united-states/.*

**Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations    **81219**

determination, in violation of U.S. asylum law. A commenter remarked that in perpetuating the "division" between "classes of people seeking asylum"—"those who have a smartphone and access to the internet and are technologically literate" and "those who do not have these required items, skills or abilities"—the IFR fails to apply protections equally under U.S. and international law.

Many commenters also discussed limited language accessibility for the CBP One app, stating that the app is only available in Spanish, English, and Haitian Creole, and expressed that conditioning access to asylum on the use of a smartphone app that is only available in three languages denies equal access to asylum to those in need of protection who are unable to use the app. Commenters expressed concerns about the fact that different stages for securing a CBP One appointment are available in different sets of languages (*e.g., Login.gov*, the initial app registration page, and app form responses), as this results in noncitizens, even those who are literate in Spanish and Haitian Creole, requiring assistance with completing the CBP One app form. The commenter further remarked that the system is particularly difficult for vulnerable populations to navigate as a result of challenges with finding adequate translation services, reasoning, for example, that it can take up to a week to find interpretation for Indigenous languages.

Several commenters additionally raised concerns about access to the app among those who are illiterate, have disabilities, or have limited language and digital literacy. In particular, commenters expressed that the IFR assumes technological literacy in the use of smartphone apps, such as the ability to access an email account, check the account on an ongoing basis, upload a video, and enable Global Positioning System/geolocators with many people requiring assistance to undertake these steps. A commenter provided an account of their experiences with individuals in Ciudad Juarez who struggle to navigate the app despite knowing how to read in Spanish and Haitian Creole, and the inability of legal service providers to provide logistical support to all the individuals with potential asylum claims who lack the digital literacy to navigate the mobile app.

Commenters further remarked on technological issues surrounding the app. Commenters expressed concerns that CBP One remains inaccessible to many due to facial recognition technology errors, which commenters stated are frequent for migrants with darker skin tones. Commenters stated that the app cannot read the faces of Black, Brown, Asian, and Indigenous people seeking asylum, and Haitians and Africans are particularly likely to experience "algorithm bias" while using the CBP One app which would prevent large classes of individuals from using the app to secure an appointment, and, therefore, from seeking asylum, perpetuating racism in the U.S. immigration system.

Commenters also noted additional technology concerns, such as issues with error messages, account access, and deactivated accounts. One commenter listed various reported issues with the CBP One app, such as difficulty uploading files, error messages only provided in English, saturated bandwidth resulting in delays, appointments being rejected if GPS is not activated, and phones unable to take video or photos of sufficient quality to be recognized by the app. Another commenter provided various anecdotal examples of individuals who were unable to access the CBP One app under the Circumvention of Lawful Pathways rule, and who the commenter said would similarly be harmed under the IFR, while another commenter added that complications with the app forced nongovernmental organizations to spend resources helping people use the app rather than assisting noncitizens with credible fear interviews, reviews of negative determinations, and representation in immigration court. A commenter also stated that "[t]here is a thriving black market for appointments available only to the wealthiest refugees."

Separately, while some commenters expressed support for the "expansion of mechanisms for [CBP One] appointments," commenters also stated that these expansions are insufficient to counteract noncitizens' unawareness of the CBP One application and the inability to obtain appointments.

Lastly, a commenter asserted that the use of CBP One results in family separation due to different appointment dates. Furthermore, a commenter expressed additional concern that families with a CBP One appointment are not always guaranteed the ability to cross the border, citing examples of families who were turned away despite arriving on time for a valid appointment.

*Response:* The Departments disagree that the CBP One app is a barrier to asylum. Rather, it is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion. CBP One is also a free app, and noncitizens are not required to pay to register or schedule an appointment.

The Departments acknowledge that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of or limited smartphone access or ability to use a smartphone (due to lack of digital literacy, disability, or other reasons) may limit a migrant's ability to use the CBP One app to schedule an appointment. However, individuals who do not have a smartphone or who have other phone-related issues can seek assistance, including sharing phones, or translation or technical assistance, from trusted partners, if needed. In addition, as noted above, individuals may utilize shared or borrowed devices to register for the CBP One app and to schedule an appointment. CBP conducts extensive engagement with non-governmental organizations ("NGOs") and stakeholders, and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs have discussed providing assistance with completing individuals' CBP One registrations and offering continued assistance with requesting appointments. CBP also notes that individuals seeking to create a CBP One registration can do so from anywhere. To create a registration, users are not required to enable location services, although they are required to enable location services in order to request and schedule an appointment.

With regard to internet access, the Departments acknowledge there can be connectivity gaps, electrical outages, and unreliable wireless internet access in northern Mexico. However, CBP made significant updates to the appointment scheduling process in 2023, including transitioning CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. Under this system, users must "ask for an appointment" each day, by selecting the relevant registration and submitting a request for that registration.[247] If a noncitizen receives an appointment that day, they are notified in multiple ways, and have up to 23 hours to confirm that appointment.[248] If a noncitizen does not receive an appointment, they must "request an appointment" the following day, again by selecting the relevant registration and requesting that registration. Individuals are not required to use the same mobile phone or device to request an appointment each day, and, as noted above, may use a shared or borrowed device to request and schedule the appointment. In addition, in July 2024, CBP updated the appointment allocator to increase the percentage of appointments allocated to users who had been waiting for longer periods of time, based on the date on which their registration was created.

CBP also continually takes steps to provide access to the app for individuals in different languages. The app was originally available in Spanish and English. Haitian Creole was added in February 2023 in response to feedback from stakeholders. Additionally, after the user makes a language preference, error messages are available in the selected language (English, Spanish, or Haitian Creole). While the app remains available in Spanish, English, and Haitian Creole, quick reference guides are now available in many languages (including Russian, French, Portuguese, Arabic, Dari, Pashto, Punjabi, and Chinese). According to the UNHCR, of the top 5 nationalities of displaced individuals in Mexico, all are from Spanish-speaking countries and Haiti.[249] Between May 11,

2023 (when the Title 42 public health Order terminated) and September 11, 2024, USBP data show that over 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English. The next most common languages were Mandarin, representing just over 2 percent of apprehensions, followed by Portuguese and French, which each represent less than 2 percent of noncitizens apprehended.[250] Finally, a CBP analysis conducted in September 2024 showed that, of all of the CBP One appointment requests during the first week of September 2024, approximately 90 percent were made by individuals from Spanish-speaking countries, with the next highest percentage, 5 percent, made by Haitians, and the remainder by other nationalities. The fact that Haitian nationals represent a relatively large proportion of the displaced persons in Mexico generally, are more likely to be encountered at POEs, and use the CBP One app further supports the prioritization of Haitian Creole and Spanish translations in the app. In addition, based on NGO feedback, CBP will be adding a French translation to the app. CBP has also been made aware of concerns with regard to the accuracy of the app's Haitian Creole translation and is currently taking steps to improve its accuracy.

CBP acknowledges that individuals who do not speak Spanish, English, or Haitian Creole, including those who speak Portuguese or Mandarin, may have more difficulty accessing the app, but has determined that it is appropriate to prioritize translation services in the app to those languages spoken by the vast majority of users of the app and noncitizens in the region. And CBP believes that its efforts to make the app accessible in other ways, such as through the quick reference guides, are working. CBP has seen a significant number of individuals who do not speak Spanish, English, or Haitian Creole requesting appointments, suggesting that the quick reference guides, as well as other information about CBP One

available on CBP's website,[251] are working to provide accessibility to the app even for those who do not speak one of those languages. With regard to concerns about different stages of the CBP One appointment process being in different languages, CBP does not exercise control over Login.gov, which is used to register for an appointment, as it is operated by the General Services Administration.[252] Login.gov is available in several languages, including English, Spanish, and French. And while Login.gov is not available in Haitian Creole, CBP analysis showed that, as noted above, Haitian nationals continue to be the second-highest population of noncitizens requesting CBP One appointments, indicating that Login.gov's languages are not posing a substantial limitation for those users. Moreover, the CBP One quick reference guides include a description of the Login.gov steps in the process. The Departments also appreciate the concerns related to the information required to access or use the CBP One app. The Departments note that users of the app are not required to upload any documents in order to use the app. Users are required to submit a photograph, and may, although are not required to, upload document information, such as scanning their passport information. With regard to concerns raised by commenters relating to facial recognition and access to the app by individuals with darker skin tones, CBP and the third party responsible for liveness detection took steps in 2023 to improve the liveness capability of the application and increase bandwidth. Since that time, CBP has data showing that the app successfully matches liveness in 80–90 percent of attempts, with the difference in performance across ethnicities on the order of tenths of a percent. If an individual initially is not able to successfully match to their live photo, they are not prohibited from trying again, and they may seek an extension to continue to try to complete liveness. Individuals who continue to fail liveness are able to reach out to CBP either directly or, if appropriate, through an NGO or other external entity. CBP notes that it does not collect data on race or skin complexion.

CBP engages frequently with stakeholders to determine further updates and changes in the app that improve the users' experience and

[247] *See* CBP, CBP One™ Mobile Application, Frequently Asked Questions—English (last modified Sept. 19, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[248] *See* CBP, CBP One™ Application Update Announcement—English (Mar. 1, 2024), *https://www.cbp.gov/document/guidance/cbp-one-application-update-announcement-english.*

[249] *See* United Nations High Commissioner for Refugees ("UNHCR"), *Country Operations: Mexico, Population by Origin, https://reporting.unhcr.org/operational/operations/mexico#* (last visited Sept. 19, 2024). For purposes of this analysis, the Departments are excluding the nationalities

grouped as "various," given a lack of information on what such category includes.

[250] Due to the way that CBP's OFO records and documents language services, data for languages used by those encountered at POEs are not readily available. Although there is a high volume of displaced Haitian nationals in Mexico, CBP's experience is that, particularly in recent years, Haitian nationals have been much more likely to be encountered at POEs than between POEs. For instance, in FY 2023, more than 75,000 Haitian nationals were encountered at SWB POEs, compared with just over 1,000 between POEs. *See* OHSS analysis of July 2024 Persist Dataset (Haitian Encounters tab).

[251] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[252] *See* U.S. General Servs. Admin., *Login.gov, https://login.gov/* (last visited Aug. 10, 2024).

enhance access to its features. For example, because of NGO feedback, height and weight were made optional fields and additional response options were added such as ''I don't have one'' for a foreign address and ''Unknown'' for parental information. CBP also acknowledges that reading comprehension and disability may present challenges for some users among this user population. CBP has improved the app's text for users with low literacy and will continue to make improvements to the app for this population. The app has also undergone a compliance review pursuant to section 508 of the Rehabilitation Act regarding its accessibility to people with disabilities, with a final certification expected by the end of November 2024.

Regarding concerns raised by NGOs regarding the resources expended to address questions from migrants about the app and its impacts, the Departments are not able to comment on how such entities determine the use of their own resources. With regard to concerns regarding a ''black market'' for appointments, CBP has advised noncitizens and the general public that appointments that purport to be ''for sale'' are fraudulent, and migrants should not pay for such appointments.[253]

With regard to the commenters' concerns related to whether noncitizens have sufficient awareness of the availability of the CBP One app and this rule, the Departments believe that they have provided sufficient notice to the public. The Departments note the use of, and benefits of, the CBP One app have been broadly publicized. Indeed, the CBP One app is widely used, as evidenced by the number of requests CBP receives each day for appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. Demand for CBP One appointments has outpaced supply, which has resulted in average wait times increasing since June 2023. CBP continues to regularly announce updates and improvements made to the app to the public. In particular, CBP regularly announces changes and updates to the app on its public website at *https://www.cbp.gov/about/mobile-apps-directory/cbpone*. This website also contains a number of detailed questions and answers regarding the use of the app. Additionally, DHS has

published a Privacy Impact Analysis (PIA) for CBP One, and subsequent updates to the original CBP One PIA to address privacy risks in the deployment and use of the CBP One app.[254] Moreover, the Departments' publication of the Circumvention of Lawful Pathways rule, the IFR, and this rule have provided (and in the case of this rule, will provide) further notice to the public and to noncitizens of the pathways available to them and the potential consequences of not availing themselves of such pathways. The Departments believe that such efforts provide sufficient information for noncitizens seeking to travel to the United States.

With respect to comments suggesting that families are processed separately or have been turned away, the Departments note that all individuals—including members of families—are processed pursuant to existing CBP policies and practices. Family members who register together on CBP One using a single registration number to schedule an appointment for their whole family are given the same appointment date and time. So long as they arrive as a family for their appointment at that date and time, they will be processed at that appointment time.

b. Regulatory Exception—Exceptionally Compelling Circumstances

*Comment:* Commenters raised concerns regarding the preponderance of the evidence standard for establishing exceptionally compelling circumstances under the IFR. Commenters argued that applying a limitation on asylum eligibility during credible fear interviews, and then requiring noncitizens to demonstrate exceptionally compelling circumstances by a preponderance of the evidence in order to overcome the limitation on asylum eligibility, is inconsistent with

the INA and congressional intent. Rather, commenters stated that Congress enacted a ''significant possibility'' standard for the credible fear interview in order to safeguard a noncitizen's opportunity to present potentially viable asylum claims in full proceedings and to prevent noncitizens from being returned to persecution or torture.

Relatedly, commenters stated that noncitizens should not have to demonstrate exceptionally compelling circumstances unrelated to their asylum claim by a preponderance of the evidence in order to have their asylum claims adjudicated. Some commenters believed that the preponderance of the evidence standard was too onerous for noncitizens to meet during the credible fear interview, even if the noncitizen had experienced a situation or event prior to entry that should otherwise qualify as an exceptionally compelling circumstance.

Lastly, at least one commenter implied that AOs conducting credible fear interviews did not have adequate training and were not equipped to conduct the analyses required by the IFR, including applying the preponderance of the evidence standard to determine whether a noncitizen is subject to the limitation on asylum eligibility.

*Response:* Many of commenters' concerns are based on an incorrect premise. The Departments recognize that the ''significant possibility'' standard is established by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the Departments lack the authority to—and have not sought to—alter this statutory standard through rulemaking. By statute, to determine whether a noncitizen has a ''credible fear,'' an AO must assess whether there is a ''significant possibility . . . that the alien could establish eligibility for asylum.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Thus, during credible fear proceedings, the overall standard of proof for establishing exceptionally compelling circumstances to overcome the limitation on asylum eligibility remains the ''significant possibility'' standard, which must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the exception applies). *See* 89 FR at 48739. Accordingly, at the credible fear interview, the AOs assess whether there is a ''significant possibility'' that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen satisfies the rule's exception.

---

[253] *See* CBP, *CBP One™ Mobile Application, Frequently Asked Questions—English, CBP One™ Mobile Application,* ''*What if someone asks me to pay for an appointment?*'' (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[254] *See* DHS, DHS/CBP/PIA–068, *Privacy Impact Assessment for CBP One™ Mobile Application* (2021 and subsequent updates), *https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf;* DHS, DHS/CBP/PIA–068(a), *Privacy Impact Assessment [Update] for CBP One™ Mobile Application* (2024), *https://www.dhs.gov/sites/default/files/2024-07/24_0725_priv_pia-cbp-068%28a%29-cbpone-update.pdf; see also* DHS, DHS/CBP/PIA–076, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf;* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42* (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

Likewise, during credible fear reviews, IJs will apply the ''significant possibility'' standard to determine whether a noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception.

To the extent commenters voiced general opposition to requiring a noncitizen to demonstrate exceptionally compelling circumstances by a preponderance of the evidence so as not to be subject to the rule's limitation on asylum eligibility, the Departments note that this standard is the general standard noncitizens must meet to determine that a ground of ineligibility does not apply in a merits adjudication. *See* 8 CFR 1240.8(d) (''If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.''). Additionally, this burden for establishing exceptionally compelling circumstances was codified by the Circumvention of Lawful Pathways rule, which has been in effect since May 11, 2023. 88 FR at 31450–51 (codified at 8 CFR 208.33(a)(3), 1208.33(a)(3)). The Departments believe that maintaining consistency in the preponderance of the evidence standard between these two related rules promotes consistent adjudications when adjudicators must determine whether a noncitizen has demonstrated exceptionally compelling circumstances. To promote such consistency, the rule provides that if a noncitizen demonstrates an exceptionally compelling circumstance for purposes of this rule, then the noncitizen has necessarily demonstrated an exceptionally compelling circumstance for purposes of the Circumvention of Lawful Pathways rule, and vice versa, further underscoring the importance of maintaining a consistent analytical framework between the two rules. *See* 89 FR at 48754–55 (explaining that the IFR's exception to the limitation on asylum eligibility mirrors the Circumvention of Lawful Pathways rule's rebuttal grounds to simplify administration of each while both rules are in effect).

Further, contrary to commenter concerns, the preponderance of the evidence standard is not onerous or unduly burdensome such that a noncitizen would be unable to demonstrate exceptionally compelling circumstances. To the extent that commenters expressed concern with the preponderance of the evidence standard during credible fear proceedings, the Departments again clarify that the applicable standard during credible fear proceedings is the ''significant possibility'' standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and AOs will assess whether there is a significant possibility that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen meets the ''exceptionally compelling circumstances'' exception. Similar to the Circumvention of Lawful Pathways rule's rebuttal grounds, *see* 88 FR at 31380, the Departments believe that there should generally be sufficient evidence available at the time of the credible fear interview for an AO to evaluate whether there is a significant possibility that the noncitizen would be able to establish exceptionally compelling circumstances by a preponderance of the evidence. Notably, the credible fear screening process involves eliciting testimony from noncitizens seeking protection, and the rule does not require noncitizens to provide any specific form of evidence, such as written statements or other documentation. *See* 89 FR at 48746 & n.239.

Indeed, DHS data show that the standard is not unduly challenging to meet at the credible fear stage. Since the IFR went into effect through August 31, 2024, USCIS determined that the limitation on asylum eligibility did not apply in over 2,200 cases (approximately 11 percent of credible fear interviews completed under the IFR during that period) because the noncitizen was able to demonstrate exceptionally compelling circumstances under the credible fear screening standard.[255] The Departments believe that these data show that the exception is both meaningful and appropriately tailored to ensure that, during emergency border circumstances, only those with a time-sensitive imperative are able to avoid the rule's limitation on asylum eligibility.

Regarding the preponderance of the evidence standard during a full merits adjudication, the Departments similarly do not believe that it imposes an onerous or unduly burdensome evidentiary standard. The INA explicitly provides that during full merits adjudication of an asylum claim ''testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration'' in

[255] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Thus, as the Departments have explained, the preponderance of the evidence standard may be met through credible testimony alone. *See* 88 FR at 31395. For example, if a noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom they were traveling faced an acute medical emergency, an imminent and extreme threat to life or safety, or satisfied the definition of a victim of a severe form of trafficking in persons, or faced other exceptionally compelling circumstances, then the noncitizen could present testimony of those facts and circumstances.

Lastly, to the extent commenters expressed skepticism about an AO or IJ's ability to properly apply the screening standard during a credible fear interview, the Departments note that both AOs and IJs receive extensive training in substantive law and procedure, *see* 88 FR at 31395 & nn.211–213, and the Departments are confident that AOs and IJs have the requisite knowledge, skills, and experience to properly apply the framework of this rule, as they have been doing for months.

*Comment:* Some commenters recommended that the Departments rescind the ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility, stating that the exception codifies ''loopholes'' that are easy for noncitizens to exploit and undermines the Departments' goal of discouraging irregular migration across the SWB.

*Response:* The Departments decline to rescind the ''exceptionally compelling circumstances'' exceptions at 8 CFR 208.35(a)(2)(i) and 1208.35(a)(2)(i). As the Departments explained in the IFR, maintaining an exception to the limitation on asylum eligibility for exceptionally compelling circumstances is intended to mitigate potential adverse impacts of the rule on certain particularly vulnerable individuals and family members as described in 8 CFR 208.30(c) with whom they are traveling, without undermining the Departments' stated policy objectives of disincentivizing irregular migration during emergency border circumstances. 89 FR at 48754. The Departments believe the nature of the exceptionally compelling circumstances—such as facing an acute medical emergency, facing an imminent and extreme threat to life or safety, or meeting the definition of a victim of a severe form of trafficking in persons—appropriately balances the Departments' stated policy

objectives and does not create a "loophole" as commenters suggest.

The Departments are also confident that AOs and IJs will appropriately assess a noncitizen's testimony and any evidence presented to determine whether a noncitizen has established that the rule's exception to the limitation on asylum eligibility applies. Indeed, DHS and EOIR personnel have the training and experience necessary to determine whether the exception applies, including several months of experience from implementing the IFR and other rules. For example, AOs were provided specific training for the implementation of the Circumvention of Lawful Pathways rule to elicit and analyze testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility. *See* 88 FR at 31330. Additionally, before any AO can interview a noncitizen where the IFR's limitation on asylum eligibility applies, or any supervisory AO can review such a case, they must receive specific training on the IFR, including on applying the IFR's limitation on asylum eligibility and the "exceptionally compelling circumstances" exception.

*Comment:* Commenters stated that the enumerated per se exceptionally compelling circumstances in 8 CFR 208.35(a)(2) and 1208.35(a)(2) are, on the whole, too limited in number and narrow in scope, and are framed in a restrictive manner with a high burden of proof that commenters asserted many noncitizens will be unable to meet. According to commenters, because the exception is so difficult to establish, the vast majority of noncitizens who enter between POEs will be ineligible for asylum. Commenters also alleged that noncitizens may not have access to or be aware of what information or evidence is necessary to sufficiently demonstrate exceptionally compelling circumstances, particularly as they may not be aware of the rule and its evidentiary requirements until they are placed in proceedings. Similarly, commenters expressed concern about the evidentiary burden noncitizens would face in trying to establish that exceptionally compelling circumstances existed at the time of entry when their case may not be adjudicated until years after the date of entry due to existing backlogs, and when evidence and witnesses may be lost over time. Commenters offered, as an example, the difficulty that noncitizens would face in demonstrating that they or a family member with whom they traveled experienced an acute medical emergency, in the absence of concurrently issued medical documents.

Commenters stated that it will be difficult for AOs to evaluate whether a noncitizen satisfies an exception at the credible fear stage because it is a fact-intensive inquiry and will require significant development of the record. Commenters also stated that there is insufficient guidance about how, in practice, AOs are supposed to make a finding regarding exceptionally compelling circumstances. Further, commenters expressed concern that AOs are not required to elicit potentially relevant facts about the rule's exceptions to ensure that noncitizens are not improperly subject to the IFR's limitation on asylum eligibility and recommended that the Departments adopt a screening framework in which AOs have a shared burden to elicit all information relevant to asylum eligibility, preferably in a non-adversarial manner.

*Response:* The Departments believe that the rule's exception to the limitation on asylum eligibility for exceptionally compelling circumstances, including the enumerated per se circumstances, are appropriate in scope and detail, and as such, the Departments decline to modify those provisions. Indeed, during emergency border circumstances, limiting the "exceptionally compelling circumstances" exception to those who are unable to wait for an appointment due to an acute medical emergency or an imminent and extreme threat to life or safety is important to deter irregular migration and provide for efficient border processing during a period of high encounters.[256] *See* 89 FR at 48732 n.171. As discussed above in this section of the preamble, the data reflect that the "exceptionally compelling circumstances" exception is achieving this balance; USCIS determined that the exception had been met in approximately 11 percent of credible fear interviews completed between the IFR's effective date and August 31, 2024.[257]

The Departments stress, however, that exceptionally compelling circumstances are not limited to the enumerated examples. Rather, similar to the rebuttal grounds adopted in the Circumvention

of Lawful Pathways rule, the examples are a non-exhaustive list intended to preserve AO and IJ flexibility and permit consideration of all facts giving rise to potential exceptionally compelling circumstances. 89 FR at 48733; 88 FR at 31394. Additionally, the Departments continue to prioritize family unity by extending these exceptions to qualifying family members with whom the noncitizen is traveling. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Regarding concerns that establishing exceptionally compelling circumstances is a fact-intensive inquiry that will require significant development of the record, and that noncitizens will not have access to information and evidence of exceptionally compelling circumstances at the time of screening, the Departments note that relevant evidence of such circumstances generally relates to the situation immediately prior to the noncitizen's entry into the United States, and focuses on relevant personal facts and circumstances within the noncitizen's knowledge. Accordingly, the Departments expect that any evidence necessary for a noncitizen to demonstrate that they have a significant possibility of ultimately showing exceptionally compelling circumstances should generally be readily available— whether from the noncitizen in the form of credible testimony or other evidence or from government records relating to the noncitizen's circumstances at the time of entry—at the time of the credible fear screening. With respect to cases where the existence of exceptionally compelling circumstances at the time of entry may be evaluated later in time, the Departments similarly note that the rule does not impose any requirement for the type of evidence necessary to establish exceptionally compelling circumstances, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in a full merits hearing in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Regarding commenter concerns that noncitizens would have difficulty demonstrating that they faced an acute medical emergency at the time of entry without medical documents, the Departments expect that credible testimony about the medical emergency would generally be sufficient at the credible fear stage, and the rule does not require any specific type of evidence related to the acute medical emergency. *See* 89 FR at 48746 & n.239 (explaining that credible testimony is sufficient in a credible fear screening and that

---

[256] Separately, noncitizens facing an urgent humanitarian situation may not be subject to the limitation at all if, under the Proclamation, a noncitizen is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of urgent humanitarian interests at the time of the entry or encounter. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); Section 3(b) of the Proclamation.

[257] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

corroborating evidence is not required); *see also* 88 FR at 31392 (discussing the analogous acute medical emergency rebuttal ground under the Circumvention of Lawful Pathways rule).

Additionally, when conducting credible fear interviews, AOs have an obligation to elicit testimony relevant to a noncitizen's claim, which will necessarily include any information related to exceptionally compelling circumstances.[258] Moreover, during credible fear reviews before IJs, noncitizens have an opportunity to be heard and to be questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). During section 240 removal proceedings, IJs also must develop the record, which will, as relevant, necessarily include facts and testimony pertaining to exceptionally compelling circumstances. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses."); 8 CFR 1003.10(b) (same); *see also Quintero* v. *Garland*, 998 F.3d 612, 626 (4th Cir. 2021).

Finally, the Departments disagree with the assertion that there is insufficient guidance regarding making a finding related to exceptionally compelling circumstances. The rule clearly sets forth both the standard for the "exceptionally compelling circumstances" exception and the process for evaluating the limitation on asylum eligibility during credible fear determinations. *See* 8 CFR 208.35(a), (b), 1208.35(a), (b). Additionally, AOs must receive training on application of the limitation on asylum eligibility and the "exceptionally compelling circumstances" exception before any AO can interview a noncitizen where the limitation on asylum eligibility applies, or any supervisory AO can review such a case. Further, the Departments have experience in applying the "exceptionally compelling circumstances" standard in the context of the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733 (explaining that the exception mirrors the rebuttal circumstances adopted in the Circumvention of Lawful Pathways rule and is intended to apply to the same circumstances); *see also* 88 FR at 31380, 31390–93 (explaining the standard for establishing and procedure for evaluating analogous rebuttal

grounds under the Circumvention of Lawful Pathways rule). The Departments also now have several months of experience implementing the IFR, and implementation itself yields valuable information on continued operation of its provisions. *See supra* Section II.A.2.

*Comment:* Commenters raised concerns that the "exceptionally compelling circumstances" exception does not provide adequate protection for vulnerable groups. Specifically, commenters alleged that the exceptions are insufficient to protect vulnerable groups who face a disproportionate risk of harm in Mexico, including LGBTQI+ noncitizens, Black and Indigenous noncitizens, women, and children, among others. Commenters observed that some such noncitizens, and particularly those without access to legal representation, may not understand the intricacies of the IFR or the requirements to establish an exception. Further, commenters stated that the complicated exceptions will contribute to confusion among and disparate treatment of such noncitizens, making them vulnerable to smugglers and undermining the Departments' goal of orderly processing at the SWB.

*Response:* For general discussion regarding concerns related to specific vulnerable populations, please see Section III.B.2.a.iii of this preamble.

With regard to the "exceptionally compelling circumstances" exception and vulnerable populations specifically, the Departments believe that the exception provides sufficient protection for such populations. The exception focuses on relevant personal facts and circumstances within the noncitizen's knowledge relating to potential harm they faced immediately preceding their entry into the United States. *See* 89 FR at 48747–48. To determine whether the exception applies, the AO questions the noncitizen regarding the circumstances of their entry into the United States, which does not require any particular legal knowledge by the noncitizen.

Further, the Departments disagree that the "exceptionally compelling circumstances" provision will make noncitizens more vulnerable to smugglers due to confusion about the rule. As the Departments explained in the IFR, 89 FR at 48733, the exception for exceptionally compelling circumstances was drafted to mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule, which the Departments believe will help reduce any confusion among noncitizens or adjudicators. Moreover, the Departments believe that, overall, this rule is a key measure to combat illegal

smuggling activity by drastically reducing incentives for noncitizens without a lawful basis to remain in the United States to rely on smugglers for entry into the United States. *See* 89 FR at 48714–15 (explaining how the rule is necessary to combat illegal smuggling activity), *id.* at 48766. The "exceptionally compelling circumstances" exception is an important provision of this rule because it appropriately balances the essential need to use resources effectively during emergency border circumstances with consideration of whether a noncitizen or family member with whom they are traveling is specifically vulnerable to immediate harm and has entered the United States during emergency border circumstances due to serious and urgent needs to do so. *See* 89 FR at 48754.

*Comment:* Commenters stated that the exception to the IFR was subjective, highly discretionary, and insufficient to ensure individuals were not refouled. Commenters also expressed concern that the enumerated per se exceptionally compelling circumstances require a subjective assessment of the degree and temporal nature of the needs and threats faced by noncitizens at the time of entry, which commenters allege is inconsistent with the right to seek asylum and the principle of non-refoulement.

*Response:* The Departments disagree that the "exceptionally compelling circumstances" exception is overly subjective or affords too much discretion to AOs and IJs, as the Departments are confident in AOs' and IJs' ability to fairly and accurately apply the exception. AOs and IJs have significant training and experience in eliciting testimony and applying legal standards in immigration proceedings. *See, e.g.,* 89 FR at 48747 (noting that AOs and IJs have the training and experience necessary to elicit information required to determine whether a case meets the necessary requirements); 8 CFR 1003.10(b) (requiring IJs to "seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations").

Further, to the extent a noncitizen has concerns with an AO's determination, all credible fear determinations undergo supervisory review to ensure consistency. 8 CFR 208.30(e)(8). Noncitizens may also request IJ review of negative credible fear determinations. 8 CFR 208.35(b)(2)(v). Moreover, if the limitation on asylum eligibility is applied to a noncitizen in section 240 removal proceedings, IJ determinations are subject to review by the BIA. 8 CFR 1003.1(b)(3).

---

[258] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.").

**Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations **81225**

With regard to concerns about potential refoulement, the Departments note that, even in those cases where a noncitizen is unable to establish exceptionally compelling circumstances and is subject to the limitation on asylum eligibility, the noncitizen remains eligible to pursue statutory withholding of removal and CAT protection, which implement the United States' non-refoulement obligations. *See* 8 CFR 208.35(b)(2); 8 CFR 1208.35(b)(2)(iii). For additional discussion regarding the United States' non-refoulement obligations, please see Sections III.A.1.a and III.A.1.d of this preamble.

*Comment:* Commenters noted that the per se exceptionally compelling circumstances mirror the rebuttal grounds established in the Circumvention of Lawful Pathways rule; some commenters incorporated their previous objections to that rule, concerning the per se exceptionally compelling circumstances, into comments submitted in response to this IFR.

*Response:* Commenters correctly assert that the per se exceptionally compelling circumstances mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733. To the extent that commenters stated that they were incorporating their previous comments submitted in response to the Circumvention of Lawful Pathways NPRM, the Departments responded to those comments as part of the Circumvention of Lawful Pathways rulemaking, and commenters are encouraged to refer to that rule for the Departments' responses. *See, e.g.,* 88 FR at 31390–95 (responding to commenter concerns related to the grounds for rebutting the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule).

*Comment:* Commenters alleged that the "imminent and extreme threat to life and safety" exception is inadequate and illusory, claiming that CBP officers would, in practice, turn away noncitizens who could otherwise establish such threats. For example, commenters provided anecdotal reports of women being turned away from POEs after CBP officers determined that their accounts of being sexually assaulted and raped in Mexico did not fall within an exception.

Commenters also stated that the exception incentivizes noncitizens to wait in Mexico until they are subject to harm or violence before seeking protection. Further, commenters were concerned that the IFR included a per se exception for forward-looking threats, but not for being a survivor of "recent and severe forms of violence." Commenters stated that such survivors have a significant need for protection to mitigate past harm and to prevent further harm.

Commenters also noted that, in responding to comments about the analogous rebuttal ground in the Circumvention of Lawful Pathways rule, the Departments explicitly stated that generalized threats of violence, membership in a particularly vulnerable group, and dangerous country conditions will not rise to the level of an "imminent and extreme threat to life and safety," which commenters believed was overly limiting.

Commenters further recommended broadening the per se exceptionally compelling circumstances, so that "acute medical emergencies" includes non-medical and non-life-threatening medical needs; and "imminent and extreme threats to life or safety" includes threats to life or safety that may not necessarily be "imminent" or "extreme." Commenters further stated that the grounds for rebutting the presumption of asylum ineligibility contained within the Circumvention of Lawful Pathways rule have been interpreted narrowly, resulting in noncitizens wrongfully being unable to rebut the presumption, not receiving a full adjudication of their claims, and ultimately being ordered removed. Commenters also urged the Departments to ensure that these per se exceptionally compelling circumstances encompass the medical risks and harms reported by asylum seekers while waiting in Mexico.

*Response:* The Departments decline to amend the list of per se exceptionally compelling circumstances established in the rule. The per se circumstances contained in the rule—acute medical emergencies, imminent and extreme threats to life or safety, or being a victim of severe trafficking in persons—are intended to capture noncitizens with a time-sensitive imperative for entering the United States to avoid immediate, serious harm. *See* 89 FR at 48732 n.171. Broadening these per se circumstances further would undermine the goal of this rule: to address the significant strain on the United States' immigration system during emergency border circumstances. *See* 89 FR at 48726–31 ("Need for These Measures").

Likewise, requiring a situation-specific analysis of potential harm to the noncitizen is necessary to limit the "exceptionally compelling circumstances" exception to only those noncitizens who truly require entry to the United States to avoid putting their life or well-being at extreme risk. Allowing, for example, concern about generalized violence to establish an imminent and extreme threat to life or safety would be purely speculative as to an individual noncitizen, and further undermine the objectives of the rule. However, in requiring specific evidence of potential harm, the Departments note that more generalized evidence, such as membership in a particularly vulnerable group, "may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry." 88 FR at 31393.

Additionally, the Departments disagree that the parallel rebuttal grounds in the Circumvention of Lawful Pathways rule have been interpreted too narrowly, and therefore, that the per se exceptions should be expanded in this rule. Departmental data show that, during the immediate post-pandemic period, over 10 percent of noncitizens subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility were able to rebut the presumption during USCIS credible fear interviews.[259] This indicates that those rebuttal grounds were meaningfully available to noncitizens, and the Departments note that Departmental data show that the parallel exceptions in this rule are being similarly applied. Since the IFR went into effect through August 31, 2024, USCIS determined that there was a significant possibility the noncitizen could demonstrate an "exceptionally compelling circumstances" exception to the limitation on asylum eligibility in over 2,200 cases—approximately 11 percent of credible fear interviews completed by USCIS that were subject to the IFR during that period.[260]

With regard to consideration of past harm, the Departments note that, to the extent a noncitizen suffered harm immediately preceding their entry into the United States, such harm can be relevant to whether the noncitizen faces further imminent and extreme harm or threats to their life or safety, and adjudicators could consider such immediate, past harm as relevant to making an "exceptionally compelling circumstances" determination.

The Departments also disagree with commenters' assertions that the imminent and extreme threat to life or safety exception incentivizes noncitizens to wait in another country until they are harmed to then seek an

---

[259] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[260] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

exception under the rule. To the extent that waiting in another country could increase the risk of potential harm, the Departments note that noncitizens need not have actually been harmed or show that the feared harm was certain to occur to demonstrate exceptionally compelling circumstances. Rather, the rule states that those who demonstrate that they or a member of their family as defined in 8 CFR 208.30(c) with whom they are traveling ''[f]aced an imminent and extreme threat to life and safety, such as an imminent threat of rape, kidnapping, torture, or murder'' shall have demonstrated exceptionally compelling circumstances. 8 CFR 208.35(a)(2)(i)(B), (ii), 1208.35(a)(2)(i)(B), (ii). Therefore, this exception is intended to balance the emergency border circumstances necessitating implementation of the rule's limitation on asylum eligibility with recognition that there may be noncitizens with a specific, time-sensitive safety imperative for entering the United States during times where DHS's resource capacity to process noncitizens at the border is overwhelmed.

Finally, more generally, the Departments also clarify that CBP officers do not apply this rule's ''exceptionally compelling circumstances'' exception during initial border encounters, although they do implement the Proclamation's suspension and limitation on entry. Rather, the exception—and this rule's limitation on asylum eligibility more broadly—is applied during credible fear screenings before USCIS, once a noncitizen has manifested a fear of return or expressed an intention to apply for asylum or other protection and is placed in the expedited removal process. *See* 8 CFR 208.35(b) (''Application in credible fear determinations.'').

*Comment:* Commenters stated that the enumerated ''exceptionally compelling circumstances'' exception for victims of a severe form of trafficking in persons is inadequate and that this rule imposes an impossible evidentiary hurdle on trafficking survivors. For example, commenters said that not all victims of a severe form of trafficking have proof of such crimes and, during initial fear screenings, AOs do not ask specific questions about trafficking history. Commenters also stated that the trafficking exception should be expanded to encompass both noncitizens who may be at risk of trafficking and noncitizens at risk of or who have experienced trafficking, regardless of the degree of severity of the trafficking.

*Response:* The Departments disagree that the existing ''exceptionally compelling circumstances'' exception for trafficking victims should be further amended. First, pursuant to section 3(b)(iv) of the Proclamation, noncitizens who are determined to be ''a victim of a severe form of trafficking in persons'' as defined in 22 U.S.C. 7102(16) are excepted from the Proclamation's suspension and limitation on entry and, therefore, are not subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(a)(1), 1208.35(a)(1) (providing that the limitation on asylum eligibility only applies to a noncitizen described in 8 CFR 1208.13(g) ''and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024''); 89 FR at 48733 n.172.

Nonetheless, as explained by the Departments in the IFR, the Departments have retained the per se ''exceptionally compelling circumstances'' exception for human trafficking victims to avoid confusion and to ensure that the exceptions in this rule continue to mirror the rebuttal grounds adopted by the Departments in the Circumvention of Lawful Pathways rule. 89 FR at 48733 n.172. Under the rule's exception for victims of human trafficking, both a noncitizen and any family members as defined in 8 CFR 208.30(c) with whom the noncitizen is traveling are excepted from the limitation on asylum eligibility if, at the time of entry, the noncitizen or family member satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C); 89 FR at 48733.

The Departments disagree that this rule creates an insurmountable evidentiary burden for trafficking survivors. While the Departments recognize that victims of trafficking often do not possess written or documentary evidence of their trafficking, the rule does not impose any requirements about the type of evidence a noncitizen must submit to establish exceptionally compelling circumstances. Indeed, during the credible fear screening process, AOs or IJs elicit testimony from noncitizens, and written statements or other documentation are not required. *See* 89 FR at 48746 n.239.

Regarding concerns that noncitizens will not be asked specific questions about any history involving trafficking, the Departments note that those concerns are unfounded because interview guides specifically designed for credible fear interviews pursuant to the Circumvention of Lawful Pathways rule and the IFR instruct AOs to ask

questions related to trafficking where they are relevant to the credible fear determination, including where either the Circumvention of Lawful Pathways rule's presumption of asylum ineligibility or the IFR's limitation on asylum eligibility applies. In such cases, AOs are instructed to elicit testimony related to potential ''exceptionally compelling circumstances'' rebuttal grounds (in the case of the Circumvention of Lawful Pathways rule) or the ''exceptionally compelling circumstances'' exception (in the case of the IFR), including the exceptionally compelling circumstance of the noncitizen or an accompanying family member satisfying the definition of a victim of severe form of trafficking in persons pursuant to 8 CFR 208.33(a)(3)(i)(C) and 208.35(a)(2)(i)(C). *See* 8 CFR 208.30(d). AOs receive extensive training in not only substantive law and procedure but in identifying and interviewing vulnerable noncitizens, including victims of trafficking.[261] Further, for merits adjudications, AOs and IJs receive training [262] and have experience in evaluating credibility and evidence, even in the absence of other documentation, and a noncitizen's testimony alone ''may be sufficient to sustain [their] burden without corroboration'' in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). The Departments are therefore confident in AOs' and IJs' ability to elicit relevant information from victims of trafficking and appropriately evaluate whether the noncitizen established exceptionally compelling circumstances.

Finally, the Departments believe that, as drafted, both section 3(b)(iv) of the June 3 Proclamation and the rule itself, which provides that being a victim of a

---

[261] *See* USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Apr. 24, 2024)

[262] *See* USCIS, *RAIO Directorate—Officer Training: Decision Making* (Apr. 24, 2024); 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief IJ's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''LERS develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

severe form of trafficking in persons is a per se exceptionally compelling circumstance, provide sufficient protections for victims of trafficking. The Departments decline to expand this exceptionally compelling circumstance to trafficking victims who do not rise to the level of being victims of ''severe forms of trafficking in persons.'' This is a statutorily defined term [263] which includes ''sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age'' and ''the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.'' 22 U.S.C. 7102(11). The Departments find that this statutory definition sufficiently encompasses noncitizens who have experienced exceptionally compelling circumstances that should except them from the limitation on asylum eligibility. This definition has long been employed in the immigration context, *see, e.g.,* INA 101(a)(15)(T)(i)(I), 8 U.S.C. 1101(a)(15)(T)(i)(I) (T nonimmigrant status for victims of severe forms of trafficking in persons); INA 212(a)(2)(H), 8 U.S.C. 1182(a)(2)(H) (ground of inadmissibility for those who engage in severe forms of trafficking), with which AOs and IJs are familiar, and commenters have not offered a persuasive reason for deviating from this well-established definition. Exceptionally compelling circumstances are intended to be narrow and preserved only for those who would generally be subject to the limitation, but present with the most urgent and immediate need to enter without a CBP One appointment or between POEs during times when the border system is overwhelmed. That said, noncitizens who do not satisfy the existing exception for trafficking victims (or other exceptionally compelling circumstances enumerated in the rule) may still seek to establish exceptionally compelling circumstances for another reason, and officers will evaluate every case based on its individual facts and circumstances.

*Comment:* Commenters asserted that the IFR did not provide sufficient clarity about the procedures for noncitizens to seek an exception to the IFR's limitation on asylum eligibility.

First, commenters stated that access to the IFR's exceptions requires physical access to U.S. immigration authorities at POEs but alleged that there are many factors that impede such physical access, including security agents on the Mexican side of the border restricting access to POEs. Commenters asserted that such impediments to physically accessing U.S. immigration authorities undermine the IFR's exceptions and prevent noncitizens who may satisfy an exception from accessing protection. Commenters also stated that it is unclear how the rule and Proclamation together impact access to POEs. Accordingly, commenters requested that the Departments establish clear, transparent procedures to guarantee that noncitizens seeking to establish an exception from the limitation on asylum eligibility can physically access U.S. immigration officials.

*Response:* The Departments believe that the IFR adequately explains the exception to the limitation on asylum eligibility for noncitizens who establish exceptionally compelling circumstances, including the process by which AOs and IJs will evaluate whether a noncitizen has satisfied the exception. *See* 89 FR at 48732–33. Regarding commenters' concerns related to noncitizens' ability to physically access U.S. immigration authorities, the Departments note that nothing in the IFR physically impedes a noncitizen from accessing U.S. immigration authorities and that insofar as these comments concern CBP's implementation of the Proclamation, they are outside the scope of this rulemaking, as are concerns about conduct by individuals outside of the United States who are not U.S. immigration authorities—for example, on the Mexican side of the border. *Cf.* 89 FR at 48732 n.169 (explaining that ''[w]hen it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b)'').

*Comment:* Commenters recommended that the Departments exclude noncitizens who present at a POE from the IFR's limitation on asylum eligibility, and instead limit application of any restrictions to those who cross irregularly, in order to guarantee access to border processing for noncitizens who present at a POE.

*Response:* The Departments decline to adopt an exception to the limitation on asylum eligibility for all noncitizens who present at a POE. As the Departments explained in the IFR, in the absence of congressional action, the changes made by this rule are intended to improve the Departments' ability to deliver timely decisions and consequences to noncitizens who do not have a legal basis to remain in the United States, and the Departments expect that the limitation on asylum eligibility will encourage noncitizens to present at a POE pursuant to an appointment, pursue another lawful pathway, or decline to journey to the United States at all. *See* 89 FR at 48715; *id.* at 48730–31. The Departments have determined that excepting all noncitizens who present at a POE would undermine these objectives and undermine processes designed to manage border inflows at POEs. *See, e.g.,* 88 FR at 31318 (noting that the ''ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways'' are designed to, among other things, ''protect against an unmanageable flow of migrants arriving at the SWB'').

*Comment:* Commenters questioned why the IFR's exceptions do not fully align with the exceptions available under the Circumvention of Lawful Pathways rule. In particular, commenters stated that the IFR does not provide an exception for technological failure of the CBP One app or for noncitizens who are unable to use the CBP One app due to illiteracy, a language barrier, a disability, or an inability to afford a smartphone or data plan. Noting ongoing technical and accessibility issues with the CBP One app, commenters urged the Departments to adopt an exception to the limitation on asylum eligibility for all noncitizens—whether they present at a POE or cross between POEs—who: (1) are unable to use the CBP One app due to accessibility issues with the app itself; (2) are unable to use the CBP One app due to illiteracy, disabilities, not speaking a language in which the CBP One app is provided, lack of knowledge about the existence of the CBP One app, or a lack of resources or other difficulties; or (3) fail to secure appointments after multiple attempts.

Additionally, commenters noted that the IFR does not contain an exception for being denied asylum in a country through which the noncitizen transited. Commenters stated that the Departments failed to provide a justification or explanation for eliminating such exceptions under the IFR and alleged that it is arbitrary for the Departments

---

[263] The provisions at 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) reference the definition of ''victim of a severe form of trafficking in persons'' in 8 CFR 214.201, and that regulatory provision references relevant statutory definitions, including definitions found at 22 U.S.C. 7102. *See* 8 CFR 214.201.

to include such exceptions under the Circumvention of Lawful Pathways rule but not under the IFR.

Commenters also asserted that the inconsistencies between the exceptions available under the IFR and the Circumvention of Lawful Pathways rule will create confusion for all parties, as it is unclear which rule will apply when emergency border circumstances are in effect.

*Response:* The Departments decline to add any additional exceptions to the limitation on asylum eligibility and disagree with commenters' assertions that the Departments did not provide adequate justifications for why the rule does not contain exceptions for an inability to access or use the CBP One app or being denied asylum in a transit country.

The Departments explained in the IFR that they were not adopting these exceptions from the Circumvention of Lawful Pathways rule because, unlike that rule, this rule only applies during emergency border circumstances, when the number of encounters strains the capacity of immigration and border security systems. 89 FR at 48732 n.171. Because of this rule's focus on emergency border circumstances, the Departments have determined that the rule's exceptions should be limited to noncitizens "with a time-sensitive imperative" to enter the United States. *Id.* For example, the rule focuses its exception for exceptionally compelling circumstances on noncitizens who require immediate entry into the United States, due to medical emergencies or imminent and extreme threats to life or safety, among other reasons. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments have explained above why they have not included in the IFR and this rule the exception for difficulty using the CBP One app and refer readers to that discussion.

Similarly, and as explained in the IFR, the Departments did not include and are not adding an exception for noncitizens who received a final decision denying asylum in a country through which they transited because this rule serves a different purpose than the Circumvention of Lawful Pathways rule. 89 FR at 48732 n.171. While the Circumvention of Lawful Pathways rule sought to encourage noncitizens to seek protection in other countries, this rule is focused on deterring irregular migration and speeding up the border process during emergency border circumstances, when the immigration system is experiencing extreme and enduring strains. *Id.* Accordingly, the Departments believe that limiting exceptions to those noncitizens who

have the most immediate and urgent need to present at or cross the U.S. border is imperative. *See id.* Importantly, however, noncitizens who were denied protection in another country remain eligible to apply for asylum if they "enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances" under this rule. *Id.*

The Departments also disagree that omission of these exceptions will create confusion. The Departments clarify that both this rule and the Circumvention of Lawful Pathways rule are applied during credible fear screenings when emergency border circumstances are in effect. If it is determined that this rule does not apply, AOs and IJs will then consider the noncitizen's claim through the now familiar Circumvention of Lawful Pathways rule, which has been in effect for over a year. Given the Departments' experience in implementing the Circumvention of Lawful Pathways rule, the Departments are confident in adjudicators' ability to implement this rule, which is similar in structure to the Circumvention of Lawful Pathways rule, and to apply this rule's "exceptionally compelling circumstances" exception, which mirrors the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48739. If the noncitizen establishes exceptionally compelling circumstances under this rule pursuant to 8 CFR 208.35(a)(2)(i) or 8 CFR 1208.35(a)(2)(i), they will also have established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). However, adjudication of the additional exceptions in Circumvention of Lawful Pathways are unlikely to be dispositive in cases where both this rule and the Circumvention of Lawful Pathways rule apply, because if the noncitizen does not meet the exception to this rule, this rule's limitation on asylum eligibility will apply.

### c. Implementation by CBP Officers

*Comment:* A few commenters expressed concern that, unlike the Circumvention of Lawful Pathways rule, in which AOs and IJs solely adjudicate the application of its presumption of asylum ineligibility and exceptions, the application of the Proclamation and the IFR are first adjudicated by CBP officers at the limit line, resulting in at-risk individuals and survivors of violence being denied entry. Relatedly, commenters stated that although the IFR allows CBP officials at POEs to assess whether a noncitizen qualifies for an

exception, it is unclear what guidance or training has been provided to those officials to ensure fair determinations or whether there is a mechanism for noncitizens to be screened for application of the bar when they approach a POE. A commenter noted that it is difficult to understand from the IFR how CBP will determine whether noncitizens are subject to the rule and how the rule and Proclamation would impact access to POEs and CBP conduct. Another commenter similarly stated that it is unclear whether the Departments would equip CBP officers or noncitizens to navigate the changes under the Proclamation and IFR, including in circumstances where the applicable legal standards could change within short windows of time, depending on whether crossing thresholds are being met.

*Response:* Comments relating to the implementation of the Proclamation itself are outside the scope of this rule, which applies a separate limitation on asylum eligibility. Additionally, to the extent that commenters expressed concern about CBP officials assessing whether a noncitizen qualifies for a regulatory exception to the limitation on asylum eligibility, commenters misunderstand the operation of the IFR. CBP officials may determine whether an exception to the June 3 Proclamation applies to a particular noncitizen, but do not apply the rule's limitation on asylum eligibility and its exception. Rather, it is AOs and IJs, during credible fear screenings and reviews, who must determine "whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances." 89 FR at 48739; *see also* 8 CFR 208.35(b), 1208.35(b). AOs and IJs—not CBP officials—will thus be evaluating whether the limitation on asylum eligibility applies and whether a noncitizen has established a regulatory exception. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a), (b).

### d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

*Comment:* Commenters stated broad concerns with the credible fear review process in general, including concerns over whether there are adequate opportunities to present supplementary evidence and testimony, questions over whether IJ review is truly de novo, concerns that IJs do not appropriately

weigh evidence in the record, and concerns that the outcome of credible fear reviews is dependent upon the IJ considering the case, rather than the strength of the claim.

Commenters also objected to the IFR's provision that would require noncitizens to affirmatively request IJ review of a negative credible fear determination. Commenters stated that this affirmative request requirement removes an important safeguard intended to minimize the risk of refoulement, with particular harm to the most vulnerable noncitizens. Commenters explained that, given the frequency of IJs reversing negative credible fear findings, IJ review is a necessary procedural protection for the integrity of the asylum screening process, especially since the IFR's changes may lead to erroneous decisions by AOs. Moreover, commenters stated that requiring noncitizens to affirmatively request review is especially problematic when combined with the other changes in the IFR, namely the limited opportunity to access counsel and the heightened standards of proof for pre-screening interviews. Commenters stated that there must be an opportunity for IJ review of negative fear determinations to be considered an effective remedy under international law.

Commenters also stated there are a multitude of reasons why a noncitizen may fail to request IJ review. For example, a noncitizen may fail to request IJ review due to mental health conditions, language barriers, trauma, or because they are not adequately informed of the procedure for requesting review. Similarly, one commenter stated that requiring noncitizens to affirmatively request review mirrors the Global Asylum Final Rule, 85 FR 80274, which the Departments later reversed in a subsequent rulemaking, *see* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"), citing fairness concerns and noting that treating a failure to elect review as a request for review better accounts for the range of explanations for a noncitizen's failure to seek review.

Commenters supported the IFR's requirement that DHS inform noncitizens of the procedure to request review and recommended that such information be provided both verbally and in writing in a language that the noncitizen understands. However, commenters said that noncitizens may find the concept of an IJ review hearing

confusing, and requiring noncitizens to request review may unfairly punish noncitizens for their confusion.

*Response:* To the extent that commenters raise concerns about the credible fear review process in general, such concerns are outside the scope of this rulemaking, which is focused only on the credible fear review process for noncitizens who are subject to this rule.

As to concerns about credible fear review under this rule, the Departments emphasize that, although the rule requires noncitizens to affirmatively request review of a negative credible fear determination, the statutory right to IJ review remains available. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). The Departments will continue to seek to ensure noncitizens are aware of the right to IJ review and the consequences of failure to affirmatively request such review. *See, e.g.,* 88 FR at 11747. Specifically, if an AO enters a negative credible fear determination, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. 8 CFR 208.35(b)(1)(i), (2)(iii). Thus, contrary to commenters' concerns, this safeguard remains in place and the Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review of negative credible fear determinations can elect it under this rule.

As explained in the analogous provision introduced in the Circumvention of Lawful Pathways rule, to ensure that the noncitizens referenced by commenters—including noncitizens with mental health conditions, those who have suffered trauma, or those who are unable to read or speak English—understand what review is available to them, DHS provides explanations to noncitizens "to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review." 88 FR at 11747. These explanations are provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. As a result, the Departments believe it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, see *id.,* and the enhanced explanations described above, can be fairly processed as if they have declined to seek additional IJ review. See 88 FR at 11747.

Moreover, the Departments previously acknowledged in the Circumvention of Lawful Pathways rule that "the

procedure for IJ review of negative credible fear determinations . . . differ[ed] from the credible fear review procedures implemented by the Asylum Processing IFR." 88 FR at 31423 (citing 88 FR at 11744). There, the Departments explained that "'the need for expedition under the current and anticipated exigent circumstances' weigh[ed] in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination." *Id.*

Following this reasoning, the Departments believe that this requirement that noncitizens affirmatively request IJ review of negative credible fear determinations continues to be necessary during times of emergency border circumstances, despite other measures to address the exceptionally high levels of irregular migration along the southern border, including the Circumvention of Lawful Pathways rule. *See* 89 FR at 48712–13 (listing measures). This rule has been adopted to address emergency border circumstances, times where the Departments' limited resources are under maximum strain to the point where border security and immigration systems are experiencing serious operative impacts and further fueling more lasting effects of a backlogged system. Accordingly, the Departments believe requiring noncitizens to affirmatively request IJ review of credible fear determinations will help ensure that such reviews take place only for those who desire such review. The alternatives suggested by commenters risk extending such review to those not actually interested in IJ review, thereby unnecessarily expending valuable adjudicatory capacity during a time when such resources are not available.

As to requests to provide information about review procedures verbally and in writing in a language that the noncitizen understands, noncitizens receive that information in writing (via a written English document), and noncitizens who do not speak English receive that information verbally through a real-time translation of the written document as well. This approach satisfies the Departments' statutory obligations, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), and in DHS's judgment, provides adequate notice of the ability to seek review. It is neither required nor feasible to, in addition, provide that information in written form in all languages that may be spoken.

*Comment:* Commenters stated that the same complexity concerns about the IFR raised by commenters in the credible fear context will apply to removal proceedings before IJs. For example,

commenters stated that determinations as to the timing and applicability of emergency border circumstances, including determining whether emergency circumstances were in effect on the noncitizen's dates of entry, whether to apply this rule versus the Circumvention of Lawful Pathways rule, and whether exceptionally compelling circumstances apply, would only lead to longer, more complex removal proceedings, and an inefficient focus on inquiries having no bearing on the merits of the protection claim in an already backlogged immigration court system. Commenters said that proceedings could be prolonged due to a potential rise in the numbers of motions to reopen or reconsider and appeals to the BIA or Federal courts challenging application of the rule, among other reasons.

Commenters stated that these determinations will be especially complex for noncitizens who enter without inspection ("EWI"). Commenters explained that it is unclear how the Departments will accurately determine whether this rule applies, especially when few people who EWI remember the exact date they crossed the border and, regardless, will likely not have evidence of the time of such crossing. Therefore, commenters stated that the rule will result in arbitrary IJ decisions, because IJs will not be able to determine whether the rule applies. As a result, commenters suggest creating a specific policy for noncitizens who EWI.

*Response:* The Departments disagree with commenters' concerns about the complexity in applying this rule in EOIR proceedings. To the contrary, given the IJ's role as the fact finder in removal proceedings, IJs are well-equipped to make fact-based determinations, such as dates of entry and whether emergency border circumstances were in effect on a specific date. *See, e.g.,* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("Authority of immigration judge"). For example, regarding commenters' concerns about noncitizens who EWI, the Departments note that IJs routinely make similar entry timing determinations, such as determining application of the one-year filing deadline for asylum and continuous physical presence for cancellation of removal for certain nonpermanent residents. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B) (one-year time limit); INA 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A) (cancellation of removal for certain nonpermanent residents). Moreover, IJs have been applying the Circumvention of Lawful Pathways rule since its effective date, which similarly requires determining a

noncitizen's entry date. *See* 8 CFR 1208.33(a)(1)(i) (requiring determination as to whether a noncitizen entered the United States "[b]etween May 11, 2023, and May 11, 2025").

Additionally, one change made by this rule—requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters between POEs for 28 consecutive calendar days before the 14-day waiting period is triggered—will further reduce complexity concerns by reducing the probability that emergency border circumstances will be discontinued and then continued or reactivated soon thereafter. This requirement not only better ensures that emergency border circumstances have abated, but also mitigates potential confusion in determining whether emergency border circumstances were in effect on a noncitizen's date of entry. Contrary to commenters' concerns, this rule's provisions will not consistently "turn off" one day and "turn on" the next day. Rather, when triggered, this rule will be in effect for a more sustained period of time, making it easier for noncitizens and adjudicators to determine the timing and applicability of emergency border circumstances. Lastly of note, at all times since issuance of the June 3 Proclamation and publication of the IFR, DHS has maintained a publicly available record of the dates that a suspension and limitation on entry is in effect.[264] This DHS-maintained record will be available into the future, and the Departments believe that it will serve as an essential aid for IJs in determining whether the provisions of the rule should be applied based on a noncitizen's date of entry.

e. Family Unity Provisions

*Comment:* Commenters expressed general support for the family unity provisions in the IFR, stating that family unity is a key principle in both international and U.S. immigration law. However, commenters also raised concerns that the provisions were not sufficient, and that family unity would be better preserved by eliminating the rule's limitation on asylum eligibility altogether. For example, commenters stated that the family unity provisions are overly limiting, as they only benefit noncitizens who are able to meet the higher burden of proof for statutory withholding of removal.

Commenters were also concerned that the family unity provisions would create unnecessary procedural hurdles

for families. For example, commenters raised concerns that the family unity provisions only apply to qualifying family members who cannot independently establish other protection from removal. In doing so, commenters also questioned what forms of protection would qualify as "other protection from removal" sufficient to disqualify spouses or children from the family unity provisions.

Commenters stated that this requirement would result in ethical dilemmas where families would need to ensure that qualifying family members do not independently qualify for statutory withholding of removal so that the family members can receive derivative asylum relief under the family unity provisions. Commenters also claimed that this requirement would require family members to obtain separate counsel and sever proceedings, which will cause unnecessary financial hardship to the family and undue burdens to the Government. Rather, commenters recommended removing altogether the requirement that qualifying spouses or children not independently qualify for relief.

Commenters also raised procedural questions about how the family unity provisions function where a noncitizen is belatedly eligible for asylum under the family unity provisions, but after their spouse or child have undergone their own immigration adjudications.

*Response:* The Departments agree with commenters that keeping families unified and avoiding family separation is an important goal. Emergency border circumstances necessitated implementation of the IFR's limitation on asylum eligibility to better manage border operations and substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain in the United States. *See* 89 FR at 48715.

Nevertheless, recognizing the importance of family unity, the Departments included a number of provisions in the IFR to eliminate the risk of family separation. For example, the "exceptionally compelling circumstances" exception applies to all qualifying family members of the noncitizen's traveling party if the noncitizen, or the noncitizen's qualifying family member with whom the noncitizen is traveling, meets the exception. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Similarly, the IFR made no changes to the family unity provision, which establishes an "exceptionally compelling circumstances" exception for noncitizens who can, among other

---

[264] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigration laws.*

requirements, establish eligibility for statutory withholding of removal or CAT protection and could have, but for either the IFR's limitation or Circumvention of Lawful Pathways presumption, established eligibility for asylum. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 88 FR at 11723–24 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to treat "the possibility of separating the family" as "an exceptionally compelling circumstance" when the provision's requirements are met). This provision allows qualifying noncitizens to pursue asylum, and its allowance for derivative beneficiaries, instead of statutory withholding of removal and CAT protection, with their comparatively fewer benefits. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Importantly, these provisions are not intended to serve as wholesale "family" exceptions to the IFR's limitation on asylum eligibility, which would significantly reduce the effectiveness of the limitation on asylum eligibility and incentivize families to engage in dangerous irregular migration to the United States. *See* 89 FR at 48757 (explaining that "[e]xcepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so"). Rather, the exceptionally compelling circumstances family unity exceptions help ensure that noncitizens who qualify for the rule's exception are not separated from their qualifying spouses or children while pursuing relief or protection in the United States, including, for example, through derivate asylee status if granted relief, or through removal of the family unit if denied.

With regard to commenter concerns about qualifying spouses or children obtaining their own independent relief or protection, which would in turn make the IFR's family unity provisions inapplicable, the Departments clarify that the IFR's family unity provisions are intended as limited exceptions solely to prevent potential family separation due to the IFR's limitation on asylum eligibility. If qualifying spouses or children obtain independent relief or protection that allows them to remain in the United States, then they will have necessarily avoided the family separation concerns underlying the IFR's family unity provisions. *See, e.g.,* 88 FR at 11724 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to avoid family separation where "at least one other family member would not qualify for asylum or

other protection from removal on their own"). The Departments further note that asylum "or other protection" under this family unity provision refers to statutory withholding of removal and CAT protection. *See, e.g.,* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023) (noting that "asylum or other protection" refers to claims "relating to a fear of persecution or torture").

Additionally, to the extent that commenters raised concerns over qualifying spouses or children independently receiving statutory withholding of removal, with comparatively fewer benefits than asylum, the Departments note that statutory withholding of removal protects the qualifying spouse or child from removal to a country where they more likely than not would be persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 419 (1999); *Stevic,* 467 U.S. at 429–30; *see also* 8 CFR 208.16, 1208.16. Moreover, if noncitizen families wish to pursue asylum relief specifically, the IFR and the Circumvention of Lawful Pathways rule are designed to encourage noncitizens to make an appointment to present at the SWB or take advantage of other lawful migration pathways. *See* 89 FR at 48730–31.

Relatedly, the Departments do not share commenters' concerns about potential ethical dilemmas faced by representatives related to pursuing independent relief for family members due to the family unity provisions. Representatives must be truthful to the court in presenting the record facts and will either be able to zealously advocate on behalf of all of their clients where the family members' interests present no conflict, or counsel can withdraw from such representation if they believe they cannot advocate for each client's interests equally. *See* 8 CFR 1003.102 (acknowledging that practitioners who appear before EOIR have a duty to zealously represent their clients "within the bounds of the law"); *see also* 8 CFR 1003.102(c) (setting forth that a practitioner may face disciplinary sanctions for "[k]nowingly or with reckless disregard" making a false statement of material fact or law).

Further, this rule does not impact EOIR's existing procedures for consolidating or severing cases, which

has always involved parties making assessments and strategic decisions on how best to proceed with their cases. *See* Immigration Court Practice Manual ch 4.21 (setting forth procedures for combining and severing cases). Prior to this rule, family units have been able to seek asylum and related forms of protection in consolidated proceedings, and family units are always permitted to sever their proceedings if they so choose, including for strategic reasons based on their own assessment about the strength of their individual claims. *Id.* Thus, the Departments disagree that the rule will meaningfully impact noncitizens choosing to sever their cases from those of their families in the way that commenters claim, especially given the family unity provisions included in the IFR and maintained in this final rule.

Lastly, with regard to procedural timing concerns in applying the family unity provisions, the Departments clarify that the family unity provisions only apply to qualifying family members who are accompanying the principal applicant or who are eligible to follow to join that applicant. *See* 8 CFR 208.35(c), 1208.35(c). Therefore, principal applicants and accompanying family members who are traveling together will generally have their claims adjudicated together in removal proceedings. *See, e.g.,* Immigration Court Practice Manual ch. 4.21(a) (Oct. 25, 2023) (explaining that immigration courts may consolidate cases together that involve immediate family members into a single adjudication). As a result, there are unlikely to be significant timing gaps between determinations on any individual relief or protection claims within a family unit.

*Comment:* Commenters supported the inclusion of a family unity provision in the AMI process, wherein DHS retains jurisdiction over an asylum application for further adjudication after a positive credible fear determination. Commenters stated that it is logical and efficient for AOs to apply the same family unity provision as IJs when adjudicating the merits of an asylum application. However, commenters also expressed concern that the family unity provision in the AMI process is discretionary for AOs, and urged the Departments to make the provision mandatory, similar to the family unity provision for IJs in the IFR. Commenters also recommended amending the Circumvention of Lawful Pathways rule to allow DHS to apply the same family unity exception under that rule to avoid confusion that the disparity would allegedly cause for applicants, counsel,

and AOs, particularly where the two rules are both in effect and overlapping.

*Response:* In the IFR, the Departments included a family unity provision in the AMI process before USCIS, but made it discretionary to provide USCIS with flexibility while implementing the new AMI process. *See* 89 FR at 48733. After further consideration, the Departments are retaining the discretionary nature of the family unity provision in the AMI process before USCIS.

USCIS maintains complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f). In exercising this discretion, USCIS does not foresee that it would be a prudent use of resources to place cases into the AMI process where, at the credible fear stage, the IFR's limitation on asylum eligibility applied and there was not a significant possibility the noncitizen could establish an exception to the limitation. USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the southern border. *See* 89 FR at 48756. Accordingly, it is unlikely that USCIS would adjudicate a case where the 8 CFR 208.35(c) family unity provision could apply in the foreseeable future.

With that understanding, were such a case ever to be placed into the AMI process, USCIS has the discretion to apply the 8 CFR 208.35(c) family unity provision, depending on the circumstances of the individual case. Importantly, if USCIS exercises its discretion not to apply the family unity provision, the noncitizen will not be prejudiced because, if USCIS does not grant asylum in such a case, the asylum application will be reviewed de novo by an IJ, 8 CFR 1240.17(i), who is required to apply the family unity provision in removal proceedings pursuant to 8 CFR 1208.35(c).

Additionally, the discretionary nature of the family unity provision before USCIS in 8 CFR 208.35(c) is necessary in order for USCIS to comply with the AMI regulatory timeline laid out in 8 CFR 208.9. This timeline requires USCIS to conduct the AMI interview no later than 45 days of the applicant being served with a positive credible fear determination, absent exigent circumstances, 8 CFR 208.9(a)(1), and prohibits extensions on the submission of additional evidence that would prevent the AMI decision from being issued within 60 days of service of the positive credible fear determination, 8 CFR 208.9(e)(2). While the IFR allows for USCIS to extend both of those timelines up to 15 days in the event

USCIS requires the noncitizen to submit a Form I–589, 8 CFR 208.35(b)(2)(ii), even with a 15-day extension, these are still accelerated time frames that would not accommodate applying the family unity provision in every AMI case where it could potentially apply before USCIS.

In some cases, USCIS may be able to apply the family unity provision without running afoul of the regulatory time frames, such as where the accompanying family members are also dependents on the AMI case, and the principal applicant is found eligible at the AMI for statutory withholding of removal with respect to their country of nationality based on the record before USCIS. In such a case, the AO could likely apply the family unity provision within the regulatory timelines, as there would likely be no need to request additional evidence verifying the qualifying family relationships. Additionally, if the principal applicant was already found eligible for statutory withholding of removal with respect to their country of nationality based on the record before USCIS, it is likely that they also would be found eligible for asylum if the limitation on asylum eligibility is not applied. In such a circumstance, USCIS could likely exercise discretion to apply the 8 CFR 208.35(c) family unity provision in a logical and efficient manner and complete the case within the regulatory time frame without issue.

In other cases, however, applying the family unity provision in an AMI case could prove excessively cumbersome within the regulatory time frame. For example, if the qualifying family relationship relates to a family member outside of the United States for which additional proof is needed to establish the relationship, it may be impossible for an AO to extend the timeline to accommodate the production of such evidence and still meet the processing timeline for an AMI under 8 CFR 208.9(e)(2). In a case where the AO finds the noncitizen is not eligible for asylum due to the IFR's limitation on asylum eligibility, and is not eligible for statutory withholding of removal, but would be eligible for withholding of removal under 8 CFR 208.16(c)(2) (withholding of removal under the CAT) based on the record before USCIS, requiring the AO to apply the 8 CFR 208.35(c) family unity provision would entail the AO conducting a cumbersome analysis, including revisiting the noncitizen's asylum eligibility, absent application of the IFR's limitation on eligibility, only to possibly still find the applicant ineligible for asylum on the merits and refer the case to the IJ, who

would then review the asylum application de novo. *See* 8 CFR 1240.17(i).

Indeed, if USCIS were required to apply the 8 CFR 208.35(c) family unity provision in all AMI cases, significant extra resources would likely have to be expended in any case where the provision might apply (including additional interview time, extending the evidentiary submission timeline, and additional time writing up the case) even where it would not result in a grant of asylum. If asylum is not granted by USCIS, asylum eligibility would still be reviewed de novo by an IJ. *See* 8 CFR 1240.17(i). Keeping the provision discretionary, in contrast, allows USCIS to apply the provision where it can do so in a logical and efficient manner without thwarting the regulatory timelines for AMI processing.

While logic and efficiency support keeping the 8 CFR 208.35(c) family unity provision discretionary for AMI cases before USCIS, it is also logical for the 8 CFR 1208.35(c) family unity provision to apply in all removal proceedings (whether they originated as AMI cases or not) before EOIR. Removal proceedings before the IJ are potentially the last opportunity the noncitizen will have to be granted asylum. In contrast, the AMI process before USCIS cannot result in a denial of asylum, only a referral to the IJ for a de novo review of the asylum application. 8 CFR 208.14(c)(1), 1240.17(i). Additionally, while removal proceedings for AMI cases operate on a streamlined time frame, there is still substantially more time allotted for removal proceedings before EOIR than for the initial AMI adjudication before USCIS, 8 CFR 208.9(a)(1), (e)(2), *id.* at 1240.17(f), so there is more flexibility in the time frame for the IJ to apply the family unity provision at the final adjudication stage than there would be for an AO to apply the provision in the AMI process before USCIS.

Separately, the Departments note that any comments regarding family unity amendments to the separate Circumvention of Lawful Pathways rule are outside the scope of this rulemaking.

### 2. Manifestation of Fear Standard

#### a. Legality Concerns

*Comment:* Commenters expressed concerns that implementing a manifestation of fear requirement would ultimately lead to noncitizens with valid claims being removed without proper evaluation, which would violate U.S. international non-refoulement obligations and "circumvent U.S. asylum law." One advocacy group

called the manifestation requirement a "deeply deficient" means of screening applicants for fear that will cause "credible fear pass rates to plummet and lead to refoulement." Another commenter described the change as "morally and legally troubling," while a third commenter stated that it would create significant hurdles for noncitizens seeking statutory withholding of removal and CAT protection.

Commenters further asserted that the manifestation requirement violates specific international refugee laws or principles. Citing amicus briefs, the UNHCR handbook, and other UNHCR publications, one commenter stated that the United States has an "affirmative obligation" under international law "to elicit information that might reveal potential refugee status" and "conduct an individualized assessment to evaluate whether the individual is entitled to protection as a refugee," which the manifestation requirement violates. In that same vein, another commenter observed that international refugee organizations have "long emphasized that to fully carry out . . . obligations under the Refugee Convention" the parties should implement procedures that "affirmatively identify" possible applicants and provide guidance to them on how to apply for relief and protection, and the IFR's "reliance on manifestation of fear is inadequate to fulfill these basic requirements."

Commenters stated that the manifestation requirement violated proper implementation of the credible fear process outlined in the INA. One commenter characterized the IFR's manifestation requirement as an attempt to expand the reach of expedited removal by creating additional barriers to credible fear interviews, in violation of Federal law. Another commenter stated the manifestation requirement did not align with "Congressional intent" to "ensure that asylum was available to all those with legitimate claims." Other commenters echoed the sentiment that the manifestation requirement was implemented without regard for the risk of refoulement and purely as a means to efficiently remove noncitizens without a hearing.

Commenters also stated that eliminating the requirement that immigration officers affirmatively document and inquire about a noncitizen's fear of persecution during initial encounters at the border is a "sharp break from prior practice by the Departments" that would ultimately lead to higher numbers of noncitizens being refouled. One commenter

described the change to using manifestation as "a dangerous reversal of a procedural safeguard" designed to ensure legal compliance, expressing concern that other safeguards are already being removed. Other commenters recommended that the Departments end the manifestation of fear approach and reinstate the previous policy of using preliminary questions to identify whom to refer for credible fear screenings.

Some commenters opposed the manifestation requirement due to concerns that it violated DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), and pointed to what they purport was the Government's acknowledgment (*see* 89 FR at 48741 n.194) that an argument could be made that the IFR conflicts with the INA. Specifically, commenters argued that the INA requires DHS to provide information concerning credible fear interviews to noncitizens who may be eligible and eliminating use of the forms in lieu of a manifestation requirement was a violation of that statutory obligation. Commenters were specifically concerned that the alternatives outlined in the IFR—such as providing signs and videos in facilities—would not be "sufficient to put noncitizens on notice of how they may assert a claim for protection."

Commenters pointed to different parts of the IFR where they believe the Government explicitly acknowledged that the manifestation requirement will result in refoulement and stated that these purported acknowledgements are problematic. One commenter stated that the IFR was creating a standard that "knowingly accepts" a probability of violating non-refoulement and fails to satisfy the statutory requirement to provide information about credible fear interviews to noncitizens who may be eligible for such interviews. Another commenter highlighted part of the IFR that they said conceded that the manifestation requirement would result in the removal of noncitizens with valid claims. Similarly, commenters discussed the IFR's purported admission that asylum seekers who are asked affirmative questions about whether they have a fear of returning to their home country are seven times more likely to assert a claim.

*Response:* The Departments disagree that the manifestation standard violates any international obligations or that it is inconsistent with Federal law.

As to concerns related to international law, commenters did not specify any binding international law source that creates such obligations and instead

cited publications and amicus briefs, which do not have the force of law and are not international treaties to which the United States is a party. As described in Section II.B of this preamble, the United States' non-refoulement obligations are implemented through domestic law, and neither the 1967 Protocol nor the CAT are self-executing. Regardless, as outlined in the IFR, 89 FR at 48740–41, the applicable international laws do not specifically prescribe the minimum screening requirements that must be implemented to determine whether a noncitizen should be referred for a credible fear interview.[265] Instead, it is up to each participating state "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure."[266] Thus, it is within the Departments' discretion to revisit the screening process the United States implements during emergency border circumstances.

Moreover, the United States continues to uphold its non-refoulement obligations during emergency border circumstances.[267] Under applicable international law, the United States has an obligation (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured. *See* Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176 (outlining standard under the Refugee Convention); *Pierre* v. *Gonzales*, 502 F.3d 109, 114 (2d Cir. 2007) (outlining standard under the CAT). During the emergency circumstances at the southern border, the manifestation standard temporarily affords immigration officers the ability to refrain from affirmatively asking noncitizens about fear, and instead refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a

---

[265] *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967* (highlighting that the process for identifying refugees is not "specifically regulated").

[266] *Id.*

[267] The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), for mandatory withholding of removal. And the United States implements its obligations under Article 3 of the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. 89 FR at 48739–40. This rule does not, in any way, prevent noncitizens from manifesting or expressing such fears; rather, the rule ensures that noncitizens who manifest or express such fears are properly screened consistent with United States' non-refoulement obligations. *See* 8 CFR 235.15(b)(4). As explained in the IFR and this rule, the Departments believe that this requirement represents the best way to remain consistent with U.S. international obligations while simultaneously addressing the emergency circumstances at the southern border.

The Departments also do not believe the manifestation standard violates the INA or any other Federal law. As addressed in the IFR, 89 FR at 48739–40, DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO, so long as those procedures are consistent with the INA.[268] In using this authority, the Departments are confident the manifestation standard is fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). That statutory section provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As such—and contrary to commenters' assertions—the INA does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture, nor does it define what circumstances constitute the requisite indication of intent or fear. To the contrary, the onus under the statute is on the noncitizen to indicate either of the circumstances warranting referral, which the IFR provides a noncitizen can do at any time during the process. *See* 89 FR at

48740.[269] Thus, as discussed in Section III.B.2 of this preamble, the rule's approach accords with section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[270]

Separately, regarding commenters' concerns about departing from the longstanding practice of providing individualized advisals and asking affirmative questions, the Departments disagree that there are insufficient procedural protections for individuals subject to the rule. As the IFR acknowledged, the practice of providing individualized advisals and asking affirmative questions was originally adopted to "ensure that bona fide asylum claimants [were] given every opportunity to assert their claim[s]." 89 FR at 48742 (quoting 62 FR at 10318–19). However, importantly, the legacy INS further explained that enacting these procedures was intended to "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* (quoting 62 FR at 10318). While such procedures have remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule must show that there are good reasons for the new policy but need not necessarily "provide a more detailed justification

than what would suffice for a new policy created on a blank slate"). And indeed, when emergency circumstances are present on the southern border, the procedures adopted in 1997 are unduly suggestive and, thus, unnecessarily burden the inspections process, which necessitates revisiting screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return to their native country or country of removal or indicate an intention to seek fear-based relief or protection. Given the extraordinary circumstances facing the Departments during times of emergency border circumstances, DHS has determined it is reasonable to implement the manifestation standard.

The Departments similarly disagree that discontinuing use of the Form I–867A and Form I–867B during emergency border circumstances violates DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible." DHS continues to provide information concerning credible fear interviews to noncitizens in CBP custody subject to expedited removal who may be eligible to receive such an interview via signs and videos in multiple languages, satisfying DHS's statutory duty under the INA. This is precisely what footnote 194 of the IFR explains. Rather than any purported acknowledgment of conflict with the INA, that footnote was simply included to clarify the points above and illustrate that the IFR does, in fact, satisfy this statutory obligation. Moreover, as the IFR explains, 89 FR at 48741–42, noncitizens who manifest a fear of return (and, thus, who are in fact eligible for a credible fear interview) are given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.[271] Additionally, noncitizens who manifest a fear in CBP custody are shown a video prior to their credible fear interview, which also explains the credible fear process in more detail.

The Departments also recognize commenters' concern regarding the IFR's explicit acknowledgment that the manifestation standard may result in some noncitizens with meritorious claims not being referred to a credible fear interview. *See, e.g.,* 89 FR at 48743–44. The Departments included these statements to demonstrate their

---

[268] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority over the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

[269] *Accord Indicate,* Merriam-Webster's Collegiate Dictionary 592 (10th ed. 1996) ("to point out or point to," "to be a sign, symptom, or index of," "to demonstrate or suggest the necessity or advisability of," or "to state or express briefly"); *Indicate,* New International Webster's Comprehensive Dictionary of the English Language 644 (1996) ("To be or give a sign of; betoken," "To point out; direct attention to," or "To express or make known, especially briefly or indirectly"); *Indicate,* The American Heritage Dictionary of the English Language 918–19 (3d ed. 1996) ("To show the way to or the direction of; point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the necessity, expedience, or advisability of," or "To state or express briefly"); *Indicate,* Webster's II New Riverside University Dictionary 622–23 (1994) ("To show or point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the need, expedience, or advisability of," or "To express briefly").

[270] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *Knauff,* 338 U.S. at 543 ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. at 18.

[271] That explanation will be translated into certain common languages or will be read to the noncitizen if required. 89 FR at 48741 n.194.

thorough consideration of all possible issues that might arise from the implementation of a manifestation standard at the southern border during emergency circumstances. In that vein, the Departments emphasize that the manifestation standard is a temporary solution to emergency border circumstances. In light of those circumstances, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek fear-based relief or protection. Unfortunately, any screening mechanism—even affirmative questioning—could result in some noncitizens with potentially meritorious claims not being referred for a credible fear interview. But given the emergency border circumstances facing the Departments and discussed in the June 3 Proclamation, the IFR, and this rule, the Departments believe the manifestation standard is appropriate and necessary.

b. Concerns About the Efficiency and Complexity of the Manifestation Standard

*Comment:* Several commenters expressed doubts about the Departments' claims that the change to the manifestation approach would increase efficiency, while others observed that the change would make the system more complex and create further inefficiencies. Relatedly, multiple commenters questioned the stated purpose of efficiency for eliminating the credible fear questions by CBP officers, writing that it instead appears to be a desire to reduce referrals of noncitizens for fear interviews and described the assertion by DHS in the preamble that the questions are suggestive and do not result in grants of asylum as unfounded.

One commenter questioned whether the Departments are sacrificing legitimate claims in the name of speed. Commenters wrote that the three questions and explanation previously required by the Form I–867A and Form I–867B take only a few minutes to read and criticized the Departments for alleging efficiency gains of 20 to 30 minutes by eliminating critical questions that could prevent refoulement. The commenters further stated that investing in adequate training and enforcing compliance with the "standard" screening process would be more efficient than providing additional guidance and requiring CBP officers to complete additional training. Another commenter described the scenario of CBP officers directing noncitizens to interpreters, who will

refer to the informative signs and videos the IFR's preamble described in CBP waiting rooms, and questioned whether this process would be shorter.

*Response:* Regarding commenters' concerns regarding complexity and efficiencies, the Departments continue to believe that the manifestation standard outlined in the IFR meets the purposes for which it was implemented—to increase processing efficiency and avoid suggestive advisals and questioning, while still ensuring that noncitizens are able to seek protection in the United States.

As outlined in the preamble to the IFR, DHS determined that, in times of emergency border circumstances, it was appropriate to temporarily eliminate the use of affirmative advisals and questions on the Forms I–867A and I–867B, based on DHS's determinations that such advisals and questioning can be suggestive. *See* 89 FR at 48743–45. The Departments disagree with the assertion that this determination was "unfounded." It was based on CBP's experience that, when noncitizens are asked affirmative questions like those on the Form I–867B, noncitizens are more likely to respond in the affirmative. The affirmative questions thus can serve as a prompt for noncitizens in custody to respond in the affirmative, even if they do not actually have a fear of persecution or torture. As outlined in the IFR, the Departments' determination is also consistent with the behavioral science concept of "acquiescence," or the tendency of respondents to "consistently agree to questionnaire items, irrespective of item directionality." *See* 89 FR at 48743 n.220. Regarding concerns that such studies are less probative of noncitizens' experiences in CBP custody, DHS notes that it did not rely, and is not relying, on these studies as the sole basis for its determination that the advisals and affirmative questions are suggestive, nor is it asserting that these studies provide the only justification for the implementation of the manifestation standard in this rule. Rather, the implementation of the standard was, as noted above, based in part on CBP's experience in the years implementing the expedited removal process that providing affirmative advisals and asking affirmative questions was suggestive. As noted in the IFR, these studies provide illustrative support for this learned experience. *See* 89 FR at 48743.

DHS continues to believe that the concept of acquiescence supports its determination, based on its decades of experience in the processing of noncitizens who enter the United States,

that the affirmative advisals on the Form I–867A and the questions on the Form I–867B are suggestive. This determination is informed, in part, by information that agency personnel regularly receive about the activities of TCOs in the region, including information that TCOs guide or coach many noncitizens on what to say in order to remain in the United States. It is DHS's experience that, upon encounter and inspection, the questions on the Form I–867B can prompt noncitizens to follow this guidance, thus leading them to claim a fear even if they would not have done so on their own. While DHS acknowledges that noncitizens could similarly be prompted to manifest a fear under the approach of the IFR and this rule, DHS continues to believe that this approach will at minimum mitigate this problem by removing suggestive questions. Moreover, DHS continues to believe that it is likely that noncitizens with a fear of return or an intent to seek asylum will manifest a fear absent the affirmative advisals and questions on the Form I–867B. This is supported by the fact that DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[272]

DHS's determination that it was appropriate to eliminate the use of affirmative advisals and questions on the Form I–867B was also based in part on its assessment that such action would make the process more efficient. In particular, the Departments anticipated that the implementation of the manifestation standard would save approximately 20–30 minutes of processing time, contributing to increased efficiencies in processing and across the immigration process. *See* 89 FR at 48745. This assessment was based on the experience of CBP officers and agents with extensive experience reading and completing these forms, and DHS thus disagrees with commenters' contention that the completion of these forms only takes a few minutes. This is, in part, due to the fact that, when completing a sworn statement, such as the Form I–867A, officers and agents ask a number of questions of the noncitizen, each of which may need to be translated; the noncitizens' answers may need to be translated; and the officers and agents must record the answers to each question in the processing system. The noncitizen also must sign the sworn statement, which requires additional explanation that may require

---

[272] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

translation. This question-and-answer process is in addition to the potential need to provide translation services to noncitizens, if needed, when reading noncitizens the contents of the Form I–867A. While it is difficult to provide the exact time saved as a result of these changes in processes (because USBP systems do not automatically track processing time, standing alone), it is CBP's experience in the time since the Proclamation and IFR were implemented that the elimination of these questions and processes (including not reading the contents of the Form M–444) has, as anticipated, saved approximately 20–30 minutes per person, and led to more efficient and expedited processing overall.

With regard to concerns questioning the stated purpose behind the changes, the Departments disagree that the true purpose of the changes was to reduce the number of individuals referred for credible fear screenings. As explained in the IFR, the shift to a manifestation standard is intended to address suggestive questions and, in so doing, reduce the gap between high rates of referrals and screen-ins with historic ultimate grant rates as well as increase processing efficiency for DHS. *See* 89 FR at 48742–44 & n.220. As explained above in this section, there are multiple reasons why the referral rate observed under a direct questioning approach is very likely greater than the true rate of noncitizens who fear removal or intend to seek asylum—including coaching by TCOs and the possibility that the advisals and questions lead to an unduly high rate of false positives. *See id.* at 48743 & n.220. Seeking to address this problem is not the same as seeking to decrease the number of referrals for that purpose alone, as commenters suggest. Moreover, noncitizens who manifest or express a fear still have their claims adjudicated as required by the INA.

The Departments appreciate commenters' suggestion that, rather than implementing a manifestation standard, resources should be devoted to providing additional training to CBP officers and agents on the non-IFR process, but decline to eliminate or change the manifestation standard at this time. As noted in the IFR and in this section, the Departments believe that, in the emergency border circumstances outlined in this rule, the manifestation standard is appropriate. In addition, CBP notes that its officers and agents have had experience implementing the statutory and regulatory requirements of expedited removal since they became effective and were implemented by legacy INS in

1997, including experience identifying indicators of fear.[273] Guidance authored at that time explained that inspectors were required to refer a noncitizen to an AO if that noncitizen indicated an intention to apply for asylum or a fear of harm or concern about returning home.[274] The guidance stated that immigration inspectors should consider verbal as well as non-verbal cues given by the noncitizen; and it provided that, when determining whether to refer the noncitizen, ''inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.''[275] The guidance also highlighted that ''[t]he inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution.''[276] CBP also notes that, like legacy INS, under the IFR procedures and consistent with agency policy, agents and officers are instructed to err on the side of caution and refer any questions to supervisory officers.[277]

The Departments also disagree with comments indicating that the manifestation standard creates complexities. They maintain that the manifestation standard, in fact, decreases the complexity of the process, given the more streamlined approach taken in the rule and disuse of the Form I–867A and the Form I–867B. In addition, as outlined in the preamble to the IFR and throughout this rule, the rule also allows DHS to effectively and efficiently remove inadmissible noncitizens who are subject to expedited removal orders while quickly identifying inadmissible noncitizens who require a credible fear screening by USCIS AOs. *See* 89 FR at 48742–43.

---

[273] *See* Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[274] *See id.* at 3.

[275] *Id.*

[276] *Id.*

[277] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance;* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum of Fear Claims or Fear Manifestations* (July 18, 2024); Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. and & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal at 3 (Mar. 31, 1997).

## c. Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return

*Comment:* Several commenters described the manifestation approach presented by the IFR as an unclear method of assessing fear of return and critiqued the rule as confusing or lacking clear guidance on implementation. A commenter expressed concern that the criteria requiring referral for a credible fear interview are overly broad, including a ''mere belief'' that a noncitizen may have a fear of return. Similarly, another expressed concern that the IFR lacks guidance around what degree of manifestation is required, whether immigration officers will consistently implement the manifestation requirement, and whether noncitizens will be provided information ''if and when the Departments begin to figure out what is sufficient under this test,'' while another commenter added that the existing U.S. asylum infrastructure is inadequate to administer the multiple layered and broad-ranging changes of the IFR, including the change to use manifestation.

Many commenters wrote that it is difficult and inappropriate for immigration officers to use manifestation of fear to assess fear of return. Commenters expressed concern that the IFR creates a confusing, non-transparent, and unfair situation for CBP officers to consider. A commenter described the manifestation standard as ''deficient'' in refugee protection and far from an equitable standard. The commenter wrote that requiring officers to simultaneously interrogate people at the border while also determining if their behaviors indicate fear is ''nonsensical.'' Similarly, another commenter remarked that Border Patrol agents and CBP officers focus on border security and the identification and prevention of criminal activity at the border, often placing them in an adversarial role with noncitizens that would leave these workers ill-equipped to make careful and considered asylum determinations. The commenter also described the contrasting trauma-informed training given to AOs to learn interviewing techniques designed for vulnerable populations, adding that research shows that many noncitizens who qualify for asylum relief have difficulty expressing their claims without the support of such trained techniques.

A commenter referenced a statement in the IFR noting that although the video explaining the importance of expressing a fear of return will not be

CHNV-FRN-00464

played at small facilities, immigration officers at such facilities have resources to be able to "devote a great deal of attention to observing individuals" to see if they manifest fear or need a translator or reading assistance. *See* 89 FR at 48741 n.196. The commenter stated that this suggests that the opposite is true at the larger facilities, *i.e.,* that officers at larger facilities will not have the time or wherewithal to scrutinize noncitizens for nonverbal signs of fear, and, in fact, expect the videos and signs to do a great deal of work for them.

Multiple commenters critiqued the IFR's directive for immigration officers to assess non-verbal shaking, crying, or fleeing behaviors as "unworkable." Commenters further expressed concern that the officers would not be able to discern whether newly arrived noncitizens were cold, hungry, tired, or exhibiting other unconscious behaviors as opposed to a fear of return. Commenters described this directive in the IFR as "absurd and disingenuous," writing that it would be more effective and accurate for CBP officers to directly ask simple questions regarding fear than trying to be "mind readers." Another commenter referenced studies and stated that nonverbal cues of fear would likely go unheard, reasoning that express manifestations of fear are being ignored.

Several commenters recommended requiring CBP officers to ask, in a language understood by the noncitizen, one question regarding whether they have a fear of return.

Many commenters cited research—including a 2022 study by the Center for Gender & Refugee Studies that interviewed 97 families expelled during a previous use of a manifestation approach while the Title 42 public health Order was in effect—that requiring manifestation lowers the rate of noncitizens receiving fear screenings. Commenters stated that human rights monitors have documented that using the manifestation approach has resulted in "CBP failing to refer people who expressed a fear of return to the required fear screening interviews," and that the "shout" test under the Title 42 public health Order resulted in the erroneous return of many people, including women and children, to situations of danger. Another commenter observed lower statistics of credible fear interviews granted to Haitian nationals when given the "shout test" at sea by the U.S. Coast Guard ("USCG") compared to the historical rate of credible fear interviews granted to migrants encountered by immigration officials at land borders, when the shout

test was not used. Lastly, commenters stated that the IFR is already leading to failures in properly referring noncitizens for fear interviews.

In addition, several commenters referenced research [278] and expressed strong concern that CBP officers have a pattern of ignoring signs of fear in migrants. They critiqued the Departments' discussion and statistics of the likelihood of migrants responding affirmatively to asylum questions regardless of a valid fear of return, stating that the IFR's preamble does not cite any statistics about noncitizens failing to present legitimate fear claims in their interview or account for greater numbers of people seeking fear interviews if they are told they are available. A commenter stated that the statistics cited by the Departments have been directly contradicted by other research findings.

Similarly, a couple of commenters cited research [279] that some families have been ignored or chastised for requesting asylum, voiced concern that CBP officers were hostile and mistreated noncitizens at the southern border, and further expressed concerns that under "the Shout Test" immigration officers have prevented migrants from speaking or verbally abused them.

*Response:* The Departments disagree that the manifestation standard is an unclear, confusing, or inaccurate method of assessing fear of return and are confident that the manifestation process in the IFR—including the use of signage and a video to provide generalized notice of the right to seek asylum and protection and the way to raise such a claim—is sufficient to provide individuals with an opportunity to seek asylum and protection, while also maintaining the efficiency gains discussed above. During the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health Order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[280]

The Departments acknowledge that immigration officers have historically provided advisals regarding the credible fear process and ascertained a

noncitizen's fear through affirmative questioning, through use of the Form I–867A and Form I–867B, and that removing these questions is a significant change. Thus, the Departments acknowledge that the manifestation process is, in the context of expedited removal, a new process both for officers and agents and for noncitizens. However, the Departments disagree that USBP agents and CBP officers are not equipped or trained to properly identify individuals who are vulnerable or who indicate or manifest fear. When implementing this process, agents and officers draw on their longstanding experience and practice observing and interacting with individuals, including observing any indications or behaviors of concern. Immigration officers have implemented the regulatory and statutory standards governing expedited removal since it was implemented in 1997, and, as noted above, they have had guidance regarding the treatment of noncitizens processed under these provisions since that time.

Additionally, CBP provided guidance to its frontline workforce implementing the IFR delineating how fear can be manifested by a noncitizen in many different ways, including verbally, non-verbally, or physically; CBP also provided examples and indicators. Such indicators include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (*e.g.,* bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

Furthermore, the recent guidance on IFR implementation provides that, if officers or agents are in doubt, or if ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then officers and agents should refer the matter to a supervisor.[281] And, as noted above, existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS.[282]

---

[278] *See, e.g.,* Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions,* Jan. 30, 2024, *https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[279] *See, e.g., id.*

[280] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[281] *See id.; see also* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum or Fear Claims or Fear Manifestations* (July 18, 2024).

[282] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP,
Continued

The Departments also disagree with the commenters' concerns that the manifestation of fear standard is difficult and inappropriate, confusing, or unfair for agents and officers to apply, or that agents and officers are ill-equipped to determine the nature of an individual's fear claim. Indeed, USBP agents and CBP officers, as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with recognizing the needs of such individuals. As a result of their experience and training, CBP immigration officers (both USBP agents and CBP officers) have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow-up steps with regards to any behaviors or indicators of concern. *See* 89 FR at 48744. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. *Id.* Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. *Id.* Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. *Id.* DHS believes that this experience, coupled with guidance, helps agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach. *Id.*

The Departments acknowledge that interactions between agents and noncitizens occur in the context of an immigration inspection and interview and in a custodial environment, but disagree with commenters' suggestion that the interview is "adversarial" in such a manner that noncitizens would be unlikely to manifest fear or officers would have difficulty recognizing manifestations of fear. Such immigration inspections and interviews are conducted for the sole purpose of

determining an individual's admissibility under the immigration laws of the United States and ensuring that they are processed accordingly.[283] In addition, the Departments note that, when in use, the Form I–867A and Form I–867B are also completed in this same context. During such an immigration inspection, officers and agents have face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or indicate an intention to seek fear-based relief or protection.[284] The Departments reiterate that agents and officers do not assess the merits of an individual's claim of fear. The Departments acknowledge that fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, officers and agents should involve supervisors or managers to ensure appropriate decisions are made. The Departments also reiterate that USBP agents and CBP officers do not determine whether a noncitizen is excepted from the rule's limitation on asylum eligibility. Such decisions are made by a USCIS AO or, for those processed with an NTA, by an IJ. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a). Agents and officers are responsible for identifying whether an individual has manifested or expressed a fear and, if so, referring them for further consideration by an AO.

Additionally, the Departments note that, under the manifestation standard, a noncitizen is not required to verbally express or state that they have a fear. Contrary to commenters' concerns, the IFR does not impose a "shout test." As outlined in the IFR, manifestations of fear may be verbal, non-verbal, or physical. 89 FR at 48739–45. Thus, a migrant can manifest a fear through an unconscious behavior. *Id.* at 48744. The Departments acknowledge and appreciate that some noncitizens may have difficulty volunteering a fear of return to agents and officers during processing. However, certain migrants may also have difficulty volunteering their fear in response to the previous questions on the Form I–867B, given that the questions are asked by immigration officers in the context of the immigration process. Additionally, for noncitizens who may be hesitant to answer questions or to affirmatively express a fear, the manifestation

standard and CBP officer and agent training and experience, as well as observations from the inspection itself, take into account physical and non-verbal manifestations, some of which may be unconscious by the noncitizen.

The Departments acknowledge a two-page document cited by commenters regarding the prior use of a manifestation standard under the Title 42 public health Order.[285] The document asserts that from June through October 2022, advocates interviewed at least 97 families expelled to cities along the SWB, of whom over half reported that they had verbally expressed a fear of return and nearly three-quarters reported having non-verbally expressed a fear. According to the document, multiple migrants sought to raise fear claims with "CBP officers" but such officers did not allow them to speak and ultimately expelled them to Mexico. The Departments lack a basis to independently evaluate the advocates' methodology (which is largely undescribed) or the accuracy of migrants' claims as described in the document. At the same time, the Departments note that most of the specific allegations in the document involve behavior—officers not allowing noncitizens to speak—that would be a violation of CBP policy under the Title 42 public health Order, under this rule,[286] and under the Form I–867A/B approach that applies when emergency border circumstances are not in place.[287] For this reason, and due to the distinctions between processing under the IFR and during the implementation of the Title 42 public health Order described below, DHS does not regard this study as providing persuasive evidence that the manifestation approach of the IFR and this rule has not been and will not be effective.

The Departments disagree with commenters' implicit suggestion that the implementation of the IFR is substantially similar to the

---

*Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re:* Expedited Removal Policy (Aug. 11, 2004); Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[283] *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1; 8 CFR 235.3(a).

[284] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance.*

[285] *See* Ctr. for Gender & Refugee Studies, "*Manifesting*" *Fear at the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), *https://cgrs. uclawsf.edu/our-work/publications/ %E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[286] *See, e.g.,* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance* (requiring officers and agents to refer any noncitizen who manifests a fear for a credible fear interview with USCIS).

[287] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. at 1 (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re: Expedited Removal Policy* at 7–8 (Aug. 11, 2004).

CHNV-FRN-00466

implementation of the manifestation standard used during the Title 42 public health Order, such that experience under Title 42, including in the study mentioned above, demonstrates that the manifestation standard is inherently unreliable. As an initial matter, the manifestation under the IFR occurs in the context of immigration processing under title 8, rather than in the context of processing and expulsion under Title 42. Immigration processing is, as a general matter, a more complex process than the processing that occurred under Title 42, with noncitizens generally interacting with immigration officers during processing for a longer period of time than occurred during processing for expulsion. For example, the processing of an individual for expulsion under Title 42 took, on average, less than 30 minutes, as compared to, under the current processes under the IFR, approximately 1.5 hours. Therefore, noncitizens have a longer period of time to interact with the processing agents or officers, and potentially manifest a fear. In addition, noncitizens processed under title 8 procedures under the IFR provisions are generally in CBP custody for longer than under Title 42, and can manifest a fear at any time in DHS custody.

Additionally, based on best practices and lessons learned during the implementation of the Title 42 public health Order, the Departments have implemented several operational advancements and information sharing developments. Under the IFR and this rule, noncitizens have access to signage explaining that they may manifest fear during their time in DHS custody. Noncitizens in large-capacity facilities can also view videos explaining the manifestation standard and the general process they are receiving. 89 FR at 48741–42. As noted above, during implementation of the public health Order under Title 42, the DHS process was more expedited. This resulted in a narrower window of opportunity for a noncitizen to manifest a fear in DHS custody. This difference can be seen through the higher number of noncitizens manifesting fear under the IFR. Since the implementation of the IFR, 27 percent of noncitizens encountered between POEs at the SWB have manifested fear while in DHS custody.[288] Between June 3, 2022, and May 11, 2023, when the use of the manifestation standard for noncitizens encountered and subject to the Title 42 public health Order was tracked, less than 7 percent of individuals in family

units processed under the Title 42 public health Order nationwide were recorded as having manifested a fear in USBP custody and were, in general, excepted from the Title 42 public health Order. As evidenced by the significantly higher manifestation rate under the IFR as compared to what had been recorded during implementation of the Title 42 public health Order, the two circumstances are not comparable. Noncitizens encountered along the SWB under the IFR have manifested a fear and been referred to an AO for a credible fear interview on a much more frequent basis. At the same time, as discussed in Section II.A.2 of this preamble, fear-claim rates remain well below the very high rates following the ending of the Title 42 public health Order and prior to the IFR. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances. *See* 89 FR at 48744.

With regards to commenters' concerns that, particularly at large-capacity facilities, officers and agents may not be able to ''scrutinize'' noncitizens for nonverbal signs of manifestation of fear, the Departments disagree. As acknowledged in the preamble to the IFR, CBP has placed signs in its facilities along the SWB advising noncitizens of their ability to express or manifest a fear, and has placed videos in its larger facilities. 89 FR at 48741–42. DHS explained that, at smaller facilities, such videos are not played, but officers and agents have had sufficient resources to devote to observing individuals to determine if they manifested a fear. *Id.* at 48741 n.196. This statement was intended to explain why a video was not necessary at such facilities, but is not intended to convey any lack of attention to such claims at large-capacity facilities. Indeed, as noted above, agents and officers interview and observe noncitizens during their immigration inspection and interviews, which occur one-on-one. CBP operations at any CBP facilities with noncitizens in custody are staffed and operate 24 hours a day. Every CBP officer and agent receives annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)—which provide standards for the custodial conditions in CBP facilities—that ensures every noncitizen in CBP

custody is monitored for care and safety, including a provision requiring officers and agents to ''physically check'' areas where noncitizens are held ''on a regular and frequent manner,'' providing noncitizens with an opportunity to raise any concerns or needs directly with CBP personnel conducting the checks.[289] Noncitizens in custody at CBP facilities are generally under continuous and direct supervision by multiple personnel and may seek assistance or ask questions of any of those individuals supervising their holding areas at any time. *See* 89 FR at 48744. DHS is confident that, during this time, even in large-capacity facilities, agents and officers have sufficient experience and expertise to identify manifestations or expressions of fear. Likewise, noncitizens in custody at ICE facilities may seek assistance or ask questions and are supervised such that officers, who have experience and expertise in these interactions, can identify manifestations or expressions of fear. It is important to note that a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody.

Further, regarding comments that express concerns and reference reports concluding that the manifestation standard has resulted in failures to refer noncitizens for a required fear interview, and comments recommending that, given this, officers and agents should ask, at a minimum, a question about fear in the noncitizen's native language, the Departments are aware of these studies and their conclusions. The Departments acknowledge that, under the manifestation approach outlined in this rule, there may be some noncitizens who have a fear of persecution or a fear of return, but who are not referred for a credible fear interview. However, the Departments do not believe that such a possibility is unique to the manifestation standard, and, in any event, DHS has taken steps, including posting signs and videos and providing guidance to its personnel, to help mitigate this possibility. Having considered the reports commenters cite, as well as the mitigating steps DHS has taken and the lessons learned from DHS's experiences during processing under the Title 42 public health Order, the Departments continue to believe that the manifestation standard is

---

[288] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[289] CBP, *National Standards on Transport, Escort, Detention, and Search (TEDS) 4.6,* at 16 (Oct. 2015), *https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.*

appropriate in the circumstances outlined in the IFR and this rule. Moreover, as explained earlier in this response, the Departments' implementation of the IFR has resulted in a fear-claim rate substantially higher than the rate observed under the Title 42 public health Order, further suggesting that the circumstances from other operational contexts, including those studied in earlier research, may be inapposite.[290] DHS acknowledges that asking a single question about fear would be an alternative to the approach adopted in this IFR. However, DHS declines to implement such an option, as it would be subject to the same concerns that DHS outlined in the preamble to the IFR with regards to a short, individualized advisal. As noted in that preamble, DHS has determined that, during times of emergency border circumstances, a short, individualized advisal would be unlikely to convey information more effectively than signs and videos. *See* 89 FR at 48744. In particular, the Departments assessed that if an advisal could be developed that was short enough to avoid unduly lengthening processing times in the current emergency situation, such an advisal would be unlikely to convey information more effectively than the existing signs and videos, and such an advisal would still have the suggestiveness problems of the current system. The Departments assess that asking a single question—particularly in the context of the expedited removal process under the IFR where there are no individualized advisals provided—would likely present the suggestiveness problems of the current system. DHS thus declines to implement this change.[291]

To the extent that there are allegations that an agent or officer ignored expressions or manifestations of fear by a noncitizen, such conduct is contrary to DHS policies and practices, and would be treated as such. The Departments again note that, to the extent it exists, such employee misconduct would not be unique to the implementation of this rule. Nor do such claims provide a persuasive reason to depart from the approach this rule adopts to address emergency border circumstances. As already explained, DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear; that guidance directs them to refer individuals who manifest fear for a credible fear screening, including instructing them to err on the side of referral. 89 FR at 48744. If agents or officers disregard those instructions— which could occur with or without this rule—DHS has procedures in place for reporting misconduct.[292] DHS relies on

these procedures generally to ensure that personnel are following applicable law and guidance, and DHS assesses that these procedures are generally effective. If allegations of misconduct are found to be substantiated and misconduct is found, such findings may lead to, for instance, disciplinary action against involved personnel and referral for criminal charges if a determination is made that any laws were violated. In addition, regardless of whether any such findings are substantiated, DHS may impose additional training and policy measures consistent with the rule's provisions.

Concerns about misconduct by individual employees are further mitigated by the reality that, as explained above, noncitizens do not have just one chance to manifest fear while in CBP or ICE custody: Noncitizens will typically interact with multiple agents and officials, and they can manifest fear to any of them. Noncitizens will have these opportunities, moreover, after being exposed to signs and videos explaining that they can manifest fear. From June 5, 2024, through August 31, 2024, the median processing time from encounter through repatriation for a case with no fear claims was 6 days.[293]

Moreover, commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR. As described above, there are a number of mechanisms within the Department for such complaints and concerns to be raised, and CBP is not aware of any substantiated allegations of misconduct raised through these channels. And the data showing a manifestation rate of 27 percent under the IFR—though not alone proving a negative or showing that no fear claims are being missed— indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases. For all these reasons, DHS does not believe the commenters' arguments provide a reason to depart from the rule's approach.

*Comment:* A few commenters reasoned that because the manifestation of fear approach does not require documentation, unlike affirmative questioning, the IFR removes appropriate accountability. One commenter described the change to using manifestation as ''a dangerous reversal of a procedural safeguard that

---

[290] As noted in the IFR, the manifestation standard is used by the USCG, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea. *See* 89 FR at 48744. Although the Departments believe these other uses support the view that a manifestation standard can be effective, having implemented the IFR's manifestation standard and observed the results of that standard, the Departments now believe that the difference between the operational contexts limits the usefulness of the direct comparison as suggested by some commenters.

[291] As noted in the preamble to the IFR, the Departments acknowledge that there are some studies articulating that the Form I–867A and Form I–867B provide important protections. As explained in the IFR, DHS disagrees with these studies to the extent that they conclude that individualized advisals and affirmative questions are not suggestive, based on DHS's longstanding experience with this process. Indeed, such studies are now nearly two decades old and were done at a time when, as described above, the ER process was very different from what it is now. Additionally, given that the studies do not account for the signs, videos, and other means of providing information under the IFR's approach, DHS does not believe they are

particularly probative as a means of assessing the effectiveness of this approach.

[292] CBP takes allegations of employee misconduct very seriously, and allegations of serious misconduct are investigated by CBP's Office of Professional Responsibility (OPR). CBP, *Office of Professional Responsibility, https://www.cbp.gov/about/leadership-organization/professional-responsibility* (last modified Mar. 29, 2024). Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Intake Center via email: *JointIntake@cbp.dhs.gov*, or via phone: 1–877–2INTAKE (246–8253), Option 5. Similarly, ICE's Office of Professional Responsibility (''OPR'') takes employee misconduct very seriously and manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs that protect the public trust and preserve the highest standards of integrity and accountability across the agency. ICE, *Office of Professional* Responsibility, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). To promote integrity, mitigate risk, and uphold the agency's professional standards, the OPR-led Integrity Coordination Center receives and assesses information and refers any allegations of employee misconduct to appropriate offices for investigation, if necessary. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). This process ensures that allegations of criminal or administrative misconduct against ICE personnel are properly assessed and thoroughly investigated. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). Allegations of misconduct by an ICE employee or contractor can be sent to ICE OPR's Integrity Coordination Center via email: *ICEOPRIntake@ice.dhs.gov*, via phone: 1–833–4ICE–OPR (833–442–3677), or via the ''File a Complaint'' web link. ICE, *Integrity Coordination Center—Intake Form, https://www.ice.gov/webform/opr-contact-form* (last updated Jan. 9, 2024).

Additionally, the DHS Office of Inspector General and the DHS Office for Civil Rights and Civil Liberties are also available for the public, including previously removed noncitizens, to provide feedback and make complaints involving DHS employees, including officers and agents, or programs; to submit allegations of civil rights and civil liberties violations; and to submit other types of grievances. *See, e.g.,* DHS, Off. of Inspector Gen.,

*Hotline, https://www.oig.dhs.gov/hotline* (last visited Sept. 21, 2024); UDHS, *Office for Rights and Civil Liberties, https://www.dhs.gov/office-civil-rights-and-civil-liberties* (last visited Sept. 21, 2024).

[293] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

CHNV-FRN-00468

has been implemented to ensure the United States' compliance with its international obligations,'' expressing concern that other safeguards are already being removed. A commenter expressed concern that the Departments have eliminated the Form I–867A and Form I–867B without replacing them with any other documentation, which they wrote could make it impossible to have any record of missed viable claims for asylum or the total extent of any such errors. Another commenter asserted that the previous system of requiring immigration officials to complete and sign two forms incentivized officials to be honest and critiqued the manifestation approach as leaving no paper trail. Another commenter stated that the manifestation standard would worsen already problematic interactions between CBP officers and noncitizens. The commenter referenced a report [294] finding that CBP officers had an ''alarming'' rate of irregularities and non-conforming practices when assessing fear of return, including failing to read the required script for the Form I–867A, failing to record answers correctly, and using questionable interpretation practices. Another commenter discussed reports finding that many interviews conducted by CBP and ICE were marked by inaccuracies, mistranslations, and fabricated information, as well as research showing that in most situations when migrants stated that CBP agents did not ask about their fear of return, the immigration records showed instead that this question had been asked and answered.

*Response:* The Departments disagree that the manifestation of fear standard removes accountability or eliminates official documentation of a fear claim. As an initial matter, while CBP officers and agents are not required to provide noncitizens with an M–444 and do not complete a Form I–867A or Form I–867B when the IFR's provisions are in effect, fear claims are documented in the relevant electronic systems. Guidance issued to both USBP and the OFO requires that, when a noncitizen subject to the Proclamation and the IFR is being processed for expedited removal, and manifests a fear, that noncitizen is to be processed under a particular disposition code in the electronic processing

system.[295] This code is unique to those who are processed for expedited removal and who manifest a fear. Additionally, while noncitizens processed for expedited removal under the IFR procedures are not required to be provided the Form M–444, they continue to be provided information about the credible fear process, through a tear sheet called *Information about Credible Fear Interview* and by video, and they are provided the opportunity to consult with an individual of their choosing.[296] CBP facilities also have signage and, in some cases, videos, providing notice to all noncitizens in custody that, if they have a fear of return, they should inform an agent or officer. 89 FR at 48741. This manifestation may occur at any point during a noncitizen's time in CBP custody, and if such a claim is made, it must be documented in the relevant electronic system at that time.

ICE maintains an electronic system to record case management actions for noncitizens, including referrals to an AO and the disposition of a noncitizen's credible fear determination.[297] If a noncitizen manifests or expresses a fear after their initial encounter with CBP, while in ICE custody, ICE guidance requires officers to refer the case to USCIS for a credible fear interview, including having an opportunity to

consult with an individual of their choosing prior to their credible fear interview.[298]

Per applicable guidance, ICE documents any manifestation or expression of fear on the Form G–166C, which also verifies that the noncitizen has been provided information on the credible fear interview process and the specific language in which it was provided.[299] ICE guidance requires that all documentation, including the claim of credible fear and USCIS fear referral package, are captured in an electronic system of records.[300]

ICE and CBP utilize the same electronic database system for case management of noncitizens and have electronic access to these records.[301] ICE tracks noncitizens transferred from CBP to ICE custody who have manifested fear through the same system.[302] This system ensures that information relating to a noncitizen's case, including fear manifestation, is properly referred to USCIS.[303]

---

[294] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal,* at 19 (Aug. 2, 2016), *https://www.uscirf.gov/publications/barriers-protection-treatment-asylum-seekers-expedited-removal.*

[295] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[296] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); 6.4.24 USBP Field Guidance ER IFR 1; Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 4 (June 4, 2024) (Muster).

[297] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (ICE officers are instructed ''to document the Claim Credible Fear, Fear Referral package submitted, and all subsequent CF related actions in [the electronic system's] Actions and Decisions Tab''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[298] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border, at 4 (June 4, 2024) (''If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview.'').

[299] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024).

[300] *Id.*

[301] DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[302] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (''The new processing dispositions [by CBP] can be tracked in the ICE [system's] Dashboard . . . by selecting these new processing dispositions . . . .''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[303] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (for cases transferred to ICE from CBP after a noncitizen has manifested fear, ''[t]he existing automated referral solution using the 'Refer Credible Fear to USCIS button' in [the electronic system] will be available for use . . . [and the automated] functionality will function as designed.''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4

Continued

With regard to a commenter's concern that the absence of affirmative questioning will result in irregularities and non-conforming practices when assessing fear of return, the Departments disagree. The Departments acknowledge that, under the standard outlined in this rule, official documentation will indicate if a noncitizen expressed or manifested a fear, but will *not* contain an express similar record of a lack of such manifestation. DHS acknowledges that this is a change from non-IFR practices, in which a noncitizen's case file will reflect that the individual was provided with the Form I–867A advisals and will contain the noncitizen's response to the questions in the Form I–867B. DHS disagrees that the lack of such documentation under the manifestation of fear standard removes accountability from CBP officers and agents, incentivizes any falsification of records, or undermines the validity of the manifestation process. During immigration processing, CBP officers and agents ask a noncitizen a number of questions, including about their biographic information, nationality, and purpose of travel to the United States. The processing officer or agent records the noncitizen's answers to these questions in the electronic processing system.[304] In addition, as noted above, any individual who is processed for expedited removal and manifests or expresses a fear is processed using a unique code in the electronic system.[305] Officers and agents have an obligation, as law enforcement officers and Federal employees, to ensure that the record of a particular individual's case file is accurate and complete,[306] which

includes any manifestations or expressions of fear. Thus, the lack of such a code indicates that the individual did not manifest a fear. However, to the extent that an officer or agent failed to accurately record a manifestation of fear, the lack of the unique code in the noncitizen's file itself would provide a record of that failure—just as an inaccurate "no" answer to a question on a Form I–867B would if a noncitizen actually answered "yes" to the question. To the extent that commenters are concerned about potential misconduct by officers and agents, CBP and ICE take allegations of misconduct very seriously and have mechanisms in place to investigate and respond to such allegations as discussed above.

*Comment:* Multiple commenters expressed concern that the IFR and "shout test" approach avoids the provision of necessary interpretation by immigration officers and thwarts appropriate language access for migrants, often adding that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish. Commenters further stated that the IFR might disproportionately impact speakers of Indigenous languages, who may be able to communicate regarding basic information in Spanish but may be unable to discuss the complicated matter of a fear-based claim in anything other than their native language. Similarly, a commenter observed that noncitizens are held in facilities for only a limited time and that during that time language needs might be overlooked. In the same vein, another commenter expressed concern that the IFR and the preamble are not clear regarding how noncitizens who speak languages other than English or Spanish are expected to manifest fear, when they may be able to communicate only basic identification in English or Spanish and Border Patrol agents are not incentivized to seek an interpreter in the noncitizen's language.

*Response:* The Departments disagree with commenters expressing a belief that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish and that they are not incentivized to seek an interpreter. As noted, noncitizens are not required to verbally express or state a fear. A fear can also be manifested non-verbally or physically. In addition, CBP has legal and policy obligations to provide language access services and translation and has long recognized the importance of effective and accurate communication between CBP personnel and the public. Ensuring effective communication with

all persons, including limited English proficiency ("LEP") persons, facilitates CBP's mission.

It is the policy of CBP to take reasonable steps to provide LEP persons with meaningful access, free of charge, to its operations, services, and other conducted activities and programs without unduly burdening the Agency's fundamental mission.[307] This policy applies to all methods of communication—*e.g.,* verbal (including telephone); correspondence (including emails); websites; newsletters; community engagement activities; and flyers, posters, pamphlets, and other documents explaining CBP programs.[308] This policy also applies to interactions with the public, including law enforcement encounters (*e.g.,* questioning, processing, etc.).[309] As a result of and related to these policy obligations, CBP agents and officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[310] Upon implementation of the IFR, signs were posted in areas of CBP facilities where individuals are most likely to see those signs, instructing individuals that, in addition to being able to inform the inspecting immigration officers of

---

(Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[304] *See* DHS, *Privacy Impact Assessment for the CBP Portal (E3) to ENFORCE/IDENT, DHS/CBP/PIA–012,* at 1, 3 (July 25, 2012), *https://www.dhs.gov/publication/cbp-portal-e3-enforceident* (discussing the type of information collected from noncitizens and how it is recorded in the electronic system).

[305] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[306] *See, e.g.,* 44 U.S.C. 3101 (providing that federal agencies "make and preserve records containing adequate and proper documentation of the [official activities] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons affected by the agency's activities").

[307] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[308] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[309] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[310] *See* CBP, *Language Access Plan* 7 (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 3, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 3, 2024); *see also* DHS, *DHS Language Access Resources* (July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials.*

urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. 89 FR at 48741. Moreover, in CBP's large-capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return is shown on a loop in the processing areas and will also be available in commonly-spoken languages. To the extent that noncitizens do not speak one of these languages, CBP provides language assistance services consistent with CBP's Language Access Plan.[311] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the signs and videos are presented will be read the contents of the signs and videos in a language they understand.

*Comment:* One commenter expressed concern that, as a result of the signs and videos in CBP facilities advising migrants of their ability to manifest or express a fear, noncitizens are "in essence . . . coached" by DHS with regard to manifesting fear.

*Response:* With regard to this concern that the existence of signs and videos amount to DHS "coaching" migrants with regards to manifesting or expressing a fear, the Departments are cognizant that, for some individuals, such messaging may result in migrants expressing or manifesting a fear when they otherwise would not. However, as explained in the preamble to the IFR, DHS adopted the approach outlined in this rule—a manifestation standard, coupled with a general notice of the right to express or manifest a fear—in an effort to mitigate this potential, compared with the existing practice of asking affirmative questions. *See* 89 FR at 48743–44. DHS believes that the approach taken in this rule appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States.

### d. Trauma Impacting Manifestation and Vulnerable Populations

*Comment:* Many commenters expressed concern that noncitizens have endured significant trauma en route to

the United States or are under stress after escaping harm and "might not be able to explicitly state their fears" and, thus, would fail the manifestation requirement. One commenter pointed out that trauma does not always present with the physical cues identified in the IFR, such as "shaking, crying, or signs of physical injury." The commenter stated that the relevant USCIS Training Module "explains that survivors of severe trauma may appear emotionally detached"; the commenter wrote that removing an affirmative individualized explanation of the process makes it even harder for survivors to pursue protection for which they are entitled to apply. Other commenters similarly observed that people who have suffered trauma "often have great difficulty raising their fears of return in non-confidential group settings" and might be hesitant to disclose their fear to armed, uniformed officials. One commenter expressed concern that many migrants have fled violence at the hands of government officials and would have difficulty volunteering their fear of return to uniformed CBP agents who are not asking questions about their fear but about other aspects of their situation, while another commenter observed that "all people [seeking] asylum remain traumatized, and very few are able or prepared to tell their full story even if they understand the consequences of the [credible fear interview] process." Commenters also asserted that noncitizens may not understand the importance of their first encounter with a government official or may believe they will have an opportunity to raise their claim later in the process.

*Response:* The Departments acknowledge that many noncitizens arriving in CBP custody may have experienced trauma of some kind and that being taken into immigration custody may exacerbate some of this trauma. The Departments also acknowledge that it may be difficult for some noncitizens to articulate details of their fear claim to CBP officers and agents during processing, and may, in general, have negative reactions to law enforcement officials in uniform. On this point, however, the Departments note that, during CBP processing, the relevant factor determining whether a noncitizen is referred to USCIS is whether the noncitizen manifests a fear. They are not required to, nor expected to, articulate the full scope of their fear or the rationale behind it. Indeed, CBP agents and officers do not determine the validity of any fear claim. Additionally, to the extent that an individual may

react negatively to a CBP officer or agent in uniform, such concerns are not limited to the process under the IFR and would ostensibly apply to any screening process implemented by the Departments. CBP has taken steps over the past several years to integrate trauma-informed care for all persons in custody, with a particular focus on UCs.[312] In particular, in CBP holding facilities, the agency has taken steps to ensure that processing procedures are informed by the potential for trauma experienced by individuals in custody, with a particular emphasis on providing a sense of safety and security, providing caregivers for children in custody and increased custodial oversight, increasing medical standards for individuals in CBP custody, providing regular orientation and assistance, and providing activities and recreation for children.[313] In addition, CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews, where noncitizens may discuss traumatic situations. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. While DHS has taken steps to mitigate the impact of such trauma on the effectiveness of the screening process, including through its signage and videos, it is not possible to develop a screening process that completely eliminates the potential effects of past trauma.

*Comment:* Many commenters expressed specific concerns that certain vulnerable populations of noncitizens would be at a particular disadvantage when seeking protection due to the manifestation requirement. Some commenters highlighted survivors of sexual violence, political dissidents, and LGBTQI+ populations as particularly disadvantaged, in that they may not easily manifest fear in asylum settings due to their specific history of oppression. For example, one commenter wrote that political dissidents may have a fear and mistrust of government officials and be unlikely to reveal their stories to immigration officials. They also discussed the significant harm that they believe the manifestation requirement will have on members of the LGBTQI+ community who are fleeing persecution and thus are

---

[311] *See* CBP, *Language Access Plan* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[312] *See* Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Re:* Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody at 1 (Apr. 29, 2022).

[313] *Id.* at 2–4.

likely afraid to reveal intimate details of their lives in immigration facility spaces that lack privacy and confidentiality.

*Response:* Regarding concerns that certain populations, including LGBTQI+ individuals, survivors of sexual violence, and political dissidents, may not be comfortable expressing the details of their fear claim to CBP officers and agents, the Departments reiterate that, at the time of CBP processing, agents and officers do not inquire about or ask questions about the nature of an individual's fear claim, nor do they evaluate the validity of that claim. Thus, such migrants are not required to—and are not expected to—provide the details of any fear claim, or even the basis for their claim, during CBP processing. In addition, the Departments note that concerns regarding the ability of these populations to articulate their fear claims are not limited to the process under the IFR, and would seemingly apply to any screening process implemented by the Departments, including the process utilizing the Form I–867A and Form I–867B.

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum

*Comment:* Several commenters critiqued the assertion in the IFR that a manifestation of fear aligns with a valid claim for asylum. One commenter articulated that the Departments provided no rationale to think that the new manifestation of fear approach would only affect people with "frivolous claims" to asylum and wrote that this conclusion was contrary to common sense. A commenter wrote that requests for relief or visibly detectable signs of fear are not proxies for a strong claim and that other factors, such as coaching by a smuggler, might determine whether or not a migrant manifests fear.

*Response:* Contrary to the contention contained in the comments, the IFR did not state that the manifestation standard will only impact those with "frivolous" claims. The Departments noted in the preamble to the IFR that they believed that the manifestation standard "is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return." 89 FR at 48744. This decision was informed by the Department's experience that providing the affirmative advisals on the Form I–867A and asking the affirmative questions on the Form I–867B is, in some cases, suggestive, and by the Departments' belief and experience that those with meritorious claims will make their fear or desire to request asylum known when

given the opportunity to do so. However, the Departments also acknowledge that any screening mechanism may result in some noncitizens with valid claims not being referred for a credible fear interview. *Id.* at 48743–44. Nonetheless, the Departments believe that the manifestation standard will allow DHS to identify claims that may be meritorious in an efficient and effective manner, and that this change remains appropriate and necessary in light of the emergency border circumstances in which this rule is implemented. *Id.* at 48744.

f. Noncitizens May Not Understand Their Legal Right To Seek Asylum

*Comment:* Multiple commenters wrote that some noncitizens may not know that they legally can raise their fears of harm. Other commenters wrote that many immigrants would be unable to meet the requirement to express their fear of return explicitly, due to lack of access to legal counsel or unfamiliarity with the legal requirements. A commenter remarked that noncitizens may not understand that the experiences they suffered based on gender, racism, or homophobia or transphobia in their countries of origin might be grounds for asylum in the United States.

Some commenters described the signs and videos discussed in the IFR as insufficient for communicating the complex concepts of manifestation of fear and credible fear screenings. A commenter criticized the content and design of the signs as insufficient to inform the reader that they forfeit their right to seek asylum if they do not manifest a fear of their return. Another commenter noted that the videos would not necessarily even be played at smaller facilities.

Some commenters stated that signs or videos are an inadequate systematic approach to reaching a broad pool of noncitizens with valid asylum claims, particularly given the limited number of languages used. One commenter criticized the "arbitrary" limitation on the number of languages used for the signs and videos and stated that the IFR at footnote 195 (89 FR at 48741 n.195) suggests the signs and videos in CBP facilities will be posted in English, Spanish, Mandarin, and Hindi, but the ICE Implementation Guidance says only that the signs must be posted in English and Spanish without mentioning additional languages to be used on the signs themselves.[314] The comment

stated that limiting language access to these four languages will clearly leave many without any way to understand the procedure they must follow to have their claims heard. The commenter stated that neither the Implementation Guidance nor the Rule explain how someone who cannot understand one of these four languages would know to seek out translations in the law library, as indicated in the rule, or if all facilities even have a law library.

*Response:* The Departments disagree with the commenters' assertions that the signs and videos are not sufficient to notify noncitizens that they can manifest a fear. CBP has posted signs in areas of its facilities where individuals are most likely to see those signs. In addition, CBP has developed a video that is shown on a loop in the processing areas of its large-capacity facilities. Commenters are correct that these videos are not shown in smaller facilities. However, as outlined in the IFR, in such smaller facilities, the signs are posted, and officers and agents are generally able to devote significant attention to noncitizens in custody and identify either fear manifestations or language needs. *See* 89 FR at 48741 n.196. Contrary to commenters' assertion that the list of languages in which these signs and videos are provided is arbitrary, they are provided in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by most of the individuals in CBP custody who are subject to the rule. And if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan.[315]

These signs and videos have also been provided in short, concise language, rather than explaining the complex details of the credible fear process or the standards for addressing a claim for asylum or other protection. This is based on DHS' experience that short, concise, and simple notifications are most effective for noncitizens in custody at CBP facilities, given the nature of CBP facilities and CBP operations.[316] In

---

[314] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3,*

*2024, Securing the Border, and Interim Final Rule,* Securing the Border, at 5 (June 4, 2024) ("These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages. . . .").

[315] *See* CBP, *Supplementary Language Access Plan: Fiscal Years 2020–2021,* at 6 (Feb. 7, 2020), *https://www.cbp.gov/about/language-access.*

[316] *See* CBP, *Directive 2130–031: Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access,* at 1, 4–5 (Dec. 4, 2018), *https://www.cbp.gov/document/directives/2013-031-roles-and-responsibilities-us-customs-and-border-protection-offices?language=pt.*

particular, CBP's role in the credible fear screening process is to identify those who may be seeking protection in the United States, in order to ensure that such individuals are referred to a USCIS AO. This role thus requires officers and agents to identify claims of fear, and, at this initial stage, err on the side of caution.[317] In addition, noncitizens in CBP custody go through a number of steps and may move between various locations in a single facility while completing processing and awaiting transfer out of CBP custody. Therefore, it is CBP's experience that short, simple signs, which can be noticed and read quickly, are more effective for communicating with noncitizens than signs with more complex language. Such claims of fear are, under non-IFR procedures, identified in part through the questions on the Form I–867B. Under this rule, such claims may be manifested or expressed to an officer or agent at the time of processing. However, this rule does not change the role of either the noncitizen or CBP immigration officers in the process—a noncitizen may express or manifest a fear, and, once that fear is expressed, CBP refers the individual to a AO. Additionally, those noncitizens who are referred and who undergo their credible fear interviews in CBP custody are provided additional information about the credible fear process, through the *Information about Credible Fear* tear sheet and the USBP video explaining the credible fear process.

Additionally, for those transferred to ICE custody, commenters are correct that initial ICE guidance called for ICE to provide signage in English and Spanish,[318] but ICE subsequently directed the relevant facilities to post signage in the same four languages as CBP. In addition, as noted by the commenter, ICE has translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.[319]

Noncitizens in ICE detention facilities have access to law libraries for at least five hours per week.[320] Furthermore, ICE has access to an ICE-wide 24/7 language services contract for interpretation and translation, and guidance and best practices materials for identifying LEP individuals and their primary language to secure the necessary interpretation and translation services for them.[321] ICE detention standards provide that oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.[322] Each detained noncitizen in an ICE detention facility is provided an ICE National Detainee Handbook,[323] which is currently available in 16 languages (English, Spanish, Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Pulaar, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese).[324] The Handbook describes the noncitizen's ability to ask for relief from removal, including by seeking asylum, and also provides information regarding the law library and additional resources available to noncitizens.[325] All ICE detainees have the right to use the facility's law library to access approved legal materials.[326]

With regard to concerns that migrants may not know that their experience in their home country or on their journey to the United States may be grounds for asylum, the Departments note that this has always been the case, even under non-IFR credible fear processes. In any event, the Departments note that the current signs and videos use general language to advise noncitizens that they should tell an officer if they "[f]ear persecution or torture if removed from the United States." This open-ended language does not require a noncitizen to fully understand the legal nuances or complexities of their claim at the time it is manifested. CBP therefore believes that the existing signs and videos are sufficient.

### 3. "Reasonable Probability" Screening Standard for Statutory Withholding of Removal and CAT Protection

Commenters largely opposed the heightened "reasonable probability" screening standard for statutory withholding of removal and CAT protection for noncitizens subject to this rule. By contrast, one commenter supported the "reasonable probability" standard for this rulemaking and recommended more broadly applying it to all withholding of removal credible fear screenings.

*Comment:* Commenters stated the "reasonable probability" standard was too high and would lead to refoulement. Some commenters stated that the "reasonable probability" standard is inconsistent with the statutory "significant possibility" standard for asylum in credible fear screenings, and that any attempt to change the "significant possibility" standard was ultra vires. Commenters also explained that the higher standard would cause credible fear passage rates to drop dramatically and result in the removal of noncitizens with valid asylum claims. Commenters stated that Congress intended, as evidenced by the plain language of the statute, for the threshold credible fear screening standards to be low so as not to exclude legitimate asylum seekers, and not to ensure the quick imposition of consequences for irregular entry as described in the IFR.

Similarly, commenters believed the "reasonable probability" standard was set too close to the ultimate burdens of proof for statutory withholding of removal and CAT protection and would require excessively specific evidence, particularly as the credible fear process is designed to move quickly. Rather, commenters suggested that only claims that were "manifestly unfounded" should be screened out at the credible fear stage and that, as much as possible,

---

[317] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance,* at 1 ("If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.").

[318] Memorandum for Enforcement and Removal Operations Exec. Assoc. Dir. Daniel A. Bible, from ICE Deputy Dir. and Senior Off. Performing the Duties of the Dir. Patrick J. Lechleitner, *Re:* Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border,* and Interim Final Rule, *Securing the Border* at 5 (June 4, 2024).

[319] *Id.*

[320] ICE, *Attorney Information and Resources: Other Legal Resources Available to Noncitizens in ICE Custody* (Aug. 9, 2024), *https://www.ice.gov/ detain/attorney-information-resources.*

[321] ICE, *Language Access Information and Resources* (May 7, 2024), *https://www.ice.gov/ detain/language-access* (describing current language access policies); ICE, *ICE Language Access Plan, Supplemental Update Covering Fiscal Years 2019 and 2020,* at 3–5 (July 21, 2020), *https:// www.ice.gov/doclib/about/offices/ero/pdf/ iceLanguageAccessPlanSupplemental2020.pdf;* ICE, *Language Access Plan,* at 7, 10, 13 (June 14, 2015), *https://www.ice.gov/sites/default/files/documents/ Document/2015/LanguageAccessPlan.pdf.*

[322] *See, e.g.,* ICE, *6.3 Law Libraries and Legal Material,* at 422 (revised Dec. 2016), *https:// www.ice.gov/doclib/detention-standards/2011/6- 3.pdf.*

[323] ICE, *Detention Management, National Detainee Handbook* (Sept. 4, 2024), *https:// www.ice.gov/detain/detention-management/ national-detainee-handbook.*

[324] *Id.*

[325] ICE, *National Detainee Handbook,* at 9, 16 (2024), *https://www.ice.gov/doclib/detention/ ndHandbook/ndhEnglish.pdf* ("You have the right to ask for relief from removal based on various legal grounds if you believe you qualify. These might include cancellation of removal, adjustment of status, asylum, withholding of removal, or relief under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. For example, you have the right to ask for asylum to stay in the U.S. if you were (or are afraid that you will be) persecuted in your native country or a country where you last lived because of your race, religion, nationality, political opinion, or membership in a particular social group.").

[326] *Id.* at 16.

asylum, statutory withholding of removal, and CAT protection claims should be adjudicated in full removal proceedings before an IJ, as such claims are complex and require robust processes with more procedural safeguards. Commenters noted a number of issues that would make it difficult for noncitizens to provide the specific evidence required to establish a reasonable probability under this rule, including the inability to obtain counsel during the credible fear process; being interviewed shortly after arriving in the United States; difficulties sharing information due to trauma, exhaustion, or translation availability; additional stress placed on vulnerable populations; detention status; challenges surrounding placement into the non-detained Family Expedited Removal Management ("FERM") process, such as challenges involving children attending credible fear interviews and difficulty obtaining Indigenous language interpreters; and difficulties procuring documentary evidence, expert opinions, or witnesses.

*Response:* The Departments disagree with commenters that the rule's reasonable probability screening standard for statutory withholding of removal and CAT claims is too high and decline to make changes to the standard. The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

To start, and as discussed in Section III.A.1 of this preamble, the Departments note that the "reasonable probability" standard neither affects nor changes the "significant possibility" standard used to screen for asylum eligibility, which is set by statute and remains in effect for asylum claims in the credible fear process. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (a credible fear of persecution "means that there is a significant possibility" that a noncitizen could establish eligibility for asylum). Commenter concerns about changes to the statutory "significant possibility" standard are therefore misplaced.

While Congress clearly expressed its intent that the "significant possibility" standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening

procedures are to be employed with respect to statutory withholding of removal and CAT protection. The Departments therefore have some discretion to articulate the screening standard for such claims. And in the context of the emergency border circumstances described in the IFR and this rule, the Departments believe the "reasonable probability" screening standard better captures the population of noncitizens with potentially valid claims and is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection.

As explained in the IFR and the June 3 Proclamation, resource limitations, outdated laws, and significantly elevated encounter levels at the southern border have made it difficult for the Departments to quickly grant relief or protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. In light of the emergency border circumstances outlined in the June 3 Proclamation, the IFR, and this rule, the goal of this rule is to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross our border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. The Departments believe that imposing a "reasonable probability" screening standard for statutory withholding of removal and CAT protection is needed to further this goal and is consistent with all statutory and regulatory requirements and the United States' international law obligations.

Specifically, the elevated "reasonable probability" screening standard will better allow the Departments to screen out claims that are unlikely to be meritorious, as the higher screening standard is more proportional to the ultimate burdens of proof for statutory withholding of removal and CAT protection, which are each higher than that for asylum. *See, e.g.,* 89 FR at 48747 (noting that the higher screening standard will help better predict the likelihood of success on the ultimate application for relief or protection); *see also* Regulations Governing the Convention Against Torture, 64 FR at 8485 (applying a higher screening standard for statutory withholding of removal and CAT protection in the reasonable fear context "[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution)"). Identifying non-meritorious claims early

in the process is an important deterrent to disincentivize noncitizens from making the perilous journey to the United States under the belief that they will be released and able to remain in the United States for a significant period, or indefinitely. Instead, under this rule, those who do not establish eligibility for statutory withholding of removal or CAT protection under the "reasonable probability" standard will be swiftly removed rather than being released into the United States to potentially wait years for a hearing. This will also allow the Departments to focus limited resources on processing of those who are most likely to be persecuted or tortured if removed, and to more quickly provide stability and benefits to noncitizens whose asylum claims are granted. *See, e.g.,* INA 209, 8 U.S.C. 1159 ("Adjustment of status of refugees").

The Departments made a similar determination in the Circumvention of Lawful Pathways rule in implementing the "reasonable possibility" standard for statutory withholding of removal and CAT protection for noncitizens subject to that rule. *See* 88 FR at 31336 (noting that the heightened standard would help in "reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly"). That determination has been subsequently validated, as the elevated standard for statutory withholding of removal and CAT protection in credible fear screenings under the Circumvention of Lawful Pathways rule resulted in an approximately 30 percent decrease in positive credible fear findings. *See* 89 FR at 48745–46 (providing Circumvention of Lawful Pathways data).

The Departments recognize that, as identified by commenters, noncitizens may face difficulties in their journeys to the United States and in presenting their claims during credible fear screenings. However, the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B) (implementing credible fear "[a]sylum interviews," to include "material facts as stated by the applicant"). As part of this threshold screening, the "reasonable probability" standard is not intended to be an insurmountable hurdle; rather, it requires noncitizens to provide greater specificity in their testimony related to their claim than that which might be sufficient to meet the "reasonable possibility" or "significant possibility" screening standards. *See* 89 FR at

48746–48 (explaining that "the new standard requires a greater specificity of the claim in the noncitizen's testimony"). This greater specificity is intended to be straightforward for noncitizens to provide, as it entails answering standard credible fear screening questions, such as variations of the following questions: Why do you fear return to the country of removal? Who do you believe would harm you if you were removed from the United States? Have you been previously harmed in the country of removal? If so, why were you harmed? Having the noncitizen answer these types of questions with greater specificity is not intended to require legal expertise and instead seeks to have communicated relevant personal facts and circumstances within the noncitizen's knowledge. Moreover, such evidence is generally provided through testimony at the credible fear screening stage, and credible testimony alone can satisfy the noncitizen's burden. *See, e.g.,* 89 FR at 48746.

Furthermore, to the extent that commenters expressed concerns about the compounding effects of trauma resulting in difficulty expressing fear, less time for consultation, and the need to meet a "reasonable probability" standard at the screening stage, the Departments note that AOs have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations.[327] As discussed at greater length at section III.B.2.a.ii(2) of this preamble, while the length of the consultation period is outside the scope of this rulemaking, this rule ensures that noncitizens are provided with all of the rights due to them under the statutory expedited removal and credible fear processes, including the right to consult with a legal representative or other individual of their choosing prior to the credible fear interview and to have such an individual present during their credible fear interview, provided it will not unreasonably delay the process. *See* INA 235(b)(1)(B)(iv), 8 U.S.C.

1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). AOs apply the same training and draw from the same breadth of experience in eliciting testimony and conducting non-adversarial interviews described above regardless of the screening standard that is being applied. Noncitizens are not expected to have legal knowledge or to be familiar with specific standards or elements related to a persecution or torture screening; rather, they are only expected to truthfully testify about their claim and testimony alone can be sufficient to support a positive fear determination.

The Departments take seriously concerns raised by commenters related specifically to difficulties faced by families in the non-detained FERM process, including children attending credible fear interviews and challenges obtaining Indigenous language interpreters. Where issues arise in non-detained credible fear interviews in the FERM process, just as when issues arise in any interview, AOs and supervisory AOs tap into their extensive training and experience and follow existing procedures to address the issue.[328] USCIS has established procedures in place in order to obtain interpreters for credible fear interviews and ensure appropriate steps are taken where an interpreter is not available, including issuing a discretionary NTA where warranted. And while there are inherent challenges in conducting non-detained interviews with families, including attending to children during an interview, these issues are not unique to the FERM process. They are issues dealt with during interviews where children may be present in various situations, including affirmative asylum interviews; and AOs, supervisory AOs, and asylum office staff handle these issues as they arise in various circumstances. Whether the credible fear interview is taking place in a detained setting or is taking place in a non-detained setting as part of the FERM process, AOs apply their extensive training related to non-adversarial interviewing, combined with their substantive legal training, to make a determination as to whether a noncitizen meets the given screening standard. Additionally, all credible fear determinations must be reviewed by a supervisory AO before they become final. 8 CFR 208.30(e)(8).

Moreover, as provided by statute and as the IFR makes clear, noncitizens have a right to request review by an IJ of the AO's credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b)(1); 89 FR at 48748. Where it is requested, the IJ conducts a de novo review of the negative credible fear determination, including the application of the rule's limitation on asylum eligibility and possible exceptions to that limitation. 8 CFR 1208.35(b). Importantly, noncitizens will have additional time to consult with other persons prior to this review. 8 CFR 235.15(b)(4) (requiring written disclosure of a noncitizen's right to consult with other persons prior to an interview or any review thereof). During such review, noncitizens will have the opportunity to make statements in support of their claims, and IJs may also consider other such facts as are known to the IJ. *See* 8 CFR 1003.42(c)–(d); *see also* Immigration Court Practice Manual ch. 7.4(d)(4)(E), *https://www.justice.gov/eoir/reference-materials/ic/chapter-7/4* (noting that "[e]ither the noncitizen or DHS may introduce oral or written statements" during a credible fear review). IJs have significant training and experience in eliciting testimony from individuals who have experienced trauma and developing the record accordingly.[329] As further explained in the IFR, AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards. As such, they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the

---

[327] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[328] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024).

[329] *See* 8 CFR 1003.0(b)(1)(vii) (authorizing the provision of comprehensive training and support to IJs); 8 CFR 1003.9(b)(2) (authorizing the Chief IJ to provide "appropriate training . . . on the conduct of their powers and duties"); *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline;* DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

CHNV-FRN-00475

merits stage. *See* 89 FR at 48747. In sum, the Departments believe the procedural safeguards in place that comport with all statutory requirements and the extensive training and experience of AOs, supervisory AOs, and IJs in conducting screening interviews and making and reviewing fear determinations will ensure that noncitizens in the credible fear process, including those experiencing the effects of trauma and other vulnerable populations, will be screened for potential claims in a sensitive and fair manner at the applicable fear standard.

*Comment:* Commenters stated that the rule's "reasonable probability" definition—which requires "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not"—is vague and amorphous; overly subjective; and lacks interpretive guidance or similar usage in other comparative contexts. Commenters stated that the definition would result in inconsistent application due to a lack of meaningful instruction for AOs and IJs, who would instead rely on their own discretion.

*Response:* The Departments believe that the "reasonable probability" definition set forth in the IFR, which comparatively references the "reasonable possibility" and "more likely than not" legal standards, provides adequate guidance for AOs and IJs and noncitizens to understand the level of evidentiary proof needed to satisfy the threshold credible fear screening process. Both "reasonable possibility" and "more likely than not" are longstanding legal standards familiar to AOs and IJs and representatives, so implementing a new "reasonable probability" standard that falls between those two existing standards provides a stable benchmark for determining whether the new standard has been satisfied. *See, e.g.,* 8 CFR 208.13(b)(1)(iii)(B), 1208.13(b)(1)(iii)(B) ("reasonable possibility" standard); 8 CFR 208.16(b)(2), 1208.16(b)(2) ("more likely than not" standard). AOs and IJs also receive training on the applicable legal screening standards.[330]

Moreover, as explained in the IFR, evaluating evidence under both the "reasonable probability" standard and the "reasonable possibility" standard remains the same, "save for the degree of specificity required." 89 FR at 48747; *see also id.* at 48746 (explaining the difference between the two standards "as being that the new standard requires

a greater specificity of the claim in the noncitizen's testimony"). Indeed, USCIS AOs and supervisory AOs have applied this new standard in a manner that is consistent with expectations, resulting in a somewhat, but not drastically, lower screen-in rate for USBP credible fear cases screened by USCIS under the IFR (51 percent for all fear screening cases subject to the rule, including 48 percent of those screened under the "reasonable probability" standard)[331] than USBP credible fear cases screened by USCIS under the Circumvention of Lawful Pathways rule (54 percent overall, including 51 percent of those screened under the: reasonable possibility" standard).[332] In addition, during credible fear reviews overall, IJs have vacated negative credible fear determinations under the IFR at a much lower rate than under the Circumventing Legal Pathways rule.[333]

*Comment:* Commenters stated that an additional "reasonable probability" screening standard in the credible fear process will lead to confusion amongst adjudicators. Commenters explained that there are now three different legal standards in credible fear screenings— significant possibility, reasonable possibility, and reasonable probability— all of which could be applicable in some cases. Moreover, commenters noted that the governing standards might change depending on whether emergency border circumstances are in effect under this rule. Commenters were concerned that multiple standards would lead to AOs and IJs applying the wrong standard, or conflating the requirements of each standard, which could result in potential refoulement because there will be few mechanisms for accountability if a mistake occurs.

Commenters also stated that adding another screening standard is inefficient, as AOs and IJs will need to

determine which standard applies to each aspect of a case. Commenters also noted that this will require more resources from legal organizations to gather necessary evidence.

*Response:* The Departments disagree with commenters' claims that the "reasonable probability" screening standard for statutory withholding of removal and CAT protection will result in confusion or adjudication errors or would otherwise be inefficient. AOs and IJs regularly work with various standards, and determine which standards apply, in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A), 1208.13(b)(1)(iii)(A). Indeed, deciding which legal standard applies is a critical aspect of the role of AOs and IJs. *See* 8 CFR 1003.10(b).

Further, AOs and IJs have significant training and experience in eliciting testimony and applying evidentiary standards in immigration proceedings. *See, e.g.,* 89 FR at 48747. The Departments are similarly confident that AOs and IJs will efficiently apply the "reasonable probability" standard, which is similar to the "significant possibility" and "reasonable possibility" standards. *See id.* at 48748 (explaining that the reasonable probability standard "is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis" but is rather "a matter of degree"). Further, credible fear determinations are reviewed by a supervisory AO before they become final to ensure consistency and quality and are subject to de novo review by an IJ if a noncitizen requests such review. *See* 8 CFR 208.30(e)(8), 1208.35(b); 89 FR at 48748. Additionally, to avoid confusion, any changes regarding the applicability of emergency border circumstances are communicated to AOs, IJs, and the public, and have been made publicly available since the June 3 Proclamation and publication of the IFR.[334]

For comparison, under the Circumvention of Lawful Pathways rule,

---

[330] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Evidence* 20–26 (Apr. 24, 2024); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[331] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab). Data are limited to SWB encounters between POEs. The total rate excludes cases referred for fear screening but determined by USCIS not to be subject to the IFR.

[332] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab). The overall rate includes Mexican nationals (even though they are not technically covered by the rule) and excludes cases referred for fear screening but determined by USCIS not to be subject to the Circumvention of Lawful Pathways rule. Data are limited to SWB encounters between POEs.

[333] *See* OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (IFR ERCF tab and Imm Post-Pandemic ERCF tab). During the immediate post-pandemic period, OHSS estimates that IJs vacated 16 percent of negative fear credible fear interviews resulting from USBP ER cases, and 6 percent of all credible fear interviews; under the IFR the corresponding rates for USBP ER cases through July 31, 2024, were 9 percent and 4 percent.

[334] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws.*

AOs and IJs have successfully applied the "significant possibility" screening standard to asylum claims and the "reasonable possibility" screening standard to statutory withholding of removal and CAT protection claims since its implementation. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). And for several months, AOs and IJs have successfully applied the "reasonable probability" standard in screenings under the IFR. Therefore, the Departments believe that AOs and IJs can continue to apply the "reasonable probability" standard implemented in this rule.

With regard to concerns from legal service organizations about gathering additional evidence under the "reasonable probability" standard, the Departments again reiterate that the relevant evidence largely remains the same, and simply requires more specificity. *See* 89 FR at 48746–47. Much of this specificity is likely to come through the noncitizen's testimony, which will require the noncitizen to describe why they, in particular, are likely to be harmed or threatened with harm. This testimony focuses on relevant personal facts and circumstances within the noncitizen's knowledge, which should not significantly increase the burden of production on the noncitizen or legal service providers.

*Comment:* Commenters raised concerns with the IFR's justifications for implementing the "reasonable probability" standard.

Commenters argued that the ultimate asylum grant rate should not be the sole justification for implementing the "reasonable probability" standard. Commenters noted that the disparity between positive credible fear determinations and ultimate asylum grant rates itself was not a reason to raise the credible fear screening standard. Commenters explained that the credible fear screening threshold was intended to be low to avoid refoulement and, therefore, the credible fear screening passage rate should necessarily be higher than the ultimate asylum grant rate.

Commenters also believed the IFR relied on misleading statistics in claiming that the screening standard should be raised because the credible fear screening passage rate was significantly higher than the ultimate asylum grant rate in removal proceedings. Commenters explained that the ultimate asylum grant rate statistic in removal proceedings includes all disposition types—not just grants and denials—and also includes factors such as a lack of counsel, poor translation, and variable IJ grant rates, which does not necessarily mean that the asylum claim itself was insufficient. Moreover, commenters pointed to additional EOIR statistics, which they stated showed that the ultimate asylum grant rates were higher than portrayed in the IFR.

Commenters also stated that the Departments did not adequately explain why they imposed a higher screening standard in this rule while, in the previous Asylum Processing IFR (87 FR 18078), the Departments argued that the "significant possibility" standard was preferable for screening statutory withholding of removal and CAT protection claims. Separately, commenters argued that the "reasonable probability" would not meet the IFR's stated goals of deterring irregular migration, asserting that the Circumvention of Lawful Pathways rule's increased screening standard did not "significantly lower" the credible fear passage rate. Lastly, commenters stated that the Departments did not consider that deterrence-based policies, such as a heightened standard, only result in temporary reductions in border crossings.

*Response:* The Departments disagree with objections to the IFR's justifications supporting the "reasonable probability" standard.

First, the Departments disagree that the disparity between the credible fear screening passage rate and ultimate asylum grant rate is irrelevant or should not be relied upon. This disparity is a clear indication of how many positive credible fear determinations ultimately translate into grants of asylum relief. The Departments understand that the credible fear screening process is only a threshold determination and will, by design, result in asylum claims that meet the initial screening standard but fail during the ultimate merits adjudication. However, for purposes of the IFR, the Departments cited to this disparity to explain that such a wide disparity ultimately indicates a screening process that is excessively overinclusive, resulting in a large number of non-meritorious asylum claims increasing adjudicatory backlogs. *See* 89 FR at 48746 (explaining that, under the Circumvention of Lawful Pathways rule, the "screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule" and that, under the IFR, the existence of emergency border circumstances necessitates focusing limited resources on "processing those

who are most likely to be persecuted or tortured if removed").

The Departments also disagree that any cited statistics in the IFR regarding asylum grant rates in section 240 removal proceedings are misleading. While commenters are correct that section 240 removal proceedings may be completed without an ultimate adjudication on an asylum application (such as through dismissal or termination of proceedings), EOIR data are consistent that, for completed cases, only a small percentage of asylum claims referred from the credible fear process are ultimately granted in section 240 removal proceedings, which was a relevant concern underlying the IFR's justification for the heightened "reasonable probability" standard.[335] For example, in 2023, only 18 percent of referred asylum claims ultimately resulted in an asylum grant at the completion of section 240 removal proceedings, even when excluding cases that were administratively closed or did not have the asylum claim adjudicated.[336] Moreover, the Departments note that the data also demonstrate that a large percentage of completed cases without an ultimate asylum adjudication of grant or denial involve noncitizens who never filed an asylum application once placed in section 240 removal proceedings.[337] Additionally, to the extent that section 240 removal proceedings are terminated before an asylum application is adjudicated, the termination does not necessarily have any bearing on the ultimate strength or weakness of the asylum claim.

In response to commenters' concerns regarding the Departments' decision in the 2022 Asylum Processing IFR to maintain the "significant possibility" screening standard for statutory withholding of removal and CAT protection, the Departments note that they addressed these concerns in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31336. In response to similar comments on that rule, the Departments explained that "the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings" and that the "Asylum Processing IFR was designed for non-exigent circumstances." *Id.* Similarly, as explained in the IFR and this rule, prior to implementation of the IFR, migration

---

[335] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline.*

[336] *See id.*

[337] *See id.*

patterns and other factors resulting in emergency border circumstances had only intensified, thereby necessitating a further change to the relevant credible fear screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48724 ("While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration."); *see also supra* Section II.A.1 ("Basis for the IFR").

Lastly, the Departments disagree with commenters regarding the overall efficacy of this rule and of the "reasonable probability" standard in particular. Contrary to commenters' claims, the Departments have seen a significant decrease in the credible fear screen-in rate since the Circumvention of Lawful Pathways rule's implementation of the "reasonable possibility" standard, and a further decrease since the IFR's implementation of the "reasonable probability" standard. *See* 89 FR at 48745–46 (showing a 31 percent decrease in the screen-in rate under the Circumvention of Lawful Pathways rule); *see also* Section II.A.2 of this preamble (providing statistics on the IFR's efficacy to date). The Departments also disagree that deterrence-based policies have only temporary or limited effects, but they do note that deterrence is only one part of an overall border and migration strategy that can help to better manage migratory flows. *See* 89 FR at 48729–30 (explaining that DHS's migration strategy focuses on "enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy").

Overall, the Departments believe that the screening standard changes made in this rule will help better manage an overwhelmed immigration system, while also noting that, as explained in IFR, this rule is only a piece of broader efforts that will likely require further congressional action. *See* 89 FR at 48715 ("Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.").

*Comment:* Commenters noted that the "reasonable probability" standard could also apply in the context of the consideration of mandatory asylum bars as proposed in a separate DHS rulemaking, Application of Certain Mandatory Bars in Fear Screenings, 89

FR 41347 (May 13, 2024) ("Mandatory Bars NPRM"). Commenters stated that the Departments should not apply the "reasonable probability" standard to noncitizens found to be barred from asylum due to a mandatory bar, noting the Mandatory Bars NPRM.

*Response:* The Departments agree with commenters that the "reasonable probability" standard may apply in the context of consideration of mandatory bars if DHS finalizes the DHS Mandatory Bars NPRM as proposed, as the Departments noted in the IFR. *See* 89 FR at 48739 n.186 (explaining that, if the DHS Mandatory Bars NPRM is finalized, the "reasonable probability" standard would still apply when a noncitizen is subject to this rule's limitation on asylum eligibility).

The Departments decline to amend the "reasonable probability" standard so that it would not apply to considerations of mandatory bars. First, as stated above in this section, the Departments have determined that a higher "reasonable probability" standard is needed in light of the emergency border circumstances. Accordingly, the Departments decline to make edits to reduce the standard's applicability. If DHS ultimately decides to consider the mandatory bars as part of fear screenings under the steady-state regulations and the Circumvention of Lawful Pathways rule, it would be appropriate for DHS to consider those bars under this rule as well, also under a "reasonable probability" standard. *See* 8 CFR 208.35(b)(2)(i). This would be consistent with the overall purpose of the DHS Mandatory Bars NPRM. *See* 89 FR at 41351 (explaining that the proposed rule "is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible" and that the proposed rule would "allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern").

4. Other Comments on the Regulatory Provisions

a. Application to Mexican Nationals

*Comment:* Commenters raised several concerns regarding the applicability of the IFR's limitation on asylum eligibility to Mexican nationals. Generally, commenters argued that Mexican

asylum seekers should be exempt from the rule's limitation on asylum eligibility and should not be forced to wait in Mexico, the country where they fear persecution or torture, during emergency border circumstances. Commenters stated that requiring Mexican asylum seekers to wait in the country where they claim to face persecution is tantamount to refoulement in violation of international law and would further expose them to the threat of future harm. Similarly, commenters stated that Mexican nationals cannot be expected to apply for asylum in Mexico—the country where they are claiming harm—which commenters explained was a "common-sense principle" that the Departments abandoned in the IFR.

Relatedly, commenters stated that the Departments' available pathways to pursue asylum, including the CBP One app, are too limited for Mexican nationals, who would be exposed to an increased risk of persecution if forced to wait in Mexico for the ability to pursue asylum. Commenters expressed further concerns about the rule's lack of exceptions, including that, if the IFR's exceptions are intended to "mirror" the Circumvention of Lawful Pathways rule, it is "unfair and dangerous" for the IFR to apply to Mexican nationals, and that the IFR's requirements would "trap" Mexican nationals in the country of alleged persecution in violation of international law and non-refoulement obligations.

*Response:* The Departments decline to change the rule's applicability to Mexican nationals, as excepting Mexican nationals from the rule would undermine the rule's foundational purpose to alleviate strain on border security and immigration systems while entry is suspended and limited under the Proclamation. *See* 89 FR at 48738–39. The strains that resulted in emergency border circumstances and necessitated implementation of the IFR were driven in part by a recent sharp increase in Mexican nationals processed for expedited removal and referred for credible fear interviews. *Id.* The Departments believe that these emergency border circumstances weigh heavily in favor of applying the rule to Mexican nationals in order to better process increased inflows of Mexican nationals and return border processing to more manageable levels.

Moreover, the rule's applicability to Mexican nationals does not violate non-refoulement obligations because the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory

withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). All noncitizens, including Mexican nationals, maintain the opportunity to make a threshold showing for statutory withholding of removal and CAT protections during the credible fear screening process, as the rule's limitation on asylum eligibility does not extend to those forms of protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2).

The Departments also disagree that Mexican nationals do not have sufficient paths for seeking relief or protection in the United States. First, Mexican nationals may avail themselves of lawful, safe, and orderly pathways to the United States, such as making an appointment through the CBP One app. *See, e.g.,* 8 CFR 208.33(a)(2)(ii)(B); *see also* 89 FR at 48754 (explaining that CBP One appointments create an efficient and orderly process at POEs). To the extent a Mexican national cannot wait in Mexico for a CBP One appointment due to urgent safety concerns, the rule contains an exception for exceptionally compelling circumstances, including for imminent and extreme threats to life or safety. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). This exception maintains the rule's efficacy by ensuring that Mexican nationals with specific, urgent safety needs to enter the United States can do so, while otherwise allowing the rule to apply to those Mexican nationals who, for example, are able to safely wait in another part of Mexico for their appointment. Furthermore, as of August 23, 2024, the Departments note that Mexican nationals are able to request and schedule a CBP One appointment from anywhere within Mexico.[338] This new adjustment to the CBP One app will enable Mexican nationals facing imminent danger in a specific area of Mexico to internally relocate while waiting for their CBP One appointment.[339]

Second, this rule ensures that noncitizens are able to avoid refoulement through the availability of statutory withholding of removal, in addition to CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2). Third, the rule contains a number of provisions that may apply to Mexican nationals. For example, the limitation on asylum eligibility does not apply to groups that are excepted from the suspension and limitation on entry under section 3(b) of

the Proclamation, including UCs. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). The rule also provides an exception for noncitizens who can establish the aforementioned exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Additionally, the rule includes a provision to ensure family unity and avoid potential family separation for certain noncitizens who can establish eligibility for statutory withholding of removal or CAT protection. *See* 8 CFR 208.35(c), 1208.35(c). Taken together, these provisions help ensure that, while some Mexican nationals may not be granted asylum after entering the United States during emergency border circumstances, sufficient options exist for Mexican nationals to pursue available protection and avoid immediate harm.

*Comment:* Commenters stated that the rule's exceptions are inadequate for Mexican nationals. Commenters stated that, for Mexican nationals, the facts underlying their asylum claim would be conflated with the rule's exception for an "imminent and extreme threat to life or safety." According to commenters, in practice, this would result in Mexican nationals having to essentially present their full asylum claim to establish the exception.

*Response:* If a Mexican national is unable to remain in Mexico while awaiting a CBP One appointment due to an imminent and extreme threat of harm, the rule provides an exception for exceptionally compelling circumstances, in order to provide a potential avenue for the Mexican national to avoid application of the rule's limitation on asylum eligibility. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments disagree that this exception for noncitizens who demonstrate exceptionally compelling circumstances is inadequate for Mexican nationals.

The Departments clarify that the analysis to determine whether any noncitizen—including a Mexican national—has demonstrated exceptionally compelling circumstances based on an "imminent and extreme threat to life or safety" at the time of entry is separate from the ultimate determination regarding the merits of a noncitizen's asylum claim, even if, in certain circumstances, some of the same facts underlying a Mexican national's asylum claim may also be relevant to a determination on the rule's exception. For purposes of the "imminent and extreme threat to life or safety" exception, noncitizens need only provide evidence focused on threats that the noncitizen faced at the time they

crossed the SWB, such that the noncitizen could not wait for an opportunity to present at a POE. *See, e.g.,* 88 FR at 11723 (explaining operation of similar ground for rebutting presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule). In contrast, for the asylum claim itself, the noncitizen must demonstrate that they otherwise have a credible fear of persecution or torture during credible fear proceedings and, during a full merits adjudication, that they satisfy the eligibility requirements for asylum. *See* 8 CFR 208.35(b)(1)(iii), 1208.35(b)(2)(ii) (directing AOs and IJs to proceed under 8 CFR 208.30 and 1208.30, respectively, in credible fear proceedings where a noncitizen has established the exception to the limitation on asylum eligibility based on exceptionally compelling circumstances); *see generally* 8 CFR 208.13, 1208.13 (describing asylum eligibility requirements).

Relatedly, the Departments also clarify that the "exceptionally compelling circumstances" exception is applied during the credible fear process, and not during any initial border encounter with CBP. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the rule discriminates against Mexican nationals, both in intent and effect. Commenters stated that, by comparison, the rule is more restrictive than prior Departmental policies, including the Circumvention of Lawful Pathways rule and the now-defunct MPP, which specifically exempted Mexican nationals. Thus, commenters stated, this rule was issued to limit the entry of Mexican nationals and would result in more drastic consequences for Mexican nationals than those other rules and policies. Furthermore, commenters argued that, because the Circumvention of Lawful Pathways rule does not apply to Mexican nationals, there will be significant confusion in applying these rules together during the credible fear process.

*Response:* The Departments disagree with commenters' assertions that this rule discriminates against Mexican nationals. Commenters stated that the discriminatory intent and purpose is evidenced by the Circumvention of Lawful Pathways rule's comparative inapplicability to Mexican nationals. However, the Departments emphasize that this rule and the Circumvention of Lawful Pathways rule serve different objectives. For example, unlike with respect to this rule, traveling through a third country is a key requirement of the Circumvention of Lawful Pathways rule

---

[338] *See* CBP, *CBP One™ Mobile Application: Recent Updates* (last modified Sept. 23, 2024), https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[339] *See id.*

**81252**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

because requiring that noncitizens apply for protection in a third country is one means for providing protection in the United States where necessary while also sharing the responsibility of providing necessary protections with the United States' regional partners. *See* 8 CFR 208.33(a)(1)(iii); 1208.33(a)(1)(iii); 88 FR at 31316. Thus, the Circumvention of Lawful Pathways rule generally does not apply to Mexican nationals residing in Mexico, who would not need to travel through another country to reach the United States. To the contrary, this rule applies uniformly to all noncitizens who enter the United States at the southern border during emergency border circumstances and are not excepted under the June 3 Proclamation or able to establish exceptionally compelling circumstances, without consideration of the path of transit to the southern border. *See* 8 CFR 208.13(g), 1208.13(g).

Additionally, since the implementation of the Circumvention of Lawful Pathways rule, emergency border circumstances dictate applying the rule broadly in order to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross the southern border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. As relevant here, the United States saw a sharp increase in the number of encounters of Mexican nationals at the SWB during the COVID–19 pandemic prior to implementation of the Circumvention of Lawful Pathways rule, which continued into the immediate post-pandemic period.[340] During the same period, the United States saw a corresponding increase in credible fear referrals, which necessitates applying the rule to Mexican nationals. *See id.* at 48738.

Moreover, the Departments do not believe that the rule's broad applicability will cause confusion, as the rule maintains a straightforward application to noncitizens who enter the United States at the southern border during periods of emergency border circumstances and are not excepted under the Proclamation or able to establish exceptionally compelling circumstances.

*Comment:* Commenters stated that the rule's expediency justification for subjecting Mexican nationals to the limitation on asylum eligibility is insufficient. Commenters argued that the statistics provided in the IFR cannot justify extending the limitation on asylum eligibility to Mexican nationals,

noting that statistics evincing recent increases in Mexican nationals making fear claims indicate increasingly dangerous conditions in Mexico and an increased need for protection. Another commenter claimed that applying the rule to Mexican nationals is contrary to the record before the agency because, according to the commenter's characterization of that record, encounters of Mexican nationals have actually declined significantly. Similarly, a commenter objected that the IFR subjects Mexican nationals fleeing persecution to extensive stays in Mexico if they wish to seek asylum in the United States, but fails to consider the impact on Mexican nationals or provide any rationale for that result.

*Response:* The Departments have considered the commenters' concerns and reaffirm the justifications for applying the IFR's limitation on asylum eligibility to Mexican nationals. The foundational basis of the June 3 Proclamation and the IFR is to address substantial migration levels at the southern border, including a ''sharp increase'' in SWB encounters of Mexican nationals. *See, e.g.,* 89 FR at 48726–27; *id.* at 48738. Addressing these migration levels, and their significant impact on border processing and the United States' immigration system more broadly, thereby necessitates applying the rule's limitation on asylum eligibility to all noncitizens, with limited exception, who enter the United States across the southern border during emergency border circumstances, including Mexican nationals.

The Departments believe the cited data fully support the rule's application to Mexican nationals. Departmental data show that excluding Mexican nationals would undermine the rule's deterrent effect, as Mexican nationals comprise the largest portion of recent (post-IFR) SWB encounters between POEs, at approximately 41 percent.[341] And, contrary to one commenter's claim, the data in the IFR did not show a decline in encounters of Mexican nationals. Rather, the Departments explained that, since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from northern Central American countries, and then to single adults and families from throughout the hemisphere (and beyond), many of whom are more likely to seek asylum and other forms of protection. *See* 89 FR at 48721. The Departments further explained that, as the demographics of border encounters

have shifted in recent years to include a higher rate of Mexican nationals claiming fear, in addition to larger encounter numbers of other nationalities with high historical rates of asserting fear claims, the deterrent effect of apprehending noncitizens at the SWB has become more limited. *See id.* at 48731 n.167 (explaining that for noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for a determination, whereas from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024). Given this demonstrated increase in encounters of, and fear claims made by, Mexican nationals, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems during emergency border circumstances. Without broad application, the practical result would be that those with meritorious claims would wait years for their claims to be granted, while noncitizens who are ultimately denied protection potentially would spend years in the United States before being issued a final order of removal.

*Comment:* Commenters stated that not creating an exception for Mexican nationals is especially concerning for vulnerable Mexican nationals, including people fleeing gang and cartel violence or other severe forms of violence, women, members of the LGBTQI+ community, those escaping sexual and gender-based violence, children, families, Indigenous people, journalists, and activists, among others. Commenters explained that violence against these vulnerable populations is endemic in Mexico and has been recognized by the Departments, including through individual asylum adjudications. Therefore, the commenters stated that it is concerning that the IFR does not except these vulnerable populations despite the clear need to prevent further harm and mitigate past harms suffered.

*Response:* Regarding concerns about specific vulnerable populations of Mexican nationals, the Departments emphasize that agents and officers frequently encounter noncitizens who may be vulnerable and are trained on appropriate action. *See* 89 FR at 48744–

---

[340] *See* OHSS analysis of July 2024 Persist Dataset (USPB Encounters by Citizenship tab).

[341] *See id.*

45. Moreover, the rule contains an explicit exception for exceptionally compelling circumstances that is intended to limit potential adverse effects of the rule's limitation on asylum eligibility, including on uniquely vulnerable populations. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may qualify for the exception if the noncitizen faces an imminent and extreme threat to the noncitizen's life or safety immediately prior to entry into the United States. *See id.*

b. Adequacy of Statutory Withholding of Removal and CAT Protection

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for noncitizens who would be ineligible for asylum under the rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

First, commenters explained that statutory withholding of removal and CAT protection require noncitizens to meet a higher burden of proof than asylum and that, ultimately, these higher burdens will result in more noncitizens being denied protection under the rule.

Second, commenters stated that, even if noncitizens were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the noncitizen would not be accorded the same benefits as asylees. For example, commenters stated that recipients of statutory withholding of removal and CAT protection are subject to the continued risk of removal; cannot petition for derivative beneficiaries; are unable to apply for permanent residency or citizenship; are unable to travel abroad; and must apply annually for work authorization, which commenters claimed is subject to frequent adjudicatory delays. As a result, commenters argued that recipients of statutory withholding of removal and CAT protection are left in an uncertain status incongruent with the United States' obligations to protect refugees; that such status would lead to community instability in the United States, as it prevents noncitizens from investing in their communities and fully recovering from harm; and that such status would fail to ensure family unity—and even promote family separation—due to an inability to petition for derivative beneficiaries.

Further, commenters argued that the Departments cannot meet their non-refoulement obligations with statutory withholding of removal or CAT protections alone, stating that neither statutory withholding of removal nor CAT protections are equivalent to asylum because those protections do not convey rights guaranteed by the Refugee Protocol or meet the goals of the Refugee Convention. Those commenters said that the United States must comply with the Refugee Convention in its entirety, not only with Article 33. For example, commenters said that the United States is obligated to comply with Article 34 of the Refugee Convention and facilitate the integration and naturalization of refugees.

Lastly, commenters claimed that noncitizens who attempt to pursue statutory withholding of removal or CAT protection under the rule would increase confusion in their interactions with DHS, particularly due to the rule's interactions with other rulemakings.

*Response:* As an initial matter, the Departments reiterate that this rule fully complies with the United States' non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol), which the United States implements through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* Section III.A.1.d of this preamble. This rule's limitation on asylum eligibility does not affect a noncitizen's ultimate eligibility for statutory withholding of removal. *See* 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(i) (requiring an AO to assess a noncitizen's eligibility for statutory withholding of removal and CAT protection when applicable). Similarly, this rule's implementation of the "reasonable probability" screening standard is well within the Departments' broad discretion to determine which screening standard should apply in implementing the United States' non-refoulement obligations. *See* 89 FR at 48740–41.

The rule is similarly compliant with Article 34 of the Refugee Convention, which is precatory and encourages the assimilation and naturalization of refugees. Importantly, although the rule limits asylum eligibility for noncitizens who enter the United States during emergency border circumstances, Article 34 "does not require the implementing authority actually to grant asylum to all those who are eligible." *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987). Indeed, under U.S. law, asylum is a discretionary form of relief. *Id.; see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); 8 CFR 1208.14(a)–(b). Consistent with that authority, the Departments have determined that this rule's limitation on asylum eligibility is necessary to address the emergency border circumstances described in the IFR. *See* 89 FR at 48726–31. Further, the rule does not preclude the availability of asylum for those to whom the rule does not apply or who demonstrate that exceptionally compelling circumstances exist. For example, noncitizens may utilize the CBP One app to schedule an appointment to present themselves at a POE. *See* June 3 Proclamation Sec. 3(b)(v)(D) (excepting "noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States"); 89 FR at 48737 ("One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum."). Additionally, noncitizens may overcome the limitation on asylum eligibility if they, or a family member as described in 8 CFR 208.30(c) with whom they are traveling, are able to demonstrate exceptionally compelling circumstances by a preponderance of the evidence, such as if they face an acute medical emergency or an imminent and extreme threat to life or safety, among other circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Next, the Departments recognize that the burdens of proof for statutory withholding of removal and CAT protection are higher than that for asylum, as they require a demonstration that it is more likely than not that noncitizens will be persecuted or tortured in another country, while asylum requires that noncitizens demonstrate a lesser burden of proof: a well-founded fear of persecution. *See Cardoza-Fonseca,* 480 U.S. at 423. These higher burdens of proof for those to whom the limitation applies align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences. *See* 89 FR at 48718 (explaining that the rule is intended to "address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances"). These differences in burdens of proof also correspond with the distinct, but related, objectives of the Circumvention of Lawful Pathways

**81254**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

rule: to encourage noncitizens to avail themselves of lawful, safe, and orderly pathways, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection is still available for those who satisfy the applicable standards for statutory withholding of removal or CAT protection. *See* 88 FR at 31428. Therefore, if a noncitizen is subject to the rule's limitation on asylum eligibility, being required to meet comparatively higher existing standards for statutory withholding of removal or CAT protection is intended to further disincentivize irregular migration when encounters are above a certain benchmark and to "substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain." 89 FR at 48715; *see also id.* at 48754.

Separately, and as explained in response to similar comments on the Circumvention of Lawful Pathways rule, the Departments also recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, employment authorization documents. *See* 88 FR at 31428. However, the Departments again emphasize that the rule's limitation on asylum eligibility, along with the comparatively fewer benefits of statutory withholding of removal and CAT protection, align with the overall purposes of the June 3 Proclamation and this rule: to address historic levels of migration at the southern border and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718; *id.* at 48726–31.

Moreover, with regard to concerns about the inability of statutory withholding of removal or CAT protection recipients to petition for beneficiary derivatives,[342] this rule contains a family unity provision to help prevent family separation for noncitizens who can establish eligibility for statutory withholding of removal or CAT withholding. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, the family unity provision treats the following noncitizens as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those (1) who are found eligible for statutory withholding of removal or CAT withholding; (2) who would be eligible for asylum, but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) who have a qualifying spouse or child. *See id.*

Lastly, the Departments do not believe that the ability of a noncitizen to apply for statutory withholding of removal or CAT protection when subject to the rule's limitation on asylum eligibility will cause confusion. Noncitizens have long maintained the ability to pursue such protection, and DHS and EOIR personnel are well-trained in screening for, and adjudicating, such forms of protection. *See* 89 FR at 48748 (explaining that "AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards").

### c. Requests for Reconsideration

*Comment:* Several commenters opposed eliminating noncitizens' ability to request reconsideration of a negative credible fear determination by USCIS. Commenters stated that the opportunity to request reconsideration of a negative credible fear determination after IJ concurrence is an important safeguard against non-refoulement. One commenter noted that in the Asylum Processing IFR, the Departments counted at least 569 negative credible fear determinations that were changed to positive credible fear determinations after a request for reconsideration between FY 2019 and 2021. Commenters stated that USCIS should continue the practice of allowing requests for reconsideration, as it may be the only opportunity for noncitizens to present additional evidence that was not presented during the credible fear interview or to correct procedural defects in the credible fear interview, alleging that the IJ review process generally does not provide meaningful review and routinely affirms erroneous negative credible fear determinations. A commenter also claimed that even with the regulatory language acknowledging that USCIS maintains the discretion to reconsider its own negative credible fear determinations following IJ concurrence, it is unclear under the rule when or how USCIS would exercise its *sua sponte* authority to reconsider a negative credible fear finding.

*Response:* The Departments disagree with comments urging USCIS to allow noncitizens to request reconsideration of negative credible fear determinations under the present rule. This rule does not eliminate the discretionary authority of USCIS to reconsider negative credible fear determinations concurred upon by an IJ, but instead only prohibits noncitizens from submitting a request to reconsider a negative credible fear determination in cases subject to the rule. 8 CFR 208.35(b)(2)(v)(B). The Departments deem it appropriate to include this prohibition against requests for reconsideration in the rule to further its purpose of effectuating efficient yet fair credible fear case processing where emergency border circumstances are present. As noted in prior rulemakings, allowing requests for reconsideration of negative credible fear determinations diverts limited USCIS resources away from initial screenings, and relatively few such requests ultimately result in a reversal of the determination.[343]

The Departments acknowledge that they previously provided information in the Asylum Processing IFR that USCIS counted at least 569 negative credible fear determinations that were reversed after a request for reconsideration was submitted between FY 2019 through FY 2021. The Departments note, however, that that number was out of a total of at least 5,408 requests for reconsideration that were submitted during those years. *See* 87 FR at 18132. Under the present rule, where emergency border circumstances are present and a credible fear determination is made pursuant to the rule's limitation on asylum eligibility, the Departments assess that, in light of the safeguards in place, efficiency interests outweigh the interest in providing an opportunity to request reconsideration.

To the extent commenters argue that this provision of the rule implicates statutory or due process rights of noncitizens, the Departments note that noncitizens have no statutory right to request reconsideration of a negative credible fear determination. The Supreme Court has held that the due process rights of noncitizens applying

---

[342] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT protection, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, *Central American Minors (CAM) Program, https://www.uscis.gov/CAM* (last updated Mar. 7, 2024).

[343] *See* Asylum Processing IFR, 87 FR at 18132; *see also* 88 FR at 31419.

for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 591 U.S. at 140. In establishing the streamlined procedures governing credible fear screening, Congress explicitly mandated that review of any negative credible fear determination made by an AO be conducted by an IJ and provided no mechanism for noncitizens to request reconsideration of the IJ's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

With respect to commenters' concerns about fairness, the Departments note that all credible fear determinations, including determinations made under the processes set forth in this rule, will continue to be reviewed by a supervisory AO. *See* 8 CFR 208.30(e)(8); *see also* 89 FR at 48748. And the rule does not impact a noncitizen's right to request IJ review of a negative credible fear determination. Where requested, the IJ will evaluate the case de novo, including making a de novo determination as to whether there is a significant possibility the noncitizen could demonstrate they are not subject to the rule's limitation on asylum eligibility or are eligible for the exception. 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b). Accordingly, this rule ensures IJ review of the entirety of the negative credible fear determination, including application of the rule's limitation on asylum eligibility. To the extent commenters raise general concerns about IJ review of negative credible fear determinations, those concerns are outside the scope of this rulemaking.

In response to the comment noting that it is unclear when USCIS would exercise its discretion to reconsider a negative credible fear determination *sua sponte,* the Departments note that the regulatory framework makes clear that USCIS possesses the inherent discretion to reconsider its own negative credible fear determination that has been concurred upon by an IJ, and that such discretion may be exercised on a case-by-case basis dependent on the facts and circumstances in an individual case. *See, e.g.,* 8 CFR 1208.30(g)(2)(iv)(A) (2018) (noting that ''[t]he Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge''); 208.35(b)(2)(v)(B). As noted above, the Departments contend that the existing safeguards under the present rule comport with all statutory requirements and believe that these safeguards sufficiently address any concerns related to adequate review of negative credible fear determinations under the present rule.

*D. Other Issues Relating to the Rule*

1. Scope of the Rule and Implementation

a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary

*Comment:* Some commenters expressed concern with the 2,500-encounter threshold that would trigger the limitation on asylum eligibility for certain individuals who enter during emergency border circumstances. Some commenters characterized the threshold as ''arbitrary.'' Another commenter claimed that encounter rates have historically never fallen below the 2,500-encounter threshold due to the urgent humanitarian need and expressed concern that, contrary to the realities of forced displacement, the IFR limiting entries to 2,500 encounters effectively serves as a policy to close the border and end access to asylum.

Several commenters remarked that the low threshold required for the limitation on asylum eligibility to be discontinued is unrealistic and would virtually guarantee the limitation would always be in place. One commenter expressed concern that 1,500 daily encounters is well below historical averages. Another commenter stated that in the past 6 FYs, monthly average border apprehensions consistently surpassed 1,500 individuals. Similarly, another commenter stated that the ''emergency border circumstances'' would apply during 58 percent of all months this century. Another commenter stated that the 1,500-encounter threshold is unreasonable given the number of encounters at the SWB in 2024, which, according to the commenter, has lately hovered between 170,000 to 190,000 per month, or around 6,000 people per day on average.

While referencing the thresholds, a commenter remarked that the preamble acknowledges that the Departments cannot swiftly change from one means of processing to another. Citing high levels of border crossings since May 2023 (after the implementation of the Circumvention of Lawful Pathways rule), the commenter stated that the Departments' intent is to keep this rule in place indefinitely, punishing migrants in an attempt to deter them from seeking protection in the United States. A commenter warned that ''the mechanism for lifting the restrictions in the IFR is insufficient to meet the humanitarian needs at the U.S. border, jeopardizing the asylum system for many years to come.''

*Response:* The Departments disagree that the numerical thresholds are arbitrary or too low. As explained in the IFR, the emergency border circumstances described in the June 3 Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48726–31. This is because, in such circumstances, DHS lacks the capacity to deliver timely consequences and must resort to large-scale releases of noncitizens pending section 240 removal proceedings. *Id.* at 48749. Such large-scale releases in the absence of this rule would lead to significant harms and incentivize human smuggling organizations to recruit more potential migrants based on the limitations on the Departments' ability to deliver timely decisions and consequences. *Id.* at 48749–50. The 1,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when the border security and immigration systems, as currently resourced, are no longer over capacity and the measures adopted in this rule are not necessary. *Id.* at 48750. And the 2,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when there has been a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States. *Id.* at 48752. Were the resourcing of border security and immigration systems to change, this change (if sufficiently substantial) could trigger reassessment of these thresholds, in order to ensure that they reflect the Departments' ability to deliver timely decisions and consequences.

In the IFR, the Departments demonstrated the reasonableness of the thresholds in two ways. First, during the FY 2013 to FY 2019 pre-pandemic period, USBP total encounters (including all UCs) only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 noncitizens released each day,[344] while months in which daily

---

[344] Although the demographic composition of current encounters (*e.g.,* a higher percentage of noncitizens encountered who assert fear claims) means that such a low release rate is likely unachievable in the near term, releases remain much lower when daily encounters are below the 2,500-encounter threshold. *See* 89 FR at 48731; *see also* OHSS analysis of July 2024 Persist Dataset and

Continued

encounters exceeded 2,500 resulted in approximately 1,300 noncitizens released each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.*

Second, the Departments demonstrated that at the 1,500-encounter level and assuming a similar level of voluntary returns and reinstatements to those seen during implementation of the Circumvention of Lawful Pathways rule, DHS would be able to refer for expedited removal more than 70 percent of the single adults and family unit individuals who are not quickly repatriated (through voluntary return or reinstatement), and would be able to repatriate a total of about 830 noncitizens (*i.e.,* 56 percent of the 1,500 encounters counted towards the threshold). *Id.* at 48752 & nn.274, 276. By contrast, at above 2,500 encounters—the level at which the June 3 Proclamation and the IFR would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level; for instance, at that level DHS would be able to refer for expedited removal 43 percent of the single adults and family unit individuals who are not quickly repatriated, and would be able to repatriate a total of about 1,010 noncitizens (*i.e.,* 40 percent of the 2,500 encounters counted towards the threshold). *Id.* at 48752–48753.

In this second analysis as presented in the IFR, consistent with the June 3 Proclamation, DHS excluded encounters of UCs from non-contiguous countries from the threshold counts. But as noted in the IFR, "the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals." *Id.* at 48753. Consistent with this reality, the September 27 Proclamation and this rule include, in both thresholds, consideration of encounters of all UCs, including those from non-contiguous countries. As discussed in Section II.C.1 of this preamble and later in this Section III.D.1, most UCs are from non-contiguous countries, and the processing of all UCs requires the use of significant CBP resources.

Including non-contiguous UCs in the 7-consecutive-calendar-day average calculation recognizes this impact. Depending on the levels of such UCs encountered at any given time, failing to include such UCs in the 1,500 and 2,500 encounter limits may result in an overestimate of resources available to the Departments to efficiently process noncitizens encountered at the SWB while delivering timely decisions and consequences to noncitizens who enter without a lawful basis to remain. This is because the number of UCs from non-contiguous countries encountered by USBP can fluctuate—something that models that assume stable demographics cannot fully account for. And if encounters of such UCs rise but are not included in the rule's thresholds, then those thresholds become much less useful predictors of overall capacity. Although encounters of UCs from non-contiguous countries have generally declined since the IFR took effect,[345] their proportion of USBP encounters has increased,[346] and the population of UCs from non-contiguous countries at the border has surged on several occasions in the past.[347]

As part of this final rule, DHS updated the second analysis discussed above to reflect more recent data and to demonstrate the impact on that analysis of counting all UCs—at current encounter levels—towards the encounter thresholds. The Office of Homeland Security Statistics ("OHSS") updated the IFR's methodology by (1) applying fear claim rates for the entirety of the immediate post-pandemic period (*i.e.,* not ending in April 2024, as the prior analysis did), (2) assuming a demographic makeup (including with respect to UCs) similar to that observed between June 5, 2024, and July 30, 2024 for that entire period, and (3) including all UCs in the 1,500 and 2,500 encounter figures.[348]

Under these parameters, at 1,500 encounters between the POEs (including all UCs) and assuming USBP is able to process 900 cases for expedited removal per day (as was approximately the case during the immediate post-pandemic period between May 12, 2023 and June 4, 2024), DHS would be able to refer for expedited removal 77 percent of the noncitizen single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 880 noncitizens per day (*i.e.,* under 60 percent of the 1,500 encounters counted towards the threshold).[349]

Similarly, at 2,500 encounters between the POEs (including all UCs) and assuming USBP can process 900 people for expedited removal per day, DHS would be able to refer for expedited removal 46 percent of the single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 1,040 noncitizens per day (*i.e.,* over 40 percent of the 2,500 encounters counted towards the threshold).[350]

The Departments caution that this type of analysis depends on a range of assumptions regarding capacity, fear claim rates, screen-in rates, and geographic and demographic distribution of encounters, among other variables. A change in these variables—for instance, a spike in UC encounters—could place a strain on custody resources that would further reduce the Departments' overall capacity to deliver timely decisions and consequences, such as by processing noncitizens for expedited removal. The analysis does show, however, that the change to the thresholds to include counting of all UCs is incremental in nature and consistent with the rule's overall purpose.

Finally, with respect to claims that either threshold effectively serves as a policy to "close the border" and end access to asylum, the Departments

---

[345] *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[346] *See id.*

[347] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[348] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). The figures presented in the IFR were based on fear claim rates, demographics, and average expedited removal capacity under the Circumvention of Lawful Pathways rule; these rates were pulled in early April 2024. *See* 89 FR at 48752 nn.274, 276. For instance, based on data pulled in early April 2024, the figures in the IFR assumed that CBP could process approximately 900 USBP encounters for expedited removal per day and that 17 percent of encounters would result in rapid returns via

voluntary return to Mexico, reinstatement of a removal order, or administrative removal. *Id.* Accounting for all of the immediate post-pandemic period (*i.e.,* also, including April, May, and early June 2024), USBP averaged about 860 people processed for expedited removal per day during that time period. OHSS analysis of July 2024 Persist Dataset (Imm Pos Pandemic ERCF tab). CBP processed for expedited removal about 920 people on average during that time. *Id.* From June 5, 2024 through August 31, 2024, CBP processed over 1,100 people for expedited removal per day and about 16 percent of encounters resulted in such rapid returns. OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab, IFR ERCF tab, and CLP v pre-CLP Projection Tool tab).

[349] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[350] *Id.*

---

data downloaded from UIP on September 3, 2024 (Summary Statistics tab, see cells L27 and M27).

disagree. The Departments also disagree with commenters' specific claims about historical encounter rates and numbers. Commenters are incorrect that daily encounters rates have never fallen below 2,500.[351] Commenters are also wrong that an average of 1,500 daily encounters is far below historical averages. From FY 2013 through FY 2019, the 7-consecutive-calendar-day average of encounters was below 1,500 nearly 80 percent of the time, and above 2,500 approximately 5 percent of the time.[352] And for over 70 percent of days during that time frame, the 7-consecutive-calendar-day average had been below 1,500 encounters for 28 consecutive days.[353] Over a longer time period, from FY 2009 through FY 2020, there were a total of only four months (all during the spring 2019 family unit surge) that encounters averaged more than 2,500 per day.[354] One commenter argued that in the past six fiscal years, monthly average apprehensions have consistently surpassed 1,500 noncitizens. But this only shows that the past six fiscal years have generally been times of historically high migrations, and the Departments established the 1,500-encounter daily threshold not by selecting an arbitrary figure but by estimating capacity to deliver timely consequences at current resource levels.

Even since the IFR took effect, encounters have dropped to levels indicating that it is possible the 1,500-encounter threshold will be met in the future. If, consistent with the June 3 Proclamation and IFR, one excludes UCs from non-contiguous countries, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 27.[355] And if, consistent with the September 27 Proclamation and this rule, one includes such UCs, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 29.[356]

*b. Concerns Regarding Exceptions From the Encounter Thresholds*

*Comment:* A commenter remarked that there are too many exceptions to the types of encounters that are counted daily. The commenter stated that it is ''hard to count up to 1,500'' when there are so many exceptions. The commenter used the exception for non-contiguous country UCs, who are not counted under the June 3 Proclamation, as an example. The commenter stated that this exception encourages the trafficking of children and prevents reporting these as encounters. The commenter also objected to the exception for noncitizens who are determined to be inadmissible at a SWB POE, which the commenter asserted significantly limits the number of encounters considered.

Another commenter expressed similar concerns regarding the exclusion of UCs from the 2,500-encounter threshold. The commenter stated that the current UC policies, influenced by the Flores Settlement Agreement and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, are susceptible to exploitation. The commenter further noted that during the current Administration, UC encounters have exponentially increased, with more than 480,000 UCs encountered at the southern border between POEs. The commenter cautioned that without counting all UC encounters towards the 1,500-encounter threshold, existing policies may be further abused by criminal elements, leading to increased risks for UCs, such as human trafficking and other forms of exploitation. The commenter maintained that in addition to excluding non-contiguous country UCs, the encounter thresholds in the IFR also exclude 1,650 encounters every day at POEs, plus 30,000 noncitizens processed every month through the CHNV parole processes.

*Response:* Regarding UCs from non-contiguous countries, as discussed in Section II.C.1 of this preamble, the September 27 Proclamation amends the June 3 Proclamation to remove section 2(c), which provided that UCs from non-contiguous countries shall not be included in calculating the number of encounters, and this rule makes a parallel change. As discussed in Section II.C.1 of this preamble, the Departments' experience implementing the IFR has shown that excluding encounters of UCs from non-contiguous countries results in an incomplete assessment of the

Departments' resources and capabilities. UCs, regardless of their country of origin or nationality, require considerable resources to process and safely hold in CBP facilities and the Departments have in the past experienced surges of encounters of such UCs.[357] One of the primary purposes of this rule is to alleviate undue strain on the limited resources of border security and immigration systems, and through their experience with the IFR the Departments have recognized the need to consider the full operational burden that results from all UC encounters at the southern border. The resource burden posed by UCs from non-contiguous countries, along with recent increases in the proportion of such UCs relative to types of encounters, support the Departments' determination that UCs from all countries, not just from contiguous countries, are relevant to the thresholds contained in the rule.

The Departments disagree that the encounter thresholds should include daily encounters at the SWB POEs or CHNV parolees. The IFR applies only when encounters strain the border security and immigration systems' capacity. To date, this strain has been caused primarily by increased encounters between POEs. CBP can more efficiently process those at SWB POEs, particularly those who have used the CBP One app to make an appointment. In the past several years, processing capacity at POEs has been significantly expanded, enabling CBP to manage processing of noncitizens in a safe and efficient manner. However, despite the efforts to increase capacity within the limits of available resources and funding, processing between POEs continues to tax DHS resources and remains very resource intensive.

The CHNV processes do not adversely affect the Departments' resources at the southern border because noncitizens arriving under the CHNV processes travel by air to an interior POE.[358] The Departments do not believe it necessary or appropriate to include noncitizens who use the CHNV processes as part of encounter calculations under this rule for that reason.

---

[351] Average daily encounters averaged 1,310 between FYs 2011 and 2018. In FY 2009, average daily encounters were approximately 1,200. *See* OHSS analysis of July 2024 Persist Dataset (Daily Encounters FY2000–2024 tab).

[352] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the 7-consecutive-calendar-day average was below 1,500 nearly 85 percent of the time and above 2,500 only 4 percent of the time. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[353] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the resulting figure is just below 80 percent. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[354] OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[355] OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters Tab).

[356] *Id.*

[357] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[358] *See, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR 1255, 1256, 1263 (Jan. 9, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

**81258** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

c. Other Concerns About the Encounter Thresholds

*Comment:* A commenter wrote that it is reasonable to assume the threshold for suspending the rule will not be met in the foreseeable future, because even if the number of encounters dropped to the level where the 1,500-encounter threshold might be met, the Departments could issue a new IFR to keep the procedure in place. A commenter stated that the IFR provides no end dates and the Departments do not provide an explanation as to why the IFR should be in place indefinitely.

*Response:* The Departments disagree with the suggestion that they would perpetually take actions to lower the threshold for discontinuation solely to keep these emergency measures in place. If the Departments intended to permanently have these measures in place, they could have made the IFR apply indefinitely without using encounter thresholds. The two changes to the threshold made in this rule and the September 27 Proclamation are incremental in nature and consistent with the underlying purpose of the June 3 Proclamation. The Secretary will monitor encounter levels and make relevant determinations consistent with the September 27 Proclamation. Should further policy changes prove necessary—whether in response to comments submitted in response to this final rule's request or in another context—the Departments may take appropriate action to implement such changes. Additionally, the rule does not contain specific end dates because its measures are designed to be responsive to patterns in daily encounters. The IFR does not contain an overall expiration date because, due to the unpredictable nature of migration trends and for so long as Congress fails to increase the Departments' resources and modernize the current U.S. immigration system, such measures will be necessary when the Departments' operational capacity, as measured by daily encounter thresholds, is greatly overwhelmed.

*Comment:* A commenter stated that it would be challenging for noncitizens to know when thresholds have been met. The commenter stated that they had surveyed migrants in Mexico and over half of respondents in the first half of 2024 affirmed that they do not understand the requirements and processes for accessing U.S. territory, and that nearly half of respondents in certain areas confirmed that the main channel through which they receive information on policy changes is word of mouth, while around a third receive this information through social media.

The commenter said noncitizens would not be able to discern the application of the IFR without access to official information, particularly given that, according to the commenter, the United States Government does not currently publish statistics on encounters. The commenter wrote that even when some noncitizens might be aware of the dynamics of irregular movements, this awareness is likely to be limited to the specific region of the SWB where they are located and would very likely not cover the overall number of encounters.

The commenter stated that, given the swiftness with which the limitations established under the IFR can be invoked and applied, they are not likely to influence the ability of noncitizens in different parts of the transit route to adapt their decisions to increase their chances of receiving the protection that they need. The commenter stated that those who are already at or around Mexico's northern border when the rule's provision apply cannot meaningfully consider any potential alternative pathways. The commenter further stated that a significant proportion of people of concern present in Mexico could be ineligible for certain alternatives. For example, 97.9 percent of respondents to the commenter's protection monitoring activities during the first semester of 2024 reported having entered Mexico irregularly, which could render them ineligible for certain parole processes. The commenter stated that as a result, persons of concern are unlikely to become aware of when the additional limitations on asylum eligibility would apply with sufficient lead time to be able to adapt their decisions. This will thus undermine their ability to make decisions that increase their chances of receiving the protection that they need.

The commenter further stated that confusion around changing policies and practices governing access to U.S. territory has fueled the widespread belief that there are certain moments when the U.S. border is "open" and others when it is "closed," and that access to U.S. territory requires individuals to remain close to the border and attentive to any information suggesting that the border is "open." The commenter stated that the IFR has already contributed to this dynamic, with migrants along the U.S.-Mexico border expressing their understanding that the new limitations effectively "close off" access to U.S. territory. According to the commenter, this has led to desperation and fostered the likelihood that the population resorts to imprecise and misleading information

provided by human traffickers or on social media.

*Response:* DHS posts statistics on SWB encounters on CBP's website.[359] The website includes data extracted from CBP systems and data sources regarding encounters with single adults, individuals in family units, and UCs. Information about the status of the suspension and limitation on entry, and the related provisions in this rule, is available in English and Spanish at: *https://www.dhs.gov/immigrationlaws.* In addition, regardless of whether the threshold for discontinuing or continuing or reactivating the suspension and limitation on entry under the Proclamation or the limitation on asylum eligibility under this rule has been met, migrants may, for instance, arrive in the United States at a SWB POE pursuant to a process the Secretary determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States.

For similar reasons, the Departments do not believe that it is necessary to adjust the rule to ensure that the potentially "abrupt" nature of its provisions allows sufficient time for those already in Mexico to adjust their behavior in order to access protection. The IFR was not the first time that the Departments encouraged migrants to use lawful, safe, and orderly pathways to come to the United States. The Circumvention of Lawful Pathways rule also incentivized the use of such pathways, *see generally* 8 CFR 208.33, 1208.33, and since their inception, the CHNV parole processes have included an ineligibility for those who crossed into Mexico irregularly, *see, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR at 1263; Implementation of a Parole Process for Venezuelans, 87 FR 63507, 63515 (Oct. 19, 2022). And the CBP One app remains available to noncitizens in Mexico.[360] The rule also provides an exception for those who are able to demonstrate exceptionally compelling circumstances, *see* 8 CFR 208.35(a)(2)(i)

---

[359] CBP, *Southwest Land Border Encounters* (last modified Sept. 16, 2024), *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

[360] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.* On August 23, 2024, CBP expanded the areas from which noncitizens can request appointments through the CBP One app. With this expansion, Mexican nationals will be able to request an appointment from anywhere within Mexico. Additionally, non-Mexican nationals will be able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico—enabling them to make appointments without having to travel all the way north to do so. *See id.*

and (ii), 1208.35(a)(2)(i) and (ii), and the rule's limitation on asylum eligibility does not apply those who are excepted under the Proclamation, *see* 8 CFR 208.35(a)(1), 1208.35(a)(1). And the rule preserves access to statutory withholding of removal, as well as CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b). Thus, migrants already in Mexico have the ability under the rule to access available protection.

The Departments acknowledge the potential that some migrants would perceive the possibility of abrupt changes in procedures at the southern border as a reason to remain close to the border and attentive to any information suggesting that the border is or soon will be "open." In the IFR, the Departments explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749 n.248. This rule makes an additional change that addresses this concern: The rule's provisions will not be discontinued unless there has been a 7 consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the 14-day waiting period after the Secretary makes a factual determination to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.

*Comment:* A commenter wrote that while DHS has created a website that states whether the border is currently open or closed, it is unlikely that noncitizens in desperate conditions in Mexico would review the website before deciding to cross the border. Further, the commenter stated that, if the border were to reopen under the rule, it seems inevitable that smugglers would charge higher fees to move noncitizens across the border, and that if noncitizens understand the rule at all, they will flood the border when the suspension and limitation discontinues—leading again to its immediate closure. The commenter stated that the burden of tracking, identifying, and applying different standards over a matter of days is significantly more complex for USCIS personnel as they consider protection claims. The commenter expressed concern that the preamble to the IFR did not consider that this complexity would affect and complicate merits adjudications and lead to longer, more complex hearings in an already overwhelmed, backlogged system.

*Response:* As noted in Section II.A.2 of this preamble, encounters between POEs have dropped substantially since implementation of the IFR, suggesting that many migrants have not responded as the commenter predicted. But in any event, if a migrant were to disregard the existence of the rule and other restrictions on crossing between POEs, or if a migrant who is unaware of the existence of the rule were to cross between the POEs, the rule would allow the Departments to swiftly deliver decisions and consequences, while allowing noncitizens who are able to demonstrate the existence of exceptionally compelling circumstances to avoid application of the rule's limitation on asylum eligibility and preserving access to statutory withholding of removal and CAT protection, as discussed in the preceding response.

With respect to the commenter's suggestion that noncitizens could respond to the discontinuation of the rule's provisions by "flood[ing] the border" and "leading again to its immediate closure," to the extent there is a prospect of such actions, this highlights the need for this rule, the overall effect of which will be to combat such actions by alleviating stresses on the border security and immigration systems at the southern border; it is not a reason to withdraw the rule. Moreover, the historical encounter data discussed in Section II.C of this preamble suggest that when regional migration decreases, encounter numbers often remain below 2,500 for very long periods. Those data militate against the commenter's view that encounters will inevitably rise quickly above 2,500.

Further, as discussed in Section II.C of this preamble, the September 27 Proclamation and this rule revise the timeline for the 1,500-encounter threshold to reduce the probability that an ephemeral drop in encounters would result in rapid shifts in applicable policy. With respect to the commenter's concern about complexity for Government personnel, the use of a 7-consecutive-calendar-day average, combined with the new requirement for the average to be below 1,500 encounters for each of 28 consecutive calendar days, also reduces the prospect of undue complexity. Although some section 240 removal proceedings and credible fear interviews may become more complex by virtue of this rule's provisions, many such proceedings may be avoided entirely. *See, e.g.,* 89 FR at 48767 ("[T]he Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.").

## 2. Other Comments on Issues Relating to the Rule

*Comment:* Commenters asked how USCIS' implementation of the IFR would be funded, remarking that the funds to execute the IFR as written have not been allocated.

*Response:* USCIS applies the IFR's provisions as part of the credible fear determination or the full asylum adjudication. It is not a discrete or separate adjudication that would require its own funding stream separate from that which is used for credible fear determinations or asylum adjudications.

*Comment:* Commenters expressed concern about their ability to comment on the proposals in DHS's recent Mandatory Bars NPRM, the comment period for which ended four days after the IFR published. For example, a commenter noted that, in the IFR, the Departments expressly asked for comment on the interaction between the two rules, including whether to explicitly apply the heightened "reasonable probability" standard to those who are subject to a mandatory bar but not subject to the Circumvention of Lawful Pathways rule, but the commenter asserted that they could not provide comment on those issues without knowing how and whether DHS plans to finalize the DHS Mandatory Bars NPRM. Commenters also stated that DHS failed to analyze the interaction between the two rulemakings, which they stated will create additional hurdles for noncitizens seeking asylum and will lead to inconsistencies and potential challenges in processing. Commenters expressed the need for a comprehensive examination of how the policies overlap to avoid uncertainty.

*Response:* The Departments disagree that commenters did not have adequate opportunity to comment on the potential interaction between the DHS Mandatory Bars NPRM and the IFR. Indeed, as the commenters note, the Departments requested comment in the IFR on whether to expand 8 CFR 208.35(b)(3) (directing asylum officers to apply a reasonable probability screening standard in protection screenings in the event that 8 CFR 208.35(a) is held to be invalid or unenforceable) to cover "those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to

asylum eligibility if the [DHS Mandatory Bars NPRM] is finalized.'' 89 FR at 48756. The DHS Mandatory Bars NPRM provides ample notice of the proposed mandatory bars policy, and the commenters do not explain with any specificity why they must review any final rule associated with the DHS Mandatory Bars NPRM in order to provide relevant comments about its potential impact on the IFR.

Moreover, the Departments have considered the interaction between the two rulemakings and do not believe any corresponding changes to this rule are necessary. While both rules address DHS screening procedures, the DHS Mandatory Bars NPRM relates to a different issue than the issues raised in this rulemaking. The DHS Mandatory Bars NPRM proposes to allow AOs to consider the applicability of certain statutory bars to asylum, statutory withholding of removal, and withholding of removal under the CAT regulations during credible fear screenings, but it does not propose changes to the substantive screening standards by which AOs make their credible fear determinations. *See generally* 89 FR at 41347–61. On the other hand, the IFR established a new "reasonable probability" standard for the statutory withholding and CAT screening of noncitizens determined to be subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(iii). Except for this changed screening standard, the AO and IJ would otherwise follow the pre-existing standards at 8 CFR 208.30, 208.33, 1208.30, or 1208.33, as applicable. *Id.* Accordingly, as stated in the IFR, if DHS finalizes the DHS Mandatory Bars NPRM as drafted, the "reasonable probability" standard would still apply to determinations involving a noncitizen who is subject to this rule's limitation on asylum eligibility. 89 FR at 48739 n.186.

*Comment:* A commenter added that the Departments failed to explain how the IFR will interact with the Circumvention of Lawful Pathways rule.

*Response:* In the IFR, the Departments explained how the IFR will interact with another recent rule, the Circumvention of Lawful Pathways rule. 89 FR at 48754. The Departments explained that they were adding to 8 CFR 208.13 and 1208.13 a paragraph (g), entitled "Entry during emergency border circumstances," which "explain[s] when a noncitizen is potentially subject to th[e] IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful

Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13." *Id.* These new paragraphs added to 8 CFR 208.13 and 1208.13 provide that, "[f]or an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35." 8 CFR 208.13(g), 1208.13(g).

In short, during emergency border circumstances, those who enter across the southern border are subject to this rule, "[n]otwithstanding" the Circumvention of Lawful Pathways rule or any other regulatory provision. *See* 8 CFR 208.35, 1208.35. A noncitizen who establishes exceptionally compelling circumstances under this rule has established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). And the credible fear process under this rule uses the same framework as the Circumvention of Lawful Pathways rule, except for the use of a "reasonable probability" screening standard. *See* 8 CFR 208.35(b)(1)(ii), (b)(2)(i), (c), 1208.35(b)(2)(i), (b)(2)(iii), (c). The Departments described the provisions of the regulatory text in detail in the IFR's preamble. 89 FR at 48754–48759; *id.* at 48762–66.

*Comment:* A commenter asserted that recent rulemakings have complicated the asylum system and that the Departments have not provided reliable information about those changes to affected noncitizens.

*Response:* The Departments acknowledge that recent rulemakings have modified the credible fear screening process to better enable the Departments to deliver timely decisions and consequences to noncitizens entering across the southern border who do not have a basis to remain in the United States. Specifically, in the past two and a half years, the Departments have issued the Asylum Processing IFR, the Circumvention of Lawful Pathways rule, and the IFR discussed here. DHS has also issued a proposed rule—the DHS Mandatory Bars NPRM. Each rule has been accompanied by detailed preamble discussion and regulatory text. In addition to the public-facing

materials, although not required to by law, the Departments have executed robust communications plans to notify and inform the public about the consequences of irregular migration while noting the expansion of lawful pathways and the tools that can be used to access those lawful pathways.[361] The public engagement plans have both domestic and international dimensions.[362] Domestically, these plans have included engagement with NGOs, international organizations, legal services organizations, and others.[363] Internationally, the Departments have also executed communications campaigns throughout the Western Hemisphere in coordination with interagency partners and partner governments to educate migrants and would-be migrants about lawful pathways and consequences for not using them.[364] This includes media engagements with in-country reporters, graphics and explainer videos, and press releases highlighting removal flights as a direct consequence of

---

[361] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[362] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (Apr. 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/;* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[363] *See* U.S. Department of State, *Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas Opening Remarks at the Ministerial Conference on Migration and Protection Reception* (Apr. 19, 2022), *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-opening-remarks-at-the-ministerial-conference-on-migration-and-protection-reception/.*

[364] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas; see also* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

CHNV-FRN-00488

coming to the United States irregularly.[365]

The Departments understand concerns about changes to southern border processing. However, as discussed throughout the June 3 Proclamation, the IFR, and this rule, the circumstances at the southern border have changed, and U.S. policy has had to change with them to ensure the effective functioning of the immigration and border management systems. The Departments have consistently encouraged noncitizens seeking to enter the United States to pursue lawful, safe, and orderly pathways to do so, and they continue to provide that encouragement now.

*Comment:* One commenter expressed concern that the Departments failed to analyze how the IFR interacts with the DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings (May 9, 2024).[366]

*Response:* The Departments acknowledge that the IFR did not discuss DHS guidelines governing the use of classified or confidential information, but the IFR does not contain any provisions calling for or governing the use of classified information. Regardless, the rule and DHS's policy on the use of classified information in immigration proceedings are harmonious. The INA permits the use of classified information in certain immigration proceedings, and noncitizens have no right to examine classified national security information that DHS may consider or proffer in opposition to the noncitizen's admission to the United States or application for relief from removal. INA 235(c), 8 U.S.C. 1225(c); INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); 8 CFR 235.8(b)(3), 1240.33(c)(4). That was the case before DHS issued its updated policy and guidance on the use of classified information in immigration proceedings on May 9, 2024. The updated guidance does not alter those fundamental principles or the type of information that may be used in the immigration proceedings governed by

the IFR,[367] and so there was no need for the Departments to address the interaction between the IFR and the new classified information policy.

*E. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters expressed concerns with the Departments' decision to issue an IFR instead of an NPRM, and the Departments' invocation of the "foreign affairs" and "good cause" exceptions. Commenters stated that the Departments have not proved that either exception applies and, therefore, argued the IFR did not comply with the APA.

*Response:* Under the APA, agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). However, consistent with the APA, the Departments did not employ these procedures before issuing the IFR because (1) the IFR involved a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3). *See also* 89 FR at 48759–66 (explaining use of these APA exceptions). Because the Departments have now issued this final rule after soliciting comments, those concerns are moot—but regardless, the Departments address commenters' concerns below.

a. Foreign Affairs Exception

*Comment:* A commenter suggested that the Departments' invocation of the foreign affairs exception is inappropriate because this exception has been "selective[ly] appli[ed]," pointing to other rules concerning processing of noncitizens at the border (the Circumvention of Lawful Pathways rule and the DHS Mandatory Bars NPRM) for which the Departments did not invoke this exception. Another commenter remarked that the foreign affairs exception cannot apply because the IFR is a "unilateral action" by the United States, seemingly without any formal agreements with Mexico or other affected countries, and the rule's effects might exacerbate undesirable international consequences. A third commenter stated that the foreign affairs exception does not apply to rulemakings concerning the U.S. border, stating that these are matters of domestic policy. Similarly, another commenter noted that Federal courts have previously informed agencies that these exceptions to the APA's notice-and-comment requirement "do not apply to regulations that alter domestic law around asylum eligibility." A fifth commenter expressing opposition to the Departments' invocation of the foreign affairs exception remarked that the exception's interpretation is "overly broad."

*Response:* The IFR is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question is "clearly and directly involve[d]" in "a foreign affairs function." *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up). In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted). This rule satisfies both standards. Nevertheless, the Departments provided an opportunity for public comment after issuing the IFR and in this final rule are responding to those comments.

With respect to comments asserting this rule represents "unilateral action" by the United States, the United States' border management strategy, as further developed in this rule, is predicated on the belief that migration is a shared responsibility among all countries in the

---

[365] *See* Ecuador Envivo, *La tragedia detrás de la migración irregular, una desgarradora realidad (The tragedy behind irregular migration, a heartbreaking reality)* (July 31, 2024), *https:// ecuadorenvivo.com/blog/2024/07/31/la-tragedia-humana-detras-de-la-migracion-expertos-analizan-crisis-de-migracion-irregular/; see also* ICE, *ICE conducts single adult, family unit removal flights Aug. 9* (Aug. 9, 2024), *https://www.ice.gov/news/ releases/ice-conducts-single-adult-family-unit-removal-flights-aug-9-0.*

[366] DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/ publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.*

[367] The previous policy and guidelines permitted the use of classified national security information in an individual's immigration proceedings only as a matter of last resort. *See* DHS, *DHS Guidelines for the Use of Classified Information in Immigration Proceedings* (Oct. 4, 2004), *https://www.dhs.gov/ publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings-october.* The new policy and guidelines now permit the use of classified national security information as the Department deems necessary to protect our national security and public safety interests, subject to procedures outlined in the new guidance. *See* DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/ dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.* Neither the new or old policies and guidelines provide the individual who is subject to the immigration proceedings any entitlement to review classified national security information. Such classified information would be reviewed either *ex parte* or *in camera.*

region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.[368] This strategy takes particular inspiration from the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was joined by world leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[369]

Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing. This work includes efforts to expand access to and increase the number of lawful, safe, and orderly pathways, such as the Safe Mobility Initiative;[370] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols with the Government of Mexico along our shared border; and share information, technical assistance, and best practices. *See* 89 FR at 48759–60 & nn.300–02. These also include the commitment by the United States and Mexico to strengthen their joint humanitarian plan on migration. *See id.* at 48760 & n.310. The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.

Given the particular challenges facing the United States and its regional partners at this moment, the Departments appropriately assessed that it was critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that the IFR and the Proclamation—and the strong consequences they were intended to impose at the border—would send an important message to the region that the

United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.[371] *See* 89 FR at 48761.

In response to the comments that the Departments' invocation of the foreign affairs exception is overly broad and that because the IFR impacts asylum and issues at the southern border of the United States, it implicates only domestic policy and law and thus does not qualify for the foreign affairs exception, the Departments point out that the IFR stems from international cooperation and directly addresses international challenges. As one commenter noted, at least one court has determined that a rule imposing a limitation on asylum eligibility is not subject to the foreign affairs exception when that rule has only an indirect impact on foreign affairs. *See Capital Area Immigrants' Rights Coalition* v. *Trump,* 471 F. Supp. 3d 25, 56 (D.D.C. 2020). But recently Mexico and the United States have worked together on a joint humanitarian plan on migration intended "to address the humanitarian situation caused by unprecedented migration flows at our shared border and in the region."[372] In a joint statement following a meeting between President Biden and President López-Obrador on April 28, 2024, the presidents "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce

irregular border crossings while protecting human rights."[373] The IFR and this rule further this international mission by limiting heightened levels of migration. This contrasts with the "indirect international effects," including potential "downstream effects in other countries or on international negotiations," that the court discussed in *Capital Area Immigrants' Rights Coalition. Capital Area Immigrants' Rights Coalition,* 471 F. Supp. 3d at 55. Given the IFR's direct and clear involvement in foreign affairs, the foreign affairs exception applies.

In addition to the IFR's clear and direct involvement in foreign affairs, the Departments believed that conducting a notice-and-comment process and providing a delayed effective date likely would have led to a surge to the southern border before the Departments could finalize the rule, as occurred in anticipation of the end of the Title 42 public health Order.[374] Regional partner countries have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See* 88 FR at 31444. For example, one foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. *Id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid. The Departments appropriately concluded that the emergency measures taken in the IFR would help address this regional challenge, rather than exacerbate it as one commenter suggested, and that any decrease in migration that results would help relieve the strain not just on the U.S.-Mexico border, but also on

---

[368] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador; see also* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7.*

[369] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited Aug. 2, 2024).

[370] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 21, 2024).

[371] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[372] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[373] The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.*

[374] *See* 89 FR at 48761–62. Note that the encounter projections included in the IFR excluded encounters of people who had registered with the CBP One app along with administrative encounters at POEs, but included non-CBP One enforcement encounters at POEs, which at the time averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day;* Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

countries throughout the hemisphere.[375] The actions the United States took in the IFR thus affected conditions beyond the southern border and demonstrated a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration.[376] Thus, regardless of whether the foreign affairs exception has been invoked for other rulemakings involving border issues, that exception is applicable here. *See* 5 U.S.C. 553(a)(1). The Departments note, however, that the Circumvention of Lawful Pathways rule did invoke the foreign affairs exception to the APA's delayed-effective-date requirement on similar grounds to the IFR. *See* 88 FR at 31444–45.

b. Good Cause Exception

*Comment:* Commenters stated that the good cause exception did not apply to the IFR because the Departments' claim that proceeding via NPRM would yield a surge in border encounters was misguided, not supported by evidence, and an insufficient reason to invoke the good cause exception. Similarly, commenters stated that the IFR acknowledged that border encounters were lower in 2024 than the year prior, belying the claim of a border emergency. Commenters expressed concern that there is no indication of a new emergency sufficient for the Departments to immediately change their rules without allowing the public an opportunity to engage with or be warned about the coming changes. Commenters further claimed that evidence shows that migration rates rise independently of U.S. efforts to enact consequences, that any change in policy leads to a short-term decrease in encounters and, thus, that the IFR should not have been excepted from the APA. Commenters noted that the increase in encounters in December 2023 was not tied to any policy change. Commenters also criticized the Departments' discounting of the lack of a surge after the Circumvention of Lawful Pathways NPRM, stating that although at that time the Title 42 public health Order remained in effect, "it is disingenuous to compare the current IFR with the lifting of Title 42, which,

as the agencies report, led to increased border entries." Commenters expressed opposition to the Departments' invocation of the good cause exception, remarking that the assumption that "not seeking safety in the United States protects the welfare of people who otherwise would undertake that dangerous journey is unsubstantiated and false."

Commenters compared the IFR to the Circumvention of Lawful Pathways NPRM, which according to the commenters did not invoke the good cause exception. Commenters wrote that the good cause exception should not have applied to the IFR because providing notice would have been both "practicable and in the public interest." Commenters stated that the Departments' good cause exception claim of an emergency is based on "long standing structural challenges," such as backlogged immigration case processing and limited resources.

*Response:* The Departments' decision to invoke the good cause exceptions to the APA's notice-and-comment and delayed-effective-date procedures at 5 U.S.C. 553(b)(B) and (d)(3) was reasonable and appropriate. Notwithstanding that the Departments had ample basis to forgo advance notice and comment, the Departments nevertheless provided an opportunity for public comment and in this final rule are responding to these comments.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." *Id.* 553(b)(B). Here, the notice-and-comment procedures were impracticable and contrary to the public interest because the delays associated with such procedures would have unduly postponed implementation of a policy that was urgently needed to avert significant public harm. While courts have "narrowly construed" this exception, it can "excuse[ ] notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n* v. *U.S. DOE,* 72 F.4th 1324, 1339–40 (D.C. Cir. 2023) (internal citations omitted). An advance announcement of the IFR would have seriously undermined a key goal of the policy in disincentivizing substantial levels of irregular migration, *see, e.g.,* 89 FR at 48754, and instead would have incentivized noncitizens to irregularly enter the United States before the IFR took effect.

First, the "impracticable" prong of the good cause exception "excuses notice

and comment in emergency situations . . . or where delay could result in serious harm." [377] Findings of impracticability are "inevitably fact- or context-dependent," [378] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [379] and the agency's diligence in addressing the problem it seeks to address.[380]

The critical need to immediately implement more effective border management measures is described at length in the June 3 Proclamation, the IFR, and Section II.A of this preamble. Despite the strengthened consequences in place at the SWB and adjacent coastal borders, including the Circumvention of Lawful Pathways rule and other measures (which led to the highest numbers of returns and removals in more than a decade, 89 FR at 48713), when the IFR was published, the U.S. Government continued to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[381] While encounter

[375] *See* 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras in 2021, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).

[376] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[377] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[378] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[379] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[380] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("'[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .'").

[381] There were approximately 250,000 USBP encounters along the SWB in December 2023, higher than any previous month on record, *see*
Continued

levels in calendar year 2024 prior to issuance of the IFR had decreased from these record numbers, there was still a substantial and elevated level of migration. Historically high percentages of migrants were claiming fear. 89 FR at 48713.

DHS was forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[382] Even then, it can take a substantial period to effectuate the removal of these individuals.[383] This difficulty in predictably delivering timely decisions

---

OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[382] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated in February 2022 were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, Current Operating Environment, https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-environment* (last visited Aug. 2, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (July 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,241 days); EOIR, *Median Completion Times for Detained Cases* (July 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the third quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (July 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months); *see also* 89 FR at 48749–54 (discussing the limits in the Departments' ability to quickly repatriate noncitizens when encounters are elevated, which results in the release of many of these noncitizens into the United States); Section III.D.1 of this preamble (describing how the rule's thresholds target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered).

[383] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html* ("Most asylum claims are ultimately rejected. But even when that happens, years down the road, applicants are highly unlikely to be [removed]. . . ."); OHSS analysis of 2024 Persist Dataset (Removal Orders tab); *see also* 88 FR at 31326, 31381.

---

and consequences further compounded incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application. 89 FR at 48714. The emergency border circumstances were not, however, due solely to longstanding structural challenges such as case backlogs in immigration court and the lack of government resources, as one commenter suggested; rather, the heightened level of encounters at the southern border occurred despite recent increases in the number of immigration court judges, immigration court cases completed, individuals processed through expedited removal, and expanded opportunities to use lawful, safe, and orderly processes. *Id.* at 48712–13. The Departments reasonably determined that the heightened levels of migration and forced displacement that resulted in the President's determination to apply the suspension and limitation on entry and the Departments' determination to adopt the IFR would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. *See id.* at 48763. The Departments acted immediately to safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. *See id.*

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, when significant public harm would result from the notice-and-comment process.[384] If, for

---

[384] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was

---

example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[385] A number of cases follow this logic in the context of economic regulation.[386]

With respect to comments stating that migration rates can rise independently of policy changes, commenters are correct that there are increases in migration rates that do not appear to be a result of changes in U.S. policies, such as the increase in encounters in December 2023. But that does not diminish the impact of even short-term surges after announcements of policy changes, which the Departments have experienced time and again, as detailed in the IFR. *See* 89 FR at 48764–66.

The Departments reasonably assessed that announcing this rule in advance would have likely yielded a surge. As explained in the IFR, the Departments were responding to emergency border circumstances, and advance announcement of the response—a significant change in border policy that increased the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly—would have significantly incentivized migrants to engage in actions likely to compound those very challenges.[387]

---

'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[385] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[386] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[387] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2) (noting that on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols, a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), and almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting

---

These incentives are exacerbated by smugglers, who routinely emphasize the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.[388] For the same reasons, ''the [need] for immediate implementation'' outweighed the ''principles'' underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forgo it.[389] The stark drop in encounters following implementation of the Proclamation and IFR, as discussed in Section II.A.2 of this preamble, is strong evidence that announcements of such changes in policy can have significant effects on migration patterns; by making the IFR immediately effective, the Departments avoided triggering a surge in migration that might otherwise have occurred during a notice-and-comment period or pending a delayed effective date.

The increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what DHS resources and operations are designed to handle. Increasing encounters raised detention capacity concerns anew, and, at that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities.[390] Given the nature of its facilities, increased numbers and custody duration increase the likelihood that USBP facilities will become quickly overcrowded.[391] In response to the comment noting skepticism over the Departments' assumption that deterring irregular migration will protect migrants' welfare, the Departments disagree: crowding, particularly given how USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[392] The Departments thus assessed that there

would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for the IFR or delayed its effective date.

The Departments' determination in the IFR was also consistent with the United States' past practice. For example, and in response to the comment that the Departments did not invoke the good cause exception in promulgating the Circumvention of Lawful Pathways rule, the Departments provided notice and an opportunity to comment on that rule while the Title 42 public health Order remained in effect[393] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. Contrary to the comment asserting that it was disingenuous for the Departments to compare the potential surge of migrants between the end of Title 42 and the effective date of the Circumvention of Lawful Pathways rule with the potential surge associated with the delayed implementation of this rule, the Departments merely refer to the Title 42 surge to illustrate that a surge would be likely given the significance of the border policy change made by the IFR, not that the surge would have been of precisely the same degree. *See* 89 FR at 48761–62.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures, and witnessed a drastic reduction in irregular migration by Venezuelans.[394] Had the parole process been announced before a lengthy notice-and-comment period, thousands of Venezuelan nationals would have likely attempted to cross the United States and Mexican borders before the ineligibility criteria went into effect and before the United States could return Venezuelan nationals to Mexico. *See* 89 FR at 48766.

DHS similarly concluded in January 2017 that it was imperative to give immediate effect to a rule designating

Cuban nationals arriving by air as eligible for expedited removal because ''[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region.''[395] The ''publication of the rule as a proposed rule . . . would [have] signal[ed] a significant change in policy while permitting continuation of the exception for Cuban nationals, [and] could [have led] to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.''[396] A surge of this kind ''would [have] threaten[ed] national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities'' and ''could also have [had] a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations,'' and ''could [have] result[ed] in significant loss of human life.''[397]

Given the emergency border circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for the IFR would have been contrary to the public interest because an advance announcement of the rule would have incentivized even more irregular migration by those seeking to enter the United States before the IFR took effect.

#### c. Length and Sufficiency of Comment Period

*Comment:* Commenters remarked that the 30-day post-promulgation comment period was not long enough to allow for ''meaningful[ ] comment'' on the IFR, including from experts. Multiple commenters recommended that the Departments either rescind the IFR, reissue it with a longer comment period, or both, and suggested the new comment period be at least 60 days or 90 days. A few commenters expressed concern with the IFR's publication four days before the end of the 30-day comment period for the DHS Mandatory Bars NPRM, stating that the Departments did not give the public an adequate opportunity to analyze or comment on them separately or in conjunction.

---

to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part).

[388] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html.*

[389] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[390] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[391] *Id.* ¶¶ 6, 14, 17.

[392] *Id.* ¶ 17.

---

[393] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[394] *See* 88 FR at 31317 (''A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.'').

---

[395] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[396] *Id.*

[397] *Id.*; accord U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

*Response:* As explained earlier in this Section III.E of this preamble, the Departments did not provide notice and an opportunity to comment or provide for a delayed effective date because the foreign affairs and good cause exceptions to those procedures applied. *See* 5 U.S.C. 553(a)(1), (b)(B). Thus, the IFR became effective on June 5, 2024, after the Proclamation was issued and the IFR was placed in public inspection. *See* 89 FR at 48710. The Departments invited the public to provide post-promulgation comments on the ''rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by'' July 8, 2024. *Id.* It bears noting that the APA does not impose any requirements governing the process for submitting public comments when an agency voluntarily chooses to receive them following the promulgation of a rule that is exempt from notice-and-comment procedures; much less does it establish any set number of days for which the Departments would have to leave such a comment period open.

This post-promulgation comment period spanned 30 days from the date of publication (from June 7, 2024, through July 8, 2024) and 34 days from the date the IFR was filed for public inspection (the afternoon of June 4, 2024). *See* 89 FR at 48710; *id.* at 48772. The Departments believe this comment period was sufficient to allow for meaningful public input, as evidenced by the 1,067 public comments received, including numerous detailed comments from interested organizations.[398]

Even where notice and comment is required, the APA does not require that the comment period be any particular length. *See* 5 U.S.C. 553(b), (c). And although Executive Orders 12866 and 13563 generally recommend a comment period of at least 60 days, they do not impose any binding requirement that a 60-day period be utilized in every case. In fact, courts have found 30 days to be a reasonable comment period length, finding that such a period is generally ''sufficient for interested persons to meaningfully review a proposed rule and provide informed comment,'' even when ''substantial rule changes are proposed.'' *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Connecticut Light & Power Co.* v. *Nuclear Regul. Comm'n,* 673 F.2d 525, 534 (D.C. Cir. 1982) (noting that a 30-day comment period was not

unreasonable despite complexity of proposed rule). Comment periods shorter than 30 days, often in the face of exigent circumstances, have also been deemed adequate. *See, e.g., Omnipoint Corp.,* 78 F.3d at 629–30 (concluding 15 days for comments was sufficient); *NW Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

Regarding commenters' concerns about the comment period in light of the DHS Mandatory Bars NPRM, the Departments first emphasize that the two rules regard separate aspects of DHS screening procedures, as discussed above in Section III.D.2 of this preamble. Nevertheless, the Departments explained the relationship between the two rules in the IFR by noting that, ''[i]f DHS were to finalize that rule as drafted, [the IFR's] 'reasonable probability' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.'' 89 FR at 48739 n.186; *see id.* at 48756. In addition, because the DHS Mandatory Bars NPRM was published prior to the IFR, commenters were able to use that NPRM to inform their comments on the IFR. Accordingly, the Departments disagree that commenters were provided an inadequate opportunity to comment on the interaction of these two rules.

Here, the 30-day comment period allowed for significant, meaningful public participation. Commenters have provided numerous and detailed comments regarding the IFR, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule. The 30-day comment period also allowed the Departments to swiftly finalize a critical border measure needed to address the emergency border circumstances posed by the Departments' lack of resources for delivering timely consequences to the heightened number of migrants attempting to enter the southern border without a viable legal basis for doing so. *See* 89 FR at 48749–54.

2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

*Comments:* One commenter reasoned that the effects of removal on noncitizens should not be disregarded because the costs are not low. The commenter stated that the costs resulting from removal would ''encourage refoulement for individuals attempting to reach safety.'' The commenter stated that correctly identifying meritorious claims of fear is an invaluable process that should not be categorized as costs in ''additional time

and resources.'' The commenter further stated that the Departments cannot simply dismiss the task of identifying meritorious claims or characterize their failure to do as purported cost savings, as the commenter alleges is done in the IFR.

*Response:* The commenter misrepresents the IFR's discussion of costs and impacts, *see* 89 FR at 48766–67, which acknowledged that a noncitizen who would have received asylum in the absence of the rule would incur costs from the denial of that benefit. The IFR also acknowledged that noncitizens may incur further costs upon removal. The Departments have described these potential costs qualitatively not as a means of dismissing the importance of such costs, but in order to assess the costs and benefits of the rule in accordance with certain executive orders addressing the regulatory process. *See id.*

Furthermore, the Departments disagree with the commenter's suggestion that the rule does not result in cost savings. The rule does not cause a reduction in overall resources dedicated to immigration processing and enforcement. Rather, it prevents those resources from being spread so thin. As the IFR's analysis explains, given ongoing strains on limited Federal Government immigration processing and enforcement resources, any reduction in new asylum claims would necessarily increase the availability of those resources and allow for more timely adjudications of existing claims. The benefits of the rule include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the nation's immigration laws; and a reduction in the role of exploitative TCOs and smugglers. *Id.* at 48767. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments. *Id.*

3. Alternatives

a. Address Root Causes of Migration

*Comment:* A few commenters specifically urged the United States Government to address ''root causes'' of migration. Many commenters blamed United States foreign policy generally for creating conditions in foreign countries that have caused irregular migration. For example, one commenter stated that the United States must

[398] Document Comments, Securing the Border, *https://www.regulations.gov/document/USCIS-2024-0006-0002/comment.*

amend its foreign policies "which contribute to poverty and injustice in the countries migrants are trying to escape." Another commenter called immigration "payback" for the United States's foreign policies. Some commenters specified foreign policies they would like to see changed, such as those regarding weapons sales, fossil fuels, the environment, humanitarian aid, and sanctions on foreign governments. Other commenters criticized the Government and corporations for contributing to destabilization in other countries leading to immigration. Commenters suggested that the Government should disrupt corporate greed causing destabilization in other countries.

*Response:* As a preliminary matter, these comments are outside the scope of this rulemaking. Regardless, the Departments disagree with the suggestion that addressing the root causes of migration obviates the necessity of the rule. Rather, the United States' ongoing efforts, along with those of partner nations, to address the root causes of migration and abate adverse effects from unprecedented levels of global irregular migration will not immediately resolve the urgent border security and immigration systems' situations. Efforts to address the root causes of irregular migration will take significant time to create impact, and in the meantime the more targeted policies set forth in the IFR and this rule are necessary to alleviate the current acute stress on the border security and immigration systems.

The Departments nonetheless agree with commenters that addressing root causes is a necessary element of regional migration management. For example, the *U.S. Strategy for Addressing the Root Causes of Migration in Central America,* directed by the President in Executive Order 14010, 86 FR 8267 (Feb. 5, 2021), focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and it takes into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society.[399] The strategy includes addressing economic, governance, and security challenges through five pillars: (1) addressing economic insecurity and inequality; (2) combating corruption and strengthening democratic governance; (3) promoting human rights and labor rights; (4) countering and preventing violence; and

(5) combating sexual and gender-based violence.[400] In March 2024, the White House announced that the Administration is on track to meet its commitment in the root causes strategy to provide $4 billion to the region over four years.[401]

The United States has also worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. The IFR provided a detailed account of the United States' efforts throughout the region to implement such strategies. *See* 89 FR at 48759–62. For instance, the United States, along with 21 other countries in the Western Hemisphere, has endorsed the L.A. Declaration, which proposes a comprehensive approach to managing migration throughout the Western Hemisphere. *See id.* at 48759. Under the L.A. Declaration's framework, the United States has been working closely with foreign partners to manage the unprecedented levels of migration that countries throughout the region have been experiencing, including efforts to expand access to and increase lawful pathways; conduct joint enforcement efforts; and share information, technical assistance, and best practices. *Id.* at 48759–60.

Additionally, the Government has developed and implemented a number of policy measures, including the Circumvention of Lawful Pathways rule and other measures, which are complemented by a range of actions taken by foreign partners in the region, such as campaigns by Colombia and Panama to counter smuggling networks in the Darién Gap. The Government believes that migration is a shared responsibility among all countries in the region, which is reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.

Consistent with these efforts, this rule will further incentivize noncitizens to avoid irregular migration and instead avail themselves of other lawful, safe, and orderly means for seeking

protection in the United States or elsewhere. The Departments agree with commenters that recent surges in irregular migration have been caused by multiple factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose timely consequences at the border is limited by the lack of resources and tools available and by partner nations' operational constraints.

Although this rule does not purport to—and a single rule cannot—address all of the root causes and factors driving migration, the Departments assess that this rule has significantly increased their ability to deliver timely decisions and consequences at the southern border with currently available resources, combating perceptions and messaging to the contrary. Given the challenges facing the United States and its regional partners, this regulatory effort—and the strong consequences it imposes at the southern border—have sent and will continue to send an important message throughout the region that the United States has put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In short, the Departments acknowledge that international migration trends are the product of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59. The United States Government is working to address these root causes of migration, including by cooperating closely with partner countries, and to abate adverse effects from unprecedented levels of irregular migration.

**b. Prioritize Funding and Other Resources**

*Comment:* Many commenters urged the United States Government to prioritize funding, other resources, or alternative policies to make border processing and asylum adjudications more effective and efficient. Commenters suggested various priorities for funding, including hiring more personnel and staff, such as immigration officers, IJs, and court personnel; allocating more funding to already existing personnel and staff; allocating more funding and other resources to local governments and organizations that assist immigrants; increasing access to legal representation and mental health services; and devoting more resources to asylum processing and adjudications at POEs and the interior.

---

[399] Nat'l Sec. Council, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* at 4 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[400] The White House, *Fact Sheet: Update on the U.S. Strategy for Addressing the Root Causes of Migration in Central America* (Mar. 25, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/25/fact-sheet-update-on-the-u-s-strategy-for-addressing-the-root-causes-of-migration-in-central-america-3/.*

[401] *Id.*

Other commenters suggested more generally that the Government devote more resources to recent arrivals and the asylum system. A few commenters specified that the Government should provide additional funding for the Shelter and Services Program and the Case Management Pilot Program. One commenter suggested that the Government create a system to require asylum seekers to have their applications vetted in their home countries as a way to reduce costs and migration. Another commenter suggested sending noncitizen arrivals with family members in the United States to their families. One commenter stated that the Government should expand capacity at the border, while another commenter questioned DHS's ability to increase capacity at POEs.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for the increased arrivals at the southern border, but those suggestions are outside the scope of this rulemaking, and they would require congressional action. As discussed in the IFR, the circumstances that the Departments faced in June 2024 existed despite the Departments' efforts to address substantial levels of migration and were a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. *See* 89 FR at 48712–15. The Administration has repeatedly requested additional resources from Congress, only some of which have been provided. *See id.* at 48728. USCIS also implemented a new fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service.[402] While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate, keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget. 89 FR at 48729.

Additional financial support would require additional congressional actions, including significant additional appropriations, which are outside the scope of this rulemaking. The Departments agree with the commenters that additional resources would provide substantial benefits for managing the border and immigration systems but decline to wait to act pending receipt of additional funding from Congress. DHS notes that despite this lack of additional funding it has taken steps to increase processing at SWB POEs, including through use of the CBP One app.[403]

Additionally, the Departments note that they are leading ongoing Federal Government efforts to support NGOs, local and state governments, and other migrant support organizations as they work to respond to the unprecedented migration impacting communities across the United States. As noted in the Circumvention of Lawful Pathways rule, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 31327 (citing 88 FR at 11704–05). In December 2022, $75 million was awarded through the program.[404] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[405] For FY 2023, there were $363.8 million in available funds to enable non-federal entities to provide humanitarian services to noncitizen migrants following their release from DHS.[406] In FY 2024, that figure increased to nearly $650 million.[407]

The Departments do not agree with commenter's suggestions that alternative policies, including vetting migrants in their home countries and sending those who arrive the United States who have family members in the United States to those family members, should be pursued in place of this rule. In addition to being far outside the scope of the rule, such policies would lack the demonstrably effective incentive structure of this rule. The Departments nonetheless agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our southern border. During the emergency border circumstances underlying the rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed and overall border security and immigration systems efficiencies. Swift removal of noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period.

*Comment:* Some commenters stated that the Government "should focus on educating the public about the complexities of immigration" and "provide information to the American people" regarding contributions of immigrants to society.

*Response:* The Departments maintain publicly accessible information regarding the border security and immigration systems and routinely publicize law enforcement action and efforts against human trafficking, smuggling, and TCOs that profit from irregular migration.[408] The Departments will continue to make such information publicly available through routine publication. To the extent commenters suggest that the Departments should inform the American public about the contributions migrants have made to the United States, the Departments respectfully note that such action is outside the scope of this rulemaking as it is unrelated to and would have no immediate effect on encounters at the southern border.

c. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to asylum and humanitarian protections. Commenters expressed concern that the United States' annual rates of refugee admissions have not kept pace with

---

[402] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction,* 89 FR 20101 (Mar. 21, 2024) (making corrections).

[403] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[404] *See* FEMA, Release No. HQ–22–232, *Emergency Food and Shelter Program National Board Allocates $75 Million for Humanitarian Assistance* (Dec. 23, 2022), *https://www.fema.gov/press-release/20230103/emergency-food-and-shelter-program-national-board-allocates-75-million.*

[405] Public Law 117–328, Division F, Title II, Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support, 131 Stat. 4459, 4730 (2022).

[406] FEMA, Shelter and Services Program (June 14, 2024), *https://www.fema.gov/grants/shelter-services-program.*

[407] *Id.*

[408] *See* DHS, Securing the Border (last updated Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws;* DHS, Border Security (last updated Nov. 7, 2023), *https://www.dhs.gov/topics/border-security.*

worldwide demand for refugee protections, driving migrants to seek alternative and oftentimes irregular, migration routes. While many commenters focused on noncitizens arriving at the border, at least one commenter suggested expanding protections for "those who have long called the United States home." Many commenters stated that the Government "should be creating accessible pathways to citizenship." Many commenters emphasized the need for expanded lawful pathways and speeding up processing times. One commenter requested that the Government "invest in expanding pathways to lawful status." Several commenters implored the Government to focus "on a solutions strategy."

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally.[409] As explained in detail in the IFR, in recent years, the Government has overseen the largest expansion of lawful, safe, and orderly pathways and processes for noncitizens to come to the United States in decades. 89 FR at 48760. Such steps include promulgating the Circumvention of Lawful Pathways rule, refocusing a significant portion of DHS's southern border workforce to prioritize migration management above other border security missions, implementing the CHNV parole processes, implementing the Safe Mobility Initiative in several countries, expanding country-specific family reunification parole processes, expanding opportunities to enter the United States for seasonal employment, establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive at POEs through the CBP One app, increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024, completing approximately 89 percent more immigration court cases in FY 2023 compared to FY 2019, and increasing the IJ corps by 66 percent from FY 2019 to FY 2023. 89 FR at 48712–13.

---

[409] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and* (citing continued efforts to expand lawful pathways and processes, including establishing country-specific parole processes for certain nationals, working with interagency partners and the private sector to increase access to H–2 nonimmigration visa programs, expanding capacity at POEs to increase CBP One app processing capabilities, and implementing new family reunification parole processes among other efforts).

Despite these and other efforts to expand lawful pathways and provide border security, and while DHS is processing noncitizens in record numbers and with record efficiency, the border security and immigration systems have not been able to keep pace with the number of noncitizens arriving at the southern border. Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross irregularly and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection, when noncitizens are arriving at such elevated volumes.

Further, existing levels of migration make clear that the efforts described above, on their own, are insufficient to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the current surges of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. The Departments note that, while they continue to explore the possibility of providing additional lawful pathways, this rule does not create, expand, or otherwise constitute the basis for any lawful pathway. The Departments further note that requests that the United States create a path to citizenship is outside the scope of this rulemaking.

### d. Expand Asylum Merits Process

*Comment:* One commenter stated that instead of finalizing the IFR, the Departments should consider expanding the use of the AMI process outlined in the Asylum Processing IFR. The commenter stated that the rule has the same stated purpose of increasing efficiency and fairness of asylum adjudications for those in expedited removal, but that DHS had reduced its use of the AMI process in the last quarter of 2022 and has not explained why finalizing the IFR is preferable.

*Response:* The Departments do not view the present rulemaking and the Asylum Processing IFR as mutually exclusive. Rather, the Departments view these rulemakings as complementary efforts. The AMI process promulgated in the Asylum Processing IFR is predicated on a noncitizen receiving a positive credible fear determination and seeks to make the process following a positive credible fear determination more efficient and streamlined, while maintaining fairness; meanwhile, the present rulemaking establishes a limitation on asylum eligibility and addresses the credible fear process

itself. While both rulemakings seek to increase efficiency and maintain fairness, they do so by focusing on separate parts of the process—one primarily prior to and during a credible fear determination (the present rulemaking) and one following service of a positive credible fear determination (the Asylum Processing IFR). Additionally, the Asylum Processing IFR was written with the express intent of being implemented in a discretionary manner. As the Departments explained, the discretion of USCIS to place an individual with a positive credible fear determination into the AMI process under the rule or to issue an NTA for removal proceedings under section 240 of the INA was a necessary part of the rule in order for it to function, as the rule would have to be implemented in a reality in which USCIS did not have all of the resources necessary to place every case with a positive credible fear determination into the AMI process. *See* 87 FR at 18185. Accordingly, the Asylum Processing IFR provided USCIS complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f).

As explained in the preamble to the IFR, there are simply not enough AOs available to conduct fear screenings to keep pace with current sustained high encounter rates. *See* 89 FR at 48714. USCIS has a finite number of AOs to conduct all of its casework, including fear screenings, and does not plan on placing cases into the AMI process in circumstances in which the noncitizen did not establish a significant possibility that they would ultimately be able to establish by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that they qualify for the exception; such an approach would not be a prudent use of resources given current operational realities. *See* 89 FR at 48756. The Departments nonetheless formulated the present rulemaking in a manner that preserves the ability of USCIS to exercise its discretion to place cases with positive credible fear determinations in the AMI process should USCIS have the resources available to do so in the future. *See id.; see also* 8 CFR 208.35(b)(2)(ii). The Departments will continue to implement the Asylum Processing IFR in a manner consistent with the way the rule was envisioned to function, enrolling new cases in the process at the discretion of USCIS, in accordance with available resources.

e. Other Congressional Action

*Comment:* Many commenters stated that the Administration should work with Congress on comprehensive legislative reforms. Commenters emphasized the need for meaningful legislative reform of the U.S. immigration system. Several commenters demanded that Congress address "the issue of immigration." Commenters pointed to a variety of reforms that they believed Congress should implement. However, one commenter disagreed with any suggestion that the border crisis was the result of any failure of Congress and felt it was the Administration's consistent "abdication" of border security and immigration enforcement that has resulted in the sustained, high rate of encounters since 2021.

*Response:* These are suggestions for Congress and are outside the scope of this rulemaking. Nevertheless, the Departments acknowledge the commenters' expressed frustration with Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. The Departments observe that this failure, combined with unprecedented levels of irregular migration along the southern border, makes up the causal background of the June 3 Proclamation and this rule, and they therefore disagree with one commenter's suggestion that the current border circumstances can be ascribed to the Administration's alleged "abdication" of border security, and in no part to any congressional inaction. As explained in the June 3 Proclamation and the IFR, in the absence of congressional action to provide appropriate resources to DHS and EOIR and to reform the outdated statutory framework, the rule implements new policies to substantially improve the Departments' ability within that framework to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. *See* 89 FR at 48715. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border.

f. Additional Suggested Measures or Revisions

*Comment:* One commenter suggested that the Departments "engage in meaningful dialogue with legal experts and humanitarian groups to develop compassionate and effective approaches to migration."

*Response:* The Departments appreciate the commenter's suggestion and welcome the views of legal experts and humanitarian groups. Indeed, the Departments have sought comment on their rules relating to border management—such as the Asylum Processing IFR, Circumvention of Lawful Pathways rule, DHS Mandatory Bars NPRM, and the IFR here—and have either considered and responded to those comments, or, in the case of the DHS Mandatory Bars NPRM, are in the process of doing so. Additionally, such experts and organizations are able to petition the Departments for rulemaking, through which process they may present their proposals for consideration by the Departments. The Departments appreciate the thoughtful comments and feedback they have received from the public, including legal experts and humanitarian groups, and hope that the public's interest in aiding the Departments in their efforts to manage the border continues. Further, since the June 3 Proclamation and the IFR came into force, DHS has continually engaged advocacy, non-governmental, and international organization partners to seek their feedback and perspectives.

*Comment:* One commenter made several suggestions for additional, stricter measures instead of or in addition to this rule. Such suggested measures included strictly limiting parole into the United States, reinstating MPP and requiring noncitizens to wait in Mexico pending removal proceedings, rescinding enforcement priorities and enforcing immigration law in the interior of the United States, expanding expedited removal, terminating policies the commenter viewed as hindering immigration enforcement, requiring AOs to apply all mandatory bars to asylum and statutory withholding of removal in credible fear screenings, raising the standard for withholding of removal and deferral of removal to the "reasonable probability" standard for all credible fear proceedings, and terminating USCIS's policy of accepting requests for reconsideration after an IJ has concurred with an AO's negative credible fear determination. The commenter, addressing the instant rule, requested that the Departments eliminate "overbroad and easy to exploit loopholes," specifically stating that the Departments should "strike" the exception for those who establish exceptionally compelling circumstances. One commenter stated that the rule should also apply to the northern border.

*Response:* The Departments acknowledge the commenters' varying viewpoints and concerns but believe that even if some of the alternatives proposed by the commenters are suitable to pursue, they would not obviate the need for this rule. Proposals to broadly limit lawful pathways to enter the United States, such as parole processes, are outside the scope of this rulemaking, as are other comments advocating for immigration policy changes or reforms unrelated to the IFR.

The Departments nonetheless note that this rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations. Even so, in the Departments' experience, the various parole processes work in tandem with other lawful pathways in a complementary manner to address surges in migration. Examples of the success of DHS's discretionary parole processes include the CHNV parole processes and family reunification parole processes resulting in use of lawful pathways for entry into the United States. Importantly, the parole processes themselves are lawful pathways for qualifying individuals seeking to come to the United States, and this rule does not discourage their use. The parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances.

The Departments disagree with commenters' suggestion to reinstate MPP for the reasons stated in the IFR and the Circumvention of Lawful Pathways rule. *See* 89 FR at 48752 n.271; 88 FR at 31370.

Regarding commenters' request for expansion of expedited removal, the Departments observe that, among the series of steps the Government has taken to strengthen consequences for irregular entry at the border, DHS has processed record numbers of individuals through expedited removal. For example, in the months between May 12, 2023, and June 4, 2024, CBP processed more than 359,000 noncitizens encountered at and between POEs along the SWB for expedited removal [410]—almost twice as many as any prior full FY.[411] Indeed, under the IFR, from June 5 through August 31, 2024:

---

[410] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[411] OHSS analysis of June 2024 Enforcement Lifecycle and July 2024 OHSS Persist Dataset. Prior to FY 2024, the single-year FY record for Southwest Border cases processed for expedited removal was 202,000 in FY 2013 (Historic CFIs tab).

• DHS removed or returned more than 119,000 individuals encountered at the SWB [412] to more than 140 countries, including by operating more than 400 international repatriation flights; [413]

• DHS has doubled the percentage of noncitizens encountered at the SWB who are removed or returned directly from CBP custody compared to the immediate post-pandemic period (32 percent compared to 16 percent); [414]

• DHS has more than tripled the percentage of noncitizens encountered by USBP at the SWB who are processed through expedited removal (up from 18 percent to 59 percent; expedited removal processing was already at record levels, as noted above); [415] and

• DHS has decreased the percentage of noncitizens encountered at the SWB who are released by USBP pending their section 240 removal proceedings by more than half (from 64 percent to 31 percent).[416]

However, as explained at length in the IFR, DHS's ability to apply expedited removal is subject to resource constraints. *See, e.g.,* 89 FR at 48752. At high levels of encounters, DHS simply lacks sufficient resources, such as AOs to conduct fear screenings and temporary processing facilities, to refer noncitizens for expedited removal processing. The mismatch in resources and encounters has created stress on the border security and immigration systems, forcing DHS to rely on processing pathways outside of expedited removal.

With respect to the suggestion that mandatory bars be considered at the screening stage under a reasonable possibility standard, DHS is considering that issue in a separate rulemaking. *See* Mandatory Bars NPRM.

The Departments decline to apply the "reasonable probability" standard to screen all statutory withholding of removal and CAT protection claims during all credible fear interviews at this time. Although the Departments acknowledge the commenters' concerns, the Departments emphasize that the primary focus of this rule is to substantially improve the Departments' ability, during periods of high encounters, to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. Application of a the "reasonable

probability" standard under emergency border circumstances as defined in the rule satisfies these goals.

The suggestion to generally disallow USCIS from accepting requests for reconsideration of negative credible fear determinations exceeds the scope of this rulemaking, which regards the procedures applied during emergency border circumstances. The Departments note that during such circumstances, if it was determined at the credible fear interview that there is not a significant possibility a noncitizen could ultimately demonstrate by a preponderance of the evidence that they are not subject to the IFR's limitation on asylum eligibility or are eligible for the exception to the limitation, the noncitizen would not be permitted to submit requests for reconsideration with USCIS. *See* 8 CFR 208.35(b)(2)(v)(B). In such circumstances, USCIS may, in its sole discretion, reconsider a negative determination. *See id.; see also* 89 FR at 48756.

The Departments disagree with the concern one commenter raised about what it characterized as "loopholes." The exceptions to the limitation on eligibility for asylum are necessary to prevent undue hardship. The Departments have limited the means of avoiding the limitation on asylum eligibility to those identified in the June 3 Proclamation and to exceptionally compelling circumstances in an effort to maximize the rule's applicability.

With respect to a commenter's suggestion that the rule apply to the northern border, the Departments do not currently assess that application of the rule is necessary at the U.S.-Canada land border. Instead, the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the Safe Third Country Agreement between the United States and Canada, which expands the Agreement to apply to noncitizens who claim asylum or other protection within 14 days of crossing the U.S.-Canada land border between POEs, including certain mutually designated bodies of water. *See* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). Under the Safe Third Country Agreement, with limited exceptions, noncitizens who cross from Canada to the United States cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.

*Comment:* A commenter suggested exempting persons who manifest a credible fear from penalties arising from expedited removal, including restrictions on subsequent admission to the United States, and conditioning the implementation of restrictions on eligibility for protection at the border "on the actual availability of an alternative pathway[ ]."

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

With regard to comments recommending that all noncitizens who manifest a fear be exempted from facing "penalties" arising from expedited removal, including restrictions on future admission to the United States, the Departments note that such a change would require a change to the INA, and thus is not within the Department's authority. *See* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing that noncitizens removed pursuant to an order of expedited removal are inadmissible for a period of five or ten years following the date of such removal).

With regard to the commenter's suggestion to condition the limitation on asylum eligibility on whether each individual had a lawful, safe, and orderly pathway available to them, the Departments note that the current framework already effectively does so. Any noncitizen without documents sufficient for lawful admission to the United States may pre-schedule a time and place to present at a POE through the CBP One app.[417] Those who cannot wait for such an appointment may present at a POE and seek an exception to the Proclamation's suspension and limitation on entry or establish exceptionally compelling circumstances before an AO or IJ, both of which except them from the limitation on asylum eligibility. *See* 8 CFR 208.35(a), 1208.35(a). To the extent commenters think these mechanisms are insufficient, the Departments have considered those arguments but believe that the rule strikes an appropriate balance between managing emergency border circumstances and protecting noncitizens' access to asylum, as discussed in Section III.C.1.b of this preamble.

---

[412] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR details tab).

[413] OHSS analysis of data downloaded from UIP on September 3, 2024 (Flights and Removals tab).

[414] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[415] *Id.*

[416] *Id.*

---

[417] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

### F. Out of Scope

*Comment:* In addition to the comments discussed above, commenters also discussed a range of topics that are outside the scope of this rule. For example, some commenters shared a general concern relating to overpopulation; a recommendation that the United States accept a certain number of noncitizens each year to compensate for labor shortages; a suggestion that the Government provide legal counsel at no expense to noncitizens or otherwise fund court-appointed counsel; a suggestion to issue "general rules or guidelines in lieu of case by case assessments that would allow asylum officers to quickly approve certain cases"; a suggested amendment to the DHS Mandatory Bars NPRM to require AOs to apply all mandatory bars to asylum and statutory withholding of removal at the credible fear stage; a recommendation to preclude USCIS from considering requests for reconsideration of negative credible fear or reasonable fear determinations that have been reviewed by an IJ; concern with and strong opposition to the United States' military support for Israel; a request for open borders; a request for the Government to focus its efforts on providing asylum seekers access to mental health services; requests related to custody and detention of noncitizens and asylum seekers, such as investing in "non-custodial processing centers"; concerns about family separation and reunification policies; a recommendation to provide "relief for undocumented caregivers by modernizing existing rules"; suggestions relating to work authorization for migrants and asylum seekers; sentiments that the Government should provide funding to support migrant communities with public services and respite; a recommendation that the Government grow "federal support for case management support"; claims that the President does not have authority under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), for the policies and objectives of the Proclamation; a claim that the President's use of his authority under section 212(f) of the INA, 8 U.S.C. 1182(f), to issue the Proclamation is a departure from how other presidents have used the authority in the past, relying on statements from the Ninth Circuit's decision in *Hawaii* v. *Trump,* 878 F.3d 662, 689 (9th Cir. 2017), *rev'd and remanded,* 585 U.S. 667 (2018); challenges to DHS's parole authority and use of parole; and a recommendation to give second chances to noncitizens involved in unlawful activities and to shut down operations such as the Western Hemisphere Institute for Security Cooperation because they further perpetuate drug-related violence.

*Response:* These comments address matters beyond the scope of the rule and do not require further response. To the extent that commenters' concerns raised in relation to actions taken under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f), 1185(a), apply also to the legality of actions taken by the Departments, and not only to the President's June 3 Proclamation or DHS's implementation of it, those concerns are addressed in Section III.A.1 of this preamble.

## IV. Requests for Comments

*A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule*

The Departments request comment on whether to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility applies to a noncitizen who "enters the United States from Mexico at the southwest land border or adjacent coastal borders." *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). In addition, among other requirements, the rebuttable presumption only applies if the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or the Refugee Protocol. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

The Departments specifically welcome comment on two proposals: first, whether, in 8 CFR 208.33(a)(1) and 1208.33(a)(1), the Departments should remove the words "from Mexico at the southwest land border or adjacent coastal borders" and replace them with the words "across the southern border (as that term is described in section 4(d) of Presidential Proclamation 10773)." Second, the Departments welcome comment on whether to add to the beginning of 8 CFR 208.33(a)(1)(iii) and 1208.33(a)(1)(iii) a clause that reads, "After the alien entered the United States by sea, or"—so that paragraph (a)(1)(iii) would state in full, "After the alien entered the United States by sea, or after the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees." In a future final rule, the Departments may adopt the first proposal, the second proposal, or both.

Although this request for comment is similar to the Departments' request for comment in the Circumvention of Lawful Pathways rule, *see* 88 FR at 31440–44, the Departments are now seeking comments on the geographic scope in the broader context of this Securing the Border [418] rulemaking. Given the intervening Securing the Border rulemaking, the comments that will be most useful are those that are informed by the full range of actions taken to address migration since the end of the Title 42 public health Order. Accordingly, although the Departments intend to incorporate any comments received on the 2023 Circumvention of Lawful Pathways rule's request for comment into the docket for this request for comment, those who submitted comments in response to that request for comment are encouraged to update their comments in light of the intervening Securing the Border rulemaking and resubmit their comments here.

Unlike the Circumvention of Lawful Pathways rule, the Proclamation and the Securing the Border rule apply to certain noncitizens entering the United States across the "southern border," which includes "southern coastal borders." 89 FR at 48491; *see also* 8 CFR 208.13(g), 1208.13(g). Section 4(b) of the Proclamation defines "southern coastal borders" to mean "all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico." 89 FR at 48491. The term "southern border" adopted by the Proclamation and the Securing the Border rule is categorically broader than the term "adjacent coastal borders" adopted in the Circumvention of Lawful Pathways rule, which the Departments defined as "any coastal border at or near the U.S.-Mexico border." 88 FR at 31320. In contrast to this definition, the term "southern coastal borders" encompasses certain specified coastlines that are not at or

---

[418] Although the Departments have not referred to the present rule as the "Securing the Border rule" throughout this preamble, the Departments do so in this request for comment to distinguish the present rule from the Circumvention of Lawful Pathways rule in an effort to avoid confusion.

near the U.S.-Mexico border, such as the maritime borders of Puerto Rico and the United States Virgin Islands. 89 FR at 48711 n.4.

The Departments believe it is best to align the geographic reach of the Circumvention of Lawful Pathways rule to that in the Proclamation, which was adopted by the Securing the Border rule, for three reasons: (1) to make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to crossing irregularly no matter where along the southern border they cross; (2) to deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) to ensure consistency in implementation. This modification to the geographic reach of the Circumvention of Lawful Pathways rule would encourage noncitizens to avoid dangerous maritime migration and further persuade them to utilize lawful, safe, and orderly pathways. As discussed in more detail below, maritime migration results in life-threatening risks for both migrants and DHS personnel.

When the Departments initially proposed the Circumvention of Lawful Pathways rule, the rule would have covered migrants who entered the United States from Mexico ''at the southwest land border''—that is, ''along the entirety of the U.S. land border with Mexico.'' 88 FR at 11704 n.1; *see also id*. at 11750, 11751. However, the Departments received comment from the public expressing concern that limiting the rebuttable presumption to only those who entered the United States from Mexico by land would incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making the hazardous attempt to reach the United States by sea. 88 FR at 31320. Concurring with this concern, the Departments modified the geographic reach of the rebuttable presumption to include ''adjacent coastal borders'' so that it applied to noncitizens who crossed into the United States from Mexico via adjacent coastal borders. Further, this definition mirrored the geographic reach of the Centers for Disease Control and Prevention's (''CDC'') Title 42 public

health Order and, as implemented by CBP, the Amended CDC Order issued in May 2020. *Id.* Because CBP had been interpreting the term in this way for three years before the Circumvention of Lawful Pathways rule's finalization, the Departments believed this consistency with the Title 42 public health Order in geographic application would help prevent smugglers from exploiting what could be perceived as a loophole by persuading migrants to take the perilous journey of trying to reach the United States by sea upon the termination of the Order. *Id.*

The Departments now believe that further expanding the geographic scope of the Circumvention of Lawful Pathways rule beyond ''adjacent coastal borders,'' and, with respect to those who arrive by sea, removing the restriction that the rule only applies to noncitizens who enter the United States from Mexico, could be supported by the same justification for the Securing the Border rule's inclusion of southern coastal borders: these changes would ''help avoid any incentive for maritime migration to such locations'' that are currently covered by the Securing the Border rule but not by the Circumvention of Lawful Pathways rule. 89 FR at 48711 n.4. For example, expanding the scope of the Circumvention of Lawful Pathways rule in this manner would mean that a noncitizen who enters the United States at a border via the Gulf of Mexico would be subject to the Circumvention of Lawful Pathways rule regardless of whether they transited through Mexico. Further, as an operational matter, this would ensure consistency in processing. Aligning the geographic scope of the Circumvention of Law Pathways rule with that of the Securing the Border rule would eliminate one operational switch that DHS personnel would have to make when the provisions of the Securing the Border rule discontinue in the absence of emergency border circumstances. This would allow DHS personnel to operate consistently with respect to noncitizens encountered utilizing maritime migration to cross the southern coastal borders, all of whom would be presumptively ineligible for asylum.

Maritime migration poses unique hazards to life and safety to both migrants and DHS personnel.[419] Human smugglers and noncitizens migrating to the United States continue to use unseaworthy, overly crowded vessels,

piloted by inexperienced mariners, without any safety equipment— including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.[420] The USCG regularly interdicts noncitizens employing maritime migration in the Gulf of Mexico and Atlantic Ocean in makeshift, overcrowded vessels.[421] In FY 2022, over 12,500 noncitizens were interdicted by the USCG and in FY 2023, that figure was nearly 13,500.[422] This is a dramatic increase from previous years. For example, between FY 2017 and FY 2020, annual maritime interdictions never exceeded 3,600.[423] Between October 1, 2023 and April 30, 2024, the USCG carried out 35 maritime migration interdictions in the Mona Passage and waters near Puerto Rico, with nearly 1,200 noncitizens interdicted at sea from various countries such as the Dominican Republic, Haiti, and Venezuela.[424] Between October 1, 2022 and August 5, 2023, the USCG interdicted over 6,900 migrants from Cuba alone.[425] In August 2024, the

---

[419] The Departments also reiterate the explanation of the dangers of maritime migration in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31441–42.

[420] *See* David C. Adams, James Wagner, *At Least 40 Migrants Die in Boat Fire Off Haitian Coast, U.N. says,* N.Y. Times (July 19, 2024), *https://nytimes.com/2024/07/19/world/americas/boat-fire-haiti-migrants.html;* Samantha Schmidt, Paulina Villegas, Hannah Dormido, *Dreams and Deadly Seas: Bahamas Human Smuggling by Boat,* The Wash. Post (July 27, 2023), *https://www.washingtonpost.com/nation/interactive/2023/bahamas-human-smuggling-by-boat/* (''The United States . . . Coast Guard cutters have been rescuing migrants from foundering or overcrowded boats every few days.''); Adriana Gomez Licon, *Situation 'dire' as Coast Guard seeks 38 missing off Florida,* Associated Press (Jan. 26, 2022), *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe06430474de0c3a3019;* Gina Martinez, *Coast Guard rescues more than 180 people from overloaded sailboat in Florida Keys,* CBS News, CW44 Tampa (Nov. 22, 2022), *https://www.cbsnews.com/news/coast-guard-rescues-more-than-180-people-overloaded-sailboat-florida-keys/.*

[421] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate; see also* USCG, *Press Release: Coast Guard repatriates 119 migrants to Dominican Republic following 2 interdictions near Puerto Rico* (Apr. 29, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3758973/coast-guard-repatriates-119-migrants-to-dominican-republic-following-2-interdic/.*

[422] OHSS analysis of July 2024 Persist Dataset (Maritime Interdictions tab).

[423] *Id.*

[424] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate.*

[425] USCG, *Press Release: Coast Guard repatriates 27 people to Cuba* (Aug. 5, 2023), *https://www.news.uscg.mil/Press-Releases/Article/*

Continued

USCG interdicted a disabled migrant vessel and repatriated 182 migrants back to Haiti.[426] In May 2024, the USCG located and intercepted a 30-foot makeshift vessel with over 60 migrants crammed into it traveling nearly 63 miles north of Punta Cana, Dominican Republic.[427] During a second interdiction occurring on May 20, 2024, CBP's Air and Marine Operations interdicted a ''grossly overloaded makeshift vessel'' carrying 68 migrants located two miles from Puerto Rico's coastline.[428]

In FY 2023, the USCG recorded 112 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. IOM's Missing Migrants Project found that from 2014 to 2024, in the Americas, the maritime route from the Caribbean to the United States resulted in the second-highest number of dead and missing migrants, after the U.S.-Mexico border crossing.[429] The intention behind the Circumvention of Lawful Pathways rule is to discourage individuals from resorting to irregular migration, including markedly more dangerous maritime migration, and to instead incentivize noncitizens to utilize lawful, safe, and orderly pathways and processes to come to the United States. Expanding the geographic scope of the Circumvention of Lawful Pathways rule's rebuttable presumption would expand that incentive structure to cover the entire southern border, rather than just a portion of it.

The United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States.[430] The United States has increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba and Haiti parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment.[431] In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.[432] The availability of these pathways serves as important background for the proposal to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. Such pathways for migrants from this region provide meaningful opportunities for these individuals to use a lawful, safe, and orderly pathway to enter the United States, even if they did not first travel through a third country where they could request such protection. Accordingly, the Departments are considering and seeking comment on applying the Circumvention of Lawful Pathways rebuttable presumption to those who enter the United States via the southern coastal border, irrespective of whether they traveled through a third country, to discourage noncitizens from using dangerous maritime migration routes.

### B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption

Currently, the Circumvention of Lawful Pathways rule applies to a noncitizen who, *inter alia*, entered the United States from Mexico ''between May 11, 2023 and May 11, 2025'' and ''[s]ubsequent to the end of implementation of the Title 42 public health Order.'' 8 CFR 208.33(a)(1)(i)–(ii),

1208.33(a)(1)(i)–(ii). When issuing that rule, the Departments acknowledged that ''aspects of the present situation at the border are likely to continue for some time and are unlikely to be significantly changed in a short period,'' but the Departments opted for a two-year ''entry period'' to, *inter alia*, address the surge in migration that, in the absence of the Circumvention of Lawful Pathways rule, was anticipated to follow the lifting of the Title 42 public health Order and to provide sufficient time to implement and assess the effects of the policy contained in that rule. *See* 88 FR at 11727; 88 FR at 31421. The Departments are now considering, and request comment on, whether to extend the entry period indefinitely so that the rebuttable presumption will apply to noncitizens who entered the United States without documents sufficient for lawful admission any time on or after May 11, 2023, and, if the applicability is extended, other appropriate changes. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); *see also, e.g., id.* 208.33(c), 1208.33(d) (providing the ongoing applicability of the Circumvention of Lawful Pathways rebuttable presumption to any future asylum applications filed by noncitizens who enter during the entry period regardless of when the application was filed, except in the case of certain children who entered as part of a family unit if they later apply for asylum as principal applicants).

In the Circumvention of Lawful Pathways NPRM, the Departments specifically welcomed comment on whether the proposed two-year duration of the rule's applicability ''should be modified, including whether it should be shorter, longer, or of indefinite duration.'' *See* 88 FR at 11708. In response to comments received on the NPRM, the Departments maintained the proposed two-year period in the Circumvention of Lawful Pathways final rule because that rule's focus was to respond to the anticipated surge in migration upon the termination of the Title 42 public health Order. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); 88 FR at 31421–22. The Departments stated that a 24-month period would provide ''sufficient time to implement and assess the effects of the policy contained in this rule'' and that ''a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not

---

3484466/coast-guard-repatriates-27-people-to-cuba/.

[426] USCG, *Press Release: Coast Guard repatriates 182 migrants to Haiti* (Aug. 21, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3878831/coast-guard-repatriates-182-migrants-to-haiti/*.

[427] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate/*.

[428] *Id.*

[429] IOM, *Missing Migrants Project: Migration Within the Americas, https://missingmigrants.iom.int/region/americas* (last visited Aug. 15, 2024). IOM cautions that ''[c]ollecting information about migrants who die or disappear on maritime routes while attempting to migrate by boat in the Caribbean is also very challenging. The remote nature of maritime routes, the secrecy in which boats set out, and the lack of information on trajectories means that many shipwrecks carrying migrants are never reported. It is rarely known exactly how many people were on board boats that ran into trouble at sea, making it difficult to verify how many people went missing, or to know any information about their identities.'' *Id.*

[430] *See* DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[431] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[432] *See* DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

have such an effect.'' 88 FR at 31421. The Departments further stated that the United States would continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *Id.*

The Departments recognized, however, ''that there is not a specific event or demarcation that would occur at the 24-month mark,'' and stated that they would ''closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of th[e] rule.'' *Id.* The Departments explained that such review and decision would consider all relevant factors, such as resource limitations and the Departments' capacity to safely, humanely, and efficiently administer the immigration system; the availability of lawful pathways to seek protection in the United States and partner nations; and foreign policy considerations. *Id.* The Departments also expected to consider their experience under the Circumvention of Lawful Pathways rule at the 24-month mark, including the effects of the rebuttable presumption on those pursuing asylum claims. *Id.* In addition, the Departments expected to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. *Id.* The Departments did not identify specific metrics for extending the rule *ex ante*, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments. *Id.*

The Departments have considered these factors and propose and seek comment on an indefinite extension of the applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions. The Departments also seek comment on whether other changes to the Circumvention of Lawful Pathways rule's provisions would be appropriate if its applicability becomes indefinite. First, as detailed in the IFR, although the Circumvention of Lawful Pathways rule did not fully mitigate the very high levels of irregular migration during the

immediate post-pandemic period, it yielded tangible results that ameliorated a situation that otherwise would have been more challenging. *See* 89 FR at 48723–31.[433] Extending the entry period for the Circumvention of Lawful Pathways rule would ensure that DHS can continue to deliver timely consequences, where appropriate, to more noncitizens encountered, even at levels of migration below the threshold at which the suspension and limitation on entry under this rule would be active. As the Departments explained in the IFR, ''at 1,500 daily encounters between POEs . . . DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.'' *Id.* at 48752. This estimate was expressly based on the Departments' demonstrated performance under the Circumvention of Lawful Pathways rule, *see id.,* and therefore accounted for the effects of that policy as well as the most recent data on capacity limitations, demographics, fear claim rates, and other variables. *See id.* Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption would mean that when encounters between POEs begin to exceed 1,500 encounters and the threshold for continuing or reactivating the measures in this rule is not yet met, the Departments' ability to deliver timely decisions and consequences would likely be impaired.[434]

Second, the Departments continue to be subject to significant resource

limitations, *see* 89 FR at 48728–31, such that—as explained earlier in this section—even at levels of encounters below the 2,500-encounter threshold contained in section 2(b) of the Proclamation, DHS would not be able to quickly remove the majority of those encountered who do not have a basis to remain.[435] In such circumstances, DHS will need policy interventions like the Circumvention of Lawful Pathways rule to continue delivering timely consequences. Although there were months during the FY 2013–FY 2019 period ''in which daily encounters . . . between 1,500 and 2,500 resulted in an average of 210 individuals released each day,'' *see* 89 FR at 48753, such a low release rate would be unrealistic given today's demographic mix of encounters, even at 1,500 daily encounters, particularly in the absence of policy interventions such as the Circumvention of Lawful Pathways rule. For instance, even under the Circumvention of Lawful Pathways rule, assuming that USBP processes 900 noncitizens per day for expedited removal at 1,500 daily encounters between POEs, and assuming a similar level of voluntary returns and reinstatements as observed during the immediate pre-pandemic period, DHS would be able to refer into expedited removal 77 percent of single adults and individuals in family units to expedited removal, and would likely release over 530 single adults and individuals in family units.[436] This is due to current resource limits for expedited removal, current demographics, and fear-claim and screen-in rates under the Circumvention of Lawful Pathways rule.[437] If one adjusts the calculation to use the fear-claim and comprehensive screen-in rates that existed during the pre-pandemic period, over 700 single adults and family members would be released.[438] In short, unless the Departments extend the entry period of the Circumvention of Lawful Pathways rule, DHS's ability to deliver timely consequences would be further degraded because releases pending

---

[433] Between May 12, 2023, and June 4, 2024, CBP placed into expedited removal approximately 920 individuals encountered at and between POEs each day on average. OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab). While encounters at the SWB and in coastal sectors averaged over 5,000 per day for the period from May 12, 2023, to June 4, 2024, border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule. *Id.;* 89 FR at 48724 & n.99.

[434] Assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs) approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption. *Id.*

[435] After the conditions for discontinuing the suspension and limitation on entry under section 2(a) of the Proclamation are met, the suspension and limitation on entry in this rule will continue or reactivate when the 2,500-encounter threshold in section 2(b) of the Proclamation is reached. This numerical gap between discontinuation and continuation or reactivation is important for operational reasons, *see* 89 FR at 48753, but also potentially results in periods of relatively high encounter numbers that the Circumvention of Lawful Pathways rule is needed to manage.

[436] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[437] *Id.*

[438] *Id.*

section 240 removal proceeding would be significantly higher. If the demographics were to shift such that the Circumvention of Lawful Pathways rule was no longer necessary to manage steady-state levels of migration, the Departments could at that time revise policy as appropriate.

Third, even as the United States has continued to coordinate extensively with its regional partners to expand the availability of lawful, safe, and orderly pathways, the Departments have found that these efforts are strengthened by the imposition of appropriate measures to prepare for and respond to ongoing migration challenges as needed. A key component of the Departments' engagement with foreign counterparts has been their ability to demonstrate a willingness to impose, and as appropriate expand, meaningful policy and operational measures in direct response to the pressures caused by migratory flows. *See* 89 FR at 48759. The Departments believe that ''leading by example'' has been an important part of our overall regional engagement and helped encourage regional partners to continue to adopt new and creative policy and operational migration responses. *Id.* By extending the applicability of the Circumvention of Lawful Pathways rule, the Departments believe it would not only demonstrate to our regional partners that we are committed to disincentivizing irregular migration, but it would also encourage our international partners to maintain their mutual efforts to address the unprecedented migration of people in the Western Hemisphere.

Fourth, with respect to the effects of the rule in general and on those who migrate irregularly in particular, experience has proven that the ability to deliver swift consequences for those who do not use lawful, safe, and orderly pathways or processes for entering the United States is critical; the expiration of the Circumvention of Lawful Pathways rule would limit the Departments' abilities to deliver consequences where appropriate, likely changing the perception and decision-making calculus of would-be migrants and thus could be a pull-factor and serve to increase border encounters. Extending the entry period indefinitely would avoid creating the impression among those contemplating crossing irregularly that no timely consequences will apply to them if they wait until the suspension and limitation on asylum eligibility provided for in the Securing the Border rule is lifted and then cross irregularly.

The indefinite applicability of the entry period would also ensure that the

Circumvention of Lawful Pathways rule's incentive for migrants to utilize lawful, safe, and orderly pathways will continue should the enhanced measures in the Securing the Border rule not be in effect in the future. Although initially designed as a temporary measure, the Circumvention of Lawful Pathways rule is also a critical component of DHS's broader efforts to incentivize migrants to use the lawful, safe, and orderly pathways and processes that the United States Government has made available to them, thereby reducing irregular migration and allowing more efficient and timely processing at the southern border. *See* 88 FR at 31318. Since 2021, the Departments have steadily expanded such pathways, including by increasing refugee processing in the Western Hemisphere; providing country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit; and expanding the availability of the CBP One app to allow noncitizens to schedule appointments to present at a POE rather than risking their lives by crossing the border unlawfully.[439] To encourage noncitizens to continue to pursue such pathways, rather than putting their lives in the hands of dangerous smugglers and resorting to irregular migration that strains the border security and immigration system, the Departments are considering extending the Circumvention of Lawful Pathways rule indefinitely.

Fifth, there are a variety of factors outside of DHS's control that an indefinite extension could help mitigate. Political unrest abroad, natural disasters and climate change, perceptions about U.S. elections or changes in domestic policy, implications of elections in the region, large-scale economic fluctuations, and the migration management practices of regional partners (*e.g.,* their enforcement practices or visa policies)—all have the potential to serve as push or pull factors and dramatically impact encounters at the southern border. *See* 88 FR 31327. An indefinite extension would ensure consistency in U.S. border management practices and maintain a basic tool necessary to address potential migration surges.

Sixth, the Departments believe this approach would complement recent policy initiatives, including this Securing the Border rule, by allowing

DHS to continue to deliver timely consequences to more noncitizens encountered who do not have a legal basis to remain, even at levels of migration below the threshold at which the suspension and limitation on entry would be continued or reactivated.

Finally, extending the applicability of the rebuttable presumption would guard against a circumstance where an adverse litigation outcome against any aspect of this rule or its limitation on asylum eligibility would leave the Departments without sufficient tools in place to address high volumes of migration. Litigation against the IFR remains ongoing,[440] as does litigation against the Circumvention of Lawful Pathways Rule.[441] Maintaining the rebuttable presumption as a fallback measure is a commonsense way to address the possibility of a judicial decision that temporarily or permanently impairs the Departments' ability to implement this rule.

In considering whether to extend the temporal applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions and, if so, how to implement such a change, the Departments expect to consider other changes to the rule's provisions warranted by an extension, and as necessary to achieve the goals of the rule. The Departments request comment regarding any such changes and particularly welcome comments addressing whether and how extending the Circumvention of Lawful Pathways rule's temporal applicability—especially an indefinite extension—would warrant:

• Amendments to the continuing applicability provisions at 8 CFR 208.33(c)(1) and 1208.33(d)(1) regarding future applicability of the rebuttable presumption of asylum ineligibility to those who enter and are subject to the Circumvention of Lawful Pathways rule's provisions;

• Amendments to the exception to continuing applicability at 8 CFR 208.33(c)(2) and 1208.33(d)(2) for certain asylum applications filed after May 11, 2025, by noncitizens who entered as children in a family unit and who later apply for asylum as principal applicants;

---

[439] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[440] *See Las Americas Immigrant Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC (D.D.C. filed June 12, 2024).

[441] *See East Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), vacatur stayed pending appeal *East Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023); *M.A.* v. *Mayorkas,* No. 23–cv–01843 (D.D.C. June 6, 2023); *Texas* v. *Mayorkas,* No. 23–cv–00024 (W.D. Tex. May 23, 2023); and *Indiana* v. *Mayorkas,* 23–cv–00106 (D.N.D. May 31, 2023).

• Amendments to the grounds for necessarily rebutting the rebuttable presumption;
• Amendments to the exceptions to the rebuttable presumption; and
• The addition or amendment of any other specific regulatory provisions related to the Circumvention of Lawful Pathways rule in light of the proposal to extend the temporal application of the rebuttable presumption and related credible fear provisions.

## V. Regulatory Requirements

### A. Administrative Procedure Act

The Departments have forgone the Administrative Procedure Act's ("APA") delayed-effective-date procedure in implementing this rule because the Departments have found good cause to do so and because this rule relates to a foreign affairs function of the United States. *See* 5 U.S.C. 553(d)(3), (a)(1).[442] This rule generally adopts the provisions of the IFR with a few technical amendments and changes to the calculation of thresholds to ensure those provisions can remain in force until there has been a sustained decrease in daily encounters. None of the amendments, crucially, implicate the justifications for the 30-day waiting period. The purpose of the waiting period is "to give affected parties time to adjust their behavior before the final rule takes effect." *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992). Here, however, that purpose would not be served by delaying the effective date of the rule: The IFR has been in effect since June 5, and the limited changes adopted in this rule do not require anyone other than the Departments themselves to change their conduct or to take any particular steps in advance of the effective date. *See United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (noting that the "legislative history of the APA" indicates that the waiting period "was not intended to unduly hamper agencies from making a rule effective immediately," but intended "to 'afford persons affected a reasonable time to prepare for the effective date of a rule . . . or to take other action which the issuance may prompt'" (citing S. Rep.

No. 752, 79th Cong., 1st Sess. 15 (1946); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946))). Instead, the changes made by this rule address the encounter thresholds that the Departments will use to determine the applicability of the rule's suspension and limitation on entry and better ensure that the measures devised to deal with emergency border circumstances will remain in place until there has been a sustained easing of those circumstances.

In finding good cause to bypass the 30-day waiting period, the Departments have taken care to "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable [amount of] time to prepare for the effective date of [the] rul[e]." *Gavrilovic,* 551 F.2d at 1105. Here, that balance tips considerably in favor of immediate implementation, where the limited changes introduced by this rule preserve the status quo and do not interfere with the operative provisions of the IFR. At most, the amendments in this rule are designed to buttress the IFR's effectiveness in dealing with the emergency border circumstances by better ensuring that its limitation on asylum eligibility and other measures will stay in place until there has been a sustained improvement in encounter patterns across the southern border. For instance, the September 27 Proclamation and this rule provide that UCs from non-contiguous countries should be included in calculating the number of encounters to determine whether the suspension and limitation on entry remain in effect or are discontinued. They additionally provide that the suspension and limitation on entry are not to be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The changes to the threshold represent an incremental improvement upon the prior thresholds. These changes fine-tune the statistical parameters for tracking daily encounters so as to immunize the emergency measures from transitory blips in the data, but do not disturb or add to requirements imposed by the IFR.

Even in the narrow circumstances where the changes made in this final rule might have an effect on whether the rule's provisions apply, a waiting period would provide little benefit. The amendments do not impose new requirements or obligations on migrants contemplating a border crossing, nor on other entities that might claim an interest in the rulemaking, such as legal service organizations looking to help

noncitizens navigate the immigration system (or, to the extent such interests should be considered, smugglers and TCOs angling to learn about legal developments ahead of time so as to exploit perceived gaps in the border processing regime). All of those parties have long been on notice of the substantive provisions of the June 3 Proclamation and the IFR, none of which this rule purports to invalidate. The Proclamation and the IFR went into effect months ago and have since been the subject of regular public updates from DHS, as well as detailed coverage from the national news press.[443]

To the extent the threshold adjustments might have any effect in the next 30 days—*i.e.,* by preventing the IFR's emergency measures from being discontinued, when they otherwise would have turned off under the old parameters—this would only heighten the impetus for human smugglers and other criminals to inflate or distort the significance of the policy development to manufacture a sense of urgency among migrants and induce them to attempt to enter the country without delay.[444] As the Departments explained in the IFR, individuals contemplating entry into the United States may respond to both real and perceived incentives that stem from changes to border management and immigration

---

[442] There is also good cause to forgo notice and comment on the rule's updates to the cross-reference to the definition of "victim of a severe form of trafficking in persons" in 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) from "§ 214.11" to "§ 214.201." Notice and an opportunity to comment on that technical change to the cross-reference is unnecessary as it does not change the substance of the provision and merely updates a cross-reference that has been rendered imprecise by a subsequent rulemaking. *See* 89 FR at 34931–32 (moving the definitions from 8 CFR 214.11 to the newly created 8 CFR 214.201).

[443] *See* DHS, *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS–DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), *https:// www.dhs.gov/news/2024/07/24/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim;* CBP, *Statistics Show Lowest Southwest Border Encounters in Nearly Four Years* (Aug. 16, 2024), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2024-monthly-update;* Miriam Jordan & J. David Goodman, *Amid Talk of Border Chaos, Crossings Have Sharply Declined,* N.Y. Times (July 20, 2024), *https://www.nytimes.com/2024/07/20/us/border-immigration-current-situation.html;* Rebecca Santana & Elliot Spagat, *Border arrests fall more than 40% after Biden's halt to asylum processing,* Homeland Security says, AP News (June 26, 2024), *https://apnews.com/article/border-arrests-biden-asylum-mexico-immigration-6e302f06f567b96d88 cc1333aa6d10fe.*

[444] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257 c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

policies. 89 FR at 48764. In such circumstances, it may be easier for smugglers to ''prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.'' *Id.*

Immediate implementation is warranted not only in the absence of any benefit that advance notice would provide, but also to avoid the significant costs that would accrue to the Department if they had to toggle between applying and discontinuing the emergency border measures while waiting for this rule to go into effect. That is especially true for the amendment expanding the timeline over which a decline in encounters must be observed before the agencies will lift the suspension and limitation on entry consistent with the June 3 Proclamation. Prior to this rule, a one-day drop in the 7-consecutive-day average to a number below 1,500 encounters would have triggered the process by which the agencies must discontinue the emergency border measures—even if that drop turned out to be a mere one-off event amidst a longer pattern of daily encounters far exceeding 1,500. The amendments contained in this rule guard against such situations where the agencies' ability to consistently apply the rule's important measures might be disrupted by short-lived and intermittent fluctuations in the longitudinal tracking data.[445] That rationale extends to the decision to bypass the 30-day waiting period for this rule. Unless the amendments are implemented immediately, the agencies could face a predicament where they would have to abruptly suspend the emergency measures if the 7-consecutive-calendar-day-average dipped below 1,500 for a single day, only to then reverse course and reimpose the same measures as soon as encounters rose again to an average of 2,500 or more. Such sudden shifts in the

implementation of the June 3 Proclamation and IFR would be operationally burdensome to the agencies and would require the development and issuance of starkly differing instructions and internal guidance based on whether the measures had been discontinued, continued, or reactivated. The possibility of such shifts is arguably an inevitable consequence of the decision to limit the applicability of the rule's provisions to the existence of a temporary circumstance; at the same time, the Departments have sought to temper the frequency and severity of such shifts through two means: (1) in the IFR, providing for a gap between the 1,500-encounter threshold and the 2,500-encounter threshold, *see* 89 FR at 48753; and (2) in this rule, making modest changes to the provisions governing encounter calculations and discontinuation mechanics.

Finally, for similar reasons, immediate implementation is justified in light of the United States' foreign policy priorities. Because this rule involves a foreign affairs function of the United States, it is exempt from the APA's delayed-effective-date requirement. *See* 5 U.S.C. 553(a)(1); *see also* 89 FR at 48759–62. It is conceivable that had a 30-day waiting period been imposed, a very substantial one-day drop in the encounters average would have led to a discontinuation of the emergency provisions of the Proclamation and IFR. That in turn could have had a direct and immediate impact on migratory flows through other countries in the region, as those countries have articulated before. *See* 89 FR at 48761. Past experience has shown that even a *perceived* policy development can touch off a surge in irregular migration throughout the region. One regional partner, for example, concluded that the formation of caravans in the spring of 2022 was attributable to rumors of the termination of the Title 42 public health Order, which were followed by an official announcement. *Id.* Such effects are precisely the kind of ''definitely undesirable international consequences'' that the Departments seek to avoid by forgoing a waiting period. *Rajah*, 544 F.3d at 437 (quotation marks omitted). Immediate implementation also allows the United States to demonstrate its continued and shared commitment to addressing

irregular migration in the region, an objective that directly involves a foreign affairs function of the United States. *See* 89 FR at 48761–62.

In sum, the amendments introduced in this final rule do not fundamentally change the way in which the IFR addresses the emergency circumstances at the border and instead ensure that the system created in response to those circumstances remains in force until a decrease in encounters proves to be sustained. As a result, the purpose of the delayed-effective-date-requirement—providing affected parties time to adjust to changes in the status quo—would not be served by delaying effectiveness here, where the changes preserve the status quo. Moreover, even in the narrow circumstances in which this rule's changes to the thresholds would have an effect (by avoiding a discontinuation of the rule's emergency procedures due to a short-term change in encounter numbers), the Departments are unable to identify sufficient particular hardships to affected persons that would contravene fairness and potentially outweigh the Departments' considered assessment of the need for immediate implementation, including the need to avoid disruptive changes to the continuation of the rule's emergency provisions. There is good cause to forgo the 30-day waiting period for this rule and to instead implement it without delay.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Orders 12866 (''Regulatory Planning and Review''), as amended by Executive Order 14094 (''Modernizing Regulatory Review''), and 13563 (''Improving Regulation and Regulatory Review'') direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

---

[445] For similar reasons, the June 3 Proclamation provides that the suspension and limitation on entry remain in place for 14 days after the agencies have determined there has been an average of less than 1,500 encounters. This allows ''the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749.

The Office of Management and Budget has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the Office of Management and Budget has reviewed this rule.

### 1. Effects Under a Without-IFR Baseline

The primary effect of the final rule, as compared to a without-IFR baseline,[446] is to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum eligibility under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable probability of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular

migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are denied or do not seek asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail not only the loss of asylum but also its attendant benefits, although such persons may be granted statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek asylum and protection. In these cases, there would likely be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration and to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The effects should be considered relative to the baseline condition that would exist in the

absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See, e.g.,* 89 FR 67459, 67486–88.

### 2. Effects Under a With-IFR Baseline

The only expected effects of this rule relative to a with-IFR baseline would involve the changes to the thresholds discussed above. As explained in Section II.C.1 of this preamble, the amendments marginally reduce the probability that the suspension and limitation on entry will be discontinued prematurely or remain discontinued during periods in which high levels of migration place significant strain on the Departments' resources and capabilities. The amendments do so by (1) requiring the 7-consecutive-calendar-day average below 1,500 encounters to persist for 28 consecutive calendar days before the 14-day waiting period is triggered, and by (2) including encounters of UCs from non-contiguous countries when calculating encounters for the purpose of the thresholds under sections 2(a) and 2(b) of the Proclamation.

It is challenging to predict with certainty the effects of the Departments' decision to adopt these changes. Although in some circumstances the Departments' decision could reduce the likelihood that the rule's limitation on asylum eligibility and changes to the credible fear process would be discontinued or remain discontinued, the Departments have not assigned a specific probability to such circumstances occurring. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59.

If the changes to the thresholds were to result in this rule's emergency provisions remaining activated for a longer period of time than they would have been under the IFR, those changes would amplify this rule's effects relative to a with-IFR baseline. In such a circumstance, the same analysis presented with respect to the without-IFR baseline above would apply here as well, but the marginal impacts of this final rule (compared to the with-IFR baseline) are expected to be smaller than the marginal impacts of the IFR (compared to the without-IFR baseline). For instance, the primary effects of this

---

[446] The benefits and costs of a regulation under Executive Order 12866 are generally measured against a no-action baseline: an analytically reasonable forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time. *See* OMB Circular No. A–4 11 (Nov. 9, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.* For purposes of this analysis, the Departments use the without-IFR baseline as the primary baseline, and a with-IFR baseline as a secondary baseline. The primary baseline also serves as the baseline for the significance determination under section 3(f)(1) of Executive Order 12866.

rule would still be felt by noncitizens outside of the United States. And for those who are present in the United States, the rule would still likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of persecution or torture would remain in the United States. The changes made in this rule may decrease the administrative burdens associated with discontinuing and continuing or reactivating the measures contained in the rule.

3. Discontinuation Analysis Under a Without-IFR Baseline

For purposes of this assessment, the Departments have also analyzed the potential effects of the 7-consecutive-calendar-day average of encounters falling below 1,500. If that average remains below 1,500 encounters for 28 consecutive calendar days, and the 2,500-encounter threshold is not reached during the 14-day waiting period, the rule's provisions will be discontinued 14 days after the Secretary's determination and remain so until one day after the Secretary determines that the 7-consecutive-calendar-day average of encounters has reached 2,500.

The effects of discontinuation would depend on a wide range of factors that are difficult to predict and may involve factors arising from events occurring outside the United States, or entirely outside the Departments' control. Some such factors would include:

• Whether the Circumvention of Lawful Pathways rule would apply at the time of the discontinuation; [447]

• Whether metrics such as fear-claim rates and screen-in rates during the discontinuation period would resemble rates previously observed under the Circumvention of Lawful Pathways rule; [448]

• Whether, in the absence of a discontinuation, such rates would continue to resemble those observed from June 5, 2024, through August 31, 2024;

• Encounter levels and related demographics during the discontinuation period, which, in turn, are influenced by factors such as family and community networks, economic conditions, environmental and security-related push factors, responses to policy changes such as the discontinuation itself, and rapidly evolving criminal smuggling networks;

• Available processing resources;

• Tactical changes by smugglers and migrants;

• Misinformation, disinformation, or malinformation generated by smugglers and circulating online among migrant communities; and

• Whether and how soon the 2,500-encounter threshold for continuing or reactivating the rule's provisions would be reached.

Assuming the Circumvention of Lawful Pathways rule remains in effect at the time of a discontinuation, in the immediate aftermath of a discontinuation, the Departments would begin the processing of noncitizens under the Circumvention of Lawful Pathways rule's provisions: the Departments would apply the rebuttable presumption of asylum ineligibility during covered credible fear screenings and section 240 removal proceedings and employ a ''reasonable possibility of persecution or torture'' standard to screen for potential eligibility for statutory withholding of removal and CAT protection for those noncitizens who are unable to establish a significant possibility that the rebuttable presumption does not apply or that they can rebut it. Although it is impossible to reliably address these uncertainties quantitatively, the Departments offer a number of observations about the potential outcomes of a discontinuation while the Circumvention of Lawful Pathways rule applies.

Although the Circumvention of Lawful Pathways rule meaningfully improved the Departments' capacity to deliver timely decisions and consequences and is a critical tool for the Departments to incentivize the use of lawful, safe, and orderly pathways, see Section IV of this preamble, it did not yield efficiency benefits comparable to those delivered by the IFR. [449] Under

the Circumvention of Lawful Pathways rule, the average processing time for USBP encounters, from encounter to removal, was 44 days—down from 75 days in the pre-pandemic period; under the IFR, the average processing time decreased more than 25 percent as compared to the time period under the Circumvention of Lawful Pathways rule, to 32 days. [450] A comparison of the number of expedited removals processed per day is also instructive. Under the Circumvention of Lawful Pathways rule, USBP referred, on average, about 860 people for expedited removal per day, [451] while under the IFR, USBP referrals for expedited removal increased approximately 28 percent, to an average of nearly 1,100 persons per day. [452]

In particular, the elimination of lengthy and suggestive advisals and the shift to a manifestation standard under the Securing the Border rule contributes to a substantially lower proportion of noncitizens encountered between POEs at the SWB being referred for credible fear interviews. Fear-claim rates dropped from 57 percent under the Circumvention of Lawful Pathways rule to a 27 percent fear-claim rate under the IFR. [453]

The reduction in fear-claim rates allows USCIS to focus its resources more effectively and efficiently on those noncitizens who may have a fear of return to their native country or their country of removal or indicate an intention to seek fear-based relief or protection and enables DHS to more swiftly process and remove those who do not manifest a fear or express an intent to apply for asylum. [454] Congress has not provided the resources necessary to timely and effectively process and interview all those who

---

[447] In Section IV.B of this preamble, the Departments seek comment on whether to extend the applicability of that rule to certain noncitizens who enter the United States after May 11, 2025.

[448] As noted in Section II.A.2 of this preamble, under this rule, from June 5, 2024, through August 31, 2024, 27 percent of those encounters between POEs at the SWB and processed for expedited removal claimed fear, compared to a 57 percent fear-claim rate under the Circumvention of Lawful Pathways rule and a 37 percent fear-claim rate during the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Similarly, with this rule's ''reasonable probability'' standard in place, the comprehensive screen-in rate for those USBP encounters manifesting fear has decreased to approximately 57 percent, compared to approximately 62 percent for those screened under the Circumvention of Lawful Pathway rule with its lower ''reasonable possibility'' standard in place, and 83 percent in the pre-pandemic period.

OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[449] As discussed elsewhere in this preamble and in the Circumvention of Lawful Pathways rule, high

encounter rates at the southern border, combined with inadequate resources and tools to keep pace, have limited DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities. See 89 FR at 48714. This mismatch between the resources made available by Congress and large numbers of encounters creates significant stress on the border and immigration systems that forces DHS to rely on slower processing pathways—limiting the Departments' ability to more quickly deliver consequences to individuals who do not have a legal basis to remain in the United States.

[450] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[451] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[452] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[453] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[454] Id. (showing both reduced rates of fear claims/fear manifestation and reduced time from encounter to negative fear removals).

invoke credible fear procedures through the expedited removal process at the southern border, including under the Circumvention of Lawful Pathways rule. *See* 89 FR at 48732. When the Departments' ability to timely process, detain, and remove, as appropriate, noncitizens who do not establish a legal basis to remain in the United States is limited, it exacerbates the risk of severe overcrowding in USBP facilities and POEs and creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. *Id.* This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants to make the dangerous journey to the southern border to invoke credible fear procedures and take their chances on being allowed to remain in the country for a lengthy period. *Id.*

The Securing the Border rule expressly guards against the resource strains posed by very high levels of encounters; the day after the Secretary makes a factual determination that there have been 2,500 daily encounters, the Departments will again implement the Securing the Border rule, thereby reestablishing stronger incentives against irregular migration. But as discussed in Section II.C.1 of this preamble, the Departments may not be able to fully realize the benefits of the Securing the Border rule in the first few days of reactivation, because encounters made prior to reactivation must still be processed under the Circumvention of Lawful Pathways rule. Unnecessary discontinuations and reactivations also impose unnecessary costs on the Departments. And frequent discontinuations—which the changes made in this rule seek to avoid—risk signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided entirely by simply waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing.

Finally, there are of course other differences between the two frameworks as well. For instance, the Circumvention of Lawful Pathways rule affects the asylum eligibility of a smaller number of migrants, because that rule generally does not affect the asylum eligibility of Mexican nationals. For short persons, the application of the Circumvention of Lawful Pathways rule instead of the Securing the Border rule could result in

greater access to asylum and its attendant benefits, and even those determined to be subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility will be screened for statutory withholding of removal and CAT protection at the "reasonable possibility" standard, rather than the "reasonable probability" standard applied during statutory withholding of removal and CAT protection screenings under the Securing the Border rule.

### 4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

In Section IV of this preamble, the Departments also propose to extend and expand the applicability of the Circumvention of Lawful Pathways rebuttable presumption. First, in Section IV.A of this preamble, the Departments request comment on whether to expand the rebuttable presumption (which currently applies to noncitizens who "enter[ ] the United States from Mexico at the southwest land border or adjacent coastal borders" after traveling through certain third countries) such that the rebuttable presumption would also apply to noncitizens who enter across southern coastal borders by sea and irrespective of whether such noncitizens traveled through a third country before entry across the southern coastal borders. This would expand the geographic reach of the rebuttable presumption. Second, in Section IV.B of this preamble, the Departments request comment on whether to indefinitely extend the entry period (currently scheduled to end on May 12, 2025) so that the rebuttable presumption will apply to noncitizens who enter the United States without documents sufficient for lawful admission any time on or after May 11, 2023. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i).

The potential effects of such an expansion and extension are described in Section IV of this preamble. The expansion would (1) make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to irregular migration no matter where along the southern border they cross; (2) deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of

Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) ensure consistency in implementation between the Circumvention of Lawful Pathways rule's rebuttable presumption and the provisions in the Securing the Border rule.

The proposed extension of the Circumvention of Lawful Pathways rule's entry period would better preserve the Departments' ability to deliver timely decisions and consequences. Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption after May 11, 2025 would mean that when the following three conditions are satisfied—(1) the threshold for discontinuing the Securing the Border rule's provisions has been met, (2) encounters between POEs begin to exceed 1,500 encounters, and (3) the threshold for continuing or reactivating the measures in this rule is not yet met—without the ability to apply the Circumvention of Lawful Pathways rebuttable presumption, the Departments' ability to deliver timely decisions and consequences would likely be impaired. For example, assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs), approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption.[455] At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption.[456] These differences are driven by differences in fear-claim and screen-in rates.[457]

The primary effect of the Departments' proposed expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption would be to reduce incentives for irregular migration and illegal smuggling activity during periods when the threshold for discontinuing

---

[455] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[456] *Id.*

[457] *Id.*

the measures in the Securing the Border rule has been met or where that rule is otherwise not in effect due to an adverse litigation outcome against its asylum limitation or any aspect of that rule. The primary effects of such an expansion and extension would be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and subject to the rebuttable presumption, such an action would likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable possibility of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the rebuttable presumption if they meet certain exceptions, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable possibility of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of such an expansion or extension would include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the strain that further surges in irregular migration would impose on the Departments.

The direct costs of the expansion or extension would be borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rebuttable presumption but would otherwise have received asylum, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States—although such noncitizens may in the end be granted asylum despite the rebuttable presumption by operation of the family

unity provision that applies in section 240 removal proceedings. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would.

The expansion and extension of the rebuttable presumption may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rebuttable presumption to the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rebuttable presumption would require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. However, such an expansion or extension may reduce perceived incentives for irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rebuttable presumption.

Other entities may also incur some indirect, downstream costs as a result of an expansion or extension. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of such an action, which would be the application of steady-state regulations that have not been the primary mode of the processing of noncitizens at the southern border since before the Title 42 public health Order. As compared to the baseline condition, an expansion and extension would be expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See* 89 FR at 67486–88.

## C. Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), "[w]henever an agency is required by section 553 of [the APA], or any other law, to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). Such analysis requires agencies to consider the direct impact of the proposed rule on "small entities." *Id.* 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not

mandate any actions or requirements for small entities. Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA. *See* 5 U.S.C. 601(6). Based on the evidence presented in this analysis and throughout this preamble, the Departments certify that this final rule would not have a significant economic impact on a substantial number of small entities. And for the same reason, the Departments certify that the Circumvention of Lawful Pathways rule, if extended or expanded, would not have a significant economic impact on a substantial number of small entities.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI–U).[458]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition

---

[458] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Sept. 21, 2024). Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023 − Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not constitute a Federal mandate because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

### E. Congressional Review Act

The Administrator of the Office of Information and Regulatory Affairs has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). When compared to the with-IFR baseline, the changes made in this final rule[459] have not resulted in, and are not likely to result in, an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

---

[459] The Administrator of the Office of Information and Regulatory Affairs has measured the effects of this final rule with a with-IFR baseline. *See* 5 U.S.C. 804(2); *compare* Section V.B of this preamble.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

### I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### J. National Environmental Policy Act

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual 023–01–001–01") establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(c)(8), 1508.1(e). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01–001–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

The rule adopts as final the following three changes to the process for those seeking asylum, statutory withholding of removal, or CAT protection during emergency border circumstances:

• For those who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will continue to provide general notice regarding the processes for seeking asylum, statutory withholding of removal, and CAT protection, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal.

• During emergency border circumstances, those who enter the United States across the southern border and who are not described in paragraph 3(b) of the June 3 Proclamation will continue to be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of

their family as described in 8 CFR 208.30(c) when they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.

• The limitation on asylum eligibility will continue to be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation and do not establish exceptionally compelling circumstances under the credible fear screening standard will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

This rule also makes a small number of changes consistent with the overall purpose and structure of the IFR, as discussed in Section II.C of this preamble, and requests comment on the potential expansion and extension of the applicability of the Circumvention of Lawful Pathways rebuttable presumption.

Given the nature of the final rule with request for comment, DHS has determined that it is categorically excluded under its NEPA implementing procedures, as it satisfies all three relevant conditions. First, the final rule with request for comment clearly fits within categorical exclusions A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changed certain procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. This final rule makes only modest changes to the IFR and seeks comment on the expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption. Second, this final rule with request for comment is a standalone rule and is not part of any larger action.[460] Third, in accordance

with its NEPA implementing procedures, DHS has determined no extraordinary circumstances exist that would cause a significant environmental impact. Therefore, this final rule is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this final rule is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, because the final rule's limitation on asylum eligibility and the "reasonable probability" standard will be applied by EOIR in substantially the same manner as it will be applied by DHS and DOJ is not aware of any extraordinary circumstances that would require the preparation of an environmental assessment or environmental impact statement. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

### K. Paperwork Reduction Act

This rule does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

### List of Subjects

#### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Department of Homeland Security

Accordingly, the interim final rule amending 8 CFR parts 208 and 235, which was published at 89 FR 48710 on June 7, 2024, is adopted as final with the following changes:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*     \*     \*     \*     \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and this chapter, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 208.33   [Amended]

■ 3. Amend § 208.33 by removing the reference to "§ 214.11(a)" in paragraph (a)(3)(i)(C) and adding in its place "§ 214.201.

■ 4. Amend § 208.35 by:

■ a. Removing the reference to "§ 214.11" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";

■ b. Revising paragraph (b)(2)(i); and

■ c. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

The revision reads as follows:

### § 208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\*     \*     \*     \*     \*

(b) \* \* \*

(2) \* \* \*

---

[460] *See* Instruction Manual 023–01–001–01, at V–5.

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\* \* \* \* \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 5. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

### § 235.15 [Amended]

■ 6. Amend § 235.15 by removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

### Department of Justice

Accordingly, the interim final rule amending 8 CFR part 1208, which was published at 89 FR 48710, on June 7, 2024, is adopted as final with the following changes:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\* \* \* \* \*

(g) *Entry during emergency border circumstances.* For a noncitizen who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 1208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and § 1208.35, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 1208.33   [Amended]

■ 9. Amend § 1208.33 by removing the reference to "8 CFR 214.11" in paragraph (a)(3)(i)(C) and adding in its place "8 CFR 214.201".

■ 10. Amend § 1208.35 by:
■ a. Removing the reference to "§ 214.11(a)" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";
■ b. Revising paragraph (b)(2)(iii);
■ c. Removing the words "An alien" and adding in their place the words "A noncitizen", wherever they appear;

■ d. Removing the words "the alien" and adding in their place the words "the noncitizen", wherever they appear;
■ e. Removing the words "the alien's" and adding in their place the words "the noncitizen's", wherever they appear;
■ f. Removing the words "an alien" and adding in their place the words "a noncitizen", wherever they appear;
■ g. Removing the words "The alien" and adding in their place the words "The noncitizen", wherever they appear; and
■ h. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 1208.13(h).

The revision reads as follows:

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iii) Where the immigration judge determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the noncitizen under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\* \* \* \* \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

Dated: September 27, 2024.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–22602 Filed 9–30–24; 1:00 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

CHNV-FRN-00513

**48710** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 235**

[USCIS Docket No. USCIS–2024–0006]

RIN 1615–AC92

# DEPARTMENT OF JUSTICE

## Executive Office for Immigration Review

**8 CFR Part 1208**

[A.G. Order No. 5943–2024]

RIN 1125–AB32

## Securing the Border

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS"); Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA"), finding that the entry into the United States of certain noncitizens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those noncitizens. The Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. The Departments are now issuing this IFR.

**DATES:**

*Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5, 2024.

*Submission of public comments:* Comments must be submitted on or before July 8, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS–2024–0006, through the Federal eRulemaking Portal: *https:// www.regulations.gov*. Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and

may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov*, please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For the Executive Office for Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  B. Legal Authority
  C. Summary of Provisions of the IFR
III. Discussion of the IFR
  A. Current Framework
  1. Asylum, Statutory Withholding of Removal, and CAT Protection
  2. Expedited Removal and Screenings in the Credible Fear Process
  3. Lawful Pathways Condition on Asylum Eligibility
  B. Justification
  1. Global Migration at Record Levels
  2. Need for These Measures
  3. Description of the Rule and Explanation of Regulatory Changes
  C. Section-by-Section Description of Amendments
  1. 8 CFR 208.13 and 1208.13
  2. 8 CFR 208.35
  3. 8 CFR 1208.35
  4. 8 CFR 235.15
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  1. Foreign Affairs
  2. Good Cause
  B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Family Assessment
  I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  J. National Environmental Policy Act
  K. Paperwork Reduction Act

## List of Abbreviations

AO    Asylum Officer
APA    Administrative Procedure Act
BIA    Board of Immigration Appeals (DOJ, EOIR)
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CBP    One app CBP One mobile application
CDC    Centers for Disease Control and Prevention
CHNV    Cuba, Haiti, Nicaragua, and Venezuela
DHS    Department of Homeland Security
DOD    Department of Defense
DOJ    Department of Justice
EOIR    Executive Office for Immigration Review
FARRA    Foreign Affairs Reform and Restructuring Act of 1998
FRP    Family Reunification Parole
FY    Fiscal Year
HSA    Homeland Security Act of 2002
ICE    U.S. Immigration and Customs Enforcement
IFR    Interim Final Rule
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ    Immigration Judge
INA    or the Act Immigration and Nationality Act
INS    Immigration and Naturalization Service
MPP    Migrant Protection Protocols
NGO    Non-Governmental Organization
NEPA    National Environmental Policy Act
NTA    Notice to Appear
OHSS    Office of Homeland Security Statistics
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
POE    Port of Entry
RFA    Regulatory Flexibility Act
SWB    Southwest Land Border
TCO    Transnational Criminal Organization
UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UIP    U.S. Customs and Border Protection Unified Immigration Portal
UMRA    Unfunded Mandates Reform Act of 1995
UNHCR    United Nations High Commissioner for Refugees
USBP    U.S. Border Patrol
USCIS    U.S. Citizenship and Immigration Services

## I. Public Participation

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments

that relate to the economic, environmental, or federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov*.

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov*, referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens [1] is detrimental to the interests of the United States, and

suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term "emergency border circumstances" to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at

the southwest land border ("SWB").[4] In

250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder, unhcr.org/refugee-statistics/download/?url=PhV1Xc* (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8, 9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation, https://www.unhcr.org/emergencies/venezuela-situation* (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB" and "the southern border." In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. As defined in section 4(d) of the Proclamation, the term "southern border" includes both the southwest land border ("SWB") and the southern coastal borders. As defined in section 4(c) of the Proclamation, the term "southwest land border" means the entirety of the United States land border with Mexico. And as defined in section 4(b) of the Proclamation, the term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico. The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used. The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations. The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented. *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.*, 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most "Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas. Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands. Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.'"); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), *https://www.pbs.org/newshour/world/more-than-100-migrants-stranded-near-puerto-rico-await-help-during-human-smuggling-operation* ("Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats. Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and

Continued

---

[1] For purposes of this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr*, 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees ("UNHCR") data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans,

CHNV-FRN-00515

response to record levels of encounters at the SWB,[5] the United States

Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6] These steps include:

• Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) ("Circumvention of Lawful Pathways rule");

• Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection ("CBP") operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

• Deploying over 1,000 additional Department of Defense ("DOD") personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

• Processing record numbers of individuals through expedited removal;[9]

• Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

• Expanding opportunities to enter the United States for seasonal employment;[11]

• Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry ("POEs") through the CBP One mobile application ("CBP One app");[12]

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year ("FY") 2021 to up to 50,000 in FY 2024;[13]

violence."); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/*; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/*; United States Coast Guard, *Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-search-for-possible-survivors/*; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/*. There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year ("FY") 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019—roughly a 90-fold increase. Office of Homeland Security Statistics ("OHSS") analysis of March 2024 OHSS Persist Dataset.

[5] At the SWB, U.S. Customs and Border Protection ("CBP") completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf* (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf* (apprehensions from FY 1996 to FY 2002). In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's ("CDC's") Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process. DHS primarily relies on two separate datasets for most of the data in this IFR. Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay. Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which

combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process. Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates. The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records. CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by six percent between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR. Excluding March through April 2020, which was an unusual case because of the onset of the COVID-19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 others experiencing increases.

[6] See DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border*.

[7] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), *https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border*.

[8] *Id.*; see also DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2,

2023), *https://www.defense.gov/News/News-Stories/Article/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/*.

[9] In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal ("UIP") on April 2, 2024.

[10] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration*.

[11] DHS, *DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), *https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024*.

[12] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration*; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day*.

[13] U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023), *https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/*.

• Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019; [14] and

• Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734. [15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency [16]— the border security and immigration systems have not been able to keep pace with the number of individuals arriving at the southern border. [17] Simply put, the Departments do not have adequate resources and tools to deliver timely

decisions and consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes. [18]

This became even more clear in the months following the lifting of the Title 42 public health Order. [19] As the Departments resumed widespread processing under title 8 authorities, the insufficiency of both the available statutorily authorized tools and the

resources provided to implement them came into stark focus. Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade, [20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record. [21] While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble. [22] This

---

[14] See EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1–2 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.*

[15] See EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline* (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] See *supra* note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] See Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[18] *Id.; see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border."). DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023. 170 Cong Rec. H1809–10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents."). However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements. Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year. The hiring process requires time and resources to bring additional agents on board. For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training. *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19"). Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023. *See* 88 FR at 31319.

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-*

Continued

substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers. Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23] This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the

INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). After an IJ, a process that can take several years to conclude.[25] These immigration court proceedings can be less resource intensive for processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States. This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID–19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30] The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32] All of these factors, taken together, pose significant threats to the

---

*monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains. Similar to FY 2022, during FY 2023, Enforcement and Removal Operations' limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior." Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf*. In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations." Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 26, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*. OHSS estimates that

1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html*.

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border,* Insight Crime (June 28, 2023), *https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/*.

[29] *See supra* note 25.

[30] *See, e.g.,* Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

CHNV-FRN-00518

safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. By suspending and limiting entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the

Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01 a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for

the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT'').[36] The Homeland Security Act of 2002 (''HSA''), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary ''with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,'' except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions ''necessary for carrying out'' the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with ''such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR].'' INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to ''establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out'' the Attorney General's authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a (''section 240 removal proceedings''). These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1). With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (''BIA''), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai,* 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the ''determination and ruling by the Attorney General with respect to all questions of law shall be controlling.'' INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37] Section 208 of the INA, 8 U.S.C. 1158, authorizes the ''Secretary of Homeland Security or the Attorney General'' to ''grant asylum'' to a noncitizen ''who has applied for asylum in accordance with the requirements and procedures established by'' the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a ''refugee'' within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to ''establish[ ]'' ''requirements and procedures'' to govern asylum applications. *Id.* The statute further authorizes them to ''establish,'' ''by regulation,'' ''additional limitations and conditions, consistent with'' section 208, under which a noncitizen ''shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to ''provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]'').[38] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (''Refugee Protocol''), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention''). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouler'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' Refugee Convention, *supra,* 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

---

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

[37] The HSA further provides, ''Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General.'' Public Law 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the ''Attorney General'' in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations    **48717**

Congress implemented these obligations through the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS and DOJ have implemented the obligations of the United States under Article 3 of the CAT in the Code of Federal Regulations, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the

asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has been the Executive Branch's consistent position for four decades.[40] That longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[ ]." *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute,

first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.,* as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

*Cf., e.g., Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA," while emphasizing the particular "sphere[ ]" in which it operates).

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration." Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also

Continued

[39] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

### C. Summary of Provisions of the IFR

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border (''Presidential Proclamation of June 3''):

• During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11.

• During emergency border circumstances, rather than asking

---

invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for ''any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe,'' the Attorney General could issue regulations governing entry during such an emergency to ''deny [certain noncitizens] a hearing . . . in special cases'' notwithstanding the ordinary exclusion hearing provisions governing entry). This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

---

specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The ''reasonable probability'' standard is defined to mean substantially more than a ''reasonable possibility'' but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.

### III. Discussion of the IFR

#### A. Current Framework

1. Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney General if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1)–(2), 8 U.S.C. 1158(b)(1)–(2)

(providing that, unless subject to a mandatory bar, the Secretary or Attorney General ''may'' grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining ''refugee''). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or, if they have no nationality, their last habitual residence, (2) receive employment authorization incident to their status, (3) may be permitted to travel outside of the United States and return with prior consent, and (4) may seek derivative benefits for their spouses or children. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez,* 594 U.S. 523, 536 (2021) (''[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]'' (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing for return to the United States after travel with a requisite travel document for a ''person who holds . . . asylum status pursuant to section 208 of the Act''); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the ''Secretary'' with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as ''affirmative'' or ''defensive'' applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are ''affirmative'' filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are ''defensive'' filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted

---

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the United States under Article 3 of the CAT. FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would ''more likely than not'' face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman Chavez,* 594 U.S. at 536 (''distinguish[ing] withholding-only relief from asylum'' on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does

not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that ''the Act does not permit derivative withholding of removal under any circumstances''); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (''IIRIRA''), Public Law 104–28, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to certain noncitizens present or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be ''removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution.'' *Id.*

Congress created a screening process, known as ''credible fear'' screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection. If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4). A noncitizen has a ''credible fear of persecution'' if ''there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the

alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f), 8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively, USCIS can retain jurisdiction over the application for asylum for further consideration in an asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive credible fear determination is treated as the asylum application, and strict timelines thereafter govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii), 208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum, subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1). Where USCIS does not grant asylum, the AO's decision will also include a determination on eligibility for statutory withholding of removal and CAT protection based on the record before USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and the record the AO developed during the asylum merits interview, as supplemented by the parties, serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(1), (f)(2)(ii)(B). The IJ reviews applications for asylum de novo and also reviews applications for statutory withholding of removal and CAT protection de novo where USCIS found the noncitizen ineligible for such protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for statutory withholding of removal or CAT

protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection. 8 CFR 1240.17(i)(2). With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible. *Id.*

### 3. Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention ("CDC") issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45] The CDC's Title 42 public health Order was extended multiple times.[46] While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA. Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) ("Circumvention of Lawful Pathways NPRM"). In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that "most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future"). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.*, and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless,

last habitual residence, that is a party to the Refugee Convention or Refugee Protocol. 8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii). A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule ("Lawful Pathways condition") applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C. 265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), *https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf*.

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear ("NTA") to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

### B. Justification

#### 1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the 2010s, a growing share of migrants were from northern Central America[48] and, since the late 2010s, from countries throughout the Americas.[49] Since 2010,

the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond). Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol ("USBP") encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018. *See* 88 FR at 11708. This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011. *Id.* at 11708, 11716. Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border— demographics that present unique challenges due to their vulnerability.[51]

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID–19 pandemic—continued to increase in FY 2021 and FY 2022.[52] In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53] In FY 2022, encounters at the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics ("OIS") Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.*, INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf*. For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States*, 86 J. Am. Hist. 518, 522–27, 530–31, 535–36 (1999).

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras. 88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March); and all other countries

accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54] FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55] By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56] This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years. *See* 88 FR at 11716.[57] In 2019—prior to the implementation of the Title 42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear

claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate citizens of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on those nationals.[60]

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014

to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

---

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters). During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded. *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset. Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs. Even if 100 percent of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Citizenship").

[60] *See* 88 FR at 11708–11.

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexico side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Selected Citizenship").

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

CHNV-FRN-00526

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66] This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67] This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68] And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy. DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of information explaining the credible fear process;[72] returning certain third-country nationals to Mexico, consistent

with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75] These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today. DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76] A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The

sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff. Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85] To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86] This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led

---

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

to significant challenges for local border communities.[88] For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89] In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90] Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91] The surge in encounters also placed strain on interior cities. In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95]

These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97] Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs. After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98] While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the

Circumvention of Lawful Pathways rule and complementary measures.[99]

While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month.[101] That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to. For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102] And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels

---

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), *https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; see also* Mayor of Chicago Declares Emergency Exec. Order No. 2023–2 (May 9, 2023).

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), *https://www.justice.gov/eoir/media/1344816/dl?inline.*

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under Title 42 authority.

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf*; Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge,* CNN (Dec. 22, 2023), *https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html.*

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences to those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments. In response to the record high levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations. As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023;[105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening;[106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107] On

January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly. The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109] Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In

subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-on meetings between United States and Mexican Cabinet members in Washington, DC, Mexico's Foreign Secretary enumerated a series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115] The

---

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona.*

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations.*

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-san-diego-california.*

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-resumption-field-operations-arizona-california-and/.*

[109] *See, e.g.,* Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions,* Axios (Dec. 22, 2023), *https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions* (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection 5* (Apr. 2013), *https://ebtc.info/wp-content/uploads/2014/07/U.S.C.-Create-CBP-Final-Report.pdf* (discussing the benefits of adding staffing to land border POEs).

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/;* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/.*

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-*

bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/.*

[113] *Id.; see also, e.g.,* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; US, Mexico Agree to Strengthen Efforts to Curb Record Migration,* Reuters (Dec. 28, 2023), *https://www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/.*

[114] *See, e.g.,* Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks,* Reuters (Jan. 22, 2024), *https://www.reuters.com/world/americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/;* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc; Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents,* NPR (Dec. 10, 2023), *https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents;*

Continued

Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116] In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117] Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118] However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly

impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights." [120]

Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121] But these efforts—while significant—are likely to be less effective over time. Smuggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the

funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

2. Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend. Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. The case of migration through the Darién jungle between Colombia and Panama is illustrative. For example, between January and April, 2024, the United Nations High Commissioner for Refugees ("UNHCR") tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a sevenfold increase over migration levels during that period in 2022.[122] The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking. As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups. This has been true even as DHS has experienced sustained levels of historically high encounter levels. Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123] These

---

Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends,* Washington Office of Latin America (Dec. 15, 2023), *https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/;* Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly,* AP News (May 17, 2024), *https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e.*

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.*

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a;* Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides,* ABC News (Jan. 2, 2024), *https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555;* Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration,* AP News (Apr. 30, 2024), *https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b;* Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down,* NBC News (May 15, 2024), *https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821.*

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022. OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring—January–December 2023, https://data.unhcr.org/en/documents/details/105569* (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring—April 2024, https://data.unhcr.org/en/documents/details/108399* (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations    **48727**

international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124] The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126] But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The

model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are

justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]

---

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* 7 Nat. Hum. Behaviour 484 (2023), *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and

multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[130] *See, e.g.,* Decl. of Blas Nuñez-Neto ¶ 8, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[132] March 2024 OHSS Persist Dataset. As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component* (last modified May 15, 2024). Border encounters typically fall around the New Year and often remain lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/*

Continued

When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences. At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135] Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136] These surges affect more

CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137] These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139] On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion for CBP and $714 million for ICE for border management and enforcement and an additional $416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for supplemental funding for DHS, which would provide funding to enhance enforcement and processing, procure and operationalize needed technologies, and hire additional personnel.[141] This funding

would further support critical border enforcement efforts, including:

• An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents proposed in the President's FY 2024 budget request, as well as 300 Border Patrol Processing Coordinators and support staff;[142]

• An additional 1,600 AOs and associated support staff to process migrant claims, which would provide USCIS with the critical resources needed to expand its current credible fear interview capacity to support timely processing of those placed in expedited removal;[143] and

• An expansion of detention beds and ICE removal flight funding to sustain the current significantly increased use of expedited removal, provide necessary surge capacity, and allow DHS to process more expeditiously noncitizens who cross the SWB unlawfully and swiftly remove those without a legal basis to remain in the United States.[144]

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194, 6194 (Jan. 31, 2024); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is

enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region"). Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001. Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. OHSS Enforcement Lifecycle December 31, 2023.

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/

ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary*, 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), *https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf*; Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas*, No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas*, No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*.

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical

National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request*.

no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149] Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

• Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;

• Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;

• 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

• Shelter and critical services for newcomers in U.S. cities and States; and

• 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152] It also failed to pass the emergency supplemental funding requests that the Administration submitted. Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers. Such releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although

this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget ("OMB"), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain. Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal. Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody. Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the

---

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), *https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf* (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[148] *Id.*

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call*

it dead in the House, NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024,* at 14, 25 (Mar.

18, 2024), *https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.*

[154] *See id.* at 14, 22 (explaining that for CBP, "[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise," and for ICE, "[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise").

situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials. The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155] EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024.[156] This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157] The FY 2024 budget creates even greater strains on EOIR. EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159] EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160] As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives. Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161] USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog. In sum, the border security and immigration systems are badly strained and not functioning to provide timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration

---

[155] See DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on. Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program. Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl. DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request*.

[156] See EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/workload-and-adjudication-statistics*.

[157] See EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical 1* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[158] Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance*, *https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance*, *https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

[162] See 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] See, e.g., Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says*, CNN (July 27, 2022), *https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html*; Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), *https://www.bbc.com/news/world-us-canada-65848683*.

CHNV-FRN-00534

pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a ''manifestation of fear'' process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened ''reasonable probability of persecution or torture'' standard—a higher standard than the ''reasonable possibility'' standard under the Circumvention of Lawful Pathways rule.

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the

time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had

Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result. The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

### 3. Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation. The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168] Below is an explanation of the limitation and each change to the expedited removal and fear screening process. The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

#### a. Limitation on Asylum Eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to timely process, detain, and remove, as appropriate, and

---

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (*i.e.,* El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[168] The Departments understand that the President has directed the agencies to promptly consider issuing ''any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border.'' Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions. The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

---

[164] 8 CFR 235.3(b)(2).

[165] 88 FR at 31315.

[166] *See supra* note 25.

thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border. This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available. The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation. The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances. This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances. The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border. *See* 8 CFR 208.33(c), 1208.33(d). Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal. Thus, those provisions would not apply to those who have long since entered the United States. Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily

---

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—*e.g.*, whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(ii); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was ''permitted to enter by . . . a CBP immigration officer'' based on two sets of specified considerations ''at the time of the entry or encounter that warranted permitting the noncitizen to enter,'' *id.* Sec. 3(b)(vi)–(vii). These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention. *See id.* sec. 3(b)(vi).

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival. *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B) and (D).

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See*

exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that cannot be

8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for "exceptionally compelling circumstances" captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a "victim of a severe form of trafficking in persons" are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain "victims of severe form of trafficking in persons" as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

adequately addressed outside of the United States. Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The "exceptionally compelling circumstances" exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule. *See, e.g.,* 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families. *See* 8 CFR 208.35(c), 1208.35(c). Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings. Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection. *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) ("[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien"), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), *and* 8 CFR 1208.16(c) (not providing for derivative CAT protection); *see also Sumolang* v. *Holder,* 723 F.3d 1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance). Again, mirroring EOIR's

family unity provision in the Circumvention of Lawful Pathways rule, *see* 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings. 8 CFR 1208.35(c). The Departments have determined that the possibility of separating the family should be avoided. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) ("It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.").

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's. The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings. *See* 88 FR at 11725–26; 88 FR at 31336–37. For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision. *See* 8 CFR 208.35(c). This provision is discretionary to allow USCIS flexibility as it implements the new process. The Departments request comment on whether to adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority To Impose Additional Limitations on Asylum Eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility. Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum. When section

208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that the noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS*, 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko* v. *INS*, 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe* v. *Mukasey*, 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989). 55 FR at 30678. Specifically, although the statute defines a "refugee" and thus allows asylum for a noncitizen based on a showing of past "persecution or a well-founded fear of persecution," INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a presumption of a well-founded fear of future persecution, which can be rebutted by showing that circumstances have changed such that the noncitizen no longer has a well-founded fear of future persecution or that the noncitizen can relocate to avoid persecution and under all the circumstances it is reasonable to expect the noncitizen to do so.[173] 8 CFR 208.13(b)(1), 1208.13(b)(1). Where the presumption is rebutted, the adjudicator, "in the

exercise of his or her discretion, shall deny the asylum application." [174] 8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i). In 1990, Congress added a mandatory statutory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4978, 5053.

With the passage of IIRIRA, Congress added three categorical statutory bars to the ability to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or multilateral agreement, to a third country where they would not be persecuted on account of a specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in the United States; and (3) noncitizens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars that had been set forth in the Attorney General's asylum regulations. These bars cover (1) noncitizens who "ordered, incited, assisted, or otherwise participated" in the persecution of others; (2) noncitizens who, having been convicted of a "particularly serious crime," constitute a danger to the United States; (3) noncitizens for whom there are serious reasons to believe committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a "danger to the security of the United States"; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and

conditions on the granting of asylum. The INA provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum" so long as those conditions or limitations are "not inconsistent with this chapter," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR") (limit on eligibility for applicants subject to certain presidential proclamations);[175] Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar final rule") (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States);[176] Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses);[177] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called "humanitarian asylum," where the noncitizen establishes "compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution" or "that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to the [noncitizen's] country." 8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

[175] *See O.A.* v. *Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant* v. *Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.*, 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

Removal Proceedings; Asylum Procedures, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang,* 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility. *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

ii. Litigation Over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions. The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f). In *East Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically rendered certain noncitizens ineligible for asylum if they entered the United States in violation of a presidential proclamation or other presidential order suspending or limiting the entry of noncitizens along the southern border. The relevant presidential proclamation in that case suspended entry of all migrants along the southern border except those who entered at a POE. *See id.* at 659. The court held that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." *Id.* at 670.[179]

The Departments regard this rule as substantially different than the rule the Ninth Circuit deemed invalid in *East Bay III.* The Proclamation and limitation on asylum eligibility at issue here differ significantly from the prior categorical bar on "manner of entry" because they do not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether—during emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established during these emergency situations when it is essential that noncitizens use such pathways to ensure the United States Government's ability to manage the border. And even during these situations, AOs and IJs have the ability to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III.* The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (*i.e.,* the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible

---

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect. On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions. *E. Bay Sanctuary Covenant* v. *Biden,* 93 F.4th 1130 (9th Cir. 2024).

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B). *See East Bay III,* 993 F.3d at 676–77.

to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula,* 19 I&N Dec. at 473; *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons detailed above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440– 41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.,*

*Singh* v. *Nelson,* 623 F. Supp. 545, 560– 61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

### iii. Litigation Over Other Limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), must "further[ ] the purpose" of another provision in section 208 to be "consistent with" it. 994 F.3d at 977, 977–80. The Departments disagree. A requirement that additional asylum limitations can only "further[ ] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum bars that do not further the purpose the Ninth Circuit identified—*e.g.,* the one-year filing deadline and the bar on successive applications—it has granted to the Departments the broad discretion to add more such bars. The Ninth Circuit's approach is also inconsistent with *Trump* v. *Hawaii,* 585 U.S. 667, 690–91 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The statutory asylum bars likewise do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. *See, e.g.,* INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those whose orders of removal have been reinstated regardless whether they have asylum claims stemming from events that occurred after the original order of removal); *see R–S–C* v. *Sessions,* 869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a limitation on asylum eligibility.[180] The President has determined that, under certain emergency border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration. And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum. Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision. Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted. Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)– (C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak. Congress did

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts. The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case. *Envtl. Def. Fund, Inc.* v. *EPA,* 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996). The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy. *Id.* Other courts have adopted the same understanding of "consistent with." *See, e.g., Jimenez-Rodriguez* v. *Garland,* 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.' " (quoting *Nuclear Energy Inst., Inc.* v. *EPA,* 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n* v. *Sec'y of U.S. Dep't of Transp.,* 960 F.3d 872, 878 (6th Cir. 2020) (" '[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it. Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory. Consistency does *not* mean exact, point-by-point correspondence." (cleaned up)).

not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility. Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief ''appears in the best interests of th[e] country,'' *Matter of Marin,* 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades). The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's ''circumvention of orderly refugee procedures'' to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula,* 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's ''manner of entry or attempted entry.'' *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 244 (2001); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993); *Yang,* 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the

President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula,* the BIA explained that a noncitizen's ''circumvention of orderly refugee procedures,'' including their ''manner of entry or attempted entry,'' is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g., id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who ''circumvent orderly refugee procedures,'' consistent with *Matter of Pula,* 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions for asylum.[181]

iv. This Limitation on Asylum Eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182] Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above. The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the ''best interests of th[e] country,'' *Matter of Marin,* 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it. Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus ''consistent with'' it. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang,* 79 F.3d at 939 (observing that ''it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208''); *see also id.* at 935 (''We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . .' that is, if it rationally pursues a purpose that it is lawful for the

reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.' '' *Matter of Pula,* 19 I&N Dec. at 473. ''The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, irrespective of such alien's status.' '' *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum ''irrespective of [their] status.'' *Id.* ''Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion.'' *Id.*

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule. *See E. Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

[immigration agencies] to seek.' '' (quoting *Reno,* 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements. Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez,* 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking' '' (quoting *Heckler* v. *Campbell,* 461 U.S.458, 467 (1983))); *Reno,* 507 U.S. at 313–14 (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules" (quotation marks omitted)); *Fook Hong Mak,* 435 F.2d at 730 (upholding INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *see also Singh,* 623 F. Supp. at 556 ("attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens"); *Matter of Salim,* 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula,* explaining that a certain form of entry can be considered an "extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities"); *cf. Peulic* v. *Garland,* 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean,* 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros* v. *Lynch,* 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion

for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY

2019) average of approximately 239,000 to more than 717,000 in FY 2023.[183] Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal. The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184] But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185] Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation. At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for

---

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

*v. Application During Credible Fear Screenings and Reviews*

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal ''without further hearing or review'' unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption—specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied asylum or other protection in a third country and those who were unable to schedule an appointment through the CBP One app for certain reasons. *See* 8 CFR 208.33(a)(2)(ii)(B)–(C), 1208.33(a)(2)(ii)(B)–(C). Given the Departments' experience with implementing the Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and exceptions established here will be just as straightforward to apply as the similar provisions are for the Circumvention of Lawful Pathways rule.

*b. Manifestation of Fear*

This rule also alters certain aspects of the expedited removal process for individuals who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. When an immigration officer inspects a noncitizen at a POE or between POEs and determines that the noncitizen is inadmissible and will be subject to expedited removal, current regulations require the immigration officer to take certain steps before ordering the noncitizen removed from the United States. *See* 8 CFR 235.3(b). This process takes approximately two hours per individual in USBP custody. In particular, the immigration officer conducts an inspection, including taking biometrics; running background checks; collecting biographic information, citizenship, and place and manner of entry; and advising the noncitizen of the charges against them. 8 CFR 235.3(b)(2)(i). The noncitizen has an opportunity to provide a response. *Id.* The officer must also read (or have read through an interpreter, if appropriate) the information contained in the Form I–867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in the United States. *Id.* The examining immigration officer must also read the noncitizen the questions on the Form I–867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any fear of return or would be harmed if returned. *Id.* After the noncitizen has provided answers to the questions on Form I–867B, the immigration officer records the answers, and the noncitizen then reads the statement (or has the statement read to them) and signs the statement. *Id.* On average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I–867A and the Form I–867B. Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M–444, which includes more detailed information about the credible fear process. 8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is

---

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's ''reasonable probability'' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview. These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a). Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above. 8 CFR 235.3(b)(2)(i). However, the immigration officer will not complete either the Form I–867A or Form I–867B or a sworn statement. Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear. *See* 8 CFR 235.15(b)(4). Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. *See id.* This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187] In such situations, the immigration officer will not proceed further with the removal and will comply with the existing regulations, policies, and procedures, including as outlined in 8 CFR 235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews. At the time that a noncitizen is referred for a credible fear interview, they will receive additional information about the credible fear process that has the same substantive information as in the current process, but without the requirement that such information be provided on a particular form.

DHS is making these changes to address the emergency circumstances at the southern border discussed in the

Proclamation and the rule in a manner consistent with its legal obligations. DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO so long as those procedures are consistent with the INA. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

DHS believes that the above-described changes are fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an AO for a credible fear interview. Instead, the statute provides that the immigration officer may order removed any noncitizen who, subject to certain exceptions, is arriving in the United States, or who is within a class of noncitizens subject to expedited removal as designated by the Secretary, and who is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). The statute further provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). But the statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture. Moreover, Congress has not provided a particular definition of the phrase "indicates . . . an intention." The statute's text thus gives DHS discretion to employ the procedures it reasonably concludes are appropriate to implement

section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States' international law obligations. As described in Section II.B of this preamble, the United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.[189] Neither the Refugee Convention nor the Protocol prescribes minimum screening procedures that must be implemented.[190] Rather, each state party has the authority "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191] The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured. *See Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 (" '[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse. *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.* A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

[188] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 543 (1950) ("'[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.*

[191] *Id.*

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48741**

Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' '' (quoting the Senate resolution of ratification)). The CAT similarly does not prescribe screening requirements. As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States. The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. The Departments have concluded that the manifestation standard is consistent with their obligations (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a ''manifestation'' standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal, that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim. DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194] Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see these signs. The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the

Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the sign and video will be presented will be read the contents of the sign and video in a language they understand.[199]

---

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground. As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. And the United States implements its obligations under the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, '' 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' '' is understood to mean '' 'if it is more likely than not that he would be tortured' ''); *see also Pierre,* 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS ''shall provide information concerning the asylum interview . . . to aliens who may be eligible,'' is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and ''may'' be eligible for an interview. In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States. As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview. That explanation will be translated into certain common languages or will be read to the noncitizen if required.

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf*; CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; see also* DHS, *DHS Language Access Resources, https://www.dhs.gov/publication/dhs-language-access-materials* (last updated July 17, 2023); DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last updated Mar. 10, 2021).

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in custody of the amenities available to them (*e.g.,* food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the
Continued

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service ("INS") provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would "ensure that bona fide asylum claimants are given every opportunity to assert their claim[s]," and that it was including the requirement that immigration officers must provide advisals about the credible fear process and ask questions about fear as "safeguards" to "protect potential asylum claimants." *See* 62 FR at 10318–19. INS further explained that these procedures would "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S.

502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show "good reasons" for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews[201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to "arriving aliens," noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens between POEs annually.[204] The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205] In February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and USBP

processed more than 28,000 in March 2024.[207] Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209] These high levels of encounters and credible fear referrals impose a significant burden on the expedited removal process and have strained DHS and EOIR resources, substantially impairing the Departments' ability to deliver timely decisions and timely consequences. At a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days— processing the approximately 28,000 expedited removal cases in March 2024 under the current process. High numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded.[210] This type of crowding in USBP facilities creates health and safety concerns for noncitizens and Government personnel.[211]

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process. AOs and IJs must devote substantial resources to credible fear interviews and reviews.[212] Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf.*

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000,* at D1 (Jan. 2001), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf* (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925–2020, https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf* (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

---

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf.*

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the "SW Border Credible Fear Screenings Referred to USCIS by citizenship" tab); *see also* 88 FR at 31314, 31326, 31381.

---

areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

the expedited removal process.[213] Therefore, DHS has determined that a different approach is needed here. The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances. It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I–867A and B. DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum. DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons outlined below. At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection. Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States. DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day. In FY 2019, prior to COVID–19, for example, the approximately 28,000 officers of CBP's Office of Field Operations [214] processed more than 1.1 million people at POEs every day.[215] USBP's 20,000 agents [216] encountered more than 2 million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997. It therefore has nearly 30 years of experience completing the Form I–867A advisals and asking the questions on Form I–867B.[218] Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I–867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims— particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum. For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I–867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. DHS anticipates that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I–867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes

[213] See Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18 cv 6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida* v. *Mayorkas*, No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab* v. *Wolf*, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

[214] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Jan. 30, 2024).

[215] See CBP, *On a Typical Day in 2019, CBP . . . , https://www.cbp.gov/newsroom/stats/typical-day-fy2019* (last modified May 11, 2022).

[216] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Apr. 19, 2024).

[217] See CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[218] See 62 FR at 10312, 10318–19.

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of "acquiescence," in which individuals tend to "consistently agree to questionnaire items, irrespective of item directionality." Shane Costello & John Roodenburg, *Acquiescence Response Bias— Yeasaying and Higher Education,* 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. *See, e.g.,* Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences,* 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions,* 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I–867A information and the Form I–867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. *See, e.g.,* Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 16–18 (2005), *https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf* ("USCIRF Report") (finding that noncitizens who are read the information in Form I–867A are seven times more likely to be referred for a credible fear interview and "the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked"); *see also* U.S. Gov't Accountability Off., *Opportunities Exist to Improve the Expedited Removal Process,* No. GAO/GGD–00– 176 (Sept. 2000). DHS acknowledges that one study concluded that there was "little evidence" that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied "spontaneously expressed fear of returning to their home country." *See* USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I–867A. *See id.* Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held "concerns that [noncitizens] may be 'prompted' to express fears to officers by the I–867B fear questions." *Id.* As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I–867A raise similar "prompting" concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I–867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I–867B questions, individualized Form I–867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that because these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I–867B questions, there are studies that show that such advisals make it more likely that a noncitizen will indicate a fear of return.[223] However, based on DHS's

experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims. This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225] This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic—while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227] A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse.[228] An individual who may

not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear. In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear. If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience. Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically. DHS believes that this experience, coupled with guidance, will help agents and officers effectively

---

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

[223] See, e.g., USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos. But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer. Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (notifying the public that U.S. Coast Guard personnel were provided updated training "on identifying manifestations of fear by interdicted migrants").

[226] See *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] See U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (noting implementation of training that "demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear").

[228] *Id.*

identify noncitizens with potential fear or asylum claims under a manifestation approach. Therefore, DHS believes that this rule remains consistent with the need to "safeguard[]" the rights of asylum seekers. *See* 62 FR at 10319. Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule. In particular, DHS anticipates that omitting the requirement to complete Form I–867A and I–867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024— approximately 14,000 extra personnel hours per month.[229] This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection. Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule. As discussed above, given the number of noncitizens and the time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the "manifestation of fear" standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process. During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection. Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble. DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

c. Raising the Standard for Protection Screening

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim. *See* 8 CFR 208.35(b)(1)(i). The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231] *See* 8 CFR 208.35(b)(2)(i). Likewise, when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture. *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications." 88 FR at 11742. In addition, "the legislative history regarding the credible fear screening process references only asylum." *Id.* at 11743. By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a "reasonable possibility" screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used "in other contexts where noncitizens would also be ineligible for asylum." 88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.,* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing "the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context"). Under the Circumvention of Lawful Pathways rule, "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." 88 FR at 11742. For those noncitizens, the Departments implemented a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

[230] See Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

uses a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard,[234] compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235] From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately resulted in a grant of protection or relief.[236]

Screening under the "reasonable possibility" standard has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage. Although fewer noncitizens are screened in under the "reasonable possibility" standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule.[237] Under the emergency border circumstances described in the Proclamation and this rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed, and overall border security and immigration systems efficiencies outweigh any challenges related to training on a new screening standard and a possible marginal increase in interview length resulting from the application of a new standard in screening interviews. Likewise, the benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard. Swiftly removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period. *See, e.g.,* 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who the Departments are confident are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to "reasonable probability of persecution or torture" during the emergency border circumstances described in the Proclamation and this rule. The Departments define this "reasonable probability" standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony[239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

The Departments view the difference between the "reasonable possibility" standard and the new "reasonable probability" standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the "reasonable possibility" standard where evidence in the record of country conditions

---

[232] Decl. of Blas Nuñez-Neto ¶ 7, *M.A.* v. *Mayorkas,* No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (*i.e.,* positive and negative fear determinations). *See id.* ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[234] OHSS analysis of data downloaded from UIP on April 2, 2024. At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent date for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent). In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[238] *See also, e.g.,* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border

enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

CHNV-FRN-00550

indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma* v. *Garland,* 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain* v. *Rosen,* 985 F.3d 634, 646 (9th Cir. 2012))); *Prasad* v. *INS,* 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara* v. *Gonzales,* 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab* v. *INS,* 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez* v. *Barr,* 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard* v. *Sessions,* 881 F.3d 1042, 1047 (7th Cir. 2018) ("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga* v. *Lynch,* 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes* v. *Lynch,* 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve

[the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz* v. *Holder,* 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable possibility" standard because it provides more specificity as to why the noncitizen believes he would be harmed. The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out. The level of specificity and certainty that the "reasonable probability" standard requires remains lower than the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241] This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required. AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242] If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the Circumvention of Lawful Pathways rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule

the Departments are addressing emergency border circumstances rather than regulating to change the status quo. The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g., Matter of Mogharrabi*, 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine—depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may

be the case that where a noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244] Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen. *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is not a

significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence—whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the process is functioning

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.* Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf,* which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.* Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence. *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1(a) (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ). Federal Government country

conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look. *See, e.g., Sowe v. Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen v. U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

more effectively.[246] Screening out those unlikely to establish eligibility for protection has the added benefit of saving United States Government resources overall because fewer noncitizens who are unlikely to establish eligibility for protection will be placed into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of different screening standards to "the same or a closely related set of facts" might result in inefficiencies. *See* 87 FR at 18091; *see also* 88 FR at 11746. The Departments note, however, that under this rule, that is unlikely to be the case. The facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture. For example, whether the noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal and so only the "reasonable probability" standard will be applied to the facts relevant to their persecution or torture claim. And where a noncitizen meets such an exception, they will continue to be eligible to pursue asylum in addition to any claim of persecution or torture,

and those claims will all be considered only under the "significant possibility" standard. Similarly, whether a noncitizen faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

**d. The Scope of This Rule**

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize

the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize the

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and

2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

[249] *See, e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

limitations on the ability to deliver timely consequences.[250]

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal. This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251] The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context. From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252] The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253] As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those

encountered at the SWB using comparatively few resources. *See* 88 FR at 11708, 11716.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that May surge.[254] Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs above 2,500 per day.[255] In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256] However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020. Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257] Finally, and as described in

greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID–19

---

[250] See Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication. However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary. And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] See CBP, *Custody and Transfer Statistics* (May 15, 2024), *https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

[254] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period. For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of March 2024 OHSS Persist Dataset. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980–1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

pandemic.[262] The global COVID–19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263] As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews. In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus. Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265] As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration. This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular

migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources. As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases. This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters. Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented. This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily

encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS does not

---

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.*

[266] March 2024 OHSS Persist Dataset.

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

Continued

have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271] The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer most individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal. Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day. As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs. Given current resources, however, and in the absence of congressional action, there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272] During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273] This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274] As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275] This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries. DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings. By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated

---

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*; *see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape*, Migration Pol'y Inst., at 1 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8–9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be

repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48753**

encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.[279] During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals. During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281] Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282] At the same time, the proportion of encounters

involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283] Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great

deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's

---

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March. OHSS analysis of March 2024 OHSS Persist Dataset.

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more efficiently and in a more orderly way than individuals encountered between POEs.[288] This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly. CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry—reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization. Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500. Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances. Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

## C. Section-by-Section Description of Amendments

### 1. 8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility,* to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13. Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

### 2. 8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances. This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility. Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation. This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

• Faced an acute medical emergency;

• Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

• Satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291] Paragraph (a)(2)(iii) deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition. This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of

---

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

[288] *See, e.g.,* 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an

action. Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely*

---

*Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[291] *See, e.g.,* 88 FR at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.").

Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the "reasonable probability" standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order. Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a). The paragraph sets forth three possible procedural scenarios depending on the AO's findings. First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below. *See* 8 CFR 208.35(b)(1)(i). Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of

eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f). *See id.* 208.35(b)(2)(ii). Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii). Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture

pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application. 8 CFR 208.3(a)(2). Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard. *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim. USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility. Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application. For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination. *See id.* 208.35(b)(2)(ii). Under this IFR, if the applicant does not submit the

---

[292] In the Circumvention of Lawful Pathways rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard. *See* 88 FR at 31380. That discussion in the Circumvention of Lawful Pathways rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

[293] In such cases, consistent with the Circumvention of Lawful Pathways rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ. USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border. Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. *See id.* 208.35(b)(2)(iii). If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v). *See* 88 FR at 11747; 88 FR at 31423. The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for

asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.;* 88 FR at 11747; 88 FR at 31418–19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher screening standard if the limitation remained in force would be subject to it in the event of an injunction—*i.e.*, those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear

screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity provision where the other requirements are met. The expressly permissive, discretionary nature of this provision, which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48757**

such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294] The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue. The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application. For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available

after the end of the emergency border circumstance during which the applicant entered. Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This

approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule. *See id.* 208.35(e).

### 3. 8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances. This provision applies notwithstanding any contrary provision in EOIR's regulations. Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations. Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ. *See* 8 CFR 1208.35(b)(1). The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations. First, where the IJ determines that the

---

[294] Under this rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance. 8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 1208.33(b). *See id.* 1208.35(b)(2)(i).[295] This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30. Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30. *See id.* 1208.35(b)(2)(ii). Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a "reasonable probability" standard to parallel the standard adopted by DHS. *See id.* 1208.35(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule. *See id.* 1208.33(c), 1208.35(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above. If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. *See id.* 1208.35(e).

### 4. 8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission,* a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in section 3(b) of the Proclamation. *See* 8 CFR 235.15. The changes would not affect implementation of 8 CFR 235.3(b)(4)(ii) or any other portion of 8 CFR 235.3. *See id.* The changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement using Form I–867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.* Under the existing regulations, the examining immigration officer reads (or has read) to the noncitizen all information contained on Form I–867A. Following questioning and recording of the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining immigration officer records the noncitizen's response to the questions contained on Form I–867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this current process during emergency border circumstances. Under this procedure, Forms I–867A and I–867B will no longer be mandated in such circumstances. Instead, the immigration officer shall advise the individual of the charges against them on the Form I–860 and give him or her an opportunity to respond to those charges. *See* 8 CFR 235.15(b)(2)(i)(B). This provision does not require that the response be done through a sworn statement. *See id.* Consistent with current regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited removal order in accordance with § 235.3(b)(7). *Id.* Moreover, consistent with current regulations, the examining immigration official shall serve the noncitizen with Form I–860, and the noncitizen shall be required to sign the form acknowledging receipt. *Id.* The new 8 CFR 235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the requirement that the noncitizen be required to sign, allowing greater flexibility for location of signature blocks on the document. *See id.* 235.3(b)(2)(i). The new provision maintains the requirement that interpretative assistance shall be used if necessary to communicate with the noncitizen. *Id.* 235.3(b)(2)(i)(B). The new 8 CFR 235.15(b)(2)(i) also allows for greater flexibility regarding how DHS records the information that supports the finding that the noncitizen is inadmissible and subject to expedited removal. This operational flexibility is consistent with the President's determination that emergency border circumstances are present such that the suspension and limitation on entry is warranted.

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer does not proceed further with removal of the noncitizen until the noncitizen has been referred for an interview by an AO in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.3(b)(4), applicable to those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. Under this provision the immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a written disclosure on Form M–444, *Information About Credible Fear Interview,* describing (1) the purpose of the referral and description of the credible fear interview process; (2) the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; (3) the right to request a review by an IJ of the AO's credible fear determination; and (4) the consequences of failure to establish a credible fear of persecution or torture. New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of the AO's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the information that must be provided to the noncitizen, the regulation removes the requirement that it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS believes that each of these changes can function sensibly without the others, given that each change is independently seeking to provide greater flexibility during a time when the suspension and limitation on entry is in effect, while still protecting

the important ability of individuals to seek protection from removal. DHS further believes that even if a court order enjoins or vacates the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can continue to apply to those described in § 208.13(g) and not described in section 3(b) of the Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). Consistent with the APA, the Departments have not invoked these procedures because (1) this rule involves a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments have found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below. At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

#### 1. Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function." [296] In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d

Cir. 2008) (quotation marks omitted). [297] This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere. This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries. [298] Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative; [299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols [300] with the Government of Mexico along

[296] *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see also Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984); *see also Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g., Rajah,* 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.,* 583 F. Supp. 3d at 64–66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https:// losangelesdeclaration.com/endorsing-countries* (last visited May 27, 2024).

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative, https://www.state.gov/refugee-admissions/safe-mobility-initiative* (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), *https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border* (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/* (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

**48760** Federal Register / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

our shared border;[301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address irregular migratory flows in the region.[305] Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306] However, in the

intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced irregular border crossings.[309] Sustaining and, as appropriate, ramping

up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes. For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed. *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals;[311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere;[312] the implementation of new Family Reunification Parole ("FRP") processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

---

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[302] *See, e.g., Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* Exec. Order 14010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/;* The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/;* U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.*

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say,* CBS News (May 10, 2023), *https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.*

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/;*

DHS, *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows that Lawful Pathways Work* (July 25, 2023), *https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and.*

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era,* Migration Pol'y Inst. (Mar. 7, 2023), *https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis;* James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America,* N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north. The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration,* AP News (Oct. 20, 2023), *https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7feec6463a6e9cdae* (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc* (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a* (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published* (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), *https://www.uscis.gov/CHNV.*

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 and for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers,* 88 FR 80394 (Nov. 17, 2023).

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10,

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314] The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315] These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319] These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320] January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border. Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321] Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa Rica has recently hosted hundreds of thousands of Nicaraguans.[325] Mexico has received record-breaking numbers of

2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

[314] *See* Kathia Martinez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap,* AP News (June 3, 2023), *https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.*

[315] *See, e.g.,* Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico,* NPR (Apr. 13, 2024), *https://www.npr.org/2024/04/13/1244590706/mexico-border-arrests-fall-march* ("Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States. While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.").

[316] *See, e.g.,* The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[317] *See* Servicio Nacional de Migración Panamá, *Estadísticas, Tránsito Irregular por Darién 2023, https://www.migracion.gob.pa/inicio/estadisticas.*

[318] *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (noting that "[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday").

[319] *See supra* Section III.B.1 of this preamble.

[320] *See, e.g.,* White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/;* Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Foreign Secretary Bárcena as describing "much more law enforcement to bring down the pressure in the border" by Mexico in the preceding weeks).

[321] *See* Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream,* CNN (Apr. 17, 2023), *https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html;* Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us;* Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023.*

[322] *See* UNHCR, *Colombia Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/colombia.*

[323] *See* UNHCR, *Peru Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/peru.*

[324] *See* UNHCR, *Ecuador Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/ecuador.*

[325] *See* UNHCR, *Costa Rica Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/costa-rica.*

asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327] Regional migration trends support these projections. For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328] Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329] Any delay between announcement of this rule and its implementation through notice and comment would almost certainly trigger a surge in migration that would

undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

### 2. Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm."[330] Findings of impracticability are "inevitably fact- or

context-dependent,"[331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures[332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble. Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334] DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

---

[326] See UNHCR, *Operational Update: Mexico* (Dec. 2023), *https://reporting.unhcr.org/mexico-operational-update-6421;* UNHCR, *Fact Sheet, Mexico* (Nov. 2023), *https://data.unhcr.org/en/documents/download/105202* ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* Reuters (Feb. 13, 2023), *https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/* ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[330] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics,* tbls. 33 & 35, *https://www.dhs.gov/ohss/topics/immigration/yearbook.*

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain. Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335] Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337] The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338] At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339] During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants [342]—only a small proportion of whom are likely to be granted asylum or other protection— would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343] And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344] Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests. Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico. These

---

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.,* Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[340] *See id.;* EOIR, *New Cases and Total Completions-Historical, https://www.justice.gov/eoir/media/1344801/dl?inline* (Jan. 18, 2024).

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day* (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.,* NPR, (Apr. 22, 2024), *https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration* ("[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . . Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said."); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us* ("The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals."); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023/* ("Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination— aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S."); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border* ("Record flows of extracontinental migrants through the Darien Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico. The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darien Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.").

numbers show that a very large number of migrants would likely have the ability and the incentive to travel to the U.S. border, and the Departments assess that announcing this rule in advance would likely yield the type of surges described in connection with prior changes in significant border policies affecting the availability of asylum for large numbers of migrants. For these reasons, consistent with the President's judgment, and given the emergency circumstances facing the Departments, the Departments assess that it would be impracticable to delay the policies set forth in this rule to allow time to complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[345] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[346] A number of cases follow this logic in the context of economic regulation.[347] The same logic

applies here, where the Departments are responding to exceedingly serious challenges at the border, and advance announcement of this response—which will increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. For the same reasons, "the [need] for immediate implementation" outweighs the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348] The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349] This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure. Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

The acuteness of such concerns is borne out by the facts. An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351] Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. 88 FR at 31315. In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a

---

[345] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[346] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[347] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can

be expected to precipitate activity by affected parties that would harm the public welfare.").

[348] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/*

*national-security/theres-still-one-way-into-america/ 2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters. *See, e.g.,* Myah Ward, *Biden considering major new executive actions for migrant crisis,* Politico (Feb. 21, 2024), *https:// www.politico.com/news/2024/02/21/biden-considering-major-new-executive-actions-for-southern-border-00142524.* But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha* v. *Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted, Arizona* v. *Mayorkas,* ___ S. Ct. ___, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42.*

[352] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times (Dec. 23, 2022), *https:// www.latimes.com/world-nation/story/2022-12-23/ la-fg-mexico-title-42-confusion.*

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

nationwide injunction of the Migrant Protection Protocols ("MPP"), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354] Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[355] Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356] Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357] And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359] This surge culminated with

what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360] Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11).[361] The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and immigration systems render DHS unable to effect removals and apply consequences at a sufficient scale to deter migration by those whose claims may not ultimately succeed.[363] This, too, serves as an incentive for migrants to take a chance. And sudden influxes, which result in part from smugglers' deliberate actions, overload scarce United States Government resources dedicated to border security that, as reflected above, are already stretched extremely thin.[364] This rule is specifically designed to allow the United States Government to deliver consequences more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral decompression flights and similar efforts.[365] But the increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what

DHS resources and operations are designed to handle. They raised detention capacity concerns anew. At that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population[368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369]

[354] See Innovation Law Lab v. Wolf, 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), vacated as moot sub nom. Innovation Law Lab v. Mayorkas, 5 F.4th 1099 (9th Cir. 2021).

[355] See Decl. of Robert E. Perez ¶¶ 4–15, Innovation Law Lab, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[356] Id. ¶¶ 4, 8.

[357] Id. ¶ 14.

[358] Id. ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, E. Bay Sanctuary Covenant v. Biden, No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2). Conversely, as noted above, smugglers also messaged that the border would be open starting on May 12. See Valerie Gonzalez, Migrants rush across US border in final hours before Title 42 expires, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c23976 6c2cb6e257c0220413b8e9cf9. This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, E. Bay Sanctuary Covenant v. Biden, No. 4:18–cv–6810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[361] Id.

[362] Id.

[363] See EOIR, Adjudication Statistics: Pending Cases (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344791/dl?inline.

[364] Decl. of Enrique Lucero ¶¶ 6–8, Innovation Law Lab v. Wolf, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3); Decl. of Robert E. Perez ¶ 15, Innovation Law Lab, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[365] See 88 FR at 11715.

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, Florida v. Mayorkas, No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[367] Id. ¶ 17.

[368] U.S. Census Bureau, Mexico, https://www.census.gov/popclock/world/mx (last visited May 27, 2024).

[369] See, e.g., Ariel G. Ruiz-Soto et al., Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape, Migration Pol'y Inst., at 1 (rev. Jan. 2024), https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); The White House, Fact Sheet: White

Continued

Therefore, the Departments believe that a gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap ''would likely result in a significant further increase in irregular migration,'' and that such an increase, ''exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions.'' *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the

---

*House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 (''A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.'').

---

date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because ''[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region.''[373] DHS cited the prospect that ''publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.''[374] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities,'' ''could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations,'' and ''could result in significant loss of human life.''[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

---

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.; accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

---

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Order 12866 (''Regulatory Planning and Review''), as amended by Executive Order 14094 (''Modernizing Regulatory Review''), and Executive Order 13563 (''Improving Regulation and Regulatory Review''), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs (''OIRA'') of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A–4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the ''no action'' baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish

a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions) when the agency was required "to publish a general notice of proposed rulemaking" prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon

the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of Title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

## E. Congressional Review Act

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

## F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.*, applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 [376] and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual 023–01") [377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ")

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

• For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

• During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and

extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's Instruction Manual 023–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. Second, this IFR is a standalone rule and is not part of any larger action. Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K. Paperwork Reduction Act*

This IFR does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163,

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01* (Oct. 31, 2014), https://www.dhs.gov/sites/default/files/publications/DHS_Directive%2023-01%20Rev%2001_508compliantversion.pdf.

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01* (Nov. 6, 2014), https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%2023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.

[378] Instruction Manual 023–01 at V.B(2)(a) through (c).

44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. In § 208.13, add paragraph (g) to read as follows:

### § 208.13    Establishing asylum eligibility.

\* \* \* \* \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

■ 3. Add subpart D, consisting of § 208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS within 30 days from the date of service of the positive credible fear determination. The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I–589, it may extend the

timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I–589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.* If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.* In cases where the Department

retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 5. Add § 235.15 to read as follows:

### § 235.15  Inadmissible aliens and expedited removal during emergency border circumstances.

(a) *Applicability.* Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal.* (1) [Reserved]

(2) *Determination of inadmissibility*— (i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]

(iii) [Reserved]

(3) [Reserved]

(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal

provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]

(c)–(f) [Reserved]

(g) *Severability.* The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 7. In § 1208.13, add paragraph (g) to read as follows:

### § 1208.13    Establishing asylum eligibility.

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

■ 8. Add subpart D, consisting of § 1208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 1208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June

3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or

unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*
[FR Doc. 2024–12435 Filed 6–4–24; 4:15 pm]
**BILLING CODE 4410–30–P; 9111–97–P**

Case 1:25-cv-10495-IT   Document 203-13   Filed 11/25/25   Page 297 of 420

# 'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards



*Run by a private firm hired by the city, migrants stay in a makeshift shelter at O'Hare International Airport, Sept. 20, 2023, in Chicago. Five mayors from around the U.S. want a meeting with President Joe Biden to ask for ... Run by a private firm hired ... more >*

By Stephen Dinan
*The Washington Times*
*Friday, August 2, 2024*

The Department of Homeland Security has temporarily shut down its most prominent "parole" program, which allows unauthorized migrants to fly directly to U.S. airports, after revelations of massive fraud.

The department revealed the shutdown after a watchdog group, the Federation for American Immigration Reform, released portions of an internal government report showing the extent of the fraud, including the use of Social Security numbers of dead people and the same addresses on thousands of applications.

CHNV-FRN-00577

"DHS has temporarily paused the issuance of advanced travel authorizations for new beneficiaries while it undertakes a review of supporter applications. DHS will restart application processing as quickly as possible, with appropriate safeguards," the department said in a statement Friday.

The program applies to people from Cuba, Haiti, Nicaragua and Venezuela. It offers them "parole" into the United States without legal visas as long as they schedule their arrivals in advance and present an affidavit from some entity in the U.S. promising to support them.

Those affidavits are full of fraud, the watchdog said.

The same 100 IP addresses were used on more than 51,000 applications. One address in Tijuana, Mexico, was used 1,328 times.

Looking at individual sponsors, some 3,200 names were responsible for more than 100,000 applications. That works out to one sponsor each for more than 30 migrants.

## MY TIMES

VIEW ALL ⊙

**DHS warns illegal immigrants to self-deport**
**Social Security employee given two-year sentence for using fake kids, dead person to get benefits**
EXCLUSIVE | **'Reverse flow': Illegal immigrants streaming back home after being blocked by Trump's border**

Of the most common sponsors, 24 used Social Security numbers of dead people.

ADVERTISEMENT

Advertisement

CHNV-FRN-00578

The Federation for American Immigration Reform called the bungles "astounding."

The program, known in the government by the acronym CHNV, is one of several paroles established by the Biden administration. It acts as a presidentially fabricated immigration system, working around limits set by Congress.

Other programs are for Afghans, Ukrainians and migrants who schedule their arrivals at the border. President Biden has also announced a slightly different type of parole to allow illegal immigrants to avoid deportation if they have been in the U.S. for at least 10 years and are married to a U.S. citizen.

The Department of Homeland Security has justified the external parole programs as a way to ease the chaos at the border.

Republicans on Capitol Hill have long suspected that the programs were inviting fraud. They point to the high rate of application approvals within CHNV and the border program, known as CBP One App.

ADVERTISEMENT

Advertisement

CHNV-FRN-00579

2/27/25, 11:04 AM
Case 1:25-cv-10495-IT    Document 203-13    Filed 11/25/25    Page 300 of 420
DHS suspends parole program amid rampant fraud - Washington Times

Anecdotal evidence of malfeasance also has been found.

Some people who came through the CHNV program were found to be living in government-run shelters, which experts said would seem to violate the point of having a sponsor.

One of those is a Haitian man charged with raping a disabled 15-year-old girl at the shelter in Rockland, Massachusetts.

Emilio Gonzalez, who ran USCIS in the Bush administration, sounded an alarm on fraud months ago and said Friday's news was a grim confirmation of what he had feared.

ADVERTISEMENT

Advertisement

"As expected, the CHNV program, while it had good intentions, is riddled with fraud and abuse," he said. "We got what we expected, and the American public will pay the price."

CHNV accepts roughly 1,000 arrivals a day.

From the time CHNV started in October 2022, when it was confined to Venezuelans, to this past March, nearly 500,000 people won parole through the program.

Responsibility for CHNV is split between two agencies in the Homeland Security Department. U.S. Citizenship and Immigration Services is charged with approving the financial affidavits, and Customs and Border Protection

CHNV-FRN-00580

Case 1:25-cv-10495-IT    Document 203-13    Filed 11/25/25    Page 301 of 420

is supposed to vet the migrants.

ADVERTISEMENT

Advertisement

The financial sponsorship form can be filled out online.

It asks potential sponsors about their current sources of income and assets. The form prods sponsors to describe the resources they plan to use to help house and settle the migrants.

The Washington Times reported earlier this year that smugglers were selling financial support affidavits for $5,000 each.

Mr. Gonzalez last week found a case involving someone who paid $6,000 to a broker in Nicaragua. The applicant had no clue who the sponsor was.

ADVERTISEMENT

Advertisement

CHNV-FRN-00581

Case 1:25-cv-10495-IT    Document 203-13    Filed 11/25/25    Page 302 of 420

The administration said paying for sponsorships was "not encouraged" but did not say it was against the rules.

USCIS did tell The Times that it was able to screen out bad applications.

"The agency carefully vets every prospective supporter through a series of fraud- and security-based screening measures before confirming a properly submitted [financial support form]," the agency said in March.

Experts say fraud is a growing problem in the U.S. immigration system.

Marriage visas, asylum petitions and victim visas have been targets of fraud in recent years. Those operations sell bogus access to the U.S. for tens of thousands of dollars.

• *Stephen Dinan can be reached at sdinan@washingtontimes.com.*

Copyright © 2025 The Washington Times, LLC. Click here for reprint permission.

**Please read our comment policy before commenting.**

CHNV-FRN-00582

2/27/25, 11:04 AM
Case 1:25-cv-10495-IT    Document 203-13    Filed 11/25/25    Page 303 of 420
DHS suspends parole program amid rampant fraud - Washington Times



**MY TIMES**

VIEW ALL ⊕

CHNV-FRN-00583

 **FBI looking into James Comey's off-the-books 'honeypot' operation targeting 2016 Trump campaign**

 **Reversing Biden's regulatory decrees**

 **New FBI whistleblower disclosures reveal agent who infiltrated Trump's campaign a decade ago**

 **Alexandria Ocasio-Cortez slipping into obscurity, irrelevance**

 **Trump says tariffs on Canada and Mexico will go into effect March 4**

 **Supreme Court backs Trump in dispute over USAID funding**

 **Pennsylvania transgender runner to race in girls' state finals despite Trump executive order**

 **Trump's bold move to strengthen the Second Amendment**

CHNV-FRN-00584


## Captured prisoners in Ukraine reveal surprising fragility of Kim's North Korea


## How much has the Department of Government Efficiency really saved?

**COMMENTARY**


## Musk says Verizon network 'not working' as FAA switches over to Starlink tech


## FDA cancels panel meeting to discuss flu strain


## It's Judea and Samaria, not the West Bank — and that matters hugely

**COMMENTARY**


## Lawmakers push to ban top-level government officials from trading stocks

**EXCLUSIVE**

---

## LATEST VIDEO

Advertisement

1/30/25, 2:39 PM
Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 306 of 420
Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times

# Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program



*Migrants who crossed the Rio Grande and entered the U.S. from Mexico are lined up for processing by U.S. Customs and Border Protection, Saturday, Sept. 23, 2023, in Eagle Pass, Texas. A federal judge in Texas on Friday, March 8, ... Migrants who crossed the Rio Grande ... more >*

By Stephen Dinan
*The Washington Times*
*Wednesday, November 20, 2024*

CHNV-FRN-00586

Sex traffickers may be using a Biden administration "parole" program to sneak illegal immigrant women into the U.S., the House Judiciary Committee revealed Wednesday in an explosive report exposing fraud in one of the Homeland Security Department's marquee border operations.

Welfare recipients, people involved with criminal activity and even other illegal immigrants have been approved as sponsors for parolees from Cuba, Haiti, Nicaragua and Venezuela (CHNV).

Homeland Security acknowledged it doesn't have a way to check criminal records of would-be sponsors. Indeed, the department said it approved sponsors who reported that at least some of their income came from illegal sources such as criminal activity.

The report, provided first to The Washington Times, is the latest setback for the CHNV program, which was paused this summer after shocking allegations of fraud.

"This oversight has uncovered how the Biden-Harris Administration's willingness to cast aside the best interests of Americans has enabled fraud, undermined national security, and endangered public safety, all in favor of ensuring that hundreds of thousands of otherwise illegal aliens can come to the U.S. through CHNV," the committee said in the interim staff report.

Homeland Security Secretary Alejandro Mayorkas created the CHNV program two years ago as a startling surge of Venezuelans rushed to the U.S. border.

**SEE ALSO: Tren de Aragua gang, known for trafficking people and targeting police, infiltrates D.C. region**

CHNV-FRN-00587

1/30/25, 2:39 PM · welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times

Case 1:25-cv-10495-IT   Document 203-12   Filed 1/25/25   Page 308 of 420

His idea was to encourage the migrants to skip the border and fly directly into airports, relieving pressure on Border Patrol agents. The migrants are still in the U.S. as inadmissible aliens, meaning they lack legal status, could be deported at any time and must leave the country when their two-year parole period expires.

## MY TIMES

VIEW ALL ⊙

**California Democrat blames hiring freeze for deadly D.C. aircraft collision**
**Political finger-pointing ensues after a deadly aircraft collision over the Potomac River**
**Trump to send 30,000 illegal immigrants to Guantanamo Bay**

Mr. Mayorkas' idea was that all arrivals would need a U.S.-based sponsor who would promise to take care of them and ensure they didn't become burdens on taxpayers.

ADVERTISEMENT

Advertisement

The sponsorship program has been plagued by fraud.

An internal investigation at U.S. Citizenship and Immigration Services found the list of applicants included Venezuelan gang members, dead people and stolen identities. One case even used former first lady Michelle Obama's passport number.

CHNV-FRN-00588

The report from the staff of Judiciary Committee Chairman Jim Jordan, Ohio Republican, suggests the program was fatally flawed from conception and allowed people at bad risk to act as sponsors.

Among the committee's findings:

• At least 336 recipients of welfare benefits were approved as sponsors. The report said sponsors are supposed to prove they can support migrants without them becoming dependent on the government.

ADVERTISEMENT

Advertisement

• 21 sponsorship applications were approved for people who admitted at least some of their income came from illegal sources. Homeland Security told the committee that the department thought legal sources provided "sufficient income."

• Homeland Security can't say how many sponsors have criminal records beyond their financial entanglements.

The department said it is "not aware" of any cases in which a person with a serious criminal record was approved as a sponsor.

An internal document obtained by the committee said that the USCIS doesn't perform criminal records checks and is not authorized to run names through FBI databases.

ADVERTISEMENT

CHNV-FRN-00589

Advertisement

• More than 80,000 sponsors were noncitizens with, at best, only temporary visas to be in the U.S. That included 311 DACA recipients, nearly 20,000 asylum-seekers and 224 other parolees.

"In other words, the Biden-Harris Administration's CHNV program incentivizes a new form of chain migration, in which foreign nationals in the U.S. on a temporary basis can sponsor additional foreign nationals to travel to the U.S. on a temporary basis, who can then sponsor additional foreign nationals to enter the country, and so on," the committee report said.

• The sex trafficker issue was raised after Homeland Security analysts found large numbers of electronic applications filed from the same Internet Protocol addresses. In one case, a single address filed 21 sponsorship applications, and 18 of them were for female migrants — six of them younger than 18.

• Homeland Security doesn't appear to be monitoring sponsors to determine whether they are supporting the migrants as promised. Officials told the committee they have a complaint line for government agencies to "share concerns" but had received no referrals as of Aug. 6.

ADVERTISEMENT

Advertisement

CHNV-FRN-00590

Shocking evidence shows supporters aren't living up to their promises.

In one case, a Haitian man was arrested on a charge of raping a fellow migrant in a taxpayer-funded migrant shelter in Massachusetts and was in the U.S. on parole.

Emilio Gonzalez, who ran USCIS in the Bush administration, said the parole program was flawed from the start.

"The premise of the program is to get as many people into the U.S. as possible, away from Congress' and the public's eye," he said.

ADVERTISEMENT

Advertisement

CHNV is one of several parole programs Mr. Mayorkas created during the Biden administration. President-elect Donald Trump has promised to reel in the programs as he pursues a stricter policy toward illegal immigration.

Democrats at a Judiciary Committee hearing examining the treatment of illegal immigrant children said Wednesday that they don't expect the Trump administration to do any better than past presidents.

CHNV-FRN-00591

1/30/25, 2:39 PM Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times

Case 1:25-cv-10495-IT Document 203-12 Filed 11/25/25 Page 312 of 420

"I won't be holding my breath," said Rep. Jerrold Nadler, New York Democrat.

USCIS, which approves the sponsorships, and Customs and Border Protection, which issues parole, are responsible for CHNV.

The program has proved wildly popular.

Some 3 million sponsorship applications have been filed and some 650,200 had been approved as of Aug. 6.

As of Sept. 30, the end of fiscal year 2024, 531,000 migrants had arrived under the program. By early August, more than 400,000 had been granted work permits, meaning they could legally compete with Americans for jobs.

Haitian migrants have accounted for nearly 1.5 million of the sponsorship applications. Cubans are second at about 760,000, Venezuelans are third at more than 432,300 applications, and Nicaraguans trailed with 178,000 sponsorship requests.

• *Stephen Dinan can be reached at sdinan@washingtontimes.com.*

**READ MORE THREAT STATUS**

CHNV-FRN-00592

1/30/25, 2:39 PM     Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times

Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 313 of 420



**ICE arrests nearly 1,200 on Sunday including 67 Tren de Aragua gang members**



**Trump signs executive order to establish an 'Iron Dome for America'**



**F-35 pilot safe after dramatic Alaska base crash**



**Groups are ready to file the first lawsuit to challenge Trump's new order on transgender troops**

## GET WITH THE TIMES. BALANCED REPORTING AND FEARLESS OPINIONS.

Copyright © 2025 The Washington Times, LLC. Click here for reprint permission.

**Please read our comment policy before commenting.**

1/30/25, 2:39 PM
Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times
Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 314 of 420



**MY TIMES**

VIEW ALL ⊕

CHNV-FRN-00594



## Adam Schiff extends olive branch, Trump asks if he was 'hit with a baseball bat'



## Fetterman blows up 'The View' with the simplest thing: Common sense



## Trump says Democrats put 'policy first' ahead of airline safety



## Victims of crash that sent truck plunging into Potomac River ID'd



## Noem says Trump will revive 'Remain in Mexico' border policy



## Chevron continues business as U.S. rejects Venezuelan President Maduro's reelection



## RFK Jr. fumbles under questioning from swing vote Sen. Bill Cassidy



## Trump says deadly D.C. air collision should have been prevented

CHNV-FRN-00595

1/30/25, 2:39 PM    Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program - Washington Times

Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 316 of 420



## First American-made supersonic civilian jet breaks sound barrier in flight over the Mojave Desert



## End the speed camera swindle



## Man dies after crashing car through Arlington Memorial Bridge barrier, plunging into Potomac River



## American Airlines worker killed in accident at Charlotte airport



## GOP accuses Biden's citizenship director of 'dereliction of duty'



## House Republican works to turn Trump's DEI ban into law

**EXCLUSIVE**

---

**TOP OF THE TIMES**

Advertisement

CHNV-FRN-00596

Menu



Search

BRIEFINGS & STATEMENTS

# STATEMENT FROM THE PRESS SECRETARY

January 26, 2025

"The Government of Colombia has agreed to all of President Trump's terms, including the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay. Based on this agreement, the fully drafted IEEPA tariffs and sanctions will be held in reserve, and not signed, unless Colombia fails to honor this agreement. The visa sanctions issued by the State Department, and enhanced inspections from Customs and Border Protection, will remain in effect until the first planeload of Colombian deportees is successfully returned. Today's events make clear to the world that America is respected again. President Trump will continue to fiercely protect our nation's sovereignty, and he expects all other nations of the world to fully cooperate in accepting the deportation of their citizens illegally present in the United States."

CHNV-FRN-00597

News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

CHNV-FRN-00598

THE WHITE HOUSE

Menu      THE WHITE HOUSE      Search

BRIEFINGS & STATEMENTS

# READOUT OF PRESIDENT DONALD J. TRUMP'S CALL WITH PRESIDENT NAYIB BUKELE

January 23, 2025

Today, President Donald J. Trump held a call with President Nayib Bukele of the Republic of El Salvador. The two leaders discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.

CHNV-FRN-00599

President Trump also praised President Bukele's leadership in the region and the example he sets for other nations in the Western Hemisphere.

News

Administration

Issues

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

CHNV-FRN-00600

Copyright

Privacy

CHNV-FRN-00601

Document Produced in Native Format

CHNV-FRN-00602

<u>Para tener acceso a este sitio en español, presione aquí (./es)</u>

# Check Case Processing Times

## Select your form, form category, and the office that is processing your case

*Refer to your receipt notice to find your form, category, and office. For more information about case processing times and reading your receipt notice, visit the <u>More Information About Case Processing Times (./more-info)</u> page.*



**Form** *

| I-765 | Application for Employment Authorization ⌄ |

**Form Category** *

| Based on parole ⌄ |

**Field Office or Service Center** *

| National Benefits Center ⌄ |

**Get processing time**

## Processing time for Application for Employment Authorization (I-765) at National Benefits Center



| 80% of cases are completed within |
| **1.5** Months |

<u>Sign in or create (https://my.uscis.gov/account)</u> a new account to see your estimated case timeline.

ⓘ **What does this processing time mean?**

We generally process cases in the order we receive them. This processing time is based on how long it took us to complete 80% of adjudicated cases over the past six months. Each case is unique, and some cases may take longer than others. Processing times should be used as a reference point, not an absolute measure of how long your case will take to be completed.

Learn more about processing times (./more-info).

## ⓘ When can I ask about my case?

Many routine factors impact how quickly a case is processed. We only allow inquiries for cases that are well outside the processing time listed above.

Learn more about the Case Inquiry Date (./more-info).

Enter your receipt date below to find out if you can contact us with questions.

**When is your receipt date?**

| mm/dd/yyyy |     | Get Inquiry Date |

## ⬈ Other case processing times resources

**Reducing Processing Backlogs (./reducing-processing-backlogs)**

**Frequently Asked Questions About Processing Times (./processing-times-faqs)**

**When to expect to receive your Green Card (./expect-green-card)**

**Processing information for the I-765 (./i765)**

**Affirmative Asylum Interview Scheduling (http://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-scheduling-bulletin)**

**Administrative Appeals Office (https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/aao-processing-times)**

**Historical Average Processing Times (./historic-pt)**

**Parole Processing (https://www.uscis.gov/humanitarian/humanitarian-parole/parole-processing)**



CHNV-FRN-00604

# Case management tools

[Inquire about a case outside normal processing time (https://egov.uscis.gov/e-request/displayONPTForm.do? entryPoint=init&sroPageType=onpt)](https://egov.uscis.gov/e-request/displayONPTForm.do?entryPoint=init&sroPageType=onpt)

[Check your case status (https://my.uscis.gov/account)](https://my.uscis.gov/account)

[Update your mailing address (https://egov.uscis.gov/coa/)](https://egov.uscis.gov/coa/)

[Ask about missing mail (https://egov.uscis.gov/e-Request/Intro.do)](https://egov.uscis.gov/e-Request/Intro.do)

[Correct a typographical error (https://egov.uscis.gov/e-request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)](https://egov.uscis.gov/e-request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)

[Request appointment accommodations (https://egov.uscis.gov/e-request/displayAccomForm.do? entryPoint=init&sroPageType=accommodations)](https://egov.uscis.gov/e-request/displayAccomForm.do?entryPoint=init&sroPageType=accommodations)

## Feedback

Let us know what you think about our redesigned Processing Times webpage at [ProcessingTimesFeedback@uscis.dhs.gov (mailto:ProcessingTimesFeedback@uscis.dhs.gov)](mailto:ProcessingTimesFeedback@uscis.dhs.gov)    (Please do not submit case-specific inquiries).

[Return to top](#)

**Topics [(https://www.uscis.gov/topics)](https://www.uscis.gov/topics)**

**Forms [(https://www.uscis.gov/forms)](https://www.uscis.gov/forms)**

**Newsroom [(https://www.uscis.gov/news](https://www.uscis.gov/news)**

**Citizenship [(https://www.uscis.gov/citizens](https://www.uscis.gov/citizens)**

**Green Card [(https://www.uscis.gov/green-card)](https://www.uscis.gov/green-card)**

**Laws [(https://www.uscis.gov/laws-and-policy)](https://www.uscis.gov/laws-and-policy)**

**Tools [(https://www.uscis.gov/tools)](https://www.uscis.gov/tools)**

(https://www.facebook.com/uscis)(https://twitter.com/uscis)(https://www.youtube.com/uscis)(https://www.instagram.com/uscis)

# Contact USCIS [(https://www.uscis.gov/about-us/contact-us)](https://www.uscis.gov/about-us/contact-us)

CHNV-FRN-00605

USCIS.gov

(https://www.dhs.gov)    **An official website of the U.S.**
**Department of Homeland Security**
**(https://www.dhs.gov)**

**National Terrorism Advisory System**

About USCIS
(https://www.uscis.gov/about-us)

Accessibility
(https://www.uscis.gov/website-policies/accessibility)

Budget and Performance
(https://www.uscis.gov/about-us/budget-planning-and-performance)

DHS Components
(https://www.uscis.gov/website-policies/dhs-component-websites)

Freedom of Information Act
(https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act)

No FEAR Act Data
(https://www.uscis.gov/about-us/equal-employment-opportunity/equal-employment-opportunity-data-posted-pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers
(https://www.uscis.gov/website-policies/privacy-and-legal-disclaimers)

Site Map
(https://www.uscis.gov/sitemap)

Office of the Inspector General
(https://www.oig.dhs.gov/)

The White House
(https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

CHNV-FRN-00606



| | |
|---|---|
| **Receipt Number**<br>ZAG0000204564 | **Case Type**<br>I134A - Online Request to be a Supporter and Declaration of Financial Support |
| **Received Date**<br>01/01/2012 | **Priority Date** | **Supporter** A102 938 475<br>Adams, John Quincy |
| **Notice Date**<br>01/18/2024 | **Page**<br>1 of 1 | **Beneficiary** A987 654 321<br>Kennedy, John Fitzgerald |

Qin_RecipientName
c/o Perry Mason
Qin_Street
Qin_City MD  99999

**Notice Type:** NON CONFIRM Notice

A Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, was filed on your behalf by the supporter named above.  USCIS has determined that we cannot confirm the Form I-134A because the parole program under which it was filed has been terminated.  If USCIS previously sent you a notice of confirmation and instructions to verify your information, that confirmation is rescinded by this notice and is no longer valid. No further action is necessary.

There is no appeal of this non-confirmation.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

Texas Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd., STE 110
Irving TX 75038-0012

**USCIS Contact Center: www.uscis.gov/contactcenter**



CHNV-FRN-00607

HQFDNS Fraud Division                                    **Issued**: May 10, 2024
I-134A Filing Trend Analysis                             **Data as of**: April 17, 2024

The HQFDNS Fraud Division (FD) reviewed data points within Forms I-134A, Online Request to be a Supporter and Declaration of Financial Support filed under the U4U/CHNV programs to identify patterns, trends, and potential fraud indicators. All data used in this analysis is as of April 17, 2024. FD's analysis is broken down as follows:

1. Form I-134A Filing Overview
2. Top 10 Reoccurring Values by Type on Form I-134A
3. Suspicious Data Changes
4. Using Fictitious Information to Support the Form
5. Other Concerning Trends and Patterns

## 1. Form I-134A Filing Overview

The following chart provides the month filed and current review state for forms I-134A. For example, in January 2023, 325,738 forms I-134A were filed with USCIS. Of these forms, 146,988 were confirmed, 20,097 were not confirmed, and 158,653 remain pending.



Forms I-134A Review State by Recieved Date

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 2023 | | | | | | | | 2024 | | |
| Not Confirmed | 20097 | 15089 | 12347 | 8803 | 8484 | 7241 | 6875 | 8047 | 6642 | 6311 | 5539 | 4547 | 3700 | 2626 | 1915 | 202 |
| Confirmed | 146988 | 66797 | 51259 | 36019 | 36436 | 31207 | 30481 | 31037 | 24464 | 21505 | 17623 | 11576 | 9891 | 7811 | 5746 | 99 |
| Pending | 158653 | 314073 | 260218 | 160525 | 136890 | 104099 | 100018 | 100657 | 78044 | 80367 | 81236 | 81697 | 84409 | 87887 | 102334 | 43565 |

The following table provides total forms I-134A by review state.

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

| Forms I-134A Review State | |
|---|---|
| **Review State** | **Form Count** |
| Confirmed | 528,939 |
| Not Confirmed | 118,465 |
| Pending | 1,974,672 |
| **Total** | **2,622,076** |

## 2. Top 10 Reoccurring Values by Type on Form I-134A

**IP Address:** FD queried forms I-134A by IP address. FD's analysis revealed that the 100 most used IP addresses accounted for 51,133 total form submissions. On Average, each IP address associated with these programs submitted 2.2 forms. The table below represents total form submissions and location[1] for the top 10 IP addresses:

| Search type | Value | Form Count | Location |
|---|---|---|---|
| **IP Addresses** | ▮▮▮▮▮ | 1328 | Tijuana, Mexico |
| | ▮▮▮▮ | 1116 | Naples, FL, USA |
| | ▮▮▮▮▮ | 1092 | Elizabeth, NJ, USA |
| | ▮▮▮▮▮ | 1090 | Houston, TX, USA |
| | ▮▮▮▮ | 1045 | Hialeah, FL, USA |
| | ▮▮▮▮ | 937 | Las Vegas, NV, USA |
| | ▮▮▮▮▮ | 907 | Las Vegas, NV, USA |
| | ▮▮▮▮ | 896 | Brooklyn, NY, USA |
| | ▮▮▮▮ | 844 | Brooklyn, NY, USA |
| | ▮▮▮▮▮ | 834 | Miami, FL, USA |

---

[1] FD relied on https://www.ip-tracker.org/ to obtain locations for the IP addresses.

**For Official Use Only (FOUO) / Law Enforcement Sensitive**

2

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

**Device Unique User Identification (UUID):** FD observed when a device's UUID was used to update USCIS systems for this form type. A device's UUID is an anonymized string of numbers and letters that identifies every individual smartphone, tablet, or computer in the world. On average, each unique device associated with the program submitted 3.4 forms. Additionally, each device may use multiple IP addresses. The table below depicts the top 10 device UUIDs by form count and number of unique IP addresses used by each device UUID:

| Search type | Device # | Form Count | # of IP Addresses Using Device UUID |
|---|---|---|---|
| **Device UUID** | 1[2] | 1875 | 91 |
| | 2 | 1382 | 77 |
| | 3 | 1307 | 76 |
| | 4 | 1159 | 237 |
| | 5 | 871 | 74 |
| | 6 | 827 | 205 |
| | 7 | 816 | 202 |
| | 8 | 780 | 218 |
| | 9 | 762 | 48 |
| | 10 | 741 | 241 |

**Sponsor Social Security Number (SSN)**: FD queried sponsor social security numbers (SSNs) by form count. On average, each sponsor SSN associated with the program was used to sponsor 3.3 parolees. FD defines a serial sponsor as someone whose SSN appears on 20 or more forms. A total of 100,948 forms have been filed by 3,218 different serial sponsors. As an additional observation, many of the sponsors on this list do not provide an income on the applicable item in Form I-134A. For sponsors that do report income, these incomes often do not meet the financial threshold to support the number of parolees they intend to sponsor.

According to CLEAR, one system used by FDNS officers, 24 out of the 1,000 most used sponsor SSNs belong to a deceased individual. Out of 34,854 sponsor SSNs that appear in 10 or more forms, CLEAR indicates 464 belong to a deceased individual. An additional 1,846 of these 34,854 sponsor SSNs were not found in CLEAR at all. USCIS confirmed at least 934 forms listing a sponsor SSN that, per CLEAR, belongs to a deceased individual.

| Search type | Value | Form Count |
|---|---|---|
| | 000000000 | 938[3] |

---

[2] Due to the size of device UUIDs, the Device UUID table uses generic numbers instead of true device UUIDs. For example, one device's UUID is a series of numbers and letters 128 characters long.

[3] Social Security Number (SSN) 000000000 appears to be a system placeholder when the value is left blank, a mistake, or a default value.

**For Official Use Only (FOUO) / Law Enforcement Sensitive**

3

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

| Sponsor SSN Count | | 363 |
|---|---|---|
| | | 326 |
| | | 254 |
| | | 238 |
| | | 231 |
| | | 212 |
| | | 208 |
| | | 206 |
| | | 201 |

**Sponsor and Parolee Phone Number[4]**: Fraud Division queried Form I-134A data for reoccurring phone numbers provided for sponsors and parolees. One sponsor phone number (▮▮▮▮▮▮▮) was reported on over 2,000 forms submitted by 200 different sponsors. One parolee phone number (▮▮▮▮▮▮) was reported on 626 different forms and was associated with 238 different parolee last names and 142 different parolee addresses.

FD grouped sponsor and parolee phone numbers and counted instances where those phone numbers occurred on 20 or more forms. There were 3,355 sponsor phone numbers that were used on 20 or more forms for a total of 110,894 different forms. There were 471 parolee phone numbers that were used on 20 or more forms, for a total of 22,749 different forms. The tables below depict the sponsor and parolee phone numbers with the highest occurrences.

| Search Type | Value | Form Count |
|---|---|---|
| Sponsor Phone Number | | 2043 |
| | | 544 |
| | | 456 |
| | | 423 |
| | | 369 |
| | | 363 |
| | | 314 |
| | | 264 |

| Search Type | Value | Form Count |
|---|---|---|
| Parolee Phone Number | | 626 |
| | | 594 |
| | | 470 |
| | | 401 |
| | | 280 |
| | | 246 |
| | | 235 |
| | | 229 |

---

[4] Sponsors and parolees provide a daytime and mobile phone number. In many instances they are the same number. FD used the data found in mobile phone number for any analysis found in this paper.

**For Official Use Only (FOUO) / Law Enforcement Sensitive**          4

HQFDNS Fraud Division                                                   **Issued**: May 10, 2024
I-134A Filing Trend Analysis                                           **Data as of**: April 17, 2024



| | | 260 |
|---|---|---|
| | | 227 |

| | | 211 |
|---|---|---|
| | | 198 |

**Sponsor and Parolee Email address**: FD queried Form I-134A data for reoccurring email addresses. The most used sponsor email address is listed on 363 different forms. The most used parolee email address is listed on 1,723 different forms collectively submitted by 477 different sponsors.

FD grouped instances where sponsor and parolee email addresses occur on 20 or more forms. There were 1,995 different sponsor emails used on 20 or more forms for a total of 60,300 different forms. There were 570 different parolee emails used on 20 or more forms for a total of 32,473 forms. The tables below depict the top 10 most used emails for sponsors and parolees.

| Search Type | Value | Form Count |
|---|---|---|
| **Sponsor Emails** | ███ @gmail.com | 363 |
| | ███ @gmail.com | 326 |
| | ███ @gmail.com | 238 |
| | ███ @yahoo.com | 231 |
| | ███ @americanservice.in.ua | 212 |
| | ███ @gmail.com | 206 |
| | ███ @gmail.com | 201 |
| | ███ @gmail.com | 195 |
| | ███ @aol.com | 163 |
| | ███ @gmail.com | 156 |

| Search Type | Value | Form Count |
|---|---|---|
| **Parolee Emails** | ███ @gmail.com | 1723 |
| | ███ @gmail.com | 744 |
| | ███ @gmail.com | 666 |
| | ███ @gmail.com | 527 |
| | ███ @gmail.com | 509 |
| | ███ @gmail.com | 491 |
| | ███ @gmail.com | 482 |
| | ███ @gmail.com | 480 |
| | ███ @gmail.com | 429 |
| | ███ @gmail.com | 422 |

**Free text field**: FD queried responses to Form I-134A free text questions to determine how often answers reoccurred verbatim. There were no "fuzzy" searches on the matches, meaning spaces and letters had to be exact for the grouping to occur. One of the groupings had a text response that was 184 words long and appeared on 1,834 different forms, submitted by 187 different sponsors.

| Search Type | Value | Form Count |
|---|---|---|
| **Free Text Answers** | Beneficiary will be living in a safe place in our home during the entire time he is here. | 4978 |
| | Beneficiary will be living in a safe place in our home during the entire time she is here. | 2837 |

**For Official Use Only (FOUO) / Law Enforcement Sensitive**

HQFDNS Fraud Division                                                    **Issued**: May 10, 2024
I-134A Filing Trend Analysis                                            **Data as of**: April 17, 2024

| | |
|---|---|
| The beneficiary will be living in a safe place in our home during the entire time he is here. | 2557 |
| Housing, groceries, utilities, transportation, and spending expenses as needed. | 2453 |
| TO COVER THE BASIC NEEDS OF MY BENEFICIARY SUCH AS: CLOTHING, FOOTWEAR, HYGIENE, HEALTH, FOOD, AMONG THE MOST COMMON NEEDS, DURING HIS PAROL PROCESS I THINK TO USE MY SALARY AS WELL AS SOME SMALL SAVINGS THAT I HAVE. | 2303 |
| HELLO, GOOD DAY, MY BENEFICIARY DESERVES PROBATION FOR THE FOLLOWING REASONS, IN MY COUNTRY OF ORIGIN THERE IS A SYSTEM OF THE FOLLOWING PROHIVIONS: WE DO NOT HAVE FREE EXPRESSION, WE DO NOT HAVE WATER, ELECTRICITY, HOUSING, WE DO NOT HAVE A WORK, TO CARRY A PLATE WORTHY TO OUR HOUSE AND PROVIDE THE SUPPORT TO OUR FAMILY, AND IF WE HAVE WORK THE SOURCE OF EMPLOYMENT IS NOT ENOUGH FOR US EVEN FOR A QUEZO SINCE THE SALARY DOES NOT BE ABLE TO PROVIDE THE BASIC BASKET. WE HAVE BEEN FLEEING THESE REPRESSIONS, TRAVELING COUNTRY TO COUNTRY, AND NO COUNTRY OTHER THAN THE UNITED STATES PROVIDES US THIS BENEFIT, FOR HUMANITARIAN REASONS, I REQUEST TO ENTER THE COUNTRY SUBJECTING TO ALL ITS LAWS AND REGULATIONS THAT WERE INTERPOSED TO ME, BUT I NEED TO BRING A DECENT PLATE AND A ROOF WHERE TO LIVE TO BE ABLE TO SURVIVE, I THANK YOU FOR THE SUPPORT YOU DO NOT PROVIDE WITH THIS BENEFIT. | 2026 |
| Granting the parole visa to this individual would serve as a vital intervention, considering their current living conditions. It holds the potential to significantly improve their chances of survival and ensure their overall safety within the context of their precarious environment. By providing the parole visa, we can extend a lifeline to this person, shielding them from the profound dangers that surround them daily. The hazardous nature of their residing environment accentuates the urgency of this decision, as it directly impacts their well-being and potentially places their life in imminent jeopardy. Recognizing this critical situation, we must prioritize the issuance of the parole visa, as it represents a crucial lifeline that can safeguard this individual from life-threatening circumstances. By acknowledging the inherent risks and vulnerabilities they face, we must proactively act to mitigate these dangers by granting the parole visa and effectively empowering them to escape the perils that currently engulf their existence. In doing so, we embrace the responsibility to take immediate action and secure their safety, realizing the profound impact this decision can have on preserving their precious life. | 1834 |
| I will provide housing. | 1778 |
| I AGREE TO ENROLL MY BENEFICIARY IN ENGLISH CLASSES, SO THAT HE CAN ADAPT TO THE LANGUAGE OF THE SOCIETY, ALSO TO PROCESS HIS SOCIAL SECURITY AND WORK PERMIT SO THAT HE CAN GET A DECENT JOB FOR HIS WORK SKILLS, AND SO MAY SUBSIST. | 1724 |
| Beneficiary will stay with the supporter as needed. The supporter will assist the beneficiary in finding rental housing if needed. | 1709 |

## 3. Suspicious Data Changes

**Sponsor Name Changes:** FD pulled data for instances where an alleged sponsor logged into their ELIS account and changed their name. There were 132,106 instances of this occurring in the date range for which this data was generated. FD reviewed 50 case examples within this dataset and observed that in 48 of 50 instances the name change was consistent with one of the following three situations:

HQFDNS Fraud Division                                                                    **Issued**: May 10, 2024
I-134A Filing Trend Analysis                                                             **Data as of**: April 17, 2024

- The name change reflected the name of a prospective parolee for which the sponsor was submitting a Form I-134A (25 of 50);
- The name change reflected someone the sponsor identified as a dependent or co-sponsor on Form I-134 (16 of 50); and,
- The name change was listed as another name used by the sponsor on Form I-134A (7 of 50).

Each of these 48 instances was found to include a reasonable explanation for the name change. However, the remaining two instances included a very high number of Forms I-134A (134 and 231) in the account, which is concerning. Given FD's review of the 50 case examples, sponsor name change may not be a strong area to target for additional review. Filing volume is perhaps a better area to target.

**Parolee Name Changes:** Data was pulled to reflect instances where the sponsor logged into their ELIS account and changed the prospective parolee's name on Form I-134A. There were 7,129 instances of this occurring in the date range for which this data was generated. FD reviewed 50 case examples within this dataset and observed that in 50 of 50 instances the name change was consistent with one of the following three situations:

- The name change was listed as another named used by the parolee on Form I-134A (29 of 50);
- The name change reflected a different combination/order of prospective parolee's first, middle, and last name (19 of 50); and,
- The name change reflected the name of the sponsor submitting the Form I-134A (2 of 50).

Each of these 50 instances was found to include a reasonable explanation for the name change. Based on this review, relying on instances where a sponsor logged into an ELIS account and changed the prospective parolee's name may not be a strong area to target for additional review.

### 4. Using Fictious Information to Support the Form

**Zip Code Physical Address:** FD compared sponsor physical zip codes provided on Forms I-134A against the United States Postal Service's, USCIS' SRMT, and USCIS' InfoPass databases to determine if the sponsor provided a valid U.S. address.

There are 465 zip codes used on Forms I-134A that did not appear in any of the above-mentioned data sources. In total there are 2,839 forms with non-existent physical zip codes. A cursory review found obvious application errors, as well as potential fraud and eligibility concerns that warrant closer examination. The table below represents the top ten physical zip codes that failed FD's validation measures by form count:

| Top 10 Non-existent Physical Zip Code by Form Count | |
|---|---|
| **Zip Code** | **Form Count** |
| 08819 | 49 |
| 33360 | 39 |
| 33456 | 30 |
| 20845 | 26 |

CHNV-FRN-00614

HQFDNS Fraud Division                                    **Issued**: May 10, 2024
I-134A Filing Trend Analysis                             **Data as of**: April 17, 2024

| | |
|---|---|
| 41111 | 22 |
| 49647 | 21 |
| 34963 | 20 |
| 11915 | 20 |
| 50024 | 19 |
| 33824 | 18 |

**Zip Code Mailing Address**: Additionally, FD compared sponsor mailing zip code against the databases. There was a total of 539 zip codes used on Forms I-134A that did not appear in any of those data sources. In total there are 2,149 forms with a non-existent mailing zip code. The table below represents the top ten count of forms associated to mailing zip codes that failed FD's validation measures:

| Top 10 Non-existent Mailing Zip Code by Form Count | |
|---|---|
| **Zip Code** | **Form Count** |
| 34168 | 154 |
| 33360 | 38 |
| 33456 | 30 |
| 20845 | 26 |
| 41111 | 22 |
| 49647 | 21 |
| 14669 | 20 |
| 11915 | 20 |
| 50024 | 19 |
| 33824 | 18 |

**Phone Number:** The North American Numbering Plan Administration (NANPA) maintains the official database of area codes for the United States, Canada, and several other countries. FD obtained the data set from NANPA and compared it against area codes provided to USCIS on Forms I-134A to determine if sponsors were submitting real phone numbers.

In total, sponsors submitted 1,908 Forms I-134A which reported 3,264 phone numbers (to include sponsor mobile phone number and sponsor daytime phone number) with an area code not provided in the NANPA database. Below are the most occurring area codes that are not provided in the NANPA database:

CHNV-FRN-00615

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

| Search Type | Area code | Form Count |
|---|---|---|
| Sponsor Mobile Phone Area Codes not in the NANPA Database | 535 | 302 |
| | 565 | 146 |
| | 789 | 47 |
| | 654 | 43 |
| | 768 | 32 |
| | 911 | 30 |
| | 783 | 23 |
| | 111 | 23 |
| | 746 | 23 |
| | 987 | 22 |

| Search Type | Area code | Form Count |
|---|---|---|
| Sponsor Daytime Phone Area Codes not in the NANPA Database | 535 | 414 |
| | 565 | 155 |
| | 789 | 59 |
| | 768 | 46 |
| | 654 | 43 |
| | 987 | 41 |
| | 783 | 31 |
| | 911 | 30 |
| | 756 | 25 |
| | 796 | 24 |

Additionally, there were 497 phone numbers summitted on Forms I-134A that did not match any standardized U.S. phone number convention and were not included in this evaluation. There was a total of 233 unique numbers did not start with 1 and were 11 digits long. The chart below represents the top 10 occurring phone numbers that do not match any standard U.S. number convention:

| Top 10 Phone Numbers not in US Standard Format | |
|---|---|
| Phone Number | Form Count |
| ███████ | 15 |
| ███████ | 11 |
| ███████ | 11 |
| ███████ | 11 |
| ███████ | 9 |
| ███████ | 8 |
| ███████ | 6 |
| ███████ | 6 |
| ███████ | 6 |
| ███████ | 6 |

**For Official Use Only (FOUO) / Law Enforcement Sensitive**

CHNV-FRN-00616

HQFDNS Fraud Division                                      **Issued**: May 10, 2024
I-134A Filing Trend Analysis                               **Data as of**: April 17, 2024

**A-Number:** FD compared A-numbers claimed by sponsors to USCIS Central Index System (CIS) to determine if they were ever issued. There was a total of 1,085 A-numbers used that were never issued by USCIS. These 1,085 A-numbers appear on 4,590 forms. The following table shows the most occurring non-existent A-numbers by form count.

| Top 10 Non-existent A-number Count | |
|---|---|
| **A-number** | **Form Count** |
| ███████ | 353 |
| ███████ | 109 |
| ███████ | 91 |
| ███████ | 82 |
| ███████ | 75 |
| ███████ | 72 |
| ███████ | 50 |
| ███████ | 48 |
| ███████ | 46 |
| ███████ | 45 |

**Presumably Fraudulent SSN:** In addition to reoccurring SSNs, FD queried a list of what is likely a fraudulent SSN. For awareness, FD is attempting to obtain further data from the Social Security Administration to query non-issued SSNs against USCIS holdings.

| SSN | Confirmed | Not Confirmed | Pending | Grand Total |
|---|---|---|---|---|
| ███████ | 4 | 10 | 156 | 170 |
| ███████ | 5 | 50 | 70 | 125 |
| ███████ | | 1 | 67 | 68 |
| ███████ | 10 | 2 | 8 | 20 |
| ███████ | | 1 | | 1 |
| ███████ | | | 3 | 3 |
| ███████ | | 1 | 3 | 4 |
| ███████ | 7 | 2 | 76 | 85 |

**For Official Use Only (FOUO) / Law Enforcement Sensitive**                    10

CHNV-FRN-00617

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

| Grand Total | 26 | 67 | 383 | 476 |
|---|---|---|---|---|

## 5. Other Concerning Trends and Patterns

**High Occurrence of Underage or Gender Based Filings:** A select few IP addresses had a high female to male parolee ratio (86%). Additionally, there were some IP addresses that had both a high female to male parolee ratio, and also a high number of parolees under 18 at the time of filing. The following table displays the highest female to male parolee ratios for IP addresses associated with at least 20 forms.

| IP | Form Count | Female Count | Male Count | Female Ratio | Under 18 |
|---|---|---|---|---|---|
| ██████████ | 22 | 19 | 3 | 86.36 | 6 |
| ██████████ | 22 | 19 | 3 | 86.36 | 6 |
| ██████████ | 21 | 18 | 3 | 85.71 | 14 |
| ██████████████████ | 21 | 18 | 3 | 85.71 | 3 |
| ████████████████ | 21 | 18 | 3 | 85.71 | 6 |
| ████████ | 25 | 21 | 4 | 84 | 8 |
| ████████████████ | 35 | 29 | 6 | 82.86 | 9 |
| ██████████ | 22 | 18 | 4 | 81.82 | 2 |
| ██████ | 22 | 18 | 4 | 81.82 | 7 |

**High Occurrences of Physical Addresses:** FD queried form data by the first twelve digits of the sponsor's physical address for patterns. There were 100 addresses used between 124 and 739 times on unique forms. These 100 addresses were associated to 19,062 forms. FD reviewed twenty of those 100 addresses. One address was used by six unique sponsors to file 501 unique forms. The physical address provided on all six accounts is a storage unit facility. Another address associated to an apartment complex was used for 297 forms, 24 of which were submitted by 10 different sponsors and 10 different IP addresses. While this initially seems plausible, each of those 10 IP addresses was also used to submit a minimum of 150 additional USCIS filings to include other benefit types. In one instance one of these 10 IP addresses was used to submit 490 USCIS filings. The following table displays the physical addresses associated with the most forms:

| Address (first 12 digits) | Type of Property (Notes if available) | Form Count | Total USCIS Accounts |
|---|---|---|---|
| ████████ | Mobile Home Park (278 lots) | 739 | 195 |
| ████████ | Commercial Property/Warehouse (10 units) | 596 | 15 |
| ████████ | Mobile Home Park | 572 | 239 |

CHNV-FRN-00618

HQFDNS Fraud Division
I-134A Filing Trend Analysis

**Issued**: May 10, 2024
**Data as of**: April 17, 2024

| | Description | | |
|---|---|---|---|
| ███████ | Mobile Home Park (Demolished mobile home park being redeveloped into 240 workforce housing apartments. Residents required to relocate by January 2023 for building to begin) | 542 | 151 |
| ███████ | Storage Units | 501 | 6 |
| ███████ | Single-family Home (3 bdrm, 1,656 sq ft) | 449 | 5 |
| ███████ | Commercial Property/Warehouse | 367 | 3 |
| ███████ | Mobile Home Park | 330 | 119 |
| ███████ | Apartment Complex (income restricted property) | 311 | 97 |
| ███████ | Apartment Complex | 128 | 103 |
| ███████ | Single-family Home (818 sq ft) | 127 | 1 |
| ███████ | Apartment Complex | 127 | 77 |
| ███████ | U.S. Postal Service | 127 | 1 |
| ███████ | Apartment Complex | 127 | 34 |
| ███████ | Townhouse Complex | 127 | 56 |
| ███████ | Apartment Complex (6 stories, 133 units) | 126 | 29 |
| ███████ | Single-family Home | 126 | 2 |
| ███████ | Apartment Complex (2 stories, 128 units) | 125 | 47 |
| ███████ | Apartment Complex (6 stories, 91 units) | 124 | 33 |
| ███████ | Apartment Complex (6 stories, 53 units) | 128 | 39 |

CHNV-FRN-00619

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 340 of 420



**U.S. Citizenship
and Immigration
Services**

MENU

Home⇗ > Humanitarian⇗ > Processes for Cubans, Haitians, Nicaraguans, and Venezuelans⇗ > Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

# Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

English | Kreyòl Ayisyen⇗ |

> ℹ **ALERT : Case Inquiries and Corrections**
>
> **See more**  ⌄

✕ Close All⇗    ↗ Open All⇗

## General Questions    ⌃

**Q1. Is the U.S. government limiting how many individuals are allowed to enter the United States under these processes?**

The U.S. government will provide travel authorization for up to 30,000 individuals to come to the United States each month across the Cuban, Haitian, Nicaraguan, and Venezuelan parole processes. This allows for a steady pace of operations and arrivals of individuals seeking parole. DHS removed the prior 24,000 limit on Venezuelan beneficiaries to conform with this new approach.

The U.S. government is implementing these comprehensive efforts to reduce the irregular migration of Cubans, Haitians, Nicaraguans, and Venezuelans, to lawfully and safely bring qualifying individuals into the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. DHS is not setting a limit on the overall number of beneficiaries or anticipated duration of these processes at this time and will continue to monitor the processes and their impact.

**Q2. If I am paroled into the United States through these processes, what happens when my 2-year period of parole ends?**

There are a full range of existing lawful immigration pathways, including an extension of parole, immigrant and nonimmigrant visas, asylum, and Temporary Protected Status (TPS), that certain parolees may be eligible for in accordance with U.S. laws.

**Q3. What is the current status of the CHNV processes?**

CHNV-FRN-00620

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 341 of 420

*On Aug 29, 2024, DHS issued the following statement regarding the parole processes.*

"As part of an internal review of the Cuba, Haiti, Nicaragua, and Venezuela (CHNV) parole processes, DHS has incorporated additional vetting of U.S.-based supporters to strengthen the integrity of the processes. U.S. Citizenship and Immigration Services' Fraud Detection and National Security Directorate and U.S. Customs and Border Protection's National Targeting Center are partnering to implement new and enhanced vetting protocols.

With these updated procedures in place, DHS is resuming the issuance of new Advance Travel Authorizations and will closely monitor how this new process is operating moving forward. The enhanced vetting measures include, but are not limited to: further scrutiny of supporters' financial records and criminal background, additional vetting to identify fraudulent supporter profiles, and bolstered review methods to identify serial filing trends. DHS will also now require fingerprints from U.S.-based supporters. Together with our existing rigorous vetting of potential beneficiaries seeking to travel to the United States, these new procedures for supporters have strengthened the integrity of these processes and will help protect against exploitation of beneficiaries. This is an example of DHS's ongoing commitment to consistently review filing trends to identify and address potential risks to process integrity. DHS is committed to holding accountable individuals who commit fraud or attempt to exploit others for gain. Any individuals found to have committed fraud or other abuse will be referred to law enforcement for potential prosecution.

DHS has taken significant action to strengthen enforcement of our immigration laws and deter irregular migration, including referring record numbers of individuals into expedited removal.  DHS has expanded access to lawful, safe, and orderly processes and pathways, while at the same time enhancing enforcement operations at the southern border. In July 2024, U.S. Border Patrol encounters of CHNV nationals between ports of entry were down 98% compared to December 2022 before the parole processes for these nationalities were fully implemented.

Migrants seeking to come to the United States should use these and other lawful, safe, and orderly processes and pathways, including opportunities available through the Safe Mobility Offices, instead of placing themselves in the hands of cartels and smugglers and crossing the border between ports of entry where they will be arrested by the Border Patrol and swiftly removed if they do not have a legal basis to remain in the United States."

## Filing Form I-134A, Online Request to be a Supporter and Declaration of Financial Support ⌃

### Q1. How can attorneys fill out Form I-134A for their clients who would like to become a supporter?

There is no option at this time for an attorney or accredited representative to use an online representative account to file a Form I-134A on behalf of a supporter or submit travel authorization information on behalf of a beneficiary after confirmation of the Form I-134A.

### Q2. I am an attorney assisting a supporter with Form I-134A. If the supporter fills out the preparer declaration on the form, can I get information about the supporter or beneficiary?

CHNV-FRN-00621

3/6/25, 12:03 PM Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT Document 203-12 Filed 11/25/25 Page 342 of 420

No. The preparer declaration simply reflects that you helped an individual complete the declaration (form filling). If you are an attorney or accredited representative, you must submit a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative to USCIS if you wish to receive information about your client's (supporter's) Form I-134A. USCIS does not currently allow representatives to complete Form I-134A online on behalf of a supporter using a representative account. However, a representative who has submitted a valid Form G-28 to USCIS separately through a representative account may inquire about their client's (supporter) case by contacting the USCIS Contact Center⍈.

**Q3. Can you submit Form I-134A by paper?**

No. Supporters filing under these processes may only submit Form I-134A online through their USCIS online account⍈.

**Q4. Is there a cost to file Form I-134A?**

No. There is no fee to file Form I-134A, and supporters may not ask for a fee from a beneficiary to file the Form I-134A on the beneficiary's behalf. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the request. Beware of any scams or potential exploitation by anyone who asks for money for the Form I-134A or for participation in these processes.

**Q5. If I submitted Form I-134 before Jan. 6, 2023, do I need to submit the new Form I-134A?**

No. If you submitted Form I-134 online before Jan. 6, 2023 (for the process for Venezuelans or Uniting for Ukraine), we will continue to process your Form I-134. You should not file a new Form I-134A.

**Q6. What is the difference between Form I-134 and Form I-134A?**

Before Jan. 6, 2023, there were 2 versions of Form I-134: a version filed online by potential supporters filing under Uniting for Ukraine and the process for Venezuelans, and a version filed on paper by individuals agreeing to provide financial support to other types of beneficiaries.

When we implemented the processes for Cuba, Haiti, and Nicaragua on Jan. 6, 2023, we updated the online version of Form I-134 and renamed it Form I-134A to differentiate between the 2 versions of the form. As of Jan. 6, 2023, if you seek to support a beneficiary under Uniting for Ukraine or the processes for Cubans, Haitians, Nicaraguans, or Venezuelans, you must submit Form I-134A through a free online account. If you submitted Form I-134 online before Jan. 6, 2023 (for the process for Venezuelans), we will continue to process your Form I-134.

## Processing Times 

**Q1. How long will it take between the time a potential supporter submits Form I-134A and when a beneficiary is granted advance travel authorization under these processes?**

Case processing times vary. USCIS and U.S. Customs and Border Protection (CBP) are reviewing and processing cases as thoroughly and efficiently as possible. The U.S. government will provide advance travel authorization for up to 30,000 noncitizens to come to the United States each month to seek parole on a case-by-case basis under these processes.

CHNV-FRN-00622

Due to high interest in these processes, we are updating the review process effective May 17, 2023. We are updating this process because the number of supporters who have submitted Form I-134A is significantly higher than the 30,000 monthly advance travel authorizations available. It is intended to maintain a fair, equitably balanced, and available pathway for all beneficiaries of a Form I-134A to move forward through the review process and seek travel authorization.

Under the new review process, we will randomly select about half of the monthly total of Forms I-134A, regardless of filing date, from the entire pending workload to review. We will review the other half of the monthly total based on when the case was submitted under the first-in, first-out method, which prioritizes the oldest Forms I-134A for review.

We will not accept a duplicate Form I-134A from a potential supporter if a previously submitted Form I-134A between the same potential supporter and beneficiary is pending. If we do not confirm a Form I-134A, but a supporter believes they meet the requirements to be a supporter under the process, they may file a new Form I-134A and submit additional information as evidence.

During the process, several steps must be completed, including robust security vetting, which will depend on action taken by potential supporters and beneficiaries. In the initial part of the process, we will review and provide responses to the potential supporter's Form I-134A as quickly as possible. Once we confirm the Form I-134A, we will contact the beneficiary via email with instructions on how to create a USCIS online account and add their case⬀. In the online account, the beneficiary reviews their biographical information and completes the necessary attestations (including attestations for eligibility and vaccine requirements) for themselves and travel group members and submits the information to CBP.

The beneficiary must also take and submit their photo within the CBP One mobile app. After they submit their photo, the process transitions to CBP. CBP will vet available biographic information and the facial photograph to determine whether to authorize the beneficiary's travel to the United States to seek parole. CBP will then send the travel authorization determination to USCIS to post it to the beneficiary's USCIS online account. If CBP approves the travel authorization, the beneficiary is responsible for arranging and funding their own airline travel to the United States. If CBP approves travel authorization, it is generally valid for 90 days.

The status of a travel authorization may change at any time as a result of the vetting process. Individuals should monitor their USCIS online account frequently for messages and notices from USCIS, and for the most current travel authorization status.

**Q2. If the processing of my Form I-134A is taking longer than expected, should I submit a new Form I-134A?**

No. Potential supporters cannot submit a duplicate Form I-134A for the same beneficiary. We will not accept a duplicate Form I-134A when a Form I-134A filed by the potential supporter on behalf of the same beneficiary is already pending.

You can monitor the status of your Form I-134A in your USCIS online account or check your most recent status in Case Status Online. Please note that the USCIS Contact Center cannot provide any additional information on the status of your case.

We will only accept an inquiry if the Form I-134A filed on your behalf has been pending more than six months. This includes inquiries submitted through the secure mailbox in your USCIS online account.

CHNV-FRN-00623

Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 344 of 420

Please note this is a default timeframe for inquiring and you should not necessarily expect a decision on your Form I-134A in that timeframe.

## Questions Relating to Supporters 

**Q1. I have a pending immigration case (such as an application for asylum or Temporary Protected Status (TPS)). Am I eligible to apply to become a supporter?**

No. If you have a pending immigration case such as a pending asylum application or pending initial TPS application but do not hold a lawful status in the United States, or are not a parolee or recipient of deferred action or Deferred Enforced Departure (DED), you are ineligible to become a supporter.

In general, to serve as a supporter, an individual or an individual representing an entity must:

- Be a U.S. citizen, U.S. national, or lawful permanent resident; hold a lawful status in the United States such as TPS or asylum; or be a parolee or recipient of deferred action or DED;
- Pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- Demonstrate sufficient financial resources to receive, maintain, and support the beneficiary for the duration of their parole period.

For more information about who can be a supporter, please visit our [Processes for Cubans, Haitians, Nicaraguans, and Venezuelans](#) page.

**Q2. I was granted an initial TPS and have re-registered for TPS but am waiting for final approval from USCIS. Can I apply to be a supporter?**

Yes. If you were granted initial TPS and have a pending re-registration for TPS, you are eligible to be a supporter. In general, to serve as a supporter, an individual or individual representing an entity must be a U.S. citizen, U.S. national, or lawful permanent resident; hold a lawful status in the United States such as Temporary Protected Status or asylum; or be a parolee or recipient of deferred action or Deferred Enforced Departure.

For more information about who can be a supporter, please visit our [Processes for Cubans, Haitians, Nicaraguans, and Venezuelans](#) page.

**Q3. If I am in removal proceedings and have TPS, can I be a supporter?**

Yes, you can be a supporter if you have TPS and are in removal proceedings. However, if an immigration judge has issued a removal order in your case and you are appealing your decision to the Board of Immigration Appeals, you cannot be a supporter.

**Q4. If I am paroled into the United States for removal proceedings, can I be a supporter?**

No. If you have been paroled into the United States solely for removal proceedings, you cannot be a supporter, unless you otherwise hold lawful status in the United States or are the beneficiary of deferred action or Deferred Enforced Departure (DED).

CHNV-FRN-00624

**Q5. Do I need to be a family member of a beneficiary to submit a Form I-134A on their behalf under the process?**

No. Anyone who meets the requirement to become a supporter and is confirmed by USCIS under the processes may support eligible beneficiaries, or their immediate family members, whether or not they are related to the beneficiary.

**Q6. Can organizations serve as supporters?**

Although an individual is required to file and sign the Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all the necessary support to the beneficiary.

Individual supporters filing with or on behalf of an entity should submit evidence of the entity's commitment to support the beneficiary when they file Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other authorized representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary (See the USCIS Policy Manual⟱ for more information.) Individuals who are filing in association with an entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary. For more information, please visit the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans⟱ webpage.

**Q7. How does the process work when there is more than one supporter for a beneficiary?**

Multiple supporters may join together to support a beneficiary. In this case, one supporter should file a Form I-134A and include supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. We will assess these supporters' collective ability to support a beneficiary.

Organizations, businesses, and other entities based in the United States can also support individuals arriving through the process. Although an individual is required to file and sign the Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all of the necessary support to the beneficiary. Individual supporters filing with or on behalf of an organization, business, or other entity should submit evidence of the entity's commitment to support the beneficiary when they file the Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other authorized representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary (See the USCIS Policy Manual⟱ for more information.) Individuals who are filing in association with an organization, business, or other entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary.

**Q8. I want to support a family of 4. Can I file 1 Form I-134A for the entire family?**

No. Supporters must file a separate Form I-134A for each beneficiary, including minor children. Note that children under the age of 18 must be traveling to the United States in the care and legal custody of their parent or legal guardian.

**Q9. Can I agree to support more than one beneficiary?**

CHNV-FRN-00625

Yes. An individual may submit a separate Form I-134A for each beneficiary the individual wants to agree to support. There is no limit on how many beneficiaries a supporter may agree to support, but USCIS will determine whether a supporter has the financial ability to support all beneficiaries for the duration of the parole period, which is up to 2 years. File all Forms I-134A using the supporter's same online USCIS Account.

**Q10. I am a U.S. citizen, but I live outside the United States. Can I become a supporter?**

No. To be eligible to become a supporter, you must be based in the United States.

**Q9. If USCIS does not confirm my Form I-134A, will you explain why?**

After we complete our review of Form I-134A, if we determine that a potential supporter does not meet the requirements to be a supporter, we will send a non-confirmation notice to both the supporter and beneficiary. If we need additional information, we may send a Request for Evidence. If a supporter believes they meet the requirements to be a supporter under the process, they may file a new Form I-134A and submit additional information as evidence. An alternative potential supporter may also file a Form I-134A for a beneficiary who was included in a prior Form I-134A that was not confirmed.

## Proof of Supporter Income and Assets    ⌃

**Q1. Is there a specific income requirement for Form I-134A?**

No. Each potential supporter's circumstances are unique, and we review financial information provided by them on Form I-134A about all assets and resources. We use the Federal Poverty Guidelines, as outlined by the Department of Health and Human Services, as a general guide in determining the supporter's ability to support the beneficiary for the duration of the beneficiary's anticipated period of parole. When we use the Federal Poverty Guidelines, we consider a supporter's household size to include the beneficiary listed on the supporter's Form I-134A, even if they do not intend to live with the supporter.

**Q2. For Form I-864, Affidavit of Support Under Section 213A of the INA, a sponsor must show the means to maintain income at 125 percent of the Federal Poverty Guidelines for the household size (or 100 percent of the Federal Poverty Guidelines, if the sponsor is on active duty in the Armed Forces of the United States). On Form I-134A, will I have to show income at 100 percent or 125 percent of the Federal Poverty Guidelines?**

Form I-864 and Form I-134A are used for different purposes. Under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, we will use the Federal Poverty Guidelines as a general guide in determining your financial ability, using information you provide on Form I-134A to support a beneficiary for the duration of their parole, which could be up to 2 years.

**Q3. What type of financial proof must I provide? Do I need to provide my tax filings, proof of employment, and bank statement, or can I submit only 1 of these documents?**

Supporters should determine what financial information they have about their assets to help USCIS determine their financial suitability. Some examples of financial evidence may include your federal

3/6/25, 12:03 PM — Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 347 of 420

income tax filing; bank statements, Form W-2, Wage and Tax Statement, from your employer; pay stubs or pay statements from the past few months; and any proof of income coming into your household.

**Q4. Will the named beneficiary on my Form I-134A be able to see my financial information, including the evidence that I provide?**

No. Beneficiaries do not have access to their supporters' financial information submitted to USCIS as proof of income and assets.

**Q5. Does USCIS consider the beneficiary's income and financial resources in determining whether their Form I-134A is sufficient?**

No. When we are determining whether a Form I-134A is sufficient, we do not consider information about the beneficiary's income or financial resources.

---

## Questions Relating to Beneficiaries 

**Q1. Can I apply for re-parole at the end of my initial parole period?**

There is no re-parole process under any of the CHNV parole processes. Parole is not an immigration status. During your period of parole, you are allowed to temporarily remain in the United States, apply for employment authorization, and seek any immigration benefits you may be eligible for that may allow you to remain in the United States in a lawful status or category.

Parole will automatically terminate at the end of your parole period (up to 2 years from the day you were paroled into the United States). If you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires. If your parole expires, you will no longer be employment authorized based on being a parolee, and if you have not been granted a lawful status or period of authorized stay, you may begin to accrue unlawful presence in the United States.

You may be eligible to apply for certain immigration benefits with USCIS. You may want to explore the immigration benefits listed at uscis.gov before your parole expires. As a reminder, you can find the duration of your parole on your Form I-94, Arrival/Departure Record, which was issued by U.S. Customs and Border Protection (CBP) during the inspection process at a U.S. port of entry when you arrived. At any time, you may view and print a copy of your most updated Form I-94 at i94.cbp.dhs.gov.

**Q2. If I am already in the United States, can I be a beneficiary under these processes?**

No. To be eligible to be a beneficiary under these processes, you must be outside the United States. When the potential supporter files Form I-134A, Online Request to be a Supporter and Declaration of Financial Support ⧉, on a beneficiary's behalf, the beneficiary's current physical address must be outside of the United States.

**Q3. If I reside in another country with a Temporary Protection Permit (Permiso de Protección Temporal), does this temporary permit disqualify me from being considered for advance travel under the process?**

CHNV-FRN-00627

No. A Temporary Protection Permit is a temporary status. This permit does not mean you are a permanent resident of the third country and does not disqualify you from this process. However, you are not eligible for this process if you are a permanent resident or a dual national of any other country or hold refugee status in any country.

### Q4. If I am a beneficiary, do I have to live with my supporter after I am paroled into the United States?

No. You are not required to live with your supporter. However, the types of support beneficiaries may need in addition to financial support for the duration of their parole period include safe and appropriate housing, health care, transportation, obtaining initial basic necessities, assistance with submitting forms such as the employment authorization application, learning English, securing employment, and enrolling children in school.

### Q5. Can children under age 18 who have dual citizenship be considered for parole under these processes?

Yes. Eligible children under age 18 who have dual citizenship can be considered for parole under these processes if they meet all requirements.

### Q6. I meet the requirements to be considered for a travel authorization under the process, but my husband is a dual national of another country. Can I be the primary beneficiary so he can qualify for the process?

Yes. While eligible beneficiaries under the process may not be a permanent resident or be a dual national of any other country and may not currently hold refugee status in any country (unless DHS operates a similar parole process for the country's nationals), this requirement does not apply to immediate family members. Immediate family members in this process include a spouse or common-law partner of an eligible beneficiary under the process and their unmarried child(ren) under the age of 21.

### Q7. Can children under age 18 be paroled into the United States without their parent or legal guardian under these processes?

No. Children under age 18 must arrive with an accompanying parent or legal guardian. If unaccompanied, children are not eligible for parole under this process. If a child who is not traveling with their parent or legal guardian arrives at a U.S. port of entry, they may be transferred to the custody of the Department of Health and Human Services (HHS), as required by law under the Trafficking Victims Protection Reauthorization Act of 2008, to protect the child from human trafficking and other forms of exploitation. For more information, please visit the HHS Unaccompanied Children webpage. Children who are not traveling with a parent or legal guardian but are coming to the United States to meet a parent or legal guardian may instead seek parole through the standard Form I-131 parole process.

### Q8. Can a parent or legal guardian currently residing in the United States travel out of the United States to accompany their child under age 18 to the United States through these processes?

A child's parents or legal guardians may be eligible to leave the United States to accompany their child under age 18 to the United States if the child is otherwise eligible for parole under these processes and the parent or legal guardian:

- Has lawful status in the United States, is a parolee (including a parolee under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans), or is a beneficiary of deferred action or Deferred

CHNV-FRN-00628

3/6/25, 12:03 PM Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT Document 203-12 Filed 11/25/25 Page 349 of 420

Enforced Departure (DED); and

- Has documentation or authorization to reenter the United States, which may include proof of U.S. citizenship, a Green Card, or advance parole for parolees (Application for Travel Document, Form I-131).

For the child under age 18 to be considered for parole under these processes, a supporter must file Form I-134A on behalf of the child seeking to reunite with their parent or legal guardian in the United States. The parent or legal guardian may serve as a supporter and file Form I-134A on behalf of their child if they meet the eligibility requirements. However, the U.S.-based supporter does not need to be related to the beneficiary they file Form I-134A for.

After USCIS has confirmed the Form I-134A, the supporter should follow these steps:

- Step 1: Log in to their online account.

- Step 2: From the top of the webpage, select the My Account drop-down menu and select Inbox.

- Step 3: Click on the New Message button.

- Step 4: For the subject, select "Other" from the drop-down menu, and for the case receipt number, select the receipt number for Form I-134A, Online Request to be a Supporter and Declaration of Financial Support.

- Step 5: In the message field, write "CHNV Child Reunification" and state that they are contacting USCIS on behalf of a child under age 18 who is eligible for the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, and who has a parent or legal guardian who can depart and reenter the United States to accompany their child to use these processes.

In addition, the supporter should upload the following supporting documentation in their online account:

- Evidence of the parental relationship or legal guardianship of the child. (Evidence may include a birth certificate for the child and identity documents for the parent or legal guardian. Generally, evidence of legal guardianship requires a legal or administrative process involving the courts or other recognized government entity. A power of attorney or written or notarized statement is not a formally recognized arrangement.)

- Evidence that the parent or legal guardian has documentation or authorization to reenter the United States. This documentation may include proof of U.S. citizenship, a Green Card, or an Advance Parole Document (Application for Travel Document, Form I-131).

- A signed statement affirming that the parent or legal guardian will accompany the child to the United States and provide care and physical custody of that child in the United States.

## Q9. What is a "legal guardian"?

A legal guardian is an individual who:

- Has been granted legal custody of an individual or minor by a court of competent jurisdiction or by the state or recognized governmental entity; and

- Can lawfully exercise and assume legal obligations on that individual's or minor's behalf.

If a document is provided in a foreign language, you must include a certified translation into English.

CHNV-FRN-00629

3/6/25, 12:03 PM    Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT   Document 203-12   Filed 11/25/25   Page 350 of 420

Written authorization from a parent to allow an individual other than the parent or legal guardian of a child under age 18 to travel with the child is not sufficient evidence of legal guardianship.

**Q10. Does each family group member need their own individual USCIS online account, including children under the age of 18 years old?**

No. Each beneficiary must have their own confirmed Form I-134A, but principal beneficiaries can add travel group members to their USCIS online account, including their spouses or common-law partners of any nationality and their children under age 18. For example, after we confirm a Form I-134A for a child under age 18 and a separate Form I-134A for that child's parent or legal guardian, the parent or legal guardian, as the principal beneficiary, can add the child to their own travel group through their own USCIS online account. The principal beneficiary will review and confirm biographic information and complete attestations for travel group members, including their spouse and children. However, after the principal beneficiary completes and submits the attestations to CBP for their travel group members and themselves, the principal beneficiary cannot add any other travel group members to their USCIS online account unless the travel group members are under age 18.

**Q11. I lived outside my country of nationality for some time and returned there recently. Do I need to reside there for a specific amount of time before I will be eligible under this process?**

There is no required length of time that you must have resided in your country of nationality before your supporter submits Form I-134A on your behalf.

**Q12. I understand that having a pending immigration case with USCIS will not make me ineligible for the process; however, if I am paroled into the United States under the process and my pending immigration case is approved, will that affect my ability to get a Green Card later?**

If you are paroled into the United States under these processes and have a separate immigration case pending with USCIS, your parole under this process will not directly affect your ability to get a Green Card. The 2-year parole period under these processes will enable you to seek humanitarian relief or other immigration benefits, including adjustment of status, that you may be eligible for, and to work in the United States.

**Q13. Do I need to repay my supporter for agreeing to financially support me under this new process?**

No. Beneficiaries do not need to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134A on their behalf or for providing financial support while they are in the United States. Access to this process is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A or to participate in the process. Beware of any scams or potential exploitation by anyone who asks for money associated with applying to this process.

For more information, visit our [Processes for Cubans, Haitians, Nicaraguans, and Venezuelans](#) page and reference the section "Resources for Victims of Abuse, Violence, or Exploitation."

## Passport Questions for Beneficiaries



CHNV-FRN-00630

3/6/25, 12:03 PM    Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 351 of 420

**Q1. My passport is expired. Do I need to request an extension, or will my expired passport be accepted?**

You must have a valid, unexpired passport. Certified extensions of passport validity serve to meet this requirement. If your government has extended the validity of your passport, the passport expiration date should be the expiration date of the extension. CBP will not authorize travel if your passport or extension has expired.

**Q2. Can children travel under the passport of their parents?**

Minor children traveling with their parent must have their own passport and may not be included on a parent's passport.

---

## Biometric Screening    ⌄

**Q1. Where will my biometrics be taken?**

You must submit certain biographic and biometric information to DHS for screening and vetting purposes. If you receive authorization to travel to the United States, upon arrival to a U.S. port of entry, you must submit additional information, to include fingerprints, for further biometric vetting.

---

## Medical Screening and Vaccines    ⌄

**Q1. What if I do not have access to a U.S. Food and Drug Administration COVID-19 vaccine?**

Before traveling to the United States, you must attest that you have completed vaccine requirements or are eligible for an exception to vaccine requirements for measles, polio, and the first dose of COVID-19 vaccine approved or authorized by the U.S. Food and Drug Administration or Emergency Use Listed (EUL) by the World Health Organization .

Previews of the required attestations can be found on our Processes for Cubans, Haitians, Nicaraguans, and Venezuelans  page.

---

## Travel Authorization    ⌄

**Q1. My travel authorization will expire soon, and I have been unable to arrange travel to the United States. Can I request an extension?**

If, for reasons beyond your control, you cannot travel within the 90-day travel authorization validity period, your supporter may submit a one-time request for a 90-day travel authorization extension to USCIS. Only confirmed supporters who have filed Form I-134A, Online Request to be a Supporter and Declaration of Financial Support (previously the Form I-134, Declaration of Financial Support) on behalf

CHNV-FRN-00631

3/6/25, 12:03 PM    Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans and Venezuelans | USCIS

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 352 of 420

of an eligible beneficiary or their immediate family member may request a one-time extension of a previously approved travel authorization. You may not request an extension of your travel authorization on your own behalf.

Supporters must submit the extension request no more than 30 days before, and no more than 30 days after, the expiration date of the original approved travel authorization period. Supporters must request a separate extension for each beneficiary by following the steps below.

To submit the request, a supporter must:

- Step 1: Log in to your online account.

- Step 2: From the top of the webpage, select the "My Account" drop-down menu and select "Inbox."

- Step 3: Click on the "New Message" button.

- Step 4: For the subject, select "A case already filed online" from the drop-down menu, and for your case receipt number, select your receipt number for Form I-134A.

- Step 5: In the message field, state your continued interest in supporting the named beneficiary who has not yet traveled to the United States and indicate that you are requesting an extension of the beneficiary's travel authorization, then click Send.

We will review the supporter's request for a travel authorization extension and submit the request, along with the beneficiary's information, to CBP to conduct additional vetting. If CBP approves the request the beneficiary will receive an email notification when the extended travel authorization notice has been posted to their account. Please note that for privacy reasons, only the beneficiary will be able to view their extended travel authorization notice in their online account. The beneficiary should notify the supporter when they receive their extended travel authorization notice.

If the beneficiary's original approved travel authorization expired more than 30 days before or after the submission of the extension request, or if the beneficiary cannot travel to the United States during the one-time 90-day extension, the supporter must submit a new Form I-134A on the beneficiary's behalf to obtain a new travel authorization.

### Q2. I (a beneficiary) mistakenly submitted incorrect information about myself and my minor children to CBP and was denied travel authorization. What should I do?

Your supporter will need to submit a new Form I-134A on your behalf.

### Q3. If my travel authorization is denied, can CBP tell me why?

Due to the secure nature of the vetting and screening process, CBP cannot offer additional information about the process, or provide details about the status or result of a beneficiary's travel authorization review. If your travel authorization is denied, CBP cannot explain why the denial occurred. If your travel authorization is still pending, CBP asks you to remain patient while the review continues.

### Q4. If I am paroled into the United States under these processes, will I be able to apply for an Advance Parole Document?

Yes. If you are paroled into the United States and want to apply for an Advance Parole Document, which will allow you to seek parole into the United States at a port of entry when you return from a trip outside

CHNV-FRN-00632

the United States, you should file a Form I-131, Application for Travel Document. For more information about Advance Parole Documents, including about fees and fee waivers, visit the Form I-131 ⧉ webpage.

Please note that obtaining an Advance Parole document does not guarantee you will be paroled back into the United States. CBP will make a separate discretionary decision on your request for parole when you arrive at a port of entry.

## Employment Authorization    ⌃

**Q1. If I am paroled into the United States under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, will I be employment authorized incident to parole, as certain Afghan and Ukrainian nationals are?**

No. Parolees under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans do not automatically receive employment authorization. You must file a Form I-765, Application for Employment Authorization ⧉.

**Q2. If approved to travel to the United States as a beneficiary under this new process, when can I apply for employment authorization?**

After you are paroled into the United States, you are eligible to apply for discretionary employment authorization from USCIS. To apply for an Employment Authorization Document, you must submit Form I-765, Application for Employment Authorization ⧉, using the (c)(11) category code with the required fee or apply for a fee waiver. You may submit Form I-765 through your USCIS online account with the required fee. To request a fee waiver, you must file by mail Form I-912, Request for a Fee Waiver, and Form I-765. You cannot file Form I-912 online through your USCIS online account.

**Q3. How long will it take to approve my employment authorization application?**

While processing times will vary depending on the complexities of each case, we encourage online filing ⧉ because it prevents delays associated with mailing, provides an immediate receipt, and requires an applicant to establish a USCIS account that allows you to track the progress of your case. Paper-filed employment authorizations can also be added to an individual's online account. Whether you submit an application by mail or online, we will use available technology to reduce the processing time.

## Correcting a Submitted Form I-134A    ⌃

**Q1. What issues can I correct through the USCIS Contact Center?**

This chart shows issues you can correct through the USCIS Contact Center:

CHNV-FRN-00633

| Issue | Request Correction through the USCIS Contact Center |
|---|---|
| The supporter needs to correct the beneficiary email address and needs USCIS to resend the Account Access Notice to the beneficiary's correct email address **after** USCIS has confirmed Form I-134A but **before** the beneficiary has submitted their attestations. | The supporter logs in to their USCIS online account and uses the Unsolicited Evidence feature to upload a letter signed by hand (not electronically).<br><br>The supporter then sends a secure message from their USCIS online account stating that the beneficiary's email address needs to be changed and that they have uploaded unsolicited evidence.<br><br>The supporter should select "case already filed online" as the subject of the message and "correcting my biographical information" as the issue. The supporter must also acknowledge that the evidence has already been uploaded.<br><br>The Contact Center will email the supporter after we resolve the issue. |
| The beneficiary's passport information needs to be corrected on Form I-134A **after** USCIS has confirmed Form I-134A. | If Form I-134A has been confirmed, the beneficiary will need to use their online account to upload a copy of a valid, unexpired passport as Unsolicited Evidence in the Notices tab and send a message from the secure mailbox.<br><br>The supporter should select "case already filed online" as the subject of the message and "correcting my biographical information" as the issue. The supporter must also acknowledge that the evidence has already been uploaded.<br><br>The Contact Center will respond by email after we resolve the issue. |

CHNV-FRN-00634

| Issue | Request Correction through the USCIS Contact Center |
|---|---|
| The supporter mistakenly selected the wrong country for the beneficiary. | The supporter should log in to their USCIS online account and use the Unsolicited Evidence feature to upload evidence of the correct country.

If the case has been confirmed, they will need to submit a secure message to the Contact Center. The supporter should select "case already filed online" as the subject of the message and "correcting my biographical information" as the issue. |
| The supporter needs to correct biographical data for the beneficiary **after** USCIS confirmed Form I-134A and the beneficiary submitted their attestations, but **before** the travel authorization has been issued. | If name, date of birth, or passport information is incorrect, either the supporter or the beneficiary should log in to their USCIS online account and use the Unsolicited Evidence feature to upload a copy of the beneficiary's passport.

They should then send a secure message from their USCIS online account. They should select "case already filed online" as the subject of the message and "correcting my biographical information" as the issue. They must also acknowledge that they have already uploaded the evidence. |

**Q2. What issues can I correct through my USCIS online account?**

You can upload evidence to your USCIS online account to correct the issues shown in the chart below. You do not need to send a secure message or call the USCIS Contact Center. If you send a secure message, you will not receive a response from the USCIS Contact Center; we will review the request for a correction when we select your Form I-134A for review.

CHNV-FRN-00635

| Issue | Request Correction by Uploading Evidence Only |
|---|---|
| The supporter needs to correct non-biographical data for the supporter or beneficiary. Non-biographical data may include:<br><br>• Anticipated Length of stay<br>• Job history<br>• Social Security number | This information can be updated if Form I-134A remains pending and has not been confirmed by USCIS.<br><br>The supporter should log in to their USCIS online account and use the Unsolicited Evidence feature to upload a letter explaining that the information they entered on the Form I-134A for the supporter or beneficiary was incorrect.<br><br>We will review the requested correction when we review the Form I-134A for sufficiency. |
| The supporter needs to correct the beneficiary's passport information **before** USCIS has confirmed their Form I-134A. | The supporter should log in to their USCIS online account and use the Unsolicited Evidence feature to upload a copy of the beneficiary's passport.<br><br>We will review the requested correction when we review the Form I-134A. Note that the record will not reflect the correction until we confirm the case. |
| The supporter needs to correct the beneficiary's email address **before** USCIS has confirmed Form I-134A. | The supporter should log in to their USCIS online account and use the Unsolicited Evidence feature to upload a letter signed by hand (not electronically).<br><br>We will review the requested correction when we review the Form I-134A. Note that the record will not reflect the correction until we confirm the case. |

The chart below lists issues that can either be resolved by the supporter or beneficiary, or that cannot be corrected. You do not need to send a secure message or call the USCIS Contact Center. If you send a secure message, you will not receive a response from the USCIS Contact Center.

CHNV-FRN-00636

3/6/25, 12:03 PM    Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Case 1:25-cv-10495-IT    Document 203-12    Filed 11/25/25    Page 357 of 420

| Issue | Self-Service or No Action Needed to Correct Error |
|---|---|
| The supporter needs to correct biographical data for the beneficiary **after** USCIS has confirmed Form I-134A and **before** the beneficiary has submitted their attestations. | When the beneficiary creates their online account, they can edit certain fields when they complete their biographical information confirmation (attestations). Fields that are editable are: <ul><li>Name</li><li>Date of birth</li></ul> |
| The supporter needs to correct biographical data for the beneficiary **after** the travel authorization notice has been issued. | If the travel authorization has been issued, you will not be able to make any corrections. The supporter may file a new Form I-134A on behalf of the beneficiary. If a supporter files a new Form I-134A, we recommend including a detailed letter of explanation stating why you are filing again. |
| The supporter needs to withdraw Form I-134A. | A supporter may only withdraw their Form I-134A if it remains pending. If Form I-134A has been confirmed, it cannot be withdrawn. To request to withdraw a pending Form I-134A, the supporter must upload a withdrawal request to their online account. We will review the withdrawal request when we review the Form I-134A. |

**Q3: I am a beneficiary, and I received an error code in the CBP One mobile app that says, "Record cannot be found: Check your date of birth, passport and A-Number in your myUSCIS account to ensure they are correct." What do I do?**

To address the error and check that your attestations have been properly submitted:

- Log in to your USCIS online account and check that your attestations were submitted to CBP. You should see an alert that says: "Your information and attestations were successfully submitted to U.S. Customs and Border Protection (CBP)."

- Next, select "View your biographic information" and ensure your date of birth is in the mm/dd/yyyy format and that your passport number is correct.

CHNV-FRN-00637

If you need to correct your passport information or date of birth, or if all your information appears correct and you are still unable to proceed, you should use your USCIS account to:

- Upload a copy of your valid, unexpired passport as Unsolicited Evidence in your Notices tab; and
- Send USCIS a message from your inbox. In the message, you must either identify the information that is incorrect, or you must indicate that your information appears correct but you cannot proceed in the CBP One mobile app.

---

## Contacting USCIS About Form I-134A 

**Q1. If I need to submit an inquiry on my case, how can I contact USCIS?**

The best way to contact us depends on the type of inquiry.

*Technical Assistance with Online Account Access or a Password Reset*

If you have an issue with account access or need a password reset, use our online need help form.

*Case Status Inquiries*

You can monitor the status of your Form I-134A in your USCIS online account or check your most recent status in Case Status Online. Please note that the USCIS Contact Center cannot provide any additional information on the status of your case.

We do not currently list the processing time for Form I-134A on uscis.gov, and there is no expedite process. We will update your status in your online account when we make a decision on your case.

We will only accept a case status inquiry if the Form I-134A filed on your behalf has been pending more than 6 months. This includes inquiries submitted through the secure mailbox in your USCIS online account. Please note this is just a time frame for accepting inquiries. You should not necessarily expect a decision on your Form I-134A within 6 months.

*Form I-134A Corrections*

If you need to correct information on submitted Form I-134A, see the section above on 'Correcting a Submitted Form I-134A.'

**Q2. How can I, a potential supporter, withdraw a pending Form I-134A?**

If the Form I-134A you filed is still pending review by USCIS, you should log in to your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter you have signed by hand (not electronically). The letter must clearly explain that you would like to withdraw the Form I-134A you filed. You must keep the original signed letter in case we ask for it later. You will not receive a response to your letter from USCIS. However, USCIS will review the withdrawal request when we select the Form I-134A for review.

Note that we will not accept mailed requests to withdraw your Form I-134A. You must upload the withdrawal request as noted above.

CHNV-FRN-00638

If your Form I-134A has been confirmed, it cannot be withdrawn.

**Q3. My Form I-134A has been confirmed, but you have not contacted my beneficiary yet. What should I do?**

If your beneficiary has not received the emailed notices, you should review the Form I-134A and ensure that you provided the correct email address. If the email address is correct, the beneficiary should check their spam and junk mail folders. In general, in situations where the beneficiary has not received their Account Access Notice, they should call the USCIS Contact Center. The number for those outside the United States is +1-212-620-3418. Alternatively, the supporter can send USCIS a secure message regarding the issue through their own USCIS online account, and after we complete the verification process, we can email the Account Notice to the beneficiary's email that we have on file.

If the email address is incorrect, log in to your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter you have signed by hand (not electronically). The letter should:

- Explain that the email address for the beneficiary you entered on Form I-134A was incorrect; and
- Request that USCIS update the beneficiary's email address and send the USCIS Account Notice to the beneficiary's correct email address.

Note: Your letter should list both the original, incorrect email address provided on the Form I-134A and the updated, correct email address for the beneficiary. You must also keep the original signed letter in case we ask for it later.

If a beneficiary still cannot find the notices, they should call the USCIS Contact Center at 800-375-5283. The number for those outside the United States is +1-212-620-3418.

## How to Avoid Scams ⌃

**Q1. Where can I get more information about the processes or help with Form I-134A?**

We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a Department of Justice recognized organization can give you legal advice. Visit the Avoid Scams page for information and resources as well as our Common Scams page that includes information on specific scams targeting supporters and beneficiaries under these processes.

Organizations outside of the government may be able to help potential supporters and beneficiaries to prepare for these processes. Two organizations that specialize in providing the public with information about providing welcome to newcomers and resources to support participation in these processes are listed below.

- Welcome.us provides information on welcoming and supporting newcomer populations.
- Community Sponsorship Hub has established the Sponsor Circle Program, which can provide resources and ongoing guidance to supporters.

CHNV-FRN-00639

This information is provided for informational purposes only. DHS does not endorse these entities. Using these entities instead of any other entity does not give any parolee preferential treatment when we adjudicate their application.

**Q2. Is there a fee or cost to participate in this process?**

Access to these processes is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134A or participation in these processes. Please note that beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134A on their behalf or for providing financial support while they are in the United States.

**Q3. What should I do if someone reached out online or through social media and offered to be my supporter?**

Beware of individuals who contact you online or through social media and:

- Say they are government officials;
- Offer to be your supporter or connect you to a supporter in exchange for a fee or other form of compensation; or
- Ask biographic information such as your passport number or date of birth.

Neither the supporter nor the beneficiary needs to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134A or participation in these processes. USCIS will only contact you through official government channels and will never contact you through your personal social media accounts (such as Facebook, Twitter, LinkedIn, etc.). Please see our Common Scams⧉ page for more information.

---

## REAL ID    ⌄

**Q1. Are parolees who came to the United States through these processes eligible for REAL ID-compliant driver's licenses or identification cards?**

Eligible beneficiaries under the process and their immediate family members paroled into the United States are not eligible for a REAL ID-compliant driver's license or identification card because parole is not included in the REAL ID Act (PDF) as a category authorized to receive a REAL ID-compliant license or identification card. This does not apply to Afghan parolees who fall within the scope of section 2502(b)(3) of the Afghanistan Supplemental Appropriations Act. However, parolees with another eligible category covered under the REAL ID Act, such as an approved or pending application for Temporary Protected Status or asylum, can potentially qualify for a REAL ID-compliant driver's license or identification card. In addition, many driver's license issuing authorities allow parolees to apply for a driver's license or ID card that is not REAL ID-compliant. For more information, please see REAL ID Frequently Asked Questions and guidance from the Department of Motor Vehicles for the jurisdiction where you live.



CHNV-FRN-00640

3/6/25, 12:03 PM
Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans | USCIS

Last Reviewed/Updated: 10/04/2024

CHNV-FRN-00641

**Office of Policy & Strategy**

**Immigration Records and Identity Services Directorate**

# *Form I-134A – Reviewers Guide*

(Last Revision – December 2, 2024)

Version 8.0

| Version | Date | Updated by | Description of Changes |
|---|---|---|---|
| 1.0 | April 27, 2022 | M. Dhanjal | Issuance of Draft Reviewers Guide |
| 2.0 | October 4, 2022 | M. Dhanjal | Addition of Step by Step Guides |
| 3.0 | October 19, 2022 | M. Dhanjal | Addition of Process for Venezuelans |
| 4.0 | January 17. 2023 | M. Dhanjal | Addition of CHNV and 134A |
| 5.0 | March 28, 2023 & April 11, 2023 | M. Dhanjal, M. Paredes | Preparation of Training, merging worksheets into the Guide; corrections |
| 6.0 | August 1, 2023 | M. Dhanjal, M. Paredes | Technical Updates, addition of Text Box |
| 7.0 | August 14, 2023 | J. Rondeau | Consolidating updated guidance |
| 8.0 | September 12, 2023 | J. Rondeau | Updated guidance for cases on hold, protected warning banners, cases on hold, duplicate case review, adding Alien Number to case, rendering Administratively Closed. |
| 9.0 | October 19, 2023 | J. Rondeau | Updated guidance for Text Box responses, Cases Placed on Hold for Other Reason, Tips for Reviewing Financial Evidence, Case Tracker Primary Reasons, Added appendices for Duplicate Case Process Map and TPS Evaluation Process Map. Inserted links to referenced appendices and chapters throughout document. |
| 10.0 | March 28, 2024 | M. Paredes | Updated guidance for co-supporter, Non-confirmation comments and contact for BOLO list. |
| 11.0 | July 9, 2024 | J. Rondeau | 1099s, Hosts, Shared ELIS Accounts, Business Accounts, Questions 27-29 (28-30) |
| 12.0 | August 6, 2024 | R. Alberre | Part 3, Question 20 (19) process. 7.3 Review Financial Evidence. 8.2 Render Non-Confirmation. Financial Questions |
| 13.0 | December 2, 2024 | R. Alberre | Part 3, Question 22 (21) process. 7.3 Review Financial Evidence. 8.2 Render Non-Confirmation. Financial Questions |

CHNV-FRN-00643

# 1.0  Introduction

## 1.1 Background – Uniting for Ukraine

On April 21, 2022, President Biden announced Uniting for Ukraine, a new streamlined process to provide Ukrainian citizens who have fled Russia's unprovoked war of aggression opportunities to come to the United States, fulfilling President Biden's commitment to welcome up to 100,000 Ukrainians and others fleeing Russia's aggression in response to the ongoing Russia-Ukraine crisis.

For the full press release, see Appendix I(a) – Press Release – President Biden to Announce Uniting for Ukraine, a new Streamlined Process to Welcome Ukrainians Fleeing Russia's Invasion of Ukraine, OR visit https://www.dhs.gov/news/2022/04/21/president-biden- announce-uniting-ukraine-new-streamlined-process-welcome-ukrainians.

Uniting for Ukraine will provide a safe and orderly process for displaced Ukrainians with a supporter in the United States to be considered for parole, on a case-by-case basis, for a period of up to two years. Ukrainians participating in Uniting for Ukraine must have a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States. The process begins when the supporter files Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, 1 with U.S. Citizenship and Immigration Services (USCIS) to include information both on the supporter and the Ukrainian beneficiary. Ukrainians who meet the requirements receive authorization to travel directly to the United States and seek parole, authorized by Customs and Border Patrol (CBP), at a port of entry. If granted parole under this process, Ukrainians are eligible for employment authorization.

More information on accessing and navigating procedures will be available on the DHS website at, https://www.dhs.gov/ukraine

## 1.2 Background – Process for Venezuelans

On October 12, 2022, the Department of Homeland Security announced joint actions with Mexico to reduce the number of people arriving at our Southwest border and create a more orderly and safe process for people fleeing the humanitarian and economic crisis in Venezuela. DHS' effort to reduce the irregular migration of Venezuelans also includes a new process to lawfully and safely bring up to 24,000 qualifying Venezuelans into the United States. 2 The United States will not implement this process without Mexico keeping in place its independent but parallel effort to accept the return of Venezuelan nationals who bypass this process and attempt to enter irregularly.
This effort is intended to enhance border security by reducing the number of Venezuelans seeking to irregularly enter the United States. It is derived from the success of the Uniting for Ukraine (U4U) program, which decreased flows at the border by creating an orderly process for the entry of Ukrainians fleeing Russia's invasion of Ukraine.

DHS will closely monitor the implementation of this process, and Mexico's independent and parallel efforts, and may consider expanding it in the future.

---

1 The electronic Form I-134 was replaced by the Form I-134A. This user guide references the I- 134A, but the information still applies to any pending I-134 cases.
2 The 24,000 cap on Venezuelan travel authorizations was changed with the announcement of the Process for Cubans, Haitians, and Nicaraguans announced in January 2023.

CHNV-FRN-00644

For the full announcement, see Appendix I(b) – Announcement – DHS Announces New Migration Enforcement Process for Venezuelans OR visit https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

### 1.3 Background – Process for Cubans, Haitians, and Nicaraguans

On January 5, 2023, DHS announced the establishment of new parole processes for Cubans, Haitians, and Nicaraguans, modeled on the successful processes for Venezuelans and Ukrainians, which combine safe, orderly, and lawful pathways to the United States, including authorization to work, with significant consequences for those who fail to use those pathways.

Building upon the success of Uniting for Ukraine and the Process for Venezuelans announced in October – which combine a safe and lawful pathway with a consequence for failing to use that pathway – today's announcement establishes similar processes for Cuban, Haitian, and Nicaraguan nationals who face unique challenges in their home countries. The Venezuelan process also will continue; Border Patrol saw a dramatic drop – 90 percent – in the number of Venezuelans encountered at the border following the establishment of the program in October. Nationals from Venezuela, Cuba, Haiti, and Nicaragua who do not avail themselves of this process, attempt to enter the United States without authorization, and cannot establish a legal basis to remain will be removed or returned to Mexico, which will accept returns of 30,000 individuals per month who fail to use these new pathways. The expansion of the Venezuela process to Cuba, Haiti, and Nicaragua is contingent on the Government of Mexico's willingness to accept the return or removal of nationals from those countries. It also is responsive to a request from the Government of Mexico to provide additional legal pathways for migrants, and it advances both countries' interests in addressing the effects throughout the hemisphere of deteriorated conditions in these countries.

Specifically, these processes will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border. Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization, provided that they: pass rigorous biometric and biographic national security and public safety screening and vetting; have a supporter in the United States who commits to providing financial and other support; and complete vaccinations and other public health requirements. Individuals who enter the United States, Mexico, or Panama without authorization following today's announcement will generally be ineligible for these processes. These processes will allow up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period.

For the full announcement, see Appendix I(c) – Announcement – DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes OR visit https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new- border-enforcement-measures-and.

### 1.4 Parole Supporter Definition and Requirements

The parole supporter is the individual who makes a financial obligation to provide support to the beneficiary while he or she is in the United States for the duration of the parole authorization period.

CHNV-FRN-00645

Generally, the supporter is a lawful permanent resident (LPR) or U.S. citizen (USC) and has sufficient income or financial resources to meet the Health and Human Services (HHS) Federal poverty guidelines. The supporter is required to submit a FormI-134A, Online Request to be a supporter and Declaration of Financial Support for each parole request to establish the adequacy of financial resources to support the parolee during his or her stay in the United States. Occasionally, a non-profit organization or medical institution may serve as a supporter on a parole application, with an individual completing the individual Form I-134A. In those instances, reviewers may accept a letter of commitment from the organization.

## 1.4.1 Lawful Status

The supporter must be in the United States under lawful status to qualify as a supporter for a beneficiary of the above-mentioned parole programs.  Additionally, they must submit evidence of lawful status with their Form I-134A package.  Here are the acceptable types of status for becoming a supporter:

- A U.S. Citizen or national,
- Lawful Permanent Resident (including lawful temporary resident and conditional permanent resident),
- nonimmigrant in lawful status (i.e., maintains the nonimmigrant status and has not violated any of the terms or conditions of the nonimmigrant status),
- asylee,
- refugee,
- parolee,
- TPS holder,
- beneficiary of deferred action (including DACA) or Deferred Enforced Departure (DED)
- or anyone else in the United States with lawful immigration status meets this requirement.

A pending application/petition with USCIS is not sufficient; however, if a pending application/petition for lawful status, or deferred action is approved (or if the supporter has been paroled into the United States) between the time the Form I-134 is filed and the time of review, then the supporter has met the lawful status requirement.

Reviewers may refer to Appendix VI – TPS Evaluation Process Map for guidance on how to determine if an individual is granted Temporary Protected Status.

See the **I-134 Status – Reference Guide – 20221102** and additional resources under the Teams I- 134A – Review Team, General Channel, in the Files Tab, for further information.

## 1.4.2 Sufficient Financial Evidence

The supporter must show evidence of sufficient financial resources according to the Health & Human Services (HHS) Poverty Guidelines to qualify as a supporter of the above-mentioned parole programs.

The number of people residing in the household plus the number of beneficiaries the supporter is petitioning for are the total number to consider when using this chart. Locate these guidelines here:

CHNV-FRN-00646

https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines.

All financial evidence, including bank accounts in the U.S. must be in English or have a translation provided in English.

Here are some acceptable forms of financial evidence a supporter may provide:

- Taxes - 2022, 2021, and/or 2020 tax filings are sufficient evidence when submitted alone
  - o Form 1040 U.S. Individual Income Tax Return - Use the Adjusted Gross Income (AGI)
    - Look for number of exemptions to determine number in household
    - Form 1040 – Line 11
    - Add anything listed in Lines 2a through 6a and any refund listed on page 2, line 35a
  - o State Tax Refund
    - Money due to supporter
    - Check to see if wages or AGI are listed on state tax form
  - o Business Taxes
    - Schedule C Profit or Loss from Business: Line 29 – Tentative Profit or Loss
    - 1120 U.S. Corporation Income Tax Return: Line 30 – Taxable Income
    - 1120-S Income Tax Return for an S Corporation: Line 21 – Ordinary business income (loss)
      - May look for Schedule K1, Part 11, Line E to see how many shareholders will split the total profit.  Divide Line 21 by this number.
  - o W-2 Wage and Tax Statement – Box 1, Wages, tips other compensation:
    - Don't worry about dependents if not listed on I-134A
  - o 1099s
    - Form SSA-1099, dated within 12 months of the request/application received date is valid evidence of income.
    - Exclusions – 1099-G, 1099-MISC, and 1099-NEC, by themselves, should not be considered as valid evidence of income.
  - o Paystubs – Look for pattern and add up for the past year – note whether pay period is weekly/bi-weekly/monthly
- Bank Accounts
  - o Statements should be dated within 3 months of date supporter submitted the I-134A
  - o Personal Accounts
    - Total: Available balance may be used toward the amount needed for poverty guidelines
    - Bi-monthly or regular deposits from business account (Example: If bi- monthly, multiply amount by 24)
  - o Business Accounts – If we can discern the supporter is the business owner and is using their business account's financial information, we may accept this as financial evidence. (Signer, Cardholder, Business Owner must reflect supporter's name)
  - o Bank statements in a foreign language must include a translation with uploaded evidence
- Letters
  - o Statements from supporter's employer – We DO NOT accept offer letters from employers for work that has not started.

CHNV-FRN-00647

- o Statements from supporter's employer should include:
  - ▪ Date and nature of employment (Form I-134 Instructions 04/25/22 Page 6 of 8)
  - ▪ Salary paid; and
  - ▪ Whether the position is temporary or permanent
- o Letter from Corporation, Church, or other organization expressing authorization for supporter to use finances for the beneficiary/beneficiaries
- o Approval letters for other benefit programs that are NOT Means-Tested (Means-Tested benefits are not acceptable income for Form I-134A)
- o Veterans Affairs Benefits
  - ▪ VA benefits are considered tax free, please see: 2023 Veterans Disability Compensation Rates | Veterans Affairs (va.gov)

**Identifying Federal Means-Tested Programs**

| **Means-Tested benefit programs that do NOT count as income for Form I-134A** | **Benefit programs that are not Means-Tested and DO count as income for Form I-134A** |
|---|---|
| Some examples include:<br><br>• Supplemental Nutrition Assistance Program (SNAP, formerly called Food Stamps)<br><br>• Temporary Assistance to Needy Families (TANF)<br><br>• Supplemental Security Income (SSI) | Some examples include:<br><br>• Unemployment benefits<br><br>• Social Security benefits<br><br>• Social Security Disability Insurance (SSDI)<br><br>• Retirement, Survivors and Disability Insurance (RSDI)<br><br>• Student financial aid/loans/grants<br><br>• Veterans Affairs (VA) benefits |

See guidance for reviewing evidence in Section 7.3 Review Financial Evidence. See additional information, including images of acceptable financial evidence in the Files Tab of the I-134A – Review Team / General Channel.

# 2.0 Case Assignment and Case Administration in ELIS and Microsoft Teams

This section provides detailed guidance regarding case assignment, workflow, and requirements related to reviewing the Form I-134A, Online Request to be a Supporter and Declaration of Financial Support.

## 2.1 Case Assignment in ELIS

At this time, staff will assign cases to themselves for review in ELIS. However, it should be noted that

CHNV-FRN-00648

cases may be assigned based on the need to be expedited and on the age of the case. Once your profile has been updated in ELIS, you will click "Get Work" to find an available case to start reviewing.



ELIS allows you to work the previous Form I-134 as well as the Form I-134A. Depending on your case assignment, you may be asked to work the Form I-134 or the Form I-134A. In addition, you may also be asked to work a specific country.

The drop down for the Form Type looks like:



When you pull a specific country, it will look like:



Once you select the correct Form Type, Country, and Location, you will select "1 case(s) to pull" from the Case Review drop-down and click on the "Get 1 Case" button to assign the case to yourself.



CHNV-FRN-00649

The case will look like this in your queue:



Click the Receipt Number hyperlink to open and review the case. If the supporter submitted multiple cases, ELIS automatically assigns all related and unassigned cases to you upon opening the case. You will see a banner stating "You have been assigned to x case(s) for this same supporter".



*2.2 Resources and Case Administration*

This section provides detailed guidance for adding cases to the Case Tracker, creating and maintaining folders, viewing case assignment, and unassigning a case from your queue. Additionally, it provides housekeeping tips for how to stay organized and avoid common mistakes.

### *2.2.1 Resources in Microsoft Teams*

We store all resources pertinent to reviewing I-134A in the Files Tab of the I-134A – Review Team General Channel.



- 01 – Administrative Information folder stores only administrative guidance
- 02 – Case Tracker stores only the Case Tracker (NOTE: There should only be one)
- 03 – Form I-134-134A – Training Materials stores all guidance for reviewing I-134As

I-134A Review Team Leads will post updated guidance in the General channel. You may request assistance from subject matter experts (SMEs) in your designated Teams Chat:

9

- USCIS Detailee Reviewers Discussion
- VER Staff Reviewer Discussion

Tips for searching previous conversations and asking questions in Teams:

- Watch for updated guidance in the General Channel (Only I-134A Review Team Leaders may post in this channel).
- Use key word in Search Bar to search for previous conversations.
- Keep conversations in the same thread and only start new conversations when you have a unique inquiry.
- Always include the receipt number.
- No need to add a screen shot, the SMES will look up your case.
- It may take 24 hours for SMEs to respond to questions.
  - Place case aside and pull another case.
  - Your case queue may get lengthy - Remain flexible and stay organized.
- If you are unsure about anything, ask your SMEs.

### 2.2.2 BOLO List and Case Tracker in Microsoft Teams

You may need to add a case to the Case Tracker for various reasons. Additionally, you will look for EVERY supporter's name on the BOLO List of Serial Supporters and FDNS Review spreadsheets. Locate these documents in Teams under the I-134 – Review Team, General Channel, in the Files Tab.

- Case Tracker is in the "02 – Case Tracker" folder.
- BOLO List of Serial Supporters and FNDS Review spreadsheet is in the "03 – Form I-134-134A – Training Materials" folder.

#### 2.2.2.1 Search Supporter on BOLO List of Serial Supporters and FDNS Review

Open the BOLO List of Serial Supporters and FDNS Review spreadsheet from Teams. We recommend you click Open in Desktop App and keep this open and easily accessible while you review cases.

**NOTE:** Do not save or make copies of this spreadsheet, as we need to rely on one accurate list for all to use.

The **FDNS** tab displays supporters who have been flagged by FDNS for various reasons. The **SS** Tab displays names of confirmed serial supporters. If a supporter's name appears on either of these lists, you must stop processing, and place the case in a folder.

- If your case has a red banner attached, follow the guidance under 3.2 Review Banners.
- If the case does not have a banner, add the case to the Case Tracker following guidance in the next section.

#### 2.2.2.2 Add Case to Case Tracker in Teams

When you open the Case Tracker, select Open in Browser or Open in Desktop App so you can keep the tracker open and easily accessible while reviewing cases.  Reviewers should add each related case individually.  Subject matter experts (SMEs) from the I-134A Review Team review cases placed on this tracker and will pull each case from the initial reviewer's  queue when they are ready to review.

When adding cases to the Case Tracker, reviewers must include:

CHNV-FRN-00651

- Primary Reason
- Date
- Receipt Number
- Reviewer's name
- Brief comments to include the total number of beneficiaries + household members

Primary Reason options may change as deemed necessary.  Currently, these are the Primary Reasons reviewers may choose from when adding cases to the Case Tracker:

- FDNS Hold
- Financial
- Possible Serial Supporter 11+
- Red TECS Banner
- RFE Needed
- ROA
- Text Box

### 2.3 Create and Manage Folders in ELIS

Using folders is essential for grouping and organizing cases in your assigned queue. Click the settings wheel to open Manage My Folders, where you may create up to 10 folders and edit folder names at any time. The number to the right of the folder name tells you how many cases you have in that folder.



### 2.4 View Case Assignment and Unassign Case in ELIS

You may need to see who a related case is assigned to and communicate with that reviewer for various reasons. If you need to view the owner of a case, click the Case (receipt) number to the left of the Open Evidence button from within the Case Review tab.



Once the Case (receipt) number tab is open, click the Task tab to view the Owner of the case. If you are listed as the Owner and must unassign the case from your queue, click the Unassign link under your name and the case will return to the unassigned queue.

CHNV-FRN-00652



## 2.5 Case Statuses

The evolution of a case looks like this:

- Resolving Preprocessing Checks = case is ready for review.
- Awaiting Beneficiary Attestation = case was confirmed and is awaiting beneficiary attestation.
- Accepted = case is ready to review and/or Awaiting Beneficiary Attestation (this is found in the ELIS account page of the supporter at the bottom for the I-134A).
- Closed – Confirmation = case was confirmed, beneficiary attested, now closed.
- Closed – Not Confirmed = case was not confirmed, and it is now closed.
- Administratively Closed = case was administratively closed (probably because it was a duplicate).

## 2.6 Housekeeping Tips

- Open guidance material prior to reviewing a case for easy access to helpful information.

- Close ELIS tabs and Digital Evidence Viewer after reviewing each case to avoid using information that belongs to another case.

- Keep these URL browsers open while reviewing:
  - ELIS
  - PCIS
  - ASPE Poverty Guidelines: https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines

- The title of the ELIS tab you are working in will be highlighted blue. All other open tabs display gray titles.

- Pull only ONE case at a time and process all newly assigned cases before signing out for the day.

- Reach out to SMEs in the Teams channel assigned to your group when you are unsure how to proceed with a case. If you don't receive an immediate response, place the case(s) in a folder and get another case to review while you wait.

CHNV-FRN-00653

    o   VER Staff Reviewer Discussion – for Verification Division staff

    o   USCIS Detailee Reviewer Discussion – for USCIS detailees

# 3.0 Review Security Check and Banners in ELIS Case

### 3.1 Review Security Check

When a Supporter completes an application in ELIS, biographic security checks will be performed automatically on the Supporter.  If biographic security checks result in a TECS hit, the Form I-134A will be taken out of the queue, and SCOPS BCU (Texas Service Center Background Check Unit) will prepare a resolution memo and give a "red light" or resolve the hit before the reviewer reviews the case.

To review the TECS check, go to **"Case"** section, and click the **"Risk & Fraud"** accordion, to see TECS result run by SCOPS BCU.



In this example, the TECS check was conducted and there is no match and you can continue reviewing the case:



If there is a TECS/NCIC Hit, SCOPS BCU will place a "red banner" on the case in the following circumstances:

- Where the supporter is under investigation for, has been arrested for (without disposition), or has been convicted of any Egregious Public Safety (EPS) offenses (see Appendix II);

- Where the supporter is under investigation for, has been arrested for (without disposition), or has been convicted of any specified offense against a minor as defined by the Adam Walsh Act (see Appendix III); and

13

- Where the supporter is the subject of a protected person order, is under investigation for, has been arrested for (without disposition), or has been convicted of domestic violence, has been arrested for (without disposition), or has been convicted of sexual assault, or is under investigation for, has been arrested for (without disposition), or has been convicted of immigration fraud or passport or identity theft (not applicable for individuals who have had a passport lost or stolen).
- If FDNS otherwise determines in reviewing the TECS hit that the supporter poses a significant national security or public safety risk, they will issue a "red banner".

If a case falls into your queue that may have been bundled with related cases, and under the Task Tab workflow status states: "Backend TECS Review, Review Backend TECS Hit Check", unassign that case as it needs to complete the TECS Review prior to processing.

If you pull a case that has related cases with mixed TECS banners (green/red), place a comment in your assigned chat with the IOE#s and do not process until you receive a response.

### 3.2 Review Banners

### 3.2.1 TECS Results Affect Eligibility

A TECS check with a "red banner" will look like this example, with the "TECS Results affect eligibility" message:



If you see this banner, keep the case and all related cases open, add the case information to the Case Tracker, select "Red TECS Banner" as the primary reason, and keep the case(s) in a folder in your queue.  These cases will disappear from your queue when a SME pulls the case(s) for review.

### 3.2.2 Cases Placed on Hold for Other Reason

If you see the below banner, keep the affected case and all associated cases in a folder even if only one or some of the associated cases have this banner.



Reviewers may receive assigned cases that do not contain this banner, but the ELIS account shows associated cases are

14

on hold, as displayed in the view below:



If you see this scenario, add the assigned case(s) in your queue to the Case Tracker, select "FDNS Hold" as the primary reason, and keep the case(s) in a folder in your queue. These cases will disappear from your queue when a SME pulls the case(s) for review.

### 3.2.3 Record of Action (ROA) Attached Warning

If the case has a Record of Action (ROA) attached, you will see a yellow banner when you open the case. If you see this, add the case to the Case Tracker in Teams, select ROA as the Primary Reason, and place the case in a folder. A SME will pull the case from your queue to review. See below example of the ROA banner:



### 3.2.4 Duplicate Case Alert

If the supporter submitted another case for the same beneficiary under the same ELIS account, ELIS displays a banner like this when you open the case.



If you see this banner, you must follow instructions under 5.0 Duplicate Case Review in ELIS.

### 3.2.5 Number of Beneficiaries

A supporter filing more than ten (10) Form I-134A, including duplicates, will result in a one-time automatic referral to FDNS for additional vetting. ELIS automatically refers to FDNS the eleventh (11th) Form I-134A filed by a supporter and suspends case review on other open Form I-134A associated with the same supporter. When the FDNS Immigration Officer completes review, a Record of Action will be uploaded to the ELIS file for the QA/SME team to review. See below example:

CHNV-FRN-00656



### 3.2.6 Protected Information Banners

DHS systems display a protected information banner to remind staff certain individuals hold protected status.  The warning for 8 U.S.C. § 1367 ("1367") is the confidentiality statute that applies to VAWA relief, Trafficking Victims nonimmigrants ("T visas") and U Victims of Crimes, nonimmigrants ("U visas").  The warning for individuals protected under 8 CFR 208.6 reminds that we are prohibited from disclosing information pertaining to asylum and refugee applications to third parties.

While we are charged with protecting personally identifiable information (PII) for all we serve, these banners are a reminder we must adhere to a special protected status for these individuals.  Reviewers may continue reviewing the I-134A if they see one or more of the below banners.







## 4.0 Check Number of Beneficiaries in ELIS

CHNV-FRN-00657

Locate the Alien Number and ELIS Account Number in the case number tab. This tab label only displays the case/receipt number. If the case number tab displays an Alien Number, click that hyperlink to view the supporter's ELIS accounts and cases associated with this Alien Number.



Click the Account Number hyperlink to view all I-134As submitted by this supporter. If there are multiple Account Numbers, you must open them all to search for the total number submitted and check to see if there are duplicate submissions for the case you are reviewing.



This is what the ELIS Account Number tab looks like:



Scroll to the bottom of the ELIS Account Number tab to locate the cases associated with this supporter.



CHNV-FRN-00658

Make a note of the total number of I-134As for this supporter, as you will need this information when determining if the supporter submitted sufficient financial evidence.

Sort the Beneficiary Name column in alphabetical order and search for duplicates. Look for your current assigned case number in the Receipt Number column, then locate beneficiary's name associated with this case. If there is a duplicate case for this beneficiary, follow instructions in the 5.0 Duplicate Case Review in ELIS section.

Tips for navigating case information:

- Click the light gray up & down arrows to sort any column header in ascending or descending order.
- Click the Receipt Number to open any associated case listed in this section.
- If there are more than 10 associated cases (may be other than I-134As), click the right facing arrow next to "Rows per page: 10" on the bottom right side of your screen. If there are 10 or fewer associated cases, the arrow will be grayed out and inaccessible.
- Pay attention to the Submitted Date and Case Status when working a duplicate case.

## 5.0 Duplicate Case Review in ELIS

Supporters may submit additional I-134s for the same beneficiary for various reasons:

- They need to update key beneficiary information (name spelling, date of birth, passport number and/or expiration date, email address);
- The beneficiary's travel authorization expired from the previous case;
- Reviewer was unable to render confirmation on the initial I-134A;
- Sometimes supporters submit a 2nd I-134 because significant time has passed, and they think the first case didn't go through.

When the supporter submitted more than one I-134A for the same beneficiary under the same ELIS account number, ELIS provides the Duplicate Case Alert banner shown in 3.2.4 Duplicate Case Alert. However, ELIS will not display this banner if the supporter submitted the second I-134A using a different ELIS account number. Reviewers must search all available data and related ELIS Accounts to determine if there are multiple I-134s for the same beneficiary.

Reviewers may refer to Appendix V – Duplicate Case Process Map and the below tips for how to proceed when they determine there are duplicate I-134As for the same beneficiary:

| Scenario | Selection | Reason |
|---|---|---|
| You have more than one case from the same supporter for the same beneficiary in your queue that has not been rendered a decision and meets confirmation criteria. | Render the confirmation on the most recently filed case, then select Administratively Closed for the oldest case. Case Acceptance in the Task or History will show date and time of submission. | The case most recently submitted may have edited info for next phase of processing such as Name, DOB, passport number, passport expiration, passport country, or email address. |

CHNV-FRN-00659

| You have one case that you would confirm and see an unassigned duplicate for the same supporter and beneficiary. | Assign the unassigned case to yourself and render confirmation on the most recently filed case. Select Administratively Closed for the oldest case. Case Acceptance in the Task or History will show date and time of submission. | The case most recently submitted may have edited info for next phase of processing such as Name, DOB, passport number, passport expiration, passport country, or email address. |
|---|---|---|
| You have one case that you would confirm and see an assigned duplicate for the same supporter and beneficiary with another reviewer. | If your case is the most recent render the confirm and notify the other reviewer. If your case is the oldest, do not Select Administratively Closed until the other reviewer renders the confirmation on their receipt. | The case most recently submitted may have edited info for next phase of processing such as email address. Admin close only after most recent has been confirmed to not confuse supporter notices. |
| You have a case to confirm that has an exact duplicate resolved by another reviewer as confirm. | Select Administratively Closed if Exact Duplicate. | Make sure it is an exact duplicate with no changes to name, dob, passport number, passport expiration, passport country, email address, or expired Travel Authorization. |
| Duplicate case in queue, assigned, or already worked that is a non-confirm and you have the associated duplicate case from the same supporter that still is non-confirm. | Select Non-confirm. | Supporter can submit for reconsideration multiple times. |
| Duplicate case in queue, assigned, or already worked that is a non-confirm and you have another case that now meets confirmation. | Select Confirm. | Supporter can submit for reconsideration multiple times. |
| Any scenario that has a duplicate that does not meet confirm criteria on the open case. | Select Non-confirm. | We should not confirm a case that does not meet confirmation criteria. We do not select Admin close on any case that is a non-confirmation. |

## *5.1 Compare Beneficiary Data*

If you determine the supporter submitted more than one case for this beneficiary under the same ELIS account, you will see the duplicate cases under the Associated Cases section at the bottom of the ELIS Account Number tab. Locate the receipt number for the duplicate case (not the case currently in your queue) and click the Receipt Number hyperlink to open and view the duplicate case. This will open the receipt number (IOEXXXXXXXXXX) tab where you may review case details and beneficiary information.

Click on Case Details to view case details and beneficiary information.

CHNV-FRN-00660



Scroll down and click Beneficiary Account to view beneficiary information.



Capture a screenshot of the Beneficiary Account section and compare this with the beneficiary information in the Beneficiary Account section of your assigned case. If the five highlighted data points are an exact match (**Name, Date of Birth, Passport Number, Passport Expiration Date, and Email Address**), then your assigned case is a true duplicate, and you will proceed to the next section 5.2 Add Beneficiary Alien Number. If it is not a true duplicate, continue processing as a new case and proceed to section 6.0 Conduct Supporter Review.



If the case is a true duplicate and the initial case was confirmed, administratively close the 2nd case following guidance in 8.3 Render Administratively Closed. However, before administratively closing the case, ensure the first case was travel authorized. If travel authorization has not yet expired, proceed to administratively closing the new filing. If the initial filing was NOT travel authorized OR if the travel authorization expired, continue to process the new case.

If the case is a true duplicate and the initial case is still open and not yet processed with a confirmation decision, confirm the most recently submitted case first, and then render Administratively Closed to the initial case and include a case comment referring to the receipt number of the confirmed case.

CHNV-FRN-00661

## 5.2 Add Beneficiary Alien Number

When a supporter submits Form I-134A and does not include an Alien Number for the beneficiary, ELIS automatically assigns the beneficiary an Alien Number when the case is confirmed.  If the supporter submits an additional case for the same beneficiary, reviewers must check to see that the new case includes the beneficiary's previously assigned Alien Number.  If the beneficiary's Alien Number was not included in the additional case, reviewers must manually add it prior to rendering another Confirmation.  Follow the below instructions to locate the beneficiary's Alien Number and issue date, then add them to the additional case.

Copy the Alien Number found in the Beneficiary account section in Case Details tab of the previously confirmed case.



Click the History tab in the previously confirmed case (next to Case Details) and look for the date the beneficiary's Alien Number was issued.



Return to the Beneficiary Account section in the additional case and click Add A-Number.

21



Type or paste the Alien number and start date, then click Save.



### 5.3 Review Case Details from Initial Case

When you confirm you are assigned a duplicate case, you must research the initial case details and try to determine why the supporter submitted a 2nd case. Click Case and check Render Decision to see the decision rendered for the initial case and whether the previous reviewer added comments explaining the decision. If the previous reviewer non-confirmed the case for any reason, you may continue processing and proceed to the next section 6.0 Conduct Supporter Review and continue processing.



If the case was Confirmed, click Notices and Snapshots and look for a Travel Authorization Document.

CHNV-FRN-00663



Open the Travel Authorization Document and look for the expiration date.  If the travel authorization expired, that is likely why the supporter submitted another case.  Notate the date the travel authorization expired.  In some instances, travel was not authorized in the previous case.  If you encounter either situation, you will add a comment to your current assigned case.



Enter applicable comment in your current assigned case:

- Travel Authorization under IOEXXXXXXXXX expired on XX/XX/202X
- Travel not authorized under previous case IOEXXXXXXXXX

## 6.0 Conduct Supporter Review

We must conduct a thorough supporter review to look for various information: More than 10 submitted I-134As, supporter's status, and situations where individuals may be trying to use these programs to circumvent adoption or fiancé application processes. You will search for the supporter's name on the BOLO List and in ELIS to determine if the supporter submitted more than 10 Forms I-134A. You will search PCIS for the supporter's status and possible fiancé and adoption applications.

### 6.1 Search BOLO List in Microsoft Teams

Search for the supporter's name on the BOLO List of Serial Supporters and FDNS Review in the Files Tab of the I-134 – Review Team General Channel:

https://teams.microsoft.com/l/channel/19%3aN59r3yiXn0g4qpExCaocnoNUIgxTvKzBzEyxTPEs1KE1%40t hread.tacv2/General?groupId=be5fc61a-f6b0-45f5-9fa4-b9b21ffc8a81&tenantId=5e41ee74-0d2d-4a72-8975-998ce83205eb

See guidance in 2.2.2.1. Search Supporter on BOLO List of Serial Supporters and FDNS Review.

CHNV-FRN-00664

### *6.2 Search Supporter in ELIS*

The name and date of birth displayed in the ELIS account should match the supporter's name and date of birth.  Supporters may not share ELIS accounts.  If you determine the supporter is sharing the ELIS account with one or more individuals, render non-confirmation following guidance in 8.2 Render Non-Confirmation.

Locate your supporter's name and date of birth from the Case Review tab.  If the supporter has an Alien Number, their information will appear in the worksheet portion of this tab.



If there is no Alien Number, you will have to click on Name and Date of Birth under the Financial Supporter Information Section to retrieve this information.  Notate the Name and Date of Birth to use in all supporter searches.



Click the Search tab next to My Cases in ELIS and enter the supporter's last name, first name and date of birth.  Use 01 as the month and 01 as the day in the date of birth range section and the supporter's actual birth year in the **Date of Birth From** box.  Then use 01 as the month, 01 as the day, and the year following the supporter's actual birth year in the **Date of Birth To** box.  If the supporter's date of birth was in the year 1993, you would enter 01/01/1993 in the Date of Birth From box and enter 01/01/1994 in the Date of Birth To box.  Click Search.  ELIS will return every case filed under different Alien Numbers and ELIS account numbers by this supporter.

CHNV-FRN-00665



If you discover the supporter submitted 11 or more unique Forms I-134A (not including duplicates) across one or multiple ELIS accounts, you must add this case to the Case Tracker, and select "Possible Serial Support 11+" as the primary reason.

If the supporter's name is not included on the BOLO List, place the case in a folder in your queue and notify Lead John Garside.  Please refer to the latest guidance provided by the Leads.

If the search returns no results, continue processing the case.

## 6.3 Search Supporter in PCIS

Reviewers must search PCIS for the supporter's status and evidence of adoption or fiancé applications. If the supporter has activity with USCIS, the Identity Details page in PCIS will display the supporter's name, biographical data, and Immigration Status.  The information you need to enter depends on whether the supporter has an Alien Number.  See each respective section for guidance on how to search the supporter in PCIS and how to review results.

### 6.3.1 Search Supporter with Alien Number

If the supporter has an Alien Number, enter it in the Identifier Search box and click the blue box with the magnifying glass (or press Enter).  PCIS will return an exact match.  Click View to open the Identity Details page.  PCIS displays the exact criteria you entered in a gray box under the Identifier Search box.



### 6.3.2 Search Supporter with No Alien Number

If the supporter does not have an Alien Number, enter the supporters last name, first name, and exact date of birth in the Advanced Search section and click Search (or press Enter).

25

CHNV-FRN-00666



Alternatively, you may click the drop-down next to Select Identifier and enter any of the unique identifiers available, such as Social Security Number (SSN).  You can find the supporter's SSN in ELIS under Financial Supporter Data in the Other Information field.



## 6.4 Review Results

### 6.4.1 No Results in PCIS

If the supporter has no activity with USCIS, PCIS will display "Your search criteria does not have any exact matches."

### Search Results



Proceed to 7.0 Review Evidence in ELIS.

### 6.4.2 Exact Match in PCIS

The supporter's name and date of birth (DOB) will display at the top of the Summery Tab and the Immigration Status will display in the middle.

CHNV-FRN-00667



### 6.4.3 Search PCIS for Approved Lawful Status

If a supporter has lawful status granted by USCIS, PCIS should display the individual's approval in the **Timeline Tab**. Click the Timeline Tab to search for an approval giving them status. PCIS takes about 30 seconds to check multiple systems for updated information. Click the blue circle with the carat next to the year to view activity for that year. You may need to open all years to locate approved status.



**NOTE:** If you are unable to locate an approved qualifying status in PCIS, contact your SMEs using the designated Teams channel and ask for assistance with confirming status.

- If SME confirms supporter does not have lawful status, issue Non-Confirmation following steps in 8.2 Render Non-Confirmation

- If SME confirms supporter does have lawful status, continue reviewing.

### 6.4.4 Search for Intercountry Adoptions and Petitions for Fiancé

Supporters are allowed to submit I-134A for family members (spouse/fiancé, child, sibling parent), but reviewers must watch for situations where individuals may be trying to circumvent normal application processes for adoption and fiancé petitions.

To ensure individuals are not circumventing intercountry adoption and fiancé petition procedures, reviewers must check

27

CHNV-FRN-00668

the Details Tab in PCIS for the below form types. Check the Form Type column for any of these forms:

- Form I-600
- Form I-600A
- Form I-800
- Form I-800A
- Form I-130 (on the basis of adoption)
- Form I-129F



### 6.4.4.1 Search for Intercountry Adoptions

To ensure individuals are not trying to circumvent the adoption process, you must check to see if the supporter also filed adoption related forms on behalf of the beneficiary.  If PCIS displays any of these forms submitted by the supporter, post a comment in your designated Teams chat and include the Case # (IOEXXXXXXXXXX). A SME will review and refer to FDNS if necessary.

- Form I-600
- Form I-600A
- Form I-800
- Form I-800A
- Form I-130 (on the basis of adoption)

### 6.4.4.2 Search for Petition for Alien Fiancé

To ensure individuals are not circumventing the Fiancé application process, you must check to see if the supporter previously filed three (3) or more Forms I-129F, Petition for Alien Fiancé. If PCIS displays three or more Forms I-129F, you must post a comment in your designated Teams chat and include the Case # (IOEXXXXXXXXXX). A SME will review and refer to FDNS if necessary.

It is ok if the supporter also filed one Form I-130 or I-129F for the same beneficiary.

## 7.0 Review Evidence in ELIS

Return to Case Review Tab in ELIS and click **Open Evidence**.  ELIS will open the Digital Evidence Viewer in a new browser where you may review all evidence submitted by the supporter.  Click the drop-down arrow next to the document title to view available documents.  Click the drop-down arrow in the Page to toggle between pages.  The Form I-134A should be the first document you see.

CHNV-FRN-00669



If evidence is blurry or illegible, try viewing the evidence in raw file to see if you can get a clearer image. Click Evidence and RFE in the Case Review Tab, locate the document you wish to view and click Raw File.



If the raw file is still blurry or illegible, reviewers may need to issue a Request for Evidence (RFE), following guidance in 7.4 Request for Evidence (RFE).

**Note**:  When you have a case where the supporter is filing for multiple beneficiaries and does not upload sufficient evidence/documents/proof of status for one case, but did include it in the other cases, you can confirm the one that lacks it, but must add a comment in the case that lacks the evidence referencing to the IOE# that contains the evidence.

## 7.1 Review I-134A

USCIS updated Form I-134A multiple times since we began supporting these parole programs. Depending on when the form was submitted, you may see variances in the format.  Forms submitted after 7/13/2023 will include a text box response reviewers must consider when reviewing the case.

Here are the key elements you will look for when reviewing Form I-134A:

- Did the supporter provide sufficient responses to questions 27-29 (or 28-30 in the 07/13/2023 form)?
- Did the supporter sign the form?
- Did the supporter provide a sufficient statement in the text box question (Forms submitted 7/13/2023 or later)?
- Did the Supporter provide additional information requesting we update Beneficiary's information (DOB/Passport #/Expiration date/Email), please update it under the Beneficiary Account.

Some portions of I-134A are not required for our financial review:

29

- Beneficiary's Anticipated Length of Stay is not required.
- Beneficiary's Financial Information is not required.
- Beneficiary signature and proof of status or photo ID are not required.

See the following sections for guidance on each element.

### 7.1.1 Responses to Questions

Reviewers must review the responses on page 8 of Form I-134 and determine whether the response is sufficient. Supporters must provide an affirmative response to questions 27-29 (28-30 for forms submitted 7/13/2023 or later), based on the following:

- Responses must be in English.  If not in English – issue non-confirmation according to guidance in 8.2 Render Non-Confirmation.
- Responses don't have to be lengthy, but "Yes" is not an acceptable response.  We're looking to see that the supporter responds affirmatively to accepting financial responsibility and assisting the beneficiary in their basic needs. If supporter responds only "Yes" under Intent to Provide Specific Contributions to the Beneficiary, reviewers will issue a non-confirmation.
  - The supporter's response does not have to specifically state "learn English" or "get a job" but needs to be an affirmative response.
  - If supporter responds only "Yes" to one of the questions, but affirms intent to support in other responses, ok to continue processing.  We're looking for the overall intent to support.
  - See below examples of Acceptable and Non-Acceptable responses:

| ACCEPTABLE | NOT ACCEPTABLE |
|---|---|
| • Yes, I have the resources to support (or some variation)<br>• I will support the beneficiary (or some variation) | • "Yes" to all 3 questions<br>• "Fine" to all 3 questions<br>• "Yes, I will"<br>• "Okay" |

- If the supporter references or alludes to a "host" (an unknown/unidentified 3rd party), but does not identify the host's name and doesn't provide a signed letter of intent from that individual, render non-confirmation following guidance under 8.2 Render Non-Confirmation. See below example.

> The host is the husband and father of this family. He has confirmed that he will provide financial support for as long as needed. Here is his name and contact information. They will live in

- If the supporter names a host and includes a signed letter from that person saying they agree to hosting, you may continue to process.
- If the supporter states the beneficiary will live elsewhere other than with the supporter, that is ok to process, no requirement for beneficiary to live with supporter.

30

### 7.1.2 Supporter Signature

Locate the supporter's signature block on page 11 of Form I-134A. If supporter digitally signed the form, continue to process. If supporter did not sign the form, issue a non-confirmation according to guidance in 8.2 Render Non-Confirmation.

Examples of acceptable signatures may include:

- The supporter's full name,
- The supporter's initials,
- An "X", and
- Two signatures are acceptable, but one signature must belong to the financial supporter.

### 7.1.3 Text Box Response

Forms I-134A submitted on 7/13/2023 or later will include a text box response in Part 2., Question 4. The text box response applies only to CHNV cases and is used to determine whether we will prioritize these cases for processing. The text box response does not apply to UKR cases and reviewers should continue processing UKR cases following all other guidance.

When reviewing CHNV I-134A cases, it is best to review in this order:

1. Status eligibility of supporter

2. Responses to Questions 28-30 are sufficient based on current guidance

3. Supporter signed the application

4. Financial eligibility of supporter

5. Text Box response is sufficient according to below guidance

If numbers 1-4 are sufficient to render the case confirmable, then move to number 5 to determine if the response in the Text Box question is sufficient to prioritize and process.

- If the response to the Text Box question is sufficient, then confirm the case.

- If the response to the Text Box question is not sufficient according to below guidance, place the case on hold as shown below and do not confirm the case.

- If numbers 1-4 would render the case non-confirmable, reviewers do not need to consider the Text Box response and should either issue the non-confirmation or add the case to the Case Tracker and keep the case in a folder, based on current guidance for the issue determining ineligibility.

#### 7.1.3.1 Required Elements for Text Box Response

Reviewers should look for these elements in the Text Box response:

- Does the response demonstrate the need for pressing or immediate action or attention?
- Does the response demonstrate a concern for the beneficiary's welfare?
- Does the response demonstrate that parole would be helpful to a community or population?

Example of response in text box:

31

4.  A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual.

> MY GRAND FATHER IS AN OLD PERSON, WITH SOME MEDICAL CONDITIONS. OSTEOARTHRITIS, DIABETES
> AND HYPERTENTION ARE SOME OF THEM, IN CUBA HE DOES NOT HAVE THE MEDICAL ASSISTANT NEEDS
> AND MEDICATION FOR ALL THIS DISEASESTHE ACTUAL CONDITIONS IN CUBA ARE TERRIBLE,HE HAS TO
> SPEND ALL DAY IN LINES TO BUY SOME FOOD AND MEDICATIONS, HE LIVES ALONG AND DOES NOT HAVE
> ANY OTHER FAMILY MEMBER WHO CAN TAKE CARE OF HIMHE TRAVEL TO MEXICO TO INTENT ARRIVE AT

Reviewers must consider whether the response references any of the following:

- General civil strife or political unrest;
- Rejoining with family;
- Medical needs or treatment;
- Vulnerabilities of either the beneficiary or a US-based person, including the need to provide caregiving assistance;
- Severe economic hardship

If any of these elements are present in the supporter's response, continue processing the case.

If none of these elements are present, but the supporter otherwise meets all criteria for status and financial evidence, put the case on hold following the below steps.

**7.1.3.2 Place Case on Hold for Insufficient Text Box Response**

Reviewers should follow these steps to place the case on hold due to insufficient Text Box response:

1.  Click "Put Case on hold" in ELIS (top right when receipt is in case view)



2.  Add case comment when prompted in pop-up window: "*Eligible for Confirmation, being held for lack of prioritization.*"
3.  Add case to Case Tracker with Primary Reason as Text Box and keep the case in a folder in your queue.

## *7.1.4 Additional Information – Update Needed*

If the supporter submitted an Additional Information supplement to Form I-134A, stating the beneficiary's DOB/Passport #/Expiration date/Email information should be updated, the reviewer may update the information in the Beneficiary Account.  Additionally, supporters sometimes mistakenly enter incorrect information for the beneficiary.  Reviewers should look for documents in evidence supporting the need to update beneficiary data.

When reviewers update the name and DOB, ELIS will automatically initiate another TECS check and could create a task that will hold the case from being able to be rendered.

Reviewers should follow these steps to update beneficiary DOB information in ELIS:

1.  Under the Date of Birth section for the Supporter, you may add a new DOB (upper right "+ Add" button)
2.  Once added, at the far-right side for the correct DOB, click on the 3 dots
3.  A drop down will appear indicating Make Primary or Make Inactive
4.  Select Make Primary and the "N" in the Primary column will change to "Y"

CHNV-FRN-00673

## 7.2 Review Evidence of Lawful Status

Click the drop-down arrow next to the Document field showing document title and look for an Immigration Status document in the evidence.



If submitted evidence meets criteria described in 1.4.1 Lawful Status, continue processing.

If supporter is a U.S. Citizen and submitted evidence does not meet criteria described in 1.4.1 Lawful status, follow guidance in 7.4 Request for Evidence (RFE).

If the supporter is not a U.S. Citizen, and did not include sufficient evidence of status, look for the individual's status in PCIS Timeline.

- If you locate an approved status in the Timeline, you may add a case comment: "PCIS confirmed status" and continue processing.
- If you are unable to locate an approved status in the Timeline, reach out to a SME in your designated chat and ask them to confirm status (include IOE#).
    - If SME confirms supporter does not have status, issue Non-Confirmation following steps in 8.2 Render Non-confirmation.
    - If SME confirms supporter does have lawful status, continue processing.

If the response to the RFE demonstrates the individual holds lawful status or has been paroled into the United States or granted deferred action or DED as of the date the response is received/reviewed, we will consider the Supporter to have met this requirement.

## 7.3 Review Financial Evidence

Reviewers must determine whether the income/liquid assets/outside support evidenced in the Form I-134A and supporting evidence meet at least 100% of the HHS Poverty Guidelines based on the number of persons in the family/household.  The number of persons in the family/household includes the supporter, any dependents, any beneficiaries already confirmed, and the beneficiary on whose behalf Form I-134A is being filed. The supporter should demonstrate that they are able to "receive, maintain, and support" the Beneficiary listed on the Form I-134A for two years (the anticipated period of parole).

- Regardless of the information submitted into the form fields, the supporting documentation should demonstrate that the supporter has income/liquid assets/outside support to meet at least 100% of the poverty guideline threshold for the supporter's household size.
- The 2023 HHS poverty guidelines are located at: https://aspe.hhs.gov/topics/poverty-

CHNV-FRN-00674

economic- mobility/poverty-guidelines, or see Appendix IV – Health and Human Services – 2023 Federal Poverty Guidelines

- Reviewers are to assume reported income will continue at the same rate for subsequent years, and household size will be static.  If there is insufficient income to meet the poverty guidelines threshold, we assume liquid assets would be spent over the course of the period of support.

Staff will assess income, liquid assets, and any commitments of support from outside organizations or additional individual supporters to determine in the totality of the circumstances whether the supporter is able to financially support the beneficiary for the duration of parole.  Totality of supporter's financial evidence must meet criteria outlined in 1.4.2 Sufficient Financial Evidence.

### 7.3.1 Tips for Reviewing Financial Evidence:

- If the supporter failed to upload sufficient financial evidence in one case but they did upload sufficient financial evidence with a related I-134A for another beneficiary, reviewer may use the evidence from the related case to continue processing.
- Form 1040 and/or 1040 Tax Transcripts are not required, if there is other financial evidence present that meets specified criteria.
- If AGI from the supporter's Form 1040 taxes (usually line 11) or 1040 Tax Transcript, shows sufficient financial funds to support beneficiary(s) (unless they hit the 11+ limit), plus themselves and number of others living in household, case is ok to confirm, no need to look at all other financial documents provided.
- If the AGI is insufficient to meet guidelines or in some cases a negative dollar amount, but there is other evidence such as an employment validation letter, bank account balances, W2's etc. that do meet the guidelines – continue to process the case.
- If Part 3. Information about the Individual Agreeing to Financially Support Beneficiary Named in Part 2. question 20 (Q-19), Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)? is marked "Yes", please non-confirm, and use the following comment: Non-Confirm, cannot use financial support from illegal activity or sources.
- If Part 3. Information about the Individual Agreeing to Financially Support Beneficiary Named in Part 2. Question 22 (Q-21), Does any of the income listed above come from means-tested public benefits as defined in 8 CFR 213a.1? is marked "Yes", please non-confirm, and use the following comment: Non-Confirm, cannot use financial support means-tested public benefits.
- When counting totality of beneficiaries + # in HH, remember to include prior confirmed I-134/I- 134As.
- If there is a co-supporter to assist with the financial support, we do not need to confirm co- supporter's status as long as the person signing the I-134/I-134A has status.
  - Co-supporter needs to be named in the application.
  - Places on application you may find co-supporters information.
    1. Page 4, Part 3. Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2, #3. If "Parole Process" selected in Part 1., Item Number 2. Provide the name of the organization, group, or individual that is providing support to the beneficiary with you (if any)

34

2. Page 7, #19, Income and/or #24, Assets

o If there is mention of a co-supporter, but they are not named in one of the places above and/or not mentioned at all and financial information is uploaded for someone other than the supporter, unless it's the supporter's spouse, then we cannot use that information as financial evidence.

- We may not include home/vehicle equity when calculating income.
- We are currently awaiting a policy decision on whether we may include Form 1099 as sufficient financial evidence. If the supporter uploaded a Form 1099 and there is no other sufficient financial evidence present, add the case and all related cases to the Case Tracker with "1099" as the reason and keep the cases in a folder in your queue.

### 7.3.2 Decision Steps:

If financial evidence is sufficient and meets required criteria, and you verified the supporter has lawful status and has not submitted I-134As for 11+ beneficiaries, render Confirmation according to guidance in 8.1 Render Confirmation.

If financial evidence is insufficient and does not meet required criteria, add the case to the Case Tracker for SME review and place the case in a folder.

If question 20 (Q-19 on applications prior to July, 2023), is marked "Yes", render Non-confirmation according to guidance 8.2 Render Non-Confirmation.

If question 22 (Q-21 on applications prior to July, 2023), is marked "Yes", render Non-confirmation according to guidance 8.2 Render Non-Confirmation.

### 7.4 Request for Evidence (RFE)

There are only two instances in which we send RFEs. Reviewers will add the case to the Case Tracker under the separate tab marked RFE and keep the case in a folder in their queue.

- If the supporter provided no proof of status and you cannot find any evidence of status in our databases (remember native born USC will not be in our databases); and/or
- If the evidence the supporter submits is blurry or illegible.
  - However, reviewers should first review the raw documents in the Case Review Tab. Reviewers can find the I-134 under Notices and Snapshots and raw files of all supporting documentation under Evidence and RFE.



CHNV-FRN-00676

If you encounter either scenario listed above and add the case to the RFE tab on the tracker, a SME or Team Lead will re-assign the case to their queue and address the RFE.

The following steps apply to the SME or Team Lead who will issue the RFE on the case.

**DO NOT** issue RFE for these scenarios:

- If supporter did not provide their A# or evidence of status, and you confirm they are a USC or have another acceptable status to support after a search in PCIS or other database, you can proceed with the case, no need to update their ELIS account or RFE. Add a case a comment: "Verified status via PCIS".
- If supporter provides no proof of financial support or no supporting documents at all, render Non-Confirmation.  Do not RFE and do not place on tracker.

### 7.4.1 Issue an RFE in ELIS

1. Under "Case Data" in Case Review Tab, click on "Evidence and RFE," you will see the RFE section under Evidence.
2. Click the drop-down under "Select Letter Type" and select "VER Request for Evidence Form I- 134 (84 days)," then under RFE Type, select "Initial".  Click Create.
3. This will launch you into the Enterprise Correspondence Handling Online (ECHO) system.



### 7.4.2 Complete RFE in ECHO

1. Click the plus sign next to the letter corresponding with your Form type.
   a. I-134
      i. VER 001 – No Evidence for Requirement Was Submitted
      ii. VER 002 – Illegible Documents – Legal Status and/or Finances
   b. I-134A
      i. VER 003 – No Evidence for Requirement Was Submitted
      ii. VER 004 – Illegible Documents – Legal Status and/or Finances
2. Click Compose – This opens the draft where you may add supporter and beneficiary names.
3. Click Edit Contact Info.
4. Click the spy glass in the Action column to edit beneficiary contact information.
   a. Replace the name of the sponsor with the name of the beneficiary (No need to remove other information).
   b. Click Save Applicant Beneficiary.
5. Click the green plus sign under Petitioner to add the Supporter's Name.
   a. Enter the supporter's first and last name.
   b. Click Save Petitioner.
   c. Click Close window.
6. Click Build.
7. Click Finalize Letter and Change Letter Date.
8. Click Mark Sent.

CHNV-FRN-00677

### 7.4.3 Link Letter in ELIS

1. On the RFE screen where you initiated the RFE, click the drop-down under Actions and select Link Notice.
2. ELIS provides a pop-up window
   a. Check box under Link
   b. Click Link Letter
3. RFE status updates to Issued
4. Place case in a RFE folder

### 7.4.4 Review RFE Response

Check your RFE folder periodically to watch for responses. When you receive a response to RFE, the case status updates to Awaiting Review. You may need to look at the evidence again to refresh your memory on why you submitted the RFE. Review the newly uploaded document in evidence to determine if it satisfies criteria and follow the below steps to mark it as reviewed.

1. Click receipt number to open response.
2. Select RFEID#hyperlink to populate the Response Received for RFE table.
3. Select the checkbox in the Document Reviewed column.
4. Select Mark Reviewed.
5. Select Go.

### 7.4.5 Cancel an RFE in ELIS

There may be instances where you need to cancel an RFE, such as the supporter withdraws their application. You may only cancel the RFE if the supporter has not yet responded. Follow the below steps to cancel the RFE in ELIS.

1. Navigate to the RFE page in Case Review Tab.
2. Click drop-down menu under Actions.
3. Select Cancel.
4. Click Go.
5. In the Update Notes pop-up window, enter an explanation in the comment field.
6. Click Save.
7. Click OK to confirm.

### 7.4.6 Process Expired RFE

Supporters have 87 days to respond to a RFE. If the supporter does not respond, the RFE will show expired in your queue. If this occurs, access the RFE under Case Details and update as follows:

1. Select Close - Response Not Received from drop-down menu under Actions.
2. Add a case comment "Issuing Non-Confirmation due to lack of response to RFE." and non- confirm the case.



| RFE ID# | Type | Issued On | Response Period | Due Date | Status | RFE Notes | Actions |
|---------|------|-----------|-----------------|----------|--------|-----------|---------|
| 181069753 | Initial | 08/10/2022 | 84 Days | 11/02/2022 | Expired | | Close - Response Not Received ▾ Go |

Showing 1 to 1 of 1 entries

CHNV-FRN-00678

# 8.0 Render Decision in ELIS

If you reviewed Form I-134A and submitted evidence, and determined the supporter has lawful status and is financially able to sponsor the beneficiary, you will render a Confirmation in ELIS.  Alternatively, if during review you determine the supporter does not have lawful status or did not provide sufficient responses to questions in the I-134A.  In this case, you would render a Non-Confirmation.

## *8.1 Render Confirmation*

Scroll to the bottom of the Case Review Tab and click Render Decision.  Click the drop-down arrow under Render Decision and select Confirmation.  Click Save and Finalization.  Double check that you selected the correct decision and click Yes in the pop-up window to confirm your selection.



The case will disappear from your queue.


## *8.2 Render Non-Confirmation*

Reviewers must enter a case comment explaining the reason for issuing a Non-Confirmation.  When non-confirming a case, please be mindful that our case comments are subject to FOIA.  Reviewer should enter comments using the below language:


- Non-confirm for lack of status.
- Non-confirm for lack of evidence/supporting documents.
- Non-confirm for marking "Yes" to question 20 (Q-19).
- Non-confirm for marking "Yes" to question 22 (Q-21).
- Non-confirm for lack of or insufficient responses to questions #27-29. (#28-30)
- Non-confirm for lack of/insufficient supporter signature on Form I-134A.
- Non-confirm, duplicate case. (use when you have duplicates from different supporters)
- Administratively Close, duplicate filing. (use when you have duplicates from same supporter)
- Supporter asked to withdraw so USCIS non-confirmed the case, without prejudice. (use when you see a letter from the Supporter requesting to withdraw Form I-134/I-34A)


Scroll to the bottom of the Case Review Tab and click the plus sign to add Case Comment.  Type the comment, per above guidelines and click Save.

38



Click Render Decision and select Non-Confirmation from the drop-down arrow under Render Decision. Click Save and Finalization.  Double check that you selected the correct decision and click Yes in the pop- up window to confirm your selection.



The case will disappear from your queue.

## 8.3 Render Administratively Closed

Reviewers may determine a case should be administratively closed for various reasons.  Before rendering Administratively Closed on a case, reviewers should first consider the following:

- If you are going to render an Administratively Closed decision, you must ensure there is a previously confirmed case for the same beneficiary.

- See 5.0 Duplicate Case Review in ELIS for reasons to administratively close a case.

Reviewers may render an Administratively Closed decision by following these steps:

- Add a comment explaining why you are rendering Administratively Closed. (See instructions for adding comments under 8.2 Render Non-Confirmation.

    - Example: "True duplicate to IOEXXXXXXXXXX, confirmed on xx/xx/20xx."
- Open the Case Review Tab and click Render Decision, then select Administratively Closed from

CHNV-FRN-00680

the drop-down arrow under Render Decision.

- Click Save and Finalization.
- Double check that you selected the correct decision and click Yes in the pop-up window to confirm your selection.



The case will disappear from your queue.

CHNV-FRN-00681

## Appendix I(a) – Press Release – President Biden to Announce Uniting for Ukraine, a new Streamlined Process to Welcome Ukrainians Fleeing Russia's Invasion of Ukraine

https://www.dhs.gov/news/2022/04/21/president-biden-announce-uniting-ukraine-new-streamlined-process-welcome-ukrainians

WASHINGTON – Today, the President will announce *Uniting for Ukraine*, a new streamlined process to provide Ukrainian citizens who have fled Russia's unprovoked war of aggression opportunities to come to the United States, fulfilling President Biden's commitment to welcome up to 100,000 Ukrainians and others fleeing Russia's aggression as a result of the ongoing Russia-Ukraine crisis. In addition, the State Department is announcing increased refugee resettlement processing and broadened access to visa processing at consular posts overseas.

This builds on the robust humanitarian assistance the U.S. government is providing to complement the efforts of generous countries throughout Europe who are hosting Ukrainian citizens who have been displaced.

"We are proud to deliver on President Biden's commitment to welcome 100,000 Ukrainians and others fleeing Russian aggression to the United States. The Ukrainian people continue to suffer immense tragedy and loss as a result of Putin's unprovoked and unjustified attack on their country," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "DHS will continue to provide relief to the Ukrainian people, while supporting our European allies who have shouldered so much as the result of Russia's brutal invasion of Ukraine."

"The U.S. Department of State stands with the people of Ukraine," **said Secretary of State Antony J. Blinken.** "We will help deliver on the President's commitment to welcome 100,000 Ukrainian citizens and others forced to flee their homes in Ukraine, and our partnership with the Department of Homeland Security will help us fulfill that commitment."

*Uniting for Ukraine* is a streamlined process for Ukrainian citizens who have been displaced by Russia's aggression to apply for humanitarian parole in the United States. To be eligible, Ukrainians must have been residents in Ukraine as of February 11, 2022, have a sponsor in the United States, complete vaccinations and other public health requirements, and pass rigorous biometric and biographic screening and vetting security checks. Ukrainians approved via this process will be authorized to travel to the United States and be considered for parole, on a case-by-case basis, for a period of up to two years. Once paroled through this process, Ukrainians will be eligible for work authorization.

Beginning on April 25, 2022, U.S.-based individuals and entities can apply to DHS to sponsor Ukrainian citizens who have been displaced by Russia's aggression through the *Uniting for Ukraine* process, which will go live that day on the DHS website. Any U.S. citizen or individual, including representatives of non-government organizations, can supporter Ukrainian applicants. Individuals and organizations seeking to sponsor Ukrainian citizens in the United States will be required to declare their financial support and pass security background checks

41

to protect against exploitation and abuse. The Department of Homeland Security will administer the program. Eligibility requirements will include required vaccinations and other public health requirements, as well as biographic and biometric screening, vetting, and security checks.

The United States strongly encourages Ukrainians seeking refuge in the United States who do not have and are not eligible for a visa to seek entry via *Uniting for Ukraine* from Europe, this will be the safest and most efficient way to pursue temporary refuge in the United States. The
U.S. government is working with European partners to ensure Ukrainians can meet the vaccination requirements of *Uniting for Ukraine.*

Ukrainians should not travel to Mexico to pursue entry into the United States. Following the launch of *Uniting for Ukraine*, Ukrainians who present at land U.S. ports of entry without a valid visa or without pre-authorization to travel to the United States through *Uniting for Ukraine* will be denied entry and referred to apply through this program.

In addition to *Uniting for Ukraine*, the United States is announcing a series of measures designed to expand access to existing legal pathways for Ukrainian citizens.

The Department of State will expand U.S. Refugee Admissions Program (USRAP) operations in Europe to provide eligible Ukrainians with greater access to refugee resettlement processing under the Lautenberg program, while also expanding referral mechanisms for Ukrainians and others fleeing Russia's war in Ukraine who are in need of permanent resettlement.

As part of these efforts, the Department of State will expand U.S. resettlement operations in Europe to provide more resources to process Ukrainian citizens for refugee resettlement under the Lautenberg program, and will expand referral mechanisms for Ukrainian citizens and others fleeing Russia's war against Ukraine to the U.S. Refugee Admissions Program (USRAP). To do so, the United States is working with European partners, the UN High Commissioner for Refugees and NGOs to identify particularly vulnerable Ukrainian citizens and others fleeing the conflict who may warrant permanent resettlement through USRAP. These particularly vulnerable populations include women and girls, children, older persons with special needs, members of ethnic and religious minority groups, LGBTQI+ persons, persons with disabilities, medically fragile individuals, and stateless persons.

In addition, European embassies and consulates are increasing, to the extent possible, the number of nonimmigrant visa appointments and ensuring there is an expedited visa appointment program for individuals with humanitarian, medical, or other extraordinary circumstances to get priority access.

The Biden-Harris Administration remains committed to supporting the people of Ukraine and continues to closely coordinate our efforts with our European allies and partners who are on the frontlines of aiding Ukrainian citizens forced to flee due to Russian aggression. The United States has contributed nearly $300 million in humanitarian assistance to provide displaced Ukrainians with food, safe drinking water, shelter, and winterization services, and will continue to serve as a global leader in the international humanitarian response. The United

CHNV-FRN-00683

States is prepared to provide more than $1 billion in new funding toward humanitarian assistance for those affected by Russia's war in Ukraine and its severe impacts around the world.

###

CHNV-FRN-00684

## Appendix I(b) – Announcement – DHS Announces New Migration Enforcement Process for Venezuelans

https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans

WASHINGTON – Today, as part of the Biden-Harris Administration's ongoing work to build a fair, orderly, and secure immigration system, the Department of Homeland Security (DHS) is announcing joint actions with Mexico to reduce the number of people arriving at our Southwest border and create a more orderly and safe process for people fleeing the humanitarian and economic crisis in Venezuela.

Almost four times as many Venezuelans as last year attempted to cross our southern border, placing their lives in the hands of ruthless smuggling organizations. Meanwhile, irregular migration from northern Central America is down by a quarter from the level encountered last year. The actions the United States and Mexico are announcing today are intended to address the most acute irregular migration and help ease pressure on the cities and states receiving these individuals.

Effective immediately, Venezuelans who enter the United States between ports of entry, without authorization, will be returned to Mexico. At the same time, the United States and Mexico are reinforcing their coordinated enforcement operations to target human smuggling organizations and bring them to justice. That campaign will include new migration checkpoints, additional resources and personnel, joint targeting of human smuggling organizations, and expanded information sharing related to transit nodes, hotels, stash houses, and staging locations. The United States is also planning to offer additional security assistance to support regional partners to address the migration challenges in the Darién Gap.

Our comprehensive effort to reduce the irregular migration of Venezuelans also includes a new process to lawfully and safely bring up to 24,000 qualifying Venezuelans into the United States.  The United States will not implement this process without Mexico keeping in place its independent but parallel effort to accept the return of Venezuelan nationals who bypass this process and attempt to enter irregularly.

"These actions make clear that there is a lawful and orderly way for Venezuelans to enter the United States, and lawful entry is the only way," **said Secretary of Homeland Security Alejandro N. Mayorkas**. "Those who attempt to cross the southern border of the United States illegally will be returned to Mexico and will be ineligible for this process in the future. Those who follow the lawful process will have the opportunity to travel safely to the United States and become eligible to work here."

This effort is intended to enhance border security by reducing the number of Venezuelans seeking to irregularly enter the United States. It is derived from the success of the Uniting for

CHNV-FRN-00685

Ukraine (U4U) program, which decreased flows at the border by creating an orderly process for the entry of Ukrainians fleeing Russia's invasion of Ukraine.

DHS will closely monitor the implementation of this process, and Mexico's independent and parallel efforts, and may consider expanding it in the future.

To be eligible, Venezuelans must:
- have a supporter in the United States who will provide financial and other support;
- pass rigorous biometric and biographic national security and public safety screening and vetting; and
- complete vaccinations and other public health

requirements. Venezuelans are ineligible if they:
- have been ordered removed from the United States in the previous five years;
- have crossed without authorization between ports of entry after the date of announcement;
- have irregularly entered Mexico or Panama after the date of announcement, or are a permanent resident or dual national of any country other than Venezuela, or currently hold refugee status in any country; or
- have not completed vaccinations and other public health

requirements. Venezuelans should not travel to Mexico to pursue entry into the United States.

Venezuelans approved via this process will be authorized on a case-by-case basis to travel to the United States by air directly to an interior port of entry, thus relieving pressure at the border.  Once in the United States, they will be eligible to apply for work authorization.

DHS will administer the process, working with communities and other partners. Any U.S.-based individual with lawful status, including representatives of businesses or other organizations or entities, can support a potential beneficiary from Venezuela. A supporter must prove that they have the means to provide financial and other support for the beneficiary. In the coming days, potential supporters can apply to DHS to support individual eligible Venezuelans via www.uscis.gov/Venezuela. Individuals and representatives of organizations seeking to apply as a supporter must declare the organization's financial support and they must pass security background checks to protect against exploitation and abuse.

The State Department will also engage in a robust in-region messaging campaign to communicate about this new process and the consequences of attempting irregular entry.

More information will be available at www.uscis.gov/Venezuela in the coming days.

Today's actions are part of the Biden-Harris Administration's ongoing efforts to reduce irregular migration throughout the Western Hemisphere, including through the U.S. Strategy for Addressing the Root Causes of Migration and the multinational Los Angeles Declaration on Migration and Protection. The process announced today is one more element of the United States' multilateral approach to addressing irregular migration that is impacting countries

throughout Latin America, and it is premised on pairing increased enforcement in response to irregular immigration with the development of lawful and safe pathways for qualifying individuals.

Venezuelans have been migrating throughout the hemisphere since approximately 2014, yet the level of irregular migration of Venezuelans has increased dramatically throughout the hemisphere in the past several years. There are currently 2.4 million Venezuelans residing in Colombia. More than 25% of Venezuela's population has left the country.  The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–
2019.  Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

The United States, in partnership with Mexico, also is committing to further expanding lawful labor pathways for Mexican and Northern Central American nationals. This last year, the United States doubled the number of H-2 visas issued to nationals of the Northern Central American countries of Guatemala, Honduras, and El Salvador. Today, we are [announcing](#) the largest H-2B supplemental in history for Fiscal Year 2023: nearly 65,000 new H-2B visas, including a set-aside of 20,000 to nationals of Northern Central American countries and Haiti. Historically, approximately 90% of these visas have been used by Mexican nationals.  This increase is coupled with strong measures to protect both U.S. and H-2B workers. Concurrent with this announcement, the Biden-Harris Administration is launching a White House-led Worker Protection Task Force to ensure ethical recruitment and dignified labor standards for foreign workers alongside protections for U.S. workers.

The United States also is renewing its commitment to tackle the root causes of migration and support countries in the region that are most impacted by these flows. For that reason, the United States has announced nearly $817 million in new assistance since September 2022 under the Los Angeles Declaration on Migration and Protection. This includes more than $240 million in new regional humanitarian and security assistance, $376 million in additional humanitarian assistance for people affected by the Venezuela regional crisis, and more than $199 million in additional humanitarian assistance for Mexico and Central America.

　　###

# Appendix I(c) – Announcement – DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes

https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and

WASHINGTON – The Department of Homeland Security (DHS) continues to prepare for the end of the Title 42 public health order, which is currently the subject of multiple court orders, and a return to processing all noncitizens under the Department's Title 8 immigration authorities. To that end, DHS today announced new border enforcement measures to improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to lawfully come to the United States. These measures, taken together, are concrete steps to enhance the security of our border while the Title 42 public health order is in place, and that DHS will continue to build on in preparation for the Title 42 order being lifted.

- DHS is establishing new parole processes for Cubans, Haitians, and Nicaraguans, modeled on the successful processes for Venezuelans and Ukrainians, which combine safe, orderly, and lawful pathways to the United States, including authorization to work, with significant consequences for those who fail to use those pathways. We are also continuing the process with respect to Venezuelans.

- Through the CBP One app, we are also providing a new mechanism for noncitizens to schedule appointments to present themselves at ports of entry, facilitating safe and orderly arrivals. Initially this will be used for those seeking an exception from the Title 42 public health order. Once the Title 42 order is no longer in place, CBP One will be used  to help ensure safe and orderly processing at ports of entry.

- DHS is increasing and enhancing the use of expedited removal under Title 8 authorities for those who cannot be processed under the Title 42 public health order. These efforts include surging personnel and resources and enrolling individuals under the asylum processing interim final rule published in March 2022.

- As a complement to these efforts, and in response to the unprecedented surge in migration across the hemisphere and to reduce encounters at our border, DHS and the Department of Justice (DOJ) intend to shortly issue a proposed rule that will, subject to public comment, incentivize the use of the new and existing lawful processes available in the Unites States and partner nations, and place certain conditions on asylum eligibility for those who fail to do so.

DHS will continue to monitor developments on the southwest border and will accelerate or implement additional measures, as needed, consistent with applicable court orders.

CHNV-FRN-00688

"We can provide humanitarian relief consistent with our values, cut out vicious smuggling organizations, and enforce our laws," said **Secretary Alejandro N. Mayorkas**. "Individuals without a legal basis to remain in the United States will be subject to prompt expulsion or removal. Individuals who are provided a safe, orderly, and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry."

As required by a combination of the Supreme Court's December 27 order and a separate district court injunction prohibiting the implementation of the CDC termination of the Title 42 public health order, the Title 42 order remains in effect, and individuals who attempt to enter the United States without authorization will continue to be expelled.

### *Country-Specific Enforcement Processes*

Building upon the success of [Uniting for Ukraine](#) and the [process for Venezuelans](#) announced in October – which combine a safe and lawful pathway with a consequence for failing to use that pathway – today's announcement establishes similar processes for Cuban, Haitian, and Nicaraguan nationals who face unique challenges in their home countries. The Venezuelan process also will continue; Border Patrol saw a dramatic drop – 90 percent – in the number of Venezuelans encountered at the border following the establishment of the program in October. Nationals from Venezuela, Cuba, Haiti, and Nicaragua who do not avail themselves of this process, attempt to enter the United States without authorization, and cannot establish a legal basis to remain will be removed or returned to Mexico, which will accept returns of 30,000 individuals per month who fail to use these new pathways. The expansion of the Venezuela process to Cuba, Haiti, and Nicaragua is contingent on the Government of Mexico's willingness to accept the return or removal of nationals from those countries. It also is responsive to a request from the Government of Mexico to provide additional legal pathways for migrants, and it advances both countries' interests in addressing the effects throughout the hemisphere of deteriorated conditions in these countries.

Specifically, these processes will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border. Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization, provided that they: pass rigorous biometric and biographic national security and public safety screening and vetting; have a supporter in the United States who commits to providing financial and other support; and complete vaccinations and other public health requirements.
Individuals who enter the United States, Mexico, or Panama without authorization following today's announcement will generally be ineligible for these processes. These processes will allow up to 30,000 qualifying nationals per month from all four of these countries to reside

CHNV-FRN-00689

legally in the United States for up to two years and to receive permission to work here, during that period.

Starting tomorrow, potential supporters can apply to DHS to support eligible individuals via www.uscis.gov/CHNV. Individuals and representatives of organizations seeking to apply as supporters must declare their financial support, and they must pass security background checks to protect against exploitation and abuse.

### *Safe and Orderly Processes at Ports of Entry*

To facilitate the safe and orderly arrival of noncitizens seeking an exception from the Title 42 public health order, DHS is expanding use of the free CBP One mobile app for noncitizens to schedule arrival times at ports of entry. Individuals do not need to be at the border to schedule an appointment; expanded access to the app in Central Mexico is designed to discourage noncitizens from congregating near the border in unsafe conditions. Initially, this new scheduling function will allow noncitizens to schedule a time and place to come to a port of entry to seek an exception from the Title 42 public health order for humanitarian reasons based on an individualized assessment of vulnerability. This will replace the current process for individuals seeking exceptions from the Title 42 public health order, which requires noncitizens to submit requests through third party organizations located near the border.

Once the Title 42 public health order is no longer in place, this scheduling mechanism will be available for noncitizens, including those who seek to make asylum claims, to schedule a time to present themselves at a port of entry for inspection and processing, rather than arriving unannounced at a port of entry or attempting to cross in-between ports of entry. Those who use this process will generally be eligible for work authorization during their period of authorized stay.

Individuals who use the CBP One app will be able to schedule an appointment to present themselves at the following ports of entry:

- Arizona: Nogales;

- Texas: Brownsville, Hidalgo, Laredo, Eagle Pass, and El Paso (Paso Del Norte); and

- California: Calexico and San Ysidro (Pedestrian West – El Chaparral).

During their inspection process, noncitizens must verbally attest to their COVID-19 vaccination status and provide, upon request, proof of vaccination against COVID-19 in accordance with Title 19 vaccination requirements.

Individuals will be able to schedule appointments in CBP One in the coming days. The CBP One application is free to download and available in the Apple and Google App Stores as well as at https://www.cbp.gov/about/mobile-apps-directory/cbpone.

CHNV-FRN-00690

### *Enhanced Use of Expedited Removal*

We will comply with the court orders that require us to continue enforcing the Title 42 public health order. There are, however, migrants who cannot be expelled pursuant to Title 42 authorities and as a result are processed under Title 8 authorities. For those processed under Title 8, we are increasing and enhancing our use of expedited removal, which allows for the prompt removal of those who do not claim a fear of persecution or torture or are determined not to have a credible fear after an interview with an Asylum Officer, in accordance with established procedures.

This enhanced expedited removal process will include: dedicating additional resources including personnel, transportation, and facilities; optimizing processes across DHS and DOJ; and working with the State Department and countries in the region to increase repatriations. We also will continue to process individuals under the interim final rule published in March 2022 outlining procedures for U.S. Citizenship and Immigration Services to process asylum requests for noncitizens found to have a credible fear. Together, these measures will allow for the prompt removal of those who do not have a legal basis to stay and improve our overall preparedness for when the Title 42 public health order is lifted. Individuals removed under Title 8 are subject to a five-year bar on admission and potential criminal prosecution should they seek to reenter.

### *Notice of Proposed Rulemaking*

As a complement to these efforts, and in response to the unprecedented surge in migration across the hemisphere and to reduce encounters at our border, DHS and DOJ intend to issue a proposed rule to provide that individuals who circumvent available, established pathways to lawful migration, and also fail to seek protection in a country through which they traveled on their way to the United States, will be subject to a rebuttable presumption of asylum ineligibility in the United States unless they meet exceptions that will be specified. Individuals who cannot establish a valid claim to protection under the standards set out in the new rule will be subject to prompt removal under Title 8 authorities, which carries a five-year ban on reentry. DHS and DOJ will invite public comment on the proposed rule.

Overall, through today's announcements, DHS is strengthening the availability of legal, orderly pathways to the United States while imposing consequences on those who fail to use pathways made available to them by the United States and its regional partners.

These new measures complement ongoing efforts to increase refugee resettlement from the Western Hemisphere. The U.S. Government intends to welcome at least 20,000 refugees from Latin America and the Caribbean in Fiscal Year 2023 and 2024, putting the United States on pace to more than triple refugee admissions from the Western Hemisphere this Fiscal Year

CHNV-FRN-00691

alone. This delivers on the President's commitment under the Los Angeles Declaration for Migration and Protection to scale up refugee admissions from the Western Hemisphere.

Taken together, these efforts will: reduce irregular migration by disincentivizing migrants from taking the dangerous journey to the southwest border of the United States and attempting to cross without authorization; significantly expand lawful pathways to the United States for vetted individuals; and reduce the role for – and profits of – smuggling networks that callously endanger migrants' lives for personal gain.

The Department is taking these measures in light of Congress's failure to pass the comprehensive immigration reform measures President Biden proposed on his first day in office and the economic and political instability around the world that is fueling the highest levels of migration since World War II, including throughout the Western Hemisphere. The surge in global migration is testing many nations' immigration systems, including that of the United States. The actions announced today are part of the Biden-Harris Administration's ongoing commitment to enforce our laws and build a fair, orderly, and humane immigration system, and build on efforts outlined in the Department's December 2022 Update on Southwest Border Security and Preparedness. Today's announcements also show the imperative of partner countries working together, as agreed in the Los Angeles Declaration following the Summit of the Americas, to take action against smugglers and provide protection to asylum seekers. Hemispheric challenges require hemispheric solutions.

Everyone agrees that we are operating within a fundamentally broken immigration system. The steps we are taking reflect the constraints of our outdated statutes, which have not been updated in decades and were designed to address a fundamentally different migratory reality than that which exists today along the southwest border and around the world. As it has since its first day in office, the Biden-Harris Administration continues to call on Congress to pass legislation that strengthens border security, holistically addresses the root causes of migration, and improves legal pathways. We also encourage Congress to provide critical funding and advance bipartisan efforts to create a fair, fast, and functioning asylum system – enabling those who merit protection to quickly receive it, and those who do not to quickly be removed. In the absence of such action, the Administration is committed to pursuing every avenue within its authority to secure our borders, enforce our laws, and stay true to our values as we build safe, orderly, and humane processes.

###

CHNV-FRN-00692

# Appendix II – Egregious Public Safety (EPS) Concerns

An **EPS** case is defined by USCIS and ICE in the [2020 Memorandum of Agreement (MOA) Between DHS USCIS and DHS ICE Regarding the Referral of Immigration Benefit Fraud and Public Safety Cases](#) as a case where information indicates the noncitizen is under investigation for, has been arrested for (without disposition), or has been convicted of, any of the following:

a) Murder, rape, or sexual abuse of a minor as defined in section 101(a)(43)(A) of the Immigration and Nationality Act (INA).

b) Illicit trafficking of controlled substances as defined in section 101(a)(43)(B) of the INA.

c) Illicit trafficking in firearms or destructive devices as defined in section 101(a)(43)(C) of the INA.

d) Offenses relating to explosive materials or firearms as defined in section 101(a)(43)(E) of the INA.

e) Crimes of violence for which the term of imprisonment imposed, or where the penalty for a pending case, is at least one year as defined in section 101(a)(43)(F) of the INA.

f) An offense relating to the demand for, or receipt of, ransom as defined in section 101(a)(43)(H) of the INA.

g) An offense relating to child pornography as defined in section 101(a)(43)(I) of the INA.

h) An offense relating to racketeer influenced corrupt organizations as defined in 101(a)(43)(J) of the INA.

i) An offense relating to peonage, slavery, involuntary servitude, and trafficking in persons as defined in section 101(a)(43)(K)(iii) of the INA.

j) An offense relating to alien smuggling as defined in section 101(a)(43)(N) of the INA.

k) An offense relating to an attempt or conspiracy to commit any EPS offense in accordance with 101(a)(43)(U) of the INA.

l) An offense related to Human Rights Violators, including aliens who persecuted others as described in sections 101(a)(42)(B), 212(a)(2)(G), 212(a)(3)(E), 212(a)(3)(G), 212e, 237(a)(4)(D), 237(a)(4)(E), 237(a)(4)(F) of the INA, known or suspected street gang members, or Interpol hits.

m) Re-entry after an order of exclusion, deportation or removal subsequent to a conviction for a felony where Form I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal, has not been approved.

CHNV-FRN-00693

# Appendix III – Adam Walsh Act

Under the **Adam Walsh Act**, the term "specified offense against a minor" means an offense against a minor (defined as an individual who has not attained the age of 18 years) that involves any of the following:

- An offense (unless committed by a parent or guardian) involving kidnapping;
- An offense (unless committed by a parent or guardian) involving false imprisonment;
- Solicitation to engage in sexual conduct;
- Use in a sexual performance;
- Solicitation to practice prostitution;
- Video voyeurism as described in 18 USC 1801;
- Possession, production, or distribution of child pornography;
- Criminal sexual conduct involving a minor, or the use of the Internet to facilitate or attempt such
- conduct; or
- Any conduct that by its nature is a sex offense against a minor.

CHNV-FRN-00694

# Appendix IV – Health and Human Services – 2023 Federal Poverty Guidelines

*Poverty Guidelines for the District of Columbia and 48 Contiguous States*

| 2023 POVERTY GUIDELINES FOR THE 48 CONTIGUOUS STATES AND THE DISTRICT OF COLUMBIA | |
|---|---|
| **Persons in family/household** | **Poverty guideline** |
| 1 | $14,580 |
| 2 | $19,720 |
| 3 | $24,860 |
| 4 | $30,000 |
| 5 | $35,140 |
| 6 | $40,280 |
| 7 | $45,420 |
| 8 | $50,560 |
| For families/households with more than 8 persons, add $5,140 for each additional person. | |

54

CHNV-FRN-00695

*Poverty Guidelines for Alaska*

| 2023 POVERTY GUIDELINES FOR ALASKA | |
| --- | --- |
| **Persons in family/household** | **Poverty guideline** |
| 1 | $18,210 |
| 2 | $24,640 |
| 3 | $31,070 |
| 4 | $37,500 |
| 5 | $43,930 |
| 6 | $50,360 |
| 7 | $56,790 |
| 8 | $63,220 |

For families/households with more than 8 persons, add $6,430 for each additional person.

CHNV-FRN-00696

*Poverty Guidelines for Hawaii*

| 2023 POVERTY GUIDELINES FOR HAWAII | |
|---|---|
| **Persons in family/household** | **Poverty guideline** |
| 1 | $16,770 |
| 2 | $22,680 |
| 3 | $28,590 |
| 4 | $34,500 |
| 5 | $40,410 |
| 6 | $46,320 |
| 7 | $52,230 |
| 8 | $58,140 |
| For families/households with more than 8 persons, add $5,910 for each additional person. | |

56

CHNV-FRN-00697

## Appendix V – Duplicate Case Process Map



CHNV-FRN-00698

# Appendix VI – TPS Evaluation Process Map



CHNV-FRN-00699

## Administrative Issues

o ***Why are there two form – Form I-134 and Form I-134A?  And what does it mean for my review?***

The Form I-134, Declaration of Financial Support, was utilized by supporters filing for individual beneficiaries for both *Uniting for Ukraine* and *Process for Venezuelans*.  In January 2023, when *Processes for Cuba, Haiti, and Nicaragua* was announced, USCIS amended the Form I-134 to the Form I-134A, *Online Request to be a Financial Supporter and Declaration of Financial Support*, under the direction of the Office of Information and Regulatory Affairs (OIRA), a Division within the Office of Management and Budget (OMB).

Form I-134A is the only form being used for both *Uniting for Ukraine (U4U) and Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV).*

o ***What Teams Channel should I post questions to?***

I-134A Review Team Leads will post updated guidance in the General channel. You may request assistance from subject matter experts (SMEs) in your designated Teams Chat:

- USCIS Detailees should use the USCIS Detailee Reviewers Discussion Channel
- VER Staff should use the VER Staff Reviewer Discussion Channel

o ***Does a Supporter have to file a Form I-134A for every beneficiary including minor children of parents claimed on a Form I-134A?***

Yes, a Form I-134A needs to be filed for every individual separately; for every individual beneficiary including minor children.

o ***If I catch a mistake, what should I do if I confirmed already?***

Be careful when selecting Confirmation or Non-confirmation.  But if you make a mistake and select the wrong decision (confirm vs non-confirm), please email your Lead and SC Marianna Paredes with the case information ASAP.

The ELIS team has developed a pop-up to remind you of the decision you are rendering.  The ELIS team has also created a re-assess (re-open) feature that is available to a Level 6 Supervisor.

CHNV-FRN-00700