# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

        Plaintiffs,

   *v.*

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, et al.,

        Defendants.

Civil Action No.: 1:25-cv-10495-IT

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND/OR STAY OF THE *EN MASSE* TRUNCATION OF ALL EXISTING GRANTS OF FAMILY REUNIFICATION PAROLE (Doc. No. 216)**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

    A.  The Family Reunification Parole Processes ........................................................ 3

    B.  The Individual FRP Plaintiffs/Proposed Class Representatives ......................................... 5

    C.  December 15, 2025 FRN Terminating the FRP Processes ................................. 6

ARGUMENT ........................................................................................................................ 9

I.       PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT SECRETARY NOEM ACTED UNLAWFULLY IN CUTTING SHORT THOUSANDS OF GRANTS OF FAMILY REUNIFICATION PAROLE. ........................................ 9

    A.  Plaintiffs are likely to succeed on their arbitrary and capricious claim ............................ 9

          i.      Rationale for termination. .................................................................. 10

          ii.      Reliance interests and alternatives "within the ambit". ..................... 12

    B.  Plaintiffs are likely to prove Secretary Noem exceeded her statutory authority .............. 14

    C.  Plaintiffs are likely to prove the decision not to attempt actual notice to FRP parolees was arbitrary and capricious, conflicted with regulation, and violated due process......... 17

    D.  Plaintiffs are likely to succeed on their claim that the mass truncation of FRP grants was a legislative rule that was required to go through notice and comment ................... 18

II.     PRELIMINARY RELIEF IS NECESSARY TO STOP IMPENDING IRREPARABLE INJURY THAT IS CERTAIN TO OCCUR ......................................... 19

III.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY RELIEF ...................................... 20

CONCLUSION .................................................................................................................... 20

CERTIFICATE OF SERVICE ............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Araujo v. LaRose,*
   No. 25CV2942, 2025 WL 3278016 (S.D. Cal. Nov. 24, 2025)...........................................16

*Arevalo v. Lynch,*
   No. 1:25-cv-1365, 2025 WL 3522106 (W.D. Mich. Dec. 9, 2025).......................................16

*Arias v. LaRose,*
   No. 3:25-cv-02595, 2025 WL 3295385 (S.D. Cal. Nov. 25, 2025).......................................16

*A.V.V. v. Archambeault,*
   No. 25CV3272, 2025 WL 3493566 (S.D. Cal. Dec. 4, 2025) ...............................................16

*Biden v. Texas,*
   597 U.S. 785 (2022)...........................................................................................................14

*Castellon v. Kaiser,*
   No. 1:25-cv-00968, 2025 WL 2373425 (E.D. Cal. Aug. 14, 2025) .....................................16

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979)...........................................................................................................18

*Dadfar v. Arnott,*
   No. 6:25-CV-3329, 2025 WL 3452372 (W.D. Mo. Dec. 1, 2025).......................................18

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ..........................................................................................................13

*DHS v. Regents of the Univ. of Calif.,*
   591 U.S. 1 (2020)........................................................................................................12, 14, 18

*Doe v. Noem,*
   152 F.4th 272 (1st Cir. 2025)...........................................................................................13

*Doxy v. Larose,*
   No. 3:25-cv-02609, 2025 WL 3527054 (S.D. Cal. Dec. 8, 2025) .......................................16

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016)...........................................................................................................12

*Espinoza v. Kaiser,*
   No. 1:25-CV-01101, 2025 WL 2675785 (E.D. Cal. Sept. 18, 2025) ...................................16

*E.V. v. Raycraft,*
   No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025).......................................16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................................................12

*Gabriel v. Bondi*,
  No. 25-cv-4298, 2025 WL 3443584 (D. Minn. Dec. 1, 2025) ...........................................14, 16

*Garcia v. Andrews*,
  No. 1:25-cv-01006, 2025 WL 2420068 (E.D. Cal. Aug. 21, 2025) ....................................16

*Infante Rodriguez v. Raycraft*,
  No. 1:25-cv-1560, 2025 WL 3673583 (W.D. Mich. Dec. 18, 2025)....................................16

*J-C-R-M v. Wamsley*,
  No. 3:25-cv-990, 2025 WL 3527108 (D. Or. Dec. 9, 2025)..................................................16

*Joint Anti-Fascist Comm. v. McGrath*,
  341 U.S. 123 (1951).................................................................................................. 17-18

*Mata Velasquez v. Kurzdorfer*,
  794 F. Supp. 3d 128 (W.D.N.Y. 2025) .......................................................................16, 18, 20

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)....................................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................... *passim*

*Munoz Materano v. Arteta*,
  No. 25-cv-6137, 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025) ...........................................16

*Munoz v. Lynch*,
  No. 1:25-cv-1632, 2025 WL 3687338 (W.D. Mich. Dec. 19, 2025)....................................16

*Navarro Perez v. Larose*,
  No. 3:25-cv-02620, 2025 WL 3171742 (S.D. Cal. Nov. 13, 2025)........................................16

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................................20

*Padilla Hernandez v. Raycraft*,
  No. 1:25-cv-1719, 2025 WL 3730936 (W.D. Mich. Dec. 26, 2025)....................................16

*Parra Ocanto v. Lynch*,
  No. 1:25-cv-1447, 2025 WL 3522113 (W.D. Mich. Dec. 9, 2025)....................................16

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015)....................................................................................................18

*Pirona v. Noem*,
    No. 1:25-cv-1571, 2025 WL 3687339 (W.D. Mich. Dec. 19, 2025)................................16, 18

*Puerta Marin v. Lynch*,
    No. 1:25-cv-1444, 2025 WL 3533028 (W.D. Mich. Dec. 10, 2025)....................................16

*Quintero-Martinez v. Raycraft*,
    No. 1:25-cv-1507, 2025 WL 3649515 (W.D. Mich. Dec. 17, 2025)....................................16

*Rodriguez Martinez v. Raycraft*,
    No. 1:25-cv-1504, 2025 WL 3511093 (W.D. Mich. Dec. 8, 2025)......................................16

*Rojas v. Almodovar*,
    No. 25-cv-7189, 2025 WL 3034183 (S.D.N.Y. Oct. 30, 2025).............................................16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000)................................................................................................20

*Salazar v. Casey*,
    No. 25-CV-2784, 2025 WL 3063629 (S.D. Cal. Nov. 3, 2025)....................................16, 18

*Savane v. Francis*,
    No. 25-CV-2784, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025).........................................16

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................................................................................13

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided Court*, 579 U.S. 547 (2016)..............19

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011)................................................................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................9, 20

*Y-Z-L-H v. Bostock*,
    792 F. Supp. 3d 1123 (D. Or. 2025) ..............................................................................16

*Zelaya v. Lynch*,
    No. 1:25-cv-1355, 2025 WL 3496472 (W.D. Mich. Dec. 5, 2025)....................................16

## Statutes and Regulations

5 U.S.C. § 553(b) ............................................................................................................18

5 U.S.C. § 705 ..................................................................................................................1

8 U.S.C. § 1182(a)(9)(B)(i)................................................................................................8

8 U.S.C. § 1182(d)(5)(A) ................................................................ *passim*

8 C.F.R. § 103.2(b)(19) ....................................................................9, 17

8 C.F.R. § 212.5(d) ...............................................................................16

8 C.F.R. § 212.5(e)(2) .............................................................2, 9, 15, 17

**<u>Federal Register Notices</u>** (in reverse chronological order)

*Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) (Doc. No. 216-1) ....................................... *passim*

*Termination of the Cuba, Haiti, Nicaragua, and Venezuela Parole Processes*, 90 Fed. Reg. 13611 (Mar. 15, 2025) (Doc. No. 71-1). ............................................... *passim*

*Implementation of a Family Reunification Parole Process for Ecuadorians*, 88 Fed. Reg. 78762 (Nov. 16, 2023) (Doc. No. 24-27) ............................................ *passim*

*Implementation of Changes to the Cuban Family Reunification Parole Process*, 88 Fed. Reg. 54639 (Aug. 11, 2023) (Doc. No. 24-32) ......................................................3, 4

*Implementation of Changes to the Haitian Family Reunification Parole Process*, 88 Fed. Reg. 54635 (Aug. 11, 2023) (Doc. No. 24-31) ...............................................3, 4

*Implementation of a Family Reunification Parole Process for Colombians*, 88 Fed. Reg. 43591 (July 10, 2023) (Doc. No. 24-26) ............................................... *passim*

*Implementation of a Family Reunification Parole Process for Guatemalans*, 88 Fed. Reg. 43581 (July 10, 2023) (Doc. No. 24-28) ............................................... *passim*

*Implementation of a Family Reunification Parole Process for Hondurans*, 88 Fed. Reg. 43601 (July 10, 2023) (Doc. No. 24-29) ............................................... *passim*

*Implementation of a Family Reunification Parole Process for Salvadorans*, 88 Fed. Reg. 43611 (July 10, 2023) (Doc. No. 24-30) ............................................... *passim*

*Agency Info. Collection Activities; Application for Travel Doc. Removal of Instructions Regarding the Haitian Family Reunification Program and Filipino World War II Veteran Parole Program*, 85 Fed. Reg. 84362 (Dec. 28, 2020) (Doc. No. 216-2) ...............14

*Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28097 (May 9, 2016) .....................3

*Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75581 (Dec. 18, 2014) (Doc. No. 24-33) .................................................... *passim*

*Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65588 (Nov. 21, 2007) (Doc. No. 24-34) .................................................... *passim*

## INTRODUCTION

Plaintiffs respectfully request that the Court enter a temporary restraining order, preliminary injunction, and/or stay under 5 U.S.C. § 705, on a class-wide basis, of Secretary Noem's mass truncation of parole for up to 15,000[1] Family Reunification Parole ("FRP") beneficiaries whose parole and any associated work authorization will now end on January 14, 2026. *See Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) (hereinafter, "FRP FRN"), Doc. No. 216-1. FRP parolees entered the United States through distinct parole processes for nationals of seven Latin American countries. All FRP parolees, including the proposed class representatives,[2] are beneficiaries of approved family-based immigration petitions filed by U.S. citizen and lawful permanent resident ("LPR") relatives. Every FRP sponsor is someone the federal government affirmatively and personally invited to apply to FRP so that their family could be reunited while waiting the last few years before the parolee's visa becomes available and they can obtain a green card. In other words, FRP parolees may be here with a temporary status, but they are not here temporarily—they are future LPRs with a clear path to citizenship, and several Plaintiffs are only a few months away.

The FRP FRN identifies no rational basis for truncating every FRP parolee's grant of parole and associated work authorization. While Defendants suspended the FRP processes in January

---

[1] The FRP FRN indicates that as of December 15, 2025, there were 15,229 individuals with active grants of FRP parole, with an unknown number (but the vast minority) qualifying for an exception.

[2] The five individual FRP parolees have grants of parole that were supposed to expire between February 2027 and September 2027. *See* David Doe Decl., Doc. No. 214-2; Francisca Doe Decl., Doc. No. 214-3; John Doe Decl., Doc. No. 214-4; Jose Doe Decl., Doc. No. 214-5; Luciana Doe Decl., Doc. No. 214-6. *See also* Decl. of Plaintiff Valentin Rosales Tabares, Doc. No. 24-12 (Cuban LPR who lives in Portland with his wife and son and whose applications to sponsor his daughter and granddaughter for FRP were conditionally approved in December 2024 that the FRP FRN rescinds).

2025, the FRP parolees have become increasingly integrated into their communities, where they intend to stay indefinitely, while awaiting their visas. The adults have employment authorization, close family nearby, and a green card within sight—for themselves and their children, who are enrolled in school (more than a quarter of FRP parolees are children). Yet Secretary Noem never acknowledges—let alone justifies—the inevitable consequence of her decision: re-separating these families. And by recycling (often verbatim) the justifications she used to end CHNV, Secretary Noem ignores the fundamental differences in these processes in purpose, design, eligible populations, and scale. These are "important aspect[s] of the problem" that she "entirely failed to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This is textbook arbitrary and capricious agency action. *Id.* Secretary Noem failed to provide a reasoned explanation for ending the FRP processes. She fundamentally misunderstood the purpose of the FRP processes and the reliance interests of parolees and their family members who structured their lives around the government's personal invitations and assurances, failing to grapple with the (many) distinctions between FRP and the other processes that she invokes to justify termination. She also ignored the statute's requirement that she determine the "purposes" of each grant "have been served," 8 U.S.C. § 1182(d)(5)(A), and the regulation's requirement of "written notice to the [noncitizen]," 8 C.F.R. § 212.5(e)(2)(i)—not a Federal Register notice that most parolees will never see. Plaintiffs are likely to succeed on the merits, and the balance of harms and public interest weigh decisively in favor of preserving the status quo while this Court adjudicates the lawfulness of the mass termination. Secretary Noem makes clear that FRP parolees whose parole she is terminating will be subject to arrest, detention, removal, and potentially long-term derailment from their path to permanent status—all without any meaningful notice or due process.

## BACKGROUND

### A. The Family Reunification Parole (FRP) Processes

The FRP processes were created to expedite family reunification and to promote family unity, while also providing a lawful pathway out of dangerous, country-specific circumstances. The FRP processes allow U.S. citizens and LPRs to be reunited with close family members (spouses, siblings, and parents only) while those family members wait for their immigrant visas to become available. To be eligible to participate, the U.S.-based sponsor had to have on file a Form I-130 family-based immigrant visa petition approved by USCIS, with the beneficiary's visa expected to become available within a few years. Sponsors were required to demonstrate that they could financially support their family members for the duration of the parole period. By definition, every FRP parolee has a clear path under existing law to a green card in the near future—and, from there, to eventual U.S. citizenship. *See* Proposed Third Am. Compl. (Doc. No. 212-1) ¶¶ 138-79.

The FRP processes are not a novel use of the parole statute. The Cuban Family Reunification Parole program dates to 2007; the Haitian Family Reunification Parole program to 2014; and a similar process for eligible Filipinos (not at issue here) was created in 2016.[3] In 2023, DHS created five new FRP processes, for nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras.[4] DHS also "modernized" the processes for Cubans and Haitians in 2023 "in light

---

[3] *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65588 (Nov. 21, 2007), Doc. No. 24-34; *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75581 (Dec. 18, 2014), Doc. No. 24-33; *see also Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28097 (May 9, 2016).

[4] *Implementation of a Family Reunification Parole Process for Guatemalans*, 88 Fed. Reg. 43581 (July 10, 2023), Doc. No. 24-28; *Implementation of a Family Reunification Parole Process for Colombians*, 88 Fed. Reg. 43591 (July 10, 2023), Doc. No. 24-26; *Implementation of a Family Reunification Parole Process for Hondurans*, 88 Fed. Reg. 43601 (July 10, 2023), Doc. No. 24-29; *Implementation of a Family Reunification Parole Process for Salvadorans*, 88 Fed. Reg. 43611 (July 10, 2023), Doc. No. 24-30; *Implementation of Changes to the Haitian Family Reunification*

of technological advancements and process efficiencies" realized since their initial creation, 88 Fed. Reg. at 54639 (Cuba); *id.* at 54635 (Haiti), but the justifications for those parole processes are in the original FRNs. 72 Fed. Reg. at 65588 (Cuba), 79 Fed. Reg. at 75581-82 (Haiti).

Unlike other sponsor-based parole processes, the FRP application process must be initiated by the federal government. To apply, a U.S. citizen or LPR sponsor must first receive a personal invitation from the State Department. *See* 90 Fed. Reg. at 58033 ("invitation only"). The State Department sent those invitations to individuals who, per its records, met the eligibility criteria: all were U.S. citizens and LPRs with approved I-130 petitions for one of the backlogged family-based visas and where the visa for the beneficiary is expected to be available within approximately five years.[5] Invitees were additionally chosen based on operational capacity, country-specific considerations, and the policy aim of promoting family unity. *See, e.g.*, 88 Fed. Reg. at 78768.

Even upon receiving the State Department's invitation, sponsors could apply solely on behalf of the relative listed as the beneficiary in their approved I-130 petition, along with the primary beneficiary's spouse and unmarried minor children as derivative beneficiaries. Under the "modernized" FRP processes, applying sponsors used the same Form I-134A that was used for the U4U and CHNV parole processes (and have been lumped together with them for that reason).

USCIS received 35,700 applications through the "modernized" FRP processes (combined),

---

*Parole Process*, 88 Fed. Reg. 54635 (Aug. 11, 2023), Doc. No. 24-31; *Implementation of Changes to the Cuban Family Reunification Parole Process*, 88 Fed. Reg. 54639 (Aug. 11, 2023), Doc. No. 24-32; *Implementation of a Family Reunification Parole Process for Ecuadorians*, 88 Fed. Reg. 78762 (Nov. 16, 2023), Doc. No. 24-27.

[5] Under the "legacy" Haiti processes—through which individuals received two-year grants of parole—the State Department sent invitations when the beneficiary's visa was "expected to become available within approximately 18 to 30 months," 79 Fed. Reg. at 75582. The 2023 FRNs removed any specific time window but said the State Department would "consider when a beneficiary's immigrant visa is expected to become available" as a factor. 88 Fed. Reg. 54637; *accord id.* at 78768 (Ecuador); *id.* at 43606 (Honduras); *id.* at 43586 (Guatemala); *id.* at 43616 (El Salvador); *id.* at 43596 (Colombia); *id.* at 54641 (Cuba).

filed by a total of 10,608 potential sponsors.[6] USCIS "confirmed" eligibility for approximately 19,500 of those applications (56%). CBP paroled 14,069 individuals under the seven "modernized" processes. 90 Fed. Reg. at 58037 n.45. In addition, USCIS continued processing pending applications to the "legacy" Cuban process through January 2025, *id.* at 58035 n.14, and there are approximately 1,060 Cubans and 100 Haitians with currently active grants of parole following applications (via Form I-131) to their respective "legacy" parole processes. *Id.* at 58043.

Families paroled through the 2023 FRP processes began arriving in the United States in November 2023 and continued to do so until January 2025. They were given three-year initial grants of parole. Re-parole was available under the FRPs, but the State Department did not invite potential sponsors to apply if their beneficiaries were likely to need more than one grant.

### B.  The Individual FRP Plaintiffs/Proposed Class Representatives

Amongst the future LPRs paroled in through the FRP processes are five individual Plaintiffs: Luciana Doe, from Colombia; David Doe, from Ecuador; John Doe, from El Salvador; Francisca Doe, from Guatemala; and Jose Doe, from Honduras. *See* Doc. Nos. 214-2 through 214-6. Like all other FRP parolees, each Plaintiff is the beneficiary of an approved I-130 petition filed by a close family member in the United States who was personally invited by the government to apply to sponsor the Plaintiff for FRP. Each Plaintiff has waited for years for their priority date[7] to become current so that they may file an adjustment of status for a green card, and each Plaintiff

---

[6] The FRP processes required the invited sponsor to file a separate I-134A application for each beneficiary and derivative beneficiary. *See, e.g.*, 88 Fed. Reg. at 43598. On average, each FRP sponsor filed applications for 3.3 beneficiaries, reflecting that FRP was often used by family units. 90 Fed. Reg. at 58039.

[7] The "priority date" is the date (typically the filing date of the I-130 petition) marking a beneficiary's place in line for an immigrant visa. A priority date is considered "current" when it is earlier than the cutoff date published in the State Department's monthly Visa Bulletin for the applicable preference category and country of chargeability. *See generally* TAC ¶¶ 149-55.

was paroled through their respective country's FRP process with a relatively short wait remaining.

Because each Plaintiff understood that the purpose of FRP was to enable them to reunite with their sponsoring family member while waiting for their priority date to become current—at which point they could apply to adjust status to an LPR—each Plaintiff prepared to move permanently to the United States when their sponsor's FRP application was granted. Luciana Doe, for example, sold her car, her apartment, and all her possessions, and gave up the degree she was pursuing at university. Doc. No. 214-6 ¶ 8. John Doe and others likewise sold their cars and other belongings and gave up their housing in their home country. Doc. Nos. 214-4 ¶ 11 (John Doe); 214-5 ¶ 18 (Jose); 214-3 ¶¶ 10, 16 (Francisca); 214-2 ¶ 11 (David). Now, each of the Plaintiffs faces the threat of having their parole terminated in a matter of weeks despite having grants of parole that permit them to remain lawfully in the United States until 2027. Like the thousands of similarly situated FRP parolees, Plaintiffs' parole will be prematurely terminated on January 14, 2026, and they will be forced to leave the country if they do not wish to accrue unlawful presence and jeopardize their ability to immigrate in the future.

## C. December 15, 2025 FRN Terminating the FRP Processes

On December 15, 2025, DHS published the FRP FRN formally announcing that Secretary Noem had decided to terminate all seven "modernized" FRP processes as well as the two "legacy" processes for Cubans and Haitians. To a large extent, the FRP FRN recycles the March 15, 2025 FRN terminating the CHNV parole processes. 90 Fed. Reg. 13611 (Doc. No. 71-1). The two FRNs have identical structures and near-verbatim language throughout about, e.g., the parole statute and legislative history; five specific foreign-policy related actions the Trump Administration took in January and February 2025; how parolees' reliance interests compare to immigrants with DACA; and how DHS analyzed the reliance interests of third parties, like landlords. Secretary Noem

likewise recycled from the CHNV termination the conclusion that the parole processes should be terminated because they were ineffective at deterring unlawful migration to the southwest border, 90 Fed. Reg. at 58037; imposed significant resource burdens on USCIS (in adjudicating the I-134As) and CBP (in inspecting potential parolees one-by-one at ports of entry, particularly in Florida), *id.* at 58039; and raised vague fraud concerns based on an unreleased, internal report, *id.* at 58041 ("[O]ver 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half.").[8] The FRP FRN follows the CHNV termination strategy of ignoring most everything country-specific or humanitarian in nature about the humanitarian parole processes, this time with the bald claim, buried in a long footnote, that, "But for the significant public benefit justification"—which it claimed to be deterring unlawful migration—"DHS would not have established the FRP programs." *Id.* at 58034 n.11; *but see id.* (acknowledging FRP grants could be for "urgent humanitarian reasons" instead).

As to the FRP parolees already here, Secretary Noem announced that she had decided that "the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date." *Id.* at 58043. There are two exceptions to the January 14 cutoff: if Secretary Noem decides otherwise on a case-by-case basis or if the parolee had filed an adjustment of status application (Form I-485) as of December 15, 2025 that remains pending as of January 14, 2026. *Id.* In that latter situation—which likely applies to a small fraction of FRP parolees and mostly Cubans eligible under the Cuban Adjustment Act to adjust status after one

---

[8] "Confirmed" refers to a specific, early step in processing (step two of seven). *See* 88 Fed. Reg. at 43598. Secretary Noem did not claim that anyone was paroled because of these applications; nor that a single one was fraudulent (as opposed to mistaken or uncertain). *See* 90 Fed. Reg. at 58041. She did note that the invitations were Defendants' error. *Id.* at 58041 ("Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked.").

year of physical presence following parole or admission—the FRP FRN adds a new condition: if those parolees' pending adjustment of status applications are denied, their parole now automatically terminates that same day if it had not expired already. 90 Fed. Reg. at 58043. The FRP FRN says that FRP parolees can still request re-parole but changes the application form to use (from I-134A to I-131), the filing fee (from no fee to at least $580 per person), and the process and substantive standard applicable to those requests (continued "facial eligibility" is now insufficient to warrant re-parole). 90 Fed. Reg. at 58043 & n.90.

"Once parole is terminated," and absent some other legal basis to remain—which is unlikely, given that FRP parolees had no reason to seek it—the parolees "must return to their home country to maintain their path to lawful immigration status."[9] *Id.* at 58043. As a result, FRP parolees, including those weeks from being adjustment-eligible, have a matter of days to uproot the lives that they have been building here after accepting U.S. government's invitation. Secretary Noem confirms that DHS "intends to promptly remove" those who remain after January 14. *Id.*

Notwithstanding these consequences, Secretary Noem decided not to mail or otherwise give the affected individuals personal notice of the significant changes made to their parole.[10] Instead, she relied on publication in the Federal Register as "constructive notice" because she determined it was "the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses." *Id.* at 58045. Secretary Noem said that "DHS will also provide individual notice to each parolee through

---

[9] *Accord* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (imposing a three-year admission bar on noncitizens who voluntarily depart the United States after accruing more than six months but less than one year of unlawful presence); *id.* § 1182(a)(9)(B)(i)(II) (ten-year bar on admission of noncitizens who leave or are removed after accruing one year or more of unlawful presence).

[10] There is one exception: "For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account." 90 Fed. Reg. at 58045.

their USCIS online account," *id.* & n.102 (citing 8 C.F.R. § 103.2(b)(19)(ii)(B)), asserting that these "myUSCIS" messages and Federal Register publication "each independently constitute 'written notice to the alien' under 8 C.F.R. § 212.5(e)(2)(i)," and "regardless of actual knowledge or hardship resulting from ignorance." *Id.* at 58045.

**ARGUMENT**[11]

Plaintiffs seek preliminary relief as to the FRP FRN to the extent that it applies to current FRP parolees in the United States (the proposed class). Plaintiffs are likely to succeed in proving that Secretary Noem failed to engage in reasoned decision-making, failed to give the regulatorily and constitutionally required notice to the parolees themselves, ignored the constraints on and requirements of the parole authority, and issued a legislative rule without required procedures. Absent preliminary relief, Plaintiffs and the other FRP parolees are certain to be irreparably injured. Many are already spending the holiday season packing up their homes and preparing to quit their jobs and pull their kids out of school mid-year; others will not even learn that their parole has been prematurely revoked until after they are arrested by ICE. The balance of the equities and the public interest weigh heavily against this unlawful and illogical cruelty.

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT SECRETARY NOEM ACTED UNLAWFULLY IN CUTTING SHORT THOUSANDS OF GRANTS OF FAMILY REUNIFICATION PAROLE.**

**A. Plaintiffs are likely to succeed on their arbitrary and capricious claim.**

Secretary Noem justified terminating the FRP processes using the same template and reasoning she applied to CHNV. The two programs differ so fundamentally that her CHNV justifications—which were arbitrary and capricious even as to CHNV, *see* Doc. Nos. 198, 209—

---

[11] Plaintiffs' requests for preliminary equitable and statutory relief are governed by the familiar four-factor *Winter* test. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

9

are not even coherent when applied to FRP. The mismatches that result from this find-and-replace approach pervade Secretary Noem's analysis and present distinct violations of her duty to engage with the relevant factors and explain her decision. *State Farm*, 463 U.S. at 43.

**Rationale for termination.** Section III of the FRP FRN, entitled "Rationale for Termination," is seven pages long and comprises roughly half of the Notice as a whole. 90 Fed. Reg. at 58034-41. Secretary Noem devotes about two-thirds of it to analyzing whether the FRP processes failed to deter unlawful migration of third parties to the southwest border, repeatedly concluding that they failed to serve that purpose and so would be ended principally on that basis.[12]

This reasoning fails to recognize that (unlike certain other parole processes) none of the Family Reunification Parole processes were designed or intended to provide a deterrent to irregular migration of third-party nationals of these seven countries. As evidenced by their originating FRNs, that was not an issue they were intended to address. *Supra* nn.3-4. Nor would it have made sense to premise the FRP processes on a general deterrence rationale, given their modest scale and their criteria limiting invitations to those who already had a lawful immigration pathway within reach.[13] But the purpose of Family Reunification Parole was family reunification. Specifically,

---

[12] *See, e.g.*, 90 Fed. Reg. at 58037 ("DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration"); *id.* at 58038 ("[A]lthough the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument."); *id.* at 58039 ("[T]he FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border"); *id.* at 58041 ("The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration").

[13] Secretary Noem acknowledges the FRP processes were not well suited to deterring "unlawful" migration but repeatedly claims that reality as her own revelation to which DHS was previously blind. *See, e.g.*, 90 Fed. Reg. at 58037 ("DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period."); *id*. at 58038 ("[I]t was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration.").

FRP sought to reunite filers of approved I-130 petitions with their beneficiaries with priority dates relatively close. For those eligible immigrants whose families accepted the U.S. government's invitation to apply, passed multiple rounds of vetting, and whose U.S.-based families proved they can financially support them throughout their parole period, the FRP processes provided a jumpstart on their new lives in their new home country, and a safe route out of specific countries experiencing political instability, persecution and violence, natural disasters, and economic deprivation. Deterring unlawful migration by third parties was not their purpose.

To be sure, the processes provided beneficiaries with an alternative to dangerous irregular migration. But the processes were not created on a deterrence rationale, much less to deter third parties. To the contrary, to the extent they sought to prevent or "discourage" irregular migration, that aim was explicitly about the safety of the beneficiary and promoting family unity:

> Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants. While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migration in the absence of an alternative path to come to the United States for family reunification.

88 Fed. Reg. at 78765 (footnote omitted); *accord id.* at 43594 (Colombia); *id.* at 43614 (El Salvador); *id.* at 43604 (Honduras); *id.* at 43584 (Guatemala).[14] Each of these five FRNs and the legacy Haiti FRN detailed the country-specific reasons why some nationals of these countries might feel compelled to attempt to migrate irregularly, notwithstanding a visa being available in a few years. *See id.*; 79 Fed. Reg. at 75581 (Haiti). Similarly, while some of FRNs establishing FRP processes said parole could reduce strain on DHS, the comparison was to *that beneficiary* coming

---

[14] The legacy Cuba and Haiti processes also identified providing safe passage to beneficiaries as a purpose and benefit. 79 Fed. Reg. at 75582 (Haiti); 72 Fed. Reg. at 65588 (Cuba).

to the border instead—not third parties.[15] *See* 88 Fed. Reg. at 78768 (Ecuador); *id.* at 43596 (Colombia); *id.* at 43616 (El Salvador); *id.* at 43586 (Guatemala); *id.* at 43606 (Honduras).

Secretary Noem can disagree with her predecessors' policy choices, but she cannot rewrite history to justify her own. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**Reliance interests and alternatives "within the ambit."** Secretary Noem's failure to engage in reasoned decisionmaking is particularly evident in her discussion of reliance interests and alternatives. Much of her discussion is grafted incoherently from the CHNV FRN, and what is new demonstrates she did not appreciate the distinctions between FRP and CHNV.

Secretary Noem's discussion of FRP reliance interests is nearly identical to what she said about CHNV. In both termination FRNs, Secretary Noem identified two factors as lessening CHNV/FRP parolees' reliance interests,[16] and both FRNs assert that the reliance interests of CHNV/FRP parolees "are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in DHS v. Regents of the Univ. of Cal.[, 591 U.S. 1, 32 (2020)]," *id.* at 13619 & 58044, but that apples-to-oranges comparison does no explanatory work.

And then they diverge. For CHNV, Secretary Noem next said that she decided to cut short all grants of parole to maximize the number of parolees DHS could put through expedited removal. *Id.* at 13619. From there, she concluded: "Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning [CHNV] parolees when the basis for

---

[15] Reducing strain on DHS was not a justification for the parole processes for Cubans or Haitians.

[16] "(1) the Secretary retained the discretion . . . to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served; and (2) the initial [grant] of parole would be limited to a maximum of [two/three] years." 90 Fed. Reg. at 13619 & 58044 (footnotes omitted).

the underlying parole no longer exists." *Id.* For FRP, on the other hand, Secretary Noem reached the verbatim conclusion in the preceding sentence, but she jettisoned all mention of the expedited removal rationale, and without adding a single consideration. *Id.* at 58044. Without the expedited removal rationale, nothing remains but a bare conclusion. Agency action is arbitrary and capricious when one can only "guess at the theory underlying" it. *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947); *accord Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement … is meant to ensure that agencies offer … reasons that can be scrutinized by courts and the interested public.").

Worse than the incoherence in what she said, Secretary Noem failed to acknowledge or consider that these are not identical populations, processes, or situations; that, too, was arbitrary and capricious. *State Farm*, 463 U.S. at 43. She failed to consider or explain, for example, why it made no difference to her that, *inter alia*: (1) every FRP parolee is a beneficiary of an approved I-130 petition—and thus a future LPR with a path to citizenship—and is merely waiting for their priority date to become current; (2) every FRP parolee has a close relative in the United States who sponsored them after being personally invited to do so by the State Department; (3) DHS offered these families parole (and re-parole, unlike CHNV) as a bridge to adjustment of status[17]; (4) DHS's stated purpose was to promote family unity; and (5) given the FRP processes' eligibility criteria, terminating parole here necessarily produces family separation. Her CHNV-grafted explanations do not account for these material distinctions. Nor did Secretary Noem acknowledge or explain why her consideration of these reliance interests deviates so radically from the previous time DHS

---

[17] Secretary Noem's failure to consider this factor is likewise evident in her discussion of third-party reliance interests like landlords and employers. She repeats verbatim the CHNV FRN explanation that, "even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration," 90 Fed. Reg. at 58044, ignoring that FRP parolees did not move here temporarily.

sought to sunset the Haitian FRP process (and another not at issue here), during the First Trump Administration. 85 Fed. Reg. 84362, 84364-65 (Dec. 28, 2020), Doc. No. 216-2.

Secretary Noem compounded this arbitrariness by ignoring obvious alternatives to mass early termination and giving nonsensical reasons for rejecting those she did consider. The FRN alleges Secretary Noem considered (1) letting current grants expire "and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration"; (2) "allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available"; and (3) giving more than 30 days' notice. 90 Fed. Reg. at 58044. Conspicuously absent is simply letting existing grants "to remain in effect until the natural expiration of the parole, as DHS has in the past done with some parole terminations." 90 Fed. Reg. at 13619-20 (CHNV). Secretary Noem's failure to consider this option as to FRP is inexplicable, and "[t]hat omission alone renders [her] decision arbitrary and capricious." *Regents*, 591 U.S. at 30.

### B. Plaintiffs are likely to prove Secretary Noem exceeded her statutory authority.

The Secretary's authority under the parole statute "is not unbounded." *Biden v. Texas*, 597 U.S. 785, 806 (2022). To terminate grants of parole Plaintiffs and any other FRP parolee, the statute requires Secretary Noem to determine that the "purposes" of their grants of parole "have been served." 8 U.S.C. § 1182(d)(5)(A). To be sure, *whether* those purposes have been served is a matter of the Secretary's "opinion," *id.*, but making that determination is a precondition for ending anyone's parole. "If [Defendants] were not required to make such a determination to effect termination of parole, then there would be no reason for this language to have been included in the statute." *Gabriel v. Bondi*, 2025 WL 3443584, at *7 (D. Minn. Dec. 1, 2025).

The FRP FRN addresses this statutory requirement in one sentence, saying: "For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP

programs and the purposes of such parole therefore have been served." 90 Fed. Reg. at 58045. This sentence (derived from DHS's parole regulation[18]) is insufficient under the parole statute.

First, Secretary Noem's statement makes plain that she did not make the required determination. Everything "set forth above" concerned her decision to end the FRP processes. *See* 90 Fed. Reg. at 58034-40. That explanation says nothing about whether the individual parolees have accomplished the family reunification purposes of their parole. Moreover, the language "above" fundamentally misidentified the purpose of the FRP processes as deterring unlawful migration. To the extent she considered the purpose of anything "served," Secretary Noem did not consider the purpose of Plaintiffs' parole, which was to promote family unity. *See, e.g.*, 72 Fed. Reg. at 65588 ("The purpose of the [Cuban FRP] program is to expedite family reunification …."). Had she considered that purpose, she would have had difficulty explaining how it "has been served" with regards to FRP parolees who are not yet eligible to apply to adjust status to LPR.

Second, even if the boilerplate recitation of a legal conclusion can suffice, Secretary Noem's boilerplate does not even recite the necessary legal conclusion. The statute requires her to conclude that the purposes of the parole have been served, but that is not what she said. She asserted that "neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of" FRP parolees, and concluded that "the purposes of such parole *therefore* have been served." 90 Fed. Reg. at 58045 (emphasis added). But "continued presence" and "purposes served" are different questions—and she answered only the former while conflating it with the latter. Those are entirely different determinations, as made clear by the regulatory

---

[18] 8 C.F.R. § 212.5(e)(2)(i) ("[U]pon accomplishment of the purpose for which parole was authorized *or* when in the opinion of one of the officials listed [above], neither humanitarian reasons or public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien" (emphasis added)).

language she mangles, which presents them in the disjunctive. *Supra* n.18. Secretary Noem had to make a specific "preconditional determination," *Gabriel*, 2025 WL 3443584, at *7, and she has not done so.[19]

      Secretary Noem exceeded her authority under the parole statute in another way as well. The statute authorizing her to parole noncitizens requires that she do so "under such conditions as [s]he may prescribe only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). In *Doe v. Noem*, the First Circuit held—tentatively—that the "case-by-case" language applies to grants but probably does not apply to terminations. 152 F.4th 272, 287 (1st Cir. 2025). That holding is an outlier— numerous district courts, including this one, have reached the opposite conclusion. *See* Doc. No. 209 at 17 n.14 (collecting cases). Regardless, the First Circuit did not consider whether the case-by-case language applies when the Secretary is changing or adding the terms ("conditions") of parole, as she plainly did here. *Cf.* 8 C.F.R. § 212.5(d) ("Conditions").

---

[19] *Accord Araujo v. LaRose*, 2025 WL 3278016, at *2 (S.D. Cal. Nov. 24, 2025); *Arevalo v. Lynch*, 2025 WL 3522106, at *5 (W.D. Mich. Dec. 9, 2025); *Arias v. LaRose*, 2025 WL 3295385, at *3-4 (S.D. Cal. Nov. 25, 2025); *A.V.V. v. Archambeault*, 2025 WL 3493566, at *2 (S.D. Cal. Dec. 4, 2025); *Castellon v. Kaiser*, 2025 WL 2373425, at *5-6 (E.D. Cal. Aug. 14, 2025); *Doxy v. Larose*, 2025 WL 3527054, at *3-4 (S.D. Cal. Dec. 8, 2025); *E.V. v. Raycraft*, 2025 WL 2938594, at *2-3 (N.D. Ohio Oct. 16, 2025); *Espinoza v. Kaiser*, 2025 WL 2675785, at *7 (E.D. Cal. Sept. 18, 2025); *Gabriel*, 2025 WL 3443584, at *7; *Garcia v. Andrews*, 2025 WL 2420068, at *6 (E.D. Cal. Aug. 21, 2025); *Infante Rodriguez v. Raycraft*, 2025 WL 3673583, at *4-6 (W.D. Mich. Dec. 18, 2025); *J-C-R-M v. Wamsley*, 2025 WL 3527108, at *5, 9 (D. Or. Dec. 9, 2025); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 145 (W.D.N.Y. July 16, 2025); *Munoz v. Lynch*, 2025 WL 3687338, at *3-4 (W.D. Mich. Dec. 19, 2025); *Munoz Materano v. Arteta*, 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025); *Navarro Perez v. Larose*, 2025 WL 3171742, at *6 (S.D. Cal. Nov. 13, 2025); *Padilla Hernandez v. Raycraft*, 2025 WL 3730936, at *4-6 (W.D. Mich. Dec. 26, 2025); *Parra Ocanto v. Lynch*, 2025 WL 3522113, at *6 (W.D. Mich. Dec. 9, 2025); *Pirona v. Noem*, 2025 WL 3687339, at *4-7 (W.D. Mich. Dec. 19, 2025); *Puerta Marin v. Lynch*, 2025 WL 3533028, at *4 (W.D. Mich. Dec. 10, 2025); *Quintero-Martinez v. Raycraft*, 2025 WL 3649515, at *5-6, 9 (W.D. Mich. Dec. 17, 2025); *Rodriguez Martinez v. Raycraft*, 2025 WL 3511093, at *5 (W.D. Mich. Dec. 8, 2025); *Salazar v. Casey*, 2025 WL 3063629 (S.D. Cal. Nov. 3, 2025); *Savane v. Francis*, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025); *Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1138 (D. Or. 2025); *Zelaya v. Lynch*, 2025 WL 3496472, at *6 (W.D. Mich. Dec. 5, 2025).

**C. Plaintiffs are likely to prove the decision not to attempt actual notice to FRP parolees was arbitrary and capricious, conflicted with regulation, and violated due process.**

Independent of all her other decisions, Secretary Noem's confessed indifference to whether affected FRP parolees receive notice amply justifies preliminary relief. In this context, the need for notice arises from several distinct sources of law. First, DHS's parole regulation provides that where, as here, parole is not being terminated automatically, "parole shall be terminated upon written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i). This is not an empty requirement—it's the triggering event. *Id.* Second, constitutional due process requires that the government notify individuals when it acts to take something from them, and absent an exceedingly good reason, *before* it has done so. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Third, where the lawfulness of the agency action depends on affected parties receiving notice—as it does here under both regulation and the Constitution—the arbitrary and capricious standard requires the agency to articulate a rational basis for concluding notice will actually occur. *See State Farm*, 463 U.S. at 43.

Yet Secretary Noem expressly disclaimed any obligation to ensure parolees actually learn their status is being revoked, asserting that Federal Register publication suffices "regardless of actual knowledge or hardship resulting from ignorance." 90 Fed. Reg. at 58045. This position is untenable under any of the three frameworks.[20] The parole revocation regulation plainly contemplates notice *to* the individual, not notice to the world through a publication that parolees have no reason to monitor. Due process's demand that persons facing serious deprivation receive "notice of the case against [them] and opportunity to meet it," *Mathews*, 424 U.S. at 348 (quoting

---

[20] Secretary Noem also said USCIS "will" send USCIS account notifications, 90 Fed. Reg. at 58045 (citing 8 C.F.R. § 103.2(b)(19)(ii)(B)), but the relevant regulation only applies when the applicants filed with counsel, and apparently few FRP parolees did. Doc. Nos. 214-5 ¶ 9 (Jose Doe); 214-3 ¶ 10 (Francisca Doe); 214-2 ¶ 9 (David Doe); 214-6 ¶ 5 (Luciana Doe); 214-4 ¶ 10 (John Doe). For them, the regulation says USCIS will send notice "directly to the applicant" instead. 8 C.F.R. § 103.2(b)(19)(i).

*Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951)), cannot be satisfied by a method the agency itself acknowledges may never reach them. And the arbitrary and capricious standard is violated when an agency premises its action on a legal requirement—here, notice— while disclaiming any obligation to ensure it is met.[21] Any way you look at it, Secretary Noem's indifference to actual notice was unlawful, as many courts have held as to the same decisions regarding CHNV.[22]

### D. Plaintiffs are likely to succeed on their claim that the mass truncation of FRP grants was a legislative rule that was required to go through notice and comment.

Agencies must publish notice and provide an opportunity for public comment before promulgating legislative rules. 5 U.S.C. § 553(b). A rule is "legislative" when it effects a change in existing law or policy or imposes new rights or obligations. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). The mass truncation of FRP grants satisfies both criteria.

Before the termination notice, FRP parolees had lawful authorization to remain in the United States for up to three years, eligibility for employment authorization, and, if needed, re-parole under the same criteria as current grants. Now, they face immediate loss of work authorization, accrual of unlawful presence, and potential expedited removal. That is a textbook change in legal status imposing new obligations where none previously existed. Rules with such "binding" legal consequences are legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).

Secretary Noem's characterization of the termination as a "general statement of policy," 90

---

[21] DHS maintains address information for parolees, who are required by law to keep those addresses updated. Yet Secretary Noem never explained why she did not consider mailing notice to all affected parolees, ignoring her obligation to consider "alternatives that are within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (cleaned up); *State Farm*, 463 U.S. at 51.

[22] *See, e.g.*, *Dadfar v. Arnott*, 2025 WL 3452372, at *3-4 (W.D. Mo. Dec. 1, 2025); *Mata Velasquez*, 794 F. Supp. 3d at 146-53; *Pirona v. Noem*, 2025 WL 3687339, at *8 (W.D. Mich. Dec. 19, 2025); *Rojas v. Almodovar*, 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025); *Salazar v. Casey*, 2025 WL 3063629, at *3 (S.D. Cal. Nov. 3, 2025).

Fed. Reg. at 58045, does not withstand scrutiny. A policy statement does not "impose any rights and obligations" and "genuinely leaves the agency and its decisionmakers free to exercise discretion." *General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (citation and alteration omitted). The FRP FRN does neither regarding the FRP parolees.[23] It mandates that all FRP grants "shall be terminated" thirty days after publication—a command, not a guide to discretion. 90 Fed. Reg. at 58032. When an agency action binds both the agency and the public, it is legislative regardless of how the agency labels it. *See Texas v. United States*, 809 F.3d 134, 171-78 (5th Cir. 2015), *aff'd by equally divided court*, 579 U.S. 547 (2016).

## II.    PRELIMINARY RELIEF IS NECESSARY TO STOP IMPENDING IRREPARABLE INJURY THAT IS CERTAIN TO OCCUR

Plaintiffs and the members of the putative class face imminent and irreparable harm if the FRP FRN is not enjoined or stayed as to them before January 14, 2026. All five individual FRP Plaintiffs and thousands of other similarly situated putative class members will have their grants of parole prematurely terminated on that date and will begin accruing unlawful presence if they have not left the United States. But Plaintiffs have nothing to return to. They gave up jobs, educational degrees, housing, cars, and most of their possessions when they accepted the government's invitation—because the government led them to believe they were coming here to stay. *See, e.g.*, Doc. Nos. 214-4 ¶¶ 11, 20-21 (John Doe); 214-5 ¶18 (Jose Doe); 214-3 ¶ 10 (Francisca Doe); 214-2 ¶¶ 11, 17 (David Doe); 214-6 ¶ 8 (Luciana Doe). Not only must these FRP Plaintiffs now uproot their families' lives here and separate from their close family members in the United States (and with a mere thirty days' notice over the end-of-year holidays to do so), but they must also return to their home countries to start new lives from scratch—for some only for a short

---

[23] Plaintiffs do not argue that the termination of the FRP processes themselves was required to go through notice and comment rulemaking—just the categorical truncation of existing grants.

period until their priority date becomes current and they can apply for a green card, and return to the United States as LPRs. These harms represent a betrayal by the federal government of future U.S. citizens—and one that cannot be compensated by money damages. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000).

The harms inflicted by the FRP FRN are even greater for those class members who, due to the government's inexplicable and unlawful unwillingness to provide actual notice, will not learn that their grants of parole will be cut short on January 14, 2026.[24] FRP parolees have been granted parole up to January 2028. If any such individual remains in the United States after their parole is terminated *ex parte*, they will accrue unlawful presence, which could render them inadmissible and have serious consequences for their ability to become an LPR and U.S. citizen. *See supra* n.9.

## III.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY EQUITABLE RELIEF

The balance of equities and the public interest, which merge here, likewise support Plaintiffs' request for preliminary equitable relief. *See Winter*, 555 U.S. at 20; *Nken v. Holder*, 556 U.S. 418, 435 (2009). In contrast to the concrete and irreparable injury facing Plaintiffs and other FRP parolees, as well as their U.S. citizen and LPR families, Defendants will not be harmed one iota by preliminary relief. To the contrary, Defendants themselves decided to wait eleven months to issue the FRP FRN, demonstrating that they are not harmed by the status quo.

## CONCLUSION

Secretary Noem has the legal authority to end the FRP processes and to terminate Plaintiffs' grants of parole, but she can't stack the deck or ignore legal requirements to do so. Plaintiffs' respectfully request that the Court issue the proposed order (Doc. No. 216-3).

---

[24] *Mata Velasquez*, 794 F. Supp. 3d at 145 ("[CHNV parolee] Mata Velasquez was arrested and detained before he was given any notice that his parole was revoked.").

Dated: December 29, 2025

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
 Washington, D.C. 20001-3743
 Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, <u>Justin B. Cox</u>, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 29, 2025

*/s/ Justin B. Cox*

Justin B. Cox
