national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[25] Accordingly, the termination of the Ethiopia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that Ethiopian Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Ethiopia through February 13, 2026. Therefore, as proof of continued employment authorization through February 13, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a ''Card Expires'' dates of June 12, 2024 and December 12, 2025.

The Secretary has considered putative reliance interests in the Ethiopia Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

### Notice of the Termination of the Temporary Protected Status Designation of Ethiopia

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Ethiopia; (b) whether permitting the nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether Ethiopia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Ethiopian nationals, and (d) whether extraordinary and temporary conditions in Ethiopia that prevent Ethiopian nationals from returning in safety continue to exist. Based on my review, I have determined that Ethiopia no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Ethiopia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 13, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–22746 Filed 12–12–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2806–25]

RIN 1615–ZC12

### Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (''DHS'') is terminating the categorical parole processes for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023 (hereinafter referred to as ''modernized FRP programs''). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program (''legacy CFRP'') and the Haitian Family Reunification Parole program (''legacy HFRP'') first implemented by USCIS in 2007 and 2014, respectively (collectively, the ''legacy FRP programs''). This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of all nine programs (hereinafter ''the FRP programs''), termination of parole for aliens paroled under the FRP programs, and revocation of employment authorization based on being an alien paroled under the FRP programs.

**DATES:** DHS is terminating the FRP programs as of December 15, 2025. The temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026 will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485, Application to Register Permanent Residence or Adjust Status, that is postmarked or electronically filed as of December 15, 2025 that is still pending adjudication as of December

---

[25] Whether to allow for an additional ''orderly departure'' period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an ''option'' left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same).

[26] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

15, 2025; or (2) the Secretary of Homeland Security ("the Secretary") determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

### I. Background

Over the previous two years, DHS implemented updates to the modernized FRP programs.[1] The modernized FRP programs were available by invitation only to certain petitioners with approved Forms I–130, Petition for Alien Relative, filed on behalf of principal beneficiaries who were nationals of designated countries and their immediate family members. DHS also updated the legacy FRP programs to align with the procedures used for the modernized FRP programs.[2] Under the modernized FRP programs, qualified beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole for urgent humanitarian reasons or significant public benefit. Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023);[3] Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).[4]

On January 20, 2025, President Trump issued Executive Order ("E.O.") 14165, "Securing Our Borders."[5] Section 2 of the E.O. establishes the policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the E.O. directs the Secretary of Homeland Security ("Secretary") to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders."[6]

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the FRP programs. Although DHS established the categorical program for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the seven categorical programs was very similar,[7] as is the rationale for terminating them. Therefore, DHS is announcing the termination of all seven modernized FRP programs, in addition to any continued processing under the legacy FRP programs, by publishing this single notice in the **Federal Register**. Consistent with the Secretary's statutory and regulatory authority, the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date, subject to certain exceptions.

### II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary the narrow discretionary authority to parole aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(a), (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien shall "return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the legislative history of the parole statute supports the contention that Congress has sought to limit the use of the parole authority to specific instances rather than as a means of circumventing established immigration laws or processing times.[8]

---

[1] The five new categorical parole programs implemented in 2023 for Colombia, Ecuador, El Salvador, Guatemala, and Honduras, and the two existing programs for Cuba and Haiti that were updated in August 2023, all utilize the online Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, to initiate the process of being considered for parole by DHS. Collectively, these seven Form I–134A-reliant programs will be referred to as the "modernized FRP programs." The FRP programs created in 2007, for Cuba, and 2014, for Haiti, utilized Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to request parole from USCIS. Collectively, these Form I–131-reliant programs will be referred to as the "legacy FRP programs." All nine programs combined, both modernized and legacy, are referred to as the "FRP programs."

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). These programs were superseded by the modernized processes implemented on August 11, 2023. No new filings were accepted for these programs after August 11, 2023, except for certain add-on derivative beneficiaries of principal beneficiaries with a pending legacy CFRP application. However, processing of applications that were pending under legacy CFRP continued according to the process established in December 2014. *See* Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014). Requests for re-parole have continued to be processed under legacy HFRP.

[3] *See* 72 FR 65588 (legacy CFRP was originally established in 2007 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed for new filings in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[4] *See* 79 FR 75581 (legacy HFRP was originally established in 2014 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[5] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[6] *Id.*

[7] *Compare, e.g.,* 88 FR at 43593–43596, *with* 88 FR at 78765–78768, 72 FR at 65588, and 79 FR at 75582 (setting out the justifications for the parole programs for Colombia, Ecuador, Cuba, and Haiti, respectively).

[8] Parole was codified into immigration law in the 1952 INA. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, "the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress. For example, the House Report for the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA") stated:

[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who

Continued

Under the law, the determination to parole an alien into the country should only be made on a discretionary, case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a U.S. port of entry ("POE") is made by U.S. Customs and Border Protection ("CBP") officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the FRP programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11); *see also* One Big Beautiful Bill Act, Public Law 119–21, secs. 100003(b), 100010(a), 139 Stat 72, 366, 372 (July 4, 2025) (8 U.S.C. 1803(b), 1809(a)) (prescribing fees and specific validity periods for parole-based EADs). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an applicant for admission. *See* INA 212(d)(5)(A), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."), 1001.1(q) (same).

### III. Rationale for Termination

When DHS established the FRP programs, DHS wrote that the programs would provide a significant public benefit for the United States by: (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.[9]

For the reasons discussed below, DHS has determined that it is now appropriate to terminate the FRP programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes.[10] These reasons, independently and cumulatively, support termination of the FRP programs.[11]

Accordingly, the Secretary, in her discretion, is terminating the FRP programs. Consistent with her statutory authority, the Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs, temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

*1. Promote Family Unity*

According to the notices that announced their creation, the FRP programs were designed to provide a faster pathway for U.S. citizens and lawful permanent residents (LPRs) to reunite with family members in the United States while awaiting availability of their immigrant visas. The notices justified the action by stating that nationals of those countries often face long waits for immigrant visas before they can travel to the United States and apply for admission.[12]

DHS acknowledges that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States. However, upon further review of the scope and impact of the FRP programs in their totality, and in line with Executive Orders issued by President Trump, DHS has determined that national security and fraud concerns, and the current Administration's priorities outweigh those interests and weigh in favor of terminating the programs.

The modernized FRP programs, based on their specific procedures, created security gaps not present in other paths for family members pursuing LPR status, such as through consular processing. Through consular processing, potential beneficiaries chose to remain outside the United States until their immigrant visa priority dates are current. Once a visa is available based on their priority date, the potential beneficiary completes consular processing with the Department of State ("State"), including submission of biometrics, an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner before a visa is issued. The use of biometrics for background and security checks as part of consular processing allows for robust public safety and national security vetting of the potential beneficiary before travel to the United States on a commercial air carrier is authorized and completed.

In contrast, under the modernized FRP programs, potential beneficiaries would travel to the United States to seek parole at a POE, and if paroled, they could then apply to adjust status to that of an LPR once their immigrant visa priority dates became current. Under these programs, DHS conducted minimal public safety and national security vetting of the supporters based on biographic information the supporter

---

do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

*See* H.R. Rep. 104–469, pt. 1, at 140 (1996). In IIRIRA, Congress struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, "for emergent reasons or for reasons deemed strictly in the public interest" as grounds for granting parole into the United States and inserted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Public Law 104–208, div. C, § 602(a). "The legislative history indicates that this change was animated by concern that parole under [INA 212(d)(5)(A)] was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[9] *See, e.g.,* 88 FR at 43593–96; *see also* 72 FR 65588 (The legacy CFRP initial implementation notice in 2007 relied on family unification, discouragement of unlawful migration, and furtherance of the U.S.-Cuba Migration Accords as justifications); 79 FR at 75582 (The legacy HFRP initial implementation notice in 2014 relied on family unification and reconstruction and development assistance for Haiti through remittances).

[10] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the [Secretary of Homeland Security], have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . .").

[11] The FRP programs were promulgated under the theory that they would, in general, provide a significant public benefit to the United States. *See, e.g.,* 88 FR at 43613 ("The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy . . ."). Although the Secretary retained the authority to parole eligible aliens on a case-by-case basis based on "urgent humanitarian reasons," the driving impetus for the creation of the FRP programs or attendant grants of parole was the significant public benefit justification. But for the significant public benefit justification, DHS would not have established the FRP programs.

[12] *See e.g.,* 88 FR at 43593–94; *see also* 72 FR at 65588; 79 FR at 75582.

provided on the Form I–134A. For example, DHS only vetted to ensure that the supporter was the named petitioner on the Form I–130 for the principal beneficiary and that supporters that were LPRs had not lost their LPR status, in addition to TECS [13] checks. Additionally, DHS conducted minimal public safety and national security vetting of potential beneficiaries by only reviewing biographic information and photos that each beneficiary provided before being considered for an advance travel authorization (ATA). Moreover, biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole from CBP. Therefore, additional vetting, that could otherwise be completed as part of consular processing before travel is authorized, did not occur prior to issuance of an ATA or before the potential beneficiary boarded a plane to travel to the United States. Many of the security screening systems used by the U.S. government to evaluate applicants for immigration benefits rely on biometrics. Since beneficiaries were not fingerprinted before arriving at a U.S. POE, these checks could not be conducted beforehand to thoroughly vet the alien. Furthermore, beneficiaries under the modernized FRP programs were not interviewed by USCIS, unlike beneficiaries of the legacy FRP programs. In the legacy CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony. However, these programs were replaced by the modernized FRP programs for Cuba and Haiti for prospective beneficiaries in 2023.[14]

Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety.

The FRP programs also presented an unacceptable risk of abuse and fraud. When biometrics collection and interviews do not occur prior to a beneficiary's arrival in the U.S., the risk of fraud increases. U.S.-based petitioners may misrepresent family relationships (*e.g.,* falsely claiming a familial tie) to facilitate the entry of unauthorized aliens. Moreover, reliance solely on an approved Form I–130 does not guarantee the ongoing legitimacy of a relationship, particularly in cases involving spouses where circumstances may have changed since the petition was filed. Even with an approved Form I–130, adjudicators may have missed key indicators of fraud, and adding another layer of scrutiny, such as an interview, can be valuable in verifying eligibility. Additionally, beneficiaries from countries with weak civil registry systems may submit fraudulent documents (such as birth certificates or other identity documents) to support their claims. Having in-country experts, such as consular officers familiar with local documentation, can be critical in identifying and preventing document fraud during the visa process. The process of interviewing beneficiaries overseas and collecting their biometrics plays a critical role in preventing fraud and abuse of the immigration system—steps that were entirely bypassed under the modernized FRP programs. Accordingly, the FRP programs' lack of procedural and vetting guardrails created an unacceptable level of risk of fraud and abuse.

DHS has determined that the desire to reunite families before their priority dates are current does not outweigh the U.S. government's responsibility to prevent fraud and abuse of these programs and to uphold national security and public safety for the American people.

Moreover, the FRP programs no longer accord with the Administration's current enforcement-based priorities, namely to better ''achieve the total and efficient enforcement, including through lawful incentives and detention capabilities'' of U.S. immigration law.[15] The modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and eliminating fraud and abuse. Indeed, E.O. 14165, ''Securing Our Borders,'' embodies the priorities of this Administration and makes clear that ''all future parole determinations fully comply with [the order to terminate all categorical parole programs] and with applicable law.'' [16]

### 2. Further Important Foreign Policy Objectives

One of the stated goals of the modernized FRP programs established in July 2023 was to promote the foreign policy objectives of the prior administration.[17] Indeed, DHS explained consistently in its notices promulgating the FRP programs that implementation would advance the foreign policy objectives of the then-current administration.[18]

Furthermore, DHS established the legacy CFRP Program in 2007, and modernized it in August 2023, in part to further enable the United States to meet its commitment to ensure the lawful migration of a minimum of 20,000 Cubans each year under the U.S.-Cuba Migration Accords.[19] DHS also established the legacy HFRP Program in 2014 to support ''U.S. goals for Haiti's long-term reconstruction and development,'' [20] and modernized it in August 2023, in part because ''[i]mproving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues.'' [21] The foreign policy objectives underlying the FRP programs, however, are not consistent with those of the current Administration and may be achieved through other means.[22]

E.O. 14150, ''America First Policy Directive to the Secretary of State'', clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [23] E.O. 14159, ''Protecting the American People Against Invasion'' states that ''[i]t is the policy of the United States to faithfully execute the immigration laws against all

---

[13] TECS, not an acronym, is a data system and platform owned by U.S. Customs and Border Protection (CBP). See *DHS/CBP/PIA–021 TECS System: Platform* for more information, available at *https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform* (last updated Apr. 10, 2025).

[14] While legacy CFRP and legacy HFRP programs were replaced by the modernized FRP programs for Cuba and Haiti in 2023, USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused.

[15] *See* E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025); *see also FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (''[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.'').

[16] *See* E.O. 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[17] *See, e.g.,* 88 FR at 43594.

[18] *See, e.g., Id.* (''[T]he parole of noncitizens, on a case-by-case basis, under [the FRP program for Colombians] will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.'').

[19] 72 FR 65588; 88 FR at 54640.

[20] 79 FR at 75582.

[21] 88 FR at 54639.

[22] U.S. commitments under the Cuban Migration Accords, for example, may be met through immigrant visa processing.

[23] *See* 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.''[24]

To reiterate, E.O. 14165, ''Securing Our Borders'' states that DHS shall ''terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders.''[25] In the same E.O., the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southwest border of the United States and ensure that, pending section 240 removal proceedings, aliens described in INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C), are returned to the territories from which they came.

The President has pursued the cooperation of foreign partners on migration issues in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[26]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[27]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to ''do what's right'' in regard to illegal migration.[28]

• Since February 1, 2025, President Trump has issued several tariff-related executive orders in connection with the situation at the southwest border.[29]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, with the plan to repatriate them to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[30]

• On May 19, 2025, a Department of State spokesperson announced steps ''to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States.''[31]

• Secretary Rubio had calls with Mexican Foreign Secretary de la Fuente on March 31, 2025,[32] May 30, 2025[33] and July 2, 2025,[34] during which they discussed efforts to secure the U.S.-Mexico border, dismantle cartels, stop the flow of illicit drugs, firearms, and illegal aliens.

Multiple agencies of the U.S. government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[35] consistent with Secretary of State Rubio's January 22, 2025, announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[36] In that announcement, the Department of State made clear that it ''will no longer undertake any activities that facilitate or encourage mass migration'' and that ''[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.''[37] Additionally, pursuant to his authority under INA 219, 8 U.S.C. 1189, Secretary of State Rubio designated the gang Mara Salvatrucha (active in El Salvador, Guatemala, and Honduras, among other countries), along with other cartels and gangs, as Foreign Terrorist Organizations.[38] On May 5, 2025, Secretary Rubio also designated two Haitian criminal organizations, Viv Ansanm and Gran Grif, as designated Foreign Terrorist Organizations under INA 219, 8 U.S.C. 1189.[39]

The actions set forth in this notice complement and underscore the Administration's pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful immigration. Regardless of whether the prior Administration saw the FRP programs as a component of a regional migration management strategy, the current Administration is not

---

[24] 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[25] *See* 90 FR 8467, 8468 (Jan. 20, 2025) (published Jan. 30, 2025).

[26] The White House, ''Readout of President Donald J. Trump's Call with President Nayib Bukele'' (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/*.

[27] The White House, ''Statement From the Press Secretary'' (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/*.

[28] Meryl Sebastian, ''Trump Says India 'Will Do What's Right' on Illegal Immigration,'' BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo*.

[29] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[30] *Panama Receives First US Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration*.

[31] U.S. Department of State, Press Releases: Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States, May 19, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/visa-restrictions-on-travel-agencies-facilitating-illegal-immigration-to-the-united-states/*.

[32] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, March 31, 2025, *https://www.state.gov/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/*.

[33] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, May 30, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente/*.

[34] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, July 2, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/*.

[35] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) (''President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country.''), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/*; U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) (''Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap.''), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/*.

[36] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025), *https://www.state.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/*.

[37] *Id.*

[38] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025); *see also* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[39] Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 (May 5, 2025).

pursuing that strategy given it is no longer consistent with current Administration's priorities. Rather, as described above, the current Administration continues to focus its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States.

These measures will allow DHS to better ''achieve the total and efficient enforcement'' of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[40] In short, the continued implementation of the FRP programs does not accord with the President's stated priorities and foreign policy objectives.

*3. Provide a Lawful Pathway and Timely Alternative to Unlawful Migration*

DHS intended for the FRP programs to provide a lawful, safe, and orderly alternative to unlawful migration to the United States as part of a regional migration management strategy developed by the prior Administration.[41] Because the INA allocates a certain number of immigrant visas each year, beneficiaries of approved Form I–130 petitions often face years-long waits before a visa becomes available. The prior Administration claimed that the FRP programs were designed to discourage unlawful migration during this period by offering a faster, lawful pathway for U.S. citizens and LPRs to reunite with family members while awaiting availability of immigrant visas.[42] These programs were specifically aimed at nationals of countries who often face especially long wait times for immigrant visas.[43] DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period.[44] Since the implementation of the modernized FRP programs beginning in July 2023 and the modernization of the legacy FRP programs, approximately 16,100 aliens have been granted parole under the FRP programs.[45] In contrast, CBP encounters of aliens from the seven FRP countries at and between POEs on the U.S. southwest land border totaled over 888,000 in FY2024.[46]

DHS acknowledges that some aliens who have been paroled into the United States under the FRP programs may have otherwise sought to enter unlawfully along the southwest border. However, upon review and further consideration of the number of aliens that were determined to be eligible to participate in the programs, the relatively small number who actually chose to participate, and other more recent measures that have dramatically reduced southwest border encounters, DHS has ultimately determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal. DHS ultimately determined that policy actions such as increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology represent a more prudent approach to the short and long-term challenges presented at the southwest border.

The FRP programs required that a petitioner with an approved Form I–130, Petition for Alien Relative, first receive an invitation to submit a request to be a supporter on behalf of the principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. Generally, invitations were issued based on operational capacity and the period of time until the principal beneficiary's immigrant visa was expected to become available, among other factors. Considering the limitation on the number of aliens who have family-sponsored immigrant visas that are expected to become available within any given period, the number of invitations sent was minimal compared to the flow of aliens coming from the countries for which an FRP program existed.[47] Even if every one of the approximately 36,000 petitioners invited to participate in the modernized FRP programs had filed a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary of the approved Form I–130, and all such Form I–134A requests were confirmed and the beneficiaries granted advance travel authorization by DHS, the number of beneficiaries who could have been paroled into the United States would still account for a fraction of the approximately 890,000 aliens from the FRP program countries who were encountered by CBP in Fiscal Year (FY) 2024. DHS did not intend for the FRP programs to, on their own, substantially decrease the number of encounters along the southwest border. The FRP programs were just one part of the previous administration's broader strategy of expanding access to lawful pathways to aliens who may otherwise travel to the United States as part of the unlawful migration flows at the southwest border.[48] In practice, at the time DHS paused processing under the FRP programs in late January 2025,[49] the participation rate for petitioners who had been invited to these programs was approximately 30%.[50] Overall, other policy actions represent a more prudent and effective path to addressing unlawful immigration generally and especially at the southwest border.

The decision to terminate discretionary and temporary parole programs like the FRP programs is further informed by the actions of the prior administration, which found the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans [51]

---

[40] *See* 90 FR 8443 (Jan. 29, 2025).

[41] *See, e.g.,* 88 FR at 43595.

[42] *See, e.g.,* 88 FR 78762, 88 FR 43591, 72 FR 65588.

[43] *Id.; see also* 72 FR 65588; 79 FR 75581.

[44] As of Feb. 18, 2025, the overall responsiveness rate to invitations sent under the modernized FRP programs was approximately 30% based on an internal USCIS analysis. This means that 70% of petitioners who received FRP invitations did not opt to participate in FRP programs and did not file an I–134A as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[45] The information provided here is based on analysis of internal data from U.S CBP tracking aliens paroled under the FRP programs performed in June 2025. CBP shows 14,069 aliens paroled under FRP class of admission (COAs) (Colombian Family Reunification Parole (RCO), Cuban Family Reunification Parole (RCU), Ecuadorian Family Reunification Parole (RED), Guatemalan Family Reunification Parole (RGT), Honduran Family Reunification Parole (RHN), Haitian Family Reunification Parole (RHT), and El Salvadoran Family Reunification Parole (RSV) as of January 20, 2025. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025. USCIS estimates there are 1,852 aliens with valid parole under the legacy CFRP program and 108 aliens with valid parole under the legacy HFRP program as of April 2, 2025. *See* USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11].

[46] *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025) (filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras)).

[47] In FY2024, CBP encounters of unlawful aliens on the U.S. southwest land border from the seven FRP countries totaled 888,023. *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025).

[48] *See, e.g.,* 88 FR at 43593.

[49] Email from Jennifer Higgins, Acting Director, USCIS (Jan. 23, 2025).

[50] Responsiveness rate is based on internal USCIS analysis whereby a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs, and of those, a total of 10,608 invitees filed requests as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[51] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR

Continued

("CHNV parole programs") and FRP programs, even when paired with the *Circumvention of Lawful Pathways* rule, to be insufficient to address very high levels of illegal immigration.[52] For example, following the implementation of the FRP programs and the *Circumvention of Lawful Pathways* rule, DHS and the Department of Justice ("DOJ") promulgated the *Securing the Border* rule[53] as an emergency measure to address ongoing high levels of unlawful immigration between the southwest border POEs.[54] DHS and DOJ then explained that "at current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle."[55] This conclusion—that DHS's ability to swiftly impose consequences for unlawful immigration "continue[d] to be overwhelmed"[56]—followed more than a year of the *Circumvention of Lawful Pathways* framework, nearly a year of the modernized FRP programs, and two years of the CHNV parole programs, with the implementation of each being justified as facilitating operational control of the southwest border of the United States by discouraging unlawful immigration. The promulgation of the *Securing the Border* interim final rule in June 2024 underscored the stark failure of categorical parole programs, like the FRP programs and CHNV parole programs, as well as the *Circumvention of Lawful Pathways* rule to deliver on their promises. These policies not only fell short of enhancing border security but also failed to curb the persistent surge of unlawful immigration along the southwest border.

The *Securing the Border* framework[57] and implementation of President Trump's subsequent policies have resulted in a dramatic reduction in unlawful migration to the U.S. southwest border. For example, encounters between southwest border POEs decreased from an average of about 4,910 per day in the six months prior to the *Securing the Border* interim final rule to an average of 1,880 per day between June and December 2024.[58] Moreover, southwest border encounters have declined even more dramatically since President Trump took office on January 20, 2025, and issued a series of proclamations and orders designed to address the urgent situation at our borders, including Proclamation 10888, *Guaranteeing the States Protection Against Invasion,* 90 FR 8333 (Jan. 20, 2025) (published Jan. 29, 2025). Indeed, in the 161 days from January 21 through June 30, 2025, encounters between POEs averaged fewer than 290 per day, down from over 1,600 per day in the last 161 days of the prior administration, while encounters at POEs averaged about 120 per day, down from over 1,580 per day.[59] Accordingly, even assuming the FRP programs had any impact on reducing unlawful migration, the FRP programs are no longer needed due to reduction in southwest border encounters as a result of other, more effective, policies.

Ultimately, the FRP programs failed in their stated intention to sufficiently deter unlawful migration. A July 2024 report found that, prior to the implementation of the *Securing the Border* framework, "in the first five months of the year [2024], CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order."[60] Despite the categorical parole programs that the previous administration put in place, four out of six of the nationalities with the highest entry numbers in the first half of 2024 had a dedicated FRP program.[61] The modernized FRP program for Haiti was implemented on August 11, 2023. CBP data indicates that in FY2022, 53,910 Haitian nationals were encountered at the Southwest border, in FY2023, 76,130 and in FY2024, 88,673.[62] This year-on-year substantial increase in encounters of Haitian nationals at the Southwest border show that the modernized FRP program for Haiti failed to slow the increase in unlawful migration to the Southwest border. This data reflects that the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies implemented at the same time to reduce unlawful migration.

When the modernized FRP programs were established, they were promoted as timely alternatives to unlawful migration and as tools to address the root causes of migration. However, it was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration. FRP beneficiaries had approved I–130 petitions and U.S.-based supporters who were LPRs or U.S. citizens, and thus had a lawful immigration pathway available to them, even if it involved a significant wait. In contrast, aliens arriving at the southwest border may lack U.S. family ties or access to any lawful immigration channel. It is therefore unlikely that someone with an existing legal pathway would risk compromising their eligibility by pursuing unlawful entry. Economic migrants and asylum seekers, on the other hand, may resort to appearing at the border regardless, due to the absence of viable legal alternatives. Perhaps most significantly, although the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument. For example, the FRP program for Ecuadorians was implemented on November 16, 2023. CBP data indicates that in FY2022, 24,060 Ecuadorian nationals were encountered at the

---

13611 (Mar. 25, 2025). *See also* "CBP Released December 2024 Monthly Update", *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update* (last modified Jan. 14, 2025) (providing that over 531,000 aliens were granted parole under the CHNV parole programs).

[52] *See* Circumvention of Lawful Pathways 88 FR 31314 (May 16, 2023).

[53] *See* Securing the Border, Interim Final Rule, 89 FR 48710 (June 7, 2024); Securing the Border, Final Rule, 89 FR 81156 (Oct. 7, 2024).

[54] "On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens]." 89 FR at 81157–58.

[55] 89 FR at 48714.

[56] 89 FR at 48715.

[57] On May 9, 2025, a district court vacated and set aside the *Securing the Border* rule's limitation on asylum eligibility and manifestation of fear requirement but allowed the rule's "reasonable probability" standard to remain in effect. *See Las Americas Immigr. Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC,—F. Supp. 3d—, 2025 WL 1403811, at *21 (D.D.C. May 9, 2025).

[58] OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2].

[59] OHSS analysis of May 2025 OHSS Persist Dataset and CBP data downloaded from UIP on July 2, 2025 [OHSS tab 1].

[60] Council on Foreign Relations, "Why Six Countries Account for Most Migrants at the U.S.-Mexico Border" July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

[61] It should be noted that Venezuela, one of the six highest entry populations by nationality mentioned, also had a parole program which is not addressed in this FRN. The Venezuelan parole program, largely premised on the same justifications as those contained in the FRP parole programs, has been terminated in another notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[62] CBP, "Nationwide Encounters" Filtered for Region: Southwest Land Border, Citizenship: Haiti, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

Southwest border, in FY2023, 116,229 and in FY2024 122,072.[63] Petitioners with an approved Form I–130 filed for an alien abroad were invited to submit Form I–134A which served as a declaration of financial support. Neither petitioners nor beneficiaries were asked through a form or an interview prior to applying for admission at a POE in the U.S. whether they had any intention of attempting entry to the U.S. unlawfully as an alternative to waiting for consular processing in their countries. DHS believes, based on available data, that the FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border. The programs do not appear to have influenced the number of attempted entries in any meaningful way. Moreover, any limited impact they may have had on reducing unlawful border encounters falls far short when compared to the effectiveness of other enforcement-focused policies implemented by the current administration.

The Department has determined that terminating the FRP programs will allow the Administration to adopt and implement more prudent, durable, and appropriate strategies that will lead to a sustainable reduction of encounters at the southwest border. The Department's objective of breaking the vicious cycle of unlawful immigration supports termination of the FRP programs along with the implementation of enforcement-based actions that are consistent with the policy objectives outlined in the new presidential directives calling for enhanced border security beyond the 2024 *Securing the Border* framework.[64]

*4. Reduce Strain on Limited U.S. Resources*

The FRP programs were designed with the goal of easing pressure on DHS resources and personnel by lowering the number of encounters at the Southwest border enough to offset the added processing and administrative burden; but that outcome never materialized. Instead, the programs failed to reduce encounters at the Southwest border and only added to DHS' workload. There was no reduction in burden with regards to detention, monitoring, processing, and removal of aliens for DHS personnel and resources, and, at the same time, there was an increased burden in for both CBP and USCIS components who processed these applications from receipt of Form I–134A to arrival at a U.S. POE.

As discussed in the previous section of this notice, the number of aliens who chose to participate in the FRP programs and who otherwise would have chosen to unlawfully migrate as an alternative option is too uncertain or limited towards meaningfully realizing the original justifications for their implementation and the current Administration's shift in policy focus to deter unlawful migration and achieve operational control of the southwest border.[65]

After a thorough review assessing the costs of implementing these programs, preliminary findings show that the programs have not met their stated goal of burden-reduction. On the contrary, these programs have led to an increased strain on DHS personnel and resources to process, review, and adjudicate parole requests, especially when considering the programs did not meaningfully result in any reduction of encounters at or between POEs.[66] For USCIS, there have been approximately 35,700 Form I–134A filed with USCIS under the modernized FRP programs since July 2023, which includes approximately 420 pending review, 19,500 confirmed by USCIS, and 15,450 non-confirmed by USCIS.[67] It has required significant USCIS resources to administer these parole programs. CBP has also expended considerable resources implementing the FRP programs. Under the modernized FRP programs, CBP has received 16,976 advance travel authorization (ATA) requests, including 1,987 pending review or CBP One submission, 13,983 approved by CBP, 975 denied by CBP, and 31 that expired after being approved.[68]

Due to the originating location of beneficiaries of the FRP programs and available travel routes via commercial air, approximately 70% of beneficiaries of these programs who were issued an ATA flew to Florida POEs.[69] With the addition of three POEs in Texas and New York City, these POEs in just three states account for nearly 85% of all arrivals of FRP beneficiaries requesting parole.[70] Processing an alien requesting parole under the modernized FRP programs requires secondary processing and enrollment of biometrics, resulting in a more extensive interaction with the alien and prolonged time in CBP facilities.

Although DHS, under the previous administration, argued that aliens who had been paroled into the U.S. may have otherwise sought to enter unlawfully along the southwest border, there is little to no evidence to support this argument. DHS has no way of determining whether aliens paroled into the U.S. under the respective FRP programs might have otherwise attempted to enter unlawfully, as they were never asked this question at any point, either before or after the programs were implemented. Instead, these aliens with lawful pathways available to them likely would have remained overseas while waiting for an immigrant visa to become available and then would have completed consular processing so they could be admitted to the United States as an LPR. Aliens in this portion of the population would have been processed by the Department of State if they had gone through consular processing. Under the FRP programs, DHS reassigned personnel from other caseloads to work on processing Forms I–134A, requests for ATAs, and for parole processing at interior POEs. Therefore, the FRP programs not only shifted the strain from the Department of State to DHS personnel, they also increased the overall strain on DHS

---

[63] CBP, "Nationwide Encounters" Filtered for Region: Southwest Land Border, Citizenship: Ecuador, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[64] As explained above, southwest border encounters decreased following implementation of the *Securing the Border* framework and complementary actions, and border encounters decreased even more dramatically following implementation of President Trump's policies. Another example of President Trump's policy directives include the Presidential Proclamation "Guaranteeing the States Protection Against Invasion" which suspends entry of aliens across the southwest border, imposes restrictions on entry for aliens, and suspends and restricts entry for aliens posing public health, safety, or national security risks. *See* Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[65] 90 FR 8467, Sec. 2(g).

[66] See discussion above concerning drops in southwest land border encounters from the months of December 2024 to June 2025. DHS has determined, based on the available evidence, that other enforcement-based policies, including the *Circumvention of Lawful Pathways* and *Securing the Border* rules, proved more effective at reducing southwest land borders. OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2]; OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1].

[67] Data pulled from internal DHS reports on parole processing [OHSS tab 12]. Further, "Confirmed" in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[68] ATA request data is based on an internal USCIS analysis of information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6].

[69] Data provided on arrivals at specific POE is based on an internal USCIS analysis of arrival information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9].

[70] *Id.*

resources because of the extra processing required under the programs combined with the little to no concomitant reduction of unlawful entries of nationals from the seven FRP countries.

The reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable, especially given DHS' critical need to address border and interior enforcement and other Administration priorities. Implementation of these programs resulted in increased expenditure of DHS personnel and resources on administering the programs without any related burden reduction for processing, detention, monitoring, and removal of aliens unlawfully entering or present within the United States.

As previously noted, reports indicate that nationals of the countries eligible for the FRP programs have continued to migrate unlawfully at some of the highest rates among all nationalities. CBP personnel, in particular, experienced no relief. In contrast, the implementation of the FRP programs introduced additional demands on DHS, increasing workloads across multiple USCIS directorates including the Service Center Operations Directorate (SCOPS) and Field Operations Directorate (FOD).

The FRP programs have also resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a ''qualified alien.'' *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued three-year periods of parole from the outset, FRP parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all FRP parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[71] Overall, the domestic impact of the FRP programs counsel against their continued operation.

*5. Address the Root Causes of Migration Through Economic Stability and Development Supported by Increased Remittances*

Finally, DHS intended for the FRP programs to aid in encouraging development and addressing economic concerns in the eligible countries by increasing the flow of remittances to those countries.[72] Aliens paroled into the United States under the FRP programs are eligible for discretionary employment authorization, and aliens with employment authorization typically enjoy higher wages than those without employment authorization, allowing them the opportunity to send greater amounts of money back to their home country in the form of remittances.[73] However, upon review of the modernized FRP programs more than a year and a half [74] after they were made available, DHS has determined that a relatively low percentage of invited petitioners decided to participate in the programs. Because of the low acceptance rate of invited petitioners, the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries. Consequently, the FRP programs fell short of addressing the underlying economic drivers of unlawful migration. The modernized FRP programs' failure to address the economic motivations behind illegal immigration weighs in favor of terminating the FRP programs.

In 2023 and 2024, the countries whose nationals were eligible for consideration for parole under the FRP programs had remittance volumes ranging from a low of $2.5 billion in Cuba to a high of $21.6 billion in Guatemala.[75] The remittance volumes referenced were not tied exclusively to aliens paroled into the United States under the FRP programs, that is, those remittances could have been sent from anyone in the United States, regardless of immigration status. From 2020 to 2023, remittance volumes in 6 of the 7 countries whose nationals were eligible for an FRP process grew between 8% and 43%.[76] Only Haiti experienced a lower growth rate at just 1%.[77] In 2023, remittances accounted for over 20% of the GDP of Guatemala, with similar increases noted in El Salvador (24.5%), and Honduras (28.0%).[78] Comparing the high volumes of remittances in each of the FRP countries to the small populations from each country that were invited to participate in the FRP programs and the even smaller populations that did participate, DHS has determined that any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration.

The FRP programs failed in their intention of addressing the root causes of migration. A July 2024 report stated ''The Joe Biden administration has responded by designing policies to mitigate 'root causes' of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors— including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future.'' [79] Due to the low numbers of participants in the FRP programs, it is also unlikely that the remittances provided by the FRP participant population would meaningfully impact migration flows. As previously stated, it is unlikely that someone with an existing legal pathway would risk

---

[71] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[72] *See, e.g.,* 88 FR at 43596.

[73] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https:// www.nber.org/papers/w23236* (providing that aliens without authorization to work earn less than those with employment authorization).

[74] The FRP process for Ecuadorians was established in November 2023 so has been available for approximately four fewer months. *See* 88 FR 78762.

[75] Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows, Table 2, The Dialogue: Leadership for the Americas (Aug. 6, 2024), *https://thedialogue.org/family-remittances-in-2024-looking-ahead-amid-possible-shifts-in-flows.*

[76] *Id.* at table 1 (The growth rates in each country were: Cuba—43%; Guatemala—15%; Honduras— 14%; Ecuador—11%; Colombia—10%; and El Salvador—8%.).

[77] *Id.*

[78] Family Remittances to Latin America and the Caribbean 2023, Slide 6, The Dialogue: Leadership for the Americas (Sept. 9, 2023), *https:// thedialogue.org/analysis/family-remittances-to-latin-america-and-the-caribbean-2023/.*

[79] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/ article/why-six-countries-account-most-migrants-us-mexico-border.*

compromising their eligibility by pursuing unlawful entry to the United States. Economic migrants and asylum seekers, on the other hand, may resort to the border route regardless, due to the absence of viable legal alternatives and the push and pull factors that remain unaddressed by the FRP programs.

More broadly, the United States cannot bear sole responsibility for the development and economic stability of other nations. In line with the America First Policy Directive, the President instructed the Secretary of State to ''issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [80] While strategic partnerships and targeted support can play a role, U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries.

Lessons Learned

The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration or alleviate operational burdens on DHS—particularly CBP—and instead increased administrative strain across multiple USCIS directorates and CBP ports of entry. Moreover, the programs had no measurable effect on addressing root causes of migration and introduced additional vulnerabilities that actively undermined the integrity of the U.S. immigration system and posed risks to public safety and national security.

While the modernized FRP programs established a framework for vetting, the processes in place proved insufficient and introduced significant opportunities for fraud. For instance, a recent internal audit revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half. Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked.[81] Under program requirements, the individual submitting the request to be a supporter must be the same petitioner who filed the original family-based immigrant visa petition—the same petitioner to whom the Department of State issued the parole invitation. Additionally, the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity.

Taken together, these operational shortcomings, security vulnerabilities, and policy failures underscore that the FRP programs not only failed to meet their intended goals, but actively strained DHS resources and undermined public trust. For these reasons, termination of the FRP programs is a prudent course of action.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the FRP programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Further, the notices establishing the modernized FRP programs expressly advise the public that, ''[t]he Secretary retains the sole discretion to terminate this FRP process at any point'' [82] and that ''DHS may terminate parole upon notice in its discretion at any time.'' [83] The FRP programs were ''being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.'' [84]

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, and the additional notice provided in E.O. 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution. DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate. To analyze the reliance interests of affected parties, DHS describes the main steps in the process below and analyzes the reliance interests of parties who have reached that point in the process.

### 1. Reliance Interests of Potential Supporters and Beneficiaries

DHS first considered the potential reliance interests of those U.S.-based I–130 petitioners invited by DHS to participate in the FRP programs and who had intended to file or have filed a Form I–134A or Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, in support of a potential parolee.[85] In general, the costs associated with Form I–134A filings are minimal. While there is no fee for the petitioner to file a Form I–134A and there is no fee for a potential beneficiary to seek consideration under the FRP programs, petitioners who have already filed Form I–134A, or who have completed the Form I–134A in anticipation of filing, may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response.[86]

There are currently over 15,000 pending initial requests for parole under the legacy CFRP program at various stages of adjudication. There are no pending initial requests under the legacy HFRP program, so there are no reliance interests for potential petitioners or beneficiaries under that program. Petitioners under the legacy CFRP program were required to pay the filing fee for Form I–131, unless they were eligible for a fee waiver. For a Form I–131 filed before December 23, 2016, petitioners paid $360. For a Form I–131 filed after December 23, 2016, petitioners paid $575. For a Form I–131 filed after April 1, 2024, petitioners generally paid $630, although CFRP add-on derivatives were exempt from the fee.

At this early stage in the process, the costs incurred by a potential beneficiary in both the Form I–134A-based modernized FRP programs, as well as the Form I–131-based legacy CFRP program are minimal. In the Form I–134A-based process, once a petitioner's Form I–134A is confirmed, the potential beneficiary receives instructions to create an online account with myUSCIS, confirms biographic information in the online account, and attests to meeting the eligibility requirements, including the completion of a medical examination by a panel physician. Potential beneficiaries who received notification that the Form I–134A filed on their behalf was confirmed were instructed on next steps in the process,

---

[80] 90 FR 8337.

[81] *See generally* 8 CFR 205.1(a)(3)(i)(B) and (C). There are certain noted exceptions, such as INA 204(*l*) and humanitarian reinstatement of a revoked petition.

[82] *E.g.,* 88 FR at 43598; 88 FR at 54643.

[83] *E.g.,* 88 FR at 43593; *see also* 88 FR at 54643.

[84] *E.g.,* 88 FR at 43598–99; 88 FR at 54643.

[85] The information collection approval of Form I–134A has expired and it is no longer available for submission. DHS sent its most recent invitation for a petitioner to submit a Form I–134A on June 28, 2024, and has not accepted a request from a prospective supporter since January 28, 2025. Only 420 Forms I–134A are pending, and USCIS will send them each nonconfirmation notices.

[86] See SUPPORTING STATEMENT FOR Online Request to be a Supporter and Declaration of Financial Support, OMB Control No.: 1615–0157, COLLECTION INSTRUMENT(S): Form I–134A, page 10, question 12, *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202409-1615-006* (last visited Feb. 7, 2025).

including completion of the medical requirements. The medical examination required being cleared of any Class A medical conditions and receiving certain required vaccinations. Therefore, it is possible that a potential beneficiary took the time to complete the medical examination and receive the required vaccinations. After confirming biographic information and properly completing the medical examination, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. The alien was required to complete these steps prior to being considered for authorization to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the ATA process was 10 minutes.[87]

In the Form I–131-based legacy process, the adjudication of the Form I–131 took place in two stages. First, a designated USCIS Service Center adjudicator would review the application package submitted by the petitioner and confirm that the petitioner had received a U.S. government invitation to apply to the legacy process, and that all documentary filing requirements were met. If the petitioner failed to submit the required evidence, adjudicators would issue a Request for Evidence to obtain the missing information. Unless a sufficient response was received, the filing would be denied. For cases where all required evidence was provided and eligibility was established, USCIS conditionally approved the Form I–131. There were no costs to the potential beneficiary during this first stage of the process. However, the second stage of the process required the potential beneficiary to report for an in-person interview at a USCIS office overseas, which could result in travel costs and medical exam costs. During this stage, USCIS would verify the identity and qualifying familial relationship between the petitioner and a potential beneficiary.

In general, the costs to petitioners and potential beneficiaries are not significant and pale in comparison to the U.S. government's sovereign interest in determining who may be paroled into the United States. DHS issued invitations as a use of administrative grace that could end at any time and made no assurances that each invitation would result in a grant of parole. DHS made no assurances that each Form I–134A would be processed, nor did DHS assure that each Form I–134A or Form I–131 would ultimately result in a grant of parole to a potential beneficiary. For petitioners/beneficiaries who received a conditional approval of Form I–131 from USCIS under the legacy CFRP program, the conditional approval made it clear that additional steps were required—including completion of a medical examination and in-person interview—before parole could be authorized.[88] Therefore, neither the petitioner nor the potential beneficiary has a significant reliance interest in continuation of the process at this stage. Any costs incurred by a potential beneficiary in the Form I–131 or Form I–134A-based process, both for completing the medical examination and for receiving the required vaccinations, can be impactful, depending on the country and the relative cost of these items compared to the average wage received by that country's population and the rate of unemployment in the country. However, both the costs of the vaccinations and the medical examination are offset by their attendant benefit to the beneficiary of identifying health issues that may have existed and preventing future illness. Once again, the interest of petitioners and potential beneficiaries in preserving the FRP programs is minimal compared to the U.S. government's interest in exercising its discretion to decide which programs to continue and which benefits to provide, based on the policy priorities of the current administration.

Accordingly, DHS will issue a notice of non-confirmation for all pending Forms I–134A. DHS will also rescind the confirmation of all Forms I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A. DHS also intends to issue denial notices for all conditionally approved Form I–131 under the legacy CFRP program that have not been issued a travel document. The Form I–131 filing fee will not be refunded as USCIS has already expended resources in partially completing their adjudication.

---

[87] *See* 88 FR 62810, 62812 (Sept. 13, 2023).

[88] *See* USCIS, "The Cuban Family Reunification Parole Program," *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program* ("Process Steps") (last updated Oct. 11, 2024).

### 2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Petitioners

DHS has canceled all pending requests for advance authorization to travel to the United States to seek a discretionary grant of parole under the FRP programs.

DHS considered allowing any approved ATAs to remain in place until they were used or expired by their terms. However, DHS did not want aliens to fly to the United States at significant personal expense to seek parole under policies that DHS no longer supports or appear to encourage aliens to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. DHS wants to be as transparent as possible and not exacerbate the problems created by the FRP programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, in the exercise of discretion. If parole is not granted, aliens may be removed to their home country at U.S. government expense or processed for another appropriate disposition under the INA.

In sum, the FRP programs have failed to achieve their stated objectives. They are inconsistent with the current Administration's enforcement priorities, do not advance current U.S. foreign policy goals, did not meaningfully reduce unlawful migration, did not alleviate the strain on DHS personnel and resources, nor address the root causes of migration through economic development. Instead, the programs imposed additional administrative burdens on DHS and introduced vulnerabilities that significantly undermined the integrity of the U.S. immigration system. While some petitioners and beneficiaries may have relied on the availability of FRP programs, those reliance interests are limited in scope and involved minimal financial or procedural burdens. Even if the reliance interests were greater, DHS has determined that the federal government's interest in controlling the circumstances under which foreign nationals may be paroled into the United States outweigh those interests. Accordingly, terminating the FRP programs is both lawful and reasonable.

### V. Effect of Termination on Current Parolees Under the FRP Programs and Corresponding Reliance Interests

The notices establishing the FRP programs explain that parole is not an admission of the alien to the United

States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the FRP programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, since July 10, 2023, approximately 14,000 aliens were granted parole into the United States pursuant to the modernized FRP programs. While some aliens in this population have subsequently pursued other lawful immigration statuses and benefits, all aliens within this population are still within the 3-year initial period of parole under the modernized FRP programs. Approximately 1,060 Cubans are currently in the United States with a valid period of parole under the legacy CFRP program. Approximately 100 Haitians are currently in the United States with a valid period of parole under the legacy HFRP program.

Parolees under the FRP programs may be able to seek an additional period(s) of parole ("re-parole") by filing Form I–131, and demonstrating urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for re-parole. These cases and any such pending cases will be assessed on a case-by-case basis.

DHS has determined that as one aspect of the termination of the FRP programs, and consistent with the Secretary's statutory and regulatory authority,[89] the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485 before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. The parole of an alien with a pending Form I–485 will remain valid until either the expiration date provided on the alien's Form I–94, Arrival/Departure Record, or the date a final adjudication of the Form I–485 is completed, whichever is sooner. If the Form I–485 is denied, the alien's parole period will be terminated as of the date of the denial and the alien is expected to depart the United States immediately if they have no other lawful basis for remaining. Pending Form I–131 requests for re-parole filed by aliens initially paroled under the FRP programs will be adjudicated and may be approved on a case-by-case basis.[90] Note that with respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs, facial eligibility under those programs does not entitle an alien to re-parole. The alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole, as required by section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A).

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action, consistent with law, against any alien at any time, including during the 30-day waiting period created by this notice. Once parole is terminated, and if no exception applies and no lawful immigration status, relief, classification, or protection is obtained, aliens must return to their home country to maintain their path to lawful immigration status or be removed from the United States subject to a final order of removal. Parolees without any other lawful basis to remain in the United States following the termination of the FRP programs should depart the United States before their parole termination date. As detailed below, aliens whose parole period is terminated are encouraged to submit their intent to depart through the CBP Home Mobile App. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home Mobile App. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

DHS has recently announced a historic opportunity for aliens to receive both financial and travel assistance to facilitate travel back to their home country or another country in which they have lawful status through the CBP Home App. Once unlawful aliens submit their intent to depart through the CBP Home Mobile App and pass vetting, they will be deprioritized by ICE for enforcement action, detention and removal before their scheduled departure, as long as they demonstrate they are making meaningful strides in completing the departure.[91]

In implementing this approach, DHS intends to prioritize for removal those whose parole is terminated and who have not, prior to the publication of this notice, submitted an immigration benefit request to obtain a lawful basis to remain in the United States. Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS' institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer

---

[89] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"); 8 CFR 212.5(e)(2) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*[.]." (emphasis added)).

[90] Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131. Aliens will not, however, be able to apply for re-parole under the legacy FRP programs.

[91] DHS, "DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation" May 5, 2025, *https://www.dhs.gov/news/2025/05/05/dhs-announces-historic-travel-assistance-and-stipend-voluntary-self-deportation.*

exists and thus DHS intends to revoke parole-based employment authorization consistent with the revocation on notice procedures. *See* 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and moved to the United States.[92] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside. In addition, employers who employ parolees may incur costs related to lost productivity and finding new employees. Property owners who rent homes, condos, or apartments to parolees may lose steady rent payments. Retailers and restaurants in the communities the parolees have been living in will lose customers. Aliens paroled under the modernized FRP programs have been in the United States for as long as 20 months, while some aliens initially paroled under the legacy FRP programs and subsequently granted additional parole periods may have been in the United States for years.[93]

However, any assessment of the reliance interests of FRP parolees must account for FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served;[94] and (2) the initial period of parole would be limited to a maximum of three years. These clear, limiting conditions of the FRP programs served to attenuate any long-term expectations and interests amongst FRP parolees. Accordingly, DHS has taken these limiting conditions, along with FRP parolees' knowledge of them, into consideration when weighing their reliance interests.[95]

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the University of California.*[96] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[97] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than most FRP parolees have been, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchasing of homes.[98] As the Court noted, these interests, though noteworthy, were not "necessarily dispositive," and "DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests."[99] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the FRP programs are far less than the population in *Regents.* Furthermore, as stated above, consideration of the reliance interests under the FRP programs must take into account the express, discretionary terms of the parole programs. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual FRP parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice and allowing the parole period of parolees with pending Forms I–485 to continue, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, the Department finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS considered several alternatives to termination of parole after a 30-day wind-down period, including, (1) allowing the current period of parole for each FRP beneficiary to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration; (2) allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available and the beneficiary may qualify to file Form I–485; and (3) announcing the termination of parole for each beneficiary following a wind down period of longer than 30 days from the date of publication of the termination notice. After due consideration, DHS has opted to not pursue these routes.

Option 1 would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency. Staggered parole expirations could result in extended unauthorized stays and generate confusion among parolees due to differing timelines. Option 2 fails to meaningfully implement the policy shift outlined in this **Federal Register** notice, as it would allow continued reliance on parole as a pathway to adjustment of status— effectively maintaining the existing parole framework for current beneficiaries. Moreover, permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases. Critically, both Option 1 and 2 dilute the intended impact of the policy change and fail to communicate the urgency of this administration's shift in direction. A protracted off-ramp could be perceived as a reluctance to fully enforce key policy priorities aimed at realigning parole authority with the original congressional intent. Moreover, allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety.

When determining whether to adopt the alternative of a longer than 30-day

---

[92] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)).

[93] As noted earlier in this section, there are approximately 100 aliens in this category.

[94] *See e.g.,* 88 FR at 43593; 88 FR at 54643; 88 FR at 54638; *see also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(e)(2)(i).

[95] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is "unjustified in light of the express limitations" in relevant immigration policy). Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131.

[96] *Id.*

[97] *Id.* at 31.

[98] *Id.*

[99] *Id.*

wind-down period, DHS determined such an alternative was not the best path forward. First, regardless of the wind-down period, parolees, their employers, their landlords, their friends, and their communities may incur costs. Given this reality, DHS decided to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion. Accordingly, the Department has determined that a 30-day wind down period provides the affected parties sufficient notice while also preserving the Department's interest in promptly terminating attendant grants of parole for which the Department deems no longer provide significant public benefit to the United States. Accordingly, the Department is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.[100] For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served. This constructive notice accordingly serves as written notice to FRP parolees. DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.[101]

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses. *See* 8 U.S.C. 1305; 8 CFR 265.1. Nevertheless, all FRP parolees under the modernized programs should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account.[102] For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account. This notice, and the individual notice through the USCIS online account or sent by mail, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A), *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[103] By terminating the FRP programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 43599—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act ("APA").[104]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the FRP programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary "in [her] discretion." The FRP programs therefore were general statements of policy.

Because the FRP programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice-and-comment rulemaking requirements. Through the termination of the FRP programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[105] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation. *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[106]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[107] Consistent with the Secretary of State's February 21, 2025, determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[108]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-

---

[100] *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien.* . . ." (emphasis added)).

[101] *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

[102] *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . .").

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] *Cf. Perez* v. *Mortgage Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[105] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[106] *See* 5 U.S.C. 553(a)(1); *see, e.g.,* 88 FR at 43599.

[107] *See Am. Ass'n of Exporters & Importers— Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[108] U.S. Department of State, Determination, *Foreign Affairs Function of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate categorical parole programs.

comment rulemaking, some courts have required such a showing,[109] and DHS can make one here. Delaying termination of the FRP programs to undertake rulemaking would undermine the U.S. government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in the notices implementing the modernized FRP programs, they were implemented as an integral part of negotiations with regional neighbors, including Colombia, Costa Rica, Ecuador, and Guatemala, to address unlawful migratory flows challenging immigration systems throughout the region.[110] For instance, in announcing the FRP program for Colombians, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[111] DHS explained that "the expansion of lawful pathways for aliens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of [Safe Mobility Offices or SMOs]." [112] DHS continued that "[t]he success of SMOs and other new measures to reduce unlawful migration to the [southwest border] is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs." [113] DHS noted that the U.S. government continued "to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and [was] building goodwill and momentum to seek SMOs in still more countries in the region." [114]

When implementing changes to the FRP programs for Cubans and Haitians, DHS invoked the foreign affairs exemption on similar grounds.[115]

However, as discussed in this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the FRP programs was one part of a broader strategy to collaboratively manage unlawful migration with neighboring countries, the U.S. government is pursuing a range of other policy initiatives that would allow DHS to return or remove FRP program nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.[116]

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the FRP programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of FRP program nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.2 of this notice, with countries to accept the return of their nationals, including FRP program nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. 5 U.S.C. 553(b)(B), (d)(3). Any delay for such procedures would harm the U.S. government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the FRP programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border.[117] Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[118] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the FRP programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new or modified reporting requirements they impose. The termination of the programs announced by this notice requires changes to the collections of information on Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records (OMB control number 1615–0013). Form I–131 will be revised in

---

[109] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[110] *See, e.g.,* 88 FR at 43594.

[111] *See, e.g.,* 88 FR at 43599.

[112] *Id.*

[113] *Id.* at 43600.

[114] *Id.*

[115] *See* 88 FR at 54643 (Cuba); 88 FR at 54639 (Haiti).

[116] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries, *https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols* (updated Mar. 21, 2025).

[117] 5 U.S.C. 553(b)(B); 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) ("a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required"); *see also* Executive Order 14159, 90 FR 8443 (Jan. 29, 2025).

[118] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

connection with this notice by removing specific mention of the FRP programs. As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–22744 Filed 12–12–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**[Docket No. FWS–HQ–ES–2025–0613; FXES111609M0000–256–FF09420000; OMB Control Number 1018–0194]**

**Agency Information Collection Activities; Approval Procedures for Incidental Harassment Authorizations of Marine Mammals**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), we, the U.S. Fish and Wildlife Service (Service), are proposing to renew an information collection without change.

**DATES:** Interested persons are invited to submit comments on or before February 13, 2026.

**ADDRESSES:** Send your comments on the information collection request (ICR) by one of the following methods (please reference 1018–0194 in the subject line of your comments):

• *Internet (preferred): https://www.regulations.gov.* Follow the instructions for submitting comments on Docket No. FWS–HQ–ES–2025–0613.

• *Email: Info_Coll@fws.gov.*

• *U.S. mail:* Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803.

**FOR FURTHER INFORMATION CONTACT:** Madonna L. Baucum, Service Information Collection Clearance Officer, by email at *Info_Coll@fws.gov,* or by telephone at (703) 468–8211. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act (PRA; 44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of response).

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972 (MMPA; 16 U.S.C. 1361 *et seq.*) authorizes the Secretary of the Interior (Secretary) to allow, upon request, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specific geographic region for periods of not more than 1 year. The Service may authorize incidental take by harassment if statutory and regulatory procedures are followed and the Service finds: (i) take is of a small number of marine mammals of a species or stock, (ii) take will have a negligible impact on the species or stock, and (iii) take will not have an unmitigable adverse impact on the availability of the species or stock for taking for subsistence uses by Alaska Natives.

The term "take" means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal. Harassment means any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (the MMPA defines this as "Level A harassment"), or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (the MMPA defines this as "Level B harassment").

The terms "negligible impact," "small numbers," and "unmitigable adverse impact" are defined in 50 CFR 18.27 (*i.e.,* the Service's regulations governing small takes of marine mammals incidental to specified activities). "Negligible impact" is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival. "Unmitigable adverse impact" means an impact resulting from the specified activity (1) that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) that cannot be sufficiently mitigated by other measures to increase