YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ELISSA FUDIM
*Trial Attorney*

U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Svitlana Doe, *et al.*, | ) Civil Action No. 1:25-cv-10495 |
| Plaintiffs, | ) |
|  | ) **LEAVE TO FILE GRANTED ON 1/5/25** |
| v. | ) |
| Kristi Noem, in her official capacity as | ) |
| Secretary of Homeland Security, *et al.*, | ) |
| Defendants. | ) |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO
### PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING
### ORDER AND/OR STAY OF THE TERMINATION OF EXISTING GRANTS OF FRP
### PAROLE

# <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................................... 1

Background .................................................................................................................... 3

Standard ........................................................................................................................ 7

Argument ...................................................................................................................... 8

I.     The Court Cannot Grant Preliminary Relief On Grounds Not Asserted In The Complaint ................................................................................... 8

II.    The Court Lacks Jursidiction Over Claims Challenging Parole Termination ................................................................................ 9

III.   Plaintiffs Are Not Likely To Succeed On Their Claim That The Secretary's Termination of Parole Was Arbitrary And Capricious ................................................................................... 10

      (i)    The Secretary Appropriately Considered Whether FRP Had Discouraged Irregular Migration .................................................. 11

      (ii)   The Secretary Considered Reliance Interests ............................. 13

      (iii)  The Secretary Adaquately Considered Alternatives .................. 14

IV.   The Secretary Did Not Exceed Her Statutory Authority ..................... 16

V.    The Notice Was Sufficient And Complied With The Law ..................... 20

VI.   Notice And Comment Was Not Required ............................................. 21

VII.  The Balance of the Equities Favors the Government ........................... 23

VIII. The Court Should Require Bond Under Fed. R. Civ. P. 65(c) .............. 25

Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

<u>Cases</u>

*Adair v. England,*
   193 F.Supp.2d 196 (D.D.C. 2002) ............................................................................. 8

*Aldea-Tirado v. PricewaterhouseCoopers, LLP,*
   101 F.4th 99 (1st Cir. 2024) ..................................................................................... 21

*Am. Mining Cong. v. MSHA,*
   995 F.2d 1106 (D.C. Cir. 1993) ............................................................................... 22

*Amanullah v. Nelson,*
   811 F.2d 1 (1st Cir. 1987) .......................................................................................... 3

*American Hospital Association v. NLRB,*
   499 U.S. 606 (1991) ................................................................................................. 16

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................................. 24

*Baldwin v. Bader,* No. 07-46-P-H,
   2008 WL 564642 (D. Me. Feb. 28, 2008) ................................................................ 9

*Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.,*
   513 F.2d 164 (10th Cir. 1975) ................................................................................. 21

*City of Brookings Mun. Tele. Co. v. F.C.C.,*
   822 F.2d 1153 (D.C. Cir. 1987) ............................................................................... 15

*Connecticut Bd. of Pardons v. Dumschat,*
   452 U.S. 458 (1981) ................................................................................................. 20

*Doe v. Noem,*
   152 F.4th 272 (1st Cir. 2025) ........................................................................... passim

*Federal Power Commission v. Texaco, Inc.,*
   377 U.S. 33 (1964) ................................................................................................... 16

*General Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) ................................................................................. 22

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .............................................................................................. 8

*Granny Goose Foods, Inc. v. Teamsters,*
   415 U.S. 423 (1974) ................................................................................................. 8

*Heckler v. Campbell*,
  461 U.S. 458 (1983) ........................................................................................ 16

*INS v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ...................................................................................... 24

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ........................................................................................ 23

*Kucana v. Holder*,
  558 U.S. 233 (2010) ................................................................................... 9, 10

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................................ 22

*Log Cabin Republicans v. United States*,
  658 F.3d 1162 (9th Cir. 2011) ........................................................................ 8

*Lopez v. Davis*,
  531 U.S. 230 (2001) ........................................................................................ 16

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .......................................................................................... 8

*Mak v. INS*,
  435 F.2d 728 (2d Cir. 1970) ........................................................................... 17

*Maryland v. King*,
  567 U.S. 1301 (2012) ...................................................................................... 23

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................... 10, 11

*Munaf v. Geren*,
  553 U.S. 674 (2008) .......................................................................................... 8

*Myers v. United States*,
  272 U.S. 52 (1926) .......................................................................................... 23

*Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*,
  16 F.3d 1032 (9th Cir. 1994) ......................................................................... 25

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................ 23

*Reno v. Flores*,
  507 U.S. 292 (1993) ........................................................................................ 16

*Rodriguez v. Wall,* No. CIV.A. 00–90T,
  2000 WL 1371254 (D.R.I. Aug. 4, 2000) ............................................................. 9

*Stewart v. U.S. Immigration & Naturalization Serv.,*
  762 F.2d 193 (2d Cir. 1985) ............................................................................... 9

*Stuhlbarg Int'l Sales Co. v. John Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) ............................................................................. 8

*Succar v. Ashcroft,*
  394 F.3d 8 (1st Cir. 2005) ................................................................................ 4

*Thomas v. Garland,*
  25 F.4th 50 (1st Cir. 2022) ............................................................................... 4

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ......................................................................................... 9

*United States v. Storer Broadcasting Co.,*
  351 U.S. 192 (1956) ......................................................................................... 16

*Webster v. Doe,*
  486 U.S. 592 (1988) ......................................................................................... 10

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................ 8, 24

*Yang v. INS,*
  79 F.3d 932 .................................................................................................... 17

<u>Statutes</u>

5 U.S.C. § 701(a)(1) ............................................................................................ 10

8 U.S.C. § 1153(a) ............................................................................................... 4

8 U.S.C. § 1182(d)(5) .......................................................................................... 22

8 U.S.C. § 1255(a) ............................................................................................... 4

8 U.S.C. § 1255(c)(2) ........................................................................................... 4

## <u>INTRODUCTION</u>

Plaintiffs seek emergency relief from the government's termination of the parole of aliens who received parole under the family reunification parole programs for nationals of Cuba, Haiti, Colombia, Ecuador, El Salvador, Guatemala, and Honduras and their immediate family members (the FRP programs). The FRP programs, which were created and modernized in 2022 and 2023, relied on categorical reasons that the parole statute's requirements were met to permit the parole into the United States of inadmissible aliens who would otherwise have been required to await an available immigrant visa to enter the United States. Parolees were advised that their parole could be terminated at any time.

On December 15, 2025, the Secretary of Homeland Security terminated the FRP programs, which included terminating, as of January 14, 2026, any existing periods of parole granted to aliens under the FRP programs, unless the aliens filed an application for adjustment of status as of December 15, 2025 or the Secretary decides not to terminate their parole on a case-by-case basis. *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorans, Guatemalans, Haitians, Hondurans, and Salvadorans,* 90 Fed. Reg. 58032 (Dec. 15, 2025) (the "FRP FRN"). The existing Plaintiffs in this case—none of whom are affected by termination of the FRP programs—have sought to amend their complaint to, *inter alia*, challenge that termination. They contend that the Secretary's termination decision was arbitrary and capricious, contrary to law, unlawful for failure to undergo notice-and-comment, and effected without proper notice to parolees. *See* Doc. No. 218.

These arguments lack merit. The Secretary's decision to terminate individual grants of parole was reasonable and reasonably explained. In particular, she explained in painstaking detail that the FRP programs did not meet one of their stated goals—the reduction in irregular migration from the FRP countries. Plaintiffs dispute that reduction in irregular migration was a goal of the

FRP programs, but the Federal Register Notices announcing the implementation of the new programs belie that assertion. *See, e.g.*, Doc. No. 24-28, 88 Fed. Reg. at 45583. Those Notices plainly state that the FRP programs were intended to reduce irregular migration in two ways—first by reducing unlawful migration by parole beneficiaries themselves, and second by reducing unlawful migration by the friends, family, and communities of the beneficiaries, to whom the beneficiaries would send remittances. *Id*. Relying upon empirical data, the Secretary explained that this goal had not been meaningfully realized. 90 Fed. Reg. at 58034-44. Plaintiffs argue that this explanation supports only the Secretary's decision to terminate the FRP programs but not grants of parole pursuant to the programs. Not so. The failure of the programs to meet their stated goals supports not only the termination of the programs but also grants of parole thereunder. *Doe*, 152 F.4th at 290. The Secretary discussed other reasons for terminating grants of parole, including, for example, concerns with inadequate vetting in the new and modernized FRP programs and resulting national-security and public-safety risks, as well as the fact that administering the programs, including the review of re-parole applications by parolees, uses valuable agency resources that could be allocated elsewhere. 90 Fed. Reg. at 58045. And contrary to Plaintiffs' conclusory arguments, the Secretary also considered reliance interests and alternatives to termination. *Id*.

Neither was the Secretary's decision contrary to law. Plaintiffs argue the Secretary did not determine that the purposes of parole "have been served," as the statute requires, but that is plainly not true. 90 Fed. Reg. at 58045. Plaintiffs also argue that the Secretary was obligated to make such a determination on a case-by-case basis. Plaintiffs made a similar argument in support of their motion for preliminary relief from the CHNV[1] parole termination, but the First Circuit held

---

[1] CHNV refers to the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans instituted in 2022 and 2023. *See, e.g., Doe v. Noem*, 152 F.4th 272, 279–80 (1st Cir. 2025).

2

otherwise. *Doe v. Noem*, 152 F.4th 272, 285 (1st Cir. 2025). To the contrary, it concluded that Congress "made a deliberate choice" to require "the Secretary to implement a case-by-case approach to granting parole, but not to end such grants." *Id*. That decision applies equally here.

Plaintiffs' arguments that parole terminations were required to undergo notice-and-comment is also plainly wrong, as the Secretary did not engage in rulemaking by using the discretion given to her by Congress to terminate parole. Nor was the Secretary required to provide notice to all FRP parolees individually by mail. The notice provided—via the FRN, via parolees' USCIS online accounts, and via mail for legacy FRP parolees (Cubans and Haitians paroled into the United States under the FRP programs for those countries before those programs were modernized in 2023)—was reasonable and adequate under applicable regulations and the Constitution.

Thus, the Court should deny Plaintiffs' motion for a temporary restraining order and/or emergency stay.

## **BACKGROUND**

Parole is, by definition, a temporary permission for an alien to enter the United States. In 8 U.S.C. § 1182(d)(5)(A), Congress granted the Secretary "remarkably broad" discretion with respect to parole. *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987). That statute authorizes the Secretary, "in [her] discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It further provides that parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." *Id.*; *see also* 8 C.F.R. § 212.5.

The U.S. Department of Homeland Security (DHS) previously created limited family-reunification parole (FRP) programs to permit certain aliens with approved family-based

immigrant petitions to seek parole in order to enter the United States while awaiting an available immigrant visa number. Potentially eligible beneficiaries who must await an immigrant visa number included, for example, adult children of lawful permanent residents (LPRs), married or adult children of U.S. citizens (USCs), or brothers or sisters of USCs. *See* 8 U.S.C. § 1153(a). A grant of parole allowed those beneficiaries to temporarily enter the United States, as well as to be potentially eligible for adjustment of status under 8 U.S.C. § 1255(a) once an immigrant visa number becomes available—which meant they would not have to remain or return abroad to seek an immigrant visa through consular processing (unless their parole expires and is not renewed prior to applying for adjustment of status). *See* 8 U.S.C. § 1255(c)(2). However, those parolees who eventually apply for adjustment of status still must demonstrate eligibility for the benefit and that they warrant a favorable exercise of discretion. *See Thomas v. Garland,* 25 F.4th 50, 51–52 (1st Cir. 2022); *Succar v. Ashcroft*, 394 F.3d 8, 23 (1st Cir. 2005).

DHS first established an FRP program for Cuban nationals in 2007, and one for Haitian nationals in 2014. *See* Doc. No. 24-34; Doc. No. 24-33; *see also* 79 Fed. Reg. 75579 (Dec. 18, 2014). Each of these two legacy programs cited, as a reason for the program, the significant public benefit of promoting orderly migration or discouraging irregular migration. *See* Doc. No. 24-34, 72 Fed. Reg. at 65588; Doc. No. 24-33, 79 Fed. Reg. at 75582. Each program is described as an exercise of discretionary parole authority. *See id.* In 2023, DHS "modernized" those two legacy FRP programs and created new FRP programs for nationals from five more countries: Colombia, Ecuador, El Salvador, Guatemala, and Honduras. Doc. Nos. 24-32, 24-31, 24-30, 24-29, 24-28, 24-27, 24-26. Under these new and modernized FRP programs, beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole. *See id.* Each of the new FRP programs was said to provide a "significant public benefit" for the same five reasons: promoting family unity;

furthering foreign policy objectives by responding to the requests and interests of key foreign partners necessary to address migration issues; providing an alternative to irregular migration; reducing strain on DHS processing capacity along the southwest border; and aiding U.S. efforts to address economic insecurity in the sending countries through remittances. *See* Doc. No. 24-26, 88 Fed. Reg. at 43593 (Columbia); Doc. No. 24-27, 88 Fed. Reg. at 78768 (Ecuador); Doc. No. 24-30, 88 Fed. Reg. at 43613 (El Salvador); Doc. No. 24-28, 88 Fed. Reg. at 43583 (Guatemala); Doc. No. 24-29, 88 Fed. Reg. at 43603 (Honduras).

On January 20, 2025, the President issued Executive Order 14165, "Securing Our Borders," which directed the Secretary to take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders." 90 Fed. Reg. 8467 (published Jan. 30, 2025).

On December 15, 2025, the Secretary announced that DHS had independently evaluated the FRP programs and was terminating these FRP programs because they "do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." 90 Fed. Reg. at 58034. As part of that termination, the Secretary announced that existing parole periods granted under the FRP programs will terminate as of January 14, 2026, with two exceptions: (1) the alien filed an application for adjustment of status that is postmarked as of December 15, 2025, that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. *Id.* at 58032–33.

The Secretary provided the reasons for her discretionary termination decision, addressing each of the goals of the various FRP programs. First, the Secretary acknowledged that the programs were created for the purpose of promoting family unity, but determined that national security and fraud concerns, as well as the current Administration's policy priorities, outweighed that interest. *Id.* Unlike with consular processing for a visa, under the modernized FRP programs there was no

collection of biometrics or in-person interview abroad for the beneficiary, and only "minimal public safety and national security vetting of potential beneficiaries" before issuing an advance travel authorization. *Id.* at 58034–35. Accordingly, the programs created "security gaps not present in" consular processing, and created an "untenable likelihood" of the entry of bad actors, "posing an unacceptable level of risk to the United States' national security and public safety." *Id.* at 58035. The Secretary also addressed the risk of abuse and fraud where biometrics collection does not occur before arrival in the United States and where beneficiaries are from countries with weak civil registry systems. *See id.* DHS "determined that the desire to reunite families" does not outweigh these weighty fraud, national security, and public safety concerns. *Id.*

Next, the Secretary addressed the goal of furthering prior Administrations' foreign policy objectives. She determined that those policy objectives did not align with those of the current Administration. This Administration is not pursuing the same regional migration management strategy, but instead aims to reduce and deter unlawful immigration through other means. *Id.* at 58035–37.

The Secretary then turned to key goals of each of the FRP programs: encouraging orderly entry and discouraging irregular migration, thereby reducing strain at the Southwest border. *See id.* at 58037, 58039. The Secretary acknowledged that the FRP programs were not meant to, "on their own, substantially decrease the number of encounters along the southwest border" and recognized that some aliens may have pursued FRP rather than seeking to enter unlawfully. *Id.* at 58037. But the Secretary determined that the relatively small number of parolees as compared to the huge numbers of illegal entrants during the relevant period did not warrant maintaining this pathway. *See id.* at 58037, 58039. This is particularly so because other immigration enforcement policies serve to discourage visa-petition beneficiaries from undertaking the dangerous journey. *See id.* In sum, "the FRP programs did not noticeably decrease unlawful migration, or at the very

least were not nearly as effective as other policies." *Id.* at 58038. The programs in fact led to "an increased strain on DHS personnel and resources" to process parole requests. *Id.* at 58039–40.

The Secretary then evaluated the final significant-public-benefit factor underlying the FRP programs: increased remittances to sending countries, determining that the low volume of participants in the FRP program "fell short of addressing underlying economic drivers of unlawful migration." *Id.* at 58040. Overall, the Secretary concluded that the FRP programs did not meet their intended goals and also strained DHS resources and undermined public trust. *Id.* at 58041.

The Secretary also acknowledged reliance interests of parolees and supporters. As to current parolees, the Secretary noted that the assessment of their reliance interests must account for the fact that parole was always terminable at the Secretary's discretion at any time, and that their initial parole period was always time-limited. *Id.* at 58044. She found that the government's strong interest in promptly returning parolees when the basis for the programmatic parole is no longer served outweighed any reliance interests. *See id.* The Secretary emphasized that allowing parolees' current period of parole to expire or providing a longer wind-down period would defeat the Administration's policy of restricting the use of parole grants in line with the statutory language, because it would "allow continued reliance on parole as a pathway to adjustment of status." *Id.* It would also countenance the aliens' continued presence in the United States despite the risk posed by the "insufficient vetting they received prior to entry." *Id.*

Any parolee whose parole will terminate on January 14, 2026 may still seek an additional period of parole by filing a Form I-131 and demonstrating urgent humanitarian reasons or significant public benefit based on his or her individual circumstances and that he or she merits a favorable exercise of discretion. *Id.* at 58043 & n.90.

## **STANDARD**

In deciding whether to grant a TRO, courts generally look to substantially the same factors

that apply to a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A "preliminary injunction is an extraordinary and drastic remedy" that is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A TRO "should be restricted to … preserving the status quo and preventing irreparable harm" just until a preliminary injunction hearing may be held, "and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974). Moreover, Article III demands that a remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see Log Cabin Republicans v. United States*, 658 F.3d 1162, 1168 (9th Cir. 2011) (per curiam), and bedrock principles of equity similarly require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

## ARGUMENT

### I.    The Court Cannot Grant Preliminary Relief on Grounds Not Asserted in the Complaint.

Federal courts lack jurisdiction to grant injunctive relief when that relief is not directly connected to a claim asserted in the operative complaint. *Adair v. England,* 193 F.Supp.2d 196, 200 (D.D.C. 2002) ("Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."); *id*. at 201 ("For jurisdiction to exist over the instant motion for injunctive relief, the motion must be closely related to the facts, legal issues, and parties addressed in the plaintiffs [operative complaint]"). Nor can the Court grant injunctive relief to non-parties.

*Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). While Plaintiffs have moved for leave to file a Third Amended Complaint to add claims and parties, that motion has not been granted, and at the time they filed their motion for temporary injunctive relief (and as of this filing), the operative complaint in this matter is the Second Amended Complaint. The individuals seeking temporary injunctive relief from the FRP FRN are not parties to this lawsuit, and the Second Amended Complaint does not concern, or assert claims relating to, the termination of FRP. Accordingly, this Court should deny Plaintiffs' motion for injunctive relief. *See Stewart v. U.S. Immigration & Naturalization Serv.*, 762 F.2d 193, 198–99 (2d Cir. 1985) (finding the court lacked jurisdiction over a plaintiff's motion for preliminary injunction where the injunctive relief was not reasonably related to the claims contained in the complaint.); *Baldwin v. Bader*, No. 07-46-P-H, 2008 WL 564642, at *4 (D. Me. Feb. 28, 2008) (plaintiff not entitled to injunctive relief concerning events that post-date the complaint); *Rodriguez v. Wall,* No. CIV.A. 00–90T, 2000 WL 1371254, at *3 (D.R.I. Aug. 4, 2000) (plaintiff not entitled to TRO when motion for TRO was "based on new assertions of mistreatment that are entirely different from the claims raised and the relief requested in his instant lawsuit.").

## II.    The Court Lacks Jurisdiction Over Claims Challenging Parole Termination.

Threshold grounds preclude granting Plaintiffs' motion for preliminary injunctive relief.

*First*, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes jurisdiction over claims challenging the Secretary's discretionary decision to terminate individual grants of parole. The Secretary may terminate parole when she determines, in her "opinion," that the "purposes" of parole "have been served." *See* 8 U.S.C. § 1182(d)(5)(A). The parole statute thus specifies that the authority to terminate parole is in the Secretary's discretion, and § 1252(a)(2)(B)(ii)'s judicial-review bar applies. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *Kucana v. Holder*, 558 U.S. 233, 247–48 (2010). The INA makes clear that review is precluded where the statute makes a determination discretionary,

*regardless* of whether that discretion is exercised appropriately. *Cf. Kucana*, 558 U.S. at 247–48. An *individual* parole-termination decision is discretionary and thus not judicially reviewable. *See, e.g.*, Doc. No. 125 at 15–16. Such a decision does not become reviewable if made alongside approximately 10,000 others. Had the Secretary only issued separate notices terminating each alien's parole—with no explanation—that would be unreviewable. Yet, under Plaintiffs' view, those determinations become reviewable when combined and set forth in a notice explaining in detail the common reasons behind the parole terminations, with explicit consideration of reliance interests. Nothing in the statutory text suggests that Congress intended such a scheme.

*Second*, even if § 1252(a)(2)(B)(ii) did not preclude review, the parole termination decision is "committed to agency discretion by law" because Congress's delegation of authority to the "opinion" of the Secretary indicates that Congress committed this decision to the Secretary's judgment and "foreclose[s] the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988); 5 U.S.C. § 701(a)(1); *see also* Doc. No. 114 at 15. This forecloses, at minimum, any substantive review of the rationales for the Secretary's opinion that the purposes of parole have been served.

### III.    Plaintiffs Are Not Likely to Succeed on Their Claim that the Secretary's Termination of Parole Was Arbitrary and Capricious.

The termination of parole is committed to the Secretary's "opinion," and the APA does not compel the Secretary to provide a reasoned explanation for her opinion, let alone painstakingly justify it. But the Secretary did thoroughly explain her decision—addressing each of the justifications cited for the FRP programs and explaining why they did not justify the continuation of parole or the parole programs. Even without the benefit of the administrative record on this accelerated emergency briefing schedule, the Secretary's parole termination decision clearly withstands the APA's deferential standards of review. *See Motor Vehicle Manufacturers Ass'n of*

*the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made."). Plaintiffs may disagree with the Secretary's discretionary decision, but the Court cannot substitute its judgment for that of the agency. *Id.*; *Doe*, 152 F.4th at 290.

<blockquote>

**(i)    The Secretary Appropriately Considered Whether FRP Had Discouraged Irregular Migration.**

</blockquote>

Plaintiffs acknowledge that that the Secretary explained her rationale for terminating the FRP programs. Doc. 218 at 10. But they argue that her rationale is arbitrary and capricious because it focuses in substantial part on whether the FRP programs had reduced unlawful migration at the Southwest border. Plaintiffs contend there is a mismatch between this rationale and the reasons for implementing the FRP programs because, they claim, none of the FRP programs were "designed or intended to provide a deterrent to irregular migration." *Id.* This argument misrepresents the Secretary's reasoning and is contradicted by the notices announcing the programs.

DHS justified each of the legacy FRP programs by claiming they served the "significant public benefit" of providing an alternative pathway to discourage aliens from making the often-dangerous journey to try to enter the United States through irregular means. *See* Doc. No. 24-34, 72 Fed. Reg. 65588 (legacy Cuban FRP); Doc. No. 24-23, 79 Fed. Reg. 75581 (legacy Haitian FRP). And each of the new 2023 FRP programs *specifically* relied on the reduction of migration at the Southwest border and a concomitant reduction in strain on DHS resources and on border communities as a "significant public benefit" of those programs. *See* Doc. No. 24-26, 88 Fed. Reg. at 43593; Doc. No. 24-27, 88 Fed. Reg. at 78768; Doc. No. 24-30, 88 Fed. Reg. at 43613; Doc. No. 24-28, 88 Fed. Reg. at 43583; Doc. No. 24-29, 88 Fed. Reg. at 43603. DHS "expected" and "anticipate[d]" that the FRP processes would "reduce the number of irregular migrants who may

be exploited by [organizations] engaged in human smuggling" and "minimize the burden" on border communities. *See, e.g.*, Do. No. 24-27, 88 Fed. Reg. at 76767–68.

As a reduction in irregular migration was, indeed, a key justification for those programs, the Secretary reasonably and appropriately considered whether the FRP programs actually provided this significant public benefit. 90 Fed. Reg. at 58037. Relying on data and evidence, the Secretary concluded they did not. 90 Fed. Reg. at 58037-38. The Secretary observed that in the first five months of 2024, CBP encountered over 900,000 migrants and asylum seekers seeking to cross the Southwest border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, four of which had dedicated parole programs. *Id.* at 58038. In fact, in 2024 alone, over 888,000 aliens from the seven FRP countries were encountered by CBP trying to cross the Southwest Border. *Id*. at 58037. The Secretary provided more examples of the programs' failures to produce a meaningful reduction in irregular migration. For example, CBP encounters of Haitians at the Southwest border increased year-by-year since the modernized and expanded FRP program for Haiti. *Id.* at 58038. Her conclusion that the FRP processes did not decrease illegal migration was fully supported by data.

Plaintiffs argue, however, that to the extent the FRP programs were intended to discourage unlawful migration—which they explicitly were—they were not intended to deter unlawful migration of *third parties*, but rather of the intended beneficiaries themselves. Doc. 218 at 11-12. But that is not entirely true. While the FRP programs were intended to deter unlawful migration by visa-petition beneficiaries who might in the absence of the programs choose to unlawfully migrate to the United States while awaiting visa availability, one of the other stated purposes of the programs was to "address[] root causes of migration through economic stability and development supported by increased remittances." *See, e.g.*, 88 Fed. Reg. at 43613. The idea was that FRP parolees would be able to work in the United States, earning far more than they would in

their home countries, and then be able to send money back to their families and communities. *Id.* at 43616. Those remittances would "provide a crucial financial lifeline that enhances economic development and promotes economic stability" for the friends, family and community of the beneficiary, which was intended to "impact[] individual decisions on whether to leave the region," *id.*, thus decreasing unlawful migration from those seven countries. That did not occur. Indeed, the Secretary observed that because a relatively low percentage of invited petitioners decided to participate in the program, "the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries," and thus did not "address the root causes of migration." 90 Fed. Reg. at 58040.

### (ii)    The Secretary considered reliance interests.

Plaintiffs argue that the Secretary did not meaningfully consider reliance interests, because her discussion of reliance interests has some similarities to her discussion of the reliance interests with respect to the CHNV termination. Doc. No. 218 at 12-13. But the mere fact that the Secretary used similar language to discuss the reliance interests of CHNV beneficiaries and sponsors and FRP beneficiaries and sponsors does not negate that she considered such interests or render her conclusions arbitrary or capricious.

According to Plaintiffs, the Secretary failed to consider that FRP parolees are different from CHNV parolees because they have a path to lawful permanent resident status and a close relationship to a supporter, were invited to apply for parole by the government, and will be separated from their families if parole is terminated. Doc. No. 218 at 13. But these interests are not unique to FRP parolees. CHNV parolees likewise were often eligible to pursue asylum or other pathways to lawful permanent resident status (including under the Cuban Adjustment Act), had a supporter in the United States, and often had relatives within the United States. *See, e.g.*, Doc. No. 68 at ¶¶ 226–27, 249–51. Indeed, Plaintiffs' invocation of the term "family separation" in this

13

context is misleading. Because of the nature of the FRP programs—which primarily provided a means of entry to those who would otherwise need to wait for available visas—those aliens whose parole is being terminated are, like the new proposed plaintiffs, primarily adult or married children of USCs or LPRs and adult siblings of USCs who had already left those family members behind to reside in the United States. *See, e.g.*, Doc. No. 212-1 at ¶¶ 358–59, 369, 374. And while FRP supporters were invited to apply on behalf of their visa-petition beneficiaries, whereas CHNV supporters were not, the Secretary did consider this unique factor. *See, e.g.*, 90 Fed. Reg. at 58041 ("DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate."). More to the point, the reliance interests of CHNV parolees and beneficiaries and FRP parolees and beneficiaries are overall more similar than different. Indeed, they are most similar in a critical respect: the inherently discretionary and time-limited nature of parole. FRP parolees always risked having to return to their home countries before a visa number became available. *See* 90 Fed. Reg. at 58044. The Secretary weighed these tempered expectations of parolees against the government's interests in discontinuing the use of parole as a pathway to adjustment of status and in mitigating the risk posed by the continued presence of parolees whose entrance to the United States was marked by insufficient vetting and introduced significant opportunities for fraud. 90 Fed. Red. at 58041. Thus, the Secretary appropriately considered FRP parolees' reliance interests; Plaintiffs simply disagree with the weight she placed on those interests. *See Doe*, 152 F.4th 290.

### (iii)    The Secretary adequately considered alternatives.

Plaintiffs argue, in conclusory fashion, that the Secretary failed to adequately consider alternatives to terminating individual grants of FRP parole. Doc. 218 at 14. Not so. The Secretary considered and rejected three alternatives. First, she considered and rejected the alternative of allowing the current period of parole for each FRP beneficiary to expire and notifying the

14

beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration. She explained that, among other problems, this option would "require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency." 90 Fed. Reg. at 58044. Next, she rejected the option of allowing FRP beneficiaries to continue to seek re-parole until their visa is available. She rejected this option because it "fails to meaningfully implement the policy shift outlined in [the] Federal Register Notice," by allowing parole to continue to be used as a pathway to adjustment of status, and it also would allow beneficiaries to "continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry," thus leaving in place the safety and national security risks she outlined as a reason for terminating FRP. *Id*. The Secretary also rejected the option of providing longer than thirty-days' notice of termination because she recognized that regardless of the length of the period, beneficiaries, employers, friends and communities would likely still incur the same costs. Given that likely reality, she decided "to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs" to other issues and programs deemed more essential and beneficial to the United States. *Id*.

Plaintiffs complain, however, that the Secretary failed to consider the option of simply letting existing grants remain in effect until their natural expiration. Doc. No. 218 at 14. But this option is not meaningfully different from the first option the Secretary considered and rejected. Furthermore, the Secretary was under no obligation to consider every conceivable alternative. *City of Brookings Mun. Tele. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987). The Secretary considered alternatives to the parole termination and explained her reasons for rejecting those alternatives. No more is required.

In sum, the Secretary's conclusion was based on reasoned decision making. While Plaintiffs disagree with her conclusion, there is no defect in the decision-making process.

## IV.    The Secretary Did Not Exceed Her Statutory Authority.

There is no dispute that the Secretary possesses the statutory authority to terminate parole. The parole statute empowers the Secretary to terminate parole "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5)(A). The phrase "in the opinion of the Secretary of Homeland Security" is exceptionally deferential. And the Court of Appeals has explained that the Secretary need not terminate parole on a case-by-case basis; rather, Congress "made the deliberate" choice in § 1182(d)(5)(A) to permit her to terminate parole individually or *en masse*. *Doe*, 152 F.4th at 285.

Regardless, even if the INA imposed some sort of case-by-case requirement on parole terminations, that would not preclude the Secretary from establishing generally applicable criteria to guide her exercise of discretion. Even when Congress "requires individualized determinations," that requirement does not displace decisionmakers' "authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hospital Association v. NLRB*, 499 U.S. 606, 612 (1991); *see also*, *e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 467 (1983) (agency may rely on generally applicable medical-vocational guidelines even where statute requires individualized determinations of disability); *Federal Power Commission v. Texaco, Inc.*, 377 U.S. 33, 44 (1964) (similar, under Natural Gas Act); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205 (1956) (similar, under the Communications Act of 1934); *cf. Lopez v. Davis*, 531 U.S. 230, 243-244 (2001). Indeed, longstanding regulations implementing Section 1182(d)(5)(A) take that approach. *See* 8 C.F.R. § 212.5. And the Supreme Court and other courts have repeatedly observed that generally applicable determinations are appropriate elsewhere in the immigration context. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting that the agency need not "forswear use of reasonable presumptions and generic rules" even where statute required "'some level of individualized

determination'") (citation omitted); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir.) (similar), *cert. denied*, 519 U.S. 824 (1996); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar).

Plaintiffs argue that the Secretary still exceeded her authority because, to terminate parole, she had to determine that "the purposes of such parole shall. . . have been served," and according to Plaintiffs, the Secretary never reached that conclusion. Doc. No. 198 at 16-17. Plaintiffs are wrong. Over the course of ten pages, the Secretary explained that the FRP programs, inclusive of parole grants bestowed upon beneficiaries, did not accomplish several of their intended purposes. 90 Fed. Reg. at 58034-44. The Secretary then explained that for the "same reasons set forth above. . . neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served." *Id*. at 58045.

Plaintiffs argue that the Secretary cannot dispense with her obligation to consider whether the purposes of parole have been served in just one sentence. Doc. 218 at 15. This argument lacks any basis. The Secretary is not barred from relying on the same considerations to terminate individual parole grants that she relied on to terminate the FRP programs, where the rationales substantially overlap. And indeed, in response to a virtually identical argument made by Plaintiffs with respect to the Secretary's decision to terminate CHNV parole grants, the Court of Appeals "agree[d] with the Government" that the appropriate scope of review requires consideration of the termination notice as a whole, including the overlapping rationales for terminating the parole programs and the individual grants issued under them. *Doe*, 152 F.4th at 290.

Plaintiffs' argument also rests on a faulty premise, seemingly conflating "have been served" with "have been accomplished." *See* Doc. No. 218 at 15 (asserting that the Secretary's "explanation says nothing about whether the individual parolees have *accomplished* the family reunification purposes of their parole. . . . Had she considered that purpose, she would have had difficulty

explaining how it 'has been served' with regards to FRP parolees who are not yet eligible to apply to adjust status to LPR.") (emphasis added). Plaintiffs seemingly believe that for the Secretary to determine that the purposes of parole "have been served," she needs to establish that *all* the objectives of the parole—including family reunification—were successfully "accomplished" to completion. *Id.* The statute imposes no such requirement. A grant of parole may rest on multiple purposes, and the Secretary may determine that those purposes have been served even if some objectives were not yet fully realized. The statute requires only a judgment that—in *the opinion of* the Secretary—the purpose has run its course, not that it succeeded, concluded, or achieved every hoped-for result. *Doe*, 152 F.4th at 286 ("Once the executive branch determines . . . that achieving the policy aim is *no longer possible or desired*, then it takes no individualized determination in any way to ascertain those persons for whom it can no longer be said that parole furthers the country's interest.") (emphasis added); 8 C.F.R. § 212.5(e)(2)(i) ("upon accomplishment of the purpose for which parole was authorized or when in the opinion [of the Secretary] . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated."). Here, the Secretary determined that the goal of allowing certain relatives of LPRs or USCs to apply for adjustment of status in the United States rather than awaiting consular processing was outweighed by the national security and public safety risks engendered by FRP's insufficient vetting.

Plaintiffs also take issue with the verbiage the Secretary used to justify her termination of individual grants of parole. Doc. No. 218 at 15-16. They contend that the Secretary unlawfully conflated two distinct bases for termination—whether the purposes of parole have been served and whether parolees' continued presence is warranted—because the regulation lists those grounds in the disjunctive. Doc. No. 218 at 15–16 (citing 8 C.F.R. § 212.5(e)(2)(i)). This argument misconstrues the regulation. Section 212.5(e)(2)(i), the regulation implementing § 1182(d)(5),

clarifies that the purposes of parole may be "served" in more than one way. A purpose may be served because it has been accomplished. But it may also be served because continuing to pursue it is no longer possible, worthwhile or desirable—such that neither urgent humanitarian reasons nor significant public benefit justifies the parolee's continued presence in the United States. The regulation thus reflects the common-sense understanding that a purpose has been served once it has run its course, whether by completion or by exhaustion.

In concluding that "neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs" and that "the purposes of such parole therefore have been served," 90 Fed. Reg. at 58045, the Secretary made a judgment squarely contemplated by the statute: parole no longer furthers the interests that justified it in the first place, including because certain of those interests are no longer desired objectives and are outweighed by other interests. Continued presence is not an extraneous consideration divorced from parole's purposes; it is the practical manifestation of them. As the Court of Appeals has explained, parole may be terminated en masse "[o]nce the executive branch determines . . . that achieving the policy aim is no longer possible or desired." *Doe*, 152 F.4th at 286.

Plaintiffs next argue that the Secretary was required to terminate parole on a "case-by-case" basis. Doc. No. 218 at 16. However, as Plaintiffs recognize, the First Circuit held that Plaintiffs were unlikely to succeed on their argument that the parole statute's "case-by-case" limitation applies to parole terminations: although the parole "statute specifies that the Secretary's decision to grant parole must be carried out 'only on a case-by-case basis' and 'for urgent humanitarian reasons or significant public benefit,' . . . the clause describing the Secretary's authority to terminate any grants of parole does not contain the same limiting language." *Doe*, 152 F.4th at 286. "The statutory text, therefore, favors an interpretation that the 'case-by-case' requirement only limits the Secretary's discretion to grant parole." *Id.*

In their attempt to distinguish the First Circuit's ruling, Plaintiffs argue that the FRP FRN "plainly" "chang[ed] or add[ed]" the "conditions" of parole rather than terminating parole. Doc. No. 218 at 16. This characterization makes no sense—Plaintiffs point to no conditions of their parole that are modified, or what modifications were made. And if Plaintiffs are arguing that changing the duration of each grant of parole is a modification of conditions, this is an odd reframing of a much more straightforward description of what happened: their parole was terminated. Nor does the duration of parole fall into the category of parole "conditions" like "periodic reporting" or "bond" that are in place for the duration of parole. *See* 8 C.F.R. § 212.5(c) (addressing "conditions" of parole). Finally, even assuming that the Secretary changed the conditions of their parole, the statutory language Plaintiffs point to—"under such conditions as [s]he may prescribe only on a case-by-case basis"—still modifies only the conditions imposed upon the grant of parole. *See* 8 U.S.C. § 1182(d)(5)(A).

## V. The Notice Was Sufficient and Complied with the Law.

The Secretary's method of notifying parolees of their parole termination through both the Federal Register and individualized written notice via USCIS online account or (for legacy FRP parolees) mail was not arbitrary and capricious, accords with agency regulations requiring "written notice," and in no way contravenes due process. *See* Doc. 218 at 17–18.

As an initial matter, because Plaintiffs have no protected interest in discretionary parole, there can be no procedural due process claim. *See Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 463 (1981). Accordingly, *Mathews v. Eldridge* is inapplicable. *See* Doc. No. 218 at 17.

Next, Plaintiffs' claim that DHS's notice violated regulatory requirements is wrong. The regulation requires only that "parole shall be terminated upon written notice to the alien[.]" 8 C.F.R. § 212.5(e)(2)(i). Neither the statute nor regulations define or limit "written notice" of parole termination. *See id.* The regulation does not specify that written notice of parole termination must

be accomplished by a particular means or require DHS to "furnish individual notice." *See Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.*, 513 F.2d 164, 167 (10th Cir. 1975).

Plaintiffs incorrectly argue that the Secretary "confessed indifference" to whether parolees received notice of the termination. Doc. No. 218 at 17. But the Secretary explained that she found publication more practicable in light of the potential noncompliance with change-of-address requirements and outdated email addresses. 90 Fed. Reg. at 58045. The Secretary also explained that aliens who used the modernized FRP processes were required to set up an online account with USCIS, and thus individual notice of termination would be provided through that account to those parolees, and that notice would be mailed to legacy FRP parolees. *Id*. In providing notice via online account, DHS is using a method countenanced by the regulation that provides for electronic notice where, as here, the parole application was filed electronically, 8 C.F.R. § 103.2(b)(19)(ii)(B), and independently satisfies the parole regulation's notice requirement. *Cf. Aldea-Tirado v. PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103-06 (1st Cir. 2024) (finding email notice sufficient). The chosen notice methods were thus reasonably calculated to reach parolees.

## VI.    Notice and Comment Was Not Required.

Plaintiffs are unlikely to prevail on their argument that "the mass truncation of FRP grants" was required to go through notice and comment. Plaintiffs concede that the Secretary's decision to terminate the FRP programs was not required to go through notice-and-comment, Doc. No. 218 at n. 23, but they contend that the Secretary's subsidiary discretionary decision to terminate grants of parole issued pursuant to those programs does require notice-and-comment. Doc. No. 218 at 18-19. This distinction is illusory. If the Secretary may, without notice-and-comment, exercise her discretion to terminate the FRP programs altogether, she may likewise exercise that same discretion to terminate parole grants issued under those programs, and Plaintiffs cite no authority holding otherwise.

The APA also does not require notice and comment for discretionary decisions terminating individual grants of parole, even when the agency announces those decisions through generally applicable guidelines. That is because the decision to terminate parole does not constitute rulemaking. That does not change merely because the Secretary chose to terminate those parole grants in a single action. Rather, she correctly identified her decision as a "general statement of policy," exempt from notice-and-comment. 90 Fed. Reg. at 58045. A general statement of policy is a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993).

Plaintiffs argue that the termination of parole grants is not a general statement of policy because "[a] policy statement does not 'impose any rights and obligations' and 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" Doc. No. 221 at 19 (quoting *General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)). But contrary to Plaintiffs' argument, the termination of FRP parole grants did not impose any rights or create any obligations. Parole is temporary and terminable at any time, and it confers no entitlement to remain in the United States, to employment authorization, or to future re-parole. 8 U.S.C. § 1182(d)(5). An "obligation" for APA purposes refers to an affirmative legal duty imposed by agency action, not the loss of discretionary benefits or consequences that flow from that loss. *See Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109–12 (D.C. Cir. 1993). Plaintiffs conflate the fact that practical *consequences* may follow from the termination of parole with the imposition of new, legally binding *obligations* created by the termination. Any consequences flowing from the termination of parole—including the need to depart the country, the loss of work authorization or accrual of unlawful presence— arise by operation of existing law, not because the Secretary promulgated a new rule.

Further, Plaintiffs' contention that the Secretary's decision to terminate existing grants of parole is "binding," Doc. No. 218 at 18, ignores the discretion the notice expressly preserves. The

22

Secretary retained authority to exempt individual parolees from termination, 90 Fed. Reg. at 58033, and the statute, § 1182(d)(5) does the same work by giving the Secretary discretion to grant parole, re-parole on a case-by-case basis. Simply put, what Plaintiffs characterize as a "mass truncation" is simply the uniform application of a discretionary policy choice within the bounds of existing statutory authority. The APA does not require notice-and-comment rulemaking whenever an agency exercises discretion in a way that affects many people, nor is it required here.

### VII.    The Balance of the Equities Favors the Government.

A stay of the parole termination on a class-wide basis imposes irreparable harm on the government and public, whose interests "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009). The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. The United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating those policies. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Those concerns escalate when, as here, the temporary restraining order or emergency stay would undermine the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Moreover, the Legislative Branch's prerogatives are injured as well where, as here, the temporary injunctive relief bypasses a judicial-review bar. The irreparable harm to the government and the public is acute. The relief Plaintiffs seek would stymie the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests and thus inhibit the government's pursuit of its foreign policy goals. Further, the Secretary explained that administering the parole programs, including the application and adjudication process for re-parole under the process, consumes

agency resources that this Administration has determined would be better focused elsewhere. 90 Fed. Reg. at 58045. In this way, staying parole terminations improperly encroaches on the core Executive function of managing the immigration system. *See Arizona v. United States*, 567 U.S. 387, 394-396 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). An emergency stay of the parole termination contravenes the government's—and the public's—strong interest in allocating resources most effectively to secure our borders. A stay by the district court would force DHS to individually terminate each grant of parole, costing the department time and resources, while at the same time, delaying DHS's ability to address the national security and public safety concerns that animated, in part, the Secretary's decisions' to terminate parole grants.

On the flip side, Plaintiffs do not establish that they or the class are likely to suffer irreparable injury in the absence of temporary injunctive relief. *See Winter*, 555 U.S. at 20, 22 ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."). Plaintiffs and class members are or should be well aware that parole is a discretionary benefit that can be terminated at any time—not least because Secretary Mayorkas repeated that admonition when establishing and updating these very parole programs. *See, e.g.*, Doc. No. 24-28, 88 Fed. Reg. at 45583 ("DHS may terminate parole upon notice in its discretion at any time."). At no point was parole or re-parole guaranteed. *See id.* at 43588 (providing that all steps of the parole process were "entirely discretionary and not subject to appeal on any grounds"). Further, each of the new Plaintiffs and any member of the class they seek to represent may apply for another period of parole if they believe their circumstances warrant continued parole. *See* 90 Fed. Reg. at 58034 ("[T]he Secretary retains discretion to grant a new period of parole, also known

as re-parole, to any alien who was paroled into the United States under the FRP programs . . . .").[2] And parolees whose parole terminates will still be able to pursue a family-based immigrant visa from abroad. There was never any guarantee to any beneficiary of the FRP programs that he or she would ultimately be eligible for adjustment or warrant a favorable exercise of discretion. *See, e.g.*, Doc. No. 24-28, 88 Fed. Reg. at 43588. Finally, those parolees whose adjustment applications have been or will be denied before January 14, 2026, lack any argument to remain in the United States.

**VIII.   The Court Should Require Bond Under Fed. R. Civ. P. 65(c).**

If the Court grants temporary injunctive relief, it is required to impose "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). As a result of the posting of the bond, a presumption arises that damages will be awarded from those posted bond amounts to compensate defendants "for their damages . . . where it is later determined that [they were] wrongfully enjoined." *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc*., 16 F.3d 1032, 1036 (9th Cir. 1994). The risk of harm here is not insubstantial, and if the court were to grant a temporary restraining order, the court should require Plaintiffs to post security of an appropriate amount during the pendency of the court's order, in the event it is later determined that Defendants were wrongfully enjoined.

<u>**CONCLUSION**</u>

The Court should deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.

---

[2] Although there is currently a hold on applications for parole for those from Haiti and Cuba. *See* Doc. No. 224; https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf (Jan. 1, 2026).

DATED: January 6, 2026     Respectfully submitted

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*

By: /s/ *Elissa Fudim*
ELISSA FUDIM
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
*Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: _/s/ Elissa Fudim_
ELISSA FUDIM
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation

*Counsel for Defendants*